**EXHIBIT 11**

1

1

2

UNITED STATES BANKRUPTCY COURT
3    SOUTHERN DISTRICT OF NEW YORK
------------------------------x
4    In re
                              Case No.
5    WORLDCOM, INC., et al,        02-13533
                              **SEE BELOW
6          Reorganized Debtors.
------------------------------x
7              February 1, 2006
               10:40 a.m.
8
               United States Custom House
9              One Bowling Green
               New York, New York    10004
10

11

          TRANSCRIPT UNDER SEAL
12    DIGITALLY RECORDED PROCEEDINGS
          (Proceedings -- Entire Day)
13
      10:30 WORLDCOM, INC., ET AL
14
      Debtors' Objection to Proof of Claim No.
15    38365 filed by Department of the Treasury.

16

17    B E F O R E:

18      THE HONORABLE ARTHUR J. GONZALEZ
        United States Bankruptcy Judge
19

20

21

22        DEBORAH HUNTSMAN, Court Reporter
          198 Broadway, Suite 903
23        New York, New York  10038
          (212) 608-9053     (917) 723-9898
24

25

2

1

2    A P P E A R A N C E S:

3        WEIL, GOTSHAL & MANGES LLP
         Attorneys for Reorganized Debtors
4             700 Louisiana, Suite 1600
              Houston, Texas    77002
5
         BY:   ALFREDO R. PEREZ, ESQ.
6                   -and-
               JAMES T. GROGAN, III, ESQ.
7

8        U.S. DEPARTMENT OF JUSTICE
         U.S. ATTORNEY'S OFFICE
9        SOUTHERN DISTRICT OF NEW YORK
         Attorneys for the IRS and the United
10       States
              86 Chambers Street
11            New York, New York    10007

12       BY:   NICOLE GUERON, ESQ.
                    -and-
13             DANNA DRORI, ESQ.

14

15

16

17

18

19

20

21

22

23

24

25

1 CONFIDENTIAL - Anderson - Direct - Perez

2    a legal determination as to what privilege

3    is, but it is also plain language.  The only

4    case that is cited, went to the dictionary to

5    look up what it meant.  I think the person

6    who has been in the business for over 25

7    years can tell what his understanding is of

8    these terms.

9            JUDGE GONZALEZ:  I think he can

10   tell what his understanding of the terms is,

11   but he can't interpret the statute as to

12   whether that is what it means.  The word

13   "person" has a common understanding and the

14   word "person" in a statute may mean something

15   else.

16           MR. PEREZ:  Absolutely, Your Honor.

17   He is not a lawyer.  He doesn't purport to be

18   acting as a lawyer.  This is a statute that

19   was promulgated in 1965, so it has been

20   around.  It has been around for a while.

21       Q    Could MCI plug a telephone into the

22   COBRA service?

23       A    No.  Because all we had was a

24   high-speed data line, and you can't plug a

25   phone into a high-speed data line.

1 CONFIDENTIAL - Anderson - Direct - Perez

2      Q      Where did the high-speed data line

3  get plugged in?

4      A      On the MCI side?

5      Q      Yes.

6      A      We took the high-speed data line

7  and plugged it into what we call an internet

8  edge router.

9      Q      On the COBRA side, where did it get

10  plugged in?

11      A      On the COBRA side, they plugged it

12  into either the frame relay or the output of

13  the NAS.

14      Q      Now, could MCI get a dial tone

15  using COBRA services?

16      A      No.

17      Q      Could MCI make a telephone call to

18  anyone having a telephone station using the

19  COBRA service?

20      A      No.

21      Q      Could MCI receive a telephone call

22  from anyone using COBRA services?

23      A      No.  MCI cannot.

24      Q      Let's look back to Exhibit 3.  Did

25  MCI own any of the equipment that is shown on

1 CONFIDENTIAL - Anderson - Direct - Perez

2 says that the lines can have telephone calls

3 go in one direction only.  When I say "one

4 direction," the origination of a telephone

5 call.  So an end user or someone anywhere in

6 the telephone network could dial that phone

7 number and connect to the modem.  But with

8 the Direct Inward Dial, the modem, even if

9 you could make the modem dial a digit, there

10 is no dial tone back.  So you can't dial out.

11 It only works one way.

12      Q      Was there a dial tone at the egress

13 point in the NAS?

14      A      No.  There is no dial tone

15 anywhere.  It doesn't exist.

16      Q      Now, were all of the COBRA systems

17 kind of similarly configured?

18      A      Yes.  There was a consistent

19 network design.

20      Q      Now, do you have an opinion whether

21 COBRA entitles MCI to the exclusive use of

22 any communication channel of groups of

23 channel?

24      A      Yes.  The COBRA platform was for

25 exclusive use of MCI.

```
 1  CONFIDENTIAL - Anderson - Direct - Perez
 2       Q       What is the basis of your opinion?
 3       A       The basis is my understanding of
 4  the platform, in that the platform had
 5  dial-up users coming into it.  The egress
 6  port was only handed to MCI.  So we were the
 7  only people that could have traffic come
 8  across that platform for us.  In addition,
 9  like my description before, as the traffic
10  came in, the dial-up data traffic came in to
11  the platform, and it was converted to data
12  and the data was then integrated into a
13  single datastream, a high-speed datastream,
14  out of the NAS or RAS, that datastream was
15  exclusively for MCI.  So within the RAS,
16  there is no way to get the data to anyone
17  else, but MCI.
18       Q       Did MCI pay a separate charge for
19  the COBRA service?
20       A       Yes.  We paid for the COBRA
21  platform.
22       Q       How was that charge paid?
23       A       By port, which is the capacity of
24  the network -- the capacity of the platform,
25  not the network.
```

92

1 CONFIDENTIAL - Anderson - Direct - Perez

2        Q        Is the line from the egress point

3   of the NAS to MCI's pop exclusively used by

4   MCI?

5        A        Definitely.  It is a point to point

6   private line.

7        Q        Now, we have heard about Voice Over

8   IP in Ms. Gueron's opening statement.  Is the

9   COBRA service a Voice Over IP gateway?

10       A        No, it is not.

11       Q        Did MCI, to your knowledge, have

12   the ability to make it a Voice Over IP

13   gateway?

14       A        No.  It could not be a Voice Over

15   IP gateway for numerous reasons.

16       Q        Would you turn to Exhibit 23, and

17   could you explain to the Court what

18   Exhibit 23 is?  Before you do that, I want to

19   ask you one question.

20       A        Okay.  Go ahead.

21       Q        In every other diagram we started

22   with the end user on the right, and this one

23   starts with the end user on the left; right?

24       A        Yes.  It is reversed.

25       Q        So pretend you are on the right

```
 1    CONFIDENTIAL - Hills- Cross - Perez
 2    want to have originating or terminating VOIP
 3    calls, we need to renegotiate terms to deal
 4    with that.
 5         Q      Now, you don't dispute
 6    Mr. Anderson's statement that what MCI
 7    receives from the COBRA services is a
 8    high-speed datastream?
 9         A      I agree with Mr. Anderson in that
10    statement.
11         Q      You don't dispute that the
12    demarcation point between the COBRA services
13    and the Debtors is the egress port in the
14    NAS?
15         A      That is what the contract says.
16         Q      You do not dispute Mr. Anderson's
17    testimony that the COBRA components were not
18    configured in such a way to permit voice
19    quality calls?
20         A      I don't dispute his statements
21    saying it wasn't configured to the right
22    VOIP.
23         Q      I guess I am asking a little bit of
24    a different question.  Was the COBRA service
25    which MCI purchased configured to provide
```

```
 1     CONFIDENTIAL - Hills- Cross - Perez

 2   voice quality calls?

 3       A       I would agree with Mr. Anderson

 4   when he says that the COBRA equipment was not

 5   designed for a normal telephone user to dial

 6   up and access it without a modem.

 7       Q       So you agree with him that it is

 8   not configured in a way to allow voice

 9   quality calls?

10       A       No.  I didn't say that.

11       Q       Do you have your deposition in

12   front of you?

13       A       Yes.  My deposition, do I?

14       Q       Let me bring that up here.

15       A       Thank you.

16       Q       If you would turn to page 162 --

17       A       Okay.

18       Q       -- lines 10 through line 17.

19   Question:   Was the service configured in a

20   way that would allow voice quality calls?

21   Answer:  Was the COBRA service configured?

22   Question:  Yes.  The entire COBRA service

23   which MCI purchased.  Answer:  The components

24   within COBRA were, based on Mr. Anderson's

25   testimony, weren't configured to do that.
```

```
 1    CONFIDENTIAL - Hills- Cross - Perez
 2                 Do you agree you said that?
 3      A        I agree I said that.
 4      Q        You don't disagree with
 5    Mr. Anderson's testimony that the COBRA
 6    services were not configured to permit MCI to
 7    dial out calls?
 8      A        I agree with Mr. Anderson there.
 9      Q        In your opinion, whether the
10    Debtors could plug in a telephone or a
11    private branch exchange keyset or other
12    recognized instrument for making telephonic
13    quality calls, is irrelevant to your opinion?
14      A        My opinion is that the PRI service
15    that is purchased as part of the COBRA
16    service could support other forms of voice
17    communication such as a PBX.
18      Q        But, if it is a PBX, then it is not
19    COBRA service; correct?
20      A        Right.  I made the very simple
21    statement that the PRI as part of it could be
22    plugged into a PBX.
23      Q        But if you plugged a PRI into a
24    PBX, would MCI be purchasing COBRA services?
25      A        No.
```