UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

In re                                                                   :

                                                                           :        Chapter 11

WORLDCOM, INC., et al.,                                    :        Case No. 02-13533 (AJG)

                                                                           :

                    Reorganized Debtors.                   :

-------------------------------------------------------- x

INTERNAL REVENUE SERVICE,                          :

                                                                           :

                    Appellant,                                    :

                                                                           :        07 Civ. 7414 (BSJ)

          v.                                                           :        08 Civ. 3070 (BSJ)

                                                                           :

WORLDCOM, INC., et al.,                                    :

                                                                           :

                    Appellees.                                    :

-------------------------------------------------------- x


**BRIEF OF THE APPELLANT**
**In Support of the Government's Appeal from the Order of the Bankruptcy Court**
**Granting Debtors' Objection to the Internal Revenue Service's Proof of Claim and**
**Granting Debtors' Refund Motion**


                                             MICHAEL J. GARCIA
                                             United States Attorney for the
                                             Southern District of New York
                                             Attorney for Appellant


BENJAMIN H. TORRANCE
Assistant United States Attorney
86 Chambers Street
New York, New York  10007
Telephone: 212.637.2703
Fax: 212.637.2702
E-mail: benjamin.torrance@usdoj.gov

          – Of Counsel –

**Table of Contents**

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Jurisdictional Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of the Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    The Federal Communications Excise Tax. . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    C.    Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        1.    COBRA Services to Connect Dial-Up Users to the Internet. . . . . . . . 4

        2.    Two-Way Telephonic-Quality Communication Through COBRA
               Services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        3.    VoIP Communications Over COBRA. . . . . . . . . . . . . . . . . . . . . . . . . . 8

    D.    The Bankruptcy Court's Decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B.    The IRS's Claim Is Presumptively Valid. . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    C.    The Bankruptcy Court Erred in Holding That Incoming-Only Telephone
        Lines Did Not Provide Taxable Local Telephone Service. . . . . . . . . . . . . . . 12

        1.    The Bankruptcy Court Wrongly Interpreted § 4252(a)(1). . . . . . . . . 13

        2.    Courts Need Not Construe the Internal Revenue Code in Favor of
               Taxpayers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        3.    IRS Revenue Rulings Contradict the Bankruptcy Court's Conclusion,
               and Deserve This Court's Deference. . . . . . . . . . . . . . . . . . . . . . . . . . 19

                a.    The IRS Has Ruled That Taxable Local Service Includes
                    Incoming-Only Telephone Service. . . . . . . . . . . . . . . . . . . . . . 19

                b.    Revenue Rulings Are Entitled to Judicial Deference. . . . . . . . 20

   c. The Rulings at Issue Here Should Be Followed. . . . . . . . . . . 24

D. Debtors Have Failed to Establish That the IRS's Tax Claims Are Invalid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

  1. COBRA Service Provided "Access to a Local Telephone System" and the "Privilege of Telephonic Quality Communication". . . . . . . . . . . 26

  2. COBRA Service Was Able to Support Computer-to-Computer VoIP, Demonstrating Its Capacity for "Telephonic Quality Communication" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

  3. Modem-to-Modem Calls Are Taxable. . . . . . . . . . . . . . . . . . . . . . . . 32

  4. COBRA Service Could Have Been Configured to Originate Telephone Calls. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

  5. COBRA Service Is Not a "Private Communication Service" Exempt from the Excise Tax. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## TABLE OF AUTHORITIES

*Cases*:

*USA Choice Internet Service, LLC v. United States*, 73 Fed. Cl. 780 (2006). . . . . . . . . . . . . . 9, 12

*USA Choice Internet Services, LLC v. United States*, 522 F.3d 1332
    (Fed. Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Aeroquip-Vickers, Inc. v. Commissioner*, 347 F.3d 173 (6th Cir. 2003). . . . . . . . . . . . . . . . . . . . 23

*In re Allegheny International, Inc.*, 954 F.2d 167 (3d Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . 12

*America Mutual Life Insurance Co. v. United States*, 267 F.3d 1344
    (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Ammex, Inc. v. United States*, 367 F.3d 530 (6th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Atlantic Mutual Insurance Co. v. Commissioner*, 523 U.S. 382 (1998). . . . . . . . . . . . . . . . . . . . 21

*Barnhart v. Walton*, 535 U.S. 212 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Bob Jones University v. United States*, 461 U.S. 574 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Boeing Co. v. United States*, 537 U.S. 437 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Carmody v. ProNav Ship Management, Inc.*, 224 F.R.D. 111 (S.D.N.Y. 2004). . . . . . . . . . . . . . 37

*Chevron USA, Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984). . . . . . . . . . 21

*Comcation, Inc. v. United States*, 78 Fed. Cl. 61 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Comdata Network, Inc. v. United States*, 21 Cl. Ct. 128, 130–31 (1990). . . . . . . . . . . . . . . . *passim*

*In re Dayton Seaside Associates Number2, L.P.*, 257 B.R. 123
    (Bankr. S.D.N.Y. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Del Comm'l Properties v. Commissioner*, 251 F.3d 210 (D.C. Cir. 2001). . . . . . . . . . . . . . . . . . . 22

*In re Forte*, 234 B.R. 607 (Bankr. E.D.N.Y. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Gillespie v. United States*, 23 F.3d 36 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hospital Corp. of America & Subs. v. Commissioner*, 348 F.3d 136 (6th Cir. 2003). . . . . . . . . . . 21

*Houlihan Lokey Howard & Zukin Capital v. High River Ltd. Partnership*,
    369 B.R. 111 (S.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Kahn*, 114 B.R. 40 (Bankr. S.D.N.Y. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re King*, 305 B.R. 152 (Bankr. S.D.N.Y. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Kornman & Associates, Inc. v. United States*, 527 F.3d 443 (5th Cir. 2008). . . . . . . . . . . . . . 22, 23

*LaBow v. IRS*, 763 F.2d 125 (2d Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Neptune Mutual Association, Ltd. v. United States*, 862 F.2d 1546 (Fed. Cir. 1988). . . . . . . . . . 18

*Nico v. Commissioner*, 565 F.2d 1234 (2d Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*OfficeMax v. United States*, 428 F.3d 583 (6th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Raleigh v. Illinois Department of Rev.*, 530 U.S. 15 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Read v. United States*, 320 F.2d 550 (5th Cir. 1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Rexnord Holdings, Inc. v. Biderman*, 21 F.3d 522 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . 11

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Shugrue v. Air Line Pilots Association (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984
(2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*Texaco, Inc. v. United States*, 528 F.3d 703 (9th Cir. 2008).. . . . . . . . . . . . . . . . . . . . . . . . . 22

*Texasgulf, Inc. v. Commissioner*, 172 F.3d 209 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . 20

*Trans-Lux Corp. v. United States*, 696 F.2d 963 (Fed. Cir. 1982). . . . . . . . . . . . . . . . 16, 26, 37, 40

*United Dominion Indus. v. United States*, 532 U.S. 822. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200 (2001). . . . . . . . . . . . . . 21, 22, 24

*United States v. McCombs*, 30 F.3d 310 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Mead Corp.*, 533 U.S. 218 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21–24

*Vines v. IRS (In re Vines)*, 200 B.R. 940 (M.D. Fla. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Weisbart v. U.S. Department of Treasury*, 222 F.3d 93 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . 20

*Western Electric Co. v. United States*, 564 F.2d 53 (Ct. Cl. 1977). . . . . . . . . . . . . . . . . . . . 37, 40

*White v. United States*, 305 U.S. 281 (1938). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Wolder v. Commissioner*, 493 F.2d 608 (2d Cir. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re WorldCom, Inc.*, 371 B.R. 19 (Bankr. S.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . . . . . . *passim*


**Statutes, Rules, and Regulations:**

26 U.S.C. § 4251. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

26 U.S.C. § 4252. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

26 U.S.C. § 6662. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

26 U.S.C. § 7805. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28 U.S.C. § 158. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Pub. L. No. 89-44, 79 Stat. 136. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 27, 28, 37

Fed. R. Evid. 801. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

26 C.F.R. § 1.6662-3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

26 C.F.R. § 601.601. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Revenue Ruling 74-617, 1974-2 C.B. 365. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Revenue Ruling 75-102, 1975-1 C.B. 351. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

Revenue Ruling 75-9, 1975-1 C.B. 348. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Revenue Ruling 77-196, 1977-1 C.B. 343. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Revenue Ruling 78-437, 1978-2 C.B. 266. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Revenue Ruling 79-245, 1979-2 C.B. 380. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

Revenue Ruling 89-84, 1989-1 C.B. 296. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Treas. Order 111-2, 1981-1 C.B. 698, 699. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## Preliminary Statement

The Internal Revenue Service ("IRS") respectfully submits this brief in support of its appeal of two orders of the bankruptcy court (Hon. Arthur J. Gonzalez, J.), granting debtors' objection to an IRS tax claim and granting debtors' request for a refund of taxes.[1] Both the IRS claim and the requested refund concerned the application of the federal communications excise tax to a service known as "central-office-based remote access," or COBRA. The COBRA service enabled individual modem users to dial in to debtors' computer network servers, thus allowing the users to connect to the Internet.

Relying on a decision of the Court of Federal Claims, the bankruptcy court here ruled that based on a small difference in the statute's use of prepositions—"communication *with*" as opposed to "communication *to or from*"—the excise tax cannot be applied to a communication service such as COBRA that does not initiate outgoing calls. However, that analysis, unsupported by the text, history, or purpose of the statute to begin with, has since been rejected by the United States Court of Appeals for the Federal Circuit, which reversed the very Court of Federal Claims decision that the bankruptcy court relied on. The Federal Circuit (along with another decision of the Court of Federal Claims) held that a service enabling dial-up Internet access—one essentially indistinguishable from COBRA—was subject to the federal excise tax. Thus, the bankruptcy court's analysis is no longer supported by any precedent, and its decision should be reversed.

---

[1] During the course of this bankruptcy, the principal debtor has been known (among other names) as WorldCom Inc., MCI Inc., and (at present, after a merger) Verizon Business Global LLC. The subsidiary debtors whose actions are at issue in this case are primarily UUNet Technologies Inc. and MCI WorldCom Network Services Inc. Although debtors are referred to in the record by these various names, for simplicity this brief simply refers to "debtors."

Putting aside the linguistic arguments, the record in this case demonstrates that COBRA service is taxable. Debtors' primary argument is that even though COBRA is capable of carrying the "telephonic quality communication" required by the statute, debtors do not actually use it for that type of communication. But that logic has been repeatedly rejected by the courts. Debtors have not carried their burden of demonstrating that the taxes imposed in this case are unlawful; therefore, their objection to the IRS claim and their motion for a tax refund must be denied, and the decision of the bankruptcy court reversed.

### Jurisdictional Statement

The bankruptcy court entered a final order granting debtors' objection to the IRS's proof of claim, and granting debtors' motion for a determination of refund rights, on June 27, 2007. R 285.[2] The IRS timely appealed on July 2, 2007. R 288 (No. 07 Civ. 7414). The bankruptcy court then entered a final stipulated order, determining the amount of the refund sought by debtors, on February 20, 2008. R 358. The IRS again timely appealed on February 27, 2008. R 362 (No. 08 Civ. 3070). Accordingly, this Court has jurisdiction over these appeals—which were consolidated by the Court by a memo-endorsed order dated March 28, 2008—pursuant to 28 U.S.C. § 158(a).

### Statement of the Issues

1.    Whether the bankruptcy court erred in holding that the excise tax statute "requires that the taxpayer have the privilege to both initiate and receive" communications for the tax to apply. The Court reviews this question of law de novo.

---

[2]    Citations to the "Record on Appeal to the District Court" appear herein as "R __." Page numbers of the Record referring to documents that were filed under seal in the bankruptcy court are preceded by an "S."

2.      Whether the debtors have met their burden of demonstrating that the IRS's application of the excise tax statute was invalid.  The application of the law to the largely uncontested facts at issue here is reviewed de novo.

### Statement of the Case

**A.      The Federal Communications Excise Tax**

Federal law imposes a three percent excise tax on amounts paid for communications services, including "local telephone service."  26 U.S.C. § 4251.  Local telephone service, in turn, is defined as

> (1) the access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and
> (2) any facility or service provided in connection with a service described in paragraph (1).

*Id.* § 4252(a).  The dispute in this case concerns whether communications services purchased by debtors fit within this definition and are therefore taxable.

**B.      Procedural History**

Debtors filed their Chapter 11 bankruptcy petition on July 21, 2002; a plan of reorganization was confirmed on October 31, 2003.  R 364.  On July 2, 2004, the IRS filed an administrative proof of claim numbered 38,365.  R 1.  That proof of claim sought payment of $16,276,440.81 in federal communications excise taxes and interest owed pursuant to 26 U.S.C. § 4251 for certain telephone services known as "central-office-based remote access," or "COBRA."  On August 5, 2004, debtors filed an objection to the IRS's proof of claim, and on January 31, 2006, debtors filed a motion for a refund of excise taxes they had already paid for COBRA services.  R 2, 61.  The bankruptcy court held an evidentiary hearing on February 1, 2006.  R S1087.  In an opinion dated June 1, 2007, the bankruptcy court ruled that debtors' objection and refund motion should be granted.

R 259, *published at In re WorldCom, Inc.*, 371 B.R. 19 (Bankr. S.D.N.Y. 2007). An order granting the objection was entered on June 22, 2008. R 285. The parties later stipulated to the amount of the refund due if the bankruptcy court's order were to be upheld, and the bankruptcy court entered that stipulation as a second order granting debtors' refund. R 358. The government now appeals the two orders of the bankruptcy court. R 288, 362.

## C.    Facts

### 1.    COBRA Services to Connect Dial-Up Users to the Internet

During the period relevant to this case, debtors sold access to computer networks, particularly the Internet. *In re WorldCom,* 371 B.R. at 23. Debtors provided network access directly to residential and business customers; they also sold network access to independent Internet service providers ("ISPs"), who in turn sold Internet access to their customers. *Id.* Especially prior to the wide-spread use of broadband Internet access, some of the end-user customers accessed an ISP's services through a dial-up connection: that is, such a customer would use a modem attached to her computer to dial a telephone number, which connected it to the ISP's server via a modem on the ISP's end. *Id.*

To facilitate the connection between ISPs and dial-up users, debtors purchased "central-office-based remote access" ("COBRA") service from a "local exchange carrier" ("LEC")—that is, a local telephone company. *Id.* at 24. COBRA service aggregated several dial-up connections into one high-speed data stream, improving the efficiency and lowering the cost to debtors of providing dial-up Internet service. *Id.* To gain access to the COBRA system, a dial-up user was required to connect to and use the Public Switched Telephone Network ("PSTN")—i.e., the standard telephone network used for normal voice calls.

R S1113 (Tr. 106, Anderson); S1154 (Ex. 2).[3]  In fact, the very purpose of the COBRA system was to permit dial-up users to use the telephone network to access the Internet. R S1123, S1126 (Tr. 146, 158, Hills).  Thus, access to the local telephone network and the ability to receive telephone calls from "substantially all persons" within the local calling area was an integral and necessary part of the COBRA service debtors purchased. R S1123 (Tr. 147, Hills).

### 2.    Two-Way Telephonic-Quality Communication Through COBRA Services

All COBRA services purchased by debtors used modems (or digital service processors ("DSPs") that operated as modems) for all their communications.  R S1104, S1113–14 (Tr. 70, 107–11, Anderson).  The modems "[took] data from the computer and convert[ed] it to the same set of frequencies that are used by voice transmission."  R S1123 (Tr. 148, Hills).  Data leaving the modem of a dial-up user used "the same exact range" as the human voice.  R S1111 (Tr. 99, Anderson), S1124 (Tr. 149, Hills).  The modems were designed to transmit analog signals using exactly the same characteristics as are required for voice.  R S1125 (Tr. 154, Hills).  Successful operation of a modem in a telecommunication system required telephonic quality communication channels, because modems would not operate without a telephonic quality communication channel.  R S1113–14 (Tr. 108–12, Anderson), R S1124 (Tr. 150, Hills).  Thus, communication between modems or DSPs required two-way, voice-grade telephonic quality communication, and COBRA service included a telephonic-quality path—i.e., one capable of transmitting telephonic quality communication—all the way from the dial-up user's modem to the

---

[3]    References to the transcript of the evidentiary hearing held on February 1, 2006, are designated as "Tr.," and accompanied by the name of the witness testifying.  The two witnesses were John Anderson, an employee of the debtors whom they offered as an expert witness, and Dr. Michael Hills, the government's independent expert witness.

References to the exhibits introduced at that same hearing are designated as "Ex."

COBRA service's network access server modems.[4]  R S1113–14, S1116–17(Tr. 108–12, 118, 121, Anderson), R S1124 (Tr. 150, Hills).

To gain access to the COBRA system, a dial-up user's modem dialed a telephone number into the COBRA service's network access server ("NAS") modem, and the two modems then connected.  R S1113 (Tr. 105–07, Anderson).  That connection was made via an LEC voice switch, and the dial-up user's modem called into the LEC switch in exactly the same way as used in a voice call: the modem detected a dial tone and sent out touch-tone or rotary signals to connect the call.  R S1114 (Tr. 112, Anderson), S1125 (Tr. 153, Hills), S1154 (Ex. 2).  Once connected, there was a telephonic quality connection between the dial-up user and the LEC switch.  R S1114–15 (Tr. 112–13, Anderson), S1125 (Tr. 153–54, Hills).  The modem call then traveled from the LEC voice switch to a Primary Rate Interface ("PRI") line.  R S1115 Tr. 113, Anderson); S1154 (Ex. 2).  PRIs were a component of the COBRA service purchased by debtors.  R S1116 (Tr. 118, Anderson), S1126–27 (Tr. 157, 162–64, Hills), S1154 (Ex. 2), S1726 (Ex. 27), S1799 (Ex. 29).  COBRA PRIs provided 23 local voice channels and one data channel between two points.  R S1115 (Tr. 115–16, Anderson), S1125 (Tr. 155, Hills).  The communication between the LEC voice switch and the PRI was of telephonic quality, just as was the connection between the dial-up user's modem and the LEC switch.  R S1115 (Tr. 113–15, Anderson), S1125 (Tr. 156, Hills).  The PRI then connected the call from the LEC voice switch to the COBRA network access server, which was then connected to the COBRA DSP device, which served as a modem.  R S1115–16 (Tr. 116–17, Anderson), S1125 (Tr. 156, Hills), S1154 (Ex. 2).  That connection from the PRI to the modem was also of telephonic quality.  R S1116 (Tr. 117, Anderson),

---

[4]  As the bankruptcy court noted, both experts essentially agreed that a telephone system capable of carrying voice calls is of "telephonic quality." 371 B.R. at 26 n.4; R S1125, 1132 (Tr. 154, 183–84, Hills); *see* R S1108 (Tr. 86, Anderson).

S1126 (Tr. 157, Hills).  The PRI circuits included in the COBRA services could be plugged into a "private branch exchange," or PBX—i.e., an intra-office telephone system used for voice communication.  R S1115 (Tr. 116, Anderson); *see* R S1128 (Tr. 166–67, Hills (defining PBX)), S1136 (Tr. 199, Hills).

In short, to connect to the Internet through the COBRA system, the dial-up user's modem dialed into the telephone system and was connected to the PRI, which then connected the call to the COBRA modem.  At each of those steps, the communication was of telephonic quality—or, at a minimum, along a path capable of carrying telephonic quality communications.  R S1116 (Tr. 118, Anderson), S1131 (Tr. 177, Hills).

The system also worked the same way in reverse: when signals were sent back to the dial-up user from the Internet, the communication traveled from the COBRA modem in the network access server, along the PRI back to the LEC's voice switch, then back to the dial-up user's modem; the communication was of telephonic quality the whole way. R S1116 (Tr. 118–19, Anderson).  The only difference was that the COBRA service debtors purchased was not configured to originate calls.  *Id.*; R S1136 (Tr. 199, Hills).  However, the system could easily have been reconfigured to do so, by replacing the COBRA DSP cards with DSP cards that were capable of originating calls.  R S1116–17 (Tr. 120–21, Anderson); S1669–78 (Exs. 13, 14, 15).  The only barriers to doing so were contractual and the business and economic judgment concerns of debtors and the LEC.  R S1116–17 (Tr. 120–21, Anderson).  In sum, COBRA provided "full duplex" communication: that is, two-way communication in which information traveled from the dial-up user to the COBRA system to the Internet, and also in reverse from the Internet to the COBRA system and then back to the dial-up user.  R S1116 (Tr. 119, Anderson), S1126 (Tr. 158–59, Hills).

7

### 3.    VoIP Communications Over COBRA

Voice Over Internet Protocol ("VoIP") is a technology that allows regular voice signals to be converted to packets that are designed to travel on the Internet.  R S1129 (Tr. 169–70, Hills).  Computer-to-computer VoIP is a system in which the transformation from voice signals to Internet Protocol ("IP") packets occurs on the end user's own computer.  *Id.*

COBRA was capable of computer-to-computer VoIP.  R S1117 (Tr. 121, Anderson), S1127, S1129–30 (Tr. 161, 170–73, Hills).  As it was configured, the COBRA system could accept and transmit a computer-to-computer VoIP packet from the dial-up user to the Internet.  *Id.*  The COBRA services could not distinguish between a computer-to-computer VoIP packet carrying a voice transmission and any other non-voice packet coming out of a dial-up user's computer.  R S1117 (Tr. 122, Anderson).  Indeed, debtors cannot rule out the possibility that the COBRA system did, in fact, transmit computer-to-computer VoIP packets from dial-up users to the Internet.  R S1117 (Tr. 121–22, Anderson).

## D.    The Bankruptcy Court's Decision

After a hearing on debtors' objection to the IRS's proof of claim for communication excise taxes owed and their motion for a refund of such taxes already paid, the bankruptcy court issued an opinion in debtors' favor on June 1, 2007.

The court first noted that the parties had focused on whether the COBRA services provided the "'privilege of telephonic quality communication.'"  371 B.R. at 26 (quoting 26 U.S.C. § 4252(a)).  The court found that both parties' expert witnesses had "agreed that COBRA service utilizes a telephonic quality path."  *Id.*  While debtors conceded this fact, they argued that even though the path was capable of telephonic quality communication, the actual communication in the COBRA system was not actually telephonic quality.  The bankruptcy court ruled that because local telephone service is defined in terms of the

"privilege" it affords the purchaser—a "more expansive concept than use"—the service at issue should be judged based on its actual capabilities, not simply on how it is used. *Id.* at 27. However, the bankruptcy court went on to determine that such capabilities should be assessed based on the "service *as purchased*," rather than based on the broader technical capacity the system could potentially support. *Id.*

The court then held that under undisputed facts, COBRA service was not taxable. Following the reasoning of the Court of Federal Claims in *USA Choice Internet Service, LLC v. United States*, 73 Fed. Cl. 780 (2006),[5] the bankruptcy court focused on the statutory requirement that "the privilege of telephonic quality communication be '*with* substantially all persons'" whose telephone stations constituted the local telephone system, and contrasted that language with the definition of "toll telephone service," which specifies that the subscriber be entitled to "'communications *to or from* all or a substantial portion of the persons'" with telephone stations in a specified area. 371 B.R. at 28 (quoting 26 U.S.C. § 4252(a)(1), (b)(2)). The bankruptcy court concluded that "[t]his distinction . . . suggests that the concept of privilege incorporates some element of directionality. . . . '[T]o or from' could signify that the relevant service need not include the privilege to both receive and originate telephonic quality communication, whereas the use of 'with' would signify that both privileges are required." *Id.* Similarly, the court found that "the term 'telephonic quality communication' incorporates the concept of two-way communication. Telephone service is distinguished from other communication methods in that it is two-way, or 'full-duplex,' communication . . . ." *Id.* From that premise, and without further analysis,

---

[5]    As discussed below, this decision was reversed by the Federal Circuit after the bankruptcy court's ruling in this case. 522 F.3d 1332 (Fed. Cir. 2008).

the court ruled that "section 4252(a) requires that the taxpayer have the privilege to both initiate and receive telephonic quality communication." *Id.*

The bankruptcy court then found it uncontested that "the PRI ingress lines that route the incoming dial-up connections to the COBRA system are configured as Direct-Inward-Dial (DID) lines [which] allow for call reception but do not allow for call origination," and therefore the COBRA service is not taxable. *Id.* The court rejected the IRS's arguments that the inability to originate calls was the self-imposed result of business choices, instead finding that the communications package debtors purchased utilized only inward-only lines. *Id.* at 28–29. The court also ruled that the admitted technical possibility of changing the COBRA system's modem cards to allow outgoing calls was irrelevant, as the system was to be assessed as purchased and not based on possible other configurations. *Id.* at 29.

Next, the court found § 4252(a)(2), which taxes "any facility or service provided in connection with a service described in [§ 4252(a)(1)]," inapplicable; the court determined that the fact that "COBRA service is dependent on access to the local telephone system is not a sufficient basis upon which to conclude that COBRA service" is taxable under § 4252(a)(2). *Id.* The court also ruled that to be taxed, a subscriber must purchase both the service and the "facility or service" provided in connection with that service—even though that requirement is not in the statute—based on "deduction." *Id.* at 30.

Finally, the court addressed several IRS revenue rulings that held incoming-only services to be taxable. *Id.* The court declined to defer to the revenue rulings, concluding that they were unpersuasive. *Id.* at 30–32.

**ARGUMENT**

**A.    Standard of Review**

A bankruptcy court order is subject to plenary review by the district court. *Shugrue v. Air Line Pilots Ass'n (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 988–89 (2d Cir. 1990); *Houlihan Lokey Howard & Zukin Capital v. High River Ltd. P'ship*, 369 B.R. 111, 114 (S.D.N.Y. 2007) (Jones, J.). This Court thus reviews the bankruptcy's conclusions of law de novo, and its findings of fact for clear error. *Ionosphere*, 922 F.2d at 988–89; *Houlihan*, 369 B.R. at 114.

**B.    The IRS's Claim Is Presumptively Valid**

"It is well settled that the party objecting to a proof of claim has the burden of coming forward with sufficient evidence rebutting the validity of a properly filed proof of claim." *In re King*, 305 B.R. 152, 162 (Bankr. S.D.N.Y. 2004). A proof of claim executed and filed in accordance with the Federal Rules of Bankruptcy Procedure constitutes prima facie evidence of the validity and amount of the claim. Fed. R. Bankr. P. 3001(f); *In re Kahn*, 114 B.R. 40, 44 (Bankr. S.D.N.Y. 1990); *Vines v. IRS (In re Vines)*, 200 B.R. 940, 949 (M.D. Fla. 1996). "'Prima facie case' has a clear meaning: evidence of an amount and quality sufficient to send a case to the trier of fact." *SEC v. Unifund SAL*, 910 F.2d 1028, 1037 (2d Cir. 1990). Unsupported allegations cannot rebut the prima facie validity of a claim. *Rexnord Holdings, Inc. v. Biderman*, 21 F.3d 522, 526 (2d Cir. 1994) (party cannot rebut prima facie case without "competent evidence"); *King*, 305 B.R. at 164; *Kahn*, 114 B.R. at 44. Thus, in the face of the claim here, "the Debtor may not rebut the prima facie case merely by stating that the amount of taxes claimed by the Service is not correct; the [debtor] must produce some evidence to support that statement." *In re Forte*, 234 B.R. 607, 618 (Bankr. E.D.N.Y. 1999) (internal quotation marks omitted). Such a rebuttal requires

"specific evidence" concerning the Debtor's tax liability, not just "unsupported statements." *LaBow v. IRS*, 763 F.2d 125, 131 (2d Cir. 1985). The evidence produced in objection to a claim must also have probative force at least equal to that of the proof of claim. *E.g.*, *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173–74 (3d Cir. 1992); *see* 4 Lawrence P. King, ed., Collier on Bankruptcy ¶ 502.02[3][f], at 502–18 (15th ed. rev. 2005) ("Unless the . . . objector . . . introduces evidence as to the invalidity of the claim or the excessiveness of its amount, the claimant need offer no further proof of the merits of the claim.").

Furthermore, debtors carry the burden of proving the invalidity of the IRS's claim because "[a] taxpayer who wishes to challenge the validity of the [federal tax] assessment . . . bears the burden both of production and persuasion." *United States v. McCombs*, 30 F.3d 310, 318 (2d Cir. 1994) (internal quotation marks omitted). The fact of bankruptcy does nothing to alter this burden, since "[t]he burden of proof in a bankruptcy case with respect to a tax obligation rests on the party who would have the burden in accordance with the underlying substantive law." *In re Dayton Seaside Assocs. No.2, L.P.*, 257 B.R. 123, 127 (Bankr. S.D.N.Y. 2000) (citing *Raleigh v. Illinois Dep't of Rev.*, 530 U.S. 15, 23 (2000)).

**C.    The Bankruptcy Court Erred in Holding That Incoming-Only Telephone Lines Did Not Provide Taxable Local Telephone Service**

As noted above, the bankruptcy court closely followed the analysis of the Court of Federal Claims in *USA Choice*, adopting that decision's reading of the excise tax statute to exclude any telephone service that cannot originate calls. 371 B.R. at 28–29 (citing 73 Fed. Cl. 780). But after the bankruptcy court's decision, the Federal Circuit reversed in *USA Choice*, repudiating the Court of Federal Claims's reasoning and extensively examining the excise tax statute to reach the opposite conclusion: taxability is not affected by whether the telephone service can originate calls. *USA Choice Internet Servs., LLC v. United States*,

522 F.3d 1332, 1336–43 (Fed. Cir. 2008).  Similarly, another decision of the Court of

Federal Claims reached the same result in favor of the government.  *Comcation, Inc. v.*

*United States*, 78 Fed. Cl. 61 (2007).

Both *USA Choice* and *Comcation* involved essentially identical facts as are present

here: an Internet service provider purchased service from a local exchange carrier, in order

to provide service to dial-up customer.  *USA Choice*, 522 F.3d at 1334; *Comcation*, 78 Fed.

Cl. at 62.  The dial-up customer used a modem to call a local access number, which

connected the call to the ISP's modem.  522 F.3d at 1334; 78 Fed. Cl. at 62.  Just as with

debtors' service in this case, the dial-up user's connection was made over Primary Rate

Interface, or PRI, lines, capable of carrying 23 simultaneous communications.  522 F.3d at

1335; 78 Fed. Cl. at 62.  Anyone could call the ISP's local access number, though if the

caller failed to provide valid authentication information the call would be disconnected.

522 F.3d at 1335; 78 Fed. Cl. at 62.  Due to the nature of providing Internet service—in

which there is no need for the company's servers to make outbound calls—the telephone

service was configured so that it was able to receive incoming calls only.  522 F.3d at 1335;

78 Fed. Cl. at 62.  And the connection between the dial-up user's modem and the ISP was

of telephonic quality.  522 F.3d at 1334; 78 Fed. Cl. at 62.  Considering those facts—all of

which are found in this case—both the Federal Circuit and the Court of Federal Claims

rejected the reasoning applied by the bankruptcy court here.  This Court should follow

their analysis and reverse.

### 1.    The Bankruptcy Court Wrongly Interpreted § 4252(a)(1)

The bankruptcy court's primary rationale for its ruling was that the statutory

phrase "communication *with*" other telephone users implied—especially taken in contrast

to the phrase found in the next subsection of the statute, "communications *to or from*" other

users—that a subscriber must have the privilege both to make and to receive phone calls for the service to be taxable.  371 B.R. at 28–29.  As held in *USA Choice* and *Comcation*, the bankruptcy court misread the statute.

First, the bankruptcy court concluded that, although the phrase "communications to or from [a person]" could cover one-way communication, in contrast "communication with [a person]" must mean two-way communication.  *Id.* at 28.  But as the circuit concluded in *USA Choice*, "[e]ven if we accept this conclusion . . . it does little to resolve the underlying dispute.  After all, most telephone calls, including communications negotiated by computer modems, involve reciprocal communication once a connection has been established.  For example, 'I spoke *with* Jane on the phone' does not indicate who initiated the conversation."  522 F.3d at 1338.  Or, as the *Comcation* court put it, "'inward dialing' and 'one-way communication' are not synonymous phrases; . . . although the PRI lines in question[] were configured for 'inward dialing,' once a call was initiated, two-way communication occurred over lines that supported telephonic quality communication."  78 Fed. Cl. at 72, *quoted in* 522 F.3d at 1338.  In both those cases, as here, it is undisputed that once the connection is established, the communication over the telephone lines travels in both directions, regardless of who initiated (or could have initiated) it.

The bankruptcy court's reasoning was flawed for another reason: "Congress' use of different prepositions in subsection (b)(2) [does not] compel the narrow reading of subsection (a)(1)" the bankruptcy court adopted.  *USA Choice*, 522 F.3d at 1339.  The use of the word "with" in no way connotes that both parties must have the capability to initiate the conversation.  The bankruptcy court's conclusion was wholly inconsistent with this common understanding of that meaning.  As the *Comcation* court held, "the more broadly-accepted meaning of the term 'with' . . . carries none of the restrictions" the bankruptcy

court imposed here. 78 Fed. Cl. at 67. "[N]o [dictionary] definition . . . even hints that for one person to be deemed in communication 'with' another, both must be able to initiate the contact." *Id.*[6] The *Comcation* court further noted that Congress has repeatedly used the phrase "communication with" in other statutes, and has plainly not meant to imply that both parties to the communication must be able to initiate the contact. *Id.* at 67–68 & nn.9, 10.

"A more natural reading of the statute indicates" that the distinction between "with" and "to or from" "likely relates to grammatical—rather than substantive—context. Subsection (a)(1) refers to 'communication [singular] with' in the abstract, while subsection (b)(2) is framed in terms of 'an unlimited number of . . . [individual] communications [plural] to or from.'" *Id.* (bracketed words and ellipsis in original). In other words, by referring to a "number" of "communications," § 4252(b)(2) refers to discrete acts of transmission: "communication" here is synonymous with the noun "call." *See Am. Heritage Dictionary of the Eng. Lang.* (4th ed. 2000) (defining "communication" as "The act of communicating; transmission"). When used in that sense, "communication" is naturally followed by a directional preposition to indicate who initiated ("from") or received ("to") the transmission. Section 4252(a)(1), in contrast, uses the word "communication" to refer to a continuous activity between two parties. *See id.* ("The exchange of thoughts, messages, or information, as by speech, signals, writing, or behavior"). When "communication" is used in that sense, it is naturally followed by "with" (or "between" or "among") to indicate who is participating in the ongoing activity. Thus, if A and B are having a conversation, one

---

[6]    Indeed, the court in *Comcation* surveyed dictionaries from the 1960s, when the relevant language was enacted, to discern if the word's meaning had changed. Unsurprisingly, it had not. 78 Fed. Cl. at 67 n.8.

would say that A is engaged in communication *with* B (not *to* or *from* B)—with no implication regarding who initiated, or was able to initiate, the conversation.

Legislative history, too, confirms that Congress never intended to limit the taxability of telephone service on the ground relied on by the bankruptcy court. The statute's present language was added in 1965 by the Excise Tax Reduction Act of 1965. Pub. L. No. 89-44, § 302, 79 Stat. 136, 145–46; *see USA Choice*, 522 F.3d at 1339; *Comcation*, 78 Fed. Cl. at 69–71. That Act amended a long line of predecessor provisions dating back to 1898, with three purposes: to lower the tax rate (and eventually abolish the tax[7]), to exempt private communications services from taxation, and to update and modify the statutory definitions of various telephone services. *Trans-Lux Corp. v. United States*, 696 F.2d 963, 966 (Fed. Cir. 1982); H.R. Rep. No. 89-433 (1965), *reprinted in* 1965 U.S.S.C.A.N 1645, 1676–78; S. Rep. No. 89-324 (1965), *reprinted in* 1965 U.S.S.C.A.N. 1690, 1724–27. But nothing in the text or history of the statute demonstrates any legislative intent to limit the excise tax to local service in which both parties can initiate the call. Indeed, the history makes clear that the 1965 amendment, while it "updated and modified [the statutory definitions] to reflect and to meet the changing technology and market conditions of the industry," *Trans-Lux*, 696 F.2d at 967, was not meant to alter the scope of the statute's coverage from the prior versions—and those prior versions did not even arguably exclude one-party-initiated telephone calls. *USA Choice*, 522 F.3d at 1339–40 (pre-1965 language did not implicate ability to make outgoing calls, and the 1965 "definition of local telephone service was designed to track the earlier definition"; there is therefore "no reason to infer that Congress meant to impose other new limitations on local

---

[7]    A goal abandoned by subsequent legislation.

telephone service related to call initiation"); *Comcation*, 78 Fed. Cl. at 69–71 (same, extensively surveying legislative history).[8]

In sum, the statute's text, read in light of both common usage and the legislative history, requires the conclusion that local telephone service is taxable regardless of whether the service allows the subscriber to initiate calls.  The bankruptcy court erred in holding otherwise, and should be reversed.

### 2.    Courts Need Not Construe the Internal Revenue Code in Favor of Taxpayers

In interpreting the excise tax statute, the bankruptcy court stated that doubt as to taxability should be resolved in favor of the taxpayer.  371 B.R. at 26.  However, although several other courts have cited it, the interpretive canon resolving doubts in tax statutes in favor of taxpayers is far from well-settled.  To the contrary, the Supreme Court disavowed that rule in 1938:

> We are not impressed by the argument that, as the question here decided is doubtful, all doubts should be resolved in favor of the taxpayer.  It is the function and duty of courts to resolve doubts.  We know of no reason why

---

[8]    From 1958 to 1965, the excise tax statute referred to local telephone service as "general telephone service."  26 U.S.C. § 4252(a) (1964).  That definition applied to "any service through which a communication 'may be established' regardless of who initiated the communication or which way it primarily flowed."  *Comcation*, 78 Fed. Cl. at 70.  The president's initial proposal for the 1965 modification indicated that "the definition of 'local telephone service' was designed generally to track the prior concept of 'general telephone service,'" with two exceptions: accommodation of private communication systems such as intra-office intercom systems, and of Wide Area Telephone Service, or WATS, a new service introduced by the AT&T monopoly that provided for flat-rate long-distance—neither of which is applicable here.  *Id.* at 71, 73–74.  The president's initial proposal was adopted verbatim by Congress (to the extent relevant here), and nothing in the subsequent legislative history indicates any desire by Congress to depart from or add to those statutory purposes.  *Id.* at 71; *see USA Choice*, 522 F.3d at 1340.  Thus, "the legislative history suggests that neither the President nor the Congress intended anything by their selection of differing, yet common prepositions."  *Comcation*, 78 Fed. Cl. at 71.

A copy of the president's proposal and accompanying analysis, entitled "Material Prepared by the Executive Branch Concerning Recommendations Proposed by the President Relative to Excise and Fuel Taxes," can be provided to the Court upon request.

that function should be abdicated in a tax case more than in any other where the rights of suitors turn on the construction of a statute and it is our duty to decide what that construction fairly should be.

*White v. United States*, 305 U.S. 281, 292 (1938) (citations omitted).  No Supreme Court holding since then has relied on the supposed canon in construing a federal tax statute. The Second Circuit has cited *White* in expressing "doubt[ as to] the present day validity of the underlying philosophical premise of [the rule] that 'If the words are doubtful, the doubt must be resolved against the government and in favor of the taxpayer.'"  *Wolder v. Comm'r*, 493 F.2d 608, 611 n.4 (2d Cir. 1974); *see OfficeMax v. United States*, 428 F.3d 583, 594 (6th Cir. 2005*)* (questioning the current vitality of the canon); *cf. United Dominion Indus. v. United States*, 532 U.S. 822, 838–39 (2001) (Thomas, J., concurring) (advocating return of canon; collecting cases no later than 1927); *id.* at 839 n.1 (Stevens, J., dissenting) (noting "countervailing tradition" of construing in government's favor exceptions to general revenue duties, citing cases as recent as 1992).  Other courts have similarly declined to rely on that interpretive method, *e.g.*, *Read v. United States*, 320 F.2d 550, 552–53 (5th Cir. 1963).  *See* Assaf Likhovski, *The Duke and the Lady:* Helvering v. Gregory *and the History of Tax Avoidance Adjudication*, 25 Cardozo L. Rev. 953, 977–81 (2004) (detailing history of Supreme Court's retreat from this canon in the 1930s); Steve R. Johnson, *The Canon That Tax Penalties Should Be Strictly Construed*, 3 Nev. L.J. 495, 511–14 (2003) (describing repudiation of canon by *White*).[9]

In any case, "[c]lear evidence of legislative intent prevails over other principles of statutory construction."  *Neptune Mut. Ass'n, Ltd. v. United States*, 862 F.2d 1546, 1549

---

[9]    In *Nico v. Comm'r*, 565 F.2d 1234, 1238 n.5 (2d Cir. 1977), the Second Circuit cited the canon in a footnote that is plainly *dictum*, as the decision relied on a Treasury Regulation, rather than any principle of interpretation, to resolve the purported statutory ambiguity.  *Id.* at 1238.

(Fed. Cir. 1988).  For all those reasons, the dubious "canon" cited by the bankruptcy court should be rejected.

### 3.    IRS Revenue Rulings Contradict the Bankruptcy Court's Conclusion, and Deserve This Court's Deference

In three separate revenue rulings, the IRS has concluded that incoming-only telephone service is taxable under § 4252(a)(1).  That conclusion is entitled to this Court's deference.  As the bankruptcy court mischaracterized the reasoning in those revenue rulings and failed to defer to the IRS's expertise expressed in them, its orders should be reversed.

### a.    The IRS Has Ruled That Taxable Local Service Includes Incoming-Only Telephone Service

In Revenue Ruling 77-196, 1977-1 C.B. 343, the IRS specifically addressed the issue of "whether the fact that an ACD [automatic call distributing] system is capable of receiving only incoming calls makes a difference in determining the tax consequences for that system" under § 4251.  The IRS concluded:

> In defining taxable local telephone service, section 4252(a)(1) makes no distinction between systems that provide access to a local telephone network only by receiving calls and systems that both receive and originate calls.  See Rev. Rul. 75-102, 1975-1 C.B. 351, which holds amounts paid for time-of-day and weather-forecast telephone announcements are taxable.  In that case, access to a local telephone system, as described in section 4252(a)(1), is achieved through receiving incoming calls.  Accordingly, the fact that in the instant case the basic ACD switching equipment can only receive incoming calls from a local telephone system is not material to the tax determination.

*Id*. at 344.

In Revenue Ruling 75-102, 1975-1 C.B. 351, the telephone company offered a service whereby subscribing businesses could purchase a local telephone number that the general public could call to hear a time or weather announcement along with the subscriber's advertising message.  The telephone company billed the subscribing businesses monthly

based on the number of incoming calls, plus an additional charge for the taped message. The IRS concluded:

> The time-of-day and weather forecast services furnished by the telephone company in the instant case provide access to a local telephone system and the privilege of telephonic quality communication with all persons having telephones in the system.  Accordingly, such services constitute local telephone service within the meaning of section 4252(a)(1) of the Code.

Rev. Rul. 75-102, 1975-1 C.B. 351.

Fourteen years later, the IRS reached the same conclusion with respect to amounts paid to the telephone company by providers of recorded information for a call-in public announcement service.  Rev. Rul. 89-84, 1989-1 C.B. 296 (such payments "provide[] the [information providers] with local telephone service in the form of access to the local telephone system and the privilege of telephonic quality communication with all persons having telephones in the system").  Similarly, in Revenue Ruling 75-9, 1975-1 C.B. 348, the IRS concluded that incoming telephone lines furnished by the telephone company to a talk radio station provided access to the local telephone system and the privilege of telephonic quality communication so as to constitute local telephone service.

### b.    Revenue Rulings Are Entitled to Judicial Deference

Those longstanding, consistent, and reasoned conclusions are entitled to this Court's deference.  "In [the Second] Circuit, a Revenue Ruling is 'entitled to great deference' . . . and is presumed to have 'the force of legal precedent unless unreasonable or inconsistent with the provisions of the Internal Revenue Code.'"  *Weisbart v. U.S. Dep't of Treasury*, 222 F.3d 93, 98 (2d Cir. 2000) (quoting *Texasgulf, Inc. v. Comm'r*, 172 F.3d 209, 217 (2d Cir. 1999), and *Gillespie v. United States*, 23 F.3d 36, 39 (2d Cir. 1994)).  This is because

> ever since the inception of the tax code, Congress has seen fit to vest in those administering the tax laws very broad authority to interpret those laws.  In an area as complex as the tax system, the agency Congress vests with administrative responsibility must be able to exercise its authority to meet

> changing conditions and new problems. . . . [T]his Court has long recognized the primary authority of the IRS and its predecessors in construing the Internal Revenue Code.

*Bob Jones Univ. v. United States*, 461 U.S. 574, 596 (1983) (upholding IRS determination made by revenue ruling); *see United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 220 (2001) (reasonable revenue rulings "attract[] substantial judicial deference" where they reflect longstanding interpretation of tax regulations).

Indeed, revenue rulings should be accorded full deference under *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The Second Circuit has never decided whether revenue rulings deserve *Chevron* deference, as do Treasury Regulations. *See Atlantic Mut. Ins. Co. v. Comm'r*, 523 U.S. 382, 387–89 (1998). However, the Supreme Court has made it clear that, while notice-and-comment rulemaking and formal adjudication almost always assure *Chevron* deference, the absence of such formalities does not preclude such deference, so long as it appears that Congress intended to grant the agency the power to make rules with the "force of law" and "the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27, 230–31 (2001); *accord Barnhart v. Walton*, 535 U.S. 212, 221–222 (2002) (according *Chevron* deference to a "longstanding" agency interpretation reached through "means less formal than 'notice and comment' rulemaking").

Revenue rulings satisfy this standard. The IRS promulgates revenue rulings pursuant to its statutory authority to "prescribe all needful rules and regulations for the enforcement of" the Internal Revenue Code. 26 U.S.C. § 7805(a); Treas. Order 111-2, 1981-1 C.B. 698, 699. That general regulatory authority has been found sufficient to earn *Chevron* deference for other Treasury determinations made under its aegis. *Hosp. Corp. of*

*Am. & Subs. v. Comm'r*, 348 F.3d 136, 140-41, 144-45 (6th Cir. 2003).[10]  Moreover, revenue

rulings are formal interpretative rulings involving "substantive tax law."  26 C.F.R.

§ 601.601(d)(2)(v)(a).  They are issued by the IRS National Office and published in the

Internal Revenue Bulletin as the agency's "official" position to guide taxpayers and IRS

officials alike.  *Id.* § 601.601(d)(2)(i)(a).  Both rulings and regulations are written and

reviewed at the same levels of the IRS and the Treasury Department.  *Ammex, Inc. v.*

*United States*, 367 F.3d 530, 535 (6th Cir. 2004); Treas. Order 111-2.  Like regulations,

revenue rulings have legal force and effect, as they are "precedents to be used in the

disposition of other cases" that "may be cited and relied upon for that purpose."  26 C.F.R.

§ 601.601(d)(2)(v)(d).  And a taxpayer's disregard of applicable revenue rulings can result

in the imposition of penalties.  26 U.S.C. § 6662; 26 C.F.R. § 1.6662-3(b)(2).  Revenue

rulings consequently have the "force of law" within the meaning of *Mead*, 533 U.S. at 227,

and *Chevron* deference is therefore required.[11]

---

[10]    *See also Boeing Co. v. United States*, 537 U.S. 437, 448, 449 (2003) (concluding, without citing *Chevron* or *Mead*, that a Treasury regulation is entitled to deference even though "it was promulgated under § 7805(a)'s general rulemaking grant rather than pursuant to a specific grant of authority").

[11]    The Supreme Court has left open the question of the precise degree of deference accorded to revenue rulings.  *Cleveland Indians*, 523 U.S. at 220.  At least one federal court of appeals appears to have rejected *Chevron* deference for revenue rulings after *Mead*. *Kornman & Assocs., Inc. v. United States*, 527 F.3d 443, 452–55 (5th Cir. 2008)—although, since that court ultimately deferred to and upheld the revenue ruling, its conclusion that *Chevron* deference does not apply is dicta.  Others have expressly left open the possibility of applying *Chevron*, *e.g.*, *Texaco, Inc. v. United States*, 528 F.3d 703, 711 & n.8 (9th Cir. 2008);  *Am. Mut. Life Ins. Co. v. United States*, 267 F.3d 1344, 1352 n.3 (Fed. Cir. 2001); and others (like the Second Circuit) have never addressed the matter.

In declining to apply *Chevron* deference, *Kornman* misread several precedents.  The court stated that *Chevron* deference has been rejected in the Ninth Circuit, but the Ninth Circuit itself in *Texaco* plainly disagreed with that reading.  *Kornman* also found the D.C. Circuit rejected *Chevron* deference, but the case cited, *Del Comm'l Props. v. Comm'r*, 251 F.3d 210, 214 (D.C. Cir. 2001), predates *Mead* and is thus inapplicable; in any event, the decision there merely applied the lesser *Skidmore* deference to accept a revenue ruling's

(continued...)

If revenue rulings are not entitled to *Chevron* deference, they retain the "great deference" the Second Circuit accorded them under *Weisbart* and its predecessors—cases that did not rely on *Chevron* and are thus unaffected by *Mead*'s specification of when *Chevron* deference is applicable.  *See Kornman & Assocs., Inc. v. United States*, 527 F.3d 443, 452–55 (5th Cir. 2008) (declining *Chevron* deference, but "continu[ing] to apply" that circuit's previous highly deferential standard).  Continuing "great deference" to revenue rulings accords with *Mead*, which directed courts to give deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), to agency determinations when *Chevron* deference is not appropriate.  Under that standard, "[t]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position."  *Mead*, 533 U.S. at 228 (footnotes omitted); *accord Aeroquip-Vickers, Inc. v. Comm'r*, 347 F.3d 173, 181 (6th Cir. 2003) (granting "substantial judicial deference" under *Mead*/*Skidmore* to longstanding revenue ruling).  Given the presence of these indicia in the case of revenue rulings, "great deference" is warranted under *Mead* and *Skidmore*, and should remain the law in this Court.

---

[11]  (...continued)
conclusion without explicitly rejecting *Chevron*.  Finally, *Kornman* cited *Aeroquip-Vickers, Inc. v. Comm'r*, 347 F.3d. 173, 181 (6th Cir. 2003), as rejecting *Chevron* deference for revenue rulings; however, a later decision of the Sixth Circuit makes clear that that holding only applied to "the revenue ruling at issue," and the broader question of whether revenue rulings generally can receive *Chevron* deference remained open.  *Ammex*, 367 F.3d at 535 & n.3.

### c.    The Rulings at Issue Here Should Be Followed

Whatever level of deference applies, Revenue Rulings 77-196, 75-102, 75-9, and 89-84 should be followed in their holdings that incoming-only telephone service is taxable. The bankruptcy court found Revenue Rulings 75-102 and 89-84 to be "conclusory"; but the rulings, while brief on this subject, apply the language of the statute to the situation at hand, and thus provide all the analysis that is needed.  And, as the bankruptcy court acknowledged, Revenue Ruling 77-196 "does provide a fuller discussion of the IRS's interpretation of section 4252(a)," finding that the statute "'makes no distinction between systems that provide access to a local telephone network only by receiving calls and systems that receive and originate calls.'" 371 B.R. at 32 (quoting Rev. Rul. 77-196).  But the bankruptcy court unfairly criticized that ruling for citing only to the prior ruling, 75-102, and thus for "only support[ing] a conclusory statement by reference to another conclusory statement." *Id.*  That ignores the "fair measure" of *Skidmore/Mead* deference, which depends on "degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." *Mead*, 533 U.S. at 228. Revenue Ruling 77-196 was "'consisten[t] with earlier and later pronouncements'"; its parsing of the statutory language and finding of "no distinction" between incoming-only and other forms of telephone service evidenced the "'thoroughness evident in its consideration [and] the validity of its reasoning.'" *Id.* (quoting *Skidmore*, 323 U.S. at 140). And the longstanding nature of the IRS's conclusions itself warrants "substantial judicial deference." *Cleveland Indians*, 532 U.S. at 220.  With those factors considered, the

consistent holdings of the IRS over several decades deserve deference, and require reversal of the bankruptcy court.[12]

## D.    Debtors Have Failed to Establish That the IRS's Tax Claims Are Invalid

The bankruptcy court declined to reach other factual issues presented at the evidentiary hearing.  The facts in this case are largely undisputed, however, and the Court may resolve the issues presented here as a matter of law.[13]  As demonstrated here, the evidence shows that the COBRA service purchased by debtors was taxable—and that the facts here are indistinguishable from those in *USA Choice* and *Comcation*.

Debtors primarily argued to the bankruptcy court that COBRA service did not provide "the privilege of telephonic quality communication" because it was used for data, not voice, communication.  But the courts have consistently held that the applicability of the excise tax is determined based on the capability of the service at issue, not on how it is actually used.  Debtors' own expert testified that the COBRA system provided the capability of two-way telephonic quality communication—indeed, that telephonic quality capability was necessary for modems to function.  Additionally, the evidence before the bankruptcy court showed that COBRA could carry computerized voice packets, further demonstrating that it was a voice-capable, telephonic quality system.  Debtors also argued below that a modem-to-modem communication service is not taxable because actual telephones are not used, a conclusion already rejected by the IRS and the courts.  Finally,

---

[12]    Even if the bankruptcy court were correct that the ability to originate calls is legally relevant, it failed to address the fact that the COBRA service here could easily be reconfigured to permit debtors to make calls.  *See infra* Point D.4.

[13]    The government moved at the close of debtors' evidence for judgment as a matter of law.  The bankruptcy court agreed "it really is a legal issue for the most part" and there were not "a lot of factual differences," but deferred ruling on the motion.  R S1120–22 (Tr. at 136–43).

debtors argued (for the first time at trial) that COBRA service was exempt from taxation as a "private communication service," again a conclusion inconsistent with judicial holdings.  As all of those arguments should be rejected, debtors have failed to carry their burden of demonstrating that the excise tax does not apply.

**1.    COBRA Service Provided "Access to a Local Telephone System" and the "Privilege of Telephonic Quality Communication"**

COBRA services are subject to the excise tax because they provided debtors with "access to a local telephone system, and the privilege of telephonic quality communication"—or, at a minimum, they were services "provided in connection with" a local telephone system.  26 U.S.C. § 4252(a)(1), (2).  Debtors argued that the "telephonic quality" requirement has not been satisfied, but they have failed to carry their burden of establishing that.

The term "access" means "the interface or connection between" the service provided and the transmission lines.  *Trans-Lux*, 696 F.2d at 965 (interpreting the term "access" as used in 26 U.S.C. § 4252(c) governing teletypewriters).  And, as used in § 4252, "the word privilege connotes right," rather than any particular use of telecommunications services. *Comdata Network, Inc. v. United States*, 21 Cl. Ct. 128, 130–31 (1990); *accord USA Choice*, 552 F.3d at 1341 ("It is undisputed that 'privilege' implicates either a 'right' or 'legal freedom' rather than actual use."); *Comcation*, 78 Fed. Cl. at 64–65.  Thus, a party's actual use of telecommunications technology is irrelevant to the applicability of the excise tax; instead, "the tax is applicable because the service provided . . . grants it the *right* to utilize the telephone lines to communicate . . . .  That the service may not, in fact, be so used . . . is

irrelevant to the existence of the privilege." *Comdata*, 21 Cl. Ct. at 131 (emphasis added); *accord USA Choice*, 552 F.3d at 1341; *Comcation*, 78 Fed. Cl. at 64–65.[14]

It is undisputed that COBRA service provided debtors with that privilege. Debtors' own expert testified that a modem call from a dial-up user to the COBRA modems traveled on a telephonic quality path the entire way, including throughout the COBRA system. R S1116–17 (Tr. 118, 121, Anderson). The fact that the COBRA PRI responded to modem communications rather than voice calls in the COBRA system's configuration is irrelevant for excise tax purposes, because, as conceded by debtors, a PRI was capable of telephonic quality communication. R S1115 (Tr. 115, Anderson). Under *Comdata*, the PRI's telephonic-quality capability renders the COBRA system taxable, even if COBRA was configured to respond only to modems, because debtors possessed the "privilege" (even if it was an unused privilege) of telephonic quality communication. 21 Cl. Ct. at 130–31.

In *Comdata*, the Claims Court considered a telephonic money transfer system, in which a company provided money to its customers upon a request made through the system. *Id.* at 129. As security measures, the company put in place a number of restrictions on the use of the telephonic system. *Id.* at 130. The company then argued that the configuration of the system made it "closed," and therefore the company was no longer subject to the excise tax. *Id.* The Claims Court rejected that argument, holding that the configuration was irrelevant for tax purposes as long as the system had the "potential" or "capability" for wider use. *Id.* at 130–31. The configuration that the subscriber chose to

---

[14]   The legislative history of the excise tax supports this analysis; it states that "in the case of local telephone service, the definition makes it clear that it is the right of access to a local telephone system and the privilege of telephonic quality communication which is taxed together with facilities or services provided with this service." S. Rep. 89-324, P.L. 89-44, 1965 WL 4428 (June 14, 1965).

impose was, therefore, irrelevant, because "[t]he opportunity for broad area access is there if [the subscriber] chooses to use it." *Id.* at 131.

Debtors have not contested that holding. Instead, they contended that the COBRA system was only "a data service," because debtors received a high-speed data stream at the egress of the COBRA system. R S1122 (Tr. 141, argument). But what debtors received from the COBRA services is irrelevant. It may be that the information contained in a dial-up user's calls left the COBRA system as an Internet-protocol data stream, but within the COBRA services purchased by debtors all communications traveled on a telephonic quality path. In other words, within COBRA, "the data [was] transmitted through the telephonic quality voice channel." R S1124 (Tr. 152, Hills). Indeed, debtors acknowledged that, in debtors' expert's own words, dial-up Internet access "*requires* a telephonic quality grade telephone line." R S1114 (Tr. 111, Anderson); *accord* R S1123 (Tr. 150, Hills: "Modems will not operate without a telephonic quality channel."). Overall, debtors admit that the COBRA service accepted telephone quality transmissions from modems that used the PSTN, and that the modem calls traveled within COBRA on telephonic quality paths. R S1116–17 (Tr. 118, 121, Anderson); *see* R S1124 (Tr. 151–52, Hills). Indeed, debtors' expert has agreed that telephonic quality communication was required for COBRA: he agreed that "[a]ll access to modems or DSPs *requires two-way voice grade telephonic quality communication*. The COBRA services purchased by [debtors] provide access between dial-up user[s'] modems and the modems and/or DSPs within the COBRA system, and, thus, *require* two-way voice capable telephonic quality communications." R S1113–14 (Tr. 108–11, Anderson; emphasis added).[15]

_____

[15] Debtors' expert, Anderson, agreed with this quotation at deposition, R S1114 (Tr. 110–11); *see* R S1036 (Anderson Dep., agreeing with R S38 (Hills Decl. ¶ 8)), but attempted

(continued...)

Thus, debtors' own testimony proves that COBRA was a voice-capable—and therefore telephonic quality—system.  COBRA accepted incoming voice quality communications from the dial-up user's modem, and sent outgoing voice quality communications back to the dial-up user's modem.  That, in itself, establishes that the COBRA system is taxable.

Moreover, debtors have conceded that PRI circuits included in the COBRA services could have been plugged into a "private branch exchange," or PBX—a system that is used for traditional voice telephone service.  R S1115 (Tr. 116, Anderson); *see* R S1128 (Tr. 166–67, Hills (defining PBX)), S1136 (Tr. 199, Hills).[16]  Thus, the PRI line was necessarily capable of carrying voice—i.e., telephonic quality—communication.  Additionally, the contracts between debtors and the COBRA vendors specifically acknowledged that the

---

[15]  (...continued)
to distance himself from that concession at trial, R S1119 (Tr. 129–31).  His deposition statement, however, was admissible for its truth at the evidentiary hearing, both as a prior inconsistent witness statement and as an admission by a party-opponent (as Anderson was an employee of the debtors).  Fed. R. Evid. 801(d).

In any event, Anderson never denied that the telephone line had to be capable of telephonic quality communication, but instead drew a distinction between the capability of the line and the actual use: as he put it,

> you *need* a telephonic quality *capable* line in order to put modem tones on there. . . . In this case, you have a telephonic quality communication capable line, both from the customer to the switch and from the switch to the modems.  But . . . I won't agree that it is telephonic quality communications.  It is a telephonic quality path, but not communications.

R S1119 (Tr. 130–31, Anderson; emphasis added).  As explained above, that distinction is irrelevant because a system's capacity for telephonic quality communication, rather than its actual use, governs the excise tax analysis.

[16]  A PBX, which Dr. Hills defined as a telephone switch on a company's premise, is the familiar intra-office telephone system that allows employees to speak to one another by telephone (typically by dialing a three- or four-digit extension) without the call being transmitted over the public telephone network.  *See* R S1128 (Tr. 166, Hills).

COBRA services were capable of, and may later be used for, voice telephony services. R S25–34; *see infra* Point D.2.

It is also undisputed that COBRA service was "full duplex," i.e., two-way communication, in which information is conveyed from the dial-up user to debtors' server and vice versa.  R S1116 (Tr. 118–19, Anderson).  Indeed, two-way telephonic quality communications were the essence of the COBRA system, without which it could not link a dial-up user to the Internet.  *Id.*; R S1126, S1133 (Tr. 158–59, 185, Hills).  Debtors have conceded that COBRA provided two-way communication.  R S1116 (Tr. 118–19, Anderson).

Because it is capable of carrying two-way voice communication, the COBRA system therefore included the "privilege of telephonic quality communication."  26 U.S.C. § 4252(a)(1).  The fact that the COBRA service may have been configured to use its voice-capable paths for data was a matter of choice, not capability—just as in *Comdata*. Thus, debtors have failed to demonstrate that COBRA service was not taxable.

### 2.    COBRA Service Was Able to Support Computer-to-Computer VoIP, Demonstrating Its Capacity for "Telephonic Quality Communication"

The COBRA system was capable of Voice Over Internet Protocol ("VoIP") telephony by the transmission of VoIP packets.  This fact provides an independent basis for concluding that the COBRA services purchased by debtors provided telephonic quality communication.

As both parties' expert witnesses testified, the COBRA system, as configured, could accept and transmit a computer-to-computer VoIP packet from the dial-up user to the Internet.  R S1117 (Tr. 121–22, Anderson), S1126–27, 1129–30 (Tr. 160–61, 170–73, Hills). Debtors' expert witness conceded that debtors cannot rule out the possibility that the COBRA system did, in fact, transmit computer-to-computer VoIP packets from the dial-up user to the Internet.  R S1117 (Tr. 121–22).  And he acknowledged that the COBRA

services could not distinguish between a computer-to-computer VoIP packet and any other packet coming out of a dial-up user's computer.  *Id.*  Debtors' expert thus confirmed the opinion of the government's expert witness, Dr. Hills, who explained that there were at least two types of VoIP telephony, including one in which a user sent a traditional voice call into a VoIP gateway, which converted it to VoIP Internet packets, and another (called computer-to-computer VoIP) in which the VoIP conversion from voice to packets was done on the user's own computer, which generated packets which were then indistinguishable from any other packet—voice or non-voice—going over the Internet. R S1129 (Tr. 169–70, Hills).  The two experts agreed that COBRA could transmit computer-to-computer VoIP. R S1117 (Tr. 121–23, Anderson), S1126–27, 1129–30 (Tr. 160–61, 170–73, Hills).[17]  A dial-up user, using a system such as the commercial service Skype, could place a VoIP call, convert the voice signals into packets on the dial-up user's computer, transmit those packets via modem to the COBRA system, and send those packets onto the Internet. R S1117 (Tr. 121–22, Anderson), S1126–27, 1129–30 (Tr. 161, 170–73, Hills).  That packet would therefore carry a voice transmission from the dial-up user's home to the Internet via the COBRA services purchased by debtors.  *Id.*

Debtors' contracts with COBRA vendors included language that specifically contemplated that debtors may wish to use the COBRA service for VoIP.  R S25–34

---

[17]   Debtors' expert testified that the voice transmission by VoIP would be garbled because voice requires a transmission speed of 64 kilobytes per second, while (after taking into account a variety of factors that slow down data transmission) a dial-up user's modem will transmit at about 18 kilobytes per second.  R S1107–08 (Tr. 83–86, Anderson). However, the government's expert testified, without contradiction, that certain types of VoIP required only 14, or even 3, kilobytes per second, R S1126–27 (Tr. 160–61, Hills)— meaning that VoIP was possible even under debtors' expert's assessment of modem speeds.

(government's argument, quoting contracts);[18] S1130 (Tr. 173–74, Hills (quoting contracts at S1800 (Ex. 29), S1874 (Ex. 31))); *see also* R S1669–75 (Exs. 13, 15 (hardware description referring to VoIP capabilities)).  In their briefs to the bankruptcy court, debtors tried to distance themselves from this contractual language, claiming that COBRA cannot support VoIP communications.  R S952–53.  As demonstrated above and conceded by their own expert, that argument is wrong.  Further, debtors failed to explain why they would enter a contract that specifically considered the terms under which COBRA can be used for VoIP, and the consequences to the parties if COBRA was used for VoIP, if COBRA were actually incapable of VoIP.

The COBRA services purchased by debtors were capable of VoIP telephony and thus the privilege of telephonic quality communications, and were therefore subject to the excise tax.

### 3.    Modem-to-Modem Calls Are Taxable

In a 1979 revenue ruling, the IRS held that the excise tax applies to a service using the local telephone system to connect modems to one another—in other words, exactly what the COBRA service did.  Revenue Ruling 79-245, 1979-2 C.B. 380.  Thus, the presence or absence of an actual telephone is irrelevant to the excise tax analysis.

Debtors argued to the bankruptcy court that § 4252 requires the presence of "actual telephones," that the tax cannot apply to any technology "other than plain old telephone service," and that "the exchange of data between computer modems" is not taxable.

---

[18]    Because the confidentiality of contracts between the vendors and debtors was the reason debtors sought a protective order from the bankruptcy court requiring many documents to be filed under seal, *see* R 14, 35, the government has refrained from quoting or fully discussing those contracts in this publicly filed brief.  The pages cited immediately before this footnote refer to the government's papers filed with the bankruptcy court under seal, which in turn quote the contracts, provide specific citations, and discuss more fully the technical aspects addressed in those contracts.

R S1095 (Tr. 33); S948–50.  That proposition is completely unsupported by the law, and debtors cannot cite anything in its support.

Contrary to debtors' assertion, the IRS has long held that the excise tax applies to systems that do not use traditional telephones.  The IRS ruled in 1979 that the excise tax for local telephone service was owed on a system that relied on modem-to-modem communication.  Rev. Rul. 79-245.  In that system, a company paid monthly charges for local telephone service, "but, instead of having standard telephones connected to the telephone lines the business establishment has its computer unit and terminals connected to the telephone lines."  *Id.*  As the system was configured,

> The modems convert the computer signals into signals that can be transmitted over telephone lines.  While these telephone signals are the same type used to transmit voice, the modems are designed only for nonvoice transmission and produce a signal which is usable only for transmission to other computer stations.

*Id.*  This modem-to-modem system was taxable, the IRS concluded, regardless of the absence of an actual telephone, because the company "has access to the local telephone exchange system through the lines used with the computer system."  *Id.*  In other words, the IRS held that the excise tax applies even when the local telephone service is being used by computer modems, not human callers.  *Id.*  The IRS determined that the excise tax was owed because "[w]here a telephone service provides the subscriber the privilege of telephonic quality communication with substantially all other subscribers to the local telephone system, it is immaterial whether the subscriber exercises the privilege."  *Id.*  The company "is a subscriber to local telephone service, even though the privilege of telephonic quality communication may not be exercised."  *Id.*

The courts have agreed.  In *Comdata*, the court considered an automated communication system in which electronic fund request messages were transmitted by

computers over telephone lines. 21 Cl. Ct. at 129. No telephones were used, yet the service was taxable. *Id.* at 130–31. Similarly—and particularly relevant to this case—the courts in *USA Choice* and *Comcation* considered services that were essentially identical to those at issue here, involving modem-to-modem Internet dial-up service, in which the customer calls through the local loop to the local telephone company's switches on the PSTN; the call is then routed to the ISP through a PRI line that can carry 23 simultaneous communications. *USA Choice*, 522 F.3d at 1334–35; *Comcation*, 78 Fed. Cl. at 62–63. Just as was the case with debtors' COBRA service, neither party to the telephone calls in those two cases used an actual telephone—yet both courts found the service connecting the ISP to the local switch to be taxable.

Moreover, debtors do not explain why a traditional telephone is a necessary feature of a service taxable under § 4252(a)(2), which expressly includes in the definition of local telephone service "any facility or service provided in connection with" a local telephone system. Nothing in the language of § 4252(a)(2) mandates the presence of a traditional telephone (rather than a modem or a fax machine) in the facility or service provided in connection with the taxable service.

The only authority debtors have pointed to in support of their arguments is Revenue Ruling 74-617, 1974-2 C.B. 365. But in that ruling, the IRS considered paging services in which a subscriber received a message through a radio-signal broadcast; the radio receiver could only receive signals from the pager company, and could not send a message back. The IRS held that this purely one-way system did not satisfy the statutory definition of local service. Rev. Rul. 74-617. Debtors have attempted to characterize this ruling as holding that there must be "the right to plug into a telephone jack or communicate with other persons having telephones," R 138—but the revenue ruling rests on the one-way

nature of the pager service, and never mentions "jacks" or any requirement for a particular type of equipment.

Thus, debtors are incorrect when they argue that a traditional telephone is a prerequisite for excise tax liability. Communications between computer modems over the local telephone system are taxable as local telephone service.

### 4.    COBRA Service Could Have Been Configured to Originate Telephone Calls

As described above, the law is clear that the ability to initiate telephone calls is irrelevant to whether the telephone service is taxable. *Supra* Point C. But even if that ability were pertinent, in this case debtors' own evidence showed that the COBRA service could easily have been reconfigured to permit outgoing calls—and therefore the service was taxable.

Such a reconfiguration to the COBRA system could have been accomplished by debtors and the LEC. Debtors' expert testified at trial that the only barriers to replacing the DSP cards within the COBRA system that could not originate calls with DSP cards that could—thus enabling the system to place outgoing calls—were contractual and the business and economic judgment concerns of debtors and of the LEC. R S1116–17 (Tr. 120–21, Anderson).[19]

Thus, a change in COBRA's configuration would have permitted call initiation by COBRA and still preserved all the COBRA functions purchased by debtors—the DSP cards

---

[19]    Anderson testified to this unambiguously on cross examination. R S1116–17 (Tr. 120–21, Anderson). However, he then qualified it on redirect examination by debtors' attorney. R S1119–20 (Tr. 131–34, Anderson). At that time, Anderson testified that some other reconfiguration would have been necessary to fully enable COBRA to make outgoing calls, but did not deny that such an capacity could have been achieved. Anderson also implied that DSP cards capable of making outgoing calls were not available for part of the time debtors purchased COBRA service, but provided no support for that conclusion.

that permitted call initiation also permitted dial-up users to call into COBRA and provided debtors with a high speed data stream from COBRA.  R S1130–31 (Tr. 175–77, Hills); S1669–78 (Exs. 13, 14, 15).  The system could then originate telephonic quality calls.  The only barriers to such a change are the business choices of the contracting parties.  Thus, despite debtors' claims to the contrary, any limits on call origination by COBRA were self-imposed, not technological.  Such self-imposed limitations are the type of restrictions that were at issue in *Comdata*, in which the system had the "potential" to be used in an indisputably taxable manner, but had been configured—at the subscriber's choice—to restrict its use.  21 Cl. Ct. at 130.  And just as the *Comdata* plaintiffs unsuccessfully argued, debtors maintain that the IRS should look to "actual use," not "the capability of the service provided."  *Id.*  The response of the *Comdata* court, however, was unequivocal: "We cannot accept this argument."  *Id.*

In short, it is the capability of the COBRA service that triggers its taxability, not its actual use or configurations imposed by the subscriber that limit its functions.  Although the ability to originate calls is not relevant to the excise tax, the COBRA service at issue here is capable of doing so if configured differently.

### 5.    COBRA Service Is Not a "Private Communication Service" Exempt from the Excise Tax

Debtors have argued that COBRA service falls within the exemption from taxation in 26 U.S.C. § 4252(d), for "private communication service."  That argument was waived in the bankruptcy court, but in any event runs counter to the case law and the statute.

As a threshold matter, debtors argued that COBRA is a private communication service for the first time at the trial in this matter, on February 1, 2006; they did not raise this argument in their initial objection, dated August 5, 2004, or in their Response to the Reply of the United States, dated December 16, 2005.  R 2, S941.  Debtors failed to raise

this argument until the trial was underway and they had reviewed the government's submissions.  The argument therefore should not be considered.  *See Carmody v. ProNav Ship Mgmt., Inc.*, 224 F.R.D. 111, 131 (S.D.N.Y. 2004) (court need not consider argument raised for the first time in reply brief).

In any event, COBRA was not a private communication service—as the *USA Choice* and *Comcation* courts have already ruled with respect to indistinguishable services.[20] Congress enacted the private communication services exclusion to allow the Bell monopoly to compete for the business of providing intra-premise communication systems (i.e., intercom or private-line services), which were not taxed when provided by other companies. *Trans-Lux*, 696 F.2d at 967; *Western Elec. Co. v. United States*, 564 F.2d 53, 57 (Ct. Cl. 1977); H.R. Rep. No. 89-433, P.L. 89-44, 89th Cong., 1st Sess., 1965 WL 4427 (May 28, 1965).  The exclusion for private communications services applies only to such private lines and intercom systems, including, for example, telephone systems located within a single plant facility.  *Western Electric*, 564 F.2d at 55.  The systems covered by the exemption are those "'solely for the use of a single subscriber.'"  *Comcation*, 78 Fed. Cl. at 74 (quoting legislative history).

----

[20]  The statute defines "private communication service" as

(1)     the communication service furnished to a subscriber which entitles the subscriber—
    (A)  to exclusive or priority use of any communication channel or groups of channels, or
    (B)  to the use of an intercommunication system for the subscriber's stations,
regardless of whether such channel, groups of channels, or intercommunication system may be connected through switching with a service described in subsection (a), (b), or (c) [i.e., taxable local, toll, or teletypewriter service] . . . .

26 U.S.C. § 4252(d).  Debtors conceded in the bankruptcy court that paragraphs (2) and (3) of this subsection do not apply.  R 143 n.58.

Thus, the private communications exclusion means that, in systems that include both private services and access to the public local telephone services, the IRS will tax some components and not others. Revenue Ruling 78-437, 1978-2 C.B. 266. In that revenue ruling, the IRS considered the taxability of a communication system that included an intraoffice intercom service and access to the local telephone service, with separate charges for the various services. Rev. Rul. 78-437. The IRS ruled that excise tax applied to charges for "lines that give access to the local telephone service" that are not "necessary or unique to the private communication service." *Id.* By contrast, the excise tax did not apply to charges for lines that are "necessary to the use of the private communication service." *Id.*

As the *USA Choice* court put it, "[t]he most significant shortcoming in [debtors' argument] is that it fail[s] to recognize that [debtors'] lines did not serve to provide a distinct '*communication service* . . . regardless of whether [that service] may be connected through switching with a [local telephone service].'" 522 F.3d at 1344 (last two alterations in original). To be exempt from tax, the service at issue must do more than simply connect the subscriber to the local system (that would be "local telephone service" as defined in § 4252(a)); it must include a separate communication service:

> the system at issue [must] provide a "communication service" beyond that of mere local telephone service, not just connectivity to the local telephone system *itself*. Dedicated lines that, alone or in combination with other privately owned or publicly shared equipment, do no more than furnish a subscriber with the ability to obtain local telephone service do not constitute the statutorily defined "private communication service" entitled to the exemption of § 4252(d)(1). As contrasted with typical private lines, PBX systems, Centrex systems, and answering service switchboard systems in existence at the time this statutory provision was enacted, all of which could be characterized as having communication channels that facilitated communications services beyond mere local telephone service, the lines at issue in this case served *only* to provide connectivity to the LEC and not to facilitate or provide any "communication service" that can be fairly characterized as "private."

*Id.*; *accord Comcation*, 78 Fed. Cl. at 73–75 (analyzing legislative history and rejecting claim that service is "private communication service").

Just like the systems in *USA Choice* and *Comcation*, the system here—indistinguishable for this purpose—provided no separate communication service, and therefore was not an exempt "private communication service." COBRA was not a set of private communication channels, nor an intra-premise intercom service. All COBRA did was provide a connection between debtors' modems and the local telephone system, which was accessible by dial-up users. The COBRA "platform had dial-up users coming into it"; anyone with a telephone or a fax machine could call the COBRA modems (although they would have heard only screeching tones), and anyone with a modem could connect to the COBRA modems. R S1109, S1112 (Tr. 91, 101-03, Anderson), S1123, S1128–29 (Tr. 146, 168-69, Hills). That was the point of the COBRA service: to connect subscribers (members of the public) to debtors' Internet service through the local telephone system—not to provide a private, internal communication system, "solely for the use of a single subscriber." *Comcation*, 78 Fed. Cl. at 74 (internal quotation marks omitted).

Moreover, even if COBRA provided a "communication service," these facts establish that debtors were not entitled to "exclusive or priority" of those lines. As *USA Choice* held, the fact that "anyone else on the PSTN was free to dial [debtors'] access numbers and necessarily made use of [debtors'] dedicated lines" means that the service was non-exclusive, non-priority—and thus non-private and non-tax-exempt. 522 F.3d at 1346. Indeed, were debtors' arguments to prevail, "*any* business telephone line could be considered a private communication service if the subscriber chooses to use it exclusively to communicate with its customers." *Id.* Telephone lines that "provided access to [an ISP's] network servers from *any* telephone number, and which . . . permitted at least limited

communication with *any* subscriber" do not meet the statutory definition of a "private communication service." *Id.*

Further, and fatally for debtors' claim, a private communication service "does not include any communication service unless a separate charge is made for such service." 26 U.S.C. § 4252(d); *Trans-Lux*, 696 F.2d at 967; *Western Electric*, 564 F.2d at 56, 58. There was no separate charge for a private communication channel or service here. It is undisputed that debtors paid for COBRA on a monthly, per port basis. R S1117 (Tr. 124, Anderson); S1715–48 (Ex. 27); S1783–815 (Ex. 29). According to debtors' expert, the monthly, per port charge that debtors paid for COBRA services included the entire COBRA service and all of its components—including the PRI that connects the LEC voice switch to the COBRA modems, that the parties agree was accessible to modem calls from any dial-up user and capable of telephonic quality communication. R S1118 (Tr. 126–27, Anderson); *see* R S1726 (Ex. 27 (contract defining COBRA service)), R S1799 (Ex. 29 at 35 (same)).

Accordingly, debtors' COBRA service did not meet the definition of a "private communication system," and was therefore taxable.

## Conclusion

The bankruptcy court's reasoning based on the statute's language has been overturned by later decisions, including one by the Federal Circuit. And the record overall supports the applicability of the excise tax. The orders of the bankruptcy court, therefore, must be reversed.

Dated:      New York, New York        Respectfully submitted,
            July 18, 2008

                                          MICHAEL J. GARCIA
                                          United States Attorney for the
                                          Southern District of New York
                                          Attorney for Appellant

                By:     <u>/s/ Benjamin H. Torrance</u>
                                          BENJAMIN H. TORRANCE
                                        Assistant United States Attorney
                                          Telephone: 212.637.2703
                                          Fax: 212.637.2702
                                          E-mail: benjamin.torrance@usdoj.gov

**ADDENDUM**

**Internal Revenue Code (26 U.S.C.):**

**§ 4251. Imposition of tax**

    **(a) Tax imposed.**—

        **(1) In general.**—There is hereby imposed on amounts paid for communications services a tax equal to the applicable percentage of amounts so paid.

        **(2) Payment of tax.**—The tax imposed by this section shall be paid by the person paying for such services.

    **(b) Definitions.**—For purposes of subsection (a)—

        **(1) Communications services.**—The term "communications services" means—

            (A) local telephone service;

            (B) toll telephone service; and

            (C) teletypewriter exchange service.

        **(2) Applicable percentage.**—The term "applicable percentage" means 3 percent.

    **(c) Special rule.**—For purposes of subsections (a) and (b), in the case of communications services rendered before November 1 of a calendar year for which a bill has not been rendered before the close of such year, a bill shall be treated as having been first rendered on December 31 of such year.

    **(d) Treatment of prepaid telephone cards.**—

        **(1) In general**.—For purposes of this subchapter, in the case of communications services acquired by means of a prepaid telephone card—

            (A) the face amount of such card shall be treated as the amount paid for such communications services, and

            (B) that amount shall be treated as paid when the card is transferred by any telecommunications carrier to any person who is not such a carrier.

        **(2) Determination of face amount in absence of specified dollar amount**.—In the case of any prepaid telephone card which entitles the user other than to a specified dollar amount of use, the face amount shall be determined under regulations prescribed by the Secretary.

        **(3) Prepaid telephone card.**—For purposes of this subsection, the term "prepaid telephone card" means any card or any other similar arrangement which permits its holder to obtain communications services and pay for such services in advance.

**§ 4252. Definitions**

    **(a) Local telephone service.**—For purposes of this subchapter, the term "local telephone service" means—

        (1) the access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and

(2) any facility or service provided in connection with a service described in paragraph (1).

The term "local telephone service" does not include any service which is a "toll telephone service" or a "private communication service" as defined in subsections (b) and (d).

**(b) Toll telephone service.**—For purposes of this subchapter, the term "toll telephone service" means—

(1) a telephonic quality communication for which (A) there is a toll charge which varies in amount with the distance and elapsed transmission time of each individual communication and (B) the charge is paid within the United States, and

(2) a service which entitles the subscriber, upon payment of a periodic charge (determined as a flat amount or upon the basis of total elapsed transmission time), to the privilege of an unlimited number of telephonic communications to or from all or a substantial portion of the persons having telephone or radio telephone stations in a     specified area which is outside the local telephone system area in which the station provided with this service is located.

**(c) Teletypewriter exchange service.**—For purposes of this subchapter, the term "teletypewriter exchange service" means the access from a teletypewriter or other data station to the teletypewriter exchange system of which such station is a part, and the privilege of intercommunication by such station with substantially all persons having teletypewriter or other data stations constituting a part of the same teletypewriter exchange system, to which the subscriber is entitled upon payment of a charge or charges (whether such charge or charges are determined as a flat periodic amount, on the basis of distance and elapsed transmission time, or in some other manner).  The term "teletypewriter exchange service" does not include any service which is "local telephone service" as defined in subsection (a).

**(d) Private communication service.**—For purposes of this subchapter, the term "private communication service" means—

(1) the communication service furnished to a subscriber which entitles the subscriber—

(A) to exclusive or priority use of any communication channel or groups of channels, or

(B) to the use of an intercommunication system for the subscriber's stations,

regardless of whether such channel, groups of channels, or intercommunication system may be connected through switching with a service described in subsection (a), (b), or (c),

(2) switching capacity, extension lines and stations, or other associated services which are provided in connection with, and are necessary or unique to the use of, channels or systems described in paragraph (1), and

(3) the channel mileage which connects a telephone station located outside a local telephone system area with a central office in such local telephone system, except that such term does not include any communication service unless a separate charge is made for such service.