# Request for Payment of Internal Revenue Taxes

## (Bankruptcy Code Cases—Administrative Expenses)

Department of the Treasury/Internal Revenue Service

United States Bankruptcy Court for the ___SOUTHERN___
District of ___NEW YORK STATE___

**In the Matter of:**  UUNET TECHNOLOGIES, INC.
500 CLINTON CENTER DRIVE
CLINTON, MS  39056

Fiduciary:



| | |
|---|---|
| Case Number | 02-42302-AJG |
| Type of Bankruptcy Case | CHAPTER 11 |
| Date of Petition | 07/21/2002 |

Filed: USBC - Southern District of New York
Worldcom, Inc., Et Al.
02-13533 (AJG)                0000038365

---

Amendment No. 1 to Request for Payment dated 02/25/2004

1. The undersigned, whose business address is ___IRS Insolvency Group 4 290 Broadway, Stop 5TH FLR, New York, NY 10007___ is the agent of the Department of the Treasury, Internal Revenue Service, and is authorized to make this request for payment on behalf of the United States.

2. Request is made for payment of taxes and any interest or penalty due under the internal revenue laws of the United States as shown below.

3. The ground of liability is taxes due under the internal revenue laws of the United States.

### Administrative Claims

| Taxpayer ID Number | Kind of Tax | Tax Period | Tax Due | Interest Due | Penalty Due | Balance Due |
|---|---|---|---|---|---|---|
| 54-1543611 | 5 EXCISE | 12/31/2002 | $3,997,592.00 | $275,259.66 | $0.00 | $4,272,851.66 |
| 54-1543611 | 5 EXCISE | 03/31/2003 | $3,737,766.00 | $208,960.20 | $0.00 | $3,946,726.20 |
| 54-1543611 | 5 EXCISE | 06/30/2003 | $1,726,848.00 | $73,705.70 | $0.00 | $1,800,553.70 |
| 54-1543611 | 5 EXCISE | 09/30/2003 | $1,395,081.00 | $42,549.48 | $0.00 | $1,437,630.48 |
| 54-1543611 | 5 EXCISE | 12/31/2003 | $1,476,730.00 | $29,788.86 | $0.00 | $1,506,518.86 |
| 54-1543611 | 5 EXCISE | 03/31/2004 | $2,466,803.00 | $23,088.91 | $0.00 | $2,489,891.91 |
| 54-1543611 | 5 EXCISE | 04/01/2004-04/20/2004 | $822,268.00 | $0.00 | $0.00 | $822,268.00 |
| | | | $15,623,088.00 | $653,352.81 | $0.00 | $16,276,440.81 |

**Total Amount Due:**   $16,276,440.81



RECEIVED
JUL 2 2004
U.S. BANKRUPTCY COURT
S. DIST. OF NEW YORK

---

*5  UNASSESSED TAX CLAIMS HAVE BEEN FILED DUE TO PROPOSED ADDITIONAL ASSESSMENT DUE TO AN EXAMINATION OF THE TAX RETURN FOR THE PERIOD UNASSESSED.*

The amount due includes interest and penalty computed to 07/09/2004. Compound interest will accrue at the rate established under IRC Section 6621(a) and late payment penalty will be charged under IRC Section 6651. If the claim is paid after 07/09/2004, contact NAN DILLINGHAM at (212) 436-1341 for the current balance.

| | | |
|---|---|---|
| Penalty for Presenting Fraudulent Claim - Fine of not more than $5,000 or imprisonment for not more than 5 years or both - Title 18, U.S.C., Section 152. | Signature  *N. Dillingham*  Marcia Smith | Date  06/28/2004 |
| | Title  Insolvency Territory 2 Manager | Telephone Number  (212) 436-1341 |

Form 6338 - A (C)

WEIL, GOTSHAL & MANGES LLP
Attorneys for Reorganized Debtors
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Pérez, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **WORLDCOM, INC., et al.** | : | **02-13533 (AJG)** |
| | : | |
| **Debtors** | : | **Jointly Administered** |
| | : | |

---------------------------------------------------------------- x

### REORGANIZED DEBTORS' OBJECTION TO PROOF OF CLAIM NO. 38365
### (DEPARTMENT OF TREASURY ADMINISTRATIVE EXPENSE CLAIM)

TO THE HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE

Reorganized Debtor MCI, Inc. and certain of its direct and indirect subsidiaries

(collectively, the "Reorganized Debtors") respectfully represent:

### JURISDICTION

1.     The Court has jurisdiction to consider this Objection and the relief

requested herein pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding

pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408

and 1409.

## BACKGROUND

### General

2.     On July 21, 2002 (the "Commencement Date") and November 8, 2002, WorldCom, Inc. and certain of its direct and indirect subsidiaries (the "Debtors") commenced cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). By Orders, dated July 22, 2002 and November 12, 2002, the Debtors' chapter 11 cases were consolidated for procedural purposes. During the chapter 11 cases, the Debtors operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.     On October 31, 2003, this Court entered an order confirming the Debtors' Modified Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan").[1]

4.     On April 20, 2004, the Plan became effective in accordance with its terms, and pursuant to the Plan, WorldCom, Inc. merged with and into MCI, Inc. with MCI, Inc. being the survivor.

### Schedules and Proofs of Claim

5.     On November 21, 2002, the Debtors filed their Schedules of Liabilities (as amended and supplemented, the "Debtors' Schedules") and their Schedules of Executory Contracts and Unexpired Leases. On December 5, 2002, the Debtors filed their Statements of Financial Affairs.

6.     On October 29, 2002, this Court entered its Order (a) Pursuant to Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Certain Proofs of Claim and

---

[1]     Unless otherwise defined herein, capitalized terms shall have the meanings that are ascribed to such terms in the Plan.

Approving the Form and Manner of Notice Thereof (the "Bar Date Order"). The Bar Date Order established January 23, 2003 as the bar date for filing proofs of claim in these cases. Pursuant to the terms of the Bar Date Order, on or about November 22, 2002, the Debtors mailed notice of the bar date to in excess of 1.2 million creditors and potential claimants.

7.    On March 25, 2003, the Court entered its Order Pursuant to 11 U.S.C. § 105 Approving Notice Procedures Regarding Claim Objections and Deemed Schedule Amendment Motions ("Claim Objection Procedure Order"), approving certain procedures regarding noticing of claims objections and omnibus motions for deemed schedule amendments.

8.    As of the date of this Objection, in excess of 35,000 proofs of claim have been filed in connection with these chapter 11 cases (the "Proofs of Claim"). The Debtors have begun the process of conducting a comprehensive review and reconciliation of all prepetition claims, including both the claims scheduled in the Debtors' Schedules and the claims asserted in the Proofs of Claim (the "Filed Claims"). This process includes identifying particular Filed Claims that may be targeted for disallowance and expungement, reduction and allowance, or reclassification and allowance. This is one such objection.

## OBJECTION TO CLAIM

9.    The Reorganized Debtors hereby object to proof of claim no. 38365 filed by the Department of Treasury/Internal Revenue Service ("DOT") in the amount of $16,276,440.81 (the "Treasury Claim"). Claim no. 38365 amends DOT's claim no. 37947. The Treasury Claim was filed as an administrative expense claim for excise taxes assessed against UUNET Technologies, Inc. ("UUNET"), a Debtor, and includes interest computed to July 9, 2004. The Reorganized Debtors have reviewed this proof of claim, the Debtors' books and records, and the applicable provisions of the Internal Revenue Code (the "IRC"), and have

HO1:\294688\06\6BDS06!.DOC\81793.0004            3

determined that there is no amount due with regard to the Treasury Claim.

          10.     The Debtors are in the business of building communication networks and selling access to these networks to internet service providers ("ISPs"). ISPs in turn provide their customers access to the ISPs' services via the Debtors' networks. In order to build these networks, the Debtors purchase services known as central office-based remote access services ("COBRA") from local exchange carriers ("LECs"). COBRA services permit the end users of the Debtors' data network to send and receive data packets to and from the Debtors' data network and, ultimately, to other users of the Internet. LECs provide COBRA services to the Debtors via network access servers which are not capable of carrying voice transmissions. The end users of the Debtors' data network connect with the network access servers by dialing in, using their computer modems. The network servers then route data to and from the Debtors' data network and end users.

          11.     Section 4251 of the IRC imposes a tax on amounts paid for taxable communications services, such as local telephone service and toll telephone service. A purchaser of such services must pay any tax owed under section 4251 of the IRC. *See* IRC Section 4251(a)(2). Providers of such services must collect such tax from the purchaser. *See* IRC Section 4291.

          12.     Local telephone service is defined in IRC Section 4252(a) as: (1) the access to a local telephone system and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and (2) any facility or service provided in connection with a service described in (1).

4

13. Toll telephone service is defined in IRC Section 4252(b) as: (1) a telephonic quality communication for which (A) there is a toll charge which varies in amount with the distance and elapsed transmission time of each individual communication and (B) the charge is paid in the United States, and (2) a service which entitles the subscriber, upon payment of a periodic charge (determined as a flat amount or upon the basis of total transmission time), to the privilege of an unlimited number of telephonic communications to or from all or a substantial portion of the persons having telephone or radio telephone stations in a specified area which is outside the local telephone system area in which the station provided with the service is located.

14. UUNET's purchase of the COBRA services from LECs does not fall within the applicable definitions of taxable communications services. The COBRA service is a data-only service that does not provide UUNET with access to any telephone system and the privilege of voice-quality communication with substantially all persons on that system. In other words, UUNET could not plug in a telephone and gain access to a telephone system or the privilege of telephonic quality communication. Therefore, amounts paid by UUNET to the LECs for the purchase of COBRA services are not subject to the communications excise tax imposed by IRC Section 4251.

15. Because of the nature of the services purchased by UUNET, federal excise taxes do not apply and the taxes and interest that form the basis of the Treasury Claim are not owed. The service purchased by UUNET was controlled by the LEC's, not by UUNET. Accordingly, the Debtors hereby request that the Court enter an order expunging and disallowing the Treasury Claim, claim no. 38365, in addition to the claim it amends, claim no. 37947.

## RESERVATION OF RIGHTS

16.    In the event that the Treasury Claim or claim no. 37947 are not expunged and disallowed for the reasons set forth herein, the Debtors hereby reserve their right to object to such proof(s) of claim on other grounds at a later date.

## MEMORANDUM OF LAW

17.    This Objection does not raise any novel issues of law, and, accordingly, the Debtors respectfully request that the Court waive the requirement contained in Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York that a separate memorandum of law be submitted in support of the Objection.

## NOTICE

18.    In accordance with the Claim Objection Procedures Order, notice of this Objection has been provided to counsel for: the U.S. Trustee, the Committee, the Debtors' postpetition lenders, the United States Attorney for the Southern District of New York, the ad hoc MCI Noteholders Committee, AT&T Corporation, Puerto Rico Telephone Company, Inc., the Mid-Size Carrier Group.  Further, in accordance with the Claim Objection Procedures Order, notice of this Objection has been provided to the persons or entities that filed the proof of claim identified above and their counsel (if known) by means of a personalized Claim Objection Notice.  The Reorganized Debtors submit that no other or further notice need be given.

19.    No previous application for the relief sought herein has been made to this or any other Court.

WHEREFORE the Reorganized Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: Houston, Texas
      August 5, 2004

                        */s/ Sylvia M. Baker*
                        Marcia L. Goldstein, Esq. (MG 2606)
                        Lori R. Fife, Esq. (LF 2839)

                        WEIL, GOTSHAL & MANGES LLP
                        767 Fifth Avenue
                        New York, NY 10153-0119
                        Telephone: (212) 310-8000
                        Facsimile: (212) 310-8007

                                and

                        Alfredo R. Pérez, Esq.
                        Sylvia M. Baker, Esq.
                        WEIL, GOTSHAL & MANGES LLP
                        700 Louisiana, Suite 1600
                        Houston, TX 77002
                        Telephone: (713) 546-5000
                        Facsimile: (713) 224-9511

                        Attorneys for Reorganized Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

**In re**                                                          :          **Chapter 11 Case No.**
                                                              :
**WORLDCOM, INC., et al.**                      :          **02-13533 (AJG)**
                                                              :
                          **Debtors**            :          **Jointly Administered**
                                                              :

-------------------------------------------------------- x

### ORDER GRANTING THE REORGANIZED DEBTORS' OBJECTION TO PROOF OF CLAIM NO. 38365 (DEPARTMENT OF TREASURY ADMINISTRATIVE EXPENSE CLAIM)

Upon consideration of the Reorganized Debtors' Objection to Proof of Claim No. 38365 (Department of Treasury Administrative Expense Claim) filed by Reorganized Debtor MCI, Inc. and certain of its direct and indirect subsidiaries (collectively, the "Debtors") dated August 5, 2004, seeking expungement and disallowance of the amended administrative expense claim and original administrative expense claim filed by the Department of Treasury for excise taxes, and it appearing that there is no amount due with respect to such claims because federal excise taxes do not apply to the services which form the basis of such claims, all as described more fully in the Objection; and it appearing that the expungement and disallowance of these proofs of claim is in the best interest of the Reorganized Debtors, their estates and their creditors; and good and sufficient notice having been given in accordance with the Claim Objection Procedures Order; and after due consideration and sufficient cause appearing therefore, it is

ORDERED that proof of claim no. 38365 and any amendments thereto are hereby expunged and such claims are hereby disallowed in their entirety;

ORDERED that proof of claim no. 37947 is hereby expunged as an amended claim, and such claim is hereby disallowed in its entirety;

ORDERED that the requirement under Rule 9013-1(b) of the Local Bankruptcy

Rules for the Southern District of New York for the filing of a memorandum of law is waived.

Dated: New York, New York

_____, 2004

_____

HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE

**Proposed Hearing Time and Date: October 5, 2005 at 10:00 a.m. (Eastern Time)**
**Objection Deadline Date: October 4, 2005 at 4:00 p.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and Debtors In Possession
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Perez, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
| | |
|---|---|
| **In re** | : |
| | :    **Chapter 11 Case No.** |
| **WORLDCOM, INC., et al.,** | :    **02-13533 (AJG)** |
| | : |
| | :    **(Jointly Administered)** |
| **Debtors.** | : |

-----------------------------------------------------------------x

## NOTICE OF REORGANIZED DEBTORS' EMERGENCY MOTION PURSUANT TO SECTION 107(b)(1) OF THE BANKRUPTCY CODE AND RULE 9018 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR PROTECTIVE ORDER

      **PLEASE TAKE NOTICE THAT** a hearing (the "Hearing") to consider

the emergency motion, dated September 28, 2005 (the "Motion"), of MCI, Inc. and

substantially all of its direct and indirect domestic subsidiaries, as debtors and

reorganized (the "Reorganized Debtors"), seeking entry of a protective order with respect

to matters related to the Reorganized Debtors' objection to proof of claim no. 38365, as

more fully set forth in the Motion, shall be held before the Honorable Arthur J. Gonzalez,

United States Bankruptcy Judge, in Room 523 of the United States Bankruptcy Court,

Alexander Hamilton Custom House, One Bowling Green, New York, New York, 10004,

on **October 5, 2005, at 10:00 a.m.** (New York City Time), or as soon thereafter as

counsel may be heard.

HO1:\321286\03\6VWM03!.DOC\81793.0023       1

**PLEASE TAKE FURTHER NOTICE** that responses or objections to the Motion, if any, must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (General Order M-242 and the User's Manual for the Electronic Case Filing System can be found at www.nysb.uscourts.gov), by registered users of the Bankruptcy Court's case filing system and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (with a hard-copy delivered directly to Chambers), and shall be served in accordance with General Order M-242 upon (i) the Reorganized Debtors, 1133 19th Street, Washington, D.C. 20036, Attention: Anastasia Kelly, Esq., General Counsel; (ii) Weil, Gotshal & Manges LLP, 700 Louisiana, Suite 1600, Houston, Texas 77002, Attention: Alfredo R. Pérez, attorneys for the Debtors; and (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st floor, New York, New York 10004, Attention: Mary Elizabeth Tom, Esq.; and shall be filed with the Clerk of the United States Bankruptcy Court for the Southern District of New York, in each case so as to be received no later than **October 4, 2005, at 4:00 p.m.** (New York City Time).

Dated: Houston, Texas
       September 28, 2005

                */s/ Alfredo R. Pérez*
                Marcia L. Goldstein, Esq. (MG 2606)
                Lori R. Fife, Esq. (LF 2839)

                WEIL, GOTSHAL & MANGES LLP
                767 Fifth Avenue
                New York, NY 10153-0119
                Telephone: (212) 310-8000
                Facsimile: (212) 310-8007

                      and

                Alfredo R. Pérez, Esq.

                WEIL, GOTSHAL & MANGES LLP
                700 Louisiana, Suite 1600
                Houston, TX 77002
                Telephone: (713) 546-5000
                Facsimile: (713) 224-9511

                Attorneys for Reorganized Debtors

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Pérez, Esq.
Attorneys for the Reorganized Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                     :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **WORLDCOM, INC., et al.,** | : | **02-13533 (AJG)** |
| | : | |
| **Reorganized Debtors** | : | **(Jointly Administered)** |

---------------------------------------------------------------x

**REORGANIZED DEBTORS' EMERGENCY MOTION PURSUANT TO**
**SECTION 107(b)(1) OF THE BANKRUPTCY CODE AND RULE 9018 OF THE**
**FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR**
**PROTECTIVE ORDER**

TO THE HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE

Reorganized Debtor MCI, Inc. and certain of its direct and indirect

subsidiaries (collectively, the "Reorganized Debtors") respectfully represent:

**JURISDICTION**

1.     This Court has jurisdiction to consider this matter pursuant to 28

U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### General

2.      On July 21, 2002 (the "Commencement Date") and November 8, 2002, WorldCom, Inc. and certain of its direct and indirect subsidiaries (the "Debtors") commenced cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). By Orders dated July 22, 2002 and November 12, 2002, the Debtors' chapter 11 cases were consolidated for procedural purposes.

3.      On October 31, 2003, this Court entered an order confirming the Debtors' Modified Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan").[1]

4.      On April 20, 2004, the Plan became effective in accordance with its terms, and pursuant to the Plan, WorldCom, Inc. merged with and into MCI, Inc. with MCI, Inc. being the survivor.

### Objection to Department of Treasury's Claim

5.      The Department of Treasury/Internal Revenue Service ("DOT") filed proof of claim no. 38365 (the "Treasury Claim") in the amount of $16,276,440.81 as an administrative expense claim for excise taxes assessed against UUNET Technologies, Inc. ("UUNET"), a Reorganized Debtor herein, plus interest.

6.      On August 5, 2004, the Reorganized Debtors filed an objection (the "Objection") (Docket No. 12235) to the Treasury Claim on the grounds that no amount was due on such claim because, as explained more fully in the Objection,

---

[1]      Unless otherwise defined herein, capitalized terms shall have the meanings that are ascribed to such terms in the Plan.

UUNET's purchase of certain central office-based remote access services was not subject to the communications excise tax imposed by section 4251 of the Internal Revenue Code. DOT's deadline to file a response to the Objection was September 27, 2005. A hearing on the Objection is currently scheduled before the Court on October 18, 2005.

### Confidentiality Stipulation and Informal Discovery

7.      In July 2005, the Reorganized Debtors and DOT (the "Parties") executed a confidentiality stipulation (the "Confidentiality Stipulation"), which governed the use of certain confidential information disclosed during informal discovery related to the Treasury Claim and the Objection. Pursuant to the Confidentiality Stipulation, materials designated as "CONFIDENTIAL" are prohibited from disclosure without prior written consent, subject to certain limited exceptions.

8.      As part of their good faith efforts to resolve the Treasury Claim and in accordance with the terms of the Confidentiality Stipulation, the Reorganized Debtors provided to DOT certain proprietary and confidential information that was designated as "CONFIDENTIAL." Such information included, among other things, sensitive commercial information, pricing information and technical descriptions of how the Reorganized Debtors operate certain of their businesses, and contracts with suppliers that may contain trade secrets.

9.      On September 27, 2005, DOT gave notice to the Reorganized Debtors that it intends to file with the Court, as evidentiary support to its response to the Objection, certain of the commercially sensitive information designated by the Reorganized Debtors as "CONFIDENTIAL" (Docket No. 17177).

## RELIEF REQUESTED

10.     By this Motion, the Reorganized Debtors respectfully request that,

pursuant to section 107(b)(1) of the Bankruptcy Code and Rule 9018 of the Federal Rules

of Bankruptcy Procedure, the Court enter a proctective order that (a) directs DOT to file

its response to the Objection and any exhibits thereto under seal to the extent that such

response includes commercially sensitive materials that were designated by the

Reorganized Debtors as "CONFIDENTIAL" pursuant to the Confidentiality Stipulation,

(b) provides that such response and exhibits shall remain confidential and shall not

otherwise be made available to the general public; and (c) permits the Reorganized

Debtors to reply to such response under seal.

## GROUNDS FOR RELIEF

11.     Section 107(b)(1) of the Bankruptcy Code provides an exception to

the general rule that court records are open for public examination and gives bankruptcy

courts the power to issue orders that will protect entities with respect to confidential

commercial information. *See* 11 U.S.C. § 107(b)(1) ("On request of a party in interest,

the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy

court may – (1) protect an entity with respect to ... commercial information."). Rule

9018 of the Federal Rules of Bankruptcy Procedure defines the procedure by which a

party may move for relief under section 107(b):

> [o]n motion, or on its own initiative, with or without notice,
> the court may make any order which justice requires (1) to
> protect the estate or any entity in respect of a trade secret or
> other confidential research, development, or commercial
> information [or] (2) to protect any entity against scandalous
> or defamatory matter contained in any paper filed in a case
> under the Code....

Fed. R. Bankr. P. 9018.

12.    Pursuant to section 107(b)(1), an interested party must show only that the information it seeks to seal is "confidential" and "commercial" in nature. *In re Orion Pictures Corp.*, 21 F.3d 24, 27 (2d Cir. 1994). Commercial information need not rise to the level of confidentiality of a trade secret in order to be protected, and unlike Rule 26(c)(7) of the Federal Rules of Civil Procedure, section 107(b) of the Bankruptcy Code does not require a showing of "good cause" as a condition for sealing confidential commercial information. *Id.* at 28.

13.    The materials that DOT intends to annex to its response to the Objection contain highly sensitive commercial information that the Reorganized Debtors designated as "CONFIDENTIAL" under the Confidentiality Stipulation. The dissemination of such materials, including information pertaining to the Reorganized Debtors' business relationships and pricing formulas, would prejudice the Reorganized Debtors by allowing their competitors to gain an unfair commercial advantage. Accordingly, the Reorganized Debtors respectfully request that the Court protect such information by directing DOT to file such materials under seal pursuant to section 107(b)(1) of the Bankruptcy Code.

## MEMORANDUM OF LAW

14.    This Motion does not raise any novel issues of law, and, accordingly, the Reorganized Debtors respectfully request that the Court waive the requirement contained in Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York that a separate memorandum of law be submitted in support of the Motion.

## NOTICE

15.     Notice of this Motion has been provided in accordance with the

First Amended Case Management Order, dated December 23, 2002. In addition, the

Reorganized Debtors intend to give notice by facsimile and overnight delivery to:

> Michael J. Garcia, Esq.
> United States Attorney
> for the Southern District of New York
> BY:     Danna Drori, Esq.
>          Nicole Guerron, Esq.
> Assistant United States Attorneys
> 86 Chambers Street, 3rd Floor
> New York, New York 10007
> Telephone: (212) 637-2689, 637-2699
> Facsimile: (212) 637-2686
> Attorneys for the United States of America

The Debtors submit that no other or further notice need be provided. No previous motion

or application for the relief sought herein has been made to this or any other Court..

16.     No previous application for the relief sought herein has been made

to this or any other Court.

WHEREFORE the Reorganized Debtors respectfully request entry of an

order granting the relief requested herein and such other and further relief as is just.

Dated: Houston, Texas
September 28, 2005

/s/ Alfredo R. Pérez
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007

and

Alfredo R. Pérez, Esq.

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX 77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

Attorneys for the Reorganized Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                              :
In re                                         :    **Chapter 11 Case No.**
                                              :
**WORLDCOM, INC., et al.,**                   :    **02-13533 (AJG)**
                                              :
        **Reorganized Debtors**               :    **(Jointly Administered)**
------------------------------------------------------------x

### ORDER PURSUANT TO SECTION 107(b)(1) OF THE BANKRUPTCY CODE AND RULE 9018 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE GRANTING REORGANIZED DEBTORS MOTION FOR PROTECTIVE ORDER

Upon the motion dated September 28, 2005 (the "Motion") of MCI, Inc.

and certain of its direct and indirect subsidiaries (collectively, the "Reorganized

Debtors"), pursuant to section 107(b)(1) of title 11 of the United States Code (the

"Bankruptcy Code") and Rule 9018 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") requesting an order directing DOT[1] to file their response to the

Reorganized Debtors' Objection to their claim and any exhibits attached thereto under

seal to the extent that such response includes confidential commercial information that

was designated by the Reorganized Debtors to be "CONFIDENTIAL" pursuant to the

Confidentiality Stipulation, as is more fully set forth in the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28

U.S.C. §§ 157 and 1334; and due notice of the Motion having been provided, and it

appearing that no other or further notice need be provided; and upon the Motion and all

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is hereby granted in all respects; and it is further

ORDERED that, pursuant to section 107(b)(1) of the Bankruptcy Code and Bankruptcy Rule 9018, DOT is required to file its response to the Objection and any exhibits attached thereto under seal to the extent that such response includes confidential commercial information that was designated by the Reorganized Debtors as "CONFIDENTIAL"; and it is further

ORDERED that the response to the Objection and any and all exhibits annexed thereto shall remain confidential and shall not be made available to the general public; and it is further

ORDERED that the Reorganized Debtors are hereby permitted, but not required, to file any reply to the DOT's response under seal; and it is further

ORDERED that the requirement contained in Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York that a separate memorandum of law be submitted in support of the Motion is hereby waived.

Dated: New York, New York
_____, 2005


_____
HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

In re                                            :
                                                 :
                                                 :    **Chapter 11 Case No.**
WORLDCOM, INC., *et al.*,                        :    **02-13533  (AJG)**
                                                 :
                                                 :    **(Jointly Administered)**
                  **Reorganized Debtors.**       :
-----------------------------------------------------------x

## DECLARATION OF ALFREDO R. PÉREZ IN SUPPORT OF ORDER SETTING DATE, TIME AND PLACE FOR AN EXPEDITED HEARING TO CONSIDER THE REORGANIZED DEBTORS' EMERGENCY MOTION PURSUANT TO SECTION 107(b)(1) OF THE BANKRUPTCY CODE AND RULE 9018 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR PROTECTIVE ORDER

ALFREDO R. PEREZ, hereby declares pursuant to section 1746 of title

28 of the United States Code:

1.    I am a member of the law firm of Weil, Gotshal & Manges LLP,

located at 767 Fifth Avenue, New York, New York 10157, attorneys for the above-

captioned reorganized debtors (the "Reorganized Debtors").

2.    I am making this declaration in support of the Reorganized

Debtors' request for an order fixing date, time and place (the "Scheduling Order") for

hearing on the Reorganized Debtors' emergency motion (the "Motion") pursuant to

section 107(b)(1) of title 11 of the United States Code (the "Bankruptcy Code") and Rule

9018 of the Federal Rules of Bankruptcy Procedure for protective order.[1]  A copy of the

proposed Scheduling Order is attached hereto as Exhibit "A."

---

[1] All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

3.     I am aware of the facts and circumstances relating to the Motion. The facts set forth herein are based upon personal knowledge or information the Reorganized Debtors provided me.

4.     The Department of Treasury/Internal Revenue Service ("DOT") has recently informed the Reorganized Debtors that it intends to file as evidentiary support for its response to the Reorganized Debtors' objection (the "Objection") to its proof of claim certain sensitive commercial information that was designated by the Reorganized Debtors as "CONFIDENTIAL" pursuant to a confidentiality stipulation executed in July 2005 ("Confidentiality Stipulation") and produced to DOT pursuant to such stipulation. DOT stated that it would file the confidential information publicly unless the Reorganized Debtors moved, by October 3, 2005, for a protective order. A copy of the Notice Regarding Reply of the United States of America to Reorganized Debtors' Objection to IRS Request for Payment No. 38365 is attached hereto as Exhibit "B."

5.     Because the information to be submitted in the response could be used by the Reorganized Debtors' competitors to the disadvantage of the Reorganized Debtors' estates, the Reorganized Debtors requested that, pursuant to section 107(b)(1) of the Bankruptcy Code and Rule 9018 of the Federal Rules of Bankruptcy Procedure, the Court (a) direct DOT to file its response to the Objection and any exhibits thereto under seal to the extent that such response includes commercially sensitive materials that were designated by the Reorganized Debtors as "CONFIDENTIAL" pursuant to the Confidentiality Stipulation and (b) order that such response and exhibits shall remain confidential and shall not otherwise be made available to the general public.

6.      DOT has agreed not to file their response publicly until the Motion can be heard. Because DOT's response to the Objection was due on September 27, 2005, and the hearing on the Objection is scheduled for October 18, 2005, the Reorganized Debtors request that the Motion be heard on an expedited basis. Specifically, the Reorganized Debtors have requested that the Court set the hearing on the Motion for October 5, 2005 at 10:00 a.m. (New York City Time), with responses to the Motion, if any, due October 4, 2005 at 4:00 p.m. (New York City Time).

6.      No previous application for the relief requested herein has been made to this or any other court.

I declare under penalty of perjury that the foregoing is true and correct to the best of knowledge, information and belief.

Dated:  New York, New York
        September 28, 2005

                            /s/ Alfredo R. Pérez
                            Alfredo R. Perez, Esq.

**EXHIBIT A**

HO1:\32131702\6VXH02!.DOC\81793.0023

**Hearing Date: October 5, 2005 at 10:00 a.m. (New York City Time)**
**Objection Deadline: October 4, 2005 at 4:00 p.m. (New York City Time)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
In re                                       :        **Chapter 11 Case No.**
                                            :
**WORLDCOM, INC., et al.,**                 :        **02-13533 (AJG)**
                                            :        **Jointly Administered**
              **Reorganized Debtors**       :
                                            :
-------------------------------------------------------------------x

### ORDER SETTING DATE, TIME AND PLACE FOR AN EXPEDITED HEARING TO CONSIDER THE REORGANIZED DEBTORS' EMERGENCY MOTION PURSUANT TO SECTION 107(b)(1) OF THE BANKRUPTCY CODE AND RULE 9018 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR PROTECTIVE ORDER

Upon the Reorganized Debtors' Emergency Motion (the "Motion") Pursuant to Section 107(b)(1) of Title 11 of the United States Code (the "Bankruptcy Code") and Rule 9018 of the Federal Rules of Bankruptcy Procedure For a Protective Order; and upon the Declaration of Alfredo R. Pérez, Esq. a member of Weil, Gotshal & Manges LLP, attorneys for the Reorganized Debtors, certifying the necessity for relief on an expedited basis (the "Declaration"); and upon due deliberation and good and sufficient cause appearing therefor, it is hereby

ORDERED that a hearing to consider the relief requested in the Motion and entry of the Proposed Order shall be held before Honorable Arthur J. Gonzalez, United States Bankruptcy Judge, in Room 523 of the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York, 10004, on October 5, 2005 at 10:00 a.m., or as soon thereafter as counsel may be heard (the "Hearing"); and it is further

ORDERED that on or before September 30, 2005, the Debtors shall serve a copy of this Order and the Motion by e-mail, telecopy, overnight delivery services or hand delivery upon the DOT and the Office of the United States Attorney for the Southern District of New

York, and such service shall be deemed good and sufficient service and notice of this Order, the Proposed Order, the Motion, the Hearing and all proceedings to be held thereon; and it is further

ORDERED that responses or objections to the Motion, if any, must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (General Order M-242 and the User's Manual for the Electronic Case Filing System can be found at www.nysb.uscourts.gov), by registered users of the Bankruptcy Court's case filing system and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (with a hard-copy delivered directly to Chambers), and shall be served in accordance with General Order M-242 upon (i) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attention: Marcia L. Goldstein, Esq. and Lori R. Fife, Esq.; (ii) Weil, Gotshal & Manges LLP, 700 Louisiana, Suite 1600, Houston, Texas 77002, Attention: Alfredo R. Pérez, Esq.; (iii) the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attention: Mary Tom, Esq.; (iv) Shearman & Sterling, 550 Lexington Avenue, New York, New York 10022, Attention: Douglas P. Bartner, Esq. and Marc B. Hankin, Esq.; and (v) Akin Gump Strauss Hauer & Feld LLP, 590 Madison Avenue, New York, New York 10022-2524, Attention: Daniel H. Golden, Esq., and shall be filed with the Clerk of the United States Bankruptcy Court for the Southern District of New York, in each case so as to be received by no later than 4:00 p.m. (New York Time), on October 4, 2005.

Dated:    New York, New York
                 _____, 2005

                           _____

                           HONORABLE ARTHUR J. GONZALEZ
                           UNITED STATES BANKRUPTCY JUDGE

HO1:\321317\02\6VXH02!.DOC\81793.0023         6

**EXHIBIT B**

MICHAEL J. GARCIA
United States Attorney
Southern District of New York
By:    DANNA DRORI (DD-7690)
        NICOLE GUERON (NG-7682)
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2689, 637-2699
Facsimile: (212) 637-2686

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:                                    :        CHAPTER 11
                                          :
WORLDCOM, INC., et al.,                   :        Case No. 02-13533 (AJG)
                                          :
          Debtors.                        :        (Jointly Administered)
-------------------------------------------------------X

### NOTICE REGARDING REPLY OF THE UNITED STATES OF AMERICA TO REORGANIZED DEBTORS' OBJECTION TO IRS REQUEST FOR PAYMENT NO. 38365

1.    This document provides notice that, on September 27, 2005, the Government

served the Reply of the United States of America to Reorganized Debtors' Objection to IRS

Request for Payment No. 38365 (the "Reply") on Debtors and the Court, along with the

declarations of Assistant United States Attorney Nicole Guéron and Dr. Michael Hills, and

exhibits attached thereto.

2.    The Government did not file the Reply, declarations or exhibits with the Court

either electronically or by hand, because these documents quote at length from information

designated as confidential by Debtors.

3.    The Government will electronically file the Reply, declarations and exhibits with

Page 1 of 2

the Court on Monday, October 3, 2005, unless the Debtors move for a protective order prior to

that date.

Dated: New York, New York
      September 27, 2005

                        _____/s/ Nicole Guéron_____
                        NICOLE GUERON (NG-7682)
                        Assistant United States Attorney

**Proposed Hearing Time and Date:  October 5, 2005 at 10:00 a.m.**
**Objection Deadline Date:  October 4, 2005 at 4:00 p.m.**

MICHAEL J. GARCIA
United States Attorney
Southern District of New York
By:    DANNA DRORI (DD-7690)
         NICOLE GUERON (NG-7682)
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York  10007
Telephone: (212) 637-2689, 637-2699
Facsimile: (212) 637-2686

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:                                          :          CHAPTER 11
                                                :
WORLDCOM, INC., et al.,                         :          Case No. 02-13533 (AJG)
                                                :
            Debtors.                            :          (Jointly Administered)
-------------------------------------------------------X

## RESPONSE OF THE UNITED STATES OF AMERICA TO
## REORGANIZED DEBTORS' MOTION FOR PROTECTIVE ORDER

TO THE HONORABLE ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE:

1.    The United States of America takes no position in response to Reorganized

Debtors' Emergency Motion Pursuant to Section 107(b)(1) of the Bankruptcy Code and Rule

9018 the Federal Rules of Bankruptcy Procedure for Protective Order, dated September 28, 2005.

Dated: New York, New York
          September 28, 2005

                                   MICHAEL J. GARCIA
                                   United States Attorney for the
                                   Southern District of New York
                                   Attorney for the United States of America

                    By:         /s/ Nicole Guéron
                                   DANNA DRORI (DD-7690)
                                   NICOLE GUERON (NG-7682)
                                   Assistant United States Attorneys
                                   86 Chambers Street, 3rd Floor
                                   New York, New York  10007
                                   Telephone: (212) 637-2689, 637-2699
                                   Facsimile: (212) 637-2686

**Hearing Date:  October 5, 2005 at 10:00 a.m. (New York City Time)**
**Objection Deadline:  October 4, 2005 at 4:00 p.m. (New York City Time)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

In re                                          :        **Chapter 11 Case No.**
                                               :
**WORLDCOM, INC., et al.**                     :        **02-13533 (AJG)**
                                               :        **Jointly Administered**
            **Reorganized Debtors**            :
                                               :
-----------------------------------------------------------------x

### ORDER SETTING DATE, TIME AND PLACE FOR AN EXPEDITED HEARING TO CONSIDER THE REORGANIZED DEBTORS' EMERGENCY MOTION PURSUANT TO SECTION 107(b)(1) OF THE BANKRUPTCY CODE AND RULE 9018 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR PROTECTIVE ORDER

Upon the Reorganized Debtors' Emergency Motion (the "Motion") Pursuant to Section 107(b)(1) of Title 11 of the United States Code (the "Bankruptcy Code") and Rule 9018 of the Federal Rules of Bankruptcy Procedure For a Protective Order; and upon the Declaration of Alfredo R. Pérez, Esq. a member of Weil, Gotshal & Manges LLP, attorneys for the Reorganized Debtors, certifying the necessity for relief on an expedited basis (the "Declaration"); and upon due deliberation and good and sufficient cause appearing therefor, it is hereby

ORDERED that a hearing to consider the relief requested in the Motion and entry of the Proposed Order shall be held before Honorable Arthur J. Gonzalez, United States Bankruptcy Judge, in Room 523 of the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York, 10004, on October 5, 2005 at 10:00 a.m., or as soon thereafter as counsel may be heard (the "Hearing"); and it is further

ORDERED that on or before September 30, 2005, the Debtors shall serve a copy of this Order and the Motion by e-mail, telecopy, overnight delivery services or hand delivery upon the DOT and the Office of the United States Attorney for the Southern District of New

York, and such service shall be deemed good and sufficient service and notice of this Order, the Proposed Order, the Motion, the Hearing and all proceedings to be held thereon; and it is further

ORDERED that responses or objections to the Motion, if any, must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (General Order M-242 and the User's Manual for the Electronic Case Filing System can be found at www.nysb.uscourts.gov), by registered users of the Bankruptcy Court's case filing system and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (with a hard-copy delivered directly to Chambers), and shall be served in accordance with General Order M-242 upon (i) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attention: Marcia L. Goldstein, Esq. and Lori R. Fife, Esq.; (ii) Weil, Gotshal & Manges LLP, 700 Louisiana, Suite 1600, Houston, Texas 77002, Attention: Alfredo R. Pérez, Esq.; (iii) the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attention: Mary Tom, Esq.; (iv) Shearman & Sterling, 550 Lexington Avenue, New York, New York 10022, Attention: Douglas P. Bartner, Esq. and Marc B. Hankin, Esq.; and (v) Akin Gump Strauss Hauer & Feld LLP, 590 Madison Avenue, New York, New York 10022-2524, Attention: Daniel H. Golden, Esq., and shall be filed with the Clerk of the United States Bankruptcy Court for the Southern District of New York, in each case so as to be received by no later than 4:00 p.m. (New York Time), on October 4, 2005.

Dated: New York, New York
September 28, 2005

_s/ Arthur J. Gonzalez_
HONORABLE ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE

2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                              :

**In re**                               :        **Chapter 11 Case No.**
                              :

**WORLDCOM, INC., et al.,**          :        **02-13533 (AJG)**
                              :

        **Reorganized Debtors**        :        **(Jointly Administered)**
------------------------------------------------------------x

### ORDER PURSUANT TO SECTION 107(b)(1) OF THE BANKRUPTCY CODE AND RULE 9018 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE GRANTING REORGANIZED DEBTORS MOTION FOR PROTECTIVE ORDER

Upon the motion dated September 28, 2005 (the "Motion") of MCI, Inc. and

certain of its direct and indirect subsidiaries (collectively, the "Reorganized Debtors"), pursuant

to section 107(b)(1) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9018

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") requesting an order

directing DOT[1] to file their response to the Reorganized Debtors' Objection to their claim and

any exhibits attached thereto under seal to the extent that such response includes confidential

commercial information that was designated by the Reorganized Debtors to be

"CONFIDENTIAL" pursuant to the Confidentiality Stipulation, as is more fully set forth in the

Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein

in accordance with 28 U.S.C. §§ 157 and 1334; and due notice of the Motion having been

provided, and it appearing that no other or further notice need be provided; and upon the Motion

and all of the proceedings had before the Court; and after due deliberation and sufficient cause

appearing therefor, it is

ORDERED that the Motion is hereby granted in all respects; and it is further

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

ORDERED that, pursuant to section 107(b)(1) of the Bankruptcy Code and Bankruptcy Rule 9018, DOT is required to file its response to the Objection and any exhibits attached thereto under seal to the extent that such response includes confidential commercial information that was designated by the Reorganized Debtors as "CONFIDENTIAL"; and it is further

ORDERED that any response to the Objection and any and all exhibits annexed thereto shall remain confidential and shall not be made available to the general public; and it is further

ORDERED that the Reorganized Debtors are hereby permitted, but not required, to file any reply to the DOT's response under seal; and it is further

ORDERED that the requirement contained in Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York that a separate memorandum of law be submitted in support of the Motion is hereby waived.

Dated: New York, New York
      October 5, 2005

s/Arthur J. Gonzalez
HONORABLE ARTHUR J. GONZALEZ, UNITED
STATES BANKRUPTCY JUDGE

2

WEIL, GOTSHAL & MANGES LLP
Attorneys for Reorganized Debtors
767 Fifth Avenue
New York, NY    10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Pérez, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x
| | |
|---|---|
| **In re** | : **Chapter 11 Case No.** |
| | : |
| **WORLDCOM, INC., et al.** | : **02-13533 (AJG)** |
| | : |
| **Reorganized Debtors** | : **Jointly Administered** |
| | : |
-------------------------------------------------------- x

### NOTICE OF REORGANIZED DEBTORS' MOTION TO EXCLUDE CERTAIN TESTIMONY OF DR. MICHAEL HILLS FROM THE HEARING ON THE OBJECTION TO PROOF OF CLAIM NO. 38365 (DEPARTMENT OF TREASURY ADMINISTRATIVE EXPENSE CLAIM)

PLEASE TAKE NOTICE THAT on November 2, 2005, the United States of

America filed under seal the Declaration of Dr. Michael Hills in support of Proof of Claim No.

38365 (Docket No. 17490), and that on November 16, 2005, the Reorganized Debtors took the

oral deposition of Dr. Michael Hills, an expert witness retained by the United States of America

in connection with the Reorganized Debtors' Objection to Proof of Claim No. 38365

(Department of Treasury Administrative Expense Claim) (Docket No. 12235) (the "Objection").

On December 16, 2005, the Reorganized Debtors served the United States Attorney with a prior

draft of the attached Motion to Exclude Certain Testimony of Dr. Michael Hills from the Hearing

on the Objection to Proof of Claim No. 38365 to confer with opposing counsel regarding Dr.

HO1:\326153\04\6ZNT04!.DOC\81793.0023

Hills's testimony in this matter.    There is currently a hearing scheduled for February 1, 2006, on

the Reorganized Debtors' Objection.    This Motion is being filed as a protective matter to the

extent that the United States seeks to rely on any of Dr. Hills's testimony other than that elicited

in open court.

Dated: Houston, Texas
       January 30, 2006

                                    Marcia L. Goldstein, Esq. (MG 7606)
                                    Lori R. Fife, Esq. (LF 2839)

                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, NY    10153-0119
                                    Telephone: (212) 310-8000
                                    Facsimile: (212) 310-8007

                                            and

                                    Alfredo R. Pérez, Esq.

                                    WEIL, GOTSHAL & MANGES LLP
                                    700 Louisiana, Suite 1600
                                    Houston, TX    77002
                                    Telephone: (713) 546-5000
                                    Facsimile: (713) 224-9511

                                    Attorneys for the Reorganized Debtors

WEIL, GOTSHAL & MANGES LLP
Attorneys for Reorganized Debtors
767 Fifth Avenue
New York, NY    10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Pérez, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **WORLDCOM, INC., et al.** | : | **02-13533 (AJG)** |
| | : | |
| **Reorganized Debtors** | : | **Jointly Administered** |
| | : | |

-------------------------------------------------------------- x

### REORGANIZED DEBTORS' MOTION TO EXCLUDE CERTAIN TESTIMONY OF DR. MICHAEL HILLS FROM THE HEARING ON THE OBJECTION TO PROOF OF CLAIM NO. 38365 (DEPARTMENT OF TREASURY ADMINISTRATIVE EXPENSE CLAIM)

TO THE HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE

The Reorganized Debtors respectfully bring this motion to exclude certain

testimony of Dr. Michael Hills from the hearing on their Objection to Proof of Claim No. 38365

(Department of Treasury Administrative Expense Claim), and represent as follows:

## I.  PRELIMINARY STATEMENT

1.      The Internal Revenue Service ("IRS") has retained Dr. Michael Hills to

testify about the capabilities of central office-based remote access ("COBRA") services that the

Reorganized Debtors purchase from local exchange carriers.  In particular, Dr. Hills opines that

HO1:\326153\04\6ZNT04!.DOC\81793.0023

COBRA service includes access to the local telephone system and the capability of providing telephonic quality communication. Dr. Hills also concludes that the federal communications excise tax imposed by sections 4251 and 4252 of the Internal Revenue Code applies to COBRA service.

2.    Although Dr. Hills was designated to testify about the capabilities of COBRA service, the opinions he renders are not the product of reliable principles and methods. The deposition testimony given by Dr. Hills, and his declaration in support of the IRS claim, reveal that Dr. Hills has rendered opinions based upon his subjective interpretation of various contracts between the Debtors and COBRA service providers. Prior to this case, Dr. Hills had never heard of COBRA services. Hills Depo. Tr. at 36:10-11. He also has no prior experience with network design or implementation. *Id.* at 50:21-51:1, 98:3-7. Nonetheless, Dr. Hills opines at length about the design and capabilities of COBRA services based on what various contracts "mean," "prove," "demonstrate," and "concede." But these conclusions offer nothing more than his interpretation of the documents, and therefore add nothing to the evidentiary record beyond the witness's own testimony. Because Dr. Hills has no legal training or other similar expertise in contract interpretation, his testimony on the meaning and import of contractual terms should be excluded.

3.    In addition to his primary opinions regarding these contracts, Dr. Hills also offers opinions on the applicability of section 4252 of the Internal Revenue Code to COBRA service. While Dr. Hills has no legal expertise or experience with respect to section 4252, the Declaration he submitted in connection with this matter, and his deposition transcript, are filled with statements that track the exact language of section 4252 and interpret its provisions.

4.      This Court is the appropriate party to review all relevant contracts involving COBRA services and make a determination as to any tax liability.  Dr. Hills's testimony on these matters will not assist this Court in any way and, therefore, should be excluded.

## II.    THE IRS'S EXCISE TAX CLAIM

5.      The IRS filed proof of claim no. 38365 (the "Excise Tax Claim")[1]  in the amount of $16,276,440.81 as an administrative expense claim for excise taxes assessed against UUNET, one of the Reorganized Debtors.

6.      On August 5, 2004, the Reorganized Debtors filed an objection (Docket No. 12235) (the "Objection") to the Excise Tax Claim on the basis that no amount was due on such claim because COBRA services are not one of the services taxed by section 4251 of the Internal Revenue Code (the "Tax Code").

7.      On November 2, 2005, the IRS filed its Reply to the Objection under seal (the "Reply") (Docket No. 17489).   In support of the Reply, the IRS offered the Declaration of Dr. Michael Hills (the "Hills Declaration") (Docket No. 17490).[2]   Dr. Hills based his opinions on the applicability of section 4252 of the Tax Code almost exclusively on his review of various COBRA agreements between UUNET and local exchange carriers (the "UUNET Contracts") Hills Declaration, at ¶ 5.  The Hills Declaration attached a Tutorial on Methods of Dial-Up Access to ISP's (the "Tutorial"), which was drafted by Dr. Hills.

---

[1]      On or about February 25, 2004, the IRS filed a related Request for Payment of Internal Revenue Taxes (Bankruptcy Code Cases—Administrative Expense) (Claim No. 37947).   Later, the IRS withdrew Claim No. 37947 (Docket No. 16282).   The Excise Tax Claim amends Claim No. 37947.

[2]      On October 5, 2005, this Court entered a Protective Order pursuant to section 107(b)(1) of the Bankruptcy Code and Rule 9018 of the Federal Rules of Bankruptcy Procedure (the "Protective Order") (Docket No. 17290).   In accordance with the Protective Order, the Reply and the Hills Declaration were filed under seal with this Court.

8.      On November 16, 2005, the Reorganized Debtors took the oral deposition

of Hills.   The relevant portions of Dr. Hills's deposition are attached hereto as Exhibit 1.

## III.  ARGUMENT

### A.     Dr. Hills's opinions based on the UUNET Contracts should be excluded.

9.      This Court should exclude Dr. Hills's interpretation of the UUNET

Contracts because those opinions constitute inadmissible legal conclusions.[3]   While Dr. Hills

admitted in his deposition that he is not a contract expert (Depo. Tr. at 87:15-21), over 30% of

the paragraphs in his Declaration state legal conclusions based on the UUNET Contracts.[4]   For

example, paragraphs 12, 15, 17, 18, 21, 23, 25, 27, 31, and 32 of the Hills Declaration

improperly offer testimony as to what certain sections of the UUNET Contracts: (i) mean; (ii)

prove; (iii) demonstrate; and (iv) concede:

> i.      The COBRA services contracts prove that the services are VoIP
> capable, thereby conceding that the COBRA services are capable of
> voice quality communications.   Hills Declaration, at ¶ 12.
>
> ii.      This contract thus concedes, by its very language, that the
> COBRA services obtained by WorldCom from [Vendor] are capable of
> "one-way or two-way voice telephony communications" and VoIP
> telephony without any change in the COBRA's access services from the
> LEC.   . . . Accordingly, the COBRA services can provide voice capable,
> telephonic quality communications.   Id. at ¶ 15.
>
> iii.      This paragraph means that the COBRA Services purchased by
> WorldCom provide WorldCom's employees and customers with regular
> telephonic access to modems, which modems then connect to
> WorldCom's Internet network.   Id. at ¶ 17.
>
> iv.      In my professional opinion, this agreement that the COBRA
> Services will be offered so widely demonstrates that the [Vendor]
> COBRA Access Contract offered WorldCom access to substantially all
> of the local telephone system. . . .   Id. at ¶ 18.

---

[3]      See paragraphs 12, 15, 17, 18, 21, 23, 25, 27, 31, and 32 of the Hills Declaration.   ·

[4]      See id.

v.      This contract thus concedes, by its very language, that the COBRA services obtained by UUNET from [Vendor] are capable of "two way voice telephony communications" and VoIP telephony without any change in the COBRA's access services from the LEC.   Section 6.1.1 [of this contract] makes evident that no change in the COBRA's access services is necessary for UUNET unilaterally to use the COBRA services to provide VoIP.   Accordingly, the COBRA services can provide voice capable, telephonic quality communications.   *Id.* at ¶ 21.

vi.      This paragraph means that the COBRA Services purchased by UUNET provide UUNET's employees and customers with regular telephonic access to modems, which modems then connect to WorldCom's Internet network.   . . . In my professional opinion, these factors are all hallmarks of a voice-capable telephony system, which uses telephonic quality connections and dedicated telephone numbers to connect the dial-up customers to the Internet.   *Id.* at ¶ 23.

vii.      This paragraph means that the COBRA services purchased by UUNET provide UUNET's employees and customers with regular telephonic access to modems, which modems then connect to WorldCom's Internet network.   . . . In my professional opinion, these factors are all hallmarks of a voice-capable telephony system, which uses telephonic quality connections and dedicated telephone numbers to connect the dial-up customers to the Internet.   *Id.* at ¶ 25.

viii.      It is my professional opinion that, as per the text of this product description . . . the [Vendor] COBRA services used by UUNET can provide voice capable, telephonic quality communications.   *Id.* at ¶ 27.

ix.      It is my professional opinion that, as per the text of this product description . . . the [Vendor] COBRA services used by UUNET can provide voice capable, telephonic quality communications.   *Id.* at ¶ 31.

x.      It should be noted that the contractual billing arrangements between UUNET and all of the LEC's are bundled monthly charges per port which include two-way telephonic access to the local telephone network.   *Id.* at ¶ 32.

Dr. Hills also states in the Tutorial that the local exchange carriers and internet service providers recognize the capability for Voice over IP and included contractual language covering its possible use.   *See* Tutorial, at ¶ 17.

        10.      Because Dr. Hills is not a lawyer or an expert on contracts, he is not qualified to offer legal opinions on the UUNET Contracts. Depo. Tr. at 87:15-21. This Court is better suited to interpret the UUNET Contracts and determine whether services rendered under

those contracts are subject to federal excise tax. *See Burkhart v. Washington Metro. Area Trans. Auth.*, 112 F.3d 1207 (D.C. Cir. 1997) (stating that "each courtroom is equipped with a 'legal expert' called a judge"). Dr. Hills's testimony will not assist this Court and should be excluded.

11.    Moreover, because Dr. Hills's testimony on COBRA service is entirely derived from the aforementioned interpretations, Dr. Hills is also not qualified to be an expert on COBRA services. Dr. Hills testified in his deposition that he was not familiar with COBRA service before he was retained by the IRS. Depo. Tr. at 36:6-11. Dr. Hills further testified that his knowledge of COBRA service is based on his review of the UUNET Contracts and other documents supplied by the Reorganized Debtors. *Id.* at 49:10-15. In his deposition, Dr. Hills testified that his company does not design networks, and that he personally has never implemented a voice system or a network system. *Id.* at 50:21-51:1, 98:3-7. He also testified that neither he nor his company would be able to tell what hardware, software or firmware is needed in order to make a telecommunications network run. *Id.* at 50:8-11.

12.    Despite these obvious limitations in knowledge and experience, Dr. Hills opines at length on the capabilities and design of the COBRA system. Dr. Hills's concessions about his lack of expertise demonstrate that he is not qualified to testify as an expert in this case. Therefore, this Court should exclude any testimony from Dr. Hills on those issues.

**B.    Dr. Hills's opinions on federal excise tax should be excluded.**

13.    Dr. Hills opines on the applicability of section 4252 of the Tax Code even though he is not a lawyer and has no proven experience or expertise on this issue and. *Id.* at 34:2-4, 44:20-45:4. Federal Rule of Evidence 702 requires that an expert be qualified "by knowledge, skill, experience, training or education." *See* FED. R. EVID. 702; *see also Pan Am.*

44

*World Airways v. Port Auth. of N.Y. and N.J.*, 995 F.2d 5, 10 (2d Cir. 1993) (holding that Rule 702 requires a determination of whether an expert is qualified); *In re Med Diversified, Inc.*, 2005 WL 3077228 at *1 (Bankr. E.D.N.Y. Nov. 14, 2005) (same). Dr. Hills has only testified in one other case involving section 4252 of the Tax Code or in connection with a federal excise tax matter. *See* Depo. Tr. at 44:20-45:1. Dr. Hills concedes his lack of expertise by testifying that he familiarized himself with section 4252 of the Tax Code by downloading the statute. *See* Depo. Tr. at 45:2-20. While Dr. Hills does not purport to have any expertise in federal tax law, he improperly offers several opinions on his interpretation of section 4252 of the Tax Code in paragraph 33 of the Hills Declaration.

14.    In paragraph 33, Dr. Hills cites to section 4252(a)(1) to support his opinion that the billing system between UUNET and the local exchange carriers demonstrates that the COBRA services include access to the local telephone system. Hills Declaration, at ¶ 33. Dr. Hills then cites to section 4252(a)(1) to support his opinion that the modems included in the COBRA service are a facility or service provided in connection with local telephone service. *Id.* Finally, Dr. Hills opines that since telephonic quality access to the public switched telephone network is bundled into the port charges, federal excise tax applies to the port charges. *Id.*

15.    In addition, Dr. Hills states in paragraph 5 of Tutorial that, in a traditional domestic telephone call, "the person placing the call and the person receiving the call pay federal excise tax." Tutorial, at ¶ 5. Dr. Hills further states in paragraph 7 of the Tutorial that "it is undisputed in this case that the local loop associated dial-up access to the internet service provider and any calls charges [*sic*] are subject to federal excise tax." *Id.* at ¶ 7.

16.    This Court should determine purely legal issues. *Palazzetti Imp./Exp. v. Morson, Inc.*, 2001 WL 793322 at *2 (S.D.N.Y. July 13, 2001) (excluding the testimony of an expert interpreting whether a contract was a franchise agreement). A court must determine whether an expert's proposed testimony usurps either the role of the judge in making a determination of the applicable law or in applying that law to the facts. *United States v. Scop*, 846 F.2d at 135, 138-40 (2d Cir. 1988) (excluding the testimony of an expert witness who repeatedly testified using terms that tracked the language of the relevant securities law statute). While Federal Rule of Evidence 704 states that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact," it was not intended to allow experts to offer opinions embodying legal conclusions. *See Scop*, 846 F.2d at 139.

17.    Dr. Hills's testimony on the applicability of section 4252 of the Tax Code should be excluded because he is a non-lawyer with no proven experience or expertise on federal excise tax. Dr. Hills's testimony improperly attempts to shift the role of this Court to a witness by attempting to tell the Court the appropriate legal interpretation of section 4252 of the Tax Code. Accordingly, this Court should exclude such testimony.

## IV. CONCLUSION

18.    Dr. Hills is not qualified to testify as an expert on section 4252 of the Tax Code or to interpret the UUNET Contracts. Dr. Hills is not a lawyer and had no knowledge, educational or professional experience with the COBRA system prior to this case. Dr. Hills also lacks any expertise on section 4252 of the Tax Code. Therefore, this Court should exclude Dr. Hills's testimony regarding the UUNET Contracts and whether section 4252 of the Tax Code applies to COBRA services.

## V. **NOTICE**

19.    Notice of this Motion has been provided to the United States. In light of the nature of the relief requested herein, the Reorganized Debtors submit that no other or further notice need be provided. To the extent that the Court only considers Dr. Hills's oral testimony at the hearing on the Objection, the Reorganized Debtors will make their objections to such testimony at that time.

## VI. **WAIVER OF MEMORANDUM OF LAW**

20.    Pursuant to Local Bankruptcy Rule for the Southern District of New York 9013-1(b), because there are no novel issues of law presented herein, the Reorganized Debtors respectfully request that this Court waive the requirement that they file a memorandum of law in support of this Motion.

## VII. **NO PREVIOUS APPLICATION**

21.    No previous application for the relief sought herein has been made to this or any other Court.

47

WHEREFORE the Reorganized Debtors respectfully request that this Court enter

an order granting the relief requested herein and other and further relief as is just.

Dated: Houston, Texas
      January 30, 2006

                              Marcia L. Goldstein, Esq. (MG 2606)
                              Lori R. Fife, Esq. (LF 2839)

                              WEIL, GOTSHAL & MANGES LLP
                              767 Fifth Avenue
                              New York, NY   10153-0119
                              Telephone: (212) 310-8000
                              Facsimile: (212) 310-8007

                                     and

                              Alfredo R. Pérez, Esq.

                              WEIL, GOTSHAL & MANGES LLP
                              700 Louisiana, Suite 1600
                              Houston, TX   77002
                              Telephone: (713) 546-5000
                              Facsimile: (713) 224-9511

                              Attorneys for the Reorganized Debtors

# EXHIBIT 1

HO1:\326153\04\6ZNT04!.DOC\81793.0023

**CONFIDENTIAL**
**Michael Hills, Ph.d.**

Page 1

1          UNITED STATES BANKRUPTCY COURT

2          SOUTHERN DISTRICT OF NEW YORK

3     _____

4     IN RE:                    CHAPTER 11 Case No.

5     WORLDCOM, INC., ET AL,     02-13533 (AJG)

6     _____/    Jointly Administered

7                              Pages 1-190

8                              CONFIDENTIAL

9

10          The CONFIDENTIAL Deposition taken of

11               Michael Hills, Ph.D.

12               1300 Eye Street, N.W.

13                    Suite 900

14               Washington, D.C.  20005

15

16                    CONFIDENTIAL

17                    ORIGINAL

18

19 Reported by:   Chris Fox, Notary Public

20 Job No:   171232

21

**Esquire Deposition Services**
**DC 1-800-441-3376   MD 1-800-539-6398   VA 1-800-752-8979**

**CONFIDENTIAL**
**Michael Hills, Ph.d.**

Page 34

1 and out.

2    Q.   Now, Dr. Hills, I'm stating the obvious, but

3 you're not an attorney?

4    A.   Correct.

5    Q.   And you don't purport to give legal advice in

6 your opinion, correct?

7    A.   Correct.

8    Q.   Now, what were you asked to do in connection

9 with your opinions in this case?

10    A.   I was asked basically to educate the

11 attorneys as to what the different components were, and

12 how the -- how they behaved, how they were used --

13 sorry, how they behaved.

14    Q.   Anything else?  I'm not asking for, you know,

15 communications.

16    A.   I don't recall.  But the primary purpose was

17 education.

18    Q.   And in addition to that, obviously you were

19 asked to render an opinion and provide testimony?

20    A.   Yes.

21    Q.   What did you do in order to prepare your

**CONFIDENTIAL**
**Michael Hills, Ph.d.**

Page 36

1 website, you're a better man than I.

2    A.    I have no basis to give you an opinion on

3 that.

4    Q.    Anything else, sir?

5    A.    Not that I can recall.

6    Q.    Were you familiar with the COBRA service

7 prior to the time you were asked to, or you were

8 engaged in this matter?

9        MS. GUERON:  Objection.

10   A.    I had not heard the term COBRA before I was

11 engaged in this.

12   Q.    Have you -- have you conducted any sort of

13 physical inspection or any other on-site inspection of

14 the components of the COBRA service?

15   A.    No.

16   Q.    Do you know whether COBRA services are still

17 deployed or continues to be used?

18   A.    I have no knowledge, no.

19   Q.    And you have no knowledge that the COBRA

20 service was ever used for anything other than data?

21       MS. GUERON:  Objection.

**Esquire Deposition Services**
**DC 1-800-441-3376   MD 1-800-539-6398   VA 1-800-752-8979**

**CONFIDENTIAL**
**Michael Hills, Ph.d.**

Page 44

```
 1              (Deposition Exhibit No. 4 marked.)

 2      A.    This is one of the documents that considered.

 3      Q.    All right.  Can you recall any other

 4 documents that you considered?

 5      A.    I considered all the documents that were in

 6 the attachments.

 7      Q.    All right.  Well, I mean we've talked about

 8 the documents in the attachments, the objection.

 9 Anything else?

10      A.    Not that I can recall.

11      Q.    Did you review the statute?

12      A.    Yes.

13      Q.    And were you familiar with the statute?

14      A.    Yes.

15      Q.    How did you become familiar with the statute?

16      A.    From my work on the XO-case.

17      Q.    Is that the first time that you had learned

18 about that statute?

19      A.    I can't recall.

20      Q.    Had you ever rendered testimony in connection

21 with a federal excise tax before?
```

**CONFIDENTIAL**
**Michael Hills, Ph.d.**

Page 45

1    A.   Before XO?  No.

2    Q.   **What did you do to become familiar with the**

3 **statute?**

4    A.   I downloaded it from something,.gov.

5    Q.   **And did you -- did you get any other**

6 **information with respect to the statute?**

7    A.   In the XO case, I recall reviewing some IRS

8 opinion letters I think they were called.

9    Q.   **And did you rely on those opinion letters to**

10 **form your opinion, the opinion in your declaration?**

11    A.   No.

12    Q.   **Do you remember the gist of the opinion**

13 **letters?**

14    A.   No.

15    Q.   **Do you have any recollection what they were**

16 **about?**

17    A.   I can't recall.

18    Q.   **Did it aid you in forming your opinion?**

19          MS. GUERON:  Objection.

20    A.   No.

21    Q.   **When you -- did you -- other than counsel,**

**CONFIDENTIAL**
**Michael Hills, Ph.d.**

Page 49

1 opinion in this matter?

2          MS. GUERON:  Objection.

3     A.    I read five.  What was your question?

4     Q.    Is that your opinion in this matter?

5     A.    That is my opinion in the matter.

6     Q.    All right.  And what did you do to

7 familiarize yourself with what the COBRA services were?

8     A.    I reviewed all the documents in the

9 attachment to the original claim.

10     Q.    All right.  So your knowledge of COBRA is

11 limited by the various contractions that were included

12 in there?

13     A.    My knowledge is -- was based on the

14 contracts, plus other documents that were provided by

15 MCI.

16     Q.    Was there any -- oh, was there any other --

17 what I would call third party documentation, not

18 provided by MCI, that you used in order to determine

19 what COBRA services were?

20     A.    No.

21     Q.    Do you feel you have a good understanding of

**CONFIDENTIAL**
**Michael Hills, Ph.d.**

1 what the COBRA services were?

2      A.    Yes.

3      Q.    Do you -- would putting together the network

4 for the COBRA services, is that something that your

5 company would do?

6      A.    Our company would assist in sizing such

7 network, yes.

8      Q.    Would you or your company be able to tell

9 what it is, what things, what hardware, software,

10 firmware, was needed in order to make the network run?

11     A.    No.

12     Q.    What determination of what software, firmware

13 and hardware is needed to make the network run?  Is

14 that basically network design?  What is called network

15 design?

16     A.    That could be one component of what is called

17 network design, yes.

18     Q.    Are there other component of the network

19 design?

20     A.    I'm sure there are.

21     Q.    Does your company do network design?

**Esquire Deposition Services**
**DC 1-800-441-3376  MD 1-800-539-6398  VA 1-800-752-8979**

**CONFIDENTIAL**
**Michael Hills, Ph.d.**

Page 51

1     A.   Our company does network sizing.

2     Q.   **Can you tell me the difference between sizing**

3 **and design?**

4     A.   In sizing, we say how many ports you need,

5 and where they should be located.

6     Q.   **All right.**

7     A.   In design, you go out and buy the services or

8 the equipment to implement that number.

9     Q.   **So sizing comes first before design?**

10    A.   I would say it's an interactive process.

11    Q.   **The -- to your knowledge, based on your**

12 **information, who actually provides the COBRA services?**

13    A.   My understanding of the contracts is that

14 they're provided by the LEC.

15    Q.   **And who owns the equipment used to provide**

16 **the COBRA services?**

17    A.   I would have to review the contracts.

18 There's specific language in the contracts on ownership

19 and control that I can't recall.

20    Q.   **And what does -- what is it that MCI is**

21 **purchasing?**

**CONFIDENTIAL**
**Michael Hills, Ph.d.**

Page 87

1     A.    Based on Mr. Anderson's report, he said it

2 did not at the current configuration.

3     **Q.    When somebody dials, uses a dial-up Internet,**

4 **who are they calling?**

5          MS. GUERON:  Objection.

6     A.    They're calling a modem that is associated

7 with their ISP supplier.

8     **Q.    And who owns that modem?**

9          MS. GUERON:  Objection.

10    A.    That depends on contractual arrangements.

11    **Q.    I'm sorry, I'm talking about -- I'm talking**

12 **about COBRA.  In the COBRA context, who owns the modem?**

13    A.    The modem is part of the service that COBRA

14 provides to MCI.

15    **Q.    And so, in other words, the LEC owns the**

16 **modem?**

17    A.    That is a contractual issue.  My

18 understanding is yes, but I'm not a contractual expert.

19    **Q.    Is it fair to say that the person who uses**

20 **the dial-up Internet is calling the LEC?**

21    A.    That's a contractual issue.

**Esquire Deposition Services**
**DC 1-800-441-3376   MD 1-800-539-6398   VA 1-800-752-8979**

**CONFIDENTIAL**
**Michael Hills, Ph.d.**

Page 98

1      Q.    Do you know what that would be?

2      A.    There's a variety of solutions to that.

3      Q.    Have you actually implemented a VoIP system?

4      A.    No.

5      Q.    Have you -- have you implemented a network

6 system?

7      A.    I previously said no.

8      Q.    Now, the next question, and we'll get to this

9 in a little bit more detail.  You said COBRA services

10 contracts prove that the VoIP, that the services are

11 VoIP capable; thereby conceding that the COBRA services

12 are capable of voice quality communication.

13          Now, is that what you have you do in the next

14 few paragraphs and the next -- in your opinion,

15 paragraphs 13 through 31?

16          MS. GUERON:  Objection.

17     A.    Yes, that is my recollection.

18     Q.    And is your conclusion that the services are

19 VoIP capable, strictly based on a reading of the

20 contracts?

21     A.    It's based on a reading of the contracts,

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **WORLDCOM, INC., et al.,** | : | **02-13533 (AJG)** |
| | : | |
| **Reorganized Debtors** | : | **(Jointly Administered)** |

-------------------------------------------------------------------x

### ORDER GRANTING REORGANIZED DEBTORS' MOTION TO EXCLUDE CERTAIN TESTIMONY OF DR. MICHAEL HILLS FROM THE HEARING ON THE OBJECTION TO PROOF OF CLAIM NO. 38365 (DEPARTMENT OF TREASURY ADMINISTRATIVE EXPENSE CLAIM)

Upon consideration of the Reorganized Debtors' Motion to Exclude Certain

Testimony of Dr. Michael Hills from the Hearing on the Objection to Proof of Claim No. 38365

(Department of Treasury Administrative Expense Claim), dated January 30, 2006 (the "Motion"),

seeking entry of an order excluding testimony of Dr. Michael Hills, all as more fully set forth in

the Motion; and upon all the proceedings before the Court; and after due deliberation and good

and sufficient cause appearing therefor,

ORDERED that the Motion is hereby GRANTED; and it is further

ORDERED that all objections, if any, to the Motion or the relief requested therein,

that have not been withdrawn, waived or settled, and all reservations of rights included therein,

are overruled; and it is further

ORDERED that the requirement under Rule 9013-1(b) of the Local Bankruptcy

Rules for the Southern District of New York for the filing of a memorandum of law is waived.

Dated: New York, New York
_____, 2006

_____
United States Bankruptcy Judge

HO1:\326153\04\6ZNT04!.DOC\81793.0023

60

WEIL, GOTSHAL & MANGES LLP
Attorneys for Reorganized Debtors
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Pérez, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
```
|  |  |  |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11 Case No.** |
| **WORLDCOM, INC., et al.,** | : | **02-13533 (AJG)** |
| | : | |
| | : | **(Jointly Administered)** |
| **Reorganized Debtors.** | : | |

```
-------------------------------------------------------------x
```

**REORGANIZED DEBTORS' MOTION FOR (I) A DETERMINATION OF**
**REFUND RIGHTS PURSUANT TO SECTION 505(a)(1) OF THE BANKRUPTCY**
**CODE AND (II) CONSOLIDATION OF THAT DETERMINATION WITH THE**
**REORGANIZED DEBTORS' OBJECTION TO PROOF OF CLAIM NO. 38365**
**(DEPARTMENT OF TREASURY ADMINISTRATIVE EXPENSE CLAIM)**
**PURSUANT TO SECTION 105 OF THE BANKRUPTCY CODE AND RULES**
**9014 AND 7042 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

TO THE HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE:

MCI, LLC ("MCI"), f/k/a WorldCom, Inc., and certain of its direct and

indirect subsidiaries (collectively, the "Reorganized Debtors") hereby move this Court as

follows:

### PRELIMINARY STATEMENT

1.    The Reorganized Debtors and the Internal Revenue Service

("IRS") dispute whether a data service called COBRA (central office-based remote

access) that converts analog data from dial-up modems into a high-speed data stream for

the Internet should be subject to the forty-year old excise tax on local telephone service. Each party has claims against the other that arise from this same core set of facts and involve the same legal issues. On the one hand, one of the Reorganized Debtors, UUNET Technologies, Inc. ("UUNET"), paid millions of dollars in prepetition federal excise tax for its purchases of COBRA service, and has requested a refund of those payments from the IRS. On the other hand, the IRS asserts that UUNET owes approximately $16 million in additional excise tax for the COBRA services that it purchased.

2.    These factual and legal issues have been previously submitted to the Court in briefing related to the IRS claim and the Reorganized Debtors' objection to that claim. A hearing on the Reorganized Debtors' claim objection is currently scheduled for February 1, 2006. To date, the Reorganized Debtors have been pursuing their refund claims through the administrative procedures established by the IRS.

3.    Section 505 of the Bankruptcy Code provides this Court with authority to determine the legality of any tax *and* any right to a refund of taxes that have been erroneously collected. Because the parties are currently litigating the issue of whether federal excise tax applies to COBRA service in this Court, litigating the refund claims in a separate court would force the parties and the respective courts to duplicate efforts, thereby wasting limited resources.    Accordingly, the Reorganized Debtors request that this Court also determine their rights to a refund of any excise tax paid for COBRA service under section 505 of the Bankruptcy Code, and consolidate this motion with the pending claim objection.

## JURISDICTION

4.    This Court has jurisdiction to consider this matter pursuant to 28

U.S.C. §§ 157 and 1334 and the Confirmation Order. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### General

5.       On July 21, 2002 (the "Commencement Date") and November 8, 2002, the WorldCom and certain of its domestic subsidiaries commenced cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). By Orders dated July 22, 2002 and November 12, 2002, those chapter 11 cases were consolidated for procedural purposes. During the chapter 11 cases, WorldCom operated its businesses and managed its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.       On October 31, 2003, this Court entered an order (the "Confirmation Order") confirming WorldCom's Plan of Reorganization (the "Plan"). On April 20, 2004, the Plan became effective in accordance with its terms.

### UUNET's Refund Claims

7.       The Communications Excise Tax, codified in section 4251 of the Internal Revenue Code (the "Tax Code"), provides that only three types of "communications services" are subject to taxation: "local telephone service;" "toll telephone service;" and "teletypewriter exchange service." Although COBRA service does not provide the purchaser of the service with the ability to use a "telephone" or "communicate telephonically" with anyone, local exchange carriers ("LECs") that sell COBRA service collected the federal excise tax pertaining to telephone service from UUNET. Because COBRA service does not fall within any the definition of any taxable

service described in section 4251 of the Tax Code, UUNET submitted three refund claims to the IRS in the aggregate approximate amount of $38 million.

8.     First, UUNET requested a refund for federal excise tax it paid during the period beginning July, 1998 through December, 1998 (the "First Refund Claim"). A copy of the First Refund Claim is annexed hereto as Exhibit 1. Second, UUNET requested a refund for federal excise tax it paid during the period beginning January, 1999 through September, 2001 (the "Second Refund Claim"). A copy of the Second Refund Claim is annexed hereto as Exhibit 2. Third, UUNET requested a refund for federal excise tax it paid during the period beginning October, 2001 through December, 2004 (the "Third Refund Claim"). A copy of the Third Refund Claim is annexed hereto as Exhibit 3. These refund claims are hereinafter referred to collectively as the "Refund Claims."

9.     The Refund Claims were properly submitted to the IRS on Forms 8849 with supporting documentation in accordance with the procedures established by the IRS for refunds of taxes erroneously collected under section 4251 of the Tax Code. Pursuant to section 6415 of the Tax Code, the IRS has a duty to process claims for a refund of federal excise tax. The Reorganized Debtors have waited more than 120 days since the filing of the Refund Claims, as prescribed by section 505(a)(2)(B)(i) of the Bankruptcy Code, for the IRS to process such claims for refund before filing this motion. No judicial or administrative tribunal of competent jurisdiction adjudicated the Refund Claims prior to the Commencement Date.

## Proceedings Related to the IRS Claims

10.     On July 2, 2004, the IRS filed proof of claim no. 38365 (the "IRS

Claim")[1] in the amount of $16,276,440.81 as an administrative expense claim for excise taxes assessed against UUNET for its purchase of COBRA service.

11.    On August 5, 2004, the Reorganized Debtors filed their Objection to Proof of Claim No. 38365 (the "Objection") (Docket No. 12235) on the basis that no amount was due on such claim because COBRA services are not one of the services taxed by section 4251 of the Internal Revenue Code.

12.    On November 2, 2005, the IRS filed its Reply to the Objection under seal (the "Reply") (Docket No. 17489). In support of the Reply, the IRS offered the Declaration of Dr. Michael Hills (the "Hills Declaration") (Docket No. 17490).[2]

13.    On December 19, 2005, the Reorganized Debtors filed their Response to the Reply under seal regarding Proof of Claim No. 38365 (the "Response") (Docket No. 17743).

14.    The facts and legal theories underlying the Refund Claims are substantially similar to those described in the Objection and the Response. Accordingly, the Reorganized Debtors hereby incorporate their Objection and Response by reference as if fully set forth herein.

### RELIEF REQUESTED

15.    Pursuant to section 505(a)(1) of the Bankruptcy Code, the Reorganized Debtors request that the Court determine their rights under the Refund

---

[1]    On or about February 25, 2004, the IRS filed a related Request for Payment of Internal Revenue Taxes (Bankruptcy Code Cases—Administrative Expense) (Claim No. 37947). Later, the IRS withdrew Claim No. 37947 (Docket No. 16282). The Excise Tax Claim amends Claim No. 37947.

[2]    On October 5, 2005, this Court entered a Protective Order pursuant to section 107(b)(1) of the Bankruptcy Code and Rule 9018 of the Federal Rules of Bankruptcy Procedure (the "Protective Order") (Docket No. 17290). In accordance with the Protective Order, the Reply and the Hills Declaration were filed under seal with this Court.

Claims with respect to federal excise taxes paid for the purchase of COBRA service. UUNET has paid federal excise tax for a service that does not fall within the parameters of section 4251 of the Tax Code. Section 505(a)(2)(B) of the Bankruptcy Code expressly authorizes this Court to adjudicate and determine the Company's right to a refund of those tax payments.

16.     Moreover, this Court will determine whether UUNET owes federal excise tax on its purchases of COBRA service in connection with the Reorganized Debtors' Objection to the IRS Claim. In order to avoid wasting limited resources with duplicative litigation, the Reorganized Debtors also move the Court to consolidate this Motion with their Objection to the IRS Claim.

## ARGUMENT

### A.     Section 505 of the Bankruptcy Code vests this Court with authority to determine the Refund Claims.

17.     Section 505 of the Bankruptcy Code provides, in relevant part, as follows:

> Except as provided in paragraph (2) of this subsection, the court may determine the amount or legality of any tax, any fine or penalty related to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

11 U.S.C. § 505(a)(1).

18.     There are only two exceptions to section 505(a)(1)'s broad grant of authority to determine tax liabilities, contained in subsection (2) of the statute.[3] The first

---

[3]     Section 505(a)(2) of the bankruptcy Code provides as follows:

The court may not so determine –

exception prevents the court from adjudicating claims that were already contested and adjudicated in a court of competent jurisdiction prior to the commencement of the case.[4] The second exception provides that in the event the debtor seeks a tax refund, the court must grant the IRS a 120-day period in which to review the request.[5]

19.    In the present case, the first prohibition does not apply because there has been no final adjudication of the Refund Claims.  Likewise, the second prohibition does not apply because UUNET's refund requests were properly made on the IRS far longer than 120 days ago.  Because the Refund Claims have not been previously adjudicated, and the IRS has had more than 120 days to consider the Refund Claims, the Court is vested with the authority to determine the Refund Claims pursuant to section 505(a).[6]

**B.    Consolidation of the Refund Claims with the Objection is Appropriate.**

20.    Rule 42 of the Federal Rules of Civil Procedure, made applicable

---

(A)  the amount or legality of a tax, fine, penalty, or addition to tax if such amount or legality was contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the commencement of the case under this title; or

(B)  any right of the estate to a tax refund, before the earlier of –

(i)  120 days after the trustee properly requests such refund from the governmental unit from which such refund is claimed; or

(ii)  a determination by such governmental unit of such request.

11 U.S.C. § 505(a)(2).

[4]    *See* 11 U.S.C. § 505(a)(2)(A).

[5]    *See* 11 U.S.C. § 505(a)(2)(B).

[6]    *See, e.g.*, *City Vending of Muskogee, Inc. v. Oklahoma Tax Comm.*, 898 F.2d 122 (10th Cir. 1990); *In re Goldblatt Bros., Inc.*, 106 B.R. 522 (Bankr. N.D. Ill. 1989).

here by Rules 9014 and 7042 of the Federal Rules of Bankruptcy Procedure, provides that: "When actions involving a common question of law or fact are pending before the Court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning the proceedings therein as may tend to avoid unnecessary costs or delay." The Reorganized Debtors request that the Court consolidate the Objection to the IRS Claims with this Motion because the Refund Claims and the Objection require a determination of similar factual and legal issues that arise out of the same set of operative facts—UUNET's purchase of COBRA services. Consolidation of these matters would prevent the parties from wasting limited resources while litigating these issues in different courts. Further, consolidation of these matters is appropriate in this Court due to this Court's familiarity with the relevant facts and issues from the extensive briefing in the pleadings filed in connection with the Reorganized Debtors' Objection to the IRS Claim.

21.    Moreover, section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); *see also In re Hughes*, 281 B.R. 224, 226 (Bankr. S.D.N.Y. 2002) (stating "section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code"). As the competing claims arise from essentially the same set of operative facts, discovery and trial of the relevant issues in two courts would be largely duplicative. The Reorganized Debtors' Objection to the IRS Claim will require a determination of the following legal/factual issues: (a) did COBRA services provide UUNET with access to a local telephone system; (b) did COBRA service provide

UUNET with the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations in that local telephone system; and (d) did COBRA service provide UUNET with exclusive or priority use of communications channels, regardless of whether such channels or groups of channels may be connected through switching with a local telephone service. The determination of these same issues will determine the Reorganized Debtors' right to a refund of excise taxes paid in connection with the purchase of COBRA services. Because of the overlapping and intertwined nature of the parties' claims, liquidating them in a single forum would substantially reduce the litigation costs and burdens on both parties and the courts.

22.     Courts in the Second Circuit have recognized the importance of consolidating cases to serve the best interest of justice and judicial economy.[7]  Similarly, Courts in this Circuit recognize that duplicative actions thwart effective and efficient resolution of the underlying dispute.[8]  In accordance with established case law, the Refund Claims should be consolidated with the Objection in the interest of judicial economy and to avoid the needless duplicative liquidation of these claims, which are derived from the same set of operative facts.

---

[7]     *See, e.g.*, *Andrada v. Atherogenics, Inc.*, 2005 WL 912359, at *1 (S.D.N.Y. April 19, 2005) (noting that courts generally espouse the view that considerations of judicial economy favor consolidation); *A.V. by Versace, Inc. v. Versace*, 2005 WL 147364, at *2 (S.D.N.Y. Jan. 24, 2005) (citing *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284-85 (2d Cir. 1990)).

[8]     *See, e.g.*, *Mouchantaf v. Int'l Modeling & Talent Assoc.*, 368 F. Supp.2d 303, 307 (S.D.N.Y. 2005); *Lumbermens Mut. Cas. Co. v. Conn. Bank & Trust Co.*, 806 F.2d 411, 414 (2d Cir.1986) (noting the desirability of avoiding piecemeal litigation and the possibility of two interpretations of the same policy language in different courts); *Congress Talcott Corp. v. Roslin*, 1996 WL 499337, at *4 (S.D.N.Y. Sept. 4, 1996) (same).

## NOTICE

23.    Notice of this Motion has been provided pursuant to this Court's Order, dated December 23, 2002, establishing notice procedures in these chapter 11 cases and the IRS. In light of the nature of the relief requested herein, the Reorganized Debtors submit that no other or further notice need be provided.

## WAIVER OF MEMORANDUM OF LAW

24.    This Motion does not present any novel issues of law. Pursuant to Local Bankruptcy Rule for the Southern District of New York 9013-1(b), the Reorganized Debtors respectfully request that this Court waive the requirement that they file a memorandum of law in support of this Motion.

WHEREFORE the Reorganized Debtors respectfully request that this Court enter

an order granting the relief requested herein and other and further relief as is just.

Dated: Houston, Texas
       January 31, 2006

                                        /s/   Alfredo R. Pérez
                                        Marcia L. Goldstein, Esq. (MG 2606)
                                        Lori R. Fife, Esq. (LF 2839)

                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, NY 10153-0119
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007

                                                  and

                                        Alfredo R. Pérez, Esq.

                                        WEIL, GOTSHAL & MANGES LLP
                                        700 Louisiana, Suite 1600
                                        Houston, TX 77002
                                        Telephone: (713) 546-5000
                                        Facsimile: (713) 224-9511

                                        Attorneys for the Reorganized Debtors

Exhibit 1

Page 1 of 1

| Form **8849** (Rev. January 2001) | Department of the Treasury—Internal Revenue Service<br>**Claim for Refund of Excise Taxes** | | OMB No. 1545-1420 |
|---|---|---|---|

Please print in ALL CAPITAL LETTERS. Leave a blank box between words.

**Name of claimant**

U U N E T | T E C H N O L O G I E S | I N C

**Employer identification number (EIN)**

5 4 1 5 4 3 6 1 1

**Address (number, street, room or suite no.)**

1 1 3 3 | 1 9 t h | S t r e e t , | N W

**Social security number (SSN)**

**City and state or province. If you have a foreign address, see page 2.**

W a s h i n g t o n | D C

**ZIP code**

2 0 0 3 6

**Foreign country. If applicable. Do not abbreviate.**

**Month claimant's income tax year ends**

1 2

**Daytime telephone number (optional)**

2 0 2 7 3 6 6 1 6 9

**Caution:** *Do not claim any amounts on Form 8849 that were or will be claimed on Schedule C (Form 720), Adjustments and Claims, or Form 4136, Credit for Federal Tax Paid on Fuels.*

## Schedules Attached

Check (✓) the appropriate box(es) for the schedule(s) you attach to Form 8849. Only attach the schedules on which you are claiming a refund. Claims on Schedules 2, 3, 5, and Section 4091(d) claims on Schedule 6, cannot be combined with any other schedules on Form 8849. File each of these schedules with a separate Form 8849.

| | | |
|---|---|---|
| Schedule 1 | Nontaxable Use of Fuels. . . . . . . . . . . . . . . . . . . . . . . | ☐ |
| Schedule 2 | Sales by Registered Ultimate Vendors of Undyed Diesel Fuel and Undyed Kerosene. . . . . | ☐ |
| Schedule 3 | Gasohol Blending . . . . . . . . . . . . . . . . . . . . . . . | ☐ |
| Schedule 4 | Sales by Gasoline Wholesale Distributors . . . . . . . . . . . . . . . | ☐ |
| Schedule 5 | Section 4081(e) Claims . . . . . . . . . . . . . . . . . . . . | ☐ |
| Schedule 6 | Other Claims . . . . . . . . . . . . . . . . . . . . . . . | ☒ |

Under penalties of perjury, I declare (1) that I have examined this claim, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and (2) that amounts claimed on this form have not been, and will not be, claimed on any other form.

**Sign Here**

Signature and title (if applicable)                11-30-01

Date

David Mahida        Director, Consumption Taxes
(Please type or print your name below signature)

For Privacy Act and Paperwork Reduction Act Notice, see instructions.        Cat. No. 20027J        Form **8849** (Rev. 1-2001)

[ Return to top of document ]
Click here to download the link templates for your publications.

*We welcome your comments and suggestions on our web site.
Please send them to CSINTNET@cch.com*

Copyright © 2001, CCH INCORPORATED. All rights reserved.

Page 1 of 2

| Schedule 6 (Form 8849) (Rev. January 2001) | Department of the Treasury—Internal Revenue Service **Other Claims** ► Attach to Form 8849. ► See Instructions on page 2. | | OMB No. 1545-1420 |
|---|---|---|---|
| Name as shown on Form 8849 UNNET TECHNOLOGIES, INC. | | EIN or SSN 54-1543611 | Total refund $ 2,793,989 |

Enter the earliest and latest dates of the events included in this claim. Enter In MMDDYYYY format.

Earliest date ► 07011998.        Latest date ► 12311988

Claimant's registration number for Section 4091(d) claims. ► _____

| Claim | Amount of refund | |
|---|---|---|
| 1  Federal Excise Tax paid to local exchange companies on purchases of Communications Services | $ 2,793,989 | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |

Use the space below for an explanation of each claim listed.

    SEE ATTACHED

For Privacy Act and Paperwork Reduction Act Notice, see Form 8849 Instructions.    Cat. No. 27454M    Schedule 6 (Form 8849) [Rev. 1-2001]

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| AMERITECH | $ 1,353,714 | $ 40,611 |
| ATT | 2,273,809 | 68,214 |
| BANKNET | 62,328 | 1,870 |
| BELL ATLANTIC | 5,227,327 | 156,820 |
| BELL CANADA | 70,112 | 2,103 |
| BROOKF | 47,737 | 1,432 |
| BELL SOUTH | 5,633,815 | 169,014 |
| CINCINNATI BELL | 205,019 | 6,151 |
| FBRSOUTH | 96,187 | 2,886 |
| FIBERNET | 45,810 | 1,374 |
| FRANCE TELECOM | 34,024 | 1,021 |
| GTE | 22,310,111 | 669,303 |
| IC | 73,951 | 2,219 |
| ICTC | 58,427 | 1,753 |
| NEXTLINK | 37,757 | 1,133 |
| ORION | 55,644 | 1,669 |
| PACBELL | 1,347,552 | 40,427 |
| QWEST | 3,457,546 | 103,726 |
| SNET | 345,164 | 10,355 |
| SPRINT | 347,964 | 10,439 |
| SOUTHWESTERN BELL | 2,713,657 | 81,410 |
| TCG | 89,354 | 2,681 |
| **3rd Quarter 1998** | **$ 45,887,008** | **$ 1,376,610** |
| | | |
| ALLTEL | $ 6,163 | $ 185 |
| AMERITECH | 1,786,494 | 53,595 |
| ATCTEL | 350,840 | 10,525 |
| ATT | 1,341,912 | 40,257 |
| BANKNET | 41,552 | 1,247 |
| BELL ATLANTIC | 4,904,264 | 147,128 |
| BELL CANADA | 103,320 | 3,100 |
| BELL SOUTH | 6,244,509 | 187,335 |
| CINCINNATI BELL | 277,560 | 8,327 |
| COMSAT | 43,512 | 1,305 |
| FBRSOUTH | 65,089 | 1,953 |
| GTE | 20,408,062 | 612,242 |
| IC | 33,874 | 1,016 |
| ICTC | 88,397 | 2,652 |
| ORION | 60,704 | 1,821 |
| PACBELL | 2,102,969 | 63,089 |
| QWEST | 4,544,053 | 136,322 |
| SNET | 425,492 | 12,765 |
| SPRINT | 398,336 | 11,950 |
| SOUTHWESTERN BELL | 4,018,852 | 120,566 |
| **4th Quarter 1998** | **$ 47,245,955** | **$ 1,417,379** |
| | | |
| **1998 Total** | **$ 93,132,962** | **$ 2,793,989** |

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| AMERITECH | 1,353,714 | 40,611 |
| ATT | 2,273,809 | 68,214 |
| BANKNET | 62,328 | 1,870 |
| BELL ATLANTIC | 5,227,327 | 156,820 |
| BELL CANADA | 70,112 | 2,103 |
| BROOKF | 47,737 | 1,432 |
| BELL SOUTH | 5,633,815 | 169,014 |
| CINCINNATI BELL | 205,019 | 6,151 |
| FBRSOUTH | 96,187 | 2,886 |
| FIBERNET | 45,810 | 1,374 |
| FRANCE TELECOM | 34,024 | 1,021 |
| GTE | 22,310,111 | 669,303 |
| IC | 73,951 | 2,219 |
| ICTC | 58,427 | 1,753 |
| NEXTLINK | 37,757 | 1,133 |
| ORION | 55,644 | 1,669 |
| PACBELL | 1,347,552 | 40,427 |
| QWEST | 3,457,546 | 103,726 |
| SNET | 345,164 | 10,355 |
| SPRINT | 347,964 | 10,439 |
| SOUTHWESTERN BELL | 2,713,657 | 81,410 |
| TCG | 89,354 | 2,681 |
| **3rd Quarter 1998** | **45,887,008** | **1,376,610** |
| | | |
| AMERITECH | 1,786,494 | 53,595 |
| ATCTEL | 350,840 | 10,525 |
| ATT | 1,341,912 | 40,257 |
| BANKNET | 41,552 | 1,247 |
| BELL ATLANTIC | 4,904,264 | 147,128 |
| BELL CANADA | 103,320 | 3,100 |
| BELL SOUTH | 6,244,509 | 187,335 |
| CINCINNATI BELL | 277,560 | 8,327 |
| COMSAT | 43,512 | 1,305 |
| FBRSOUTH | 65,089 | 1,953 |
| GTE | 20,408,062 | 612,242 |
| IC | 33,874 | 1,016 |
| ICTC | 88,397 | 2,652 |
| ORION | 60,704 | 1,821 |
| PACBELL | 2,102,969 | 63,089 |
| QWEST | 4,544,053 | 136,322 |
| SNET | 425,492 | 12,765 |
| SPRINT | 398,336 | 11,950 |
| SOUTHWESTERN BELL | 4,018,852 | 120,566 |
| **4th Quarter 1998** | **47,245,955** | **1,417,379** |
| | | |
| **1998 Total** | **93,132,962** | **2,793,989** |

Exhibit 2

Page 1 of 1

| Form **8849** (Rev. January 2001) | Department of the Treasury—Internal Revenue Service **Claim for Refund of Excise Taxes** | OMB No. 1545-1420 |
|---|---|---|

Please print in ALL CAPITAL LETTERS. Leave a blank box between words.

**Name of claimant**
H U N P T   T E C H N O L O G I E S   I N C

**Employer identification number (EIN)**
5 4   1 5 4 3 6 1 1

**Address (number, street, room or suite no.)**
1 1 3 3   1 9 t h   S T R E E T,   N W

**Social security number (SSN)**

**City and state or province. If you have a foreign address, see page 2.**
W A S H I N G T O N ,   D C

**ZIP code**
2 0   0 3 6

**Foreign country, if applicable. Do not abbreviate.**

**Month claimant's income tax year ends**
1 2

**Daytime telephone number (optional)**
2 0 7   3 6 6 1 6 5

**Caution:** *Do not claim any amounts on Form 8849 that were or will be claimed on Schedule C (Form 720), Adjustments and Claims, or Form 4136, Credit for Federal Tax Paid on Fuels.*

## Schedules Attached

Check (✓) the appropriate box(es) for the schedule(s) you attach to Form 8849. Only attach the schedules on which you are claiming a refund. Claims on Schedules 2, 3, 5, and Section 4091(d) claims on Schedule 6, cannot be combined with any other schedules on Form 8849. File each of these schedules with a separate Form 8849.

| Schedule 1 | Nontaxable Use of Fuels | ☐ |
|---|---|---|
| Schedule 2 | Sales by Registered Ultimate Vendors of Undyed Diesel Fuel and Undyed Kerosene | ☐ |
| Schedule 3 | Gasohol Blending | ☐ |
| Schedule 4 | Sales by Gasoline Wholesale Distributors | ☐ |
| Schedule 5 | Section 4081(e) Claims | ☐ |
| Schedule 6 | Other Claims | ☑ |

Under penalties of perjury, I declare (1) that I have examined this claim, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and (2) that amounts claimed on this form have not been, and will not be, claimed on any other form.

**Sign Here**

Signature and title (if applicable)                                Date  2-20-02

David Mahida
(Please type or print your name below signature.)                Director, Consumption Taxes

For Privacy Act and Paperwork Reduction Act Notice, see instructions.        Cat. No. 20027J        Form **8849** (Rev. 1-2001)

---

**[ Return to top of document ]**
Click here to download the link templates for your publications.

*We welcome your comments and suggestions on our web site.*
Please send them to CSINTNET@cch.com

*Copyright © 2001, CCH INCORPORATED. All rights reserved.*

| Schedule 6<br>(Form 8849)<br>(Rev. January 2001) | Department of the Treasury—Internal Revenue Service<br>**Other Claims**<br>► Attach to Form 8849. ► See instructions on page 2. | | OMB No. 1545-1420 |
|---|---|---|---|
| Name as shown on Form 8849<br>UUNET TECHNOLOGIES, INC. | | EIN or SSN<br>54-1543611 | Total refund<br>$ 21,242,772 |

Enter the earliest and latest dates of the events included in this claim. Enter in MMDDYYYY format.

Earliest date ► 01011999        Latest date ► 09302001

Claimant's registration number for Section 4091(d) claims. ► _____

| Claim | Amount of refund | |
|---|---|---|
| FEDERAL EXCISE TAX paid to local exchange companies <br> 1 on purchases of Communication services. | $ 21,242,772 | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |

Use the space below for an explanation of each claim listed.

For Privacy Act and Paperwork Reduction Act Notice, see Form 8849 instructions.    Cat. No. 27454M    Schedule 6 (Form 8849) (Rev. 1-2001)

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**REFUND SUMMARY**

| Period | | Communication Services | | Tax Paid |
|---|---|---|---|---|
| 1st Quarter 1999 | $ | 48,597,321 | $ | 1,457,920 |
| 2nd Quarter 1999 | | 55,071,524 | | 1,652,146 |
| 3rd Quarter 1999 | | 43,381,853 | | 1,301,456 |
| 4th Quarter 1999 | | 51,063,226 | | 1,531,897 |
| 1st Quarter 2000 | | 49,694,955 | | 1,490,849 |
| 2nd Quarter 2000 | | 55,185,674 | | 1,655,570 |
| 3rd Quarter 2000 | | 61,553,949 | | 1,846,618 |
| 4th Quarter 2000 | | 67,415,604 | | 2,022,468 |
| 1st Quarter 2001 | | 77,273,753 | | 2,318,213 |
| 2nd Quarter 2001 | | 85,921,073 | | 2,577,632 |
| 3rd Quarter 2001 | | 112,933,419 | | 3,388,003 |
| Total Refund Claim | $ | | $ | 21,242,772 |

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**1ST QUARTER 1999**

| Vendor Name | Communication Services | | Tax Paid |
|---|---:|---|---:|
| ALLTEL | $ | 91,417 | $ 2,743 |
| AMERITECH | | 2,140,102 | 64,203 |
| ATCTEL | | 2,517,837 | 75,535 |
| ATT | | 2,310,281 | 69,308 |
| BANKNET | | 62,328 | 1,870 |
| BELL ATLANTIC | | 3,687,631 | 110,629 |
| BELL CANADA | | 75,215 | 2,256 |
| BELL SOUTH | | 696,114 | 20,883 |
| CINCINNATI BELL | | 273,534 | 8,206 |
| COMSAT | | 170,966 | 5,129 |
| FIBER SOUTH | | 124,331 | 3,730 |
| GCI | | 59,815 | 1,794 |
| GTE | | 22,649,840 | 679,495 |
| IC | | 65,515 | 1,965 |
| ICG | | 64,729 | 1,942 |
| ICTC | | 88,254 | 2,648 |
| ORION | | 80,976 | 2,429 |
| PACIFIC BELL | | 2,169,643 | 65,089 |
| QWEST | | 5,251,858 | 157,556 |
| SNET | | 523,377 | 15,701 |
| SPRINT | | 566,833 | 17,005 |
| SOUTHWESTERN BELL | | 4,891,083 | 146,732 |
| TIME WARNER | | 35,641 | 1,069 |
| 1st Quarter 1999 | $ | 48,597,321 | $ 1,457,920 |

/z

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**2ND QUARTER 1999**

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| ALLTEL | $ 131,594 | $ 3,948 |
| AMERITECH | 255,381 | 7,661 |
| ATCTEL | 1,560,270 | 46,808 |
| ATT | 2,153,612 | 64,608 |
| BANKNET | 98,258 | 2,948 |
| BELL ATLANTIC | 3,229,116 | 96,873 |
| BELL CANADA | 56,524 | 1,696 |
| BELLSOUTH | 1,783,927 | 53,518 |
| CINCINNATI BELL | 294,931 | 8,848 |
| COMSAT | 130,181 | 3,905 |
| FIBER SOUTH | 147,259 | 4,418 |
| FRONTIER | 185,188 | 5,556 |
| GCI | 42,088 | 1,263 |
| GTE | 27,226,668 | 816,800 |
| IC | 166,598 | 4,998 |
| ICG | 57,867 | 1,736 |
| ICTC | 115,327 | 3,460 |
| NEXTLINK | 37,179 | 1,115 |
| ORION | 64,607 | 1,938 |
| PACIFIC BELL | 2,295,949 | 68,878 |
| QWEST | 8,203,911 | 246,117 |
| SNET | 687,147 | 20,614 |
| SPRINT | 770,098 | 23,103 |
| SOUTHWESTERN BELL | 5,035,443 | 151,063 |
| TELDAT | 296,007 | 8,880 |
| TIME WARNER | 46,394 | 1,392 |
| **2nd Quarter 1999** | **$ 55,071,524** | **$ 1,652,146** |

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**3RD QUARTER 1999**

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| ALLTEL | $ 160,366 | $ 4,811 |
| AMERITECH | 3,754,528 | 112,636 |
| ATCTEL | 1,582,980 | 47,489 |
| ATT | 1,952,283 | 58,569 |
| BANKNET | 46,588 | 1,398 |
| BELL ATLANTIC | 4,723,261 | 141,698 |
| BELL CANADA | 48,460 | 1,454 |
| BELLSOUTH | 1,177,901 | 35,337 |
| CINCINNATI BELL | 291,880 | 8,756 |
| COMSAT | 272,200 | 8,166 |
| FIBER SOUTH | 146,651 | 4,400 |
| FRONTIER | 897,454 | 26,924 |
| GCI | 47,596 | 1,428 |
| GTE | 4,528,451 | 135,854 |
| IC | 60,010 | 1,800 |
| ICG | 93,163 | 2,795 |
| ICTC | 125,206 | 3,756 |
| NEXTLINK | 73,122 | 2,194 |
| PACIFIC BELL | 2,625,585 | 78,768 |
| QWEST | 11,463,854 | 343,916 |
| SCT.A | 96,665 | 2,900 |
| SNET | 659,455 | 19,784 |
| SPRINT | 704,869 | 21,146 |
| SOUTHWESTERN BELL | 7,641,142 | 229,234 |
| TIME WARNER | 159,611 | 4,788 |
| TXU | 48,573 | 1,457 |
| 3rd Quarter 1999 | $ 43,381,853 | $ 1,301,456 |

UUNET TECHNOLOGIES, INC.
ATTACHMENT TO SCHEDULE 6 OF FORM 8849
DETAIL FOR REFUND
4TH QUARTER 1999

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| ALLTEL | $ 181,798 | $ 5,454 |
| AMERITECH | 4,891,973 | 146,759 |
| ATCTEL | 1,675,493 | 50,265 |
| ATT | 1,760,189 | 52,806 |
| BANKNET | 139,764 | 4,193 |
| BELL ATLANTIC | 5,476,916 | 164,307 |
| BELL CANADA | 57,732 | 1,732 |
| BELL SOUTH | 2,019,339 | 60,580 |
| CINCINNATI BELL | 235,236 | 7,057 |
| COMSAT | 156,809 | 4,704 |
| FIBER SOUTH | 160,643 | 4,819 |
| FRONTIER | 104,111 | 3,123 |
| GCI | 60,752 | 1,823 |
| GTE | 1,400,037 | 42,001 |
| IC | 51,468 | 1,544 |
| ICG | 87,153 | 2,615 |
| ICTC | 126,015 | 3,780 |
| NEXTLINK | 50,968 | 1,529 |
| ORION | 75,879 | 2,276 |
| PACIFIC BELL | 2,863,952 | 85,919 |
| QWEST | 13,236,703 | 397,101 |
| SNET | 450,906 | 13,527 |
| SPRINT | 1,403,675 | 42,110 |
| SOUTHWESTERN BELL | 14,045,696 | 421,371 |
| TIME WARNER | 130,425 | 3,913 |
| TXU | 219,593 | 6,588 |
| 4th Quarter 1999 | $ 51,063,226 | $ 1,531,897 |

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**1ST QUARTER 2000**

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| ALLTEL | $ 247,762 | $ 7,433 |
| AMERITECH | 3,030,799 | 90,924 |
| ATCTEL | 2,865,434 | 85,963 |
| ATT | 1,948,447 | 58,453 |
| BANKNET | 69,882 | 2,096 |
| BELL ATLANTIC | 7,074,129 | 212,224 |
| BELL CANADA | 64,590 | 1,938 |
| BELLSOUTH | 2,092,542 | 62,776 |
| CINCINNATI BELL | 259,048 | 7,771 |
| COMSAT | 142,305 | 4,269 |
| FIBER SOUTH | 157,183 | 4,715 |
| FRONTIER | 78,908 | 2,367 |
| GCI | 85,104 | 2,553 |
| GTE | 2,168,124 | 65,044 |
| HICKORY | 36,810 | 1,104 |
| IC | 53,683 | 1,611 |
| ICG | 149,127 | 4,474 |
| ICTC | 126,696 | 3,801 |
| NORTHWESTERN BELL | 101,284 | 3,039 |
| NEXTLINK | 50,559 | 1,517 |
| ORION | 83,646 | 2,509 |
| PACIFIC BELL | 3,319,142 | 99,574 |
| PANAMSAT | 36,900 | 1,107 |
| QWEST | 14,332,755 | 429,983 |
| SNET | 445,232 | 13,357 |
| SPRINT | 1,292,839 | 38,785 |
| SOUTHWESTERN BELL | 8,608,550 | 258,257 |
| TELENERGY | 60,433 | 1,813 |
| TELLARGA | 317,350 | 9,521 |
| TIME WARNER | 160,148 | 4,804 |
| TXU | 235,543 | 7,066 |
| 1st Quarter 2000 | $ 49,694,955 | $ 1,490,849 |

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**2ND QUARTER 2000**

|  | Communication | |
| --- | --- | --- |
| **Vendor Name** | **Services** | **Tax Paid** |
| **ALLTEL** | $      177,097 | $        5,313 |
| **AMERITECH** | 5,930,025 | 177,901 |
| **ATCTEL** | 3,533,657 | 106,010 |
| **ATT** | 2,842,854 | 85,286 |
| **BANKNET** | 69,882 | 2,096 |
| **BELL ATLANTIC** | 7,232,571 | 216,977 |
| **BELL CANADA** | 54,785 | 1,644 |
| **BELL SOUTH** | 1,747,331 | 52,420 |
| **CINCINNATI BELL** | 266,960 | 8,009 |
| **COMSAT** | 111,152 | 3,335 |
| **FIBER SOUTH** | 155,955 | 4,679 |
| **FRONTIER** | 205,872 | 6,176 |
| **GCI** | 84,841 | 2,545 |
| **GTE** | 1,074,100 | 32,223 |
| **HICKORY** | 34,977 | 1,049 |
| **ICG** | 193,626 | 5,809 |
| **ICTC** | 140,089 | 4,203 |
| **KMCTEL** | 382,133 | 11,464 |
| **NORTHWESTERN BELL** | 68,054 | 2,042 |
| **NEXTLINK** | 43,564 | 1,307 |
| **ORION** | 59,962 | 1,799 |
| **PACIFIC BELL** | 4,287,948 | 128,638 |
| **PANAMSAT** | 36,900 | 1,107 |
| **QWEST** | 16,229,355 | 486,881 |
| **SNET** | 729,111 | 21,873 |
| **SPRINT** | 1,296,570 | 38,897 |
| **SOUTHWESTERN BELL** | 7,580,319 | 227,410 |
| **TELENERG** | 55,500 | 1,665 |
| **TELLARGA** | 153,000 | 4,590 |
| **TIME WARNER** | 171,218 | 5,137 |
| **TXU** | 236,266 | 7,088 |
| **2nd Quarter 2000** | $  55,185,674 | $    1,655,570 |

86

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**3RD QUARTER 2000**

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| ACCESS | $ 47,364 | $ 1,421 |
| ALLTEL | 250,801 | 7,524 |
| AMERITECH | 6,820,970 | 204,629 |
| ATCTEL | 3,339,635 | 100,189 |
| ATT | 2,394,602 | 71,838 |
| BANKNET | 54,682 | 1,640 |
| BELL ATLANTIC | 7,791,872 | 233,756 |
| BELL SOUTH | 2,434,303 | 73,029 |
| CENTURA | 99,868 | 2,996 |
| CINCINNATI BELL | 271,070 | 8,132 |
| COMSAT | 125,415 | 3,762 |
| FIBER SOUTH | 157,285 | 4,719 |
| FRONTIER | 322,055 | 9,662 |
| GCI | 84,841 | 2,545 |
| GTE | 1,257,333 | 37,720 |
| ICG | 300,198 | 9,006 |
| ICTC | 145,211 | 4,356 |
| INTERNATIONAL FIBER | 119,083 | 3,572 |
| KMCTEL | 2,000,961 | 60,029 |
| NEXTLINK | 47,735 | 1,432 |
| ORION | 85,722 | 2,572 |
| PACIFIC BELL | 4,902,890 | 147,087 |
| PANAMSAT | 42,700 | 1,281 |
| QWEST | 17,059,817 | 511,795 |
| SCT.A | 64,557 | 1,937 |
| SNET | 1,015,576 | 30,467 |
| SPRINT | 1,425,546 | 42,766 |
| SOUTHWESTERN BELL | 8,247,457 | 247,424 |
| TELENERGY | 55,500 | 1,665 |
| TELLARGA | 153,000 | 4,590 |
| TIME WARNER | 153,503 | 4,605 |
| TXU | 282,398 | 8,472 |
| 3rd Quarter 2000 | $ 61,553,949 | $ 1,846,618 |

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**4TH QUARTER 2000**

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| ACS.A | $ 46,681 | $ 1,400 |
| ALLTEL | 214,824 | 6,445 |
| AMERITECH | 7,626,980 | 228,809 |
| ATCTEL | 3,579,092 | 107,373 |
| ATT | 2,513,645 | 75,409 |
| BANKNET | 47,082 | 1,412 |
| BELL ATLANTIC | 9,157,166 | 274,715 |
| BELL CANADA | 45,862 | 1,376 |
| BELLSOUTH | 4,883,182 | 146,495 |
| CENTURA | 481,609 | 14,448 |
| CINCINNATI BELL | 312,546 | 9,376 |
| COMSAT | 125,415 | 3,762 |
| FIBER SOUTH | 157,285 | 4,719 |
| FRONTIER | 379,672 | 11,390 |
| GCI | 84,841 | 2,545 |
| GTE | 2,127,531 | 63,826 |
| ICG | 519,662 | 15,590 |
| ICTC | 143,584 | 4,308 |
| INTERNATIONAL FIBER | 102,071 | 3,062 |
| KMCTEL | 1,039,171 | 31,175 |
| NEXTLINK | 49,380 | 1,481 |
| ORION | 85,722 | 2,572 |
| PACIFIC BELL | 4,977,922 | 149,338 |
| PANAMSAT | 36,900 | 1,107 |
| QWEST | 17,785,034 | 533,551 |
| SCT.A | 41,288 | 1,239 |
| SNET | 1,173,865 | 35,216 |
| SPRINT | 1,628,339 | 48,850 |
| SOUTHWESTERN BELL | 7,267,893 | 218,037 |
| TELENERGY | 55,500 | 1,665 |
| TELLARGA | 262,086 | 7,863 |
| TIME WARNER | 184,318 | 5,530 |
| TXU | 279,454 | 8,384 |
| 4th Quarter 2000 | $ 67,415,604 | $ 2,022,468 |

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**1ST QUARTER 2001**

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| ALLTEL | $ 201,561 | $ 6,047 |
| AMERITECH | 9,218,390 | 276,552 |
| ATCTEL | 3,181,197 | 95,436 |
| ATT | 2,362,770 | 70,883 |
| BELL ATLANTIC | 9,562,350 | 286,871 |
| BELL CANADA | 257,120 | 7,714 |
| BELLSOUTH | 4,619,950 | 138,598 |
| CENTURA | 330,115 | 9,903 |
| CINCINATTI BELL | 273,914 | 8,217 |
| CITIZEN | 1,018,315 | 30,549 |
| FIBER SOUTH | 172,211 | 5,166 |
| FRONTIER | 416,024 | 12,481 |
| GCI | 84,906 | 2,547 |
| GTE | 1,864,089 | 55,923 |
| ICG | 281,358 | 8,441 |
| ICTC | 143,855 | 4,316 |
| INTENATIONAL FIBER | 102,071 | 3,062 |
| KMCTEL | 1,141,793 | 34,254 |
| NEXTLINK | 42,051 | 1,262 |
| ORION | 72,448 | 2,173 |
| PACIFIC BELL | 6,716,428 | 201,493 |
| QWEST | 24,925,904 | 747,777 |
| SCT.A | 41,288 | 1,239 |
| SNET | 1,194,414 | 35,832 |
| SPRINT | 1,540,901 | 46,227 |
| SOUTHWESTERN BELL | 6,658,443 | 199,753 |
| TELENERGY | 37,000 | 1,110 |
| TELLARGA | 316,629 | 9,499 |
| TIME WARNER | 217,048 | 6,511 |
| TXU | 279,211 | 8,376 |
| 1st Quarter 2001 | $ 77,273,753 | $ 2,318,213 |

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**2ND QUARTER 2001**

|  | Communication | | |
| --- | --- | --- | --- |
| <u>Vendor Name</u> | <u>Services</u> | | <u>Tax Paid</u> |
| **ALLTEL** | $ 276,802 | $ | 8,304 |
| **AMERITECH** | 9,012,772 | | 270,383 |
| **ATCTEL** | 3,053,661 | | 91,610 |
| **ATT** | 2,469,777 | | 74,093 |
| **BELL ATLANTIC** | 13,000,004 | | 390,000 |
| **BELLSOUTH** | 4,670,992 | | 140,130 |
| **CINCINNATI BELL** | 254,408 | | 7,632 |
| **CITIZEN** | 83,105 | | 2,493 |
| **FIBER SOUTH** | 156,611 | | 4,698 |
| **FRONTIER** | 416,301 | | 12,489 |
| **GCI** | 96,405 | | 2,892 |
| **GTE** | 1,952,558 | | 58,577 |
| **ICG** | 246,492 | | 7,395 |
| **ICTC** | 147,589 | | 4,428 |
| **INTERNATIONAL FIBER** | 102,071 | | 3,062 |
| **KMCTEL** | 1,251,174 | | 37,535 |
| **NEXTLINK** | 49,079 | | 1,472 |
| **ORION** | 85,722 | | 2,572 |
| **PACIFIC BELL** | 6,865,151 | | 205,955 |
| **QWEST** | 31,797,284 | | 953,919 |
| **SCT.A** | 85,094 | | 2,553 |
| **SNET** | 1,001,887 | | 30,057 |
| **SPRINT** | 1,605,124 | | 48,154 |
| **SOUTHWESTERN BELL** | 5,977,717 | | 179,332 |
| **TELLARGA** | 698,430 | | 20,953 |
| **TIME WARNER** | 285,432 | | 8,563 |
| **TXU** | 279,431 | | 8,383 |
| **2nd Quarter 2001** | $ 85,921,073 | $ | 2,577,632 |

UUNET TECHNOLOGIES, INC.
ATTACHMENT TO SCHEDULE 6 OF FORM 8849
DETAIL FOR REFUND
3RD QUARTER 2001

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| ALLTEL | $ 237,285 | $ 7,119 |
| AMERITECH | 18,564,610 | 556,938 |
| ATCTEL | 2,177,750 | 65,333 |
| ATT | 2,683,310 | 80,499 |
| BELL ATLANTIC | 14,060,881 | 421,826 |
| BELL SOUTH | 18,438,247 | 553,147 |
| CENTURA | 68,112 | 2,043 |
| CINCINNATI BELL | 67,717 | 2,032 |
| CITIZEN | 82,511 | 2,475 |
| FIBER SOUTH | 152,675 | 4,580 |
| FRONTIER | 433,531 | 13,006 |
| GCI | 84,938 | 2,548 |
| GTE | 2,238,583 | 67,157 |
| ICG | 176,012 | 5,280 |
| ICTC | 144,006 | 4,320 |
| INTERNATIONAL FIBER | 102,071 | 3,062 |
| KMCTEL | 1,225,577 | 36,767 |
| NEXTLINK | 55,830 | 1,675 |
| ORION | 77,268 | 2,318 |
| PACIFIC BELL | 9,706,614 | 291,198 |
| QWEST | 31,809,812 | 954,294 |
| SCT.A | 96,671 | 2,900 |
| SNET | 3,001,502 | 90,045 |
| SPRINT | 1,557,132 | 46,714 |
| SOUTHWESTERN BELL | 4,955,216 | 148,656 |
| TELLARGA | 218,086 | 6,543 |
| TIME WARNER | 238,261 | 7,148 |
| TXU | 279,211 | 8,376 |
| 3rd Quarter 2001 | $ 112,933,419 | $ 3,388,003 |

Exhibit 3

Form **8849**
(Rev. January 2003)

Department of the Treasury—Internal Revenue Service

# Claim for Refund of Excise Taxes

OMB No. 1545-1420

Print clearly. Leave a blank box between words.

Name of claimant

U U N E T   T e c h n o l o g i e s   I n c

Employer identification number (EIN)

5 4 1   5 4 3 6   1 1

Address (number, street, room or suite no.)

2 2 0 0 1   L o u d o u n   C o u n t y   P k w y

Social security number (SSN)

City and state or province. If you have a foreign address, see page 2.

A s h b u r n ,   V A

ZIP code

2 0 1 4 7

Foreign country, if applicable. Do not abbreviate.

Month claimant's income tax year ends

1 2

Daytime telephone number (optional)

7 0 3 8 8   6 5 2 9 1

**Caution:** *Do not use Form 8849 to make adjustments to liability reported on Forms 720 for prior quarters or to claim any amounts that were or will be claimed on Schedule C (Form 720), Claims, Form 4136, Credit for Federal Tax Paid on Fuels, Form 2290, Heavy Highway Vehicle Use Tax Return, or Form 730, Monthly Tax Return On Wagers.*

## Schedules Attached

Check (✓) the appropriate box(es) for the schedule(s) you attach to Form 8849. Only attach the schedules on which you are claiming a refund. Schedules 2, 3, 5, and section 4091(d) claims on Schedule 6 cannot be filed with any other schedules on Form 8849. File each of these schedules with a separate Form 8849.

| | | |
|---|---|---|
| **Schedule 1** | Nontaxable Use of Fuels . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ☐ |
| **Schedule 2** | Sales by Registered Ultimate Vendors of Undyed Diesel Fuel and Undyed Kerosene . . . . . . . | ☐ |
| **Schedule 3** | Gasohol Blending . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ☐ |
| **Schedule 4** | Sales by Gasoline Wholesale Distributors . . . . . . . . . . . . . . . . . . . . . . . . | ☐ |
| **Schedule 5** | Section 4081(e) Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ☐ |
| **Schedule 6** | Other Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ☒ |

Under penalties of perjury, I declare (1) that I have examined this claim, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and (2) that amounts claimed on this form have not been, and will not be, claimed on any other form.

**Sign
Here**

Signature and title (if applicable)                                    Date   1/31/05

Nancy S. McCarty                                    Director, Consumption Taxes
Type or print your name below signature.

For Privacy Act and Paperwork Reduction Act Notice, see instructions.         Cat. No. 20027J         Form **8849** (Rev. 1-2003)



**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com.

# OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | 2.30 |
| Return Receipt Fee (Endorsement Required) | 1.75 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here
JAN 31 2005

Sent To: Internal Revenue Service
Street, Apt. No.; or PO Box No.
City, State, ZIP+4: Cincinatti, OH 45999-0002

PS Form 3800, June 2002                See Reverse for Instructions



SENDER: COMPLETE THIS SECTION / COMPLETE THIS SECTION ON DELIVERY

PS Form 3811, February 2004    Domestic Return Receipt

| Schedule 6 (Form 8849) (Rev. January 2003) | Department of the Treasury—Internal Revenue Service **Other Claims** ▶ Attach to Form 8849. | | OMB No. 1545-1420 |
|---|---|---|---|
| Name as shown on Form 8849 UUNET Technologies, INC. | | EIN or SSN 54-1543611 | Total refund (total of lines 1–5) $ 14,260,752 |

Enter the earliest and latest **dates of the events** included in this claim. Enter in MMDDYYYY format.

Earliest date ▶ _10012001_    Latest date ▶ _12312004_

Claimant's registration number for Section 4091(d) claims. ▶ _____

| Tax | Amount of refund | | CRN |
|---|---|---|---|
| 1 Communications excise tax paid to local exchange companies on purchases of certain telecommunication 2 services | $ 14,260,752 | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |

Use the space below for an explanation of each tax claimed.    **See enclosures**

For claims under section 6416(b)(2) relating to certain uses and resales of certain articles subject to manufacturers or retailers taxes, claimant certifies that it sold the article at a tax-excluded price, repaid the amount of tax to the ultimate vendor, or has obtained the written consent of the ultimate vendor to make the claim; and has the required supporting evidence.

## Instructions

*Section references are to the Internal Revenue Code unless otherwise noted.*

**Purpose of schedule.** Use Schedule 6 for claims not reportable on Schedules 1–5, including refunds of excise taxes reported on:

• **Form 720,** Quarterly Federal Excise Tax Return, including section 4091(d) claims;

• **Form 2290,** Heavy Highway Vehicle Use Tax Return;

• **Form 730,** Monthly Tax Return for Wagers; and

• **Form 11-C,** Occupational Tax and Registration Return for Wagering.

**Caution:** *Do not use Schedule 6 to make adjustments to liability reported on Forms 720 filed for prior quarters. Use Form 720X, Amended Quarterly Federal Excise Tax Return. Also, do not use Schedule 6 to claim amounts that were taken or will be taken as a credit on Form 2290 or Form 730.*

**Claim requirements.** Generally, a claim must be filed within 3 years of the filing of the return to which the claim relates, or 2 years from when the tax reported on that return was paid, whichever is later.

**How to file.** Attach Schedule 6 to Form 8849. Mail it to the IRS at the address under **Where To File** in the Form 8849 instructions. If you are filing a Section 4091(d) claim, write "Section 4091(d)" at the top of Form 8849 and on the envelope. If you attach additional sheets, write your name and taxpayer identification number on each sheet.

For Privacy Act and Paperwork Reduction Act Notice, see Form 8849 instructions.    Cat. No. 27454M    Schedule 6 (Form 8849) (Rev. 1-2003)

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**REFUND SUMMARY**

| Period | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| 4th Quarter 2001 | $2,077,473 | $62,324 |
| 1st Quarter 2002 | $2,163,162 | $64,895 |
| 2nd Quarter 2002 | $1,436,523 | $43,096 |
| 3rd Quarter 2002 | $2,252,162 | $67,566 |
| Paid with Form 5384 | | $13,573,017 |
| 4th Quarter 2002 | $2,013,808 | $60,414 |
| 1st Quarter 2003 | $2,686,309 | $80,589 |
| 2nd Quarter 2003 | $1,952,892 | $58,587 |
| 3rd Quarter 2003 | $1,728,893 | $51,866 |
| 4th Quarter 2003 | $998,419 | $29,953 |
| 1st Quarter 2004 | $881,276 | $26,438 |
| 2nd Quarter 2004 | $724,120 | $21,723 |
| 3rd Quarter 2004 | $2,291,030 | $68,731 |
| 4th Quarter 2004 | $1,718,420 | $51,553 |
| Total Refund Claim | | $14,260,752 |

form8849attach                    1/28/2005      8:41 AM

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**4TH QUARTER 2001**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| Bell South Telecomunications | $604,332 | $18,130 |
| Frontier Communications | $333,429 | $10,003 |
| Hickory Tech | $118,845 | $3,565 |
| Iowa Telecom | $202,752 | $6,083 |
| Qwest/Mountain Bell | $670,970 | $20,129 |
| SBC/Nevada Bell | $147,145 | $4,414 |
| Quarterly Total | $2,077,473 | $62,324 |

form8849attach                    1/27/2005      5:38 PM

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**1ST QUARTER 2002**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| Bell South Telecomunications | $716,531 | $21,496 |
| Frontier Communications | $332,776 | $9,983 |
| Hickory Tech | $118,845 | $3,565 |
| Iowa Telecom | $247,104 | $7,413 |
| Qwest/Mountain Bell | $599,620 | $17,989 |
| SBC/Nevada Bell | $148,286 | $4,449 |
| Quarterly Total | $2,163,162 | $64,895 |

form8849attach                    1/27/2005        5:38 PM

98

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**2ND QUARTER 2002**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| Bell South Telecomunications | $650,524 | $19,516 |
| Iowa Telecom | $164,736 | $4,942 |
| Qwest/Mountain Bell | $478,378 | $14,351 |
| SBC/Nevada Bell | $142,885 | $4,287 |
| Quarterly Total | $1,436,523 | $43,096 |

form8849attach                    1/27/2005       5:38 PM

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**3RD QUARTER 2002**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| Alltel | $1,114,431 | $33,433 |
| Bell South Telecomunications | $533,452 | $16,004 |
| Qwest/Mountain Bell | $457,056 | $13,712 |
| SBC/Nevada Bell | $147,223 | $4,417 |
| Quarterly Total | $2,252,162 | $67,566 |

form8849attach                    1/27/2005        5:38 PM

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**4TH QUARTER 2002**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| Alltel | $1,536,980 | $46,109 |
| Qwest/Mountain Bell | $476,828 | $14,305 |
| Quarterly Total | $2,013,808 | $60,414 |

form8849attach                1/27/2005        5:38 PM

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**1ST QUARTER 2003**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| Alltel | $2,066,579 | $61,997 |
| Qwest/Mountain Bell | $619,730 | $18,592 |
| Quarterly Total | $2,686,309 | $80,589 |

form8849attach                    1/27/2005      5:38 PM

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**2ND QUARTER 2003**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| Alltel | $1,381,052 | $41,432 |
| Qwest/Mountain Bell | $571,840 | $17,155 |
| Quarterly Total | $1,952,892 | $58,587 |

form8849attach                    1/27/2005      5:38 PM

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**3RD QUARTER 2003**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|-------------|--------------------------|--------------------------------|
| Alltel | $1,414,011 | $42,420 |
| Qwest/Mountain Bell | $314,882 | $9,446 |
| Quarterly Total | $1,728,893 | $51,866 |

form8849attach                1/27/2005    5:39 PM

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**4TH QUARTER 2003**

| Vendor Name | COBRA<br>Services Purchased | Communications<br>Excise Tax Paid |
|-------------|-----------------------------|-----------------------------------|
| Alltel | $654,558 | $19,637 |
| Qwest/Mountain Bell | $343,861 | $10,316 |
| Quarterly Total | $998,419 | $29,953 |

form8849attach                1/27/2005      5:39 PM

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**1ST QUARTER 2004**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| Alltel | $581,096 | $17,433 |
| Qwest/Mountain Bell | $300,180 | $9,005 |
| Quarterly Total | $881,276 | $26,438 |

form8849attach                    1/27/2005    5:39 PM

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**2ND QUARTER 2004**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| Alltel | $578,345 | $17,350 |
| Qwest/Mountain Bell | $145,775 | $4,373 |
| Quarterly Total | $724,120 | $21,723 |

form8849attach                    1/27/2005    6:31 PM

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**3RD QUARTER 2004**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| Alltel | $452,724 | $13,582 |
| Qwest/Mountain Bell | $1,838,306 | $55,149 |
| Quarterly Total | $2,291,030 | $68,731 |

form8849attach                     1/27/2005      5:39 PM

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**4TH QUARTER 2004**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| Qwest/Mountain Bell | $1,718,420 | $51,553 |
| Quarterly Total | $1,718,420 | $51,553 |

form8849attach                     1/27/2005        5:39 PM

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and Debtors in Possession
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212)310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Pérez, Esq.

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | **Chapter 11 Case No.** |
| | : | |
| **WORLDCOM, INC., et al.,** | : | **02-13533 (AJG)** |
| | : | |
| **Debtors** | : | **(Jointly Administered)** |

------------------------------------------------------------x

**NOTICE OF HEARING REGARDING THE REORGANIZED DEBTORS'
MOTION FOR (I) A DETERMINATION OF REFUND RIGHTS PURSUANT TO
SECTION 505(a) OF THE BANKRUPTCY CODE AND (II) CONSOLIDATION
OF THAT DETERMINATION WITH THE REORGANIZED DEBTORS'
OBJECTION TO PROOF OF CLAIM NO. 38365 (DEPARTMENT OF
TREASURY ADMINISTRATIVE EXPENSE CLAIM) PURSUANT TO SECTION
105 OF THE BANKRUPTCY CODE AND RULES 9014 AND 7042 OF THE
FEDERAL RULES OF BANKRUPTCY PROCEDURE**

PLEASE TAKE NOTICE THAT on February 1, 2006, MCI, LLC, formerly

WorldCom, Inc., and substantially all of its direct and indirect domestic subsidiaries, as

reorganized debtors (collectively, the "Reorganized Debtors") filed their Motion for (I) A

Determination of Refund Rights Pursuant to Section 505(a) of the Bankruptcy Code and

(II) Consolidation of that Determination with the Reorganized Debtors' Objection to

Proof of Claim No. 38365 (Department of Treasury Administrative Expense Claim)

Pursuant to Section 105 of the Bankruptcy Code and Rules 9014 and 7042 of the Federal

Rules of Bankruptcy Procedure (Docket No. 17945) (the "Motion").

HO1:\327022\03\70BY03!.DOC\81793.0028

PLEASE TAKE FURTHER NOTICE THAT a hearing to consider Part II of the Motion referenced above (namely, the portion of the Motion that moves the Bankruptcy Court to consolidate the determination of refund rights under section 505 of the Bankruptcy Code with the Objection to Proof of Claim No. 38365), as described more fully in the Motion, will be held before the Honorable Arthur J. Gonzalez, United States Bankruptcy Judge, in Room 523 of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York on **April 11, 2006 at 10:00 a.m. (New York City Time)**, or as soon thereafter as counsel may be heard.

PLEASE TAKE FURTHER NOTICE that responses or objections, if any, to the Reorganized Debtors' request for consolidation of the matters described in the Motion, must be in writing, conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (General Order M-242 and the User's Manual for the Electronic Case Filing System can be found at www.nysb.uscourts.gov, the official website for the Bankruptcy Court), by registered users of the Bankruptcy Court's case filing system and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (.pdf), WordPerfect or any other Windows-based word processing format (with a hard copy delivered directly to Chambers) and shall be served in accordance with General Order M-242 upon: (1) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attention: Marcia L. Goldstein, Esq. and Lori R. Fife, Esq.; (2) Weil, Gotshal & Manges LLP, 700 Louisiana, Suite 1600, Houston, Texas 77002, Attention: Alfredo R. Pérez, Esq.; (3) the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004,

Attention:  Mary Tom, Esq.; (4) Shearman & Sterling, 550 Lexington Avenue, New

York, New York 10022, Attention:  Douglas P. Bartner, Esq. and Marc B. Hankin, Esq.;

and (5) Akin Gump Strauss Hauer & Feld LLP, 590 Madison Avenue, New York, New

York 10022-2524, Attention:  Daniel H. Golden, Esq., so as to be received in each case

by no later than **4:00 p.m. (New York City Time), on March 9, 2006**.

Dated:  Houston, Texas
        February 17, 2006

> /s/ *Alfredo R. Pérez* _____ _____
> Marcia L. Goldstein, Esq. (MG 2606)
> Lori R. Fife, Esq. (LF 2839)
> WEIL, GOTSHAL & MANGES LLP
> 767 Fifth Avenue
> New York, New York  10153-0019
> Telephone:  (212) 310-8000
> Facsimile:  (212) 310-8007
>
>         and
>
> Alfredo R. Pérez, Esq.
>
> WEIL, GOTSHAL & MANGES LLP
> 700 Louisiana, Suite 1600
> Houston, Texas  77002
> Telephone:  (713) 546-5000
> Facsimile:  (713) 224-9511
>
> Attorneys for the Reorganized Debtors

WEIL, GOTSHAL & MANGES LLP
Attorneys for Reorganized Debtors
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Pérez, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11 Case No.** |
| **WORLDCOM, INC., et al.,** | : | **02-13533 (AJG)** |
| | : | |
| | : | **(Jointly Administered)** |
| **Reorganized Debtors.** | : | |

-----------------------------------------------------------------x

### NOTICE OF REORGANIZED DEBTORS' PROPOSED
### FINDINGS OF FACT AND CONCLUSIONS OF LAW
### WITH RESPECT TO THEIR OBJECTION TO PROOF OF CLAIM NO. 38365
### (DEPARTMENT OF TREASURY ADMINISTRATIVE EXPENSE CLAIM)

PLEASE TAKE NOTICE that on March 27, 2006 the Reorganized Debtors filed

Proposed Findings of Fact and Conclusions of Law (the "Proposed Findings") with

Respect to their Objection to Proof of Claim No. 38365 (Department of Treasury

Administrative Expense Claim). A copy of the Proposed Findings is annexed hereto as

Exhibit A.

HO1:\329541\04\729X04!.DOC\81793.0023

113

Dated: Houston, Texas
March 27, 2006

*/s/ Alfredo R. Pérez*
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

and

Alfredo R. Pérez, Esq.

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Attorneys for Reorganized Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                          :
In re                                     :
                                          :    Chapter 11 Case No.
WORLDCOM, INC., et al.,                    :    02-13533 (AJG)
                                          :
                                          :    (Jointly Administered)
          Reorganized Debtors.            :
------------------------------------------------------------x
```

### REORGANIZED DEBTORS' PROPOSED
### FINDINGS OF FACT AND CONCLUSIONS OF LAW
### WITH RESPECT TO THEIR OBJECTION TO PROOF OF CLAIM NO. 38365
### (DEPARTMENT OF TREASURY ADMINISTRATIVE EXPENSE CLAIM)

On February 1, 2006 and April **[11]**, 2006, the Court held hearings (collectively,

the "Hearing") to consider (A) Proof of Claim No. 38365, dated July 2, 2004, which was

filed by the Department of Treasury/Internal Revenue Service of the United States of

America (the "IRS") as a request for payment of postpetition federal communications

excise taxes under section 4251 *et. seq.* of the Internal Revenue Code and (B) the

Reorganized Debtors' Objection to Proof of Claim No. 38365 filed by the IRS, dated

August 5, 2004 (the "Objection") [docket no. 12235].

The findings and conclusions set forth herein constitute the Court's findings of

fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, as made applicable to this

proceeding by Fed. R. Bankr. P. 9014. To the extent any of the following findings of fact

constitute conclusions of law, they are adopted as such. To the extent any of the

following conclusions of law constitute findings of fact, they are adopted as such.

HO1:\329541\04\729X04!.DOC\81793.0023

## I.    BACKGROUND

1.    At issue is whether the Reorganized Debtors[1] are required to pay federal excise taxes when they purchase a data service called COBRA (central office based remote access)[2] that converts analog data from dial-up computer modems into high-speed data packets suitable for transmission over Internet networks.  Although largely decommissioned at this time,[3] the Reorganized Debtors purchased COBRA service from various local exchange carriers ("LECs")[4] to facilitate the exchange of data packets between Internet service providers ("ISPs") who buy access to the Reorganized Debtors' Internet network and the ISPs' customers, who access the Internet using dial-up computer modems ("Dial-up Users").

### The Telephone Excise Tax.

2.    While Congress enacted the first telephone excise tax more than 100 years ago,[5] the current governing provisions were enacted as part of the Excise Tax

---

[1]    References herein to the "Reorganized Debtors" shall also include their predecessors in interest that were debtors in these chapter 11 cases.

[2]    For ease of reference, the term COBRA services is used herein to refer to all central office-based remote access services that were purchased by the Reorganized Debtors, regardless of whether the vendor of such services may have used another name for the service in the operative agreement between the parties.  *See generally*, Exs. 27 – 32.

[3]    Almost all COBRA service that the Reorganized Debtors purchased at one time has now been replaced by a different networking platform.  The transition from COBRA service was substantially completed by March 2005.  *See* 2/1/06 Tran. at 62:3-20.

[4]    Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Objection.  To the extent such capitalized terms are not defined herein or in the Objection, then such terms shall have the meaning ascribed to them in the Reorganized Debtors' Response to the Reply of the United States of America to Reorganized Debtors' Objection to IRS Request for Payment No. 38365 (the "Reorganized Debtors' Response"), dated December 16, 2005 [docket no. 17743].

[5]    30 Stat. at 460, Pub. L. No. 55-133 (1898); *see also*, LOUIS ALAN TALLEY, THE FEDERAL EXCISE TAX ON TELEPHONE SERVICE: A HISTORY 1 (Congressional Research Service 2001), *available at* http://www.law.umaryland.edu/marshall/crsreports/crsdocuments/RL30553_01042001.pdf.

Reduction act of 1965, Pub. L. No. 89-44, 79 Stat. 146 (the "1965 Act"). The 1965 Act

has been codified at 26 U.S.C. §§ 4251 through 4254 (the "Tax Code").

       3.     The 1965 Act imposes a tax on amounts paid for three categories

of communications services, namely, local telephone service, toll telephone service, and

teletypewriter exchange service. 26 U.S.C. § 4251(a)(1), (b)(1). Each of those services

is separately defined in section 4252 of the Tax Code. In particular, section 4252(a) of

the Tax Code defines "local telephone service" as:

> (1) . . . access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and

> (2) any facility or service provided in connection with a service described in (1).

> The term 'local telephone service' does not include any service which is a 'toll telephone service' or a 'private communication service' as those terms are defined in subsections (b) and (d).

       4.     In accordance with the preceding provision, an excise tax is only

payable where the purchased service meets <u>all</u> of the following requirements:

> (a) provides access to a local telephone system;

> (b) provides the privilege of telephonic (*i.e.*, voice) quality communication;

> (c) provides telephonic (*i.e.*, voice) quality communication with substantially all persons having a telephone; and

> (d) is not a private communication service as defined in section 4252(d) of the Tax Code.

**Procedural History.**

       5.     On July 2, 2004, the IRS filed Proof of Claim No. 38365 (the "IRS

Claim") in the amount of $16,276,440.81 for postpetition excise taxes that it contends are

owed by the Reorganized Debtors. On August 5, 2004, the Reorganized Debtors filed

their Objection to the IRS Claim asserting that COBRA service is not one of the communications services subject to taxation under the 1965 Act.

6.    On January 31, 2006, the Reorganized Debtors filed their Motion for (I) A Determination of Refund Rights Pursuant to Section 505(a) of the Bankruptcy Code and (II) Consolidation of that Determination with the Reorganized Debtors' Objection to Proof of Claim No. 38365 (Department of Treasury Administrative Expense Claim) Pursuant to Section 105 of the Bankruptcy Code and Rules 9014 and 7042 of the Federal Rules of Bankruptcy Procedure (the "Refund Motion") [docket no. 17945]. Pursuant to the Refund Motion, the Reorganized Debtors asserted that they are entitled to a refund of any excise taxes previously paid in connection with their purchase of COBRA service. The Refund Motion is pending consideration by the Court.

7.    In accordance with the Court's January 31, 2006 Scheduling Order, the Hearings on liability and damages with respect to the IRS Claim have been bifurcated. Accordingly, the Court has considered the evidence and argument presented by the parties at the Hearing solely for purposes of determining whether the Reorganized Debtors are liable for excise taxes in connection with their purchases of COBRA services. The parties' respective rights regarding the amount, if any, of such tax liability have been reserved for consideration by the Court at a later date.

**Summary of the Dispute.**

8.    Much of the evidence introduced by the Reorganized Debtors at the Hearing was undisputed. For example, the government has not disputed that (i) the LECs own all of the equipment used to deliver COBRA service to the Reorganized Debtors, (ii) the service provides the Reorganized Debtors with high-speed data packets

that are suitable only for communications over the Internet, and (iii) COBRA service lacks the common functions associated with local telephone service, such as a dial tone, a line or jack for plugging in a telephone, the ability to initiate telephone calls to other persons within a local telephone system, and the ability to receive telephone calls from other persons.[6]

      9.    Instead, the government first argues that even though COBRA service provides the Reorganized Debtors with Internet data packets instead of the ability to make or receive telephone calls, the service should nonetheless be taxed because Dial-up Users have the "privilege of telephonic quality communications" through the use of their computer modems which connect to the LECs' network access servers in the COBRA system.[7] The Reorganized Debtors, in turn, contend that the fact that Dial-up Users may have the privilege of telephonic quality communications is entirely irrelevant to whether the *Reorganized Debtors* should be taxed under section 4252 because the statute requires that the *Reorganized Debtors* (*i.e.*, the person paying for COBRA service) must have the privilege of telephonic quality communications before the tax may be properly assessed. *See* 26 U.S.C. § 4251(a)(2) (stating that the tax "shall be paid *by the person paying for such services*.") Thus, the Reorganized Debtors contend that the government cannot impute the Dial-up Users' privilege of telephonic quality communications to the Reorganized Debtors.

      10.    Second, the government maintains that because COBRA service is

---

[6]    *See, e.g.*, 2/1/06 Tran. at 168:23 – 169:6, 197:5 – 199:8.

[7]    Surreply of the United States of America to the Reorganized Debtors' Objection to IRS Request for Payment No. 38365, dated January 26, 2006 (the "IRS Surreply") [docket no. 17864], at ¶ 3.

provided "in connection with a local telephone system," the Reorganized Debtors' use of COBRA services is subject to taxation under section 4252(a)(2).[8] The Reorganized Debtors, in turn, contend that the government has misconstrued the plain language of the statute. The statute does not state that a "facility or service provided in connection with a local telephone system" is subject to taxation. Instead, it states that "a facility or service provided in connection with *a service* described in paragraph (1)," is subject to taxation and thus, liability under section 4252(a)(1) is a condition precedent to any liability under section 4252(a)(2). Accordingly, the Reorganized Debtors contend that because they did not purchase the service described in section 4252(a)(1), the provisions of section 4252(a)(2) do not apply.

11.    Third, the government argues that the Reorganized Debtors' inability to use traditional telephones with COBRA service is "neither relevant nor material to the excise tax analysis."[9] The government reasons that because precedent establishes that the excise tax applies where a taxpayer elects to connect modems to one another, the excise tax likewise applies to COBRA service because the Reorganized Debtors have elected to connect modems to one another with COBRA service. The Reorganized Debtors, in turn, contend that the government has misconstrued existing precedent and that the present facts are markedly different from those involving a taxpayer's election to either use, or not use, a regular telephone line for dial-up modem services.

12.    Fourth, the government argues that the Court should ignore the

---

[8]    *Id.* at ¶ 3.

[9]    *Id.* at ¶¶ 4, 28-36 (relying on Revenue Ruling 79-245).

nature of the services *actually purchased* by the Reorganized Debtors because even if COBRA service is not itself subject to the tax, other services that *could have been* purchased by the Reorganized Debtors are subject to the tax. Specifically, the government urges that even though the LECs did not configure their equipment in such a way as to allow voice quality calls,[10] because the COBRA system is *capable* of such telephonic quality communications (either through reconfiguration of the equipment used to deliver the service, or through the use of computer-to-computer voice over Internet technologies that could be separately purchased by Dial-up Users), the Reorganized Debtors are subject to the tax.[11] The Reorganized Debtors, in turn, argue that (a) they do not have the privilege of reconfiguring the LECs' equipment and facilities, (b) the antiquated equipment used with COBRA service did not operate at speeds that were capable of providing voice quality communications, (c) the statute requires communications with telephones rather than computers, and (d) in any event, section 4251(a)(1) of the 1965 Act requires taxation only where an entity has *actually purchased—not merely could have purchased*—local telephone service.

13.      Finally, although the government does not expressly argue that COBRA service is not a "private communication service," the Reorganized Debtors do argue as much. In particular, the Reorganized Debtors urge that even if COBRA service provides the "privilege of telephonic quality communications," it is still not subject to taxation because it is a "private communication service," which is expressly excluded from the definition of local telephone service under the 1965 Act. The Reorganized

---

[10]      2/1/06 Tran. at 198:11 – 199:3.

[11]      The IRS Surreply at ¶ 5, 37, 43-46, 54-60.

Debtors have presented testimony establishing that COBRA service is a "private communication service."

## Evidence and Matters Considered by the Court in Connection with the Objection.

14.     The Court has reviewed and considered the IRS Claim, the Reorganized Debtors' Objection to the IRS Claim, all other pleadings submitted by the parties,[12] and all evidence adduced and admitted at the Hearing, including (i) the live testimony of Mr. John Anderson ("Mr. Anderson"), the Reorganized Debtors' expert witness, (ii) the live testimony of Dr. Michael Hills ("Dr. Hills"), the IRS's expert witness, and (iii) the trial exhibits admitted into evidence (Trial Exs. 1 – 25 and 27 – 31). The Court is also cognizant of the entire record in these chapter 11 cases, all of which the Court hereby takes judicial notice.

## Summary of Conclusions.

15.     Based upon the Court's consideration of the evidence and matters identified above, its evaluation of the credibility and persuasiveness of the parties' respective witnesses, and the findings of fact and conclusions of law set forth below, the Court concludes that the Reorganized Debtors are not liable for federal excise tax under 26 U.S.C. § 4251 *et. seq.* in connection with their purchase of COBRA service. The Court will enter an order disallowing and expunging the IRS Claim, in its entirety, and herein disposes of all claims or proofs of claim that have been, or that could have been, asserted by the IRS for any unpaid excise taxes related to the Reorganized Debtors' purchase of COBRA service. Because the Court concludes that the Reorganized Debtors

---

[12]     These pleadings include: (i) the Reply of the United States of America to Reorganized Debtors' Objection to IRS Request for Payment No. 38365, dated September 27, 2005 (the "IRS Reply") [docket no. 17489]; (ii) the Reorganized Debtors' Response; (iii) the IRS Surreply; and (iv) the Refund Motion.

are not so liable, the Court will determine the amount of any refund owed to the

Reorganized Debtors at a later date in connection with the Refund Motion.

## II.    FINDINGS OF FACT

### Findings of Fact Relating to the Technical Capabilities of COBRA Service.

16.    The Reorganized Debtors are in the business of building Internet

networks and selling access to those networks to Internet service providers ("ISPs").

These ISPs use the Reorganized Debtors' Internet networks to provide Internet services

to their customers (the Dial-up Users), who access the Internet using dial-up computer

modems.[13]

17.    In connection with these operations, the Reorganized Debtors paid

local exchange carriers for a data aggregation and conversion service known as central

office based remote access (COBRA) service.  The Reorganized Debtors purchased

COBRA service from these LECs pursuant to written contracts (the "COBRA

Contracts").[14]  As Mr. Anderson testified during the Hearing, "COBRA service is a

service provided by the incumbent LECs that aggregates dial-up data and puts it into an

internet protocol and hands it off to MCI as a high-speed datastream. . . . It is high-speed

data, IP or TCP/IP, which is basically known as your internet data."[15]

18.    These high-speed Internet protocol ("TCP/IP") data packets are

---

[13]    *See, e.g.*, Exs. 2 – 3, 20, 2/1/06 Tran. at 58:21 – 60:16, 66:18 – 67:20.

[14]    The COBRA Contracts contain confidential and proprietary commercial information.
Accordingly, these agreements were submitted for *in camera* review at the Hearing and were
admitted into evidence as Exhibits 27 – 32.  In order to preserve the confidentiality of these
Exhibits, the counterparties to the COBRA Contracts are not identified in these Findings of Fact
and Conclusions of Law.

[15]    2/1/06 Tran. at 66:10-14, 67:23-25.

transmitted to the Reorganized Debtors by means of either frame relay or a router. The

Reorganized Debtors connect their network equipment to the frame relay card or the

router so that they can deliver the high-speed data packets to the appropriate ISP over

their Internet network. This, in turn, allows the ISPs' customers to access the Internet.[16]

19.     The LECs deliver high-speed data to the Reorganized Debtors in

TCP/IP format using network access servers ("NAS") that are deployed in the LECs'

central offices. The LECs use a digital signal processor ("DSP") card located in the NAS

to aggregate and convert the analog computer data exchanged between the Dial-up Users

and the LEC.[17]

### (i)     The Reorganized Debtors were not able to Reconfigure the COBRA Equipment and Facilities.

20.     The terms on which COBRA service has been provided to the

Reorganized Debtors are defined by the LECs in the COBRA Contracts and related

federal tariffs.[18] The COBRA Contracts specify, among other things, (i) the obligations

of the LECs in delivering COBRA service, (ii) the applicable charges for the service, (iii)

the equipment that the LECs agree to use in delivering the service, (iv) where the LECs

will make the service available, and (v) the functions of the service.

21.     In accordance with the COBRA Contracts, the LECs owned all

---

[16]    *See, e.g.*, Exs. 2 – 3; Ex. 27 at DOJ 00012; Ex. 28 at DOJ 00126; Ex. 29 at DOJ 00035; Ex. 30 at DOJ 00058; Ex. 31 at DOJ 00109; Ex. 32 at DOJ 00191, 00198; 2/1/06 Tran. at 66:8 – 67:25, 69:14 – 70:18.

[17]    *See, e.g.*, Exs. 2 – 3; Ex. 27 at DOJ 00012; Ex. 28 at DOJ 00126; Ex. 29 at DOJ 00035; Ex. 30 at DOJ 00058; Ex. 31 at DOJ 00109; Ex. 32 at DOJ 00191, 00198; 2/1/06 Tran. at 66:8 – 67:25, 69:14 – 70:18.

[18]    *See generally* Exs. 27 – 32; *see also* Ex. 27 at DOJ 00002, DOJ 00012 – 00018 (describing the terms of the LEC's tariff).

equipment used to deliver COBRA service.[19]  That equipment (including the NAS and
DSP cards) was located in the LECs' central offices and the Reorganized Debtors did not
have physical access to such equipment.[20]

      22.     The demarcation point between equipment the LECs used to
deliver COBRA services and the Reorganized Debtors' network was at the connection to
the output port of the NAS.  The Reorganized Debtors had only remote access to the
NAS equipment using a high-speed point-to-point data private line.  Although the
Reorganized Debtors could remotely disable modems within the COBRA system that had
technical problems, they had no authority or ability to make physical modifications to the
COBRA sites or equipment.[21]  As Mr. Anderson testified, that equipment "was behind
central office's locked doors."[22]  In addition, because the Reorganized Debtors accessed
COBRA service at the connection of the NAS output port, the Reorganized Debtors had
no access to the LECs' local telephone systems.[23]

      23.     Further, replacing the equipment that the LECs used to provide
COBRA service with a completely different system architecture would fundamentally

---

[19]    *See, e.g.*, Ex. 27 at DOJ 00012; Ex. 28 at DOJ 00126, 00128; Ex. 29 at DOJ 00035; Ex. 30 at DOJ 00058; Ex. 31 at DOJ 00097, 00100; Ex. 32 at DOJ 00144; 2/1/06 Tran. at 68:2-5, 80:22 – 81:2, 82:24 – 83:4.

[20]    *See* Exs. 2 – 3; 2/1/06 Tran. at 77:9-20.

[21]    *See, e.g.*, Exs. 2-3; Ex. 27 at DOJ 00012; Ex. 28 at DOJ 00126, 00128; Ex. 29 at DOJ 00035-36; Ex. 30 at DOJ 00058-59; Ex. 31 at DOJ 00100; Ex. 32 at DOJ 00159, 00202; 2/1/06 Tran. at 72:24 – 73:12, 76:2-13, 79:7 – 81:2, 82:16-23, 87:5-19, 92:2-6.

[22]    2/1/06 Tran. at 77:19-20.

[23]    *See, e.g.*, Exs. 2-3; 2/1/06 Tran. at 72:24 – 73:12, 76:2-13, 79:7 – 81:2, 82:16-23, 87:5-12, 92:2-6, 122:23 – 123:8, 123:14-18; *see also* Ex. 28 at DOJ 00127 (specifying that the Reorganized Debtors only had access to the egress port of the NAS); Ex. 29 at DOJ 00039 (same); Ex. 30 at DOJ 00062 (same); Ex. 32 at DOJ 00159 (referring to interconnection of the egress port with an egress circuit).

alter the service the LECs were providing and the service provided would no longer be COBRA service.[24]

## (ii)  Dial-up Users Purchase Separate and Distinct Services from the LECs.

24.     Dial-up Users access the Internet using a computer, a dial-up modem, and a telephone line that the Dial-up User separately purchases from a LEC. Using the telephone line, a Dial-up User's modem sends analog data through the public switch telephone network (the "PSTN") to a switch at the LEC's central office.[25]  The government's expert witness, Dr. Hills, testified that COBRA service does not include the Dial-up User's calls into the PSTN or the LECs' transmission of those communications.[26]  Dr. Hills also testified that the Dial-up Users, not the Reorganized Debtors, pay for the telephone lines that LECs use to transmit their communications.[27] As such, if any excise tax is due in connection with Dial-up Users' access to the local telephone system, that tax is owed by Dial-up Users and not the Reorganized Debtors.

## Findings of Fact Relating to Local Telephone Service.

25.     As understood in the telecommunications industry, local telephone service allows one subscriber to converse with other subscribers within a geographically bounded area.[28]  The subscribers to the service must have the ability to talk to each other

---

[24]     2/1/06 Tran. at 87:5-21, 116:13-15, 131:9-13, 166:9 – 167:18, 199:9-25.

[25]     *See, e.g.*, Ex. 2, 24; 2/1/06 Tran. at 66:18 – 67:20, 129:4-14, 187:10-22.

[26]     2/1/06 Tran. at 187:10-18.

[27]     2/1/06 Tran. at 187:19-22.

[28]     2/1/06 Tran. at 73:18-23.

if the service is to qualify as a local telephone service.[29]

### (i)    COBRA Service is not Local Telephone Service Because it is Incapable of Delivering Telephonic Quality Communications.

26.    The parties' witnesses largely agreed on their understanding of telephonic quality communications. Dr. Hills testified that a telephonic quality communication "is defined as the set of characteristics that allow a pair of people to be able to conduct a conversation and hear each other satisfactorily."[30] Similarly, Mr. Anderson testified that a telephonic quality communication "is an ability to communicate between . . . two individuals, a telephone call."[31]

27.    As explained at the Hearing, with traditional telephone services, LECs carry signals across the public switched telephone network using time-division multiplexing ("TDM") technology and TDM switches, pursuant to which they create a digital representation of the human voice. Due to the complexity of the human voice, this digital voice representation can only be transmitted to other persons using a minimum bandwidth of 64 kilobytes per second of digitized data.[32] COBRA service was incapable of delivering digitized data at 64 kilobytes per second because, as Mr. Anderson explained, "the COBRA platform was dial-up data or low speed data on input, [and] a platform at low speed . . . is not capable of carrying voice."[33] Mr. Anderson further explained that because COBRA service was designed to process data from these low-

---

[29]    2/1/06 Tran. at 73:18 – 74:3.

[30]    2/1/06 Tran. at 154:13-17.

[31]    2/1/06 Tran. at 68:20-23.

[32]    2/1/06 Tran. at 78:22 – 79:6, 83:11 – 86:12, 97:15 – 100:10.

[33]    2/1/06 Tran. at 83:18-21.

speed dial-up computer modems operating at approximately 24 to 33 kilobytes per

second, rather than the required 64 kilobytes per second, COBRA service would degrade

the quality of any voice communication to the point where it would be unintelligible.[34]  It

was therefore technologically impossible to use COBRA service for telephonic quality

communications.  As Mr. Anderson testified,

> you can pass packets at a slow speed, and it will get to the other end, but
> when it puts the packets back together to represent the voice, there is not
> enough data to really give you a clear voice.  Like I said, you wouldn't be
> able to understand it.  It would be garbled or it would be noise.[35]

      28.     Consistent with Mr. Anderson's testimony, Dr. Hills also conceded

several facts that indicate that COBRA service was not capable of delivering a telephonic

quality communication, including the following:

- At the output port of the NAS, COBRA service provided the
  Reorganized Debtors with a high-speed datastream instead of the
  TDM signals that would be compatible with the public switched
  telephone network.[36]

- The LECs did not design COBRA service for a telephone user to
  dial up and access the COBRA system.[37]

- The LECs did not configure the components used to deliver
  COBRA service in way that allowed voice quality calls.[38]

- Any use of the COBRA platform for telephonic quality
  communications would require the implementation of an entirely
  different technology known as Voice over Internet Protocol

---

[34]    2/1/06 Tran. at 74:4-12, 83:11 – 87:4, 133:3 – 135:22.

[35]    2/1/06 Tran. at 135:12-18.

[36]    2/1/06 Tran. at 197:5-10.

[37]    2/1/06 Tran. at 168:23 – 169:6, 197:23 – 198:6.

[38]    2/1/06 Tran. at 198:11 – 199:3.

("VoIP").[39]

- The systems used by the LECs to deliver COBRA service did not contain the hardware and software required for VoIP technology.[40]

29.    Although Dr. Hills made these concessions, he also testified that the COBRA system could act as a conduit for data packets representing a voice delivered from one Dial-up User's computer to another computer on the Internet. According to Dr. Hills, these voice packets could be transmitted through the COBRA system if the Dial-up Users separately purchased computer-to-computer voice services by connecting to Internet sites that host those services. Dr. Hills suggested that such services were offered by companies such as Skype. If the Dial-up User purchased the Skype service, the host Internet site could then transmit that call to another user of computer-to-computer voice services.[41]

---

[39]    2/1/06 Tran. at 182:12-18.

[40]    2/1/06 Tran. at 185:15-22. VoIP is a recent technological development that allows telephone calls to be made between the Internet and the PSTN using specific hardware (such as a VoIP gateway and SIP server) and software. COBRA services use outdated, antiquated equipment and lack these necessary components. For example, the LECs installed equipment manufactured by either Lucent Technologies or 3Com on the COBRA service NAS. *See* Ex. 3; 2/1/06 Tran. at 69:16 – 70:18. With a Lucent configuration, COBRA service used card part numbers TNT-SL-48MODV3-S-C and TNT-SL-HLDC2. *See* Ex. 27 at DOJ 00245; Ex. 29 at DOJ 00246. According to the manufacturer, these cards cannot support voice communications over an Internet protocol. *See* Ex. 4 (stating that only parts TNT-SL-ADI-C and APX8-SL-96DSP support VoIP); *see also* Ex. 12 at DOJ 00247 (stating same).    Further, voice services on a Lucent platform require Ethernet connections. Ex. 17 at DOJ 00252. The Lucent hardware used with COBRA service is frame relay (FR). *See* Ex. 3; Ex. 28 at DOJ 00178; Ex. 29 at DOJ 00246; 2/1/06 Tran. at 69:16 – 70:18. Similarly, the 3Com Commworks TCH 1000 router connections used with COBRA services do not support the origination and termination of telephonic quality communications. For voice communications, 3Com requires an EdgeServer Pro NAC line card and an Edge server NAC line card. *See* Ex. 6 at p. 17-18. The COBRA hardware configuration used by the LECs lacked the EdgeServer Pro NAC line card or the Edge server NAC line card. *See, e.g.*, Ex. 27 at DOJ 00235; Ex. 28 at DOJ 00188; Ex. 29 at DOJ 00234, Ex. 30 at DOJ 00233. In addition, the current DSP cards that can be used in connection with a VoIP service did not even exist at the time that the LECs began offering COBRA service. As a result, COBRA service was not a VoIP service and was technologically incapable of delivering telephonic quality communications, including VoIP. *See* Ex. 23; 2/1/06 Tran. at 92:7 – 96:21, 133:3 – 135:22.

[41]    2/1/06 Tran. at 170:22 – 172:25, 185:15-23.

30.     While Dr. Hills testimony suggests that a Skype subscriber could communicate with another Skype subscriber, this suggestion does not further the government's case because the Tax Code requires that the *Reorganized Debtors* (*i.e.* the person purportedly paying for "local telephone service") must have the privilege of telephonic quality communications if they are to be taxed. The fact that a Skype subscriber might have the ability to communicate with another Skype subscriber, therefore, does not provide a basis for taxing the Reorganized Debtors. In short, because the Tax Code requires that the person paying for "local telephone service" must have the privilege of telephonic quality communication with substantially all persons having a telephone, and Dr. Hills's testimony does not establish that the use of the Skype service in any way entitled the Reorganized Debtors to such privilege, the government's argument must fail.

31.     Moreover, even if the Court were to accept Dr. Hills's testimony that voice quality communications could be generated in conjunction with the use of another technology or service (such as Skype), there is no evidence that the Reorganized Debtors ever purchased an ancillary service so as to obtain (or be capable of obtaining) such a voice quality communication.

32.     Additionally, and most importantly, this Court is persuaded by Mr. Anderson's very credible testimony that the Reorganized Debtors could not utilize a service such as Skype to communicate with another Skype subscriber in a manner that would result in voice quality communication because the COBRA service is technologically incapable of supporting such communications. *See* paragraph 27 *supra.*

33.     Finally, when Dr. Hills was asked whether these technologies were

commercially available in 2002, he answered: "I don't know the exact dates."[42]  As such,

there is no evidence that a technology was commercially available during the relevant

time period that would have enabled a telephonic quality computer-to-computer voice

communication over the COBRA system.

> **(ii)**     **COBRA Service did not Provide the Reorganized Debtors with the Ability to Communicate with Substantially All Persons Having Telephones in the Local Telephone System.**

    34.     As Mr. Anderson testified, COBRA service does not provide the

Reorganized Debtors with the ability to communicate with substantially all persons

having telephones within the local telephone system.[43]  Indeed, communications with

substantially all persons having telephones cannot be achieved with COBRA service for

several reasons, including:

- No dial tone is provided with COBRA service that would allow the Reorganized Debtors to originate telephone calls to substantially all persons having telephones.

- The Reorganized Debtors cannot receive a telephone call with COBRA service from any person having a telephone.

- There is no telephone connection with COBRA service because COBRA service only provides access to a high-speed data line and it is impossible to plug a telephone into a high-speed data line.

- The public switched telephone network requires the use of TDM protocols and TDM switches, but COBRA service provides the Reorganized Debtors with high-speed Internet data in the TCP/IP protocol.  High-speed data in TCP/IP format is not suitable for communications with telephones or the public switched telephone network.

- It is impossible to plug a telephone into the output port of the NAS

---

[42]     2/1/06 Tran. at 204:16-18.

[43]     2/1/06 Tran. at 88:9 – 89:6.

because the NAS output port has different dimensions than a
telephone jack.[44]

35.    The lines that the LECs used to connect a Dial-up User to the

COBRA equipment are Direct Inward Dial ("DID") only.  DID lines allow the LEC to

receive calls from the PSTN, but they do not provide a dial tone for making outgoing

telephone calls.  Consequently, the COBRA equipment used by the LECs does not allow

for dialing out to the PSTN.[45]  Indeed, if a telephone user dialed a number associated with

the COBRA service equipment, the caller would hear unintelligible noise until the circuit

was disconnected.[46]  COBRA service simply does not allow the Reorganized Debtors to

make a telephone call to anyone having a telephone.

36.    Further, if the Court were to assume (as Dr. Hills has urged) that

computer-to-computer voice services had some bearing on the outcome of this dispute,

the Court further finds as follows:

- Substantially all persons having telephone or radio telephone
  stations in a local telephone system subscribe to a traditional
  telephone service on the PSTN.  Accordingly, the right to
  communicate with only those persons who have subscribed to a
  computer-to-computer voice service like Skype would not provide
  communications with substantially all persons having telephone or
  radio telephone stations in a local telephone system.[47]

- Computer-to-computer voice services require the use of a
  computer and, accordingly, do not provide a communication with

---

44    *See, e.g.*, 2/1/06 Tran. at 74:4 – 76:23, 78:18 – 79:6, 81:3 – 83:10, 89:18 – 90:19, 187:23 – 188:3.

45    Ex. 28 at DOJ 00126; Ex. 29 at DOJ 00035; Ex. 30 at DOJ 00058; Ex. 32 at DOJ 00194; 2/1/06
      Tran. at 76:14-20, 89:18 – 90:19, 187:23 – 188:3.

46    Dr. Hills admitted that if persons having telephones called a number associated with the COBRA
      system, they would hear "an annoying screech" and the COBRA equipment would disconnect the
      call. *See* 2/1/06 Tran. at 168:23 – 169:6; *see also* 100:20 – 103:15.

47    2/1/06 Tran. at 98:4-7.

persons having telephones.[48]

### Findings of Fact Relating to Private Communication Service: the Reorganized Debtors' Exclusive Use of, and Separate Charge for, COBRA Service.

37.    At the Hearing, Mr. Anderson testified that the NAS "converts the data that is coming from the end user's PC to packets and aggregates it with other data and puts it on this high-speed connection which MCI plugs into which is labeled 'frame relay.'"[49]  When asked whether this service entitles the Reorganized Debtors to the exclusive use of any communication channel or groups of channels, Mr. Anderson testified that the COBRA platform was dedicated to the Reorganized Debtors' exclusive use, and that the Reorganized Debtors had exclusive use of (and access to) the data channels on the NAS.[50]  The government did not controvert that testimony, nor did it offer any rebuttal evidence.  Consequently, this Court accepts, and hereby finds, that no other entity had the use of, or access to, any channels or groups of channels on the NAS.

38.    Further, the government did not controvert or rebut Mr. Anderson's testimony that the Reorganized Debtors are separately charged each month for COBRA service.  As the COBRA Contracts stipulate, these charges are incurred on a per port basis.[51]

---

[48]    2/1/06 Tran. at 134:10-17.

[49]    2/1/06 Tran. at 67:13-17 (describing Ex. 2).

[50]    2/1/06 Tran. at 90:20 – 92:6.

[51]    Ex. 27 at DOJ 00014-15; Ex. 28 at DOJ 00127; Ex. 29 at DOJ 00038-40; Ex. 30 at DOJ 00061-62; Ex. 31 at DOJ 00101-02; Ex. 32 at DOJ 00159; 2/1/06 Tran. at 91:18-25,124:14-21.

### III.    CONCLUSIONS OF LAW

**Conclusions Regarding Jurisdiction**

39.    The Court has subject matter jurisdiction over these cases under 28

U.S.C. §§ 157(a) and 1334(b) and under the July 10, 1984 "Standing Order of Referral

of Cases to Bankruptcy Judges" of the United States District Court for the Southern

District of New York (Ward, Acting C.J). This is a core matter under 28 U.S.C. §

157(b)(2)(A), (B), (C) and/or (O).

**Conclusions Regarding Notice and Due Process**

40.    The Reorganized Debtors have satisfied all procedural and due

process requirements with regard to the Objection. Due and proper notice and

opportunity to be heard have been given as to the Objection and the relief requested

therein, and no other or further notice is required.

**Conclusions Regarding the 1965 Act**

41.    The 1965 Act imposes a tax on "amounts paid for communications

services." 26 U.S.C. § 4251(a)(1). The term "communications services" means (i) local

telephone service, (ii) toll telephone service, and (iii) teletypewriter exchange service. 26

U.S.C. § 4251 (b)(1). The tax imposed by this statute "shall be paid by the person paying

for such services." 26 U.S.C. § 4251(a)(2).

42.    The terms "local telephone service," "toll telephone service," and

"teletypewriter exchange service," are defined in sections 4252(a), (b), and (c) of the Tax

Code, respectively. In particular, "local telephone service" is defined as:

(1) . . . access to a local telephone system, and the privilege of telephonic
quality communication with substantially all persons having telephone or
radio telephone stations constituting a part of such local telephone system,
and

(2) any facility or service provided in connection with a service described in (1).

The term 'local telephone service' does not include any service which is a 'toll telephone service' or a 'private communication service' as those terms are defined in subsections (b) and (d).

26 U.S.C. § 4252(a).

## Conclusions Regarding Interpretation of the Statute

43.    When construing a statute, "the preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'" *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (alteration in original) (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)). Thus, this Court must begin, and end, its analysis with the language of the statutory text if that text is unambiguous. *See Am. Bankers Ins. Group v. United States,* 408 F.3d 1328, 1332 (11th Cir. 2005) (citing *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004)). Further, the Court must give the words used in the statute "their ordinary, plain meaning unless defined otherwise." *Id.* When the statute itself provides a "definition which declares what a term 'means' . . . [it] excludes any meaning that is not stated." *Colautti v. Franklin*, 439 U.S. 379, 393 n.10 (1979).

44.    Moreover, where the statute at issue concerns a federal tax, the language used by the legislature "should not be extended by implication to reach other matters." *America Online v. United States*, 64 Fed. Cl. 571, 576 (2005) (citing *Gould v. Gould*, 245 U.S. 151, 153 (1917)). If any doubt exists as to the construction of a tax statute, "the doubt should be resolved in favor of the taxpayer." *Hassett v. Welch*, 303 U.S. 303, 314 (1938) (footnote omitted); *see also Trans-Lux Corp.*, 696 F.2d 963, 968 (Fed. Cir. 1982) (stating that any doubts about the taxability of communications services

HO1:\329541\04\729X04!.DOC\81793.0023        21

135

under the 1965 Act are to be resolved in favor of the taxpayer); *Western Elec. Co. v. United States*, 564 F.2d 53, 66 (Ct. Cl. 1977) (same).

### Conclusions Regarding Application of the 1965 Act to the Pending Facts

45.     The Court concludes that COBRA service is not a "local telephone service" under section 4252(a) of the Tax Code because COBRA service did not provide the Reorganized Debtors with the privilege of telephonic quality communications with substantially all persons having telephone or radio telephone stations constituting a part of the local telephone system. Alternatively, even if COBRA service did provide the Reorganized Debtors with such a privilege, the Court nonetheless concludes that COBRA service is not "local telephone service" because it falls within the definition of a "private communication service" under section 4252(d) of the Tax Code.

**A.      COBRA Service is not a Local Telephone Service Because it did not Provide the Reorganized Debtors with the Privilege of Telephonic Quality Communication.**

46.     In order to impose an excise tax on local telephone service, the subscriber must have the privilege of telephonic quality communications with substantially all persons who have telephones in the local telephone system.

47.     In *Comdata Network, Inc. v. United States*, 21 Cl. Ct. 128 (1990), the court addressed whether a taxpayer that purchased WATS service (a form of toll telephone service) had the privilege of telephonic quality communications with all or a substantial portion of the persons having telephones even though the taxpayer had implemented a number of security measures that limited its use of that service to calls between its service centers and its administrative office. *Id.* at 129-30. The court determined that: (i) WATS service was a toll telephone service within the meaning of the

statute (*id.* at 130); and (ii) the excise tax applied under section 4252(b)(2) irrespective of the fact that the taxpayer elected to restrict its use of the WATS service (*i.e.*, a "self-imposed limitation"), rather than using it to access all or a substantial portion of the persons having telephones outside of the local telephone system area. *Id.* The court reasoned that the tax applied because the taxpayer had the "privilege" of using a WATS service to communicate with all or a substantial portion of the persons having telephones outside the local telephone system area even though it elected not to actually exercise that privilege. *Id.* at 131. Despite this, the court nonetheless concluded that there would be a critical difference in its holding if the service purchased was "inherently incapable of being used [to communicate with all or a substantial portion of the persons having telephones outside the local telephone system area]." *Id.* at 131.[52]

48.    The facts before this Court are inapposite to those addressed in *Comdata* (and Revenue Ruling 79-245), because COBRA service is inherently incapable of being used for telephone service, and does not allow the Reorganized Debtors to elect or not to elect to plug into a telephone jack and thereby access voice quality communications with substantially all other telephones in the local system. Indeed, COBRA service:

---

[52]    In one IRS proceeding, a business paid charges for two regular telephone lines, one that it used for telephone communications, and another that it used with its computer modems to store, merge, and calculate data according to programmed instructions received over the telephone network from terminals at other locations. Rev. Rul. 79-245, 1979-2 C.B. 380. The IRS contended that, "by plugging in a regularly [*sic*] telephone set, if it so chooses, it may exercise the privilege of telephonic (voice) quality communication with substantially all persons having telephones in the local system...." *Id.* Accordingly, the IRS ruled that telephone service was subject to tax under section 4252(a) even if the subscriber elected not to use it to make telephone calls. This ruling is consistent with *Comdata* in requiring that there be: (1) the right to plug in a regular telephone set; and (2) the right to voice quality communications with substantially all other telephones, before imposing any excise tax.

a) does not allow the Reorganized Debtors to make or receive telephone calls;

b) uses antiquated equipment that operates at speeds below the threshold required for telephonic quality communications;

c) does not provide the hardware and software required for voice over Internet protocol communication; and

d) delivers only an Internet protocol datastream that is incompatible with telephones.

Based on these findings, the Court concludes that COBRA service did not provide the Reorganized Debtors with the privilege of telephonic quality communications with substantially all persons having telephones in the local telephone system, and as such, *Comdata* and Revenue Ruling 79-245 are inapposite.

49.     Consistent with this finding, the IRS has ruled that where the service at issue does not offer the taxpayer the right to plug into a telephone jack or communicate with other persons having telephones, no local telephone service exists and the excise tax does not apply. For instance, where a communications company furnished one-way messages over regular telephone facilities to radio receivers or beepers, those services were found not to have provided the subscribers with "local telephone service" as defined in section 4252(a) of the Tax Code. Rev. Rul. 74-617, 1974-2 C.B. 365. The IRS reasoned that beeper service did not provide the privilege of telephonic quality communications because while the subscriber could receive data messages and signals, it could not plug into a regular telephone jack or receive voice quality communications from substantially all telephones in a local system. Accordingly, the IRS determined that it was not local telephone service.

50.     Despite the foregoing, the IRS argues that the Reorganized Debtors are nonetheless subject to the excise tax because (i) Dial-up Users use a voice quality

path to connect their computer modems to the LEC's network access server, (ii) COBRA service is a facility "provided in connection with a local telephone system," and (iii) the LECs' current configuration of the COBRA system amounts to a self-imposed limitation (by the Reorganized Debtors) on its use.[53]  As counsel for the IRS argued at the Hearing, "[u]nder *Comdata*, the COBRA system is taxable, because its modems and PRIs (primary rate interface lines) have telephonic quality capability, regardless of whether they are used for traditional voice calls."[54]

51.    The government's arguments lack merit.  First, although the government states that the Dial-up Users have the privilege of telephonic quality communication as a result of their access to the LECs' local telephone system, this fact is irrelevant to whether the Reorganized Debtors themselves have the privilege of telephonic quality communications.  The Tax Code plainly requires that the Reorganized Debtors themselves (*i.e.*, the person paying for a local telephone service) must have the privilege of telephonic quality communications.  Because there is no basis in the statute for imputing the Dial-up Users' privilege of telephonic quality communications to the Reorganized Debtors, the fact that an entity other than the Reorganized Debtors may have the privilege of telephonic quality communications is entirely irrelevant to whether the tax is applicable to the Reorganized Debtors.

52.    Second, while the government suggests that COBRA service is taxable because it is a facility "provided in connection with a local telephone system," section 4252(a)(2) of the Tax Code does not in fact state that a facility provided in

---

[53]    *See* IRS Surreply at ¶¶ 2-5, 43-46.

[54]    2/1/06 Tran. at 43:2-6 (parenthetical added).

connection with a local telephone system must be taxed.  Instead, it states that "a facility or service provided in connection with *a service* described in paragraph (1)," is subject to taxation and thus, liability under section 4252(a)(1) is a condition precedent to any liability under section 4252(a)(2).  Because the pending facts amply demonstrate that COBRA service is not a "service" described in section 4252(a)(1) of the Tax Code, the Reorganized Debtors are not subject to taxation.

53.    Third, even though the IRS concedes that COBRA service does not provide the right to make or receive ordinary telephone calls, it nonetheless maintains that the Reorganized Debtors have erected "self-imposed limitations" on the use of the COBRA system which, pursuant to *Comdata* and Revenue Ruling 79-245, subject them to the federal excise tax.  Notwithstanding this contention, the government has offered no evidence that the Reorganized Debtors implemented any self-imposed procedures or systems to limit the use of COBRA service beyond the inherent limitations of the service actually purchased from the LECs.  Moreover, the record is bereft of any evidence that the Reorganized Debtors simply unplugged their telephone in order to avoid using COBRA service for telephone calls.  And unlike in *Comdata*, where the court found that it was "virtually self-evident" that ordinary WATS service[55] was a toll telephone service under section 4252(b)(2), and that Comdata had the ability to make a toll telephone call to all or a substantial portion of persons having telephones outside the local telephone system area if it elected to do so, the present case is entirely distinguishable because the Reorganized Debtors have not simply elected to avoid using the COBRA service to make

---

[55]     The *Comdata* court explained that WATS "is a service which allows the user to both initiate and receive (at no cost to the calling party) long distance telephone calls from anywhere in selected service areas at bulk rates."  *Comdata*, 21 Ct. Cl. at 129.

telephone calls to substantially all persons having telephones in the local telephone system; rather, COBRA service is simply incapable of providing the Reorganized Debtors with the ability, right, or privilege to make such telephone calls. Indeed, the only evidence before this Court indicates that the Reorganized Debtors (i) could not directly use COBRA service for any telephonic quality communications; and (ii) could not reconfigure or alter COBRA service into a service that would be capable of telephonic quality communications because the capabilities of such service are controlled by the LECs that sell the service. Thus, the Court cannot conclude that any limitations on the Reorganized Debtors' use of the COBRA service have been "self-imposed."

**B.    COBRA Service is not a Local Telephone Service Because it did not Provide Communications with Substantially All Persons that have Telephones.**

54.    Section 4252(a) of the Tax Code requires the ability to communicate with substantially all *persons having telephone stations* in the local telephone system. This Court is required to "presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

55.    The reference to communications with "substantially all persons having telephone stations" cannot be presumed by this Court to be mere surplusage, nor can the reference to a "telephone station." Indeed, the IRS has consistently interpreted the reference to "telephone stations" in section 4252(a) to mean ordinary telephone sets. *See* Rev. Rul. 78-437, 1978-2 C.B. 266 (equating stations with a "telephone set"); Rev. Rul. 79-245, 1979-2 C.B. 380 (stating that the tax applied where the subscriber had the right to voice quality communications with all persons having "telephones" in the local

system); *see also Agron v. Illinois Bell Tel. Co.*, 319 F. Supp. 418, 420 (D. Ill. 1970) (stating that the IRS agreed that the term "local telephone service" in section 4252(a) is to be given its "commonly accepted and understood meaning—the right to use a telephone which is part of a telephone system and to communicate thereby with other persons having telephones which are part of this system"), *rev'd on other grounds*, *Agron v. Illinois Bell Tel. Co.*, 449 F.2d 906, (7th Cir. Ill. 1971).

56.     While the IRS now argues that the reference to telephones is "neither relevant nor material to the excise tax analysis,"[56] and that the ability to communicate with telephones is not a necessary component of local telephone service, the Court rejects this position because the statute expressly defines local telephone service to mean a service that provides telephonic quality communications with persons having telephones.

57.     While the IRS argues that COBRA service is taxable because that service "provides access between [the ISPs'] dial-up customers' modems and the modems and/or DSPs within the COBRA system, and thus require two-way, voice capable, telephonic quality communication,"[57] this argument fails to satisfy the express requirement that the service grant the subscriber (*i.e.* the Reorganized Debtors) the right to communicate with telephones. The uncontroverted and undisputed evidence before the Court demonstrates that the Reorganized Debtors did not have the capability of engaging in telephonic quality communications with persons having telephone or radio telephone stations. As defined, a local telephone service must provide the subscriber with the

---

[56]     *See* IRS Surreply at ¶ 4.

[57]     Reply at ¶ 40.

privilege of interconnection to actual telephones, and accordingly, the Court concludes

that COBRA service is not a "local telephone service" under the 1965 Act.

## C.    COBRA Service is not a Local Telephone Service Because it is a Private Communication Service.

58.    The 1965 Act creates an exemption from taxation for private

communication services. *Trans-Lux Corp.*, 696 F.2d at 967. Congress created this

exemption by excluding private communication services from the definition of "local

telephone service." *See* 26 U.S.C. § 4252(a) (stating that "the term 'local telephone

service' does not include any service which is a 'toll telephone service' or a 'private

communication service' as defined in subsections (b) and (d)").

59.    Section 4252(d) provides that:

For purposes of this subchapter, the term "private communication service" means—

**(1)** the communication service furnished to a subscriber which entitles the subscriber—

**(A)** to exclusive or priority use of any communication channel or groups of channels, or

**(B)** to the use of an intercommunication system for the subscriber's stations,

regardless of whether such channel, groups of channels, or intercommunication system may be connected through switching with a service described in subsection (a), (b), or (c),

. . . except that such term does not include any communication service unless a separate charge is made for such service.[58]

---

[58]    Only section 4252(d)(1) is applicable here because the IRS Claim relates to amounts paid for COBRA service only. *See* 26 U.S.C. § 4251(a) (imposing tax only on amounts paid for subject services). In this case, no amounts have been paid for switching capacity, extension lines and stations, other associated services, or channel mileage. As a result, the provisions related to such other associated services (4252(d)(2)) and channel mileage (4252(d)(3)) have not been implicated.

60.     Accordingly, if COBRA service entitles the Reorganized Debtors to "exclusive" use of any communication channel or groups of channels, and a separate charge is made for COBRA service, the service will be exempt from the telephone tax, regardless of whether the channels may be connected through switching with a local telephone service, a toll telephone service, or a teletypewriter exchange service. In everyday speech the word "exclusive" means "relating to or marked by exclusion; not shared with others." WEBSTER'S II NEW COLLEGE DICTIONARY 391 (1999).

61.     The government did not controvert the evidence adduced at trial that COBRA service is a private communication service, nor did it offer any rebuttal evidence. The Court thus accepts such evidence and concludes that COBRA service is a private communication service for purposes of section 4252(d) of the Tax Code. The facts demonstrate that COBRA service entitles the Reorganized Debtors to exclusive use of any channel or groups of channels and that a separate charge is made for such service. The factors that lead to this conclusion are set forth in the Court's Findings of Fact above, but include:

        a)  the Reorganized Debtors do not share the COBRA platform or any service related thereto with others;

        b)  the Reorganized Debtors have sole and exclusive access to the data channels on the NAS;

        c)  no other entity has use of, or access to, the single, integrated datastream transmitted through the NAS; and

        d)  the Reorganized Debtors are separately charged each month for COBRA service on a per port basis.

62.     Because the Court has concluded that COBRA service constitutes a private communication service under section 4252(d), that service necessarily cannot be

a "local telephone service" as defined in section 4252(a).

**D.     COBRA Service is not a Teletypewriter Exchange Service Because it does not Provide the Reorganized Debtors with Access to or from the Teletypewriter Exchange System.**

63.     The Court also concludes that COBRA service is not a

"teletypewriter exchange service" under section 4251 *et. seq.* of the Tax Code because it

is uncontroverted, and in any event, the facts demonstrate that COBRA service does not

provide access from a teletypewriter or other data station to the teletypewriter exchange

system.

**E.     COBRA Service is not a Toll Telephone Service Because the Reorganized Debtors are Charged Per Port.**

64.     The Court also concludes that COBRA service is not a "toll

telephone service" under section 4251 *et. seq.* of the Tax Code. The Court reaches this

conclusion because it is uncontroverted, and the facts demonstrate that the Reorganized

Debtors do not pay a toll charge which varies in amount with the distance and elapsed

transmission time of each individual communication. *See* 26 U.S.C. § 4252(b)(1)(A).

Moreover, Reorganized Debtors do not pay a periodic charge (determined as a flat

amount or upon the basis of total elapsed transmission time) as would be required. *See*

26 U.S.C. § 4252(b)(2).

## CONCLUSION

65.     This Court does not have the power to enlarge the scope of the

statutory language; "[t]o supply omissions transcends the judicial function." *Iselin v.

United States*, 270 U.S. 245, 251 (1926). In accordance with the plain meaning of the

statute, COBRA service is not a local telephone service. Moreover, COBRA service is

not a toll telephone service or a teletypewriter exchange service.

66.    The Reorganized Debtors have met their burden, both of

production and persuasion, in challenging the validity of the federal communications

excise tax as applied to COBRA service.

67.    The Objection is granted.

68.    The IRS Claim is disallowed and expunged.

69.    The Court will enter an appropriate order.

Dated: New York, New York
         _____, 2006

                                                    _____
                                                    United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
In re:                                                    :

                                                          :

WORLDCOM, INC., et al.,                                   :

                                                          :

            Debtors.                                      :

--------------------------------------------------------X

CHAPTER 11

Case No. 02-13533 (AJG)

(Jointly Administered)

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
## OF THE UNITED STATES OF AMERICA AS TO
## DEBTORS' OBJECTION TO IRS REQUEST FOR PAYMENT NO. 38365

### INTRODUCTION

1.      The COBRA services purchased by MCI from local exchange carriers ("LECs")

are subject to federal excise taxes pursuant to 26 U.S.C. § 4251 *et seq* (the "Excise Tax").

According to MCI, before the advent of broadband and cable services providing Internet access,

COBRA "was the way to access the internet using local telephone lines, because the best way to

get the public to access the internet was using an existing telephone line." (Transcript of Trial,

dated February 1, 2006 ("Trial Tr.") 86). Because COBRA uses telephone lines that are capable

of telephonic quality communication, it is subject to the Excise Tax, and the Debtors' Objection

and refund claims should be denied.[1]

2.      COBRA functions as follows: (a) the dial-up access customer of an internet

service provider ("Dial-up User") uses a modem to place a telephone call and connect to a

modem within the COBRA system, via an analog signal call placed over the Public Switched

Telephone Network ("PSTN"). The parties agree that "[t]he dial-up user's modem calls the

---

[1]      Alternatively, the Government respectfully requests that the Court permit the
parties to engage in formal discovery on the facts underlying Debtors' Objection to the Excise
Tax claim, which has not yet occurred in this matter.

COBRA system's modem using a telephonic quality path." (Trial Tr. 106); (b) after the

COBRA's modem accepts the Dial-up User's modem call, it converts the analog signal call into

Internet Protocol ("IP") packets which can travel over the Internet; (c) upon receipt of IP packets

from the Internet, the COBRA modem converts the packets to an analog format for travel over

telephone lines back to the Dial-up User. As MCI's expert acknowledged, COBRA is "full

duplex," two-way communication. (Id. 119).

## PROPOSED FINDINGS OF FACT

3.      The purpose of the COBRA system is to permit Dial-up Users to use the

telephone network to access the Internet. (Id. 158). Thus, an integral part of the COBRA

services purchased by MCI is access to the local telephone network and the ability to receive

calls from substantially everybody within the local calling area. (Id. 147).

4.      The parties agree that the COBRA services purchased by MCI include a

telephonic quality communications path all the way from the Dial-up User's modem to the

COBRA service's Network Access Server ("NAS") modems. (Id. 118). The parties further

agree that a telephonic quality path is capable of transmitting telephonic quality communication.

(Id. 118, 121). Thus, the path connecting the Dial-up User to the COBRA NAS modems is

capable of carrying telephonic quality communications. (Id. 177).

### Modems Are Integral to the COBRA System
### and Require Telephonic Quality Communication

5.      A modem is a device which "takes data from the computer and converts it to the

same set of frequencies that are used by voice transmission." (Id. 148). Data leaving the modem

of a Dial-up User uses "the same exact range" as the human voice. (Id. 99, 149). A modem is

designed to transmit analog signals using exactly the same characteristics as are required for

-2-

voice. (Id. 154).

6.      The parties agree that the successful operation of a modem in a
telecommunication system requires telephonic quality communication channels, because
modems will not operate without a telephonic quality communication channel. (Id. 111-12, 149-
50). This is because in order to transmit data from a modem successfully, a telephonic quality
channel with the same frequencies and characteristics as voice is required. (Id. 150).

7.      All access to modems or digital service processors ("DSPs") requires two-way,
voice grade, telephonic quality communication. The COBRA services purchased by UUNET
provide access between Dial-up Users' modems and the modems and/or DSPs within the
COBRA system, and thus require two-way, voice capable, telephonic quality communications.
(Id. 110-11).[2]

8.      The COBRA system's modem resides within its NAS, in a DSP card. (Id. 107;
Trial Exhibit ("Ex.") 2, 3).

9.      The Dial-up User's modem calls the COBRA system's modem using a telephonic
quality path. (Id. 106). The COBRA modem accepts the call from the Dial-up User's modem.
(Id. 107).

---

[2]      This paragraph is a verbatim quote of paragraph 8 of the expert report of Dr.
Michael Hills, the Government's independent expert witness. At deposition, MCI's non-
independent expert witness John Anderson (an MCI employee for 24 years (Trial Tr. 52)) was
asked "Do you agree with Dr. Hills' conclusions in paragraph 8?" and he replied "yes." (Id. 110-
11). At trial, Mr. Anderson conceded that he had agreed with paragraph 8 at deposition. (Id.).
Mr. Anderson attempted to distance himself from that concession on redirect testimony,
maintaining the he agreed only that modems require a telephonic quality path, not telephonic
quality communications. (Id. 129-31). However, as Dr. Hills testified, "[a] voice grade
communication path provides a voice grade communication or provides the ability to support a
voice grade communication." (Id. 184). Since a system's capacity for telephonic quality
communication governs whether the Excise Tax applies, see infra Point I, the distinction MCI
draws is irrelevant.

-3-

**COBRA Includes Telephonic Quality Communication**
**From the Dial-up User's Modem to the COBRA Modem**

10.     To gain access to the COBRA system, the Dial-up User must connect to and use the Public Switched Telephone Network ("PSTN"). (Id. 106; Ex. 2).[3] MCI concedes that the COBRA service it purchases includes access to the PSTN. (Trial Tr. 123).

11.     The PSTN and COBRA are provided by the LEC and owned and maintained by the LEC on LEC premises and/or facilities. (Id. 124).

12.     A Dial-up User gains access to the COBRA system when the Dial-up User's modem dials a telephone number into the COBRA's NAS modem and the two modems connect. (Id. 105-07).

13.     When a Dial-up User makes a call, the Dial-up User's modem connects to the LEC via a voice switch. (Id. 112; Ex. 2).

14.     The modem calls into the LEC switch in exactly the same way as a voice call – the modem detects a dial tone and sends out touch tone or rotary signals to commence the call. (Trial Tr. 153).

15.     There is a telephonic quality communication between the Dial-up User and the LEC switch. (Id. 112-13, 153-54).

16.     Next in the COBRA system, the Dial-up User's modem call travels from the LEC voice switch to a Primary Rate Interface ("PRI") trunk. (Id. 113; Ex. 2). PRIs are a component of the COBRA service purchased by MCI, and the COBRA service includes PRI circuits. (Id. 118, 157, 162-64; Ex. 27 at DOJ 12; Ex. 29 at DOJ 35).

---

[3]     The Public Switched Telephone Network is the network which allows voice communication to be established between one or more people throughout the United States and overseas. (Trial Tr. 148).

-4-

17.     In the COBRA configuration, the PRI is a circuit that provides 23 local voice channels and one data channel between two points. (Trial Tr. 115-16, 155).

18.     There is a telephonic quality communication between the LEC switch and the PRI. (Id. 113-15, 156).

19.     A PRI is capable of telephonic quality communication. (Id. 115). Indeed, the PRI is designed to be able to carry telephonic quality communication. (Id. 155, 186).

20.     Next in the COBRA system, the PRI connects the LEC voice switch to a PRI line card inside the COBRA NAS, which is then connected to the COBRA DSP devices, which serve as modems. (Id. 116-17, 156; Ex. 2).

21.     The communication between the PRI and the modems in the COBRA NAS is a telephonic quality communication. (Trial Tr. 157, 117).

22.     Thus, the COBRA services purchased by MCI include telephonic quality communications, or at a minimum a telephonic quality communications path capable of telephonic quality communications, all the way from the Dial-up User's modem to the COBRA service's NAS modem. (Id. 118, 177).

23.     A representation of analog data travels across the COBRA PRI into the COBRA DSP modem in the COBRA's NAS; the COBRA's DSP accepts the representation of the analog signal from the PRI. (Id. 107).

24.     A PRI can plug into a PBX, which is a switch permitting traditional telephone voice communication. (Id. 116, 166, 199).

25.     The COBRA system also works the same way as described above in reverse, except that COBRA is not currently configured to originate calls (id. 119), although it could be

-5-

reconfigured to do so (Exs, 13, 14, 15).[4]

26.    The only barriers to replacing the COBRA DSP cards that cannot originate calls

with DSP cards that can originate calls (such that the COBRA system could originate calls) were

contractual and the business and economic judgment concerns of MCI and of the LEC.  (Id. 120-

21).[5]



27.    COBRA provides "full duplex" communication, that is, two-way communication.

(Id. 158-59, 119).  Information travels from the Dial-up User to the COBRA system to the

Internet, and also in reverse from the Internet back to the COBRA system and then back to the

Dial-up User.  (Id. 158-59).

28.    Only once the Dial-up User's modem call leaves the PRI inside the COBRA's

NAS modem bank is it converted to IP packets, which can be sent over the Internet.  (Id. 67, 70;

Ex. 2).

29.    Thus, the parties agree that COBRA services purchased by MCI include access to

local telephone system and telephonic quality communications, or at a minimum a telephonic

quality communications path capable of telephonic quality communications, from the Dial-up

User to the COBRA NAS modem.  (Id. 118, 177).

---

<sup>4</sup> As discussed infra, Point IV, the ability or inability of COBRA to originate calls is irrelevant to the Excise Tax analysis.

<sup>5</sup> Mr. Anderson conceded this point on cross examination at trial (Trial Tr. 120-21). He then tried to distance himself from it on redirect, arguing that DSP cards for VoIP are "a recent development."  (Id. 133-34).  MCI provided no evidence, however, that DSP cards that can originate calls were unavailable in the fourth quarter of 2002, the first taxable period at issue in this suit.  (Ex. 22).  Moreover, as discussed infra at Point IV, the ability or inability of COBRA to originate calls is irrelevant to the Excise Tax analysis.

-6-

**COBRA Can Transmit VoIP Communications**

30.     Voice Over Internet Protocol ("VoIP") is a technology which allows regular voice signals to be converted to packets that are designed to travel on the TCP/IP network, which is commonly known as the Internet.  (Id. 169).

31.     Computer to Computer VoIP is a system in which the transformation from voice signals to IP packets occurs on the end user's own computer.  (Id. 170).

32.     COBRA is capable of Computer to Computer VoIP.  (Id. 121, 161, 170-73).  As currently configured, the COBRA system can accept and transmit a Computer to Computer VOIP packet from the Dial-up User to the Internet.  (Id. 121, 161, 170-73).

33.     The COBRA services cannot distinguish between a Computer to Computer VoIP packet carrying a packetized voice transmission and any other non-voice packet coming out of a Dial-up User's computer.  (Id. 122).

34.     MCI cannot rule out the possibility that the COBRA system did, in fact, transmit Computer to Computer VoIP packets from the Dial-up User to the Internet.  (Id. 121-22).

**COBRA Was Purchased on a Bundled, Monthly, Per Port Basis**

35.     MCI paid for COBRA on a monthly basis.  (Id. 124).  MCI paid for COBRA on a per port basis; the price of the port includes all access to the PSTN.  (Id. at 126; Ex. 27 at DOJ 14, Ex. 29 at DOJ 38-39).

36.     The monthly charge that MCI paid for COBRA services excluded the egress circuits that connected COBRA to MCI.  (Ex. 29 at DOJ 39 ¶ 3; Ex. 30 at DOJ 62 ¶B(7)).

37.     The monthly charge that MCI paid for COBRA services did not vary with the volume carried by each port.  (Id.).

-7-

38.    The monthly charge that MCI paid for COBRA services did not vary with the

content of the packet – whether representations of voice or data – sent over COBRA.  (Id. 126).

39.    The monthly charge that MCI paid for COBRA services would not have varied if

VoIP packets were sent over COBRA.  (Id.).

40.    The monthly per port charge that MCI paid for COBRA services included the

entire COBRA service and all of its components, including the PRI.  (Id. 126-27).

## PROPOSED CONCLUSIONS OF LAW

### I.    The COBRA Service Provides Access to the Local Telephone System and the Privilege of Telephonic Quality Communication, or, at a Minimum, Is a Facility or Service Provided in Connection With a Local Telephone System

41.    The COBRA services are subject to the Excise Tax because they provide MCI

with access to the local telephone system and the privilege of telephonic quality communication,

or, at a minimum, they are facilities or services provided in connection with a local telephone

system, regardless of the conversion of the analog signals to IP packets that occurs within the

COBRA system.  26 U.S.C. §§ 4251, 4252(a).  Two-way telephonic quality communications are

the essence of the COBRA system, without which it could not link a Dial-up User to the Internet.

(Trial Tr. 185).

42.    Sections 4251 and 4252(a) impose an excise tax on "local telephone service,"

defined to include "(1) the access to a local telephone system, and the privilege of telephonic

quality communication with substantially all persons having telephone or radio telephone stations

constituting a part of such local telephone system, and (2) any facility or service provided in

connection with a service described in paragraph (1)."  26 U.S.C. § 4252(a).

43.    The term "access" has been interpreted to mean "the interface or connection

-8-

between" the service provided and the transmission lines.  See Trans-Lux Corp. v. United States,

696 F.2d 963, 965 (Fed. Cir. 1982) (interpreting the term access as used in 26 U.S.C. § 4252(c)

governing teletypewriters).

44.    As used in Sections 4251 and 4252, "the word privilege connotes right," rather

than any particular use of telecommunications services.  Comdata Network, Inc. v. United States,

21 Cl. Ct. 128, 130-31 (1990).[6]

45.    Thus, a party's actual use of telecommunications technology is irrelevant to the

applicability of the Excise Tax; instead, "the tax is applicable because the service provided [to

Comdata] grants it the *right* to utilize the telephone lines to communicate with a substantial

number of stations in a distant area.  That the service may not, in fact, be so used by [Comdata] is

irrelevant to the existence of the privilege."  Id. at 131 (emphasis added).

46.    The legislative history of the Excise Tax supports this analysis:  it states that "in

the case of local telephone service, the definition makes it clear that it is the right of access to a

local telephone system and the privilege of telephonic quality communication which is taxed

together with facilities or services provided with this service."  S. Rep. 89-324, P.L. 89-44, 1965

WL 4428 (June 14, 1965).

47.    Mr. Anderson testified – on behalf of MCI – that a modem call from a Dial-up

User to the COBRA modems travels on a telephonic quality path the entire way, including

throughout the COBRA system.  (Trial Tr. 118, 121).  The fact that the COBRA PRI responds to

modem communications rather than voice calls in the COBRA system's current configuration is

---

[6]    The Government's prior briefs in this matter include extensive discussion of
Comdata.  See Surreply of the United States of America to Reorganized Debtors' Objection to
IRS Request for Payment No. 38365, at 6-7, and Reply of the United States of America to
Reorganized Debtors' Objection to IRS Request for Payment No. 38365, at 7-8.

irrelevant for Excise Tax purposes, because, as conceded by MCI, a PRI is capable of telephonic quality communication (id. 115). Under Comdata, the PRI's telephonic-quality capability renders the COBRA system taxable, even if COBRA is currently configured to respond only to modems. See 21 Cl. Ct. at 130-31.

     48.     MCI does not contend that Comdata was wrongly decided, but merely – and unsuccessfully – attempts to distinguish Comdata by arguing that the COBRA system is only "a data service" because MCI receives a high-speed data stream at the egress of the COBRA system. (Trial Tr. 141). What MCI receives from the COBRA services is irrelevant. It may be that the information contained in the Dial-up User's calls leave the COBRA system as an IP data stream, but within the COBRA services purchased by MCI all communications travel on a telephonic quality path. In other words, within COBRA, "the data is transmitted through the telephonic quality voice channel." (Trial Tr. 152). Indeed, MCI acknowledges that the COBRA service accepts telephone quality transmissions from modems that use the PSTN, that the modem calls travel within COBRA on telephonic quality paths, and that "[a]ll access to modems or DSPs requires two-way, voice grade, telephonic quality communication. The COBRA services purchased by UUNET provide access between Dial-up Users' modems and the modems and/or DSPs within the COBRA system, and thus require two-way, voice capable, telephonic quality communications." (Trial Tr. 110-11, 118, 121, 151-52).[7]

     49.     Thus, MCI's own testimony proves that COBRA is a voice-capable system. COBRA accepts incoming voice quality communications from the Dial-up User's modem, and

     [7]     As noted supra note 2, Mr. Anderson agreed with this quotation at deposition (Trial Tr. 110-11), but attempted to distance himself from that concession at trial (id. 129-31) with a distinction that is irrelevant because a system's capacity for telephonic quality communication governs the Excise Tax analysis.

-10-

sends outgoing voice quality communications back to the Dial-Up User's modem. Indeed, MCI

concedes that PRI circuits included in the COBRA services could be plugged into a PBX for

traditional voice telephone service. (Trial Tr. 116, 167, 199).

50.      Therefore, the COBRA system includes the privilege of voice quality

communication. That COBRA may be configured to use its voice-capable paths for data is a

matter of choice – not capability – just as in Comdata.

51.      Finally, in seeking to exclude COBRA from the coverage of the Excise Tax, MCI

ignores the fact that the Excise Tax lists numerous specific exemptions from tax, but does not

exempt voice-capable systems that are used for transmitting data. See 26 U.S.C. § 4253. The

Excise Tax statute's express exemptions bolster the Government's arguments against MCI's

effort to create a new, unlegislated exception to the Excise Tax.

**II.      IRS Revenue Rulings Are Entitled to "Great Deference"**

52.      As discussed in Sections III, IV and VII below, numerous IRS Revenue Rulings

support the IRS's arguments in this matter. These rulings, many of which are decades old,

deserve "great deference" from the Court.

53.      "In [the Second] Circuit, a Revenue Ruling is 'entitled to great deference' . . . and

is presumed to have 'the force of legal precedent unless unreasonable or inconsistent with the

provisions of the Internal Revenue Code.'" Weisbart v. U.S. Dep't of Treasury, 222 F.3d 93, 98

(2d Cir. 2000) (quoting Texasgulf, Inc. v. Comm'r, 172 F.3d 209, 217 (2d Cir. 1999) and

Gillespie v. United States, 23 F.3d 36, 39 (2d Cir. 1994)). This is because

> [E]ver since the inception of the tax code, Congress has seen fit to vest in those
> administering the tax laws very broad authority to interpret those laws. In an area
> as complex as the tax system, the agency Congress vests with administrative
> responsibility must be able to exercise its authority to meet changing conditions

-11-

> and new problems. . . . [T]his Court has long recognized the primary authority of
> the IRS and its predecessors in construing the Internal Revenue Code.

Bob Jones Univ. v. United States, 461 U.S. 574, 596 (1983) (upholding IRS determination made

by revenue ruling); see United States v. Cleveland Indians Baseball Co., 532 U.S. 200, 220

(2001) (reasonable revenue rulings "attract[] substantial judicial deference" where they reflect

longstanding interpretation of tax regulations); United States v. Correll, 389 U.S. 299, 306–07

(1967) (deferring to IRS's administration of tax laws and right to "make appropriate

adjustments").

      54.     The Second Circuit has never decided whether revenue rulings are entitled not just

to "great deference," but additionally to the full deference accorded under Chevron USA, Inc. v.

Natural Res. Def. Council, Inc., 467 U.S. 837 (1984). However, the Supreme Court has made it

clear that, while notice-and-comment rulemaking and formal adjudication almost always assure

Chevron deference, the absence of such formalities does not preclude such deference, so long as

it appears that Congress intended to grant the agency the power to make rules with the "force of

law" and "the agency interpretation claiming deference was promulgated in the exercise of that

authority." United States v. Mead Corp., 533 U.S. 218, 226–27, 230–31 (2001); accord Barnhart

v. Walton, 535 U.S. 212, 221–22 (2002) (according Chevron deference to a "longstanding"

agency interpretation reached through "means less formal than 'notice and comment'

rulemaking").

      55.     Revenue rulings satisfy this standard. The IRS promulgates revenue rulings

pursuant to its statutory authority to "prescribe all needful rules and regulations for the

enforcement of" the Internal Revenue Code. 26 U.S.C. § 7805(a); Treas. Order 111-2, 1981-1

C.B. 698, 699. Revenue rulings are formal interpretative rulings involving "substantive tax law."

26 C.F.R. § 601.601(d)(2)(v)(a). They are issued by the IRS National Office and published in the

Internal Revenue Bulletin as the agency's "official" position to guide taxpayers and IRS officials

alike. Id. § 601.601(d)(2)(i)(a). Both rulings and regulations are written and reviewed at the

same levels of the IRS and the Treasury Department. Treas. Order 111-2. Like regulations,

revenue rulings have legal force and effect, as they are "precedents to be used in the disposition

of other cases" that "may be cited and relied upon for that purpose." 26 C.F.R.

§ 601.601(d)(2)(v)(d). And a taxpayer's disregard of applicable revenue rulings can result in the

imposition of penalties. 26 U.S.C. § 6662; 26 C.F.R. § 1.6662-3(b)(2). Revenue rulings

consequently have the "force of law" within the meaning of Mead, and Chevron deference is

therefore required. Mead, 533 U.S. at 227.

56.    In any event, whether or not revenue rulings are entitled to Chevron deference,

they are without doubt entitled to "great deference" under Weisbart. The revenue rulings

discussed below are the considered, long-standing opinions of the IRS, and the Government

respectfully submits that the Court should defer to those determinations.

## III.    A Modem to Modem Call Is Taxable and the Presence or Absence of a Traditional Telephone Is Irrelevant to the Excise Tax Analysis

57.    In a 1979 revenue ruling, the IRS ruled that the Excise Tax applies to a service

using the local telephone system to connect modems to one another – in other words, what the

COBRA service does. See IRS Revenue Ruling 79-245, 1979-2 C.B. 380, 1979 IRB LEXIS 290

(July 1979) ("Rev. Rul. 79-245"). Thus, the presence or absence of an actual telephone is

irrelevant to the Excise Tax analysis.

58.    MCI argues that Section 4252 requires the presence of "actual telephones," that

the tax cannot apply to any technology "other than plain old telephone service," and that "the

-13-

exchange of data between computer modems" is not taxable. (Trial Tr. 32-33; Resp. ¶¶ 18-21).

In its pretrial briefs, MCI did not cite a single case, regulation or revenue ruling in support of this

proposition. MCI is incorrect.

59.    Contrary to MCI's assertion, the IRS has long held that the Excise Tax applies to

systems that do not use traditional telephones. As discussed in the Government's two prior

briefs, the IRS ruled in 1979 that Excise Tax for local telephone service was owed on a system

that relied on modem to modem communication. See Rev. Rul. 79-245, at *6. In this system, a

company paid monthly charges for local telephone service, "but, instead of having standard

telephones connected to the telephone lines the business establishment has its computer unit and

terminals connected to the telephone lines." Id. at *3. As the system was configured,

> The modems convert the computer signals into signals that can be transmitted over
> telephone lines. While these telephone signals are the same type used to transmit voice,
> the modems are designed only for nonvoice transmission and produce a signal which is
> usable only for transmission to other computer stations.

Id. at *2.

60.    This modem to modem system was taxable, the IRS concluded, regardless of the

absence of an actual telephone, because the company "has access to the local telephone exchange

system through the lines used with the computer system." Id. at *4 (emphasis added). In other

words, the IRS held that the Excise Tax applies even when the local telephone service is being

used by computer modems, not human callers. Id.

61.    The IRS determined that Excise Tax was owed because "[w]here a telephone

service provides the subscriber the privilege of telephonic quality communication with

substantially all other subscribers to the local telephone system, it is immaterial whether the

subscriber exercises the privilege." Id. at *5. The company "is a subscriber to local telephone

-14-

service, even though the privilege of telephonic quality communication may not be exercised."
Id.[8]

62.    Similarly, the Comdata case involved, in part, an automated communication
system in which electronic fund request messages were transmitted by computers over telephone
lines. 21 Cl. Ct. at 129. No telephones were used, yet the service was taxable. Id. at 130-31.

63.    Finally, MCI does not explain why the Court should conclude that a traditional
telephone is a necessary feature of a service taxable under Section 4252(a)(2), which expressly
includes in the definition of local telephone service "any facility or service provided in
connection with" a local telephone system. Nothing in the language of 4252(a)(2) mandates the
presence of a traditional telephone (rather than a modem or a facsimile machine) in the facility or
service provided in connection with the taxable service.

64.    Thus, communications between computer modems over the local telephone
system are taxable, and MCI is incorrect when it argues that a traditional telephone is a
prerequisite for Excise Tax liability.

## IV.    COBRA's Inability to Originate A Call Is Irrelevant to the Excise Tax Analysis and, In Any Event, Could Be Changed

65.    The fact that COBRA – as currently configured – cannot originate calls is
irrelevant to the Excise Tax analysis and does not undermine the fact that COBRA provides two-
way communication. Furthermore, COBRA is technologically capable of being reconfigured to

---

[8]    MCI tries to distinguish Rev. Rul. 79-245 by noting that the company could have unplugged its modems and plugged in a telephone and had "regular telephone service," which it claims is impossible with the COBRA services. (Resp. ¶¶ 23-24). As confirmed by Mr. Anderson, MCI is incorrect, because the PRI included in the COBRA services could be plugged into a PBX for traditional telephone service. (Trial Tr. 116, 167, 199). Thus, the COBRA services are just as capable of "regular telephone service" as the services discussed in Rev. Rul. 79-245.

-15-

originate calls; the sole barriers to such a change are self-imposed contractual and economic ones.

A.     **The Ability to Originate a Call Is Legally Irrelevant**

66.     MCI maintains that the Excise Tax does not apply here because the COBRA system cannot initiate or originate telephone calls. (Trial Tr. 33, 90; Resp. ¶ 23). This ability is not required for the Excise Tax to apply.

67.     The IRS has held for decades that the ability to initiate calls is immaterial under the Excise Tax. In 1977, the IRS determined that "[i]n defining taxable local telephone service, section 4252(a)(1) makes no distinction between systems that provide access to a local telephone network only by receiving calls and systems that both receive and originate calls." IRS Revenue Ruling 77-196, 1977-1 C.B. 343, 1977 WL 43147 ("Rev. Rul. 77-196"). Accordingly, "the fact that . . . the basic [automatic call distributing] switching equipment can only receive incoming calls from a local telephone system is not material to the tax determination." Id.

68.     This decision was supported by IRS precedent: the IRS had previously ruled that Excise Tax is owed on the purchase of time-of-day and weather-forecast telephone announcements by companies that subscribe to the announcement service and attached advertising messages to the announcements. See IRS Revenue Ruling 75-102, 1975-1 C. B. 351, 1975 WL 34847 ("Rev. Rul. 75-102"). In the time and weather systems, "access to a local telephone system . . . is achieved through receiving incoming calls." Rev. Rul. 77-196 (describing the services at issue in Rev. Rul. 75-102). Nonetheless, the IRS concluded that "the time-of-day and weather forecast services furnished by the telephone company . . . provide access to a local telephone system and the privilege of telephonic quality communication with all

-16-

persons having telephones in the system." Rev. Ruling 75-102. Thus, the Excise Tax applied.

Accord Revenue Ruling 75-9, 1975-1 C.B. 348, 1975 WL 34846 (1975) (Excise Tax applies to

charges for lines used by radio station for listeners' incoming calls only).

69.    The 1975 and 1977 revenue rulings were reinforced by a 1989 revenue ruling, in

which the IRS reviewed a service that permitted subscribers (labeled "call initiators" by the IRS)

to call a telephone number to hear information on news, sports or other topics recorded by an

information provider. See IRS Revenue Ruling 89-84, 1989-1 C.B. 296, 1989 WL 572070

("Rev. Rul. 89-94"). The information provider was the "call recipient" because the service

received incoming calls only. Id. The IRS determined that the information provider was liable

for Excise Tax, because by providing a service which could receive telephone calls from

subscribers, the information provider had "access to the local telephone system and the privilege

of telephonic quality communication with all persons having telephones in the system." Id.

70.    Again with no support in statute, regulation or case law, MCI seeks to reverse

decades of consistent administrative practice in the application of Section 4252(a), and numerous

re-enactments of the statute by Congress. Nothing in the language of the Excise Tax statute, the

legislative history, or decades of IRS administrative interpretation supports the argument that the

Excise Tax applies only where there is a capacity to both initiate and receive calls. To the

contrary, the IRS has repeatedly held otherwise. Accordingly, MCI's argument must fail.

### B.    COBRA Can Be Reconfigured to Originate Calls

71.    In any event, although it is not relevant to the Excise Tax analysis, the COBRA

system could be reconfigured by MCI and the LEC to originate telephonic quality

communications. Mr. Anderson testified at trial that the only barriers to replacing the DSP cards

-17-

within the COBRA system that cannot originate calls with DSP cards that could originate calls, such that the COBRA system could originate calls, were contractual and the business and economic judgment concerns of MCI and of the LEC. (Id. 120-21).[9]

72.    Thus, a change to COBRA would permit call initiation by COBRA and still preserve all the COBRA functions purchased by MCI – the DSP cards that permit call initiation also permit Dial-up Users to call into COBRA and provide MCI with a high speed data stream from COBRA. (Id. 175-77; Exs. 13, 14, 15).

73.    COBRA could be reconfigured to originate telephonic quality calls; the only barriers to such a change are the business choices of the contracting parties. Thus, despite MCI's claims to the contrary, any limits on call origination by COBRA are self-imposed, not technological. Such self-imposed limitations are the type of restrictions that were at issue in Comdata – the disputed Comdata system had the "potential" to be used in an indisputably taxable manner, but was being used otherwise by choice. And just as the Comdata plaintiffs argued unsuccessfully, MCI maintains that the IRS should look to "actual use," not "the capability of the service provided." 21 Cl. Ct. at 130. The response of the Comdata Court, however, was unequivocal: "We cannot accept this argument." Id.

74.    As shown above, it is the capability of the COBRA service that triggers its taxability, not its actual use, and the COBRA service is capable of being configured to permit call origination.

---

[9]    As noted above, supra note 5, Mr. Anderson conceded this point on cross examination at trial (Trial Tr. 120-21), but then unsuccessfully tried to deny it on redirect (id. 133-34), despite providing no evidence about the call-originating capabilities of DSP cards in late 2002.

-18-

### C.    COBRA Is a Two-Way Communication System

75.    Finally, MCI concedes through the testimony of its expert that although the COBRA system cannot originate calls as currently configured, it nonetheless provides two-way communication between it and the Dial-up User.  Specifically, Mr. Anderson testified at trial that COBRA is "full duplex," two-way communication.  (Trial Tr. 119; cf. 158-59).

76.    In other words, MCI's own expert concedes that COBRA provides two-way communication over telephonic quality paths between the Dial-up User and the COBRA modems.  The issue of whether COBRA can initiate this communication is entirely irrelevant to the Excise Tax analysis.

### V.    COBRA Provides Access to a Local Telephone System

77.    MCI appears to argue that the COBRA services are not a "local" telephone service because the IP packets that COBRA produces on the egress end of its system can travel anywhere geographically by means of the Internet.  (Trial Tr. 33).  Again, MCI's argument relies on considerations that are irrelevant to the Excise Tax law.

78.    The path of IP packets once they leave the COBRA system is beside the point.  As established by MCI's own expert witness, the services provided by the COBRA system connect the Dial-up User to the COBRA modem bank via PRIs, which are circuits that provide 24 local loops or circuits.  (Trial Tr. 115-16, 155).

79.    Thus, the parties agree that a Dial-up User typically places a *local* telephone call via modem to the *Local* Exchange Carrier, which connects to the COBRA's PRI via *local* loops, and then travels on the PRI's local circuits to the COBRA's modem, which then converts the voice-quality modem signals to IP packets for transmission to the Internet.  (Id. 105, 115-16, 155;

-19-

Ex. 2). The PSTN and COBRA are provided by the *Local* Exchange Carrier and owned and maintained by the *Local* Exchange Carrier on the *Local* Exchange Carrier's premises and/or facilities. (Trial Tr. 124 (emphasis added)).

80.    Whereas the IP packets can of course travel anywhere on the Internet, the pre-conversion voice quality modem transmissions are sent through the local telephone system. Accordingly, the COBRA system includes "access to a local telephone system," or, at a minimum, is a "facility or service provided in connection with" a local telephone system, is taxable under Section 4252(a).

## VI.    COBRA's VoIP Capability is a Separate Basis for Excise Taxes to Apply

81.    The COBRA system is capable of Voice Over Internet Protocol ("VoIP") telephony by the transmission of VoIP packets. This fact provides an independent basis for applying the Excise Tax to the COBRA services purchased by MCI.

82.    As both parties' expert witnesses testified at trial, the COBRA system, as currently configured, can accept and transmit a Computer to Computer VoIP packet from the Dial-up User to the Internet. (Trial Tr. 121, 161, 170-73). MCI's expert witness conceded that MCI cannot rule out the possibility that the COBRA system did, in fact, transmit Computer to Computer VoIP packets from the Dial-up User to the Internet. (Id. 121-22). And he acknowledged that the COBRA services cannot distinguish between a Computer to Computer VoIP packet and any other packet coming out of a Dial-up User's computer. (Id. 122).

83.    Mr. Anderson thus confirms the opinion of the Government's expert witness, Dr. Hills, who explained at trial that there are at least two types of VoIP telephony, including one in which a user sends a traditional voice call into a VoIP gateway, which converts it to VoIP

-20-

Internet packets, and another (called Computer to Computer VoIP) in which the VoIP conversion

from voice to packets is done on the user's own computer, which generates packets which are

then indistinguishable from any other packet – voice or non-voice – going over the Internet.

(Trial Tr. 169-70).

      84.     Dr. Hills and Mr. Anderson agree that COBRA can transmit Computer to

Computer VoIP. (Id. 121-23, 161, 170-73). A Dial-up User, using a system such as the

commercial service Skype, can place a VoIP call, convert the voice signals into packets on the

Dial-up User's computer, transmit those packets via modem to the COBRA system, and send

those packets onto the Internet, with no conversion of that packet by the COBRA services. (Trial

Tr. 121-22, 161, 170-73). That packet would therefore carry a voice transmission from the Dial-

up User's home to the Internet via the COBRA services purchased by MCI. (Id.).

      85.     MCI's COBRA Access Contracts include language such as the following:

> Should WorldCom or any of its affiliates wish to directly use the COBRA Services to
> directly provide any one-way or two-way voice telephony communications, whether local
> or long distance ("VoIP"), WorldCom and Vendor shall negotiate terms, conditions, and
> rate structures that are applicable to VoIP prior to WorldCom utilizing the COBRA
> Services to directly provide VoIP services. . . . If WorldCom or any of its affiliates at any
> time during the Service Term of this Schedule directly use the COBRA Services to
> provide VoIP without the prior development of mutually agreed-upon terms, conditions,
> and rate structures for VoIP, WorldCom shall be in breach of this Schedule . . . .

(Trial Tr. 173-74, quoting Ex. 29 at DOJ 37; Ex. 31 at DOJ 99 (same); see also Exs. 13, 15

(referring to VoIP capabilities)).

      86.     In its briefs, MCI tried to distance itself from this contractual language, claiming

that COBRA cannot support VoIP communications. (Resp. ¶ 26). As demonstrated above and

conceded by Mr. Anderson, MCI's argument is wrong. Further, MCI fails to explain why MCI

would enter a contract which specifically considers the terms under which COBRA can be used

-21-

for VoIP, and the consequences to the parties if COBRA is used for VoIP, if COBRA were actually incapable of VoIP.

87.    The COBRA services purchased by MCI are capable of VoIP telephony and the privilege of telephonic quality communications, and are therefore subject to the Excise Tax.

**VII.    COBRA Services Are Not a Private Communication Service**

88.    Based on arguments made briefly by MCI's counsel at trial, the Government anticipates that MCI will argue that COBRA is excluded from the Excise Tax because it is a private communication service, pursuant to 26 U.S.C. § 4252(d).  Any such argument should fail. COBRA is not a private communication service because it provides access between all Dial-up Users and the COBRA system over the PSTN, and there is no private aspect of the service that is billed separately from the rest of the COBRA service.

89.    MCI argued that COBRA is a private communication service for the first time at the trial in this matter, on February 1, 2006.  MCI did not raise this argument either in its initial objection, dated August 5, 2004, or in its Response to the Reply of the United States, dated December 16, 2005.

90.    Accordingly, MCI has waived this argument, and the Court should not consider it. See Carmody v. ProNav Ship Mgmt., Inc., 224 F.R.D. 111, 131 (S.D.N.Y. 2004) (court need not consider argument raised for the first time in reply brief); Hughes v. JP Morgan Chase & Co., 01 Civ. 6087, 2004 WL 1403337, at *3 n. 3 (S.D.N.Y. June 22, 2004) ("The Court . . . declines to analyze this argument on its merits because it was raised for the first time in a reply brief."); Playboy Enter., Inc. v. Dumas, 960 F. Supp. 710, 720 n. 7 (S.D.N.Y. 1997), aff'd 159 F.3d 1347 (2d Cir. 1998) ("Arguments made for the first time in a reply brief need not be considered by a

-22-

court.") (collecting cases); U.S. ex rel. Morgan v. McElroy, 981 F. Supp. 873, 876 n.3 (S.D.N.Y.

1997) ("It is well settled in the Second Circuit that a party may not raise an argument for the first

time in his reply brief.").

      91.     In each of these cases, the Court declined to consider an argument raised for the

first time in a reply brief. Here, MCI's waiver is more troubling – it filed both an objection and a

reply brief, and never argued the "private communication service" theory in either filing. Only at

trial, after having reviewed all of the Government's submissions, did MCI raise for the first time

the entirely new legal argument that COBRA is a Section 4252(d) private communication

service. (Trial Tr. 34).

      92.     In any event, COBRA is not a private communication service. The Internal

Revenue Code defines a private communication service as follows:

> "private communication service" means –
>
> (1)     the communication service furnished to a subscriber which entitles the
> subscriber –
>
>      (A)     to exclusive or priority use of any communication channel or
> groups of channels, or
>
>      (B)     to the use of an intercommunication system for the subscriber's
> stations, regardless of whether such channel, groups of channels, or
> intercommunication system may be connected through switching
> with a service described in subsection (a), (b), or (c),
>
> (2)     switching capacity, extension lines and stations, or other associated
> services which are provided in connection with, and are necessary or
> unique to the use of, channels or systems described in paragraph (1), and
>
> (3)     the channel mileage which connects a telephone station located outside a
> local telephone system area with a central office in such local telephone
> system,
>
> except that such term does not include any communication service unless a

-23-

separate charge is made for such service.

26 U.S.C. § 4252(d).

93.    Congress enacted the private communication services exclusion to correct a competitive imbalance between the public telephone companies (that provided both public and private services, both of which were taxed), and private companies (that were permitted to provide private services tax-free).  See Trans-Lux Corp. v. United States, 696 F.2d 963, 967 (Fed. Cir. 1982); Western Elec. Co. v. United States, 564 F.2d 53, 57 (Cl. Ct. 1977) (citing legislative history that "telephone companies presently are losing intrapremise business"); H.R. Rep. No. 89-433, P.L. 89-44, 89th Cong., 1st Sess., 1965 WL 4427 (May 28, 1965) (Section 4252(d) passed to correct competitive imbalance between telephone companies and private companies providing intercom services or private lines).  As explained by the Trans-Lux Court, the private communication services exclusion created by Section 4252(d) "provided that the charges for intrapremise telephone services and associated services were not subject to the excise tax even though the telephones also had access to a local exchange system."  Trans-Lux, 696 F.2d at 967.  The exclusion for private communications services applies only to private lines and intercom systems, including, for example, telephones located within a single plant facility.  See Western Electric, 564 F.2d at 55 (Excise Tax inapplicable to "private communication services (commonly known as 'intercoms')").

94.    Thus, the private communications exclusion means that, in systems that include both private services and access to the public local telephone services, the IRS will tax some components and not others.  See Revenue Ruling 78-437, 1978-2 C.B. 266, 1978 WL 42231 (1978) ("Rev. Rul. 78-437").  In that ruling, the IRS considered the taxability of a

-24-

communication system that included an intraoffice intercom service and access to the local

telephone service, with separate charges for the various services. Rev. Rul. 78-437. The IRS

ruled that Excise Tax applied to charges for "lines that give access to the local telephone service"

that are not "necessary or unique to the private communication service." Id. By contrast, the

Excise Tax did not apply to charges for lines that are "necessary to the use of the private

communication service." Id.

95.    COBRA is not a set of private communication channels, nor an intrapremise,

intercom service. As MCI concedes, the COBRA "platform had Dial-up Users coming into it."

(Trial. Tr. 91). Anyone with a telephone or a fax machine can call the COBRA modems

(although they will hear only screeching tones, since the COBRA modem is programmed to

accept only modem calls), and anyone with a modem can connect to the COBRA modems and

gain access to the Internet. (Trial Tr. 101-03, 146, 168-69). That is the point of the COBRA

service – to connect the subscribers of internet service providers to the Internet. (Id. 146-47,168-

69). Put simply, "anyone could connect to the NAS equipment." (Id. 169). Thus, COBRA has

nothing in common with a private communication channel or intrapremise intercom service

connecting coworkers in a single office. See Rev. Rul. 78-437.

96.    Further, and fatally for MCI's claim, a private communication service "does not

include any communication service unless a separate charge is made for such service." 26

U.S.C. § 4252(d). The Trans-Lux Court explained that the exclusion "was contingent on a

separate charge being made for the intrapremise service or associated service." Trans-Lux, 696

F.2d at 967; see Western Electric, 564 F.2d at 56, 58 (service is Excise Tax-free only if "a

separate charge" paid for intercom "associated services;" billing cannot be bundled with local

-25-

telephone charges).

97.    There is no separate charge for a private communication channel or service here. It is undisputed that MCI paid for COBRA on a monthly, per port basis. (Trial Tr. 124; Ex. 27; Ex. 29). According to Mr. Anderson, the monthly, per port charge that MCI paid for COBRA services included the entire COBRA service and all of its components – including the PRI that connects the LEC voice switch to the COBRA modems, that the parties agree is accessible to modem calls from any Dial-up User and capable of telephonic quality communication. (Id. 126-27; see Ex. 27 at DOJ 12 (COBRA service encompasses "all NAS equipment, telecommunications services and related facilities (including without limitation active PRI lines) . . . required to connect a call that has been dialed into the PSTN . . . ."); Ex. 29 at 35 (same)).

98.    MCI's argument in support of the private communication service theory appears to be that the communication lines between the egress point of the COBRA system and MCI's facilities were private. (Trial Tr. 92 (Q: Is the line from the egress point of the NAS to MCI's pop exclusively used by MCI? A: Definitely. It is a point to point private line.")).

99.    This fact, even if true, is irrelevant. The trial testimony of MCI's expert made perfectly clear that "the demarcation point" between the COBRA services and MCI was at "the output of the [COBRA] NAS." (Trial Tr. 69, 79, 129, 197; Exs. 2, 3). In other words, the COBRA service ends at the egress point of its NAS, as reflected in Trial Exhibits 2 and 3. (Exs. 2, 3; Trial Tr. 69, 72 (identifying MCI as "blue cloud" to the right of COBRA), 71-72 (MCI is not depicted in Exhibit 3)). It is for this reason that the monthly charge that MCI paid for COBRA services expressly excluded the egress circuits that connected COBRA to MCI. (Ex. 29 at DOJ 39 ¶ 3; Ex. 30 at DOJ 62 ¶B(7)).

-26-

100.     Thus, MCI's testimony that the lines between COBRA and MCI are private is irrelevant to the issue before the Court, which is whether the COBRA service is taxable. MCI's testimony indicates that if there were any private lines discussed in the trial evidence, they were lines located *outside* of the COBRA service, used to connect MCI to the COBRA system (which is located at the LEC's facilities). (Ex. 2; Trial Tr. 124, 72-73 ("Q: What connects MCI to the COBRA service? A: It is a high-speed datastream, and typically we used at least point to point high-speed data private line. We would go to whoever the low cost carrier was to get to the COBRA, see the CO or the central office where the COBRA platform was, and they would plug that private line into the COBRA platform and then backhaul it to one of our hubs . . . .").

101.     The status of the lines between COBRA and MCI are irrelevant here. This suit concerns whether "the amounts paid by UUNET to the LECs for the purchase of COBRA services" should be tax exempt. (MCI Objection ¶ 14). The IRS is seeking to tax the COBRA services, not the lines outside of COBRA that connect the COBRA system to MCI's backbone network. (Ex. 2). Thus, whether or not the lines between the COBRA system and MCI are private is irrelevant to the question before the Court – whether the COBRA services purchased by MCI are subject to the Excise Tax.

## CONCLUSION

102.     For the foregoing reasons, and for the reasons stated in the Surreply of the United States of America to Reorganized Debtors' Objection to IRS Request for Payment No. 38365, filed January 26, 2006 (Docket No. 17900) and in the Reply of the United States of America to Reorganized Debtors' Objection to IRS Request for Payment No. 38365, filed September 27,

-27-

2005 (Docket No. 17177), the Excise Tax applies to the COBRA services purchased by MCI.

Accordingly, the Government respectfully requests that the Objection be denied and the Excise

Tax claim be allowed in full, and that any COBRA-related refund claim of MCI be denied.

Dated: New York, New York
March 27, 2006

> MICHAEL J. GARCIA
> United States Attorney for the
> Southern District of New York
> Attorney for the United States of America

By:    /s/
> DANNA DRORI (DD-7690)
> NICOLE GUERON (NG-7682)
> Assistant United States Attorneys
> 86 Chambers Street, 3rd Floor
> New York, New York 10007
> Telephone: (212) 637-2689; 637-2699
> Facsimile: (212) 637-2686

-28-

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                                                 :
In re:                                           :          CHAPTER 11
                                                 :
WORLDCOM, INC., et al.,                          :          Case No. 02-13533 (AJG)
                                                 :
          Debtors.                               :          (Jointly Administered)
                                                 :
-------------------------------------------------------X

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
## OF THE UNITED STATES OF AMERICA AS TO
## DEBTORS' OBJECTION TO IRS REQUEST FOR PAYMENT NO. 38365

MICHAEL J. GARCIA
United States Attorney
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2689, 637-2699
Facsimile: (212) 637-2686

DANNA DRORI (DD-7690),
NICOLE GUERON (NG-7682),
Assistant United States Attorneys

          - Of Counsel -

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................. 1

PROPOSED FINDINGS OF FACT ............................................... 2

      Modems Are Integral to the COBRA System
      and Require Telephonic Quality Communication ................................ 2

      COBRA Includes Telephonic Quality Communication
      From the Dial-up User's Modem to the COBRA Modem ......................... 4

      COBRA Can Transmit VoIP Communications ................................... 7

      COBRA Was Purchased on a Bundled, Monthly, Per Port Basis ................... 7

PROPOSED CONCLUSIONS OF LAW ........................................... 8

I.      The COBRA Service Provides Access to the Local Telephone
       System and the Privilege of Telephonic Quality Communication,
       or, at a Minimum, Is a Facility or Service Provided in Connection
       With a Local Telephone System ...................................... 8

II.     IRS Revenue Rulings Are Entitled to "Great Deference" ................... 11

III.    A Modem to Modem Call is Taxable and the Presence or Absence
       of a Traditional Telephone Is Irrelevant to the Excise Tax Analysis .......... 13

IV.    COBRA's Inability to Originate A Call Is Irrelevant to
       the Excise Tax Analysis and, In Any Event, Could Be Changed ............ 15

       A.     The Ability to Originate a Call Is Legally Irrelevant ................ 16

       B.     COBRA Can Be Reconfigured to Originate Calls ................... 17

       C.     COBRA Is a Two-Way Communication System ................... 19

V.     COBRA Provides Access to a Local Telephone System ................... 19

VI.    COBRA's VoIP Capability is a Separate Basis for Excise
       Taxes to Apply .................................................. 20

-i-