VII.    COBRA Services Are Not a Private Communication Service  . . . . . . . . . . . . . . 22

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

-ii-

## TABLE OF AUTHORITIES

**Cases**:                                                                          **Page**

Barnhart v. Walton, 535 U.S. 212 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Bob Jones University v. United States, 461 U.S. 574 (1983) . . . . . . . . . . . . . . . . . . . . . 12

Carmody v. ProNav Ship Management, Inc., 224 F.R.D. 111 (S.D.N.Y. 2004) . . . . . . . . . . . . 22

Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,
      467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-13

Comdata Network, Inc. v. United States, 21 Cl. Ct. 128 (1990) . . . . . . . . . . . . . . . . . . . . . *passim*

Gillespie v. United States, 23 F.3d 36 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Hughes v. JP Morgan Chase Co., 01 Civ. 6087,
      2004 WL 1403337 (S.D.N.Y. June 22, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Playboy Enterprise, Inc. v. Dumas, 960 F. Supp. 710 (S.D.N.Y. 1997),
      aff'd 159 F.3d 1347 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Texasgulf, Inc. v. Commissioner, 172 F.3d 209 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 11

Trans-Lux Corp. v. United States,  696 F.2d 963 (Fed. Cir. 1982) . . . . . . . . . . . . . . . . . . 9, 24-25

U.S. ex rel. Morgan v. McElroy, 981 F. Supp. 873 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . 23

United States v. Cleveland Indians Baseball Co., 532 U.S. 200 (2001) . . . . . . . . . . . . . . . . . . . 12

United States v. Correll, 389 U.S. 299 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Mead Corp., 533 U.S. 218 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Weisbart v. U.S. Department of Treasury, 222 F.3d 93 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . 11

Western Electric Co. v. United States, 564 F.2d 53 (Cl. Ct 1977) . . . . . . . . . . . . . . . . . . . . 24-25


**Statutes and Regulations:**

26 U.S.C. § 4251 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

-iii-

26 U.S.C. § 4252 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

26 U.S.C. § 6662 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

26 U.S.C. § 7805(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

26 C.F.R. § 601.601(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

26 C.F.R. § 1.6662-3(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## Revenue Rulings:

IRS Revenue Ruling 75-9, 1975-1 C.B. 348, 1975 WL 34846 (1975) . . . . . . . . . . . . . . . . . . . . 17

IRS Revenue Ruling 75-102, 1975-1 C. B. 351, 1975 WL 34847 (1975) . . . . . . . . . . . . . . . . . 16

IRS Revenue Ruling 77-196, 1977-1 C.B. 343, 1977 WL 43147 (1977) . . . . . . . . . . . . . . . . . . 16

IRS Revenue Ruling 79-245, 1979-2 C.B. 380, 1979 IRB LEXIS 290 (July 1979) . . . . . . . 13-14

IRS Revenue Ruling 89-84, 1989-1 C.B. 296, 1989 WL 572070 (1984) . . . . . . . . . . . . . . . . . 17

IRS Revenue Ruling 78-437, 1978-2 C.B. 266, 1978 WL 42231 (1978) . . . . . . . . . . . . . . . . . 24

**Hearing Date and Time:  June 12, 2007 at 12:00 p.m. (New York Time)**
**Objection Deadline:  June 7, 2007 at 5:00 p.m. (New York Time)**

WEIL, GOTSHAL & MANGES LLP
Attorneys for Reorganized Debtors
767 Fifth Avenue
New York, NY  10153-0119
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Pérez, Esq. (AP 3629)

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------------------x
In re                                      :
                                           :    Chapter 11 Case No.
WORLDCOM, INC., et al.,                    :    02-13533  (AJG)
                                           :
                                           :    (Jointly Administered)
                    Reorganized Debtors.   :
----------------------------------------------------------------x
```

## NOTICE OF REORGANIZED DEBTORS' MOTION FOR LEAVE TO FILE
## SUPPLEMENTAL AUTHORITIES REGARDING
## THEIR OBJECTION TO PROOF OF CLAIM NO. 38365
## (DEPARTMENT OF TREASURY ADMINISTRATIVE EXPENSE CLAIM)

**PLEASE TAKE NOTICE THAT** a hearing to consider the motion dated May

17, 2007 (the "Motion") of Verizon Business Global LLC (successor by merger of the

reorganized debtor MCI, Inc.), and certain of its direct and indirect subsidiaries (collectively, the

"Reorganized Debtors"), requesting leave to file supplemental authorities regarding their

Objection to Proof of Claim No. 38365 (Department of Treasury Administrative Expense

Claim), shall be held before the Honorable Arthur J. Gonzalez, United States Bankruptcy Judge,

in Room 523 of the United States Bankruptcy Court, Alexander Hamilton Custom House, One

Bowling Green, New York, New York, 10004, on **June 12, 2007 at 10:00 a.m. (New York City**

**Time)**, or as soon thereafter as counsel may be heard.

HO1:\347517\03\7G59031.DOC\81793.0023

**PLEASE TAKE FURTHER NOTICE** that responses or objections, if any, to the relief requested in the Motion, must be in writing, conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (General Order M-242 and the User's Manual for the Electronic Case Filing System can be found at www.nysb.uscourts.gov, the official website for the Bankruptcy Court), by registered users of the Bankruptcy Court's case filing system and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (.pdf), WordPerfect or any other Windows-based word processing format (with a hard copy delivered directly to Chambers) and shall be served in accordance with General Order M-242 upon: (1) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attention: Marcia L. Goldstein, Esq. and Lori R. Fife, Esq.; (2) Weil, Gotshal & Manges LLP, 700 Louisiana, Suite 1600, Houston, Texas 77002, Attention: Alfredo R. Pérez, Esq.; and (3) the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attention: Elizabeth Austin, Esq., so as to be received in each case by no later than **4:00 p.m. (New York City Time), on June 7, 2007**.

Dated: Houston, Texas
May 17, 2007

    */s/ Alfredo R. Pérez*
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0019
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

and

Alfredo R. Pérez, Esq. (AP 3629)
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Attorneys for Reorganized Debtors

WEIL, GOTSHAL & MANGES LLP
Attorneys for Reorganized Debtors
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Pérez, Esq. (AP 3629)

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

| | |
|---|---|
| **In re** : | |
| : | **Chapter 11** |
| **WORLDCOM, INC., et al.,** : | |
| : | **Case No. 02-13533 (AJG)** |
| : | |
| **Debtors.** : | **(Jointly Administered)** |

-----------------------------------------------------------------x

### REORGANIZED DEBTORS' MOTION FOR LEAVE TO FILE SUPPLEMENTAL
### AUTHORITIES REGARDING THEIR OBJECTION TO PROOF OF CLAIM NO. 38365
### (DEPARTMENT OF TREASURY ADMINISTRATIVE EXPENSE CLAIM)

TO THE HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE:

Verizon Business Global LLC (successor by merger of the reorganized debtor

MCI, Inc.), and certain of its direct and indirect subsidiaries (collectively, the "Reorganized

Debtors")[1] respectfully submit this Motion for Leave to File the attached Notice of Supplemental

Authorities, representing as follows:

---

[1]    On July 21, 2002 and November 8, 2002, WorldCom, Inc. and certain of its direct and indirect subsidiaries
commenced cases under chapter 11 of the Bankruptcy Code. For the purposes of this Motion, the term
"Reorganized Debtors" shall refer both to the reorganized debtors and to their predecessors-in-interest.

**BACKGROUND**

1.      The Reorganized Debtors objected to Claim No. 38365 (the "Objection,"
Docket No. 12235), which was filed by the IRS, on the grounds that no telephone-excise tax is
due for purchases of a data service known as COBRA (central office based remote access) that
converts analog data from dial-up-computer modems into high-speed data packets suitable for
Internet networks.[2]  In support of the Objection, the Reorganized Debtors argued, *inter alia*, that
COBRA is not a "local telephone service" under 26 U.S.C. § 4252(a) because:  (a) it is
impossible to make a telephone call using COBRA; (b) COBRA does not provide the privilege
of communications with actual telephones as required by statute; and (c) the channels deployed
with COBRA were for the Reorganized Debtors' exclusive or priority use and therefore are
excluded from taxation under the statutory provisions.

2.      In response, the IRS has contended, among other things, that it is possible
to engage in telephonic quality communications with COBRA service using "Voice over Internet
Protocol" ("VOIP") technologies.  The Reorganized Debtors have disputed this contention.

3.      After the Court heard evidence and argument from the parties in early
2006, it took the matter under advisement.  Recently, the United States Court of Federal Claims
clarified that the federal telephone-excise tax is not applicable to Internet-based technologies like
the one at issue in this case.  Moreover, the IRS has recently issued notices that refute the
position it has taken in this case regarding VOIP communications.

---

[2]      Capitalized terms that are used, but not defined, in this Motion have the meanings ascribed to them in the
Objection.

## JURISDICTION

4.      The Court has jurisdiction to consider this motion and the relief requested here pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Pursuant to section 12.01(c) of the Debtors' Modified Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan"), the Court retained exclusive jurisdiction over all matters arising out of, and related to, the chapter 11 cases.

## RELIEF REQUESTED

5.      By this Motion, the Reorganized Debtors respectfully request that the Court:  (i) grant the Reorganized Debtors leave to file their Notice of Supplemental Authorities as set forth in Exhibit A to this Motion (the "Notice"); and (ii) consider these additional authorities in further support of the Objection.

## BASIS FOR RELIEF REQUESTED

6.      The attached Notice has been prepared to inform the Court of recent decisions pertaining to the federal telephone-excise tax that were not available when the Court took the Objection under advisement.

7.      On November 15, 2006, the United States Court of Federal Claims issued its decision in *USA Choice Internet Serv. v. United States*, 73 Fed. Cl. 780 (2006), regarding: (1) the inapplicability of telephone-excise tax to communications technologies that, like COBRA, do not permit outgoing calls or communications with persons using actual telephones; and (2) the inapplicability of telephone-excise tax to communications channels that, like those used with COBRA, are dedicated for use by a single subscriber and thus are not "lines where multiple

telephone service subscribers would share the same loop on an equal basis." A copy of the *USA Choice* decision is attached to the Notice as Exhibit 1.

        8.     In addition, the IRS has recently notified taxpayers that, except in limited circumstances not applicable here, VOIP services are no longer subject to telephone-excise tax. Copies of IRS Notice 2006-50 and Notice 2007-11 are attached to the Notice as Exhibit 2 and Exhibit 3, respectively.

        9.     Each of these authorities is described more fully in the attached Notice. These supplemental authorities are relevant to the pending objection because they clarify that COBRA service is not a taxable telephone service under 26 U.S.C. §§ 4251 and 4252. In addition, the recent notices issued by the IRS regarding VOIP are in conflict with the position it has taken in this Court regarding COBRA service. Accordingly, the Reorganized Debtors submit that leave to file the attached Notice should be granted.

## NOTICE

        10.    Notice of this Motion has been provided pursuant to this Court's Order, dated December 23, 2002, establishing notice procedures in these chapter 11 cases, to the United States Trustee, and to United States Attorney for the Southern District of New York. Moreover, on May 26, 2006, the Reorganized Debtors conferred with counsel from the Office of the United States Attorney and requested that the IRS withdraw its claim based on IRS Notice 2006-50. On September 22, 2006, the IRS declined this request. In light of the nature of the relief requested herein, the Reorganized Debtors submit that no other or further notice need be provided.

## MEMORANDUM OF LAW

        11.    Pursuant to Local Bankruptcy Rule 9013-1(b), because there are no novel issues of law presented herein and because this Motion includes citations to the applicable authorities, MCI respectfully requests that the Court waive the requirement that a separate

memorandum of law be submitted.

      WHEREFORE, the Reorganized Debtors request that the Court grant this Motion,

consider the supplemental authorities described in the Notice, and award the Reorganized

Debtors such other and further relief as is just.

Dated: Houston, Texas
     May 17, 2007

                 Respectfully submitted,


                 */s/ Alfredo R. Pérez* _____
                 Marcia L. Goldstein, Esq. (MG 2606)
                 Lori R. Fife, Esq. (LF 2839)

                 WEIL, GOTSHAL & MANGES LLP
                 767 Fifth Avenue
                 New York, NY  10153-0119
                 Telephone: (212) 310-8000
                 Facsimile: (212) 310-8007

                      and

                 Alfredo R. Pérez, Esq. (AP 3629)
                 WEIL, GOTSHAL & MANGES LLP
                 700 Louisiana, Suite 1600
                 Houston, TX  77002
                 Telephone: (713) 546-5000
                 Facsimile: (713) 224-9511

                 Attorneys for the Reorganized Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
In re                                  :
                                       :      Chapter 11 Case No.
WORLDCOM, INC., et al.,                :      02-13533  (AJG)
                                       :
                                       :      (Jointly Administered)
              Debtors.                 :
-----------------------------------------------------------------x
```

### ORDER GRANTING REORGANIZED DEBTORS' MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITIES REGARDING THEIR OBJECTION TO PROOF OF CLAIM NO. 38365 (DEPARTMENT OF TREASURY ADMINISTRATIVE EXPENSE CLAIM)

Upon consideration of the Motion of the Reorganized Debtors for leave to file

supplemental authorities regarding their objection to Proof of Claim No. 38365, the Court finds

that the Motion has merit and that the relief requested therein is warranted under the

circumstances. Accordingly, the Court hereby ORDERS that:

1.    Leave is hereby granted to file the Notice of Supplemental Authorities,

attached as Exhibit A to the Motion.

2.    The requirement under Rule 9013-1(b) of the Local Rules for the Southern

District of New York for the filing of a memorandum of law is waived.

New York, New York
_____, 2007


_____
Honorable Arthur J. Gonzalez
United States Bankruptcy Judge

# Exhibit A

WEIL, GOTSHAL & MANGES LLP
Attorneys for Reorganized Debtors
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Pérez, Esq. (AP 3629)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11** |
| **WORLDCOM, INC., et al.,** | : | |
| | : | **Case No. 02-13533  (AJG)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

-----------------------------------------------------------------x

## NOTICE OF SUPPLEMENTAL AUTHORITIES REGARDING THE REORGANIZED DEBTORS' OBJECTION TO PROOF OF CLAIM NO. 38365 (DEPARTMENT OF TREASURY ADMINISTRATIVE EXPENSE CLAIM)

The Reorganized Debtors respectfully submit this Notice of Supplemental

Authorities to advise the Court of relevant decisions rendered by the United States Court of

Federal Claims and the Internal Revenue Service ("IRS") after the parties completed briefing and

argument on the Reorganized Debtors Objection to IRS Claim No. 38365 (the "Objection,"

docket no. 12235).[1]  First, on November 15, 2006, the United States Court of Federal Claims

issued its decision in *USA Choice Internet Serv. v. United States*, 73 Fed. Cl. 780 (2006), a copy

of which is attached as Exhibit 1.[2]  Second, the IRS issued Notice 2006-50, dated May 25, 2006,

---

[1]     Capitalized terms that are used, but not defined, in this Notice have the meanings ascribed to them in the Objection.  Unless attached hereto, references to Exhibits refer to documents admitted into evidence at the February 1, 2006 hearing on the Objection.

[2]     On February 28, 2007, the United States appealed the judgment of the Court of Federal Claims to the Federal Circuit.  That appeal remains pending.

HO1:\347517\03\7G59031.DOC\81793.0023

and Notice 2007-11, dated January 29, 2007, copies of which are attached as Exhibit 2 and Exhibit 3, respectively. As discussed below, these authorities provide further support for the Reorganized Debtors' Objection to Claim No. 38365.

### *USA Choice Internet Serv. v. United States*

12.    In *USA Choice*, the Court of Federal Claims addressed the application of the telephone-excise tax to Internet-based communications that are similar, but not identical, to COBRA service.[3] *See USA Choice Internet Serv. v. United States*, 73 Fed. Cl. 780 (2006). In that case, an Internet service provider ("ISP") purchased circuits from local exchange carriers ("LECs") to connect dial-up Internet users ("Dial-up Users") with network access servers ("NAS") so that Dial-up Users could access the Internet. *See id.* at 781-83. Unlike the Reorganized Debtors, the ISP owned the NAS that was used to convert modem data into Internet protocol and, ultimately, connect Dial-up Users to the Internet. *See id.* at 783. Dial-up Users were, therefore, actually placing modem calls to the ISP via the LEC's data line. The government's case here is even more attenuated because, with COBRA, a Dial-up User calls the LEC's modem, the LEC creates a high-speed datastream in Internet protocol, and the Reorganized Debtors receive only the datastream.

13.    Even though the ISP was receiving modem calls, the court found it significant that certain circuits were configured by the LECs for incoming calls only, and thus were unable to originate calls to persons who have telephones. *Id.* at 783, 795. In this case, the government has acknowledged that COBRA was configured for incoming calls only, but

---

[3]    The ISP in *USA Choice* was not purchasing a data aggregation and conversion service, like COBRA, in which the local exchange carrier provides all services associated with the network access server. Rather, the ISP purchased the use of circuits to connect Dial-up Users from the central office directly to its own network access server. *Compare USA Choice,* 73 Fed. Cl. at 783-84, *with, e.g.,* Trial Exs. 2 – 3; Ex. 27 at DOJ 00012; Ex. 28 at DOJ 00126, 00128; Ex. 29 at DOJ 00035; Ex. 30 at DOJ 00058; Ex. 31 at DOJ 00097, 00100; Ex. 32 at DOJ 00144; 2/1/06 Hr'g Tran. at 68:2-5, 77:9-20, 80:22 – 81:2, 82:24 – 83:4.

nonetheless argues that call origination is irrelevant to the excise tax analysis. *See* 2/1/06 Hr'g

Tr. at 168:7-8 (Dr. Hills testifying that COBRA was configured to "have incoming only calls");

4/11/06 Hr'g Tr. at 40:1-2. The *USA Choice* court flatly rejected this argument, noting instead

that section 4252(a) of title 26 of the United States Code (the "Tax Code") defines "local

telephone service" as "the privilege of telephonic quality communication *with* substantially all

persons having telephone . . . stations." *USA Choice,* 73 Fed. Cl. at 792 (emphasis in original).

The court reasoned that the word "*with*," as used in section 4252(a), "connotes reciprocity." *Id.*

Services that do not allow the subscriber to initiate calls—like COBRA service—fail to offer

reciprocal communications and therefore are not subject to telephone-excise tax. *See id.* at 795.

      14.    Next, the court rejected the argument, which was also made here, that the

ability to communicate with actual telephones is irrelevant to the excise tax analysis. *See* Docket

No. 17864 (IRS Surreply) at ¶¶ 28-36. Instead, the court found that the statute requires

reciprocal communications with *actual telephones*, rather than with computer modems. *USA*

*Choice,* 73 Fed. Cl. at 794, 794 n.23. In reaching this conclusion, the court held that "[t]he term

'telephone stations,' as it is used in [section] 4252(a)(1), encompasses telephone sets, each

having an earphone and microphone, but cannot be considered to include modems." *Id.* at 794

n.23. Because of the inherent limitations with dial-up Internet communications, the court

concluded that the exchange of data with the ISP's NAS could not "be considered to be a

'telephonic quality communication' in the ordinary sense of those words. *Id.* at 794-95.

      15.    Notably, the *USA Choice* court also rejected any argument, as the

government has made here, that the services purchased by *Dial-up Users* can be used to impose

tax on the *Reorganized Debtors. See* Docket No. 17864 (IRS Surreply) at ¶ 3. Indeed, the court

recognized that the only issue "is whether USA Choice, not its customers, had the 'privilege' to

which [section] 4252(a)(1) refers." *USA Choice,* 73 Fed. Cl. at 794 n.24. For these reasons, the court concluded that no tax was owed on circuits that were configured for the sole purpose of receiving data transmissions from Dial-up Users. *See id.* at 795.

16.    Finally, the *USA Choice* court clarified the statutory exemption for "private communication services" in the context of Internet-based technologies. Similar to arguments made by the Reorganized Debtors, the ISP argued in *USA Choice* that it had exclusive or priority use of the communications channels for purposes of section 4252(d) of the Tax Code. The court agreed, stating that the government's arguments to the contrary ignored "that the services at issue provide channels that another telephone subscriber could effectively use only to call USA Choice for internet access if the subscriber was one of USA Choice's customers." *Id.* at 800. Accordingly, the court held that the ISP purchased non-taxable "private communication services" because the channels at issue could not be shared by multiple subscribers on an equal basis. *See id.*

17.    The decision in *USA Choice* supports the Reorganized Debtors' argument that no tax is owed for purchases of COBRA service. COBRA service did not allow the Reorganized Debtors to communicate with telephones, had no ability to originate calls, and was, at a minimum, a non-taxable private communication service.

### *IRS Notice 2006-50 and Notice 2007-11*

18.    In this case, the government maintains that voice over Internet protocol ("VOIP") "capability is a separate stand alone basis for the excise taxes to apply." 4/11/06 Hr'g Tr. at 51:1-2. Although the Reorganized Debtors refute this contention for the reasons set forth in the record, and also note that VOIP was expressly prohibited by COBRA vendors in the applicable contracts, it is now apparent that the government's arguments to this Court regarding

VOIP capability are contradicted by their own stated policies.

19.     In Notice 2006-50, the IRS explains that the IRS will no longer collect excise taxes on "nontaxable service," which is defined in section 3(d) of the Notice as "bundled service and long distance service." In turn, section 3(a) of Notice 2006-50 states that the term "bundled service" includes, among other things, VOIP service.

20.     In Notice 2007-11, the IRS revised the definition of "bundled service." According to section 5(c) of Notice 2007-11, non-taxable bundled service includes VOIP, so long as the VOIP service at issue provides both local and long distance service and does not state a separate charge for the local service.

21.     Even under this revised definition, the government cannot argue that the Reorganized Debtors owe excise tax under the theory of VOIP capability because there is no evidence that any purported VOIP communications with COBRA were limited to local calling areas or that the Reorganized Debtors paid a separate charge for such local VOIP service. But there is evidence to the contrary. According to the government's own witness, if the Reorganized Debtors had subscribed to an ancillary VOIP service for use with COBRA (which they did not), the service would have permitted calls to "phone numbers both in the U.S. and overseas." 2/1/06 Hr'g Tr. at 183:3-7 (Dr. Hills). Moreover, all COBRA costs were bundled into a single, per-port charge. *Id.* at 126:21-25 (Anderson, J.). Accordingly, the government's prior arguments regarding VOIP in this case are refuted by its own current tax policy.

WHEREFORE the Reorganized Debtors respectfully submit these authorities for

the Court's consideration with respect to their Objection to Claim No. 38365.

Dated: Houston, Texas
     May 17, 2007

Respectfully submitted,

*/s/ Alfredo R. Pérez*
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

and

Alfredo R. Pérez, Esq. (AP 3629)
Sylvia A. Mayer, Esq.
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Attorneys for the Reorganized Debtors

# Exhibit 1

Westlaw.

73 Fed.Cl. 780                                                                    Page 1
73 Fed.Cl. 780, 98 A.F.T.R.2d 2006-7815, 2006-2 USTC P 70,262
**(Cite as: 73 Fed.Cl. 780)**

# H

USA Choice Internet Service, LLC v. U.S.
Fed.Cl.,2006.

United States Court of Federal Claims.
**USA CHOICE** INTERNET SERVICE, LLC,
Plaintiff,
v.
UNITED STATES, Defendant.
**No. 05-0525T.**

Nov. 15, 2006.

**Background:** Internet service provider (ISP) brought
suit against the United States seeking refund of com-
munications excise tax it paid on certain communica-
tions services it purchased for use in providing inter-
net access to its customers.

**Holdings:** The Court of Federal Claims, Lettow, J.,
held that:

(1) ISP's purchase of communications services was
not subject to communications excise tax insofar as
such services involved the use of digital telephone
circuits configured as incoming-only, as such service
did not fall within statutory definition of "local tele-
phone service";

(2) ISP's purchase of communications services was
subject to communications excise tax insofar as such
services involved the use of digital telephone circuits
configured as both incoming and outgoing, even if
ISP only used the two-way circuits for incoming calls
and never for outgoing calls, as such service fell
within statutory definition of "local telephone ser-
vice" and

(3) "private communication service" exemption from
excise tax on local telephone service was applicable
to ISP's payments for use of digital telephone circuits
to provide internet access to its customers insofar as
there was separate charge for such service.

Judgment for plaintiff in part.
West Headnotes

**[1] Internal Revenue 220 ⟜5007**

220 Internal Revenue
   220XXVIII Refunding Taxes
      220XXVIII(B) Actions for Refunds
         220XXVIII(B)3 Conditions Precedent
            220k5002 Claim for Refund
               220k5007 k. Variance Between Claim
and Grounds of Action. Most Cited Cases
"Substantial variance rule" bars a taxpayer from
presenting claims in a tax refund suit that substan-
tially vary the legal theories and factual bases set
forth in the tax refund claim presented to the Internal
Revenue Service (IRS). 26 U.S.C.A. § 7422(a); 26
C.F.R. § 301.6402-2(b)(1).

**[2] Internal Revenue 220 ⟜3049**

220 Internal Revenue
   220I Nature and Extent of Taxing Power in Gen-
eral
      220I(F) Administrative Rules, Regulations and
Decisions
         220I(F)2 Construction and Operation
            220k3047 Operation and Effect
               220k3049 k. Letter Rulings. Most
Cited Cases
Revenue rulings lack the force of law, although they
may be instructive in the absence of controlling au-
thority.

**[3] Internal Revenue 220 ⟜3049**

220 Internal Revenue
   220I Nature and Extent of Taxing Power in Gen-
eral
      220I(F) Administrative Rules, Regulations and
Decisions
         220I(F)2 Construction and Operation
            220k3047 Operation and Effect
               220k3049 k. Letter Rulings. Most
Cited Cases
Revenue rulings are entitled to deference to the ex-
tent that they reflect well-reasoned, long-standing in-
terpretations of the Internal Revenue Code or tax reg-
ulations.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73 Fed.Cl. 780                                                                                               Page 2

73 Fed.Cl. 780, 98 A.F.T.R.2d 2006-7815, 2006-2 USTC P 70,262

**(Cite as: 73 Fed.Cl. 780)**

**[4] Internal Revenue 220 🔗4349**

220 Internal Revenue
    220XIV Taxes on Specific Articles and Transactions
        220XIV(C) Transportation and Communication Taxes
            220k4349 k. Telecommunications. Most Cited Cases
Purchase of communications services by internet service provider to provide internet access to its customers was not subject to communications excise tax insofar as such services involved the use of digital telephone circuits configured as incoming-only, as such service did not fall within statutory definition of "local telephone service." 26 U.S.C.A. § 4252(a)(1).

**[5] Internal Revenue 220 🔗4349**

220 Internal Revenue
    220XIV Taxes on Specific Articles and Transactions
        220XIV(C) Transportation and Communication Taxes
            220k4349 k. Telecommunications. Most Cited Cases
Purchase of communications services by internet service provider (ISP) to provide internet access to its customers was subject to communications excise tax insofar as such services involved the use of digital telephone circuits configured as both incoming and outgoing, even if ISP only used the two-way circuits for incoming calls and never for outgoing calls, as such service fell within statutory definition of "local telephone service." 26 U.S.C.A. § 4252(a)(1).

**[6] Internal Revenue 220 🔗4349**

220 Internal Revenue
    220XIV Taxes on Specific Articles and Transactions
        220XIV(C) Transportation and Communication Taxes
            220k4349 k. Telecommunications. Most Cited Cases
"Private communication service" exemption from excise tax on local telephone service was applicable to internet service provider's payments for use of digital telephone circuits to provide internet access to its customers insofar as there was separate charge for such service, as payments entitled provider to priority use of such circuits or channels. 26 U.S.C.A. § 4252(d).

Anthony Gulotta, Anderson & Gulotta, P.C., Harrisburg, Pennsylvania, for the plaintiff. With him at trial was David Anderson, Anderson & Gulotta, P.C., Harrisburg, Pennsylvania.
Karen Elisabeth Servidea, Attorney, Tax Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs were Eileen J. O'Connor, Assistant Attorney General, and David Gustafson and G. Robson Stewart, Attorneys, Tax Division, U.S. Department of Justice, Washington, D.C.

**OPINION AND ORDER**

LETTOW, Judge.
USA Choice Internet Service, LLC, ("USA Choice") seeks a refund of communications excise tax it paid on certain communications services it purchased for use in providing internet access to its customers. The taxes were paid from January 1999 through April 2002 respecting various services provided by Verizon (including its predecessor entities GTE and Bell Atlantic), ALLTEL, and Sprint. Excise taxes at the statutory rate of 3% were collected by the telephone companies and paid over to the government. *See* 26 U.S.C. ["I.R.C."] § 4251(b)(2); 26 C.F.R. ("Treas.Reg.") § 49.4251-2(c) (1993). [FN1]

> FN1. The government does not dispute the taxpayer's payment of the taxes or that USA Choice is the proper party to seek the refund. Tr. 11:2-9.
> In this opinion, references to "Tr. ---" are to the transcript of the testimony at trial. References to plaintiff's exhibits admitted into evidence at trial are to "PX ---" and to defendant's exhibits are to "DX ---." References to "Cl. Tr. ---" are to the separately paginated transcript of the post-trial closing argument.

USA Choice avers that the communications services on which it paid excise tax fell outside the scope of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73 Fed.Cl. 780, 98 A.F.T.R.2d 2006-7815, 2006-2 USTC P 70,262
**(Cite as: 73 Fed.Cl. 780)**

I.R.C. § 4251 because they were not "local telephone service" as defined in I.R.C. § 4252(a) on which the communications services excise tax is imposed by I.R.C. § 4251, or, alternatively, because they were "private communication services" excluded from tax as provided by I.R.C. §§ 4252(a) and 4252(d). USA Choice also claims that it wrongly paid the excise tax on certain long distance charges that were not "toll telephone service" subject to the tax as defined in I.R.C. § 4252(b). The government resists each of these contentions.

USA Choice filed a request for a refund with the Internal Revenue Service ("IRS") on May 24, 2002. *See* Compl. Ex. A. On April 27, 2004, the IRS notified USA Choice that its claim would be disallowed. *See* Compl. Ex. C. The taxpayer waived the formal statutory notice requirements on May 17, 2004, *see id.,* and filed its complaint in this court on May 5, 2005. The government filed its answer on July 5, 2005.

A trial was held in July 2006. The parties filed opening post-trial briefs on August 24 and 25, 2006, and responsive briefs on September 12 and 13, 2006. Closing argument was held on September 22, 2006. The case is ready for disposition.

# FACTS[FN2]

> [FN2]. This recitation of facts constitutes the court's principal findings of fact in accord with Rule 52(a) of the Rules of the Court of Federal Claims ("RCFC"). Other findings of fact and rulings on questions of mixed fact and law are set out in the analysis.

## A. The Characteristics of USA Choice's Dial-Up Internet System

USA Choice is an internet service provider based in Oil City, Pennsylvania, delivering internet access to residential and business customers in Pennsylvania. Compl. Ex. A; Tr. 21:18 to 23:24 (Test. of Michael Phillips, a co-founder of USA Choice). In support of its business, the taxpayer maintains computer servers in facilities referred to as Points of Presence ("POPs").[FN3] PX 1; Tr. 23:14 to 25:7, **\*782** 27:10-22 (Test. of Phillips).[FN4]

> [FN3]. The government's expert, Dr. Michael Hills, defined Point of Presence as "[t]he physical access location interface between a local exchange carrier and an [internet service provider's] digitized packet network[-] the point at which the telephone company terminates a subscriber's local loop circuit and the internet routing begins. The Point of Presence for an [internet service provider] was the physical location where [its] customers would connect in order to gain access to the [i]nternet." DX 2 (Expert Report of Dr. Michael Hills) at 12.

> [FN4]. The taxpayer's POPs initially were located in Altoona, Brookville, Bradford, Butler, Clarion, Dubois, Emporium, Kittanning, Oil City, Meadville, New Bethlehem, Punxsutawney, Ridgway, State College, and Warren. PX 1. Subsequently, the POPs at Bradford, Clarion, Dubois, Punxsutawney, State College, and Warren were eliminated, with the traffic routed from the local exchanges at those locations directly to the POP located at Altoona. Tr. 24:13 to 25:1 (Test. of Phillips).

A USA Choice customer ("dial-up customer") gains access to the internet by initiating a call with his modem to one of USA Choice's access numbers assigned to a POP. Tr. 51:19 to 52:8 (Test. of Phillips); Pl.'s Post-Trial Br. at 8; Def.'s Post-Trial Br. at 2. This communication is routed through a local loop, circuit, or channel connecting the dial-up customer's modem and the central office of the local telephone system serving the dial-up customer. Tr. 51:19 to 53:15 (Test. of Phillips); DX 2 (Expert Report of Dr. Michael Hills ("Hills Report"), who testified on behalf of the government) at 4.[FN5] The telephone company's central office provides "dial tone" to the customer initiating the telephone call and contains "switches" that route the call to its proper destination. DX 2 (Hills Report) at 11; Tr. 177:10 to 178:5 (Test. of Hills); *see also Ameritech Corp. v. McCann,* 308 F.Supp.2d 911, 915 (E.D.Wis.2004), *vacated on other grounds,* 403 F.3d 908 (7th Cir.2005). These switches are connected with switches in other locations throughout the country via the domestic tele-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73 Fed.Cl. 780                                                                                    Page 4
73 Fed.Cl. 780, 98 A.F.T.R.2d 2006-7815, 2006-2 USTC P 70,262
**(Cite as: 73 Fed.Cl. 780)**

communications network, called the "Public Switched Telephone Network" or "PSTN." *See* Government Insts., Inc., *Telecommunications-Glossary of Telecommunication Terms* P-27 (1997) ( *"Telecommunications Glossary"*); *see also Paetec Comm'ns, Inc. v. Connecticut Dept. of Pub. Util. Control,* No. Civ. A. 3:03CV1783, 2005 WL 701280, at *1 (D.Conn.2005). "When [a call is initiated], the switch does one of two things. If the [origination point and the destination point] are both connected to the same switch, the switch simply connects the two. If the [destination point] is on a different switch, the switch routes the call to the remote switch." *Paetec Communications,* 2005 WL 701280, at *1.[FN6] In this instance, the dial-up customer's communication is routed from the central office of the telephone company serving USA Choice over a circuit (comprising a group of communications channels, the use of which is purchased by USA Choice) to USA Choice's POP. Tr. 31:24 to 32:19, 51:19 to 53:15 (Test. of Phillips); Pl.'s Post-Trial Br. at 8; Def.'s Post-Trial Br. at 2-3. At the POP, the circuit connects to USA Choice's network access servers via a "smart jack." Tr. 137:5-13, 141:18-25 (Test. of Phillips). The smart jack is the demarcation point for responsibility between the telephone company and USA Choice. Tr. 137:8-17 (Test. of Phillips).

> FN5. Charges associated with the dial-up customer's access to the telephone company's central office were borne by the dial-up customer as part of his or her local telephone service charges. DX 2 (Hills Report) at 4; Tr. 28:7-10 (Test. of Phillips).

> FN6. As the court in *Paetec Communications* explained:
> Calls are routed across the PSTN by means of the North American Numbering Plan ("NANP"). Each terminating point on the PSTN is assigned a ten-digit number, in the format NXX-NXX-XXXX, where N is any digit from 2 to 9, and X is any digit from 0 to 9. The first three digits are the Numbering Plan Area ("NPA"), more commonly called an "area code," which typically designates a specific geographic area.[FN3] For a given geographic NPA, the second three digits in

an NANP number designate the switch or central office to which the customer is connected. This second set of digits is referred to as both the "central office prefix" and "NXX." Finally, for a given NPA and central office prefix-collectively known as an NPA/NXX-the last four digits designate a particular customer's phone line.
> [FN3] Not all NPAs are geographic. The most common non-geographic NPAs are the so-called Easily Recognizable Codes, such as 800, 888, and 900.
> Accordingly, at least for geographic NPAs, when a customer dials a ten-digit telephone number, the customer is entering three pieces of routing information. The NPA directs the call to a general geographic area, the NXX directs the call to a particular switch within that geographic area, and the final four digits direct the call to a specific customer on that switch.
> 2005 WL 701280, at *2.

The telephone companies providing the circuits used by USA Choice charged USA **\*783** Choice for the circuits connecting the telephone company's central office and USA Choice's POP. Tr. 31:24 to 32:20; Pl.'s Post-Trial Br. at 8; Def.'s Post-Trial Br. at 2-3. The tax at issue was assessed on the charges for these circuits. Tr. 13:9-12, 119:16 to 120:6 (Test. of Phillips).

Once the dial-up customer's communication generated by the customer's modem reaches the POP, one of the modems comprising USA Choice's network access servers answers the communication and a connection between the two modems is established. Tr. 53:10-15, 120:17 to 121:20, 140:6-13 (Test. of Phillips). For this connection to be successful, "[t]elephonic quality is required." Tr. 178:6-11 (Test. of Hills); DX 2 (Hills Report) at 4.[FN7] USA Choice's modem transmits a request for the dial-up customer's username and password, and the dial-up customer then transmits his or her username and password via his or her modem. Tr. 121:12 to 122:7 (Test. of Phillips). If the username and password do not match USA Choice's records, USA Choice's modem would transmit a further request. Tr. 122:4-15 (Test. of Phil-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73 Fed.Cl. 780                                                                                                      Page 5
73 Fed.Cl. 780, 98 A.F.T.R.2d 2006-7815, 2006-2 USTC P 70,262
**(Cite as: 73 Fed.Cl. 780)**

lips). After some number of unsuccessful attempts, USA Choice's modem would disconnect the call. Tr. 122:12-15 (Test. of Phillips). If the username and password are confirmed, then the dial-up customer would be connected to the internet through USA Choice's network. Tr. 144:4-18 (Test. of Phillips); Pl.'s Post-Trial Br. at 8.[FN8]

> FN7. When using the term "telephonic quality," the government's expert used "what [he] believe[d] would be the industry understood definition[, that is] a communication channel over which it [i]s possible to have a two-way conversation with the use of telephones." Tr. 174:12-17 (Test. of Hills).

> FN8. Mr. Phillips described the dial-up customer's modem as "communicating with" USA Choice's modem. Tr. 143:2-9. He elaborated: "[I]nitially there is a negotiation that takes place between those modems so that they can understand each other and understand how to talk to each other[. This] deal[s] with ... IEEE protocols [and the like] to compress data[, etc.] [A]t a very basic level, those modems just need to negotiate with each other so ... they can communicate in both directions." Tr. 143:9-17.

A home-based dial-up customer typically uses a "POTS" line, a somewhat euphemistic acronym for a "Plain Old Telephone Service" line. Tr. 140:23 to 141:3 (Test. of Phillips). *See* Harry Newton, *Newton's Telecom Dictionary* 542 (17th ed. 2001) (POTS is "[t]he basic service supplying standard single line telephones, telephone lines and access to the public switched network."). The dial-up customer's modem converts his or her computer's digital signal to an analog signal that can be carried over the local telephone system's line between the customer's home and the central office. That analog signal is converted back to a digital signal by the telephone company's central office. Tr. 141:5-15 (Test. of Phillips) ("[The dial-up customer's] modem connects to [the POTS line] in their home, and it's the same type of line that they would use to pick up and call

their neighbor or family member or whatever. So the modem itself is doing what's called a digital analog conversion so that the analog line between the home and the central office, that traffic can be carried over that analog line. At the central office, though, the central office telephone system changes that to a digital signal and routes that down our line.").

Limiting access through use of a username and password prevents computer users who are not USA Choice customers from connecting to the internet through USA Choice's network. Tr. 122:4-15 (Test. of Phillips). USA Choice does not block incoming calls from telephone numbers not associated with its subscribers. Tr. 145:11 to 146:1 (Test. of Phillips). One result of this aspect of USA Choice's system is that persons who are not customers but who nonetheless dial USA Choice's access numbers, whether inadvertently or purposefully, would be connected briefly to USA Choice's modem and might hear a set of electronically generated beeps before being disconnected. Tr. 121:12 to 122:15 (Test. of Phillips). Another result, however, is that a dial-up customer could connect to USA Choice's network using his or her username and password from any telephone line connected to his or her modem, even if the connection was not from his or her ordinary telephone number. Tr. 145:11 to 146:1 (Test. of Phillips).

In general, the connections USA Choice sought to purchase from the local telephone systems to support its internet service were incoming-only channels. Tr. 28:22 to 29:18 (Test. of Phillips). It was USA Choice's understanding that the circuits it purchased were "provisioned by the telephone companies [as] inward dial lines." Tr. 29:6-12 (Test. of Phillips). However, the telephone ***784** company may not have offered an incoming-only circuit or it may not have configured the circuits USA Choice obtained as incoming-only. Arguably, as will appear from the analysis, the type of circuit USA Choice obtained for its use may have a bearing on the applicability of the communications excise tax. Consequently, as a factual matter, much of the evidence adduced by the parties at trial concerned the nature and capabilities of the circuits USA Choice obtained and on which it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73 Fed.Cl. 780
73 Fed.Cl. 780, 98 A.F.T.R.2d 2006-7815, 2006-2 USTC P 70,262
**(Cite as: 73 Fed.Cl. 780)**

paid tax.

### B. The Communications Services Purchased and Used by USA Choice

#### 1. *"PRI" services.*

Most of USA Choice's purchases were of Primary Rate Interface ("PRI") groups of channels provided by ALLTEL and Verizon. A PRI circuit functions as the Integrated Services Digital Network ("ISDN") equivalent of a T-1 circuit, *see Newton's Telecom Dictionary* at 548, providing 24 channels-23 "B" or bearer channels and one "D" or signaling and control channel. *Telecommunications Glossary* at P-21.[FN9] In essence, a PRI circuit, or in international parlance, a "PRA" circuit,[FN10] is a high-capacity digital circuit that can carry 23 simultaneous communications. Tr. 51:19-21 (Test. of Phillips). Only one local telephone number was used per circuit: "[A]ll of [the up to 23 dial-in communications at a time] are originated by dialing one telephone number so that the [dial-up] customer, when [his or her] modem dials that number, it goes through the public switch telephone network and eventually travels over this PRI ... circuit into our network access server." Tr. 51:21 to 52:1 (Test. of Phillips). The traffic is consolidated and put on the PRI by the central office. Tr. 52:5-24 (Test. of Phillips). As Dr. Hills, the government's expert, testified, the 23 "B" or "bearer" channels "can be dedicated to or from the public network. Trunk group types include incoming, outgoing, two-way direct outward dialing or direct inward dialing.... [A]ny one of these could be possible on any ... of the twenty-three channels.... [I]t would be up to the customer *[e.g.,* USA Choice] when they order the service to configure it for whatever combination ... required." Tr. 204:10-22 (Test. of Hills) (referring to PX 18, ALLTEL Pennsylvania, Inc., Telephone PA P.U.C. No. 1, Section 10.3, Advanced Digital Services-Primary Rate Access (eff.Mar.14, 1998) ("ALLTEL PRA tariff") ¶ 10.3.3(B)).[FN11]

> FN9. "T-1" stands for "Trunk Level 1." *Newton's Telecom Dictionary* at 669. It is "[a] digital transmission link with a total signaling speed of 1.544 mbps (1,544,000 bits per second)." *Id.* "In the olden days, T-1 was

delivered ... on two pairs of unshielded twisted copper wires-one pair for transmit and one pair for receive.... These days, T-1 often is delivered on fiber optic transmission systems." *Id.*

> FN10. "PRA" is an ISDN term "used internationally to mean 23B+D and also 30B+D. [It is] [t]he international version of what the Americans call PRI." *Newton's Telecom Dictionary* at 545. In this opinion, the terms PRI and PRA will be used interchangeably to mean the same type of service, with the particular nomenclature used varying by the provider's terminology.

> FN11. Telecommunications carriers are required to file and maintain tariffs with the Pennsylvania Public Utility Commission for each service provided. *See* 52 Pa.Code §§ 63.103 to 63.105. The tariffs must set forth a description of the service and the applicable rates and are subject to approval by Pennsylvania's Public Utility Commission. *Id.; see also* Tr. 195:14 to 197:4 (Test. of Hills).

#### a. *ALLTEL's PRA service.*

The configuration for a given PRI service would have been established by the provider at the time of installation. As the ALLTEL tariff stated: "Basic PRA Service is provided assuming a Dedicated Trunk Configuration. Optional PRA capabilities may be used to alter that configuration. Additional charges ... shown below." ALLTEL PRA tariff ¶ 10.3.6(A)(1). According to Dr. Hills, the government's expert, "a Dedicated Trunk configuration" means "that the function [, be it incoming, outgoing, or both ways,] of each ... trunk[ ] is decided at installation time," and the telephone company would charge an additional fee to change that configuration later. Tr. 243:10-21 (Test. of Hills). Dr. Hills opined that the channels USA Choice obtained were most likely configured as incoming or possibly as two-way. Tr. 242:24-25, 245:1 to 246:7 (Test. of Hills). Either configuration by the provider would establish **\*785** the requisite functionality for USA Choice's purposes. Tr. 245:1 to 246:7

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73 Fed.Cl. 780                                                                                          Page 7
73 Fed.Cl. 780, 98 A.F.T.R.2d 2006-7815, 2006-2 USTC P 70,262
**(Cite as: 73 Fed.Cl. 780)**

(Test. of Hills).

Separate charges were made for basic service: "The basic service would essentially just be the telephone number itself.... [The non-basic service would be t]he PRI circuit that's carrying those calls." Tr. 54:25 to 55:14 (Test. of Phillips) (referring to PX 6, an ALL-TEL invoice for telephone number 322-512-1697); Tr. 57:23 to 58:3 (referring to PX 7, an ALLTEL invoice for telephone number 322-512-1698); Tr. 79:11-18 (referring to PX 15, an ALLTEL invoice for telephone number 814-772-9075). The federal communications excise tax was paid on both basic and non-basic charges. *See, e.g.,* PX 6 (an ALLTEL invoice for telephone number 322-512-1697), PX 7 (an ALLTEL invoice for telephone number 322-512-1698), PX 15 (an ALLTEL invoice for telephone number 814-772-9075).

### b. *Verizon's IntelliLinQ PRI service.*

Verizon provided USA Choice with a type of PRI service designated as "Enhanced IntelliLinQ PRI Hub Service." PX 19 (Bell Atlantic-Pennsylvania, Inc. Pa. P.U.C. No. 500, Section 22 (eff.Feb.1, 2000) ("Verizon IntelliLinQ PRI tariff"). In applying for this service, the "[c]ustomer, [USA Choice had to], ... certif[y] that any circuits provided ... w[ould] be used ... solely to provide Internet access." PX 21 (USA Choice's application for Verizon IntelliLinQ Service (June 28, 2002)) at 2. The Verizon tariff for the IntelliLinQ PRI service provided either 23 B channels and one D channel or, alternatively, 24 B channels. Verizon IntelliLinQ tariff at Original Sheet 1A, ¶ B.1. The tariff specified that the "Service allow[ed]: (1) ISRAPs ["Information Services Remote Access Providers"] to receive dial-up traffic from their end users utilizing local telephone numbers or by dialing a single number; and (2) *B channels to be provisioned as two-way service or incoming-only service* using individual telephone numbers." *Id.* at 1st Revised Sheet 4, ¶ B.3 (emphasis added).

USA Choice contends that "this service was provisioned for and used for incoming dial-up calls only." Pl.'s Post-Trial Br. at 25; *see also* Tr. 67:10-20 (Test. of Phillips) (stating that PX 10, a Verizon invoice for telephone number 814-368-3952, shows no calls be-

ing made "because there is no outbound calling on that line."). Dr. Hills testified on behalf of the government that Verizon's Enhanced IntelliLinQ Hub Service could have been configured as either incoming only or two-way: "It depends [on] whether the signaling system at the [telephone company's] switch is ... programmed to look ... for that particular [signaling] bit or whether it's just told to ignore any originating calls. I have no idea." Tr. 235:22 to 236:1 (Test. of Hills). He also said "the functional use [by USA Choice] was incoming only." Tr. 235:15. Language from the tariff led Dr. Hills to conclude that USA Choice "probably [could] not" make outgoing calls. Tr. 236:23-25 (Test. of Hills). The portion of the tariff relied upon by Dr. Hills indicated that the Enhanced IntelliLinQ PRI Hub Service "offers single, LATA-wide[ [FN12]] telephone number connectivity on a dial-up basis for the ISRAP's end user customers with transport to a designated hub interconnection within the LATA. From there, the call continues to the ISRAP's premises location over dedicated high-speed access facilities purchased separately by the ISRAP." Verizon IntelliLinQ PRI tariff at 1st Revised Sheet 1, ¶ A.[FN13] Additionally, Dr. Hills opined "[t]he services that were charged at $495 were for incoming calls only." Tr. 231:13-15.

> FN12. LATA is an acronym for "local access and transport area." *Telecommunications Glossary* at L-8. It refers to the geographical area within which "a divested Bell Operating Company ... is permitted to offer exchange telecommunications and exchange access services." *Id.*

> FN13. The tariff also states: "The ISRAP must purchase suitable access facilities from its premises location to the Telephone Company's designated point of interconnection to handle the call volume in the LATA." Verizon IntelliLinQ PRI tariff at 1st Revised Sheet 1, ¶ A. The tariff listed as a condition of the Enhanced IntelliLinQ PRI Hub Service that "[d]edicated local distribution channels from the point of interconnection to the ISRAP's customer location are provided at rates and charges, as specified elsewhere in this tariff, for the facilities used

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73 Fed.Cl. 780                                                                                                          Page 8
73 Fed.Cl. 780, 98 A.F.T.R.2d 2006-7815, 2006-2 USTC P 70,262
**(Cite as: 73 Fed.Cl. 780)**

to provide the service." *Id.* at Original Sheet 4C, ¶ B.4.b.

At a minimum, this incoming-only "single number service" appeared to include telephone**\*786** numbers 814-237-5400, 814-723-5087, and 814-940-0925. In examining a Verizon invoice, PX 9 at 3, Dr. Hills concluded that the charges were for "single number service," Tr. 219:10-21 (Test. of Hills) (relying on the $495 per month charge listed). That invoice showed "the individual charges for each channel on this particular PRI circuit." Tr. 64:5-6 (Test. of Phillips). PX 9 addresses fourteen channels associated with State College, ten channels associated with Warren, and one channel associated with Altoona.

Nonetheless, on the Verizon invoices, a long distance service was shown to be associated with one of the telephone numbers, 814-227-2694, included with the Verizon IntelliLinQ PRI service, thus at least suggesting a capability to make outgoing long-distance calls on a channel associated with that particular number. Tr. 60:21-23 (Test. of Phillips) (referring to PX 8); Tr. 248:22 to 249:22 (Test. of Hills). No actual outgoing calls were listed on invoices for that number, however. Tr. 60:18-20 (Test. of Phillips) (referring to PX 8). Mr. Phillips testified that "no long distance calls originated over this line ... [b]ecause you can't place an outgoing call over this particular line." Tr. 61:19-23 (Test. of Phillips). Plaintiff's counsel attributed the long distance service for this number and "maybe two or three" other numbers to a billing error. Tr. 62:8-24.

#### c. *Sprint's PRI service.*

USA Choice also used a PRI service offered by Sprint, described in a tariff admitted into evidence as DX 5, Sprint Communications Company L.P., Telephone PA P.U.C. Tariff No. 5, Supplement No. 18, Section 5, 2nd Revised Page 21, and Original Page 38, and Supplement No. 43, 3d Revised Page 22 and 2d Revised Page 23 ("Sprint PRI tariff"). The Sprint PRI tariff specified that *"[t]raffic can be inward, outward or a combination of both. This is controlled by the Customer's CPE* [Customer Premises Equipment]." Sprint PRI tariff at 2d Revised Page 21, ¶ 5.3.6.A.1 (emphasis added). Based upon an examina-

tion of the tariff, Dr. Hills opined that "traffic can be outward and that local exchange access includes [usage]-sensitive local calling.... [I]t's explicitly available for outgoing calls." Tr. 213:24 to 214:2 (Test. of Hills).

#### 2. *"DCS" services.*

Besides the PRI services on which USA Choice primarily relied, it also used two types of Digital Channel Services ("DCS") provided by ALLTEL and Verizon's predecessor, GTE North Incorporated.

#### a. *ALLTEL's DCS service.*

ALLTEL's DCS service "package[d] Private Branch Exchange ('PBX') trunks and DID ["direct inward dialing"] trunks with a T-1 transmission facility." PX 8 (ALLTEL Pennsylvania, Inc., Telephone-PA P.U.C. No. 1, Section 10.2, Fourth Revised Contents, at First Revised Sheet 18 (eff. March 14, 1998) ("ALLTEL DCS tariff")). Under the ALLTEL DCS tariff, each facility provided up to 24 channels. *Id.* at ¶ 10.2.1.B. The "Exchange Services (per channel)-define [d] how each channel is to be used." *Id.* at ¶ 10.2.2.B. A charge applied to each channel, and when features were changed after initial installation, a separate additional charge was made. *Id.* at First Revised Sheet 20, ¶ 10.2.5.

USA Choice maintains that its ALLTEL DCS service at Emporium "was provisioned for inward dial only." Pl.'s Post-Trial Br. at 26. USA Choice "concede[d]" that the other ALLTEL accounts were "not direct inward dial." Cl. Tr. 13:14-23, 16:18-21. USA Choice avers "a review of the invoices [for the service it claims was incoming only] notes that it is a 'Direct in Dial Trunk.' " Pl.'s Post-Trial Br. at 26; *see also* Cl. Tr. 13:14-16. The words "direct in dial trunk" appear on an invoice associated with this service. *See* PX 5 at 1A.[FN14] By contrast, Dr. Hills stated he "would have every expectation this service would allow outgoing calls." Tr. 199:17-19, 200:22-23. According to him, any "restrict[ions] ... to outgoing calls [only] would be [imposed by] customer premise equipment." Tr. 201:11-13. He opined that "nothing in the tariff suggests that" **\*787** ALLTEL provided the service in a way that prevented outgoing calls. Tr.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73 Fed.Cl. 780                                                                    Page 9
73 Fed.Cl. 780, 98 A.F.T.R.2d 2006-7815, 2006-2 USTC P 70,262
**(Cite as: 73 Fed.Cl. 780)**

201:15-18 (Test. of Hills); *see also* Tr. 200:12 (Test. of Hills) ("There is no mention of directionality of origination" in the tariff.).

> FN14. *Newton's Telecom Dictionary* defines "direct inward dialing" as "[t]he ability for a caller outside a company to call an internal extension without having to pass through an operator or attendant." *Newton's Telecom Dictionary* at 212.

### b. *Verizon's DCS service.*

Verizon (and its predecessor GTE) offered a DCS service used by USA Choice, described in a tariff admitted into evidence as PX 20 (GTE North Incorporated, Telephone-Pa. P.U.C. No. 3, Section 18, Original Sheets 1-14 (eff.Aug.19, 1994) ("Verizon DCS tariff")). Verizon's CONTROLINK® DCS service was offered as a T-1 service with either 24 or 28 channels. Verizon DCS tariff at Original Sheet 1, ¶ A.1.c.(2). The rates for the service applied across the group of channels, and not to individual channels within the group. *Id.* at Original Sheet 7, ¶ 18.A.6.b(1).

The evidence at trial was in conflict respecting whether Verizon's DCS service as provided to USA Choice was configured by Verizon to allow outgoing as well as incoming calls. On the one hand, Mr. Phillips testified that the "DCS circuits don't originate calls outbound and they don't use long distance." Tr. 73:15, 75:15-16 (Test. of Phillips). On the other hand, Dr. Hills testified the DCS lines "had the capability" of originating outgoing calls. Tr. 221:15 to 222:11 (Test. of Hills). In examining a particular invoice dated April 13, 2001, related to telephone number 814-677-8724, and comparing it with the Verizon DCS tariff, Dr. Hills noted that this number had charges for a measured-service option, for which there would be a separate charge for each outgoing call. *See* Tr. 221:15 to 222:15 (Test. of Hills) (comparing DX 8 with the Verizon DCS tariff at First Revised Sheet 9).<sup>FN15</sup> However, the measured-service option in the tariff related to analog services, not digital data services. Verizon DCS tariff at First Revised Sheet 9, ¶ 18.6.c(b). <sup>FN16</sup>

> FN15. He explained, "For seven dollars, you

could have outgoing calling, measured service whereby seven dollars is obviously much cheaper than [the] thirty-five dollar [alternative], but you pay for every outgoing call you make. Consequently, the prudent person ordering this service would choose the seven dollar option because they had no intention of making outgoing calls on these lines, but they had the capability. When you look at the invoice, you will see that there were 288 seven dollar charges applied, so they chose the measured service option." Tr. 221:23 to 222:7 (Test. of Hills).

> FN16. An "interstate access charge," "interstate subscriber line charge," and a "DCS Interstate access charge" are each separately stated from the DCS activation and channel fees on an invoice dated April 13, 2001. *See* DX. 8. There were also charges for "CentraNet feature package 2000." *See id.;* Tr. 221:1-7 (Test. of Hills).

PX 12 is a Verizon North invoice for a time period subsequent to the period covered by the current claim, relating to 814-676-3909. This invoice shows Sprint long distance charges. Mr. Phillips explained that these charges appeared on this invoice "because we have staff offices and tech support staff at the Oil City office, so we would be using Sprint as a long distance carrier." Tr. 72:16-18 (Test. of Phillips). He agreed with plaintiff's counsel's statement that-"[S]o, in addition to having the DCS capability, which is bringing the data traffic to your router, to your location, to your modems actually from the central office, you also have regular phone lines and Verizon has just put those regular phone lines on here?" Tr. 72:19-25 (Test. of Phillips). However, the only monthly service shown on the Verizon invoice is DCS. No "regular phone lines" appear. PX 12.

### 3. *"BRA" services.*

At one location, ALLTEL provided USA Choice with a "BRA" service. PX 18 (ALLTEL

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73 Fed.Cl. 780                                                                                      Page 10
73 Fed.Cl. 780, 98 A.F.T.R.2d 2006-7815, 2006-2 USTC P 70,262
**(Cite as: 73 Fed.Cl. 780)**

Pennsylvania, Inc., Telephone PA P.U.C. No. 1, Second Revised Sheet, ¶ 10.1. 1.A (eff. March 14, 1998) ("ALLTEL BRA Tariff")). The acronym "BRA" refers to "basic rate access" and is "[a] Canadian term for the ISDN 2B+D standard, which is called BRI ['basic rate interface'] in the US." *Newton's Telecom Dictionary* at 100-101. As the definition suggests, ALLTEL's BRA service provided USA Choice with "just a two channel circuit plus a signaling channel." Tr. 81:15-18 (Test. of Phillips). The ALLTEL BRA tariff provided that the service could be configured to allow, among other things, "the user to originate and receive only data calls over a single circuit-switched B channel." ALLTEL BRA tariff at Second Revised Sheet 1, ¶ 10.1.1.C.1.b. The tariff ostensibly did not provide for an incoming-only option. Dr. Hills accordingly opined that the ALLTEL BRA service "can provide ... two-way communication for originating calls and for terminating calls." Tr. 210:20 to 211:10 **\*788** (Test. of Hills). Mr. Phillips testified that USA Choice used the BRA service in a way that precluded incoming calls. Tr. 125:15-17, 127:15-16 (referring to DX 1, an ALLTEL invoice for telephone number 814-849-0167).

### 4. *Other services.*

#### a. *ALLTEL "private lines."*

Dr. Hill described telephone numbers 825-512-0339 and 825-513-0397 as "private lines." DX 3 at 2; *see also* PX 3 at 1. He used the "private line" label to indicate "a service that doesn't access the local exchange switching services." Tr. 262:2-5 (Test. of Hills).[FN17]

> FN17. The government's expert explained that this means that "at the central office, there will be 24 jacks, and they can plug some of those jacks into the switch and some of those jacks can go off to private line services and some can go off to other data services." Tr. 253:16-20 (Test. of Hills). An examination of the tariffs led the government's expert to conclude that other telephone numbers were not "private lines" because in his view "they all incorporated access to the local exchange carrier's switches

as an integral part of the service." Tr. 262:10-21 (Test. of Hills).

#### b. *Bell Atlantic long distance.*

USA Choice also included a claim for refund of the communications excise tax paid on "long distance" service that arguably did not constitute taxable "toll telephone service" because the charges for the service were not based upon time and distance. PX 3 at 1-2. A review of the pages from the invoices that were admitted into evidence shows Bell Atlantic and later Verizon "tolls" for telephone number 814-375-8001. *See* PX 5 at 157 to 164B. A review of the corresponding pages for a second claimed set of charges, for telephone number 814-938-9600, does not include similar line items. *See* PX 5 at 318 to 331B.

### BURDENS OF PROOF AND PERSUASION

[1] The plaintiff bears the burden of establishing that the court has subject matter jurisdiction over its claim. *McNutt v. General Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988). Before this court can exercise jurisdiction over a tax refund claim, the plaintiff must have first filed a tax refund claim with the IRS. I.R.C. § 7422(a).[FN18] The claim filed with the IRS must "set forth in detail each ground upon which a ... refund is claimed and facts sufficient to apprise the Commissioner [of Internal Revenue] of the exact basis thereof." Treas. Reg. § 301.6402-2(b)(1).[FN19] "Courts have long interpreted § 7422(a) and Treasury Reg. § 301.6402-2(b)(1) as stating a 'substantial variance' rule which bars a taxpayer from presenting claims in a tax refund suit that 'substantially vary' the legal theories and factual bases set forth in the tax refund claim presented to the IRS." *Lockheed Martin Corp. v. United States,* 210 F.3d 1366, 1371 (Fed.Cir.2000) (citing *Cook v. United States,* 220 Ct.Cl. 76, 599 F.2d 400, 406 (1979)). "The substantial variance rule (1) gives the IRS notice as to the nature of the claim and the specific facts upon which it is predicated; (2) gives the IRS an opportunity to correct errors; and (3) limits any subsequent litigation to those grounds that the IRS had an opportunity to consider and is willing to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73 Fed.Cl. 780                                                                                                                            Page 11
73 Fed.Cl. 780, 98 A.F.T.R.2d 2006-7815, 2006-2 USTC P 70,262
**(Cite as: 73 Fed.Cl. 780)**

defend." *Lockheed Martin,* 210 F.3d at 1371 (citing *Ottawa Silica Co. v. United States,* 699 F.2d at 1124, 1138-40 (Fed.Cir.1983)); *Union Pac. R.R. v. United States,* 182 Ct.Cl. 103, 389 F.2d 437, 442 (1968).

> FN18. The statute reads as follows:
> No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary [of the Treasury], according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.
> I.R.C. § 7422(a).

> FN19. This regulation specifies that "[n]o refund ... will be allowed ... except upon one or more of the grounds set forth in a claim [made to the Internal Revenue Service].... A claim which does not comply with this paragraph will not be considered for any purpose as a claim for refund or credit." Treas. Reg. § 301.6402-2(b)(1).

Thus, to be addressed by a court, the legal ground for a refund claim must be presented **\*789** by the taxpayer to the IRS. A "legal theory not expressly or impliedly contained in the application for refund cannot be considered by a court in which a suit for refund is subsequently initiated." *Lockheed Martin,* 210 F.3d at 1371 (quoting *Burlington N., Inc. v. United States,* 231 Ct.Cl. 222, 684 F.2d 866, 868 (1982)). However, as long as the "claim fairly apprises the Commissioner of the ground on which recovery is sought, ... the claim is adequate for the purposes of bringing suit under [Sub]section 7422(a)." *Burlington N.,* 684 F.2d at 869.

Furthermore, the factual foundation for a refund claim must also have been put at issue before the IRS. "The taxpayer similarly may not substantially vary at trial the factual bases raised in the refund

claims presented to the IRS." *Lockheed Martin,* 210 F.3d at 1371 (citing *Ottawa Silica,* 699 F.2d at 1138). In *Ottawa Silica,* a depletion deduction based on multiplying the gross income from a mining activity by an applicable rate was at issue. 699 F.2d at 1136. There, the taxpayer's refund claim to the IRS challenged the IRS's determination of the applicable rate, but the taxpayer did not argue that the gross income multiplicand, on which the disputed deduction was based, was erroneously low. *Id.* at 1136-38. The court rejected the taxpayer's contention that jurisdiction to consider the appropriate applicable rate in calculating the depletion deduction extended to determining the appropriate gross income multiplicand, finding the two to be separate matters, each with "a different factual basis and neither [being] a subsidiary of or integral to the other." *Id.* at 1138-39. Because the taxpayer's refund claim to the IRS did not sufficiently apprise the IRS of the second issue, the court could not consider it. *Id.* Thus, for this court to consider a claim for a refund of taxes, the taxpayer must first establish that it sufficiently apprised the IRS of the same grounds and facts on which the taxpayer bases its claim before this court.

Once jurisdiction is established, "[a] tax refund suit is a *de novo* proceeding, in which the plaintiff bears the burden of proof, including both the burden of going forward and the burden of persuasion." *Sara Lee Corp. v. United States,* 29 Fed.Cl. 330, 334 (1993) (citing *Helvering v. Taylor,* 293 U.S. 507, 515, 55 S.Ct. 287, 79 L.Ed. 623 (1935) (burden of proof); *Lewis v. Reynolds,* 284 U.S. 281, 283, 52 S.Ct. 145, 76 L.Ed. 293, *modified,* 284 U.S. 599, 52 S.Ct. 264, 76 L.Ed. 514 (1932) (burden of proof); *Rockwell v. Commissioner,* 512 F.2d 882, 885 (9th Cir.1975) (Duniway, J.) (burden of proof); *George E. Warren Corp. v. United States,* 135 Ct.Cl. 305, 141 F.Supp. 935, 940 (1956) *(de novo); Snap-On Tools, Inc. v. United States,* 26 Cl.Ct. 1045, 1055 (1992) (burden of proof)). "A plaintiff who is claiming a tax refund must prove [its] case by a preponderance of the evidence." *Ebert v. United States,* 66 Fed.Cl. 287, 291 (2005) (citing *Cook v. United States,* 46 Fed.Cl. 110, 116 (2000)). "[T]he assessment made by the [Internal Revenue] Service is presumed to be correct and this places an obligation on the taxpayer ... to rebut a pre-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73 Fed.Cl. 780                                                                                         Page 12
73 Fed.Cl. 780, 98 A.F.T.R.2d 2006-7815, 2006-2 USTC P 70,262
**(Cite as: 73 Fed.Cl. 780)**

sumption of correctness." *Cook v. United States,* 52 Fed.Cl. 62, 67 n. 6 (2002) (citing *United States v. Janis,* 428 U.S. 433, 440-41, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933)). Procedurally, this "requires the taxpayer to come forward with enough evidence to support a finding contrary to the Commissioner's determination." *Rockwell,* 512 F.2d at 885. "Plaintiff then must prove the exact dollar amount of the alleged overpayment to which it claims a refund." *Sara Lee,* 29 Fed.Cl. at 334 (citing *Janis,* 428 U.S. at 440, 96 S.Ct. 3021; *Missouri Pac. R.R. v. United States,* 168 Ct.Cl. 86, 338 F.2d 668, 671 (1964)).

"When interpreting federal tax provisions as a matter of law or as a mixed question of law and fact, the statutory language should be given its natural and quotidian meaning and should not be extended by implication to reach other matters." *America Online, Inc., v. United States,* 64 Fed.Cl. 571, 576 (2005) (citing *Gould v. Gould,* 245 U.S. 151, 153, 38 S.Ct. 53, 62 L.Ed. 211 (1917)), *appeal dismissed by agreement,* 185 Fed.Appx. 946 (Fed.Cir.2006). In this respect, a distinction should be made between statutory provisions that levy a tax and provisions that exempt taxpayers or services from a tax. *See White v. United States,* 305 U.S. 281, 292, 59 S.Ct. 179, 83 L.Ed. 172 (1938); *see also* **\*790***United Dominion Indus. v. United States,* 532 U.S. 822, 838, 839 & n. 1, 121 S.Ct. 1934, 150 L.Ed.2d 45 (2001) (comparative commentary by Justice Thomas, concurring, and Justice Stevens, dissenting). Though the ultimate burden of proof rests upon the plaintiff, the government must identify the statutory authority for imposition of a tax. *See America Online,* 64 Fed.Cl. at 576 (quoting *Leavell v. Blades,* 237 Mo. 695, 700-01, 141 S.W. 893 (1911) ("When the tax gatherer puts his finger on the citizen, he must also put his finger on the law permitting it.")); *see also Ocean Drilling & Exploration Co. v. United States,* 988 F.2d 1135, 1156 (Fed.Cir.1993); *Estate of Renick v. United States,* 231 Ct.Cl. 457, 687 F.2d 371, 376 (1982) (quoting *Gould).* Correlatively, when a taxpayer seeks to avail himself of a statutory exemption or deduction, he "must be able to point to an applicable statute and show that he comes within its terms." *America On-*

line, 64 Fed.Cl. at 576 (quoting *White,* 305 U.S. at 292, 59 S.Ct. 179, which in turn quotes *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348 (1934)).

## ANALYSIS

USA Choice's request for a refund concerns the communication excise tax paid from January 1999 through April 2002 on its purchase of dial up access and Internet Service Provider ("ISP") network lines that were used to provide internet access for its customers. Compl. Ex. A. That refund request and the IRS's denial satisfied the jurisdictional prerequisites for raising the tax refund claim in this court insofar as that claim relates to tax paid on internet-access channels and circuits.

### A. The Excise Tax on Local Telephone Service

Congress has imposed a three percent excise tax on "communications services." I.R.C. § 4251(a)(1). For purposes of this tax, Congress has defined "communications services" to include "local telephone service," I.R.C. § 4251(b)(1)(A), which in turn is defined as:

**(1)** the access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and

**(2)** any facility or service provided in connection with a service described in paragraph (1).

I.R.C. § 4252(a). The statutory definition includes an exclusion, *viz.,* "[t]he term 'local telephone service' does not include any service which is a 'toll telephone service' or a 'private communication service' as defined in subsections (b) and (d)." *Id.*[FN20]

> FN20. The communications services so taxed under Section 4251(b)(1) also include "toll telephone service" and "teletypewriter exchange service," each of which is also specifically defined by Section 4252 in technological terms that reflect customary usage in 1965, the date the statutory provisions were revised by the Excise Tax Reduction Act of 1965, Pub.L. No. 89-44, § 302, 79

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73 Fed.Cl. 780                                                                                    Page 13
73 Fed.Cl. 780, 98 A.F.T.R.2d 2006-7815, 2006-2 USTC P 70,262
**(Cite as: 73 Fed.Cl. 780)**

Stat. 136, 146, to put the current definitions in place. *See America Online,* 64 Fed.Cl. at 578.

The parties offer competing interpretations of these statutory terms. USA Choice contends that the statutory definition covers standard local telephone service but does not embrace certain specialized services such as those services provided on an "incoming only" basis that do not allow outgoing calls to be placed. Pl.'s Post-Tr. Br. at 22-23. According to USA Choice, the services in question were configured to prevent outgoing telephone calls. *Id.* at 23-26. The government, on the other hand, argues that the elements of the "local telephone service" definition can be satisfied even if the service at issue is restricted to incoming-only. Def.'s Post-Tr. Br. at 4. Although the government disputes the taxpayer's claimed inability to originate calls using some of the services at issue, the government insists that a factual inquiry into whether the services purchased by USA Choice permitted outgoing calls is irrelevant. *Id.* at 12.

"In cases of statutory interpretation, courts first examine the plain meaning of the statute, and if it is unambiguous, enforce that meaning." *America Online,* 64 Fed.Cl. at 577 (citing *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)). The examination for plain meaning must take account of the **\*791** statutory context. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dept. of Treasury,* 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989); *see also Terry v. Principi,* 340 F.3d 1378, 1385 (Fed.Cir.2003) ("When we construe a statute, we do so in the setting of the statutory scheme of which it is a part."); *Splane v. West,* 216 F.3d 1058, 1068-69 (Fed.Cir.2000). If possible, a court must endeavor to interpret the statute "as a symmetrical and coherent ... scheme," *Gustafson v. Alloyd Co.,* 513 U.S. 561, 569, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), melding "all parts into a harmonious whole." *Federal Trade Comm'n v. Mandel Bros.,* 359 U.S. 385, 389, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959). *See also Imazio Nursery, Inc. v. Dania Greenhouses,* 69 F.3d 1560, 1564 (Fed.Cir.1995)

("[P]arts of an act relating to the same subject should be considered together, and not each by itself.") (quoting 2 Sutherland & Lewis, *Statutory Construction* § 344 (1904)).

### 1. *Access to a local telephone system.*

The parties' statutory arguments first focus on the meaning of the word "access." The government contends the services at issue provided "access" to the local telephone system because they "enabled plaintiff to 'communicate with' other telephone stations constituting part of the local telephone system." Def.'s Post-Tr. Resp. at 9. By contrast, USA Choice argues that for a service to provide "access to a local telephone system," I.R.C. § 4252(a)(1), the service must provide the "ability to enter the local telephone system ... when [the taxpayer] choose[s]." Pl.'s Post-Tr. Br. at 22. Thus, USA Choice contends that a service that does not allow initiation of outgoing calls does not provide the "access" requisite to "local telephone service," *id.* at 23, and that many of the services in question permitted only incoming calls. Pl.'s Reply Brief to Def.'s Post-Trial Brief ("Pl.'s Post-Tr. Reply") at 8. The government counters by arguing that definitions of access suggesting physical entry (*e.g.*, "ability to enter") are inapposite because a local telephone system is not a physical place. Def.'s Post-Tr. Resp. at 8. Instead, the government urges definitions of "access" such as "ability to enter, approach, communicate with, or pass to and from" or "ability to obtain or make use of." Def.'s Post-Tr. Br. at 4-5 (citing *Webster's Third New Int'l Dictionary* (1986)).

The Federal Circuit has addressed the term "access" as it is used in the parallel definition of "teletypewriter exchange service," which is also subject to the same excise tax. *See Trans-Lux Corp. v. United States,* 696 F.2d 963, 965-68 (Fed.Cir.1982).FN21 There, the trial judge had concluded that "the word access was recognized ... as meaning the interface or connection between the Telex network's transmission lines (and the central exchange) and the [customer-provided terminal]." *Id.* In deciding that charges paid by the taxpayers for leasing teletypewriter equipment were not paid for "teletypewriter exchange service," the Federal Circuit held that "[a]ccess to the Telex network was ...

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73 Fed.Cl. 780                                                                    Page 14
73 Fed.Cl. 780, 98 A.F.T.R.2d 2006-7815, 2006-2 USTC P 70,262
**(Cite as: 73 Fed.Cl. 780)**

provided by Western Union's [Telex Line Adapter] ..., and not by [the] teletypewriters." *Id.* As the Federal Circuit observed, "a subscriber to the Telex network could direct-dial any other network subscriber through Western Union's central exchange and establish a point-to-point connection." *Id.* at 964. In determining whether the service at issue provided "access," however, the Federal Circuit had no reason to consider directionality of messages but instead focused simply on whether the Telex Line Adapter or the teletypewriter was the device that actually provided the interconnection with the network. *Id.* at 965-68.

> FN21. For purposes of the communications excise tax, "the term 'teletypewriter exchange service' means the access from a teletypewriter ... to the teletypewriter exchange system of which such station is a part, and the privilege of intercommunication by such station with substantially all persons having teletypewriter ... stations constituting a part of the same teletypewriter exchange system." I.R.C. § 4252(c).

Here, the issue is more complex, because the word "access" might be interpreted to mean that USA Choice could receive communications from any other station within the **\*792** local telephone system, even though an incoming-only service would not allow USA Choice itself to "approach" or "enter" the local system or "pass to and from" the system as it might choose. In short, the dictionary definition of "access" could be read both ways.

2. *"[P]rivilege of telephonic quality communication with substantially all persons having telephone ... stations constituting a part of such local telephone system."*

In addition to providing access to the local telephone system, the definition of "local telephone service" requires "the privilege of telephonic quality communication with substantially all persons having telephone ... stations constituting a part of such local telephone system." I.R.C. § 4252(a)(1).

The meanings advocated by the parties for the word

"privilege" are nuanced. The government points to *Comdata Network, Inc. v. United States,* 21 Cl.Ct. 128 (1990), where the court observed: "In everyday speech the word 'privilege' connotes right.... Accordingly, the tax is applicable because the service provided plaintiff grants it the right to utilize the telephone lines to communicate with a substantial number of stations in a distant area." *Id.* at 130-31; *see* Def.'s Post-Tr. Br. at 8-9. USA Choice emphasizes that "a privilege grants someone the legal freedom to do or not to do a given act." Pl.'s Post-Tr. Br. at 22 (quoting *Black's Law Dictionary* 1004 (abridged 8th ed.2005)). USA Choice avers that privilege is lacking where the services are configured as incoming-only, because USA Choice's ability to communicate is entirely dependant on someone else's action to initiate a call. Pl.'s Post-Tr. Reply at 10. The government responds that " 'privilege' [does] connote some type of freedom on the part of the actor, [but] nothing in the definition [ ] ... indicates that the freedom must be boundless." Def.'s Post-Tr. Resp. at 9.

The word "privilege" must be read in the context of "telephonic quality communication with substantially all persons having telephone ... stations constituting a part of [the] local telephone system." I.R.C. § 4252(a)(1). In particular, the local telephone service definition requires the "privilege of ... communication *with* substantially all persons having telephone ... stations," *id.* (emphasis added), in contrast to the definition of toll telephone service set out in the next subsection of Section 4252, which uses the language "privilege of ... communications *to or from* all or a substantial portion of the persons having telephone ... stations." I.R.C. § 4252(b)(2) (emphasis added). The words "to or from" capture single-direction communications within their meaning, but the word "with" connotes reciprocity. As the definition of "with" in *Webster's Seventh New Collegiate Dictionary* 1026 (1970) indicates, "with" is "used as a function word to indicate one to whom a usu[ally] reciprocal communication is made."

In support of its position that "with" in the context of I.R.C. § 4252 should be interpreted as equal to "to or from," the government offers Revenue Ruling 77-196, 1977 WL 43147. That revenue ruling addressed automatic call distributing systems capable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73 Fed.Cl. 780                                                                                    Page 15
73 Fed.Cl. 780, 98 A.F.T.R.2d 2006-7815, 2006-2 USTC P 70,262
**(Cite as: 73 Fed.Cl. 780)**

only of receiving incoming calls with auxiliary or separate trunk lines that could be equipped to enable origination of outgoing calls to a local telephone exchange. Separate charges were made for the auxiliary circuits that could be used for outgoing calls. *Id.* The IRS ruled that both the basic and auxiliary services were subject to the communications excise tax as "local telephone service," commenting that: "in defining taxable local telephone service, [S]ection 4252(a)(1) makes no distinction between systems that provide access to a local telephone network only by receiving calls and systems that both receive and originate calls.... [T]he fact that in the instant case the ... equipment can only receive incoming calls from a local telephone system is not material to the tax determination." *Id.* In Revenue Ruling 77-196, the IRS did not address reciprocity of communications but rather focused upon the distinctions between taxable local telephone service and private communications service exempt from tax under Subsections 4252(a) and (d). *Id.*

[2][3] Revenue rulings lack the force of law, *see Western Co. of N. Amer. v. United States,* 323 F.3d 1024, 1032 (Fed.Cir.2003) **\*793** ("[R]evenue rulings merely represent the position of the United States and do not bind this court."), although they may be instructive in the absence of controlling authority. *See, e.g., Sealy Power, Ltd. v. Commissioner of Internal Revenue,* 46 F.3d 382, 394-95 (5th Cir.1995) (applying certain factors employed in previous revenue rulings); *St. Louis Bank for Coop. v. United States,* 224 Ct.Cl. 289, 624 F.2d 1041, 1050 (1980) ("Revenue rulings ... can provide some guidance as to the types of transactions [in this case]."). Arguably, revenue rulings are entitled to deference to the extent that they reflect well-reasoned, long-standing interpretations of the Internal Revenue Code or tax regulations.[FN22] As this court previously explained,

> FN22. The Supreme Court has deferred ruling on whether revenue rulings are entitled to deference. *See United States v. Cleveland Indians Baseball Co.,* 532 U.S. 200, 220, 121 S.Ct. 1433, 149 L.Ed.2d 401 (2001).

[w]hen agency interpretations lack the force of law, such interpretations are entitled to deference "only to

the extent that those interpretations have the 'power to persuade.' " *Christensen v. Harris County,* 529 U.S. 576, 587[, 120 S.Ct. 1655, 146 L.Ed.2d 621] (2000) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140[, 65 S.Ct. 161, 89 L.Ed. 124] (1944)). This limited reliance, denominated "*Skidmore* deference," is contrasted with *Chevron* deference, which defers to reasonable, authorized agency interpretations of statutes when the meaning of those statutes is ambiguous. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Skidmore* deference is appropriate when considering "[i]nterpretations such as those in opinion letters-like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law." *Christensen,* 529 U.S. at 587, 120 S.Ct. 1655.... Prior to the Supreme Court's decisions in *Chevron* and *Christensen,* this court's predecessor granted *Skidmore* deference to IRS revenue rulings. *St. Louis Bank for Coops. v. United States,* [224 Ct.Cl. 289,] 624 F.2d 1041, 1050-51 (1980).

*America Online,* 64 Fed.Cl. at 580 (second alteration in original). The weight given agency interpretations entitled to *Skidmore* deference "depends on 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.' " *See id.* (quoting *United States v. Mead Corp.,* 533 U.S. 218, 228, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (in turn quoting *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161)).

[4] Revenue Ruling 77-196 is not particularly persuasive respecting the question of statutory interpretation at issue in this case. The previously quoted language of this revenue ruling focused on the "access" portion of the definition of "local telephone service" in addressing the distinction between taxable local telephone service and exempt private communications service. *Id.* It did not consider the "privilege of telephonic quality communication with substantially all" local telephone system subscribers under I.R.C. § 4252(a)(1). Both "access" and "privilege ... with substantially all persons" must be satisfied in order for a service to be taxable. Regarding the issue at the heart

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of this case, Revenue Ruling 77-196 simply stated, without an accompanying rationale, that the incoming-only lines at issue there provided the "privilege of telephonic communication with substantially all other persons in that local telephone network," and consequently it did not address whether, for the incoming-only services, reciprocity is necessarily indicated by Congress's use of the word "with."

The government contends that a measure of reciprocity is available with incoming circuits. It argues that even if all of USA Choice's circuits were configured to be incoming only, "USA Choice would be able to communicate with anyone who called in." Cl. Tr. 44:21 to 45:8-9. This argument by the government, however, reaches too far. It ignores the statutory language requiring that the privilege of "communication with" extend to "*substantially all persons* having telephone ... stations constituting a part of such local telephone system." I.R.C. § 4252(a)(1) **\*794** (emphasis added). Where USA Choice purchased digital circuits such as PRI groups of channels, functioning as the Integrated Services Digital Network equivalent of a T-1 circuit, those channels were not necessarily configured for voice communications. Granted, USA Choice in several instances did cause the circuit provider so to configure one or more PRI channels. *See, e.g.,* PX 8 (Verizon invoice indicating long distance service associated with telephone number 814-227-2694). Otherwise, USA Choice was only able to communicate with those local telephone system subscribers who (1) initiated a call to USA Choice, (2) had a modem, and (3) had a valid USA Choice username and password.

A telephone service subscriber using a mere telephone station would not have been able to transmit or receive the type of signal carried over the channels the services at issue typically are configured to provide.[FN23] The subscriber would need to use a computer modem. The IRS itself has previously recognized that this limitation can cause the privilege of telephonic quality communication to be with less than substantially all persons with a telephone station. In Revenue Ruling 79-245, 1979 WL 51191, the IRS considered whether fees for leasing computer equipment including modems constituted charges for local telephone service subject to the communica-

tions excise tax. The IRS concluded that "the type of telephone signal produced by the modems is usable only for nonvoice data transmission to other computer stations.... Therefore, a modem is not a facility provided in connection with the privilege of telephonic quality communication with substantially all persons having stations in the local system." *Id.* Here also, the government recognizes that the logical interpretation of Section 4252(a)(1) is that to be included within the definition, a service must allow voice communication. *See* Def.'s Post-Tr. Resp. at 12 ("[O]ne could argue that the service must be able to support voice communication").[FN24]

> FN23. A "telephone station" is defined as "[a]n installed telephone set and associated wiring and apparatus, in service for telephone communication." Institute of Electrical and Electronics Engineers, Inc., *The New IEEE Standard Dictionary of Electrical and Electronics Terms* 1346 (5th ed., 1993). A "telephone set" is defined as "[a]n assemblage of apparatus including a telephone transmitter, a telephone receiver, and usually a switch, and the immediately associated wiring and signaling arrangements." *Id.* at 1345. A telephone receiver is "[a]n earphone for use in a telephone system." *Id.* at 1084. A telephone transmitter is "[a] microphone for use in a telephone system." *Id.* at 1346. "Telephone station" is not a term in common or general usage. It is a technical term found only in engineering parlance. Accordingly, "the meaning attached to it by those who are familiar with such parlance [is] relevant in determining the meaning of the term as used by Congress." *Order of Ry. Conductors of Am. v. Swan,* 329 U.S. 520, 525, 67 S.Ct. 405, 91 L.Ed. 471 (1947). *See also O'Hara v. Luckenbach S.S. Co.,* 269 U.S. 364, 370, 46 S.Ct. 157, 70 L.Ed. 313 (1926) (A legislative "phrase ... is to be given the meaning which it had acquired in the language and usages of the trade to which the act relates."). The term "telephone stations," as it is used in I.R.C. § 4252(a)(1), encompasses telephone sets, each having an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

earphone and microphone, but cannot be considered to include modems.

FN24. The government posits that "to use the services [at issue] with a telephone, plaintiff would have to use additional customer[-]premise equipment, such as a multiplexor or PBX." Def.'s Post-Tr. Resp. at 13-14. The channel or circuit would also have to be configured by the provider to allow use of that customer-premise equipment.

In Revenue Ruling 79-245, the IRS opined that the computer user, "by plugging in a regular telephone set, if it so chooses, ... may exercise the privilege of telephonic (voice) quality communication with substantially all persons having telephones in the local system within the meaning of [S]ection 4252(a) of the Code." In this respect, USA Choice's customers presumably paid the communications excise tax on all of *their* lines to the local telephone provider's central exchange, even if a particular line might be used exclusively for a computer connection. As the IRS put it in Revenue Ruling 79-245, "[w]here a telephone service provides the subscriber with the privilege of telephonic quality communication with substantially all other subscribers to the local telephone system, it is immaterial whether the subscriber exercises that privilege." The issue here, however, is whether USA Choice, not its customers, had the "privilege" to which I.R.C. § 4252(a)(1) refers.

Even if substantially all local telephone system subscribers possessed a modem and chose to use it to call USA Choice, there would be no "communication" in the normal sense of the word. Communication cannot occur until the caller supplies a recognized username and password to USA Choice.FN25 *795 The transmission of the identification request is so limited that it cannot be considered to be a "telephonic quality communication" in the ordinary sense of those words.FN26

FN25. The government cites Revenue Rul-

ing 79-245 to suggest a taxpayer's decision to use security codes to restrict access to a service goes to the taxpayer's decision about how it will exercise its privilege, not the existence of its "privilege of telephonic quality communication with substantially all persons having telephone ... stations constituting a part of [the] local telephone system" within the meaning of Section 4252(a)(1). Def.'s Post-Tr. Br. at 10-11. However, in Revenue Ruling 79-245, the IRS's reasoning did not address the taxpayer's use of access codes but instead focused on the telephonic capability of the telephone lines in reaching the conclusion that the telephone lines in question were taxable. *See supra,* at 794 n. 24.

FN26. The government suggests that anyone in the local calling area could maintain a two-way telephonic-quality connection with the modem for the brief time period that would pass before USA Choice's modem disconnected the caller. *See* Tr. 120:2 to 121:8, 122:25 to 123:8, 182:2-6, 183:20 to 184:25. In that respect, "USA Choice concedes that the lines in question provide a telephonic quality *connection.*" Pl.'s Post-Tr. Br. at 21 (emphasis added). However, the language of the statute is "telephonic quality communication." I.R.C. § 4252(a)(1). Definitions of the word "communication" include "an act or instance of transmitting," "an exchange of information," "a process by which meanings are exchanged between individuals through a common system of symbols," and "the technology of the transmission of information." *Webster's Seventh New Collegiate Dictionary* 168 (1970). While a "telephonic quality connection" might be present, the transmission is not in the form that allows "telephonic quality communication."

Accordingly, those digital circuits, the use of which was obtained by USA Choice from providers in a form that was configured as incoming-only for digital use, do not fall within the definition of "local tele-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

phone service" within the meaning of I.R.C. § 4252(a). Thus, they were not subject to the communications services excise tax imposed by I.R.C. § 4251. A refund of amounts paid by USA Choice respecting these circuits is proper.

[5] Some of the circuits respecting which USA Choice seeks a tax refund, however, were not configured by the providing telephone company as incoming-only. Even if USA Choice only used the two-way circuits for incoming calls and never for outgoing calls, the circuits still fell within the "local telephone service" definition. USA Choice agrees "that it is a line's actual capabilities, not its use, that govern ... taxability." Pl.'s Post-Tr. Reply at 8. This criterion properly governs applicability of Subsection 4252(a). *See Comdata*, 21 Cl.Ct. at 130-31 (rejecting a taxpayer's argument that "incidence of the tax is governed not by the capability of the service provided but rather by the actual use made of it," instead focusing on whether the service had an "inherent use limitation"); Rev. Rul. 79-245, 1979 WL 51191 ("Where a telephone service provides the subscriber the privilege of telephonic quality communication with substantially all other subscribers to the local telephone system, it is immaterial whether the subscriber exercises the privilege."). If the services were configured such that USA Choice could initiate an outgoing call even if it had to use special customer-provided equipment such as a multiplexor or PBX, *see supra,* at 794 n. 24, then USA Choice had the privilege or ability to "communicate with" whomever it chose to call. With the incoming-only circuits, however, it did not.

### 3. *Application of Subsection 4252(a) to particular services.*

A preponderance of the evidence establishes that the ALLTEL PRA services were configured by ALLTEL to only be incoming-only. According to Dr. Hills, PRI services for internet service providers "are generally configured to be ... 'incoming only.' " DX 2 at 4. The ALLTEL tariff explicitly provided that the B channels could be dedicated as "incoming" only. ALLTEL PRA tariff at Original Sheet 22, ¶ 10.3.3(B). While Dr. Hills did acknowledge the possibility that a particular PRI service might be configured differently, Tr. 235:4-8, no evidence suggests

that the ALLTEL PRA services were actually configured to be other than incoming-only. Notably, a review of the invoices does not show any charges for outgoing calls. *See* PX 5 at 3-60, 222-44, 273-305C, 353-58, 368-372.

Likewise, the evidence establishes that all but one of the Verizon IntelliLinQ PRI services were configured to be incoming-only. The Verizon tariff specifically provided an incoming-only configuration as an option. *See* Verizon IntelliLinQ PRI tariff at 1st **\*796** Revised Sheet 4, ¶ B.3. According to Dr. Hills, the per-channel charges for three of the telephone numbers for which detail was provided corresponded to the incoming-only configuration. Tr. 230:11 to 231:14-15; PX 9. With one exception, there was no evidence that any of the other telephone numbers were configured differently, and USA Choice thus has established that those Verizon IntelliLinQ services were more likely than not also configured as incoming-only. One of the associated telephone numbers showed a long distance service charge. *See* PX 8. Even though no charges for actual calls were shown, that absence suggests a limitation on use, not capability. *See Comdata*, 21 Cl.Ct. at 130-31. Plaintiff's counsel's attribution of the long distance charge to a billing error, Tr. 62:8-24, may well be correct but it is unsupported by evidence. Accordingly, the court determines that USA Choice has not established that the service for 814-227-2694 was configured as incoming-only.

The Sprint PRI service was not established to be incoming-only. According to Dr. Hills, the Sprint PRI service made its channels "explicitly available for outgoing calls." Tr. 213:13 to 214:2. Whether the channels would carry inward, outward, or both types of communications was controlled by USA Choice's own equipment. *See* Sprint PRI tariff at 2d Revised Page 21, ¶ 5.3.6.A.1. Similarly, the ALLTEL BRA was not established to be configured as incoming-only. As the government points out, Def.'s Post-Tr. Resp. at 4, the tariff explicitly "[a]llows the user to originate *and* receive" calls. ALLTEL BRA tariff at 2d Revised Sheet 1, ¶ 10. 1.1(C)(1) (emphasis added).

The Digital Channel Services present a more difficult

factual question. An ALLTEL DCS invoice includes as a line item description "DIRECT IN DIAL TRUNK." PX 5 at 1B. USA Choice suggests this phrase should be deemed to mean "inward dial only." Pl.'s Post-Tr. Br. at 26. An "inward trunk" is "[u]sed only for incoming calls" and "cannot dial out." *Newton's Telecom Dictionary* at 367. The government suggests "direct in dial trunk" means a "direct inward dial service." Def.'s Post-Tr. Resp. at 6. As noted previously, "direct inward dialing" ("DID") is "the ability for a caller outside a company to call an internal extension without having to pass through an operator or attendant." *Newton's Telecom Dictionary* at 212.FN27 Dr. Hills testified he "would have every expectation this service would allow outgoing calls." Tr. 199:25 to 200:4, 200:22-23. However, according to *Newton's,* "[t]raditionally, DID lines could not be used for outdial operation, since there was no dial tone offered. More recently, the individual channels in a T-1 trunk can be defined in terms of their directional nature, with some being defined as DID, some as DOD (Direct Outward Dialing), and some as combination (both incoming and outgoing)." *Newton's Telecom Dictionary* at 205. Based on USA Choice's intent in procuring the services and the traditional definition of direct inward dialing, the court concludes the "direct in dial trunk" was more likely than not configured to be incoming-only.

> FN27. Notably, "DID is different from a DIL (Direct-In-Line) where a standard, both-way central office trunk is programmed to always ring a specific extension or hunt group." *Newton's Telecom Dictionary* at 205.

The government urges that if the court were to find the "direct in dial trunk" to be incoming-only, the court should find the ALLTEL "direct in dial trunk" was either separate from the forty-eight trunks USA Choice purchased or only one of the forty-eight trunks. Def.'s Post-Tr. Resp. at 6. The invoice shows the quantity "48" for the number of access charges applicable, but only the quantity "1" for the "DIRECT IN DIAL TRUNK." *See* PX 5 at 1B. The language of the tariff indicates the words "trunk" and "channel" are used interchangeably. *See* ALLTEL DCS tariff at First Revised Sheet 20, ¶ 10.2.5(B)

("For each channel activated a trunk charge will be applied."). USA Choice's concession that all but one account for the ALLTEL DCS service was not direct inward dial, Cl. Tr. 16:18 to 17:15, supports that the ALLTEL DCS service would allow outgoing calls unless a specific charge was made for the "direct in dial" configuration.FN28 The ***797 court concludes, based on this evidence, that one of the forty-eight ALLTEL DCS channels was configured as an incoming-only direct in dial trunk. The remaining forty-seven channels were configured also to permit outgoing calls.

> FN28. USA Choice's counsel explained that the concession reflected a business decision by USA Choice, which had acted on the premise "that if [it] wanted direct inward dial, [it] ha[d] to pay more money." Cl. Tr. 16:16-17.

USA Choice similarly has not proven by a preponderance of the evidence that the Verizon DCS service was configured to be incoming-only. Dr. Hills testified these services provided the capability of originating outgoing calls. Tr. 220:15-16, 222:3-4. The invoices reflect a seven dollar per channel charge, *see, e.g.,* DX 8, which corresponds to the charge the tariff announces for "measured service." Verizon DCS tariff at First Revised Sheet 9, ¶ A.6.c(1)(b); *see also* Tr. 221:15 to 222:15 (Test. of Hills). This indicates the ability to make outgoing calls. Additionally, next to the "Access Line/Trunk or CentraNet Line-flat rate" charge, the tariff includes the notation "SA TRK, SA DIDTRK, SA DODTRK, SA CN." *See* Verizon DCS tariff at First Revised Sheet 9, ¶ A.6.c(1)(a). Presumably, "DIDTRK" and "DODTRK" refer to direct indial trunk and direct outdial trunk, respectively. Next to the "Access Line/Trunk or CentraNet Line-measured service" charge, the tariff includes the notation "SA TRKUSS, SA DODTRKUSS, SA CNUSS." *See id.* at First Revised Sheet 9, ¶ A.6.c(1)(b). Absent from this second set of notations was a "DIDTRK," suggesting the measured service charge would not be applicable to direct indial trunks. The invoices also showed charges for direct dialed calls, *see, e.g.,* PX 5 at 168, and voicemail services, *see, e.g., id.* at 169, suggesting that USA Choice did not use the Verizon DCS service exclusively for in-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73 Fed.Cl. 780                                                                                      Page 20
73 Fed.Cl. 780, 98 A.F.T.R.2d 2006-7815, 2006-2 USTC P 70,262
**(Cite as: 73 Fed.Cl. 780)**

coming dial-up internet customers. Thus, the Verizon DCS service purchased by USA Choice constituted taxable local telephone service unless charges for that service were exempt under the "private communication service" exemption.[FN29]

> FN29. USA Choice raises yet a further ground for a refund by arguing that a principle it styles as the "Doctrine of Equality of Treatment" entitles USA Choice to relief because of the conclusion the IRS reached in a private letter ruling ("PLR") issued to another taxpayer. Pl.'s Post-Tr. Br. at 35-36 (referring to I.R.S. Priv. Ltr. Rul. 200133008 (Aug. 17, 2001) ("PLR 200133008")), *revoked by* I.R.S. Priv. Ltr. Rul. 200242021 (Oct. 18, 2002). According to USA Choice, the other taxpayer was in an "identical ... situation." Pl.'s Post-Tr. Br. at 37. While "[a] taxpayer may not rely on an advance ruling issued to another taxpayer," Treas. Reg. § 601.201, a letter ruling can be considered by a court when determining whether the IRS has abused its discretion in proscribing retroactive application of such a ruling under I.R.C. § 7805(b)(8). *See Vons Cos. v. United States,* 51 Fed.Cl. 1, 10 (2001) (explaining *International Bus. Machs. Corp. v. United States,* 170 Ct.Cl. 357, 343 F.2d 914 (1965)). I.R.C. § 7805(b)(8) provides that "[t]he Secretary may prescribe the extent, if any, to which any ruling (including any judicial decision or any administrative determination other than by regulation) relating to the internal revenue laws shall be applied without retroactive effect." The doctrine that USA Choice seeks to invoke, to the extent it was recognized in *International Business Machines,* has been, as the Federal Circuit observed, "effectively limited to its facts by subsequent decisions of the Court of Claims in *Knetsch v. United States,* 172 Ct.Cl. 378, 348 F.2d 932 (1965) and *Bornstein v. United States,* 170 Ct.Cl. 576, 345 F.2d 558 (1965)." *Florida Power & Light Co. v. United States,* 375 F.3d 1119, 1125 (Fed.Cir.2004). Specifically, the application

> of *International Business Machines* does not extend beyond situations where
>
> (i) two or more taxpayers in direct economic competition have each applied for a ruling and only one has received a favorable ruling; and (ii) the taxpayer denied the favorable ruling is arguing that the Commissioner abused his discretion under section 7805(b) by failing to apply a new legal position only prospectively.
>
> *Vons Cos.,* 51 Fed.Cl. at 10 (applying *Knetsch,* 348 F.2d at 940 & n. 14; *Bornstein* 345 F.2d at 564 n. 2). USA Choice has not established that it was in direct economic competition with the recipient of PLR 200133008 or that it applied for its own ruling. Moreover, the recipient of PLR 200133008 was a supplier to internet service providers, not itself an internet service provider. PLR 200133008. USA Choice's assertion that its refund request "had the same effect as requesting a letter ruling," Pl.'s Post-Tr. Br. at 37, is contrary to the Federal Circuit's decision in *Florida Power & Light.* Though the taxpayer in *Florida Power & Light* made a refund request to the IRS, 375 F.3d at 1120-21, the Federal Circuit held that taxpayer was unable to invoke *International Business Machines* because it had "never sought a private letter ruling from the IRS." 375 F.3d at 1125.
>
> In all events, USA Choice's equality-of-treatment contention is largely moot because this court is acting on other bases to award relief to USA Choice for taxes it paid on incoming-only and private-communication services. *See Deluxe Corp. v. United States,* 885 F.2d 848, 853 (Fed.Cir.1989).

### *798 B. The "Private Communication Service" Exemption From the Excise Tax on Local Telephone Service

[6] As noted *supra,* Congress has excluded from the definition of "local telephone service" operations that meet the definition of a "private communication service." Thus, for purposes of this case, those services

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73 Fed.Cl. 780                                                          Page 21
73 Fed.Cl. 780, 98 A.F.T.R.2d 2006-7815, 2006-2 USTC P 70,262
(Cite as: 73 Fed.Cl. 780)

that would otherwise be classified as a "local telephone service" would nonetheless be exempt from the communications excise tax if they were to meet the requirements of a "private communication service." Here, those services that were "local telephone service" but nonetheless might be "private communication service" consist of USA Choice's ALLTEL DCS service, ALLTEL BRA service, Verizon DCS service, and Sprint PRI service.

The tax-exempt "private communication service" is defined as follows:

**(d) Private communication service.**-For purposes of this subchapter, the term "private communication service" means-

**(1)** the communication service furnished to a subscriber which entitles the subscriber-

**(A)** to exclusive or priority use of any communication channel or groups of channels, or

**(B)** to the use of an intercommunication system for the subscriber's stations, regardless of whether such channel, groups of channels, or intercommunication system may be connected through switching with a service described in subsection (a), (b), or (c),

**(2)** switching capacity, extension lines and stations, or other associated services which are provided in connection with, and are necessary or unique to the use of, channels or systems described in paragraph (1), and

**(3)** the channel mileage which connects a telephone station located outside a local telephone system area with a central office in such local telephone system, except that such term does not include any communication service unless a separate charge is made for such service.

I.R.C. § 4252(d). USA Choice asserts that some of the services at issue fall within this definition. See Pl.'s Post-Tr. Reply at 12 (identifying the "exclusive or priority use" provision of Subparagraph 4252(d)(1)(A) as the portion of the "private communication service" definition USA Choice seeks to apply).

### 1. "[P]rivate" not limited to internal communications only.

The government seeks to demonstrate that the ser-

vices at issue do not qualify as private-communication services because they are not used exclusively for internal communications within USA Choice's operations. See generally Def.'s Post-Tr. Br. at 16-20. In support, the government states "the legislative history makes it clear that § 4252(d) was designed to exempt from the federal excise tax services used by businesses for 'internal communications.' " Def.'s Post-Tr. Br. at 16 (discussing H.R.Rep. No. 89-433 (1965), as reprinted in 1965 U.S.C.C.A.N. 1645). However, the statute defines several different types or categories of private-communication service, see Western Electric Co. v. United States, 215 Ct.Cl. 100, 564 F.2d 53, 62 (1977), not just the type to which the government refers. The statutory exemption must be construed to give effect to all of its terms, not just those that relate to the cited legislative history. " 'It would be a strange canon of statutory construction that would require Congress to state in committee reports ... that which is obvious on the face of a statute.' " Whitfield v. United States, 543 U.S. 209, 216, 125 S.Ct. 687, 160 L.Ed.2d 611 (2005) (quoting Harrison v. PPG Indus., 446 U.S. 578, 592, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980)).

The government more specifically argues that the "private communication component of the plaintiff's network" was limited to "the aggregation and routing of internet traffic over plaintiff's network of computer servers," Def.'s Post-Tr. Br. at 19, and that the services at issue were neither "necessary" nor "unique" to that network and did not make the USA Choice's use of that network any "easier or more convenient." Def.'s Post-Tr. **\*799** Br. at 19-20. Along a similar vein, the parties direct some of their arguments to the question of whether the services at issue fall under the definition of a private line offered by Dr. Hills, viz., a "service ... not connected to local exchange services or toll services," Def.'s Post-Tr. Resp. at 17; see Tr. 268:14-16.[FN30] USA Choice maintains that the definition of "private communication services" includes more than just "private lines," Pl.'s Post-Tr. Br. at 30-32, and in this respect, the government agrees that Dr. Hill's definition of a private line is "different from the statutory definition of 'private communication service.' " Def.'s Post-Tr. Resp. at 17. Indeed, the very language of the statute ("*regard-*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73 Fed.Cl. 780                                                                                  Page 22
73 Fed.Cl. 780, 98 A.F.T.R.2d 2006-7815, 2006-2 USTC P 70,262
(Cite as: 73 Fed.Cl. 780)

*less* of whether such channel ... may be *connected through switching* with a service described in subsection (a), (b), or (c)," I.R.C. § 4252(d)(1) (emphasis added)), confirms that tax-exempt "private communications service" is broader than "private lines." *See Western Electric,* 564 F.2d at 65.

> FN30. An alternative definition of a "private line" is "[a]n outside telephone line, with a separate telephone number, which is separate from the PBX. The line is a standard business line which goes around the PBX. It connects the user directly with the LEC central office, rather than going through the PBX. Private line connections are considered to be very 'private' by virtue of the fact that it is not possible for a third party *(e.g.,* technician or console attendant) to listen to conversations without placing a physical tap on the circuit. Additionally, private lines are not subject to congestion in the PBX." *Newton's Telecom Dictionary* at 550. *See also id.* (defining "private line service" as "[a]n outside telephone number separate from the PBX, can be set up to appear on one of the buttons of a key telephone."). The *Telecommunications Glossary* notes, "[a]mong subscribers to the public switched telephone network(s), the term *'private line'* is often used to mean a one-party switched access line." *Telecommunications Glossary* at P-23.

USA Choice claims the services at issue have attributes of private lines, citing specifically the DS-1 technology which it avers "is generally associated with a private line" and that the telephone numbers were apparently unlisted. Pl.'s Post-Tr. Br. at 34.[FN31] The government responds "the services at issue ... do not ... fall within Dr. Hill's definition of 'private line' because the DS-1 lines providing the service were connected to the local exchange service." Def.'s Post-Tr. Resp. at 17. The government also focuses on the connection with the central office in directing the court's attention to Revenue Ruling 78-437, 1978 WL 42231. Def.'s Post-Tr. Resp. at 18. According to the government, the IRS determined in Revenue Ruling 78-437 that "phone lines that connected [a taxpayer's]

private branch exchange to the central office of the local telephone company did not constitute private communication service because they were not necessary or unique to the private communication service and were provided in connection with the local telephone service." Def.'s Post-Tr. Resp. at 18.

> FN31. "DS-x," with "x" being a number from zero to 4, refers to a "Digital Signal (level)." *Newton's Telecom Dictionary* at 227. "The fundamental speed level is DS-0 (64 kbps [kilobits per second] ... ), which is a voice grade channel." *Id.* "In North America, ... DS-1 becomes T-1, DS-2 becomes T-2, and so on." *Id.*

Revenue Ruling 78-437 analyzes a central office line charge in the context of qualifying as a private communication service under the second part of the private-communication exemption, I.R.C. § 4252(d)(2) ("associated services which are provided in connection with, and are necessary or unique to the use of, channels or systems described in paragraph (1)"), not services under the first part of the exemption, I.R.C. § 4252(d)(1)(A) ("the exclusive or priority use of any communication channel or groups of channels").[FN32] In addition to lacking any consideration as to whether the service entitled the taxpayer to "exclusive or priority use of any communication channel," there is no indication in the revenue ruling's recitation of facts that the central office line charge was separate from a charge for access to the local telephone system. *See* Rev. Rul. 78-437, 1978 WL 42231.

> FN32. Revenue Ruling 78-437 specifies that it focused on the second part of the exemption: "The central office line charge is a charge of the lines that give access to the local telephone service. Since the lines are not necessary to the private communication service, but are provided in connection with local telephone services, this charge is not within the exemption provided by section 4252(d)."

2. *"[E]xclusive or priority use of any communication channel or groups of channels."*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73 Fed.Cl. 780, 98 A.F.T.R.2d 2006-7815, 2006-2 USTC P 70,262
**(Cite as: 73 Fed.Cl. 780)**

Whether a service qualifies as a private communication service in this instance largely**\*800** turns on whether the service "entitles [USA Choice] to exclusive or priority use of any communication channel or groups of channels." I.R.C. § 4252(d)(1)(A). As USA Choice would have it, "[i]f USA Choice and its customers ... have the privilege of the use of the channels ..., superior to others in the local calling area, then the [channels] are 'private communication service.' " Pl.'s Post-Tr. Br. at 32. USA Choice argues that it "purchased the circuits [with the] intent to 'get some quantity of dedicated circuits so that [its] customer[s] [could] call into [its] network.' " *Id.* at 33 (quoting Tr. 159:19-21 (Test. of Phillips)). USA Choice argues that by terminating a call when a caller fails to properly authenticate that he or she is a USA Choice customer, USA Choice demonstrates its priority of use. Pl.'s Post-Tr. Br. at 33. Therefore, according to USA Choice, the services at issue entitle USA Choice to priority use of communication channels.

The government maintains that USA Choice "has the exclusive or priority use of *one end* of the line [but] does not have exclusive or priority use of the *channel* because anyone can dial the associated phone number and use the channel to communicate with" USA Choice. Def.'s Post-Tr. Br. at 17-18. This argument creates an artificial distinction. A "line" is a "physical medium for transferring electrical or electromagnetic energy from one point to another for purposes of communications." *Telecommunications Glossary* at L-5. A channel, "a connection between initiating and terminating nodes of a circuit," *Telecommunications Glossary* at C-9, uses a line. A node is defined as the "terminal of any branch of a network or an interconnection common to two or more branches of a network," *Telecommunications Glossary* at N-7. The nodes between which the services at issue provide communications channels are USA Choice's POPs and the local telephone company's central office. The government is correct that USA Choice did not have *exclusive* use of the communication channels at issue,FN33 but the dispositive question is whether USA Choice was entitled to *priority* use of the channels.

> FN33. The government, to support its position that the services did not provide

"exclusive" use, argues the ability of non-USA Choice customers to "access plaintiff's phone lines by dialing the associated phone number" renders the "use of the lines [to be] not in plaintiff's exclusive control." Def.'s Post-Tr. Resp. at 15-16. The government argues that USA Choice "did not have 'exclusive' use of the lines" because it lacked the "power to exclude." *Id.* at 18. The government thus would make a distinction between termination of unwanted calls and the ability to prevent unwanted calls in the first instance. *Id.* at 15-16. This distinction might suffice to show that USA Choice did not enjoy "exclusive" use of the channels but it does not show that USA Choice did not have "priority" use.

The government asserts the services at issue are indistinguishable for purposes of the "priority use" inquiry from the "regular analog telephone service" a homeowner might purchase. Def.'s Post-Tr. Br. at 17 (arguing USA Choice "did not have exclusive or priority use ... any more than" a homeowner might have). In doing so, the government ignores that so-called "regular analog telephone service," unlike some of the services at issue, does not provide a specially configured circuit for which there is a separate charge in addition to a charge for access to the local exchange. The government reaches even further afield in arguing that USA Choice "did not have 'priority' use of the lines" because other local telephone system subscribers could use the phone lines to call USA Choice's modems "without deferring to plaintiff's use of the lines." Def.'s Post-Tr. Resp. at 18. The government ignores that the services at issue provide channels that another telephone subscriber could effectively use only to call USA Choice for internet access if the subscriber was one of USA Choice's customers. These were not lines where multiple telephone service subscribers would share the same loop on an equal basis. *See Telecommunications Glossary* at P-3. USA Choice was not required to yield to anyone in its use of these communication channels.

3. *Use by the communication service "subscriber."*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73 Fed.Cl. 780                                                                                                  Page 24
73 Fed.Cl. 780, 98 A.F.T.R.2d 2006-7815, 2006-2 USTC P 70,262
(Cite as: 73 Fed.Cl. 780)

The government points to the language of the statute ("communication service furnished to a *subscriber* which entitles the *subscriber* ... to exclusive or priority use," **\*801** I.R.C. § 4252(d)(1) (emphasis added)), and argues that USA Choice alone, not USA Choice and its customers, is the subscriber to the services at issue. Def.'s Post-Tr. Resp. at 15. This ignores that the use by USA Choice's customers of the channels at issue is by dint of their relationship with USA Choice. A dial-up customer pays money to USA Choice, and USA Choice adds to its database the dial-up customer's username and password, allowing the customer to establish and maintain an internet connection. Every time a dial-up customer connects to USA Choice over these channels, USA Choice is using the channels to provide a service to its customers.

### 4. A "separate charge."

To qualify for the private-communication exemption, "plaintiff must show that it paid 'a separate charge' " for the services. *Western Electric,* 564 F.2d at 58. USA Choice avers that the channels are invoiced as "non-basic service," separate from "basic service." Pl.'s Post-Tr. Br. at 34-35. According to Mr. Phillips, the "basic service" charges covered only the telephone number. Tr. 49:21-23, 54:25 to 55:1, 55:6-14.

The ALLTEL DCS invoice categorizes all charges as "basic service" but under that heading lists separate charges for the "access charge" and the "DCS Digital ACC facility." PX 5 at 1B. Thus, ALLTEL charged USA Choice for the DCS facilities separately from the access charges related to local telephone service. Similarly, for the BRA service ALLTEL provided USA Choice at Brookville, ALLTEL charged USA Choice separately for the BRA service, differentiating between charges for the basic service (the telephone number) and for the non-basic service (the advanced digital service). PX 5 at 245-272. In addition, the government's expert, Dr. Hills, described services provided by ALLTEL on two lines, 825-512-0339 and 825-513-0397, as being for "private line[s]." Tr. 262:15-17; DX 3 at 2. The government concedes that a refund is appropriate for the excise tax paid on the charges for these lines. Def.'s Resp. at 24. Accordingly, USA Choice is entitled to a refund of communi-

nications excise tax paid on the charges that relate to the ALLTEL DCS and BRA facilities and to telephone numbers 825-512-0339 and 825-513-0397.

The Verizon invoice for the IntelliLinQ service showing the long distance service charge does not show a separate charge for the communication channels or groups of communication channels separate from local telephone service. *See* PX 8 at 3. Similarly, the Sprint PRI invoices do not show separate charges for local telephone service from the "ISDN voice/data channel" charges. *See* PX 5 at 61-64. Therefore, no refund of the corresponding tax is appropriate for those services.

### C. The Excise Tax on Toll Telephone Service

When USA Choice filed its claim for refund of excise taxes with the IRS, the explanation USA Choice attached to Form 8849 described the claim for refund as involving "dial up access and ISP network lines." Complaint at Ex. A (Form 8849). Specifically, USA Choice averred "the purchases by the [t]axpayer included in this refund request were exclusively for the [t]axpayer's customer access to the internet." *Id.* USA Choice now also seeks a refund of the communications excise taxes it paid for toll telephone (long distance) service.[FN34] USA Choice has **\*802** not satisfied the jurisdictional prerequisites for bringing that particular claim before this court. USA Choice did not raise with the IRS its claim for a refund as to toll telephone service, and that claim "substantially varies" from the claims it did raise such that it cannot now be considered. *See Lockheed Martin,* 210 F.3d at 1371.

> FN34. Respecting the toll-telephone charges, USA Choice may not invoke the refund procedure the IRS established in Notice 2006-50, 2006-25 I.R.B. 1141, 2006 WL 1452787, in which the IRS announced its acquiescence in court decisions holding that, under I.R.C. § 4252(b)(1), taxable toll telephone service did not include those services for which a toll charge did not vary in amount according to both the distance and duration of calls. *See American Bankers Ins. Group v. United States,* 408 F.3d 1328 (11th

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73 Fed.Cl. 780                                                                 Page 25
73 Fed.Cl. 780, 98 A.F.T.R.2d 2006-7815, 2006-2 USTC P 70,262
**(Cite as: 73 Fed.Cl. 780)**

Cir.2005); *OfficeMax, Inc. v. United States,*
428 F.3d 583 (6th Cir.2005); *National R.R.*
*Passenger Corp. v. United States,* 431 F.3d
374 (D.C.Cir.2005); *Fortis v. United States,*
447 F.3d 190 (2d Cir.2006); *Reese Bros. v.*
*United States,* 447 F.3d 229 (3d Cir.2006);
*America Online,* 64 Fed.Cl. at 577-78. The
IRS, in Notice 2006-50, sets forth a proced-
ure by which taxpayers filing income tax or
certain information returns may request a
credit or refund for an excise tax erro-
neously collected under I.R.C. § 4252(b)(1).
Notice 2006-50 § 5. This procedure applies
only to "tax paid on services that were billed
to customers after February 28, 2003." *Id.* §
1(b). All the invoices presently at issue pre-
cede that date. Accordingly, Notice 2006-50
would not provide USA Choice with an av-
enue for relief regarding these amounts.

### CONCLUSION

For the reasons stated, USA Choice is awarded judg-
ment for refund insofar as it paid communications ex-
cise taxes from January 1999 through April 2002 on
incoming-only PRI channels purchased from ALL-
TEL and Verizon and its predecessors and on private-
communication DCS and BRA channels obtained
from ALLTEL plus the private lines associated with
telephone numbers 825-512-0339 and 825-513-0397.
Charges for these channels and services are not tax-
able as local telephone service, in the first instance
because the services are not covered by the definition
of such service in the Internal Revenue Code, and in
the second instance because the services are exemp-
ted from the definition.

Because USA Choice has prevailed only in part, the
parties shall confer in an endeavor to resolve the spe-
cific amount of the refund due and shall submit a
reckoning of the amount on or before December 10,
2006, by agreement if possible, or separately, if
agreement is not possible. Final judgment will there-
after be entered.

IT IS SO ORDERED.

Fed.Cl.,2006.

USA Choice Internet Service, LLC v. U.S.
73 Fed.Cl. 780, 98 A.F.T.R.2d 2006-7815, 2006-2
USTC P 70,262

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 2

Part III - Administrative, Procedural, and Miscellaneous

Communications Excise Tax; Toll Telephone Service

Notice 2006-50

SECTION 1.  PURPOSE

(a) In general.  As further described in this notice, the Internal Revenue Service will follow the holdings of Am. Bankers Ins. Group v. United States, 408 F.3d 1328 (11th Cir. 2005) (ABIG); OfficeMax, Inc. v. United States, 428 F.3d 583 (6th Cir. 2005); Nat'l R.R. Passenger Corp. v. United States, 431 F.3d 374 (D.C. Cir. 2005) (Amtrak); Fortis v. United States, 2006 U.S. App. LEXIS 10749 (2d Cir. Apr. 27, 2006); and Reese Bros. v. United States, 2006 U.S. App. LEXIS 11468 (3d Cir. May 9, 2006).  These cases hold that a telephonic communication for which there is a toll charge that varies with elapsed transmission time and not distance (time-only service) is not taxable toll telephone service as defined in § 4252(b)(1) of the Internal Revenue Code.  As a result, amounts paid for time-only service are not subject to the tax imposed by § 4251.  Accordingly, the government will no longer litigate this issue and Notice 2005-79, 2005-46 I.R.B. 952, which states otherwise, is revoked.

(b) Credits and refunds.  Taxpayers may be entitled to request credit or refund of the excise taxes paid for the services covered by this notice.  This notice provides guidance regarding these requests.  In addition, the Commissioner will authorize the scheduling of an overassessment under § 6407

2

to keep the period of limitations open for these requests. This overassessment will apply to all taxpayers and to all taxes paid for the services covered by this notice beginning with the tax paid on services that were billed to customers after February 28, 2003.

SECTION 2. BACKGROUND

(a) In general--(1) Tax imposed. Section 4251(a)(1) imposes a tax on amounts paid for communications services.

(2) Payment of tax. Section 4251(a)(2) provides that the tax imposed shall be paid by the person paying for the service (taxpayer). Section 4251(b)(2) provides that the applicable percentage is 3 percent of amounts paid for communications services.

(3) Collection of tax. Section 4291 provides that the tax is collected by the person receiving the payment (collector). In most cases, the collector, which is also responsible for paying over the tax to the government, is the telecommunications company that provides the communications services to the taxpayer.

(b) Definitions--(1) Communications services. Section 4251(b)(1) provides that the term communications services means (A) local telephone service; (B) toll telephone service; and (C) teletypewriter exchange service. This notice does not address teletypewriter exchange service.

(2) Local telephone service. Section 4252(a) provides that local telephone service means (1) the access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone

3

or radio telephone stations constituting a part of such local telephone system; and (2) any facility or service provided in connection with such a service. Local telephone service does not include any service that is a toll telephone service as defined in § 4252(b) or a private communications service as defined in § 4252(d). This notice does not address private communications service.

(3) <u>Toll telephone service</u>--(i) <u>Time and distance</u>. Section 4252(b)(1) provides that toll telephone service includes a telephonic quality communication for which there is a toll charge that varies in amount with the distance and elapsed transmission time of each individual communication and for which the charge is paid within the United States.

(ii) <u>Periodic charge for a specified area</u>. Section 4252(b)(2) provides that toll telephone service also includes a service which entitles the subscriber, upon payment of a periodic charge (determined as a flat amount or upon the basis of total elapsed transmission time), to the privilege of an unlimited number of telephonic communications to or from all or a substantial portion of the persons having telephone or radio telephone stations in a specified area which is outside the local telephone system area in which the station provided with this service is located.

(c) <u>Rev. Rul. 79-404</u>. Rev. Rul. 79-404, 1979-2 C.B. 382, concludes that a long distance telephone call for which the charge varies with elapsed transmission time but not with distance is toll telephone service described in § 4252(b)(1).

4

(d) Notice of proposed rulemaking. In a notice of proposed rulemaking (68 FR 15690; April 1, 2003), the Service proposed an amendment to the Facilities and Services Excise Taxes Regulations to provide that toll telephone service described in section 4252(b)(1) may include a communication service for which the charge does not vary with the distance of each individual communication.

(e) Recent litigation. ABIG, OfficeMax, Amtrak, and Reese Bros. hold time-only service is not toll telephone service as defined in § 4252(b)(1). Further, ABIG, OfficeMax, and Reese Bros. hold that the communications service provided was not a service described in § 4252(b)(2) because the end result was not a "periodic charge" based on total elapsed time but rather a monthly bill based on a summation of toll charges for individual communications. (In Amtrak, toll telephone service described in § 4252(b)(2) would have been exempt from tax under the common carrier exception in § 4253(f).) ABIG, OfficeMax, Amtrak, and Reese Bros. also hold that the communications services provided were not local service, notwithstanding the access the services provided to the local telephone system. (Fortis affirms, in a per curiam opinion, a district court decision reaching the same results.)

(f) Notice 2005-79. Notice 2005-79, 2005-46 I.R.B. 952, states that the Service will continue to assess and collect the tax imposed by § 4251 on all taxable communications services, including those similar to the services in ABIG.

SECTION 3. TERMS DEFINED

The following terms are defined solely for purposes of this notice:

226

5

(a) Bundled service. Bundled service is local and long distance service provided under a plan that does not separately state the charge for the local telephone service. Bundled service includes, for example, Voice over Internet Protocol service, prepaid telephone cards, and plans that provide both local and long distance service for either a flat monthly fee or a charge that varies with the elapsed transmission time for which the service is used. Telecommunications companies provide bundled service for both landline and wireless (cellular) service.

(b) Local-only service. Local-only service is local telephone service, as defined in § 4252(a), provided under a plan that does not include long distance telephone service or that separately states the charge for local service on its bill to customers. The term also includes services and facilities provided in connection with service described in the preceding sentence even though these services and facilities may also be used with long distance service. See, for example, Rev. Rul. 72-537, 1972-2 C.B. 574 (telephone amplifier); Rev. Rul. 73-171, 1973-1 C.B. 445 (automatic call distributing equipment); and Rev. Rul. 73-269, 1973-1 C.B. 444 (special telephone).

(c) Long distance service. Long distance service is telephonic quality communication with persons whose telephones are outside the local telephone system of the caller.

(d) Nontaxable service. Nontaxable service means bundled service and long distance service.

227

6

SECTION 4.  EFFECT OF ABIG, OFFICEMAX, AMTRAK, FORTIS, AND REESE BROS.

(a) Tax treatment of communications service after ABIG, OfficeMax, Amtrak, Fortis, and Reese Bros.  The Service will follow ABIG, OfficeMax, Amtrak, Fortis, and Reese Bros.  Accordingly, taxpayers are no longer required to pay tax under § 4251 for nontaxable service.  In addition, collectors or taxpayers may request a refund of tax paid under § 4251 on nontaxable service that was billed to the taxpayers during the period after February 28, 2003, and before August 1, 2006 (the relevant period).

(b)  Tax on local-only service.  Collectors should continue to collect and pay over the § 4251 tax on amounts paid for local-only service.  As noted in section 3(b) of this notice, local-only service includes amounts paid for facilities or services provided in connection with local telephone service.  Thus, for example, tax will continue to be imposed on amounts paid by a taxpayer for renting an amplifier phone provided in connection with local telephone service that is subject to tax.

(c) Effect on collectors.  Collectors are directed to cease collecting and paying over tax under § 4251 on nontaxable service that is billed after July 31, 2006, and are not required to report to the IRS any refusal by their customers to pay any tax on nontaxable service that is billed after May 25, 2006.  Collectors should not pay over to the IRS any tax on nontaxable service that is billed after July 31, 2006.  The form will require collectors to certify that for the third quarter of 2006 that the § 4251 tax reported on the Form 720 does not include any tax on

228

7

nontaxable service that was billed after July 31, 2006. Consequently, the IRS will deny all taxpayer requests for refund of tax on nontaxable service that was billed after July 31, 2006. All such requests should be directed to the collector. In addition, collectors may repay to taxpayers the tax on nontaxable service that was billed before August 1, 2006, but are not required to repay such tax. Collectors may also request a refund or make an adjustment to their separate accounts, as appropriate, subject to the provisions of § 6415 and section 5(d)(4) of this notice. Collectors must continue to collect and pay over tax under § 4251 on amounts paid for local only service.

SECTION 5. REQUESTS FOR CREDIT OR REFUND

(a) In general--(1) Request must follow this notice. The Commissioner agrees to credit or refund the amounts paid for nontaxable service if the taxpayer requests the credit or refund in the manner prescribed in this Notice.

(2) Form of request. Taxpayers may request a credit or refund of tax on nontaxable service that was billed after February 28, 2003, and before August 1, 2006, only on their 2006 Federal income tax returns. For this purpose, the 2006 income tax return is the income tax return for calendar year 2006 or for the first taxable year including December 31, 2006. Forms 1040 (series), 1041, 1065, 1120 (series), and 990-T will include a line for requesting the overpayment amount. Persons that are not otherwise required to file a federal income tax return must nevertheless file a return to obtain the credit or refund. Except as provided in section 5(d)(4) of this notice, a request for this credit or refund on any other form (such as a Form 720, 843, or 8849) will not be processed by the

8

Service. Taxpayers will be permitted to request the safe harbor amount under paragraph (c) of this section only if they have paid all taxes billed by their service provider after February 28, 2003, and before August 1, 2006.

(3) Guidance on the form. The instructions to the respective federal income tax return forms will provide additional guidance. The forms and instructions will require taxpayers to certify that (1) the taxpayer has not received from the collector a credit or refund of the tax paid on nontaxable service billed during the relevant period and (2) the taxpayer will not ask the collector for a credit or refund of that tax and has withdrawn any such request that was previously submitted. The instructions will also require that taxpayers, except for those individuals using the safe harbor amount, retain records that substantiate the request. These records should include bills from the collector that show the amount of tax charged for nontaxable service for each month during the relevant period and receipts, canceled checks, or other evidence that the amount requested was actually paid.

(b) Period of request. The Commissioner will authorize the scheduling of an overassessment under § 6407 to preserve the period of limitations during which taxpayers may request refunds of the tax on nontaxable service that was billed to customers after February 28, 2003, and before August 1, 2006. Therefore, requests may be made for credits or refunds of tax paid for nontaxable service billed after February 28, 2003 and before August 1, 2006.

(c) Amount of the request--(1) Requests by individual taxpayers--(i) Safe harbor amount. Individual taxpayers may request a safe harbor amount. No

9

documentation will be required to be submitted or kept to support the safe harbor request. However, taxpayers will be permitted to request the safe harbor amount only if they have paid all taxes billed by their service provider after February 28, 2003, and before August 1, 2006; have not received a credit or refund of these taxes from the service provider, and either have not requested such a credit or refund from the service provider or have withdrawn any such request. The amount of this safe harbor is still under consideration and will be announced in later guidance.

(ii) Actual amount. Taxpayers that do not request the safe harbor amount may request a credit or refund of the actual amount of tax they paid.

(d) How to file--(1) Requests by individual taxpayers. Individual taxpayers may request a credit or refund of federal excise taxes paid on nontaxable service only on their 2006 Form 1040, 1040A, or 1040-EZ, Individual Income Tax Return. Individuals who are not otherwise required to file a federal income tax return must nevertheless file Form 1040EZ-T to request the credit or refund. Individual taxpayers, including Schedule C filers, may request either the safe harbor amount or the actual amount of tax paid for nontaxable service.

(2) Requests by taxpayers other than individual taxpayers. Taxpayers other than individual taxpayers (entities) may request only the actual amount of tax paid on nontaxable service billed during the relevant period. No safe harbor amount is allowed for entities.

(3) Requests by entities--(i) In general. Entities may request a credit or refund of federal excise taxes paid on nontaxable service only on their 2006

income tax returns. Any part of the credit or refund attributable to tax payments that were deducted as an ordinary and necessary business expense (including in the determination of unrelated business taxable income) must be included in income for the taxable year in which the refund is received or accrued to the extent that the tax payments reduced the amount of federal income tax (or unrelated business income tax) imposed.

(ii) Partnerships. A partnership, as defined in § 7701(a)(2), may request a credit or refund of federal excise taxes paid on nontaxable service only on its 2006 Form 1065, U.S. Return of Partnership Income. Any amount of the credit or refund included in partnership income and any interest on the credit or refund must be reported on the partnership's return for the taxable year in which received or accrued and must be allocated to its partners on the Schedule K-1, Partner's Share of Income, Credits, Deductions, etc., for that taxable year.

(iii) S Corporations. An S Corporation, as defined in § 1361, may request a credit or refund of federal excise taxes paid on nontaxable service only on its 2006 Form 1120S, U.S. Income Tax Return for an S Corporation. Any amount of the credit or refund included in S Corporation income and any interest on the credit or refund must be reported on the S Corporation's return for the taxable year in which received or accrued and must be allocated to its shareholders on the Schedule K-1, Shareholder's Share of Income, Credits, Deductions, etc., for that taxable year.

(iv) Estates and trusts. An estate or a trust, as defined in § 301.7701-4(a) of the Procedure and Administration Regulations, may request a credit or refund

11

of federal excise taxes paid on nontaxable service only on its 2006 Form 1041,

U.S. Income Tax Return for Estates and Trusts. Any amount of the credit or

refund included in the estate's or trust's income and any interest on the credit or

refund must be reported on the estate's or trust's Form 1041, U.S. Income Tax

Return for Estates and Trusts, for the taxable year in which received or accrued.

However, for a trust that is treated as owned by the grantor or other person under

subpart E (§ 671 and following), part I, subchapter J, chapter 1 of the Internal

Revenue Code (grantor trust), the owner of the trust may request a credit or

refund of federal excise taxes treated as paid by the owner for nontaxable

service only on its applicable 2006 federal tax return.

(v) Tax exempt organizations. An organization that is described in

§ 501(a) may request a credit or refund of federal excise taxes paid on

nontaxable service only on its 2006 Form 990-T, Exempt Organization Business

Income Tax Return. Tax exempt organizations that are not otherwise required to

file a federal income tax return must nevertheless file Form 990-T to request the

credit or refund. Any amount of the credit or refund included in the organization's

unrelated business taxable income must be reported on the organization's Form

990-T, Exempt Organization Business Income Tax Return, for the taxable year in

which received or accrued. An organization that is subject to tax on its interest

income must also report any interest on the credit or refund on its Form 990-T,

Exempt Organization Business Income Tax Return, for the taxable year in which

received or accrued.

233

12

(vi) <u>Corporations</u>. A corporation, as defined in § 7701(a)(3), that is not described in section 5(d)(3)(iii) of this notice may request a credit or refund of federal excise taxes paid on nontaxable service only on its 2006 Form 1120 (series) income tax return (generally, Form 1120, U.S. Corporation Income Tax Return). Any amount of the credit or refund included in the corporation's income and any interest on the credit or refund must be reported on the corporation's income tax return for the taxable year in which received or accrued. Corporations that are not otherwise required to file a federal income tax return must nevertheless file Form 1120 (series) to request the credit or refund

(vii) <u>Other nonfiling entities</u>. Entities that are not otherwise required to file a federal income tax return must file Form 990-T to request the credit or refund.

(4) <u>Requests and adjustments by collectors</u>--(i) <u>Section 6415 conditions to allowance</u>. The conditions to allowance described in § 6415 apply to all requests and adjustments by collectors, as defined by section 2(a)(3) of this notice. Thus, a request by a collector is allowed only if the person that paid over the tax establishes that it has repaid the amount of the tax to the person from whom the tax was collected, or obtains the written consent of such person to the allowance of the credit or refund.

(ii) <u>Requests for regular method collectors</u>--(A) <u>In general</u>. A person that collected the tax imposed by § 4251 on nontaxable service and paid it over to the government based on amounts actually collected under § 40.6302(c)-1(a)(2)(i) of the Excise Tax Procedural Regulations (regular method collectors) may request a credit or refund.

13

(B) Form of the request. Regular method collectors may use Form 720X, Amended Quarterly Federal Excise Tax Return, line 1, IRS No. 22, for credit or refund of amounts collected and repaid to taxpayers.

(iii) Account adjustments for alternative method collectors. A person that collected the tax imposed by § 4251 on nontaxable service and paid it over to the government based on amounts considered as collected under § 40.6302(c)-1(a)(2)(ii) (alternative method collectors) may adjust the separate account for the amount of an overpayment. The required adjustment to the separate account is described in § 40.6302(c)-3(b)(2)(ii)(C). The adjustment is reflected on Form 720, Schedule A, line 2, but may not reduce tax liability on Form 720 below zero.

(e) Interest on the credit or refund included in income. If a taxpayer requests a credit or refund of the actual amount of tax paid, interest on the credit or refund of the tax paid for nontaxable service must be included as income on the taxpayer's income tax return for the taxable year in which the interest is received or accrued. Thus, individuals are generally required to report the interest on their 2007 income tax returns.

(f) Estimated tax effects. Although the credit or refund allowed to a taxpayer under this notice will be requested on the taxpayer's income tax return, it is not a credit against tax for purposes of §§ 6654 and 6655. Accordingly, the taxpayer may not take the credit or refund into account in determining the amount of the required installments of estimated tax for 2006. In determining the amount of the required installments of estimated tax for 2007, the income

235

14

attributable to the credit or refund is taken into account on the date the income is paid or credited in the case of a cash method taxpayer and on the date the return making the request is filed in the case of an accrual method taxpayer.

(g) Requests that do not follow the provisions of this notice. Requests that do not follow the provisions of this notice (whether filed before or after its publication)--

(1) Will not be processed to the extent they relate to the tax paid on nontaxable service that was billed after February 28, 2003; and

(2) Will be processed normally to the extent they relate to the tax paid on nontaxable service that was billed before March 1, 2003.

SECTION 6.  EFFECT ON OTHER DOCUMENTS

Notice 2005-79, 2005-46 I.R.B. 952, is revoked.  Rev. Rul. 79-404, 1979-2 C.B. 382, will be revoked in a later revenue ruling.

SECTION 7.  DRAFTING INFORMATION

The principal author of this notice is Taylor Cortright of the Office of the Associate Chief Counsel (Passthroughs and Special Industries).  For further information regarding this notice, contact (202) 622-3130 (not a toll-free call).

**Exhibit 3**

Part III – Administrative, Procedural, and Miscellaneous

Communications Excise Tax; Toll Telephone Service

Notice 2007-11

SECTION 1. PURPOSE

This notice amplifies, clarifies, and modifies Notice 2006-50, 2006-25 I.R.B. 1141. That notice provides that the tax imposed by § 4251 of the Internal Revenue Code (relating to communications excise tax) does not apply to amounts paid for long distance service and bundled service (collectively, nontaxable service) and also provides that taxpayers may request a credit or refund of tax on nontaxable service that was billed to the taxpayer after February 28, 2003, and before August 1, 2006, only on their 2006 federal income tax returns. This notice--

(a) Provides the conditions under which individual taxpayers may use the standard amounts announced in IR-2006-137 (August 31, 2006) on their 2006 federal income tax returns to request a credit or refund of the excise tax paid on nontaxable service;

(b) Provides guidance regarding the Business and Nonprofit Estimation Method, announced in IR-2006-179 (November 16, 2006);

(c) Answers questions that have been raised since the issuance of Notice 2006-50; and

2

(d) Modifies the requirement for claims filed on or before May 25, 2006.

SECTION 2.  BACKGROUND

For the statutory background of the tax imposed by § 4251, see section 2 of Notice 2006-50.  When used in this notice, local-only service, long distance service, and nontaxable service have the meaning given to the terms in section 3 of Notice 2006-50. Bundled service has the meaning given to the term by section 5 of this notice.

SECTION 3.  STANDARD AMOUNT

(a)  Conditions to allowance of standard amount.  A request for credit or refund of the standard amount, instead of the actual amount of federal communications excise tax paid for nontaxable service, may be made on a 2006 Form 1040 Series, U.S. Individual Income Tax Return, if any person filing the return, or any dependent listed on the return--

(1) Paid for any nontaxable service (other than for a prepaid telephone card or prepaid cellular telephone) that was billed to the taxpayer after February 28, 2003, and before August 1, 2006;

(2) Paid all federal communications excise taxes billed by their telecommunications provider after February 28, 2003, and before August 1, 2006;

(3) Has not received a credit or refund of these taxes from the telecommunications provider;

(4) Has not requested a credit or refund from the telecommunications provider or, if so requested, has withdrawn any such request; and

(5) Did not file any other claim or request for credit or refund with the IRS for the federal communications excise tax for a period after February 28, 2003.

3

(b) Calculating standard amounts--(1) In general--(i) 2006 Form 1040 Series (other than EZ). To determine the standard amount, taxpayers must first determine the number of exemptions for which they are entitled on their 2006 Form 1040 Series federal income tax return (other than the 2006 Form 1040 EZ). The Instructions to the 2006 Form 1040 Series federal income tax return and Publication 501, Exemptions, Standard Deduction, and Filing Information, provide guidance on determining the correct number of exemptions. Once the individual determines the number of exemptions, the individual can select the appropriate standard amount based upon the number of those exemptions. Individuals should refer to the 2006 federal income tax return instructions to ensure that the standard amount is entered on the appropriate part of the return.

(ii) 2006 Form 1040 EZ. On line 5, a taxpayer that checks the box for "you" is treated as having one exemption. A taxpayer that checks the boxes for "you" and "spouse" is treated as having two exemptions.

(2) Amounts--(i) For each 2006 Form 1040 Series federal income tax return filed showing one exemption for purposes of determining the standard amount, the standard amount allowed on that return is $30.

(ii) For each 2006 Form 1040 Series federal income tax return filed showing two exemptions for purposes of determining the standard amount, the standard amount allowed on that return is $40.

(iii) For each 2006 Form 1040 Series federal income tax return filed showing three exemptions for purposes of determining the standard amount, the standard amount allowed on that return is $50.

4

(iv) For each 2006 Form 1040 Series federal income tax return filed showing four or more exemptions for purposes of determining the standard amount, the standard amount allowed on that return is $60.

(c) Interest. The standard amount represents both the overpayment of the federal communications excise tax paid on nontaxable service and the interest on that overpayment.

(d) Actual Amounts. To request a credit or refund for the actual amount of federal communications excise tax paid, taxpayers must complete Form 8913, Credit for Federal Telephone Excise Tax Paid, and attach that form to their 2006 Form 1040 Series federal income tax return.

(e) Examples. The following examples illustrate the application of this section.

Example 1. A, an individual, files a joint return with Z, A's spouse. A meets the conditions to allowance described in paragraph (a) of this section. A used the 2006 federal income tax return instructions to determine that their correct number of exemptions is two. A may request the credit or refund of the federal communications excise tax under § 4251 for $40.

Example 2. B, an individual, used the 2006 federal income tax return instructions to determine that she had one exemption. B further used her telephone bills for the period March 1, 2003, through July 31, 2006, to determine that the total amount paid for federal communications excise tax under § 4251 for nontaxable service to all telecommunications providers was $45. Completing Form 8913 and attaching it to her 2006 Form 1040 Series federal income tax return, B may request a credit or refund of $45, the actual amount she paid in federal communications excise tax on nontaxable

5

service under § 4251. As an alternative, B may request a credit or refund of the standard amount of $30 without having to complete Form 8913.

SECTION 4. DISTINCTION BETWEEN LOCAL-ONLY SERVICE AND BUNDLED SERVICE

(a) Technology for transmitting telephone call. The method for sending or receiving a call, such as on a landline telephone, wireless (cellular) telephone or some other method, does not affect whether a service is local-only or bundled.

(b) Combined local exchanges. If two or more telecommunications providers combine their resources to expand the geographic area that each treats as "local" service and each bills its customers for that service as local-only service, then that service is local-only service.

(c) Billing method. Section 3(a) of Notice 2006-50 and section 5 of this notice provide that bundled service is local and long distance service provided under a plan that does not separately state the charge for the local telephone service. Thus, if local and long distance service is billed to a customer on a single bill but the telecommunications company separately states the amount paid for local-only service and the amount paid for long distance service, the amount paid for local-only service is subject to federal communications excise tax.

(d) Examples. The following examples illustrate the application of this section.

Example 1. Customer A purchases telecommunications service from B, a telecommunications provider. Such service includes both local-only service and long distance service. B's bill to A states $X for telecommunications service. The bill does not separately state a charge for either local-only service or long distance service.

242

6

Since the bill does not separately state the charge for local-only service, the service is a

bundled service. Thus, the entire amount of A's telecommunications service is bundled

service and thus nontaxable service.

Example 2. Customer C purchases telecommunications service from D, a

telecommunications provider. Such service includes both local-only service and long

distance service. D's bill to C states $X amount for telecommunications service. The

bill further states $Y amount for local-only service and $Z amount for long distance

service. Since the charges for local-only service and long distance service are

separately stated, the service is not bundled service. Accordingly, only the amounts

charged for long distance service are for nontaxable service; tax is imposed on the

amounts paid for the local-only service.

SECTION 5. CLARIFICATION OF DEFINITION OF BUNDLED SERVICE

(a) Present definition. Section 3(a) of Notice 2006-50 defines bundled service as

local and long distance service provided under a plan that does not separately
state the charge for the local telephone service. Bundled service includes, for
example, Voice over Internet Protocol service, prepaid telephone cards, and
plans that provide both local and long distance service for either a flat monthly
fee or a charge that varies with the elapsed transmission time for which the
service is used. Telecommunications companies provide bundled service for
both landline and wireless (cellular) service.

(b) Reason for clarification. The example in the second sentence of the definition

of bundled service incorrectly assumes that all Voice over Internet Protocol (VoIP)

service would provide both local and long distance service and that the charges for the

two services would not be separately stated. As noted in section 4(a) of this notice, the

method of transmitting a call is not a factor in determining whether a service is local-only

7

or bundled. Accordingly, a VoIP service that provides local-only service is treated as

local-only service.

(c) Revised definition. Accordingly, the definition of bundled service is clarified to

read as follows:

Bundled service is local and long distance service provided under a plan that
does not separately state the charge for the local telephone service. Bundled
service includes plans that provide both local and long distance service for either
a flat monthly fee or a charge that varies with the elapsed transmission time for
which the service is used. Telecommunications companies provide bundled
service for both landline and wireless (cellular) service. If Voice over Internet
Protocol service provides both local and long distance service and the charges
are not separately stated, such service is bundled service.

SECTION 6. PREPAID TELEPHONE CARDS (PTC)

(a) In general--(1) Prepaid telephone cards. Section 4251(d) and § 49.4251-4 of

the Facilities and Services Excise Taxes Regulations provide rules for prepaid

telephone cards (PTC). Section 49.4251-4(b) defines PTC as a card or similar

arrangement that permits its holder to obtain a fixed amount of communications

services by means of a code (such as a personal identification number (PIN)) or other

access device provided by the carrier and to pay for those services in advance. The

amount paid for PTCs is determined under the rules of §§ 4251(d)(1) and (2) and

§ 49.4251-4(c). Under this notice, the PTC will be treated as nontaxable service unless

a PTC expressly states it is for local-only service.

(2) Other cards. This section does not address cards that permit the holder to

purchase various services in addition to telecommunications services. Such services

include, but are not limited to, ring tone downloads, music downloads, text messaging,

picture messaging, web browsing, game downloads, or screen saver downloads.

(b) Application of the tax--(1) Definitions. Section 49.4251-4(b) provides that--

244

8

(i) <u>Carrier</u> means a telecommunications carrier as defined in 47 U.S.C. 153.

(ii) <u>Holder</u> means a person that purchases other than for resale.

(iii) <u>Transferee</u> means the first person that is not a carrier to whom a PTC is transferred by a carrier.

(2) <u>Imposition, liability, and collection.</u> Section 4251(d) provides that the § 4251 tax is imposed on the transfer of a PTC to a transferee; § 49.4251-4(d)(1) provides that the person liable for the tax is the transferee and that the person responsible for collecting the tax generally is the carrier transferring the PTC to the transferee. Section 49.4251-4(d)(1) further provides that if a holder purchases a PTC from a transferee reseller, the amount the holder pays for the PTC is not treated as an amount paid for communications services and thus tax is not imposed on that payment.

(c) <u>Person eligible to request credit or refund.</u> The transferee is the person liable for the tax paid on a PTC and thus generally is the person eligible to request a credit or refund of the tax it paid. The carrier is eligible to request a credit or refund only if it meets the conditions of section 5(d)(4) of Notice 2006-50. The holder is not liable for the tax and thus cannot request a credit or refund.

SECTION 7. PREPAID CELLULAR TELEPHONES

(a) <u>In general</u>--(1) <u>Prepaid cellular telephones</u>. Certain telecommunications providers offer wireless (cellular) telecommunications service on a prepaid service basis (prepaid telephones) whereby a customer purchases the cellular telephone with a set number of minutes available for telecommunications. When the customer exhausts the number of minutes on the prepaid telephone, the customer may purchase additional minutes. The customer does not enter into a contract with the telecommunications

9

provider; there are no service charges after the additional purchase and no monthly

bills. Under this notice, the prepaid telephone will be treated as nontaxable service

unless the terms of the prepaid telephone service expressly state it is for local-only

service.

(2) Other prepaid cellular telephones. This section does not address

arrangements that permit the holder to purchase various services in addition to

telecommunications services. Such services include, but are not limited to, ring tone

downloads, music downloads, text messaging, picture messaging, web browsing, game

downloads, or screen saver downloads.

(b) Application of the tax. Rules similar to the rules for PTCs, as described in

section 6 of this notice, apply to prepaid telephones. Thus, the person liable for tax is

the person (transferee) that buys the prepaid telephone from the telecommunications

provider (carrier) and the carrier is responsible for collecting the tax. Any holder of a

prepaid telephone (that is, a person that buys the prepaid telephone other than for

resale) is not liable for tax.

(c) Person eligible to request credit or refund. The transferee is the person liable

for the tax paid on a prepaid telephone and thus generally is the person eligible to

request a credit or refund of the tax it paid. The carrier is eligible to request a credit or

refund only if it meets the conditions of section 5(d)(4) of Notice 2006-50. The holder is

not liable for the tax and thus cannot request a credit or refund.

SECTION 8. CHARGES IN CONNECTION WITH LOCAL-ONLY SERVICE

(a) Background. Section 3(b) of Notice 2006-50 defines local-only service as

including certain services and facilities provided in connection with local telephone

10

service, even though these services may also be used in connection with long distance service. As examples, the notice cites to Rev. Rul. 72-537, 1972-2 C.B. 574 (telephone amplifier), Rev. Rul. 73-171, 1973-1 C.B. 445 (automatic call distributing equipment), and Rev. Rul. 73-269, 1973-1 C.B. 444 (special telephone).

(b) Subscriber line charges. In addition to the examples in paragraph (a) of this section, amounts paid for subscriber line charges, which are described in Rev. Rul. 87-108, 1987-2 C.B. 260, are also amounts paid for local telephone service. This charge may appear on a bill as "Federal Access Charge," "Customer or Subscriber Line Charge," or "Interstate Access Charge."

(c) Universal service fees--(1) Background. All telecommunications companies that provide interstate and international telecommunications service contribute to the federal Universal Service Fund (USF). Their contributions support four Universal Service programs established and overseen by the Federal Communications Commission (FCC). Some telecommunications companies recover their contribution to the USF directly from their customers by billing them for this charge. The FCC does not require companies to pass on these costs to their customers. Each company makes a business decision about whether and how to recover USF costs. A company that separately states this charge on a bill may call it a "Federal Universal Service Fee" or "Universal Connectivity Fee."

(2) Application. Because telecommunications providers charge the USF to their customers in connection with their customers' long distance service, amounts paid for separately stated USF amounts are not amounts paid for local-only service.

11

SECTION 9. PERSON TO MAKE REQUEST IF TAXPAYER IS NO LONGER IN
BUSINESS OR DECEASED

Neither Notice 2006-50 nor this notice create any special rules regarding the
person to request a credit or refund of tax for a taxpayer that no longer exists or is
deceased. The same rules that apply to requests for credits or refunds of other federal
taxes also apply to similar requests of the tax imposed under § 4251. These rules
depend upon the facts and circumstances relating to the reasons that the taxpayer no
longer exists. The Form 8913 Instructions and Publication 559, Survivors, Executors,
and Administrators, provide general guidance for taxpayers regarding deceased
taxpayers.

SECTION 10. EFFECT OF NOTICE 2006-50 ON STATE AND LOCAL
TELECOMMUNICATIONS TAXES

Neither Notice 2006-50 nor this notice affect the ability of state or local
governments to impose or collect telecommunication taxes under the respective
statutes of those governments.

SECTION 11. NO OBLIGATION OF TELECOMMUNICATIONS PROVIDERS TO
SUPPLY RECORDS TO CUSTOMERS

The IRS has been asked to require telecommunications providers to supply their
customers with those customers' telecommunications bills for periods after February 28,
2003, and before August 1, 2006. Neither Notice 2006-50 nor this notice requires
telecommunications providers to supply billing records to their customers.

12

SECTION 12. BUSINESS AND NONPROFIT ESTIMATION METHOD

(a) In general. This section provides rules for the Business and Nonprofit Estimation Method (EM) that eligible entities may use to determine the amount of their credit or refund for nontaxable service. Eligible entities may, but are not required to, use the EM instead of the actual amount of federal communications excise tax they paid on nontaxable service to calculate the amount of their credit or refund.

(b) Definitions. The following definitions apply to this section.

(1) Eligible entity means--

(i) Any--

(A) Business entity (including a corporation or partnership);

(B) Trust or estate;

(C) Tax-exempt organization; and

(D) Individual owner of rental property and any self-employed individual (including an independent contractor, sole proprietor, or farmer) but only if the individual (including a married couple filing a joint return) reports gross rental and business income totaling more than $25,000 on his or her 2006 federal income tax return;

(ii) That was in operation during any time from March 1, 2003 through July 31, 2006; and

(iii) That received and paid for telecommunications service that was reflected on bills dated in April 2006 and September 2006.

(2) Total telephone expenses means all amounts paid to every telecommunications provider used by the eligible entity for telephone service that were billed after February 28, 2003, and before August 1, 2006. These amounts include, but

13

are not limited to, amounts paid for long distance service, local-only service, bundled service, 900 number service, universal service fees, federal, state, and local taxes. If an eligible entity is billed for telephone and non-telephone services on one bill each month and does not separately track non-telephone services in its books and records, the entire amount of that bill is included in total telephone expenses. An eligible entity may determine the amount of its total telephone expenses by examining its books and records, including, for example, its general ledger, check register, and canceled checks.

(3) Employee means any person working for the taxpayer full or part time as reported on the eligible entity's Form 941, Employer's Quarterly Federal Tax Return, for the 2nd quarter of 2006, other than any person employed as a household employee, in a non-pay status, on a pension, or an active member of the Armed Forces.

(c) Using the EM to determine the amount of the credit or refund--(1) Determining the federal excise tax as a percentage of the telephone bill--(i) First, determine the amount of federal communications excise tax on all telephone bills dated in April 2006 and all telephone bills dated in September 2006. The amount is generally separately stated on the bill as "FET" or "federal tax".

(ii) Next, for all the April telephone bills and all the September telephone bills, divide the amount of federal communications excise tax included on the bills by the total telephone expenses on the bills. The resulting amounts are the April and September percentages, respectively.

(iii) Next, subtract the September percentage from the April percentage. For purposes of this notice, this amount is the federal excise tax percentage (FETP).

(2) Capping the FETP--(i) Determine the number of employees.

14

(ii) For taxpayers with 250 or fewer employees, the FETP is capped at 2 percent.

(iii) For taxpayers with more than 250 employees, the FETP is capped at 1 percent.

(d) Calculating the amount of the credit or refund--(1) Records kept on a monthly basis. If the entity has maintained its telephone expense records on a monthly basis, multiply the FETP amount by the taxpayer's monthly total telephone expenses for each month of the 41 month period from March 2003 through July 2006. The product of this calculation is the taxpayer's credit or refund amount.

(2) Records kept on an annual basis. If the entity has maintained its telephone expense records on an annual basis rather than a monthly basis, prorate its annual amount equally to each month of that year. Thus, for example, a taxpayer maintaining annual telephone expense records for 2003 would divide its total telephone expenses by 12. Next, the taxpayer would use that monthly amount to complete the calculations for the credit or refund amount for 2003.

(e) Actual Amounts. Use of the EM is optional. Taxpayers may use the actual amounts paid for federal communications excise tax for nontaxable service to determine the amount of their credit or refund.

(f) Examples. The following examples illustrate the application of this section.

Example 1--(i) Facts. Business A has 250 employees. A's April 2006 telephone bill is $1,700, including federal communications excise tax of $47.60. A's September 2006 telephone bill is $1,600, including federal communications excise tax of $24.00. A's total telephone expenses, for which it does not have monthly records, are as follows:

15

2003 - $10,800.00

2004 - $16,000.00

2005 - $20,000.00

2006 - $20,571.37.

(ii) Determining the April and September percentages. A's April percentage is 2.8 percent (47.60 ÷ 1,700). A's September percentage is 1.5 percent (24 ÷ 1,600).

(iii) Determining the FETP. The difference between A's April percentage and September percentage is 1.3 percent (2.8 - 1.5). Thus, the FETP is 1.3 percent.

(iv) Capping the FETP. Because A's number of employees does not exceed 250, A's FETP is not capped at 1 percent.

(v) Prorating. Because A did not maintain its total telephone expense records by month, it prorates those amounts equally to each month within the March 2003 – July 2006 period for each particular year. For 2003, A divides its total telephone expense of $10,800 by 12 and multiplies that result by 10 (the number of months between March and December). ([10,800 ÷ 12] x 10 = 9,000.) For 2006, A divides its total telephone expense of $20,571.37 by 12 and multiplies that result by 7 (the number of months between January and July). ([20,571.37 ÷ 12] x 7 = 12,000.)

(vi) Calculating the amount of the credit or refund. Using the EM, the amount of A's credit or refund is calculated as follows:

2003:   $9,000 x .013 = $117 (117÷10 = 11.7) Monthly amount $11.70

2004: $16,000 x .013 = $208 (208÷12 = 17.33) Monthly amount $17.33

2005: $20,000 x .013 = $260 (260÷12 = 21.67) Monthly amount $21.67

2006: $12,000 x .013 = $156 (156÷7 = 22.29) Monthly amount $22.29

16

(vii) Reporting the credit or refund amounts on Form 8913--(A) Because the credit or refund period does not align with the calendar quarters, Form 8913 requires taxpayers to report the credit or refund amounts in 13 three-month intervals and one two-month interval. Thus, A would report credit or refund amounts on Form 8913 as follows:

March, April, May 2003 - $35.10 (11.70 x 3 = 35.10)

June, July, August 2003 - $35.10 (11.70 x 3 = 35.10)

September, October, November 2003 - $35.10 (11.70 x 3 = 35.10)

December 2003, January, February 2004 - $46.36 (11.70 + [17.33 x 2] = 46.36)

March, April, May 2004 - $51.99 (17.33 x 3 = 51.99)

June, July, August 2004 - $51.99 (17.33 x 3 = 51.99)

September, October, November 2004 - $51.99 (17.33 x 3 = 51.99)

December 2004, January, February 2005 - $60.67 (17.33 + [21.67 x 2] = 60.67)

March, April, May 2005 - $65.01 (21.67 x 3 = 65.01)

June, July, August 2005 - $65.01 (21.67 x 3 = 65.01)

September, October, November 2005 - $65.01 (21.67 x 3 = 65.01)

December 2005, January, February 2006 - $66.25 (21.67 + [22.29 x 2] = 66.25)

March, April, May 2006 - $66.87 (22.29 x 3 = 66.87)

June, July 2006 - $44.58 (22.29 x 2 = 44.58)

(B) After determining the amount of credit or refund using the EM, A reports the amounts on Form 8913, and attaches the Form 8913 to A's 2006 federal income tax return.

17

Example 2. The same facts as Example 1 except that A has 500 employees.

A's FETP is capped at 1 percent. Thus, A must make the same calculation as in

Example 1 to determine the proper amount of A's credit or refund of federal

communications excise tax using the FETP of 1 percent, rather than 1.3 percent.

SECTION 13. FORM 1040EZ-T, REQUEST FOR REFUND OF FEDERAL

TELEPHONE EXCISE TAX

Individuals who do not have to file a federal income tax return and who meet the

conditions for requesting a refund of the federal communications excise tax may file

Form 1040EZ-T to request the refund. Individuals requesting a refund of actual

amounts of federal communications excise tax paid must complete Form 8913 and

attach that form to the Form 1040EZ-T.

SECTION 14. MODIFICATION OF PROVISION REGARDING REQUESTS FOR

CREDIT OR REFUND

(a) Present requirement. Section 5(g) of Notice 2006-50 provides as follows:

Requests that do not follow the provisions of this notice. Requests that do not
follow the provisions of this notice (whether filed before or after its publication)--
(1) Will not be processed to the extent they relate to the tax paid on nontaxable
service that was billed after February 28, 2003; and
(2) Will be processed normally to the extent they relate to the tax paid on
nontaxable service that was billed before March 1, 2003.

(b) Reason for modification. Many of the pending refund claims that were filed on

or before May 25, 2006, include refund claims for nontaxable service that was billed

before March 1, 2003, and after February 28, 2003. In the interest of sound tax

administration and efficiency, the IRS will process all claims for credit or refund that

were filed on or before May 25, 2006.

18

(c) Revised requirement. Accordingly, section 5(g) of Notice 2006-50 is modified

to read as follows:

> (1) Requests that do not follow the provisions of Notice 2006-50 and that were
> filed on or before May 25, 2006, will be processed normally.
> (2) Requests that were filed on or after May 26, 2006, and do not follow the
> provisions of Notice 2006-50, will not be processed to the extent they relate to
> the tax paid on nontaxable service that was billed after February 28, 2003.

SECTION 15.  EFFECT ON OTHER DOCUMENTS

Notice 2006-50 is amplified, clarified, and modified.

SECTION 16. DRAFTING INFORMATION

The principal author of this notice is Barbara B. Franklin of the Office of the

Associate Chief Counsel (Passthroughs and Special Industries).  For further information

regarding this notice, contact 202-622-3130 (not a toll-free number).

Hearing Date and Time: July 10, 2007 at 10:00 a.m. (New York City Time)

WEIL, GOTSHAL & MANGES LLP
Attorneys For Reorganized Debtors
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Pérez, Esq. (AP 3629)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------x
                                   :
**In re**                          :    **Chapter 11 Case No.**
                                   :
**WORLDCOM, INC., et al.,**        :    **02-13533 (AJG)**
                                   :
                                   :    **Jointly Administered**
            **Debtor.**            :
--------------------------------------------------------------x

### NOTICE OF ADJOURNMENT

PLEASE TAKE NOTICE that the hearing to consider the Reorganized

Debtors' Motion for Leave to File Supplemental Authorities Regarding Their Objection to

Proof of Claim No. 38365 (Department of Treasury Administrative Expense Claim) [docket

no. 18883], (the "Motion") scheduled to be heard on June 12, 2007, at 10:00 a.m. (New York

City Time) has been adjourned to **July 10, 2007, at 10:00 a.m. (New York City Time).** By

agreement of the Parties, the hearing on the Motion will be held at the above time before

Honorable Arthur J. Gonzalez, United States Bankruptcy Judge, in Room 523 of the United

States Bankruptcy Court for the Southern District of New York, One Bowling Green, New

York, New York.

Dated: Houston, Texas
      May 29, 2007

                                         */s/  Alfredo R. Pérez*
                                         Marcia L. Goldstein, Esq. (MG 2606)
                                         Lori R. Fife, Esq. (LF 2839)

                                         WEIL, GOTSHAL & MANGES LLP
                                         767 Fifth Avenue
                                         New York, New York   10153-0119
                                         Telephone:  (212) 310-8000
                                         Facsimile:  (212) 310-8007

                                                 and

                                         Alfredo R. Pérez, Esq. (AP 3629)

                                         WEIL, GOTSHAL & MANGES LLP
                                         700 Louisiana, Suite 1600
                                         Houston, Texas   77002
                                         Telephone:  (713) 546-5000
                                         Facsimile:  (713) 224-9511

                                         Attorneys for Reorganized Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| WORLDCOM, INC., et al., | : | Case No. 02-13533 (AJG) |
|  | : |  |
| Reorganized Debtors. | : | (Confirmed Case) |
|  | : |  |

## ORDER DENYING REORGANIZED DEBTORS' MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITIES REGARDING THEIR OBJECTION TO PROOF OF CLAIM NO. 38365 (DEPARTMENT OF TREASURY ADMINISTRATIVE EXPENSE CLAIM)

Upon consideration of the Motion of the Reorganized Debtors for leave to file supplemental authorities regarding their objection to Proof of Claim No. 38365, the Court denies the Motion and the relief requested therein. As the Court was previously aware of the supplemental authorities the Debtors wish to bring to the Court's attention, the Court finds that the Motion was moot when filed.

Accordingly, it is hereby

ORDERED that leave to file the Notice of Supplemental Authorities, attached as Exhibit A to the Motion, is denied.

Dated: New York, New York
       June 1, 2007

                                   **s/Arthur J. Gonzalez**
                                   UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT       FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK
_____

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| WORLDCOM, INC., et al., | : | Case No. 02-13533 (AJG) |
|  | : |  |
| Reorganized Debtors. | : | (Confirmed Case) |
|  | : |  |
|  | : |  |

_____:

OPINION GRANTING REORGANIZED DEBTORS' OBJECTION TO PROOF OF CLAIM
NO. 38365 AND MOTION FOR A DETERMINATION OF REFUND RIGHTS PURSUANT
TO SECTION 505(a)(1) OF THE BANKRUPTCY CODE


A P P E A R A N C E S

WEIL, GOTSHAL & MANGES LLP
Attorneys for the Debtors
767 Fifth Avenue
New York, NY 10153-0119

       Marcia L. Goldstein, Esq.
       Lori R. Fife, Esq.
       Alfredo R. Pérez, Esq.

MICHAEL J. GARCIA
United States Attorney
Southern District of New York
86 Chambers Street, 3rd Floor
New York, NY 10007

       Danna Drori, Esq.
       Nicole Guerin, Esq.

ARTHUR J. GONZALEZ
United States Bankruptcy Judge


I. INTRODUCTION

       Before the Court is Proof of Claim No. 38365 (the "IRS Claim"), filed by the Internal

Revenue Service ("IRS") on behalf of the United States of America, the Reorganized Debtors'

Objection to Proof of Claim No. 38365 (the "Objection"), and the Reorganized Debtors' Motion for a Determination of Refund Rights Pursuant to Section 505(a)(1) of the Bankruptcy Code (the "Refund Motion"). The parties' dispute concerns the Reorganized Debtors' liability for the telecommunications excise tax due pursuant to 26 U.S.C. §§ 4251 *et seq* (the "Telecommunications Excise Tax" or "Excise Tax") with respect to central office based remote access ("COBRA") services the Reorganized Debtors purchased. Having reviewed the parties' pleadings, and hearings having been held on this matter, the Court concludes that the Objection and the Motion should be granted.

II. JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. § 1334 and under the July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.). This is a "core" proceeding pursuant to 28 U.S.C § 157(b)(2)(B). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408, 1409.

11 U.S.C. § 505 grants the Court jurisdiction to "determine the amount or legality of any tax, any fine or penalty related to a tax, or any addition to tax…." subject to two exceptions not applicable here. In addition, the Debtors previously filed claims for refund with the IRS in satisfaction of 26 U.S.C. § 7422(a) and Treas. Reg. § 301.6402-2(b)(1). Accordingly, the Court may properly adjudicate the IRS Claim and the Refund Motion.

III. BURDEN OF PROOF

Although claimants typically bear the burden of proof, and in the case of administrative claims, the burden of production as well, the IRS Claim represents a federal tax assessment. "In general a government tax assessment is entitled to a presumption of correction. A taxpayer who

2

wishes to challenge the validity of the assessment, moreover, bears the burden both of production

and of persuasion." *US v. McCombs*, 30 F.3d 310, 318 (2d Cir. 1994) (citations omitted). As the

underlying substantive law determines the burden of proof vis-à-vis a proof of claim in

bankruptcy proceedings, *Raleigh v. Illinois Dept. of Rev.*, 530 U.S. 15, 120 S.Ct. 1951, 147

L.Ed.2d 13 (2000), the Debtors accordingly bear the burden of proof regarding both the

Objection and the Refund Motion.

III. FACTUAL BACKGROUND

      WorldCom, Inc., and in particular, its subsidiaries UUNET Technologies, Inc.

("UUNET") and MCI WorldCom Network Services, Inc. ("MWNS") (collectively, the

"Reorganized Debtors" or "Debtors"), constructed, maintained, and sold access to computer

networks. The Debtors' networks were in turn linked to other computer networks, collectively

forming the global digital communications network generally described as the Internet. The

Debtors' networks were among the largest in the world.

      The Debtors provided a range of network access services to a variety of customers. In

addition to providing network access directly to residential and business customers, the Debtors

also operated as an "upstream" and "wholesale" Internet Service Provider ("ISP"), selling access

and transit rights on their networks to independent ISPs, who in turn used those access and

transit rights to provide network access to their own business and residential customers.[1] The

dispute here concerns services the Debtors purchased in connection with these latter businesses.

      In order to access an ISP's network connections to the Internet, a customer is required to

establish a connection between her computer and the ISP's servers located at the ISP's Point-of-

---

[1] "Upstream" ISPs generally operate large networks and provided network access to more local networks with fewer inter-network connections; generally, "upstream" refers to the transmission of information up a network hierarchy. "Wholesale" ISPs generally sell and provide network access to virtual ISPs who sell network access to end-users but do not themselves operate networks.

3

Presence ("POP") or hub.  Prior to the widespread deployment of broadband Internet access services, such as Digital Subscriber Lines ("DSL") and cable television network connections, ISPs typically provided Internet access to their customers through the telephone system, more specifically known as the Public Switched Telephone Network ("PTSN").  The customer dialed a telephone number associated with the ISP's POP, thereby establishing a connection between the customer's computer and the ISP's server.  As the local loop,[2] that portion of the PSTN linking the customer to the Local Exchange Carrier's ("LEC")[3] central offices ("CO"), was generally only capable of or used to carry analog signals, these "dial-up" Internet connections required modems on both sides of the connection that could translate digital signals – from the computers at either end of the connection – into analog signals for transmission across the PSTN and then translate the analog signals received into digital signals useable by the customer's computer or routed through the network by the ISP's servers.

These analog dial-up connections operate at much slower speeds than the high-speed digital connections between the dedicated servers that host much of the information Internet users wish to access.  Accordingly, the upstream connection from the ISP's hub to the Internet is generally capable of greater speeds than the downstream connection over the local loop between the customer and the CO.  Therefore, in order to maximize the efficiency and productivity of their communications networks, the Debtors wished to aggregate a number of dial-up connections into a high-speed data stream that could then be routed into the Debtors' networks.

---

[2] In nearly all instances, the local loop consists of twisted pair copper cables, which run from the CO to the customer's premises.  Voice communication through these copper cables has historically been and continues to largely be analog communication, although much of interconnection between COs is now digital.  Nonetheless, twisted pair copper cables are capable of digital communication and are now used to so communicate, such as with broadband DSL connections.  Thus, while analog communication is often described in reference to communication over copper wires, whereas digital communication is often described in reference to optical communication over fiber optic lines, it is important to distinguish between the medium and the communication method.

[3] Local Exchange Carrier is the regulatory description for local telephone companies, such as Verizon and Qwest.  Central offices are the physical locations at which LECs house the telephone exchange equipment which route calls through the PSTN.

4

In addition, further efficiencies and productivity gains can be realized relative to the location of this aggregation function. By aggregating the dial-up connections at the CO, rather than at the hub, the Debtors could reduce the number of ingress lines from the CO to the hub that the Debtors were required to purchase from the LEC, as well as reducing the costs associated with adding capacity and capabilities to the aggregation system. The Debtors generally referred to this CO-located system as Central Office Based Remote Access ("COBRA"). It is this system that is at issue here.

The COBRA system consists of three basic components. First, dial-up connections are routed from CO switches to the COBRA system through ingress Primary Rate Interface ("PRI") lines, each of which is capable of transmitting 23 separate dial-up connections. These PRI lines terminate in the Network Address Server ("NAS"), which in essence processes and aggregates the dial-up data streams transmitted through the PRI lines. The aggregated streams are then transmitted from the COBRA system to the Debtors' routers located at the Debtors' POP or hub through egress T1 lines. A complete and fully utilized COBRA system has 12 ingress lines and a minimum of 2 egress lines and is capable of receiving and processing 276 distinct dial-up modem connections simultaneously.

As the COBRA system was designed to be located in LECs' COs, the Debtors offered the COBRA system to LECs as an integrated package. The Debtors simultaneously sold complete COBRA systems and contracted to purchase COBRA service on a per port basis. The LECs were responsible for maintaining the physical hardware and switching equipment comprising the COBRA system, while the Debtors had full control over the software operating the COBRA system. The egress connection marked the demarcation point between the COBRA system and the Debtors' networks.

As the Debtors purchased COBRA services from the LECs, the LECs collected the Excise Tax on behalf of the IRS pursuant to section 4251. The Debtors have identified total payments in the amount of $38,297,513 for COBRA services purchased from July 1998 to December 2004.

IV. PROCEDURAL BACKGROUND

On July 21, 2002 (the "Petition Date"), and continuing thereafter, the Reorganized Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code" and "Code"). The Court approved the Reorganized Debtors' Modified Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Reorganization Plan") on October 31, 2003. The Reorganization Plan became effective April 20, 2004. The Reorganized Debtors, renamed MCI, Inc., subsequently merged with Verizon Communications, Inc., on January 6, 2006. Under the merger agreement, MCI, Inc., merged with and into Eli Acquisition LLC as a direct, wholly owned subsidiary of Verizon Communications, Inc. Eli Acquisition LLC, as the surviving entity, was immediately renamed MCI LLC. MCI LLC is now doing business as Verizon Business Global LLC.

On November 30, 2001, February 2, 2002, and January 31, 2005, the Debtors filed IRS Form 8849 Claims for Refund of Excise Taxes paid for COBRA service (collectively, the "Refund Claims"). The Refund Claims totaled $38,297,513. On July 2, 2004, the IRS filed the IRS Claim as an administrative expense claim in the amount of $16,276,440.81, amending Claim No. 37947, which was withdrawn. On August 5, 2004, the Debtors filed the Objection. On November 2, 2005, the IRS filed its Reply to the Objection and the supporting Declaration of Dr. Michael Hills (the "Hills Declaration"). On December 19, 2005, the Debtors filed their Response to the Reply. In addition, on January 31, 2006, the Debtors filed the Refund Motion,

asserting a right to repayment of any excise taxes paid in connection with the purchase of COBRA services.

On February 1, 2006, the Court held a hearing (the "February Hearing") on the IRS Claim and the Objection. At that hearing, the Court heard the expert testimony of the Debtors' witness, John Anderson, director of switch and IP planning for Verizon Business and previously for the Debtors. The Court also heard the expert testimony of the IRS's witness, Dr. Michael T. Hills, President of HTLT Technologies Ltd., a consulting company specializing in network design and optimization.

On March 27, 2006, both parties filed Proposed Findings of Fact and Conclusions of Law as to the IRS Claim and the Objection.

On April 11, 2006, the Court held a hearing (the "April Hearing") for additional arguments regarding the IRS Claim and the Objection.

On May 17, 2007, the Debtors filed a Motion for Leave to File Supplemental Authorities. An order was entered immediately prior to the entry of this opinion denying that motion as moot.

V. DISCUSSION

26 U.S.C. § 4251(a)(1) provides, "There is hereby imposed on amounts paid for communications services a tax equal to the applicable percentage of amounts so paid." "Communications services" are defined in subsection (b)(1) as "(A) local telephone service; (B) toll telephone service; and (C) teletypewriter service." "Local telephone service" is further defined at 26 U.S.C. § 4252(a):

> For the purposes of this subchapter, the term "local telephone service" means –
> (1) the access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and
> (2) any facility or service provided in connection with a service described in paragraph (1).

7

Section 4252(a) also excludes "any service which is a 'toll telephone service' or a 'private communication service as defined in subsection (b) and (d)."

A. Statutory Interpretation

Accordingly, the statute sets forth three principal criteria for determining whether a service is subject to the Excise Tax. First, the purchaser must be provided with "access to a local telephone system." Second, the purchaser must also have "the privilege of telephonic communication." Third, that privilege must extend to "substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system."

Statutory construction requires the presumption that the "legislature says in a statute what it says there." *BedRoc Ltd., LLC v. US*, 541 U.S. 176, 183 S.Ct. 1587, 158 L.Ed.2d 338 (2004) (citations omitted). The inquiry "begins with the statutory text, and ends there as well if the statutory text is unambiguous." *Id.* The words of the statute should be given their ordinary, plain meaning unless the those words are otherwise defined. *Id.* "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). The Court also notes that "[w]hen interpreting federal tax provisions as a matter of law or as a mixed question of law and fact, the statutory language should be given its natural and quotidian meaning and should not be extended by implication to reach other matters." *America Online, Inc. v. US*, 64 Fed.Cl. 571, 576 (2005) (citing *Gould v. Gould*, 245 U.S. 151, 153, 38 S.Ct. 53, 62 L.Ed. 211 (1917). Moreover, if the Court concludes "that there must be doubt as to taxability, then it should be resolved in favor of the taxpayer." *Trans-Lux Corp. v. US*, 696 F.2d 963, 968 (C.A. Fed. 1982) (citing *Western Electric Co. v. US*, 564 F.2d 53, 57 (Ct.Cl. 1977)).

The majority of the parties' arguments concern the second criteria, the "privilege of telephonic quality communication."  The parties agree to certain basic facts, but dispute both the proper interpretation of the statutory language and the more detailed technical capabilities of the COBRA system.  Significantly, both expert witnesses agreed that COBRA service utilizes a telephonic quality path.  The IRS's arguments rest in large part on this fact, as the IRS argues that COBRA service is subject to the Excise Tax because it is dependent on the provision of a telephonic quality path and the transmission of telephonic quality communication.  The Debtors, however, argue that telephonic quality communication should be distinguished from communication traveling over a telephonic quality path.[4]  While the Debtors concede that COBRA service utilizes a telephonic quality path, they contend that COBRA service does not provide telephonic quality communication.  More fundamentally, the parties disagree as to whether the features and characteristics of COBRA service should be analyzed in term of capabilities or actual use, and relatedly, how expansively the capabilities of COBRA service should be assessed.

In *Comdata Network, Inc. v. US*, 21 Cl.Ct. 128 (Cl.Ct. 1990), the taxpayer argued that it did not owe the Excise Tax on its purchase of toll telephone service that was configured to limit outgoing calls to specific locations.  The *Comdata* court disagreed, noting that "the word 'privilege' connotes right…."  *Id*. at 130.  "Accordingly, the tax is applicable because the service provided plaintiff grants it the right to utilize the telephone lines to communicate with a substantial number of stations in a distant area.  That the service may not, in fact, be so used by plaintiff is irrelevant to the existence of the privilege."  *Id*. at 131.  The Court agrees with this

---

[4] Both expert witnesses provided similar, reductive definitions of "telephonic quality communication" as the quality of communication necessary to and present in a voice telephone call.  The statute does not provide a definition of this term.  The parties' dispute concerns in part whether "telephonic quality communication" only requires the ability to transmit voice communication or whether some additional capability, such as the provision of a telephone interface, is required.

9

reasoning.  "Privilege" is clearly a more expansive concept than use.  Privilege allows a certain act or use without regard to what is done in fact.  Therefore, the Court must look to the capability of COBRA service, not its actual use.

However, the concept of privilege is limited to the capabilities of the service as purchased.  As the *Comdata* court further noted, there is a distinction between inherent limitations and voluntary limitations.  The taxpayer in *Comdata* voluntarily limited its use of the purchased service.  In contrast, the *Comdata* court distinguished a service to which the Excise Tax did not apply by recognizing that this latter system "was inherently incapable of being used more expansively."  *Id*.  The *Comdata* court did not further explore the concept of inherent limitation, but inherent limitation should be understood in relation to the capability of the service *as purchased*.  The inherent limitations of a purchased service, that is, its capabilities, define the privileges granted.  If the purchased service is incapable of a certain use – so long as the taxpayer does not unilaterally determine that capability after purchase – it follows that the privilege to use the service in that fashion was not granted or purchased.

The parties have engaged in a detailed discussion regarding the capabilities of COBRA service vis-à-vis telephonic quality communication.  The expert testimony has established that COBRA service translates the audio representations of data into the TCP/IP Internet protocol and then aggregates that digital data into a high-speed data stream.  Beyond this the parties disagree about most facts and their relevance to the legal issues.  For example, the Debtors argue that this high-speed data stream cannot be utilized by telephone equipment such as a Private Branch Exchange ("PBX") to enable communication by telephone between the Debtors and a party connected to the local telephone system.  The IRS argues in response that a PBX can be plugged into and interface with the ingress PRI lines to provide a telephone connection.  Similarly, the

IRS argues that COBRA service can transmit VOIP communication, which is essentially voice communication in TCP/IP form rather than the typical time-division multiplexing (TDM) format used in the PSTN. The Debtors dispute this contention. The Debtors argue first that COBRA service is intended to and does receive dial-up modem communication that effectively travels at speeds much lower than that necessary to carry voice communication at a telephonic quality. Mr. Anderson testified that whereas voice communication requires transmission at 64 kilobytes per second, the dial-up modems that use COBRA service have a maximum speed of 53 Kbps and in practice typically only carry data at only 33 or 24 Kbps, depending on whether the data is traveling to or from the end user (dial-up user). Anderson further testified that voice communication traveling at those lower speeds would sound garbled and unintelligible to anyone receiving it. The Debtors also argue that the modem cards in the COBRA system are incapable of supporting VOIP communication, and that they are contractually precluded from using COBRA service in that fashion. These and other arguments the parties raise highlight the difficulty in applying statutes drafted in relation to existing technologies to new technologies.

However, the Court need not resolve these issues, as a sufficient basis in uncontested fact exists to resolve the Objection and the Refund Motion in favor of the Debtors. The third statutory element discussed previously requires that the privilege of telephonic quality communication be "*with* substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system." (emphasis added). As the court noted in *USA Choice Internet Service, Inc. v. US*, 73 Fed.Cl. 780, 792-795 (2006), this language should be contrasted with similar, but distinct language in section 4252(b)(2) defining "toll telephone service." That subsection defines, in part, such service as "a service which entitles the subscriber, upon payment of a periodic charge … to the privilege of an unlimited number of

11

269

telephonic communications *to or from* all or a substantial portion of the persons having telephone or radio telephone stations...." (emphasis added).

This distinction, between the use of "with" in section 4252(a) and the use of "to or from" in section 4252(b)(2), suggests that the concept of privilege incorporates some element of directionality. Most obviously, "to or from" could signify that the relevant service need not include the privilege to both receive and originate telephonic quality communication, whereas the use of "with" would signify that both privileges are required. Alternatively, the distinction could be conceptualized in terms of one-way as opposed to two-way communication; a beeper service, for example, would provide only one-way communication whereas CB, or citizen's band, radio provides for two-way communication. However, the term "telephonic quality communication" incorporates the concept of two-way communication. Telephone service is distinguished from other communication methods in that it is two-way, or "full-duplex," communication; indeed, the parties' expert witnesses defined "telephonic quality communication" as two-way communication. Moreover, section 4252(b)(2) describes services such as toll-free calling, whereby the recipient of a call agrees to pay the charges for the initiator of the call. Such services provide two-way communication but may be configured to only provide either call reception or call origination. For example, the service at issue in *Comdata* provided the ability to originate calls charged at bulk rates and was distinguished from a complementary service that provided incoming toll-free calling at bulk rates. *Comdata*, 21 Cl.Ct. at 129-130. Accordingly, the Court concludes that section 4252(a) requires that the taxpayer have the privilege to both initiate and receive telephonic quality communication. *See also*, *XO Comm., Inc. v. U.S.*, 99 A.F.T.R.2d 2007-473 (finding the reasoning of the court in *USA Choice* "well-reasoned and persuasive").

It is uncontested that the PRI ingress lines that route the incoming dial-up connections to the COBRA system are configured as Direct-Inward-Dial (DID) lines. *See* Transcript, February Hearing, 89:17-90:19, 187:23-188:3. DID lines allow for call reception but do not allow for call origination. Accordingly, COBRA service does not provide the Debtors with "the privilege of telephonic quality communication *with* substantially all telephone or radio telephone stations constituting a part of such local telephone system…." (emphasis added).

The IRS contends that the barriers to call origination are self-imposed, reflecting the business choices of the contracting parties. The IRS further argues that these self-imposed limitations are not inherent limitations as described in *Comdata*, which the IRS suggests arise only in relation to technical limitations or barriers. This argument simply cannot be accepted. First, the Debtors purchased COBRA service as a complete package, which package only utilized DID lines. It is certainly possible that the Debtors could have requested and paid for call origination capability, but the fact remains that they did not. The IRS has not persuasively argued why the Debtors' liability should be accessed on the basis of what the LECs could have offered but did not, or what the Debtors could have purchased but did not. Moreover, the IRS's definition of technical capability is so expansive as to be almost limitless. The IRS argues that COBRA service can originate calls with the installation of new modem cards and the use of bi-directional PRI lines. This is certainly true, but the IRS has not argued why the Court may look to such possible changes but not look to changes that would allow, for example, access to a cellular telephone network. The Debtors could obtain such functionality by adding the necessary equipment. Neither call origination nor cellular network interconnection is necessary to the Debtors' use of COBRA service, but the IRS argues that the Court should ignore the first without

distinguishing the latter.[5]  The Court thus reiterates its conclusion that the capability of COBRA

service must be assessed as purchased, not in relation to possible configurations.  Simply, the

Debtors only have the privileges that they purchased.

The IRS further argues in the alternative that under section 4252(a)(2) COBRA service is

a "facility or service provided in connection with a service described" in section 4252(a)(1).  The

IRS does not fully develop this argument by identifying the local telephone service COBRA

service is provided in connection with, nor does the IRS detail how COBRA service is provided

"in connection with" whatever local telephone service would be identified.  Presumably, the IRS

would argue that COBRA service is provided in connection with general local telephone service

or the local telephone service purchased by dial-up users accessing the COBRA system, as

COBRA service is dependent on access to the local telephone system in order to function.

However, that COBRA service is dependent on access to the local telephone system is not a

sufficient basis upon which to conclude that COBRA service is subject to the Excise Tax under

section 4252(a)(2).  Section 4252(a)(1) defines "local telephone service" in relation to three

criteria, one of which is access to the local telephone system.  If section 4252(a)(2) were to be

interpreted to apply the Excise Tax to any service or facility that accessed the local telephone

system, then the other two criteria specifically set forth in section 4252(a)(1) would be rendered

superfluous.  Moreover, the statute distinguishes between "local telephone service" and the

"local telephone system", and section 4252(a)(2) refers to a "service" not a system.  Similarly,

---

[5] The IRS analogizes to taxpayers who purchase local telephone service but only utilize that service for modem-to-modem communication.  The IRS ruled in Rev. Rul. 79-245 that the purchase of local telephone service is subject to the Excise Tax even though the service is used exclusively for data communication.  Thus, the IRS argues, the actual use of COBRA service, and by extension, its current configuration, is irrelevant.  However, the key distinction the IRS ignores is that the use of local telephone service was at issue in Rev. Rul. 79-245, whereas here the question is whether COBRA service constitutes local telephone service.  That is, the taxpayer in Rev. Rul. 79-245 purchased telephone service identical to that purchased by typical telephone users but sought to distinguish its service based upon the use to which the service was put.  Here, by contrast, the question is whether COBRA service has features sufficiently analogous to typical telephone service and which satisfy the statutory criteria such that the Excise Tax should apply.

liability under section 4252(a)(2) cannot be defined in reference to access to local telephone service purchased by another taxpayer, as the local telephone system is the network of local telephone service provided to other taxpayers; this would simply tax access to the local telephone system by another name.[6]  Finally, deduction requires the conclusion that the taxpayer who is ascribed liability under section 4252(a)(2) must have purchased the "local telephone service" the "facility or service" is provided in connection with.  This is true even though, as the IRS argues, this condition precedent is not specifically stated in section 4252(a)(2).  Accordingly, the Court concludes that COBRA service is not a "facility or service provided in connection with a service described in" section 4252(a)(1).

B. Deference to Revenue Rulings

The IRS also argues that the Court's interpretation of section 4252(a) is contrary to the IRS's interpretation as expressed in relevant revenue rulings (the "Revenue Rulings").  In Rev. Rul. 75-102, the IRS considered telephone time and weather services purchased by organizations wishing to advertise their services that provide callers with the time and date as well as an advertising message.  The IRS ruled that these services constitute "local telephone service" within the meaning of section 4252(a).  Similarly, in Rev. Rul. 77-196, the IRS concluded that automatic call distributing systems, which are only capable of receiving incoming calls, are local telephone services.  Finally, in Rev. Rul. 89-84, the IRS concluded that a service permitting subscribers to call a telephone number and receive information such stock prices, news reports, and sports scores was a "local telephone service" and thus subject to the Excise Tax.  The IRS

---

[6] However, if the facility or service was directly connected to another taxpayer's local telephone service – that is, it was not connected through the local telephone system but through a private connection – and accessed the local telephone system though that other taxpayer's local telephone service, a different conclusion would likely be required.

argues that the Revenue Rulings are entitled to great deference by the Court and impel the

conclusion that COBRA service is a "local telephone service" subject to the Excise Tax.

The level of deference due IRS revenue rulings is an unsettled issue of law.  The

Supreme Court has itself refrained from deciding the issue.  *U.S. v. Cleveland Indians Baseball

Co.*, 532 U.S. 200, 220, 149 L.Ed.2d 401, 121 S.Ct. 1433 (2001) ("We need not decide whether

the Revenue Rulings themselves are entitled to deference.").  The Second Circuit has previously

held that "a Revenue Ruling is entitled to great deference.  It is regarded as representing the

official IRS position on application of tax law to specific facts, and is presumed to have the force

of legal precedent unless unreasonable or inconsistent with provisions of the Internal Revenue

Code."  *Weisbart v. U.S. Dep't of Treasury*, 222 F.3d 93, 99 (2d Cir. 2000) (citations and internal

quotation marks omitted).  *See also Texasgulf, Inc. v. Comm'r*, 172 F.3d 209 (2d Cir. 1999);

*Gillespie v. U.S.*, 23 F.3d 36 (2d Cir. 1994).  This line of cases did not explicitly rely on *Chevron

USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), but the standard applied did

resemble and approximate Chevron deference.  However, after the Second Circuit last

considered the issue in *Weisbart*, the Supreme Court signaled a significant change in its approach

to administrative rulings, refusing in *US v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 150

L.Ed.2d 292 (2001), to accord Chevron deference to a Customs Service tariff classification.  The

Court in *Mead* held that Chevron deference is appropriate only "when it appears that Congress

delegated authority to the agency generally to make rules carrying the force of law, and that the

agency interpretation claiming deference was promulgated in the exercise of that authority"

through "notice-and-comment rulemaking, or by some other indication of Congressional intent."

*Id.* at 226-27.  *See also Christensen v. Harris County*, 529 U.S. 576, 146 L.Ed.2d 61, 120 S.Ct.

1655 (2000) (declining to apply Chevron deference to Department of Labor opinion letter).  As

16

the Second Circuit has recognized, the Court's decision in *Mead* has raised doubts concerning the Circuit's practice of according great deference to revenue rulings. *See Reimels v. Comm'r*, 436 F.3d 344, 347 n.2 (2006). *See also Fortis, Inc. v. U.S.*, 420 F.Supp.2d 166, 178-79 (S.D.N.Y. 2004) ("There is some doubt as to whether revenue rulings are necessarily entitled to [great deference under *Weisbart*] after the Supreme Court's more recent decisions in *Christensen* and *Mead*.").

Indeed, almost all courts confronting the issue post-*Mead* have denied revenue rulings Chevron deference. *See generally* Ryan Morris, Comment, *Substantially Deferring to Revenue Rulings After Mead*, 2005 B.Y.U. L.Rev. 999 (2005). Instead, these courts have relied on the Court's holding in *Mead* that "*Chevron* did nothing to eliminate [the Court's prior holding in *Skidmore v. Swift & Co.*, 323 US 134, 89 L.Ed. 124, 65 S.Ct. 161 (1944)] that an agency's interpretation may merit some deference whatever its form, given the "specialized experience and broader investigations and information" available to the agency, [*Id.*] at 139, and given the value of uniformity in its administrative and judicial understandings of what a national law requires, *Id.* at 140." 533 U.S. at 234-35. *See Christensen*, 526 U.S. at 587 (under *Skidmore*, administrative rulings and interpretations "are entitled to respect … only to the extent that those interpretations have the power to persuade") (citing *Skidmore*, 323 U.S. at 140). *See also US Freightways Corp. v. Comm'r*, 270 F.3d 1137, 1141-42 (7th Cir. 2001) ("After *Mead*, we know that we give full deference under *Chevron* only to regulations that were promulgated with full notice-and-comment or comparable formalities. We also know that deference to agency positions is not an all-or-nothing proposition; more informal agency statements and positions receive a more flexible respect, in which factors like "the degree of the agency's care, its consistency, formality, and relative expertness, and … the persuasiveness of the agency's

17

275

position," are all relevant.) (citing *Mead*, 533 U.S. at 228). In particular, the Sixth, Eighth, Ninth, and D.C. Circuits have all declined to accord revenue rulings, either specifically or generally, Chevron deference and have instead applied only Skidmore deference. *See O'Shaughnessy v. Comm'r*, 332 F.3d 1125, 1130-31 (8th Cir. 2004) ("Accordingly, we conclude that the district court did not err in declining to treat revenue ruling 75-491 as controlling or persuasive authority."); *Aeroquip-Vickers, Inc. v. Comm'r*, 347 F.3d 173, 181 (6th Cir. 2003) ("In light of the Supreme Court's decisions in *Christensen* and *Mead*, we conclude that Revenue Ruling 82-20 should not be accorded *Chevron* deference."); *Omohundro v. U.S.*, 300 F.3d 1065, 1067-68 (9th Cir. 2002) (concluding that, under *Mead*, revenue rulings generally are only entitled to Skidmore deference, but determining that specific revenue ruling at issue was entitled to deference); *Del Commer. Props. v. Comm'r*, 251 F.3d 210, 214 (D.C. Cir. 2001) (noting that revenue rulings are entitled to Skidmore deference and finding that the revenue rulings at issue were persuasive).

In light of the Supreme Court's holding in *Mead*, and the conclusions of the circuit courts that have considered the issue, the Court concludes that the Revenue Rulings are not entitled to Chevron deference. Accordingly, the Court will defer to those revenue rulings insofar as they are persuasive, "the thoroughness evident in [their] consideration, the validity of [their] reasoning, [their] consistency with earlier and later pronouncements, and all those facts which give [them] power to persuade." *Mead*, 533 U.S. at 228. The Court concludes that the Revenue Rulings are not persuasive and thus not entitled to deference.

The Court notes first that Rev. Rul. 75-102 is merely a conclusory recitation of the relevant tax code provisions. Rev. Rul. 75-102 simply states, "The time-of-day and weather forecast services furnished by the telephone company in the instant case provide access to a local

18

276

telephone system and the privilege of telephonic quality communication with all persons having telephones in the system." No analysis of these statutory criteria is provided. Similarly, Rev. Rul. 89-84 cites Rev. Rul. 75-102 and concludes, "The [taxpayer] in this case is no different from an advertiser or any other service provider that wishes to communicate a message or information using the local telephone system." Again, no analysis of the relevant statute is provided. Moreover, neither revenue ruling provides sufficient information to determine whether the purchased service provided both call origination and call reception capabilities even though only the call reception capability was utilized. As the Court previously discussed, actual use of the service is irrelevant if both call origination and call reception capabilities were purchased.

Rev. Rul. 77-196 does provide a fuller discussion of the IRS's interpretation of section 4252(a). Specifically, Rev. Rul. 77-196 states, "In defining taxable local telephone service, section 4252(a)(1) makes no distinction between systems that provide access to a local telephone network only by receiving calls and systems that receive and originate calls." However, the revenue ruling only cites to Rev. Rul. 75-102 in support of this proposition and thus only supports a conclusory statement by reference to another conclusory statement. Neither Rev. Rul. 75-102 nor Rev. Rul. 77-196 consider the import of the difference between the use of "with" in section 4252(a) and "to or from" in section 4252(b). Accordingly, the Court does not find that the Revenue Rulings are persuasive interpretations of the relevant statutory language and declines to defer to those interpretations.

VI. CONCLUSION

In light of the foregoing, the Court concludes that the Objection and the Refund Motion

should be granted.  The Debtors are to settle an order consistent with this opinion.

Dated: New York, New York
   June 1, 2007

          **s/Arthur J. Gonzalez**
          UNITED STATES BANKRUPTCY JUDGE

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By: BENJAMIN H. TORRANCE (BT-1118)
Assistant United States Attorney
86 Chambers Street
New York, New York  10007
Telephone: 212.637.2703
Fax: 212.637.2702

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

| | |
|---|---|
| In re | Chapter 11 |
| WORLDCOM, INC., et al., | Case No. 02-13533 (AJG) |
| Reorganized Debtors. | (Confirmed Case) |

------------------------------------------------------------ x

## NOTICE OF APPEAL

PLEASE TAKE NOTICE that the Internal Revenue Service, by its attorney Michael J.

Garcia, United States Attorney for the Southern District of New York, hereby appeals to the

United States District Court for the Southern District of New York, pursuant to 28 U.S.C.

§ 158(a), from the Order Granting Reorganized Debtors' Objection to Proof of Claim No. 38365

and Motion for a Determination of Refund Rights Pursuant to Section 505(a)(1) of the

Bankruptcy Code, which was entered on June 1, 2007.

The parties to the Order appealed from, and the names and addresses of their respective

attorneys, are as follows:

| | |
|---|---|
| Debtor/Appellee: | WorldCom, Inc. |
| Attorney: | Weil, Gotshal & Manges, LLP |
| | Marcia L. Goldstein, Esq. |
| | Lori R. Fife, Esq. |
| | Alfredo R. Pérez, Esq. |
| | 767 Fifth Avenue |
| | New York, New York 10153-0119 |
| | Telephone: 212.310.8000 |

| | |
|---|---|
| Creditor/Appellant: | Internal Revenue Service |
| Attorney: | Michael J. Garcia |
| | United States Attorney for the Southern District of New York |
| | Benjamin H. Torrance, Esq. |
| | Assistant United States Attorney |
| | 86 Chambers Street |
| | New York, New York 10007 |
| | Telephone: 212.637.2703 |

Dated: New York, New York                    Respectfully submitted,
    June 11, 2007

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for Defendant

By:   /s/ Benjamin H. Torrance
BENJAMIN H. TORRANCE (BT-1118)
Assistant United States Attorney
Telephone: 212.637.2703
Fax: 212.637.2702

2

**Settlement Date and Time: June 26, 2007 @ 12:00 noon (New York City Time)**
**Counter-proposal Deadline: June 25, 2007 @ 4:00 p.m. (New York City Time)**

WEIL, GOTSHAL & MANGES LLP
Attorneys for Reorganized Debtors
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo Pérez, Esq. (AP 3629)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
|                               |   |                          |
|-------------------------------|---|--------------------------|
| **In re**                     | : |                          |
|                               | : | **Chapter 11 Case No.**  |
| **WORLDCOM, INC., et al.,**   | : | **02-13533  (AJG)**      |
|                               | : |                          |
|                               | : | **(Jointly Administered)** |
| **Reorganized Debtors.**      | : |                          |
------------------------------------------------------------------x

### NOTICE OF SETTLEMENT OF ORDER GRANTING REORGANIZED DEBTORS' OBJECTION TO PROOF OF CLAIM NO. 38365 AND MOTION FOR A DETERMINATION OF REFUND RIGHTS PURSUANT TO SECTION 505(a)(1) OF THE BANKRUPTCY CODE

PLEASE TAKE NOTICE that, based upon the Opinion Granting the Reorganized

Debtors' Objection to Proof of Claim No. 38365 and Motion for a Determination of Refund

Rights Pursuant to Section 505(a)(1) of the Bankruptcy Code, entered by the Bankruptcy Court

on June 1, 2007 [docket no. 18918], the Reorganized Debtors referenced above will present the

attached proposed order (the "Proposed Order"). The Proposed Order will be presented for

signature to the Honorable Arthur J. Gonzalez, United States Bankruptcy Judge, in Room 523 of

the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green,

New York, New York, 10004 (the "Bankruptcy Court"), on June 26, 2007, at 12:00 p.m. noon

(New York City Time).

PLEASE TAKE FURTHER NOTICE that counter-proposals, if any, to the

Proposed Order must be in writing, and received in the Bankruptcy Judge's chambers and by the

undersigned no later than 4:00 p.m. (New York City Time), on June 25, 2007. Unless counter-

proposed orders are received by that time, the Proposed Order may be signed by the Bankruptcy

Judge.

Dated:   Houston, Texas
         June 18, 2007

         */s/ Alfredo R. Pérez*
         Marcia L. Goldstein, Esq. (MG 2606)
         Lori R. Fife, Esq. (LF 2839)

         WEIL, GOTSHAL & MANGES LLP
         767 Fifth Avenue
         New York, New York  10153-0019
         Telephone: (212)310-8000
         Facsimile: (212)310-8007

and

         Alfredo R. Pérez, Esq.

         WEIL, GOTSHAL & MANGES LLP
         700 Louisiana, Suite 1600
         Houston, Texas  77002
         Telephone: (713) 546-5000
         Facsimile: (713) 224-9511

         **Attorneys for Reorganized Debtors**

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By: BENJAMIN H. TORRANCE (BT-1118)
Assistant United States Attorney
86 Chambers Street
New York, New York  10007
Telephone: 212.637.2703
Fax: 212.637.2702

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

| In re | : | Chapter 11 |
| | : | |
| WORLDCOM, INC., et al., | : | Case No. 02-13533 (AJG) |
| | : | |
| Reorganized Debtors. | : | (Confirmed Case) |

------------------------------------------------------------ x

### NOTICE OF WITHDRAWAL OF APPEAL WITHOUT PREJUDICE TO RE-FILING

PLEASE TAKE NOTICE that the Internal Revenue Service, by its attorney Michael J.

Garcia, United States Attorney for the Southern District of New York, hereby withdraws the

notice of appeal, filed on June 11, 2007 (Docket #18932), as to the Opinion Granting

Reorganized Debtors' Objection to Proof of Claim No. 38365 and Motion for a Determination of

Refund Rights Pursuant to Section 505(a)(1) of the Bankruptcy Code (the "Opinion"), which was

entered on June 1, 2007 (Docket #18918).

The IRS withdraws its notice of appeal as prematurely filed because the Opinion itself

contained no order but rather a direction to Reorganized Debtors to "settle an order consistent

with" the Opinion. The IRS reserves all of its rights to re-file the notice of appeal once such an

order has been entered by the Court.

Dated: New York, New York
     June 21, 2007

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for Defendant

By:   /s/ Benjamin H. Torrance
       BENJAMIN H. TORRANCE (BT-1118)
       Assistant United States Attorney
       Telephone: 212.637.2703
       Fax: 212.637.2702

2

284

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x

In re                                          :
                                               :    **Chapter 11 Case No.**
**WORLDCOM, INC., et al.,**                    :    **02-13533  (AJG)**
                                               :
                                               :    **(Jointly Administered)**
        **Reorganized  Debtors.**              :
-------------------------------------------------------x

### ORDER GRANTING REORGANIZED DEBTORS' OBJECTION
### TO PROOF OF CLAIM NO. 38365 AND
### MOTION FOR A DETERMINATION OF REFUND RIGHTS
### PURSUANT TO SECTION 505(a)(1) OF THE BANKRUPTCY CODE

Upon consideration of (1) the Reorganized Debtors' Objection to Proof of Claim

No. 38365 (Department of Treasury Administrative Expense Claim), dated August 5, 2004

(Docket No. 12235, the "Objection"), and (2) the Reorganized Debtors' Motion, dated January

31, 2006, for a Determination of Refund Rights Pursuant to Section 505(a) of the Bankruptcy

Code and for Consolidation of that Determination with the Objection Pursuant to Section 105 of

the Bankruptcy Code and Rules 9014 and 7042 of the Federal Rules of Bankruptcy Procedure

(Docket No. 17945, the "Refund Motion"),[1] the Court finds that, as stated on the record at a

hearing on April 11, 2006, the IRS does not oppose the Reorganized Debtors' request for

consolidation of the Objection with the Refund Motion, and the Court further finds that the

Objection and the Refund Motion should be granted for the reasons set forth in the Court's

Opinion Granting the Reorganized Debtors' Objection to Proof of Claim No. 38365 and Motion

for a Determination of Refund Rights Pursuant to Section 505(a)(1) of the Bankruptcy Code,

dated June 1, 2007.[2]  Accordingly, the Court hereby ORDERS that:

---

[1]    References herein to the "Reorganized Debtors" shall also include their predecessors in interest that were debtors in these chapter 11 cases.

[2]    Capitalized terms that are used herein, but not defined, have the meanings ascribed to them in the Court's Opinion.

1.    The Refund Motion is hereby consolidated with the Objection pursuant to Rules 7042 and 9014 of the Federal Rules of Bankruptcy Procedure.

2.    The Reorganized Debtors' Objection to the IRS Claim is hereby granted in all respects. Any and all claims asserted by the United States for Telecommunications Excise Tax assessed in connection with the Reorganized Debtors' purchases of COBRA services,[3] including Proof of Claim No. 38365, are hereby disallowed and expunged in their entirety.

3.    The Reorganized Debtors' Refund Motion is hereby granted.

Accordingly, the IRS shall refund all Telecommunications Excise Tax paid by the Reorganized Debtors for purchases of COBRA services to the extent that such tax was paid during the period beginning July 1, 1998, and ending December 31, 2004.

4.    Unless otherwise ordered by the Court, within 90 days after entry of this Order the Reorganized Debtors shall file and serve an affidavit setting forth the specific amount of the refund due to the Reorganized Debtors (the "Tax Refund"). The United States shall have 60 days to object to the amount of the Tax Refund. If no objection is filed, the Court will enter an order directing the IRS to pay the Tax Refund to the Reorganized Debtors, plus interest provided by law until the Reorganized Debtors receive payment in full from the United States. If an objection is filed, a hearing on the amount of the Tax Refund will be held upon notice to the United States.

---

[3]    For ease of reference, the term COBRA services is used herein to refer generically to central office based remote access services described in the Objection and the Refund Motion, regardless of whether the vendor of such services may have used another name for the service in the operative agreement between the parties.

5.    The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for

the Southern District of New York for the filing of a memorandum of law is waived with respect

to the Objection and the Refund Motion.

New York, New York
_____, 2007

_____
Honorable Arthur J. Gonzalez
United States Bankruptcy Judge

287

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By: BENJAMIN H. TORRANCE (BT-1118)
Assistant United States Attorney
86 Chambers Street
New York, New York  10007
Telephone: 212.637.2703
Fax: 212.637.2702

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

In re                                                              :          Chapter 11
                                                                   :
WORLDCOM, INC., et al.,                                            :          Case No. 02-13533 (AJG)
                                                                   :
                              Reorganized Debtors.                 :          (Confirmed Case)
                                                                   :
------------------------------------------------------------ x

### NOTICE OF APPEAL

PLEASE TAKE NOTICE that the Internal Revenue Service, by its attorney Michael J. Garcia, United States Attorney for the Southern District of New York, hereby appeals to the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 158(a), from the Order Granting Reorganized Debtors' Objection to Proof of Claim No. 38365 and Motion for a Determination of Refund Rights Pursuant to Section 505(a)(1) of the Bankruptcy Code, which was entered on June 22, 2007.

The parties to the Order appealed from, and the names and addresses of their respective attorneys, are as follows:

288

Debtor/Appellee:    WorldCom, Inc.
Attorney:           Weil, Gotshal & Manges, LLP
                    Marcia L. Goldstein, Esq.
                    Lori R. Fife, Esq.
                    Alfredo R. Pérez, Esq.
                    767 Fifth Avenue
                    New York, New York  10153-0119
                    Telephone: 212.310.8000


Creditor/Appellant:    Internal Revenue Service
Attorney:              Michael J. Garcia
                       United States Attorney for the Southern District of New York
                       Benjamin H. Torrance, Esq.
                       Assistant United States Attorney
                       86 Chambers Street
                       New York, New York  10007
                       Telephone: 212.637.2703


Dated: New York, New York                    Respectfully submitted,
       July 2, 2007
                                             MICHAEL J. GARCIA
                                             United States Attorney for the
                                             Southern District of New York
                                             Attorney for the Internal Revenue Service

                                     By:     /s/ Benjamin H. Torrance
                                             BENJAMIN H. TORRANCE (BT-1118)
                                             Assistant United States Attorney
                                             Telephone: 212.637.2703
                                             Fax: 212.637.2702

2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
                                                      :
**In re**                                             :
                                                      :    **Chapter 11 Case No.**
**WORLDCOM, INC., et al.,**                           :    **02-13533(AJG)**
                                                      :
                                                      :    **(Jointly Administered)**
                                                      :
            **Reorganized Debtors.**                  :
-------------------------------------------------------x

### DECLARATION OF JOHN TROFIMUK IN SUPPORT OF
### THE REORGANIZED DEBTORS' MOTION FOR A DETERMINATION OF REFUND
### RIGHTS PURSUANT TO SECTION 505(a)(1)
### OF THE BANKRUPTCY CODE

JOHN TROFIMUK declares pursuant to section 1746 of title 28 of the United

States Code that:

### I.    EXPERIENCE AND QUALIFICATIONS

1.    I am the Director of Network Financial Operations for Verizon Business

Global LLC ("Verizon Business"), successor by merger to the above-captioned debtors and

reorganized debtors (collectively, the "Reorganized Debtors"). In my capacity as Director of

Network Financial Operations, I am responsible for, among other things, the audit and payment

of domestic interconnection, access and other services purchased from telephone companies. I

have worked at Verizon Business or its predecessors for more than ten years.

2.    I am responsible for numerous functions, including the audit and payment

of approximately $4.8 billion in annual third-party domestic telecommunications charges. In

addition, I manage regulated business commitments with domestic telecommunications carriers

pursuant to tariffs filed under the Federal Telecommunications Act. I have a staff of 115

individuals for whom I am responsible.

290

3.     Prior to my employment with the Reorganized Debtors in 1997, I spent fourteen years with AT&T where I managed a wide range of financial and regulatory activities. Before joining the telecommunications industry in 1983, I spent more than five years as an auditor and financial consultant with Arthur Andersen & Co.

4.     I have a Bachelor of Science degree in Accounting from Millikin University, and a Master of Science degree in Management from Northwestern University, and have been a member of the American Institute of Certified Public Accountants for more than twenty-four years.

5.     Although I receive compensation as a Verizon Business employee, I am not being separately compensated for my testimony in this matter. Except as otherwise set forth herein, all statements in this Affidavit are based on my personal knowledge, my familiarity with the Reorganized Debtors' processing and reconciliation of invoices and payments, or my review of relevant documents and data as set forth in Exhibit A to this Affidavit.

6.     I have custody and personal knowledge of the documents and data compilations set forth in Exhibit A. The documents and data compilations set forth in Exhibit A are records from the Reorganized Debtors that were made at or near the time of the occurrence of the matters set forth therein by, or from information transmitted by, a person with knowledge of those matters, were kept in the course of the Reorganized Debtors' regularly conducted business, and were made as part of the Reorganized Debtors' regular business practices. Because these records are voluminous, they are presented here in the form of a summary or calculation. Nevertheless, these records are available for inspection upon reasonable request by the Internal Revenue Service. Should additional information become available, I reserve the right to modify or supplement this Affidavit based on such additional information.

2

7.      If I were called upon to testify, I could and would testify competently to the facts set forth herein. In presenting the matters set forth in this Affidavit at trial, I may use some or all of the documents described in Exhibit A, or excerpts, summaries, and/or enlargements of them. I may also use visual aids and demonstrative exhibits to help me explain these facts.

8.      I submit this Affidavit in support of the Reorganized Debtors' Motion for a Determination of Refund Rights Pursuant to Section 505(a)(1) of the Bankruptcy Code (the "Refund Motion"). Unless otherwise defined, capitalized terms used here have the meanings ascribed to them in the Refund Motion. I am authorized to submit this Affidavit on behalf of the Reorganized Debtors.

## II.    FACTUAL BASIS FOR UUNET'S REFUND CLAIMS

### A.    Overview

9.      UUNET Technologies, Inc. ("UUNET"), a Reorganized Debtor, builds communication networks and sells access to these networks to Internet service providers ("ISPs"). ISPs, in turn, provide their customers access to the ISPs' services via the Reorganized Debtors' networks. In order to build these networks, UUNET used to purchase services generally known as central office-based remote access services ("COBRA") from local exchange carriers ("LECs") such as Verizon, BellSouth, and Qwest.

10.     UUNET has filed three claims with the IRS which seek a refund of federal excise tax paid in connection with purchases of COBRA service.

11.     First, UUNET requested a refund for federal excise tax it paid during the period beginning July, 1998 through December, 1998 (the "First Refund Claim"). A copy of the First Refund Claim is annexed as Exhibit B.

3

12.    Second, UUNET requested a refund for federal excise tax it paid during the period beginning January, 1999 through September, 2001 (the "Second Refund Claim"). A copy of the Second Refund Claim is annexed as Exhibit C.

13.    Third, UUNET requested a refund for federal excise tax it paid during the period beginning October, 2001 through December, 2004 (the "Third Refund Claim"). A copy of the Third Refund Claim is annexed as Exhibit D.

14.    The Third Refund Claim represents a request for the refund of $13,573,017 that was paid to the IRS directly, using IRS Form 5384, after the IRS assessed and collected excise taxes on account of the Reorganized Debtors' purchases of COBRA services (the "Form 5384 Payment"). The Form 5384 Payment indicates that a check for $13,573,017 was hand delivered to the IRS on or about December 17, 2002. Copies of the Form 5384 Payment and the accompanying check for $13,573,017 are annexed as Exhibit E.

15.    I have undertaken a detailed review and analysis of the billing and payment records for purchases of COBRA services. Based upon this review and analysis, I conclude that UUNET paid $11,585,922 in federal excise taxes during the period beginning July, 1998 and ending September, 2001 for its purchases of COBRA services. A summary of UUNET's billing and payment records is annexed as Exhibit F. Specifically, Exhibit F shows monthly excise tax payments to the primary COBRA service vendors between July 1998 and September 2001.

16.    UUNET's books and records therefore support a federal excise tax refund in the total amount of $25,158,939, which represents the sum of the federal excise tax payments set forth in Exhibit F plus the $13,573,017 Form 5384 Payment.

4

17.    My review and analysis of UUNET's billing and payment records is explained more fully below.

**B.    Billing and Payment Records for COBRA Services**

18.    UUNET purchased COBRA services in accordance with the terms and conditions of written agreements with the LECs. The LECs, in turn, invoiced UUNET for such services. LECs assign billing account numbers ("BANs") for all of their services, including the COBRA services they provided to UUNET. These BANs are identified on the invoices for such services.

19.    UUNET received and processed LEC invoices, including services other than COBRA service, by means of an automated bill audit and payment application called "Telco Invoice System," or TIS. As a part of the TIS process, charges on LEC invoices were assigned to various accounting units and general ledger ("G/L") accounts within UUNET based upon the nature of the service purchased and/or the intended use of the purchased services. Invoices for services that supported UUNET's dial-access Internet network, including COBRA services, were assigned to the dial-access network accounting unit within UUNET (the "Dial-Access Unit"). In addition, monthly recurring charges for COBRA services were further assigned to G/L Account 570600.

20.    Identifying the invoices and BANs relating to COBRA service required a multi-step process. Initially, I identified invoices from COBRA vendors which were assigned to the Dial-Access Unit in the TIS system, with monthly recurring charges assigned to G/L Account 570600. Next, available paper copies of those invoices were retrieved from archives. The contents of those invoices were reviewed and examined. Any invoices that were not for COBRA service were removed from further consideration.

5

294

21.     After I segregated the available paper invoices that show charges for COBRA service, I tabulated the amounts invoiced for federal excise tax, if any, in those invoices. The invoices allowed me to identify BANs which include federal excise tax as a component of the charge for COBRA services (the "COBRA FET BANs").

22.     I then reviewed and analyzed UUNET's payment records for each of the COBRA FET BANs. These payment records set forth the date of payment, the invoice number associated with the payment, and the amount of the payment made.

### C.     Excise Tax Payment Calculation

23.     For those months where original invoices from the LECs were available, I calculated the amount of excise tax billed and paid by comparing UUNET's payment records with existing invoices for each of the COBRA FET BANs. For months where an original invoice was unavailable, I reviewed UUNET's payment records. UUNET's payment records reflect the amount billed and the payment made for every COBRA FET BAN for every month, including those for which an original invoice was not available. The percentage of payment attributable to federal excise tax is calculable from the available invoices. By multiplying this percentage against the total payments made in each month I was able to calculate the amount of federal excise tax paid during each billing cycle.

### III.   CONCLUSION

24.     I conclude that UUNET's billing and payment records support a tax refund in connection with the Refund Motion of $25,158,939.

6

I declare under penalty of perjury that the foregoing is true and correct to the best

of my knowledge, information, and belief.

Dated: Chicago, Illinois
November 9, 2007

John Trofimuk

7

# EXHIBIT A

# Exhibit A

1. Monthly invoices from BellSouth Corporation for the time period July 1998 – September 2001.
2. Monthly invoices from Qwest Corporation (formerly US West) for the time period July 1998 – September 2001.
3. Monthly invoices from Verizon Northwest Inc. (formerly GTE) for the time period July 1998 – September 2001.
4. UUNET billing and payable records  - Telco Invoice System (TIS)
5. UUNET accounts payable records - Lawson

# EXHIBIT B

Page 1 of 1

| Form **8849** (Rev. January 2001) | Department of the Treasury—Internal Revenue Service<br>**Claim for Refund of Excise Taxes** | OMB No. 1545-1420 |
|---|---|---|

Please print in ALL CAPITAL LETTERS. Leave a blank box between words.

**Name of claimant**

`U U N B T` `T E C H N O L O G I E S` `I N C`

**Employer identification number (EIN)**

`5 4 . 1 5 4 3 6 1 1`

**Address (number, street, room or suite no.)**

`1 1 3 3 1 9 t h` `s t r e e t , N W`

**Social security number (SSN)**

**City and state or province. If you have a foreign address, see page 2.**

`W a s h i n g t o n D C`

**ZIP code**

`2 0 0 3 6`

**Foreign country, if applicable. Do not abbreviate.**

**Month claimant's income tax year ends**

`1 2`

**Daytime telephone number (optional)**

`2 0 2 7 3 6 6 1 6 9`

**Caution:** *Do not claim any amounts on Form 8849 that were or will be claimed on Schedule C (Form 720), Adjustments and Claims, or Form 4136, Credit for Federal Tax Paid on Fuels.*

## Schedules Attached

Check (✓) the appropriate box(es) for the schedule(s) you attach to Form 8849. Only attach the schedules on which you are claiming a refund. Claims on Schedules 2, 3, 5, and Section 4091(d) claims on Schedule 6, cannot be combined with any other schedules on Form 8849. File each of these schedules with a separate Form 8849.

| | | |
|---|---|---|
| Schedule 1 | Nontaxable Use of Fuels . . . . . . . . . . . . . . . . . . | ☐ |
| Schedule 2 | Sales by Registered Ultimate Vendors of Undyed Diesel Fuel and Undyed Kerosene . . . . . . | ☐ |
| Schedule 3 | Gasohol Blending . . . . . . . . . . . . . . . . . . | ☐ |
| Schedule 4 | Sales by Gasoline Wholesale Distributors . . . . . . . . . . . . | ☐ |
| Schedule 5 | Section 4081(e) Claims . . . . . . . . . . . . . . . | ☐ |
| Schedule 6 | Other Claims . . . . . . . . . . . . . . . | ☒ |

Under penalties of perjury, I declare (1) that I have examined this claim, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and (2) that amounts claimed on this form have not been, and will not be, claimed on any other form.

**Sign Here**

Signature and title (if applicable) _____ Date `11-30-01`

David Mahida     Director, Consumption Taxes
(Please type or print your name below signature)

For Privacy Act and Paperwork Reduction Act Notice, see instructions.     Cat. No. 20027J     Form **8849** (Rev. 1-2001)

[ Return to top of document ]
Click here to download the link templates for your publications.

*We welcome your comments and suggestions on our web site.*
*Please send them to CSINTNET@cch.com*

Copyright © 2001, CCH INCORPORATED. All rights reserved.

| Schedule 6 (Form 8849) (Rev. January 2001) | Department of the Treasury—Internal Revenue Service **Other Claims** ► Attach to Form 8849. ► See Instructions on page 2. | | OMB No. 1545-1420 |
|---|---|---|---|
| Name as shown on Form 8849 UNNET TECHNOLOGIES, INC. | | EIN or SSN 54-1543611 | Total refund $ 2,793,989 |

Enter the earliest and latest dates of the events included in this claim. Enter in MMDDYYYY format.

Earliest date ► 07011998.     Latest date ► 12311988

Claimant's registration number for Section 4091(d) claims. ► _____

| Claim | Amount of refund | |
|---|---|---|
| **1** Federal Excise Tax paid to local exchange companies on purchases of Communications Services | $ 2,793,989 | |
| **2** | | |
| **3** | | |
| **4** | | |
| **5** | | |
| **6** | | |
| **7** | | |
| **8** | | |
| **9** | | |

Use the space below for an explanation of each claim listed.

SEE ATTACHED

For Privacy Act and Paperwork Reduction Act Notice, see Form 8849 Instructions.     Cat. No. 27454M     Schedule 6 (Form 8849) (Rev. 1-2001)

301

UUNET TECHNOLOGIES, INC.
ATTACHMENT TO SCHEDULE 6 OF FORM 8849
DETAIL FOR REFUND

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| AMERITECH | $ 1,353,714 $ | 40,611 |
| ATT | 2,273,809 | 68,214 |
| BANKNET | 62,328 | 1,870 |
| BELL ATLANTIC | 5,227,327 | 156,820 |
| BELL CANADA | 70,112 | 2,103 |
| BROOKF | 47,737 | 1,432 |
| BELL SOUTH | 5,633,815 | 169,014 |
| CINCINNATI BELL | 205,019 | 6,151 |
| FBRSOUTH | 96,187 | 2,886 |
| FIBERNET | 45,810 | 1,374 |
| FRANCE TELECOM | 34,024 | 1,021 |
| GTE | 22,310,111 | 669,303 |
| IC | 73,951 | 2,219 |
| ICTC | 58,427 | 1,753 |
| NEXTLINK | 37,757 | 1,133 |
| ORION | 55,644 | 1,669 |
| PACBELL | 1,347,552 | 40,427 |
| QWEST | 3,457,546 | 103,726 |
| SNET | 345,164 | 10,355 |
| SPRINT | 347,964 | 10,439 |
| SOUTHWESTERN BELL | 2,713,657 | 81,410 |
| TCG | 89,354 | 2,681 |
| **3rd Quarter 1998** | **$ 45,887,008 $** | **1,376,610** |
| ALLTEL | $ 6,163 $ | 185 |
| AMERITECH | 1,786,494 | 53,595 |
| ATCTEL | 350,840 | 10,525 |
| ATT | 1,341,912 | 40,257 |
| BANKNET | 41,552 | 1,247 |
| BELL ATLANTIC | 4,904,264 | 147,128 |
| BELL CANADA | 103,320 | 3,100 |
| BELL SOUTH | 6,244,509 | 187,335 |
| CINCINNATI BELL | 277,560 | 8,327 |
| COMBAT | 43,512 | 1,305 |
| FBRSOUTH | 65,089 | 1,953 |
| GTE | 20,408,062 | 612,242 |
| IC | 33,874 | 1,016 |
| ICTC | 88,397 | 2,652 |
| ORION | 60,704 | 1,821 |
| PACBELL | 2,102,969 | 63,089 |
| QWEST | 4,544,053 | 138,322 |
| SNET | 425,492 | 12,765 |
| SPRINT | 398,336 | 11,950 |
| SOUTHWESTERN BELL | 4,018,852 | 120,566 |
| **4th Quarter 1998** | **$ 47,245,955 $** | **1,417,379** |
| **1998 Total** | **$ 93,132,962 $** | **2,793,989** |

UUNET TECHNOLOGIES, INC.
ATTACHMENT TO SCHEDULE 6 OF FORM 8849
DETAIL FOR REFUND

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| AMERITECH | 1,353,714 | 40,611 |
| ATT | 2,273,809 | 68,214 |
| BANKNET | 62,328 | 1,870 |
| BELL ATLANTIC | 5,227,327 | 156,820 |
| BELL CANADA | 70,112 | 2,103 |
| BROOKF | 47,737 | 1,432 |
| BELL SOUTH | 5,633,815 | 169,014 |
| CINCINNATI BELL | 205,019 | 6,151 |
| FBRSOUTH | 96,187 | 2,886 |
| FIBERNET | 45,810 | 1,374 |
| FRANCE TELECOM | 34,024 | 1,021 |
| GTE | 22,310,111 | 669,303 |
| IC | 73,951 | 2,219 |
| ICTC | 58,427 | 1,753 |
| NEXTLINK | 37,757 | 1,133 |
| ORION | 55,644 | 1,669 |
| PACBELL | 1,347,552 | 40,427 |
| QWEST | 3,457,546 | 103,726 |
| SNET | 345,164 | 10,355 |
| SPRINT | 347,964 | 10,439 |
| SOUTHWESTERN BELL | 2,713,657 | 81,410 |
| TCG | 89,354 | 2,681 |
| 3rd Quarter 1998 | 45,887,008 | 1,376,610 |
| | | |
| AMERITECH | 1,786,494 | 53,595 |
| ATCTEL | 350,840 | 10,525 |
| ATT | 1,341,912 | 40,257 |
| BANKNET | 41,552 | 1,247 |
| BELL ATLANTIC | 4,904,264 | 147,128 |
| BELL CANADA | 103,320 | 3,100 |
| BELL SOUTH | 6,244,509 | 187,335 |
| CINCINNATI BELL | 277,560 | 8,327 |
| COMBAT | 43,512 | 1,305 |
| FBRSOUTH | 65,089 | 1,953 |
| GTE | 20,408,062 | 612,242 |
| IC | 33,874 | 1,016 |
| ICTC | 88,397 | 2,652 |
| ORION | 60,704 | 1,821 |
| PACBELL | 2,102,969 | 63,089 |
| QWEST | 4,544,053 | 136,322 |
| SNET | 425,492 | 12,765 |
| SPRINT | 398,336 | 11,950 |
| SOUTHWESTERN BELL | 4,018,852 | 120,566 |
| 4th Quarter 1998 | 47,245,955 | 1,417,379 |
| | | |
| 1998 Total | 93,132,962 | 2,793,989 |

# EXHIBIT C

Page 1 of 1

| Form **8849** (Rev. January 2001) | Department of the Treasury—Internal Revenue Service **Claim for Refund of Excise Taxes** | OMB No. 1545-1420 |

Please print in ALL CAPITAL LETTERS. Leave a blank box between words.

**Name of claimant**
U N I N E T   T E C H N O L O G I E S   I N C

**Employer identification number (EIN)**
5 4   1 5 4 3 6 1 1

**Address (number, street, room or suite no.)**
1 1 3 3   1 9 t h   S T R E E T ,   N W

**Social security number (SSN)**

**City and state or province. If you have a foreign address, see page 2.**
W A S H I N G T O N ,   D C

**ZIP code**
2 0   0 3 6

**Foreign country, if applicable. Do not abbreviate.**

**Month claimant's income tax year ends**
1 2

**Daytime telephone number (optional)**
2 0 2 7   3 6 6 1 6 9

**Caution:** *Do not claim any amounts on Form 8849 that were or will be claimed on Schedule C (Form 720), Adjustments and Claims, or Form 4136, Credit for Federal Tax Paid on Fuels.*

## Schedules Attached

Check (✓) the appropriate box(es) for the schedule(s) you attach to Form 8849. Only attach the schedules on which you are claiming a refund. Claims on Schedules 2, 3, 5, and Section 4091(d) claims on Schedule 6, cannot be combined with any other schedules on Form 8849. File each of these schedules with a separate Form 8849.

| Schedule 1 | Nontaxable Use of Fuels . . . . . . . . . . . . . . . . . . . . . . . | ☐ |
| Schedule 2 | Sales by Registered Ultimate Vendors of Undyed Diesel Fuel and Undyed Kerosene . . . . . | ☐ |
| Schedule 3 | Gasohol Blending . . . . . . . . . . . . . . . . . . . . . . . . | ☐ |
| Schedule 4 | Sales by Gasoline Wholesale Distributors . . . . . . . . . . . . . . . . . . | ☐ |
| Schedule 5 | Section 4081(e) Claims . . . . . . . . . . . . . . . . . . . . . | ☐ |
| Schedule 6 | Other Claims . . . . . . . . . . . . . . . . . . . . . . . . | ☑ |

**Sign Here**

Under penalties of perjury, I declare (1) that I have examined this claim, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and (2) that amounts claimed on this form have not been, and will not be, claimed on any other form.

Signature and title (if applicable)                    Date  2-20-02

David Mahida
(Please type or print your name below signature.)                    Director, Consumption Taxes

For Privacy Act and Paperwork Reduction Act Notice, see instructions.    Cat. No. 20027J    Form **8849** (Rev. 1-2001)

[ Return to top of document ]
Click here to download the link templates for your publications.

We welcome your comments and suggestions on our web site.
Please send them to CSINTNET@cch.com

Copyright © 2001, CCH INCORPORATED. All rights reserved.

| Schedule 6 (Form 8849) (Rev. January 2001) | Department of the Treasury—Internal Revenue Service **Other Claims** ▶ Attach to Form 8849. ▶ See Instructions on page 2. | | OMB No. 1545-1420 |
|---|---|---|---|
| Name as shown on Form 8849 UUNET TECHNOLOGIES, INC. | | EIN or SSN 54-1543611 | Total refund $ 21,242,772 |

Enter the earliest and latest dates of the events included in this claim. Enter in MMDDYYYY format.

Earliest date ▶ 01011999        Latest date ▶ 09302001

Claimant's registration number for Section 4091(d) claims. ▶ _____

| Claim | Amount of refund | |
|---|---|---|
| 1 FEDERAL EXCISE TAX paid to local exchange companies on purchases of Communication services | $ 21,242,772 | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | . | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |

Use the space below for an explanation of each claim listed.

For Privacy Act and Paperwork Reduction Act Notice, see Form 8849 Instructions.    Cat. No. 27454M    Schedule 6 (Form 8849) (Rev. 1-2001)

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**REFUND SUMMARY**

| Period | Communication Services | Tax Paid |
|---|---|---|
| 1st Quarter 1999 | $ 48,597,321 | $ 1,457,920 |
| 2nd Quarter 1999 | 55,071,524 | 1,652,146 |
| 3rd Quarter 1999 | 43,381,853 | 1,301,456 |
| 4th Quarter 1999 | 51,063,226 | 1,531,897 |
| 1st Quarter 2000 | 49,694,955 | 1,490,849 |
| 2nd Quarter 2000 | 55,185,674 | 1,655,570 |
| 3rd Quarter 2000 | 61,553,949 | 1,846,618 |
| 4th Quarter 2000 | 67,415,604 | 2,022,468 |
| 1st Quarter 2001 | 77,273,753 | 2,318,213 |
| 2nd Quarter 2001 | 85,921,073 | 2,577,632 |
| 3rd Quarter 2001 | 112,933,419 | 3,388,003 |
| Total Refund Claim | $ | $ 21,242,772 |

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**1ST QUARTER 1999**

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| ALLTEL | $ 91,417 | $ 2,743 |
| AMERITECH | 2,140,102 | 64,203 |
| ATCTEL | 2,517,837 | 75,535 |
| ATT | 2,310,281 | 69,308 |
| BANKNET | 62,328 | 1,870 |
| BELL ATLANTIC | 3,687,631 | 110,629 |
| BELL CANADA | 75,215 | 2,256 |
| BELL SOUTH | 696,114 | 20,883 |
| CINCINNATI BELL | 273,534 | 8,206 |
| COMSAT | 170,966 | 5,129 |
| FIBER SOUTH | 124,331 | 3,730 |
| GCI | 59,815 | 1,794 |
| GTE | 22,649,840 | 679,495 |
| IC | 65,515 | 1,965 |
| ICG | 64,729 | 1,942 |
| ICTC | 88,254 | 2,648 |
| ORION | 80,976 | 2,429 |
| PACIFIC BELL | 2,169,643 | 65,089 |
| QWEST | 5,251,858 | 157,556 |
| SNET | 523,377 | 15,701 |
| SPRINT | 566,833 | 17,005 |
| SOUTHWESTERN BELL | 4,891,083 | 146,732 |
| TIME WARNER | 35,641 | 1,069 |
| 1st Quarter 1999 | $ 48,597,321 | $ 1,457,920 |

UUNET TECHNOLOGIES, INC.
ATTACHMENT TO SCHEDULE 6 OF FORM 8849
DETAIL FOR REFUND
2ND QUARTER 1999

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| ALLTEL | $ 131,594 | $ 3,948 |
| AMERITECH | 255,381 | 7,661 |
| ATCTEL | 1,560,270 | 46,808 |
| ATT | 2,153,612 | 64,608 |
| BANKNET | 98,258 | 2,948 |
| BELL ATLANTIC | 3,229,116 | 96,873 |
| BELL CANADA | 56,524 | 1,696 |
| BELLSOUTH | 1,783,927 | 53,518 |
| CINCINNATI BELL | 294,931 | 8,848 |
| COMSAT | 130,181 | 3,905 |
| FIBER SOUTH | 147,259 | 4,418 |
| FRONTIER | 185,188 | 5,556 |
| GCI | 42,088 | 1,263 |
| GTE | 27,226,668 | 816,800 |
| IC | 166,598 | 4,998 |
| ICG | 57,867 | 1,736 |
| ICTC | 115,327 | 3,460 |
| NEXTLINK | 37,179 | 1,115 |
| ORION | 64,607 | 1,938 |
| PACIFIC BELL | 2,295,949 | 68,878 |
| QWEST | 8,203,911 | 246,117 |
| SNET | 687,147 | 20,614 |
| SPRINT | 770,098 | 23,103 |
| SOUTHWESTERN BELL | 5,035,443 | 151,063 |
| TELDAT | 296,007 | 8,880 |
| TIME WARNER | 46,394 | 1,392 |
| 2nd Quarter 1999 | $ 55,071,524 | $ 1,652,146 |

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**3RD QUARTER 1999**

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| ALLTEL | $  160,366 | $  4,811 |
| AMERITECH | 3,754,528 | 112,636 |
| ATCTEL | 1,582,980 | 47,489 |
| ATT | 1,952,283 | 58,569 |
| BANKNET | 46,588 | 1,398 |
| BELL ATLANTIC | 4,723,261 | 141,698 |
| BELL CANADA | 48,460 | 1,454 |
| BELLSOUTH | 1,177,901 | 35,337 |
| CINCINNATI BELL | 291,880 | 8,756 |
| COMSAT | 272,200 | 8,166 |
| FIBER SOUTH | 146,651 | 4,400 |
| FRONTIER | 897,454 | 26,924 |
| GCI | 47,596 | 1,428 |
| GTE | 4,528,451 | 135,854 |
| IC | 60,010 | 1,800 |
| ICG | 93,163 | 2,795 |
| ICTC | 125,206 | 3,756 |
| NEXTLINK | 73,122 | 2,194 |
| PACIFIC BELL | 2,625,585 | 78,768 |
| QWEST | 11,463,854 | 343,916 |
| SCT.A | 96,665 | 2,900 |
| SNET | 659,455 | 19,784 |
| SPRINT | 704,869 | 21,146 |
| SOUTHWESTERN BELL | 7,641,142 | 229,234 |
| TIME WARNER | 159,611 | 4,788 |
| TXU | 48,573 | 1,457 |
| 3rd Quarter 1999 | $  43,381,853 | $  1,301,458 |

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**4TH QUARTER 1999**

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| ALLTEL | $ 181,798 | $ 5,454 |
| AMERITECH | 4,891,973 | 146,759 |
| ATCTEL | 1,675,493 | 50,265 |
| ATT | 1,760,189 | 52,806 |
| BANKNET | 139,764 | 4,193 |
| BELL ATLANTIC | 5,476,916 | 164,307 |
| BELL CANADA | 57,732 | 1,732 |
| BELL SOUTH | 2,019,339 | 60,580 |
| CINCINNATI BELL | 235,236 | 7,057 |
| COMSAT | 156,809 | 4,704 |
| FIBER SOUTH | 160,643 | 4,819 |
| FRONTIER | 104,111 | 3,123 |
| GCI | 60,752 | 1,823 |
| GTE | 1,400,037 | 42,001 |
| IC | 51,468 | 1,544 |
| ICG | 87,153 | 2,615 |
| ICTC | 126,015 | 3,780 |
| NEXTLINK | 50,968 | 1,529 |
| ORION | 75,879 | 2,276 |
| PACIFIC BELL | 2,863,952 | 85,919 |
| QWEST | 13,236,703 | 397,101 |
| SNET | 450,906 | 13,527 |
| SPRINT | 1,403,675 | 42,110 |
| SOUTHWESTERN BELL | 14,045,696 | 421,371 |
| TIME WARNER | 130,425 | 3,913 |
| TXU | 219,593 | 6,588 |
| 4th Quarter 1999 | $ 51,063,226 | $ 1,531,897 |

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**1ST QUARTER 2000**

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| ALLTEL | $ 247,762 | $ 7,433 |
| AMERITECH | 3,030,799 | 90,924 |
| ATCTEL | 2,865,434 | 85,963 |
| ATT | 1,948,447 | 58,453 |
| BANKNET | 69,882 | 2,096 |
| BELL ATLANTIC | 7,074,129 | 212,224 |
| BELL CANADA | 64,590 | 1,938 |
| BELLSOUTH | 2,092,542 | 62,776 |
| CINCINNATI BELL | 259,048 | 7,771 |
| COMSAT | 142,305 | 4,269 |
| FIBER SOUTH | 157,183 | 4,715 |
| FRONTIER | 78,906 | 2,367 |
| GCI | 85,104 | 2,553 |
| GTE | 2,168,124 | 85,044 |
| HICKORY | 36,810 | 1,104 |
| IC | 53,683 | 1,611 |
| ICG | 149,127 | 4,474 |
| ICTC | 126,696 | 3,801 |
| NORTHWESTERN BELL | 101,284 | 3,039 |
| NEXTLINK | 50,559 | 1,517 |
| ORION | 83,646 | 2,509 |
| PACIFIC BELL | 3,319,142 | 99,574 |
| PANAMSAT | 36,900 | 1,107 |
| QWEST | 14,332,755 | 429,983 |
| SNET | 445,232 | 13,357 |
| SPRINT | 1,292,839 | 38,785 |
| SOUTHWESTERN BELL | 8,608,550 | 258,257 |
| TELENERGY | 60,433 | 1,813 |
| TELLARGA | 317,350 | 9,521 |
| TIME WARNER | 160,148 | 4,804 |
| TXU | 235,543 | 7,066 |
| 1st Quarter 2000 | $ 49,694,955 | $ 1,490,849 |

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**2ND QUARTER 2000**

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| ALLTEL | $ 177,097 | $ 5,313 |
| AMERITECH | 5,930,025 | 177,901 |
| ATCTEL | 3,533,657 | 106,010 |
| ATT | 2,842,854 | 85,286 |
| BANKNET | 69,882 | 2,096 |
| BELL ATLANTIC | 7,232,571 | 216,977 |
| BELL CANADA | 54,785 | 1,644 |
| BELL SOUTH | 1,747,331 | 52,420 |
| CINCINNATI BELL | 266,960 | 8,009 |
| COMSAT | 111,152 | 3,335 |
| FIBER SOUTH | 155,955 | 4,679 |
| FRONTIER | 205,872 | 6,176 |
| GCI | 84,841 | 2,545 |
| GTE | 1,074,100 | 32,223 |
| HICKORY | 34,977 | 1,049 |
| ICG | 193,626 | 5,809 |
| ICTC | 140,089 | 4,203 |
| KMCTEL | 382,133 | 11,464 |
| NORTHWESTERN BELL | 68,054 | 2,042 |
| NEXTLINK | 43,564 | 1,307 |
| ORION | 59,962 | 1,799 |
| PACIFIC BELL | 4,287,948 | 128,638 |
| PANAMSAT | 36,900 | 1,107 |
| QWEST | 16,229,355 | 486,881 |
| SNET | 729,111 | 21,873 |
| SPRINT | 1,296,570 | 38,897 |
| SOUTHWESTERN BELL | 7,580,319 | 227,410 |
| TELENERG | 55,500 | 1,665 |
| TELLARGA | 153,000 | 4,590 |
| TIME WARNER | 171,218 | 5,137 |
| TXU | 236,266 | 7,088 |
| 2nd Quarter 2000 | $ 55,185,674 | $ 1,655,570 |

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**3RD QUARTER 2000**

| Vendor Name | Communication Services | | Tax Paid |
|---|---|---|---|
| ACCESS | $ | 47,364 | $ | 1,421 |
| ALLTEL | | 250,801 | 7,524 |
| AMERITECH | | 6,820,970 | 204,629 |
| ATCTEL | | 3,339,635 | 100,189 |
| ATT | | 2,394,602 | 71,838 |
| BANKNET | | 54,682 | 1,640 |
| BELL ATLANTIC | | 7,791,872 | 233,756 |
| BELL SOUTH | | 2,434,303 | 73,029 |
| CENTURA | | 99,868 | 2,996 |
| CINCINNATI BELL | | 271,070 | 8,132 |
| COMSAT | | 125,415 | 3,762 |
| FIBER SOUTH | | 157,285 | 4,719 |
| FRONTIER | | 322,055 | 9,662 |
| GCI | | 84,841 | 2,545 |
| GTE | | 1,257,333 | 37,720 |
| ICG | | 300,198 | 9,006 |
| ICTC | | 145,211 | 4,356 |
| INTERNATIONAL FIBER | | 119,083 | 3,572 |
| KMCTEL | | 2,000,961 | 60,029 |
| NEXTLINK | | 47,735 | 1,432 |
| ORION | | 85,722 | 2,572 |
| PACIFIC BELL | | 4,902,890 | 147,087 |
| PANAMSAT | | 42,700 | 1,281 |
| QWEST | | 17,059,817 | 511,795 |
| SCT.A | | 64,557 | 1,937 |
| SNET | | 1,015,576 | 30,467 |
| SPRINT | | 1,425,546 | 42,766 |
| SOUTHWESTERN BELL | | 8,247,457 | 247,424 |
| TELENERGY | | 55,500 | 1,665 |
| TELLARGA | | 153,000 | 4,590 |
| TIME WARNER | | 153,503 | 4,605 |
| TXU | | 282,396 | 8,472 |
| 3rd Quarter 2000 | $ | 61,553,949 | $ | 1,846,618 |

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**4TH QUARTER 2000**

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| ACS.A | $ 46,681 | $ 1,400 |
| ALLTEL | 214,824 | 6,445 |
| AMERITECH | 7,626,980 | 228,809 |
| ATCTEL | 3,579,092 | 107,373 |
| ATT | 2,513,645 | 75,409 |
| BANKNET | 47,082 | 1,412 |
| BELL ATLANTIC | 9,157,166 | 274,715 |
| BELL CANADA | 45,862 | 1,376 |
| BELLSOUTH | 4,883,182 | 146,495 |
| CENTUR.A | 481,609 | 14,448 |
| CINCINNATI BELL | 312,546 | 9,376 |
| COMSAT | 125,415 | 3,762 |
| FIBER SOUTH | 157,285 | 4,719 |
| FRONTIER | 379,672 | 11,390 |
| GCI | 84,841 | 2,545 |
| GTE | 2,127,531 | 63,826 |
| ICG | 519,662 | 15,590 |
| ICTC | 143,584 | 4,308 |
| INTERNATIONAL FIBER | 102,071 | 3,062 |
| KMCTEL | 1,039,171 | 31,175 |
| NEXTLINK | 49,380 | 1,481 |
| ORION | 85,722 | 2,572 |
| PACIFIC BELL | 4,977,922 | 149,338 |
| PANAMSAT | 36,900 | 1,107 |
| QWEST | 17,785,034 | 533,551 |
| SCT.A | 41,288 | 1,239 |
| SNET | 1,173,865 | 35,216 |
| SPRINT | 1,628,339 | 48,850 |
| SOUTHWESTERN BELL | 7,267,893 | 218,037 |
| TELENERGY | 55,500 | 1,665 |
| TELLARGA | 262,086 | 7,863 |
| TIME WARNER | 184,318 | 5,530 |
| TXU | 279,454 | 8,384 |
| **4th Quarter 2000** | **$ 67,415,604** | **$ 2,022,468** |

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**1ST QUARTER 2001**

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| ALLTEL | $ 201,561 | $ 6,047 |
| AMERITECH | 9,218,390 | 276,552 |
| ATCTEL | 3,181,197 | 95,436 |
| ATT | 2,362,770 | 70,883 |
| BELL ATLANTIC | 9,562,350 | 286,871 |
| BELL CANADA | 257,120 | 7,714 |
| BELLSOUTH | 4,619,950 | 138,598 |
| CENTURA | 330,115 | 9,903 |
| CINCINATTI BELL | 273,914 | 8,217 |
| CITIZEN | 1,018,315 | 30,549 |
| FIBER SOUTH | 172,211 | 5,166 |
| FRONTIER | 416,024 | 12,481 |
| GCI | 84,906 | 2,547 |
| GTE | 1,864,089 | 55,923 |
| ICG | 281,358 | 8,441 |
| ICTC | 143,855 | 4,316 |
| INTENATIONAL FIBER | 102,071 | 3,062 |
| KMCTEL | 1,141,793 | 34,254 |
| NEXTLINK | 42,051 | 1,262 |
| ORION | 72,448 | 2,173 |
| PACIFIC BELL | 6,716,428 | 201,493 |
| QWEST | 24,925,904 | 747,777 |
| SCT.A | 41,288 | 1,239 |
| SNET | 1,194,414 | 35,832 |
| SPRINT | 1,540,901 | 46,227 |
| SOUTHWESTERN BELL | 6,658,443 | 199,753 |
| TELENERGY | 37,000 | 1,110 |
| TELLARGA | 316,629 | 9,499 |
| TIME WARNER | 217,046 | 6,511 |
| TXU | 279,211 | 8,376 |
| 1st Quarter 2001 | $ 77,273,753 | $ 2,318,213 |

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**2ND QUARTER 2001**

| Vendor Name | Communication Services | | Tax Paid |
|---|---|---|---|
| ALLTEL | $ | 276,802 | $ 8,304 |
| AMERITECH | | 9,012,772 | 270,383 |
| ATCTEL | | 3,053,661 | 91,610 |
| ATT | | 2,469,777 | 74,093 |
| BELL ATLANTIC | | 13,000,004 | 390,000 |
| BELLSOUTH | | 4,670,992 | 140,130 |
| CINCINNATI BELL | | 254,408 | 7,632 |
| CITIZEN | | 83,105 | 2,493 |
| FIBER SOUTH | | 156,611 | 4,698 |
| FRONTIER | | 416,301 | 12,489 |
| GCI | | 96,405 | 2,892 |
| GTE | | 1,952,558 | 58,577 |
| ICG | | 246,492 | 7,395 |
| ICTC | | 147,589 | 4,428 |
| INTERNATIONAL FIBER | | 102,071 | 3,062 |
| KMCTEL | | 1,251,174 | 37,535 |
| NEXTLINK | | 49,079 | 1,472 |
| ORION | | 85,722 | 2,572 |
| PACIFIC BELL | | 6,865,151 | 205,955 |
| QWEST | | 31,797,284 | 953,919 |
| SCT.A | | 85,094 | 2,553 |
| SNET | | 1,001,887 | 30,057 |
| SPRINT | | 1,605,124 | 48,154 |
| SOUTHWESTERN BELL | | 5,977,717 | 179,332 |
| TELLARGA | | 698,430 | 20,953 |
| TIME WARNER | | 285,432 | 8,563 |
| TXU | | 279,431 | 8,383 |
| 2nd Quarter 2001 | $ | 85,921,073 | $ 2,577,632 |

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**3RD QUARTER 2001**

| Vendor Name | Communication Services | | Tax Paid |
|---|---|---|---|
| ALLTEL | $ | 237,285 | $ 7,119 |
| AMERITECH | | 18,564,610 | 556,938 |
| ATCTEL | | 2,177,750 | 65,333 |
| ATT | | 2,683,310 | 80,499 |
| BELL ATLANTIC | | 14,060,881 | 421,826 |
| BELL SOUTH | | 18,438,247 | 553,147 |
| CENTURA | | 68,112 | 2,043 |
| CINCINNATI BELL | | 67,717 | 2,032 |
| CITIZEN | | 82,511 | 2,475 |
| FIBER SOUTH | | 152,675 | 4,580 |
| FRONTIER | | 433,531 | 13,006 |
| GCI | | 84,938 | 2,548 |
| GTE | | 2,238,583 | 67,157 |
| ICG | | 176,012 | 5,280 |
| ICTC | | 144,008 | 4,320 |
| INTERNATIONAL FIBER | | 102,071 | 3,062 |
| KMCTEL | | 1,225,577 | 36,767 |
| NEXTLINK | | 55,830 | 1,675 |
| ORION | | 77,268 | 2,318 |
| PACIFIC BELL | | 9,706,614 | 291,198 |
| QWEST | | 31,809,812 | 954,294 |
| SCT.A | | 96,671 | 2,900 |
| SNET | | 3,001,502 | 90,045 |
| SPRINT | | 1,557,132 | 46,714 |
| SOUTHWESTERN BELL | | 4,955,216 | 148,656 |
| TELLARGA | | 218,086 | 6,543 |
| TIME WARNER | | 238,261 | 7,148 |
| TXU | | 279,211 | 8,376 |
| 3rd Quarter 2001 | $ | 112,933,419 | $ 3,388,003 |

318

# EXHIBIT C

Page 1 of 1

| Form **8849** (Rev. January 2001) | Department of the Treasury—Internal Revenue Service **Claim for Refund of Excise Taxes** | OMB No. 1545-1420 |

Please print in ALL CAPITAL LETTERS. Leave a blank box between words.

**Name of claimant**

U N I P T   T E C H N O L O G I E S   I N C

**Employer identification number (EIN)**
5 4 1 5 4 3 6 1 1

**Address (number, street, room or suite no.)**

1 1 3 3   1 9 t h   S T R E E T   N W

**Social security number (SSN)**

**City and state or province. If you have a foreign address, see page 2.**

W A S H I N G T O N ,   D C

**ZIP code**
2 0 0 3 6

**Foreign country, if applicable. Do not abbreviate.**

**Month claimant's income tax year ends**
1 2

**Daytime telephone number (optional)**

2 0 2 7 3 6 6 1 6 5

**Caution:** Do not claim any amounts on Form 8849 that were or will be claimed on Schedule C (Form 720), Adjustments and Claims, or Form 4136, Credit for Federal Tax Paid on Fuels.

**Schedules Attached**

Check (✓) the appropriate box(es) for the schedule(s) you attach to Form 8849. Only attach the schedules on which you are claiming a refund. Claims on Schedules 2, 3, 5, and Section 4091(d) claims on Schedule 6, cannot be combined with any other schedules on Form 8849. File each of these schedules with a separate Form 8849.

| | | |
|---|---|---|
| Schedule 1 | Nontaxable Use of Fuels. . . . . . . . . . . . . . . . . . . . . . . . . | ☐ |
| Schedule 2 | Sales by Registered Ultimate Vendors of Undyed Diesel Fuel and Undyed Kerosene. . . . . . . | ☐ |
| Schedule 3 | Gasohol Blending . . . . . . . . . . . . . . . . . . . . . . . . . | ☐ |
| Schedule 4 | Sales by Gasoline Wholesale Distributors . . . . . . . . . . . . . . . . | ☐ |
| Schedule 5 | Section 4081(e) Claims . . . . . . . . . . . . . . . . . . . . . . | ☐ |
| Schedule 6 | Other Claims . . . . . . . . . . . . . . . . . . . . . . . . . . | ☑ |

**Sign Here**

Under penalties of perjury, I declare (1) that I have examined this claim, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and (2) that amounts claimed on this form have not been, and will not be, claimed on any other form.

Signature and title (if applicable)     Date  2-20-02

David Mahida     Director, Consumption Taxes
(Please type or print your name below signature.)

For Privacy Act and Paperwork Reduction Act Notice, see instructions.     Cat. No. 20027J     Form **8849** (Rev. 1-2001)

**[ Return to top of document ]**
Click here to download the link templates for your publications.

We welcome your comments and suggestions on our web site.
Please send them to CSINTNET@cch.com

Copyright © 2001, CCH INCORPORATED. All rights reserved.

| Schedule 6 (Form 8849) (Rev. January 2001) | Department of the Treasury—Internal Revenue Service **Other Claims** ▶ Attach to Form 8849. ▶ See instructions on page 2. | | OMB No. 1545-1420 |
|---|---|---|---|
| Name as shown on Form 8849 UUNET TECHNOLOGIES, INC. | | EIN or SSN 54-1543611 | Total refund $ 21,242,772 |

Enter the earliest and latest dates of the events included in this claim. Enter in MMDDYYYY format.

Earliest date ▶ 01011999        Latest date ▶ 09302001

Claimant's registration number for Section 4091(d) claims. ▶ _____

| Claim | Amount of refund | |
|---|---|---|
| FEDERAL EXCISE TAX paid to local exchange companies ¹on purchases of Communication services | $ 21,242,772 | |
| **2** | | |
| **3** | | |
| **4** | | |
| **5** | | |
| **6** | | |
| **7** | | |
| **8** | | |
| **9** | | |

Use the space below for an explanation of each claim listed.

For Privacy Act and Paperwork Reduction Act Notice, see Form 8849 instructions.    Cat. No. 27454M    Schedule 6 (Form 8849) (Rev. 1-2001)

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**REFUND SUMMARY**

| Period | Communication Services | Tax Paid |
|---|---|---|
| 1st Quarter 1999 | $ 48,597,321 | $ 1,457,920 |
| 2nd Quarter 1999 | 55,071,524 | 1,652,146 |
| 3rd Quarter 1999 | 43,381,853 | 1,301,456 |
| 4th Quarter 1999 | 51,063,226 | 1,531,897 |
| 1st Quarter 2000 | 49,694,955 | 1,490,849 |
| 2nd Quarter 2000 | 55,185,674 | 1,655,570 |
| 3rd Quarter 2000 | 61,553,949 | 1,846,618 |
| 4th Quarter 2000 | 67,415,604 | 2,022,468 |
| 1st Quarter 2001 | 77,273,753 | 2,318,213 |
| 2nd Quarter 2001 | 85,921,073 | 2,577,632 |
| 3rd Quarter 2001 | 112,933,419 | 3,388,003 |
| **Total Refund Claim** | $ | $ 21,242,772 |

322

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**1ST QUARTER 1999**

| Vendor Name | Communication Services | Tax Paid |
|---|---:|---:|
| ALLTEL | $ 91,417 | $ 2,743 |
| AMERITECH | 2,140,102 | 64,203 |
| ATCTEL | 2,517,837 | 75,535 |
| ATT | 2,310,281 | 69,308 |
| BANKNET | 62,328 | 1,870 |
| BELL ATLANTIC | 3,687,631 | 110,629 |
| BELL CANADA | 75,215 | 2,256 |
| BELL SOUTH | 696,114 | 20,883 |
| CINCINNATI BELL | 273,534 | 8,206 |
| COMSAT | 170,968 | 5,129 |
| FIBER SOUTH | 124,331 | 3,730 |
| GCI | 59,815 | 1,794 |
| GTE | 22,649,840 | 679,495 |
| IC | 65,515 | 1,965 |
| ICG | 64,729 | 1,942 |
| ICTC | 88,254 | 2,648 |
| ORION | 80,976 | 2,429 |
| PACIFIC BELL | 2,169,643 | 65,089 |
| QWEST | 5,251,858 | 157,556 |
| SNET | 523,377 | 15,701 |
| SPRINT | 566,833 | 17,005 |
| SOUTHWESTERN BELL | 4,891,083 | 146,732 |
| TIME WARNER | 35,641 | 1,069 |
| **1st Quarter 1999** | **$ 48,597,321** | **$ 1,457,920** |

323

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**2ND QUARTER 1999**

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| ALLTEL | $ 131,594 | $ 3,948 |
| AMERITECH | 255,381 | 7,661 |
| ATCTEL | 1,560,270 | 46,808 |
| ATT | 2,153,612 | 64,608 |
| BANKNET | 98,258 | 2,948 |
| BELL ATLANTIC | 3,229,116 | 96,873 |
| BELL CANADA | 56,524 | 1,696 |
| BELLSOUTH | 1,783,927 | 53,518 |
| CINCINNATI BELL | 294,931 | 8,848 |
| COMSAT | 130,181 | 3,905 |
| FIBER SOUTH | 147,259 | 4,418 |
| FRONTIER | 185,188 | 5,556 |
| GCI | 42,088 | 1,263 |
| GTE | 27,226,668 | 816,800 |
| IC | 166,598 | 4,998 |
| ICG | 57,867 | 1,736 |
| ICTC | 115,327 | 3,460 |
| NEXTLINK | 37,179 | 1,115 |
| ORION | 64,607 | 1,938 |
| PACIFIC BELL | 2,295,949 | 68,878 |
| QWEST | 8,203,911 | 246,117 |
| SNET | 687,147 | 20,614 |
| SPRINT | 770,098 | 23,103 |
| SOUTHWESTERN BELL | 5,035,443 | 151,063 |
| TELDAT | 296,007 | 8,880 |
| TIME WARNER | 46,394 | 1,392 |
| **2nd Quarter 1999** | **$ 55,071,524** | **$ 1,652,146** |

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**3RD QUARTER 1999**

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| ALLTEL | $ 160,366 | $ 4,811 |
| AMERITECH | 3,754,528 | 112,636 |
| ATCTEL | 1,582,980 | 47,489 |
| ATT | 1,952,283 | 58,569 |
| BANKNET | 46,588 | 1,398 |
| BELL ATLANTIC | 4,723,261 | 141,698 |
| BELL CANADA | 48,460 | 1,454 |
| BELLSOUTH | 1,177,901 | 35,337 |
| CINCINNATI BELL | 291,880 | 8,756 |
| COMSAT | 272,200 | 8,166 |
| FIBER SOUTH | 146,651 | 4,400 |
| FRONTIER | 897,454 | 26,924 |
| GCI | 47,596 | 1,428 |
| GTE | 4,528,451 | 135,854 |
| IC | 60,010 | 1,800 |
| ICG | 93,163 | 2,795 |
| ICTC | 125,206 | 3,756 |
| NEXTLINK | 73,122 | 2,194 |
| PACIFIC BELL | 2,625,585 | 78,768 |
| QWEST | 11,463,854 | 343,916 |
| SCT.A | 96,665 | 2,900 |
| SNET | 659,455 | 19,784 |
| SPRINT | 704,869 | 21,146 |
| SOUTHWESTERN BELL | 7,641,142 | 229,234 |
| TIME WARNER | 159,611 | 4,788 |
| TXU | 48,573 | 1,457 |
| 3rd Quarter 1999 | $ 43,381,853 | $ 1,301,458 |

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**4TH QUARTER 1999**

| Vendor Name | | Communication Services | | Tax Paid |
|---|---|---|---|---|
| ALLTEL | $ | 181,798 | $ | 5,454 |
| AMERITECH | | 4,891,973 | | 146,759 |
| ATCTEL | | 1,675,493 | | 50,265 |
| ATT | | 1,760,189 | | 52,806 |
| BANKNET | | 139,764 | | 4,193 |
| BELL ATLANTIC | | 5,476,916 | | 164,307 |
| BELL CANADA | | 57,732 | | 1,732 |
| BELL SOUTH | | 2,019,339 | | 60,580 |
| CINCINNATI BELL | | 235,236 | | 7,057 |
| COMSAT | | 156,809 | | 4,704 |
| FIBER SOUTH | | 160,643 | | 4,819 |
| FRONTIER | | 104,111 | | 3,123 |
| GCI | | 60,752 | | 1,823 |
| GTE | | 1,400,037 | | 42,001 |
| IC | | 51,468 | | 1,544 |
| ICG | | 87,153 | | 2,615 |
| ICTC | | 126,015 | | 3,780 |
| NEXTLINK | | 50,968 | | 1,529 |
| ORION | | 75,879 | | 2,276 |
| PACIFIC BELL | | 2,863,952 | | 85,919 |
| QWEST | | 13,236,703 | | 397,101 |
| SNET | | 450,906 | | 13,527 |
| SPRINT | | 1,403,675 | | 42,110 |
| SOUTHWESTERN BELL | | 14,045,696 | | 421,371 |
| TIME WARNER | | 130,425 | | 3,913 |
| TXU | | 219,593 | | 6,588 |
| 4th Quarter 1999 | $ | 51,063,226 | $ | 1,531,897 |

UUNET TECHNOLOGIES, INC.
ATTACHMENT TO SCHEDULE 6 OF FORM 8849
DETAIL FOR REFUND
1ST QUARTER 2000

| Vendor Name | Communication Services | Tax Paid |
|-------------|-----------|----------|
| ALLTEL | $ 247,762 | $ 7,433 |
| AMERITECH | 3,030,799 | 90,924 |
| ATCTEL | 2,865,434 | 85,963 |
| ATT | 1,948,447 | 58,453 |
| BANKNET | 69,882 | 2,096 |
| BELL ATLANTIC | 7,074,129 | 212,224 |
| BELL CANADA | 64,590 | 1,938 |
| BELLSOUTH | 2,092,542 | 62,776 |
| CINCINNATI BELL | 259,048 | 7,771 |
| COMSAT | 142,305 | 4,269 |
| FIBER SOUTH | 157,183 | 4,715 |
| FRONTIER | 78,906 | 2,367 |
| GCI | 85,104 | 2,553 |
| GTE | 2,168,124 | 65,044 |
| HICKORY | 36,810 | 1,104 |
| IC | 53,683 | 1,611 |
| ICG | 149,127 | 4,474 |
| ICTC | 126,696 | 3,801 |
| NORTHWESTERN BELL | 101,284 | 3,039 |
| NEXTLINK | 50,559 | 1,517 |
| ORION | 83,646 | 2,509 |
| PACIFIC BELL | 3,319,142 | 99,574 |
| PANAMSAT | 36,900 | 1,107 |
| QWEST | 14,332,755 | 429,983 |
| SNET | 445,232 | 13,357 |
| SPRINT | 1,292,830 | 38,785 |
| SOUTHWESTERN BELL | 8,608,550 | 258,257 |
| TELENERGY | 60,433 | 1,813 |
| TELLARGA | 317,350 | 9,521 |
| TIME WARNER | 160,148 | 4,804 |
| TXU | 235,543 | 7,066 |
| 1st Quarter 2000 | $ 49,694,955 | $ 1,490,849 |

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**2ND QUARTER 2000**

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| ALLTEL | $ 177,097 | $ 5,313 |
| AMERITECH | 5,930,025 | 177,901 |
| ATCTEL | 3,533,657 | 106,010 |
| ATT | 2,842,854 | 85,286 |
| BANKNET | 69,882 | 2,096 |
| BELL ATLANTIC | 7,232,571 | 216,977 |
| BELL CANADA | 54,785 | 1,644 |
| BELL SOUTH | 1,747,331 | 52,420 |
| CINCINNATI BELL | 266,960 | 8,009 |
| COMSAT | 111,152 | 3,335 |
| FIBER SOUTH | 155,955 | 4,679 |
| FRONTIER | 205,872 | 6,176 |
| GCI | 84,841 | 2,545 |
| GTE | 1,074,100 | 32,223 |
| HICKORY | 34,977 | 1,049 |
| ICG | 193,626 | 5,809 |
| ICTC | 140,089 | 4,203 |
| KMCTEL | 382,133 | 11,464 |
| NORTHWESTERN BELL | 68,054 | 2,042 |
| NEXTLINK | 43,564 | 1,307 |
| ORION | 59,962 | 1,799 |
| PACIFIC BELL | 4,287,948 | 128,638 |
| PANAMSAT | 36,900 | 1,107 |
| QWEST | 16,229,355 | 486,881 |
| SNET | 729,111 | 21,873 |
| SPRINT | 1,296,570 | 38,897 |
| SOUTHWESTERN BELL | 7,580,319 | 227,410 |
| TELENERG | 55,500 | 1,665 |
| TELLARGA | 153,000 | 4,590 |
| TIME WARNER | 171,218 | 5,137 |
| TXU | 236,266 | 7,088 |
| **2nd Quarter 2000** | **$ 55,185,674** | **$ 1,655,570** |

328

UUNET TECHNOLOGIES, INC.
ATTACHMENT TO SCHEDULE 6 OF FORM 8849
DETAIL FOR REFUND
3RD QUARTER 2000

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| ACCESS | $ 47,364 | $ 1,421 |
| ALLTEL | 250,801 | 7,524 |
| AMERITECH | 6,820,970 | 204,629 |
| ATCTEL | 3,339,635 | 100,189 |
| ATT | 2,394,602 | 71,838 |
| BANKNET | 54,682 | 1,640 |
| BELL ATLANTIC | 7,791,872 | 233,756 |
| BELL SOUTH | 2,434,303 | 73,029 |
| CENTURA | 99,888 | 2,996 |
| CINCINNATI BELL | 271,070 | 8,132 |
| COMSAT | 125,415 | 3,762 |
| FIBER SOUTH | 157,285 | 4,719 |
| FRONTIER | 322,055 | 9,662 |
| GCI | 84,841 | 2,545 |
| GTE | 1,257,333 | 37,720 |
| ICG | 300,198 | 9,006 |
| ICTC | 145,211 | 4,356 |
| INTERNATIONAL FIBER | 119,083 | 3,572 |
| KMCTEL | 2,000,961 | 60,029 |
| NEXTLINK | 47,735 | 1,432 |
| ORION | 85,722 | 2,572 |
| PACIFIC BELL | 4,902,890 | 147,087 |
| PANAMSAT | 42,700 | 1,281 |
| QWEST | 17,059,817 | 511,795 |
| SCT.A | 64,557 | 1,937 |
| SNET | 1,015,576 | 30,467 |
| SPRINT | 1,425,546 | 42,766 |
| SOUTHWESTERN BELL | 8,247,457 | 247,424 |
| TELENERGY | 55,500 | 1,665 |
| TELLARGA | 153,000 | 4,590 |
| TIME WARNER | 153,503 | 4,605 |
| TXU | 282,398 | 8,472 |
| 3rd Quarter 2000 | $ 61,553,949 | $ 1,846,618 |

329

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**4TH QUARTER 2000**

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| **ACS.A** | $ 46,681 | $ 1,400 |
| **ALLTEL** | 214,824 | 6,445 |
| **AMERITECH** | 7,626,980 | 228,809 |
| **ATCTEL** | 3,579,092 | 107,373 |
| **ATT** | 2,513,645 | 75,409 |
| **BANKNET** | 47,082 | 1,412 |
| **BELL ATLANTIC** | 9,157,166 | 274,715 |
| **BELL CANADA** | 45,862 | 1,376 |
| **BELLSOUTH** | 4,883,182 | 146,495 |
| **CENTURA** | 481,609 | 14,448 |
| **CINCINNATI BELL** | 312,546 | 9,376 |
| **COMSAT** | 125,415 | 3,762 |
| **FIBER SOUTH** | 157,285 | 4,719 |
| **FRONTIER** | 379,672 | 11,390 |
| **GCI** | 84,841 | 2,545 |
| **GTE** | 2,127,531 | 63,826 |
| **ICG** | 519,662 | 15,590 |
| **ICTC** | 143,584 | 4,308 |
| **INTERNATIONAL FIBER** | 102,071 | 3,062 |
| **KMCTEL** | 1,039,171 | 31,175 |
| **NEXTLINK** | 49,380 | 1,481 |
| **ORION** | 85,722 | 2,572 |
| **PACIFIC BELL** | 4,977,922 | 149,338 |
| **PANAMSAT** | 36,900 | 1,107 |
| **QWEST** | 17,785,034 | 533,551 |
| **SCT.A** | 41,288 | 1,239 |
| **SNET** | 1,173,865 | 35,218 |
| **SPRINT** | 1,628,339 | 48,850 |
| **SOUTHWESTERN BELL** | 7,267,893 | 218,037 |
| **TELENERGY** | 55,500 | 1,665 |
| **TELLARGA** | 262,086 | 7,863 |
| **TIME WARNER** | 184,318 | 5,530 |
| **TXU** | 279,454 | 8,384 |
| **4th Quarter 2000** | $ 67,415,604 | $ 2,022,468 |

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**1ST QUARTER 2001**

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| ALLTEL | $ 201,561 | $ 6,047 |
| AMERITECH | 9,218,390 | 276,552 |
| ATCTEL | 3,181,197 | 95,436 |
| ATT | 2,362,770 | 70,883 |
| BELL ATLANTIC | 9,562,350 | 286,871 |
| BELL CANADA | 257,120 | 7,714 |
| BELLSOUTH | 4,619,950 | 138,598 |
| CENTURA | 330,115 | 9,903 |
| CINCINATTI BELL | 273,914 | 8,217 |
| CITIZEN | 1,018,315 | 30,549 |
| FIBER SOUTH | 172,211 | 5,166 |
| FRONTIER | 416,024 | 12,481 |
| GCI | 84,906 | 2,547 |
| GTE | 1,864,089 | 55,923 |
| ICG | 281,358 | 8,441 |
| ICTC | 143,855 | 4,316 |
| INTENATIONAL FIBER | 102,071 | 3,062 |
| KMCTEL | 1,141,793 | 34,254 |
| NEXTLINK | 42,051 | 1,262 |
| ORION | 72,448 | 2,173 |
| PACIFIC BELL | 6,718,428 | 201,493 |
| QWEST | 24,925,904 | 747,777 |
| SCT.A | 41,288 | 1,239 |
| SNET | 1,194,414 | 35,832 |
| SPRINT | 1,540,901 | 46,227 |
| SOUTHWESTERN BELL | 6,658,443 | 199,753 |
| TELENERGY | 37,000 | 1,110 |
| TELLARGA | 316,629 | 9,499 |
| TIME WARNER | 217,048 | 6,511 |
| TXU | 279,211 | 8,376 |
| **1st Quarter 2001** | **$ 77,273,753** | **$ 2,318,213** |

331

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**2ND QUARTER 2001**

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| ALLTEL | $ 276,802 | $ 8,304 |
| AMERITECH | 9,012,772 | 270,383 |
| ATCTEL | 3,053,661 | 91,610 |
| ATT | 2,469,777 | 74,093 |
| BELL ATLANTIC | 13,000,004 | 390,000 |
| BELLSOUTH | 4,670,992 | 140,130 |
| CINCINNATI BELL | 254,408 | 7,632 |
| CITIZEN | 83,105 | 2,493 |
| FIBER SOUTH | 156,611 | 4,698 |
| FRONTIER | 416,301 | 12,489 |
| GCI | 96,405 | 2,892 |
| GTE | 1,952,558 | 58,577 |
| ICG | 246,492 | 7,395 |
| ICTC | 147,589 | 4,428 |
| INTERNATIONAL FIBER | 102,071 | 3,062 |
| KMCTEL | 1,251,174 | 37,535 |
| NEXTLINK | 49,079 | 1,472 |
| ORION | 85,722 | 2,572 |
| PACIFIC BELL | 6,865,151 | 205,955 |
| QWEST | 31,797,284 | 953,919 |
| SCT.A | 85,094 | 2,553 |
| SNET | 1,001,887 | 30,057 |
| SPRINT | 1,605,124 | 48,154 |
| SOUTHWESTERN BELL | 5,977,717 | 179,332 |
| TELLARGA | 698,430 | 20,953 |
| TIME WARNER | 285,432 | 8,563 |
| TXU | 279,431 | 8,383 |
| 2nd Quarter 2001 | $ 85,921,073 | $ 2,577,832 |

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO SCHEDULE 6 OF FORM 8849**
**DETAIL FOR REFUND**
**3RD QUARTER 2001**

| Vendor Name | Communication Services | Tax Paid |
|---|---|---|
| ALLTEL | $ 237,285 | $ 7,119 |
| AMERITECH | 18,564,610 | 556,938 |
| ATCTEL | 2,177,750 | 65,333 |
| ATT | 2,683,310 | 80,499 |
| BELL ATLANTIC | 14,060,881 | 421,826 |
| BELL SOUTH | 18,438,247 | 553,147 |
| CENTURA | 68,112 | 2,043 |
| CINCINNATI BELL | 67,717 | 2,032 |
| CITIZEN | 82,511 | 2,475 |
| FIBER SOUTH | 152,675 | 4,580 |
| FRONTIER | 433,531 | 13,006 |
| GCI | 84,938 | 2,548 |
| GTE | 2,238,583 | 67,157 |
| ICG | 176,012 | 5,280 |
| ICTC | 144,006 | 4,320 |
| INTERNATIONAL FIBER | 102,071 | 3,062 |
| KMCTEL | 1,225,577 | 36,767 |
| NEXTLINK | 55,830 | 1,675 |
| ORION | 77,268 | 2,318 |
| PACIFIC BELL | 9,706,614 | 291,198 |
| QWEST | 31,809,812 | 954,284 |
| SCT.A | 96,671 | 2,900 |
| SNET | 3,001,502 | 90,045 |
| SPRINT | 1,557,132 | 46,714 |
| SOUTHWESTERN BELL | 4,955,216 | 148,656 |
| TELLARGA | 218,086 | 6,543 |
| TIME WARNER | 238,261 | 7,148 |
| TXU | 279,211 | 8,376 |
| **3rd Quarter 2001** | **$ 112,933,419** | **$ 3,388,003** |

333

# EXHIBIT D

Form **8849**
(Rev. January 2003)

Department of the Treasury—Internal Revenue Service

## Claim for Refund of Excise Taxes

OMB No. 1545-1420

Print clearly. Leave a blank box between words.

**Name of claimant**

| U | U | N | E | T |   | T | e | c | h | n | o | l | o | g | i | e | s |   | I | n | c |   |   |   |   |

**Employer identification number (EIN)**

| 5 | 4 | 1 | 5 | 4 | 3 | 6 | 1 | 1 |

**Address (number, street, room or suite no.)**

| 2 | 2 | 0 | 0 | 1 |   | L | o | u | d | o | u | n |   | C | o | u | n | t | y |   | P | k | w | y |

**Social security number (SSN)**

**City and state or province. If you have a foreign address, see page 2.**

| A | s | h | b | u | r | n | , |   | V | A |

**ZIP code**

| 2 | 0 | 1 | 4 | 7 |

**Month claimant's income tax year ends**

| 1 | 2 |

**Foreign country, if applicable. Do not abbreviate.**

**Daytime telephone number (optional)**

| 7 | 0 | 3 | 8 | 8 | 6 | 5 | 2 | 9 | 1 |

**Caution:** Do not use Form 8849 to make adjustments to liability reported on Forms 720 for prior quarters or to claim any amounts that were or will be claimed on Schedule C (Form 720), Claims, Form 4136, Credit for Federal Tax Paid on Fuels, Form 2290, Heavy Highway Vehicle Use Tax Return, or Form 730, Monthly Tax Return On Wagers.

### Schedules Attached

Check (✓) the appropriate box(es) for the schedule(s) you attach to Form 8849. Only attach the schedules on which you are claiming a refund. Schedules 2, 3, 5, and section 4091(d) claims on Schedule 6 cannot be filed with any other schedules on Form 8849. File each of these schedules with a separate Form 8849.

| | | |
|---|---|---|
| **Schedule 1** | Nontaxable Use of Fuels . . . . . . . . . . . . . . . . . . . . | ☐ |
| **Schedule 2** | Sales by Registered Ultimate Vendors of Undyed Diesel Fuel and Undyed Kerosene . . . . . . . | ☐ |
| **Schedule 3** | Gasohol Blending . . . . . . . . . . . . . . . . . . . . . | ☐ |
| **Schedule 4** | Sales by Gasoline Wholesale Distributors . . . . . . . . . . . . . . . . | ☐ |
| **Schedule 5** | Section 4081(e) Claims . . . . . . . . . . . . . . . . . . . | ☐ |
| **Schedule 6** | Other Claims . . . . . . . . . . . . . . . . . . . . . | ☒ |

**Sign Here**

Under penalties of perjury, I declare (1) that I have examined this claim, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and (2) that amounts claimed on this form have not been, and will not be, claimed on any other form.

*Nancy S. McCarty* (signature)    Date 1/31/05

Signature and title (if applicable)

Nancy S. McCarty    Director, Consumption Taxes
Type or print your name below signature.

For Privacy Act and Paperwork Reduction Act Notice, see instructions.    Cat. No. 20027J    Form **8849** (Rev. 1-2003)

335





| Schedule 6 (Form 8849) (Rev. January 2003) | Department of the Treasury—Internal Revenue Service **Other Claims** ▶ Attach to Form 8849. | | OMB No. 1545-1420 | |
|---|---|---|---|---|
| Name as shown on Form 8849 UUNET Technologies, INC. | | EIN or SSN 54-1543611 | Total refund (total of lines 1–5) $ 14,260,752 | |

Enter the earliest and latest dates of the events included in this claim. Enter in MMDDYYYY format.

Earliest date ▶ ___10012001___       Latest date ▶ ___12312004___

Claimant's registration number for Section 4091(d) claims. ▶ _____

| Tax | Amount of refund | CRN |
|---|---|---|
| **1** Communications excise tax paid to local exchange companies on purchases of certain telecommunication | $ 14,260,752 | |
| **2** services | | |
| **3** | | |
| **4** | | |
| **5** | | |

Use the space below for an explanation of each tax claimed.   **See enclosures**

For claims under section 6416(b)(2) relating to certain uses and resales of certain articles subject to manufacturers or retailers taxes, claimant certifies that it sold the article at a tax-excluded price, repaid the amount of tax to the ultimate vendor, or has obtained the written consent of the ultimate vendor to make the claim; and has the required supporting evidence.

## Instructions

*Section references are to the Internal Revenue Code unless otherwise noted.*

**Purpose of schedule.** Use Schedule 6 for claims not reportable on Schedules 1–5, including refunds of excise taxes reported on:

● **Form 720,** Quarterly Federal Excise Tax Return, including section 4091(d) claims;

● **Form 2290,** Heavy Highway Vehicle Use Tax Return;

● **Form 730,** Monthly Tax Return for Wagers; and

● **Form 11-C,** Occupational Tax and Registration Return for Wagering.

**Caution:** *Do not use Schedule 6 to make adjustments to liability reported on Forms 720 filed for prior quarters. Use Form 720X, Amended Quarterly Federal Excise Tax Return. Also, do not use Schedule 6 to claim amounts that were taken or will be taken as a credit on Form 2290 or Form 730.*

**Claim requirements.** Generally, a claim must be filed within 3 years of the filing of the return to which the claim relates, or 2 years from when the tax reported on that return was paid, whichever is later.

**How to file.** Attach Schedule 6 to Form 8849. Mail it to the IRS at the address under **Where To File** in the Form 8849 instructions. If you are filing a Section 4091(d) claim, write "Section 4091(d)" at the top of Form 8849 and on the envelope. If you attach additional sheets, write your name and taxpayer identification number on each sheet.

For Privacy Act and Paperwork Reduction Act Notice, see Form 8849 instructions.    Cat. No. 27454M    Schedule 6 (Form 8849) (Rev. 1-2003)

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**REFUND SUMMARY**

| Period | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| 4th Quarter 2001 | $2,077,473 | $62,324 |
| 1st Quarter 2002 | $2,163,162 | $64,895 |
| 2nd Quarter 2002 | $1,436,523 | $43,096 |
| 3rd Quarter 2002 | $2,252,162 | $67,566 |
| Paid with Form 5384 | | $13,573,017 |
| 4th Quarter 2002 | $2,013,808 | $60,414 |
| 1st Quarter 2003 | $2,686,309 | $80,589 |
| 2nd Quarter 2003 | $1,952,892 | $58,587 |
| 3rd Quarter 2003 | $1,728,893 | $51,866 |
| 4th Quarter 2003 | $998,419 | $29,953 |
| 1st Quarter 2004 | $881,276 | $26,438 |
| 2nd Quarter 2004 | $724,120 | $21,723 |
| 3rd Quarter 2004 | $2,291,030 | $68,731 |
| 4th Quarter 2004 | $1,718,420 | $51,553 |
| Total Refund Claim | | $14,260,752 |

form8849attach                    1/28/2005        8:41 AM

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**4TH QUARTER 2001**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| Bell South Telecomunications | $604,332 | $18,130 |
| Frontier Communications | $333,429 | $10,003 |
| Hickory Tech | $118,845 | $3,565 |
| Iowa Telecom | $202,752 | $6,083 |
| Qwest/Mountain Bell | $670,970 | $20,129 |
| SBC/Nevada Bell | $147,145 | $4,414 |
| Quarterly Total | $2,077,473 | $62,324 |

form8849attach

1/27/2005     5:38 PM

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**1ST QUARTER 2002**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| Bell South Telecomunications | $716,531 | $21,496 |
| Frontier Communications | $332,776 | $9,983 |
| Hickory Tech | $118,845 | $3,565 |
| Iowa Telecom | $247,104 | $7,413 |
| Qwest/Mountain Bell | $599,620 | $17,989 |
| SBC/Nevada Bell | $148,286 | $4,449 |
| Quarterly Total | $2,163,162 | $64,895 |

form8849attach                    1/27/2005     5:38 PM

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**2ND QUARTER 2002**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| Bell South Telecomunications | $650,524 | $19,516 |
| Iowa Telecom | $164,736 | $4,942 |
| Qwest/Mountain Bell | $478,378 | $14,351 |
| SBC/Nevada Bell | $142,885 | $4,287 |
| Quarterly Total | $1,436,523 | $43,096 |

form8849attach                     1/27/2005     5:38 PM

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**3RD QUARTER 2002**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| Alltel | $1,114,431 | $33,433 |
| Bell South Telecomunications | $533,452 | $16,004 |
| Qwest/Mountain Bell | $457,056 | $13,712 |
| SBC/Nevada Bell | $147,223 | $4,417 |
| Quarterly Total | $2,252,162 | $67,566 |

form8849attach          1/27/2005    5:38 PM

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**4TH QUARTER 2002**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| Alltel | $1,536,980 | $46,109 |
| Qwest/Mountain Bell | $476,828 | $14,305 |
| Quarterly Total | $2,013,808 | $60,414 |

form8849attach                    1/27/2005      5:38 PM

343

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**1ST QUARTER 2003**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| Alltel | $2,066,579 | $61,997 |
| Qwest/Mountain Bell | $619,730 | $18,592 |
| Quarterly Total | $2,686,309 | $80,589 |

form8849attach                    1/27/2005      5:38 PM

344

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**2ND QUARTER 2003**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| Alltel | $1,381,052 | $41,432 |
| Qwest/Mountain Bell | $571,840 | $17,155 |
| Quarterly Total | $1,952,892 | $58,587 |

form8849attach                    1/27/2005    5:38 PM

345

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**3RD QUARTER 2003**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| Alltel | $1,414,011 | $42,420 |
| Qwest/Mountain Bell | $314,882 | $9,446 |
| Quarterly Total | $1,728,893 | $51,866 |

form8849attach                    1/27/2005    5:39 PM

346

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**4TH QUARTER 2003**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| Alltel | $654,558 | $19,637 |
| Qwest/Mountain Bell | $343,861 | $10,316 |
| Quarterly Total | $998,419 | $29,953 |

form8849attach                    1/27/2005    5:39 PM

347

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**1ST QUARTER 2004**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| Alltel | $581,096 | $17,433 |
| Qwest/Mountain Bell | $300,180 | $9,005 |
| Quarterly Total | $881,276 | $26,438 |

form8849attach                    1/27/2005    5:39 PM

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**2ND QUARTER 2004**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| Alltel | $578,345 | $17,350 |
| Qwest/Mountain Bell | $145,775 | $4,373 |
| Quarterly Total | $724,120 | $21,723 |

form8849attach                    1/27/2005      6:31 PM

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**3RD QUARTER 2004**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| Alltel | $452,724 | $13,582 |
| Qwest/Mountain Bell | $1,838,306 | $55,149 |
| Quarterly Total | $2,291,030 | $68,731 |

form8849attach                    1/27/2005      5:39 PM

350

**UUNET TECHNOLOGIES, INC.**
**ATTACHMENT TO FORM 8849, SCHEDULE 6**
**DETAIL FOR REFUND**
**4TH QUARTER 2004**

| Vendor Name | COBRA Services Purchased | Communications Excise Tax Paid |
|---|---|---|
| Qwest/Mountain Bell | $1,718,420 | $51,553 |
| Quarterly Total | $1,718,420 | $51,553 |

form8849attach                1/27/2005      5:39 PM

351

# EXHIBIT E

| Form **5384** (Rev. October 1987) | Department of the Treasury – Internal Revenue Service **Excise Tax Examination Changes and Consent to Assessment and Collection** | | Return Form Number 720 | Page _1_ of _1_ Pages |

| Taxpayer's Name and Address UUNET Technologies, Inc. 1133 19th Street, NW Washington, DC 200363 | Social Security or Employer Identification Number 54-1543611 |
| | Person with Whom examination changes were discussed *(name and title)* |

| Period Ended (1) | IRS No. (2) | Kind of Tax (3) | Correct Liability (4) | Previous Assessment (5) | Adjustment - Increase (Decrease) | | |
|---|---|---|---|---|---|---|---|
| | | | | | Tax (6) | Penalties (See Explanation) (7) | Total (8) |
| 200112 | 22 | comm | 3,451,167 | 0.00 | 3,451,167 | 0.00 | 3,451,167 |
| 200203 | 22 | comm | 3,480,929 | 0.00 | 3,480,929 | 0.00 | 3,480,929 |
| 200206 | 22 | comm | 3,158,913 | 0.00 | 3,158,913 | 0.00 | 3,158,913 |
| 200209 | 22 | comm | 3,064,145 | 0.00 | 3,064,145 | 0.00 | 3,064,145 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Other Information:

| Examiner's Signature *BADGE NO.: 52-01202* *410-962-3521* | District Baltimore | Date 12/12/2002 |

## Instructions

### General Information

If you consent to the assessment of the amounts shown in this agreement, your signature will expedite our bill to you. Your consent will not prevent you from filing a claim for refund *(after you have paid the tax)* if you later believe you are so entitled; nor prevent us from later determining, if necessary, that you owe additional tax; nor extend the time provided by law for either action.

### Who Must Sign

If you are making this agreement on behalf of a partnership, all partners must sign, unless one partner, with appropriate evidence of authority to do so, signs for the partnership.

If you are making this agreement on behalf of a corporation, it must be signed with the corporate name, followed by the signatures and titles of the corporate officers authorized to sign.

An attorney or agent may sign this agreement provided such action is specifically authorized by a power of attorney which, if not previously filed, must accompany this form.

## Consent to Assessment and Collection

I consent to the immediate assessment and collection of any additional tax and penalties and accept any over-assessment *(decrease in tax and penalties)* shown above, plus any interest provided by law.

| Signature | | Date: |
| | UUNet Technologies, Inc. | Date: |
| | By *WALTER NAGEL* | Title SEE ATTACHED | Date: 1-6-03 |

Form **5384** (Rev. 10-87)

UUNET TECHNOLOGIES, INC.
SUMMARY OF TAX AND INTEREST DUE BY QUARTER
200112-200209

|        | TAX DUE    | INTEREST | TOTAL      |
|--------|------------|----------|------------|
| 200112 | 3,451,167  | 186,385  | 3,637,552  |
| 200203 | 3,480,929  | 134,710  | 3,615,640  |
| 200206 | 3,158,913  | 73,004   | 3,231,917  |
| 200209 | 3,064,145  | 23,764   | 3,087,909  |
| TOTAL  | 13,155,155 | 417,863  | 13,573,018 |

DO NOT ACCEPT THIS CHECK UNLESS YOU SEE A TRUE WATERMARK THAT APPEARS IN A DIAMOND WEAVE PATTERN WHEN HELD TO LIGHT AT AN ANGLE

**WORLDCOM**
Tax Account
Debtor in Possession

Bank of America
Controlled Disbursement Account
Northbrook, IL

70-2328/0719

Date **12/16/2002**

Check No. **1000097564**

$****13,573,017.00*

PAY EXACTLY

*** THIRTEEN MILLION FIVE HUNDRED SEVENTY-THREE THOUSAND
SEVENTEEN USD and ZERO Cents ***

Void After 120 Days

TO THE ORDER OF    **INTERNAL REVENUE SERVICE**

PHILADELPHIA PA   19255

VERIFY AUTHENTICITY BY RUBBING PINK STRIPE ON BACK OF CHECK. SEE BACK FOR ADDITIONAL SECURITY INFORMATION

⑆1000097564⑆ ⑈071923284⑈ 876580 2384⑈

| | | |
|---|---|---|
| Vendor No. **01TAX2718** | Our Account With You | Check No. **1000097564** |
| Vendor Name **INTERNAL REVENUE SERVICE** | Payment Doc. No. **2000107349** | Check Date **12/16/2002** |

| Date | Invoice No. | Doc No. | Gross | Discount | Net |
|---|---|---|---|---|---|
| 12/13/2002 | 1166303 T001 | 1900012095 | 13573,017.00 | 0.00 | 13573,017.00 |
| Check Total | | | | | 13573,017.00 |

*Hand delivered to David Friedman
at (W) 1972 St, N.W.  12/17/02*

**WORLDCOM**

PAGE  1  /  1

355

# EXHIBIT F

| Service Month | Federal Excise Tax Paid by Vendor | | | |
|---|---|---|---|---|
| | BellSouth | Qwest | GTE | Total |
| Jul-98 | | $30,095 | | $30,095 |
| Aug-98 | | $33,241 | | $33,241 |
| Sep-98 | | $33,347 | | $33,347 |
| Oct-98 | $408 | $33,652 | | $34,059 |
| Nov-98 | $10,346 | $28,605 | | $38,951 |
| Dec-98 | $64,340 | $29,574 | | $93,914 |
| Jan-99 | $118,641 | $35,320 | | $153,961 |
| Feb-99 | $103,181 | $47,614 | | $150,795 |
| Mar-99 | $120,231 | $44,957 | | $165,187 |
| Apr-99 | $130,969 | $48,099 | | $179,068 |
| May-99 | $136,746 | $57,049 | | $193,795 |
| Jun-99 | $151,471 | $78,268 | | $229,738 |
| Jul-99 | $148,597 | $83,546 | | $232,143 |
| Aug-99 | $159,758 | $83,686 | | $243,444 |
| Sep-99 | $169,180 | $95,898 | | $265,077 |
| Oct-99 | $181,253 | $88,417 | | $269,670 |
| Nov-99 | $187,164 | $104,754 | | $291,918 |
| Dec-99 | $212,975 | $101,384 | | $314,358 |
| Jan-00 | $215,439 | $114,182 | | $329,621 |
| Feb-00 | $224,215 | $112,142 | | $336,357 |
| Mar-00 | $234,569 | $117,158 | | $351,727 |
| Apr-00 | $243,932 | $126,701 | | $370,633 |
| May-00 | $245,118 | $128,778 | | $373,896 |
| Jun-00 | $263,649 | $133,684 | | $397,333 |
| Jul-00 | $238,436 | $133,666 | | $372,103 |
| Aug-00 | $252,556 | $131,993 | $47,395 | $431,945 |
| Sep-00 | $252,210 | $141,110 | $49,447 | $442,767 |
| Oct-00 | $256,669 | $142,502 | $51,255 | $450,426 |
| Nov-00 | $257,562 | $142,682 | $51,798 | $452,042 |
| Dec-00 | $279,855 | $166,223 | $51,696 | $497,774 |
| Jan-01 | $241,145 | $195,597 | $44,868 | $481,610 |
| Feb-01 | $254,997 | $216,149 | $48,234 | $519,380 |
| Mar-01 | $255,508 | $223,040 | $49,683 | $528,231 |
| Apr-01 | $275,849 | $251,458 | $47,105 | $574,411 |
| May-01 | $231,313 | $255,970 | $49,561 | $536,844 |
| Jun-01 | $263,242 | $267,322 | $48,203 | $578,766 |
| Jul-01 | $0 | $296,619 | $50,224 | $346,843 |
| Aug-01 | $0 | $154,022 | $0 | $154,022 |
| Sep-01 | $0 | $106,429 | $0 | $106,429 |
| All Periods | $6,381,521 | $4,614,932 | $589,469 | $11,585,922 |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re | x | Chapter 11 |
| WORLDCOM, INC., et al., | | Case No. 02-13533 (AJG) |
| Reorganized Debtors. | | (Confirmed Case) |
| | | STIPULATION AND ORDER |
| | x | |

WHEREAS on July 2, 2004, the Internal Revenue Service ("IRS") filed a Request for Payment, claim numbered 38365 ("Request for Payment No. 38365" or "Proof of Claim No. 38365"), against MCI subsidiary UUNET Technologies, Inc. ("UUNET") seeking payment of federal communications excise taxes owed pursuant to 26 U.S.C. § 4251 et seq. (the "Excise Tax") for certain central office-based remote access ("COBRA") services;

WHEREAS on August 5, 2004, the Reorganized Debtors filed an objection to Request for Payment No. 38365 (the "Objection");

WHEREAS on January 31, 2006, the Reorganized Debtors filed a motion for refund of the Excise Tax allegedly paid in connection with purchase of COBRA service for periods specified therein (the "Refund Motion");

WHEREAS on June 1, 2007, the Bankruptcy Court issued an opinion granting the Objection and the Refund Motion and directing the Reorganized Debtors to settle an order consistent with the opinion;

WHEREAS on June 27, 2007, the Bankruptcy Court entered an Order Granting Reorganized Debtors' Objection to Proof of Claim No. 38365 and Motion for a Determination of Refund Rights Pursuant to Section 505(a)(1) of the Bankruptcy Code (the "Excise Tax Order");

WHEREAS on July 2, 2007, the IRS filed a Notice of Appeal from the Excise Tax Order (the "IRS Appeal") to the United States District Court for the Southern District of New York (the "District Court");

WHEREAS on August 30, 2007, the Reorganized Debtors moved to dismiss the IRS' appeal in the District Court as prematurely filed and the IRS responded by arguing that the Excise Tax Order was appealable separately as to the claim objection matter and alternatively seeking leave to appeal under Rule 8003;

WHEREAS pursuant to the Excise Tax Order, the Reorganized Debtors filed the Declaration of John Trofimuk in the Bankruptcy Court on or about November 9, 2007, setting forth $25,158,939.00 as the amount of refund claimed to be due to the Reorganized Debtors;

WHEREAS the IRS has reviewed the Declaration of John Trofimuk and the supporting documentation referred to therein;

NOW THEREFORE IT IS HEREBY STIPULATED AND AGREED BETWEEN THE PARTIES AND ORDERED that:

1.    The IRS agrees that, in the event that the rulings memorialized in the opinion of June 1, 2007 and in the Excise Tax Order, are not amended, vacated, or otherwise modified after the conclusion of all appeals, the IRS will recognize that the Reorganized Debtors have overpaid their federal communications excise taxes for the periods identified in the Declaration of John Trofimuk in the total amount of $25,158,939.00 (the "Refund Amount"), which the IRS agrees shall at that time be credited or refunded pursuant to 26 U.S.C. § 6402(a).

2.    Notwithstanding the agreement in paragraph 1 above regarding the Refund Amount, the IRS reserves all its rights to make in any appeals all arguments that there was no waiver of sovereign immunity in the Bankruptcy Court regarding the Refund Motion and that the

Bankruptcy Court lacked jurisdiction to consider the Refund Motion. Similarly, the Reorganized

Debtors reserve all its rights to argue that the arguments reserved by the IRS with respect to the

Refund Motion have been waived.

3.      This Order shall be deemed a final and appealable order as to the Refund Motion.

To the extent that the Bankruptcy Court's ruling on the Objection contained in the Excise Tax

Order was not already final and appealable, this Order shall also be deemed to render it final and

appealable.


**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

4.      The parties agree that any appeal from this Order should be consolidated with the

IRS Appeal.

Dated:      New York, New York
            February 19, 2008

                                    MICHAEL J. GARCIA
                                    United States Attorney for the
                                    Southern District of New York
                                    Attorney for the IRS

                            By:  ___/s/ Danna Drori_____
                                    DANNA DRORI
                                    Assistant United States Attorney
                                    86 Chambers Street, 3rd Floor
                                    New York, New York 10007
                                    Telephone: (212) 637-2689
                                    Facsimile: (212) 637-2689

Dated:      Houston, Texas
            February 19, 2008

                                    ___/s/ Alfredo R. Perez_____
                                    Marcia L. Goldstein (MLG-2606)
                                    Lori R. Fife (LRF-2839)
                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, New York 10153
                                    Telephone: (212) 310-8000
                                    Facsimile: (212) 310-8007
                                            and
                                    Alfredo R. Perez
                                    WEIL, GOTSHAL & MANGES LLP
                                    700 Louisiana, Suite 1600
                                    Houston, Texas 77002
                                    Telephone: (713) 546-5000
                                    Facsimile: (713) 224-9511

SO ORDERED:

Dated:      New York, New York
            February 20, 2008

                            **s/Arthur J. Gonzalez**
                            ARTHUR J. GONZALEZ
                            UNITED STATES BANKRUPTCY JUDGE

HO1:\357707\01\7_0B01!.DOC\81793.0023            4

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By: DANNA DRORI
Assistant United States Attorney
86 Chambers Street
New York, New York 10007
Telephone: (212) 637-2689
Facsimile: (212) 637-2717

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

| | |
|---|---|
| In re | Chapter 11 |
| WORLDCOM, INC., et al., | Case No. 02-13533 (AJG) |
| Reorganized Debtors. | (Confirmed Case) |

------------------------------------------------------------ x

## NOTICE OF APPEAL

PLEASE TAKE NOTICE that the Internal Revenue Service, by its attorney Michael J.

Garcia, United States Attorney for the Southern District of New York, hereby appeals to the

United States District Court for the Southern District of New York, pursuant to 28 U.S.C.

§ 158(a), from the Stipulation and Order, which was entered on February 20, 2008.

This appeal relates to the same issues currently on appeal from the United States

Bankruptcy Court in Internal Revenue Service v. Worldcom, Inc., 07 Civ. 7414 (BSJ)

(S.D.N.Y.).

The parties to the Stipulation and Order appealed from, and the names and addresses of

their respective attorneys, are as follows:

Debtor/Appellee:    WorldCom, Inc.
Attorney:           Weil, Gotshal & Manges, LLP
                    Marcia L. Goldstein, Esq.
                    Lori R. Fife, Esq.
                    Alfredo R. Pérez, Esq.
                    767 Fifth Avenue
                    New York, New York 10153-0119
                    Telephone: (212) 310-8000

Creditor/Appellant:  Internal Revenue Service
Attorney:            Michael J. Garcia
                     United States Attorney for the Southern District of New York
                     Danna Drori, Esq.
                     Assistant United States Attorney
                     86 Chambers Street
                     New York, New York 10007
                     Telephone: (212) 637-2689


Dated: New York, New York               Respectfully submitted,
       February 27, 2008

                                        MICHAEL J. GARCIA
                                        United States Attorney for the
                                        Southern District of New York
                                        Attorney for the Internal Revenue Service

                                By:     /s/ Danna Drori
                                        DANNA DRORI
                                        Assistant United States Attorney
                                        Telephone: (212) 637-2689
                                        Facsimile: (212) 637-2717


2