UNITED STATES BANKRUPTCY COURT     **NOT FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
| WORLDCOM, INC., *et al.*, | : | Case No. 02-13533 (AJG) |
| Debtors. | : | (Jointly Administered) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW (1) APPROVING (i) SUBSTANTIVE CONSOLIDATION AND (ii) THE SETTLEMENTS UNDER DEBTORS' MODIFIED SECOND AMENDED JOINT PLAN OF REORGANIZATION, DATED OCTOBER 21, 2003, AND (2) CONFIRMNG DEBTORS' MODIFIED SECOND AMENDED JOINT PLAN OF REORGANIZATION, DATED OCTOBER 21, 2003

On September 8, 9, 12, 15, 16, 17 and 19, 2003 and October 14, 15, 21 and 30

2003, this Court held[1] a confirmation hearing (the "Confirmation Hearing") to consider a

plan of reorganization under chapter 11 of the Bankruptcy Code jointly proposed by

WorldCom, Inc. and certain of its direct and indirect subsidiaries, as debtors and debtors

in possession (collectively, the "Debtors"). During the course of the Confirmation

Hearing, the Debtors filed Debtors' Second Amended Joint Plan of Reorganization, dated

September 12, 2003, which was subsequently modified. Debtors thereafter filed Debtors'

---

[1] This Court has subject matter jurisdiction over these cases under 28 U.S.C. §§ 157(a) and 1334(b) and under the July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.). This is a core matter under 28 U.S.C. § 157(b)(2)(L). This Memorandum of Decision constitutes findings of fact and conclusions of law under Fed. R. Civ. P. 52, as made applicable by Fed. R. Bankr. P. 7052 and Fed. R. Bankr. P. 9014. To the extent any of the findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law constitute findings of fact, they are adopted as such.

Modified Second Amended Joint Plan Of Reorganization Under Chapter 11 Of The

Bankruptcy Code, dated October 21, 2003 ("Modified Second Amended Plan").[2]

The Court has reviewed and considered the Modified Second Amended Plan, all

affidavits submitted, as well as the testimony proffered and adduced, the exhibits

admitted into evidence at the Confirmation Hearing and the arguments of counsel

presented at the Confirmation Hearing. The Court has also considered all objections to

confirmation of the Plan. This Court is cognizant of the compromises and settlements of

the parties, and other relevant factors affecting these Chapter 11 Cases, and takes judicial

notice of the entire record. Based upon the following findings of fact and conclusions of

law, the Court will approve substantive consolidation, approve the settlements under the

Modified Second Amended Plan and confirm the Modified Second Amended Plan and

herein disposes of all objections to confirmation not otherwise previously resolved or

withdrawn.

## I. FINDINGS OF FACT

## A.  BACKGROUND, THE PLAN, AND SOLICITATION AND NOTICE

### (i) Background

The Debtors current corporate structure results from a series of prepetition

mergers and acquisitions including that involving WorldCom, Inc. and MCI

Communications Corporation ("MCIC" and the merger with WorldCom Inc., sometimes

referred to as the "Merger").

---

[2] Capitalized terms used in this Memorandum of Decision that are not otherwise defined
herein shall have the same meanings ascribed to them in the Modified Second Amended
Plan.

On July 21, 2002 (the "Commencement Date") and November 8, 2002,
WorldCom, Inc. and 221 of its direct and indirect subsidiaries commenced voluntary
cases under the Bankruptcy Code. By Orders, dated July 22, 2002 and November 12,
2002, the Debtors' Chapter 11 Cases were consolidated for procedural purposes and are
being jointly administered. The Debtors continue to operate their businesses and manage
their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the
Bankruptcy Code. On July 29, 2002, the United States Trustee for the Southern District
of New York (the "United States Trustee") appointed the statutory committee of
unsecured creditors (the "Creditors' Committee"). No trustee has been appointed in these
Chapter 11 Cases.

On October 29, 2002 this Court entered an Order Pursuant to Bankruptcy Rule
3003(c)(3) Establishing the Deadline for Filing Certain Proofs of Claim and Approving
the Form and Manner of Notice Thereof (the "Bar Date Order"). (Docket No. 1780.)
The Bar Date Order established 5:00 p.m. (Eastern Time) on January 23, 2003 (the "Bar
Date") as the deadline for filing proofs of claims in the Debtors' cases, subject to
specified exceptions.

**(ii) The Plan**

On May 23, 2003, the Debtors filed with this Court the proposed Debtors'
Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code, dated May 23,
2003 (the "Disclosure Statement") and Debtors' Joint Plan of Reorganization Under
Chapter 11 of the Bankruptcy Code (the "May 23 Plan"). (Debtors' Ex. 274.)

On May 28, 2003, after due notice and a hearing held on May 19, 2003 and May
22, 2003, this Court entered an order (the "May 28 Disclosure Statement Order"), which,
among other things, approved the Disclosure Statement, finding that it contained

3

"adequate information" within the meaning of section 1125 of the Bankruptcy Code and established procedures for the Debtors' solicitation of votes on the May 23 Plan. (Docket No. 6110.) In accordance with the May 28 Disclosure Statement Order, on June 12, 2003 the Debtors commenced the solicitation of votes on the May 23 Plan. (Debtors' Ex. 301, June 18, 2003 Sullivan Aff.)

On July 9, 2003, the Debtors filed with this Court the proposed Supplement to Debtors' Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code, dated May 23, 2003 (the "First Supplement") and Debtors' Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated July 9, 2003 (the "July 9 Plan"). (Debtors' Ex. 273.) The modifications to the May 23 Plan embodied in the July 9 Plan related to the incorporation of the Bank Settlement (described below) and the creation of the corresponding Class 3A, a revision to the SEC Settlement, and the clarification of certain implementation provisions. The First Supplement provided disclosure with respect thereto.

On July 11, 2003, after due notice and a hearing held on July 9, 2003, this Court entered an order (the "First Supplemental Disclosure Statement Order"), which, among other things, approved the First Supplement, finding that the First Supplement, together with the Disclosure Statement, contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code, established procedures for the Debtors' solicitation of votes by holders of Claims in Class 3A and the distribution of the First Supplement and the July 9 Plan to parties in interest, authorized any creditor to change its vote previously cast on the May 23 Plan, and extended the deadline for filing objections to confirmation based upon the Bank Settlement from July 28, 2003 to August 4, 2003.

4

(Docket No. 7297.)  In accordance with the First Supplemental Disclosure Statement

Order, on July 11, 2003 the Debtors commenced the solicitation of votes of holders of

Claims in Class 3A on the July 9 Plan (which amended the May 23 Plan), and

commenced the distribution of the First Supplement and July 9 Plan to parties in interest.

(Debtors' Ex. 301, July 25, 2003 Sullivan Aff.)

On July 31, 2003, the Court entered an Order:  (1) Directing Debtors to File a

Second Supplement to Debtors' Disclosure Statement; (2) Setting Objection Deadline

Related Thereto; and (3) Extending Voting Deadlines and Adjourning Date for

Commencement of Confirmation Hearing (the "July 31 Order").  Pursuant to the July 31

Order, the Court directed the Debtors to file a second supplement to the Disclosure

Statement in respect of certain newly commenced governmental investigations and

actions, extended the deadline for casting votes on the Amended Plan to August 26, 2003

and adjourned the hearing to consider confirmation of the Amended Plan to September 8,

2003.  (Docket No. 7961.)

On August 6, 2003, pursuant to the July 31 Order, the Debtors filed with the

Court the proposed Second Supplement to Debtors' Disclosure Statement Pursuant to

Section 1125 of the Bankruptcy Code, dated May 23, 2003 (the "Second Supplement"),

which notified parties of the voting and objection deadlines established by the July 31

Order, provided disclosure in respect of then-recent investigations and actions by certain

governmental agencies and departments, and set forth the Debtors' position with respect

to the allegations raised thereby, the potential impact, if any, on the Debtors' estates, and

other related information.  (Debtors' Ex. 272.)

On August 7, 2003, after due notice and a hearing held on August 6, 2003, this
Court entered an order (the "Second Supplemental Disclosure Statement Order"), which,
among other things, approved the Second Supplement, finding that the Second
Supplement, together with the Disclosure Statement and the First Supplement, contained
"adequate information" within the meaning of section 1125 of the Bankruptcy Code,
established procedures for the Debtors' distribution of the Second Supplement to parties
in interest, authorized any creditor to change its vote previously cast on the May 23 Plan
or the Amended Plan, and extended the deadline for filing objections to confirmation
based upon the Bank Settlement from July 28, 2003 to August 4, 2003. (Docket No.
8128.) In accordance with the Second Supplemental Disclosure Statement Order, on
August 9, 2003 the Debtors commenced the distribution of the Second Supplement to
parties in interest. (Debtors' Ex. 301, August 22, 2003 Sullivan Aff.)

On August 29, 2003, the Certification of Jane Sullivan with Respect to the
Tabulation of Votes on the Plan of Reorganization, sworn to on August 29, 2003 (the
"Initial Vote Certification") was filed with the Court on behalf of the Debtors' voting and
tabulation agent, Innisfree M&A Incorporated. (Debtors' Ex. 302, Docket No. 8603.)
The July 9 Plan was accepted by holders of more than two-thirds in amount and more
than one-half in number of Claims voted in each Class entitled to vote. (Debtors' Ex.
302.)

The hearing to consider confirmation of the July 9 Plan commenced on September
8, 2003. Among the parties that had interposed objections to confirmation were the Ad
Hoc MCI Trade Claims Committee, the Ad Hoc Committee of Dissenting Bondholders,
Platinum Partners Value Arbitrage Fund, L.P. ("Platinum"), Deutsche Bank Securities,

6

Inc. ("Deutsche"), and HSBC Bank USA ("HSBC"). (Docket Nos. 8033, 7938, 7939, 8038, 7707, 8011.) On September 9, 2003, the Debtors informed the Court that agreements had been reached with the Ad Hoc MCI Trade Claims Committee and the Ad Hoc Committee of Dissenting Bondholders, as well as with other objectors such as Platinum, Deutsche, and HSBC, pursuant to which, among other things, the Debtors would further amend the July 9 Plan and such objections would be withdrawn.

On September 12, 2003, the Debtors filed with this Court the proposed Third Supplement to Debtors' Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code, dated May 23, 2003 (as thereafter modified, the "Third Supplement") and Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated September 12, 2003 (the "September 12 Plan"). (Debtors' Ex. 335.) The modifications to the July 9 Plan embodied in the September 12 Plan reflect the resolution of issues with the Ad Hoc MCI Trade Claims Committee, the Ad Hoc Committee of Dissenting Bondholders, HSBC, and other objectors such as Platinum and Deutsche that had asserted unique reliance arguments based upon their pre-merger trade claims, and include a settlement regarding the treatment of MCIC Subordinated Debt Claims, a reduction to the recovery by the holders of MCIC Senior Debt Claims, a contribution of plan consideration by the holders of MCIC Senior Debt Claims and MCIC Subordinated Debt Claims, and provision for additional recoveries to Class 6 creditors that can establish that their Claims qualify as MCI Pre-merger Claims. The Third Supplement provided disclosure with respect thereto and related provisions and addressed the extent to which (if at all) the modifications would affect creditor recoveries.

7

On September 12, 2003, after due notice by announcement of the Court on the record on September 9, 2003 and a hearing held on September 11, 2003 and September 12, 2003, this Court entered an order (the "Third Supplemental Disclosure Statement Order," and collectively with the Disclosure Statement Order, the First Supplemental Disclosure Statement Order, and the Second Supplemental Disclosure Statement Order, the "Disclosure Statement Orders"), which, among other things, approved the Third Supplement, finding that the Third Supplement, together with the Disclosure Statement, the First Supplement, and the Second Supplement, contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code, established procedures for the Debtors' distribution of the Third Supplement and the September 12 Plan to parties in interest, authorized any creditor to change its vote previously cast on the May 23 Plan or the July 9 Plan and established October 8, 2003 as the deadline therefor, and established September 30, 2003 as the deadline for filing objections to confirmation based upon the modifications reflected in the September 12 Plan. (Docket No. 8893.) In accordance with the Third Supplemental Disclosure Statement Order, on September 15, 2003 the Debtors commenced the distribution of the Third Supplement and September 12 Plan to parties in interest. (Debtors' Ex. 301, September 19, 2003 Sullivan Aff.)[3]

On October 10, 2003, the Supplemental Certification of Jane Sullivan with Respect to the Tabulation of Votes on the Plan of Reorganization, sworn to on October 10, 2003 ( the "Supplemental Vote Certification," and together with the Initial Vote

---

[3] On September 19, 2003, the September 12 Plan was modified to incorporate a settlement among the Debtors, the Committee, and an Ad Hoc Committee of Intermedia Preferred Stockholders (the "Intermedia Preferred Settlement"). Notice of such modification was filed on September 24, 2003.

Certification, the "Vote Certifications") was filed with the Court on behalf of the

Debtors' voting and tabulation agent, Innisfree M&A Incorporated. (Debtors' Ex. 338;

Docket No. 9355.)  The September 12 Plan was accepted by holders of more than two-

thirds in amount and more than one-half in number of Claims voted in each Class entitled

to vote.  (Debtors' Ex. 338.)

At the October 15, 2003, the Court heard evidence and oral argument in respect of

the remaining objections to the September 12 Plan.  The objectors raised various

arguments in opposition to the September 12 Plan, including that the classification of

WorldCom General Unsecured Claims, MCI Pre-merger Claims, and Ad Hoc MCI Trade

Claims Committee Claims together in one Class violated section 1123(a)(4) of the

Bankruptcy Code.

On October 20, 2003, the Court ruled concerning the objections based on section

1123(a)(4) of the Bankruptcy Code (the "October 20 Ruling").  In the October 20 Ruling,

the Court held that Class 6 of the September 12 Plan did not comply with the

requirements of section 1123(a)(4) of the Bankruptcy Code.  The Court directed the

Debtors to separately classify WorldCom General Unsecured Claims, the MCI Pre-

merger Claims, and the members of the Ad Hoc MCI Trade Claims Committee.

Although the class of Ad Hoc Trade Claims receives the same treatment as the

WorldCom General Unsecured Claims under the September 12 Plan, the Court preferred

separate classification of those classes for voting purposes because of the Court's concern

that the members of the Ad Hoc Trade Claims Committee could, arguably, unduly

influence the outcome of the vote if the two groups were merged into one class.  The

Court also directed that the constituency of the MCI Pre-merger Claim class would be

determined by a creditor election to opt into that class. Finally, the Court directed the Debtors to advise the Court as to whether the Debtors intended to re-solicit the holders of the newly separately-classified claims or whether the Debtors would seek to confirm the September 12 Plan, as modified, under section 1129(b) of the Bankruptcy Code with respect to these Classes.

In compliance with the October 20 Ruling, on October 21, 2003, the Debtors advised the Court that they would seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code. At such time, the Court scheduled a hearing to consider confirmation of the Plan under section 1129(b) of the Bankruptcy Code for October 30, 2003.

On October 21, 2003 the Debtors filed the Debtors' Modified Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated October 21, 2003 (the "Modified Second Amended Plan"), which modifies the September 12 Plan by, *inter alia*, reclassifying the Claims in former Class 6 (WorldCom General Unsecured Claims) into Classes 6, 6A, and 6B. The Modified Second Amended Plan, thus, separately classifies (i) into Class 6A, MCI Pre-merger Claims, which are Claims arising solely from an individual transaction or series of transactions that was fully completed on or before September 13, 1998, the holders of which relied on the separate credit of MCIC or any subsidiary of MCIC as of that date, (ii) into Class 6B, solely for voting purposes, Ad Hoc MCI Trade Claims Committee Claims, which are the General Unsecured Claims

10

of the Ad Hoc MCI Trade Claim Committee and (iii) into Class 6, all other General Unsecured Claims against the WorldCom Debtors.[4]

Each holder of an Allowed Class 6 WorldCom General Unsecured Claim will receive the same treatment under the Plan consisting of (i) 7.14 shares of New Common Stock for each one thousand ($1,000) dollars of such holder's Allowed WorldCom General Unsecured Claim and (ii) Cash in an amount equal to .1785 multiplied by the Allowed amount of such WorldCom General Unsecured Claim. Each holder of an Allowed Class 6A MCI Pre-merger Claim will receive the same treatment under the Plan consisting of (i) 7.14 shares of New Common Stock for each one thousand ($1,000) dollars of such holder's Allowed MCI Pre-merger Claim and (ii) Cash in an amount equal to .4215 multiplied by the Allowed amount of such MCI Pre-merger Claim. The Claims of the Ad Hoc MCI Trade Claims Committee Claims are separately classified in Class 6B solely for voting purposes and not for treatment purposes. Holders of Claims in Class 6B will receive the same treatment as Class 6 creditors. They will also receive additional value from the contributions from the holders of Claims in Classes 9 and 10.

Although the original Class 6 (which included Class 6A Claims) overwhelmingly accepted the plan, Classes 6 and 6A are deemed to have voted to reject for purposes of seeking confirmation of the Modified Second Amended Plan pursuant to section 1129(b) of the Bankruptcy Code. The Class 6B Ad Hoc MCI Trade Claims Committee Claims are deemed to be an "accepting" Class because the members of the Ad Hoc MCI Trade

---

[4] As set forth by the Debtors on the record at the October 21, 2003 hearing, the other modifications include a modification to the Exculpation Provision, which was agreed to by the Debtors, the Committee and the United States Trustee, and conforming changes relating to the Intermedia Preferred Settlement, none of which implicates or adversely impacts creditor recoveries.

11

Claims Committee have agreed to the treatment and to support the Modified Second
Amended Plan pursuant to the Integrated Settlement and related stipulations.

     The Modified Second Amended Plan constitutes the "Plan."

**(iii) Solicitation And Notice**

     The Disclosure Statement (Debtors' Ex. 274), the First Supplement (Debtors' Ex.
273), the Second Supplement (Debtors' Ex. 272), the Third Supplement (Debtors' Ex.
335), the Plan (Debtors' Ex. 335; Docket No. 9004), the Ballots (Docket Nos. 6110,
7297, 8893), the notice of the Confirmation Hearing (Docket No. 6110), and the
Disclosure Statement Orders (Docket Nos. 6110, 7297, 8128, 8893) (as applicable, the
"Solicitation Materials") were transmitted and served in compliance with the Bankruptcy
Rules and the Disclosure Statement Orders.  As described in the Affidavits of Service of
Innisfree M&A Incorporated, sworn to by Jane Sullivan on June 18, 2003, July 8, 2003,
July 25, 2003, July 30, 2003, August 22, 2003, September 19, 2003 and September 26,
2003 (each a "Sullivan Affidavit" and collectively, the "Sullivan Affidavits") (Debtors'
Ex. 301), (i) the transmittal and service of the Solicitation Materials were adequate and
sufficient under the circumstances of these Chapter 11 Cases, and (ii) adequate and
sufficient notice of the Confirmation Hearing (including the July 28, 2003, August 4,
2003, August 19, 2003, September 30, 2003 and October 27, 2003 deadlines for filing
and serving objections to confirmation) and other requirements, deadlines, hearings and
matters described in the Disclosure Statement Orders were provided in compliance with
the Bankruptcy Rules and the Disclosure Statement Orders, and no other or further notice
is required.

375

In addition, Debtors appropriately served Notice of Modifications to Debtors'

Second Amended Plan of Reorganization dated September 19, 2003, which among other

things, revealed that Debtors agreed to provide a 5% recovery to the holders of

Intermedia Preferred Stock and that such modification did not have an adverse effect

upon the recovery of any class of creditors. (Docket No. 9066)

The Objectors at the October 15, 2003 hearing on confirmation included America

West Airlines, Inc. ("America West"), CIT Lending Services Corporation ("CIT"), Next

Factors, Inc.[5] ("Next Factors"), the United States Trustee for the Southern District of

New York ("United States Trustee"), and Wells Fargo Bank, N.A. ("Wells Fargo").[6] The

Objector at the October 30, 2003 hearing on confirmation was Liquidity Solutions Inc

("LSI").[7]

---

[5] Next Factors' denial of receipt of the Third Supplement is insufficient to rebut the presumption of its receipt of same. There is a rebuttable presumption that the addressee of a properly addressed and mailed notice receives that notice. *Hagner v. United States*, 285 U.S. 427, 430 (1932). A party must do more than merely deny receipt of the mailing; its testimony or affidavit of non-receipt is insufficient, standing alone, to rebut the presumption. *In re Ms. Interpret*, 222 B.R. 409, 413 (Bankr. S.D.N.Y. 1998); *In re Adler, Coleman Clearing Corp.*, 204 B.R. 99, 105 (Bankr. S.D.N.Y. 1997). The Court has reviewed certain Assignment of Claims filed in this case and the address used by Next Factors therein is identical to the address used by the Debtors to serve Next Factors. Indeed, Next Factor's counsel has used that same address in his submissions with this Court. Because Next Factors was provided with proper notification of the deadline to file objections to the Plan and failed to file its objection by such objection deadline and because Next Factors has failed to provide sufficient justification or excuse for such failure, Next Factors is barred from objecting to the Second Amended Plan. In any event, the Court believes that the Court's conclusions, as set forth in the text, are sufficient to overrule Next Factors objections on the merits.

[6] The America West and CIT objections to confirmation of the Plan were later withdrawn pursuant to stipulations and agreed orders between the Debtors and America West and between the Debtors and CIT.

[7] For the reasons set forth more fully at the hearing, LSI offered no convincing excuse or evidence for its failure to abide by the objection deadline. Moreover, the Court finds that allowing LSI's to file an untimely objection that, inter alia, sought a continuance of the

The Disclosure Statement, the First Supplement, the Second Supplement, and the Third Supplement provide to holders of Claims against and Equity Interests in the Debtors "adequate information" within the meaning of section 1125 of the Bankruptcy Code. Votes on the Plan were solicited after disclosure to holders of Claims against and Equity Interests in the Debtors of "adequate information" as defined in section 1125 of the Bankruptcy Code. The procedures used to distribute and tabulate the Ballots were fair, properly conducted, and in accordance with the Disclosure Statement Orders and all applicable Bankruptcy Rules.

## B. SUBSTANTIVE CONSOLIDATION

The Plan provides for the substantive consolidation of the WorldCom Debtors and the separate substantive consolidation of the Intermedia Debtors. (Plan §§ 5.01, 5.02.)

### (i) The Debtors' Operations

The WorldCom enterprise is comprised of over 400 legal entities. (Debtors' Ex. 268.) Of these, 222 are debtors in these Chapter 11 Cases.

Historically, all the Debtors operated under common senior management. This has continued during the Chapter 11 Cases, with the appointment of Michael Capellas as Chairman of the Board of Directors and Chief Executive Officer for all of the Debtors. (Debtors' Ex. 202.) Debtors never prepared separate legal entity financial statements for public financial reporting purposes. (9/15/03 Tr. at 100.) The Debtors historically have done all public financial reporting on a consolidated basis. (*See*, *e.g.*, Debtors' Ex. 226.)

---

hearing would prejudice the Debtors at this stage of the case. The Court therefore did not have to consider its objection. Nevertheless, the Court believes that the Court's conclusions, as set forth in the text, are sufficient to overrule LSI's objections on the merits.

14

The Debtors likewise filed consolidated federal income tax returns. (*See*, *e.g.*, Debtors'

Ex. 271.)

### (ii) Transfer Of Assets From WorldCom, Inc. to MCIC

After the 1998 acquisition of, and merger with, MCIC, WorldCom substantially

restructured its corporate organization.

Through a series of restructuring transactions in December 1998, June 1999 and

September 1999, the Debtors transferred significant assets from WorldCom, Inc. to

MCIC and its subsidiaries, including the following:

- WorldCom, Inc. transferred all shares of Management Company to MCIC.

- WorldCom, Inc. transferred several of its direct subsidiaries into UUNET, an indirect legacy WorldCom subsidiary. As a result of this transfer, UUNET Technologies, Inc. ("UUNET") held all of the internet operations of the Company and UUNET's direct subsidiary held all of the value-added assets and operations.

- IDB WorldCom, Inc. ("IDBWC"), a direct subsidiary of WorldCom, Inc., and a direct subsidiary of IDBWC Inc. were merged with and into MCIC.

- MCIC conveyed most of the assets and employees of the former IDBWC and its subsidiary to other subsidiaries of MCIC.

- MFS Communications Company ("MFSCC"), a legacy WorldCom subsidiary, was merged with and into MCIC.

- MCIC conveyed all assets of the former MFSCC to Network Services but did not transfer any liabilities. This transfer resulted in legacy WorldCom subsidiaries that were former subsidiaries of MFSCC, such as UUNET, becoming indirect subsidiaries of Network Services.

- WorldCom conveyed its interest in WorldCom Pacific LLC to MCIC, and MCIC merged Pacific into MCIWC Communications.

- Network Services conveyed its sales-related assets and employees as well as the interconnection agreements of the former MFSCC to MCIWC Communications.

15

- WorldCom Network Services, Inc. ("WNS"), a legacy WorldCom subsidiary, was merged with and into Network Services.

(*See* Debtors' Exs. 33-95, 113-22, 144-65 and 331 and Creditors' Committee's Ex. 2.)

### (iii) Operational Integration of the Debtors

In furtherance of the post-merger corporate restructuring efforts, the Debtors continued and expanded operational integration of the various legal entities. Although each of the Debtors exists as a separate legal entity, WorldCom's business, both before and after the MCI merger, was and is organized along operational and functional lines rather than by legal entities. (9/15/03 Tr. at 29-30.)

Debtors are comprised of two general types of business units – sales units and operating units. (9/15/03 Tr. at 28-29.) The Debtors' sales and marketing functions are organized along three major sales channels – International, Business and Consumer. International is everything outside the United States. Business markets covers everything from small- and medium-sized businesses to the largest global account customers. Consumer, or mass markets, covers residential customers and very small businesses. (Deposition of Fred M. Briggs ("Briggs Dep.") at 80.)

The Debtors' operating units provide services and support to the sales units. The operating units include: Operations and Technology, Finance, Human Resources, Purchasing, Legal, and Marketing. (9/15/03 Tr. at 29; Declaration of Matthew Johnson ("Johnson Decl.") ¶ 1.)

Although the operations of all the Debtors are integrated, the finances of the 17 Intermedia Debtors were not integrated with those of the remaining Debtors. After the 2001 acquisition of Intermedia by WorldCom, the Intermedia Debtors continued to prepare separate financial statements, annual reports and other filings with the Securities

16

and Exchange Commission. Those filings, however, are done on a consolidated basis for all of the Intermedia entities. (Debtors' Exs. 319, 320, 327.)

**(iv) Network Operations Are Integrated**

The Debtors operate a fully-integrated telecommunications network. The Debtors' Operations and Technology unit builds, maintains, supports, operates and acquires network capacity on behalf of the entire enterprise without regard to separate legal entities. The only notable exception is the Skytel paging business, which operates a separate network. (Briggs Dep. at 24-25, 34-37, 91.)

The integrated network platforms, products and services provided by the Operations and Technology unit support all three of the major sales channels and provide network services to the entire enterprise. (Briggs Dep. at 80, 91-92; Debtors' Exs. 121-22.) The costs of building, operating and maintaining the Debtors' telecommunications network are allocated to the major sales channels for management reporting purposes. (Briggs Dep. at 82-83.)

**(v) Procurement Operations Are Integrated**

The Debtors operate a centralized procurement department. The purchasing department purchased the vast majority of all capital and non-capital items that were acquired by any of the Debtors. (Johnson Decl. ¶ 3.)

The Debtors' centralized purchasing department performs, among others, the following primary functions: (a) determines that certain goods or services are needed for the Debtors' family of companies or receives an internal request for goods or services; (b) identifies potential vendors that could supply the good or services; (c) negotiates with those vendors; (d) awards contracts to the winning vendors; and (e) actually buys,

17

through the centralized procurement department's purchase order, the goods or services needed within the Debtors' organization. (Johnson Decl. ¶ 4.)

The centralized purchasing department does not send the purchase orders on behalf of any particular legal entity. The Debtors' standard purchase order provides that, "This purchase is made by WorldCom Purchasing, LLC as agent for the Subsidiaries of MCI WORLDCOM, Inc." Purchase orders did not reference the particular legal entity with which the vendor was transacting business. (Johnson Decl. ¶ 5 & Ex. A; Debtors' Exs. 249-64.)

The centralized procurement department does not know what legal entity will receive or use the goods or services that it purchases. As a result, the Debtors' centralized procurement department does not communicate to the vendors that any particular legal entity is acquiring the goods or services or will be financially responsible for the vendor's invoice for the goods or services. (Johnson Decl. ¶ 6; Briggs Dep. at 44.)

The invoices vendors submit for goods or services they sold to the Debtors under a purchase order are paid by the Debtors' centralized accounts payable department – not by any particular legal entity. The checks paying these invoices identify only the ultimate parent corporation (that is, WorldCom, Inc.). (Johnson Decl. ¶ 7.)

Numerous trade creditors have filed exactly the same claim against multiple Debtors. This has resulted from the creditors' inability to determine which particular Debtor is the proper entity against which a proof of claim should be filed. Many creditors have filed the same claim against all 222 Debtors. (Johnson Decl. ¶ 8; Debtors' Ex. 248.)

18

### (vi) Cash Management Functions Are Integrated

The Debtors operate a centralized cash management system which handles substantially all cash received by, and paid by, all of the Debtors. The Debtors' treasury department does not manage the enterprise's cash on a legal entity basis. Rather, it tracks to bank accounts. (Deposition of Mary Chastka at 15 hereafter "Chastka Dep.")

The Debtors have several hundred bank accounts. (Chastka Dep. at 16.) There is no correlation between legal entities and bank accounts. (*Id.* at 18.)

Customer payments generally are made to lockbox accounts. The lockbox accounts are swept on a daily basis and all funds therein are transferred to the Debtors' single cash concentration account. (Chastka Dep. at 16-17, 22.)

The funds in the concentration account are then sent out to cover drafts on the Debtors' various disbursement accounts, which pay payroll expenses, vendor invoices, employee benefits and all other operational expenses of the enterprise. (Chastka Dep. at 22-23.)

Any surplus of cash in the concentration account is invested overnight in one of several money market accounts. (Chastka Dep. at 23.)

External sources of cash, such as bank borrowing, are deposited directly into the concentration account. (Chastka Dep. at 79-80.)

### (vii) Actions During the Chapter 11 Cases

The Debtors and their major creditor constituencies, including the Creditors' Committee, appear to have recognized from the start of these Chapter 11 Cases that the ability to create separate legal entity financial statements, as well as the existence of

19

382

substantial intercompany claims, were important issues in connection with evaluating the need for substantive consolidation of the estates. (9/15/03 Tr. at 217-19.)

The Creditors' Committee retained FTI Consulting Inc. ("FTI") as its forensic accountant and charged FTI with investigating intercompany accounts, among other things. (9/15/03 Tr. at 95-96.) The Debtors cooperated with this effort, providing documents, access to the company's accounting systems, and access to key accounting and financial personnel. (9/15/03 Tr. at 223-25.) FTI served as a fact-finder, sharing the results of its investigations with the Creditors' Committee, as well as the Debtors, in a series of reports. (Creditors' Committee's Exs. 2-4; 9/15/03 Tr. at 95, 224.)

In addition, the Debtors provided all major creditor constituencies with equal access to financial data, establishing a data room in their Washington, DC offices where documents and access to the Essbase financial system (described below) were available. (9/15/03 Tr. at 223-24.)

As a result of the substantial investigations that have taken place, the Debtors' historical accounting systems are well understood and there is an extensive record demonstrating the many historical deficiencies that make it impossible for the Debtors to prepare accurate and reliable separate legal entity financial statements on a historical basis.

**(viii) The Debtors' Complex Accounting System**

The Debtors' accounting systems are very complex and not well integrated. (9/15/03 Tr. at 30.) The Debtors have multiple ledger systems, the largest of which is SAP (a general ledger system). There are two SAP systems – one for domestic

20

operations and one for international operations. (9/15/03 Tr. at 30-31.) These two systems, however, did not effectively communicate. (9/15/03 Tr. at 102-03.)

In addition, some of the Debtors business units operate on a Lawson system, while still others operate on an Oracle system. (9/15/03 Tr. at 31.) These various systems are aggregated in a system referred to as Essbase which consolidates all of the financial data into one system. (9/15/03 Tr. at 31.)

There are multiple accounting systems that feed these general ledgers, including approximately sixty-five billing systems that feed the general ledger system through a variety of processes, both automated and manual. (9/15/03 Tr. at 31-32.)

There are also twenty-three accounts receivable systems that feed the billing systems. The accounts receivable systems also have hundreds of front-end systems (such as order entry, provisioning, call record tracking and rating). (9/15/03 Tr. at 32.) None of the accounts are reconciled to the general ledger. For example, the sixty-five billing systems and the twenty-three AR systems were never reconciled at the sub ledger. (9/15/03 Tr. at 45.)

There are approximately 20,000 general ledger accounts and sub accounts that are used to capture transactions for specific items such as service, general and administrative and balance sheets. (9/15/03 Tr. at 32.)

There is no specific accounting for legal entities in SAP; instead accounting is by company code. There are more than 1,100 company codes notwithstanding that there are only approximately 400 legal entities. (9/15/03 Tr. at 33.)

Debtors maintained their financial books on a general ledger company code basis, not on a legal entity basis. (9/15/03 Tr. at 99.) Each company code does not represent a

21

separate legal entity as there are multiple company codes for each legal entity. In addition, there are company codes that do not represent legal entities. (9/15/03 Tr. at 33.) There exists no current accurate or complete map which ties these company codes to legal entities. (9/15/03 Tr. at 33.)

The ownership of assets, the receipt of revenues and the incurrence of expenses are accounted for in this complex accounting system. The Debtors, however, do not have records of the assets that are owned by each of the separate legal entities. (9/15/03 Tr. at 78-79.) The Debtors are unable to determine the ownership of the assets on a separate entity separate debtor basis. (9/15/03 Tr. at 138.)

**(ix) Intercompany Accounting**

Intercompany accounts are used to track transactions between related companies. There are approximately 1,400 intercompany accounts and various sub general ledger systems. The Debtors actively use approximately 300 to 320 of these accounts. (9/15/03 Tr. at 55.) Millions of transactions have flowed through these intercompany accounts and there are aggregate balances of approximately $1,000,000,000,000 (one trillion) in these accounts. (9/15/03 Tr. at 55.)

For the month of November 2002, there were over six hundred thousand transactions alone. This equates to over seven million transactions per year. (9/15/03 Tr. at 104.)

W-100 is an account counterparty in the SAP system. When the SAP system was interacting with another general ledger company code that did not have an SAP company code, the system would record the transaction in the W-100 account. The transaction in

22

W-100 reflects the transaction that should be booked in another general ledger system, such as Lawson. (9/15/03 Tr. at 112-13.)

W-100 does not represent a distinct legal entity, and where such an account was listed as the counterparty it does not provide any relevant information concerning the actual identity of the counterparty. (9/15/03 Tr. at 113.)

The Debtors never checked to see that W-100 entries were actually made in the Lawson ledgers because such a control never existed. (9/15/03 Tr. at 114.)

As of March 12, 2003, FTI, was able to identify counterparties for only about two thirds of the $1,000,000,000,000 or so of intercompany accounts. (9/15/03 Tr. at 114-15.)

From a consolidated standpoint, intercompany accounts should offset to zero in a properly functioning accounting system. The Debtors, however, never systematically balanced their intercompany accounts and the accounts therefore have a significant net out-of-balance. (9/15/03 Tr. at 55-56.)

As a basic accounting principle, the total amount of intercompany payables should equal the total amount of intercompany receivables. However, as of the Commencement Date, the sum of the receivables and payables for all of the entities did not equal zero but was out of balance by approximately $233,000,000. (9/15/03 Tr. at 108.)

At the end of 2000, the intercompany accounts, on an consolidated basis, were out of balance by a receivable amount of approximately $115,000,000. By the end of 2001, that out-of-balance had flipped and the accounts were out of balance by a payable amount of about $175,000,000. And then in June of 2002, the out-of-balance had flipped

23

again and the accounts were out of balance by a receivable of approximately $275,000,000. (9/15/03 Tr. at 56-57.)

These are net figures in which out-of-balances on the receivables side are offset against out-of-balances on the payables side. The actual aggregate out of balance is in the billions of dollars. (9/15/03 Tr. at 57-58.) Therefore, the intercompany account balances between legal entities cannot be accurately determined. (9/15/03 Tr. at 128.) Without internal controls in place, the likelihood of material errors occurring is significant. As a result, there is no way to rely on the systems to generate accurate legal entity information or accurate intercompany transactions information by legal entity. (9/15/03 Tr. at 130.)

Intercompany transactions were recorded without regard for the proper general ledger and the Debtors often failed to record significant entries in their intercompany accounts. (9/15/03 Tr. at 132-33.) For example, FTI found the following three large errors: (i) an entry for $4,300,000,000 where cash was improperly stated in a legal entity as well as an intercompany account; (ii) an error in excess of $8,000,000,000 involving transfer pricing entries; and (iii) an error in excess of $5,000,000,000 in which transfer pricing charges were incorrectly recorded as an intercompany liability. (9/15/03 Tr. at 132; Creditors' Committee's Ex. 36 at 12.) In addition, FTI also found that a billion dollar correcting entry was never made relating to intercompany transfer pricing and that interest was not charged on all intercompany accounts. (9/15/03 Tr. at 133; Creditors' Committee's Ex. 36 at 13.)

Without knowing the intercompany receivables and the intercompany payables, the Debtors cannot prepare accurate separate legal entity financial statements as of the

24

387

bankruptcy filing. (9/15/03 Tr. at 135-36.) The Debtors cannot review the accuracy of each of the underlying intercompany transactions to determine if they were appropriately entered and charged to the correct legal entities because of a lack of documentation, lack of personnel with institutional knowledge and improper historic controls. (9/15/03 Tr. at 60.)

As the Debtors acquired entities, performed restructurings and consolidated their ledgers, the integrity of the intercompany accounts was impaired. (9/15/03 Tr. at 80-81.) While lack of information regarding intercompany accounts is not a significant issue on a consolidated basis, on a legal entity basis they could not simply be written-off because there has to be an intercompany payable and receivable attached to specific legal entities. (9/15/03 Tr. at 82-83.)

**(x) The Debtors Are Unable to Create Accurate or Reliable Historical Separate Legal Entity Financial Statements**

Accurate and reliable separate entity historical financial statements cannot be created and the data in the Debtors' financial system are an unreliable base from which to prepare accurate separate legal entity financial statements. (9/15/03 Tr. at 135-38, 140-42.)

All of the Debtors' current restatement efforts are focused on generating restated financials on a consolidated basis, not on an entity-by-entity basis. (9/15/03 Tr. at 35, 41.) Virtually the entire accounting staff of the Debtors has turned over since June 2002. Approximately 400 new professionals have been hired. (9/15/03 Tr. at 44.)

Debtors have established that it would not be possible to restate results for each legal entity because the Debtors did not manage their business by legal entity, there was

25

388

never a review of financial statements by legal entity on a timely basis, there was a lack

of controls or policies in place by legal entity, no intercompany reconciliations were

performed and the work force was not trained on the importance of doing legal entity

accounting. (9/15/03 Tr. at 36, 41.) Reconstruction of legal entity books and records is

further impossible due to the lack of documentation for some transactions and the loss of

individuals with institutional knowledge. (9/15/03 Tr. at 60.)

**(xi) Lack of Historic Internal Controls**

KPMG conducted an exhaustive and detailed analysis of the Debtors' internal

accounting controls in preparation of its audit of the Debtors' 2000, 2001 and 2002

restated consolidated financial statements. (9/15/03 Tr. at 40-41; Debtors' Ex. 195.)

As a result of that analysis KPMG identified ten "material weaknesses" in the

Debtors' internal financial controls and operations which it formalized in its June 3, 2003

letter to management and which was filed by the Debtors as part of a Form 8-K on or

about June 9, 2003:

> 1.1    **The Company needs to increase the experience and depth of its
> financial management and accounting personnel.** The Company has
> several key financial management and numerous other accounting
> positions that remain vacant. These positions are critical to record,
> process, summarize and report financial data consistent with assertions of
> management in the financial statements and internal management reports.

> 1.2    **The Company needs to implement procedures and controls to review,
> monitor and maintain general ledger accounts.** Significant efforts will
> be required to implement procedures and controls to ensure the
> maintenance and integrity of the general ledger. All general ledger
> accounts should be assigned to individuals who would be responsible for
> documenting the composition of ending balances and for determining that
> activity in those accounts is appropriate. Those individuals would also be
> responsible for reconciling account balances to underlying ledgers.

> 1.3    **The Company must implement procedures to ensure that
> reconciliations between subsidiary ledgers and the general ledger are
> performed.** During our review of a substantial number of general ledger

accounts, including accounts receivable, various liability accounts and property, plant and equipment, we noted that the Company has not historically consistently reconciled the subsidiary ledgers to the general ledger. We also noted that the Company has not consistently reconciled numerous cash accounts.

1.4 **The Company's consolidation process is highly automated and extremely complex. We have found that the process is largely undocumented, and only a few individuals have a limited understanding of only certain parts of the process.**

1.5 **Significant improvement needs to be made in segregation of duties, responsibilities and management review controls.** We noted certain accounting personnel have had the ability and responsibility to post and reconcile accounts under their control without an independent review. This lack of segregation of duties allowed accounting personnel to manipulate financial information that went undetected. Additionally, procedures need to be implemented to ensure that management personnel with appropriate knowledge and understanding review reconciliations and other financial information.

1.6 **Policies, procedures and standardization of internal controls need to be implemented.** There is a severe lack of policies, procedures and standardization of operating and financial controls and a general lack of documentation related to existing controls. These basic control weaknesses allowed journal entries to be posted without adequate support and documentation. Management should develop Company-wide standards of internal control to document its commitment to compliance with applicable laws and regulations, reliable operational and financial reporting and integrity of business activities and records. Good internal controls are fundamental to the Company achieving its key initiatives and goals. Such Company-wide standards of internal control should be applicable to all subsidiaries, units, groups and departments worldwide. The standards generally should reflect control objectives and not attempt to describe specific procedures required in each business.

1.7 **The Company's operating management must be provided with appropriate financial information and appropriate procedures must be in place such that operating management is confident that financial information being used to manage their businesses is ultimately included in the Company's externally reported financial information.** In the past, the Company's process for management reporting and review limited operating management's access to financial information. This was particularly noted in revenue, line costs and property, plant and equipment. Through well defined management reporting supported by strong budget to actual analysis, together with confidence in the financial

27

390

reporting process, operating management can be assured that externally reported results are consistent with actual operating results.

1.8    **Review, monitoring and oversight of the global business units needs to be increased.**

1.9    **Sufficient analysis and documentation of non-routine transactions needs to occur.  Examples of non-routine transactions are derivatives and Indefeasible Rights of Use (IRUs).**  In a number of cases we noted that non-routine transactions were not identified or otherwise brought to the attention of and reviewed by accounting personnel with the appropriate level of expertise to properly analyze and account for these transactions. In addition, in some cases inappropriate accounting decisions were reached such as in the accounting for Avantel, Embratel and certain capitalized costs.  We are also informed that management had not performed an impairment analysis of its long-lived assets nor could we find documentation as to where impairment was considered or analysis performed.

1.10   **The items identified in Section 4 *Accounting Matters* require the attention of appropriate levels of financial management and must be addressed in the Company's preparation of its restated financial statements.**

(Debtors' Ex. 195.)

KPMG identified specific areas of concern under each of these broad topics which

relate to the inability of the Debtors to generate accurate and reliable separate financial

statements by legal entity.  For example, KPMG found that:

1.3.1   Reconciliations throughout the revenue generating process were not performed, documented or analyzed in a timely manner to ensure that the accounting records are complete and accurate.

1.3.3   A formal process had not been established to ensure that cash transfers between accounts receivable platforms were properly reconciled in both the accounts receivable subledgers and the general ledger.

1.3.12  The unapplied cash account was inappropriately used to record unreconciled differences between accounts receivable platforms and the general ledger regardless of the nature of the differences. Policies and procedures to monitor and reconcile the unapplied cash general ledger account to accounts receivable platforms and subsidiary ledgers should be developed and implemented.

1.4.2   Organizational and account structures in the general ledger system (SAP) do not match the structural configuration of the consolidation tool (Essbase). Therefore, SAP and Essbase do not necessarily match the Company's operational legal structure as old and non-operating or non-consolidating companies still exist in SAP and Essbase.

1.4.3   The legal entity structure documented by the Company does not currently match the operational legal structure within SAP and Essbase.

1.4.4   The Company does not appear to have established or documented policies and procedures to ensure the proper recording of elimination journal entries.

In addition to KPMG's findings, in its Report of Investigation dated March 31, 2003, the Special Investigative Committee of the Board of Directors of WorldCom, Inc. found that many of the accounting records were in disarray or non-existent and that Arthur Andersen, the Debtors' predecessor auditors, did not perform any testing to justify reliance on WorldCom's internal controls. (Debtors' Ex. 267, at 26.)

**(xii) Remediation of Internal Controls and Accounting Restatement**

The Debtors have established teams and developed plans to remediate the internal control weaknesses identified by KPMG on a going-forward basis and have retained a significant team of professionals from Deloitte & Touche to conduct a complete assessment of the Debtors' internal control environment, remediate the internal control weaknesses identified in the KPMG letter, and develop remediation plans for any other weaknesses that may be discovered. (9/15/03 Tr. at 52.)

Developing appropriate controls on a going-forward basis, however, will not enable the Debtors to recreate accurate and reliable separate legal entity financial statements on a historical basis for each of the Debtors. (9/15/03 Tr. at 53.) The Debtors do, however, intend to produce reliable, restated financial results on a consolidated basis

29

392

for the 2000 through 2002 time period and have devoted significant resources toward that end. (9/15/03 Tr. at 38-40.) The Debtors have made substantial progress on the restatement project. Most of the project teams have detailed action plans and are very close to completing their tasks. (9/15/03 Tr. at 61.) KPMG has been auditing each area of the restatement as it has been concluded. (9/15/03 Tr. at 38, 61.)

**(xiii) Benefits of Substantive Consolidation**

In addition to the fact that the Debtors simply are not able to produce accurate and reliable separate legal entity financial statements on a historical basis, substantive consolidation provides significant benefits to the creditor constituency as a whole.

WorldCom operates in a highly competitive industry. (9/15/03 Tr. at 215-16.) There was substantial consensus among major creditor constituencies that a speedy emergence from chapter 11 was in the best interest of the Debtors and all creditors, a view shared by the Debtor's senior management and professionals. (9/15/03 Tr. at 215-16, 242, 249.)

Absent substantive consolidation, there likely would be massive intercreditor litigation regarding the validity and enforceability of intercompany claims, as well as litigation under chapter 5 of the Bankruptcy Code regarding intercompany payments and transfers of billion of dollars in assets that occurred in the various restructuring transactions. (9/15/03 Tr. at 225, 254-46.) The costs attendant to litigation of these intercreditor disputes, both in terms of out of pocket transactional costs and the diminution of enterprise value that likely would result from a prolonged stay in chapter 11, would have a material adverse effect on all creditor recoveries and the chances of a

30

successful reorganization. (Transcript of Hearing held on September 16, 2003 ("9/16/03 Tr.") at 74-87.)

## C. THE SETTLEMENTS

The Plan incorporates and provides for three compromises and settlements (the "Settlements") under Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rule(s)") referred to as The Intermedia Settlement, The Bank Settlement and The MCIC Settlement:

- Intermedia Settlement. This settlement resolves all issues relating to (a) the validity, enforceability and priority of the Intermedia Intercompany Note (as defined below), including certain claims and causes of action that WorldCom, Inc. may have to avoid the Intermedia Intercompany Note as a fraudulent transfer or to recover payments of principal and interest thereon as preferential transfers and (b) the transfer of certain assets of Intermedia to the WorldCom Debtors (the "Intermedia Settlement"). (9/16/03 Tr. at 81-87; Plan § 5.06; Disclosure Statement at 41-49.) Under the Intermedia Settlement, WorldCom, Inc. will transfer \$1,029,000,000 in value,[8] in the form of notes and stock (the "Intermedia Settlement Consideration"), to Intermedia in complete satisfaction of any claims related to the Intermedia Intercompany

---

[8] On September 15, 2003, the Debtors announced that, based upon negotiations among representatives of the Intermedia Preferred Stock Interests, the Creditors' Committee and the Debtors, an additional \$29 million in cash would be transferred to Intermedia to provide a 5 percent recovery to holders of Intermedia Preferred Stock Interests. As a result, the objection filed by OZ Management, L.L.C. and OZF Management L.P. (together, "Och-Ziff") – a holder of Intermedia Preferred Interests – was withdrawn.

31

Note.  (9/16/03 Tr. at 82; Notice of Amendment to Debtors'

Second Amended Plan of Reorganization, Docket No. 9004.)

Pursuant to the Plan, the Intermedia Settlement Consideration will

be distributed to holders of Intermedia Senior Debt Claims (for an

estimated recovery of 93.5%), and Intermedia Subordinated Debt

Claims (for an estimated recovery of 46.4%).  (Disclosure

Statement at 43; Plan §§ 4.11-4.15; Notice of Amendments to

Debtors' Second Amended Plan of Reorganization, Docket No.

9004.)  In addition, the WorldCom Debtors will fund the

distributions under the Plan to holders of allowed Intermedia

General Unsecured Claims (for an estimated recovery of 83.2%).

(9/16/03 Tr. at 90, 96.)

- Bank Settlement.  This is a settlement with the Ad Hoc Bank

Committee of all issues relating to (i) the claims of twenty-five

institutional lenders[9] (the "Banks") arising under (a) the $2.65

billion 364-day revolving credit facility dated as of June 8, 2001

(the "364-Day Facility"), between WorldCom, Inc., as borrower,

and the Banks, as lenders and (b) the $1.6 billion revolving credit

---

[9] The institutional lenders include ABN Amro Bank, N.V., Allfirst Bank, Arab Bank PLC, Banca de Roma S.P.A., Banco Bilbao Vizcaya Argentaria, S.A., The Bank of Nova Scotia, The Bank of Tokyo-Mitsubishi, Ltd., New York Branch, Bank One, NA, Bayerische Landesbank, New York Branch, BNP Paribas, Deutsche Bank AG, New York Branch, Fleet National Bank, Fortis Capital Corp., The Governor & Company of the Bank of Scotland, Lloyds TSB Bank PLC, Mizuho Corporate Bank, Ltd., Norddeutsche Landesbank Girozentrale, New York Branch, The Royal Bank of Scotland PLC, New York Branch, UFJ Bank Limited, New York Branch, Wells Fargo Bank, National Association, Westdeutsche Landesbank Girozentrale, New York Branch and Westpac Banking Corporation.

facility (the "Revolving Credit Facility"), dated as of June 8, 2001,
between WorldCom, Inc., as borrower and certain of the Banks, as
lenders and (ii) any and all causes of action that the Banks have
against the Debtors, the Reorganized Debtors, or any of their
respective current or former officers or directors relating to or
arising from the 364-Day Facility and the Revolving Credit
Facility, including without limitation, the Constructive Trust
Action and the Maryland Action (as defined below) (the "Bank
Settlement"). Pursuant to the Bank Settlement, under the Plan, the
Banks (whose claims are classified in Class 3A) will receive a pro
rata share of New Notes of the reorganized Debtors in the
aggregate principal amount of $75,000,000. Distribution of the
New Notes pursuant to the Bank Settlement is contingent upon the
Banks dismissing the Constructive Trust Action and obtaining
from the Banks party to the Maryland Action (the "MD Banks") a
dismissal with prejudice of the Maryland Action. [10]

- MCIC Settlement. This is a settlement with the Ad Hoc
  Committee of MCIC Noteholders of all issues relating to the
  defenses of the holders of Senior MCIC Notes to the substantive
  consolidation of the WorldCom Debtors (the "MCIC Settlement").
  Pursuant to the MCIC Settlement, the holders of MCIC Senior
  Debt Claims will receive a recovery under the Plan on the principal

---

[10] The Banks have agreed to pay to the MD Banks approximately $15 million in order to
obtain the dismissal of the Maryland Action. First Supplement at 2.

33

> amount of their outstanding claims equal to 80 cents on the dollar,
> (9/15/03 Tr. at 216-27; Plan § 5.06(c)), which recovery is reduced
> to 79.2% after giving effect to additional proposed settlements
> reached in these cases. (Second Amended Plan, Docket No. 8900.)

(9/15/03 Tr. at 213-15; Disclosure Statement, at 41-49; Supplement to Disclosure

Statement, at 1-4.)

The Settlements embodied in the Plan reflect the culmination of extensive, good

faith arm's length negotiations with the Covered Parties, the major economic parties in

interest, and are based upon analyses of the issues undertaken by the Debtors' and the

Creditors' Committee's professionals and analysts, and by the professionals for other

parties in interest. (9/15/03 Tr., testimony of Frank Savage.)

### (i) The Intermedia Settlement

On July 1, 2001, WorldCom, Inc. consummated the acquisition (the "Intermedia

Merger") of Intermedia Communications, Inc. ("Intermedia"). (*See* Debtors' Exs. 304-

06.) WorldCom, Inc. acquired Intermedia for approximately $12 billion in value,

including cash, a note, stock and the assumption of long-term debt, pursuant to the

merger of a wholly-owned subsidiary of WorldCom, Inc. with and into Intermedia. (*See*

Debtors' Exs. 304-06 and 318.)

In connection with the Intermedia Merger, stockholders of Intermedia received

one share of WorldCom group stock (57.1 million WorldCom group shares in the

aggregate) and 1/25th of a share of MCI group stock (or 2.3 million MCI group shares in

the aggregate) for each share of Intermedia common stock they owned. Holders of

Intermedia preferred stock, other than Intermedia's 13.5% Series B Redeemable

34

397

Exchangeable Preferred Stock due 2009, received in exchange for their Series B securities one share of a class or series of WorldCom, Inc. preferred stock, having terms substantially identical to the exchanged Series B securities. (*See* Debtors' Exs. 304-06 and 318.)

To consummate the Intermedia Merger, WorldCom, Inc. created and capitalized Wildcat Acquisition Corp. ("Wildcat"), a wholly-owned subsidiary of WorldCom, Inc. Specifically, WorldCom, Inc. issued to WildCat a note, due June 15, 2009 in the aggregate principal amount of $7,074,929,250, bearing interest at the rate of 7.69% per annum, payable semiannually (the "Intermedia Intercompany Note") and paid to Wildcat $70,750 in cash in exchange for shares of Wildcat Junior Preferred Stock, par value $1.00 per share, having an aggregate liquidation preference of $7,075,000,000. Pursuant to the merger agreement, Wildcat was then merged with and into Intermedia, resulting in (i) the shares of Wildcat Junior Preferred Stock becoming shares of Intermedia Junior Preferred Stock and (ii) the transfer of the cash and Intermedia Intercompany Note to Intermedia. (*See* Debtors' Exs. 304-06 and 309.)

The issuance and transfer of the Intermedia Intercompany Note enabled Intermedia to remain in compliance with the indenture covenants contained in its outstanding bond debt, including certain capitalization requirements (Creditors' Committee's Ex. 4.)

Following the Intermedia Merger and until the Commencement Date, WorldCom, Inc. recorded up to $1,390,000,000 in prepayments on the Intermedia Intercompany Note and Intermedia recorded approximately $434,592,000 in interest payments. (Transcript of hearing held on September 16, 2003 ("9/16/03 Tr.") at 75-77; Creditors' Committee's

35

Ex. 4.) These payments were allocated to various debt redemptions of Intermedia and for general corporate purposes, including funding of the Digex, Inc. business plan. Most of these payments were made in installments within the one year preceding the Commencement Date. (Creditors' Committee's Ex. 4.)

As of the Commencement Date, approximately $5.6 billion was outstanding under the Intermedia Intercompany Note. (Creditors' Committee's Ex. 4; 9/16/03 Tr. at 81.) During the Chapter 11 Cases, the Debtors reviewed the Intermedia Intercompany Note, the circumstances under which it arose, and the prepetition payments recorded. Based upon this review, the Debtors determined that WorldCom, Inc. may be able to assert fraudulent conveyance or preference theories to void the Intermedia Intercompany Note, recover the prepetition payments, or reduce the amounts owed by WorldCom, Inc. to Intermedia thereunder. (9/16/03 Tr. at 81, 87.)

When the Debtors shared their views with the interested constituents, the Ad Hoc Committee of WorldCom Noteholders supported the Debtors' arguments. Certain significant Intermedia investors – the Ad Hoc Committee of Intermedia Noteholders and the Matlin Patterson Investors – disputed these contentions as well as the amount of the prepayments by WorldCom, Inc., whether the prepayments in fact were made, and if made, the purposes for which they were used. (9/16/03 Tr. at 84-86.)

The Intermedia Intercompany Note is an asset of the Intermedia estate. The validity and enforceability of the Intermedia Intercompany Note would greatly impact the recovery to Intermedia creditors as the remaining assets of Intermedia do not have significant value. (*See* Ex. C to Disclosure Statement.)

36

Litigation of the issues surrounding the Intermedia Note – including fraudulent transfer and preference theories, would require complex factual and legal determinations of, among other things, solvency, valuation and the proper application of section 502(d) of the Bankruptcy Code, implicating extensive discovery, expert witness investigations, and a lengthy multi-faceted trial, with a risk for the Debtors of a potential for a loss on all issues. (9/16/03 Tr. at 74-87.)

Although the Debtors' restated consolidated balance sheets for year-end 2001 show that the WorldCom Debtors were insolvent based on book values calculated on a GAAP basis, given the ongoing financial restatement process, the Debtors did not during the Chapter 11 Cases, and were not in a position to, undertake a traditional fraudulent transfer solvency analysis or even determine solvency on a book value basis with respect to WorldCom, Inc. as of July 1, 2001. (9/16/03 Tr. at 209-13.)

Although Intermedia's restated financial consolidated statements for year-end 2002 show that the Intermedia Debtors were insolvent on a consolidated basis based on book values calculated on a GAAP basis, they do not resolve the question of Intermedia's insolvency on the date of the Intermedia Merger. (9/16/03 Tr. at 213-15.)

In the absence of a consensual resolution of the Intermedia Intercompany Note issues, the Debtors' ability to propose a consensual chapter 11 plan would have been diminished significantly. Protracted litigation and the delay in the reorganization process would adversely affect asset values and the amounts available for distribution to all creditors. (9/16/03 Tr. at 74-87.)

The present benefits of settling these issues for an amount less than the full face amount of the Intermedia Intercompany Note far outweigh any benefit that may accrue

37

from an extended and protracted litigation. By settling all issues surrounding the Intermedia Intercompany Note, the Debtors weighed their relative risks of litigation and the benefits of settling, including, but not limited to, their ability to emerge from chapter 11 quickly and the benefit to their chapter 11 estates. (9/16/03 Tr. at 86-92.)

The Debtors and the Creditors' Committee, with the assistance of their respective counsel and financial advisors, have carefully evaluated all aspects of the Intermedia Settlement (including exploration of alternatives to the settlement) and determined that the Intermedia Settlement is fair and reasonable. (9/16/03 Tr. at 89-91.)

The $1,029,000,000 to be distributed in satisfaction of the Intermedia Note is a fair compromise of the issues surrounding the Intermedia Intercompany Note.[11] It represents approximately one-half of the recovery that would have been realized by the Intermedia estate if the validity and enforceability of the Intermedia Intercompany Note were entirely upheld by a final judicial determination of the issues. (9/16/03 Tr. at 89.) Such an analysis does not even take into account potential recoveries of alleged preferential transfers. (9/16/03 Tr. at 81, 82.)

The Intermedia Settlement is the result of extensive, good-faith arm's length negotiations among the Covered Parties over a period of forty-five to sixty days. (9/16/03 Tr. at 77-80, 87, 92.)  Absent the Intermedia Settlement, it is likely that the Ad Hoc Committee of Intermedia Noteholders and the Intermedia Preferred Shareholders would oppose the Plan.  Such a result would likely unduly delay confirmation of the Plan, and reduce recoveries to creditors.

---

[11] The total consideration was increased by $29,000,000 as a consequence of the Intermedia Preferred Settlement.

38

401

Pursuant to the Objection to Confirmation of WorldCom's Plan of Reorganization, dated July 30, 2003, filed by Dr. Seymour Licht, as supplemented (the "Licht Objection"), Dr. Licht has interposed an objection to the Intermedia Settlement. Philip S. Braunstein joined in Dr. Licht's objection. Dr. Licht and Mr. Braunstein assert claims against WorldCom, Inc. (Licht Obj. at 1; Braunstein Obj. at 1.) Dr. Licht and Mr. Braunstein's claims are classified in Class 5 (WorldCom Senior Note Claims) under the Plan. Dr. Licht and Mr. Braunstein do not assert any claims against any Intermedia Debtors.

The Intermedia Settlement is supported by the Creditors' Committee. (Memorandum of Law of Creditors' Committee in Support of Confirmation, Docket No. 8648.) Class 5, which includes Dr. Licht's and Mr. Braunstein's WorldCom Senior Note Claims voted overwhelmingly in amount and number to accept the Plan. (Debtors' Ex. 302.)

**(ii) The Bank Settlement**

On May 16, 2002, WorldCom, Inc. drew on its revolving credit facility (the "Credit Facility") in advance of its expiration and converted the $2.65 billion borrowing into a term loan, thereby extending the repayment period to June 7, 2003. (*See* Debtors' Ex. 276 ¶¶ 39-51.) On June 25, 2002, the Company issued a press release stating that certain of its historical transactions were not made in accordance GAAP, requiring a restatement of its earnings. (*See* Debtors' Ex. 276 ¶ 57.)

On July 12, 2002, the Banks commenced an action against WorldCom, Inc. in the Supreme Court for the State of New York, County of New York (the "Constructive Trust Action"), seeking damages of approximately $2,500,000,000. (*See* Debtors' Ex. 276.)

The Constructive Trust Action relates to the 364-Day Facility, pursuant to which twenty-seven lenders (including the Banks) established the Credit Facility to enable WorldCom, Inc. to borrow, repay and reborrow monies up to a maximum amount outstanding of $2.65 billion. (*See* Debtors' Ex. 276 ¶ 32.)

Each lender's obligation to lend its portion of the total amount of the Credit Facility was subject to WorldCom, Inc.'s making and abiding by certain terms, conditions, representations, warranties and covenants contained in the governing credit agreement and in compliance certificates and other documents to be provided by WorldCom, Inc. to the lenders pursuant to the credit agreement. (*See* Debtors' Ex. 276 ¶ 33.)

The Banks alleged that WorldCom, Inc. procured funding under the Credit Facility based upon fraudulent representations concerning, *inter alia*, the accuracy of WorldCom, Inc.'s financial statements. Specifically, the Banks alleged that WorldCom, Inc. represented that its then-current financials were prepared in accordance with GAAP, and that on this basis, the Banks and the other lenders funded the Credit Facility. (Debtors' Ex. 276.)

The Banks' complaint in the Constructive Trust Action requested the imposition of a constructive trust over, and payment of damages equal to, the proceeds of the Credit Facility, that is, approximately $2,650,000,000. The Banks immediately sought a temporary restraining order, preventing WorldCom, Inc. from "transferring, using, concealing or otherwise dissipating" the approximately $2,650,000,000 drawn down by WorldCom, Inc. thereunder. (*See* Debtors' Ex. 276.)

40

The New York Supreme Court rejected the Banks' request for a temporary restraining order, stating that the Banks, as creditors, were not entitled to priority over other creditors, and expressing concern that the cash lent to WorldCom, Inc. under the Credit Facility may have been "commingled" with other cash proceeds. However, that court made no final determination. (Debtors' Ex. 278.)

The Constructive Trust Action was removed to the United States District Court for the Southern District of New York, after which the Debtors and the Banks entered into a stipulation, which provided that the parties would not take any steps to prosecute or defend the Constructive Trust Action for a period of 70 days from July 18, 2002. In addition, WorldCom, Inc. agreed not to transfer or dissipate any stock of its subsidiaries, or any claims it may have against its subsidiaries for a period of 80 days from July 18, 2002. (*See* Debtors' Ex. 281.)

The Constructive Trust Action was thereafter stayed as a result of the commencement of WorldCom's chapter 11 case. 11 U.S.C. § 362(a). The Banks did not move this Court to modify the stay to proceed with the Constructive Trust Action. However, on August 7, 2002, certain Banks filed a Complaint in the Circuit Court for Montgomery County, Maryland (the "Maryland Action") against WorldCom, Inc.'s then-Senior Vice President and Treasurer, seeking $2,150,000,000 in damages for alleged acts of negligence and negligent misrepresentation allegedly committed in her capacity as an officer of WorldCom, Inc. The Banks alleged that the truthfulness, accuracy, and correctness of the representations made in connection with the draw-down of the Credit Facility were affirmed by the treasurer. The Debtors sought and received a stay of the Maryland Action from this Court. (*See* Debtors' Ex. 277.)

41

Beginning prior to April 19, 2003 and continuing extensively thereafter, the Debtors conducted negotiations with the Banks in an effort to settle the Constructive Trust Action and the Maryland Action, and to resolve all causes of action against the Debtors, or any of their respective current or former officers or directors relating to or arising from the 364-Day Facility and the Credit Facility, and the funding of any amounts thereunder. (9/15/03 Tr. at 227-31.)

The Banks contended that the lowest intermediate balance to which its trust could attach was between $150,000,000 and $250,000,000, while the Debtors asserted that a constructive trust would be denied. The agreement to resolve the Constructive Trust Action and the Maryland Action for $75 million in New Notes (an incremental recovery to the Banks of $48 million) was the result of a negotiation between those two positions. It represents less than half the amount the Banks would receive if they succeeded in the Constructive Trust Action. (9/15/03 Tr. at 227-31.)

The distribution of New Notes pursuant to the Bank Settlement will reduce, dollar for dollar, the unsecured portion of the aggregate amount of any claims by the Banks. As a result, the Banks' overall recovery under the Plan is increased by approximately $48 million. (Plan §§ 1.12, 1.13, 4.04.) No party in interest objected to the Bank Settlement.[12]

The Bank Settlement is the result of extensive, good-faith arm's-length negotiations. (9/15/03 Tr. at 229-30.) Absent the Bank Settlement, the complexity, cost and delay of litigation to address the issues resolved by the Bank Settlement would be

---

[12] Wells Fargo Bank has filed an objection to the Plan. The Debtors and Wells Fargo have stipulated to adjudicate that objection in the context of the claims objection process Wells Fargo, however, preserved its right to, and in fact did, object to Debtors' settlement with the Intermedia Preferred Shareholders.

42

substantial.  The Debtors and the Creditors' Committee, with the assistance of their respective counsel and financial advisors, have carefully evaluated all aspects of the Bank Settlement (including exploration of alternatives to the settlement) and determined that the Bank Settlement is fair and reasonable.  (9/15/03 Tr. at 230-31.)

Absent the Bank Settlement, it is likely that the Banks would oppose the Plan. Such a result would likely unduly delay confirmation of the Plan and reduce recoveries to creditors.

**(iii) The MCIC Settlement**

In September 1998, WorldCom, Inc. completed a $40 billion acquisition of MCIC and its affiliates (collectively with MCIC, "MCI") pursuant to the merger of MCIC with and into a wholly-owned subsidiary of WorldCom, Inc.  (Debtors' Exs. 235, 226.)

Several series of public notes issued by MCIC prior to the merger (the MCIC Senior Notes and the MCIC Subordinated Notes) were unaffected by the Merger.  The MCIC Senior Notes represent MCIC Senior Debt Claims  (Class 9 under the Plan) arising under the (i) senior debt indenture, dated October 15, 1989, between MCIC and the MCIC Senior Notes Indenture Trustee, which provided for the issuance of the 7-1/2% Senior Notes due August 20, 2004; 8-1/4% Senior Debentures dues January 20, 2023; 7-3/4% Senior Debentures due March 15, 2024; and 7-3/4% Senior Debentures due March 23, 2025 and (ii) the senior debt indenture, dated February 17, 1995, between MCIC and the MCIC Senior Notes Indenture Trustee, which provided for the issuance of the 6.95% Senior Notes due August 15, 2006; 6-1/2% Senior Notes due April 15, 2010; and 7.125% Debentures due June 15, 2027.  (*See* Plan §§ 1.64, 1.65.)

43

At the inception of the Debtors' Chapter 11 Cases, an informal committee of holders of MCIC Senior Notes (the "Ad Hoc Committee of MCIC Senior Noteholders") contended that the WorldCom Debtors should not be substantively consolidated with the MCI Debtors.  (9/15/03 Tr. at 216-28.)

During the course of the cases, the Debtors determined that a settlement with the MCI Senior Noteholders was appropriate and of benefit to the estate in light of their particular arguments with respect to substantive consolidation and the Debtors' objective to achieve a consensus among major classes of creditors.  The MCIC Settlement enabled the Debtors to propose a plan of reorganization supported by the Creditors' Committee and the representatives of 90% of the debt of the consolidated enterprise.  (9/15/03 Tr. at 220-25.)

After extensive negotiation, the Debtors, the Creditors' Committee, the Ad Hoc Committee of WorldCom Noteholders, the Matlin Patterson Investors and the Ad Hoc Committee of MCIC Senior Noteholders agreed to the MCIC Settlement, pursuant to which holders of MCIC Senior Debt Claims would receive a recovery, in New Notes, of 80% of the principal amount of their debt.[13]  (9/15/03 Tr. at 216-27.)

In agreeing to the settlement, the Debtors considered the effect of the contractual subordination provision contained in the governing indentures and the resulting "roll-up" to the holders of the MCIC Senior Debt Claims of any recovery that holders of MCIC Subordinated Debt Claims would receive.  Analytically, the MCIC Settlement represented a distribution pursuant to the Plan to all MCIC bondholders (including the holders of MCIC Subordinated Debt Claims) of approximately 62 cents per dollar on

---

[13] As a result of the subsequent settlement with the Ad Hoc MCI Trade Claims Committee, this recovery is reduced to 79.2%.

account of their claims, with the holders of the MCIC Senior Debt Claims receiving the benefit of the distribution that would have been payable to the holders of the MCIC Subordinated Debt Claims, absent their indentures' governing subordination provisions. (Disclosure Statement at 47.)[14]

The holders of the MCIC Senior Debt Claims asserted that absent substantive consolidation, they were entitled to payment in full of their claims, including pre- and post-petition interest, equaling roughly 113% of their principal amount due. The Debtors and the Ad Hoc Committee of WorldCom Noteholders asserted that under a substantive consolidation plan, the MCIC Senior Debt Claims were only entitled to a 35% recovery. (Disclosure Statement at 47.)

The MCIC Settlement was the result of extensive, good faith arm's-length negotiations among the Covered Parties that took place over four or five months. (9/15/03 Tr. at 217, 221.) The MCIC Senior Debt Claims are an entire class under the Plan. (Plan § 4.10.) Absent the MCIC Settlement, the complexity, cost and delay of litigation to address the issues resolved by such settlement would be substantial.

The Debtors and the Creditors' Committee, with the assistance of their respective counsel and financial advisors, have carefully evaluated all aspects of the MCIC Settlement (including exploration of alternatives to the settlement) and determined that the MCIC Settlement is fair and reasonable. (9/15/03 Tr. at 223-26.) Absent the MCIC Settlement, there would not have been a consensual plan. The MCIC Senior Noteholders asserted that they would have rejected the Plan and would have opposed it. Such a result

---

[14] Since the initial settlement, the parties agreed to a recovery to holders of MCIC Subordinated Debt Claims of approximately 44%.

45

would have significantly complicated and delayed any confirmation hearing and potentially reduced recoveries to creditors.

## D. SECTION 1129 OF THE BANKRUPTCY CODE

### (i) 1129(a)(1)

The Debtors are the proponents of the Plan. (Debtors' Ex. 335.)

The reliance by creditors upon the creditworthiness of MCIC or any of its subsidiaries in extending credit to an MCIC entity prior to the Merger is distinct from the reliance by creditors upon the creditworthiness of the Debtors (including MCIC and its subsidiaries after the Merger) in extending credit to a Debtor following the Merger. The Plan separately classifies WorldCom General Unsecured Claims and MCI Pre-merger Claims based upon the unique reliance and prejudice arguments that have been asserted by holders of MCI Pre-merger Claims that extended credit to an MCIC entity prior to the Merger. The Claims of the Ad Hoc MCI Trade Claims Committee Claims in Class 6B are separately classified solely for voting purposes and not for treatment purposes. Claims in Class 6B will receive the same treatment as Claims in Class 6.

The Debtors separately classified the MCIC Senior Debt Claims and MCIC Subordinated Debt Claims based upon the contractual subordination provisions in the MCIC Subordinated Notes Indenture.

Pursuant to the Plan, the subordination provisions in the MCIC Subordinated Notes Indenture will be cancelled on the Effective Date. The cancellation of the subordination provisions on the Effective Date is necessary to protect the holders of MCIC Subordinated Debt Claims from the risk that holders of MCIC Senior Debt Claims would seek to enforce subordination with respect to their recoveries under the Second Amended Plan.

46

Article II of the Plan provides for the treatment of Administrative Expense Claims and Priority Tax Claims, and Article III of the Plan designates Classes of Claims and Classes of Equity Interests.

Article III of the Plan specifies Class 1 and Class 3 as unimpaired and Classes 2, 3A, 4, 5, 6, 6A, 6B, 7, 8, 9, 10, 11, 12, 13, 14 and 15 as impaired.

Article IV of the Plan specifies the treatment of each impaired Class of Claims and Equity Interests.

The Plan provides the same treatment for each Claim or Equity Interest in a Class.

Pursuant to the July 9 Plan, each holder of an MCIC Senior Debt Claim was entitled to receive New Notes in an amount equal to .80 multiplied by the Allowed principal amount of such holder's MCIC Senior Debt Claim. (Debtors' Ex. 273.) Prior o its modification, holders of Class 9 MCIC Senior Debt Claims voted to accept the July 9 Plan. (Debtors' Ex. 302.) Pursuant to the Plan, each holder of an MCIC Senior Debt Claim is entitled to receive New Notes in an amount equal to .792 multiplied by the Allowed principal amount of such holder's MCIC Senior Debt Claim as a result of their contribution to the Ad Hoc MCI Trade Claims Committee (the "MCI Senior Contribution"). Such reduced recovery was subject to Class 9 having an opportunity to reconsider its prior vote. As set forth in the Sullivan Vote Certification, Class 9 voted overwhelmingly to accept the Plan and make the MCI Senior Contribution. It is, therefore, apparent that the MCI Senior Contribution is not coming from or diminishing the estate, but rather, is coming from and diminishing the previously accepted recovery of the holders of MCIC Senior Debt Claims.

47

Pursuant to the Plan, the Debtors cannot compel the holders of MCIC Subordinated Debt Claims to contribute any of their recovery to the Ad Hoc MCI Trade Claims Committee. Rather, the contribution by the holders of MCIC Subordinated Debt Claims to the Ad Hoc MCI Trade Claims Committee (the "MCI Subordinated Contribution," and together with the MCI Senior Contribution, the "Contributions") was expressly contingent upon the acceptance of the Plan by Class 10. (Debtors' Exs. 335, 339.) If Class 10 had voted to reject the Plan and the Debtors had crammed down the Plan on the holders of Class 10 Claims, no contribution from Class 10 would have been made or could have been compelled. Class 10 has overwhelmingly voted to accept to the Plan, and thus, to make the MCI Subordinated Contribution to the Ad Hoc MCI Trade Claims Committee. It is, therefore, apparent that the MCI Subordinated Contribution is not coming from or diminishing the estate, but rather, is coming from and diminishing the recovery of the holders of MCIC Subordinated Debt Claims.

If the Contributions were not made, the amounts represented thereby would not inure to the benefit of any WorldCom General Unsecured Claim, but rather would be paid under the Plan and remain available to the Classes contributing the respective amounts. The Contributions do not in any way implicate or diminish the recoveries of Classes 6, 6A and 6B creditors.

Absent the Contributions, the Ad Hoc MCI Trade Claims Committee could pursue its objection to the Plan. Although the Plan contains a condition to effectiveness that the Contributions be made, such condition can be waived.

The Plan provides adequate means for its implementation.

48

411

Section 9.03 of the Plan provides that the Certificates of Incorporation and By-laws for each of the Reorganized Debtors that are corporations shall prohibit the issuance of nonvoting equity securities.

Article IX of the Plan contains provisions with respect to the manner of selection of officers and directors of the Reorganized Debtors that are consistent with the interests of creditors, equity security holders, and public policy.

**(ii) 1129(a)(2)**

Pursuant to the Disclosure Statement Orders entered after due notice and hearings, the Court approved the Disclosure Statement, First Supplement, Second Supplement and Third Supplement pursuant to section 1125 of the Bankruptcy Code as containing "adequate information" of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment whether to accept or reject the Plan. On August 29, 2003 and October 10, 2003, the Vote Certifications were filed on behalf of the Debtors' Court-appointed voting and tabulation agent.

As set forth in the Vote Certifications, the Disclosure Statement and May 23 Plan, the First Supplement and July 9 Plan, the Second Supplement and the Third Supplement and the Plan, together with the additional solicitation materials approved by the Court in the Disclosure Statement Orders, were transmitted to each creditor that was entitled to vote, as well as to other parties in interest in this case. The Debtors did not solicit the acceptance or rejection of the Plan by any creditor prior to the transmission of the Disclosure Statement.

Creditors that were not entitled to vote to accept or reject the Plan and equity interest holders (who are deemed to reject the Plan) were provided with certain non-voting materials approved by the Court in compliance with the Disclosure Statement Orders.

Because the Debtors have determined to pay holders of Allowed Secured Tax Claims in Class 2 in cash, in full, plus interest required under section 506(b), Class 2 is unimpaired and Claims in Class 2 are conclusively presumed to have accepted the Plan.

Classes 3A, 4, 5, 9, 10, 11, 12 and 13 of the Plan are impaired and were entitled to vote to accept or reject the Plan. Classes 6 and 6A are impaired and are deemed to have voted to reject the Plan. Class 6B is impaired, however, because the members of the Ad Hoc MCI Trade Claims Committee has already agreed to support the Plan by virtue of a stipulation with the Debtors, among others, Class 6B is conclusively presumed to have voted to accept the Plan. (Docket No. 9132.)

The Debtors solicited acceptances or rejections of the Plan from the holders of all Allowed Claims in each Class of impaired claims that are to receive distributions under the Plan and that are otherwise not deemed to reject the Plan. [15] Classes 7, 8 and 15 of the Plan will not receive any distributions under the Plan, and therefore, Claims and Equity Interests in such Classes are deemed to have rejected the Plan. Class 14, which is impaired but will receive a distribution under the plan, is deemed to reject the Plan. The Plan has been accepted by creditors holding in excess of two-thirds in amount and one-

---

[15] Prior to the Court's October 20 Ruling requiring the separate classification of the various Class 6 groups, the former Class 6 was solicited as an impaired class and voted to accept the Plan.

half in number of the Allowed Claims voted in each of Classes 3A, 4, 5, 9, 10, 11, 12 and 13 of the Plan.

**(iii) 1129(a)(3)**

On June 13, 2003, the Ad Hoc MCI Trade Claims Committee filed a notice of appeal from the Order, dated June 4, 2003, Authorizing the Debtors to Assume as Amended Certain Executory Contracts with Electronic Data Systems Corporation and EDS Information Services LLC (the "EDS Appeal"). (Docket No. 6524.) On July 31, 2003, the Ad Hoc Committee of Dissenting Bondholders filed an objection to the July 9 Plan and a memorandum of law in support thereof (together, the "Dissenting Bondholder Objection"). (Docket Nos. 7938, 7939.) On August 4, 2003, the Ad Hoc MCI Trade Claims Committee filed an objection to the July 9 Plan (the "Trade Claims Committee Objection"). (Docket No. 8033.) The issues raised in the Dissenting Bondholder Objection and the Trade Claims Committee Objection were vigorously disputed by the Debtors. (Docket No. 8650.)

On August 18, 2003, the Ad Hoc Committee of Dissenting Bondholders and the Ad Hoc MCI Trade Claims Committee each filed a notice of appeal from the Order of the Court, dated August 6, 2003, Approving the Settlement with the Securities and Exchange Commission. (Docket Nos. 8305, 8287.) On September 5, 2003, HSBC Bank USA ("HSBC"), the indenture trustee under the MCIC Subordinated Notes Indenture, also filed a Notice of Appeal from the Final Judgment of the United States District Court for the Southern District of New York approving the settlement with the Securities and Exchange Commission (collectively, the "SEC Appeals," and together with the EDS Appeal, the "Appeals").

51

Prior to the September 8, 2003 Confirmation Hearing, Platinum, Deutsche, and certain other objectors (collectively, the "Pre-merger Objectors") filed objections to the July 9 Plan asserting that they were pre-Merger creditors whose reliance arguments deserved recognition on a basis similar to the MCIC Senior Debt Claims.  Prior to the Confirmation Hearing, the Debtors and, among other parties, the Ad Hoc Committee of Dissenting Bondholders, the Ad Hoc MCI Trade Claims Committee and the Pre-merger Objectors engaged in substantial discovery in preparation for such hearing.

The Confirmation Hearing commenced on September 8, 2003 at which time the Court was informed that the Debtors, the Committee, the Ad Hoc Committee of Dissenting Bondholders and the Ad Hoc MCI Trade Claims Committee had been engaged in negotiations and that an opportunity for further discussions could enable the parties to resolve the issues raised in the Dissenting Bondholder Objection and the Trade Claims Committee Objection.  (Confirmation Hearing Transcript ("Tr.") at 40 (Sept. 8).)  Based upon these representations, the Court adjourned the remainder of the day's hearing to allow the parties to continue negotiations.  (9/8/03 Tr. at 41.)

On September 9, 2003, the Court was informed that, following extensive arm's-length, good faith negotiations, agreements had been reached with the Ad Hoc Committee of Dissenting Bondholders and the Ad Hoc MCI Trade Claims Committee.  The Debtors also announced resolutions with the Pre-merger Objectors on September 9 and 12, 2003.  Pursuant to such agreements, (i) the Debtors would further amend the July 9 Plan to embody the Integrated Settlement (as defined in the Debtors' Memorandum Of Law In Support Of Confirmation Of Debtors' Second Amended Joint Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code, Dated September 12, 2003

52

415

And In Response To Certain Objections Thereto, dated October 13, 2003), (ii)
stipulations with the Ad Hoc Committee of Dissenting Bondholders and Ad Hoc MCI
Trade Claims Committee would be entered into by the Debtors, the Committee, and other
creditor representatives, and (iii) the Ad Hoc Committee of Dissenting Bondholders and
Ad Hoc MCI Trade Claims Committee would withdraw their objections.  In addition, (i)
the Ad Hoc Committee of Dissenting Bondholders, the Ad Hoc MCI Trade Claims
Committee, and HSBC would abate their respective SEC Appeals and (ii) the Ad Hoc
MCI Trade Claims Committee would abate the EDS Appeal.  (Debtors' Exs. 339, 340.)

 The Debtors' prompt emergence from chapter 11 is crucial to the continuing
viability of the Debtors' businesses.  The modifications to the July 9 Plan eliminate
significant litigation surrounding confirmation and eliminate the Appeals, paving the way
for the Debtors' expeditious emergence from chapter 11.  The agreements embodied in
the Plan are effectuated by modifications to the July 9 Plan.  The Contributions to the Ad
Hoc MCI Trade Claims Committee are outside the scope of the administration of the
estates.

 The Plan is the product of extensive, arm's-length negotiations among the
Debtors, the Committee and significant creditor constituencies in an effort to obtain a
resolution of the issues in these cases and enable the Debtors to formulate and propose a
plan of reorganization that would provide the most value to the Debtors' creditors.
(9/15/03 Tr. at 214-58.)  The provisions of the Plan were derived based upon analyses of
the issues undertaken by the Debtors' and the Committee's professionals and analysts,
and by the professionals for other parties in interest.  (9/15/03 Tr. testimony of Frank

53

Savage.)  The Covered Parties have acted in good faith within the meaning of section 1125(e) of the Bankruptcy Code.

The inclusion of the Exculpation Provision and the Obligation to Defend Provision in the Plan was an essential element of the Plan formulation process and negotiations with respect to each of the settlements contained in the Plan. (Docket Nos. 9409, Declaration of Mark A. Neporent ("Neporent Decl.") ¶ 5.)  The settlements, in turn, are key components of the nearly fully consensual Plan.  (Docket No. 9409, Neporent Decl. ¶ 5.)  The inclusion of the Exculpation Provision and the Obligation to Defend Provision in the Plan were vital to the successful negotiation of the terms of the Plan in that without such provisions, the Covered Parties would have been less likely to negotiate the terms of the settlements and the Plan.  (Docket No. 9409, Neporent Decl. ¶ 5.)

Each of the Covered Parties bargained for its respective inclusion in the Exculpation Provision and the Obligation to Defend Provision as part of the various compromises that form the basis of the Plan.  (Docket No. 9409, Neporent Decl. ¶ 5.) The Covered Parties relied upon the benefits proposed to be provided in the Exculpation Provision and the Obligation to Defend Provision in deciding to support the Plan. (Docket No. 9409, Neporent Decl. ¶ 5.)

The Debtors do not believe that the Obligation to Defend provision creates material liability or adversely impacts their "fresh start."  Entering into the Obligation to Defend provision is a reasonable exercise of the Debtors' business judgment.

**(iv) 1129(a)(4)**

All payments made or to be made by the Debtors, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in

54

connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, have been approved by, or are subject to the approval of the Court as reasonable.

**(v) 1129(a)(5)**

On August 29, 2003 the Debtors disclosed that Michael D. Capellas, Dennis R. Beresford, W. Grant Gregory, Judith Haberkorn, Laurence Harris, Eric Holder, Nicholas deB. Katzenbach, David Matlin and C.B. Rogers, Jr. will comprise the initial Board of Directors of Reorganized WorldCom. The Debtors, in consultation with the Committee, will add up to three additional directors to the Board of Directors of Reorganized WorldCom prior to the Effective Date. The Debtors also disclosed the affiliations of each of the foregoing members of the initial Board of Directors of Reorganized WorldCom. (Debtors' Ex. 303.)

On September 5, 2003, the Debtors disclosed that Robert Blakely and Richard R. Roscitt will comprise the initial Board of Directors of each of the other Reorganized Debtors. The Debtors also disclosed the affiliations of each of the foregoing members of the initial Boards of Directors of each of the other Reorganized Debtors. (Docket No. 8650.)

**(vi) 1129(a)(6)**

The Plan does not provide for rate changes by any of the Reorganized Debtors.

**(vii) 1129(a)(7)**

In a hypothetical liquidation of the WorldCom Debtors under chapter 7 of the Bankruptcy Code, the estimated liquidation proceeds realized would approximate $6.5 billion. (9/15/03 Tr. at 202; Debtors' Ex. 333.) In that case, general unsecured creditors

of the WorldCom Debtors would receive no recovery on account of their Claims and holders of administrative and priority claims would receive approximately a 92 percent recovery on account of their Claims. (9/15/03 Tr. at 203.)

In a hypothetical liquidation of the Intermedia Debtors under chapter 7 of the Bankruptcy Code, the estimated liquidation proceeds realized would approximate $140 million. (9/15/03 Tr. at 203; Debtors Ex. 333.) In that case, general unsecured creditors of the Intermedia Debtors would receive no recovery on account of their Claims and holders of administrative and priority claims would receive approximately a 48.5 percent recovery on account of their Claims. (9/15/03 Tr. at 203.)

In light of the factors established by the Debtors as to substantive consolidation of the WorldCom Debtors and the Intermedia Debtors, the Debtors are not able to provide a separate liquidation analysis for each Debtor.

**(viii) 1129(a)(8)**

The Plan has been accepted by creditors holding in excess of two-thirds in amount and one-half in number of the Allowed Claims in Classes 3A, 4, 5, 9, 10, 11, 12, and 13 of the Plan. (Debtors' Ex. 338.)

Of the $1,714,120,000 in dollar amount of Ballots received from holders of Bank Settlement Claims eligible to vote in Class 3A, $1,614,120,000 in dollar amount of Ballots were cast to accept the Plan, representing acceptance of the Plan by 94.17% in dollar amount of Bank Settlement Claims voting. Of the 16 Ballots received from holders of Bank Settlement Claims eligible to vote in Class 3A, 15 Ballots were cast to accept the Plan, representing acceptance of the Plan by 93.75% in number of Bank Settlement Claims voting. (Debtors' Ex. 338.)

56

419

Of the $24,565,091.14 in dollar amount of Ballots received from holders of Convenience Claims eligible to vote in Class 4, $19,301,067.08 in dollar amount of Ballots were cast to accept the Plan, representing acceptance of the Plan by 78.57% in dollar amount of Convenience Claims voting. Of the 3,413 Ballots received from holders of Convenience Claims eligible to vote in Class 4, 2,748 Ballots were cast to accept the Plan, representing acceptance of the Plan by 80.52% in number of Convenience Claims voting. (Debtors' Ex. 338.)

Of the $18,604,112,613.76 in dollar amount of Ballots received from holders of WorldCom Senior Debt Claims eligible to vote in Class 5, $18,422,495,649.56 in dollar amount of Ballots were cast to accept the Plan, representing acceptance of the Plan by 99.02% in dollar amount of WorldCom Senior Debt Claims voting. Of the 9,589 Ballots received from holders of WorldCom Senior Debt Claims eligible to vote in Class 5, 9,023 Ballots were cast to accept the Plan, representing acceptance of the Plan by 94.10% in number of WorldCom Senior Debt Claims voting. (Debtors' Ex. 338.)

Of the $1,709,080,191 in dollar amount of Ballots received from holders of MCIC Senior Debt Claims eligible to vote in Class 9, $1,681,044,191 in dollar amount of Ballots were cast to accept the Plan, representing acceptance of the Plan by 98.36% in dollar amount of MCIC Senior Debt Claims voting. Of the 2,017 Ballots received from holders of MCIC Senior Debt Claims eligible to vote in Class 9, 1,914 Ballots were cast to accept the Plan, representing acceptance of the Plan by 94.89% in number of MCIC Senior Debt Claims voting. (Debtors' Ex. 338.)

Of the $398,294,100 in dollar amount of Ballots received from holders of MCIC Subordinated Debt Claims eligible to vote in Class 10, $395,877,925 in dollar amount of

Ballots were cast to accept the Plan, representing acceptance of the Plan by 99.39% in

dollar amount of MCIC Subordinated Debt Claims voting. Of the 5,065 Ballots received

from holders of MCIC Subordinated Debt Claims eligible to vote in Class 10, 4,900

Ballots were cast to accept the Plan, representing acceptance of the Plan by 96.74% in

number of MCIC Subordinated Debt Claims voting. (Debtors' Ex. 338.)

      Of the $602,307,815 in dollar amount of Ballots received from holders of

Intermedia Senior Debt Claims eligible to vote in Class 11, $599,297,815 in dollar

amount of Ballots were cast to accept the Plan, representing acceptance of the Plan by

99.50% in dollar amount of Intermedia Senior Debt Claims voting. Of the 368 Ballots

received from holders of Intermedia Senior Debt Claims eligible to vote in Class 11, 366

Ballots were cast to accept the Plan, representing acceptance of the Plan by 99.46% in

number of Intermedia Senior Debt Claims voting. (Debtors' Ex. 338.)

      Of the $24,438,900.82 in dollar amount of Ballots received from holders of

Intermedia General Unsecured Claims eligible to vote in Class 12, $24,397,826.26 in

dollar amount of Ballots were cast to accept the Plan, representing acceptance of the Plan

by 99.83% in dollar amount of Intermedia General Unsecured Claims voting. Of the 20

Ballots received from holders of Intermedia General Unsecured Claims eligible to vote in

Class 12, 19 Ballots were cast to accept the Plan, representing acceptance of the Plan by

95.00% in number of Intermedia General Unsecured Claims voting. (Debtors' Ex. 338.)

      Of the $164,300,000 in dollar amount of Ballots received from holders of

Intermedia Subordinated Debt Claims eligible to vote in Class 13, $164,300,000 in dollar

amount of Ballots were cast to accept the Plan, representing acceptance of the Plan by

100% in dollar amount of Intermedia Subordinated Debt Claims voting. Of the 35

Ballots received from holders of Intermedia Subordinated Debt Claims eligible to vote in

Class 13, 35 Ballots were cast to accept the Plan, representing acceptance of the Plan by

100% in number of Intermedia Subordinated Debt Claims voting.  (Debtors' Ex. 338.)[16]

**(ix) 1129(a)(9)**

Except to the extent that the holder of an Allowed Claim of a kind specified in

section 507(a)(1) of the Bankruptcy Code has agreed to less favorable treatment, the Plan

provides that on the later of the Effective Date and the date such Administrative Expense

Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is

practicable, the holder of such Claim will receive on account of such Claim, Cash in an

amount equal to the Allowed amount of such Claim; *provided*, *however*, that Allowed

Administrative Expense Claims representing liabilities incurred in the ordinary course of

business by the Debtors, or liabilities arising under loans or advances to or other

obligations incurred by the Debtors, shall be paid in full and performed by the

Reorganized Debtors in the ordinary course of business in accordance with the terms and

---

[16] Prior to the October 20 Ruling requiring separate classification of the former Class 6, of the $642,039,986.96 in dollar amount of Ballots received from holders of WorldCom General Unsecured Claims eligible to vote in Class 6, $544,663,538.61 in dollar amount of Ballots were cast to accept the Plan, representing acceptance of the Plan by 84.83% in dollar amount of WorldCom General Unsecured Claims voting.  Of the 773 Ballots received from holders of WorldCom General Unsecured Claims eligible to vote in Class 6, 620 Ballots were cast to accept the Plan, representing acceptance of the Plan by 80.21% in number of WorldCom General Unsecured Claims voting.  (Debtors' Ex. 338). Pursuant to the Court's October 20 Ruling, separate classes were formed for the former members of Class 6 and the Debtors elected not to re-solicit votes.  Rather, the newly constituted Classes 6, and 6A are deemed to reject the Plan and the Debtors are seeking confirmation of the Plan pursuant to section 1129(b)(1) of the Bankruptcy Code.  Class 6B is deemed to accept the Plan in connection with a stipulation reached with Debtors, among others, to support the Plan.

subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

Section 4.01 of the Plan provides that on the later of the Effective Date and the date such Allowed Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable, each holder of an Allowed Other Priority Claim will receive on account of such Claim Cash in the Allowed amount of such Claim.

Except to the extent that the holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or has agreed to a different treatment of such Claim, the Plan provides that each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Reorganized Debtors, Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable or upon such other terms agreed to by the parties or determined by the Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

**(x) 1129(a)(11)**

The Debtors have prepared a three-year business plan and a consolidated financial forecast for the three-year period ending December 31, 2005. (Debtors' Ex. 273.) The Debtors' financial forecast reflects the anticipated financial performance of the Debtors with a properly capitalized balance sheet. (9/15/03 Tr. at 188-94.) The Debtors' financial forecast projects earnings before interest, taxes, depreciation, and amortization ranging from $2.67 billion in 2003 to $4.07 billion in 2005. The forecast further projects total net income ranging from $535 million in 2003 to $1.19 billion in 2005. (9/15/03 Tr.

60

423

at 192); Debtors Ex. 332.)  The Debtors' financial projections appear reasonable and achievable.  (9/15/03 Tr. at 192.)

The Debtors will emerge from chapter 11 with no more than approximately $5.665 billion in debt.  (Debtors' Ex. 335.)  Based upon the Debtors' financial forecast, the Reorganized Debtors will be able to service this debt level.  (9/15/03 Tr. at 192.)

No parties in interest have questioned the Debtors' three-year business plan or consolidated financial forecast, or challenged the feasibility of the Plan.  No creditor has prosecuted an objection to the Plan on the basis that the Plan is likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors.

**(xi) 1129(b)**

Acknowledgement of intercreditor contractual subordination provisions and prejudice to holders of (i) MCIC Senior Debt Claims, (ii) MCIC Subordinated Debt Claims, and (iii) MCI Pre-merger Claims resulting from the substantive consolidation of the WorldCom Debtors is a valid business justification and reasonable basis for the disparate treatment of MCIC Senior Debt Claims, MCIC Subordinated Debt Claims, MCI Pre-merger Claims (to the extent treatment of MCI Pre-merger Claims would be deemed disparate from WorldCom General Unsecured Claims), and WorldCom General Unsecured Claims (all of which are unsecured claims against the substantively consolidated WorldCom Debtors).

The holders of Class 6 WorldCom General Unsecured Claims hold Claims against the WorldCom Debtors generally arising from transactions with WorldCom Debtors following the Merger or from transactions with WorldCom, Inc. or its subsidiaries prior to the Merger.

61

424

None of the Claims classified in Class 5 or Class 6 arises from a transaction with an MCIC entity that both predated the Merger and evidenced the reliance by the holder of such Claim on the independent creditworthiness of a pre-Merger MCIC entity.

Classes 5 and 6 are similarly situated both legally, as general unsecured Claims against the Debtors' estates, and equitably, as Claims that do not represent the holders' reliance on a pre-Merger MCIC entity.

In extending credit to the Debtors, holders of Claims in Classes 6A, 9 and 10 relied on the credit of an MCI entity prior to the Merger and, in the case of MCIC Senior Debt Claims and MCIC Subordinated Debt Claims, relied on offering memoranda and prospectuses issued by MCIC.

In formulating the Plan, the Debtors, the Committee, and various creditor constituencies negotiated a series of formal and informal settlements resulting in the structure of the proposed plan of reorganization – a structure already overwhelmingly approved by creditors voting in favor of the September 12 Plan – which provides for distribution premiums for pre-Merger MCI creditors in respect of the asserted prejudice relating to the substantive consolidation of the WorldCom Debtors.

The Plan is premised upon the substantive consolidation of the Debtors' estates and a series of settlements, including the MCIC Senior Debt Claims settlement and the Integrated Settlement, that address the asserted prejudices to pre-merger creditors of MCIC entities that would result therefrom.

As the record in these Chapter 11 Cases shows, the Debtors would be mired in litigation for an indefinite period of time if substantive consolidation were contested and, undoubtedly, appealed. Resolution of these disputes by virtue of the differing treatment

62

425

of differently situated classes of unsecured creditors, as provided in the Plan, avoids potentially massive and protracted litigation over the following issues: the precise allocation of assets and liabilities among entities; the enforceability or validity of different types of intercompany claims; the amount of intercompany claims; which Debtor is liable on each of the thousands of claims for which proofs of claim were filed against multiple Debtors; and whether there were fraudulent or otherwise voidable transfers made.

Resolution of such disputes also eliminates the need for a complex solvency analyses of multiple Debtors, which cannot produce reliable separate financial statements.

The delay caused by such protracted litigation of multiple issues would undoubtedly require the Debtors to remain in chapter 11 for an indeterminable amount of time, causing irreparable harm and threatening the very reorganization of the Debtors that chapter 11 is designed to promote.

The degree of discrimination regarding Class 6 is in direct proportion to its rationale.

The Debtors' evidence has demonstrated the reasonableness and good faith of the 80.0% recovery by Class 9 MCIC Senior Debt Claims represented by the MCIC Senior Debt Clams settlement. (9/15/03 Tr. at 217, 221, 223-26.) The treatments afforded Class 6A MCI Pre-merger Claims and Class 10 MCIC Subordinated Debt Claims are based upon the relative and similar reliance and prejudice arguments of the holders of such Claims.

63

The Debtors' determination to provide additional recovery to the holders of Class 6A Claims compared to Class 6 Claims is consistent with the distributions afforded holders of Class 9 MCIC Senior Debt Claims and Class 10 MCIC Subordinated Debt Claims and the rationale therefore.

Holders of Class 6A MCI Pre-merger Claims hold General Unsecured Claims arising from pre-Merger transactions or series of transactions in which they relied on the separate creditworthiness of a pre-Merger MCIC entity.

The enhanced recovery provided to the holders of Class 6A MCI Pre-merger Claims is a component of the Integrated Settlement among the Debtors, the Committee, the Ad Hoc Committee of Dissenting Bondholders, and the Ad Hoc MCI Trade Claims Committee.

Prior to the formulation of the Integrated Settlement, various parties asserted that providing pre-Merger trade creditors and post-Merger trade creditors with the same distribution ignored the reliance and prejudice arguments of the holders of MCI Pre-merger Claims and was inconsistent with the principles underlying the settlement with the holders of MCIC Senior Debt Claims. (Docket No. 8038 Platinum Partners Value Arbitrage Fund L.P.'s Objection to Confirmation of the Debtors' Amended Joint Plan of Reorganization and Joinder in the Ad Hoc MCI Trade Claims Committee's Objection to Debtors' Joint Plan of Reorganization; Docket No. 7709 Objection of Deutsche Bank Securities Inc. to Confirmation of the Debtors' Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code). The enhanced treatment afforded holders of Class 6A MCI Pre-merger Claims resulted from the Debtors' good-faith negotiations with these holders, the recognition of the merits of their arguments, and consideration of

the relativity of their recoveries to the recoveries by the holders of Class 9 and Class 10 Claims.

Recognizing the reasonableness of the distribution of 80% to the holders of MCIC Senior Debt Claims, the parties who negotiated the Integrated Settlement agreed that the respective recoveries of 60% and approximately 47% by Classes 6A and 10, respectively, reflected the relative legal rights of such holders compared to Class 9 MCIC Senior Debt Claims as well as the other Classes of unsecured claims.

By virtue of the different contractual rights and reliance and prejudice arguments of the holders of MCIC Senior Debt Claims and MCIC Subordinated Debt Claims, discrimination among pre-Merger creditors is warranted.

The degree of discrimination regarding Class 6A is in direct proportion to its rationale.

All classes of preferred Equity Interests in the Intermedia Debtors are receiving the same treatment under the Plan.

All classes of common Equity Interests in the WorldCom Debtors are receiving the same treatment under the Plan.

All classes of common Equity Interests in the Intermedia Debtors are receiving the same treatment under the Plan.

No holder of a Claim or Equity Interest that is junior to MCIC Subordinated Debt Claims will receive or retain any property under the Plan on account of such junior Claim or Equity Interest.

65

Under the Plan, the only Claims against, and Equity Interests in, the Debtors that are junior to the Claims in Classes 6 and 6A are the Claims in Class 7 (WorldCom Subordinated Claims) and the Equity Interests in Class 8 (WorldCom Equity Interests).

No holder of a Claim or Equity Interest that is junior to WorldCom General Unsecured Claims will receive or retain any property under the Plan on account of such junior Claim or Equity Interest.

No holder of a Claim or Equity Interest that is junior to MCI Pre-merger Claims will receive or retain any property under the Plan on account of such junior Claim or Equity Interest

No holder of a Claim or Equity Interest that is junior to WorldCom Subordinated Claims will receive or retain any property on account of such junior Claim or Equity Interest.

No holder of an Equity Interest that is junior to Intermedia Preferred Stock will receive or retain any property under the Plan on account of such junior Equity Interest.

No holder of an Equity Interest that is junior to WorldCom Equity Interests will receive or retain any property under the Plan on account of such junior Equity Interest.

No holder of an Equity Interest that is junior to Intermedia Equity Interests will receive or retain any property under the Plan on account of such junior Equity Interest.

## II. CONCLUSIONS OF LAW

### A. SUBSTANTIVE CONSOLIDATION

Bankruptcy courts have the general equitable power to order substantive consolidation. *See, e.g., Fed. Deposit Ins. Corp. v. Colonial Realty Co.*, 966 F.2d 57, 59 (2d Cir. 1992) (authority for substantive consolidation comes from the bankruptcy court's general equitable powers under § 105 of the Bankruptcy Code); *In re Continental*

66

429

*Vending Mach. Corp.*, 517 F.2d 997, 1000 (2d Cir. 1975) (noting power to consolidate

comes from equity); *In re Leslie Fay Cos.,* 207 B.R. 764, 779 (Bankr. S.D.N.Y. 1997)

("Substantive consolidation derives from the bankruptcy court's general equitable powers

provided in section 105(a) of the Bankruptcy Code."); *Moran v. Hong Kong & Shanghai*

*Banking Corp. (In re Deltacorp, Inc.)*, 179 B.R. 773, 777 (Bankr. S.D.N.Y. 1995) (same);

*In re Richton Int'l Corp.*, 12 B.R. 555, 557 (Bankr. S.D.N.Y. 1981) (same), 2 COLLIER

ON BANKRUPTCY ¶ 105.09 [1][6], at 105-85 (L. King 15th rev. ed. 2002) ("the authority

of a bankruptcy court to order substantive consolidation derives from its general

discretionary equitable powers").

     The Bankruptcy Code itself contemplates that substantive consolidation may be

used to effectuate a plan of reorganization. Section 1123(a) provides, in relevant part:

> (a) Notwithstanding any otherwise applicable
> nonbankruptcy law, a plan shall –
>
>    . . . .
>
>      (5) provide adequate means for the plan's
> implementation, such as –
>
>    . . . .
>
>      (C) merger or consolidation of the
> debtor with one or more persons . . . .

11 U.S.C. § 1123(a)(5)(C); *In re Stone & Webster, Inc.*, 286 B.R. 532, 540-41 (Bankr. D.

Del. 2002) (noting that substantive consolidation is contemplated by section 1123(a)(5)

of the Bankruptcy Code); 11 U.S.C. § 105(a) ("The court may issue any order, process, or

judgment that is necessary or appropriate to carry out the provisions of this title.").

     Substantive consolidation has the effect of consolidating the assets and liabilities

of multiple debtors and treating them as if the liabilities were owed by, and the assets

held by, a single legal entity. *Colonial Realty Co.*, 966 F.2d at 58; *Leslie Fay,* 207 B.R. at 779. In the course of satisfying the liabilities of the consolidated debtors from the common pool of assets, intercompany claims are eliminated and guaranties from co-debtors are disregarded. *Union Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.),* 860 F.2d 515, 518 (2d Cir. 1988); *Deltacorp*, 179 B.R. at 777 (multiple claims against consolidated debtors eliminated; creditor receives only one recovery).

As an equitable remedy, substantive consolidation is to be used to afford creditors equitable treatment and thus may be ordered when the benefits to creditors therefrom exceed the harm suffered. *Augie/Restivo*, 860 F.2d at 518-19; *see also Stone v. Eacho (In re Tip Top Tailors, Inc.)*, 127 F.2d 284, 288 (4th Cir. 1942).

Traditionally, bankruptcy courts have considered the following factors in determining whether to approve substantive consolidation:

- The presence or absence of consolidated financial statements;
- The unity of interest and ownership among various corporate entities;
- The degree of difficulty in segregating and ascertaining individual assets and liabilities;
- The transfers of assets without formal observance of corporate formalities;
- The commingling of assets and business functions;
- The profitability of consolidation at a single physical location;
- The disregard of legal formalities.

*See, e.g.*, *Augie/Restivo*, 860 F.2d at 518; *Soveriero v. Franklin Nat'l Bank*, 328 F.2d 446, 447-48 (2d Cir. 1964); *In re Food Fair, Inc.*, 10 B.R. 123, 126 (Bankr. S.D.N.Y. 1981).

68

As shown by each decision granting substantive consolidation, a decision to substantively consolidate affiliated debtors need not be supported by the presence of all such factors.

In *Augie/Restivo*, the Second Circuit synthesized the foregoing factors into two, and ruled that the existence of even one such factor may justify substantive consolidation. Specifically, the Second Circuit held that substantive consolidation is required if it is demonstrated

> (i)      that the operational and financial affairs of the debtors are so entangled that the accurate identification and allocation of assets and liabilities cannot be achieved;

> *or*

> (ii)     that creditors dealt with the debtors as a single economic unit and did not rely on the separate identity of a debtor in extending credit.

*Augie/Restivo,* 860 F.2d at 518; *see also In re 599 Consumer Elec., Inc.*, 195 B.R. 244 (S.D.N.Y. 1996) ("the Second Circuit's use of the conjunction 'or' [in *Augie/Restivo*] suggests that the two cited factors are alternatively sufficient criteria.").

When deciding whether to order substantive consolidation, the courts in this circuit also use a balancing test to determine whether the relief achieves the best results for all creditors. *Colonial Realty,* 966 F.2d at 60 ("The propriety of [substantive consolidation] must, then, be determined solely in light of the principles and rules of equity"); *see also In re Affiliated Foods, Inc.*, 249 B.R. 770, 780 (Bankr. W.D. Mo. 2000) (ordering substantive consolidation because "in the final analysis the benefits of consolidation substantially outweigh the harm to creditors"); *White v. Creditors Serv. Corp. (In re Creditors Serv. Corp.)*, 195 B.R. 680, 690 (Bankr. S.D. Ohio 1996) ("the

69

432

ultimate inquiry [for a court deciding substantive consolidation] involves a balancing of the equities based on the bankruptcy court's inherent powers pursuant to § 105").

Courts have "a good deal of discretion" in determining whether substantive consolidation is appropriate. *Deltacorp*, 179 B.R. at 777. Using that discretion, numerous courts in the Second Circuit have ordered substantive consolidation in circumstances similar to those of the MCI/WorldCom Debtors and the Intermedia Debtors, including *In re I.R.C.C., Inc.*, 105 B.R. 237 (Bankr. S.D.N.Y. 1989); *In re Richton Int'l Corp.*, 12 B.R. 555 (Bankr. S.D.N.Y. 1981), *In re Food Fair, Inc.*, 10 B.R. 123, 127-28 (Bankr. S.D.N.Y. 1981), and *In re D.H. Overmyer Co., Inc.*, 1976 WL 168421 (S.D.N.Y. 1976). Additionally, the case of *In re Affiliated Foods, Inc.,* 249 B.R. 770 (Bankr. W.D. Mo. 2000), provides a model for substantively consolidating debtors in a fact pattern similar to this case.

To prevail on substantive consolidation, the Debtors are not required to prove that an allocation of assets and liabilities to the various legal entities cannot be achieved under any circumstances. Rather, it is sufficient to demonstrate that it would be so costly and difficult to untangle the Debtors' financial affairs, such that doing so is a "practical impossibility," making substantive consolidation appropriate. *Chemical Bank New York Trust Co. v. Kheel (In re Seatrade Corp.)*, 369 F.2d 845, 848 (2d Cir. 1966) (ordering substantive consolidation because of "expense and difficulty amounting to *practical impossibility* of reconstructing the financial records of the debtors to determine intercorporate claims, liabilities and ownership of assets") (emphasis added); *see also In re Bonham*, 229 F.3d 750, 766-67 (9th Cir. 2000) (adopting *Augie/Restivo* test and stating that entanglement factor is satisfied if disentangling the debtors' affairs would be

70

433

"needlessly expensive and possibly futile"); *In re Affiliated Foods, Inc.,* 249 B.R. at 780
(ordering substantive consolidation when separating the debtors' accounts "would be 'a
real nightmare'" and achieving a separate allocation "probably would not be possible").
Alternatively, the Debtors must show that it is not possible to create *accurate* financial
data for each legal entity. *Augie/Restivo*, 860 F.2d at 519.

The Court concludes that the substantive consolidation proposed in the Plan is
necessary and appropriate and satisfies both prongs of the *Augie/Restivo* test.

The facts amply demonstrate that the Debtors' operational and financial affairs
are so entangled that the accurate identification and allocation of assets and liabilities
either could never be accomplished, or, even if it could be accomplished, would take so
long and be so costly such that creditors as a whole would be substantially harmed by the
effort. Thus, disentangling the financial affairs of the Debtors is a practical impossibility.
The factors that led to this conclusion are set forth in in the Court's Findings of Fact,
above, but include:

- common management and control of the Debtors;
- the substantial operational integration and entanglement of the Debtors' business operations, including the creation of a unified telecommunications network that serves substantially all of the Debtor entities, the existence of centralized administrative functions, such as cash management, purchasing, human resources, and finance, and presentation of products and services to the marketplace on an integrated basis;
- public financial reporting on a consolidated basis;

71

- financial entanglement resulting from internal financial management being conducted on a business line and functional basis, rather than legal entity basis;

- inability to account accurately and reliably for intercompany claims, resulting from, among other things, a lack of proper internal controls;

- the Debtors' present inability to create accurate and reliable historical financial statements on a separate legal entity basis; and

- acute lack of institutional knowledge and documentation making reconstruction of historical financial information on a separate legal entity basis exceedingly difficult and perhaps impossible.

The cost of disentangling the estates, if it ever could be accomplished, is not simply the out-of-pocket expenses to pay the accountants, lawyers, and other professionals, who would have to reconstruct years of financial data and litigate significant intercreditor disputes regarding the validity of intercompany claims. It also includes the enormous employee resources that would have to be devoted to the effort, detracting from business operations, as well and the incalculable diminution of enterprise value that likely would result from a protracted chapter 11 case.

The Court further concludes that a substantial portion of creditors dealt with the Debtors as a single economic unit and did not rely on the separate identity of any particular Debtor entity in extending credit. Accordingly, both prongs of the *Augie/Restivo* test have been satisfied in these cases, with respect to both the WorldCom Debtors and the Intermedia Debtors.

72

In the final analysis here, the benefits of substantive consolidation far outweigh any possible harm to creditors. Accordingly, use of substantive consolidation as an equitable remedy is appropriate in this case.

**B. THE SETTLEMENTS**

The Plan's provision for each of the Settlements is authorized by 11 U.S.C. § 1123(b)(3) and is appropriate. Due notice of the Settlements and the hearing to be held thereon has been given and all parties in interest have had an opportunity to appear and be heard with respect thereto.

This Court is required to make an independent determination of the fairness to the Debtors and their estates of each of the settlements embodied in the Plan. *See, e.g., Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re W.T. Grant Co.*, 699 F.2d 599, 605-06 (2d Cir. 1983).

In approving each of the Settlements, this Court has considered, among other things:

- the balance of the likelihood of success of claims asserted by the claimants against the likelihood of success of the defenses or counterclaims possessed by the Debtors;

- the balance of the likelihood of success of claims asserted by the Debtors against the likelihood of success of the defenses or counterclaims possessed by the claimants;

- the complexity, cost, and delay of litigation that would result in the absence of settlements;

- whether any creditor of the Debtors or other party in interest has objected to the settlement and the acceptance of the Plan by a substantial majority of the holders of claims; and

- the fact that the Plan, which gives effect to the settlements, is the product of extensive arm's-length and good faith negotiations between and among the Debtors and the claimants.

73

*See, e.g., W.T. Grant Co.*, 699 F.2d at 608; *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493 (Bankr. S.D.N.Y. 1991); *In re Texaco Inc.*, 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

Approval of a settlement does not require a "mini-trial" on the merits. *See also In re Purofied Down Products Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) ("the court need not conduct a 'mini-trial' to determine the merits of the underlying litigation"). In determining whether to approve a proposed settlement, a bankruptcy court need not decide the numerous issues of law and fact raised by the settlement, but rather, should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" *W.T. Grant Co.*, 699 F.2d at 608 (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

In assessing the fairness of a compromise or settlement embodied in a plan of reorganization, the court does not have to be convinced that the compromise or settlement is the best possible agreement or that the parties have maximized their recovery. *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994). Further, the Court is not required to assess the minutia of each and every claim being compromised. *Id.*

**(i) The Intermedia Settlement**

Intermedia is a Debtor and an affiliate and insider of WorldCom, Inc. *See* 11 U.S.C. § 101(2)(B), 101(31)(E).

Because under the Plan, the estates of the Intermedia Debtors are not substantively consolidated with the estates of the WorldCom Debtors, assets of the Intermedia Debtors' estates are not available for distribution to satisfy allowed claims against WorldCom Debtors.

74

Pursuant to the Bar Date Order, unless otherwise ordered by the Court, Intermedia is not required to file a proof of claim in the Debtors' cases. Bar Date Order, at 3-4 ("ORDERED that the following persons or entities are **not** required to file a proof of claim on or before the Bar Date: . . . any Debtor having a claim against another Debtor . . ."); *id*. at 8 ("ORDERED that entry of this Order is without prejudice to the right of the Debtors to seek a further order of this Court fixing the date by which holders of claims **not** subject to the Bar Date established herein must file such claims against one or more of the Debtors or be forever barred from . . . receiving any payment or distribution of property from the Debtors, the Debtors' estates, or their successors or assigns with respect to such claims . . . ."). Accordingly, Intermedia's claim for amounts under the Intermedia Intercompany Notes is unaffected by the Bar Date Order.[17]

As of the date hereof, the claim held by Intermedia against WorldCom, Inc. for amounts under the Intermedia Intercompany Note has not been either disallowed or allowed in these cases. Accordingly, the claim in respect of the Intermedia Intercompany Note may be compromised and settled pursuant to Bankruptcy Rule 9019.

Moreover, as the Debtors noticed the Intermedia Settlement, pursuant to 11 U.S.C. § 1123(b)(3)(A) and Bankruptcy Rule 9019, for consideration by the Court in the context of the confirmation of the Plan and as the Intermedia Settlement was subject to

---

[17] While the language of the Bar Date Order could be read, as set forth in the Licht Objection, as merely affecting the timing of the filing of a claim by Intermedia, it is clear from the entire document that the intent of the Bar Date Order was that Intermedia would not be subject to the requirement to file a proof of claim, while preserving the Debtors' ability to seek a further order requiring the filing of such claim if subsequently determined to be necessary. According to the Debtors, as the claim related to the Intercompany Note was settled, the Debtors did not consider the filing of a proof of claim necessary and did not seek to have a date certain set for the filing of such claim. Under the circumstances, the filing of a proof of claim would serve no meaningful purpose.

objection in that context, the absence of a filed proof of claim relating to the claim based on the Intercompany Note did not impair the ability of any party in interest to object to the proposed treatment of the Intercompany Note or the ability of the Court to review such treatment. Indeed, Dr. Licht, who filed an objection to the procedural posture of the proceeding as well as the substantive basis for the Intermedia Settlement, participated in the Confirmation Hearing and voiced his concerns related to the treatment of the Intercompany Note under the Intermedia Settlement and the Plan.

Inasmuch as an opportunity was afforded to parties in interest to object to the proposed treatment of the Intercompany Note and for the Court to review such treatment in the context of the proposed Intermedia Settlement under the Plan, Intermedia was not required to file a proof of claim before it could receive a distribution or before the dispute concerning the Intermedia Note could be settled. Upon confirmation of the Plan, which includes the Intermedia Settlement, all proceedings with respect to Intermedia's claim will be completed, thereby obviating the need to require Intermedia to submit a proof of claim by any future date.

Section 544(b) of the Bankruptcy Code, authorizes a debtor in possession to avoid any transfer of an interest of the debtor that is "voidable under applicable law." 11 U.S.C. § 544(b)(1); *see, e.g., Traina v. Whitney Nat'l Bank*, 109 F.3d 244, 246 (5th Cir. 1997) ("Applicable law" means state law).

In considering the Debtors' potential fraudulent transfer claims with respect to the Intermedia Intercompany Note, a conflict of law analysis must first be undertaken to determine which state's substantive law is applicable under section 544. In determining the choice of law issue, the federal common law choice-of-law rules would likely apply.

76

439

*See, e.g., In re Best Products*, 168 B.R. 35, 51 (Bankr. S.D.N.Y. 1994), *aff'd,* 68 F.3d 26
(2d Cir. 1995). The federal common law approach is to employ the law of the
jurisdiction with the most significant relationship to the transaction and to the parties. *Id.*
(choice of law test for torts under § 145 of the Restatement (Second) of Conflicts of Laws
(the "Restatement") is applicable to fraudulent conveyances). Under section 145 of the
Restatement, contacts to be taken into account include the place where the injury
occurred, the place where the conduct causing the injury occurred, the domicile,
residence, nationality, place of incorporation and place of business of the parties, and the
place where the relationship, if any, between the parties is centered. Restatement, § 145.
Thus, under this analysis, "applicable law" could be the law of the state in which the
debtor is incorporated, the transferee's principal place of business is located, the merger
was negotiated and consummated, the state where the creditors are located, or the state
whose law would provide the most benefit to the creditors as a group. *See Best Products*,
168 B.R. at 52 (stating that the law where the majority of the creditors were located and
where the transaction was negotiated and consummated would probably apply).

Although Intermedia creditors may have argued otherwise,[18] New York Debtor
and Creditor Law ("DCL"), §§ 273, 274, may be the law applicable in such an action.
Under that statute, a transfer or obligation can be avoided if the debtor did not receive fair
consideration therefor and (i) the debtor was rendered insolvent by the transfer, (ii) the
transfer left the debtor with unreasonably small capital, or (iii) the debtor believed when
it made the transfer and incurred its obligations that it would incur debts beyond its

---

[18] Georgia law, for example, would require proof of actual intent to defraud.

77

ability to pay as they mature. An avoidance action must be commenced within six years of the date of the transfer. DCL §§ 273, 274.

The burden of proof of all elements of a fraudulent transfer action under section 544(b) of the Bankruptcy Code, would be on WorldCom, Inc., as the party seeking to avoid the transfer. *See, e.g., Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 376 n.6 (S.D.N.Y. 2003); *America Investment Bank v. Marine Midland Bank*, 191 A.D.2d 690 (N.Y. App. Div. 1993). In that regard, WorldCom, Inc. would need to establish each element of the fraudulent transfer action by a preponderance of the evidence. *See, e.g., Lippe*, 249 F. Supp. 2d at 376 n.6.

Section 271 of the DCL provides that an entity is insolvent when "the present fair salable value of [its] assets is less than the amount that will be required to pay [its] probable liability on [its] existing debts as they become absolute and matured." There are various tests used to determine insolvency under the DCL, none of which is generally accepted as the correct test. *In re Best Products*, 168 B.R. at 52. These tests include the balance sheet approach and the going concern approach. *Id.* In deciding whether the debtor was insolvent at the time of the alleged fraudulent transfer, New York courts value the debtor's assets at the time of the challenged transfer, not at some later time. *See In re Le Café Crème, Ltd.*, 244 B.R. 221 (Bankr. S.D.N.Y. 2000).

Whether a company is insolvent for fraudulent transfer purposes requires a "fair valuation" of its assets and liabilities. The determination of fair valuation is an inexact science, and there is no precise formula to determine solvency. *Constructora Maza, Inc. v. Banco de Ponce*, 616 F.2d 573, 577 (1st Cir. 1980); *Briden*, 776 at 382. A determination of insolvency should be based on appraisals and expert testimony, but

appraisals are neither the exclusive nor dispositive means to make the determination. *See Lawson v. Ford Motor Company (In re Roblin Industries, Inc.)*, 78 F.3d 30, 34 (2d Cir. 1996).

Thus, to make a prima facie showing of a fraudulent transfer under section 544 of the Bankruptcy Code, the Debtors would be required to prove that WorldCom, Inc. was insolvent on the date of the transfer of the Intermedia Intercompany Note.

Fair consideration has two prongs – the adequacy of the consideration and good faith. DCL § 272; *see also Ede v. Ede*, 598 N.Y.S.2d 90 (N.Y. App. Div. 1993) (holding that fair consideration for fraudulent transfer purposes under New York law requires that the exchange be for equivalent value and be made in good faith).

The existence of reasonably equivalent value for a transfer or obligation is a question of fact. *See Branch v. Federal Deposit Insurance Corp.*, 825 F. Supp. 384, 399 (D. Mass. 1993); *In re Lawrence Paperboard, Co.*, 76 B.R. 866, 873 (Bankr. D. Mass. 1987). "Reasonable equivalence" requires a comparison of the value of what went out with the value of what was received. *Heritage Bank Tinley Park v. Steinberg (In re Grabill Corp.)*, 121 B.R. 983, 994 (Bankr. N.D. Ill. 1990); *see also In re Suburban Motor Freight, Inc.*, 124 B.R. 984, 997 (Bankr. S.D. Ohio 1990) (the focus is placed on adequacy of consideration received by a debtor under the measurement test in which all aspects of the transaction are examined to calculate economic value of all the benefits and burdens to the debtor, direct or indirect; collapsing the transaction in question to look at the net effect of the overall transfer).

Courts generally find reasonably equivalent value for a transfer from a parent to its wholly owned subsidiary, because the parent, as the sole stockholder of the subsidiary

79

corporation, receives a benefit in the form of increased stock value resulting from the increased financial strength of the parent. *See Branch v. Federal Deposit Insurance Corporation*, 825 F. Supp. 384, 399–400 (D. Mass. 1993).

Courts have found a parent's transfer of assets to a subsidiary to be for less than reasonably equivalent value when the subsidiary was insolvent at the time of transfer. *See In re Duque Rodriguez*, 77 B.R. 939, 941-42 (Bankr. S.D. Fla. 1987), *aff'd,* 895 F.2d 725 (11th Cir. 1990); *In re Chase & Sanborn Corp.*, 68 B.R. 530 (Bankr. S.D. Fla. 1986), *aff'd*, 848 F.2d 1196 (11th Cir. 1988); *see also In re First City Bancorporation of Texas, Inc.* 1995 WL 710912 *18 (Bankr. N.D. Tex. 1995).

However, courts will also collapse multiple transactions into one to view the overall consideration received. *In re Suburban Motor Freight, Inc.*, 124 B.R. 984 (Bankr. S.D. Ohio 1990) (*citing Kupetz v. Wolf*, 845 F.2d 842 (9th Cir. 1988)); *see also HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir. 1994)

In order to avoid the Intermedia Intercompany Note as a fraudulent transfer pursuant to section 544(b) of the Bankruptcy Code and the DCL, the Debtors would have to show, among other things, that it did not receive fair consideration in return for the Intermedia Intercompany Note. This, in turn, would require a valuation of the assets received by WorldCom in exchange therefor.

To qualify as a voidable preference, a transfer must (1) benefit a creditor, (2) be on account of an antecedent debt, (3) be made while the debtor was insolvent, (4) be made within ninety days preceding the filing of the bankruptcy petition, and (5) enable the creditor to receive a larger share of the estate than if the transfer had not been made. 11 U.S.C. § 547(b); *see also Union Bank v. Wolas*, 502 U.S. 151, 112 S. Ct. 527, 529-30

(1991). Where the transfer was to an insider of the debtor, the ninety-day period is extended to one year preceding the filing of the bankruptcy petition. 11 U.S.C. § 547(b)(5)(C). The debtor in possession has the burden of proving the avoidability of a transfer under section 547(b) by a preponderance of the evidence. *Id.* § 547(g); *Lawson v. Ford Motor Company (In re Roblin Industries, Inc.),* 78 F.3d at 34.

Whether the principal prepayments and interest payments made during the one-year period prior to the chapter 11 filing on account of the Intermedia Intercompany Note satisfy the requirements for a preferential transfer set forth in section 547 of the Bankruptcy Code would require determinations of WorldCom, Inc.'s solvency at each point in time that a payment was made.

There are multiple statutory defenses that also could be raised in defense of potentially preferential transfers under section 547(c) of the Bankruptcy Code. Moreover, even if the Debtors were to prevail on their preference theory, complex issues attendant to the repayment of amounts by Intermedia to WorldCom, Inc. under section 502(d) of the Bankruptcy Code would require resolution.

Wells Fargo filed an objection to the modification of the Second Amended Plan of Reorganization as it relates to the increase of $29,000,000 over the $1,000,000,000 to be paid by the WorldCom estates to the Intermedia Debtors under the proposed settlement as set forth in the Plan. The $29,000,000 increase was agreed to as a resolution of the objection filed by certain preferred shareholders of Intermedia to the Intermedia Settlement. WellsFargo's objection is limited to the modification. Wells

444

Fargo argues among other things,[19] that the WorldCom creditors should not be burdened with the obligation to pay equity of Intermedia Debtors  As the Court found at the hearing on the Intermedia Settlement when it was advised of the $29,000,000 increase, such amount was not significant in the context of a $1,000,000,000 amount to be paid by the World Com Debtors to Intermedia and therefore not a materially adverse change.  As subsequently detailed, the Intermedia Settlement, including the $29,000,000 modification satisfies the standards for a Bankruptcy Rule 9019 settlement.

Further, the issue of a payment to equity of Intermedia is an issue for the Intermedia creditors, not the WorldCom Debtors' creditors.  The $29,000,000 was agreed to by the AdHoc Committee of Intermedia Noteholders and such increase was noticed to all creditors.  Pursuant to the Notice of Modifications to Debtors' Second Amended Plan of Reorganization, dated September 19, 2003, Intermedia creditors in Classes 11, 12 and 13 were informed of the 5% recovery that holders of Intermedia Preferred Stock would receive.  Thus, prior to the October 8, 2003 deadline to determine whether to amend their vote, such classes were given sufficient notice of the modification providing for recovery to Class 14.  Following, the October 8, 2003 deadline, the tabulation of the Intermedia creditor classes continued to show overwhelming support for confirmation.  Thus, taking into consideration the notice provided Classes 11, 12 and 13 prior to the October 8, 2003 voting deadline to amend their vote, and the fact that even with the disclosure, the tabulation of votes reflecting the votes cast prior to the October 8, 2003 deadline continued to show overwhelming support to confirm the Plan, and in light of the *de*

---

[19]As previously noted, pursuant to stipulation, the balance of Wells Fargo's objections will be addressed when the Debtors' objection to Wells Fargo's claims are considered in the context of the claims resolution process.

82

*minimis* amount of money at issue in comparison to the $1,000,000.00 available for distribution to those classes under the Intermedia Settlement, the Court deems Classes 11, 12 and 13 as having accepted the treatment of the Intermedia Preferred Shareholders and supported confirmation of the Plan, which included the modifications. There is no challenge to the validity of the vote. Thus, with respect to the Intermedia creditors, the absolute priority rule does not apply. Wells Fargo's objection is overruled.

The Intermedia Settlement is reasonable, fair and equitable and in the best interests of the Debtors, their estates and their creditors.

The Intermedia Settlement falls within the range of reasonableness, provides for the resolution of complex litigation that would likely implicate multiple appeals, and is fair and equitable and in the best interests of the Debtors, their estates, and their creditors and equity interest holders. The Intermedia Settlement has been negotiated at arm's-length and has been entered into in good faith. It is in the best interests of the Debtors to reach consensus with the major creditor groups. The Intermedia Settlement avoids costly and time-consuming litigation, paving the way toward achieving a successful reorganization of the Debtors. The avoidance of long and complicated litigation is one of the principal rationales for debtors entering into settlements with creditors. *See In re Baldwin United Corp.*, 43 B.R. 888 (Bankr. S.D. Ohio 1984).

The Intermedia Settlement removes substantial impediments to a successful restructuring and reorganization of the Debtors, furthers the Debtors' reorganization and prompt emergence from chapter 11 and reflects a reasonable balance of the risk and expense of litigation against the benefits of early resolution of the disputes and issues. *In re Teltronics Servs., Inc.*, 762 F.2d 185, 188-89 (2d Cir. 1985); *In re W.T. Grant Co.,* 699

83

446

F.2d at 608; *In re Int'l Distrib. Ctrs., Inc.*, 103 B.R. at 423. Furthermore, the Intermedia Settlement is above the lowest point in the range of reasonableness and is an exercise of the Debtors' sound business judgment.

Accordingly, the Licht Objection and Wells Fargo's objection are overruled.

### (ii) The Bank Settlement

The elements of a claim for constructive trust are (i) a confidential or fiduciary relationship, (ii) a promise, express or implied, (iii) a transfer in reliance on the promise, and (iv) unjust enrichment. *See Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag, Controle et Revision S.A.)*, 961 F.2d 341, 353 (2d Cir. 1992). However, courts use these elements merely as guideposts, not as rigid requirements. Because the doctrine of constructive trust is equitable in nature, courts focus on the fairness of the transaction. *See Simonds v. Simonds*, 45 N.Y.2d 233, 243, 380 N.E.2d 189, 408 N.Y.S.2d 359 (1978).

Litigation of the Constructive Trust Action would require a determination of complex factual and legal issues, including the Banks' ability to demonstrate each of the elements of their claim, their ability to trace the property to which such constructive trust could attach, *see United States v. Benitez*, 779 F.2d 135, 140 (2d Cir. 1985), the amount that would be subject to the trust, where funds have been commingled, *see In re Drexel Burnham Lambert Group, Inc.*, 142 B.R. 633 (S.D.N.Y. 1992), and the Debtors' ability to invoke their avoiding powers under section 544(a) of the Bankruptcy Code to avoid any constructive trust that would be imposed in the event the Banks were to prevail on their theory.

84

447

In the event that the Banks succeeded in the Maryland Action, Ms. Mayer would have a claim for indemnification against the Debtors. The allowance of that claim could be the subject of further litigation.

The Bank Settlement is reasonable, fair and equitable and in the best interests of the Debtors, their estates and their creditors.

The Bank Settlement falls within the range of reasonableness and provides for the resolution of complex litigation that would likely implicate multiple appeals. The Bank Settlement has been negotiated at arm's-length and has been entered into in good faith. It is in the best interests of the Debtors to reach consensus with the major creditor groups. The Bank Settlement avoids costly and time-consuming litigation, paving the way toward achieving a successful reorganization of the Debtors. The avoidance of long and complicated litigation is one of the principal rationales for debtors entering into settlements with creditors. *See In re Baldwin United Corp.*, 43 B.R. 888 (Bankr. S.D. Ohio 1984).

The Bank Settlement removes substantial impediments to a successful restructuring and reorganization of the Debtors, furthers the Debtors' reorganization and prompt emergence from chapter 11 and reflects a reasonable balance of the risk and expense of litigation against the benefits of early resolution of the disputes and issues. *In re Teltronics Servs., Inc.*, 762 F.2d 185, 188-89 (2d Cir. 1985); *In re W.T. Grant Co.,* 699 F.2d at 608; *In re Int'l Distrib. Ctrs., Inc.*, 103 B.R. at 423. Furthermore, the Bank Settlement is above the lowest point in the range of reasonableness and is an exercise of the Debtors' sound business judgment.

**(iii) The MCIC Settlement**

85

448

Courts have the general equitable power to order substantive consolidation. *See,
e.g., Fed. Deposit Ins. Corp. v. Colonial Realty Co.*, 966 F.2d at 59 (authority for
substantive consolidation comes from the bankruptcy court's general equitable powers
under section 105 of the Bankruptcy Code); *In re Continental Vending Mach. Corp.*, 517
F.2d 997, 1000 (2d Cir. 1975).

Substantive consolidation is appropriate if the debtors demonstrate: (i) that the
operational and financial affairs of the debtors are so entangled that the accurate
identification and allocation of assets and liabilities cannot be achieved *or* (ii) that
creditors dealt with the debtors as a single economic unit and did not rely on the separate
identity of a debtor in extending credit. *Augie/Restivo,* 860 F.2d at 518; *see In re 599
Consumer Elec., Inc.*, 195 B.R. 244 (S.D.N.Y. 1996).

Litigation of the issues resolved by the MCIC Settlement would be highly fact-
intensive, complex and protracted, involving expert analyses and detailed testimony
regarding the extent of the WorldCom Debtors' accounting and operational
entanglement, including complex issues attendant to millions of intercompany claims
aggregating more than a trillion dollars, (Disclosure Statement at 41), as well as evidence
of the extent to which each holder of an MCIC Senior Debt Claim that opposes
substantive consolidation relied upon the separate legal identity of MCIC when it
extended credit, *see, e.g., In re Bonham*, 229 F.3d 750, 767 (9th Cir. 2000) (under
*Augie/Restivo*, the burden is on the creditors opposed to substantive consolidation to
overcome presumption that they did not rely on separate credit of debtors). While the
Debtors believe that even if particular creditors are able to demonstrate that they did rely
on the separate credit of a particular debtor, substantive consolidation is warranted if the

86

debtors satisfy the entanglement factor, *id.; In re 599 Consumer Elec., Inc.*, 195 B.R. 244 (S.D.N.Y. 1996) ("the Second Circuit's use of the conjunction 'or' [in *Augie/Restivo*] suggests that the two cited factors are alternatively sufficient criteria"), the Ad Hoc Committee of MCIC Senior Noteholders could argue that, based upon the strength of their reliance defense, denial of substantive consolidation would yield the most equitable result for creditors.

The MCIC Settlement represents a resolution of issues with an entire class of creditors, and therefore, with the support of the Ad Hoc Committee of MCIC Senior Noteholders eliminated the risk that the Debtors would have to cramdown a plan of reorganization over the dissent of that class. *See* 11 U.S.C. § 1129(b)(1).

The MCIC Settlement is reasonable, fair and equitable and in the best interests of the Debtors, their estates and their creditors.

The MCIC Settlement falls within the range of reasonableness, provides for the resolution of complex litigation that would likely implicate multiple appeals, and is in the best interests of the Debtors, their estates and creditors. The MCIC Settlement has been negotiated at arm's-length and has been entered into in good faith. It is in the best interests of the Debtors to reach consensus with the major creditor groups. The MCIC Settlement avoids costly and time-consuming litigation, paving the way toward achieving a successful reorganization of the Debtors. The avoidance of long and complicated litigation is one of the principal rationales for debtors entering into settlements with creditors. *See In re Baldwin United Corp.*, 43 B.R. 888 (Bankr. S.D. Ohio 1984) (approving a compromise and finding that the value of a settlement was significantly

87

enhanced and the debtors received additional value by eliminating the possibility of costly litigation).

The MCIC Settlement removes substantial impediments to a successful restructuring and reorganization of the Debtors, furthers the Debtors' reorganization and prompt emergence from chapter 11 and reflects a reasonable balance of the risk and expense of litigation against the benefits of early resolution of the disputes and issues. *In re Teltronics Servs., Inc.*, 762 F.2d 185, 188-89 (2d Cir. 1985); *In re W.T. Grant Co.*, 699 F.2d at 608; *In re Int'l Distrib. Ctrs., Inc.*, 103 B.R. at 423. Furthermore, the MCIC Settlement is above the lowest point in the range of reasonableness and is an exercise of the Debtors' sound business judgment.

## C. SECTION 1129 OF THE BANKRUPTCY CODE

A debtor, as the proponent of the Plan, bears the burden of proof under section 1129 of the Bankruptcy Code. A debtor must meet this burden by a preponderance of the evidence. *See Heartland Federal Savings & Loan Ass'n v. Briscoe Enterprises., Ltd. II (In re Briscoe Enterprises., Ltd. II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) ("The combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof under both § 1129(a) and in a cramdown").

The Debtors have demonstrated, by a preponderance of the evidence, that all of the subsections of section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan.

### (i) 1129(a)(1)

Pursuant to section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1). The

legislative history of section 1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123 governing classification of claims and contents of a plan, respectively. H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978); *In re Johns-Manville Corp.*, 68 B.R. 618, 629 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd, Kane v. Johns-Manville Corp.* 843 F.2d 636 (2d Cir. 1988); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984). As demonstrated below the Plan complies fully with the requirements of sections 1122 and 1123, as well as other applicable provisions of the Bankruptcy Code. *See* 11 U.S.C. § 1127(a), (c).

### Section 1122

Pursuant to section 1122(a), a plan may provide for multiple classes of claims or interests as long as each claim or interest within a class is substantially similar to other claims or interests in that class. *See* 11 U.S.C. § 1122(a). The Plan adequately and properly classifies all Claims and Equity Interests. A reasonable basis exists for the classification of Claims and Equity Interests in the Plan. Claims and Equity Interests within each particular Class are substantially similar and the classification of Claims and Equity Interests in the Plan is reasonable and necessary to implement the Plan.

Consistent with the October 20 Ruling and the requirements of section 1122, the Plan provides for the separate classification of WorldCom General Unsecured Claims, MCI Pre-merger Claims, and Ad Hoc MCI Trade Claims Committee Claims. Each of the Claims in each particular Class is substantially similar to the other Claims in such Class. Such classification is proper.

89

Even if the Court were to determine that WorldCom General Unsecured Claims, MCI Pre-merger Claims, and Ad Hoc MCI Trade Claims Committee Claims are "substantially similar" to each other, section 1122(a) would not require that all such substantially similar claims be classified together. Rather, section 1122(a) requires that, if claims are classified together, then they must be substantially similar. *See In re One Times Square Associates Ltd. Partnership*, 159 B.R. 695, 703 (Bankr. S.D.N.Y. 1993); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 760 (Bankr. S.D.N.Y. 1992) A debtor need not place all substantially similar claims in the same class as long as the debtor has a reasonable basis for the separate classification. *See Times Square Associates*, 159 B.R. at 703.

Based upon the existence of the subordination provisions of the MCIC Subordinated Notes Indenture and the unique prejudice and reliance arguments of holders of pre-Merger Claims, the WorldCom Debt Claims, WorldCom General Unsecured Claims, MCI Pre-merger Claims, MCIC Senior Debt Claims, and MCIC Subordinated Debt Claims are dissimilar in their legal nature and their equitable rights. The separate classification of the WorldCom Debt Claims, WorldCom General Unsecured Claims, MCI Pre-merger Claims, MCIC Senior Debt Claims, and MCIC Subordinated Debt Claims under the Plan is appropriate.

Section 1122(b) of the Bankruptcy Code provides: "A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." 11 U.S.C. § 1122(b). Consistent with section 1122(b), for

90

453

administrative convenience, general unsecured claims against the Debtors in an amount of $40,000 or less have been classified together in Class 4.

Accordingly, the classification of claims and equity interests in the Plan complies with section 1122 of the Bankruptcy Code.

*Section 1123(a)*

Section 1123(a) of the Bankruptcy Code sets forth seven requirements with which every chapter 11 plan must comply. *See* 11 U.S.C. § 1123(a). The Plan fully complies with each such requirement.

Article II of the Plan provides for the treatment of Administrative Expense Claims and Priority Tax Claims and Article III of the Plan designates Classes of claims and Classes of equity interests as required by section 1123(a)(1). Articles III and IV of the Plan specify whether each Class of claims and equity interests is impaired under the Plan and the treatment of each such Class, as required by sections 1123(a)(2) and 1123(a)(3), respectively.

The Plan also complies with the requirements of section 1123(a)(4) and the October 20 Ruling. Section 1123(a)(4) provides that a plan shall "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to less favorable treatment of such particular claim or interest." Each Claim in Classes 6, 6A and 6B will receive the same treatment as other Claims in each of these Classes, unless such holder agreed to less favorable treatment.[20] As the

---

[20] Pursuant to section 4.08(b) of the Plan, if a holder of an MCI Pre-merger Claim is a member of the Ad Hoc MCI Trade Claims Committee, then such holder's recovery will be reduced by the amount received by such holder on account of such Claim pursuant to the contributions from the holders of MCIC Senior Debt Claims and MCIC Subordinated

91

holders of WorldCom General Unsecured Claims, MCI Pre-merger Claims, and Ad Hoc

MCI Trade Claims Committee Claims have been separately classified in Classes 6, 6A,

and 6B, respectively, the Plan satisfies the requirements of section 1123(a)(4) of the

Bankruptcy Code and addresses the Court's October 20 Ruling.

Articles V, VI, VIII, and IX and various other provisions of the Plan set forth the

means for implementation of the Plan as required by section 1123(a)(5). For example,

the substantive consolidation provisions set forth in Sections 5.01 and 5.02 of the Plan are

authorized by section 1123(a)(5). *See In re Stone & Webster, Inc.*, 286 B.R. 532, 540-41

(Bankr. D. Del. 2002).

Section 9.03 of the Plan provides for the prohibition of the issuance of nonvoting

equity securities in the Certificates of Incorporation and the By-laws of Reorganized

WorldCom and each of the other Reorganized Debtors to ensure compliance with section

1123(a)(6).

Finally, Article IX of the Plan contains provisions with respect to the manner of

selection of officers and directors of Reorganized WorldCom and each of the other

Reorganized Debtors that are consistent with the interests of creditors, equity security

holders, and public policy in accordance with section 1123(a)(7).

*Section 1123(b)*

Section 1123(b) of the Bankruptcy Code sets forth the permissive provisions that

may be incorporated into a chapter 11 plan. The Plan is consistent with section 1123(b).

Specifically, pursuant to Article IV of the Plan, Classes 1 and 3 are rendered unimpaired

and Class 2 and Classes 3A through 15 are impaired, as contemplated by section

---

Debt Claims set forth in Sections 4.12 and 4.13 of the Plan. The members of the Ad Hoc
MCI Trade Claims Committee have consented to such treatment.

92

1123(b)(1).  As contemplated by section 1123(b)(2), Article VIII of the Plan provides for

the assumption or rejection of the executory contracts and unexpired leases of the

Debtors not previously assumed or rejected (or subject to pending requests for

assumption or rejection) under section 365 of the Bankruptcy Code.  Section 5.06 of the

Plan provides for the approval, pursuant to Bankruptcy Rule 9019, of the Intermedia

Settlement, the MCIC Settlement, and the Bank Settlement, as contemplated by section

1123(b)(3).  Each of the Settlements is discussed in greater detail in section I.B. above.

Based upon the foregoing, the Plan complies fully with the requirements of

sections 1122 and 1123 of the Bankruptcy Code, and thus, satisfies the requirements of

section 1129(a)(1) of the Bankruptcy Code.

**(ii) 1129(a)(2)**

Section 1129(a)(2) of the Bankruptcy Code requires that the plan proponent

"compl[y] with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. §

1129(a)(2).  The legislative history to section 1129(a)(2) reflects that this provision is

intended to encompass the disclosure and solicitation requirements under sections 1125

and 1126 of the Bankruptcy Code.  *See In re Johns-Manville Corp.*, 68 B.R. 618, 630

(Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407

(S.D.N.Y. 1987), *aff'd, Kane v. Johns-Manville Corp.* 843 F.2d 636 (2d Cir. 1988); *In re

Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984); H.R. Rep. No.

95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978) ("Paragraph (2) [of section

1129(a)] requires that the proponent of the plan comply with the applicable provisions of

chapter 11, such as section 1125 regarding disclosure.").  The Debtors have complied

with the applicable provisions of title 11, including the provisions of sections 1125 and

1126, regarding disclosure and Plan solicitation.

*Section 1125*

Section 1125 of the Bankruptcy Code provides in pertinent part:

> (b) An acceptance or rejection of a plan may not be solicited after the commencement of the case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary or the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. . . .
>
> (c) The same disclosure statement shall be transmitted to each holder of a claim or interest of a particular class, but there may be transmitted different disclosure statements, differing in amount, detail, or kind of information, as between classes.

11 U.S.C. § 1125(b), (c).

As set forth more fully above, the Debtors did not solicit the acceptance or

rejection of the Plan by any creditor prior to the transmission of the Disclosure Statement.

Debtors transmitted the Disclosure Statement to each creditor that was entitled to vote to

accept or reject the Plan, as well as to other parties in interest in this case, in compliance

with section 1125 and this Court's Orders.  In addition, creditors that were not entitled to

vote to accept or reject the Plan and equity interest holders (who are deemed to reject the

Plan) were provided with certain non-voting materials approved by the Court in

compliance with the Court's orders.

Additionally, the Debtors have complied with section 1125 with respect to the

Third Supplement and the Plan.  In connection with soliciting votes on the September 12

Plan, the Court has already determined that the Third Supplement contains "adequate

information" of the kind and in sufficient detail to enable hypothetical, reasonable

94

investors typical of the Debtors' creditors to make an informed judgment whether to accept or reject either the September 12 Plan. The Third Supplement includes a detailed discussion of the relative rights, reliance arguments, and bases for different treatment among WorldCom General Unsecured Claims, MCI Pre-merger Claims, and Ad Hoc MCI Trade Claims Committee Claims. The September 12 Plan was solicited in accordance with the Court's prior orders and received overwhelming support from all Classes.

The Debtors are not required to re-solicit votes of holders of Claims in Classes 6, 6A, or 6B based upon the modifications to the September 12 Plan embodied in the Plan. Classes 6 and 6A are deemed to reject the Plan. Class 6B is conclusively presumed to accept the Plan.

Accordingly, Debtors complied with section 1125 of the Bankruptcy Code.

### *Section 1126*

Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan of reorganization. Under section 1126, only holders of allowed claims and allowed equity interests in impaired classes of claims or equity interests that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject such plan. *See* 11 U.S.C. §1126. As set forth in section 1126:

> (a) The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan. . . .
>
> (f) Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

95

> (g) Notwithstanding any other provision of this section, a class is deemed
> not to have accepted a plan if such plan provides that the claims or
> interests of such class do not entitle the holders of such claims or
> interests to receive or retain any property under the plan on account of
> such claims or interests.

11 U.S.C. § 1126(a), (f), (g).

In accordance with section 1126 of the Bankruptcy Code, the Debtors solicited

acceptances or rejections of the Plan from the holders of all Allowed claims in each Class

of impaired claims that are to receive distributions under the Plan and that are not

otherwise deemed to reject the Plan. Classes 1 and 3 of the Plan are unimpaired. As a

result, pursuant to section 1126(f), holders of claims in those Classes are conclusively

presumed to have accepted the Plan. Pursuant to Section 4.02 of the Plan, the Debtors

have determined to pay holders of Allowed Secured Tax Claims in Class 2 in cash, in

full, plus interest required under section 506(b), thereby rendering Class 2 unimpaired.

As a result, Class 2 now is also conclusively presumed to have accepted the Plan. *See* 11

U.S.C. §§ 1124, 1126(f).

Classes 3A, 4, 5, 6, 6A, 6B, 9, 10, 11, 12, 13 and 14 of the Plan are impaired. As

a result, pursuant to section 1126(a), holders of Claims in such Classes that were not

deemed to reject the Plan were entitled to vote to accept or reject the Plan. [21] Classes 7, 8,

and 15 of the Plan will not receive any distributions under the Plan. As a result, pursuant

to section 1126(g), holders of claims and equity interests in such Classes are deemed to

have rejected the Plan.

---

[21] Classes 6, 6A and 14 were deemed to reject the Plan. Class 6B was deemed to accept
the Plan, pursuant to their agreement to support the Plan in a stipulation entered with the
Debtors, among others.

As to impaired classes entitled to vote to accept or reject a plan, sections 1126(c)

and 1126(d) specify the requirements for acceptance of a plan by classes of claims and

classes of equity interests, respectively:

> (c) A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected the plan.

> (d) A class of interests has accepted the plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(c), (d).

The Plan has been accepted by creditors holding in excess of two-thirds in amount

and one-half in number of the Allowed claims entitled to vote in each class.

As set forth above, Class 6 (WorldCom General Unsecured Claims) and Class 6A

(MCI Pre-merger Claims) are deemed to reject the Plan. In addition, Class 7 (WorldCom

Subordinated Claims), Class 8 (WorldCom Equity Interests), and Class 15 (Intermedia

Equity Interests) will receive no recoveries under, and thus are deemed to have rejected,

the Plan. Nevertheless, as set forth below, pursuant to section 1129(b) of the Bankruptcy

Code, the Plan may be confirmed over the deemed rejections because the Plan does not

discriminate unfairly and is fair and equitable with respect to each such Class. *See* 11

U.S.C. § 1129(b).

The Debtors have complied with the applicable provisions of the Bankruptcy

Code, including, without limitation, the disclosure and solicitation requirements under

97

sections 1125 and 1126 of the Bankruptcy Code.  11 U.S.C. §§ 1125, 1126, 1127(a).

Based upon the foregoing, the requirements of section 1129(a)(2) have been satisfied.

**(iii) 1129(a)(3)**

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in

good faith and not by any means forbidden by law. "  11 U.S.C. § 1129(a)(3).  In the

context of a chapter 11 plan, courts have held that "a plan is proposed in good faith if

there is a likelihood that the plan will achieve a result consistent with the standards

prescribed under the [Bankruptcy] Code."  *In re Leslie Fay Cos.*, 207 B.R. 764, 781

(Bankr. S.D.N.Y. 1997) (quoting *In re Texaco Inc.*, 84 B.R. 893, 907 (Bankr. S.D.N.Y.),

*appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1988)).  "The requirement of good faith must be

viewed in light of the totality of the circumstances surrounding the establishment of a

chapter 11 plan. " *Leslie Fay*, 207 B.R. at 781 (citations omitted).  The primary goal of

chapter 11 is to promote the rehabilitation of the debtor.  Congress has recognized that

the continuation of the operation of a debtor's business as a viable entity benefits the

national economy through the preservation of jobs and continued production of goods

and services.  The Supreme Court similarly has recognized that "[t]he fundamental

purpose of reorganization is to prevent a debtor from going into liquidation, with an

attendant loss of jobs and possible misuse of economic resources." *NLRB v. Bildisco &*

*Bildisco*, 465 U.S. 513, 528 (1984); *see also In re Drexel Burnham Lambert Group, Inc.*,

138 B.R. 723, 760 (Bankr. S.D.N.Y. 1992) (quoting *Bildisco*).  In addition, courts have

stressed the importance of payment of creditors in Chapter 11 Cases. *See In re Ngan*

*Gung Restaurant*, 254 B.R. 566, 571 (Bankr. S.D.N.Y. 2000).

98

The Plan proposed by the Debtors accomplishes these rehabilitative goals by restructuring the Debtors' obligations and providing the means through which the Debtors may continue to operate as a viable enterprise. The Plan is the result of extensive good faith, arm's-length negotiations among the Debtors, the Committee, the Ad Hoc Committee of Intermedia Noteholders, the Ad Hoc Committee of MCIC Senior Noteholders, the Ad Hoc Committee of WorldCom Noteholders, the Ad Hoc Bank Committee, the MatlinPatterson Investors and other economic parties in interest. The Plan is overwhelmingly supported by creditors and other parties in interest in this case. The support of the Plan by each of these key constituencies with divergent interests and the Committee reflects their acknowledgment that the Plan provides fundamental fairness to creditors and equity interest holders. It is indisputable that the Plan promotes the rehabilitative objectives and purposes of the Bankruptcy Code.

Nevertheless, on October 9, 2003, the United States Trustee filed an objection that, *inter alia*, objected to the "Obligation to Defend" provision in the Plan. The United States Trustee argues that the provision is one not typically found in plans, violates the basic principle of a "fresh start" and potentially saddles the estate with unlimited liability.

The United States Trustee argues that the provision is onerous for the Debtors because it requires the Debtors to pay legal, settlement and judgment costs of the Covered Parties. The United States Trustee views this obligation as potentially impacting on the Debtors' "fresh start" because the Debtors will be responsible for an indeterminate amount of legal fees in connection with litigation involving the conduct of other parties with respect to the plan process. As a practical matter, the United States Trustee contends Debtors will be responsible for the Covered Parties gross negligence and willful

462

misconduct because most matters are resolved prior to the entry of a final judgment. The United States Trustee also adds that the Obligation to Defend provision was incorporated after the Covered Parties had reached an agreement.

In addressing the United States Trustee's objection, the Court is mindful that the Bankruptcy Code does not prohibit the inclusion of the Obligation to Defend. Stated differently, the Bankruptcy Code does not require that this Court substitute its judgment for the judgment of the debtor in possession or other stakeholders in this case. Indeed, parties with an economic stake in the outcome of this case and the continued viability in the Reorganized Debtors have not objected to its inclusion. The issue thus appears to be whether the Court should sustain the objection to the Obligation to Defend in light of what the United States Trustee views as a provision which would undermine the integrity of the reorganization process.

As a threshold matter, the Court holds that the record amply demonstrates that not only was the Plan proposed in good faith but that the inclusion of the Obligation to Defend Provision in the Plan was an essential element of the Plan formulation process and negotiations with respect to each of the settlements contained in the Plan. (*See* Neporent Decl. ¶ 5.) To the extent that the United States Trustee challenges the sufficiency of the record, the Court notes that the United States Trustee could have cross-examined Mark A. Neporent. On behalf of the Covered Parties, Mark A. Neporent provided in a declaration that the Obligation to Defend Provision in the Plan was vital to the successful negotiation of the Plan and that without such provision the Covered Parties would have been less likely to negotiate the terms of the settlement and Plan. The United States Trustee did not cross-examine Mr. Neporent. The uncontradicted evidence,

therefore, supports the conclusion that the Obligation to Defend Provision facilitated the plan process and ultimately facilitated Debtors' reorganization and rehabilitation. The Court can find nothing untoward or indicative of a lack of good faith to sustain the United States Trustee's objection.

Concerning the United States Trustee's argument that the Obligation to Defend Provision violates the basic principle of a "fresh start" and potentially saddles the estate with unlimited liability, the Court finds that the United States Trustee's argument is more appropriately suited to questioning the feasibility of the Plan and not to questioning Debtors' good faith. As will be discussed further below, the feasibility of the Plan has been established in accordance with the prevailing legal standard.

Moreover, if the Court were to sustain the United States Trustee's objection, the Court would effectively be endorsing the proposition that the inclusion of the Obligation to Defend Provision somehow transformed an otherwise arm's-length plan negotiated after many months with the participation of a representative cross-section of creditor constituencies, into a plan not proposed in good faith for purposes of section 1129(a)(3). Nothing that the United States Trustee relies upon supports this conclusion. Although the United States Trustee (in fulfilling her duties) is understandably concerned with the integrity of the chapter 11 reorganization process, WorldCom's case has been under the scrutiny of, among others, an active creditor body, the District Court through its appointed corporate monitor and a number of governmental entities, as well as this Court. Despite the fact that parties in interest were cognizant of the Obligation to Defend Provision, no one, other than the United States Trustee, objected or even questioned the propriety of the provision. This is not a chapter 11 case where because of its size and/or

101

464

lack of creditor interest that a debtor is attempting to impose an onerous term and thereby

take advantage of the lack of constituent participation. In such a situation, it is clear that

the United States Trustee's scrutiny is essential. In sum, in the Court's view, the integrity

of WorldCom's reorganization process was protected in this case and was not put at risk

by the Obligation to Defend Provision.

Further, the Court recognizes that there are certain issues that warrant aggressive

scrutiny from the United States Trustee (e.g., conflicts of interest, creditor committee

member conduct, etc.) notwithstanding the level of creditor participation; however, the

Court does not view the Obligation to Defend, under the circumstances of this case, as

one of those instances.

Accordingly, the Court overrules the objection of the United States Trustee. The

Plan has been proposed in good faith and not by any means forbidden by law.

Based upon the foregoing, the requirements of section 1129(a)(3) have been

satisfied.

**(iv) 1129(a)(4)**

Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees

and expenses paid by the plan proponent, by the debtor, or by a person receiving

distributions of property under the plan, be subject to approval by the Court as

reasonable. Specifically, section 1129(a)(4) requires that:

> Any payment made or to be made by the proponent, by the debtor, or by a
> person issuing securities or acquiring property under the plan, for services
> or for costs and expenses in or in connection with the case, or in
> connection with the plan and incident to the case, has been approved by,
> or is subject to approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4).

465

Section 1129(a)(4) has been construed to require that all payments of professional

fees that are made from estate assets be subject to review and approval as to their

reasonableness by the Court. *See In re Drexel Burnham Lambert Group, Inc*., 138 B.R.

723, 760 (Bankr. S.D.N.Y. 1992); *In re Johns-Manville Corp*., 68 B.R. 618, 632 (Bankr.

S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y.

1987), *aff'd, Kane v. Johns-Manville Corp.* 843 F.2d 636 (2d Cir. 1988).

Pursuant to the interim application procedures established under section 331 of

the Bankruptcy Code, the Court authorized and approved the payment of certain fees and

expenses of professionals retained in this case. All such fees and expenses, as well as all

other accrued fees and expenses of professionals through the Effective Date, remain

subject to final review for reasonableness by the Court under section 330 of the

Bankruptcy Code. 11 U.S.C. § 330. In addition, pursuant to sections 503(b)(3) and (4),

the Court must review any applications for substantial contribution to ensure compliance

with the statutory requirements and that the fees requested are reasonable. Further, all

payments to be made in connection with the Effective Date or which relate to the success

of the reorganization or which otherwise are required to be disclosed, including any

amounts to be paid to officers and directors, have been disclosed previously. Finally, the

Plan provides a mechanism for the Court to approve certain payments of fees and

expenses to certain indenture trustees.

The foregoing procedures for the Court's review and ultimate determination of

the fees and expenses to be paid by the Debtors satisfy the objectives of section

1129(a)(4). *See In re Elsinore Shore Assos*., 91 B.R. 238, 268 (Bankr. D.N.J. 1988)

(requirements of section 1129(a)(4) satisfied where plan provided for payment of only

103

"allowed" administrative expenses); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988) ("Court approval of payments for services and expenses is governed by various Code provisions -- e.g., §§ 328, 329, 330, 331 and 503(b) – and need not be explicitly provided for in a Chapter 11 plan.").

Based upon the foregoing, the Plan complies with the requirements of section 1129(a)(4).

**(v) 1129(a)(5)**

Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors; that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy; and that there be disclosure of the identity and compensation of any insiders to be retained or employed by the reorganized debtors. 11 U.S.C. § 1129(a)(5).

The employment of officers and directors by the Reorganized Debtors, is consistent with the interests of creditors and is essential to the ongoing viability of the Debtors' business. The individuals associated with the prior wrongdoings of the Debtors have either resigned or have been discharged by the Debtors. The current directors have exemplary reputations, and distinguished credentials. The current officers of the Debtors are intimately familiar with the Debtors' business and are needed to maintain critical business relationships with lenders, suppliers, customers, and other parties. *See In re Apex Oil Co.*, 118 B.R. 683, 704-05 (Bankr. E.D. Mo. 1990); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149-50 (Bankr. S.D.N.Y. 1984).

Based upon the foregoing, the Debtors have satisfied the requirements of

104

section 1129(a)(5).

**(vi) 1129(a)(6)**

Section 1129(a)(6) of the Bankruptcy Code requires that any regulatory commission having jurisdiction over the rates charged by the reorganized debtor in the operation of its businesses approve any rate change provided for in the plan. 11 U.S.C. § 1129(a)(6).

The foregoing provision appears inapplicable in the instant cases. The Plan does not provide for rate changes by Reorganized WorldCom or any of the other Reorganized Debtors. Accordingly, such regulatory approval is unnecessary under the terms of the statute, and the requirements of section 1129(a)(6) are met.

**(vii) 1129(a)(7)**

Section 1129(a)(7) of the Bankruptcy Code provides, in relevant part:

With respect to each impaired class of claims or interests --
    (A) each holder of a claim or interest of such class --
        (i) has accepted the plan; or
        (ii) will receive or retain under the plan on account of such claim or
             interest property of a value, as of the effective date of the plan, that is
             not less than the amount that such holder would so receive or retain if
             the debtor were liquidated under chapter 7 of this title on such date . . .

11 U.S.C. § 1129(a)(7)(A).

This section, referred to as the "best interests" test, focuses on individual dissenting creditors rather than classes of claims. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 North LaSalle St. Partnership*, 526 U.S. 434 (1999). Under the best interests test, the court "must find that each [non-accepting] creditor will receive or retain value that is not less than the amount he would receive if the debtor were liquidated." *203 North LaSalle*, 526 U.S. at 440; *United States v. Reorganized CF&I Fabricators, Inc.*,

518 U.S. 213, 228 (1996). As section 1129(a)(7) makes clear, the liquidation analysis applies only to non-accepting impaired claims or equity interests.

In the instant case, the best interests test is satisfied as to each unimpaired Class of claims. Pursuant to section 1126(f) of the Bankruptcy Code, each holder of a claim in Classes 1 and 3 is deemed to have accepted the Plan. Moreover, because the Debtors have determined to pay claimants in Class 2, in full, in cash, plus interest required under section 506(b), such Class also is rendered unimpaired and deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the best interests test is satisfied with respect to Classes 1, 2 and 3.

Debtors' liquidation analysis demonstrates that the values that may be realized by the holders of claims and equity interests in the respective Classes of claims and equity interests upon disposition of the Debtors' assets pursuant to a chapter 7 liquidation are significantly less than the value of the recoveries to such Classes provided for under the Plan. Specifically, the liquidation analysis demonstrates that holders of claims and equity interests in Classes 3A through 15 would not receive any distributions in a chapter 7 liquidation as there would be no funds for distribution after payment of claims having priority over general unsecured claims. The distributions to these Classes under the Plan, therefore, far exceed the distributions under a chapter 7 liquidation.

The Debtors do not have the ability to produce separate legal entity liquidation analyses, which is why the Debtors are seeking to substantively consolidate. In addition, the Bankruptcy Code and applicable case law make clear that the Debtors need not provide non-consolidated financial information in a disclosure statement relating to a substantive consolidation plan. *See In re Stone & Webster, Inc.*, 286 B.R. 532, 544-46

106

(Bankr. D. Del. 2002); *In re Affiliated Foods, In*c., 249 B.R. 770, 789 (Bankr. W.D. Mo.

2000). In fact, the Debtors are not obligated to provide information regarding any other

possible or proposed plan of reorganization. *See* 11 U.S.C. § 1125(a)(1); *see also Kirk v.*

*Texaco Inc.*, 82 B.R. 678, 684 (S.D.N.Y. 1988); *In re Aspen Limousine Service, Inc.*, 193

B.R. 325, 334 (D. Colo. 1996).

Based upon the foregoing, the Plan satisfies the requirements of section

1129(a)(7).

**(viii) 1129(a)(8)**

Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired

claims or interests accepts the plan, as follows:

> With respect to each class of claims or interests –
> (A) such class has accepted the plan; or
> (B) such class is not impaired under the plan.

11 U.S.C. § 1129(a)(8).

Classes 1 and 3 are unimpaired under the Plan and are conclusively presumed

pursuant to section 1126(f) to have accepted the Plan. Moreover, as a result of the

Debtors' determination to pay creditors in Class 2 of the Plan, in full, in cash, plus

interest required under section 506(b), Class 2 also is unimpaired and conclusively

presumed pursuant to section 1126(f) to have accepted the Plan.

Classes 3A, 4, 5, 9, 10, 11, 12, 13, which are impaired Classes of Claims, have

affirmatively voted to accept the Plan. Class 6B is impaired and is deemed to have

accepted the Plan because of the stipulation entered into with the Debtors, among others,

to support the Plan.

107

470

Thus, as to these (i) unimpaired and (ii) impaired and accepting Classes, the requirements of section 1129(a)(8) have been satisfied.

Classes 6, 6A, 7, 8, 14, and 15 are deemed to have rejected the Plan. Nonetheless, as set forth below, the Plan may be confirmed under the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

**(ix) 1129(a)(9)**

Unless the holder of a particular claim agrees to different treatment with respect to such claim, section 1129(a)(9) of the Bankruptcy Code requires that persons holding claims entitled to priority under section 507(a) receive specified cash payments under the plan. *See* 11 U.S.C. § 1129(a)(9). The Plan provides for payment of Claims of a kind specified in sections 507(a)(1) through 507(a)(8) of the Bankruptcy Code in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. 11 U.S.C. § 1129(a)(9).

Based upon the foregoing, the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

**(x) 1129(a)(10)**

Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Plan by at least one Class of impaired claims, "determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). The Plan satisfies this requirement because more than one class of impaired claims have accepted the Plan, without including the acceptance of the Plan by insiders, if any, in any such Classes.

**(xi) 1129(a)(11)**

108

Section 1129(a)(11) of the Bankruptcy Code requires that, as a condition precedent to confirmation, the Court determine that the Plan is feasible. Specifically, the Court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).

As described below, the Plan is feasible within the meaning of this provision. The feasibility test set forth in section 1129(a)(11) requires the Court to determine whether the Plan is workable and has a reasonable likelihood of success. *See, e.g., In re The Leslie Fay Cos.*, 207 B.R. 764, 788 (Bankr. S.D.N.Y. 1997). The Second Circuit has provided that "the feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed." *Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988); *see also In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986); *In re One Times Square Assocs. Ltd. Partnership*, 159 B.R. 695, 709 (Bankr. S.D.N.Y. 1993); *In re Texaco Inc.*, 84 B.R. 893, 910 (Bankr. S.D.N.Y.), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1988); *In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986). The key element of feasibility is whether there exists a reasonable probability that the provisions of the plan can be performed. The purpose of the feasibility test is to protect against speculative plans. As noted by the United States Court of Appeals for the Ninth Circuit:

> The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th

Cir. 1985). However, just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility. The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds. *See U.S. Truck*, 47 B.R. at 944.

Applying the foregoing standards of feasibility, courts have identified the following factors as probative:

(1) the adequacy of the capital structure;

(2) the earning power of the business;

(3) economic conditions;

(4) the ability of management;

(5) the probability of the continuation of the same management; and

(6) any other related matters which will determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*Leslie Fay*, 207 B.R. at 789; *see also Texaco Inc.*, 84 B.R. at 910; *Prudential Energy,* 58 B.R. at 862-63. The foregoing list is neither exhaustive nor exclusive. *Drexel Burnham*, 138 B.R. at 763; *cf. In re U.S. Truck Co.*, 800 F.2d 581, 589 (6th Cir. 1986).

For purposes of determining whether the Plan satisfies the feasibility standard, the Debtors have analyzed their ability to fulfill their obligations under the Plan. As part of this analysis, the Debtors have prepared projections of their financial performance for each of the three fiscal years for the period ending December 31, 2005 (the "Projections"). The Projections establish that the Debtors will have sufficient cash to meet all of their obligations under the Plan.

110

Based upon information contained in the record before this Court, after making all payments required pursuant to the Plan, the Reorganized Debtors appear to be a competitive viable operating entity. Significantly, Reorganized WorldCom will have a little more than $5.5 billion of debt as compared to approximately $32 billion prior to the Commencement Date. Accordingly, the Debtors established at the Confirmation Hearing that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

Based upon the foregoing, the Plan satisfies the feasibility standard of section 1129(a)(11).

**(xii) 1129(a)(12)**

Section 1129(a)(12) requires the payment of "[a]ll fees payable under section 1930 [of title 28 of the United States Code], as determined by the court at the hearing on confirmation of the plan. " 11 U.S.C. § 1129(a)(12). Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses. 11 U.S.C. § 507(a)(1). In accordance with sections 507 and 1129(a)(12) of the Bankruptcy Code, the Plan provides that all such fees and charges, to the extent not previously paid, will be paid in cash on the Effective Date or as soon thereafter as is practicable. *See* Plan §§ 13.05, 13.06. Thus, the Plan satisfies the requirements of section 1129(a)(12).

**(xiii) 1129(a)(13)**

Section 1129(a)(13) requires a plan to provide for retiree benefits at levels established pursuant to section 1114 of the Bankruptcy Code. The Plan provides that the Reorganized Debtors shall continue to pay all retiree benefits of the Debtors, if any, at the

111

level established in accordance with section 1114 of the Bankruptcy Code, at any time

prior to the Confirmation Date, for the duration of the period for which the Debtors had

obligated themselves to provide such benefits. *See* Plan, § 8.10.  Accordingly, the Plan

satisfies the requirements of section 1129(a)(13).

**(xiv) 1129(b)**

Section 1129(b) allows for confirmation of a plan where the plan has not been

accepted by all impaired classes of claims.  Section 1129 of the Bankruptcy Code

provides, in relevant part:

> Notwithstanding section 510(a) of [the Bankruptcy Code], if all of the
> applicable requirements of subsection (a) of this section other than
> paragraph (8) are met with respect to a plan, the court, on request of the
> proponent of the plan, shall confirm the plan notwithstanding the
> requirements of such paragraph if the plan does not discriminate unfairly,
> and is fair and equitable, with respect to each class of claims or interests
> that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1).  This procedure is known as "cram down" as it allows the Court

– in cases where all requirements of section 1129(a) are met, other than 1129(a)(8) - to

cram down the plan notwithstanding objections as long as the Court determines that the

plan is "fair and equitable" and does not "discriminate unfairly" with respect to the

dissenting classes.[22]

Under section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates

where similarly situated classes are treated differently without a reasonable basis for the

disparate treatment. *See In re Buttonwood Partners, Ltd.*, 111 B.R 57, 63 (Bankr.

S.D.N.Y. 1990); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986),

*aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1986), *aff'd*, 843

---

[22] The holders of Class 14 Intermedia Preferred Stock are receiving a distribution from
the estates of Intermedia and, thus, Class 14 is not junior to Class 6A.

F.2d 636 (2d Cir. 1988). Thus, if under the facts and circumstances of a particular case,
there is a reasonable basis for disparate treatment of two similarly situated classes of
claims or two similarly situated classes of equity interests, there is no unfair
discrimination. *See*, *e.g. Buttonwood Partners*, 111 B.R. at 63.

To determine whether a plan discriminates unfairly, courts consider whether (1)
there is a reasonable basis for discriminating, (2) the debtor cannot consummate the plan
without the discrimination, (3) the discrimination is proposed in good faith, and (4) the
degree of discrimination is in direct proportion to its rationale. *See Buttonwood*, 111 B.R.
at 63; *In re Ambanc La Mesa Ltd. Partnership*, 115 F.3d 650 (9th Cir. 1997), *cert.
denied*, 118 S.Ct. 1039 (1998), *In re Rochem, Ltd.*, 58 B.R. 641 (Bankr. D.N.J. 1985).

A mechanism that enables the Debtors to recognize the unique reliance and
prejudice arguments of the holders of (i) MCIC Senior Debt Claims, (ii) MCIC
Subordinated Debt Claims, and (iii) MCI Pre-merger Claims, which those creditors, as
parties that extended credit to an MCIC entity prior to the Merger, possess in relation to
the substantive consolidation of the WorldCom Debtors, is a valid business justification
and reasonable basis for the disparate treatment of WorldCom General Unsecured
Claims, MCI Pre-merger Claims, MCIC Senior Debt Claims, and MCIC Subordinated
Debt Claims.

Because the recoveries by holders of Class 5 Claims and Class 6 Claims are
equivalent, the treatment of Class 5 does not unfairly discriminate against Class 6. *See In
re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986).

It is appropriate for the Debtors to consider the relative prejudice to creditors that
may have relied upon the separate credit of MCIC or its subsidiaries prior to the Merger

113

476

in order to formulate a fundamentally fair chapter 11 plan. *See*, *e.g., Moran v. Hong Kong & Shanghai Banking Corp*. (*In re Deltacorp, Inc.*), 179 B.R. 773, 777 & n.5 (Bankr. S.D.N.Y. 1995).

Class 6 WorldCom General Unsecured Claims are not similarly situated to Class 6A MCI Pre-merger Claims, Class 9 MCIC Senior Debt Claims and Class 10 MCIC Subordinated Debt Claims and there is a reasonable basis for the Plan's differentiation of them. *See In re Rochem, Ltd.*, 58 B.R. 641, 643-44 (Bankr. D.N.J. 1985).

The discrimination among Classes 6, 6A, 9 and 10 under the Plan is not unfair because it is appropriate, reasonably proportional to the issues of the case and necessary to the reorganization. *See In re Kliegl Bros. Universal Electric Stage Lighting Co.*, 149 B.R. 306, 309 (Bankr. E.D.N.Y. 1992)

The Debtors have demonstrated that the disparity of treatment between Classes 5 and 6 on the one hand, and Classes 6A, 9 and 10 on the other hand, which is based primarily upon the relative prejudice and reliance arguments of pre-Merger creditors, is not only warranted, but necessary to achieve fundamental fairness. *See In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 62 (Bankr. S.D.N.Y. 1990).

The Debtors have acted in good faith in determining to provide additional recoveries to the holders of Class 6A Claims compared to recoveries Class 6 Claims.

The 35.7% distribution provided on account of Class 6 WorldCom General Unsecured Claims is both meaningful and consistent with the legal and equitable rights of similarly situated creditors and the Plan's overall distribution scheme.

The treatment afforded Class 6A does not unfairly discriminate against Class 6 and the distribution of a pre-Merger premium is "equitable for the unsecured creditors as a whole." *In re Pattni Holdings*, 151 B.R. 628, 631 (Bankr. N.D. Ga. 1992).

The Plan's provision for differing treatment among Classes 6A, 9 and 10 is reasonable because it appropriately reflects the complexities of the priorities of the Claims in these Classes *inter se. See Buttonwood Partners*, 111 B.R. at 62.

The record demonstrates that the Debtors have continuously sought to ensure that the Plan treats all creditors fairly and that the discrimination among Classes was proposed in good faith. *See Federal Deposit Insurance Corp. v. Colonial Realty Co.*, 966 F.2d 57, 61 (2d Cir. 1992).

Any enhanced value received by holders of Class 6B Claims on account of contributions from other Classes is not a treatment of these Claims under the plan and does not constitute unfair discrimination. *See In re Genesis Health Ventures, Inc.*, 266 B. R. 612 (Bankr. D. Del. 2001), (citing *In re SPM Mfg. Corp.*, 984 F.2d 1305 (1st Cir. 1993)); *In re McCorp Financial Inc.*, 160 B.R. 941 (Bankr. S.D. Tex. 1993).

The greater value received by the members of the Ad Hoc MCI Trade Claims Committee as a result of the Contributions does not violate the Bankruptcy Code, because the Contributions are the result of other creditors (holders of MCI Senior Debt Claims and MCI Subordinated Debt Claims) voluntarily sharing their recoveries under the Plan with the members of the Ad Hoc MCI Trade Claims Committee. (Debtors' Exs. 335 and 339.) The greater value received by the members of the Ad Hoc MCI Trade Claims Committee is not the result of the Debtors' distribution of estate property to such creditors. Creditors are generally free to do whatever they wish with the bankruptcy

115

dividends they receive, including sharing them with other creditors, so long as recoveries

received under the Plan by other creditors are not impacted. *See Official Comm. of*

*Unsecured Creditors v. Stern (In re SPM Mfg. Corp.)*, 984 F.2d 1305, 1313 (1st Cir.

1993); *In re MCorp Fin., Inc.*, 160 B.R. 941 (S.D. Tex. 1993); *In re Teligent, Inc.*, 282

B.R. 765 (Bankr. S.D.N.Y. 2002); *In re Nuclear Imaging*, 270 B.R. 365 (Bankr. E.D. Pa.

2001); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001); *In re*

*White Glove, Inc.*, 1998 WL 731611 (Bankr. E.D. Pa. 1998); *In re Parke Imperial*

*Canton, Ltd.*, 1994 WL 842777 (Bankr. N.D. Ohio 1994).

The Plan does not discriminate unfairly against Class 6 or Class 6A.

A plan is considered fair and equitable with respect to a class of unsecured claims

where:

> (i) the plan provides that each holder of a claim of such class receive or
> retain on account of such claim property of a value, as of the effective date
> of the plan, equal to the allowed amount of such claim; or
> (ii) the holder of any claim or interest that is junior to the claims of such
> class will not receive or retain under the plan on account of such junior
> claim or interest any property.

11 U.S.C. § 1129(b)(2)(B).

No Class of Claims or Equity Interests that is junior to WorldCom General

Unsecured Claims and MCI Pre-merger Claims will receive any property under the Plan

on account of such Claims or Equity Interests.

The absolute priority rule is inapplicable to contributions of Plan recoveries made

by certain creditors to other creditors. *See In re SPM*, 984 F.2d at 1313; *In re MCorp*,

160 B.R. 941. Agreements by creditors to share their recoveries under a plan of

reorganization with other creditors need not benefit an entire class. *See, In re White*

*Glove, Inc.*, 1998 WL 7311611; *In re Parke Imperial Center*, 1994 WL 842777.

Moreover, the contributing creditor need not be a secured creditor. *See In re MCorp.*, 160 B.R. at 960.  The holding of *Official Comm. of Unsecured Creditors v. Stern* (*In re SPM Mfg. Corp.*), 984 F.2d 1305, 1313 (1st Cir. 1993) and its progeny affirming the propriety of contributions by certain creditors to other creditors under the Bankruptcy Code is applicable to the Contributions, which are in furtherance of a consensual plan of reorganization.

The Plan is fair and equitable with respect to Class 6 and Class 6A.

With respect to each of Classes 7, 8, 14 and 15 under the Plan, the Plan (i) does not discriminate unfairly and (ii) is fair and equitable within the meaning of 1129(b) of the Bankruptcy Code.  11 U.S.C. § 1129(b).

The Plan meets all of the requirements for confirmation under sections 1127 and 1129 of the Bankruptcy Code.

The Integrated Settlement embodied in the Plan need not be approved under Bankruptcy Rule 9019.

The increase by $29,000,000,000 to the Intermedia Settlement (which will be distributed *pro rata* to the holders of Intermedia Preferred Stock) is not a material change to the Intermedia Settlement and does not adversely impact recoveries to any Class of creditors under the Plan.

Each of the objections to the July 9 Plan, September 12 Plan or the Plan not heretofore withdrawn or resolved by written or oral agreement stated and made a part of the record of the Confirmation Hearing, is overruled and denied.

### III. SUMMARY

117

480

Substantive consolidation is warranted and approved.  Each of the Settlements is

approved.  The Plan is confirmed.

An appropriate Order will be entered.

Dated:  New York, New York
        October 31, 2003

_s/ Arthur J. Gonzalez_____
UNITED STATES BANKRUPTCY JUDGE

481

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                             :

**In re**                          :        **Chapter 11**
                             :

**WORLDCOM, INC.,** *et al.,*       :        **Case No. 02-13533 (AJG)**
                             :

        **Debtors.**             :        **(Jointly Administered)**

-------------------------------------------------------x

### ORDER CONFIRMING DEBTORS' MODIFIED SECOND AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, DATED OCTOBER 21, 2003

          The Debtors' Modified Second Amended Joint Plan of Reorganization under title 11 of chapter 11 of the United States Code (the "Bankruptcy Code"), dated October 21, 2003 (as thereafter modified, the "Plan")[1] having been filed with the Bankruptcy Court (the "Court") by WorldCom, Inc. and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"); and the Debtors' Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code, dated May 23, 2003 (the "Disclosure Statement"), Supplement to the Disclosure Statement, dated July 9, 2003 (the "First Supplement"), Second Supplement to the Disclosure Statement, dated August 6, 2003 (the "Second Supplement"), Third Supplement to the Disclosure Statement, dated September 12, 2003 (the "Third Supplement"), and the Plan having been transmitted to holders of Claims against and Equity Interests in the Debtors and other parties in interest, all as provided for by Orders of the Court, dated May 28, 2003, July 10, 2003, August 6, 2003 and September 12, 2003, approving the Disclosure Statement, the First Supplement, the Second Supplement and the Third Supplement

---

[1] A copy of the Plan is annexed hereto as Exhibit A.

pursuant to section 1125 of the Bankruptcy Code and establishing solicitation and tabulation procedures and providing for other relief (collectively, the "Disclosure Statement Orders"); and the hearing to consider confirmation of the Plan having been held before the Court on each of September 8, 9, 12, 15, 16, 17, 18 and 19, 2003 and October 14, 15, 21 and 30, 2003 (the "Confirmation Hearing") after due notice to holders of Claims against and Equity Interests in the Debtors and other parties in interest in accordance with the Disclosure Statement Orders, the Bankruptcy Code, and the Bankruptcy Rules[2]; and upon all of the proceedings had before the Court and after full consideration of: (i) each of the objections to confirmation of the Plan (the "Objections"); (ii) the responses in support of confirmation of the Plan filed by (a) the Debtors, dated September 3, 2003 and October 13, 2003, (b) the statutory creditors' committee (the "Committee"), dated September 3, 2003 and October 13, 2003, (c) an informal committee of certain holders of Intermedia Senior Debt Claims and Intermedia Subordinated Debt Claims (the "Ad Hoc Committee of Intermedia Noteholders"), dated September 3, 2003, and (d) an informal committee of certain holders of MCIC Senior Debt Claims (the "Ad Hoc Committee of MCIC Senior Noteholders"), dated September 3, 2003; and (iii) the Memoranda of Law in support of confirmation of the Plan filed by the Debtors, dated September 3, 2003, October 13, 2003 and October 27, 2003; and upon the arguments of counsel and all of the evidence adduced at the Confirmation Hearing, and after due deliberation and sufficient cause appearing therefor,

---

[2] Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to such terms in the Plan.

2

It hereby is DETERMINED, FOUND, ADJUDGED, DECREED, AND

ORDERED:

## JURISDICTION

1.  The Court has jurisdiction to confirm the Plan pursuant to

28 U.S.C. §§ 157 and 1334.

2.  Venue is proper before the Court pursuant to sections 1408 and

1409 of title 28 of the United States Code.

3.  Confirmation of the Plan is a core proceeding pursuant to

28 U.S.C. § 157(b)(2)(L).

## MODIFICATIONS TO THE PLAN

4.  On October 21, 2003, the Debtors filed the Plan, which reflected

modifications (the "October 21 Modifications") made to the Debtors' Second Amended

Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated September

12, 2003 (the "September 12 Plan"). In addition, Section 10.06 of the Plan is modified as

follows:

> Exculpation.   None of the Debtors, the Reorganized
> Debtors, the Indenture Trustees, the Covered Parties, or
> their respective professionals shall have or incur any
> liability to any holder of a Claim or Equity Interest for any
> act or omission in connection with, related to, or arising out
> of, the Chapter 11 Cases, the pursuit of confirmation of the
> Plan, the consummation of the Plan, or the administration
> of the Plan or the property to be distributed under the Plan,
> except for willful misconduct, gross negligence, criminal
> conduct, misuse of confidential information that causes
> damages, or ultra vires acts and, in all respects, the Debtors,
> the Reorganized Debtors, the Indenture Trustees, and the
> Covered Parties shall be entitled to rely upon the advice of
> counsel with respect to their duties and responsibilities
> under the Plan. Nothing in this Section 10.06 shall ~~(i) be
> construed as a release of any entity's fraud, gross
> negligence, malpractice, or willful misconduct with respect~~

3

484

> to matters set forth in this Section 10.06 or (ii) limit the
> liability of the professionals of the Debtors, the
> Reorganized Debtors, the Indenture Trustees or the
> Covered Parties to their respective clients pursuant to DR
> 6-012 **6-102** of the Code of Professional Responsibility.

5.      The modifications reflected in the October 21 Modifications and

herein are referred to collectively as the "Modifications." The Plan, as modified by the

Modifications, shall constitute the "Plan."

6.      The Modifications do not adversely affect the treatment of any

Claims against or Equity Interests in the Debtors under the Plan.

7.      In accordance with section 1127 of the Bankruptcy Code and

Bankruptcy Rule 3019, all holders of Claims against the Debtors who voted to accept the

Plan, other then holders of Claims in Classes 6 and 6A, are hereby deemed to have the

accepted the Plan, as amended consistent with the Modifications.

8.      No holder of a Claim against the Debtors that has voted to accept

the Plan, other then holders of Claims in Classes 6 and 6A, which are deemed to have

rejected the Plan, shall be permitted to change its acceptance to a rejection as a

consequence of the Modifications.

9.      The filing with the Court of the September 12 Plan, the service of

same on all persons participating in the Confirmation Hearing, the filing with the Court

of the October 21 Modifications, and the disclosure of the Modifications on the record of

the Confirmation Hearing, constitute due and sufficient notice thereof.

10.     The Modifications incorporated in the Plan comply with

section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

11.     The Plan complies fully with sections 1122 and 1123 of the

Bankruptcy Code. The Debtors have complied with section 1125 with respect to the

4

Disclosure Statement, the First Supplement, the Second Supplement, the Third

Supplement and the Plan.  The requirements of section 1127 of the Bankruptcy Code

have been satisfied.

## CONFIRMATION OF THE PLAN

12.    The Findings of Fact and Conclusions of Law, dated October 31,

2003, (1) Approving (i) Substantive Consolidation and (ii) the Settlements Proposed

Under Debtors' Modified Second Amended Joint Plan of Reorganization, Dated October

21, 2003, and (2) Confirming Debtors' Modified Second Amended Joint Plan of

Reorganization, Dated October 21, 2003, are hereby incorporated by reference into, and

are an integral part of, this Confirmation Order.

13.    Pursuant to section 1129 of the Bankruptcy Code, the Plan is

CONFIRMED.  The terms of the Plan are incorporated by reference into, and are an

integral part of, this Confirmation Order.

## PLAN PROVISIONS

14.    All distributions under the Plan that are unclaimed for a period of

one year after distribution thereof shall be deemed unclaimed property under section

347(b) of the Bankruptcy Code and revested in Reorganized WorldCom and any

entitlement of any holder of any Claim to such distributions shall be extinguished and

forever barred.  11 U.S.C. § 347(b).

15.    Except as otherwise provided in the Plan, each Debtor will, as a

Reorganized Debtor, continue to exist after the Effective Date as a separate corporate

entity, with all the powers of a corporation under applicable law and without prejudice to

any right to alter or terminate such existence (whether by merger, dissolution or

5

otherwise) under applicable state law. Except as otherwise provided in the Plan, upon the Effective Date, all property of the Debtors' estates shall vest in the Reorganized Debtors free and clear of all Claims, liens, encumbrances, charges, and other interests, and all such Claims, liens, encumbrances, charges, and other interests shall be extinguished. From and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, and dispose of property, and compromise or settle any Claims and Equity Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or this Confirmation Order. 11 U.S.C. § 1141(b) and (c).

16.    Except as otherwise provided in the Plan, the rights afforded in the Plan and the payments and distributions to be made pursuant to the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all existing debts and Claims, and shall terminate all Equity Interests, of any kind, nature, or description whatsoever, including any interest accrued on such Claims from and after the Commencement Date, against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtors and Equity Interests in the Debtors, shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Equity Interests shall be precluded and enjoined from asserting against the Reorganized Debtors, or any of their assets or properties, any other or further Claim or Equity Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Equity Interest.

6

17.     Upon the Effective Date and in consideration of the distributions to be made pursuant to the Plan, except as otherwise expressly provided in the Plan, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Equity Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Equity Interests, rights, and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Equity Interest in the Debtors.

18.     Except as otherwise expressly provided in the Plan, this Confirmation Order, or a separate order of the Bankruptcy Court, all entities who have held, hold, or may hold Claims against or Equity Interests in any or all of the Debtors and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, are permanently enjoined, on and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or Reorganized Debtors with respect to any such Claim or Equity Interest, (ii) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against the Debtors or Reorganized Debtors on account of any such Claim or Equity Interest, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or Reorganized Debtors or against the property or interests in property of the Debtors or Reorganized Debtors on account of any such Claim or Equity Interest, (iv) commencing or continuing in any

7

manner any action or other proceeding of any kind with respect to any Claims and Causes of Action which are extinguished or released pursuant to the Plan, and (v) taking any actions to interfere with the implementation or consummation of the Plan.

19.     None of the Debtors, the Reorganized Debtors, the Indenture Trustees, the Covered Parties, or their respective professionals shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct, gross negligence, criminal conduct, misuse of confidential information that causes damages, or *ultra vires* acts and, in all respects, the Debtors, the Reorganized Debtors, the Indenture Trustees and the Covered Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. Nothing in Section 10.06 of the Plan shall limit the liability of the professionals of the Debtors, the Reorganized Debtors, the Indenture Trustees or the Covered Parties to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.

20.     From and after the Effective Date, the Reorganized Debtors shall have the right to prosecute any avoidance or equitable subordination or recovery actions under sections 105, 502(d), 510, 542 through 551 and 553 of the Bankruptcy Code that belong to the Debtors or Debtors in Possession other than the Intermedia Avoidance Claims, which shall be extinguished pursuant to Section 5.06(a) of the Plan, and such other avoidance or recovery actions against parties to the Compromise and Settlements under Section 5.06 of the Plan.

8

489

21.     Except as against parties to the Compromise and Settlements under Section 5.06 of the Plan, nothing contained in the Plan or this Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action that the Debtors or the Reorganized Debtors may have or which the Reorganized Debtors may choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, their officers, directors, or representatives, (ii) the turnover of any property of the Debtors' estates, and (iii) Causes of Action against current or former directors, officers, professionals, agents, financial advisors, underwriters, lenders, or auditors relating to acts or omissions occurring prior to the Commencement Date.

22.     Nothing contained in the Plan or this Confirmation Order shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left unimpaired by the Plan. The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses which they had immediately prior to the Commencement Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim left unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

9

23.     Notwithstanding any provision of the Plan or this Confirmation Order, in accordance with 18 U.S.C. § 3613(e), nothing shall be deemed to waive, release, discharge, affect, or terminate any liability of, debt of, or Claim against Debtors, the Reorganized Debtors, or any non-Debtor in connection with any criminal action or criminal proceeding by the United States concerning conduct at any time by the Debtors (or their agents or present or former employees) or by the Reorganized Debtors (or their agents or present or former employees), and nothing herein shall release the Debtors, the Reorganized Debtors, or any non-Debtor from the criminal laws of the United States. Nothing in the Plan or in any document or order associated therewith shall be deemed to waive, release, discharge, affect, or terminate any Claim or right of the United States (or any agency or department thereof) to collect any Claim against or assert any right against any non-Debtor (including, but not limited to, any present or former employee, agent, officer, director, or principal of any Debtor or Reorganized Debtor).

24.     The Debtors or the Reorganized Debtors, as the case may be, shall, with respect to any action threatened or commenced by a third party against any Covered Party relating to or arising out of the conduct of such Covered Party during the Chapter 11 Cases with respect to the Plan, confirmation of the Plan, consummation of the Plan, or the administration of the Plan: (i) pay all defense costs including, without limitation, reasonable attorneys' fees; *provided*, *however*, that choice of counsel must be reasonably acceptable to the Covered Party and the Debtor or the Reorganized Debtor, as the case may be; (ii) pay the costs of any settlement; provided, however, any such settlement must be consented to by the Debtors or the Reorganized Debtors, as the case may be, which consent shall not be unreasonably withheld; and (iii) pay any judgment. Notwithstanding

10

491

the foregoing, the obligations of the Debtors or the Reorganized Debtors, as the case may be, set forth above shall terminate with respect to any Covered Party to the extent that such Covered Party is determined by a final judgment to be guilty of gross negligence, willful misconduct, or breach of fiduciary duty. In such event, such Covered Party shall reimburse the Debtors or the Reorganized Debtors, as the case may be, for all payments made pursuant to Section 10.10 of the Plan.

25.    Except as set forth on Schedules 8.01(A) and 8.01(B), any prepetition indemnification obligations of the Debtors pursuant to their corporate charters and by-laws or agreements entered into any time prior to the Commencement Date shall be limited to the reimbursement of current directors, officers, and/or employees, other than Culpable Individuals, for legal fees and expenses and shall continue as obligations of the Reorganized Debtors in an amount not to exceed twenty-five million ($25,000,000) dollars in the aggregate.

26.    The filing and service of the Plan and Plan Supplement and the publication of notice of the entry of the Confirmation Order provide adequate notice of the assumption and assumption and assignment of executory contracts and unexpired leases that are assumed or assumed and assigned pursuant to Sections 5.05(b), 5.05(d), and 8.01 of the Plan and the CLEC Consolidation Spreadsheet contained in the Plan Supplement.

27.    Subject only to the occurrence of the Effective Date, all counterparties to all executory contracts and unexpired leases of the Debtors assumed and assigned pursuant to Sections 5.05(b) and (d) of the Plan and the CLEC Consolidation Spreadsheet contained in the Plan Supplement are deemed to have been provided with

11

492

adequate assurance of future performance pursuant to section 365(f) of the Bankruptcy Code.

28.    Subject only to the occurrence of the Effective Date and except as otherwise provided in the Plan, the assumption or rejection of all executory contracts and unexpired leases of the Debtors assumed or rejected in accordance with Section 8.01 of the Plan is approved in all respects pursuant to section 365 of the Bankruptcy Code.

29.    Subject only to the occurrence of the Effective Date, the assumption and assumption and assignment of all executory contracts and unexpired leases of the Debtors that are assumed or assumed and assigned pursuant to Sections 5.05(b) and (d) of the Plan and the CLEC Consolidation Spreadsheet contained in the Plan Supplement are approved in all respects pursuant to section 365 of the Bankruptcy Code.

30.    Subject only to the occurrence of the Effective Date, the mergers, transfers of assets, dissolutions, consolidations, and other transactions contemplated in Sections 5.05(b) and (d) of the Plan and the CLEC Consolidation Spreadsheet contained in the Plan Supplement are approved and authorized in all respects. Any provision of any contract, tariff, or other agreement to which any Debtor is party that purports to prohibit, restrict, condition, or otherwise burden any of the transactions contemplated in Sections 5.05(b) and (d) of the Plan and the CLEC Consolidation Spreadsheet contained in the Plan Supplement or that purports to require the payment by any Debtor party to such transactions of any cost, fee, charge, deposit, or other expense in connection with or as a result of the implementation of any of the transactions contemplated in Sections 5.05(b) and (d) of the Plan and the CLEC Consolidation Spreadsheet contained in the Plan

12

493

Supplement is hereby rendered null and void and shall be of no force or effect solely to

the extent such provision is sought to be enforced against such Debtor in connection with

or as a result of the implementation of the transactions contemplated in Sections 5.05(b)

and (d) of the Plan and the CLEC Consolidation Spreadsheet contained in the Plan

Supplement.

      31.     Proof of any Claim arising out of the rejection of an executory

contract or unexpired lease pursuant to Section 8.01 of the Plan is required to be filed no

later than thirty (30) days after the later of (i) notice of entry of an order approving the

rejection of such executory contract or unexpired lease, (ii) notice of entry of the

Confirmation Order, and (iii) notice of an amendment to Schedule 8.01(A) or 8.01(B)

specifically affecting such executory contract or unexpired lease. All such Claims not

filed within such time will be forever barred from assertion against the Debtors and their

estates or the Reorganized Debtors and their property.

      32.     In accordance with (and as limited by) Article XII of the Plan and

section 1142 of the Bankruptcy Code, the Court shall have exclusive jurisdiction of all

matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and

for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among

other things, the following purposes:

     (a)    To hear and determine pending applications for the
assumption or rejection of executory contracts or unexpired
leases and the allowance of cure amounts and Claims
resulting therefrom;

     (b)    To hear and determine any and all adversary proceedings,
applications and contested matters;

     (c)    To hear and determine any objection to Administrative
Expense Claims or Claims;

(d)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(e)    To issue such orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(f)    To consider any amendments to, or modifications of, the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(g)    To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code;

(h)    To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, including any disputes arising under Sections 5.12 or 6.18 of the Plan;

(i)    To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(j)    To recover all assets of the Debtors and property of the Debtors' estates, wherever located;

(k)    To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

(l)    To resolve any Disputed Claims;

(m)    To determine the scope of any discharge of any Debtor under the Plan or the Bankruptcy Code;

(n)    To hear any other matter not inconsistent with the Bankruptcy Code; and

(o)    To enter a final decree closing the Chapter 11 Cases.

14

33.    Subject to Bankruptcy Rule 9010, all distributions under the Plan
to holders of Allowed Claims in Classes 4, 6, 6A and 12 shall be made to the holder of
each Allowed Claim at the address of such holder as listed on the Schedules as of the
Distribution Notification Date, unless the Debtors or, on and after the Effective Date, the
Reorganized Debtors, have been notified in writing of a change of address, including,
without limitation, by the timely filing of a proof of claim by such holder that provides an
address for such holder different from the address reflected on the Schedules. In the
event that any distribution to any such holder is returned as undeliverable, the Disbursing
Agent shall use reasonable efforts to determine the current address of such holder, but no
distribution to such holder shall be made unless and until the Disbursing Agent has
determined the then current address of such holder, at which time such distribution shall
be made to such holder without interest; *provided*, *however*, that, at the expiration of one
(1) year from the Effective Date such distributions shall be deemed unclaimed property
and shall be treated in accordance with Section 6.14 of the Plan.

34.    Distributions for the benefit of the holders of WorldCom Note
Claims, MCIC Senior Debt Claims (net of contributed proceeds), MCIC Subordinated
Debt Claims (net of contributed proceeds), Intermedia Senior Debt Claims, and
Intermedia Subordinated Debt Claims shall be made to the WorldCom Notes Indenture
Trustee, the MCIC Senior Notes Indenture Trustee, the MCIC Subordinated Notes
Indenture Trustee, the Intermedia Senior Notes Indenture Trustee, and the Intermedia
Subordinated Notes Indenture Trustee, respectively. The Indenture Trustees shall, in
turn, promptly administer the distribution to the holders of Allowed Claims in Classes 5,
9, 10, 11 and 13, respectively, in accordance with the Plan and the applicable Indenture.

15

Distributions for the benefit of the holders of Bank Settlement Claims and Bank Claims shall be made to the Bank of America, N.A. as co-administrative agent under the 364-Day Facility and the Revolving Credit Facility. Bank of America, N.A. shall, in turn, promptly administer the distribution to the holders of Bank Settlement Claims and Bank Claims in Classes 3A and 5, respectively. The distribution of New Common Stock, New Notes, or Cash to the Indenture Trustees or Bank of America, N.A. shall be deemed a distribution to the respective holder of an Allowed Claim. The Indenture Trustees and Bank of America, N.A. shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court and, in the event that such parties are so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be paid by the Reorganized Debtors. After the Effective Date, the reasonable fees and expenses of the Indenture Trustees and Bank of America, N.A. incurred in connection with the distribution described in Section 6.07 of the Plan shall be paid by the Reorganized Debtors.

35.    Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code and the provisions of this Confirmation Order, the Plan, and all Plan-related documents shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law. 11 U.S.C. §§ 1123(a) and 1142(a).

36.    Each of the Debtors and Reorganized Debtors is authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

16

37. On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the stockholders or directors of one or more of the Debtors or Reorganized Debtors, including, without limitation, (i) the authorization to issue or cause to be issued the New Notes, the New Common Stock and the Management Restricted Stock, (ii) the effectiveness of the Reorganized WorldCom Certificate of Incorporation, the Reorganized WorldCom By-laws, the certificates of incorporation and by-laws of the other Reorganized Debtors, (iii) all restructuring transactions effectuated pursuant to the Plan, (iv) the election or appointment, as the case may be, of directors and officers of Reorganized WorldCom and the other Reorganized Debtors, (v) the authorization and approval of a new revolving credit facility, a new term loan, the New Management Restricted Stock Plan, and the Registration Rights Agreement, and (vi) the qualification of Reorganized WorldCom or any of the Reorganized Debtors as a foreign corporation wherever the conduct of business by the Company requires such qualification, shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to the applicable general corporation law of the states in which the Debtors and the Reorganized Debtors are incorporated, without any requirement of further action by the stockholders or directors of the Debtors or Reorganized Debtors. On the Effective Date, or as soon thereafter as is practicable, Reorganized WorldCom and the Reorganized Debtors may, if required, file their amended certificates of incorporation with the Secretary of State of the state in which each such entity is (or will be) incorporated, in accordance with the applicable general corporation law of each such state.

17

498

38.    On the Effective Date, all obligations owed pursuant to the $1.1

Billion Amended and Restated Senior Secured Super-Priority Debtor-In-Possession

Credit Agreement, dated October 15, 2002 (the "DIP Credit Facility," and the lenders

thereunder, the "DIP Lenders"), shall be paid in accordance with the terms of the DIP

Credit Facility, or as otherwise may be agreed to by the Debtors and the DIP Lenders,

and upon such payment the DIP Credit Facility shall be deemed terminated and canceled,

and the letters of credit outstanding under the DIP Credit Facility on the Effective Date

shall be replaced or backstopped by new letters of credit procured by the Reorganized

Debtors.

39.    The solicitation of votes on the Plan pursuant to the Disclosure

Statement, the First Supplement, the Second Supplement and the Third Supplement

constitutes a solicitation of the holders of New Common Stock for approval of the New

Management Restricted Stock Plan and the New Employee Stock Purchase Plan, and the

entry of this Confirmation Order constitutes approval of the New Management Restricted

Stock Plan and the New Employee Stock Purchase Plan for purposes of compliance with

Rule 16b-3 issued under the Securities Exchange Act of 1934, as amended.

40.    Pursuant to section 1146(c) of the Bankruptcy Code, the issuance,

transfer, or exchange of notes or equity securities under the Plan, the creation of any

mortgage, deed of trust, or other security interest, the making or assignment of any lease

or sublease, or the making or delivery of any deed or other instrument of transfer under,

in furtherance of, or in connection with the Plan, including, without limitation, any

merger agreements or agreements of consolidation, deeds, bills of sale, or assignments

executed in connection with any of the transactions contemplated under the Plan, shall

18

499

not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax. All sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Commencement Date through and including the Effective Date, including, without limitation, the transfers effectuated under the Plan, the sale by the Debtors of owned property pursuant to section 363(b) of the Bankruptcy Code, and the assumption, assignment, and sale by the Debtors of unexpired leases of non-residential real property pursuant to section 365(a) of the Bankruptcy Code, shall be deemed to have been made under, in furtherance of, or in connection with the Plan, and thus, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax. 11 U.S.C. § 1146(c).

## **MISCELLANEOUS**

41.     Each of the Objections not heretofore withdrawn or resolved by written agreement or by oral agreement stated and made a part of the record of the Confirmation Hearing, are overruled and denied.

42.     Without need for further order or authorization of the Court, the Debtors or the Reorganized Debtors are authorized and empowered to make any and all modifications to any and all documents included as part of the Plan Supplement that do not materially modify the terms of such documents and are consistent with the Plan.

43.     All actions authorized to be taken pursuant to the Plan, including, without limitation, the restructuring transactions set forth in Section 5.05 of the Plan and the corporate name change and relocation pursuant to Section 5.08 of the Plan shall be effective on or prior to the Effective Date pursuant to this Confirmation Order, without further application to, or order of the Court, or further action by the respective officers,

19

directors, members or stockholders of Reorganized WorldCom or the other Reorganized Debtors and with the effect that such actions had been taken by unanimous action of such officers, directors, members or stockholders.

44.     This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules or regulations of any State or any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Plan, the Plan Supplement, the Disclosure Statement, the First Supplement, the Second Supplement, the Third Supplement, and any documents, instruments or agreements, and any amendments or modifications thereto.

45.     The terms and provisions of the Plan and the documents, instruments and agreements contained in the Plan Supplement, as amended or modified through the Effective Date, shall be binding upon the Debtors, the Reorganized Debtors, any entity that is a party to any document, instrument or agreement contained in, or contemplated by, the Plan and the Plan Supplement, and any entity acquiring or receiving property or a distribution under the Plan, and any holder of a Claim against or Equity Interest in the Debtors, including all governmental entities, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder or entity has accepted the Plan.

46.     All applications for final allowances of compensation and reimbursement of disbursements pursuant to sections 330 and 503(b) of the Bankruptcy

20

Code shall be filed with the Court and served upon the Debtors within 90 days from and after the Effective Date.

47.    The Reorganized Debtors shall have the exclusive right (except as to applications for allowances of compensation and reimbursement of expenses under sections 330 and 503 of the Bankruptcy Code) to make and file objections to Administrative Expense Claims and Claims and shall serve a copy of each objection upon the holder of the Administrative Expense Claim or Claim to which the objection is made as soon as practicable, but in no event later than 180 days after the Effective Date, or such later date as may be approved by the Court.

48.    Within 30 days after entry of this Confirmation Order, or within such further time as the Court may allow, the Debtors shall serve notice of the entry of this Confirmation Order and of the MCI Pre-merger Claim Deadline, as defined below (the "Confirmation Notice") upon all parties that received notice of the Confirmation Hearing and shall publish the Confirmation Notice (i) on one occasion in *The Wall Street Journal* (National Edition), *The New York Times* (National Edition), *The Washington Post* (National Edition), and *The Clarion-Ledger* and (ii) electronically on the independent website authorized by the Court's Order, dated December 23, 2002 (the "Case Management Order"), establishing notice procedures in the Chapter 11 Cases, www.elawforworldcom.com.

49.    Within 10 days after occurrence of the Effective Date, or within such further time as the Court may allow, the Debtors shall publish notice of the occurrence of the Effective Date of the Plan (i) on one occasion in *The Wall Street Journal* (National Edition), *The New York Times* (National Edition), *The Washington*

21

*Post* (National Edition), and *The Clarion-Ledger* and (ii) electronically on the

independent website authorized by the Case Management Order,

www.elawforworldcom.com.

     50.    Pursuant to the Plan, the Debtors shall assume and continue the

Pension Plans in accordance with their terms, satisfy the minimum funding standards

pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082, and administer the Pension Plans in

accordance with their terms and the provisions of ERISA. Furthermore, nothing in the

Plan shall be construed as discharging, releasing or relieving the Debtors or the Debtors'

successors, including the Reorganized Debtors or any party, in any capacity, from any

liability imposed under any law or regulatory provision with respect to the Pension Plans

or the PBGC. The PBGC and the Pension Plans shall not be enjoined or precluded from

seeking to enforce such liability as a result of any provision of the Plan or the

Confirmation Order, subject to any rights and defenses of the Debtors or Reorganized

Debtors. Notwithstanding any provision of the Plan to the contrary, the Pension Plans

shall be assumed and administered in accordance with ERISA and the Tax Code.

     51.    Nothing in this Order shall be construed as relieving the Debtors or

any other person or entity of any obligation to comply with section 214 of the Federal

Communications Act.

     52.    To the extent the Plan or this Order is inconsistent with the

Stipulation Among the Objecting Parties and the Debtors Concerning the Amended Plan

and the Supplement, dated October 3, 2003 (Docket No. 9229), between the Debtors and

the California Public Utilities Commission, *et al*. (the "CPUC Stipulation"), the

provisions of the CPUC Stipulation shall govern.

22

503

53.     Entry of this Order, any findings of fact or conclusions of law therein, or the occurrence of the Effective Date, shall not prejudice the right of Wells Fargo Bank N.A. ("WFB") to argue as it deems appropriate as to how its claims should be classified or treated under the Plan and its right to argue that it is not bound by the Bank Settlement or Plan releases or discharges, *provided*, *however*, that, without impairing the express reservations of rights in the Stipulation, dated October 15, 2003, between the Debtors and WFB, with respect to such WFB arguments, nothing in this Order or in such Stipulation shall be construed to permit WFB to reargue or readjudicate this Order.

54.     Notwithstanding anything in the Plan to the contrary, following the dismissals with prejudice of the Constructive Trust Action and the Maryland Action, in order to implement the Bank Settlement, distributions to holders of Bank Settlement Claims under Class 3A shall be reduced by 35.7%, from an aggregate amount of $75,000,000 to an aggregate amount of $48,225,000.  Each named plaintiff in the Maryland Action shall receive its *pro rata* share of $9,645,000 in New Notes, and each named plaintiff in the Constructive Trust Action shall receive its *pro rata* share of $38,580,000 in New Notes.  If a named plaintiff in the Maryland Action or the Constructive Trust Action assigned the proceeds from either or both actions, such named plaintiff shall be responsible for distributing the New Notes to its assignee or assignees. The Reorganized Debtors and Bank of America, N.A., as co-administrative agent under the 364-Day Facility and the Revolving Credit Facility (the "Bank Agent"), shall have no obligation to recognize any transfer of any Bank Settlement Claim, in whole or in part, and shall instead be authorized and entitled to recognize and deal for all purposes under

23

the Plan with only the named plaintiffs in the Maryland Action and the Constructive Trust Action.

    55.    Notwithstanding anything in Section 4.06(b) of the Plan to the contrary, (i) the amount of the Allowed Bank Claims arising under the 364-Day Facility shall be determined by agreement of the parties, or, absent agreement, by the Court, (ii) the amount of the Allowed Bank Claims arising under the Revolving Credit Facility shall include the amounts set forth in Section 4.06(b) of the Plan, (iii) the Bank Agent shall have an Allowed Class 5 Claim in the amount of its reasonable fees and expenses incurred prior to the Effective Date that are rendered or occurred in connection with the 364-Day Facility and the Revolving Credit Facility, (iv) the Allowed Bank Claims of the Bank Agent shall be reduced by the Bank Agent Cash Payment (as defined below) and (v) on the Effective Date, or as soon thereafter as is practicable, the Bank Agent shall receive, in partial satisfaction of the reasonable fees and expenses of the Bank Agent and its counsel, Cash in the amount of (a) $250,000 (which amount includes any amount received for reasonable fees and expenses by the Bank Agent pursuant to Section 4.06(c) of the Plan) (the "Bank Agent Cash Payment") and (b) the postpetition letter of credit fees incurred by the Bank Agent in an amount not to exceed $40,000.  Nothing in this Order is intended to affect the rights of the Bank Agent to seek reimbursement of its reasonable fees and expenses not otherwise satisfied pursuant to the provisions of this Order or the Plan.

    56.    To the extent that the foregoing constitutes a modification of the Plan, this is deemed to be a Plan modification under section 1127(a) of the Bankruptcy Code.  So long as the Bank Agent makes distributions to the holders of Allowed Bank

24

505

Settlement Claims (Class 3A) and Allowed Bank Claims (Class 5) in accordance with the provisions of this Confirmation Order, it shall not be liable to the holders of such Allowed Claims or their assignees for the distributions made hereunder.

57.    On the Effective Date, the appeals from this Court's Order, dated August 6, 2003, Approving the Settlement with the Securities and Exchange Commission filed by the Ad Hoc Committee of Dissenting Bondholders and the Ad Hoc MCI Trade Claims Committee shall be withdrawn with prejudice and the Ad Hoc Committee of Dissenting Bondholders and Ad Hoc MCI Trade Claims Committee are directed to prepare and file any documents necessary to effectuate such withdrawal.

58.    On the Effective Date, the appeal from the Final Judgment of the United States District Court for the Southern District of New York approving the settlement with the Securities and Exchange Commission filed by HSBC Bank USA shall be withdrawn with prejudice and the HSBC is directed to prepare and file any documents necessary to effectuate such withdrawal.

59.    On the Effective Date, the appeal from the Order, dated June 4, 2003, Authorizing the Debtors to Assume as Amended Certain Executory Contracts with Electronic Data Systems Corporation and EDS Information Services LLC filed by the Ad Hoc MCI Trade Claims Committee shall be withdrawn with prejudice and the Ad Hoc MCI Trade Claims Committee is directed to prepare and file any documents necessary to effectuate such withdrawal.

60.    Pursuant to Section 5.04 of the Plan, in furtherance of the Debtors' reorganization, on or after the Effective Date, the Debtors are authorized, in their sole discretion to adjust, continue, eliminate, discharge or release, by offset or otherwise, as

25

appropriate, all Claims, or any portion thereof, held by any of the Company's non-Debtor operating subsidiaries against any of the Debtors or held by any of the Debtors against any of the Company's non-Debtor operating subsidiaries.

61.   Any holder of a General Unsecured Claim against the WorldCom Debtors that seeks to be treated as the holder of a Class 6A MCI Pre-merger Claim shall, within thirty (30) days from and after the date on which the Confirmation Notice is served (the "MCI Pre-merger Claim Deadline"), establish in writing, with supporting documentation, to the Debtors' satisfaction and, until the Effective Date, on reasonable notice to the Committee, that (i) its Claim arises solely from an individual transaction or series of transactions that was fully completed on or before September 13, 1998 and (ii) in incurring such Claim it relied on the separate credit of MCIC or any subsidiary of MCIC as of or prior to September 13, 1998. The Debtors do not concede that the mere existence of a contract dated on or before September 13, 1998 constitutes reliance. To the extent the Debtors do not agree that a claimant holds an MCI Pre-merger Claim, the Court shall resolve such dispute in accordance with the foregoing criteria after notice and an opportunity for a hearing. Any holder of a General Unsecured Claim against the WorldCom Debtors that does not provide written evidence that it holds an MCI Pre-merger Claim on or before the MCI Pre-merger Claim Deadline in accordance with this paragraph shall be forever barred from asserting an MCI Pre-merger Claim.

62.   The determinations, findings, judgments, decrees and orders set forth or incorporated herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. Bankruptcy Rules 7052 and 9014. Each finding of fact set forth

or incorporated herein, to the extent it is or may be deemed a conclusion of law, shall also

constitute a conclusion of law. Each conclusion of law set forth or incorporated herein,

to the extent it is or may be deemed a finding of fact, shall also constitute a finding of

fact.

Dated: New York, New York
        October 31, 2003

                    _s/ Arthur J. Gonzalez_____
                    UNITED STATES BANKRUPTCY JUDGE

27

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------x
                                        :
In re                                   :
                                        :        Chapter 11
WORLDCOM, INC., et al.,                 :        Case No. 02-13533 (AJG)
                                        :
                                        :        (Jointly Administered)
              Debtors.                  :
----------------------------------------------------x
```

## DEBTORS' MODIFIED SECOND AMENDED JOINT PLAN OF
## REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

WEIL, GOTSHAL & MANGES LLP
  Attorneys for Debtors and
  Debtors in Possession
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

Dated: New York, New York
       October 21, 2003

C:\DOCUMENTS AND SETTINGS\MARCUSC\MY DOCUMENTS\WORLDCOM\#1296789 V8 - WORLDCOM PLAN.DOC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------x
                                    :
In re                               :
                                    :     Chapter 11
WORLDCOM, INC., et al.,             :     Case No. 02-13533 (AJG)
                                    :
                                    :     (Jointly Administered)
            Debtors.                :
-----------------------------------------------------x
```

### DEBTORS' MODIFIED SECOND AMENDED JOINT PLAN OF
### REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

WorldCom, Inc. and certain of its direct and indirect subsidiaries, as debtors and debtors in possession, propose the following joint plan of reorganization under section 1121(a) of title 11 of the United States Code:

### ARTICLE I

### DEFINITIONS AND CONSTRUCTION OF TERMS

Definitions. As used herein, the following terms have the respective meanings specified below:

1.01.   364-Day Facility means that certain $2.65 billion 364-day revolving credit facility, dated as of June 8, 2001, among WorldCom as borrower and Bank of America, N.A. and The Chase Manhattan Bank as co-administrative agents, Banc of America Securities LLC and J.P. Morgan Securities Inc. as joint lead arrangers and joint book managers, Banc of America Securities LLC, J.P. Morgan Securities Inc., Salomon Smith Barney Inc., ABN Amro Bank N.V., and Deutsche Banc Alex Brown Inc. as co-arrangers, Citibank, N.A. as syndication agent, ABN Amro Bank N.V. and Deutsche Bank AG New York Branch as co-documentation agents, and several banks and other financial institutions as lenders.

1.02.   Access Provider means an entity providing telecommunications services to the Debtors pursuant to an executory contract or a tariff filed by such entity with the Federal Communications Commission or a relevant state commission.

1.03.   Ad Hoc Committee of Dissenting Bondholders means the informal committee of certain holders of MCIC Senior and Subordinated Debt Claims as set forth in the Statement pursuant to Bankruptcy Rule 2019, dated August 27, 2003, filed by counsel to the Ad Hoc Committee of Dissenting Bondholders.

1.04.   Ad Hoc Committee of Intermedia Noteholders means the informal committee of certain holders of Intermedia Senior Debt Claims and Intermedia Subordinated Debt Claims.

1.05.   Ad Hoc Committee of MCIC Senior Noteholders means the informal committee of certain holders of MCIC Senior Debt Claims.

1.06.   Ad Hoc Committee of WorldCom Noteholders means the informal committee of certain holders of WorldCom Note Claims.

1.07.   Ad Hoc MCI Trade Claims Committee means the informal committee of certain holders of Class 6 general unsecured trade claims against MCIC or its Subsidiaries as set forth in the Statement pursuant to Bankruptcy Rule 2019, dated August 12, 2003, filed by counsel to the Ad Hoc MCI Trade Claims Committee.

1.08.   Ad Hoc MCI Trade Claims Committee Claims means the WorldCom General Unsecured Claims and MCI Pre-merger Claims represented by the Ad Hoc MCI Trade Claims Committee.

1.09.   Administrative Expense Claim means any right to payment constituting a cost or expense of administration of any of the Chapter 11 Cases under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the estates of the Debtors, any actual and necessary costs and expenses of operating the business of the Debtors, any indebtedness or obligations incurred or assumed by the Debtors in Possession in connection with the conduct of their business, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, all compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code. Any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code shall be excluded from the definition of Administrative Expense Claim and shall be paid in accordance with Section 13.05 of the Plan.

1.10.   Allowed means, with reference to any Claim against the Debtors, (i) any Claim that has been listed by the Debtors in their Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed, (ii) any Claim allowed hereunder, (iii) any Claim that is not Disputed, (iv) any Claim that is compromised, settled, or otherwise resolved pursuant to the authority granted to the Reorganized Debtors pursuant to a Final Order of the Bankruptcy Court or under Section 7.06 of the Plan, or (v) any Claim that, if Disputed, has been Allowed by Final Order; *provided*, *however*, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder. Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest on such Administrative Expense Claim or Claim from and after the Commencement Date.

1.11.   ASR means a document known in the telecommunications industry as an "Access Service Request" under which an entity elects to purchase certain non usage-sensitive telecommunications services from an Access Provider for a specified period of time. Solely for purposes of the Plan, ASRs under which the Debtors elected to purchase certain non usage-sensitive telecommunications services for a term of more than thirty (30) days are treated as

executory contracts; *provided*, *however*, that for purposes of the Plan, ASRs under which the Debtors elected to purchase certain non usage-sensitive telecommunications services for a term of thirty (30) days or less are not treated as executory contracts.

1.12.   <u>Ballot</u> means the form distributed to each holder of an impaired Claim that is entitled to vote to accept or reject the Plan on which is to be indicated (i) acceptance or rejection of the Plan and (ii) in the case of Class 6 WorldCom General Unsecured Claims and Class 12 Intermedia General Unsecured Claims that are Allowed in an amount greater than forty thousand ($40,000) dollars, whether such holder elects to treat its Claim as a Convenience Claim under the Plan.

1.13.   <u>Bank Actions</u> means any and all Causes of Action of the Banks against the Debtors, the Reorganized Debtors, or any of their respective current or former officers or directors relating to or arising from the 364-Day Facility and the Revolving Credit Facility or the funding of any amounts thereunder, including without limitation, the Constructive Trust Action and the Maryland Action.

1.14.   <u>Bank Claims</u> means all Claims of the Banks arising under the 364-Day Facility and the Revolving Credit Facility.

1.15.   <u>Bank Settlement</u> means the settlement pursuant to Bankruptcy Rule 9019 under which the Banks party to the Constructive Trust Action will receive a Class 3A Allowed Claim entitling them to New Notes in the aggregate principal amount of seventy-five million ($75,000,000) dollars in exchange for, among other things, dismissals with prejudice of the Constructive Trust Action and the Maryland Action.  The Allowed Class 5 Claims of the Banks receiving distributions under the Bank Settlement shall be reduced by an amount equal to the Class 3A distributions such Banks receive.

1.16.   <u>Bank Settlement Claims</u> means all Claims of the Banks arising under the Bank Settlement.

1.17.   <u>Bankruptcy Code</u> means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

1.18.   <u>Bankruptcy Court</u> means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases.

1.19.   <u>Bankruptcy Rules</u> means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, and any Local Rules of the Bankruptcy Court.

1.20.   <u>Banks</u> means, collectively, the banks and financial institutions that are parties to the 364-Day Facility and the Revolving Credit Facility and their successors and assigns.

1.21.   <u>Business Day</u> means any day other than a Saturday, Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

1.22.    Cash means legal tender of the United States of America.

1.23.    Causes of Action means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, Claims, and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Commencement Date or during the course of the Chapter 11 Cases, including through the Effective Date.

1.24.    Chapter 11 Cases means the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors styled *In re WorldCom, Inc., et al.*, Chapter 11 Case No. 02-13533 (AJG), which are currently pending before the Bankruptcy Court.

1.25.    Claim shall have the meaning set forth in section 101 of the Bankruptcy Code.

1.26.    Class means a category of holders of Claims or Equity Interests as set forth in Article III of the Plan.

1.27.    Class 10 Election Form means the letter of transmittal or similar form upon which the holders of MCIC Subordinated Debt Claims may elect to receive New Notes or Cash in full and complete satisfaction of such Allowed Claims.

1.28.    Collateral means any property or interest in property of the estates of the Debtors subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

1.29.    Commencement Date means July 21, 2002 with respect to the Debtors identified on Exhibit A1 hereto and November 8, 2002 with respect to the Debtors identified on Exhibit A2 hereto.

1.30.    Committee means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

1.31.    Company means WorldCom together with approximately 225 direct and indirect domestic Debtor and Non-Debtor Subsidiaries and 200 foreign Non-Debtor Subsidiaries and affiliates.

1.32.    Confirmation Date means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

1.33.    Confirmation Hearing means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.34.    Confirmation Order means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.35.   Constructive Trust Action means the action styled *ABN Amro Bank N.V., et al. v. WorldCom, Inc.,* 02 Civ. 5437 (JSR), which is pending in the United States District Court for the Southern District of New York.

1.36.   Convenience Claim means any General Unsecured Claim that is (i) Allowed in an amount of forty thousand ($40,000) dollars or less or (ii) Allowed in an amount greater than forty thousand ($40,000) dollars but which is reduced to forty thousand ($40,000) dollars by an irrevocable written election of the holder of such Claim made on a properly delivered Ballot; *provided, however,* that any General Unsecured Claim that was originally Allowed in excess of forty thousand ($40,000) dollars may not be subdivided into multiple General Unsecured Claims of forty thousand ($40,000) dollars or less for purposes of receiving treatment as a Convenience Claim.

1.37.   Covered Parties means (i) the current and former members, partners, officers, directors, and employees of the Committee and its members (but solely in their capacity as such) and (ii) the members, partners, officers, directors, and employees of the Ad Hoc Committee of Intermedia Holders, the Ad Hoc Committee of MCIC Senior Noteholders, the Ad Hoc Committee of WorldCom Noteholders, the MatlinPatterson Investors, and Silver Lake, and each of their members, as of April 14, 2003 (but solely in their capacity as such).

1.38.   Culpable Individual means any director, officer, or employee of the Debtors who, (i) in connection with any alleged pre-Commencement Date accounting improprieties, was discharged or whose resignation was accepted on account of such individual's knowledge of or participation in such accounting improprieties, (ii) is or has been convicted of a crime, found in fact in any judicial or alternative dispute resolution proceeding to have committed fraud or to have received unjust enrichment, or is or has been sued by WorldCom or any assignee on such grounds, or (iii) has ever failed to repay or, is otherwise in default of, any corporate loans from one or more of the Debtors.

1.39.   Debtors in Possession means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

1.40.   Debtors means each of the entities listed on Exhibits A1 and A2 to the Plan.

1.41.   Disbursing Agent means any Debtor entity in its capacity as Disbursing Agent pursuant to Section 6.03 of the Plan.

1.42.   Disclosure Statement means the disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.43.   Disputed means, with reference to any Claim, any Claim proof of which was timely and properly filed, and in such case or in the case of an Administrative Expense Claim, any Administrative Expense Claim or Claim which is disputed under the Plan or as to which the Debtors have interposed a timely objection and/or request for estimation in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, and any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof

of claim was not timely or properly filed. A Claim that is Disputed by the Debtors as to its amount only, shall be deemed Allowed in the amount the Debtors admit owing, if any, and Disputed as to the excess.

     1.44.   Distribution Notification Date means the day that is three (3) Business Days from and after the Confirmation Date.

     1.45.   Effective Date means the first (1st) Business Day on which the conditions specified in Section 11.01 of the Plan have been satisfied or waived.

     1.46.   Electing Holder means, collectively, the holders of WorldCom Senior Debt Claims, Intermedia Senior Debt Claims, and Intermedia Subordinated Debt Claims that elect on a properly completed Election Form to receive New Notes or New Common Stock or a combination thereof.

     1.47.   Election Form means the letter of transmittal or similar form, which shall include the provisions set forth in Section 5.11 of the Plan, upon which the holders of WorldCom Senior Debt Claims, Intermedia Senior Debt Claims, and Intermedia Subordinated Debt Claims may elect to receive New Notes or New Common Stock (or a combination thereof) in full and complete satisfaction of such Allowed Claims.

     1.48.   Equity Interest means any share of common or preferred stock or other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire any such interest.

     1.49.   Final Order means an order of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors or, on and after the Effective Date, the Reorganized Debtors, or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or certiorari, reargument, or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; *provided*, *however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be filed with respect to such order shall not cause such order not to be a Final Order.

     1.50.   General Unsecured Claim means any Claim other than an Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, Secured Tax Claim, Other Secured Claim, Bank Settlement Claim, WorldCom Senior Debt Claim, WorldCom Subordinated Claim, MCIC Senior Debt Claim, MCIC Subordinated Debt Claim, Intermedia Senior Debt Claim, or Intermedia Subordinated Debt Claim.

1.51. Indentures means, collectively, the Intermedia Senior Notes Indentures, the Intermedia Subordinated Notes Indenture, the MCIC Senior Notes Indentures, and the WorldCom Notes Indentures.

1.52. Indenture Trustees means, collectively, the Intermedia Senior Notes Indenture Trustee, the Intermedia Subordinated Notes Indenture Trustee, the MCIC Senior Notes Indenture Trustee, the MCIC Subordinated Notes Indenture Trustee, and the WorldCom Notes Indenture Trustee.

1.53. Insured Claim means any Claim arising from an incident or occurrence that is covered under the Debtors' insurance policies.

1.54. Intermedia means Intermedia Communications Inc., a Delaware corporation.

1.55. Intermedia Avoidance Claims means the Claims, Causes of Action, and any other avoidance or equitable subordination or recovery actions under sections 105, 502(d), 510, 542 through 551, and 553 of the Bankruptcy Code relating to or arising from the issuance of the Intermedia Intercompany Note and all transfers alleged to be in respect thereof.

1.56. Intermedia Debtors means, collectively, Access Network Services, Inc., Access Virginia, Inc., Business Internet, Inc., Express Communications, Inc., ICI Capital LLC, Intermedia, Intermedia Capital, Inc., Intermedia Communications of Virginia, Inc., Intermedia Investment, Inc., Intermedia Licensing Company, Intermedia Services LLC, National Telecommunications of Florida, Inc., Netwave Systems, Inc., NTC, Inc., WorldCom Intermedia Communications Corporation f/k/a Shared Technologies Fairchild Communications Corporation, WorldCom Intermedia Telecom, Inc. f/k/a Shared Technologies Fairchild Telecom, Inc., and WorldCom Intermedia, Inc. f/k/a Shared Technologies Fairchild, Inc.

1.57. Intermedia Equity Interests means any Equity Interest in Intermedia issued and outstanding on the Commencement Date other than the Intermedia Preferred Stock.

1.58. Intermedia General Unsecured Claim means any General Unsecured Claim against any of the Intermedia Debtors other than Convenience Claims.

1.59. Intermedia Intercompany Note means the Note, dated July 1, 2001, issued by WorldCom to Intermedia.

1.60. Intermedia Intercompany Note Claim means the Claim of Intermedia arising under the Intermedia Intercompany Note. Except as otherwise provided in the Plan, the Intermedia Intercompany Note Claim shall be treated as a WorldCom General Unsecured Claim.

1.61. Intermedia Preferred Stock means all 13.5% series B redeemable exchangeable preferred stock of Intermedia issued and outstanding on the Commencement Date.

1.62. Intermedia Senior Debt Claims means any Claim arising under the Intermedia Senior Notes Indentures.

1.63.   Intermedia Senior Notes Indentures means, collectively, (i) the senior discount notes indenture, dated July 9, 1997, between Intermedia and the Intermedia Senior Notes Indenture Trustee, and all of the documents and instruments relating thereto, as amended, supplemented, modified, or restated as of the Commencement Date, which provided for the issuance of the 11¼% Senior Discount Notes due 2007; (ii) the senior notes indenture, dated October 30, 1997, between Intermedia and the Intermedia Senior Notes Indenture Trustee, and all of the documents and instruments relating thereto, as amended, supplemented, modified, or restated as of the Commencement Date, which provided for the issuance of the 8? % Senior Notes due 2008; (iii) the senior notes indenture, dated December 23, 1997, between Intermedia and the Intermedia Senior Notes Indenture Trustee, and all of the documents and instruments relating thereto, as amended, supplemented, modified, or restated as of the Commencement Date, which provided for the issuance of the 8½% Senior Notes due 2008; (iv) the senior notes indenture, dated May 27, 1998, between Intermedia and the Intermedia Senior Notes Indenture Trustee, and all of the documents and instruments relating thereto, as amended, supplemented, modified, or restated as of the Commencement Date, which provided for the 8.6% Senior Notes due 2008; and (v) the senior notes indenture, dated February 24, 1999, between Intermedia and the Intermedia Senior Notes Indenture Trustee, and all of the documents and instruments relating thereto, as amended, supplemented, modified, or restated as of the Commencement Date, which provided for the issuance of the 9½% Senior Notes due 2009.

1.64.   Intermedia Senior Notes Indenture Trustee means SunTrust Bank f/k/a SunTrust Bank, Central Florida, N.A. in its capacity as indenture trustee under the Intermedia Senior Notes Indentures or its duly appointed successor.

1.65.   Intermedia Subordinated Debt Claims means all Claims arising under the Intermedia Subordinated Notes Indenture.

1.66.   Intermedia Subordinated Notes Indenture means the senior subordinated notes indenture, dated February 24, 1999, between Intermedia and the Intermedia Subordinated Notes Indenture Trustee, and all of the documents and instruments relating thereto, as amended, supplemented, modified, or restated as of the Commencement Date, which provided for the issuance of the 12¼% Senior Subordinated Discount Notes due 2009.

1.67.   Intermedia Subordinated Notes Indenture Trustee means SunTrust Bank f/k/a SunTrust Bank, Central Florida, N.A. in its capacity as indenture trustee under the Intermedia Subordinated Notes Indenture or its duly appointed successor.

1.68.   Lien shall have the meaning set forth in section 101 of the Bankruptcy Code.

1.69.   Management Restricted Stock shall have the meaning set forth in Section 9.06 of the Plan.

1.70.   MatlinPatterson Investors means (i) MatlinPatterson Global Opportunities Partners L.P., MatlinPatterson Global Opportunities Partners (Bermuda) L.P., MatlinPatterson Phoenix SPV L.L.C., their investment advisor, managing member and other affiliates, and the successors and assigns of any of the forgoing; and (ii) Bain Capital Investors, LLC, Brookside

Capital Management, LLC, Sankaty Credit Opportunities Member, LLC, their respective affiliates, and the successors and assigns of any of the forgoing.

1.71.    Maryland Action means the action styled *ABN Amro Bank N.V., et al. v. Susan Mayer*, Case No. 235174, which is pending in the Circuit Court for Montgomery County, Maryland.

1.72.    MCIC means MCI Communications Corporation, a Delaware corporation.

1.73.    MCIC Senior Debt Claims means all Claims arising under the MCIC Senior Notes Indentures.

1.74.    MCIC Senior Notes Indentures means, collectively, (i) the senior debt indenture, dated October 15, 1989, between MCIC and the MCIC Senior Notes Indenture Trustee, and all of the documents and instruments relating thereto, as amended, supplemented, modified, or restated as of the Commencement Date, which provided for the issuance of the 7½% Senior Notes due August 20, 2004; 8¼% Senior Debentures due January 20, 2023; 7¾% Senior Debentures due March 15, 2024; and 7¾% Senior Debentures due March 23, 2025 and (ii) the senior debt indenture, dated February 17, 1995, between MCIC and the MCIC Senior Notes Indenture Trustee, and all of the documents and instruments relating thereto, as amended, supplemented, modified, or restated as of the Commencement Date, which provided for the issuance of the 6.95% Senior Notes due August 15, 2006; 6½% Senior Notes due April 15, 2010; and 7.125% Debentures due June 15, 2027.

1.75.    MCIC Senior Notes Indenture Trustee means Law Debenture Trust Company of New York, as successor in interest to Wilmington Trust Company (as successor to Citibank, N.A.), in its capacity as indenture trustee under the MCIC Senior Notes Indentures or its duly appointed successor.

1.76.    MCIC Subordinated Debt Claims means all Claims arising under the MCIC Subordinated Notes Indenture.

1.77.    MCIC Subordinated Notes Indenture means the junior subordinated deferrable interest debentures indenture and the supplemental indenture #1, each dated May 29, 1996, between MCIC and HSBC Bank USA as indenture trustee, and all of the documents and instruments relating thereto, including any guarantees by any of the Debtors in respect thereof, as amended, supplemented, modified, or restated as of the Commencement Date.

1.78.    MCIC Subordinated Notes Indenture Trustee means HSBC Bank USA in its capacity as successor indenture trustee to Wilmington Trust Company under the MCIC Subordinated Notes Indenture or its duly appointed successor.

1.79.    MCI Pre-merger Claim means an Allowed General Unsecured Claim against the WorldCom Debtors, to the extent the holder of which can establish in writing, with supporting documentation, to the Debtors' satisfaction and, until the Effective Date, on reasonable notice to the Committee, that (i) its Claim arises solely from an individual transaction or series of transactions that was fully completed on or before September 13, 1998 and (ii) it relied on the separate credit of MCIC or any subsidiary of MCIC as of or prior to September 13, 1998. The

Debtors do not concede that the mere existence of a contract dated on or before September 13, 1998 constitutes reliance. To the extent the Debtors do not agree that a claimant holds an MCI Pre-merger Claim, the Court shall resolve such dispute in accordance with the foregoing criteria after notice and hearing.

1.80.    Merger Subsidiary means New Intermedia Company, a first-tier, wholly-owned Subsidiary of WorldCom.

1.81.    New Common Stock means the common stock of Reorganized WorldCom authorized and to be issued pursuant to the Plan. The New Common Stock shall have a par value of $.01 per share and such rights with respect to dividends, liquidation, voting, and other matters as are provided for by applicable nonbankruptcy law and in the Reorganized WorldCom Certificate of Incorporation and the Reorganized WorldCom By-laws.

1.82.    New Employee Stock Purchase Plan means the Employee Stock Purchase Plan to be adopted by Reorganized WorldCom, which shall be in substantially the form contained in the Plan Supplement.

1.83.    New Management Restricted Stock Plan means the Management Restricted Stock Plan to be adopted by Reorganized WorldCom, which shall be in substantially the form contained in the Plan Supplement.

1.84.    New Notes means the senior unsecured notes, which may be issued in one (1) or more series, in a minimum principal amount of four billion five hundred million ($4,500,000,000) dollars and a maximum principal amount of five billion six hundred sixty-five million ($5,665,000,000) dollars authorized and issued pursuant to the Plan by Reorganized WorldCom on the Effective Date, the terms of which are governed by the New Notes Indenture.

1.85.    New Notes Indenture means the senior unsecured notes indenture, dated as of the Effective Date, between Reorganized WorldCom and an indenture trustee to be designated by WorldCom or Reorganized WorldCom, governing the New Notes, which shall be in the form set forth in the Plan Supplement. The New Notes shall include, without limitation, the principal terms set forth in Exhibit B to the Plan. It is the intention of the Debtors that the New Notes will be structured to trade at par value upon issuance; *provided, however*, that there shall be no legal recourse nor any adjustments or modifications to the New Notes if the New Notes do not trade at par value upon issuance.

1.86.    Non-Debtor Subsidiary means any direct or indirect Subsidiary of WorldCom that is not a Debtor; *provided, however*, that Non-Debtor Subsidiary shall not include Digex, Inc.

1.87.    Non-Specifying Holder means any holder of a WorldCom Senior Debt Claim, Intermedia Senior Debt Claim, or Intermedia Subordinated Debt Claim to the extent such holder fails to validly specify an election on its Election Form.

1.88.    Other Priority Claim means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

1.89.   Other Secured Claim means any Secured Claim, other than a Secured Tax Claim.

1.90.   Oversubscription means that Electing Holders have elected to receive New Notes in an aggregate principal amount greater than three billion three hundred fifty-three million ($3,353,000,000) dollars; *provided, however*, that to the extent the Bank Settlement is not consummated, the Oversubscription threshold amount and the amount set forth in Section 1.90(i) of the Plan shall be three billion four hundred twenty-eight million ($3,428,000,000) dollars.

1.91.   Oversubscription Rate means the quotient of (i) three billion three hundred fifty-three million ($3,353,000,000) dollars divided by (ii) the aggregate principal amount of New Notes elected by the Electing Holders.

1.92.   Pension Plans means, collectively, the WorldCom International Data Services, Inc. Pension Plan and the Pension Plan for Employees of MCI Communications Corporation and its Subsidiaries.

1.93.   Personal Injury Claim means any Claim against any of the Debtors, whether or not the subject of an existing lawsuit, arising from a personal injury or wrongful death allegation. A Personal Injury Claim may also be an Insured Claim.

1.94.   Plan means this chapter 11 plan of reorganization, including, without limitation, the Plan Supplement and all exhibits, supplements, appendices, and schedules hereto, either in its present form or as the same may be altered, amended, or modified from time to time.

1.95.   Plan Supplement means the document containing the forms of documents specified in Section 13.08 of the Plan.

1.96.   Priority Tax Claim means any Claim of a governmental unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.97.   Pro Rated Claim means, with respect to a holder of a WorldCom Senior Debt Claim, Intermedia Senior Debt Claim, or Intermedia Subordinated Debt Claim, the product of (i) the portion of such holder's Allowed Claim on account of which such holder has elected to receive New Notes in respect of such Claim multiplied by (ii) the Oversubscription Rate.

1.98.   Registration Rights Agreement means a registration rights agreement to be entered into pursuant to Section 6.09 of the Plan.

1.99.   Registration Rights Holder means each holder of an Allowed Claim (i) receiving a distribution pursuant to the Plan of ten (10%) percent or greater of the New Common Stock, (ii) that the Company reasonably determines is an underwriter pursuant to section 1145 of the Bankruptcy Code with respect to the New Common Stock or New Notes that such holder received pursuant to the Plan, (iii) that the Company reasonably determines is subject to resale restrictions on any New Common Stock that such holder received pursuant to the Plan by operation of Rule 144 of the Securities Act of 1933, or (iv) that the Company agrees shall be a Registration Rights Holder.

1.100.  Remaining Claim means, with respect to a holder of a WorldCom Senior Debt Claim, Intermedia Senior Debt Claim, and Intermedia Subordinated Debt Claim, the remainder of (i) such holder's Allowed Claim in respect of such Claim minus (ii) such holder's Pro Rated Claim.

1.101.  Reorganized Debtors means, collectively, each of the Debtors on and after the Effective Date.

1.102.  Reorganized WorldCom means WorldCom on and after the Effective Date.

1.103.  Reorganized WorldCom By-laws means the amended and restated by-laws of Reorganized WorldCom, which shall be in substantially the form contained in the Plan Supplement.

1.104.  Reorganized WorldCom Certificate of Incorporation means the amended and restated certificate of incorporation of Reorganized WorldCom, which shall be in substantially the form contained in the Plan Supplement.

1.105.  Revolving Credit Facility means that certain $1.6 billion revolving credit facility, dated as of June 8, 2001, among WorldCom as borrower and Bank of America, N.A. and The Chase Manhattan Bank as co-administrative agents, Banc of America Securities LLC and J.P. Morgan Securities Inc. as joint lead arrangers and joint book managers, Banc of America Securities LLC, J.P. Morgan Securities Inc., Salomon Smith Barney Inc., ABN Amro Bank N.V., and Deutsche Banc Alex Brown Inc. as co-arrangers, Citibank, N.A. as syndication agent, ABN Amro Bank N.V. and Deutsche Bank AG New York Branch as co-documentation agents, and several banks and other financial institutions as lenders.

1.106.  Schedules means the schedules of assets and liabilities, the lists of holders of Equity Interests, and the statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, and all amendments and modifications thereto filed with the Bankruptcy Court through and including the Confirmation Date.

1.107.  Secured Claim means any Claim (i) to the extent reflected in the Schedules or upon a proof of claim as a Secured Claim, which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (ii) that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

1.108.  Secured Tax Claim means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

1.109.  Securities Litigation Claim means any Claim against any of the Debtors, other than the Claim of the Securities and Exchange Commission that is subject to a compromise and settlement with the Debtors, whether or not the subject of an existing lawsuit, (i) arising from rescission of a purchase or sale of shares or notes, or any other securities of any of the Debtors or an affiliate of any of the Debtors, (ii) for damages arising from the purchase or sale of any such security, (iii) for violations of the securities laws, misrepresentations, or any similar Claims, including, to the extent related to the forgoing or otherwise subject to subordination under

section 510(b) of the Bankruptcy Code, but not limited to, any attorneys' fees, other charges, or costs incurred on account of the forgoing Claims, or, (iv) except as otherwise provided for in the Plan, for reimbursement, contribution, or indemnification allowed under section 502 of the Bankruptcy Code on account of any such Claim, including Claims based upon allegations that the Debtors made false and misleading statements and engaged in other deceptive acts in connection with the sale of securities.

 1.110. Silver Lake means Silver Lake Phoenix LLC, its affiliates, and the successors and assigns of any of the foregoing.

 1.111. Subsequent Distribution Date means the twentieth $(20^{th})$ day after the end of each calendar quarter after the occurrence of the Effective Date.

 1.112. Subsidiary means (i) any corporation, association, or other business entity of which more than fifty (50%) percent of the total voting power of shares or other voting securities outstanding thereof is at the time owned or controlled, directly or indirectly, by WorldCom or one or more of the other Subsidiaries of WorldCom (or any combination thereof) and (ii) any partnership or limited liability company (A) the sole general partner, the managing general partner, or the managing member of which is WorldCom or one or more of the other Subsidiaries of WorldCom (or any combination thereof) or (B) the only general partners or members of which are WorldCom or one or more of the other Subsidiaries of WorldCom (or any combination thereof).

 1.113. Tariff Services means telecommunications services required to be provided by an Access Provider pursuant to a tariff filed by such Access Provider with the Federal Communications Commission or a relevant state commission. For purposes of the Plan, the obligation of an Access Provider to provide Tariff Services does not arise under an executory contract, except to the extent services are provided pursuant to an ASR.

 1.114. Tax Code means the Internal Revenue Code of 1986, as amended.

 1.115. Trading Order means the Final Order Pursuant to Sections 362 and 105(a) of the Bankruptcy Code Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Claims Against and Interests in the Debtors, dated March 4, 2003.

 1.116. Undersubscription means that Electing Holders have elected New Notes in the aggregate principal amount of less than two billion three hundred fifty-three million ($2,353,000,000) dollars, in which case, New Notes, in an amount equal to the shortfall, shall be distributed first, proportionately to Non-Specifying Holders and, second, if any shortfall remains, proportionately to all Electing Holders electing any New Common Stock with a concomitant reduction in the amount of New Common Stock distributed to such Electing Holders; *provided*, *however*, that to the extent the Bank Settlement is not consummated, the Undersubscription threshold amount shall be two billion four hundred twenty-eight million ($2,428,000,000) dollars.

 1.117. WorldCom means WorldCom, Inc., a Georgia corporation.

1.118. <u>WorldCom Debtors</u> means, collectively, each of the Debtors, other than the Intermedia Debtors.

1.119. <u>WorldCom Equity Interest</u> means any Equity Interest in any of the WorldCom Debtors issued and outstanding on the Commencement Date, including, without limitation, (i) 7.0% series D junior convertible preferred stock issued by WorldCom, (ii) 7.0% series E junior convertible preferred stock issued by WorldCom, (iii) 7.0% series F junior convertible preferred stock issued by WorldCom, and (iv) Class A preferred stock issued by MCI WorldCom Synergies Management Co. Inc.

1.120. <u>WorldCom General Unsecured Claim</u> means any General Unsecured Claim against any of the WorldCom Debtors other than Convenience Claims and MCI Pre-merger Claims.

1.121. <u>WorldCom Note Claims</u> means any Claim arising under the WorldCom Notes Indentures.

1.122. <u>WorldCom Notes Indentures</u> means, collectively, (i) the indenture, dated March 1, 1997, between WorldCom and the WorldCom Notes Indenture Trustee, and all of the documents and instruments relating thereto, as amended, supplemented, modified, or restated as of the Commencement Date, which provided for the issuance of 6¼% Notes due August 15, 2003; 7.55% Senior Notes due April 1, 2004; 6.40% Notes due August 15, 2005; 7¾% Senior Notes due April 1, 2007; 7¾% Senior Notes due April 1, 2027; and 6.95% Notes due August 15, 2028 and (ii) the indenture, dated April 12, 2000, between WorldCom and the WorldCom Notes Indenture Trustee, and all of the documents and instruments relating thereto, as amended, supplemented, modified, or restated as of the Commencement Date, which provided for the issuance of 7.875% Unsecured Notes due May 15, 2003; 6½% Unsecured Notes due May 15, 2004; 7? % Notes due January 15, 2006; 7? % Restricted Notes due January 15, 2006; 8% Unsecured Notes due May 15, 2006; 6¾% Eurodollar Notes due May 15, 2008; 7¼% Pound Sterling Notes due May 15, 2008; 8¼% Unsecured Notes due May 15, 2031; 8¼% Unsecured Notes due May 15, 2010; 7½% Unsecured Notes due May 15, 2011.

1.123. <u>WorldCom Notes Indenture Trustee</u> means Wilmington Trust Company, as successor to Chase Manhattan Trust Company, N.A., in its capacity as indenture trustee under the WorldCom Notes Indentures or its duly appointed successor.

1.124. <u>WorldCom Senior Debt Claims</u> means (i) all WorldCom Note Claims and (ii) the Bank Claims.

1.125. <u>WorldCom Subordinated Claims</u> means (i) all Securities Litigation Claims and, (ii) to the extent permitted by applicable law and after notice and a hearing, all fines, penalties, Claims for disgorgement, or order of restitution against the Debtors; *provided, however*, that in accordance with 18 U.S.C. § 3613(e) nothing herein shall apply to any fine, penalty, Claim for disgorgement, or order of restitution entered or ordered in connection with any criminal action or criminal proceeding by the United States.

<u>Interpretation; Application of Definitions and Rules of Construction</u> Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include

both the singular and the plural and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter. Unless otherwise specified, all section, article, schedule, or exhibit references in the Plan are to the respective Section in, Article of, Schedule to, or Exhibit to, the Plan. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. A term used herein that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.

ARTICLE II

TREATMENT OF ADMINISTRATIVE
EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

2.01.    Administrative Expense Claims.  Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; *provided*, *however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors in Possession or liabilities arising under loans or advances to or other obligations incurred by the Debtors in Possession shall be paid in full and performed by the Reorganized Debtors in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

2.02.    Professional Compensation and Reimbursement Claims.  All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date pursuant to sections 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code shall (i) file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the date that is ninety (90) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court and (ii) if granted such an award by the Bankruptcy Court, be paid in full in such amounts as are Allowed by the Bankruptcy Court (A) on the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable or (B) upon such other terms as may be mutually agreed upon between such holder of an Administrative Expense Claim and the Reorganized Debtors.

2.03.    Priority Tax Claims.  Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Reorganized Debtors, (i) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable, (ii) equal annual Cash payments in an aggregate amount

equal to such Allowed Priority Tax Claim, together with interest at a fixed annual rate equal to five (5.0%) percent, over a period through the sixth (6th) anniversary of the date of assessment of such Allowed Priority Tax Claim, or (iii) upon such other terms determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

## ARTICLE III

### CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

Claims, other than Administrative Expense Claims and Priority Tax Claims, and Equity Interests, are classified for all purposes, including voting, confirmation, and distribution pursuant to the Plan, as follows:

| **Class** | **Designation** | **Impairment** | **Entitled to Vote** |
|-----------|-----------------|----------------|----------------------|
| Class 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Secured Tax Claims | Impaired | Yes |
| Class 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 3A | Bank Settlement Claims | Impaired | Yes |
| Class 4 | Convenience Claims | Impaired | Yes |
| Class 5 | WorldCom Senior Debt Claims | Impaired | Yes |
| Class 6 | WorldCom General Unsecured Claims | Impaired | No (deemed to reject) |
| Class 6A | MCI Pre-merger Claims | Impaired | No (deemed to reject) |
| Class 6B | Ad Hoc MCI Trade Claims Committee Claims | Impaired | No (deemed to accept) |
| Class 7 | WorldCom Subordinated Claims | Impaired | No (deemed to reject) |
| Class 8 | WorldCom Equity Interests | Impaired | No (deemed to reject) |
| Class 9 | MCIC Senior Debt Claims | Impaired | Yes |
| Class 10 | MCIC Subordinated Debt Claims | Impaired | Yes |
| Class 11 | Intermedia Senior Debt Claims | Impaired | Yes |
| Class 12 | Intermedia General Unsecured Claims | Impaired | Yes |
| Class 13 | Intermedia Subordinated Debt Claims | Impaired | Yes |
| Class 14 | Intermedia Preferred Stock | Impaired | No (deemed to reject) |
| Class 15 | Intermedia Equity Interests | Impaired | No (deemed to reject) |

## ARTICLE IV

### TREATMENT OF CLAIMS AND EQUITY INTERESTS

#### 4.01.   CLASS 1 - OTHER PRIORITY CLAIMS.

(a)   Impairment and Voting. Class 1 is unimpaired by the Plan. Each holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Distributions. Each holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim on the later of the Effective Date and the date such Allowed Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable.

#### 4.02.   CLASS 2 - SECURED TAX CLAIMS.

(a)   Impairment and Voting. Class 2 is impaired by the Plan. Each holder of an Allowed Secured Tax Claim is entitled to vote to accept or reject the Plan.

(b)   Distributions. Except to the extent that a holder of an Allowed Secured Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Secured Tax Claim shall receive, at the sole option of the Reorganized Debtors, (i) Cash in an amount equal to such Allowed Secured Tax Claim, including any interest on such Allowed Secured Tax Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Secured Tax Claim becomes an Allowed Secured Tax Claim, or as soon thereafter as is practicable or (ii) equal annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at a fixed annual rate equal to five (5.0%) percent, over a period through the sixth (6th) anniversary of the date of assessment of such Allowed Secured Tax Claim, or upon such other terms determined by the Bankruptcy Court to provide the holder of such Allowed Secured Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Secured Tax Claim.

#### 4.03.   CLASS 3 - OTHER SECURED CLAIMS.

(a)   Impairment and Voting. Class 3 is unimpaired by the Plan. Each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Distributions/Reinstatement of Claims. Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, at the sole option of the Reorganized Debtors: (i) each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default; (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount

equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable; or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable.

### 4.04.    CLASS 3A - BANK SETTLEMENT CLAIMS.

(a)    Impairment and Voting. Class 3A is impaired by the Plan. Each holder of an Allowed Bank Settlement Claim is entitled to vote to accept or reject the Plan.

(b)    Allowance. The Bank Settlement Claims shall be deemed Allowed Claims solely for the purposes of the Plan in the aggregate amount of $75,000,000.

(c)    Distributions. On the Effective Date, or as soon thereafter as is practicable, each holder of a Bank Settlement Claim shall receive its pro rata share of New Notes in the aggregate principal amount of seventy-five million ($75,000,000) dollars; *provided*, *however*, to the extent the holder of a Bank Settlement Claim does not hold the Bank Claim arising from the same underlying obligation, then 35.7% of such holder's distribution on account of the Bank Settlement Claim shall be paid to the holder(s) of the underlying Bank Claim. Allowance and distributions on account of Bank Settlement Claims is expressly contingent upon the prior dismissals with prejudice of the Constructive Trust Action and the Maryland Action. The Allowed Class 5 Claims of the Banks receiving distributions pursuant to this Section 4.04(c) shall be reduced by an amount equal to the Class 3A distributions such Banks receive.

### 4.05.    CLASS 4 - CONVENIENCE CLAIMS.

(a)    Impairment and Voting. Class 4 is impaired by the Plan. Each holder of an Allowed Convenience Claim is entitled to vote to accept or reject the Plan.

(b)    Distributions. Each holder of an Allowed Convenience Claim shall receive Cash in an amount equal to the lesser of (i) .40 multiplied by the Allowed amount of such Convenience Claim or (ii) sixteen thousand ($16,000) dollars, in full and complete satisfaction of such Allowed Claim; *provided*, *however*, that if the holders of Class 4 Convenience Claims do not accept the Plan by the requisite majorities set forth in section 1126(c) of the Bankruptcy Code, then the holders of Allowed Convenience Claims shall be treated as holders of Allowed WorldCom General Unsecured Claims or Allowed Intermedia General Unsecured Claims, as appropriate, and treated in accordance with Section 4.07 or 4.13 of the Plan, respectively; *provided further*, *however*, that in such event any election by a holder of an Allowed Convenience Claim to reduce the amount of its Allowed Claim to forty thousand ($40,000) dollars shall be null and void.

4.06.   CLASS 5 - WORLDCOM SENIOR DEBT CLAIMS.

(a)     Impairment and Voting. Class 5 is impaired by the Plan. Each holder of an Allowed WorldCom Senior Debt Claim is entitled to vote to accept or reject the Plan.

(b)     Allowance. The WorldCom Note Claims shall be deemed Allowed Claims solely for the purposes of the Plan in the aggregate amount of $24,728,100,760. The Bank Claims shall be deemed Allowed Claims solely for the purposes of the Plan in the aggregate amount of $2,583,940,356 plus the amount of letters of credit issued and outstanding as of the Commencement Date under the Revolving Credit Facility that are actually drawn prior to replacement or expiration of such letters of credit; *provided*, *however*, that to the extent the Bank Settlement is not consummated, the Bank Claims shall be deemed Allowed Claims solely for the purposes of the Plan in the aggregate amount of $2,658,940,356 plus the amount of letters of credit issued and outstanding as of the Commencement Date under the Revolving Credit Facility that are actually drawn prior to replacement or expiration of such letters of credit.

(c)     Distributions. On the Effective Date, or as soon thereafter as is practicable, each holder of an Allowed WorldCom Senior Debt Claim may elect on the Election Form, and shall receive on account of such Claim (i) 14.28 shares of New Common Stock for each one thousand ($1,000) dollars of such holder's Allowed WorldCom Senior Debt Claim or (ii) New Notes in a principal amount equal to .357 multiplied by the Allowed amount of such WorldCom Senior Debt Claim, or a combination thereof as set forth on a properly delivered Election Form or as modified in the event of an Undersubscription or Oversubscription, in full and complete satisfaction of such Allowed Claim. The distributions to Allowed WorldCom Senior Debt Claims shall be subject to modification on account of an Undersubscription. In addition, the holders of Allowed WorldCom Senior Debt Claims shall receive a *pro rata* share of Cash in an amount equal to the reasonable fees and expenses of the WorldCom Notes Indenture Trustee and the Bank of America (in its capacity as agent under the 364-Day Facility and Revolving Credit Facility) and its counsel in accordance with Section 5.09 of the Plan, *provided*, *however*, in no event shall the distributions on account of the reasonable fees and expenses of the Bank Agent and its counsel exceed an amount equal to 10.7% of the reasonable fees and expenses of the WorldCom Notes Indenture Trustee and its counsel.

(d)     Oversubscription. In the event of an Oversubscription, each Electing Holder in Class 5 shall receive (i) New Notes in a principal amount equal to the product of .357 multiplied by such holder's Pro Rated Claim and (ii) 14.28 shares of New Common Stock for each one thousand ($1,000) dollars of such holder's Remaining Claim; *provided*, *however*, the Debtors shall distribute a disproportionately greater amount of New Notes to an Electing Holder (not to exceed the amount of New Notes originally elected by such holder) or to a Non-Specifying Holder to the extent necessary, as determined in the reasonable discretion of the Debtors, to (A) avoid any person from becoming a "5% shareholder" or "5% entity" (within the meaning of section 382 of the Tax Code and the Treasury Regulations promulgated thereunder) of Reorganized WorldCom or (B) otherwise minimize the amount of New Common Stock that would be treated as owned for section 382 purposes by any "5% shareholder" or "5% entity" of Reorganized WorldCom or by any person to whom any presumption under section 382, which depends upon the ownership of less than five (5%) percent of New Common Stock, would not apply. Holders of WorldCom Senior Debt Claims that are Non-Specifying Holders shall be

deemed to have elected, and shall receive, New Common Stock; *provided*, *however*, that in the event of an Undersubscription, such holders shall be deemed to have elected, and shall receive, New Notes.

### 4.07.  CLASS 6 - WORLDCOM GENERAL UNSECURED CLAIMS.

(a)  Impairment and Voting. Class 6 is impaired by the Plan. Each holder of an Allowed WorldCom General Unsecured Claim is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

(b)  Distributions. On the Effective Date, or as soon thereafter as is practicable, each holder of a WorldCom General Unsecured Claim shall receive (i) 7.14 shares of New Common Stock for each one thousand ($1,000) dollars of such holder's Allowed WorldCom General Unsecured Claim and (ii) Cash in an amount equal to .1785 multiplied by the Allowed amount of such WorldCom General Unsecured Claim, in full and complete satisfaction of such Allowed Claim.

### 4.08.  CLASS 6A - MCI PRE-MERGER CLAIMS.

(a)  Impairment and Voting. Class 6A is impaired by the Plan. Each holder of an Allowed MCI Pre-merger Claim is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

(b)  Distributions. On the Effective Date, or as soon thereafter as is practicable, each holder of an Allowed MCI Pre-merger Claim shall receive (i) 7.14 shares of New Common Stock for each one thousand ($1,000) dollars of such holder's Allowed MCI Pre-merger Claim and (ii) Cash in an amount equal to .4215 multiplied by the Allowed amount of such MCI Pre-merger Claim in full and complete satisfaction of such Allowed Claim; *provided*, *however*, that if a holder of an MCI Pre-merger Claim is a member of the Ad Hoc MCI Trade Claims Committee, then such holder's recovery, if any, as a holder of an MCI Pre-merger Claim shall be reduced by the amount received by such holder on account of such Claim pursuant to the contributions set forth in Sections 4.12 and 4.13 of the Plan.

### 4.09.  CLASS 6B - AD HOC MCI TRADE CLAIMS COMMITTEE CLAIMS.

(a)  Impairment and Voting. Class 6B is impaired by the Plan. Each holder of an Ad Hoc MCI Trade Claims Committee Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)  Distributions. Ad Hoc MCI Trade Claims Committee Claims are classified in Class 6B solely for voting purposes. For distribution purposes, each holder of an Allowed Ad Hoc MCI Trade Claims Committee Claim shall be treated as the holder of an Allowed WorldCom General Unsecured Claim and shall receive on account of such Claim the treatment set forth in Section 4.07(b) of the Plan; *provided*, *however*, that, to the extent the holder of an Allowed Ad Hoc MCI Trade Claims Committee Claim can establish that it holds an Allowed MCI Pre-merger Claim, such holder shall be treated as the holder of an Allowed MCI Pre-merger Claim and shall receive on account of such Claim the treatment set forth in Section 4.08(b) of the Plan.

### 4.10.   CLASS 7 - WORLDCOM SUBORDINATED CLAIMS.

(a)   Impairment and Voting. Class 7 is impaired by the Plan. Each holder of a WorldCom Subordinated Claim is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Distributions. The holders of WorldCom Subordinated Claims shall not receive any distributions on account of such Claims and shall not retain any property under the Plan. The Plan shall neither impair nor create any right of any holder of a WorldCom Subordinated Claim to assert such Claim against any of the Debtors' insurance policies. In accordance with 18 U.S.C. § 3613(e), nothing in this Plan or any document or order associated herewith shall subordinate or affect any fine, penalty, Claim for disgorgement, or order of restitution entered or ordered in connection with any criminal action or criminal proceeding by the United States.

### 4.11.   CLASS 8 - WORLDCOM EQUITY INTERESTS.

(a)   Impairment and Voting. Class 8 is impaired by the Plan. Each holder of a WorldCom Equity Interest is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Distributions. The holders of WorldCom Equity Interests shall not receive any distributions on account of such interests. On the Effective Date, all WorldCom Equity Interests shall be extinguished.

### 4.12.   CLASS 9 - MCIC SENIOR DEBT CLAIMS.

(a)   Impairment and Voting. Class 9 is impaired by the Plan. Each holder of an Allowed MCIC Senior Debt Claim is entitled to vote to accept or reject the Plan.

(b)   Allowance. The MCIC Senior Debt Claims shall be deemed Allowed Claims solely for the purposes of the Plan in the aggregate amount of $2,650,084,583, of which $2,590,000,000 represents principal (upon which the $0.792 per dollar distribution shall be calculated) and $60,084,583 represents interest accrued through the Commencement Date (upon which no distribution shall be calculated).

(c)   Distributions. On the Effective Date, or as soon thereafter as is practicable, each holder of an Allowed MCIC Senior Debt Claim shall receive New Notes in a principal amount equal to .80 multiplied by the Allowed principal amount of such MCIC Senior Debt Claim, in full and complete satisfaction of such Allowed Claim; *provided*, *however*, that the acceptance of the Plan by Class 9 shall constitute an agreement by the holders of Allowed MCIC Senior Debt Claims to contribute to the members of the Ad Hoc MCI Trade Claims Committee on a *pro rata* basis New Notes in the aggregate principal amount of twenty-one million two hundred thousand ($21,200,000) dollars out of the aggregate distribution provided to the holders of Allowed MCIC Senior Debt Claims, which contribution shall be distributed as set forth in Section 6.06 of the Plan. Except as otherwise provided for in Section 5.09(ii) of the Plan, the MCIC Senior Notes Indenture Trustee shall make distributions to or for the benefit of the beneficial holders of MCIC Senior Debt Claims such that each holder of an MCIC Senior Debt

Claim receives New Notes in an amount equal to $0.792 on the principal amount (but not unpaid interest) of its MCIC Senior Debt Claim after taking into account the above contribution. In addition, the holders of Allowed MCIC Senior Debt Claims shall receive a *pro rata* share of Cash in an amount equal to the reasonable fees and expenses of the MCIC Senior Notes Indenture Trustee and its counsel in accordance with Section 5.09 of the Plan.

### 4.13. CLASS 10 - MCIC SUBORDINATED DEBT CLAIMS.

(a)    Impairment and Voting. Class 10 is impaired by the Plan. Each holder of an Allowed MCIC Subordinated Debt Claim is entitled to vote to accept or reject the Plan.

(b)    Allowance. The MCIC Subordinated Debt Claims shall be deemed Allowed Claims solely for the purposes of the Plan in the aggregate amount of $750,000,000.

(c)    Distributions. On the Effective Date, or as soon thereafter as is practicable, each holder of an Allowed MCIC Subordinated Debt Claim shall (pursuant to an election made in connection with the solicitation of such holders, subject to proration for an over-subscription of New Notes as set forth below) receive on account of such Claim (i) either (A) New Notes in a principal amount equal to forty-four (44%) percent of the principal amount of such holder's Allowed Claim; *provided*, *however*, that the aggregate principal amount of New Notes distributed on account of all Allowed MCIC Subordinated Debt Claims shall not exceed one hundred sixty-five million ($165,000,000) dollars as set forth below, or (B) Cash in an amount equal to forty-two (42%) percent of the principal amount of such holder's Allowed Claim; and (ii) such holder's *pro rata* share of thirty-one million ($31,000,000) dollars in Cash; *provided*, *however*, that the acceptance of Class 10 shall constitute an agreement by all holders of Allowed MCIC Subordinated Debt Claims to contribute to the members of the Ad Hoc MCI Trade Claims Committee Cash in the amount of nineteen million ($19,000,000) dollars out of the aggregate distribution to be provided to the holders of Allowed MCIC Subordinated Debt Claims, which contribution shall be distributed as set forth in Section 6.06 of the Plan. If elections made by holders of Allowed MCIC Subordinated Debt Claims would require distribution of New Notes in a principal amount in excess of one hundred and sixty five million ($165,000,000) dollars to such holders, only one hundred and sixty five million ($165,000,000) dollars of New Notes will be distributed with respect to clause (i) above to such electing holders *pro rata* at the rate of eleven ($11) dollars in principal amount of New Notes per twenty-five ($25) dollars in principal amount of such electing holders' Allowed MCIC Subordinated Debt Claim, or forty-four ($0.44) cents on the dollar, and Cash shall be distributed with respect to the balance of such electing holders' Allowed MCIC Subordinated Debt Claims at the rate of ten dollars and fifty cents ($10.50) in Cash per twenty-five ($25) dollars in principal amount of such electing holders' Allowed MCIC Subordinated Debt Claim, or forty-two ($0.42) cents on the dollar. To the extent the holder of an MCIC Subordinated Debt Claim fails to properly specify an election on a Class 10 Election Form, such holder shall be deemed to have elected to receive Cash. In addition, the holders of Allowed MCIC Subordinated Debt Claims shall receive a *pro rata* share of Cash in an amount equal to the reasonable fees and expenses of the MCIC Subordinated Notes Indenture Trustee and its counsel in accordance with Section 5.09 of the Plan. The Debtors waive any rights that they have or may have to receive a distribution under Class 10 of the Plan as holders of any securities issued or held by any of them under or in connection with the MCIC Subordinated Notes Indenture and/or the Amended and Restated

Trust Agreement among MCI Communications Corporation, Wilmington Trust Company, and certain Administrative Trustees, dated May 29, 1996.

### 4.14.    CLASS 11 - INTERMEDIA SENIOR DEBT CLAIMS.

(a)    Impairment and Voting. Class 11 is impaired by the Plan. Each holder of an Allowed Intermedia Senior Debt Claim is entitled to vote to accept or reject the Plan.

(b)    Allowance. The Intermedia Senior Debt Claims shall be deemed Allowed Claims solely for the purposes of the Plan in the aggregate amount of $938,214,684.

(c)    Distributions. On the Effective Date, or as soon thereafter as is practicable, each holder of an Allowed Intermedia Senior Debt Claim may elect on the Election Form, and shall receive on account of such Claim (i) 37.4 shares of New Common Stock for each one thousand ($1,000) dollars of such holder's Allowed Intermedia Senior Debt Claim or (ii) New Notes in a principal amount equal to .935 multiplied by the Allowed amount of such Intermedia Senior Debt Claim, or a combination thereof as set forth on a properly delivered Election Form or as modified in the event of an Undersubscription or Oversubscription, in full and complete satisfaction of such Allowed Claim. The distributions to Allowed Intermedia Senior Debt Claims shall be subject to modification on account of an Undersubscription. In addition, the holders of Allowed Intermedia Senior Debt Claims shall receive a *pro rata* share of Cash in an amount equal to the reasonable fees and expenses of the Intermedia Senior Notes Indenture Trustee and its counsel in accordance with Section 5.09 of the Plan.

(d)    Oversubscription. In the event of an Oversubscription, each Electing Holder in Class 11 shall receive (i) New Notes in a principal amount equal to the product of .935 multiplied by such holder's Pro Rated Claim and (ii) 37.4 shares of New Common Stock for each one thousand ($1,000) dollars of such holder's Remaining Claim; *provided, however,* the Debtors shall distribute a disproportionately greater amount of New Notes to an Electing Holder (not to exceed the amount of New Notes originally elected by such holder) or to a Non-Specifying Holder to the extent necessary, as determined in the reasonable discretion of the Debtors, to (A) avoid any person from becoming a "5% shareholder" or "5% entity" (within the meaning of section 382 of the Tax Code and the Treasury Regulations promulgated thereunder) of Reorganized WorldCom or (B) otherwise minimize the amount of New Common Stock that would be treated as owned for section 382 purposes by any "5% shareholder" or "5% entity" of Reorganized WorldCom or by any person to whom any presumption under section 382, which depends upon the ownership of less than five (5%) percent of New Common Stock, would not apply. Holders of Intermedia Senior Debt Claims that are Non-Specifying Holders shall be deemed to have elected, and shall receive, New Common Stock; *provided, however,* that in the event of an Undersubscription, such holders shall be deemed to have elected, and shall receive, New Notes.

### 4.15.    CLASS 12 - INTERMEDIA GENERAL UNSECURED CLAIMS.

(a)    Impairment and Voting. Class 12 is impaired by the Plan. Each holder of an Allowed Intermedia General Unsecured Claim is entitled to vote to accept or reject the Plan.

(b)     Distributions. On the Effective Date, or as soon thereafter as is practicable, each holder of an Intermedia General Unsecured Claim shall receive (i) 16.64 shares of New Common Stock for each one thousand ($1,000) dollars of such holder's Allowed Intermedia General Unsecured Claim and (ii) Cash in an amount equal to .416 multiplied by the Allowed amount of such Intermedia General Unsecured Claim, in full and complete satisfaction of such Allowed Claim.

4.16.    CLASS 13 - INTERMEDIA SUBORDINATED DEBT CLAIMS.

(a)     Impairment and Voting. Class 13 is impaired by the Plan. Each holder of an Allowed Intermedia Subordinated Debt Claim is entitled to vote to accept or reject the Plan.

(b)     Allowance. The Intermedia Subordinated Debt Claims shall be deemed Allowed Claims solely for the purposes of the Plan in the aggregate amount of $263,069,008.

(c)     Distributions. On the Effective Date, or as soon thereafter as is practicable, each holder of an Allowed Intermedia Subordinated Debt Claim may elect on the Election Form, and shall receive on account of such Claim (i) 18.56 shares of New Common Stock for each one thousand ($1,000) dollars of such holder's Allowed Intermedia Subordinated Debt Claim or (ii) New Notes in a principal amount equal to .464 multiplied by the Allowed amount of such Intermedia Subordinated Debt Claim, or a combination thereof as set forth on a properly delivered Election Form or as modified in the event of an Undersubscription or Oversubscription, in full and complete satisfaction of such Allowed Claim. The distributions to Allowed Intermedia Subordinated Debt Claims shall be subject to modification on account of an Undersubscription. In addition, the holders of Allowed Intermedia Subordinated Debt Claims shall receive a *pro rata* share of Cash in an amount equal to the reasonable fees and expenses of the Intermedia Subordinated Notes Indenture Trustee and its counsel in accordance with Section 5.09 of the Plan.

(d)     Oversubscription. In the event of an Oversubscription, each Electing Holder in Class 13 shall receive (i) New Notes in a principal amount equal to the product of .464 multiplied by such holder's Pro Rated Claim and (ii) receive 18.56 shares of New Common Stock for each one thousand ($1,000) dollars of such holder's Remaining Claim; *provided*, *however*, the Debtors shall distribute a disproportionately greater amount of New Notes to an Electing Holder (not to exceed the amount of New Notes originally elected by such holder) or to a Non-Specifying Holder to the extent necessary, as determined in the reasonable discretion of the Debtors, to (A) avoid any person from becoming a "5% shareholder" or "5% entity" (within the meaning of section 382 of the Tax Code and the Treasury Regulations promulgated thereunder) of Reorganized WorldCom or (B) otherwise minimize the amount of New Common Stock that would be treated as owned for section 382 purposes by any "5% shareholder" or "5% entity" of Reorganized WorldCom or by any person to whom any presumption under section 382, which depends upon the ownership of less than five (5%) percent of New Common Stock, would not apply. Holders of Intermedia Subordinated Debt Claims that are Non-Specifying Holders shall be deemed to have elected, and shall receive, New Common Stock; *provided*, *however*, that in the event of an Undersubscription, such holders shall be deemed to have elected, and shall receive, New Notes.

### 4.17.   CLASS 14 - INTERMEDIA PREFERRED STOCK.

(a)   Impairment and Voting. Class 14 is impaired by the Plan. Each holder of an Intermedia Preferred Stock Interest is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Distributions. Each holder of Intermedia Preferred Stock shall receive its *pro rata* share of twenty-nine million ($29,000,000) dollars, in full and complete satisfaction of such Allowed interest.

### 4.18.   CLASS 15 - INTERMEDIA EQUITY INTERESTS.

(a)   Impairment and Voting. Class 15 is impaired by the Plan. Each holder of an Intermedia Equity Interest is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Distributions. The holders of Intermedia Equity Interests shall not receive any distributions on account of such interests. On the Effective Date, all Intermedia Equity Interests shall be extinguished.

### ARTICLE V

### IMPLEMENTATION OF THE PLAN

### 5.01.   Substantive Consolidation of the WorldCom Debtors.

(a)   Entry of the Confirmation Order shall constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the WorldCom Debtors for all purposes related to the Plan, including, without limitation, for purposes of voting, confirmation, and distribution. On and after the Effective Date, (i) all assets and liabilities of the WorldCom Debtors shall be treated as though they were merged, (ii) no distributions shall be made under the Plan on account of any Claim held by a WorldCom Debtor against any other WorldCom Debtor, (iii) no distributions shall be made under the Plan on account of any Equity Interest held by a WorldCom Debtor in any other WorldCom Debtor, (iv) all guarantees of the WorldCom Debtors of the obligations of any other WorldCom Debtor shall be eliminated so that any Claim against any WorldCom Debtor and any guarantee thereof executed by any other WorldCom Debtor and any joint or several liability of any of the WorldCom Debtors shall be one obligation of the WorldCom Debtors, and (v) each and every Claim filed or to be filed in the Chapter 11 Case of any of the WorldCom Debtors shall be deemed filed against the WorldCom Debtors, and shall be one Claim against and obligation of the WorldCom Debtors.

(b)   The substantive consolidation effected pursuant to Section 5.01(a) of the Plan shall not (other than for purposes related to funding distributions under the Plan and as set forth above in this section) affect: (i) the legal and organizational structure of the WorldCom Debtors, (ii) pre and post-Commencement Date guarantees, Liens, and security interests that are required to be maintained (A) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed or (B)

pursuant to the Plan, (iii) defenses to any Cause of Action or requirements for any third party to establish mutuality in order to assert a right of setoff, and (iv) distributions out of any insurance policies or proceeds of such policies.

     5.02.  Substantive Consolidation of the Intermedia Debtors.

     (a)  Entry of the Confirmation Order shall constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Intermedia Debtors for all purposes related to the Plan, including, without limitation, for purposes of voting, confirmation, and distribution. On and after the Effective Date, (i) all assets and liabilities of the Intermedia Debtors shall be treated as though they were merged, (ii) no distributions shall be made under the Plan on account of any Claim held by an Intermedia Debtor against any other Intermedia Debtor, (iii) no distributions shall be made under the Plan on account of any Equity Interest held by an Intermedia Debtor in any other Intermedia Debtor, (iv) all guarantees of the Intermedia Debtors of the obligations of any other Intermedia Debtor shall be eliminated so that any Claim against any Intermedia Debtor and any guarantee thereof executed by any other Intermedia Debtor and any joint or several liability of any of the Intermedia Debtors shall be one obligation of the Intermedia Debtors, and (v) each and every Claim filed or to be filed in the Chapter 11 Case of any of the Intermedia Debtors shall be deemed filed against the Intermedia Debtors, and shall be one Claim against and obligation of the Intermedia Debtors.

     (b)  The substantive consolidation effected pursuant to Section 5.02(a) of the Plan shall not (other than for purposes related to funding distributions under the Plan and as set forth above in this section) affect: (i) the legal and organizational structure of the Intermedia Debtors, (ii) pre and post-Commencement Date guarantees, Liens, and security interests that are required to be maintained (A) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed or (B) pursuant to the Plan, (iii) defenses to any Cause of Action or requirements for any third party to establish mutuality in order to assert a right of setoff, and (iv) distributions out of any insurance policies or proceeds of such policies.

     5.03.  Debtor Intercompany Claims. On the Effective Date, all intercompany Claims between and among the Debtors shall be (i) eliminated by either offset, the contribution or distribution of such Claims, or otherwise (as determined by the Debtors), other than the Intermedia Intercompany Note Claim which is being resolved pursuant to Section 5.06(a) of the Plan, and (ii) subject to the New Notes Indenture.

     5.04.  Non-Debtor Intercompany Claims. All Claims held by any Debtor against any Non-Debtor Subsidiary or by any Non-Debtor Subsidiary against any Debtor shall be (i) reviewed by the Reorganized Debtors and adjusted, continued, or discharged, as appropriate and (ii) subject to the New Notes Indenture.

     5.05.  Restructuring Transactions.

     (a)  On the Effective Date, the following transactions shall be effectuated in the order set forth:

(i)      WorldCom shall make a capital contribution of the New Common Stock, New Notes, and Cash to Merger Subsidiary in an amount sufficient to satisfy distributions to holders of Allowed Intermedia Senior Debt Claims, Allowed Intermedia General Unsecured Claims, and Allowed Intermedia Subordinated Debt Claims as of the Effective Date.  Merger Subsidiary shall assume all of WorldCom's obligations under the Intermedia Intercompany Note, and WorldCom shall have no further obligations thereunder.

(ii)      Intermedia shall merge with and into Merger Subsidiary, with Merger Subsidiary surviving, pursuant to which holders of Allowed Intermedia Senior Debt Claims, Allowed Intermedia General Unsecured Claims, and Allowed Intermedia Subordinated Debt Claims against, and Allowed Intermedia Preferred Stock in, Intermedia will receive New Common Stock, New Notes, and Cash, as applicable, in accordance with Sections 4.14, 4.15, 4.16, and 4.17 of the Plan, respectively.  (Immediately following the Effective Date, Merger Subsidiary shall continue to be a first-tier, wholly-owned Subsidiary of WorldCom).  As a result of such merger, the Intermedia Intercompany Note shall be extinguished.

(iii)      Merger Subsidiary shall make a capital contribution, either directly or indirectly, to any applicable Reorganized Debtor that is a subsidiary of Intermedia of the amount of New Common Stock and Cash to be distributed to holders of Allowed Intermedia General Unsecured Claims against such Debtor as of the Effective Date.

(b)      On or as of the Effective Date, within the sole and exclusive discretion of the Debtors, the Debtors may, notwithstanding any other transactions described in this Section 5.05, but provided there are no material adverse tax consequences to the Debtors, (i) cause any or all of the Debtors to be merged into one or more of the Debtors, dissolved, or otherwise consolidated, (ii) cause the transfer of assets between or among the Debtors, or (iii) engage in any other transaction in furtherance of the Plan.  Any such transaction shall be effective as of the Effective Date pursuant to the Confirmation Order without any further action by the stockholders or directors of any of the Debtors, the Debtors in Possession, or the Reorganized Debtors.  It is the present intention of the Debtors to utilize this provision to merge, dissolve, or otherwise consolidate certain of its Subsidiaries, including, but not limited to, numerous Debtor-entities involved in the Debtors' local exchange carrier business, and transfer certain executory contracts, unexpired leases, and other assets to the surviving Subsidiaries. A list of the Subsidiaries that will be merged or dissolved will be included in the Plan Supplement.

(c)      On the Effective Date, Reorganized WorldCom shall reincorporate as a Delaware corporation and change its name to MCI, Inc.  In order to effectuate Reorganized WorldCom's reincorporation as a Delaware corporation, WorldCom shall merge into a wholly owned Subsidiary that is incorporated in Delaware, with such Subsidiary being the surviving corporation. At such time, such Subsidiary shall change its name to MCI, Inc.

(d)      The mergers, transfers of assets, dissolutions, consolidations, and other transactions contemplated in this Section 5.05 shall be approved and effective as of the Effective Date without the need for any further state or local regulatory approvals, and without any requirement or further action by the Debtors, Reorganized Debtors, or any entity created to effectuate the provisions of the Plan.  All current customers will continue to receive service under the same rates, terms, and conditions as they currently enjoy.  Impacted customers will

receive notice of all of these organizational changes. Where required, tariffs of Subsidiaries that will be merged or dissolved pursuant to this Section 5.05 will be appropriately incorporated into existing or new tariffs of surviving entities. State and local regulatory commissions will be able to review these tariff changes to assure that consumers' rights are fully protected.

    5.06.   Compromise and Settlements.

    (a)    Intermedia Settlement. Pursuant to Bankruptcy Rule 9019, the Plan incorporates a proposed compromise and settlement of all issues relating to the validity, enforceability, and priority of the Intermedia Intercompany Note, including the Intermedia Avoidance Claims which were alleged by the Debtors and the holders of Allowed WorldCom Senior Debt Claims and disputed by the holders of Allowed Intermedia Senior Debt Claims and Allowed Intermedia Subordinated Debt Claims. Pursuant to the Plan, and in consideration for the distribution and other benefits under the Plan, upon the Effective Date, the Intermedia Intercompany Note and the Intermedia Avoidance Claims shall be extinguished and the Debtors and all parties who have held, hold, or may hold Claims against or Equity Interests in any or all of the Debtors are permanently enjoined from asserting or continuing in any manner the Intermedia Avoidance Claims.

    (b)    MCIC Settlement. Pursuant to Bankruptcy Rule 9019, the Plan incorporates a proposed compromise and settlement of issues relating to the substantive consolidation of the WorldCom Debtors. The Debtors and the holders of WorldCom Senior Debt Claims alleged that substantive consolidation of the WorldCom Debtors is appropriate. This allegation was disputed by the holders of MCIC Senior Debt Claims. Pursuant to the Plan, and in consideration for the distribution premium provided to the holders of MCIC Senior Debt Claims and other benefits under the Plan, upon the Effective Date, the WorldCom Debtors shall be substantively consolidated.

    (c)    Bank Settlement. Pursuant to Bankruptcy Rule 9019, the Plan incorporates a proposed compromise and settlement of issues relating to the Bank Claims and the Bank Actions. Pursuant to the Constructive Trust Action, certain holders of Bank Claims allege that funding under the 364-Day Facility was fraudulently obtained by the Debtors and that such amounts received by the Debtors are subject to a constructive trust for the benefit of the Banks who are plaintiffs in the Constructive Trust Action. In addition, pursuant to the Maryland Action, certain Banks who are plaintiffs in such action seek damages for alleged acts of negligence and negligent misrepresentation allegedly committed in connection with the funding under the 364-Day Facility. These allegations are disputed by the Debtors. Pursuant to the Bank Settlement, the allowance and distributions on account of Class 3A Bank Settlement Claims is expressly contingent upon the prior dismissals with prejudice of the Constructive Trust Action and the Maryland Action. Pursuant to the Plan, and in consideration for the distribution provided under the Bank Settlement, other benefits under the Plan, and the dismissal with prejudice of the Constructive Trust Action and the Maryland Action, any and all parties who have held, hold, or may hold Claims against or Equity Interests in any or all of the Debtors are permanently enjoined from asserting or continuing in any manner any Bank Action.

    (d)    Subordination Rights. Notwithstanding the compromises and settlements set forth in Sections 5.06(a) and (b) of the Plan or any other provisions of the Plan or section

510(a) of the Bankruptcy Code, the Plan shall not affect and shall not be deemed to effect a waiver, cancellation, alteration, or impairment of any subordination or related rights or obligations of any person or entity, other than with respect to (i) any indebtedness that is senior to the MCIC Subordinated Debt Claims, including, without limitation, the MCIC Senior Debt Claims, and (ii) Intermedia Senior Notes and Intermedia Subordinated Notes, which rights and obligations shall be deemed cancelled and extinguished in their entirety.

5.07.   Exit Financing and Market Repurchase.  Commencing as soon as practicable after the Effective Date and in accordance with applicable laws, Reorganized WorldCom will conduct a reasonable review of its Cash needs, including, without limitation, amounts that will be necessary to satisfy holders of Convenience Claims, WorldCom General Unsecured Claims, MCI Pre-merger Claims, MCIC Subordinated Debt Claims, Intermedia General Unsecured Claims, and Intermedia Preferred Stock pursuant to Sections 4.05, 4.07, 4.08, 4.13, 4.15, and 4.17 of the Plan, respectively, and, after such review, will utilize excess Cash (determined as of the Effective Date) in excess of one billion ($1,000,000,000) dollars in accordance with Reorganized WorldCom's best business judgment to maximize shareholder value, which may include purchasing shares of New Common Stock in the open market at prevailing market prices or otherwise distribute such Cash in respect of the New Common Stock, in each case, depending upon market and business conditions and other relevant factors.  Reorganized WorldCom cannot predict the prevailing market price of New Common Stock at the time of any such market repurchase.  To the extent less than five billion six hundred sixty-five million ($5,665,000,000) dollars in principal amount of New Notes will be distributed pursuant to the Plan and to the extent deemed appropriate by Reorganized WorldCom in its reasonable business judgment, Reorganized WorldCom will use reasonable efforts to obtain a term loan in the principal amount equal to the difference between five billion six hundred sixty-five million ($5,665,000,000) dollars and the aggregate principal amount of New Notes to be distributed under the Plan not to exceed one billion ($1,000,000,000) dollars.

5.08.   Corporate Name Change and Relocation  The Reorganized WorldCom Certificate of Incorporation and Reorganized WorldCom By-laws shall provide that, on the Effective Date, WorldCom shall change its name to MCI, Inc. and reincorporate as a Delaware corporation in the manner set forth in Section 5.05(c) of the Plan.  On and after the Effective Date, the corporate offices of MCI, Inc. and the other Reorganized Debtors shall be located at 22001 Loudoun County Parkway, Ashburn, Virginia 20147.

5.09.   Cancellation of Existing Securities and Agreements and Indenture Trustee Charging Liens.  On the Effective Date, subject to Section 5.06(d) of the Plan, any document, agreement, or instrument evidencing any Claim or Equity Interest, other than a Claim that is reinstated and rendered unimpaired under the Plan or Equity Interest held by a Debtor in any Subsidiary, shall be deemed cancelled without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the Debtors under such documents, agreements, or instruments evidencing such Claims and Equity Interests, as the case may be, shall be discharged; *provided*, *however*, that the Indentures shall continue in effect for the purposes of permitting the Indenture Trustees to (i) make any distributions pursuant to the Plan and to perform such other necessary functions with respect thereto and (ii) maintain and assert any rights or liens for reasonable fees, costs, and expenses under the Indentures.  Nothing in the Plan or the Confirmation Order shall be deemed to impair, waive, or discharge the

Indenture Trustees' (or any predecessor indenture trustees') respective rights, remedies, liens, and priorities or any other rights of the Indenture Trustees (or any predecessor indenture trustees) under their respective indentures against the distributions to the holders of public debt securities, including, without limitation, the right to contest the jurisdiction of the Bankruptcy Court with respect to such matters. Without limiting any other rights, remedies, liens, and priorities of the Indenture Trustees preserved hereunder, the Indenture Trustees shall first apply towards satisfaction of their reasonable fees and expenses any Cash proceeds received in accordance with Section 6.18 of the Plan.

5.10.    Hart-Scott-Rodino Compliance. Any shares of New Common Stock to be distributed under the Plan to any entity required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such entity shall have expired or been terminated.

5.11.    Electing Holder's Designation. With respect to each Electing Holder that may receive a combination of New Notes or New Common Stock, in lieu of receiving New Notes and New Common Stock on account of each Allowed Claim as otherwise provided in Article IV of the Plan, such Electing Holder may designate (so long as such Electing Holder holds more than one (1) Allowed Claim) on the Election Form that such Electing Holder shall receive on account of specified Allowed Claims a specific portion of the New Notes and/or New Common Stock that such Electing Holder is entitled to receive on account of all Allowed Claims for which elections are made by such Electing Holder. Each Electing Holder making the designation described above shall receive the same aggregate principal amount of New Notes and aggregate shares of New Common Stock as such holder would have received pursuant to Article IV of the Plan had such holder not made such designation.

5.12.    Violations of Claims Trading Order. In the event that any person or group of persons is in violation of the Trading Order and such person or group of persons, but for the application of this Section 5.12, would become a "5% shareholder" (within the meaning of section 382 of the Tax Code and the Treasury Regulations promulgated thereunder) of Reorganized WorldCom as a result of the implementation of the Plan, such person(s) (and, to the extent necessary, any other person whose ownership would be attributed to any such person for purposes of section 382 of the Tax Code) shall not be entitled to and shall not receive distributions of New Common Stock pursuant to the Plan (i) in excess of fourteen million three hundred fifty nine thousand nine hundred ninety-nine (14,359,999) shares of New Common Stock, if such violation was a failure to notify the Debtors of ownership of one billion ($1,000,000,000) dollars or more of Claims, or (ii) in respect of any Claims acquired in violation of the Trading Order. If, after May 16, 2003 and prior to the Distribution Notification Date, the Debtors become aware of circumstances that would result in the application of the preceding sentence as to any person(s), then to the extent that such person(s) would not be entitled to receive New Common Stock by reason of this Section 5.12, such person(s) shall be treated as having elected on an Election Form to receive New Notes in accordance with the applicable provisions of Article IV of the Plan. If the Debtors or Reorganized WorldCom only become aware of such circumstances after the Distribution Notification Date, then, except as provided below, no distribution shall be made in lieu of the New Common Stock that is not distributable by reason of this Section 5.12. If such New Common Stock was already distributed, such

C:\DOCUMENTS AND SETTINGS\MARCUSC\MY DOCUMENTS\WORLDCOM#1296789 V8 - WORLDCOM PLAN.DOC        30

distribution of New Common Stock shall be null and void and the respective amount of New Common Stock, together with any dividends or other distributions that were received by the purported recipient of such New Common Stock under the Plan, shall be promptly returned to Reorganized WorldCom. Pursuant to provisions to be contained in the Reorganized WorldCom Certificate of Incorporation or Reorganized WorldCom By-Laws, Reorganized WorldCom (i) shall use good faith efforts to sell, to the extent practicable (as determined by Reorganized WorldCom), and shall only sell for Cash, any New Common Stock that was not distributable under this Section 5.12 by reason of circumstances of which Reorganized WorldCom became aware after the Distribution Notification Date or that was returned to Reorganized WorldCom pursuant to the terms of the preceding sentence, and (ii) following any such sale, shall distribute to the person (or persons on a proportionate basis) to whom such New Common Stock would otherwise have been distributable an amount equal to the lesser of (A) the sales proceeds in excess of Reorganized WorldCom's expenses in connection with the sale and (B) the value of the sold shares as of the Effective Date (as determined in good faith by Reorganized WorldCom). The reasonable determinations of the Debtors or Reorganized WorldCom under this Section 5.12 regarding any amounts of New Common Stock that are not distributable or that must be returned shall be final and binding, and shall be made by the earlier of the expiration of the restrictions on the transferability of Reorganized WorldCom Equity described in clause (ii) of the first sentence of Section 9.03 of the Plan and the filing of the federal income tax return of Reorganized WorldCom for the taxable year in which the Effective Date occurs. Any disputes under this Section 5.12 shall be resolved by the Bankruptcy Court.

## ARTICLE VI

## PROVISIONS REGARDING VOTING
## AND DISTRIBUTIONS UNDER THE PLAN

6.01. Voting of Claims. Each holder of an Allowed Claim in an impaired Class of Claims that is entitled to vote on the Plan pursuant to Article IV of the Plan shall be entitled to vote separately to accept or reject the Plan as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

6.02. Nonconsensual Confirmation. If any impaired Class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with Section 13.09 of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both. With respect to impaired Classes of Claims that are deemed to reject the Plan, the Debtors shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

6.03. Disbursing Agent. All distributions under the Plan shall be made by the Disbursing Agent.

6.04. Distributions of Cash. Any payment of Cash made by the Disbursing Agent pursuant to the Plan shall, at the Disbursing Agent's option, be made by check drawn on a domestic bank or wire transfer.

6.05.   Timing of Distributions.  In the event that any payment, distribution, or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.06.   Distributions to Classes 4, 6, 6A, and 12.  Subject to Bankruptcy Rule 9010, all distributions under the Plan to holders of Allowed Claims in Classes 4, 6, 6A, and 12 shall be made to the holder of each Allowed Claim at the address of such holder as listed on the Schedules as of the Distribution Notification Date, unless the Debtors or, on and after the Effective Date, the Reorganized Debtors, have been notified in writing of a change of address, including, without limitation, by the timely filing of a proof of claim by such holder that provides an address for such holder different from the address reflected on the Schedules. The distributions of the contributions to the members of the Ad Hoc MCI Trade Claims Committee pursuant to Sections 4.12 and 4.13 of the Plan shall be distributed by the Disbursing Agent in the manner, and in such amounts, as determined by the Ad Hoc MCI Trade Claims Committee. In the event that any distribution to any such holder is returned as undeliverable, the Disbursing Agent shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution shall be made to such holder without interest; *provided*, *however*, that, at the expiration of one (1) year from the Effective Date such distributions shall be deemed unclaimed property and shall be treated in accordance with Section 6.14 of the Plan.

6.07.   Distributions to Classes 3A, 5, 9, 10, 11, and 13.  Distributions for the benefit of the holders of WorldCom Note Claims, MCIC Senior Debt Claims (net of contributed proceeds), MCIC Subordinated Debt Claims (net of contributed proceeds), Intermedia Senior Debt Claims, and Intermedia Subordinated Debt Claims shall be made to the WorldCom Notes Indenture Trustee, the MCIC Senior Notes Indenture Trustee, the MCIC Subordinated Notes Indenture Trustee, the Intermedia Senior Notes Indenture Trustee, and the Intermedia Subordinated Notes Indenture Trustee, respectively.  The Indenture Trustees shall, in turn, promptly administer the distribution to the holders of Allowed Claims in Classes 5, 9, 10, 11, and 13, respectively, in accordance with the Plan and the applicable Indenture.  Distributions for the benefit of the holders of Bank Settlement Claims and Bank Claims shall be made to the Bank of America, N.A. as co-administrative agent under the 364-Day Facility and the Revolving Credit Facility.  Bank of America, N.A. shall, in turn, promptly administer the distribution to the holders of Bank Settlement Claims and Bank Claims in Classes 3A and 5, respectively.  The distribution of New Common Stock, New Notes, or Cash to the Indenture Trustees or Bank of America, N.A. shall be deemed a distribution to the respective holder of an Allowed Claim.  The Indenture Trustees and Bank of America, N.A. shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court; and, in the event that such parties are so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be paid by the Reorganized Debtors.  After the Effective Date, the reasonable fees and expenses of the Indenture Trustees and Bank of America, N.A. incurred in connection with the distribution described in this Section 6.07 shall be paid by the Reorganized Debtors.

6.08.    Surrender of Instruments.  Except to the extent evidenced by electronic entry, as a condition to receiving any distribution under the Plan, each holder of a certificated instrument or note must surrender such instrument or note held by it to the Disbursing Agent or its designee, unless such certificated instrument or note is being reinstated or being left unimpaired under the Plan.  Any holder of such instrument or note that fails to (i) surrender such instrument or note, or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Disbursing Agent before the first (1st) anniversary of the Effective Date shall be deemed to have forfeited all rights and Claims and may not participate in any distribution under the Plan.  Any distribution so forfeited shall become property of the Reorganized Debtors.

6.09.    Registration of New Common Stock and New Notes.  Each Registration Rights Holder shall have the right to become a party to the Registration Rights Agreement on the Effective Date.  The Registration Rights Agreement shall contain customary terms and conditions in a form reasonably agreed by WorldCom and the Registration Rights Holders holding a majority of the New Common Stock to be covered by the Agreement, including:

(a)    Shelf Registration Rights.  Reorganized WorldCom will use its reasonable efforts to file and have declared effective within one hundred eighty (180) days after the Effective Date a shelf registration statement covering the resale of the registrable New Common Stock and New Notes held by Registration Rights Holders.  Subject to customary blackouts as further described in Section 6.09(e) of the Plan, Reorganized WorldCom shall use its reasonable efforts to maintain the effectiveness of any such shelf registration statement continuously for two (2) years or such shorter period of time which shall terminate the day after the date on which the last of the Registration Rights Holders would lawfully be able to sell all of its remaining New Common Stock and New Notes under Rule 144 of the Securities Act of 1933, free of volume limitations, or the first (1st) date on which the Registration Rights Holders shall cease to hold any securities covered by the shelf registration statement.

(b)    Demand Registration Rights.  During the period expiring five (5) years after the Effective Date, in addition to the shelf registration under Section 6.09(a) of the Plan, Registration Rights Holders holding an anticipated five hundred million ($500,000,000) dollars aggregate value of New Common Stock to be registered may demand, by notice to Reorganized WorldCom, underwritten registrations of the New Common Stock held by the Registration Rights Holders who chose to participate therein, subject to *pro rata* cutback based on shares seeking to participate; *provided*, *however*, that Reorganized WorldCom shall not be obligated to effect more than an aggregate of two (2) demand registrations pursuant to this Section 6.09(b) on behalf of Registration Rights Holders, subject to increase as provided in the final sentence of this Section 6.09(b).  Reorganized WorldCom may elect to convert any demand registration into a registration for its own account.  If Reorganized WorldCom makes such election then the Registration Rights Holders that exercised their demand registration right which was so converted shall receive one (1) additional demand registration right.

(c)    Piggyback Registration Rights.  During the period expiring five (5) years after the Effective Date, Registration Rights Holders shall be entitled to piggyback onto any other registration for the issuance of New Common Stock by Reorganized WorldCom effected by Reorganized WorldCom under the Securities Act of 1933 on any forms other than Form S-4 or S-8 (or any successor or similar form(s)).  Registration Rights Holders shall have parity with

Reorganized WorldCom in any demand registration that Reorganized WorldCom has converted into a registration for its own account as described in Section 6.09(b) of the Plan. Registration Rights Holders shall have priority over third parties in any registration, including any demand registration that Reorganized WorldCom has converted into a registration for its own account as described in Section 6.09(b) of the Plan, and any cutback, which Reorganized WorldCom believes in its reasonable business judgment to be required, of the registrable New Common Stock of the Registration Rights Holders shall be effected on a *pro rata* basis among participating Registration Rights Holders.

(d)     Selection of Underwriters. In the event an offering of New Common Stock is to be underwritten, with respect to any demand registration or otherwise, Reorganized WorldCom, in its sole discretion, shall select a nationally recognized firm of underwriters.

(e)     Blackouts. Reorganized WorldCom shall have a customary right to suspend, at any time (but not more than twice in any twelve (12) month period, and only with respect to non-consecutive periods of not more than ninety (90) days), the registration process and/or suspend a holders' ability to use a prospectus if certain significant corporate events are contemplated.

(f)     Expenses. Reorganized WorldCom shall pay all customary costs and expenses associated with each registration, including for each registration statement prepared the reasonable fees and expenses of attorneys for the Registration Rights Holders selected by Registration Rights Holders holding a majority of the shares of New Common Stock covered by such registration; *provided, however*, that such attorneys for the Registration Rights Holders shall be approved by Reorganized WorldCom, such approval not to be unreasonably withheld or delayed. Registration Rights Holders will pay underwriting discounts, commissions, and applicable transfer taxes, if any, on any shares sold by such holders.

(g)     Assignment. Each Registration Rights Holder shall be entitled to assign, in whole or in part, its rights under the Registration Rights Agreement to any assignee of New Common Stock and/or New Notes that is approved by Reorganized WorldCom, such approval not to be unreasonably withheld or delayed.

(h)     Withdrawal. Any Registration Rights Holder shall be entitled to withdraw from the Registration Rights Agreement immediately upon notice to Reorganized WorldCom and the other Registration Rights Holders party to the Registration Rights Agreement.

6.10.     Minimum Distributions. No payment of Cash of less than one hundred ($100) dollars shall be made by the Reorganized Debtors to any holder of a Claim unless a request therefor is made in writing to the Reorganized Debtors.

6.11.     Manner of Payment Under the Plan. All distributions of New Common Stock or Cash to the creditors of each of the Debtors under the Plan shall be made by, or on behalf of, the applicable Reorganized Debtor. Where the applicable Reorganized Debtor is a subsidiary of Reorganized WorldCom, Reorganized WorldCom shall make a capital contribution, either directly or indirectly, to the applicable Reorganized Debtor (and, in the case of the Intermedia Debtors, in accordance with Section 5.05 of the Plan) of an amount of New Common Stock or

Cash to be distributed to the creditors of such Debtor, but only at such time as, and to the extent, the amounts are actually distributed to holders of Allowed Claims. All distributions of New Notes to the creditors of the Debtors shall be made by, or on behalf of, Reorganized WorldCom. To the extent that New Notes are issued by Reorganized WorldCom to holders of a Claim against a Debtor (other than WorldCom and Intermedia) in exchange for such holders' Claims, the portion of the Claims for which such New Notes are issued shall be treated as acquired by Reorganized WorldCom. Immediately thereafter, pursuant to the terms hereof, Reorganized WorldCom shall make a capital contribution of such Claims, either directly or indirectly, to the applicable Debtor and such Claims shall immediately be cancelled and discharged. Any distributions that revert to any of the Reorganized Debtors or are otherwise canceled (such as to the extent any distributions have not been claimed within one (1) year or are cancelled pursuant to Section 6.14 of the Plan) shall revest solely in Reorganized WorldCom, and any applicable Reorganized Debtor (other than Reorganized WorldCom) shall not have (nor shall it be considered to ever have had) any ownership interest in such amounts.

6.12.   Fractional Shares.   No fractional shares of New Common Stock shall be distributed under the Plan. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (i) fractions of one-half (½) or greater shall be rounded to the next higher whole number; and (ii) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Common Stock to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the rounding provided in this Section 6.12.

6.13.   Fractional Notes.   No New Notes shall be distributed in denominations of less than one thousand ($1,000) dollars. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of an amount of New Notes that is not a multiple of one thousand (1,000), the actual distribution of New Notes shall be rounded as follows: (i) denominations of five hundred ($500) dollars or greater shall be rounded up to one thousand ($1,000) dollars; and (ii) denominations less than five hundred ($500) dollars shall be rounded down to zero ($0.00) with no further payment therefor. The total number of New Notes to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the rounding provided in this Section 6.13.

6.14.   Unclaimed Distributions.   All distributions under the Plan that are unclaimed for a period of one (1) year after distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the Reorganized Debtors and any entitlement of any holder of any Claim to such distributions shall be extinguished and forever barred.

6.15.   Distributions to Holders as of the Distribution Notification Date.   As at the close of business on the Distribution Notification Date, the Claims register shall be closed, and there shall be no further changes in the record holder of any Claim. The Reorganized Debtors and any party responsible for making distributions pursuant to Section 6.07 of the Plan shall have no obligation to recognize any transfer of any Claim occurring after the Distribution Notification Date. The Reorganized Debtors and any party responsible for making distributions pursuant to

Section 6.07 of the Plan shall instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the Claims register as of the close of business on the Distribution Notification Date.

6.16.    Setoffs.  The Debtors may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made), any Claims of any nature whatsoever that the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such Claim the Debtors may have against the holder of such Claim.

6.17.    Allocation of Plan Distributions Between Principal and Interest.  To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

6.18.    Indenture Trustees' Fees and Expenses.  The reasonable fees and expenses of each Indenture Trustee incurred prior to the Effective Date shall be satisfied in accordance with Section 5.09 of the Plan; *provided*, *however*, that for purposes of reviewing the reasonableness of the fees and expenses of the Indenture Trustees (and their professionals), the Debtors, the Committee, and the Office of the United States Trustee for the Southern District of New York will be provided with copies of invoices of each Indenture Trustee (and its professionals) in the form typically rendered in the regular course of the Indenture Trustees' business or other professionals' representation of the Indenture Trustees, provided that the invoices contain narrative descriptions of the services rendered and itemization of expenses incurred.  To the extent that there are any disputes that the reviewing parties are unable to resolve with the Indenture Trustees, the reviewing parties will report to the Bankruptcy Court as to whether there are any unresolved disputes regarding the reasonableness of the Indenture Trustees' (and their professionals') fees and expenses.  Any such unresolved disputes may be submitted to the Bankruptcy Court for resolution.

## ARTICLE VII

## PROCEDURES FOR TREATING DISPUTED CLAIMS

7.01.    Objections to Administrative Expense Claims and Claims.  The Reorganized Debtors shall be entitled to object to Administrative Expense Claims and Claims.  Any objections to Administrative Expense Claims and Claims shall be filed and served on or before the later of (i) one hundred eighty (180) days after the Effective Date, and (ii) such date as may be fixed by the Bankruptcy Court, after notice and a hearing, whether fixed before or after the date specified in clause (i) above.

7.02.    No Distributions Pending Allowance.  Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

7.03.   Personal Injury Claims. All Personal Injury Claims are Disputed Claims.  No distributions shall be made on account of any Personal Injury Claim unless and until such Claim is liquidated and becomes an Allowed Claim.  Any Personal Injury Claim which has not been liquidated prior to the Effective Date and as to which a proof of claim was timely filed in the Chapter 11 Cases, shall be determined and liquidated in the administrative or judicial tribunal in which it is pending on the Effective Date or, if no action was pending on the Effective Date, in any administrative or judicial tribunal of appropriate jurisdiction.  Any Personal Injury Claim determined and liquidated (i) pursuant to a judgment obtained in accordance with this Section and applicable nonbankruptcy law which is no longer appealable or subject to review, or (ii) in any alternative dispute resolution or similar proceeding as same may be approved by order of a court of competent jurisdiction, shall be paid as follows:  (A) to the extent such liquidated Claim is, in whole or in part, an Insured Claim, the insured portion shall be paid by the applicable insurer pursuant to the provisions of Section 7.05 of the Plan and (B) to the extent any portion of such liquidated Claim is not covered by any of the Debtors' insurance policies, such uninsured portion shall be deemed, to the extent applicable, an Allowed Claim in Class 4, 6, or 12, as applicable, and treated in accordance with Sections 4.05, 4.07, or 4.15 of the Plan. Nothing contained in this Section 7.03 shall constitute or be deemed a waiver of any Claim, right, or Cause of Action that the Debtors may have against any person in connection with or arising out of any Personal Injury Claim, including, without limitation, any rights under section 157(b) of title 28 of the United States Code.

7.04.   Distributions to Convenience Claims, WorldCom General Unsecured Claims, MCI Pre-Merger Claims, Intermedia General Unsecured Claims, and Intermedia Preferred Stock After Allowance.  After such time as a Disputed Convenience Claim, Disputed WorldCom General Unsecured Claim, Disputed MCI Pre-merger Claim, Disputed Intermedia General Unsecured Claim, or Disputed Intermedia Preferred Stock interest becomes Allowed, the Reorganized Debtors shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan.  Such distributions to holders of Allowed Convenience Claims shall be made on or before the date that is twenty (20) days after the order or judgment of the Bankruptcy Court allowing such Disputed Convenience Claim becomes a Final Order, without any post-Effective Date interest thereon.  Such distributions to holders of Allowed WorldCom General Unsecured Claims, Allowed MCI Pre-merger Claims, Allowed Intermedia General Unsecured Claims, and Allowed Intermedia Preferred Stock interests shall be made on the next Subsequent Distribution Date that is not less than twenty (20) days from the date upon which the order or judgment of the Bankruptcy Court allowing such Disputed WorldCom General Unsecured Claims, Disputed MCI Pre-merger Claims, Disputed Intermedia General Unsecured Claims, or Disputed Intermedia Preferred Stock interest becomes a Final Order, without any post-Effective Date interest thereon.

7.05.   Distributions Relating to Allowed Insured Claims. Distributions under the Plan to each holder of an Allowed Insured Claim shall be in accordance with the provisions of any applicable insurance policy. Nothing contained herein shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any entity may hold against any other entity, including, without limitation, insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

7.06.    Resolution of Administrative Expense Claims and Claims. On and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Administrative Expense Claims and Claims and compromise, settle, or otherwise resolve Disputed Administrative Expense Claims and Disputed Claims without approval of the Bankruptcy Court.

## ARTICLE VIII

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

8.01.    Assumption or Rejection of Executory Contracts and Unexpired Leases. Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtors and any person or entity shall be deemed assumed by the Debtors, as of the Effective Date, except for any executory contract or unexpired lease (i) that has been rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date and for which the motion was filed prior to the Confirmation Date, (ii) as to which a motion for approval of the rejection of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date, or (iii) that is specifically designated as a contract or lease to be rejected on Schedule 8.01(A) (executory contracts) or Schedule 8.01(B) (unexpired leases), which Schedules shall be contained in the Plan Supplement; *provided, however*, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Schedules 8.01(A) and 8.01(B) to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, assumed or rejected. The Debtors shall provide notice of any amendments to Schedules 8.01(A) and 8.01(B) to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on Schedule 8.01(A) or 8.01(B) shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

8.02.    Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases. Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed and assigned pursuant to Section 8.01 of the Plan, (ii) the extension of time, pursuant to section 365(d)(4) of the Bankruptcy Code, within which the Debtors may assume, assume and assign, or reject the unexpired leases specified in Section 8.01 of the Plan through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such unexpired leases, and (iii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 8.01 of the Plan.

8.03.    Inclusiveness. Unless otherwise specified on Schedules 8.01(A) and 8.01(B), each executory contract and unexpired lease listed or to be listed on Schedules 8.01(A) and 8.01(B) shall include modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedules 8.01(A) and 8.01(B).

8.04.   Tariff Services. All Access Providers shall continue to provide without interruption all Tariff Services, specifically including usage-sensitive access services, provided to the Debtors prior to the Effective Date. Any Claim against a Debtor by an Access Provider for the provision of Tariff Services to such Debtor prior to the Commencement Date shall be treated in accordance with Sections 4.05, 4.07, 4.08, or 4.15, as applicable.

8.05.   Cure of Defaults. Except as may otherwise be agreed to by the parties, within thirty (30) days after the Effective Date, the Reorganized Debtors shall cure any and all undisputed defaults under any executory contract or unexpired lease assumed by the Debtors pursuant to the Plan, in accordance with section 365(b) of the Bankruptcy Code. All disputed defaults that are required to be cured shall be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Reorganized Debtors' liability with respect thereto, or as may otherwise be agreed to by the parties.

8.06.   Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan. Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 8.01 of the Plan must be filed with the Bankruptcy Court and served upon the Debtors or, on and after the Effective Date, Reorganized WorldCom, no later than thirty (30) days after the later of (i) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (ii) notice of entry of the Confirmation Order, and (iii) notice of an amendment to Schedule 8.01(A) or 8.01(B). All such Claims not filed within such time will be forever barred from assertion against the Debtors and their estates or the Reorganized Debtors and their property.

8.07.   Survival of Corporate Reimbursement Obligations. Except as set forth on Schedules 8.01(A) and 8.01(B), any prepetition indemnification obligations of the Debtors pursuant to their corporate charters and by-laws or agreements entered into any time prior to the Commencement Date shall be limited to the reimbursement of current directors, officers, and/or employees, other than Culpable Individuals, for legal fees and expenses and shall continue as obligations of the Reorganized Debtors in an amount not to exceed twenty-five million ($25,000,000) dollars in the aggregate. Other than as set forth in the preceding sentence, nothing herein shall be deemed to be an assumption of any other prepetition indemnification obligation and any such obligations shall be rejected pursuant to the Plan.

8.08.   Insurance Policies. All of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as executory contracts under the Plan. Distributions under the Plan to any holder of an Insured Claim shall be in accordance with the treatment provided under Section 7.05 of the Plan. Nothing contained herein shall constitute or be deemed a waiver of any Cause of Action that the Debtors may hold against any entity, including, without limitation, the insurer under any of the Debtors' policies of insurance.

8.09.   Compensation and Benefit Programs. Except as provided in Section 8.01 of the Plan, the Pension Plans and all savings plans, retirement plans, health care plans, performance-based incentive plans, retention plans, workers' compensation programs and life, disability, directors and officers liability, and other insurance plans are treated as executory contracts under the Plan and shall, on the Effective Date, be deemed assumed by the Debtors in accordance with sections 365(a) and 1123(b)(2) of the Bankruptcy Code; *provided*, *however*, that such programs

shall not be continued for the benefit of, and shall be deemed rejected with respect to, Culpable Individuals.

8.10.    Retiree Benefits. On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to pay all retiree benefits of the Debtors (within the meaning of section 1114 of the Bankruptcy Code), if any, at the level established in accordance with section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, for the duration of the period for which the Debtors had obligated themselves to provide such benefits.

## ARTICLE IX

### PROVISIONS REGARDING CORPORATE GOVERNANCE AND MANAGEMENT OF THE REORGANIZED DEBTORS

9.01.    General. On the Effective Date, the management, control, and operation of Reorganized WorldCom and the Reorganized Debtors shall become the general responsibility of the Boards of Directors of Reorganized WorldCom and the Reorganized Debtors, respectively.

9.02.    Directors and Officers of Reorganized WorldCom and the Reorganized Debtors.

(a)    Reorganized WorldCom Board of Directors. The initial Board of Directors of Reorganized WorldCom shall be disclosed not later than ten (10) days prior to the Confirmation Hearing. Each of the members of such initial Board of Directors shall serve in accordance with applicable nonbankruptcy law and the Reorganized WorldCom Certificate of Incorporation and Reorganized WorldCom By-laws, as the same may be amended from time to time.

(b)    Reorganized WorldCom Officers. The officers of Reorganized WorldCom immediately prior to the Effective Date shall serve as the initial officers of Reorganized WorldCom on and after the Effective Date. Such officers shall serve in accordance with applicable nonbankruptcy law, any employment agreement with Reorganized WorldCom, and the Reorganized WorldCom Certificate of Incorporation and Reorganized WorldCom By-laws, as the same may be amended from time to time.

(c)    Reorganized Debtors' Boards of Directors. The initial Boards of Directors of each of the Reorganized Debtors, other than Reorganized WorldCom, shall consist of at least one (1) individual selected by the Chief Executive Officer of Reorganized WorldCom. The names of the members of the initial Boards of Directors of each of the Reorganized Debtors shall be disclosed not later than ten (10) days prior to the Confirmation Hearing. Each of the members of such initial Boards of Directors shall serve in accordance with applicable nonbankruptcy law and its certificate of incorporation and by-laws, as the same may be amended from time to time.

(d)    Reorganized Debtors' Officers. The officers of the Reorganized Debtors, other than Reorganized WorldCom, immediately prior to the Effective Date shall serve as the initial officers of the Reorganized Debtors on and after the Effective Date. Such officers shall serve in accordance with applicable nonbankruptcy law, any employment agreement with the

Reorganized Debtors, and the applicable certificate of incorporation and by-laws, as the same may be amended from time to time.

9.03. <u>Certificates of Incorporation and By-laws</u>. The Reorganized WorldCom Certificate of Incorporation, the Reorganized WorldCom By-laws, and the certificates of incorporation and by-laws of each of the other Reorganized Debtors shall contain provisions necessary (i) to prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of such certificates of incorporation and by-laws as permitted by applicable law, (ii) unless the Debtors and the Committee deem it unnecessary or inadvisable, to impose restrictions on the direct or indirect transferability of the New Common Stock or other equity of Reorganized WorldCom ("Reorganized WorldCom Equity") such that (A) no person or "entity" may acquire or accumulate 4.75% or more (as determined under tax law principles governing the application of section 382 of the Tax Code) of the Reorganized WorldCom Equity and (B) no person or entity owning directly or indirectly (as determined under such tax law principles) on the Effective Date, after giving effect to the Plan, 4.75% or more of the New Common Stock may acquire additional shares of Reorganized WorldCom Equity, subject to certain exceptions and limitations (including, without limitation, limited duration of restrictions as described below, the right of the Board of Directors to waive such restrictions in its reasonable discretion, and allowance for certain acquisitions without the need for prior Board of Directors approval, including, without limitation, qualified tender offers for all of Reorganized WorldCom's stock), (iii) to impose the requirement that any "stock split" or "reverse stock split" within one (1) year after the Effective Date be approved by at least ninety-five (95%) percent of the holders of New Common Stock then outstanding; and (iv) to effectuate the provisions of the Plan. All restrictions on the transferability of the Reorganized WorldCom Equity described under clause (ii) above shall expire on the earlier of the second (2nd) anniversary of the Effective Date and the date on which the Board of Directors of Reorganized WorldCom in good faith determines that, (A) the requirements under section 382(l)(5) of the Tax Code will not be satisfied with respect to the ownership change occurring directly as a result of the consummation of the Plan or (B) electing treatment under section 382(l)(5) of the Tax Code is not in the best interests of Reorganized WorldCom or its stockholders. Reorganized WorldCom shall use good faith efforts to make the determination of whether a reasonable basis exists for taking the position that the requirements of section 382(l)(5) of the Tax Code have been satisfied, at the earliest date following the Effective Date that adequate information regarding the ownership of Reorganized WorldCom is reasonably available, and from time to time thereafter as additional information or developments relevant to this determination are reasonably available or occur.

9.04. <u>Authorization and Issuance of New Securities</u>. The issuance of the following securities by Reorganized WorldCom is hereby authorized without further act or action under applicable law, regulation, order, or rule:

> (a) The New Notes in an aggregate principal amount of up to five billion six hundred sixty-five million ($5,665,000,000) dollars;
>
> (b) Three billion (3,000,000,000) shares of New Common Stock; and
>
> (c) The Management Restricted Stock.

9.05.  Listing of New Common Stock.  Reorganized WorldCom shall use commercially reasonable efforts to cause the shares of New Common Stock to be listed on the NASDAQ National Market System for trading on or as soon as practicable after the Effective Date.

9.06.  New Management Restricted Stock Plan  Prior to the Effective Date, Reorganized WorldCom shall adopt the New Management Restricted Stock Plan.  Reorganized WorldCom shall, on the Effective Date, implement an equity-based program for certain of its employees, pursuant to which such employees shall receive restricted shares of New Common Stock (the "Management Restricted Stock").  The terms of the New Management Restricted Stock Plan shall be contained in the Plan Supplement.

9.07.  New Employee Stock Purchase Plan  Prior to the Effective Date, Reorganized WorldCom shall adopt the New Employee Stock Purchase Plan. Reorganized WorldCom shall, on the Effective Date, implement an employee stock purchase plan intended to qualify under section 423 of the Tax Code.  Pursuant to the New Employee Stock Purchase Plan, Reorganized WorldCom would purchase shares of New Common Stock on the open market in order to make such shares available to participating employees.  The terms of the New Employee Stock Purchase Plan shall be contained in the Plan Supplement.

## ARTICLE X

### EFFECT OF CONFIRMATION

10.01.  Vesting of Assets.  Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the estates of the Debtors shall vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided herein. From and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided herein.

10.02.  Discharge of Claims and Termination of Equity Interests.  Except as otherwise provided herein or in the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made hereunder shall be in exchange for and in complete satisfaction, discharge, and release of all existing debts and Claims, and shall terminate all Equity Interests, of any kind, nature, or description whatsoever, including any interest accrued on such Claims from and after the Commencement Date, against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtors and Equity Interests in the Debtors, shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Equity Interests shall be precluded and enjoined from asserting against the Reorganized Debtors, or any of their assets or properties, any other or further Claim or Equity Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Equity Interest.

10.03. Discharge of Debtors. Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Equity Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Equity Interests, rights, and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Equity Interest in the Debtors.

10.04. Injunction Except as otherwise expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all entities who have held, hold, or may hold Claims against or Equity Interests in any or all of the Debtors and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, are permanently enjoined, on and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or Reorganized Debtors with respect to any such Claim or Equity Interest, (ii) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against the Debtors or Reorganized Debtors on account of any such Claim or Equity Interest, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or Reorganized Debtors or against the property or interests in property of the Debtors or Reorganized Debtors on account of any such Claim or Equity Interest, (iv) commencing or continuing in any manner any action or other proceeding of any kind with respect to any Claims and Causes of Action which are extinguished or released pursuant to the Plan, and (v) taking any actions to interfere with the implementation or consummation of the Plan.

10.05. Term of Injunctions or Stays. Unless otherwise provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in such applicable order.

10.06. Exculpation None of the Debtors, the Reorganized Debtors, the Indenture Trustees, the Covered Parties, or their respective professionals shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct, gross negligence, criminal conduct, misuse of confidential information that causes damages, or *ultra vires* acts and, in all respects, the Debtors, the Reorganized Debtors, the Indenture Trustees, and the Covered Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. Nothing in this Section 10.06 shall limit the liability of the professionals of the Debtors, the Reorganized Debtors, the Indenture Trustees or the Covered Parties to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.

10.07. Avoidance Actions. From and after the Effective Date, the Reorganized Debtors shall have the right to prosecute any avoidance or equitable subordination or recovery actions

under sections 105, 502(d), 510, 542 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or Debtors in Possession other than the Intermedia Avoidance Claims, which shall be extinguished pursuant to Section 5.06(a) of the Plan, and such other avoidance or recovery actions against parties to the Compromise and Settlements under Section 5.06 of the Plan.

10.08.  Retention of Causes of Action/Reservation of Rights.

(a)    Except as against parties to the Compromise and Settlements under Section 5.06 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action that the Debtors or the Reorganized Debtors may have or which the Reorganized Debtors may choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, their officers, directors, or representatives, (ii) the turnover of any property of the Debtors' estates, and (iii) Causes of Action against current or former directors, officers, professionals, agents, financial advisors, underwriters, lenders, or auditors relating to acts or omissions occurring prior to the Commencement Date.

(b)    Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left unimpaired by the Plan. The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses which they had immediately prior to the Commencement Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim left unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

10.09.  United States Exception.  Notwithstanding any provision of the Plan or any document or order associated therewith, in accordance with 18 U.S.C. § 3613(e), nothing shall be deemed to waive, release, discharge, affect, or terminate any liability of, debt of, or Claim against Debtors, the Reorganized Debtors, or any non-Debtor in connection with any criminal action or criminal proceeding by the United States concerning conduct at any time by the Debtors (or their agents or present or former employees) or by the Reorganized Debtors (or their agents or present or former employees), and nothing herein shall release the Debtors, the Reorganized Debtors, or any non-Debtor from the criminal laws of the United States. Nothing in the Plan or in any document or order associated therewith shall be deemed to waive, release, discharge, affect, or terminate any Claim or right of the United States (or any agency or department thereof) to collect any Claim against or assert any right against any non-Debtor (including, but not limited to, any present or former employee, agent, officer, director, or principal of any Debtor or Reorganized Debtor).

10.10.  Obligation to Defend.  The Debtors or the Reorganized Debtors, as the case may be, shall, with respect to any action threatened or commenced by a third party against any Covered Party relating to or arising out of the conduct of such Covered Party during the Chapter

11 Cases with respect to the Plan, pursuit of confirmation of the Plan, consummation of the Plan, or the administration of the Plan: (i) pay all defense costs including, without limitation, reasonable attorneys' fees; *provided*, *however*, that choice of counsel must be reasonably acceptable to the Covered Party and the Debtor or the Reorganized Debtor, as the case may be; (ii) pay the costs of any settlement; *provided*, *however*, any such settlement must be consented to by the Debtors or the Reorganized Debtors, as the case may be, which consent shall not be unreasonably withheld; and (iii) pay any judgment. Notwithstanding the foregoing, the obligations of the Debtors or the Reorganized Debtors, as the case may be, set forth above shall terminate with respect to any Covered Party to the extent that such Covered Party is determined by a final judgment to be guilty of gross negligence, willful misconduct, or breach of fiduciary duty. In such event, such Covered Party shall reimburse the Debtors or the Reorganized Debtors, as the case may be, for all payments made pursuant to this Section 10.10.

## ARTICLE XI

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

11.01. <u>Effectiveness</u>. The Plan shall not become effective unless and until the following conditions shall have been satisfied or waived pursuant to Section 11.03 of the Plan:

(a)    The Confirmation Order, in form and substance acceptable to the Debtors, shall have been signed by the judge presiding over the Chapter 11 Cases, and there shall not be a stay or injunction in effect with respect thereto;

(b)    The New Notes Indenture shall be in form and substance reasonably acceptable to the Debtors, the Committee, the MatlinPatterson Investors, the Ad Hoc Committee of Intermedia Noteholders, the Ad Hoc Committee of MCIC Senior Noteholders, and the Ad Hoc Committee of WorldCom Noteholders;

(c)    The Reorganized WorldCom Certificate of Incorporation and the Reorganized WorldCom By-laws shall be in form and substance reasonably acceptable to the Debtors, the Committee, the MatlinPatterson Investors, the Ad Hoc Committee of Intermedia Noteholders, and the Ad Hoc Committee of WorldCom Noteholders and shall be in form and substance reasonably acceptable to the Ad Hoc Committee of MCIC Senior Noteholders solely to the extent such documents affect the New Notes Indenture;

(d)    The New Management Restricted Stock Plan and the New Employee Stock Purchase Plan shall be in form and substance reasonably acceptable to the Debtors, the Committee, the MatlinPatterson Investors, the Ad Hoc Committee of Intermedia Noteholders, and the Ad Hoc Committee of WorldCom Noteholders;

(e)    All actions, documents, and agreements necessary to implement the Plan shall have been effected or executed;

(f)    Subject to Section 5.05(d) of the Plan, the Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or

documents that are necessary to implement the Plan and that are required by law, regulation, or order;

(g)     The Debtors shall have paid the final judgment as set forth in the settlement between WorldCom and the Securities and Exchange Commission or, if approval of such settlement is stayed pending an appeal, the Debtors shall deposit all amounts due into an escrow account pending final resolution; and

(h)     The members of the Ad Hoc MCI Trade Claims Committee shall have received the contributions of consideration as contemplated in Sections 4.12 and 4.13 of the Plan.

11.02.  Failure of Conditions.  In the event that one or more of the conditions specified in Section 11.01 of the Plan have not occurred on or before one hundred twenty (120) days after the Confirmation Date, (i) the Confirmation Order shall be vacated, (ii) no distributions under the Plan shall be made, (iii) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iv) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

11.03.  Waiver of Conditions.  The Debtors, in their sole discretion and to the extent not prohibited by applicable law, may waive one (1) or more of the conditions precedent to effectiveness of the Plan set forth in Section 11.01 of the Plan; *provided*, *however*, that the Debtors may not waive the conditions precedent that provide for other parties' reasonable acceptance without the consent of such parties (which shall not be unreasonably withheld or delayed); *provided further*, *however*, that the Debtors may only waive the condition set forth in Section 11.01(h) with the consent of the Ad Hoc MCI Trade Claims Committee.

## ARTICLE XII

### RETENTION OF JURISDICTION

12.01.  The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)     To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of cure amounts and Claims resulting therefrom;

(b)     To hear and determine any and all adversary proceedings, applications, and contested matters;

(c)     To hear and determine any objection to Administrative Expense Claims or Claims;

(d)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(e)     To issue such orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(f)     To consider any amendments to, or modifications of, the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(g)     To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331, and 503(b) of the Bankruptcy Code;

(h)     To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, including any disputes arising under Sections 5.12 or 6.18 of the Plan;

(i)     To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(j)     To recover all assets of the Debtors and property of the Debtors' estates, wherever located;

(k)     To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

(l)     To resolve any Disputed Claims;

(m)     To determine the scope of any discharge of any Debtor under the Plan or the Bankruptcy Code;

(n)     To hear any other matter not inconsistent with the Bankruptcy Code; and

(o)     To enter a final decree closing the Chapter 11 Cases.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

13.01.  Effectuating Documents and Further Transactions.  Each of the Debtors and Reorganized Debtors is authorized to execute, deliver, file, or record such contracts, instruments,

releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

      13.02. <u>Corporate Action</u>. On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the stockholders or directors of one or more of the Debtors or Reorganized Debtors, including, without limitation, (i) the authorization to issue or cause to be issued the New Notes, the New Common Stock, and the Management Restricted Stock, (ii) the effectiveness of the Reorganized WorldCom Certificate of Incorporation, the Reorganized WorldCom By-laws, the certificates of incorporation and by-laws of the other Reorganized Debtors, (iii) all restructuring transactions effectuated pursuant to the Plan, (iv) the election or appointment, as the case may be, of directors and officers of Reorganized WorldCom and the other Reorganized Debtors, (v) the authorization and approval of a new revolving credit facility, a new term loan, the New Management Restricted Stock Plan, the New Employee Stock Purchase Plan, and the Registration Rights Agreement, and (vi) the qualification of Reorganized WorldCom or any of the Reorganized Debtors as a foreign corporation wherever the conduct of business by the Company requires such qualification, shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to the applicable general corporation law of the states in which the Debtors and the Reorganized Debtors are incorporated, without any requirement of further action by the stockholders or directors of the Debtors or Reorganized Debtors. On the Effective Date, or as soon thereafter as is practicable, Reorganized WorldCom and the Reorganized Debtors shall, if required, file their amended certificates of incorporation with the Secretary of State of the state in which each such entity is (or will be) incorporated, in accordance with the applicable general corporation law of each such state.

      13.03. <u>Withholding and Reporting Requirements</u>. In connection with the consummation of the Plan, the Debtors or the Reorganized Debtors, as the case may be, shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

      13.04. <u>Exemption from Transfer Taxes</u>. Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, any merger agreements or agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax. All sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Commencement Date through and including the Effective Date, including, without limitation, the transfers effectuated under the Plan, the sale by the Debtors of owned property pursuant to section 363(b) of the Bankruptcy Code, and the assumption, assignment, and sale by the Debtors of unexpired leases of non-residential real property pursuant to section 365(a) of the Bankruptcy Code, shall be deemed to have been made under, in furtherance of, or in connection with the Plan and, thus, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

13.05. Payment of Statutory Fees. On the Effective Date, and thereafter as may be required, the Debtors shall pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

13.06. Post-Effective Date Fees and Expenses. From and after the Effective Date, Reorganized WorldCom and the Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons thereafter incurred by Reorganized WorldCom and the Reorganized Debtors, including, without limitation, those fees and expenses incurred in connection with the implementation and consummation of the Plan.

13.07. Dissolution of the Committee. The Committee shall terminate on the Effective Date, except that the Committee may evaluate, object to (if necessary), and appear at the hearing to consider applications for final allowances of compensation and reimbursement of expenses, including applications for compensation or reimbursement under section 503 of the Bankruptcy Code, and support or prosecute any objections to such applications, if appropriate, and the Committee may continue to function after the Effective Date with respect to the consummation of the SEC final penalty judgment and distribution of the settlement funds thereunder. The post-Effective Date professional fees of the Committee for the services set forth in the preceding sentence shall be paid pursuant to Section 13.06 of the Plan.

13.08. Plan Supplement. The Reorganized WorldCom Certificate of Incorporation, the Reorganized WorldCom By-laws, the forms of certificates of incorporation and by-laws of each of the other Reorganized Debtors, Schedules 8.01(A) and 8.01(B) referred to in Section 8.01 of the Plan, a post-Effective Date revolving credit facility agreement, if any, the New Notes Indenture, the New Management Restricted Stock Plan, the New Employee Stock Purchase Plan, the Registration Rights Agreement, and any other appropriate documents shall be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court at least ten (10) days prior to the last day upon which holders of Claims may vote to accept or reject the Plan; *provided*, *however*, that the New Notes Indenture, the New Management Restricted Stock Plan, and the New Employee Stock Purchase Plan shall be filed with the Clerk of the Bankruptcy Court at least thirty (30) days prior to the last day upon which holders of Claims may vote to accept or reject the Plan; *provided further*, *however*, that the Debtors may amend (A) Schedules 8.01(A) and 8.01(B) through and including the Confirmation Date and (B) each of the other documents contained in the Plan Supplement, subject to Section 11.01 of the Plan, through and including the Effective Date in a manner consistent with the Plan and Disclosure Statement. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement on the Debtors' independent website at www.elawforworldcom.com or upon written request to WorldCom in accordance with Section 13.16 of the Plan.

13.09. Amendment or Modification of the Plan. Alterations, amendments, or modifications of or to the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, provided that the Plan, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code. The Plan may be altered, amended, or

modified at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended, or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended, or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments, or modifications. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such holder. Notwithstanding the forgoing, neither the Debtors nor any other party may modify Section 9.04(b) of the Plan or increase or decrease the aggregate number of shares of New Common Stock projected to be distributed pursuant to Article IV of the Plan between the Confirmation Date and the Effective Date. The amendment or modification of (i) the percentage recovery for the holders of MCIC Senior Debt Claims, MCIC Subordinated Debt Claims, Intermedia Senior Debt Claims, or Intermedia Subordinated Debt Claims or (ii) the form of distribution (i.e., New Notes) that shall be distributed to the holders of MCIC Senior Debt Claims shall be deemed to be material amendments or modifications to the holders of such Claims; *provided*, *however*, that the foregoing shall not be deemed to be material amendments or modifications to the holders of such Claims to the extent the Ad Hoc Committee of Intermedia Noteholders, the Ad Hoc Committee of MCIC Senior Noteholders, and the Ad Hoc Committee of Dissenting Bondholders, as appropriate, consent to such amendments or modifications.

13.10. <u>Revocation or Withdrawal of the Plan</u>  The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

13.11. <u>Severability</u>. If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

13.12. <u>Expedited Tax Determination</u>  The Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, such Reorganized Debtors for all taxable periods through the Effective Date.

13.13. Governing Law. Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit or schedule hereto or in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

13.14. Binding Effect. The Plan shall be binding upon and inure to the benefit of the Debtors, the holders of Claims and Equity Interests, and their respective successors and assigns, including, without limitation, the Reorganized Debtors.

13.15. Exhibits/Schedules. All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

13.16. Notices. All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> WORLDCOM, INC.
> 22001 Loudoun County Parkway
> Ashburn, VA 20147
> Attn: Anastasia Kelly, Esq.
> General Counsel
> Telephone: (877) 624-1000
> Facsimile: 703-886-5807
>
> -and-
>
> WEIL, GOTSHAL & MANGES LLP
> 767 Fifth Avenue
> New York, NY 10153
> Attn: Marcia L. Goldstein, Esq.
>    Lori R. Fife, Esq.
> Telephone: (212) 310-8000
> Facsimile: (212) 310-8007
>
> -and-
>
> WEIL, GOTSHAL & MANGES LLP
> 700 Louisiana, Suite 1600
> Houston, TX 77002
> Attn: Alfredo R. Perez, Esq.
> Telephone: (713) 546-5000
> Facsimile: (713) 224-9511

Dated: New York, New York
October 21, 2003

Respectfully submitted,

WORLDCOM, INC., *et al*.
(for itself and on behalf of each of the
Debtors)

By: /s/    Anastasia Kelly
Name: Anastasia Kelly, Esq.
Title: General Counsel

Counsel:

Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

    and

Alfredo R. Perez, Esq.

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Attorneys for Debtors and
Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
Attorneys for Reorganized Debtors
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Perez, Esq.
Adam P. Strochak, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------x

| In re | : | **Chapter 11 Case No.** |
| | : | |
| **WORLDCOM, INC., et al.** | : | **02-13533 (AJG)** |
| | : | |
| **Debtors** | : | **Jointly Administered** |
| | : | |

--------------------------------------------------------------x

### NOTICE OF REORGANIZED DEBTORS' OBJECTION TO PROOF OF CLAIM NO. 38365 FILED BY DEPARTMENT OF THE TREASURY

PLEASE TAKE NOTICE that a hearing (the "Hearing") to consider the Objection to

Proof of Claim No. 38365 filed by the Department of Treasury dated August 5, 2004 (the

"Objection") filed by MCI, Inc. and certain of its direct and indirect subsidiaries, as reorganized

debtors (collectively, "MCI" or the "Reorganized Debtors"), shall be held before the Honorable

Arthur J. Gonzalez, United States Bankruptcy Judge, in Room 523 of the United States

Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New

York 10004, on **August 31, 2004, at 10:00 a.m.** (New York Time), or as soon thereafter as

counsel may be heard (the "Hearing").

PLEASE TAKE FURTHER NOTICE that responses, if any, to the relief requested in the

Objection, must be in writing, conform to the Federal Rules of Bankruptcy Procedure and the

HO1:\296328\02\6CNC02!.DOC\81793.0004

Local Rules of the Bankruptcy Court, and be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (General Order M-242 and the User's Manual for the Electronic Case Filing System can be found at www.nysb.uscourts.gov, the official website for the Bankruptcy Court), by registered users of the Bankruptcy Court's case filing system, and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (.pdf), WordPerfect or any other Windows-based word processing format (with a hard copy delivered directly to Chambers) and shall be served in accordance with General Order M-242 upon (i) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153-0119, Attention: Marcia L. Goldstein and Lori R. Fife, Esq., and (ii) Weil, Gotshal & Manges LLP, 700 Louisiana, Suite 1600, Houston, Texas 77002, Attention: Alfredo R. Perez, Esq., so as to be received no later than **4:00 p.m. (New York Time), on August 26, 2004.**

Dated: August 5, 2004

/s/   *Sylvia M. Baker*
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153-0019
Telephone:  (212)310-8000
Facsimile:  (212)310-8007

and

Alfredo R. Pérez, Esq.

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas   77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

Attorneys for Reorganized Debtors

Hearing Date and Time: December 14, 2004 at 10:00 a.m. (New York City Time)
Objection Date and Time: December 9, 2004 at 4:00 p.m. (New York City Time)

WEIL, GOTSHAL & MANGES LLP
Attorneys For Reorganized Debtors
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Pérez, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
                                        :
**In re**                               :    **Chapter 11 Case No.**
                                        :
**WORLDCOM, INC., et al.,**             :    **02-13533 (AJG)**
                                        :
                                        :    **Jointly Administered**
              **Debtor.**               :
------------------------------------------------------------ x

## NOTICE OF ADJOURNMENT

PLEASE TAKE NOTICE that the hearing to consider the Reorganized

Debtors' Objection to Proof of Claim No. 38365 (Department of Treasury Administrative

Expense Claim), scheduled to be heard on August 31, 2004, at 10:00 a.m. (New York City

Time) has been adjourned to **December 14, 2004, at 10:00 a.m. (New York City Time)**.

The hearing will be held before Honorable Arthur J. Gonzalez, United States Bankruptcy

Judge, in Room 523 of the United States Bankruptcy Court for the Southern District of New

York, One Bowling Green, New York, New York.

PLEASE TAKE FURTHER NOTICE that responses or objections to the

Motion, if any, must be in writing, conform to the Federal Rules of Bankruptcy Procedure

and the Local Rules of the Bankruptcy Court, and be served in accordance with General

HO1:\256478\09\5HW#09!.DOC\81793.0004

Order M-242 upon (i) the Reorganized Debtors, MCI, Inc., 1133 19th Street, Washington,

D.C. 20036, Attention: Anastasia Kelly, Esq., General Counsel; (ii) Weil, Gotshal & Manges

LLP, 767 Fifth Avenue, New York, New York 10153, Attention: Marcia Goldstein, Esq.,

attorneys for the Reorganized Debtors; (iii) Weil, Gotshal & Manges LLP, 700 Louisiana,

Suite 1600, Houston, Texas 77002, Attention: Alfredo R. Pérez; attorneys for the

reorganized debtors; (iv) the Office of the United States Trustee for the Southern District of

New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attention: Mary

Elizabeth Tom, Esq.; (v) Akin Gump Strauss Hauer & Feld, LLP, 590 Madison Avenue,

New York, New York 10022, Attention: Daniel Golden, Esq., attorneys for the statutory

committee of unsecured creditors; (vi) Kirkpatrick & Lockhart LLP, 1800 Massachusetts

Avenue, Washington, DC 20036, Attention: Richard Thornburgh, Esq., attorneys for the

examiner; (vii) Shearman & Sterling, 599 Lexington Avenue, New York, New York 10022,

Attention: Douglas Bartner, Esq. and Marc B Hankin, Esq., attorneys for the Debtors'

postpetition lenders, and (viii) United States Attorney's Office, Southern District of New

York, 100 Church Street, 19th Floor, New York, New York, Attention: Dana Drori, Esq.,

and must be filed with the Clerk of the United States Bankruptcy Court for the Southern

District of New York, in each case so as to be received no later than **December 9, 2004 at**

**4:00 p.m.** New York City Time.

Dated: New York, New York
August 18, 2004

/s/ Alfredo R. Pérez
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York   10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

and

Alfredo R. Perez, Esq.

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas   77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Attorneys for Reorganized Debtors

Status Conference Date and Time: August 9, 2005 at 10:00 a.m. (New York City Time)

WEIL, GOTSHAL & MANGES LLP
Attorneys For Reorganized Debtors
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Pérez, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                              :
**In re**                                            :    **Chapter 11 Case No.**
                                                              :
**WORLDCOM, INC., et al.,**                :    **02-13533 (AJG)**
                                                              :
                                                              :    **Jointly Administered**
                    **Debtor.**                      :
-------------------------------------------------------------- x

### NOTICE OF ADJOURNMENT

PLEASE TAKE NOTICE that the hearing to consider the Reorganized

Debtors' Objection to Proof of Claim No. 38365 (Department of Treasury Administrative

Expense Claims) [docket no. 12235], (the "Objection") scheduled to be heard on February

15, 2005, at 10:00 a.m. (New York City Time) has been adjourned to **August 9, 2005, at**

**10:00 a.m. (New York City Time).** By agreement of the Parties, a status conference on the

Objection will be held at the above time before Honorable Arthur J. Gonzalez, United States

Bankruptcy Judge, in Room 523 of the United States Bankruptcy Court for the Southern

District of New York, One Bowling Green, New York, New York.

Dated: New York, New York
        February 11, 2005

                        */s/  Alfredo R. Pérez*
                        Marcia L. Goldstein, Esq. (MG 2606)
                        Lori R. Fife, Esq. (LF 2839)

                        WEIL, GOTSHAL & MANGES LLP
                        767 Fifth Avenue
                        New York, New York   10153-0119
                        Telephone:  (212) 310-8000
                        Facsimile:  (212) 310-8007

                                and

                        Alfredo R. Pérez, Esq.

                        WEIL, GOTSHAL & MANGES LLP
                        700 Louisiana, Suite 1600
                        Houston, Texas   77002
                        Telephone:  (713) 546-5000
                        Facsimile:  (713) 224-9511

                        Attorneys for Reorganized Debtors

DAVID N. KELLEY
United States Attorney
Southern District of New York
By: DANNA DRORI (DD-7690)
     NICOLE GUERON (NG-7682)
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2699
Facsimile: (212) 637-2686

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:                                    :    CHAPTER 11

WORLDCOM, INC., et al.,                   :    Case No. 02-13533 (AJG)

          Debtors.                        :    (Jointly Administered)
-------------------------------------------------------X

## INTERNAL REVENUE SERVICE'S
## WITHDRAWAL OF PROOF OF CLAIM # 37947

TO THE HONORABLE ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE:

          The Internal Revenue Service (the "IRS"), by and through its undersigned counsel,

withdraws the following proof of claim:

•          Claim No. 37947, dated February 25, 2004, in the amount of $19,077,092.19.


          This withdrawal in no way affects, and the IRS hereby expressly reserves, all rights to

recover under Claim No. 38365, dated June 28, 2004 and filed on or about July 2, 2004, in the

amount of $16,276,440.81 (inclusive of interest and penalties computed through July 9, 2004),

which the IRS filed as Amendment No. 1 to its prior proof of claim, Claim No. 37947.

Dated: New York, New York
      June 21, 2005

                            DAVID N. KELLEY
                            United States Attorney for the
                            Southern District of New York
                            Attorney for the Internal Revenue Service

By:    /s/ Nicole Gueron_____
        DANNA DRORI (DD-7690)
        NICOLE GUERON (NG-7682)
        Assistant United States Attorneys
        86 Chambers Street, 3rd Floor
        New York, New York 10007
        Telephone: (212) 637-2699
        Facsimile: (212) 637-2686

MICHAEL J. GARCIA
United States Attorney
Southern District of New York
By:    DANNA DRORI (DD-7690)
        NICOLE GUERON (NG-7682)
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York  10007
Telephone: (212) 637-2689, 637-2699
Facsimile: (212) 637-2686

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

In re:                                              :          CHAPTER 11
                                                    :
WORLDCOM, INC., et al.,                             :          Case No. 02-13533 (AJG)
                                                    :
        Debtors.                                    :          (Jointly Administered)

-------------------------------------------------------X

### NOTICE REGARDING REPLY OF THE UNITED STATES OF AMERICA TO REORGANIZED DEBTORS' OBJECTION TO IRS REQUEST FOR PAYMENT NO. 38365

1.      This document provides notice that, on September 27, 2005, the Government

served the Reply of the United States of America to Reorganized Debtors' Objection to IRS

Request for Payment No. 38365 (the "Reply") on Debtors and the Court, along with the

declarations of Assistant United States Attorney Nicole Guéron and Dr. Michael Hills, and

exhibits attached thereto.

2.      The Government did not file the Reply, declarations or exhibits with the Court

either electronically or by hand, because these documents quote at length from information

designated as confidential by Debtors.

3.      The Government will electronically file the Reply, declarations and exhibits with

Page 1 of 2

the Court on Monday, October 3, 2005, unless the Debtors move for a protective order prior to

that date.

Dated: New York, New York
September 27, 2005

                                /s/ Nicole Guéron
                              NICOLE GUERON (NG-7682)
                              Assistant United States Attorney

WEIL, GOTSHAL & MANGES LLP
Attorneys For Reorganized Debtors
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Pérez, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x
                                       :

**In re**                                :     **Chapter 11 Case No.**
                                         :

**WORLDCOM, INC., et al.,**          :     **02-13533 (AJG)**
                                         :

                                         :     **Jointly Administered**

              **Debtor.**              :
------------------------------------------------------------- x

## NOTICE OF ADJOURNMENT

PLEASE TAKE NOTICE that the hearing to consider the Reorganized

Debtors' Objection to Proof of Claim No. 38365 (Department of Treasury Administrative

Expense Claims) [docket no. 12235], (the "Objection") scheduled to be heard on September

27, 2005, at 10:00 a.m. (New York City Time) has been adjourned to **January 31, 2006, at**

**10:00 a.m. (New York City Time).** By agreement of the Parties, an evidentiary hearing on

the Objection will be held at the above time before Honorable Arthur J. Gonzalez, United

States Bankruptcy Judge, in Room 523 of the United States Bankruptcy Court for the

Southern District of New York, One Bowling Green, New York, New York.

Dated: New York, New York
       October 14, 2005

                              /s/ Alfredo R. Pérez
                              Marcia L. Goldstein, Esq. (MG 2606)
                              Lori R. Fife, Esq. (LF 2839)

                              WEIL, GOTSHAL & MANGES LLP
                              767 Fifth Avenue
                              New York, New York  10153-0119
                              Telephone:  (212) 310-8000
                              Facsimile:  (212) 310-8007

                                        and

                              Alfredo R. Pérez, Esq.

                              WEIL, GOTSHAL & MANGES LLP
                              700 Louisiana, Suite 1600
                              Houston, Texas  77002
                              Telephone:  (713) 546-5000
                              Facsimile:  (713) 224-9511

                              Attorneys for Reorganized Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x
In re                                          :        **Chapter 11 Case No.**
                                               :
**WORLDCOM, INC., et al.**                     :        **02-13533 (AJG)**
                                               :        **Jointly Administered**
            **Reorganized Debtors**            :
                                               :
------------------------------------------------x

## SCHEDULING ORDER REGARDING THE REORGANIZED DEBTORS' OBJECTION TO PROOF OF CLAIM NO. 38365 (DEPARTMENT OF TREASURY ADMINISTRATIVE EXPENSE CLAIM)

## RECITALS

A.      On July 2, 2004, the Internal Revenue Service ("IRS") of the United States of America filed claim number 38365 (the "Claim") requesting payment of federal communications excise taxes imposed by section 4251 of the Internal Revenue Code.

B.      On August 5, 2004, the Reorganized Debtors filed their Objection to Proof of Claim No. 38365 (the "Objection") (Docket No. 12235).

C.      On October 5, 2005, this Court entered a protective order pursuant to section 107(b)(1) of the Bankruptcy Code and Rule 9018 of the Federal Rules of Bankruptcy Procedure (Docket No. 17290) that directed the IRS to file any response to the Objection under seal in order to protect certain confidential commercial documents related to the Objection (the "Confidential Documents").

D.      On November 2, 2005, the IRS filed its Reply to the Objection under seal (the "Reply") (Docket No. 17489).

E.      On December 19, 2005, the Reorganized Debtors filed their Response to the IRS's Reply under seal (Docket No. 17743).

HO1:\326100\05\6ZMC05!.DOC\81793.0023

575

F.      A hearing to consider the relief requested in the Objection is currently scheduled on January 31, 2006, at 10:00 a.m. (New York City Time).

G.      On January 12, 2006, the Court held a telephonic status conference on the Objection during which the Court considered the parties' proposals with respect to (i) the scheduling of the hearing on the Objection, (ii) the scope of matters to be considered during that hearing, and (iii) the treatment of Confidential Documents during that hearing. The Reorganized Debtors also indicated to the Court that they intend to file a motion under 11 U.S.C. § 505 for a determination of their right to a refund of federal excise taxes paid in connection with the services described in the Objection and that they would request consolidation of that motion with the Objection.

H.      At the conclusion of that status conference, the Court requested that the parties submit a proposed order for the Court's consideration.

NOW, THEREFORE, in consideration of the forgoing, the Reorganized Debtors and the United States of America, by their undersigned counsel, stipulate and agree as follows, subject to approval by the Court:

1.      An evidentiary hearing to consider the relief requested in the Objection shall be held before Honorable Arthur J. Gonzalez, United States Bankruptcy Judge, in Room 523 of the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York, 10004, on February 1, 2006, at 10:00 a.m. (New York City Time) (the "Hearing").

2.      The evidence and argument presented by the parties at the Hearing shall be considered by the Court for purposes of determining whether the Reorganized Debtors are liable for federal excise tax under section 4251 *et seq.* of the Internal Revenue Code in

connection with their purchase of the services described in the Objection and the other pleadings related thereto. The parties' respective rights regarding the amount, if any, of such tax shall be reserved for further consideration by the Court at a later date.

      3.      To the extent that any exhibits offered at the Hearing are Confidential Documents, and consistent with the Court's prior protective order, such evidence shall be offered and/or admitted into evidence under the following rules: the parties shall (a) offer such exhibits for *in camera* review only and such exhibits shall not be made available to the general public; (b) counsel and testifying witnesses for the parties shall not refer to the name of any counter-party to Confidential Documents; and (c) counsel and testifying witnesses for the parties shall refer to Confidential Documents by exhibit number only. Except as otherwise provided herein, nothing in this Order shall be construed to prevent any party from offering any evidence, whether or not such evidence relates to or is contained in a Confidential Document.

**[Remainder of page intentionally left blank]**

4.      In accordance with Local Bankruptcy Rule 7052-1, the parties shall each

submit proposed findings of fact and conclusions of law within fifteen (15) days after receipt of

the Hearing transcript.

By: _/s/  Alfredo R. Pérez_

Marcia L. Goldstein, Esq. (MG 2606)

Lori R. Fife, Esq. (LF 2839)

WEIL, GOTSHAL & MANGES LLP

767 Fifth Avenue

New York, NY  10153-0119

Telephone: (212) 310-8000

Facsimile: (212) 310-8007

and

Alfredo R. Pérez, Esq.

WEIL, GOTSHAL & MANGES LLP

700 Louisiana, Suite 1600

Houston, TX  77002

Telephone: (713) 546-5000

Facsimile: (713) 224-9511

Attorneys for Debtors and
  Reorganized Debtors

By: _/s/  Nicole Gueron_

Nicole Gueron (NG-7682)

Danna Drori (DD-7690)

Assistant United States Attorneys

MICHAEL J. GARCIA

United States Attorney for the Southern District

of New York

86 Chambers Street, 3rd Floor

New York, NY 10007

Telephone: (212) 637-2699, 637-2689

Telecopier: (212) 637-2686

Attorneys for the United States of America,

Internal Revenue Service

IT IS SO ORDERED.

Dated:  New York, New York
          January 31, 2006

                         **s/Arthur J. Gonzalez**
                         HONORABLE ARTHUR J. GONZALEZ
                         UNITED STATES BANKRUPTCY JUDGE

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

In re                            :       **Chapter 11 Case No.**

                                :

**WORLDCOM, INC., et al.**        :       **02-13533 (AJG)**

                                :       **Jointly Administered**

          **Reorganized Debtors**     :

                                :

------------------------------------------------------------------x

## AMENDED SCHEDULING ORDER REGARDING THE REORGANIZED DEBTORS' OBJECTION TO PROOF OF CLAIM NO. 38365 (DEPARTMENT OF TREASURY ADMINISTRATIVE EXPENSE CLAIM)

## RECITALS

A.     On July 2, 2004, the Internal Revenue Service ("IRS") of the United States of America filed claim number 38365 (the "Claim") requesting payment of federal communications excise taxes imposed by section 4251 of the Internal Revenue Code.

B.     On August 5, 2004, the Reorganized Debtors filed their Objection to Proof of Claim No. 38365 (the "Objection") (Docket No. 12235).

C.     On October 5, 2005, this Court entered a protective order pursuant to section 107(b)(1) of the Bankruptcy Code and Rule 9018 of the Federal Rules of Bankruptcy Procedure (Docket No. 17290) that directed the IRS to file any response to the Objection under seal in order to protect certain confidential commercial documents related to the Objection (the "Confidential Documents").

D.     On November 2, 2005, the IRS filed its Reply to the Objection under seal (the "Reply") (Docket No. 17489).

E.     On December 19, 2005, the Reorganized Debtors filed their Response to the IRS's Reply under seal (Docket No. 17743).

HO1:\327712\04\70V404!.DOC\81793.0023

F.     On January 26, 2006, the IRS filed its Surreply to the Reorganized Debtors' Objection to IRS Request for Payment No. 38365 (Docket No. 17864).

G.     On January 31, 2006, the Court entered a Scheduling Order regarding the Reorganized Debtors' Objection (Docket No. 17873) (the "Initial Scheduling Order").   Pursuant to the Initial Scheduling Order, the hearing on the Objection commenced on February 1, 2006 (the "Hearing").

H.     On February 1, 2006, the Reorganized Debtors filed their Motion for (I) A Determination of Refund Rights Pursuant to Section 505(a) of the Bankruptcy Code and (II) Consolidation of that Determination with the Reorganized Debtors' Objection to Proof of Claim No. 38365 (Department of Treasury Administrative Expense Claim) Pursuant to Section 105 of the Bankruptcy Code and Rules 9014 and 7042 of the Federal Rules of Bankruptcy Procedure (Docket No. 17945) (the "Refund Motion").

I.     At the conclusion of the evidence presented at the Hearing, the Court requested that the parties submit proposed findings of fact and conclusions of law for the Court's consideration prior to giving closing arguments.

J.     On February 15, 2006, the Parties received the transcript of the Hearing.

NOW, THEREFORE, in consideration of the forgoing, the Reorganized Debtors and the United States of America, by their undersigned counsel, stipulate and agree as follows, subject to approval by the Court:

1.     In accordance with Local Bankruptcy Rule 7052-1, the parties shall each submit proposed findings of fact and conclusions of law by 6 p.m. (New York City Time) on March 27, 2006.

2.    The Hearing on the Objection is hereby adjourned to April 11, 2006, at 10:00 a.m. (New York City Time), and shall be held before Honorable Arthur J. Gonzalez, United States Bankruptcy Judge, in Room 523 of the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York, 10004.    At that time, the Court shall hear the parties' closing arguments regarding the Objection and shall also consider the Reorganized Debtors' request for consolidation as set forth in the Refund Motion.

3.    Except as otherwise provided in this Order, the provisions of the Court's Initial Scheduling Order shall remain in full force and effect.

By:  _/s/  Alfredo R. Pérez_____
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY   10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

          and

Alfredo R. Pérez, Esq.

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX   77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Attorneys for Debtors and
  Reorganized Debtors

IT IS SO ORDERED.

Dated: New York, New York
          March 27, 2006

By:  __/s  /Nicole Gueron_____
Nicole Gueron (NG-7682)
Danna Drori (DD-7690)
Assistant United States Attorneys

MICHAEL J. GARCIA
United States Attorney for the Southern District of New York
86 Chambers Street, 3rd Floor
New York, NY 10007
Telephone: (212) 637-2699, 637-2689
Telecopier: (212) 637-2686

Attorneys for the United States of America, Internal Revenue Service

          s/Arthur J. Gonzalez
          HONORABLE ARTHUR J. GONZALEZ
          UNITED STATES BANKRUPTCY JUDGE

581

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------X

In re:                              :

                                       In Proceedings For A
                                    :  Reorganization Under
Worldcom, Inc., et al.                 Chapter 11
                                       Case No: 02-13533 (AJG)



                                    :
            Debtor.
                                    :
-----------------------------------X

## CONFIDENTIAL - SUBJECT TO BANKRUPTCY COURT ORDER

THE MATERIAL HEREIN HAS BEEN FILED UNDER SEAL PURSUANT TO AN
ORDER OF THE BANKRUPTCY COURT DIRECTING THE CLERK TO FILE SUCH
MATERIAL UNDER SEAL.


Transcript of Hearing Held on April 11, 2006 9:04 a.m. filed by
J&J Court Transcribers, Inc.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
In re                                          :
                                               :        **Chapter 11 Case No.**
**WORLDCOM, INC., et al.,**                    :        **02-13533  (AJG)**
                                               :
                                               :        **(Jointly Administered)**
              **Reorganized  Debtors.**        :
--------------------------------------------------------------x

### ORDER GRANTING REORGANIZED DEBTORS' OBJECTION
### TO PROOF OF CLAIM NO. 38365 AND
### MOTION FOR A DETERMINATION OF REFUND RIGHTS
### PURSUANT TO SECTION 505(a)(1) OF THE BANKRUPTCY CODE

Upon consideration of (1) the Reorganized Debtors' Objection to Proof of Claim

No. 38365 (Department of Treasury Administrative Expense Claim), dated August 5, 2004

(Docket No. 12235, the "Objection"), and (2) the Reorganized Debtors' Motion, dated January

31, 2006, for a Determination of Refund Rights Pursuant to Section 505(a) of the Bankruptcy

Code and for Consolidation of that Determination with the Objection Pursuant to Section 105 of

the Bankruptcy Code and Rules 9014 and 7042 of the Federal Rules of Bankruptcy Procedure

(Docket No. 17945, the "Refund Motion"),[1] the Court finds that, as stated on the record at a

hearing on April 11, 2006, the IRS does not oppose the Reorganized Debtors' request for

consolidation of the Objection with the Refund Motion, and the Court further finds that the

Objection and the Refund Motion should be granted for the reasons set forth in the Court's

Opinion Granting the Reorganized Debtors' Objection to Proof of Claim No. 38365 and Motion

for a Determination of Refund Rights Pursuant to Section 505(a)(1) of the Bankruptcy Code,

dated June 1, 2007.[2]  Accordingly, the Court hereby ORDERS that:

---

[1]  References herein to the "Reorganized Debtors" shall also include their predecessors in interest that were debtors in these chapter 11 cases.

[2]  Capitalized terms that are used herein, but not defined, have the meanings ascribed to them in the Court's Opinion.

HO1:\349381\02\7HL102!.DOC\81793.0023

583

      1.     The Refund Motion is hereby consolidated with the Objection pursuant to Rules 7042 and 9014 of the Federal Rules of Bankruptcy Procedure.

      2.     The Reorganized Debtors' Objection is hereby granted, and Proofs of Claim Nos. 37947 and 38365 are hereby disallowed and expunged.

      3.     The Reorganized Debtors' Refund Motion is hereby granted. Accordingly, the IRS shall refund all Telecommunications Excise Tax paid by the Reorganized Debtors for purchases of COBRA services[3] to the extent that such tax was paid during the period beginning July 1, 1998, and ending December 31, 2004.

      4.     Unless otherwise ordered by the Court, within 90 days after entry of this Order the Reorganized Debtors shall file and serve an affidavit setting forth the specific amount of the refund due to the Reorganized Debtors (the "Tax Refund"). The United States shall have 60 days to object to the amount of the Tax Refund. If no objection is filed, the Court will enter an order directing the IRS to pay the Tax Refund to the Reorganized Debtors, plus interest provided by law until the Reorganized Debtors receive payment in full from the United States. If an objection is filed, a hearing on the amount of the Tax Refund will be held upon notice to the United States.

      5.     The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York for the filing of a memorandum of law is waived with respect to the Objection and the Refund Motion.

      New York, New York
      June 27, 2007

                            **s/Arthur J. Gonzalez**
                            Honorable Arthur J. Gonzalez
                            United States Bankruptcy Judge

---

[3]  For ease of reference, the term COBRA services is used herein to refer generically to central office based remote access services described in the Objection and the Refund Motion, regardless of whether the vendor of such services may have used another name for the service in the operative agreement between the parties.

WEIL, GOTSHAL & MANGES LLP
Attorneys for Reorganized Debtors
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Pérez, Esq. (AP 3629)

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
**In re**                                      :
                                               :    **Chapter 11**
**WORLDCOM, INC., et al.,**                    :
                                               :    **Case No. 02-13533 (AJG)**
                                               :
            **Reorganized Debtors.**           :    **(Jointly Administered)**
-----------------------------------------------------------x

## NOTICE OF FILING

PLEASE TAKE NOTICE that, pursuant to Local Rule 8007-1(a) of the

United States Bankruptcy Court for the Southern District of New York, on July 23, 2007,

Verizon Business Global LLC (successor by merger of reorganized debtor WorldCom,

Inc.), and certain of its direct and indirect subsidiaries (collectively, the "Reorganized

Debtors"), filed the following items with the Bankruptcy Court:

   A. Demonstrative charts from the hearing before the Bankruptcy Court on April
      11, 2006.

HO1-\350249\01\7$9501!.DOC\81793.0023

PLEASE TAKE FURTHER NOTICE that a copy of the document referenced above is annexed as Exhibit A.

Dated: Houston, Texas
July 23, 2007

Respectfully submitted,

_/s/ Alfredo R. Pérez_
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
            and
Alfredo R. Pérez, Esq. (AP 3629)
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Attorneys for the Reorganized Debtors

# Exhibit A

## The Issue

**Are the Reorganized Debtors required to pay
the federal excise tax on "local telephone service"
when they purchase COBRA (central office based
remote access) service?**

1

# 26 U.S.C. Sec. 4251

(A) Tax imposed

    1)   In general

        There is hereby imposed on amounts paid for communications services a tax equal to the applicable percentage of amounts so paid.

    2)   Payment of tax

        The tax imposed by this section shall be paid by the person paying for such services.

(B) Definitions

    For purposes of subsection (a) —

    1)   Communications services

        The term "communications services" means—

        (A) local telephone service;

        (B) toll telephone service;

        (C) teletypewriter exchange service.

    2)   Applicable percentage

        The term "applicable percentage" means 3 percent.

2

# 26 U.S.C. Sec. 4252 (a)

**Local telephone service means—**

**(1) the access to a local telephone system, and the _privilege_ of _telephonic quality communication with_ substantially all persons having _telephone or radio telephone stations_ constituting a part of such local telephone system, and (2) any facility or service provided in connection with a service described in paragraph (1).**

**The term 'local telephone service' does not include any service which is a . . . _'private communication service.'_**

3

590

# Commonly Accepted Meaning

### IRS Position Five Years After The 1965 Act

**In 1970, the IRS agreed that the term "local telephone service" in section 4252(a) is to be given its "commonly accepted and understood meaning—the right to use a telephone which is part of a telephone system and to communicate thereby with other persons having telephones which are part of this system."**

***Agron v. Illinois Bell Tel. Co.*, 319 F. Supp. 418, 420 (D. Ill. 1970).**

4

# Commonly Accepted Meaning

## IRS Position Forty Years After The 1965 Act

". . . a traditional telephone is irrelevant to the excise tax analysis."  Surreply, at Part III, p. 9.

Although the IRS may want to rewrite the statute, that task lies with Congress.

5

# Statutory Interpretation

*Statutory Interpretation*

- Presume that the legislature says in a statute what it means and means in a statute what it says there. *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249 (1992)

- Analysis begins and ends with language of statute, if it is unambiguous. *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328 (11th Cir. 2005)

- Give words their ordinary and plain meaning. *Id.*

- If definition declares what a term "means", that meaning excludes anything not stated. *Colautti v. Franklin*, 439 U.S. 379 (1979).

- If federal tax involved, language used by legislature should not be extended by implication to reach other matters. *America Online v. United States*, 64 Fed. Cl. 571 (2005).

- Any doubt regarding construction of tax statute should be resolved in favor of taxpayer. Hassett v. Welch, 303 U.S. 303 (1938); *Trans-Lux Corp. v. United States*, 696 F.2d 963 (Fed. Cir. 1982); *Western Elec. Co. v. United States*, 564 F.2d 53, 66 (Ct. Cl. 1977).

6

# Statutory Interpretation

## Statutory Interpretation

Most instructive is language from the Supreme Court and a recent opinion by Judge Koeltl in the Southern District of New York:

"What the government asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted . . . may be included within its scope. To supply omissions transcends the judicial function." *Iselin v. United States*, 270 U.S. 245, 251 (1926) (tax on tickets).

Judge Koeltl recently reiterated these reservations when he rejected the IRS's attempt to unilaterally update the definition of toll telephone service in section 4252(b): "This case does not even involve a drafting error; it involves a disconnect between a forty-year old tax scheme and recent innovations in the telecommunications industry. It is plainly Congress's responsibility to decide whether to revise the statute to accommodate such developments." *Fortis v. United States*, No. 03 Civ. 5137 (JGK), 2004 WL 2085528 at *9, (S.D.N.Y. Sept. 16, 2004).

7

# Elements Of The Tax



## The 1965 Telephone Excise Tax

- Privilege
- Of Telephonic Quality (Voice) Communications
- With All Or Substantially All Persons Having A Telephone
- Not A Private Communication Service

8

# Elements Of The Tax

## Without any *one* of these elements, the IRS Claim collapses.



9

# Who is the Purchaser?

**You have to view the statute from the perspective of the <u>purchaser</u> of the services.**

**"The tax imposed by this section shall be paid by the person paying for such services."  4251(a)(2).**

10

597

# COBRA Service

*An antiquated Internet data service—Trial Ex. 2*



## <u>What Did The Reorganized Debtors Purchase</u>

- **COBRA service "aggregates dial-up data and puts it into an internet protocol and hands it off to MCI as a high-speed datastream. . . . It is high-speed data, IP or TCP/IP, which is basically known as your internet data." John Anderson (Tran. 66:10-14, 67:23-25)**

11

598

# COBRA Service

*An antiquated Internet data service—Trial Ex. 2*



Telephone Line
- TDM protocols and TDM switches
- Dial-up user purchases telephone line from LEC

NOT a Telephone Line
- TCP/IP protocol
- No dial tone
- High-speed data line
- Not capable of being used to originate or receive calls to or from substantially all telephones in a local telephone system

12

599