UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 Case No. |
| WORLDCOM, INC., *et. al.*, | Case No. 02-13533 (AJG) |
| *Reorganized Debtors.* | (Jointly Administered) |
| INTERNAL REVENUE SERVICE, | |
| *Appellant,* | 07 CIV 7414 (BSJ) |
| v. | 08 CIV 3070 (BSJ) |
| WORLDCOM, INC., *et. al.*, | |
| *Appellees.* | |

## ANSWERING BRIEF FOR APPELLEES

Alfredo R. Pérez
James T. Grogan
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX  77002
(713) 546-5000

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*Attorneys for Appellees*

August 28, 2008

# TABLE OF CONTENTS

**Page**

Preliminary Statement ........................................................................................ 2

Jurisdiction ........................................................................................................ 5

Statement of Issues for Review ........................................................................ 5

Statement of the Case ...................................................................................... 6

Statement of Facts .......................................................................................... 10

    A.    COBRA Service Is A Separate And Distinct Data Aggregation And
        Conversion Service That Prepares And Transmits Internet Data In TCP/IP
        Protocol .............................................................................................. 10

    B.    COBRA Service Lacks Any Of The Functions Associated With Telephone
        Service ................................................................................................ 14

    C.    The Debtors Had Exclusive Use Of The Data Channels On The Network
        Access Server And Paid A Separate Charge For The Service ............ 17

Disposition in the Bankruptcy Court .............................................................. 17

Standard of Review .......................................................................................... 20

Argument .......................................................................................................... 20

I.    The Bankruptcy Court Correctly Held That The Debtors Did Not Purchase Local
    Telephone Service ...................................................................................... 22

    A.    COBRA Service Is Not A Local Telephone Service Because The Debtors
        Could Not Make A Telephone Call .................................................... 22

    B.    The Government Cannot Overcome The Plain Meaning Of The Statute
        With Secondary Sources, Legislative History, And Unpersuasive Revenue
        Rulings ................................................................................................ 25

II.   The Decision Below Should Be Affirmed Because The Debtors Did Not Purchase
    Access To A Local Telephone System .......................................................... 28

III.  The Decision Below Should Be Affirmed Because The Data Aggregation And
    Conversion Service The Debtors Actually Purchased Does Not Provide Voice-
    Quality Communication With People Who Have A Telephone ...................... 31

    A.    COBRA Service Is Not A Local Telephone Service Because It Did Not
        Provide Communications With People That Have Telephones .......... 32

    B.    Data Processing Services Like COBRA Are Not Taxable Because Data Is
        Different From Voice Communication And Substantially All Persons In
        Local Telephone Systems Use Telephones Not Data Processing
        Equipment .......................................................................................... 34

i

## TABLE OF CONTENTS
### (continued)

**Page**

    C.     The Debtors Can Only Be Taxed For The Service They Actually Purchased ....................................................................................................... 36

IV.    The Decision Below Should Be Affirmed Because The Debtors Purchased A Private Communication Service That Is Excluded From Taxation ............................... 39

Request for Oral Argument........................................................................................... 44

Conclusion ..................................................................................................................... 44

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Agron v. Illinois Bell Telegraph Co.*, 319 F. Supp. 418 (D. Ill. 1970) ..............................32

*America Bankers Insurance Group v. United States*,
    408 F.3d 1328 (11th Cir. 2005) ....................................39

*America Online, Inc. v. United States*, 64 Fed. Cl. 571 ....................................................26

*Bankers Life & Casualty Co. v. United States*, 142 F.3d 973 (7th Cir. 1998) ..................35

*Beneficial Found. v. United States*, 8 Ct. Cl. 639 (1985) ..................................................35

*Bogle-Assegai v. Connecticut*, 470 F.3d 498 (2d Cir. 2006) ............................................42

*Brown v. Glines*, 444 U.S. 348 (1980) ...............................................................................24

*Carmody v. ProNav Ship Management, Inc.*, 224 F.R.D. 111 (S.D.N.Y. 2004) ...............41

*Chapman v. The Higbee Co.*, 319 F.3d 825 (6th Cir. 2003) ..............................................26

*Chevron USA, Inc. v. Natural Resource Defense Council, Inc.*,
    467 U.S. 837 (1984) ....................................................27

*Ex parte Collett*, 337 U.S. 55 (1949) ................................................................................26

*Comcation, Inc. v. United States*, 78 Fed. Cl. 61 (2007) ..........................................2, 5, 43

*Comdata Network, Inc. v. United States*, 21 Cl. Ct. 128 (1990) ..............................2, 18, 33

*Connecticut National Bank v. Germain*, 503 U.S. 249 (1992) ..........................................32

*DuPont Glore Forgan Inc. v. AT&T*,
    437 F. Supp. 1104 (S.D.N.Y. 1977) ........................................22, 24, 28, 29

*Executive Jet Aviation v. United States*, 125 F.3d 1463 (Fed. Cir. 1997) .........................44

*Fortis, Inc. v. United States*, 447 F.3d 190 (2d Cir. 2006) ...............................................39

*Fortis, Inc. v. United States*, 420 F. Supp. 2d 166 (S.D.N.Y.) .......................22, 24, 27, 28

*Gaste v. Kaiserman*, 863 F.2d 1061 (2d Cir. 1988) ..........................................................41

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Gould v. Gould*, 245 U.S. 151 (1917) ................................................................26

*Greene v. United States*, 13 F.3d 577 (2d Cir. 1994) ..........................................42

*Hassett v. Welch*, 303 U.S. 303 (1938) ...............................................................26

*Industrial Union Department, AFL-CIO v. America Petroleum Institute*,
    448 U.S. 607 (1980) ......................................................................................24

*Estate of Kosow v. Commissioner*, 45 F.3d 1524 (11th Cir. 1995) .....................35

*Limited, Inc. v. Commissioner*, 286 F.3d 324 (6th Cir. 2002) ............................35

*In re Manville Forest Products Corp.*, 896 F.2d 1384 (2d Cir. 1990) ................20

*National R.R. Passenger Corp. v. United States*, 431 F.3d 374 (D.C. Cir. 2005) .............39

*Office Max, Inc. v. United States*, 428 F.3d 583 (6th Cir. 2005) ..................23, 39

*Perez v. MSPB*, 85 F.3d 591 (Fed. Cir. 1996) ....................................................25

*Estate of Rapp v. Commissioner*, 140 F.3d 1211 (9th Cir. 1998) .......................35

*Tesfamichael v. Gonzales*, 411 F.3d 169 (5th Cir. 2005) ...................................37

*Trans-Lux Corp. v. United States*, 696 F.2d 963 (Fed. Cir. 1982) .....................29

*United Dominion Industrial, Inc. v. United States*, 532 U.S. 822 (2001) ...........26

*United States v. Ron Pair Enterprise*, 489 U.S. 235 (1989) ...............................23

*USA Choice Internet Serv., LLC v. United States*, 73 Fed. Cl. 780 (2006) .......32

*USA Choice Internet Serv., LLC v. United States*,
    522 F.3d 1332 (Fed. Cir. 2008) ................................................................ *passim*

*Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202 (1997) ...............................37

*White v. United States*, 305 U.S. 281 (1938) ................................................26, 27

## TABLE OF AUTHORITIES
### (continued)

Page

*Wongco v. Federated Department Stores, Inc. (In re R.H. Macy & Co.),*
    283 B.R. 140 (S.D.N.Y. 2002).................................................................................20

*In re WorldCom, Inc.*, 371 B.R. 19 (Bankr. S.D.N.Y. 2007)................................... *passim*

*Xerox v. United States*, 41 F.3d 647 (Fed. Cir. 1994)........................................26

### FEDERAL STATUTES AND RULES

10 U.S.C. § 1034(a)(1)...........................................................................................24

15 U.S.C. §§ 1692-1692o ......................................................................................24

26 U.S.C. § 4251................................................................................... *passim*

26 U.S.C. § 4252................................................................................... *passim*

26 U.S.C. § 6304(a) ...............................................................................................24

28 U.S.C. § 158(a)(1).............................................................................................24

Fed. R. Evid. 103(a)(1) .........................................................................................42

### MISCELLANEOUS

Annabel Z. Dodd, The Essential Guide to Telecommunications (3d. ed. 2002) ...........3, 29

H.R. Rep. No. 433, 89th Cong., 1st Sess. 30 (1965) ........................................36

Michael I. Saltzman, IRS Practice and Procedures 3-33 (2d ed. 2008)............................35

Newton's Telecom Dictionary (19th ed. 2003) .................................................32

Notice 2006-50, 2006-25 I.R.B. 1141..................................................................39

Notice 2007-11, 2007-5 I.R.B. 405.......................................................................39

Rev. Proc. 89-14, § § 7.01(4), 7.01(5), 1989-1 C.B. 814 ...................................35

Rev. Rul. 78-437, 1978-2 C.B. 266 ......................................................................32

Rev. Rul. 79-245, 1979-2 C.B. 380 ........................................................ 2, 32-36, 38

## PRELIMINARY STATEMENT

This case boils down to whether a service that translates computer data into an Internet-compatible format can be taxed by the IRS as a "telephone" service even though subscribers to this service cannot make telephone calls, cannot receive telephone calls, and do not have a connection to a line to which a telephone can be connected.  The notion that such a data service can be deemed a "telephone" service is simply irrational and no court has ever held that such a service can be taxed as "telephone" service.  All applicable precedent establishes that taxpayers pay a "telephone" tax if and only if they purchase access to a telephone line that is capable of communications with other telephones, even if that taxpayer elects to use that the line for something other than connecting a telephone.[1]  The IRS's own revenue rulings dictate that the preparation of computer data for transmission is not taxable as a telephone service.[2]

A clear understanding of the specific service that the IRS seeks to tax as "telephone" service is necessary to understand the nature of this dispute.  The Debtors[3] built Internet networks and sold access to those networks to Internet service providers ("ISPs").  In the 1990s, local exchange carriers ("LECs") created and sold a now antiquated data-conversion service, called COBRA,[4] that allowed customers with phone service to access the Internet using a dial-up computer modem and an ISP account.  The LECs provided COBRA service through a network access server ("NAS") installed inside the LECs' central office and equipped with specialized

---

[1]    *USA Choice Internet Serv. LLC v. United States*, 522 F.3d 1332, 1341 (Fed. Cir. 2008) (holding that taxpayer purchased telephone line and use did not affect taxation); *Comcation, Inc. v. United States*, 78 Fed. Cl. 61, 65 (2007) (same); *Comdata Network, Inc. v. United States*, 21 Cl. Ct. 128, 130-31 (1990) (same); *see also* Rev. Rul. 79-245, 1979-2 C.B. 380 (stating that taxpayer could plug "in a regular telephone set, if it so chooses").

[2]    Rev. Rul. 79-245, 1979-2 C.B. 380 (amounts paid for data processing services were not taxable).

[3]    This brief adopts the same convention used in Appellant's opening brief and refers to WorldCom, Inc. and all its affiliates and successors in interest simply as "Debtors."

[4]    COBRA is an acronym for "central office based remote access."  The term COBRA is used to refer to all central office-based remote access services, even if the vendor used a different product name.

modem cards called digital signal processors ("DSPs").  When a LEC customer used a dial-up computer modem to send analog data over the telephone line, the LEC's NAS received that data and converted it so that it could be received and processed by the Debtors' Internet network.  The LECs' telephone networks relied on a time-division multiplexing (TDM) protocol, while the Debtors' Internet network (and computer systems generally) relied on transmission control protocol / Internet protocol ("TCP/IP").  The LEC converted a customer's data from TDM to TCP/IP and then transmitted the resulting high-speed data stream to the Debtors' Internet network through computer-networking equipment (a router or frame relay card) into which the Debtors connected.[5]  It is this connection to the LEC that Debtors purchased from LECs and that the IRS seeks to treat as "telephone" service for tax purposes.

The IRS seeks to ignore the fact that the Debtors, however, could neither make nor receive nor transmit a "telephone" call.  Both the text of the statute and its legislative history emphasize that it is the *service* that is taxed.[6]  The government argues however that "*what the debtors received from the COBRA services is irrelevant*."[7]  After suggesting that what the Debtors *actually* received is irrelevant, the government then argues that the Debtors *essentially* received services identical to those at issue in *USA Choice*.  The government ignores significant differences between the service and technology at issue in this case and the service found taxable in *USA Choice*.  Most importantly, the evidence in *USA Choice* led the Federal Circuit to conclude that the taxpayer purchased a telephone line and erected "self-imposed limitations" that

---

[5]     A high-speed data stream in Internet protocol consists of "packets," which are just bundles of data in binary form organized for transmission using certain protocols. ANNABEL Z. DODD, THE ESSENTIAL GUIDE TO TELECOMMUNICATIONS 316 (3d ed. 2002).  The transmission of packetized data is governed by the suite of standardized protocols called "TCP/IP."  Unlike telephony, the Internet does not require dedicated circuits or paths for the delivery of the packets.  These protocols were standardized during the late 1970s as a result of specifications developed during a Defense Advanced Research Agency research project. *Id.* at 317-18.

[6]     IRC § 4252(a)(1); H.R. Rep. No. 433, 89th Cong., 1st Sess. 30 (1965).

[7]     IRS Br. at 28.

prevented USA Choice from communicating with substantially all telephones in the system.[8] The Federal Circuit determined that USA Choice's decision to connect its telephone line to a modem "no more limited the underlying service's capabilities than would a subscriber's choice to connect a facsimile machine rather than a telephone to his or her telephone line."[9]

The evidence in this case, by contrast, demonstrates that the local exchange carriers – *and not the Debtors* - elected to connect LEC-owned modems to telephone lines. Thus, just like USA Choice did, and using LEC-owned modem systems and Internet routers, the LECs sold a service that creates and transmits Internet-data packets through Internet ports on the LECs' network access servers. The service purchased by the Debtors and delivered by the LECs was in no way akin to the service in *USA Choice* because it could not be used in any way to communicate with telephones. Nor was the decision of whether to have a telephone line that could receive and transmit telephone calls in the hands of the Debtors. The service that the Debtors received was not telephone service as that term is understood in the industry and as that term was understood in the *USA Choice* decision. As the facts in the *USA Choice* decision are inapposite to the current case, the government's reliance on the decision is misplaced.

The statute at issue uses the word "telephone" or "telephonic" six times in a single sentence, and expressly requires access to a telephone system and the ability to communicate telephonically with substantially all persons having telephones. After considering the data conversion service actually purchased by the Debtors, rather than hypothetical services also available to them or other services purchased by third parties, the bankruptcy court (Hon. Arthur J. Gonzalez) denied the government's efforts to tax a service with no telephone calls as a telephone service and granted the Debtors' request for a refund of taxes previously paid.

---

[8]     *USA Choice*, 522 F.3d at 1340-41.

[9]     *Id.* at 1341.

Throughout the proceedings below, the government contended that the COBRA *system* could be reconfigured to provide telephone service.[10]  At trial, the government made repeated claims that the Debtors *could have* purchased telephone service, but did not, and that the Debtors' "*decision*" not to replace COBRA equipment owned by the LECs and stored in the LECs' central offices amounted to a "self-imposed limitation" that should be legally disregarded.[11]  Finding these claims "almost limitless," the bankruptcy court declined the government's invitation to assess the Debtors' liability "on the basis of what the LECs could have offered but did not, or what the Debtors could have purchased but did not."[12]  Rather, the decision below concluded that the telephone tax applies only if the service "*as purchased*" has the capabilities associated with local telephone service.[13]

The bankruptcy court's analysis follows precedent from this District, comports with the plain meaning of the statute, and should be affirmed.

## JURISDICTION

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a)(1).

## STATEMENT OF ISSUES FOR REVIEW

### Counter-statement of Issues:

1.      Did the bankruptcy court correctly hold that the Debtors purchase a data aggregation and conversion service, not local telephone service?

2.      Did the bankruptcy court correctly hold that the Debtors' liability should be assessed based upon the service the Debtors purchased rather than other services that were never

---

[10]      *See, e.g.*, IRS Br. at 29, 35-36.

[11]      R S 1943, 1946-1947.  References to the record appear as "R" or "R S" followed by the pagination described in Appellant's opening brief.  Where applicable, the docket number below or the transcript designation is also supplied.

[12]      *In re WorldCom, Inc.*, 371 B.R. 19, 29 (Bankr. S.D.N.Y. 2007).

[13]      *Id.* at 27; *accord, Comcation,* 78 Fed. Cl. at 65.

purchased by the Debtors?

**Alternative Issues in Support of Affirmance:**

3.      Did the Debtors purchase access to a local telephone system even though they

lacked a connection to the local telephone system and could not even place a telephone call?

4.      Is COBRA service a private communication service because the Debtors (i)

purchased a distinct data aggregation and conversion service, (ii) had exclusive or priority use of

the channels on the network access server, and (iii) paid a separate charge for the service?

## STATEMENT OF THE CASE

UUNET Technologies, Inc. ("UUNET"), one of the Debtors, paid federal excise tax on

COBRA service and later filed refund claims with the IRS for taxes paid during the last two

quarters of 1998, and during all quarters of 1999 through 2004.[14]  The earliest of these claims

was pending before the IRS when, on July 21, 2002, UUNET and substantially all of its domestic

affiliates, including its corporate parent WorldCom, Inc., commenced cases under chapter 11 of

the Bankruptcy Code.

The IRS never rendered a final determination regarding UUNET's refund requests.

Instead, on July 2, 2004, the IRS filed a claim with the bankruptcy court (Claim No. 38365, the

"IRS Claim") seeking payment of $16,276,440.81 for postpetition excise taxes that the IRS

contended were owed by UUNET and payable as administrative expenses under section 503 of

the Bankruptcy Code.  On August 5, 2004, the Debtors filed an objection (the "Objection") to the

IRS Claim on the grounds that "UUNET's purchase of the COBRA services from LECs does not

fall within the applicable definitions of taxable communications services" as defined in sections

4251 and 4252 of the Internal Revenue Code ("IRC").[15]  The Debtors later filed a motion (the

---

[14]      R 73-109.

[15]      R 6 at ¶ 14.

"Refund Motion") pursuant to section 505 of the Bankruptcy Code seeking a judicial determination of the pending refund requests and requested consolidation of the Refund Motion with the Objection to the IRS Claim.[16]

In accordance with a scheduling order, dated January 31, 2006, the hearings on liability and damages were to be held separately.[17]  The bankruptcy court considered issues relating to liability for the excise tax at hearings held on February 1, 2006 and April 11, 2006.  The parties' respective rights regarding the amount of tax, if any, were reserved for consideration by the bankruptcy court at a later date.  During the April 11, 2006 hearing, the IRS consented to consolidation of the Objection with the Refund Motion.[18]

Many of the issues raised at trial were undisputed.  For example, the government conceded that (i) the LECs own all of the equipment, including any data lines and modem equipment, used to deliver COBRA service, (ii) COBRA service provides a high-speed datastream suitable only for communications over the Internet, and (iii) COBRA service lacks the common functions associated with telephone service, such as a dial tone, a line or jack to plug in a telephone, and the ability to make or to receive telephone calls.[19]  Despite the obvious differences between COBRA service and telephone service, the government presented four alternative arguments during the proceedings below in support of its position that COBRA services should be taxed as local telephone service.

First, the government argued that even though COBRA service provides the Debtors with Internet data instead of the ability to make or receive telephone calls, the service should

---

[16]     R 61 – 109 (Docket No. 17945)

[17]     R 575-577 at ¶ 2 (Docket No. 17873).

[18]     R S 1941 (D.18286, 4/11/2006 Hr'g Tr. at 23:6-17).

[19]     *In re WorldCom*, 371 B.R. at 24; R S 1128 – 29, 1136 (2/1/06 Tran. at 168:23 – 169:6, 197:5 – 199:8 (Hills)).

nonetheless be taxed because *Dial-up Users* have the "privilege of telephonic quality communications" through the use of their computer modems which connect to the *LECs'* network access servers in the COBRA system.[20]  The Debtors, in turn, contended that whether *Dial-up Users* and the *LECs* have the privilege of telephonic quality communications cannot form the basis for taxing the *Debtors* under IRC §§ 4251 and 4252 because the statute requires that the *Debtors* (*i.e.*, the person paying for COBRA service) must pay for the privilege of telephonic quality communication before the tax may be properly assessed.[21]  Here, the Debtors paid for data-conversion service on a per port basis.[22]  Thus, the Debtors contended that the government could not impute tax liability to the Debtors.

    Second, the government maintained that because the COBRA system is provided "in connection with a local telephone system," the Debtors' use of COBRA service is subject to taxation under IRC section 4252(a)(2).[23]  The Debtors, in turn, contended that the government misconstrued and misquoted the statute.  The statute does not state that a "facility or service provided in connection with *a local telephone system*" is subject to taxation.  Instead, it states that "a facility or service provided in connection with *a service described in paragraph (1)*," is subject to taxation and thus, liability under section 4252(a)(1) is a condition precedent to any liability under section 4252(a)(2).  Accordingly, the Debtors contended that because they did not purchase the service described in section 4252(a)(1), the provisions of section 4252(a)(2) did not apply to the facts of this case.

    Third, the government argued that the Debtors' inability to use traditional telephones

---

[20]    R S 981 (Docket No. 17864, at ¶ 3) (the "IRS Surreply").

[21]    *See* IRC § 4251(a)(2) (stating that the tax shall be paid *by the person paying for* a taxable communication service).

[22]    *In re WorldCom*, 371 B.R. at 24.

[23]    R S 981 (IRS Surreply at ¶ 3).

with COBRA service is "neither relevant nor material to the excise tax analysis."[24]  The

government reasoned that because precedent establishes that the telephone tax applies where a

taxpayer elects to connect modems to one another over a telephone line, the tax likewise applies

to COBRA service because, in the government's view, the Debtors have simply elected to

connect modems to one another through COBRA service.[25]  The Debtors, in turn, contended that

the government has misunderstood and misconstrued the factual setting, and therefore, the legal

significance of existing precedent, because the service purchased by the Debtors is completely

different from situations where a taxpayer elected to connect its telephone line to a modem.

     Fourth, the government argued that the nature of the services *actually purchased* by the

Debtors is irrelevant because, even if COBRA service is not subject to taxation, other services

that *could have been* purchased by the Debtors are subject to taxation.  Specifically, the

government suggested that even though the LECs did not configure their equipment in such a

way as to allow voice quality calls,[26] the COBRA system could be "*capable*" of such telephonic

quality communications (either through reconfiguration of the equipment used to deliver the

service, or through the use of computer-to-computer voice over Internet ("VOIP") technologies

that could be separately purchased by Dial-up Users), and thus the Debtors are subject to the

tax.[27]  The Debtors, in turn, argued below that (i) they do not have the privilege of dismantling

the LECs' equipment and facilities, (ii) the antiquated equipment used with COBRA service did

not operate at speeds that were capable of providing voice-quality VOIP communications, (iii)

the statute requires communications with "telephones," and (d) in any event, IRC section

---

[24]     R S 981, 988-90 (IRS Surreply  at ¶¶ 4, 28-36 (relying on Rev. Rul. 79-245)).

[25]     R S 24 (Docket No. 17489 at ¶ 40); R S 989 (IRS Surreply at ¶¶ 31-32 (citing Rev. Rul. 79-245, 1979-2 C.B. 380)).

[26]     R S 1136 (2/1/06 Tran. at 198:11 – 199:3 (Hills)).

[27]     R S 981, 990, 992-93, 995-97 (IRS Surreply at ¶ 5, 37, 43-46, 54-60).

4251(a)(1) requires taxation only where an entity has *actually purchased—not merely could have purchased*—local telephone service.[28]

Finally, the Debtors urged below that COBRA service should be excluded from taxation as a private communication service under IRC § 4252(d).[29]  In particular, the Debtors presented uncontroverted evidence that even if COBRA service provides the "privilege of telephonic quality communications," it is still not subject to taxation because the Debtors have exclusive or priority use of channels or groups of channels and are separately charged for COBRA service.

After the trial, the bankruptcy court issued an opinion that is published at *In re WorldCom, Inc.*, 371 B.R. 19 (Bankr. S.D.N.Y. 2007).  The bankruptcy court's decision concluded that the COBRA service purchased by the Debtors was not subject to federal excise tax.  An order followed which disallowed the IRS Claim and directed the Debtors to submit evidence regarding the amount of any refund due for taxes paid on account of COBRA service.[30]  After the Debtors submitted their evidence, the parties stipulated to the amount of the refund due, without prejudice to the right of appeal.[31]  The bankruptcy court approved the parties' stipulation and entered judgment for the Debtors in the amount of $25,158,939.00.[32]  This appeal ensued.

### STATEMENT OF FACTS

**A.    COBRA Service Is A Separate And Distinct Data Aggregation And Conversion Service That Prepares And Transmits Internet Data In TCP/IP Protocol**

There are two separate communication networks at issue in this case: (1) the global computer network that forms the Internet; and (2) the telephone network commonly known as

---

[28]    *See* IRC § 4251(a)(1), (b)(1) (imposing tax on "amounts paid for" . . . "local telephone service").

[29]    Contrary to the government's contention that this issue should be deemed waived, the Debtors properly raised this issue in the proceedings below.  *See infra* Argument Part IV.

[30]    R 286.

[31]    R 358-61.

[32]    R 358-61.

the public switched telephone network (the "PSTN").[33]  For purposes of this case, the Debtors

constructed and sold access to computer networks, not telephone networks.[34]  The Debtors sold

network access to ISPs who, in turn, sold access and information transit rights to their own

customers (the Dial-up Users) who access the Internet using dial-up computer modems.[35]

    In connection with these Internet operations, the Debtors paid local exchange carriers for

a data aggregation and conversion service known as central office based remote access

(COBRA) service.[36]  The bankruptcy court found that "COBRA service translates the audio

representations of data into the TCP/IP Internet protocol and then aggregates that digital data into

a high-speed data stream."[37]  COBRA service provides the Debtors with high-speed data in

Internet protocol, not telephone calls,[38] via either a frame relay or a router.[39]  The Debtors

connect their network equipment to the frame relay card or router and relay TCP/IP data packets

to ISPs over their Internet network.[40]

    In order to create and deliver high-speed data to the Debtors in TCP/IP format, the LECs

install a data processing machine called a network access server inside the LECs' central

offices.[41]  Each network access server contains several digital signal processor (DSP) cards that

aggregate and convert analog computer data exchanged between the Dial-up Users and the

---

[33]    *In re WorldCom*, 371 B.R. at 23-24.

[34]    *See id.* at 23.

[35]    *See id.*; *see also* R S 1154, 1156, 1693 (Trial Exs. 2 – 3, 20); R S 1101, 1103 (2/1/06 Tran. at 58:21 – 60:16, 66:18 – 67:20 (Anderson)).

[36]    *See WorldCom*, 371 B.R. at 24.

[37]    *In re WorldCom*, 371 B.R. at 27.

[38]    R S 1103 (2/1/06 Tran. at 66:8-17 (Anderson)); R S 1136 (2/1/06 Tran. at 197:5-10 (Hills)).

[39]    R S 1104 (2/1/06 Tran. at 70:7-18 (Anderson)).

[40]    *In re WorldCom*, 371 B.R. at 23; R S 1103-04 (2/1/06 Tran. at 66:8 – 67:25, 69:14 – 70:18 (Anderson)).

[41]    R S 1106 (2/1/06 Tran. at 77:9-79:6 (Anderson)).

LEC.[42]  Data from a Dial-up User's computer modem travels across the PSTN to the LEC's

switch in the LEC's central office.[43]  The LEC then sends the computer data from its switch to

the digital signal processors within the LEC's network access server using a primary rate

interface ("PRI") line.[44]  The LEC's network access server converts the analog dial-up data from

the Dial-up User's computer into data packets suitable for the Internet and transmits the packets

to the high-speed router or frame relay line card that the Debtors plug into.[45]  The Debtors'

connection point or interface for COBRA service lies at an egress port on the back end of the

network access server.[46]  The diagram below illustrates a COBRA system:[47]



A complete COBRA system will have 12 ingress lines and a minimum of 2 egress lines

connecting the Debtors to the LEC's router or frame relay line card at the back end of the

---

[42]    R S 1154, 1156 (Trial Exs. 2 – 3); R S 1921 – 1933 (Trial Ex. 32); R S 1103-04 (2/1/06 Tran. at 66:8 –
        67:25, 69:14 – 70:18 (Anderson)).

[43]    *In re WorldCom*, 371 B.R. at 24.

[44]    *In re WorldCom*, 371 B.R. at 24.

[45]    *In re WorldCom*, 371 B.R. at 24; R S 1154, 1156 (Trial Exs. 2 – 3); R S 1103 (2/1/06 Tran. at 66:15-67:20
        (Anderson)).

[46]    *In re WorldCom*, 371 B.R. at 24; R S 1154, 1156 (Trial Exs. 2 – 3); R S 1103 (2/1/06 Tran. at 66:15-67:20
        (Anderson)).

[47]    R S 1156 (Trial Ex. 3). COBRA service could utilize either Lucent or 3COM servers.

network access server.[48]  As shown in the diagram, the LEC's router or frame relay line card is the point of interface in the network from the network access server to the Debtors' Internet backbone network.  Ultimately, the LEC's data processing and conversion permits Internet access for a Dial-up User because, without this process, the time-division multiplexing (TDM) technology coming from the LECs' telephone network would be technologically incompatible with the TCP/IP protocols required for transmission on the Debtors' Internet network.[49]

The LECs owned all equipment used to deliver COBRA service.[50]  The equipment (including all network access servers and DSP cards) was located in the LECs' central offices and the Debtors did not have physical access to it.[51]  The demarcation point between equipment the LECs used to deliver COBRA services and the Debtors' network was at the connection (a router or frame relay line card) to the output port of the network access server.[52]  The Debtors had only remote access to the network access server using a high-speed point-to-point data private line.[53]

The Debtors had no authority or ability to make physical modifications to COBRA equipment.[54]  The Debtors' expert, Mr. Anderson, testified that such equipment "was behind central office's locked doors."[55]  Replacing the equipment that the LECs used to provide COBRA service with different system architecture would have fundamentally altered the

---

[48]   *In re WorldCom*, 371 B.R. at 24; R S 1154, 1156 (Trial Exs. 2 – 3); R S 1103 (2/1/06 Tran. at 66:15-67:20 (Anderson)).

[49]   R S 1106 (2/1/06 Tran. at 78:22-79:6 (Anderson)).

[50]   *See, e.g.*, R S  1898, 1921 (Trial Ex. 32); R S 1103, 1106-07 (2/1/06 Tran. at 68:2-5, 80:22 – 81:2, 82:24 – 83:4 (Anderson)).

[51]   R S 1154, 1156 (Trial Exs. 2 – 3); R S 1106 (2/1/06 Tran. at 77:9-20 (Anderson)).

[52]   *In re WorldCom*, 371 B.R. at 24.

[53]   *In re WorldCom*, 371 B.R. at 24.

[54]   R S 1154, 1156 (Trial Exs. 2 – 3); R S 1104 – 1109 (2/1/06 Tran. at 72:24 – 73:12, 76:2-13, 79:7 – 81:2, 82:16-23, 87:5-19, 92:2-6 (Anderson)).

[55]   R S 1106 (2/1/06 Tran. at 77:19-20 (Anderson)).

service.[56]

The Debtors purchased COBRA service from the LECs pursuant to written contracts ("COBRA Contracts").[57]    The COBRA Contracts specify, among other things, (i) the LECs' obligations in delivering COBRA service, (ii) the applicable charges for the service, (iii) the equipment that the LECs shall use in delivering the service, (iv) where the LECs will make the service available, and (v) the functions of the service.  COBRA service was "expected to be an integrated service offering wherein UUNET *purchases modem ports instead of circuits* from the LECs.  Billing [was] based upon the total number of active ports . . . ."[58]  UUNET purchased only COBRA service and *not* PRI services:  "the parties agree that UUNET will no longer be purchasing PRI Services from [vendor]."[59]  There is no evidence in the record that the Debtors paid the LECs for a PRI line service.

COBRA service is distinguishable from any of the services Dial-up Users purchased. The government's expert, Dr. Hills, confirmed that COBRA service does not include the Dial-up User's calls into the PSTN or the LECs' transmission of those communications.[60]  Dr. Hills also testified that the Dial-up Users, not the Debtors, pay for the telephone lines that LECs use to transmit communications between a Dial-up User and the LECs.[61]

**B.    COBRA Service Lacks Any Of The Functions Associated With Telephone Service**

As understood in the telecommunications industry, local telephone service allows the

---

[56]    R S 1107, 1115, 1119, 1128, 1136 (2/1/06 Tran. at 87:5-21, 116:13-15, 131:9-13, 166:9 – 167:18 (Anderson); 199:9-25 (Hills)).

[57]    R S 1715 – 1933 (Trial Exs. 27 – 32). The COBRA Contracts contain confidential and proprietary commercial information and were submitted for *in camera* review only at the Hearing.

[58]    R S 1921 (Trial Ex. 32) (emphasis added); *see also In re WorldCom*, 371 B.R. at 24; R S 1109, 1117 (2/1/06 Tran. at 91:18-25,124:14-21 (Anderson)).

[59]    R S 1904 (Trial Ex. 32); *see also* R S 1895 (defining PRI Service as an ISDN T1 circuit, colocation, and power, but the term "shall not include the modem and peripheral equipment").

[60]    R S 1133 (2/1/06 Tran. at 187:10-18 (Hills)).

[61]    R S 1133 (2/1/06 Tran. at 187:19-22 (Hills)).

subscriber to converse with other subscribers within a geographically-bounded area.[62]  The subscribers must be able to talk to each other if the service is to qualify as a local telephone service.[63]  The evidence at trial established that COBRA service lacks any of the functions commonly associated with local telephone service:[64]

- The Debtors cannot make or receive telephone calls using COBRA services;[65]

- The Debtors cannot plug a telephone into the COBRA system;[66]

- The antiquated equipment used to deliver COBRA services operates at speeds that fall below the minimum telecommunications thresholds required for telephonic-quality communications;[67]

- The antiquated equipment used to deliver COBRA service cannot answer telephone calls;[68]

- The output port of the network access server lacks a dial tone and the ingress circuits are direct inward dial only;[69]

- The PSTN uses completely different technology from that used on the Internet and thus the high-speed data in TCP/IP format received by the Debtors is incapable of communications over the public switched telephone network;[70] and

- The egress port of the network access server (where the Debtors connect) has different physical dimensions than a telephone connection.[71]

Furthermore, the COBRA platform is not capable of transmitting voice communications

---

[62]    R S 1105 (2/1/06 Tran. at 73:18-23 (Anderson)).

[63]    R S 1105 (2/1/06 Tran. at 73:18 – 74:3 (Anderson)).  The decision below notes that the phrase "telephonic quality communication" reflects the "quality of communication necessary to and present in a voice telephone call."  *In re WorldCom*, 371 B.R. at 26 n.4.

[64]    R S 1105 (2/1/06 Tran. at 74:13-15 (Anderson)).  Mr. Anderson's opinions were directed to local telephone service as it is commonly understood within the telecommunications industry.

[65]    R S 1105 (2/1/06 Tran. at 76:14-23 (Anderson)).

[66]    R S 1105, 1107 (2/1/06 Tran. at 75:21-25; 81:3-5, 18-19; 83:5-10 (Anderson)).

[67]    R S 1107-08 (2/1/06 Tran. at 83:11 – 87:4 (Anderson)); *In re WorldCom*, 371 B.R. at 27.

[68]    R S 1112 (2/1/06 Tran. at 103:9-15 (Anderson)).

[69]    R S 1109 (2/1/06 Tran. at 89:20 – 90:15 (Anderson)).

[70]    R S 1105 (2/1/06 Tran. at 78:18 – 79:6 (Anderson)).

[71]    R S 1107 (2/1/06 Tran. at 81:18 - 82:3 (Anderson)).

to or from *the Debtors* as is required for a telephonic quality communication.[72]  If a telephone user dialed a number associated with the local exchange carrier's network access server, the caller would hear unintelligible noise from the LECs' equipment until the LEC disconnected the circuit.[73]  Dr. Hills testimony verifies that *the Debtors* do not actually receive a telephonic quality communication with COBRA service because no "telephonic quality connection" exists beyond the *ingress* digital signal processor in the LEC's network access server and the Debtors connect to the *egress* port of the network access server at a router or frame relay connection.[74]

Dr. Hills also confirmed that COBRA service, as designed and provided by its vendors, has inherent barriers that prevent anyone from using that service to achieve telephonic communications with the Debtors:

> ➢ Question:  "Now, you don't dispute Mr. Anderson's statement that what [the Debtor] receives from the COBRA services is a high-speed datastream?"  Answer: "I agree with Mr. Anderson in that statement."[75]
>
> ➢ "I would agree with Mr. Anderson when he says that the COBRA equipment was not designed for a normal telephone user to dial up and access it . . . ."[76]
>
> ➢ "To call someone through the COBRA system requires a technology such as VOIP – PC to PC VOIP or something similar."[77]
>
> ➢ "Question: Was the service configured in a way that would allow voice quality calls?"  "Answer: The components within COBRA were, based on Mr. Anderson's testimony, weren't configured to do that."[78]

According to Dr. Hills, the COBRA system also prevented people from having open access to

---

[72]    R S 1105 (2/1/06 Tran. at 74:8-12 (Anderson)).

[73]    Dr. Hills admitted that if persons having telephones called a number associated with the COBRA system, they would hear "an annoying screech" and the COBRA equipment would disconnect the call.  R S 1128, 1111-12 (2/1/06 Tran. at 168:23 – 169:6; 100:20 – 103:15 (Hills)).

[74]    R S 1131 (2/1/06 Tran. at 177:7-17 (Hills)).

[75]    R S 1136 (2/1/06 Tran. at 197:5-10 (Hills)).

[76]    R S 1136 (2/1/06 Tran. at 197:24 – 198:6 (Hills)).

[77]    R S 1132 (2/1/06 Tran. at 182:12-18 (Hills)).

[78]    R S 1136-37 (2/1/06 Tran. at 198:19 – 199:3 (Hills)).

the Debtors' Internet networks if they used a modem: "they receive a screen from the [LEC's]

COBRA equipment asking for a password, and then that user name and password is sent to some

other system for validation."[79]  For all of these reasons, COBRA service did not provide the

Debtors with the ability to communicate with substantially all persons having telephones in a

local telephone system.[80]

**C.    The Debtors Had Exclusive Use Of The Data Channels**
       **On The Network Access Server And Paid A Separate Charge For The Service**

COBRA provides the Debtors with a "dedicated platform."[81]  At the Hearing, Mr.

Anderson testified that the network access server "converts the data that is coming from the end

user's PC to packets and aggregates it with other data and puts it on this high-speed connection

which [the Debtor] plugs into which is labeled 'frame relay.'"[82]  His testimony also reflected that

COBRA and the data channels on the network access server were dedicated to the Debtors'

exclusive use.[83]  The government did not controvert or rebut that evidence.  Further, the

government did not controvert or rebut Mr. Anderson's testimony that the Debtors are separately

charged each month for COBRA service.[84]

**DISPOSITION IN THE BANKRUPTCY COURT**

On June 1, 2007, the bankruptcy court granted the Debtors' Refund Motion and

disallowed the IRS Claim because the court determined that COBRA service did not provide the

Debtors with "the privilege of telephonic quality communication with substantially all telephone

or radio telephone stations," and therefore was not a taxable "local telephone service" for

---

[79]       R S 1137 (2/1/06 Tran. at 204:2-7 (Hills)).

[80]       R S 1108 (2/1/06 Tran. at 87:22 – 88:24 (Hills)).

[81]       R S 1921 (Trial Ex. 32).

[82]       R S 1103 (2/1/06 Tran. at 67:13-17 (Anderson, describing R S 1154 (Trial Ex. 2)).

[83]       R S 1109 (2/1/06 Tran. at 90:20 – 92:6 (Anderson)).

[84]       R S 1109, 1117 (2/1/06 Tran. at 91:18-25,124:14-21 (Anderson)).

Case 1:07-cv-07414-BSJ    Document 23    Filed 08/28/2008    Page 23 of 49

purposes of IRC §§ 4251 and 4252.  In reaching this conclusion, the court first determined that, while the statutory concept of privilege looks to the capability of a service rather than its actual use, any privilege so obtained "is limited to the capabilities of the service as purchased."[85]  Thus the court acknowledged the long-recognized "distinction between inherent limitations and voluntary limitations."[86]  Here, the bankruptcy court focused primarily on the undisputed fact that the ingress lines routing data to the LECs' network access servers did not allow for call origination because they were direct-inward dial lines, or DID lines.[87]

The court rejected the government's contention that such limitations should be considered "self imposed" – and therefore disregarded as the voluntary election of the taxpayer – for two reasons.  First, the court found that COBRA services were purchased "as a complete package."[88]  The court emphasized that the tax applies to amounts paid for a taxable service and thus the Debtors' liability could not be assessed on the basis of other potentially taxable services never purchased by the taxpayer.[89]  Second, the court flatly rejected the government's arguments regarding the technical capabilities of COBRA service.  Specifically, the government contended that COBRA service could be reconfigured to allow for telephonic quality communication – such as through the LECs' installation of new facilities and equipment – but the court declined the government's invitation to broaden the statutory concept of "privilege" beyond the capabilities of a service as sold by the vendor.[90]

With these core principles in mind, the court held that amounts paid for COBRA service,

---

[85]    *In re WorldCom*, 371 B.R. at 27.

[86]    *Id.* (citing *Comdata*, 21 Cl. Ct. at 131).

[87]    *Id.* at 28-29.

[88]    *Id.* at 29.

[89]    *See id.*

[90]    *See id.*

as it is configured by the LECs, do not entitle the Debtors to "the privilege of telephonic quality communication *with* substantially all telephone or radio telephone stations constituting a part of such local telephone system . . . ."[91]  The court reasoned that this holding comports with the language of the statute as a whole for two reasons.

First, the privilege described in section 4252(a) extends to telephonic quality communication *with* substantially all telephones in the local telephone system, while the privilege described in section 4252(b)(2) – defining a toll telephone service – extends to telephonic quality communications *to or from* all of the telephones outside the local service area. The court noted that Congress used language incorporating directionality into the privileges that are taxed.  Specifically, the privilege associated with toll service is satisfied by the ability to initiate calls "to" or receive calls "from" a distant service area, while local telephone service requires both privileges.[92]

Second, the court noted that a taxable privilege must include more than the mere presence of a telephonic quality communication because such communications already contemplate the two-way conversation inherent in a telephone call.  In order to give each provision of the statute meaning, the taxpayer must obtain the privilege of communications *with substantially all telephones* rather than just a subset of telephone users who initiate calls to the taxpayer.[93]

The court then rejected the government's arguments that the COBRA *system* should be taxed under IRC § 4252(a)(2) as a facility or service provided in connection with a service described in IRC § 4252(a)(1).[94]  Noting that the IRS failed to identify what local telephone service is provided in connection with the COBRA system, the court assumed *arguendo* that the

---

[91]    *Id.* at 28 (emphasis added in original).

[92]    *See id.*

[93]    *See id.*

[94]    *See id.* at 29-30.

IRS would maintain that COBRA is provided in connection with either local service generally or the local service purchased by Dial-up Users.  In either case, the court reasoned that the IRS was seeking to tax "access to a local telephone system" without regard to the other requirements in section 4252(a)(1).  The court also concluded that the taxpayer ascribed liability under IRC § 4252(a)(2) must have purchased the service described IRC § 4252(a)(1).  Although the government raises some of the same arguments here,[95] it does not directly challenge this aspect of the court's ruling in its opening brief.

Finally, the court addressed two revenue rulings which suggest that call origination is not a required element of local telephone service.  Because these rulings lacked any meaningful analysis, and failed to give any consideration to distinctions in the statutory text, the court found those rulings unpersuasive.  Thus, the bankruptcy court concluded that COBRA service cannot be taxed as local telephone service.

## STANDARD OF REVIEW

In accordance with Rule 8013 of the Federal Rules of Bankruptcy Procedure, this Court should accept the bankruptcy court's findings of fact unless they are clearly erroneous.[96]  The Court reviews the bankruptcy court's legal conclusions *de novo*.[97]

## ARGUMENT

The telephone tax applies only if a subscriber actually purchases access to a local telephone system *and* the privilege of a voice-quality communication with substantially all of the telephones in that system.  The bankruptcy court found that the Debtors did not purchase the privileges associated with local telephone service because COBRA service merely prepares

---

[95]    IRS Br. at 27-28.

[96]    *See In re Manville Forest Products Corp.*, 896 F.2d 1384, 1388 (2d Cir. 1990); *Wongco v. Federated Dept. Stores, Inc. (In re R.H. Macy & Co.)*, 283 B.R. 140, 143 (S.D.N.Y. 2002).

[97]    *See id.*

computer data for the Internet.  Under applicable law, COBRA cannot be local telephone service because the Debtors do not obtain (i) a connection to a telephone system, (ii) the ability to use a telephone, (iii) the ability to make or receive telephone calls, or (iv) the ability to communicate with other telephone users in the telephone system.

On appeal, the government urges the Court to disregard the bankruptcy court's findings about what the Debtors *actually received* from COBRA service as "irrelevant."[98]  The government then urges this Court to find the Debtors *essentially received* a telephone line just like the taxpayer in *USA Choice* because the bankruptcy court relied on the decision of the Claims Court in *USA Choice* and the Federal Circuit subsequently reversed the Claims Court.[99]  In the government's view, this Court should conflate the facts here with those in *USA Choice*, even though the taxpayer in *USA Choice* purchased a telephone line and the bankruptcy court found below that the Debtors purchased data aggregation and conversion services.

There are, at least, four reasons to affirm the bankruptcy court's orders.  *First*, the bankruptcy court's holding is consistent with precedent in the Second Circuit, as well as the plain meaning of the statute.  *Second*, precedent establishes that the Debtors lacked the requisite "access" to a local telephone system.  *Third*, the data aggregation and conversion service the Debtors purchased does not provide voice-quality communication with people who have a telephone.  *Fourth*, COBRA service qualifies for the private communication exemption because the Debtors had exclusive use of and paid a charge for the service.  The Court, therefore, should affirm.

---

[98]     IRS Br. at 28.

[99]     IRS Br. at 1, 13, 34.

## I.    THE BANKRUPTCY COURT CORRECTLY HELD THAT THE DEBTORS DID NOT PURCHASE LOCAL TELEPHONE SERVICE

### A.    COBRA Service Is Not A Local Telephone Service Because The Debtors Could Not Make A Telephone Call.

The privilege of making a telephone call is an essential attribute of local telephone service.  As the court in *DuPont Glore Forgan Inc. v. AT&T* stated, "telephone service consists of the privilege of *making calls* within a local exchange area and, upon payment of an additional amount (message units or a toll charge), outside that area, *plus* the privilege of *receiving telephone calls* from any telephone within or outside the local exchange area . . . [The] *ability to place calls* through the telephone network is known as "exchange access."[100]  Similarly, Judge Koeltl, in a ruling affirmed by the Second Circuit, held that the local telephone service described in IRC § 4252(a), "plainly involves the telephone users presence in, and their *ability to make calls* within, a limited geographic area."[101]

In construing the same statute, the bankruptcy court held below that the Debtors cannot be taxed for "local telephone service" because COBRA service is incapable of making telephone calls.[102]  The court emphasized that section 4252(a) incorporates an element of directionality because local telephone service conveys the right of "telephonic quality communication *with* substantially all telephone[s]" in the local system.[103]  The court explained that the statute incorporates more than the privilege of having a conversation with another subscriber – a "two-way communication" – because that privilege is fully expressed by the requirement of

---

[100]    *DuPont Glore Forgan Inc. v. AT&T*, 437 F. Supp. 1104, 1107 (S.D.N.Y. 1977) (emphasis added).

[101]    *Fortis, Inc. v. United States*, 420 F. Supp. 2d 166, 184 (S.D.N.Y.), *aff'd*, 447 F.3d 190, 191 (2d Cir. 2006) (*per curiam*) (emphasis added).

[102]    Significantly, COBRA service also cannot receive telephone calls.  R S 1136 (2/1/06 Hr'g Tr. at 197:5 – 199:8 (Hills)); R S 1105, 1136 (2/1/06 Hr'g Tr. 75:21 – 75:25, 76:14 – 76:22 (Anderson)) (stating that COBRA cannot be used to make *or receive* phone calls)).

[103]    *In re WorldCom*, 371 B.R. at 28 (emphasis in original).

22

telephonic-quality communication.[104]  In addition, the subscriber must have "access *to* a local telephone system," and "communication *with*" all other persons in that system.[105]  Even the government acknowledges in its opening brief that the word "*to*" is a "directional preposition used to indicate who initiated ('from') or received ('to') the transmission."[106]  The text of section 4252(a) therefore states on its face that the local telephone service purchaser (the call originator) has access "*to*" the local system (the call recipients) for transmissions of telephonic communication.

"The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of the statute will produce a result demonstrably at odds with the intentions of the drafters."[107]  There is nothing unusual, as the courts in *DuPont* and *Fortis* have confirmed, about drafting a statute where telephone-service subscribers have the right to make telephone calls.  There *would* be something odd, by contrast, about imposing a tax on a telephone service that lacked such capabilities because none of the subscribers could call anyone.

Even if the text is not clear, the statutory context supports the bankruptcy court's construction.  In IRC § 4252(a), Congress defined local telephone service as something that is *not* a long distance service.[108]  Consequently, the definitions for local and long-distance services are mutually exclusive.  Long distance service (§ 4252(b)) is defined in relation to the locations of the persons making and receiving the call.[109]  Thus, long-distance services capture calls made

---

[104]     *In re WorldCom*, 371 B.R. at 28.

[105]     IRC § 4252(a) (emphasis added).

[106]     IRS Br. at 15.

[107]     *United States v. Ron Pair Enter.*, 489 U.S. 235, 242 (1989).

[108]     *See* IRC § 4252(a) (stating that "the term 'local telephone service' does not include any service which is a 'toll telephone service'").

[109]     Section 4252(b)(1) addresses calls determined by "concentric mileage bands measured from the call's origin," while section 4252(b)(2) addresses WATS services that established calls between separate local service areas.  *See generally Office Max, Inc. v. United States*, 428 F.3d 583, 590 (6th Cir. 2005).

"*from*" a caller anywhere in the United States "*to*" other local systems, regardless of where the recipients of those calls reside. In construing this language, the *DuPont* court recognized that the local service subscriber will have the ability to receive "telephone calls from any telephone *within or outside the local exchange area.*"[110] The basic distinction between "local" service and long-distance service, therefore, is the right of the local subscriber, unlike the long distance subscriber, to "*make calls within a limited geographic area*" rather than within the entire United States.[111]

Furthermore, other statutes containing the words "communication with" support the bankruptcy court's construction.[112] A number of federal statutes, including the Fair Debt Collection Practices Act ("FDCPA"),[113] use the phrases "communication with" or "communicate with" to describe communication *from* a specific individual (the person subject to the statute) *to* a related group or class of persons (*e.g.* people who owe money, Members of Congress, taxpayers generally, persons having telephones).[114] In each case, the provisions of such statutes indicate how the phrase "communication with" applies to the individual subject of the law (*i.e.*, the purchaser of local telephone service) as the *originator* of the referenced communication. In the FDCPA, Congress proscribed laws regarding a debt collector's "communication with" debtors to control communication "flowing from a debt collector to the alleged debtor."[115]

---

[110]    *DuPont Glore*, 437 F. Supp. at 1107.

[111]    *Fortis*, 420 F. Supp. 2d at 184; *see also DuPont Glore*, 437 F. Supp. at 1107.

[112]    *See Indus. Union Dept., AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 718 n.30 (1980) (stating that a word's "interpretation can be informed by other contexts in which Congress has used it").

[113]    15 U.S.C. §§ 1692-1692o.

[114]    15 U.S.C. §§ 1692c, 1692e(11), 1692g(a), and 1692p(a)(2)(C)(v); *see also* 26 U.S.C. § 6304(a) (governing communications from tax collectors to taxpayers and using the phrase "communicate with" to describe communications originating from the tax collector); *Brown v. Glines*, 444 U.S. 348, 358-61 (1980) (interpreting 10 U.S.C. § 1034(a)(1), which prohibits restricting a member of the armed forces from originating a "communication with" Members of Congress).

[115]    *Comcation*, 78 Fed. Cl. at 68.

Simply put, when Congress enacts laws regarding Party A's "communication with" Group B, Party A is the intended *communicator* (the originator) and the communication flows to the members of Group B (the recipients).  For purposes of section 4252(a), Party A (the person purportedly buying telephone service) purchases the privilege of being the original telephonic communicator with any person in Group B (all other telephone service subscribers).  The bankruptcy court's construction is demonstrably correct.

**B.    The Government Cannot Overcome The Plain Meaning Of The Statute With Secondary Sources, Legislative History, And Unpersuasive Revenue Rulings.**

Citing primarily *USA Choice*, which is not binding on this Court, the government contends that the ability to receive telephone calls – an ability the Debtors also did not have – without more, fully satisfies the statutory criteria.[116]  The government urges that the statutory privilege requires only a conversation involving two-way communication, which can be satisfied even if the taxpayer cannot initiate calls.  But as the bankruptcy court explained, "the term 'telephonic quality communication' incorporates the concept of two-way, or 'full-duplex,' communication."  The government's argument on this point would render the remainder of section 4252(a) meaningless by taxing only the privilege of telephonic communication.[117]

The government also suggests that the bankruptcy court's construction is unduly narrow, but it is the government that seeks to narrow the statutory privilege required for tax.  As the bankruptcy court held, the natural understanding of the words used by Congress indicates that *both* the privilege to originate and receive calls has been purchased.  Similarly, the government's distinctions between the tax on long-distance and local service cannot be explained as mere syntactical differences.  The government has not explained why the word "*to*" in IRC §

---

[116]    IRS Br. at 14-17.

[117]    *See, e.g.*, *Perez v. MSPB*, 85 F.3d 591, 594 (Fed. Cir. 1996) (holding that a court must construe statutes so as to give effect to every clause and word).

4252(b)(2) should be given a directional connotation, but that same word in IRC § 4252(a) –

access "*to*" a local telephone system – should not.

    Next, the government directs the Court's attention to legislative history, but there is no

warrant here – a case of statutory ambiguity – for resorting to those sources.[118]  And the

legislative history offered elucidates nothing about the issue before this Court.  None of the

anecdotal sources offered by the government suggests, much less proves, that local telephone

service does not afford subscribers with the ability to originate telephone calls.  Furthermore,

reliance on these extraneous sources is at odds with the "special rule in tax cases," that, "if doubt

exists as to the construction of a taxing statute, the doubt should be resolved in favor of the

taxpayer."[119]  Were there ambiguity here – and there isn't – the doubt should be resolved in favor

of the Debtors.

    Although the government attacks this interpretive canon,[120] it remains good law.[121]  The

government mistakenly cites *White v. United States*[122] for the proposition that there is no longer

an interpretive canon of resolving doubts in tax statutes in favor of the taxpayer.[123]  That

contention is inaccurate and overbroad: *White* merely restated the rule that where a taxpayer

---

[118]    *See Ex parte Collett*, 337 U.S. 55, 61 (1949); *Chapman v. The Higbee Co.*, 319 F.3d 825, 829 (6th Cir. 2003).

[119]    *Gould v. Gould*, 245 U.S. 151, 153 (1917); *Xerox v. United States*, 41 F.3d 647, 658 (Fed. Cir. 1994); *United Dominion Indus., Inc. v. United States*, 532 U.S. 822, 839 (2001) (Thomas, J., dissenting) ("[W]e should be inclined to rely on the traditional canon that construes revenue-raising laws against their drafter." (citing cases)); *accord Hassett v. Welch*, 303 U.S. 303, 314 (1938) ("[I]f doubt exists as to the construction of a taxing statute, the doubt should be resolved in favor of the taxpayer . . . .").

[120]    IRS Br. at 17-18.

[121]    *See, e.g.*, *Am. Online, Inc. v. United States*, 64 Fed. Cl. 571, 576 ("[T]he *Gould* rule remains in effect when the taxpayer is arguing that the provision of a statute levying a tax does not apply to him in the first instance."); *see also United Dominion*, 532 U.S. at 839 n.1 (Stevens, J., dissenting) (noting the "countervailing tradition[s]" of construing revenue-raising laws against the drafter and exceptions from tax liability against the taxpayer).

[122]    *White v. United States*, 305 U.S. 281 (1938).

[123]    *See* IRS Br. at 17–18.

claims a *deduction*, he or she must identify a statute providing for the deduction.[124]  That rule is

inapplicable to the facts of this case, where the government is seeking to apply a tax law, not

defending against a claimed deduction or exemption from an applicable tax law.

The government also wrongly contends that the Revenue Rulings it cites deserve

*Chevron* deference.[125]  The same argument was raised, and rejected, in *Fortis*.[126]    Additionally,

the cited rulings offer nothing to persuade.  The decision below aptly notes that Ruling 75-102

contains a bare-bones dictum that the time and weather announcements were taxable and then

quotes the statute.  Significantly, nothing in the Ruling indicates that the time and weather

services were provided over lines that were incapable of making calls rather than lines that the

taxpayer elected to *use* only for receiving calls.  While Ruling 77-196 clarifies that the system at

issue there could not make calls, the sole support for taxing that service was Ruling 75-102 (time

and weather).[127]  Similarly, Rulings 75-9 and 89-84 make no mention of service capabilities,

begging the question of whether the services were inherently or voluntarily limited, which is the

precise issue here.[128]

*Fortis* sets out the better view:  "[t]he context of the 1965 amendments confirms that the

words employed by Congress mean precisely what they, on their face, appear to mean."[129]  There

is no need here to conjure arguments from lexicons, Congressional archives, and other anecdotal

sources as the government wants done.  The bankruptcy court has charted the far better course.

---

[124]    *White*, 305 U.S. at 292 ("'A taxpayer seeking a deduction must be able to point to an applicable statute and show that he comes within its terms.").

[125]    IRS Br. at 20-23 (relying on, *e.g.*, *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)).

[126]    *Fortis*, 420 F. Supp. 2d at 179 (citations omitted).

[127]    The government defends this brevity by stating that the Rulings "provide all the analysis that is needed," but that just begs the question.  *See* IRS Br. at 24.

[128]    *In re WorldCom*, 371 B.R. at 32.

[129]    *Fortis*, 420 F. Supp. 2d at 184.

Congress expressly premised the tax upon local service on the basic right to make calls

(connections) *to* a local telephone system, thereby obtaining a geographically limited right to

originate communications *with* the other telephone subscribers in that local system.  As an

auxiliary right (that is not taxed), the subscriber also receives calls from anywhere, including

outside the local area – and the tax on those calls is borne by the originator of the call, regardless

of whether the caller resides locally or in a distant service area – but the essence of local access

is the right of the taxpayer to initiate phone calls locally.[130]

By applying these principles, the Court will be "enforcing the specific intent of Congress

to tax the service that it expressly described and clearly intended to tax, rather than rewriting the

statute to comport with a generalized notion of what Congress might intend if it were to revise

the statute in light of subsequent innovations in the industry."[131]

## II.    THE DECISION BELOW SHOULD BE AFFIRMED BECAUSE THE DEBTORS DID NOT PURCHASE ACCESS TO A LOCAL TELEPHONE SYSTEM

The COBRA service purchased by the Debtors does not provide "access to a local

telephone system," a statutory prerequisite for imposing telephone taxes.[132]  Courts have

subsequently interpreted this to mean that a taxable service either allows the subscriber to place

calls to the local telephone system, or provides a point of connection to the local telephone

system.  COBRA service offered neither.

Courts in this district have generally equated the right of "access" with the "ability to

place a call" to the local telephone system.[133]  As the court explained in *DuPont Glore*, "[w]hen

---

[130]    *DuPont Glore*, 437 F. Supp. at 1107.

[131]    *Fortis*, 420 F. Supp. 2d at 184.

[132]    *In re WorldCom*, 371 B.R. at 26; IRC § 4252(a).

[133]    *DuPont Glore*, 437 F. Supp. at 1107; *see also Fortis*, 420 F. Supp. 2d at 184 (holding that "[l]ocal [telephone] service plainly involves the telephone users' presence in, and their ability to make calls within, a limited geographic area").

the subscriber makes a telephone call, switching equipment . . . connects his line to the line of the called telephone, thereby completing the call. *This ability to place calls through the telephone network is known as 'exchange access.'*"[134]  This conclusion is consistent with standards promulgated in the telecommunications industry, which defines switching (the basic architecture of the telephone network) as "the establishment on demand, of an individual connection *from* a desired inlet *to* a desired outlet within a set of inlets and outlets for as long as is required for the transfer of information."[135]

Courts in other jurisdictions have equated "access" with the subscriber's right to connect or interface with the local telephone system using a telephone line.  In *USA Choice* the court held that "access" should be understood as "the interface or connection between . . . the central exchange and the [customer terminal]."[136]  Because the taxpayer in *USA Choice* purchased a PRI line that connected it to the local exchange switch, the court held that the taxpayer had "access" for purposes of IRC § 4252(a).[137]

Regardless of whether this Court finds the *USA Choice* interpretation (connectivity) persuasive as the government urges,[138] or accepts the interpretation from *DuPont Glore* (call placing ability), the Debtors did not have access to a local telephone system as required by section 4252(a).  COBRA service does not provide local access as defined by *DuPont Glore* because the Debtors did not have the ability to place calls to anyone.[139]  Nor does COBRA service provide local access as defined in *USA Choice* because the Debtors' connection point or

---

[134]    *DuPont Glore*, 437 F. Supp. at 1107.

[135]    ANNABEL Z. DODD, THE ESSENTIAL GUIDE TO TELECOMMUNICATIONS 178 (3d ed. 2002) (citing the definition established by the by The International Telecommunications Union.

[136]    *USA Choice*, 522 F.3d at 1337 (quoting *Trans-Lux Corp. v. United States*, 696 F.2d 963 (Fed. Cir. 1982)).

[137]    *Id.* at 1337.

[138]    IRS Br. at 26.

[139]    *In re WorldCom*, 371 B.R. at 28.

interface for COBRA service lies at an egress Internet port on the back end of a network access server and the network access server is not part of the telephone system.[140]  An interface with Internet routers and frame relay cards for computer networks does not grant a taxpayer statutory "access" to a telephone system.  The record also reflects that the data from this egress port did not transmit any telephone signals.[141]

The government suggests that the Debtors bought services that were "essentially indistinguishable" from those purchased in *USA Choice*.  Yet, the *USA Choice* court clearly states that the taxpayer in that case purchased "digital communications channels . . .  generally known as Primary Rate Interface (PRI or PRA) circuits."[142]  No evidence in the record before this Court shows that amounts were paid for connections to switching equipment such as PRIs.  Rather, the Debtors "*purchase[d] modem ports instead of circuits* from the LECs.  Billing [was] based upon the total number of active ports . . . ."[143]  The LECs billed for COBRA service on a per port basis and allowed the Debtors to connect a data line to the back of a network access server.  The government responds to these facts with the fundamentally flawed contention that "what the Debtors received from the COBRA services is irrelevant."[144]  But what the Debtors received from COBRA service is relevant because what they did not receive was access to a local telephone system under any judicially recognized formulation of that requirement.  The decision below, therefore, was correct.

---

[140]     *Id.* at 24; R S 1153-56 (Trial Exs. 2 and 3); R S 1103 (2/1/06 Tran. at 66:15-67:20 (Anderson)).

[141]     *Id.* at 27 (noting that the evidence established that COBRA service translates data into TCP/IP protocol).

[142]     *USA Choice*, 522 F.3d at 1335.

[143]     R S 1921 (Trial Ex. 32).

[144]     IRS Br. at 28.

### III. THE DECISION BELOW SHOULD BE AFFIRMED BECAUSE THE DATA AGGREGATION AND CONVERSION SERVICE THE DEBTORS ACTUALLY PURCHASED DOES NOT PROVIDE VOICE-QUALITY COMMUNICATION WITH PEOPLE WHO HAVE A TELEPHONE

The bankruptcy court's decision may also be affirmed on the independent ground, raised below, that COBRA service does not provide the privilege of telephonic quality communication with substantially all telephones in the local telephone system.[145]  Amounts paid for processing Internet data and routing that TCP/IP data from the egress port of a computer server fail to satisfy any of the statutory criteria.

First, the record reflects that the COBRA data processing service cannot function with telephones and, despite the government's claim that the Debtors erected "self-imposed limitations," the bankruptcy court found that the service was used exactly as the vendors had designed and sold it.[146]  The government has not shown error in that finding.

Second, the IRS has ruled that data processing services using modems are <u>not</u> a taxable telephone service.  The government misreads Revenue Ruling 79-245 as support for its appeal even though the Ruling holds that data preparation service is not taxable.

Third, at trial the government conceded that COBRA service could not deliver telephonic quality communication *absent modification,* but argued instead that the Debtors should be taxed on the basis of ancillary VOIP services allegedly available to Dial-up Users.[147]  Even though the Debtors dispute those facts, the government's argument fails as a matter of law because the statute does not impose tax *on the Debtors* for ancillary services purchased by others, and the IRS has found that such ancillary VOIP services are not taxable.

---

[145]    IRC § 4252(a).

[146]    *In re WorldCom*, 371 B.R. at 29.

[147]    *In re WorldCom*, 371 B.R. at 27.

## A.    COBRA Service Is Not A Local Telephone Service Because It Did Not Provide Communications With People That Have Telephones.

One of the threshold issues in this appeal, which the court below declined to decide, is whether the service described in IRC § 4252(a) must give the subscriber some ability to communicate with people who have a telephone.  No court has ever held otherwise.  The statute expressly requires communications with "substantially all persons having *telephone or radio telephone stations*."[148]  A court should "presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete."[149]

The term "telephone station" in the statutory text is an antiquated reference to a telephone.[150]  Significantly, the IRS has long interpreted the reference to "telephone stations" in section 4252(a) to mean ordinary telephone sets.[151]  The Claims Court in *USA Choice* reviewed the relevant engineering literature and concluded that the "term 'telephone station,' as used in IRC § 4252(a)(1), encompasses telephone sets, each having an earphone and microphone, but cannot be considered to include modems."[152]  Revenue Ruling 79-245 reached the same conclusion, holding that modems serve a fundamentally different function than telephones.

The *USA Choice* case is particularly instructive.  The ISP in that case, having purchased a

---

[148]    IRC § 4252(a).

[149]    *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

[150]    NEWTON'S TELECOM DICTIONARY 698 (19th ed. 2003) (defining "station").

[151]    *See* Rev. Rul. 78-437, 1978-2 C.B. 266 (equating stations with a "telephone set"); Rev. Rul. 79-245, 1979-2 C.B. 380 (stating that the tax applied where the subscriber had the right to voice quality communications with all persons having "telephones" in the local system); *see also Agron v. Illinois Bell Tel. Co.*, 319 F. Supp. 418, 420 (D. Ill. 1970), *rev'd on other grounds*, *Agron v. Illinois Bell Tel. Co.*, 449 F.2d 906, (7th Cir. Ill. 1971) (IRS stating that "local telephone service" as used in section 4252(a) is to be given its "commonly accepted and understood meaning—the right to use a telephone which is part of a telephone system and to communicate thereby with other persons having telephones which are part of this system").

[152]    *USA Choice Internet Serv., LLC v. United States*, 73 Fed. Cl. 780, 794 n.23 (2006) (citations omitted), *rev'd on other grounds*, *USA Choice Internet Serv. LLC v. United States*, 522 F.3d 1332 (Fed. Cir. 2008); *see also* Rev. Rul. 79-245, 1979-2 C.B. 380 (distinguishing modem systems from telephones).

telephone line that ran from the central office to its own facilities, argued that it lacked the ability to communicate with "persons having . . . telephone stations" because the modem it elected to plug the line into could only communicate with other modems.[153]   The circuit court rejected this argument, *not* because the ability to communicate *with telephones is irrelevant* as the government surmises, but because the ISP *did* have the ability to communicate with telephones if it chose to do so.[154]   The court reasoned that the ISP's unilateral decision to plug a telephone line into something other than an *actual telephone* did not limit the underlying service capabilities and, as a result, had no bearing on the taxability of the service.[155]   The *Comdata* court reached the same conclusion, as does Revenue Ruling 79-245.[156]

In each of these cases, the taxpayer had *elected not to use* telephone service for telephone calls.  In every instance, however, the taxpayer retained the ability to *use* the service for telephone calls if it so chose.  Thus, in Ruling 79-245, the taxpayer purchased two *regular telephone lines*, one for ordinary telephone calls, and another for use with computer modems that stored and calculated data received over the telephone network from its other terminals.[157]   The IRS ruled that these telephone lines were taxable because, "by plugging in a regular telephone set, if it so chooses, it may exercise the privilege of telephonic (voice) quality communication with substantially all persons having telephones in the local system...."[158]   The converse, however, is just as true:  no tax is owed if the taxpayer cannot plug "in a regular telephone set, if it so chooses, [and] exercise the privilege of telephonic (voice) quality communication with

---

[153]   *USA Choice*, 522 F.3d at 1340.

[154]   *See id.* at 1340-41.

[155]   *See id.* at 1341.

[156]   *Comdata*, 21 Cl. Ct. at 129-31 (holding it was "virtually self-evident" that ordinary WATS service was telephone service even though the taxpayer elected not to use it for telephone calls).

[157]   Rev. Rul. 79-245, 1979-2 C.B. 380.

[158]   *Id.*

substantially all persons having telephones in the local system."

There is no dispute here that the Debtors could *not* plug in a telephone, access a telephone line, use a telephone, make a telephone call, or receive a telephone call.[159]  And the bankruptcy court found that COBRA was a service that the LECs sold, and the Debtors purchased, with these inherent limitations.  Thus the Debtors could not reconfigure or alter COBRA service into a service that would be capable of communicating with telephones.[160]  That is, none of the limitations on the Debtors' use of COBRA service have been "self-imposed."

The government cannot point to any contrary evidence, let alone demonstrate clear error.  Instead of presenting evidence that the Debtors erected a "self-imposed limitation," the government points out that the inherent limitations in the service resulted from "the business choices of the contracting parties"[161] – which is just another way of saying that the Debtors could have purchased telephone service but elected not to.

**B.      Data Processing Services Like COBRA Are Not Taxable Because Data Is Different From Voice Communication And Substantially All Persons In Local Telephone Systems Use *Telephones* Not Data Processing Equipment.**

The IRS held in Revenue Ruling 79-245 that amounts paid merely for data processing services are not taxable as telephone service.  While the government now contends that the "modem-to-modem system was taxable,"[162] that is not what the ruling says.  In addition to

---

[159]    R S 1132 (2/1/06 Tran. at 182:12-18 (Dr. Hills:  To call someone through the COBRA system requires a technology such as VOIP – PC to PC VOIP or something similar"));  R S 1136 (2/1/06 Tran. at 197:5-10 (Question:  "Now, you don't dispute Mr. Anderson's statement that what [the Debtor] receives from the COBRA services is a high-speed datastream?"  Dr. Hills: "I agree with Mr. Anderson in that statement."));  R S 1136 (2/1/06 Tran. at 197:24 – 198:6  (Dr. Hills: "I would agree with Mr. Anderson when he says that the COBRA equipment was not designed for a normal telephone user to dial up and access it . . . .");  R S 1136 (2/1/06 Tran. at 198:19 – 199:3  ("Question: Was the service configured in a way that would allow voice quality calls?"  Dr. Hills: "The components within COBRA were, based on Mr. Anderson's testimony, weren't configured to do that.")

[160]    *In re WorldCom*, 371 B.R. at 29.

[161]    IRS Br. at 36.

[162]    IRS Br. at 33.

34

purchasing the plain old telephone service described above, the taxpayer paid a computer company to lease the data processing and transmission equipment (modems) that it used with the telephone lines.  The issue was whether, in addition to owing tax on the purchased telephone lines, the business also owed tax on the purchased modem system.  The IRS held that amounts paid for data processing services using modems are not a taxable telephone service:

> Equipment that merely prepares data for transmission is not a facility provided in connection with local telephone service for purposes of section 4252(a) of the Code.  Therefore, because the computer unit, the terminals, and the communication control unit all serve *to prepare computer data for transmission*, such equipment is not used in connection with local telephone service.

> Although the modems, by transforming computer signals into telephone signals, do serve a function similar to the ordinary telephone set (which transforms sound waves into telephone transmission signals), the type of telephone signal produced by the modems is usable only for nonvoice data transmission to other computer stations.  In addition, relatively few stations in a telephone system are used in this computer service.  Therefore a modem is not a facility provided in connection with the privilege of telephonic quality communication with substantially all persons having stations in the local system.

Revenue Rulings are binding on the IRS[163] and "limit the IRS' ability to assert a position that is contrary to that asserted in the ruling if the ruling is published."[164]  The IRS intends "that its employees and taxpayers alike rely on revenue rulings in disposing of cases and in determining the tax treatment of transactions."[165]  Consequently, published rulings will be "dispositive" on all similar issues.[166]

---

[163]    *See Limited, Inc. v. Comm'r*, 286 F.3d 324, 337 (6th Cir. 2002) (stating that IRS revenue rulings are "binding on the IRS"); *Bankers Life & Casualty Co. v. United States*, 142 F.3d 973, 978 (7th Cir. 1998) ("Revenue rulings do not have broad application like regulations, but the IRS does consider them authoritative and binding.").

[164]    *Estate of Rapp v. Comm'r*, 140 F.3d 1211, 1217 (9th Cir. 1998); *Estate of Kosow v. Comm'r*, 45 F.3d 1524, 1528 n. 4 (11th Cir. 1995).

[165]    MICHAEL I. SALTZMAN, IRS PRACTICE AND PROCEDURES 3-33 (2d 2008) (citing Rev. Proc. 89-14, § § 7.01(4), 7.01(5), 1989-1 C.B. 814).

[166]    *Beneficial Found. v. United States*, 8 Ct. Cl. 639, 644 (1985).

Here, Revenue Ruling 79-245 disposes of several issues: (1) local telephone service includes the right to plug "in a regular telephone set" and make or receive telephone calls; (2) a modem service, standing alone, does not offer communications with *substantially all* persons in the local system due to the limited number of persons with whom the subscriber can communicate; and (3) a service which only prepares data for transmission – like COBRA service – is not taxable as telephone service.

## C.    The Debtors Can Only Be Taxed For The Service *They* Actually Purchased.

IRC § 4251(a)(2) plainly states that the tax for telephone service shall be paid *by the person paying for* a taxable telephone service.  Furthermore, Congress drafted the statute to tax *services* rather than merely equipment used to provide such services:

> The definition[] of local telephone service (previously general telephone service) . . . [has] been updated to make it clear that it is *the service as such* which is being taxed and not merely the equipment being supplied.[167]

To that end, the telephone tax may properly be assessed only upon a taxpayer actually paying for a *service* that delivers access to the telephone system and the privilege of telephonic quality communication with all telephones.[168]

In this case the *Debtors* (*i.e.*, the person paying for COBRA service) must be paying for a telephone service.  The court below, however, found that the service actually purchased translates analog data into TCP/IP data and transmits the data in an aggregated high-speed datastream.[169]  For purposes of this case, that is the only *service* that matters.  Nonetheless, the government asks the Court to impose tax on *the Debtors* because *Dial-up Users* purchase telephone lines that connect to the *LEC's* COBRA equipment, and the *Dial-up Users* also may

---

[167]    H.R. Rep. No. 433, 89th Cong., 1st Sess. 30 (1965) (emphasis added).

[168]    *See* IRC § 4251(a)(2).

[169]    *In re WorldCom*, 371 B.R. at 27.

have purchased VOIP services from a company called Skype in order to send data packets to *other Skype subscribers*.[170]   In the government's view, the service the *Debtors* purchased is simply irrelevant.[171]  This line of argument contradicts the statute and decades of IRS tax policy.

First, there is no basis in the statute for imputing the *Dial-up Users'* privilege of telephonic quality communications to the Debtors, and the fact that an entity other than the Debtors may have the privilege of telephonic quality communications cannot form the basis for imposing tax upon the Debtors.  Telephone tax must be paid by the purchaser of a taxable service.[172]

Second, the government cannot avoid the requirements of IRC § 4252(a)(1) by arguing that the *COBRA system* is independently taxable.[173]  As the court below properly points out, facilities become taxable under IRC § 4252(a)(2) only if they are provided "in connection with" *local telephone service*.[174]  Because the facts demonstrate that the purchased *service* aggregates and translates computer data, no amounts have been paid for the "telephone service" described in section 4252(a)(1) that would provide a legal basis for taxing *the COBRA system* under IRC § 4252(a)(2).  The bankruptcy court properly rejected this line of argument because it renders IRC § 4252(a)(1) superfluous.[175]

In addition, the government's contentions contradict Revenue Ruling 79-245.  The taxpayer in that matter paid *two amounts*: (i) a monthly payment to the telephone company for

---

[170]    IRS Br. at 27-30.

[171]    IRS Br. at 28.

[172]    *See* IRC § 4251(a)(2).

[173]    IRS Br. at 28-29.

[174]    *In re WorldCom*, 371 B.R. at 29.

[175]    *In re WorldCom*, 371 B.R. at 29-30; *see also, e.g.*, *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 209 (1997); *Tesfamichael v. Gonzales*, 411 F.3d 169, 175 (5th Cir. 2005) ("It is axiomatic that courts should strive to give operative meaning to every word in a statute.")

telephone service, and (ii) payments to a computer company for data processing.  On these facts, the IRS concluded that the phone service was taxable under section 4252(a)(1), while the ancillary data processing facilities and services used with the phone lines were not taxable under 4252(a)(2).  Here, the Debtors paid *one amount* for data processing services.  The Debtors did not pay for phone lines.  The government ignores Revenue Ruling 79-245 to achieve one of two alternatives.  The government wants to tax the data processing *system* as a phone service under section 4252(a)(1) even though the IRS did not do that in Ruling 79-245 and the Debtors have not paid for the telephone service at issue in that Ruling.  Or, the government wants to tax the data processing *system* as a facility under section 4252(a)(2) even though the IRS held in Ruling 79-245 that the data processing system was *not* a taxable facility provided in connection with local telephone service.  At bottom, the government's case contravenes published IRS tax policy.

Similarly, the government's arguments regarding possible computer-to-computer VOIP transmissions do not help its case.[176]  As the government explains in its brief, a Dial-up User allegedly could purchase ancillary VOIP services from a company called Skype and, thereby, obtain telephonic quality communication with other Skype subscribers which could be transmitted by modem to the COBRA system and ultimately to the global Internet networks.[177] At trial, the government introduced evidence that by procuring such services, the Dial-up User would "be able to call public phone numbers both in the U.S. and overseas."[178]

Again, that *Dial-up Users* may have accessed VOIP cannot justify taxing *the Debtors* because telephone tax must be paid by *the person paying for* a taxable service (IRC § 4251(a)(2)).  The record is devoid of any evidence that the Debtors ever paid for Skype or

---

[176]    IRS Br. at 30-32.

[177]    IRS Br. at 30-32; *see also* R S 1129  (2/1/06 Tran. at 171:12-24 (Hills)); R S 1132 (2/1/06 Tran. at 182:4-6, 12-18 (Hills)); R S 1132 (2/1/06 Tran. at 183:3-7 (Hills)); R S 1133 (2/1/06 Tran. at 185:15-22 (Hills)).

[178]    R S 1132 (2/1/06 Tran. at 182:4-6; 183:3-7 (Hills)).

similar computer-to-computer VOIP services.  Rather, the service at issue was COBRA service.

Regardless, the government's arguments on these issues have become moot.  After trial the government issued binding notice that it no longer considers such VOIP services taxable. Following several adverse rulings that invalidated long-distance taxes, including the Second Circuit's holding in *Fortis*,[179] the government notified taxpayers that it would no longer collect taxes on long-distance service or "bundled services."[180]  The IRS defines a "long distance service" as a "telephonic quality communication with persons whose telephones are *outside* the local telephone system of the caller," while "bundled service" consists of services that provide both "local and long distance service under a plan that does not separately state the charge for the local telephone service . . . for either a flat monthly fee or a charge that varies with the elapsed transmission time for which the service is used."[181]  Both bundled services and long distance services are now considered "nontaxable service" in light of *Fortis* and similar holdings.[182]

Although the Debtors disagree with the government's factual proposition, the current notices have eliminated the dispute.  An ancillary VOIP service that calls people "throughout the United States and overseas" has conclusively become "nontaxable service."

## IV.    THE DECISION BELOW SHOULD BE AFFIRMED BECAUSE THE DEBTORS PURCHASED A PRIVATE COMMUNICATION SERVICE THAT IS EXCLUDED FROM TAXATION

The Court may also affirm the ruling below on the alternative ground that COBRA service is a "private communication service" for purposes of section 4252(d) of the Internal Revenue Code.  The exemption for private communication services, defined in IRC § 4252(d),

---

[179]    *See, e.g.*, *Fortis*, 447 F.3d at 191; *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328 (11th Cir. 2005); *OfficeMax, Inc. v. United States*, 428 F.3d 583 (6th Cir. 2005); *Nat'l R.R. Passenger Corp. v. United States*, 431 F.3d 374 (D.C. Cir. 2005).

[180]    *See* Notice 2006-50, 2006-25 I.R.B. 1141; Notice 2007-11, 2007-5 I.R.B. 405.

[181]    Notice 2006-50 at § 3(c) (emphasis supplied); Notice 2007-11 at § 5(c).

[182]    Notice 2006-50 at §§ 3(d); 4.

would exclude COBRA service from the tax on local telephone service if COBRA entitles the Debtors to "exclusive" or "priority" use of any communication channel or groups of channels, and a separate charge is made for COBRA service.  Significantly, a private service is not subject to telephone tax, even if it provides channels that are connected through switching with a local telephone service.[183]

The facts developed below demonstrate that COBRA service entitles the Debtors to exclusive use of any channel or groups of channels and that a separate charge is made for such service.  Specifically the record demonstrates that:

a)  COBRA provides the Debtors with a "dedicated platform;"[184]

b)  the Debtors do not share the COBRA platform or any service related thereto with others;

c)  the Debtors have sole and exclusive access to the data channels on the NAS;

d)  no other entity has use of, or access to, the single, integrated datastream transmitted through the NAS; and

e)  the Debtors are separately charged each month for COBRA service on a per port basis.[185]

The government now raises four arguments in opposition: (i) the Debtors have waived the issue; (ii) the translation of analog data into TCP/IP data is insufficiently "distinct" from ordinary telephone service; (iii) because Dial-up Users send data to the LEC at the *ingress* of the COBRA system, the Debtors have no exclusive use of COBRA channels; and (iv) payments for COBRA service do not qualify as separate charges.

---

[183]    Only section 4252(d)(1) is applicable here because only amounts paid for COBRA service are at issue.  *See* IRC § 4251(a) (imposing tax only on amounts paid for subject services).  In this case, no amounts have been paid for switching capacity, extension lines and stations, other associated services, or channel mileage.  As a result, the provisions related to such other associated services (4252(d)(2)) and channel mileage (4252(d)(3)) have not been implicated.

[184]    R S 1921 (Trial Ex. 32).

[185]    R S 1109 (2/1/06 Tran. at 90:20 – 92:6 (Anderson)).

First, the Debtors did not *waive* the issue.  Parties do not waive issues by raising them in the trial court.  The Debtors' Objection put the IRS on notice of the Debtors' contention that COBRA service "does not fall within the applicable definitions of taxable communications services," which includes the definitional exclusion for private communication services.[186]  The evidence supporting the private communication exception was provided in the Debtors' expert report and served on the government on November 1, 2005.[187]  The government deposed the Debtors' expert regarding his report and filed additional briefing after the deposition, including a motion *in limine* to exclude certain portions of the expert's testimony.[188]  This evidence was not challenged in the motion *in limine*, nor was a timely objection raised to it at trial.[189]  At no point did the government challenge the Debtors' evidence or offer its own rebuttal evidence.

The government relies on *Carmody v. ProNav Ship Management, Inc.*,[190] for the proposition that the "court need not consider [an] argument raised for the first time in [a] reply brief."[191]  Setting aside the permissive nature of that statement, it is clear that *Carmody* does indeed stand for the cited proposition, which is a matter of *appellate* procedure, not trial procedure.[192]  If anything, the government's waiver argument is misdirected—it is the government that failed to raise a timely objection to the Debtors' evidence and thus failed to

---

[186]    R S 6 at ¶ 14; IRC § 4252(a), (d).

[187]    R S 968, 179 (Docket No. 17743, Ex. 3 ¶8 (the report stated that each NAS contains up to 672 channels, that the Debtors have exclusive or priority use of such channels within the NAS, and that the Debtors are separately charged by the LECs for COBRA service).

[188]    R S 999 – 1006, 1010-11, 975-998.

[189]    R S 1109 (2/1/06 Tran. at 90:20 – 91:25 (Anderson)).

[190]    224 F.R.D. 111 (S.D.N.Y. 2004).

[191]    IRS Br. at 37.

[192]    *Carmody* concerned a motion for a new trial.  224 F.R.D. at 131.  The defendant raised the disputed issue for the first time in a reply brief in support of that motion for a new trial.  *Id.* at 112.  The cases cited in the *Carmody* opinion similarly dealt with failing to raise issues after trial.  *See, e.g.*, *Gaste v. Kaiserman*, 863 F.2d 1061, 1069 n.6 (2d Cir. 1988) ("But if a party fails to raise an issue *on appeal* in its initial brief, the issue is waived . . . ." (emphasis added)).

41

preserve the issue on appeal.[193]

Second, the government's argument that COBRA is not a "distinct" communication service misapprehends the record and the decision below.  The bankruptcy court found, and the government did not disagree, that COBRA service translates "data into the TCP/IP Internet protocol and then aggregates that digital data into a high-speed data stream."[194]  This finding, which has not been challenged, shows that COBRA provides "a 'communication service' beyond that of mere local telephone service, not just connectivity to the local telephone system *itself*."[195]  The government once again ignores the basic factual differences between this case and *USA Choice* which it cites in support of its argument.

Third, the government's arguments regarding exclusive use rely entirely on the mistaken notion that the Debtors purchased a PRI line service – like USA Choice – and elected to plug the PRI into their own modems.[196]  In *USA Choice*, the majority held that the ISP had no exclusive use of those PRI lines because "*anyone*" could place a call to the ISP over those lines.[197]  Judge Dyk dissented from this aspect of the holding on the basis that the lines were "dedicated circuits" that could only be used to deliver calls to the ISP.[198]

As the record shows, COBRA services are vastly different from the PRI lines used in *USA Choice* and satisfy the requirements of both the majority and dissenting views in that case.

---

[193]    *See* F.R.E. 103(a)(1) (stating that error may not be predicated upon admitted evidence unless a *timely* objection or motion to strike appears of record); *Bogle-Assegai v. Connecticut*, 470 F.3d 498, 504 (2d Cir. 2006) ("'[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal.'" (quoting *Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994)).

[194]    *In re WorldCom*, 371 B.R. at 27.

[195]    *USA Choice*, 522 F.3d at 1344.

[196]    IRS Br. at 39.  The government quotes from the *USA Choice* opinion and simply replaces the word "USA Choice" with "[debtors]."  *Id.* at 38.

[197]    *USA Choice*, 522 F.3d at 1346.

[198]    *Id.* at 1347 (Dyk, C.J., concurring in part, dissenting in part).

COBRA provides the Debtors with a "dedicated platform."[199]  No one can call the Debtors through the dedicated channels deployed in the COBRA system.[200]  As the government's expert confirmed, the Debtors received only a high-speed datastream over those channels,[201] a normal telephone user could not "dial up and access it,"[202] and the configuration precluded any modem access unless permission was given to the Dial-up User.[203]  Data within the COBRA system was then aggregated and "integrated into a single datastream, a high-speed datastream," that was provided through dedicated channels exclusively for the Debtors.[204]  Section 4252(d) therefore applies because the Debtors purchased services through a "communication system *solely* for the use of a single subscriber," which is exactly the kind of service Congress had in mind when it enacted the statute.[205]  No other "subscriber" had the right to use COBRA services and thus the Debtors' use was exclusive.

Fourth, the government argues that payments made for COBRA service do not meet the "separate charge" standard.  The government asks for more than the statute requires.  Although the government concedes that "the charge the Debtors paid for COBRA service included the *entire* COBRA service,"[206] the government leaps to the unsupported conclusion that the statute refers to separate charges for "components."  The statute, which is unambiguous, simply says that the term private communication service "does not include any communication *service* unless

---

[199]     R S 1921 (Trial Ex. 32).

[200]     *Cf. USA Choice*, 522 F.3d at 1346.

[201]     R S 1136 (2/1/06 Tran. at 197:5-10 (Hills)).

[202]     R S 1136 (2/1/06 Tran. at 197:24 – 198:6 (Hills)).

[203]     R S 1137 (2/1/06 Tran. at 204:2-7 (Hills)).

[204]     R S 1109 (2/1/06 Tran. at 91:12-17 (Anderson)).

[205]     *Comcation*, 78 Fed. Cl. at 74.

[206]     IRS Br. at 40.

a separate charge is made for such *service*."[207]  The Debtors paid a separate charge for the *service*, as such.  That is all the statute requires.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Bankruptcy Rule 8012, the Debtors request oral argument.

## CONCLUSION

As defined by Congress and interpreted by the IRS over several decades, local telephone service must provide subscribers with the ability to engage in a telephone call with other people that have a telephone in the local service area.  Nothing in IRC §§ 4251 and 4252 makes those provisions uncertain or ambiguous.  Moreover, unless the IRS makes a "clear showing of contrary legislative intent, the plain meaning analysis of the statutory language begins and ends the judicial inquiry."[208]  For all of these reasons, the Court should deny the government's appeal and affirm the bankruptcy court's orders rendering judgment in favor of the Debtors.

Dated: Houston, Texas
          August 28, 2008

Respectfully submitted,

*/s/ Alfredo R. Pérez*
Alfredo R. Pérez
James T. Grogan (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX  77002-2784
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

*Attorneys For Appellee*

---

[207]     IRC § 4252(d).

[208]     *Executive Jet Aviation v. United States*, 125 F.3d 1463, 1470 (Fed. Cir. 1997) (addressing transportation excise taxes).