UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

IN RE:                                                      Case No. 02-13533 (AJG)

     WorldCom, Inc. et al.,

                    Debtor.

------------------------------------------------------------------------X

## **CONFIDENTIAL-SUBJECT TO BANKRUPTCY COURT ORDER**

THE MATERIAL HEREIN HAS BEEN FILED UNDER SEAL PURSUANT TO AN ORDER OF
THE BANKRUPTCY COURT, DATED OCTOBER 5, 2005 DIRECTING THE CLERK TO FILE
SUCH MATERIAL UNDER SEAL.

MICHAEL J. GARCIA
United States Attorney
Southern District of New York
By:    DANNA DRORI (DD-7690)
        NICOLE GUERON (NG-7682)
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2689, 637-2699
Facsimile: (212) 637-2686

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
In re:                                    :          CHAPTER 11
                                          :
WORLDCOM, INC., et al.,                   :          Case No. 02-13533 (AJG)
                                          :
          Debtors.                        :          (Jointly Administered)
-----------------------------------------------------X

## DECLARATION OF AUSA NICOLE GUERON

NICOLE GUERON, pursuant to 28 U.S.C. § 1746, declares as follows

1.    I am an Assistant United States Attorney in the office of Michael J. Garcia, United

States Attorney for the Southern District of New York, attorney for the United States of America.

Assistant United States Attorney Danna Drori and I are the attorneys assigned to this matter.

2.    I submit this declaration in support of the Reply of the United States of America

to Reorganized Debtors' Objection to IRS Request for Payment No. 38365.

3.    Annexed hereto as Exhibit A is a true and correct copy of a Request for Payment,

numbered 37947, filed by the Internal Revenue Service on or about February 25, 2004.

4.    Annexed hereto as Exhibit B is a true and correct copy of the Internal Revenue

Service's Withdrawal of Proof of Claim No. 37947, filed by the Internal Revenue Service on or

Page 1 of 2

S 2

about June 21, 2005.

      I declare under the penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
      September 27, 2005

                    NICOLE GUERON (NG-7682)
                    Assistant United States Attorney

# EXHIBIT A

# Request for Payment of Internal Revenue Taxes

**(Bankruptcy Code Cases—Administrative Expenses)**

Department of the Treasury/Internal Revenue Service

United States Bankruptcy Court for the __SOUTHERN__
District of __NEW YORK STATE__

**In the Matter of:**  UUNET TECHNOLOGIES, INC.
500 CLINTON CENTER DRIVE
CLINTON, MS 39056

Fiduciary:



| Case Number |
| --- |
| 02-42302-AJG |

| Type of Bankruptcy Case |
| --- |
| CHAPTER 11 |

| Date of Petition |
| --- |
| 07/21/2002 |

| Creditor Number |
| --- |

1. The undersigned, whose business address is __IRS Insolvency Group 4 290 Broadway  Stop 5TH FLR  New York, NY 10007__ is the agent of the Department of the Treasury, Internal Revenue Service, and is authorized to make this request for payment on behalf of the United States.
2. Request is made for payment of taxes and any interest or penalty due under the internal revenue laws of the United States, as shown below.
3. The ground of liability is taxes due under the internal revenue laws of the United States.

**Administrative Claims**

| Taxpayer ID Number | Kind of Tax | Tax Period | Tax Due | Interest Due | Penalty Due | Balance Due |
| --- | --- | --- | --- | --- | --- | --- |
| 54-1543611 | 5 EXCISE | 12/31/2002 | $3,288,789.00 | $169,773.03 | $0.00 | $3,458,562.03 |
| 54-1543611 | 5 EXCISE | 03/31/2003 | $3,288,789.00 | $127,865.84 | $0.00 | $3,416,654.84 |
| 54-1543611 | 5 EXCISE | 06/30/2003 | $3,288,789.00 | $85,079.73 | $0.00 | $3,373,868.73 |
| 54-1543611 | 5 EXCISE | 09/30/2003 | $3,288,789.00 | $45,659.89 | $0.00 | $3,334,448.89 |
| 54-1543611 | 5 EXCISE | 12/31/2003 | $3,288,789.00 | $12,242.70 | $0.00 | $3,301,031.70 |
| 54-1543611 | 5 EXCISE | 01/01/2004-02/29/2004 | $2,192,526.00 | $0.00 | $0.00 | $2,192,526.00 |
| | | | $18,636,471.00 | $440,621.19 | $0.00 | $19,077,092.19 |

**Total Amount Due:** $19,077,092.19



Filed: USBC - Southern District of New York
Worldcom, Inc., Et Al.
02-13533 (AJG)    0000037947

5  *UNASSESSED TAX CLAIMS HAVE BEEN FILED DUE TO PROPOSED ADDITIONAL ASSESSMENT DUE TO AN EXAMINATION OF THE TAX RETURN FOR THE PERIOD UNASSESSED.*

The amount due includes interest and penalty computed to 03/06/2004. Compound interest will accrue at the rate established under IRC Section 6621(a) and late payment penalty will be charged under IRC Section 6651. If the claim is paid after 03/06/2004, contact NAN DILLINGHAM at (212) 436-1341 for the current balance.

| Penalty for Presenting Fraudulent Claim - Fine of not more than $5,000 or imprisonment for not more than 5 years or both - Title 18, U.S.C., Section 152. | Signature  *M. Dillingham*  Marcia Smith | Date  02/25/2004 |
| --- | --- | --- |
| | Title  Insolvency Territory 2 Manager | Telephone Number  (212) 436-1341 |

Form 6338 - A (C)

**Page 1 of 1**

S 5

# EXHIBIT B

DAVID N. KELLEY
United States Attorney
Southern District of New York
By: DANNA DRORI (DD-7690)
    NICOLE GUERON (NG-7682)
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2699
Facsimile: (212) 637-2686

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
In re:                              :        CHAPTER 11

WORLDCOM, INC., et al.,             :        Case No. 02-13533 (AJG)

        Debtors.                    :        (Jointly Administered)
-----------------------------------------------------------X

## INTERNAL REVENUE SERVICE'S
## WITHDRAWAL OF PROOF OF CLAIM # 37947

TO THE HONORABLE ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE:

        The Internal Revenue Service (the "IRS"), by and through its undersigned counsel,

withdraws the following proof of claim:

        •    Claim No. 37947, dated February 25, 2004, in the amount of $19,077,092.19.

        This withdrawal in no way affects, and the IRS hereby expressly reserves, all rights to

recover under Claim No. 38365, dated June 28, 2004 and filed on or about July 2, 2004, in the

amount of $16,276,440.81 (inclusive of interest and penalties computed through July 9, 2004),

New York Southern Live System                                                    Page 1 of 56

## File a Claim action:
02-13533-ajg WorldCom, Inc.

### U.S. Bankruptcy Court

### Southern District of New York

Notice of Electronic Filing

The following transaction was received from Gueron, Nicole entered on 6/21/2005 at 12:05 PM and
filed on 6/21/2005

**Case Name:**        WorldCom, Inc.
**Case Number:**      02-13533-ajg
**Document Number:** 16282

**Docket Text:**
Withdrawal of Claim(s): *number 37947 filed by the Internal Revenue Service* filed by Nicole Gueron on
behalf of United States of America.(Gueron, Nicole)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**L:\JDonovan\worldcom Withdrawal Excise Claim 37947.pdf
**Electronic document Stamp:**
[STAMP NYSBStamp_ID=842906028 [Date=6/21/2005] [FileNumber=4156200-0]

[091e93d3ecaf10c2d53fa181f5648229d9541be3467640e447d5c35c648ee7e210fc5
45456e60b8a79eeb38f72c1c32ca8c5c93026fa8c4a8c7329f2e042ad7c]]

**02-13533-ajg Notice will be electronically mailed to:**

Franklin Adams    franklin.adams@bbklaw.com,

Jason R. Adams    jadams@torys.com,

Laurie B. Adams    lbadams@hewm.com,

Michael B. Adams    mbadams@mcguirewoods.com,

David J. Adler    dadler@mccarter.com

Dallas Albaugh    dalbaugh@pryorcashman.com

Robert D. Albergotti    eservice@haynesboone.com,

Marc E. Albert    malbert@stinsonmoheck.com,

Jonathan Bradley Alter    jonathan.alter@bingham.com

**Donovan, John**

| | |
|---|---|
| **From:** | nysbinfo@nysb.uscourts.gov |
| **Sent:** | Wednesday, November 02, 2005 12:21 |
| **To:** | courtmail@nysb.uscourts.gov |
| **Subject:** | 02-13533-ajg Response |

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. Bankruptcy Court

### Southern District of New York

Notice of Electronic Filing

The following transaction was received from entered on 11/2/2005 at 12:20 PM and filed on 10/7/2005
**Case Name:**         WorldCom, Inc.
**Case Number:**      02-13533-ajg
**Document Number:** 17489

**Docket Text:**
Response *to Reorganized Debtors' Objection to IRS Request for Payment No. 38365,* filed by Michael J. Garcia. (Edwards, Latoya)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**M:\latoya\02-13533 UNDERSEAL NOTICE.PDF
**Electronic document Stamp:**
[STAMP NYSBStamp_ID=842906028 [Date=11/2/2005] [FileNumber=4569448-0]

[0b22847850ce27a34e5f863702547fff721c49707c28b111e1e83e400bd03c9dfc5fa
1a1086bf32f5ef57145ab0bd26f5d91c76e79ea7f2ae3485957023ef6fb]]

**02-13533-ajg Notice will be electronically mailed to:**

Franklin C. Adams      franklin.adams@bbklaw.com

Jason R. Adams      jadams@torys.com,

Laurie B. Adams      lbadams@hewm.com,

Michael B. Adams      mbadams@mcguirewoods.com,

David J. Adler      dadler@mccarter.com

Dallas Albaugh      dalbaugh@pryorcashman.com, drose@pryorcashman.com

Robert D. Albergotti      robert.albergotti@haynesboone.com

11/2/2005

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:                                          :          CHAPTER 11
                                                :
WORLDCOM, INC., et al.,                         :          Case No. 02-13533 (AJG)
                                                :
            Debtors.                            :          (Jointly Administered)
-------------------------------------------------------X


### REPLY OF THE UNITED STATES OF AMERICA TO REORGANIZED DEBTORS' OBJECTION TO IRS REQUEST FOR PAYMENT NO. 38365


MICHAEL J. GARCIA
United States Attorney
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2689, 637-2699
Facsimile: (212) 637-2686


DANNA DRORI (DD-7690)
NICOLE GUERON (NG-7682)
Assistant United States Attorneys

        - Of Counsel -

**TABLE OF CONTENTS**

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT: DEBTORS' OBJECTION TO THE EXCISE TAX CLAIM
          SHOULD BE DENIED OR THE COURT SHOULD ORDER
          THE PARTIES TO CONDUCT DISCOVERY . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.      The IRS's Claim Is *Prima Facie* Valid and Debtors
        Have Failed to Overcome The Presumption of Its Validity . . . . . . . . . . . . . . . . . . . . . . . 4

II.     The Excise Tax Claim Is Valid Because UUNET Bought COBRA
        Services That Are Capable of Telephonic Quality Communication . . . . . . . . . . . . . . . 6

        A.    The Excise Tax Applies to Telephonic Quality Communication . . . . . . . . . . . . . 6

        B.    The Excise Tax Applies to All Systems Capable of Telephonic
              Quality Communication, Regardless of Actual Use . . . . . . . . . . . . . . . . . . . . . . . 7

        C.    The Excise Tax Claim Is Valid Because the COBRA
              Services Purchased by UUNET are Capable of
              Telephonic Quality Communication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

              1.    The COBRA Systems Purchased by UUNET Include
                    Modems and DSPs, Which Require Two-Way,
                    Telephonic Quality Communication to Operate . . . . . . . . . . . . . . . . . . 11

              2.    UUNET's Contracts With COBRA Service
                    Providers Acknowledge that the COBRA Services
                    Are Capable of Telephonic Quality Communication . . . . . . . . . . . . . . . 12

              3.    The Capabilities of the Technological Components of
                    the COBRA Services Add Further Proof that the COBRA
                    Services Are Capable of Telephonic Quality Communication . . . . . . . . 18

              4.    UUNET's Billing Arrangements Add Further Proof that
                    the COBRA Services Are Capable of Telephonic Quality
                    Communication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

III.    In The Alternative, the Government Is Entitled To Discovery
        as to Whether the Telecommunications Excise Tax Applies Here . . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

-i-

## TABLE OF AUTHORITIES

**Cases**                                                                                              **Page**

In re Allegheny International, Inc., 954 F.2d 167 (3d Cir. 1992) .................................................. 5

BellSouth Corp. v. FCC, 162 F.3d 1215 (D.C. Cir. 1999) .......................................................... 10

Comdata Network, Inc. v. United States, 21 Cl. Ct. 128 (1990) ............................................... 7-8

In re Dayton Seaside Assocs. No.2, L.P., 257 B.R. 123 (Bankr. S.D.N.Y. 2000) ........................ 5

In re Forte, 234 B.R. 607 (Bankr. E.D.N.Y. 1999) ...................................................................... 5

In re Kahn, 114 B.R. 40 (Bankr. S.D.N.Y. 1990) ......................................................................... 4

In re King, 305 B.R. 152 (Bankr. S.D.N.Y. 2004) ........................................................................ 4

LaBow v. IRS, 763 F.2d 125 (2d Cir. 1985) ................................................................................. 5

Raleigh v. Illinois Dept. of Rev., 530 U.S. 15 (2000) .................................................................... 5

Rexnord Holdings, Inc. v. Biderman, 21 F.3d 522 (2d Cir. 1994) ................................................ 4

In re Rockefeller Center Properties & RCP Associates,
    241 B.R. 804  (Bankr. S.D.N.Y. 1999) ............................................................................... 21

SEC v. Unifund SAL, 910 F.2d 1028 (2d Cir. 1990) ..................................................................... 4

In re Unimet Corp., 74 B.R. 156 (Bankr. N.D. Ohio 1987) .......................................................... 5

United States v. McCombs, 30 F.3d 310 (2d Cir. 1994) ............................................................... 5

Vines v. IRS (In re Vines), 200 B.R. 940 (M.D. Fl. 1996) ............................................................ 4

Wright v. Holm (In re Holm), 931 F.2d 620 (9th Cir. 1991) ......................................................... 4


**Statutes**

26 U.S.C. § 4251 ............................................................................................................................ 6

26 U.S.C. § 4252 .................................................................................................................... passim

Fed. R. Bankr. P. 9014 .............................................................................................................. 2, 21

Fed. R. Bankr. P. 7026 .................................................................................................................... 2

**Other Citations**

IRS Revenue Ruling 79-245, 1979-2 C.B. 380, 1979 IRB LEXIS 290 (July 1979) ................ 8-10

In the Matter of Petition for Declaratory Ruling that AT&T's Phone-to-Phone
  *IP Telephony Services Are Exempt From Access Charges*, F.C.C. 04-97,
    19 F.C.C.R. 7457, [2004 WL 856557] ............................................................................ 14

-iii-

MICHAEL J. GARCIA
United States Attorney
Southern District of New York
By:     DANNA DRORI (DD-7690)
        NICOLE GUERON (NG-7682)
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2689, 637-2699
Facsimile: (212) 637-2686

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:                                    :        CHAPTER 11
                                          :
WORLDCOM, INC., et al.,                   :        Case No. 02-13533 (AJG)
                                          :
        Debtors.                          :        (Jointly Administered)
-------------------------------------------------------X

### REPLY OF THE UNITED STATES OF AMERICA TO REORGANIZED DEBTORS' OBJECTION TO IRS REQUEST FOR PAYMENT NO. 38365

TO THE HONORABLE ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE:

1.      The United States of America (the "United States" or "Government") by its

attorney, Michael J. Garcia, United States Attorney for the Southern District of New York,

respectfully submits this reply to the Reorganized Debtors' Objection to Proof of Claim No.

38365, filed on August 5, 2004 (the "Objection," a copy of which is attached as Exhibit B to the

Declaration of Dr. Michael Hills, dated September 21, 2005 ("Hills Decl.")).[1]

2.      On or about July 2, 2004, the Internal Revenue Service ("IRS") filed a Request

For Payment, claim numbered 38365, against MCI subsidiary UUNET Technologies, Inc.

("UUNET") seeking payment of $16,276,440.81 in federal communications excise taxes. (Id.

---

[1] Debtors refer to the IRS's Request for Payment as a Proof of Claim. In fact, the IRS filed a Request for Payment of its administrative claim for post-petition taxes.

- 1 -

S 14

Ex. A).

3.      The excise taxes are owed pursuant to 26 U.S.C. § 4252(a), because UUNET has purchased central office-based remote access ("COBRA") services that include access to the local telephone system and the capability of providing telephonic quality communication with substantially all persons in the local telephone system. (Id. ¶ 5). In other words, UUNET has bought services that can provide telephonic quality communication.

4.      In the Objection, Debtors contend that the COBRA services they purchased are capable of transmitting data only, not voice communications, and that the excise taxes are therefore inapplicable. This contention is factually and legally incorrect, as explained below and in the declaration of the Government's expert witness, Dr. Michael Hills.

5.      For the reasons set forth below, the Government asks the Court to reject Debtors' efforts to expunge, disallow or modify the IRS's Request for Payment and requests that the Request for Payment be allowed in the full amount of $16,276,440.81 (plus any subsequently-accrued interest and penalties) because Debtors have not rebutted the *prima facie* validity of the IRS's claim and because the evidence demonstrates that the COBRA services purchased by UUNET are capable of telephonic quality communication. Alternatively, the Government respectfully requests that the Court permit discovery on the factual matters raised by the Objection, pursuant to Federal Rules of Bankruptcy Procedure 9014 and 7026.

## BACKGROUND

6.      On July 21, 2002 and November 8, 2002, the Debtors filed petitions for relief under Chapter 11, Title 11 of the United States Code, 11 U.S.C. § 101 *et seq*., as amended (the "Bankruptcy Code").

7.      On or about February 25, 2004, the IRS filed a Request for Payment, numbered

- 2 -

37947, against debtor UUNET, in the amount of $19,077,092.19 (inclusive of interest and penalties computed through March 6, 2004) for unpaid post-petition excise taxes for the fourth quarter of 2002, all four quarters of 2003, and some of the first quarter of 2004. (Declaration of Assistant United States Attorney Nicole Guéron, dated September 27, 2005 ("Guéron Decl.") Ex. A).[2]

8.    On or about July 2, 2004, the IRS filed the Request For Payment, claim numbered 38365, as Amendment No. 1 to its prior Request for Payment, in the amount of $16,276,440.81 (inclusive of interest and penalties computed through July 9, 2004) for unpaid post-petition excise taxes for the fourth quarter of 2002, all four quarters of 2003, the first quarter of 2004, and some of the second quarter of 2004 (the "Excise Tax Claim"). (Hills Decl. Ex. A).

9.    In approximately February, 2005, the parties agreed to engage in informal discovery, in an effort to see whether development of the factual record would permit resolution of the dispute without formal litigation. By letter dated February 14, 2005, the Government sought numerous relevant documents from the Debtors. (Hills Decl. Ex. D).

10.    On July 14, 2005, Debtors produced 265 pages of documents, and a letter describing the limited scope of this production. (Hills Decl. Ex. C). Debtors refused to produce many of the documents requested by the Government.

11.    Accordingly, the Government bases this response to the Objection on only a portion of the documents it sought from Debtors, which are only those documents that Debtors chose to disclose. Nonetheless, the documents produced by UUNET prove that the COBRA services UUNET purchased are capable of telephonic quality communication, and are therefore subject to federal communications excise taxes.

_____

[2] The IRS later withdrew Claim No. 37947 for unrelated reasons. (Guéron Decl. Ex. B).

- 3 -

## ARGUMENT

### DEBTORS' OBJECTION TO THE EXCISE TAX CLAIM SHOULD BE DENIED OR THE COURT SHOULD ORDER THE PARTIES TO CONDUCT DISCOVERY

I.   **The IRS's Claim Is *Prima Facie* Valid and Debtors Have Failed to Overcome The Presumption of Its Validity**

12.   "It is well settled that the party objecting to a proof of claim has the burden of coming forward with sufficient evidence rebutting the validity of a properly filed proof of claim." In re King, 305 B.R. 152, 162 (Bankr. S.D.N.Y. 2004).

13.   A proof of claim executed and filed in accordance with the Federal Rules of Bankruptcy Procedure constitutes *prima facie* evidence of the validity and amount of the claim. Fed. R. Bankr. P. 3001(f); see Vines v. IRS (In re Vines), 200 B.R. 940, 949 (M.D. Fl. 1996) (declining to invalidate IRS proof of claim); In re Kahn, 114 B.R. 40, 44 (Bankr. S.D.N.Y. 1990) (properly filed proof of claim is deemed valid and allowed unless debtor objects). "'*Prima facie* case' has a clear meaning: evidence of an amount and quality sufficient to send a case to the trier of fact." SEC v. Unifund SAL, 910 F.2d 1028, 1037 (2d Cir. 1990).

14.   Unsupported allegations cannot rebut the *prima facie* validity of the Excise Tax Claim. See Rexnord Holdings, Inc. v. Biderman, 21 F.3d 522, 526 (2d Cir. 1994) (party cannot rebut *prima facie* case without "competent evidence"); King, 305 B.R. at 164 (objecting party must produce sufficient evidence to refute claimant's *prima facie* case); Kahn, 114 B.R. at 44 (same); see also Wright v. Holm (In re Holm), 931 F.2d 620, 623 (9th Cir. 1991) (debtor who adduced no evidence supporting objection to claim failed to overcome *prima facie* validity of claim).

15.   Thus, in the face of the Excise Tax Claim, "the Debtor 'may not rebut the *prima facie* case merely by stating that the amount of taxes claimed by the Service is not correct; the

- 4 -

[Debtor] must produce some evidence to support that statement.'" In re Forte, 234 B.R. 607, 618 (Bankr. E.D.N.Y. 1999) (citation omitted). Such a rebuttal requires "specific evidence" concerning the Debtor's tax liability, not just "unsupported statements." LaBow v. IRS, 763 F.2d 125, 131 (2d Cir. 1985); see In re Unimet Corp., 74 B.R. 156, 167 (Bankr. N.D. Ohio 1987) (bare allegations of debtor's corporate officer, without substantiation, are insufficient to rebut *prima facie* validity of IRS's claim).

16.     The evidence produced in objection to a claim must also have probative force at least equal to that of the proof of claim.  See e.g., In re Allegheny International, Inc., 954 F.2d 167, 173-74 (3d Cir. 1992) ("[T]he objector must produce evidence equal in force to the *prima facie* case"); 4 Lawrence P. King, ed., Collier on Bankruptcy ¶ 502.02[3][f], at 502-18 (15th ed. Rev. 2005) ("Unless the . . . objector . . . introduces evidence as to the invalidity of the claim or the excessiveness of its amount, the claimant need offer no further proof of the merits of the claim.").

17.     Furthermore, UUNET carries the burden of proving the invalidity of the Excise Tax Claim, because "[a] taxpayer who wishes to challenge the validity of the [federal tax] assessment . . . 'bears the burden both of production and persuasion.'" United States v. McCombs, 30 F.3d 310, 318 (2d Cir. 1994) (citation omitted).  The fact of bankruptcy does nothing to alter this burden, since "[t]he burden of proof in a bankruptcy case with respect to a tax obligation rests on the party who would have the burden in accordance with the underlying substantive law." In re Dayton Seaside Assocs. No.2, L.P., 257 B.R. 123, 127 (Bankr. S.D.N.Y. 2000) (citing Raleigh v. Illinois Dept. of Rev., 530 U.S. 15, 23 (2000)).

18.     Here, the Debtors have submitted no evidence in support of their numerous unsupported factual contentions in the Objection.  The Objection attaches no documentary or

testimonial evidence whatsoever, let alone substantial evidence, to support the Debtors' claims.

19. Thus, the Debtors have identified no basis to support their challenge to the Excise

Tax Claim. Accordingly, the presumption that the Excise Tax Claim is valid remains in effect,

and the Excise Tax Claim should be allowed in its entirety.

## II. The Excise Tax Claim Is Valid Because UUNET Bought COBRA Services That Are Capable of Telephonic Quality Communication

20. Even if the Debtors had submitted substantiated evidence to rebut the *prima facie*

validity of the Excise Tax Claim, the claim is nonetheless valid and the Objection should be

denied.

21. The Excise Tax Claim is valid because UUNET purchased COBRA services

capable of telephonic quality communication, regardless of how UUNET chose to use the

services.

### A. The Excise Tax Applies to Telephonic Quality Communication

22. The Internal Revenue Code, Section 4251, imposes a three percent excise tax on

amounts paid for certain communications services, including local telephone service, toll

telephone service, and teletypewriter exchange service. See 26 U.S.C. § 4251 (the "Excise

Tax").

23. The taxable communications services are defined in 26 U.S.C. § 4252 ("Section

4252"). As relevant here, Section 4252(a) defines "local telephone service" to include:

(1) the access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and

(2) any facility or service provided in connection with a service described in paragraph (1).

26 U.S.C. § 4252(a).

- 6 -

**B.    The Excise Tax Applies to All Systems Capable of
Telephonic Quality Communication, Regardless of Actual Use**

24.    As explained more fully below, the applicability of Section 4252(a) of the Excise

Tax is determined by a communication system's capacity to be used for covered

communications, regardless of its actual use or contractually-obligated use. See Comdata

Network, Inc. v. United States, 21 Cl. Ct. 128, 130-31 (1990).

25.    It follows that the relevant question under 4252(a) is whether UUNET bought

COBRA services that are capable of telephonic quality communication covered by the Excise

Tax, regardless of whether the COBRA services were actually used for that purpose. See id.

26.    In Comdata, plaintiff Comdata was in the business of providing money transfer

services by making funds available to individual truckers at authorized Comdata service centers

throughout the country. See Comdata, 21 Cl. Ct. at 129. Typically, a trucker would request

funds at a Comdata service center and an agent there would contact Comdata's offices by

telephone to request authorization for the transaction. Id.

27.    The service center agent's request would be made either verbally or electronically.

Id. In a verbal transaction, the service center agent would place a telephone call to a Comdata

service representative and provide the relevant information to process the request. Id. In an

electronic transaction, the service center's automated equipment allowed a service center agent to

transmit a funds request and the relevant information electronically, through telephone lines,

directly to the Comdata computer system. Id.

28.    Both the verbal and electronic transactions used Wide Area Telecommunications

Service ("WATS"), which provides long distance telephone service for selected service areas at

bulk rates. Id. When the service center agent dialed the Comdata number, the call was

- 7 -

transmitted over the local telephone system and connected with the supplier of Comdata's WATS line. Id. The call was completed over an "INWATS" access line (for incoming WATS calls) to Comdata's office. Id. There were no restrictions on who could call Comdata's INWATS numbers, but such a call would access only a randomly-selected Comdata customer service representative. Id. at 130. The incoming call could not be patched through to other numbers and no outgoing calls could be made from Comdata's office using this service.[3] Id.

29.     Plaintiff Comdata argued that the incidence of the excise tax is governed not by the capability of the service provided but rather by the actual use made of it. Id. Thus, the company argued, the restricted configuration of the service, which greatly limited its use, rendered it exempt from the excise tax. Id.

30.     The Court of Claims rejected Comdata's argument, ruling instead that Comdata's WATS service was a toll telephone service under § 4252(b)(2) because it was a service that entitled Comdata to the privilege of an unlimited number of telephone calls to or from a substantial portion of the telephone stations in a distant service area. Id. The court held that "the tax is applicable because the service provided [to Comdata] grants it the right to utilize the telephone lines to communicate with a substantial number of stations in a distant area. That the service may not, in fact, be so used by plaintiff is irrelevant to the existence of the privilege." Id. at 131 (emphasis added). The Comdata court noted that a system with no "inherent use limitations" is taxable, regardless of how the taxpayer chooses to use it. Id.

31.     The Comdata decision reinforces IRS Revenue Ruling 79-245, 1979-2 C.B. 380, 1979 IRB LEXIS 290 (July 1979) ("Rev. Rul. 79-245"), which held that "[w]here a telephone service provides the subscriber the privilege of telephonic quality communication with

_____

[3] Comdata had a separate "OUTWATS" service for outgoing calls.

- 8 -

substantially all other subscribers to the local telephone system, it is immaterial whether the subscriber exercises the privilege." 1979 IRB LEXIS 290, at *5.

32.     In Rev. Rul. 79-245, a business leased certain data processing and transmission equipment, including modems and computers, and the computers handled data received over the regular telephone network from terminals at other locations. The modems converted the computer signals into signals that could be transmitted over telephone lines. Id. at *1. While these telephone signals were the same type used to transmit voice, the modems were designed only for nonvoice transmission and produced a signal which was usable only for transmission to other computer stations. Id. at *2.

33.     Although the business reserved the computer lines for nonvoice data transmission only, the IRS held that the excise tax still applied. Id. at *4-6. The business paid monthly charges to the local telephone company for local telephone service, but, instead of having standard telephones connected to the telephone lines the business had its computer and terminals connected to the telephone lines. Id. at *3. Thus, the system was interconnected through the local telephone exchange and anyone anywhere could connect to a station in the system by dialing the telephone number assigned by the local telephone company to that station. Id. However, to prevent access to the system from outside the business, the numbers were unlisted and a special security code had to be used to activate the equipment after the telephone connection was established. Id. Furthermore, intercommunication between teleprocessing stations could be established only if the stations had synchronized transmission speed and compatible programming. Thus, while anyone could dial the telephone number, only a station with specially programmed, compatible computer equipment could communicate with another teleprocessing station. Id.

- 9 -

34.     The IRS ruled that the amounts paid to the local telephone company for the local telephone service used with the teleprocessing equipment were subject to the Excise Tax. Id. at *6. The IRS reasoned that because the business had access to the local telephone exchange system through the lines used with the computer system, it had the privilege of telephonic quality communication with substantially all persons with telephones in the local system, within the meaning of Section 4252(a), regardless of whether the business exercised the privilege. Id. at *5-6.

35.     As with Comdata, the IRS ruled that "[w]here a telephone service provides the subscriber the privilege of telephonic quality communication with substantially all other subscribers to the local telephone system, it is immaterial whether the subscriber exercises the privilege." 1979 IRB LEXIS 290, at *5. In other words, because the subscriber could have chosen to plug a "regular telephone set" into the system, rather than a modem, in order to make regular telephone calls with other telephone users in the local system, the service was subject to the Excise Tax regardless of whether the subscriber ever actually did so. Id. at *4-6.

36.     In another context, at least one appellate court has endorsed Comdata's analytical approach and recognized the distinction between a technology's capability and its current use. In BellSouth Corp. v. FCC, the D.C. Court of Appeals questioned whether a specialized mobile radio spectrum that was "'dedicated' to data-only use is truly 'incapable' of being used for voice-to-voice services." 162 F.3d 1215, 1224 n. 8 (D.C. Cir. 1999).

## C.     The Excise Tax Claim Is Valid Because the COBRA Services Purchased by UUNET are Capable of Telephonic Quality Communication

37.     Because the applicability of Section 4252(a) of the Excise Tax is determined by a communication system's capacity to be used for covered communications, the relevant question

- 10 -

here is whether the COBRA services purchased by UUNET are capable of telephonic quality communication, regardless of whether UUNET chooses to use them this way, either voluntarily or due to contractual obligations.

38.    UUNET's contracts and technical product descriptions prove that it bought COBRA services that include "(1) the access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and (2) any facility or service provided in connection with a service described in paragraph (1)." 26 U.S.C. § 4252(a).

### 1.    The COBRA Systems Purchased by UUNET Include Modems and DSPs, Which Require Two-Way, Telephonic Quality Communication to Operate

39.    The modems and DSPs within the COBRA systems purchased by UUNET cannot operate without two-way, telephonic quality communication. (Hills Decl. ¶ 8-11). Thus, the presence of modems and DSPs in all of the COBRA services proves that those services are capable of telephonic quality communication. (Id.).

40.    All the COBRA services purchased by UUNET use either modems or DSPs for all their communication. All access to modems or DSPs requires two-way, voice grade, telephonic quality communication. The COBRA services purchased by UUNET provide access between UUNET's dial-up customers' modems and the modems and/or DSPs within the COBRA system, and thus require two-way, voice capable, telephonic quality communication. (Id. ¶ 8).

41.    The Public Switched Telephone Network ("PSTN") is the basic infrastructure of the public telephone system. It transmits telephonic quality communication in two ways, either as an analog transmission (which is the standard method from a private home) or as a digital representation of analog signals. An ISP can connect to the PSTN either by analog (using a

- 11 -

modem) or digitally (using a DSP). (Id. ¶ 9).

42.    It is contradictory for MCI to claim that the COBRA Services purchased by

UUNET rely on modems, but that these modems do not in turn rely on telephonic quality or

voice-quality communication connections. (Hills Decl. Ex. B ¶ 10). In general, a dial-up

customer's modem is connected to the dial-up customer's telephone line and requires a

telephonic or voice-quality, two-way communication channel to a recipient modem. The purpose

of a modem is to transform signals into voice-like signals that can use the voice transmission

network. The familiar beeping sound made by a modem uses the same range of frequency as

voice does, and so a modem has to "hear" these frequencies in order to operate. Therefore, the

operation of a modem in a telecommunications system requires voice or telephonic quality

communication channels. (Id. ¶ 10).

43.    Where the COBRA services use a digital interface to the PSTN (known as an

Integrated Services Digital Network Bearer Channel (an "ISDN-B channel")), an ISP has the

option of avoiding the use of a conventional modem and instead using a DSP, which converts the

digital representation of the voice quality signal directly to a format required by the ISP. The use

of a DSP in this configuration still requires a telephonic quality communication. (Id. ¶ 11).

## 2.    UUNET's Contracts With COBRA Service Providers Acknowledge that the COBRA Services Are Capable of Telephonic Quality Communication

44.    UUNET produced to the Government contracts between UUNET and five or six

of its COBRA Service providers. (Hills Decl. Ex. C, bates-numbered DOJ ("DOJ") 35-45, 95-

118, 126-132, 52-68). At least four of these contracts acknowledge that the COBRA services are

capable of telephonic quality communication, by (i) reference to the modems and DSPs within

the COBRA systems that cannot operate without voice or telephonic quality communication

- 12 -

channels, see supra Section C1, and (ii) repeated discussion of the services' ability to provide

Voice Over Internet Protocol ("VoIP") communication. (Id.). The acknowledgment that the

COBRA services are VoIP capable is a clear admission that the COBRA services are capable of

voice quality communication. (Hills Decl. ¶ 12).

45.     An ISP's modem as used in a COBRA system either acts just like a dial-up

customer's modem, or (if digital) is a DSP which can be programmed to transmit data or VoIP on

a call-by-call basis. (Id.). The COBRA services contracts produced by UUNET acknowledge

this fact, and thus the voice capability of the system. (Id.).

### The Qwest COBRA Access Contract

46.     For example, MCI produced to the Government a contract between MCI

WorldCom Network Service, Inc. and Qwest Corporation entitled "Amended & Restated Central

Office-Based Remote Access Service Schedule" (the "Qwest COBRA Access Contract"). (Hills

Decl. Ex. C, DOJ 35-45). The Qwest COBRA Access Contract provides as follows:

> Should WorldCom or any of its affiliates wish to directly use the COBRA Services to
> directly provide any one-way or two-way voice telephony communications, whether local
> or long distance ("VoIP"), WorldCom and Vendor shall negotiate terms, conditions, and
> rate structures that are applicable to VoIP prior to WorldCom utilizing the COBRA
> Services to directly provide VoIP services. . . . If WorldCom or any of its affiliates at any
> time during the Service Term of this Schedule directly use the COBRA Services to
> provide VoIP without the prior development of mutually agreed-upon terms, conditions,
> and rate structures for VoIP, WorldCom shall be in breach of this Schedule . . . .

(Id. Ex. C, DOJ 37, ¶ A12).

47.     This contract thus acknowledges, by its very language, that the COBRA services

obtained by WorldCom from Qwest are capable of "one-way or two-way voice telephony

communications" and VoIP telephony without any change in the COBRA's access services from

the local exchange carrier ("LEC"). The provision that "[i]f WorldCom or any of its affiliates at

- 13 -

any time during the Service Term of this Schedule directly use the COBRA Services to provide

VoIP without the prior development of mutually agreed-upon terms, conditions, and rate

structures for VoIP, WorldCom shall be in breach of this Schedule" makes evident that no

change in the COBRA's access services is necessary for WorldCom unilaterally to use the

COBRA services to provide VoIP. Accordingly, the COBRA services can provide voice

capable, telephonic quality communication. (Hills Decl. ¶ 15).[4]

      48.     The Qwest COBRA Access Contract also provides:

> COBRA Services provide integrated, remote analog & digital access to WorldCom that
> may be utilized by WorldCom's employees, WorldCom's end users, and the end users of
> WorldCom's affiliates, clients and resellers (collectively, "End Users") to connect to
> WorldCom's Internet network ("WorldCom Network") via modems referred to as
> network access servers ("NAS") deployed in central offices operated by Vendor [Qwest].
> . . . COBRA Services provide medium to high-speed data transport services for remote
> access to the WorldCom network. COBRA Services permit WorldCom to receive calls
> from multiple analog modems and ISDN basic rate interface lines for handoff to
> separately purchased wide area network links. Vendor shall connect each NAS used in
> connection with the COBRA Services to the Public Switched Telephone Network
> ("PSTN") via ISDN primary rate interface, or other mutually agreed comparable
> telecommunications facilities (collectively "PRI") and shall arrange for the dedicated
> assignment . . . of unique telephone numbers for (or in use by) WorldCom and End Users.

(Id. Ex. C, DOJ 35 ¶ A1).

      49.     This paragraph means that the COBRA Services purchased by WorldCom provide

WorldCom's employees and customers with regular telephonic access to modems, which

modems then connect to WorldCom's Internet network. By the terms of the contract, Qwest is

---

[4] Indeed, the FCC has determined that an AT&T service called "phone-to-phone Internet
protocol telephony services" – which switches telephone calls placed on a "regular telephone" to
an Internet Protocol format transported over AT&T's Internet backbone and then converts the
call back from the IP format and delivers it through local exchange carriers ("LECs") local
business lines – is a telecommunications service. See In the Matter of Petition for Declaratory
Ruling that AT&T's Phone-to-Phone IP Telephony Services Are Exempt From Access Charges,
FCC 04-97, 19 F.C.C.R. 7457, 2004 WL 856557 (FCC Apr. 21, 2004) (holding that access
charges apply).

- 14 -

required to connect each modem within the COBRA Services to the PSTN, which is the basic infrastructure of the public telephone system, and to assign unique telephone numbers to the dial-up customers. These factors are all hallmarks of a voice-capable telephony system, which uses telephonic quality connections and dedicated telephone numbers to connect the dial-up customers to the Internet. (Hills Decl. ¶ 17).

50.   The Qwest COBRA Access Contract also provides that: "Vendor intends to offer the COBRA Services in all cities where facilities exist and where technically and economically feasible" (Id. Ex. C, DOJ 37 ¶ A13), and that "[v]endor agrees to use commercially reasonable efforts to make the COBRA Services available in all Vendor COs [central offices]" (id. ¶ B).

51.   This agreement that the COBRA services will be offered so widely demonstrates that the Qwest COBRA Access Contract offered WorldCom access to substantially all of the local telephone system, and thus substantially all persons in that system, located in the "fourteen-state Qwest . . . service area." (Hills Decl. ¶ 18). This satisfies the requirement of Section 4252(a), which applies the Excise Tax to services providing "access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system." 26 U.S.C. § 4252(a).

### The USWC COBRA Access Contract

52.   MCI also produced to the Government an earlier service agreement between UUNET and U.S. West Communications ("USWC," the "USWC COBRA Access Contract"), which includes the following provision:

> Should UUNET or any of its affiliates wish to directly use USWC Services to directly provide any two way telephony communications, whether local or long distance ("Voice over IP"), UUNET and USWC shall negotiate terms, conditions and rate structures,

- 15 -

applicable to Voice over IP prior to UUNET utilizing the COBRA or SS7 Gateway
platform to directly provide Voice over IP.

(Hills Decl. Ex. C, DOJ 99 ¶ 6.1.1).

53.     Section 6.1.1 of the USWC COBRA Access Contract was apparently modified by

Amendment No. 1 to the agreement, which provides:

If UUNET or any of its affiliates, as defined in section 6.2, at any time during the term of
this Agreement directly use USWC Services to directly provide Voice over IP, as defined
in section 6.1.1, without the prior development of mutually accepted terms, conditions,
and rate structures applicable to Voice over IP, UUNET is in breach of this agreement.

(Id. DOJ 95 ¶ 1). The amendment also requires UUNET and USWC to use reasonable efforts to

develop technologies "that will signal USWC and UUNET of instances of activation of software

or hardware capable of supporting Voice over IP. USWC has the option to randomly poll any

USWC RAD . . . to validate that . . . voice over IP functionality is not enabled." (Id.).

54.     This contract thus contemplates, by its very language, that the COBRA services

obtained by UUNET from USWC are capable of "two way telephony communications" and

VoIP telephony without any change in the COBRA's access services from the local exchange

carrier ("LEC"). Section 6.1.1 makes evident that no change in the COBRA's access services is

necessary for UUNET unilaterally to use the COBRA services to provide VoIP. These

provisions thus further confirm that the COBRA services can provide voice capable, telephonic

quality communication. (Hills Decl. ¶ 21).

### The SBC Service Schedule

55.     MCI also produced to the Government a service schedule between UUNET and

SBC Global Services, Inc. (the "SBC Service Schedule") which includes the following provision:

The DAS [Dial Access Solution] Services provide integrated, remote dial access service
to Customer, its end users, and the end users of Customer's clients and resellers via
modems referred to as network access servers ("NAS") deployed in central offices

- 16 -

operated by SBC . . . .  The DAS Services provide medium to high-speed data transport
services for remote dial access to Customer's network.  The DAS Services permit
Customer to receive calls from multiple analog modems and ISDN basic rate interface
lines for handoff to separately purchased wide area network links.  SBC shall connect
each NAS used in connection with the DAS Services provided hereunder to the Public
Switched Telephone Network ("PSTN") via ISDN primary rate interface ("PRI") or
comparable telecommunications facilities, and shall arrange for the dedicated assignment
of unique telephone numbers for use by Customer, its end users (for example, America
OnLine), and the end users of Customer's clients (for example, a subscriber to America
OnLine).

(Hills Decl. Ex. C, DOJ 126 ¶ A.1(a), (b)).

56.    This paragraph means that the COBRA Services purchased by UUNET provide

UUNET's employees and customers with regular telephonic access to modems, which modems

then connect to WorldCom's Internet network.  By the terms of the contract, SBC is required to

connect each modem within the COBRA Services to the PSTN, which is the basic infrastructure

of the public telephone system, and to assign unique telephone numbers to the dial-up customers.

These factors are all hallmarks of a voice-capable telephony system, which uses telephonic

quality connections and dedicated telephone numbers to connect the dial-up customers to the

Internet.  (Hills Decl. ¶ 23).

### The BellSouth Contract

57.    Finally, MCI produced to the Government a master contract service arrangement

between UUNET and BellSouth Telecommunications, Inc. (the "BellSouth Contract") (Hills

Decl. Ex. C, DOJ 52-68), which provides:

the RAS [Remote Access Service] shall provide integrated, remote analog and ISDN
access to UUNET, its end users, and the end users of UUNET's affiliates . . . and
clients . . . via modems referred to as network access services ("NAS") deployed in
central offices operated by Bell South . . . .  The RAS Service shall provide medium to
high-speed data transport services for remote access to UUNET's Internet network.  The
RAS Service shall permit UUNET to receive calls from multiple analog modems and
ISDN basic rate interface lines for handoff to separately purchased wide area network
links.  BellSouth shall connect each NAS used in connection with the RAS Service to the

- 17 -

Public Switched Telephone Network ("PSTN") via ISDN primary rate interface ("PRI"), or other mutually agreed comparable telecommunications facilities. BellSouth shall arrange for the dedicated assignment (or preservation) of unique telephone numbers . . . for (or in use by) UUNET and its End Users.

(Hills Decl. Ex. C, DOJ 58 ¶ I.A.(1)).

58.     This paragraph means that the COBRA Services purchased by UUNET provide UUNET's employees and customers with regular telephonic access to modems, which modems then connect to WorldCom's Internet network. By the terms of the contract, BellSouth is required to connect each modem within the COBRA Services to the PSTN, which is the basic infrastructure of the public telephone system, and to assign unique telephone numbers to the dial-up customers. These factors are all hallmarks of a voice-capable telephony system, which uses telephonic quality connections and dedicated telephone numbers to connect the dial-up customers to the Internet. (Hills Decl. ¶ 25).

### 3.     The Capabilities of the Technological Components of the COBRA Services Add Further Proof that the COBRA Services Are Capable of Telephonic Quality Communication

59.     The documents produced by UUNET add further proof, in discussing the technical capacities of the components of the COBRA services, that the COBRA services purchased by UUNET are capable of telephonic quality communication and are therefore subject to the Excise Tax.

60.     MCI produced to the Government documents reflecting the configuration of the Qwest COBRA system. (Hills Decl. Ex. C, DOJ 234-238). These product description documents indicate that the Qwest COBRA system includes a HiPerDSP Card Set. (Id. DOJ 234-35). The documents also state that a HiPerDSP Card Set "features a fully reprogrammable digital signal processing engine that lets administrators reconfigure the system to implement new

- 18 -

technologies and applications such as voice-over-IP. The card set supports a full range of trunk and communication standards . . . ." (Id. DOJ 236; 241-42). The HiPerDSP Card Set specifications also identify VoIP as an optional feature. (Id. DOJ 237).

61.    As Dr. Hills, the Government's expert witness, explains, the text of this product description demonstrates that the HiPerDSP Card Set supports voice capable, telephonic quality communication, and therefore that the Qwest COBRA services purchased by UUNET can provide voice capable, telephonic quality communication. (Hills Decl. ¶ 27).

62.    MCI also produced to the Government documents reflecting the configuration of the Verizon COBRA system. (Hills Decl. Ex. C, DOJ 245-59). These product description documents indicate that the Verizon COBRA system includes 48-port and 96-channel Lucent TNT cards. (Id. DOJ 245). These documents also state that the 48-port and 96-channel Lucent TNT cards can support Lucent's "True Access Operating System (TAOS)" with "Universal Port" capabilities, which in turn supports "multiple applications including simultaneous analog and digital modems for remote access, voice- and fax-over-IP . . ." as well as "residential 1 + long distance (LD) and 1010 dial-around services and call routing programmability in and out of the voice-over-IP (VoIP) network based on dialed number identification service or trunk group." (Id. DOJ 247 ¶ 3, 258).

63.    The Lucent TAOS Universal Port "uses the same DSP for voice or data on a call-by-call basis" and "this new MultiVoice functionality enables any Internet service provider (ISP) to offer telephony services in the $87 billion North American market for long-distance services." (Id. DOJ 249 ¶ 11).

64.    In addition, TAOS "interoperate[s]" with Lucent technologies which can "convert circuit trunks to VoIP packets" after receiving signals from the PSTN. (Id. DOJ 249 ¶ 13).

- 19 -

65.     According to Dr. Hills, the text of this product description demonstrates that the

Lucent TAOS/TNT card system supports voice capable, telephonic quality communication, and

therefore that the Verizon COBRA services purchased by UUNET can provide voice capable,

telephonic quality communication. (Hills Decl. ¶ 31).

**4.     UUNET's Billing Arrangements Add
         Further Proof that the COBRA Services Are
         Capable of Telephonic Quality Communication**

66.     Finally, the method by which UUNET paid for the COBRA services adds further

proof that UUNET purchased COBRA systems that include two-way telephonic quality access to

the local telephone networks, and are therefore subject to the Excise Tax.

67.     The contractual billing arrangements between UUNET and all of the LECs

provided that UUNET would pay bundled monthly charges per port, which include two-way

telephonic quality access to the local telephone network. (Hills Decl. ¶ 32).

68.     Specifically, the contracts provide that, for example, the COBRA services will

encompass "all NAS equipment, telecommunications services and related facilities (including

without limitation active PRI lines) . . . required to connect a call that has been dialed into the

PSTN . . . ." (Id. Ex. C DOJ 12). Similarly, the Qwest COBRA Access Contract provides:

"COBRA services include all equipment, telecommunications services and related facilities

(including without limitation active PRI lines . . .) . . . required to connect a call that has been

dialed into the PSTN . . . ." (Id. DOJ 35 ¶ A2). Further, the COBRA services were billed on a

per port basis, where the price of the port includes all access to the PSTN. (Id. DOJ 14, 38-39).

69.     This billing system demonstrates that (a) the COBRA services include access to

the local telephone system, see § 4252(a)(1), because PRI lines are one way a user connects to

the local telephone system and the PSTN, and (b) the NAS (that is, modems) included in the

- 20 -

COBRA service is a facility or service provided in connection with local telephone service, see § 4252(a)(2). Since telephonic quality access to the PSTN is bundled into the port charges, the Excise Tax applies to the port charges. (Hills Decl. ¶ 33).

## III.   In The Alternative, the Government Is Entitled To Discovery as to Whether the Telecommunications Excise Tax Applies Here

70.   Because Debtors have filed an objection to the Excise Tax Claim, which is contested by the Government, this is a contested matter. See Fed. R. Bankr. P. 9014; In re Rockefeller Center Properties & RCP Assocs., 241 B.R. 804, 817 (Bankr. S.D.N.Y. 1999) ("When an objection to a claim is contested, a contested matter is created.").

71.   The Government is therefore entitled to formal discovery on the factual underpinnings of Debtors' challenge to the Excise Tax Claim pursuant to Rule 26 of the Federal Rules of Civil Procedure, as incorporated by the Bankruptcy Rules. See Fed. R. Bankr. P. 9014, 7026.

72.   As noted above, the applicability of Section 4252(a) of the Excise Tax is determined by a communication system's capacity to be used for covered communications, regardless of its actual or contractually-obligated uses. See Comdata, 21 Cl. Ct. at 130-31.

73.   The 265 pages of documents produced by Debtors and the Hills Declaration demonstrate that the COBRA services purchased by UUNET are capable of telephonic quality communication. If the Court concludes that the available evidence does not compel this conclusion, however, then formal discovery is required, particularly because Debtors refused to produce many of the documents sought by the Government during informal discovery, including billing invoices, certain promotional materials, and contracts between UUNET and its customers. (Hills Decl. Ex. C).

- 21 -

74.     More specifically, if the Court does not rule, based on this submission, that the

Excise Tax applies because the COBRA services purchased by UUNET are capable of telephonic

quality communication, the Government should be permitted to conduct formal, comprehensive

fact and expert discovery on the technical capacity of the COBRA systems, through

interrogatories, demands for the production of documents, and other written discovery,

depositions, expert testimony, and any other vehicle for discovery permitted under the Federal

Rules of Civil Procedure.

## **CONCLUSION**

75.     For the foregoing reasons, the Government respectfully requests that the

Objection be denied and the Excise Tax Claim be allowed in full. Alternatively, the Government

respectfully requests that the Court permit formal discovery on the facts underlying Debtors'

Objection to the Excise Tax Claim.

Dated: New York, New York
       September 27, 2005 ·

                              MICHAEL J. GARCIA
                              United States Attorney for the
                              Southern District of New York
                              Attorney for the United States of America

                     By:      _____

                              DANNA DROR (DD-7690)
                              NICOLE GUERON (NG-7682)
                              Assistant United States Attorneys
                              86 Chambers Street, 3rd Floor
                              New York, New York  10007
                              Telephone: (212) 637-2689; 637-2699
                              Facsimile: (212) 637-2686

- 22 -

MICHAEL J. GARCIA
United States Attorney
Southern District of New York
By:    DANNA DRORI (DD-7690)
          NICOLE GUERON (NG-7682)
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2689, 637-2699
Facsimile: (212) 637-2686

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
In re:                                              :          CHAPTER 11
                                                    :
WORLDCOM, INC., et al.,                             :          Case No. 02-13533 (AJG)
                                                    :
Debtors.                                            :          (Jointly Administered)
---------------------------------------------------------X

## DECLARATION OF DR. MICHAEL HILLS

MICHAEL HILLS, pursuant to the provisions of 28 U.S.C. § 1746, declares as follows:

1.    I submit this declaration in support of the Reply of the United States of America

to Reorganized Debtors' Objection to Proof of Claim No. 38365.

2.    I am President of HTLT Telemanagement Ltd. (d/b/a HTLT Technologies),

located at 1111 August Drive, Annapolis, MD 21403.

3.    HTLT Technologies is a business that provides software tools, databases and

consulting services to the telecommunications industry. Our main clients are long distance

service providers and internet services providers ("ISPs"). Our services include network

optimization, tariff data bases and maintenance of local calling area data bases.

4.    I received a Bachelor of Science degree in Physics in 1962, and a Ph.D in

-1-

S 36

Electrical Engineering in 1966, from Imperial College, London University. (An abbreviated CV is attached hereto as Exhibit F). From 1966 to 1976, I taught at the University of Essex where I helped to create the U.K.'s first graduate school in Telecommunications System Design. I moved to the United States in 1976 as a consultant for what is now Cable & Wireless, where I worked on the design and optimization of their Long Distance network. In 1980, I founded HTLT Technologies and have served as President since that date. In my current position, I perform or advise on voice network optimization, ISP dial-up network design and Local Exchange Carrier tariff analysis. I have a particular interest in the special problems associated with design of networks incorporating Voice Over Internet Protocol ("VoIP") technology.

     5.     In my professional opinion, the central office-based remote access ("COBRA") services purchased by UUNET from local exchange carriers ("LECs") include access to the local telephone system and the capability of providing telephonic quality communication with substantially all people in the local telephone system. The COBRA services include devices (such as digital service processors ("DSPs") or modems) that are capable of interfacing with the telephonic quality channels and converting the telephonic quality signals that travel on those channels to a digital format suitable for transmission over a high speed digital network. These devices provide what is commonly known as a modem function, but can be configured to provide alternative voice services such as VoIP.

     6.     I reviewed the following documents in reaching this conclusion:

     a.     Internal Revenue Service Proof of Claim No. 38365, dated June 28, 2005 and filed July 2, 2004 (attached hereto as Exhibit A).

-2-

S 37

        b.      Reorganized Debtors' Objection to Proof of Claim No. 38365, dated

August 5, 2004 (the "Objection," attached hereto as Exhibit B).

        c.      Documents produced by Debtors to the IRS in the parties' informal

document production process, bates-stamped DOJ 00001- DOJ 00265 (selected pages are

attached hereto as Exhibit C), produced in response to the Government's informal document

request to MCI and UUNET (attached hereto as Exhibit D).

        7.      A "Tutorial on Methods of Dial-Up Access to ISPs" is attached hereto as Exhibit

E. I wrote this Tutorial with the purpose of providing the Court with background on the nature of

the technology at issue in this matter.

**The Modems and DSPs Within the COBRA Systems**
**Require Two-Way, Telephonic Quality Communications**

        8.      All the COBRA services purchased by UUNET use either modems or DSPs for all

their communications. All access to modems or DSPs requires two-way, voice grade, telephonic

quality communication. The COBRA services purchased by UUNET provide access between

UUNET's dial-up customers' modems and the modems and/or DSPs within the COBRA system,

and thus require two-way, voice capable, telephonic quality communications.

        9.      The Public Switched Telephone Network ("PSTN") transmits telephonic quality

communications in two ways, either as an analog transmission (which is the standard method

from a private home) or as a digital representation of analog signals. An ISP can connect to the

PSTN either by analog (using a modem) or digitally (using a DSP).

        10.    It is contradictory for MCI to claim that the COBRA Services purchased by

UUNET rely on modems, but that these modems do not in turn rely on telephonic-quality or

voice-quality communication connections. (Exhibit B ¶ 10). In general, an dial-up customer's

-3-

modem is connected to the dial-up customer's telephone line and requires a telephonic or voice-quality, two-way communication channel to a recipient modem. The purpose of a modem is to transform signals into voice-like signals that can use the voice transmission network. The familiar beeping sound made by a modem uses the same range of frequency as voice does, and so a modem has to "hear" these frequencies in order to operate. Therefore, the operation of a modem in a telecommunications system requires voice or telephonic quality communication channels.

11.    Where the COBRA services use a digital interface to the PSTN (known as an Integrated Services Digital Network Bearer Channel (an "ISDN-B channel")), an ISP has the option of avoiding the use of a conventional modem and instead using a DSP, which converts the digital representation of the voice quality signal directly to a format required by the ISP. The use of a DSP in this configuration still requires a telephonic quality communication.

**UUNET's Contracts With COBRA Service Providers Concede that**
**the COBRA Services Are Capable of Telephonic Quality Communications**

12.    An ISP's modem as used in a COBRA system either acts just like a dial-up customer's modem, or (if digital) is a DSP which can be programmed to transmit data or VoIP on a call-by-call basis. The COBRA services contracts produced by UUNET acknowledge this fact. In addition, the COBRA services contracts prove that the services are VoIP capable, thereby conceding that the COBRA services are capable of voice quality communications.

The Qwest COBRA Access Contract

13.    For example, MCI produced to the IRS a contract between MCI WorldCom Network Service, Inc. and Qwest Corporation entitled "Amended & Restated Central Office-Based Remote Access Service Schedule," dated June 29, 2001 (the "Qwest COBRA Access

-4-

Contract"). (Exhibit C, DOJ 35-45). The contract was produced by MCI in response to the

Government's informal document request for "[a]ll contracts and/or tariffs governing network

services and communications services provided by UUNET, including all contracts between (a)

UUNET and its customers; (b) UUNET and its suppliers; and (c) UUNET and its

communications providers." (Exhibit D, Request 3).

> 14.    The Qwest COBRA Access Contract provides as follows:

> Should WorldCom or any of its affiliates wish to directly use the COBRA Services to
> directly provide any one-way or two-way voice telephony communications, whether local
> or long distance ("VoIP"), WorldCom and Vendor shall negotiate terms, conditions, and
> rate structures that are applicable to VoIP prior to WorldCom utilizing the COBRA
> Services to directly provide VoIP services. . . . If WorldCom or any of its affiliates at any
> time during the Service Term of this Schedule directly use the COBRA Services to
> provide VoIP without the prior development of mutually agreed-upon terms, conditions,
> and rate structures for VoIP, WorldCom shall be in breach of this Schedule . . . .

(Exhibit C, DOJ 37, ¶ A12).

> 15.    This contract thus concedes, by its very language, that the COBRA services

obtained by WorldCom from Qwest are capable of "one-way or two-way voice telephony

communications" and VoIP telephony without any change in the COBRA's access services from

the LEC. The provision that "[i]f WorldCom or any of its affiliates at any time during the

Service Term of this Schedule directly use the COBRA Services to provide VoIP without the

prior development of mutually agreed-upon terms, conditions, and rate structures for VoIP,

WorldCom shall be in breach of this Schedule" makes evident that no change in the COBRA's

access services is necessary for WorldCom unilaterally to use the COBRA services to provide

VoIP. Accordingly, the COBRA services can provide voice capable, telephonic quality

communications.

> 16.    The Qwest COBRA Access Contract also provides:

-5-

S 40

> COBRA Services provide integrated, remote analog & digital access to WorldCom that
> may be utilized by WorldCom's employees, WorldCom's end users, and the end users of
> WorldCom's affiliates, clients and resellers (collectively, "End Users") to connect to
> WorldCom's Internet network ("WorldCom Network") via modems referred to as
> network access servers ("NAS") deployed in central offices operated by Vendor [Qwest] .
> . . . COBRA Services provide medium to high-speed data transport services for remote
> access to the WorldCom network. COBRA Services permit WorldCom to receive calls
> from multiple analog modems and ISDN basic rate interface lines for handoff to
> separately purchased wide area network links. Vendor shall connect each NAS used in
> connection with the COBRA Services to the Public Switched Telephone Network
> ("PSTN") via ISDN primary rate interface, or other mutually agreed comparable
> telecommunications facilities (collectively "PRI") and shall arrange for the dedicated
> assignment . . . of unique telephone numbers for (or in use by) WorldCom and End Users.

(Exhibit C, DOJ 35 ¶ A1).

17.    This paragraph means that the COBRA Services purchased by WorldCom provide

WorldCom's employees and customers with regular telephonic access to modems, which

modems then connect to WorldCom's Internet network. Qwest is required to connect each

modem within the COBRA Services to the PSTN, which is the basic infrastructure of the public

telephone system, and to assign unique telephone numbers to the dial-up customers. In my

professional opinion, these factors are all hallmarks of a voice-capable telephony system, which

uses telephonic quality connections and dedicated telephone numbers to connect the dial-up

customers to the Internet.

18.    The Qwest COBRA Access Contract also provides that: "Vendor intends to offer

the COBRA Services in all cities where facilities exist and where technically and economically

feasible" (Exhibit C, DOJ 37 ¶ A13), and that "Vendor agrees to use commercially reasonable

efforts to make the COBRA Services available in all Vendor COs [central offices]" (id. ¶ B). In

my professional opinion, this agreement that the COBRA services will be offered so widely

demonstrates that the Qwest COBRA Access Contract offered WorldCom access to substantially

-6-

all of the local telephone system, and thus substantially all people in that system, located in the

"fourteen-state Qwest . . . service area." (Id.).

### The USWC COBRA Access Contract

19.    MCI produced to the IRS a service agreement between UUNET and U.S. West

Communications ("USWC," the "USWC COBRA Access Contract"), signed in December, 1998,

which includes the following provision:

> Should UUNET or any of its affiliates wish to directly use USWC Services to directly
> provide any two way telephony communications, whether local or long distance ("Voice
> over IP"), UUNET and USWC shall negotiate terms, conditions and rate structures,
> applicable to Voice over IP prior to UUNET utilizing the COBRA or SS7 Gateway
> platform to directly provide Voice over IP.

(Exhibit C, DOJ 99 ¶ 6.1.1).

20.    Section 6.1.1 of the USWC COBRA Access Contract was apparently modified by

Amendment No. 1 to the agreement, which provides:

> If UUNET or any of its affiliates, as defined in section 6.2, at any time during the term of
> this Agreement directly use USWC Services to directly provide Voice over IP, as defined
> in section 6.1.1, without the prior development of mutually accepted terms, conditions,
> and rate structures applicable to Voice over IP, UUNET is in breach of this agreement.

(Exhibit C, DOJ 95 ¶ 1).  The amendment also requires UUNET and USWC to use reasonable

efforts to develop technologies "that will signal USWC and UUNET of instances of activation of

software or hardware capable of supporting Voice over IP.  USWC has the option to randomly

poll any USWC RAD . . . to validate that . . . voice over IP functionality is not enabled." (Id.).

21.    This contract thus concedes, by its very language, that the COBRA services

obtained by UUNET from USWC are capable of "two way voice telephony communications"

and VoIP telephony without any change in the COBRA's access services from the LEC.  Section

6.1.1 makes evident that no change in the COBRA's access services is necessary for UUNET

-7-

unilaterally to use the COBRA services to provide VoIP. Accordingly, the COBRA services can provide voice capable, telephonic quality communications.

The SBC Service Schedule

22.    MCI produced to the IRS a service schedule between UUNET and SBC Global Services, Inc. (the "SBC Service Schedule"), dated December 31, 1999, which includes the following provision:

> The DAS [Dial Access Solution] Services provide integrated, remote dial access service to Customer, its end users, and the end users of Customer's clients and resellers via modems referred to as network access servers ("NAS") deployed in central offices operated by SBC . . . . The DAS Services provide medium to high-speed data transport services for remote dial access to Customer's network. The DAS Services permit Customer to receive calls from multiple analog modems and ISDN basic rate interface lines for handoff to separately purchased wide area network links. SBC shall connect each NAS used in connection with the DAS Services provided hereunder to the Public Switched Telephone Network ("PSTN") via ISDN primary rate interface ("PRI") or comparable telecommunications facilities, and shall arrange for the dedicated assignment of unique telephone numbers for use by Customer, its end users (for example, America OnLine), and the end users of Customer's clients (for example, a subscriber to America OnLine).

(Exhibit C, DOJ 126 ¶ A.1(a), (b)).

23.    This paragraph means that the COBRA Services purchased by UUNET provide UUNET's employees and customers with regular telephonic access to modems, which modems then connect to WorldCom's Internet network. SBC is required to connect each modem within the COBRA Services to the PSTN, which is the basic infrastructure of the public telephone system, and to assign unique telephone numbers to the dial-up customers. In my professional opinion, these factors are all hallmarks of a voice-capable telephony system, which uses telephonic quality connections and dedicated telephone numbers to connect the dial-up customers to the Internet.

-8-

The BellSouth Contract

24.    MCI produced to the IRS a master contract service arrangement between UUNET

and BellSouth Telecommunications, Inc. (the "BellSouth Contract"), dated September 24, 1990,

with an attachment dated September 29, 2000. (Exhibit C, DOJ 52-68). The year 2000

Attachment provides:

> the RAS [Remote Access Service] shall provide integrated, remote analog and ISDN
> access to UUNET, its end users, and the end users of UUNET's affiliates . . . and clients .
> . . via modems referred to as network access services ("NAS") deployed in central offices
> operated by Bell South . . . . The RAS Service shall provide medium to high-speed data
> transport services for remote access to UUNET's Internet network. The RAS Service
> shall permit UUNET to receive calls from multiple analog modems and ISDN basic rate
> interface lines for handoff to separately purchased wide area network links. BellSouth
> shall connect each NAS used in connection with the RAS Service to the Public Switched
> Telephone Network ("PSTN") via ISDN primary rate interface ("PRI"), or other mutually
> agreed comparable telecommunications facilities. BellSouth shall arrange for the
> dedicated assignment (or preservation) of unique telephone numbers . . . for (or in use by)
> UUNET and its End Users.

(Exhibit C, DOJ 58 ¶ I.A.(1)).

25.    This paragraph means that the COBRA Services purchased by UUNET provide

UUNET's employees and customers with regular telephonic access to modems, which modems

then connect to WorldCom's Internet network. BellSouth is required to connect each modem

within the COBRA Services to the PSTN, which is the basic infrastructure of the public

telephone system, and to assign unique telephone numbers to the dial-up customers. In my

professional opinion, these factors are all hallmarks of a voice-capable telephony system, which

uses telephonic quality connections and dedicated telephone numbers to connect the dial-up

customers to the Internet.

**The Capabilities of the Technological Components of the COBRA Services Add Further
Proof That the COBRA Services Are Capable of Telephonic Quality Communications**

26.    MCI produced to the IRS documents reflecting the configuration of the Qwest

COBRA system. (Exhibit C, DOJ 234-238). These product description documents indicate that

the Qwest COBRA system includes a HiPerDSP Card Set. (Id. DOJ 234-35). The documents

also state that a HiPerDSP Card Set "features a fully reprogrammable digital signal processing

engine that lets administrators reconfigure the system to implement new technologies and

applications such as voice-over-IP. The card set supports a full range of trunk and

communication standards . . . ." (Id. DOJ 236; 241-42). The HiPerDSP Card Set specifications

also identify VoIP as an optional feature. (Id. DOJ 237).

27.    It is my professional opinion that, as per the text of this product description, the

HiPerDSP Card Set supports voice capable, telephonic quality communications, and therefore

that the Qwest COBRA services used by UUNET can provide voice capable, telephonic quality

communications.

28.    MCI also produced to the IRS documents reflecting the configuration of the

Verizon COBRA system. (Exhibit C, DOJ 245-59). These product description documents

indicate that the Verizon COBRA system includes 48-port and 96-channel Lucent TNT cards.

(Id. DOJ 245). These documents also state that the 48-port and 96-channel Lucent TNT cards

can support Lucent's "True Access Operating System (TAOS)" with "Universal Port"

capabilities, which in turn supports "multiple applications including simultaneous analog and

digital modems for remote access, voice- and fax-over-IP . . ." as well as "residential 1 + long

distance (LD) and 1010 dial-around services and call routing programmability in and out of the

-10-

voice-over-IP (VoIP) network based on dialed number identification service or trunk group." (Id. DOJ 247 ¶ 3, 258).

29.    The Lucent TAOS Universal Port "uses the same DSP for voice or data on a call-by-call basis" and "this new MultiVoice functionality enables any Internet service provider (ISP) to offer telephony services in the $87 billion North American market for long-distance services." (Id. DOJ 249 ¶ 11).

30.    In addition, TAOS "interoperate[s]" with Lucent technologies which can "convert circuit trunks to VoIP packets" after receiving signals from the PSTN. (Id. DOJ 249 ¶ 13).

31.    It is my professional opinion that, as per the text of this product description, the Lucent TAOS/TNT card system supports voice capable, telephonic quality communications, and therefore that the Verizon COBRA services used by UUNET can provide voice capable, telephonic quality communications.

**UUNET'S Billing Arrangements Add Further Proof That the**
**COBRA Services Are Capable of Telephonic Quality Communications**

32.    Finally, it should be noted that the contractual billing arrangements between UUNET and all of the LECs are bundled monthly charges per port which include two-way telephonic quality access to the local telephone network. Specifically, the contracts provide that, for example, the COBRA services will encompass "all NAS equipment, telecommunications services and related facilities (including without limitation active PRI lines) . . . required to connect a call that has been dialed into the PSTN . . . ." (Id. DOJ 12). Similarly, the Qwest COBRA Access Contract provides that "COBRA services include all equipment, telecommunications services and related facilities (including without limitation active PRI lines . . .) . . . required to connect a call that has been dialed into the PSTN . . . ." (Id. DOJ 35

-11-

¶ A2). Further, the COBRA services are being billed on a per port basis, where the price of the port includes all access to the PSTN. (Id. DOJ 14, 38-39).

33.    This billing system demonstrates that (a) the COBRA services include access to the local telephone system, see § 4252(a)(1), because PRI lines are one way a user connects to the local telephone system and the PSTN, and (b) the NAS (that is, modems) included in the COBRA service is a facility or service provided in connection with local telephone service, see § 4252(a)(2). Since telephonic quality access to the PSTN is bundled into the port charges, Federal Excise Tax applies to the port charges.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: Annapolis, MD
       Sept. 21, 2005

MICHAEL HILLS, Ph.D

-12-

# EXHIBIT A

# Request for Payment of Internal Revenue Taxes



**(Bankruptcy Code Cases—Administrative Expenses)**

Department of the Treasury/Internal Revenue Service

United States Bankruptcy Court for the ___SOUTHERN___
District of ____NEW YORK STATE____

**In the Matter of:**   UUNET TECHNOLOGIES, INC.
500 CLINTON CENTER DRIVE
CLINTON, MS 39056

Fiduciary:

Amendment No. 1 to Request for Payment dated 02/25/2004

| Case Number |
| --- |
| 02-42302-AJG |

| Type of Bankruptcy Case |
| --- |
| CHAPTER 11 |

| Date of Petition |
| --- |
| 07/21/2002 |

Filed: USBC - Southern District of New York
Worldcom, Inc., Et Al.
02-13533 [AJG]        0000038365



1. The undersigned, whose business address is ___IRS Insolvency Group 4 290 Broadway  Stop 5TH FLR  New York, NY 1000___ is the agent of the Department of the Treasury, Internal Revenue Service, and is authorized to make this request for payment on behalf of the United States.
2. Request is made for payment of taxes and any interest or penalty due under the internal revenue laws of the United States, as shown below.
3. The ground of liability is taxes due under the internal revenue laws of the United States.

### Administrative Claims

| Taxpayer ID Number | Kind of Tax | Tax Period | Tax Due | Interest Due | Penalty Due | Balance Due |
| --- | --- | --- | --- | --- | --- | --- |
| 54-1543611 | 5 EXCISE | 12/31/2002 | $3,997,592.00 | $275,259.66 | $0.00 | $4,272,851.66 |
| 54-1543611 | 5 EXCISE | 03/31/2003 | $3,737,766.00 | $208,960.20 | $0.00 | $3,946,726.20 |
| 54-1543611 | 5 EXCISE | 06/30/2003 | $1,726,848.00 | $73,705.70 | $0.00 | $1,800,553.70 |
| 54-1543611 | 5 EXCISE | 09/30/2003 | $1,395,081.00 | $42,549.48 | $0.00 | $1,437,630.48 |
| 54-1543611 | 5 EXCISE | 12/31/2003 | $1,476,730.00 | $29,788.86 | $0.00 | $1,506,518.86 |
| 54-1543611 | 5 EXCISE | 03/31/2004 | $2,466,803.00 | $23,088.91 | $0.00 | $2,489,891.91 |
| 54-1543611 | 5 EXCISE | 04/01/2004-04/20/2004 | $822,268.00 | $0.00 | $0.00 | $822,268.00 |
| | | | $15,623,088.00 | $653,352.81 | $0.00 | $16,276,440.81 |

**Total Amount Due:**   $16,276,440.81



RECEIVED

JUL   2 2004

U.S. BANKRUPTCY COURT
S. DIST. OF NEW YORK

*5  UNASSESSED TAX CLAIMS HAVE BEEN FILED DUE TO PROPOSED ADDITIONAL ASSESSMENT DUE TO AN EXAMINATION OF THE TAX RETURN FOR THE PERIOD UNASSESSED.*

The amount due includes interest and penalty computed to 07/09/2004.  Compound interest will accrue at the rate established under IRC Section 6621(a) and late payment penalty will be charged under IRC Section 6651.  If the claim is paid after 07/09/2004, contact NAN DILLINGHAM at (212) 436-1341 for the current balance.

| Penalty for Presenting Fraudulent Claim - Fine of not more than $5,000 or imprisonment for not more than 5 years or both - Title 18, U.S.C., Section 152. | Signature  *M. Dillingham*  Marcia Smith | Date  06/28/2004 |
| --- | --- | --- |
| | Title  Insolvency Territory 2 Manager | Telephone Number  (212) 436-1341 |

Form 6338 - A (C)

**Page 1 of 1**

HEARING DATE AND TIME: August 31, 2004 at 10:00 a.m. (New York Time)
OBJECTION DATE AND TIME: August 26, 2004 at 4:00 p.m. (New York Time)

WEIL, GOTSHAL & MANGES LLP
Attorneys for Reorganized Debtors
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Pérez, Esq.

**UNITED STATES BANKRUPTCY COURT .**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------- x
In re                                              :     Chapter 11 Case No.
                                                   :
WORLDCOM, INC., et al.                             :     02-13533 (AJG)
                                                   :
                            Debtors                :     Jointly Administered
                                                   :
-------------------------------------------------- x
```

### REORGANIZED DEBTORS' OBJECTION TO PROOF OF CLAIM NO. 38365
### (DEPARTMENT OF TREASURY ADMINISTRATIVE EXPENSE CLAIM)

TO THE HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE

Reorganized Debtor MCI, Inc. and certain of its direct and indirect subsidiaries

(collectively, the "Reorganized Debtors") respectfully represent:

#### JURISDICTION

1.     The Court has jurisdiction to consider this Objection and the relief

requested herein pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding

pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408

and 1409.

## BACKGROUND

### General

2.      On July 21, 2002 (the "Commencement Date") and November 8, 2002, WorldCom, Inc. and certain of its direct and indirect subsidiaries (the "Debtors") commenced cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). By Orders, dated July 22, 2002 and November 12, 2002, the Debtors' chapter 11 cases were consolidated for procedural purposes. During the chapter 11 cases, the Debtors operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      On October 31, 2003, this Court entered an order confirming the Debtors' Modified Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan").[1]

4.      On April 20, 2004, the Plan became effective in accordance with its terms, and pursuant to the Plan, WorldCom, Inc. merged with and into MCI, Inc. with MCI, Inc. being the survivor.

### Schedules and Proofs of Claim

5.      On November 21, 2002, the Debtors filed their Schedules of Liabilities (as amended and supplemented, the "Debtors' Schedules") and their Schedules of Executory Contracts and Unexpired Leases. On December 5, 2002, the Debtors filed their Statements of Financial Affairs.

6.      On October 29, 2002, this Court entered its Order (a) Pursuant to Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Certain Proofs of Claim and

---

[1]      Unless otherwise defined herein, capitalized terms shall have the meanings that are ascribed to such terms in the Plan.

Approving the Form and Manner of Notice Thereof (the "Bar Date Order"). The Bar Date Order established January 23, 2003 as the bar date for filing proofs of claim in these cases. Pursuant to the terms of the Bar Date Order, on or about November 22, 2002, the Debtors mailed notice of the bar date to in excess of 1.2 million creditors and potential claimants.

7.      On March 25, 2003, the Court entered its Order Pursuant to 11 U.S.C. § 105 Approving Notice Procedures Regarding Claim Objections and Deemed Schedule Amendment Motions ("Claim Objection Procedure Order"), approving certain procedures regarding noticing of claims objections and omnibus motions for deemed schedule amendments.

8.      As of the date of this Objection, in excess of 35,000 proofs of claim have been filed in connection with these chapter 11 cases (the "Proofs of Claim"). The Debtors have begun the process of conducting a comprehensive review and reconciliation of all prepetition claims, including both the claims scheduled in the Debtors' Schedules and the claims asserted in the Proofs of Claim (the "Filed Claims"). This process includes identifying particular Filed Claims that may be targeted for disallowance and expungement, reduction and allowance, or reclassification and allowance. This is one such objection.

### OBJECTION TO CLAIM

9.      The Reorganized Debtors hereby object to proof of claim no. 38365 filed by the Department of Treasury/Internal Revenue Service ("DOT") in the amount of $16,276,440.81 (the "Treasury Claim"). Claim no. 38365 amends DOT's claim no. 37947. The Treasury Claim was filed as an administrative expense claim for excise taxes assessed against UUNET Technologies, Inc. ("UUNET"), a Debtor, and includes interest computed to July 9, 2004. The Reorganized Debtors have reviewed this proof of claim, the Debtors' books and records, and the applicable provisions of the Internal Revenue Code (the "IRC"), and have

determined that there is no amount due with regard to the Treasury Claim.

10.    The Debtors are in the business of building communication networks and selling access to these networks to internet service providers ("ISPs"). ISPs in turn provide their customers access to the ISPs' services via the Debtors' networks. In order to build these networks, the Debtors purchase services known as central office-based remote access services ("COBRA") from local exchange carriers ("LECs"). COBRA services permit the end users of the Debtors' data network to send and receive data packets to and from the Debtors' data network and, ultimately, to other users of the Internet. LECs provide COBRA services to the Debtors via network access servers which are not capable of carrying voice transmissions. The end users of the Debtors' data network connect with the network access servers by dialing in, using their computer modems. The network servers then route data to and from the Debtors' data network and end users.

11.    Section 4251 of the IRC imposes a tax on amounts paid for taxable communications services, such as local telephone service and toll telephone service. A purchaser of such services must pay any tax owed under section 4251 of the IRC. *See* IRC Section 4251(a)(2). Providers of such services must collect such tax from the purchaser. *See* IRC Section 4291.

12.    Local telephone service is defined in IRC Section 4252(a) as: (1) the access to a local telephone system and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and (2) any facility or service provided in connection with a service described in (1).

13.    Toll telephone service is defined in IRC Section 4252(b) as: (1) a telephonic quality communication for which (A) there is a toll charge which varies in amount with the distance and elapsed transmission time of each individual communication and (B) the charge is paid in the United States, and (2) a service which entitles the subscriber, upon payment of a periodic charge (determined as a flat amount or upon the basis of total transmission time), to the privilege of an unlimited number of telephonic communications to or from all or a substantial portion of the persons having telephone or radio telephone stations in a specified area which is outside the local telephone system area in which the station provided with the service is located.

14.    UUNET's purchase of the COBRA services from LECs does not fall within the applicable definitions of taxable communications services.  The COBRA service is a data-only service that does not provide UUNET with access to any telephone system and the privilege of voice-quality communication with substantially all persons on that system.  In other words, UUNET could not plug in a telephone and gain access to a telephone system or the privilege of telephonic quality communication.  Therefore, amounts paid by UUNET to the LECs for the purchase of COBRA services are not subject to the communications excise tax imposed by IRC Section 4251.

15.    Because of the nature of the services purchased by UUNET, federal excise taxes do not apply and the taxes and interest that form the basis of the Treasury Claim are not owed.  The service purchased by UUNET was controlled by the LEC's, not by UUNET. Accordingly, the Debtors hereby request that the Court enter an order expunging and disallowing the Treasury Claim, claim no. 38365, in addition to the claim it amends, claim no. 37947.

## RESERVATION OF RIGHTS

16.    In the event that the Treasury Claim or claim no. 37947 are not expunged and disallowed for the reasons set forth herein, the Debtors hereby reserve their right to object to such proof(s) of claim on other grounds at a later date.

## MEMORANDUM OF LAW

17.    This Objection does not raise any novel issues of law, and, accordingly, the Debtors respectfully request that the Court waive the requirement contained in Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York that a separate memorandum of law be submitted in support of the Objection.

## NOTICE

18.    In accordance with the Claim Objection Procedures Order, notice of this Objection has been provided to counsel for: the U.S. Trustee, the Committee, the Debtors' postpetition lenders, the United States Attorney for the Southern District of New York, the ad hoc MCI Noteholders Committee, AT&T Corporation, Puerto Rico Telephone Company, Inc., the Mid-Size Carrier Group. Further, in accordance with the Claim Objection Procedures Order, notice of this Objection has been provided to the persons or entities that filed the proof of claim identified above and their counsel (if known) by means of a personalized Claim Objection Notice. The Reorganized Debtors submit that no other or further notice need be given.

19.    No previous application for the relief sought herein has been made to this or any other Court.

WHEREFORE the Reorganized Debtors respectfully request entry of an order

granting the relief requested herein and such other and further relief as is just.

Dated: Houston, Texas
   August 5, 2004

                                    /s/ Sylvia M. Baker
                                    Marcia L. Goldstein, Esq. (MG 2606)
                                    Lori R. Fife, Esq. (LF 2839)

                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, NY 10153-0119
                                    Telephone: (212) 310-8000
                                    Facsimile: (212) 310-8007

                                            and

                                    Alfredo R. Pérez, Esq.
                                    Sylvia M. Baker, Esq.
                                    WEIL, GOTSHAL & MANGES LLP
                                    700 Louisiana, Suite 1600
                                    Houston, TX 77002
                                    Telephone: (713) 546-5000
                                    Facsimile: (713) 224-9511

                                    Attorneys for Reorganized Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------- x

**In re**                                                 :        **Chapter 11 Case No.**
                                                          :
**WORLDCOM, INC., et al.**                                :        **02-13533 (AJG)**
                                                          :
                        **Debtors**                       :        **Jointly Administered**
                                                          :
----------------------------------------------------------- x

### ORDER GRANTING THE REORGANIZED DEBTORS' OBJECTION TO
### PROOF OF CLAIM NO. 38365
### (DEPARTMENT OF TREASURY ADMINISTRATIVE EXPENSE CLAIM)

Upon consideration of the Reorganized Debtors' Objection to Proof of Claim No.

38365 (Department of Treasury Administrative Expense Claim) filed by Reorganized Debtor

MCI, Inc. and certain of its direct and indirect subsidiaries (collectively, the "Debtors") dated

August 5, 2004, seeking expungement and disallowance of the amended administrative expense

claim and original administrative expense claim filed by the Department of Treasury for excise

taxes, and it appearing that there is no amount due with respect to such claims because federal

excise taxes do not apply to the services which form the basis of such claims, all as described

more fully in the Objection; and it appearing that the expungement and disallowance of these

proofs of claim is in the best interest of the Reorganized Debtors, their estates and their creditors;

and good and sufficient notice having been given in accordance with the Claim Objection

Procedures Order; and after due consideration and sufficient cause appearing therefore, it is

ORDERED that proof of claim no. 38365 and any amendments thereto are hereby

expunged and such claims are hereby disallowed in their entirety;

ORDERED that proof of claim no. 37947 is hereby expunged as an amended

claim, and such claim is hereby disallowed in its entirety;

HO1:\294688\06\6BDS06!.DOC\81793.0004

S 57

ORDERED that the requirement under Rule 9013-1(b) of the Local Bankruptcy

Rules for the Southern District of New York for the filing of a memorandum of law is waived.


Dated: New York, New York
_____ _____ _____, 2004


_____
HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE

2

# EXHIBIT C

# WEIL, GOTSHAL & MANGES LLP

700 LOUISIANA
SUITE 1600
HOUSTON, TEXAS 77002
(713) 546-5000
FAX: (713) 224-9511

AUSTIN
BOSTON
BRUSSELS
BUDAPEST
DALLAS
FRANKFURT
LONDON
MIAMI
MUNICH
NEW YORK
PARIS
PRAGUE
SHANGHAI
SILICON VALLEY
SINGAPORE
WARSAW
WASHINGTON, D.C.

WRITER'S DIRECT LINE

(713) 546-5190
james.grogan@weil.com

July 14, 2005

Danna Drori
Nicole Gueron
Assistant United States Attorneys
U.S. Department of Justice
86 Chambers Street, 3rd Floor
New York, New York 10007

Re:    *WorldCom, Inc., et al.* ("MCI"), Case No. 02-13533, Jointly Administered

Dear Ms. Drori and Ms. Gueron,

Enclosed for your consideration is a binder containing documents responsive to your informal document request dated February 14, 2005 (the "Document Request"). These documents are being produced in an effort to resolve the Reorganized Debtors' Objection to Proof of Claim No. 38365 (the "Objection"), and are subject to the Confidentiality Stipulation signed on July 1 and July 5, 2005, respectively, by the Treasury Department and MCI.

Following is an explanation of what is and what is not included in the binder. This discussion is exclusively for the purpose of settlement negotiations and accordingly, is inadmissible pursuant to Rule 408 of the Federal Rules of Evidence and all similar rules in any State. Further, these responses are not intended to be in lieu of formal objections to any discovery propounded by the Treasury Department.

Request no. 1    All billing invoices relating to network services and communications services provided by UUNET.

In Claim no. 38365 (the "Claim"), the Treasury Department seeks tax payments for services *purchased* by UUNET, not for services provided by UUNET. Therefore, the invoices requested are not relevant to the Claim and have not been produced. Moreover, the request is unduly burdensome because UUNET generates approximately 90,000 invoices per month.

HO1:\316867\02\6SHV02!.DOC\81793.0023

WEIL, GOTSHAL & MANGES LLP

Danna Drori
Nicole Gueron
Assistant United States Attorneys
July 14, 2005
Page 2


Request no. 2   All billing invoices related to network services and communications services purchased by UUNET or to which UUNET subscribed.

The actual invoices satisfying this request are voluminous and not readily accessible. Therefore, we have produced a detailed schedule of UUNET"s monthly purchases of COBRA services by vendor from October, 2002 through December, 2003 as a comprehensive summary of the billing invoices. [Tab 1]

Request no. 3   All contracts and/or tariffs governing network services and communications services provided by UUNET, including all contracts between (a) UUNET and its customers; (b) UUNET and its suppliers; and (c) UUNET and its communication providers.

Part 3(a) – Contracts between UUNET and its customers relates to services provided by UUNET. For the reason previously stated in connection with Request no. 1, these documents are not relevant to the Claim and, therefore, have not been produced. Additionally, this request is unduly burdensome.

Parts 3(b) and 3(c) – The only "suppliers" relevant to the Claim are communication providers. Therefore, the documents we have produced are responsive to both Parts 3(b) and 3(c). [Tabs 2 through 17]

Request no. 4   All documents concerning the network architecture and/or system topology of UUNET's systems, including its COBRA-based systems, including but not limited to blueprints, diagrams, schematics or other descriptive documents.

We have produced documents responsive to this request. [Tabs 18 through 23]

Request no. 5   All documents reflecting what transmission lines are used by UUNET to connect their network services to customers and suppliers, and how those transmission lines are used.

We have produced documents responsive to this request. [Tabs 2 through 23]

Request no. 6   All documents concerning the specifications for the equipment used by UUNET.

WEIL, GOTSHAL & MANGES LLP

Danna Drori
Nicole Gueron
Assistant United States Attorneys
July 14, 2005
Page 3

We have produced documents responsive to this request. [Tabs 24 through 32, and Tabs 18, 21, 22]

Request no. 7   All promotional materials produced or used by UUNET describing the functions and capacities of its communications systems.

We have included responsive information taken from MCI's website. [Tab 33]

Request no. 8   All promotional materials received by UUNET from suppliers describing the functions and capacities of its communications systems.

We have produced documents responsive to this request. [Tab 34]

I understand from Sharon Loftspring that you may consider requesting another extension. Given that the status conference is not set until August 9th and the documents we've produced are not voluminous, there should be no reason that the parties cannot move forward in the time period to which we've agreed. MCI may agree to a short extension, however, if the Treasury Department would agree to file a response to the Objection or provide meaningful feedback in terms of the discovery provided and the Treasury Department's position.

Additionally, as you are aware, the Internal Revenue Service is currently reviewing a number of excise tax refund claims submitted by MCI that relate to the same COBRA services forming the basis of the Objection. MCI has been working with the IRS and its engineers in an effort to resolve their issues. Since the Bankruptcy Court's ruling on the Objection will have a direct impact on the refund claims, I suggest that we inform the Court of the refund claims at the status conference set for August 9, 2005.

MCI is eager to move toward a resolution of this matter. We understand that the government has already been working toward a resolution of the same issue in the *XO Communications, Inc. v. United States* case, pending in the United States Court of Federal Claims, Case no. 03-2754 T. Perhaps we can discuss this after you've had an opportunity to review the enclosed documents.

**WEIL, GOTSHAL & MANGES LLP**

Danna Drori
Nicole Gueron
Assistant United States Attorneys
July 14, 2005
Page 4


I look forward to hearing from you.

Best regards,

James Grogan

cc:     Sharon Loftspring [firm]
        Jeffrey Saltzberg

HO1:\316867\02\6SHV02!.DOC\81793.0023

S 63

## EXHIBIT 2

### SPECIALIZED SERVICE ARRANGEMENT

MCI WORLDCOM Network Services, Inc.

#### Service Description

Verizon will provide MCI WORLDCOM Network Services, Inc. (WCOM) with CyberPOP™ TCP/IP data aggregation service. CyberPOP service is a modem aggregation product that provides dial-up port based remote access services. CyberPOP service provides integrated, remote analog & digital access to WCOM that may be utilized by WCOM's end users and the end users of WCOM's affiliates, clients, and resellers (collectively, End Users) to connect to WCOM's Internet network (WCOM Network) via modems referred to as network access servers (NAS) deployed in central offices operated by Verizon (Verizon COs). Verizon shall connect each NAS used in connection with the CyberPOP service to the Public Switched Telephone Network (PSTN) via ISDN primary rate interface, or other mutually-agreed comparable telecommunications facilities (collectively, PRI), and shall arrange for the dedicated assignment (or preservation, to the fullest extent possible) of unique telephone numbers for (or in use by) WCOM and End Users.

CyberPOP service includes all NAS equipment, telecommunications services and related facilities (including with out limitation active PRI lines, at least 40 lead trunk numbers (LTN) (with the exception of Single Number Routing ("SNR")), space, power, and other utilities), and ancillary support and maintenance required to connect a call that has been dialed into the PSTN (such call dialing a designated telephone number) to an active DS0 channel-equivalent port (i.e., PRI B-channel) on the corresponding NAS (CyberPOP Port). The demarcation of the CyberPOP service between Verizon and WCOM shall be at the connection of the NAS egress port at Verizon's central office.

CyberPOP service will provide local points of presence for WCOM within Verizon's franchised service areas. WCOM will not own or lease any CyberPOP service equipment, but will have exclusive operational control (i.e., logical access) of all NAS and related aggregation and out-of-band management equipment (collectively, NAS Equipment) used in connection with the CyberPOP service. This product will be configured via WCOM's specifications to allow monitoring and management of the NAS Equipment. Verizon's local network will provide the service from the local dial access to the delivery of TCP/IP and other protocols via the CyberPOP data aggregation equipment located at the Verizon Central Office. WCOM is responsible for obtaining facilities from Verizon's Central Office to the WCOM Point of Presence (POP).

CyberPOP service will utilize TCP/IP and other protocols based on IETF (Internet Engineering Task Force) standards. IETF is the engineering arm of the IAB (Internet Architecture Board). IETF defines protocol standards for Internet services. This tariff supports, at a minimum, the following standards:

|  |  |
|---|---|
| IP | Internet Protocol |
| TCP | Transmission Control Protocol |
| SLIP | Serial Line IP |
| CSLIP | Compressed Serial Line IP |
| PPP | Point to Point Protocol |
| HSSI | High Speed Serial Interface |

WCOM has the option of utilizing, as a feature of CyberPOP service, SNR in lieu of local telephone numbers, which are included as part of CyberPOP service, where technically feasible. This option enables End Users with Verizon local phone service in a defined geographic area (i.e., a LATA) to have access to WCOM via one specialized telephone number. The End User can initiate a call within the service area to WCOM and this call is treated as a local call by Verizon for the connection and duration of the call. This option is part of the WCOM Specialized Arrangement and is included where available in the rates and charges for CyberPOP service at no additional charge. The following two alternatives are offered to WCOM under this option:

DOJ - 00012
CONFIDENTIAL

S 64

1.   Verizon will assign a Single Number Routing telephone number from a 500 NPA; or

2.   WCOM can provide Verizon with its own 555-XXXX telephone number acquired from the North American Numbering Plan Administration.

CyberPOP data aggregation services are available where facilities and conditions permit.

## Obligations of Verizon

Special Access Lines and Special Transport beyond the CyberPOP service are not included in the CyberPOP service port price and are available elsewhere in this FCC tariff.

Verizon is responsible to provide WCOM with a firm order confirmation notice, which will initiate the order process.

Verizon will notify WCOM of the completion and readiness of the requested CyberPOP site.

NAS Equipment to provide CyberPOP service requires the review and approval of Verizon. WCOM may propose alternative NAS Equipment platforms from time to time for Verizon's review and approval. NAS Equipment upgrades to the existing port base will be made at the discretion of Verizon. WCOM requests regarding the configuration and design of the NAS Equipment will be evaluated for network compliance and compatibility by Verizon and employed where feasible. WCOM may request that NAS Equipment or other equipment upgrades outside the scope of this arrangement be implemented and charged to WCOM on a time and materials basis.

Verizon will participate with WCOM in joint testing and turn-up activities for new and moved port activations, including, at a minimum, login and RADIUS authentication to the WCOM Network via the ports being tested.

Verizon shall perform all hardware maintenance and remote hands & eyes support for the NAS Equipment, in accordance with mutually agreed-upon support procedures.

Verizon will provide WCOM with seventy-two (72) hours notice in advance of scheduled Wire Center or Central Office maintenance that could adversely impact CyberPOP services.

## Obligations of WCOM

WCOM is responsible for obtaining all appropriate IP addresses.

WCOM is responsible to obtain the facilities required for the dedicated transport of their traffic from Verizon's Central Office to WCOM's point(s) of presence.

WCOM's NAS Equipment must be compatible with Verizon's equipment.

WCOM must maintain NAS Equipment software configuration, software management and authentication control.

WCOM shall furnish information as may be required by Verizon to design and maintain the service and to ensure that the service arrangement is in compliance with the regulations contained herein.

WCOM's NAS Equipment must be in compliance with FCC rules and regulations.

WCOM's specified NAS Equipment must be in compliance with published Verizon NEBS standards.

WCOM will participate with Verizon in joint testing and turn-up activities for new and moved port activations, including, at a minimum, login and RADIUS authentication to the WCOM Network via the ports being tested.

DOJ - 00013
CONFIDENTIAL

S 65

WCOM must notify Verizon of any firm order cancellations prior to Verizon initiating any service installation activities. Firm order cancellations received after installation has proceeded (but before joint acceptance) will incur charges for time and materials expended to-date.

WCOM, when requesting Single Number Routing, is responsible for purchasing a quantity of ports to accommodate originating dial-up traffic offered to a selected CyberPOP hub for aggregating and routing to WCOM's designated POP. Verizon shall ensure adequate network trunking to support call completion to WCOM SNR CyberPOP hubs and shall use all commercially reasonable efforts to correct any identified lack of network capacity, consistent with the then-current locations and port quantities of WCOM's SNR CyberPOP hubs . Any NAS Equipment moves by WCOM from non-SNR hubs to SNR hubs, or between SNR hubs if Verizon concurs it is necessary, shall not count against the 5% quarterly moves limitation set forth below. Traffic generated by virtue of SNR under this arrangement will be routed exclusively to Verizon-provided CyberPOP locations.

WCOM agrees to provide Verizon with at least ten (10) business days prior written notice before deploying new software on the NAS Equipment that would implement any new major features or functionalities (i.e., left-of-decimal software upgrade) on the NAS Equipment.

### Enrollment Period

CyberPOP modem based data aggregation service is provided to WCOM under this tariff with a three (3) year commitment period. All 575,000 base ports are committed for thirty-six (36) months from the tariff effective date. Each additional port is committed for thirty-six (36) months from the port install date. For base ports, billing will commence at the new rates on the tariff effective date. For new service implementations, billing will commence on the date that customer acceptance has been completed. Customer acceptance is defined as verification from WCOM that the new service is operational following execution of joint testing and turn-up activities.

This tariff transitions WCOM (previously referenced as UUNET) from previous FCC tariff arrangements with Verizon for data aggregation services. This tariff supersedes any previously tariffed terms and conditions agreed upon by WCOM, or any of its affiliates, and Verizon for CyberPOP service (including comparable modem based data aggregation services purchased from Verizon). Previous terms and commitments beyond the new three (3) year enrollment period are terminated as a result of this tariff agreement without application of any early termination fees, penalties or other charges.

### Rate Application

CyberPOP service rates will be applied on a monthly basis for all dial-up ports in service nationwide. Nationwide is defined as the aggregate of all dial-up ports for all of the Verizon Operating Companies, which includes the former Bell Atlantic, Nynex, GTE and Contel footprints. There are separate rates identified for existing base ports and additional ports as outlined below.

### Monthly Recurring Charges (MRCs)

| Port Type | Rate (MRC) Per Port |
| --- | --- |
| Base (1-575,000) | $29.00 |
| Additional (575,001 +) | $17.50 |

Rates include Single Number Routing, where available, and all applicable engineering, furnishment, installation (EF&I) service and hardware maintenance charges, and all applicable fees and surcharges (other than fees and surcharges that are imposed by the Federal Communications Commission or other government agency on the CyberPOP service subsequent to the effective date of this tariff). Rates do not include applicable taxes. Except as otherwise specified in this arrangement, no non-recurring charges shall apply with respect to the CyberPOP ports

DOJ - 00014
CONFIDENTIAL

provided hereunder. When CyberPOP services utilize a PRI trunk group, D channels do not incur the above charges. The above rates become effective upon the effective date of the tariff.

### Commitment Levels

WCOM's Minimum Port Commitment is to maintain (in the aggregate across all Verizon franchise areas) an in service base of 575,000 ports for the entire thirty-six (36) month term period with 200,000 additional ports to be installed by month thirty-six (36) of the arrangement, less any NAS Equipment buy-backs (as described below), Sold CyberPOP Ports (as defined below), cancelled ports due to missed FOC/CFA dates (as described below), and ANS/GridNet ports that will not be converted to CyberPOP (to be determined based on mutually agreed-upon procedures). All ports purchased by WCOM ISP entities, including PRI and other equivalent telecommunications services used to provide dial-up ports for the WCOM Network that are converted to CyberPOP Ports under this tariff (such conversion shall be made without the application of any early termination fees, penalties, or other charges) shall be deemed to count towards satisfaction of this Minimum Port Commitment.

Ports that are in the process of being moved (as described below) shall continue to be counted for purposes of determining whether WCOM has met its Minimum Port Commitment.

Beginning in month 37 of this arrangement and thereafter, this Minimum Port Commitment shall no longer apply, and WCOM shall not be committed to obtain any minimum number of ports from Verizon under this tariff.

### Cancellation of Service

If CyberPOP Ports are not made ready for service by Verizon no later than fifteen (15) calendar days following the applicable FOC/CFA dates specified in the firm order, WCOM may, at anytime prior to availability of the port, cancel the CyberPOP ports covered by that firm order upon written notice to Verizon, and (a) WCOM's Minimum Port Commitment shall be reduced by an amount equal to the number of CyberPOP Ports that were the subject of the cancelled firm order, and (b) WCOM shall have the right to repurchase (at the purchase price paid by Verizon to WCOM) any NAS Equipment sold by WCOM to Verizon in connection with such cancelled firm order.

### Customer Initiated Buy-Backs

WCOM at their discretion may choose to downsize their presence at any Verizon CyberPOP location by buying back NAS Equipment that was deployed for their dedicated use. Verizon will disconnect, pack and ship the designated NAS Equipment back to WCOM. Buy-back requests will be implemented using mutually agreed-upon engineering procedures. A non-recurring charge as specified below will be billed for each port that is removed from service. There are restrictions on the quantity of ports that can be removed from service in a given timeframe.

WCOM may buy back a maximum of 14,200 ports during the first year, which begins on the effective date of this tariff. During year two (2), WCOM may buy back a maximum of 2% of their nationwide quantity of installed ports which are in service (or in the process of being moved) on the one (1) year anniversary of the tariff effective date. During year three (3), WCOM may buy back a maximum of 30% of their nationwide quantity of installed ports which are in service (or in the process of being moved) on the two (2) year anniversary of the tariff effective date.

For buy-back of ports that are in the process of being moved, the "buy back year" will be based upon the date (in relation to the 36-month enrollment period of this arrangement (as specified above)) that the port(s) was taken out of service to initiate the move.

WCOM's Minimum Port Commitment is reduced as a result of buy-back activities. The buy-back will be applied to the 575,000 base ports and the 200,000 additional ports, as applicable depending on the port types being bought back by WCOM.

4

DOJ - 00015
CONFIDENTIAL

Charges for customer initiated equipment buy-backs are applied on a one-time non-recurring charge (NRC) basis for each port that is purchased.

| Port Installation Date | Rate (NRC) per Port Removed | | |
|---|---|---|---|
| | Buy-back Year (Enrollment Period) | | |
| | Year 1 | Year 2 | Year 3 |
| Prior to 1998 Installs | $375 | $250 | $100 |
| 1998 Installs | $525 | $375 | $150 |
| 1999 Installs | $570 | $435 | $285 |
| 2000 Installs | $645 | $465 | $305 |
| 2001 Installs | | $270 | $200 |
| 2002 Installs | | | $270 |

For buy-back activities, WCOM may choose between the above rate structure or pay for the remaining life of the three (3) year term at the per port monthly rate applicable to the individual port, whichever is lower.

During the first thirty (30) calendar days after the effective date of the tariff, WCOM may cancel any pending orders, or ports installed per the WCOM capacity plan, for CyberPOP service (including comparable modem based data aggregation services purchased from Verizon) provided by Verizon to WCOM or its affiliates that have not yet been installed by Verizon, for a one-time $25.00 non-recurring charge per port. Such cancellation shall not count towards the year one (1) buy-backs that otherwise might apply to such activities under the tariff.

## Customer Initiated Moves

WCOM can move (disconnect and reconnect) dial-up port capacity from one Verizon CyberPOP location to another, up to a maximum of 5% per quarter of the total ports in service at the start of each calendar quarter (January, April, July, October) ("Quarterly Move Allotment").

Following the completion of the parties' joint pre-planning and engineering work, the parties shall use all commercially reasonable efforts to place the moved ports back in service within ninety (90) calendar days, or such other reactivation time period as may be mutually agreed-upon by the parties at the time of disconnect. Move requests will be implemented using mutually agreed-upon engineering procedures, and may result in the swap-out of NAS Equipment on a port-for-port basis (at WCOM's election and expense, if any). Hardware components being moved (and swapped, if applicable) must be compatible with the hardware/software configuration at the receiving CyberPOP location. Disconnect and reconnect move orders will be processed concurrently and standard Verizon operational processes and implementation timeframes will be utilized.

For the first thirty (30) calendar days following the tariff effective date for this arrangement, WCOM may identify and execute move activities (at a flat $25 per port rate) that do not count against the 5% per quarter limitation. The joint objective is that moved ports be reinstalled and placed back in service within one hundred twenty (120) calendar days after the effective date of tariff.

Charges for moves are applied on a one-time non-recurring charge (NRC) basis for each in service port (i.e., lit B-channel passing dial-up traffic) that is moved. MRC billing for the ports will be discontinued during the move process and will be reinstated at the time the move is completed. Once reinstated, the ports will be billed for the remaining duration of the thirty-six (36) month term at the same base or additional port MRC as originally charged for the port. Out-of-service days during the move of a port will not count against satisfying the thirty-six (36) month commitment period for the port. Detailed project planning will be required by both parties in order to establish mutually agreeable timelines for port moves. Unless otherwise agreed, or unless Verizon is not able to implement service to a moved port within 105 calendar days, billing for moved ports shall commence no later than 105 calendar days from the date the port was taken out of service for the move.

5

DOJ - 00016
CONFIDENTIAL

S 68

Rate (NRC) per In Service Port Moved :

| | |
|---|---|
| First 60% of Quarterly Move Allotment: | $25 per Port |
| Next 40% of Quarterly Move Allotment: | $45 per Port |

## Service Enrollment

WCOM must specify in writing to Verizon that they elect to subscribe to the CyberPOP service as set out in this tariff. The minimum CyberPOP service for a Central Office site in which NAS Equipment is located is 138 dial-up ports.

## Periodic Reviews

The parties shall meet monthly on or about the last business day of each month to reconcile port counts and determine, for billing purposes, the number of CyberPOP Ports that shall be deemed to have been active for that month.

WCOM's service commitment will be reviewed quarterly on or about the last business day of each calendar quarter (January, April, July, October) following the tariff effective date. WCOM in-service port counts, port moves, port buy-backs, port installs, and SNR activity will be identified and jointly reconciled by WCOM and Verizon staffs. Any required reporting or billing adjustments will be agreed upon and executed within thirty (30) calendar days of completion of the reconciliation process. In the event that a final reconciliation is not agreed upon by WCOM and Verizon within thirty (30) days, the issue will be escalated to executive management of both companies for resolution.

## Shortfall Charge

At the final thirty-six (36) month review, WCOM will be notified in writing as to the status of their overall commitment requirements. This notification will inform WCOM of any shortfall in the quantity level below the Minimum Port Commitment, as specified above. At the final review, if the number of CyberPOP ports is below the Minimum Port Commitment, a one-time charge of $630 per port will be assessed for dial-up port quantity shortfalls of in-service ports below the Minimum Port Commitment.

## Service Availability

The Verizon objective level of service availability will be 95% of the monthly hours of operation for each Central Office. Should the service availability actually be less than 95% of the monthly hours for the average port of a Central Office (e.g., 30 days x 24 hours x .95 = 684 hours), WCOM will receive a credit of 40% of the monthly bill for that Central Office. Force Majeure events that impact service and which Verizon could not have prevented through the use of reasonable precautions will not be subject to the above penalty calculation.

## Withdrawal of Service Areas

In the event that Verizon ceases to offer CyberPOP service in a Verizon CO in which CyberPOP service is offered at any point under this tariff, through transfer of ownership of the Verizon CO to a non-Verizon entity, Verizon shall request the new owner to continue to provide service equivalent to Verizon's CyberPOP service at such CO, and shall, if the new owner agrees to continue the service, use commercially reasonable efforts to facilitate a smooth transition of CyberPOP service to the new provider. Notwithstanding the foregoing, with respect to any CyberPOP Ports deployed in such Verizon COs ("Sold CyberPOP Ports"), WCOM shall have the right (and reasonable opportunity following written notice from Verizon) to terminate such Sold CyberPOP Ports prior to their transfer to the new provider without the application of any early termination fees or other charges, and to repurchase the

DOJ - 00017
CONFIDENTIAL

associated NAS Equipment from Verizon at the then-current depreciated book value (with no other charges applying). Verizon shall ship such NAS Equipment to WCOM at WCOM's expense. NAS Equipment repurchases resulting from Sold CyberPOP Ports shall not count towards the annual limit of regular buy backs specified in the tariff. In addition, and regardless of whether WCOM terminates such Sold CyberPOP Ports, the Minimum Port Commitment shall be reduced by the number of such Sold CyberPOP Ports.

### Duration of Tariff and Renewal Option

This arrangement shall remain in effect so long as CyberPOP Ports are being provided under it.

At the expiration of the initial 36-month period following the effective date of this tariff, and subject to payment of any shortfall charge, the Minimum Port Commitment, adjusted as set out above, shall expire and shall no longer be binding.

During the period in which this tariff remains in effect after the expiration of the initial 36-month port term that applies to each CyberPOP Port ordered hereunder, (a) Verizon will continue with billing for such ports on a month-to-month basis at the MRC rates identified in this tariff, (b) WCOM may cancel any such ports upon sixty (60) days written notice, and (c) Verizon may cancel such ports by providing WCOM with one hundred eighty (180) calendar day notification that such ports will be terminated.

Verizon may terminate this tariff, with termination effective at any time after completion of the initial 36-months following the effective date of the tariff, by giving WCOM one hundred eighty (180) calendar day notice. Such termination shall not apply to CyberPOP Ports that are in service at the termination date, and this tariff shall remain in effect for such ports until the ports are terminated in accordance with the preceding subsection. Upon termination of this tariff, WCOM may not order any new CyberPOP Ports.

DOJ - 00018
CONFIDENTIAL

S 70

# AMENDED & RESTATED CENTRAL OFFICE-BASED REMOTE ACCESS SERVICE SCHEDULE

's Amended & Restated Central Office-Based Remote Access Service Schedule ("Schedule") is entered into by and ween MCI WORLDCOM Network Services, Inc., with a place of business located at 22001 Loudoun County Parkway, ~~nburn, VA  20147 ("WorldCom"), and Qwest Corporation, with a place of business located at 1801 California Street, Denver, CO  80202 ("Vendor"), pursuant to the Master Services Agreement between WorldCom and Qwest Government Services, Inc., dated June 29, 2001 ("Agreement").

This Schedule is governed by the terms and conditions of the Agreement, except as specifically stated herein.  Where the provisions of the Agreement and this Schedule conflict, the terms and conditions of this Schedule shall prevail.  Words and phrases defined in the Agreement shall have the same meaning in this Schedule.  This Schedule shall be effective as of June 29, 2001 ("Schedule Effective Date").

A.    Service Description:

1.    Central office-based remote access services ("COBRA Services") provide integrated, remote analog & digital access to WorldCom that may be utilized by WorldCom's employees, WorldCom's end users, and the end users of WorldCom's affiliates, clients, and resellers (collectively, "End Users") to connect to WorldCom's internet network ("WorldCom Network") via modems referred to as network access servers ("NAS") deployed in central offices operated by Vendor or its affiliates ("Vendor COs").  COBRA Services provide medium to high-speed data transport services for remote access to the WorldCom network. COBRA Services permit WorldCom to receive calls from multiple analog modems and ISDN basic rate interface lines for handoff to separately purchased wide area network links.  Vendor shall connect each NAS used in connection with the COBRA Services to the Public Switched Telephone Network ("PSTN") via ISDN primary rate interface, or other mutually agreed comparable telecommunications facilities (collectively, "PRI"), and shall arrange for the dedicated assignment (or preservation, to the fullest extent possible) of unique telephone numbers for (or in use by) WorldCom and End Users.

2.    COBRA Services include all equipment, telecommunications services and related facilities (including without limitation active PRI lines, at least 40 DID numbers per rotary, space, power, and other utilities), and ancillary support and maintenance required to connect a call that has been dialed into the PSTN (such call dialing a designated telephone number) to an active DS0 channel-equivalent port (i.e., PRI B-channel) on the corresponding NAS ("COBRA Port").  The demarcation of the COBRA Services between Vendor and WorldCom shall be at the connection of the NAS egress port to the egress circuit connecting the NAS to Vendor's or its affiliate's wide area network and/or the WorldCom Network.

   a.    Vendor acknowledges that certain of the COBRA Ports shall be utilized on WorldCom's Dial Access Network ("DAN"), which is a dial network shared by multiple WorldCom clients and resellers, and that other COBRA Ports shall be utilized on WorldCom's Fixed Port Network ("FPN"), which is a dial network dedicated to a single WorldCom reseller.  As it pertains to the COBRA Services, those distinctions between the ordering, provisioning, and/or management of COBRA Ports on the DAN and the FPN are identified herein.

   b.    For purposes of this Service Schedule, FPN ports in the back-hauled UAS circuit configuration ("ANS Ports"), which are described more fully in the Uniform Access Services Schedule between the same parties as of the same date ("ANS Port Schedule"), shall count towards fulfillment of WorldCom's First and Second Commitments, described below.

3.    Vendor and/or its affiliates shall own all of the NAS equipment (generally including the NAS, Ethernet hub, terminal server, and OOB modem) used in connection with the COBRA Services that is located on Vendor's side of the demarcation of the COBRA Services. Nothing in this Schedule is intended to, nor shall it be construed to, confer upon WorldCom any right or interest in Vendor's equipment or property, nor any right to occupy or install any of its equipment or facilities in or upon any Vendor property.

   a.    Vendor acknowledges that separate NAS equipment shall be used to support the FPN, and that certain Vendor COs may contain two sets of NAS equipment (one set to support the DAN and the other set to support the FPN).

DOJ - 00035
CONFIDENTIAL

S 71

4.  In providing COBRA Services under this Schedule, the parties agree to use NAS equipment only in specified configuration(s) as mutually agreed upon by the parties in advance. For any given Firm Order (as that term is defined in Subpart C below), the parties shall cooperate to determine the applicable NAS equipment and configuration to be deployed in connection with such ordered COBRA Ports.

5.  Vendor and/or its affiliates shall provide WorldCom with 24x7x365 NOC-to-NOC technical support. Vendor shall proactively maintain all NAS equipment (along with all related equipment on Vendor's side of the demarcation of the COBRA Services) used in connection with the COBRA Services. Vendor shall assist WorldCom in the resolution of any NAS equipment failure in accordance with the reasonable instructions of WorldCom's NOC and the response/repair times set forth in Subpart G(2) below.

6.  Notwithstanding any contrary provision set forth in this Schedule or the Agreement, WorldCom shall be exclusively responsible for the operational control (i.e., logical access) of all NAS equipment used in connection with the COBRA Services. WorldCom shall be exclusively responsible for the purchase, installation, and management of all software upgrades for the NAS equipment. WorldCom agrees that Vendor shall not be responsible for any failure by WorldCom to properly operate the NAS equipment.

    a.  WorldCom agrees to provide Vendor with at least ten (10) business days prior written notice before deploying new software on the NAS equipment that would implement any new major features or functionalities (i.e., left-of-decimal software upgrade, using the standard x.yz software version naming convention) on the NAS equipment. This notice requirement includes the intentional loading of any software that WorldCom is aware has the capability of implementing any Voice-over-IP functionalities on the NAS equipment.

    b.  In the event that Vendor reasonably determines that any software upgrade (or any right-of-decimal software update) implemented by WorldCom on the NAS equipment is adversely affecting the quality or performance of the COBRA Services, the PSTN, or other elements of Vendor's network, upon receipt of written notice from Vendor made pursuant to Section 14 of the Agreement which specifies the nature of such adverse service impacts, WorldCom shall suspend the deployment of such software upgrade/update until such service-impacting problems can be resolved.

7.  Vendor shall have no responsibility for the authentication of End Users accessing COBRA Ports. WorldCom shall be exclusively responsible for controlling all End User access to COBRA Ports.

8.  Each June after the Schedule Effective Date, the parties shall meet to review and discuss the architecture and equipment used in connection with the COBRA Services, then-current market conditions, and the market competitiveness of the prices and commitment levels set forth herein, as well as any business, performance, or operational issues as may then have arisen between the parties. The parties also shall discuss the deployment of future technologies in Vendor's networks, including without limitation - alternative call delivery technologies (e.g., SS7 and/or soft switch technologies), and any corresponding price changes associated with such deployment. The parties agree to negotiate in good faith to maintain the mutually agreed-upon competitive viability of this Schedule and the COBRA Services provided hereunder.

9.  The Lucent TNT equipment specifications, technical parameters, and operational requirements applicable to the COBRA Services and NAS equipment attached as Exhibit 1 to the original Central Office-Based Remote Access Service Schedule between UUNET Technologies, Inc. ("UUNET") and Vendor, dated August 28, 2000, and the pricing for the Lucent TNT equipment attached to that same document as Exhibit 2, remain in full force and effect and shall constitute Exhibit 1 and Exhibit 2 of this Schedule as if fully attached hereto. The draft 3Com Total Control equipment specifications attached hereto as Exhibit 3 set forth certain technical parameters and operational requirements applicable to the COBRA Services and NAS equipment. The parties recognize and agree that the 3Com Total Control equipment specifications attached as Exhibit 3 are nearly final, but that some minor changes still need to be made, and the parties will use best efforts to finalize such specifications within thirty (30) days from the Schedule Effective Date. Pricing for the 3Com Total Control equipment is set forth in Exhibit 4, attached. The equipment configurations specified in Exhibits 1 and 3 for ports to be installed after the Effective Date may be updated by WorldCom from time to time; provided that such specifications must be compatible with Vendor's equipment and compliant with published Vendor NEBS standards.

DOJ - 00036
CONFIDENTIAL

S 72

10.    In the event that the manufacturer of NAS equipment used in connection with the COBRA Services offers a hardware upgrade to such NAS equipment, the parties shall confer and mutually agree as to whether to deploy such hardware upgrade in connection with the COBRA Services, as well as the appropriate cost sharing and/or cost savings arrangements resulting from such a deployment.

11.    Vendor and WorldCom acknowledge that the COBRA Service provided hereunder is being provisioned to meet the unique needs and circumstances of WorldCom. Should the COBRA Service provided hereunder be determined by a regulatory body to be subject to regulated collocation requirements, Vendor may, in its sole discretion, terminate this Schedule and phase-out the Service over a six (6) month period. If Vendor elects to phase-out the COBRA Service, WorldCom shall not be liable to Vendor for any termination charges or other liability that otherwise would have applied to such an early cancellation of such COBRA Services.

12.    This Schedule does not represent an inter-connection agreement between the parties. Should WorldCom or any of its affiliates wish to directly use the COBRA Services to directly provide any one-way or two-way voice telephony communications, whether local or long distance ("VoIP"), WorldCom and Vendor shall negotiate terms, conditions, and rate structures that are applicable to VoIP prior to WorldCom utilizing the COBRA Services to directly provide VoIP. In the event the parties are unable to reach agreement on the terms, conditions, and rate structures for such VoIP services, WorldCom has the option to terminate this Schedule upon six (6) months' written notice to Vendor without application of any termination charges or other liability; provided that upon such termination WorldCom shall (a) purchase or lease if appropriate, any NAS equipment dedicated to WorldCom's use from Vendor at the then-current Vendor book value and/or residual lease value for such NAS equipment; and (b) promptly remove the NAS equipment from Vendor's premises. If WorldCom or any of its affiliates at any time during the Service Term of this Schedule directly use the COBRA Services to provide VoIP without the prior development of mutually agreed-upon terms, conditions, and rate structures for VoIP, WorldCom shall be in breach of this Schedule and Vendor may terminate this Schedule for cause as defined in Section 4 of the Agreement.

13.    The parties shall jointly determine where and in which Vendor Central Offices the NAS equipment will be placed and the resulting PSTN network architecture in order to: (a) provide WorldCom and its affiliates, clients, and resellers with appropriate geographic coverage; (b) minimize the number of egress circuits required to connect the NAS equipment to the WorldCom Network; and (c) balance Vendor's network loads and capacity in a manner to ensure there will be no negative impact to the dialing patterns or performance of the COBRA Services for WorldCom and its End Users. Vendor intends to offer the COBRA Services in all cities where facilities exist and where technically and economically feasible. Once the parties have mutually agreed upon the precise locations and quantities of COBRA Ports, Vendor shall be responsible for maintaining sufficient PSTN network capacity to support the current and projected peak traffic loads (not including unforeseeable one-time spike loads on the PSTN network) for each such service location, shall proactively monitor the PSTN network to ensure that sufficient capacity exists at all times, and shall use best efforts on a 24x7x365 basis to correct any identified lack of PSTN network capacity.

14.    The parties agree to mutually explore the technical parameters and implementation requirements of single number service ("SNS") in connection with the COBRA Services, including the feasibility of deploying SNS on a state-by-state or other mutually-agreeable basis across Vendor's entire service territory.

B.    Service Territory. The prices set forth in this Schedule shall apply to all COBRA Services provided hereunder for deployment in any Vendor CO where COBRA Services are available from Vendor and/or its current and future affiliates ("Available Vendor CO") within the fourteen-state Qwest (incumbent local exchange carrier) service area. Vendor agrees to use commercially reasonable efforts to make the COBRA Services available in all Vendor COs.

C.    Service Ordering Procedures.

1.    [Reserved]

2.    DAN.

a.    WorldCom agrees to provide Vendor with quarterly forecasts of potential DAN growth. Following the issuance of a given quarterly growth forecast, the parties agree to work cooperatively prior to the placement by WorldCom of a firm order for COBRA Ports in order to (i) identify the quantity of COBRA Ports for deployment; (ii) the applicable Vendor CO for such COBRA Ports; and (iii) a

DOJ - 00037
CONFIDENTIAL

mutually agreeable installation timeline for such COBRA Ports. Once the parties have cooperatively developed a deployment plan, WorldCom shall have ten (10) business days to send Vendor a firm and binding order in writing ("Firm Order") for the identified COBRA Ports.

b.    With respect to those COBRA Ports that are to be utilized on the DAN, the parties agree to implement an average NAS utilization rate across Vendor's entire deployment of 95% or greater (calculated on a NAS-by-NAS basis as the ratio of active and ordered COBRA Ports to such NAS against the total number of usable modem ports on such NAS). By way of example only, if a T1+/DC TNT is being used in a FAS configuration, the total number of usable modem ports is 460 modem ports. Accordingly, on an average basis, such TNT should have at least 437 active and ordered COBRA ports. In the event that the parties elect to deploy an alternative NAS configuration in connection with the DAN, the parties agree to negotiate in good faith to determine the applicable minimum COBRA Port order quantity for such alternative NAS configuration.

c.    Once Vendor receives WorldCom's Firm Order, any cancellation by WorldCom of the COBRA Ports identified in such Firm Order shall be subject to any applicable order cancellation charges as set forth in Subpart K(5) below, unless otherwise provided by the Agreement or this Schedule.

3.    FPN.

a.    To add any COBRA Ports that will support the FPN, WorldCom shall provide Vendor with a request for information ("RFI") in writing identifying (i) the number of COBRA Ports being considered for deployment by WorldCom; and (ii) the geographic location (for a new rotary) or the Vendor CO (for the expansion of an existing rotary) for such identified COBRA Ports.

b.    Vendor shall have seven (7) days from receipt of the RFI to advise WorldCom in writing whether (i) Vendor agrees to provision such identified COBRA Ports within the SLA installation time frame set forth in Subpart G(3) below; (ii) Vendor agrees to provision such identified COBRA Ports within an alternative, reasonable time frame that is greater than the SLA installation time frame set forth in Subpart G(3) below; or (iii) Vendor does not agree to provision such identified COBRA Ports.

c.    In the event that Vendor responds affirmatively to the RFI (i.e., provides a response pursuant to Subparts C(3)(b)(i)-(ii) above), WorldCom shall have seven (7) days from receipt of Vendor's written response to send Vendor a firm and binding order in writing ("Firm Order") for the identified COBRA Ports. Once Vendor receives WorldCom's Firm Order, any cancellation by WorldCom of the COBRA Ports identified in such Firm Order shall be subject to any applicable order cancellation charges as set forth in Subpart K(5) below, unless otherwise provided by the Agreement or this Schedule. If WorldCom does not send Vendor a Firm Order within seven (7) days from receipt of Vendor's written response pursuant to Subpart C(3)(b) above, WorldCom's RFI and Vendor's response thereto shall be deemed to have expired.

d.    With respect to those COBRA Ports that are to be utilized on the FPN, the parties agree to use commercially reasonable efforts to maximize the average NAS utilization rate across Vendor's entire deployment (calculated on a NAS-by-NAS basis as the ratio of active and ordered COBRA Ports for such NAS against the total number of usable modem ports on such NAS). The parties acknowledge that the locations and quantities of COBRA Ports for the FPN is determined by WorldCom's client, and that the management of the FPN NAS utilization rate may require the interim deployment of partially-filled NAS equipment. WorldCom agrees that any Firm Orders for new service locations on the FPN would include a minimum of 192 COBRA Ports.

D.    Service Pricing.

1.    The Monthly Fees for each port category for a given calendar month shall be in accordance with the following table:

| Port Type | Monthly Fee per Port |
|---|---|
| DAN COBRA Ports | $24.00 |

DOJ - 00038
CONFIDENTIAL

S 74

| ANS Ports | rate specified in ANS Port Schedule |
|---|---|
| ANS COBRA Ports (following conversion) | $24.00 |
| ANS Virtual COBRA Ports (following conversion) (no Buy-Down Fee) | $22.00 |
| ANS Virtual COBRA Ports (following conversion) (with Buy-Down Fee as per Subpart L(1)(c)) | $17.50 |

2.  Except where otherwise expressly provided in this Schedule (e.g., Subpart I(2) below), no non-recurring charges shall apply with respect to the COBRA Services. To the extent that any applicable tariff includes non-recurring charges, Vendor agrees that such non-recurring charges already have been factored into the Monthly Fees for the COBRA Services as set forth in Subpart D(1) above.

3.  The prices set forth herein for the COBRA Services include any applicable NAS egress port fees, but exclude any egress circuit, customer premise equipment, and enhanced service charges. In the event that WorldCom elects (in its sole discretion) not to obtain an egress circuit from Vendor, Vendor agrees to fully cooperate with WorldCom and any third-party provider selected by WorldCom to connect Vendor's NAS or wide area network equipment to the WorldCom Network via an egress circuit provisioned by such third-party provider to Vendor's central office or wide area network interconnection location. Vendor shall be compensated by WorldCom for any work associated with such third-party provider egress circuit interconnection to the extent that Vendor is compensated by third parties at similar rates for similar work.

4.  The Monthly Fees set forth in Subpart D(1) above include all applicable fees and surcharges (other than fees and surcharges that are imposed by the Federal Communications Commission or other government agency on the COBRA service subsequent to the Schedule Effective Date). Neither Vendor nor WorldCom are aware of any pending or proposed fees or surcharges that would apply to the COBRA Service.

5.  Prospectively from the Schedule Effective Date, the Monthly Fees set forth in Subpart D(1) above do not include applicable taxes; provided that the following procedures shall apply.

    a.  If any federal, state or local government tax excluding any tax levied on property or income (an "Applicable Tax") is required or permitted by applicable law, ordinance or tariff to be collected from WorldCom by Vendor, then (i) Vendor will bill, as a separately stated item, WorldCom for such Applicable Tax, (ii) WorldCom will timely remit such Applicable Tax to Vendor, and (iii) Vendor will remit such collected Applicable Tax to the applicable governmental authority as required by law. Vendor will also promptly review any new tax if requested by WorldCom, and will cooperatively seek relief, if appropriate. If, as specified in more detail below, WorldCom submits to Vendor an exemption certificate or other appropriate documentation, then Vendor shall not bill WorldCom for such Applicable Tax.

    b.  If Vendor does not collect an Applicable Tax because WorldCom asserts that it is not responsible for the Applicable Tax, or is otherwise excepted from the obligation which is later determined by formal action to be wrong then, as between Vendor and WorldCom, WorldCom will be liable for such uncollected Applicable Tax and any interest due and/or penalty assessed on the uncollected Applicable Tax by the applicable taxing authority or governmental entity.

    c.  If either Party is audited by a taxing authority or other governmental entity the other Party agrees to reasonably cooperate with the Party being audited in order to respond to any audit inquires in a proper and timely manner so that the audit and/or any resulting controversy may be resolved expeditiously.

    d.  If applicable law does exclude or exempt a purchase of services under this arrangement from an Applicable Tax, and if such applicable law also provides an exemption procedure, such as an exemption certificate requirement, then, if WorldCom complies with such procedure, Vendor will not bill or collect such Applicable Tax during the effective period of the exemption.

DOJ - 00039
CONFIDENTIAL

S 75

e.    If applicable law does not exclude or exempt a purchase of services under this Agreement from an Applicable Tax, and does not also provide an exemption procedure, then Vendor will not bill or collect such Applicable Tax if WorldCom (i) furnishes Vendor with a letter signed by an officer of WorldCom claiming an exemption and identifying the applicable law which allows such exemption, and (ii) supplies Vendor with an indemnification agreement, reasonably acceptable to Vendor, which holds Vendor harmless on an after-tax basis with respect to forbearing to collect such Applicable Tax.

f.    With respect to any Applicable Tax or Applicable Tax controversy, WorldCom will be entitled to contest, pursuant to applicable law, and at its own expense, any Applicable Tax that it is ultimately obligated to pay. WorldCom will be entitled to the benefit of any refund or recovery resulting from such a contest.

E.    Service Acceptance Procedures. WorldCom's acceptance of new, moved, or migrated COBRA Ports at a given location shall be made immediately following the successful completion of service acceptance tests conducted jointly by the parties. At a minimum, such service acceptance tests shall include the login and RADIUS authentication to the WorldCom Network via the COBRA Ports being tested. A given COBRA Port shall be deemed to be active upon WorldCom's acceptance of such COBRA Port pursuant to this Subpart E. The acceptance procedure shall be as follows:

1.    After WorldCom's receipt of written notice (including via email) indicating that a given new COBRA Port is ready for service, WorldCom shall have up to forty-five (45) days to obtain all necessary egress capacity and to complete all end-to-end testing of such new COBRA Port. Unless WorldCom notifies Vendor of any service deficiencies with the new COBRA Port during this forty-five (45) day period, such new COBRA Port shall be deemed active and Vendor will begin billing WorldCom for the new COBRA Port upon the earlier of: (A) WorldCom's notice to Vendor of service acceptance of the new COBRA Port; or (B) the expiration of the applicable forty-five (45) day period.

2.    If WorldCom notifies Vendor of any service deficiencies with a new COBRA Port during the forty-five (45) day period specified in Subpart E(1) above, the parties shall cooperatively troubleshoot the new COBRA Port in an expeditious manner until it is operational and accepted by WorldCom. If the parties mutually determine that the source of the service deficiency is within the control of Vendor (including any contractor other than WorldCom), then service activation and billing for such COBRA Port shall be suspended until the service deficiency has been corrected and WorldCom notifies Vendor that the new COBRA Port has been accepted. If the parties mutually determine that the source of the service deficiency is within the control of WorldCom (including any contractor other than Vendor), then service activation and billing for such COBRA Port shall begin as of the later of: (A) ten (10) days after the date of such mutual determination; or (B) the expiration of the original forty-five (45) day period specified in Subpart E(1) above; provided, however, that if WorldCom notifies Vendor that the new COBRA Port has been accepted, then service activation and billing for the new COBRA Port will begin upon WorldCom's acceptance.

F.    Service Billing Procedures. Vendor shall bill WorldCom monthly, based upon the applicable Monthly Fees specified in Subpart D(1) above, for each COBRA Port that is subject to WorldCom's First or Second Commitment or that is otherwise billable during the applicable monthly billing period. Vendor shall pro-rate (calculated on a daily basis) any COBRA Port that is activated, terminated, or expires during the middle of such monthly billing period. Vendor's monthly invoice for COBRA Services shall be submitted to WorldCom in accordance with the provisions of the Agreement.

G.    Service Level Agreements ("SLA").

1.    Service Availability. Service outage credits may be claimed by WorldCom when any COBRA Port is interrupted or does not meet performance standards for any period lasting two (2) or more consecutive hours after WorldCom's network operations center ("NOC") notifies Vendor's NOC that a potential service outage exists. No credit shall be available if the interruption is caused by (i) the failure of WorldCom to properly operate the NAS equipment as set forth in Subpart A(6) above; (ii) the negligence or willful misconduct of WorldCom; or (iii) an event of Force Majeure as provided in the Agreement. The amount of the credit shall be equal to three (3) times the applicable Monthly Fee specified in Subpart D(1) above for each affected COBRA Port, pro-rated for the period during which a confirmed outage has occurred, including the initial one (1) hour. Outages shall be confirmed by a Vendor employee authorized to make

S 76

such determinations and will be calculated in ½-hour increments, or major fraction thereof, of the interruption.

2.   *Service Failure Response Times.* Vendor will provide hardware support and maintenance, and deployment of resources necessary to fix/replace hardware failures (once WorldCom has contacted Vendor and requested assistance. Should an alarm occur, WorldCom will be responsible for contacting Vendor's NOC. WorldCom is responsible for determining the source/cause of the problem and resolving the problem. WorldCom may or may not choose to take action on an alarm. If the alarm involves a hardware failure, WorldCom will contact Vendor's NOC, provide specific information on the location and type of activity to occur (example: replace module XXX in device YYY located at ZZZ location). Vendor's NOC then will deploy the appropriate resources to address the hardware problem, and Vendor shall diligently respond to and repair such failure of the COBRA Services, including without limitation the NAS equipment, based upon the grade of the failure, in accordance with the tables set forth below.

| Grade | Severity / Problem Level | Mean Time to Respond | Mean Time to Repair |
|---|---|---|---|
| 5 | Critical outage (entire hub down; dial rotary isolation; reseller link down; >10% of normal dial traffic disrupted; non-redundant device failure). *Examples:* PRI outage between the telephone switch and the NAS equipment; >30% of modems at any one CO are not responding; single point of failure piece of hardware outputting major alarms. | 15 minutes | 2 hours |
| 4 | Major outage (multiple users/nodes effected; <10% of dial traffic disrupted; severe service degradation). *Example:* <30% of modems at any one CO are not responding. | 1 hour | 4 hours |
| 3 | Minor outage (single user outage; capacity degradation; redundant device down; management access outage). *Examples:* No response from maintenance ports on a NAS server; single point of failure piece of hardware outputting minor alarms | 2 hours | Next business-day |
| 2 | Important event (condition being monitored; resolved awaiting parts). *Examples:* Non-service affecting problem on a NAS server; request for call back on non-service affecting issues. | 4 hours | Second business day |
| 1 | Informational event (requests for documentation). | Next business day | Second business day |

3.   *Installation Objective.* Vendor shall install all new COBRA Ports within forty-five (45) days after receipt of a Firm Order from WorldCom (unless the parties agree upon an alternative installation timeline during the Service Order process specified in Subparts C(2)-(3) above). Vendor immediately shall provide written notice to WorldCom in the event that Vendor determines after beginning the COBRA Port installation process that Vendor will not be able to meet this installation objective (or such alternative installation timeline agreed upon by the parties during the Service Order process specified in Subparts C(2)-(3) above). Upon receipt of such notice from Vendor, WorldCom may cancel the ordered COBRA Ports without liability for any termination charges.

4.   *PRI Service Objective.* Except where such facilities are unavailable within a reasonable time frame to meet WorldCom's deployment plans, Vendor shall deploy the COBRA Services via PRI ISDN facilities.

5.   *Operations Reviews & Chronic Failures.* Each calendar quarter the parties shall conduct an operations review at which time Vendor shall present analyses of its performance against the foregoing SLA provisions. Vendor shall identify the total number of all Grade 5 and Grade 4 failures in a given month ("Total Monthly Failures"), as well as the total number of times that Vendor did not meet a Grade 5 or Grade 4 response or repair time during such month ("R/R Failures"). If the number of R/R Failures exceeds ten-percent (10%) of the number of Total Monthly Failures, both parties agree to: (a) within seven (7) days after the operations review, meet to determine the nature and source of such performance deficiencies and to develop mutually agreeable remedies and timelines to improve performance; and (b) escalate the identified deficiencies to Vendor's senior management for enhanced performance oversight. In the event that Vendor's R/R Failures affect more than 5,000 active COBRA Ports during two (2) successive calendar quarters after the beginning of the seventh (7th) month following the Schedule Effective Date, WorldCom may terminate the affected COBRA Ports without liability for any termination

DOJ - 00041
CONFIDENTIAL

S 77

charges. Any COBRA Ports cancelled by WorldCom pursuant to the foregoing provision shall reduce by an equal amount the First and Second Commitments specified in Subpart I(1) below.

6. _Escalation Matrix._  Vendor agrees to provide WorldCom with an operations and senior management escalation matrix, and to update and maintain such matrix on a current basis for the Service Term of this Schedule. Such matrix shall include email addresses and telephone access numbers for operations and senior management points of contact who are available and authorized to address and resolve Vendor performance issues on a 24x7x365 basis.

H. Service Performance Reports. The below-listed information (which may be amended from time to time by written agreement of the parties) shall be recorded by Vendor for use by WorldCom in tracking maintenance and other Vendor performance issues. Vendor shall furnish to WorldCom a copy of the trouble log for the PRI Services at the quarterly operations review. Vendor shall maintain one entry per trouble ticket opened:

- WorldCom Ticket #
- Vendor Ticket #
- Vendor Opened Date & Time
- Name and telephone # of the person initiating the trouble report
- Name and telephone # of the person receiving the trouble report
- Nature of the reported trouble
- Diagnosis of trouble; reason for outage (circuit, equipment, other, or no RFO)
- Name and telephone # of the person reporting trouble clearance
- Name and telephone # of the person receiving trouble clearance
- Vendor Restored Date & Time
- Total Time to Repair
- Total Time of Outage
- Vendor Closed Date & Time

I. Minimum Purchase Commitments.

1. _Minimum Port Commitment._

a. From July 1, 2001 through December 31, 2004, WorldCom agrees to pay for a minimum of 300,000 COBRA Ports each month ("First Commitment"). The following port categories are included in the satisfaction of this commitment: active DAN COBRA Ports, DAN COBRA Ports pending activation or egress, DAN COBRA Ports that are "on hold" or "banked", unconverted ANS Ports (ports provided through a UAS architecture under the ANS Port Schedule), ANS Ports that have been converted to COBRA or Virtual COBRA, and ports that are in the process of being moved.

b. From January 1, 2005 through August 31, 2007, WorldCom agrees to pay for a minimum of 150,000 COBRA Ports each month ("Second Commitment"). The following port categories are included in the satisfaction of this commitment: active DAN COBRA Ports, DAN COBRA Ports pending activation or egress, DAN COBRA Ports that are "on hold" or "banked", unconverted ANS Ports (ports provided through a UAS architecture under the ANS Port Schedule), ANS Ports that have been converted to COBRA or Virtual COBRA, and ports that are in the process of being moved.

c. Beginning on January 1, 2005, WorldCom may deactivate any COBRA Ports and/or ANS Ports in excess of the Second Commitment without application of any termination liability or other charges. WorldCom will give Qwest thirty (30) days advance written notice of any such deactivations, e.g., WorldCom may provide notice of deactivations on December 1, 2004 for ports to be deactivated on January 1, 2005. WorldCom shall designate in writing which COBRA Ports shall be deactivated and a commercially reasonable timeline (not to exceed six (6) months) within which to implement such deactivations. The rates set forth herein shall apply to any active COBRA Ports during such transition period. In the event that WorldCom desires to continue COBRA Ports in excess of the Second Commitment after such six (6) month transition period expires, the parties shall negotiate in good faith a new pricing schedule for such excess ports.

S 78

d.   Beginning on September 1, 2007, WorldCom may deactivate any or all COBRA Ports and/or ANS Ports.  WorldCom will give Qwest thirty (30) days advance written notice of any such deactivations, e.g., WorldCom may provide notice of deactivations on August 1, 2007, for ports to be deactivated on September 1, 2007.  WorldCom shall designate in writing which COBRA Ports shall be deactivated and a commercially reasonable timeline (not to exceed six (6) months) within which to implement such deactivations.  The rates set forth herein shall apply to any active COBRA Ports during such transition period.  In the event that WorldCom desires to continue COBRA Ports after such six (6) month transition period expires, the parties shall negotiate in good faith a new pricing schedule for such ports.

2.   For any COBRA Port located in a rotary that has been active for at least six (6) months, WorldCom may have Vendor move such COBRA Port to another Available Vendor CO for a reasonable time and materials charge related to such move (set forth in Exhibit 5).  Each COBRA Port moved pursuant to this Subpart 1(2) shall continue to count towards WorldCom's satisfaction of any applicable Minimum Port Commitment set forth in Subpart 1 above.

3.   In the event that Vendor ceases to offer COBRA Service (including without limitation ANS Ports) through transfer of ownership of the Qwest CO to a non-Qwest entity, Vendor shall request the new owner to continue to provide service equivalent to the COBRA Service (including without limitation Back-hauled UAS service) at such CO, and shall, if the new owner agrees to continue the service, use commercially reasonable efforts to facilitate a smooth transition of the COBRA Service to the new provider. Notwithstanding the foregoing, with respect to any existing COBRA Ports deployed in such Vendor COs ("Sold Ports"), WorldCom shall have the right (and reasonable opportunity following written notice from Vendor) to terminate such Sold Ports prior to their transfer to the new provider without the application of any early termination fees or other charges.  Before exercising its right to terminate, WorldCom will discuss its legitimate business and/or technical reasons for doing so with Vendor, provided that this sentence shall impose no obligation or restriction on WorldCom's exercise of its right to terminate, which it may do at its sole discretion for any reason or no reason.  In addition, and regardless of whether WorldCom terminates such Sold Ports, the First and Second Commitments set forth above shall be reduced by the number of such Sold Ports.

4.   If WorldCom elects to convert ANS Ports to ANS COBRA, then Vendor agrees to purchase from WorldCom the 3Com NAS equipment at the COBRA prices specified in Exhibit 4 to this Schedule.  Other terms and conditions of such purchase will be set forth in a separate agreement between the parties, which shall be negotiated in good faith during the thirty (30) days following the Schedule Effective Date. The parties further agree to negotiate in good faith other purchases by Vendor of additional spare parts, EF&I services, and/or maintenance/support services; provided that Vendor shall not be obligated to make such purchases from WorldCom.

5.   With respect to spare parts for ANS Virtual COBRA ports (if any), WorldCom will provide Qwest with WorldCom-owned spare parts in advance, in accordance with a reasonable, mutually agreed-upon sparing solution.  As needed, Qwest may use these spare parts to replace original parts for ANS Virtual COBRA ports, and upon such use title to such spare parts shall pass to Qwest.  Such transfer of title and Qwest's use of the spare part shall occur on an even exchange basis for no charge; provided that Qwest notifies WorldCom of such use and promptly ships the original part to WorldCom.  In the event the original part is not received by WorldCom within fifteen (15) business days from the date the spare part is first used by Qwest, Qwest shall reimburse WorldCom for the list price of the spare part used.  Upon receipt, title to the original part shall transfer to WorldCom.  This Subpart 1(5) shall apply only with respect to spares for parts listed on Exhibit 4. Vendor shall be responsible for purchasing from third parties all ancillary NAS-related spare equipment (e.g., cabinets, cabling, DSX panels, etc.).

J.   Applicable Tariffs.

1.   Vendor's General Exchange and applicable Tariffs shall apply as appropriate.  Vendor represents that such General Exchange and applicable Tariffs are not materially inconsistent with the terms and conditions of this Schedule or the Agreement.

2.   In the event that Vendor is required to make any tariff filings for the COBRA Services provided under this Schedule, Vendor agrees to provide WorldCom with a draft of such tariff filing for WorldCom's review and comment prior to such filing.   Vendor agrees to afford WorldCom a reasonable period of time to conduct

such review (but no less than ten (10) days), and to incorporate or otherwise address any reasonable modifications requested in writing by WorldCom into such tariff filing. Should any tariff filing made by Vendor (or tariff approved by the applicable governing body, to the extent that such approved tariff differs from Vendor's submittal) with respect to the COBRA Services be materially inconsistent with or contrary to the terms and conditions of the Agreement or this Schedule, WorldCom may, at its option, terminate the affected COBRA Services without any termination charges or other liability by providing Vendor with written notice specifying a transition period (ending between one (1) and six (6) months from the date of WorldCom's termination notice), which shall be conducted pursuant to Section 2.3 of the Agreement. Such option to terminate must be exercised by WorldCom within thirty (30) days after tariff approval by the applicable governing body.

K. Applicable Service Term and Early Termination Liabilities.

1. This Schedule shall remain in effect until the expiration of the Second Commitment set forth in Subpart I above and the deactivation or transition of the COBRA Ports during the subsequent six (6) month transition period.

2. [Reserved]

3. Except as otherwise provided in the Agreement or this Schedule (including without limitation the deactivations and moves conducted pursuant to Subpart I above), if WorldCom cancels a given COBRA Port prior to the expiration of the First Commitment, or if WorldCom cancels a given COBRA Port retained by WorldCom to meet the Second Commitment prior to the expiration of the Second Commitment, WorldCom shall pay an early termination charge for such COBRA Port equal to the number of months remaining until the expiration of its Port Term, times the applicable Monthly Fee set forth in Subpart D(1), times the applicable termination percentage(s) based upon the number of months that such COBRA Port was in service (based on the COBRA Port installation or billing start date, whichever is earlier) in accordance with the following table:

| Months in Service | Termination Percentage |
|---|---|
| 0 – 36 | 100% |
| 37 – 60 | 75% |
| 61 – 84 | 50% |
| 84 + | 0% |

4. Any COBRA Port and any ANS Port that WorldCom cancels and for which it pays a termination charge (as set forth in Subpart K(3) above or in the Uniform Access Services Schedule, as applicable) shall continue to count towards WorldCom's satisfaction of the First and Second Commitments set forth in Subpart I above.

5. In the event that WorldCom cancels any Firm Order prior to activation, WorldCom shall reimburse Vendor for its costs (incurred through the date of termination) that relate to such terminated Firm Order, including but not limited to restocking charges and reasonable time and materials charges.

6. WorldCom shall pay Vendor $75,100,000 for termination liability charges related to 150,000 ports associated with WorldCom's DAN COBRA Ports, ANS Ports and ANS COBRA and Virtual COBRA Ports. WorldCom shall pay Vendor $75,100,000 in two tranches, the first tranche, in the amount of $19 million, shall be due and payable on or before July 3, 2001, and the second tranche, in the amount of $56,100,000 million, shall be due and payable on or before June 30, 2002.

L. Migration of Legacy FPN Capacity.

1. WorldCom may elect to migrate ANS Ports to the COBRA architecture in accordance with one of the three following options:

a. COBRA ($24/port): Vendor shall purchase from WorldCom the 3Com NAS equipment specified in Exhibit 4 at the COBRA prices specified therein. Vendor shall be responsible for purchasing from

third parties all ancillary NAS-related equipment and services (e.g., cabinets, cabling, DSX panels, rack/stack services, etc.).

b.  Virtual COBRA ($22/port): Vendor shall purchase from WorldCom the 3Com NAS equipment specified in Exhibit 4 for $1 per major part or component. Vendor shall be responsible for purchasing from third parties all ancillary NAS-related equipment and services (e.g., cabinets, cabling, DSX panels, rack/stack services, etc.). In no event is Vendor authorized to purchase NAS Equipment at such $1 rates for any purpose other than to provide an additional COBRA Port to WorldCom in connection with this Schedule. Upon the expiration, termination, or cancellation of Virtual COBRA ports as provided in this Schedule, WorldCom shall have the right to repurchase the NAS Equipment sold to Vendor for $0.50 per major part or component.

c.  Virtual COBRA ($17.50/port): Same as the Virtual COBRA ($22/port) option; provided that (i) WorldCom pays Vendor a one-time fee of $3.2 million ("Buy-Down Fee") upon making such election; and (ii) such option is limited to 15,000 ANS Ports to be converted at this reduced rate.

2.  The parties acknowledge that the migration of the ANS Ports provided by Vendor and/or its affiliates to WorldCom under the ANS Port Schedule in connection with the FPN may require the installation of certain equipment and facilities. Contingent upon the availability of such equipment and facilities, the migration of the ANS Ports to the COBRA Services shall follow a commercially reasonable, mutually agreed-upon migration schedule. Successful migration of any portion of such ANS Ports shall be deemed to have occurred when the replacement COBRA Services are provided to and accepted by WorldCom pursuant to Subpart E above. Vendor agrees that, to the fullest extent possible, all existing telephone numbers shall be preserved in the migration to the COBRA Services; provided that Vendor shall provide WorldCom with at least thirty (30) days prior written notice in the event that Vendor is unable to preserve an existing telephone number in connection with such migration to the COBRA Services.

3.  Vendor agrees that any termination charges associated with Vendor's or its affiliates' services that result from the migration of the ANS Ports to the COBRA Services either shall be waived by Vendor or its affiliates, or (if paid by WorldCom) shall be credited against Vendor's invoices for the COBRA Services. Upon conversion, the converted ANS Ports shall be deemed to be COBRA Ports for purposes of this Schedule.

Counterparts. This Schedule may be executed in several counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same instrument.

N.  Prior Agreement. This Schedule (along with the Agreement and any exhibits hereto) shall supersede the following prior agreements: (i) COBRA Service Schedule between UUNET Technologies, Inc. ("UUNET") and Vendor, dated August 28, 2000; and (ii) the agreement between UUNET and U S WEST Communications, Inc. (a predecessor entity to Vendor) for remote dial access services, entitled U S WEST Network Services Agreement General Terms and Conditions for Signaling System 7 Gateway Service / Central Office-Based Remote Access Service, dated December 30, 1998 (CDS-980819-0115) ("Prior COBRA Agreement").

IN WITNESS WHEREOF, the parties have caused this Schedule to be executed by their respective authorized representatives.

MCI WORLDCOM NETWORK SERVICES, INC.

By: _____

Printed Name: _SCOTT SULLIVAN_

Title: _CHIEF FINANCIAL OFFICER_

Date: _6/29/01_

QWEST CORPORATION

By: _____

Printed Name: _APSHIN MOHEBBI_

Title: _PRES. & C.O.O._

Date: _6/29/01_

DOJ - 00045
CONFIDENTIAL

S 81

ORIGINAL          COPY          Master CSA Number GA00-5399-00
FINAL - 9/24/00

# MASTER CONTRACT SERVICES ARRANGEMENT
# FOR RAS SERVICE

This Master Contract Services Arrangement for RAS Service ("Agreement") is entered into by and between BellSouth Telecommunications, Inc. ("BellSouth"), a Georgia corporation, and UUNET Technologies, Inc. ("UUNET", "Customer", or "Subscriber") and is entered into pursuant to Tariff Section A5 of the General Subscriber Services Tariff. This Agreement is based upon the following terms and conditions as well as those in Attachment 1 and any Order Attachment(s) affixed (collectively, "Attachments") and the appropriate lawfully filed and approved tariffs, which are by this reference incorporated herein.

BellSouth and Customer hereby agree as follows:

1.      Subscriber requests and BellSouth agrees, subject to the terms and conditions herein, to provide the Remote Access Service ("RAS" or "RAS Service") described in Attachment 1 and the Order Attachments (collectively, "Attachments") at the monthly and non-recurring rates, charges, and conditions as described in such Attachments. The rates, charges, and conditions described in Attachments are binding upon BellSouth and Subscriber for the duration of this Agreement. For the purposes of the effectiveness of the terms and conditions contained herein, this Agreement shall become effective upon execution by the second party ("Effective Date").

     1.1    Customer will be invoiced monthly for usage of the RAS Service. Payment must be received by BellSouth within forty-five (45) days after the date of the invoice. Customer will pay or reimburse BellSouth for any and all sales and use taxes, duties, or levies imposed by any authority, government, or government agency (other than taxes levied on BellSouth's net income, gross receipts, or franchise taxes) in connection with Customer's usage of the RAS Service and invoiced by BellSouth. If any payment due hereunder is not made within sixty (60) days after the invoice date, late charges at the standard rates imposed by BellSouth for other delinquent charges, including interest, as set forth in BellSouth's tariffs and Commission rules for such charges, shall be due and payable with respect to such payment.

     1.2    All invoices for RAS Service shall be sent to: UUNET Technologies, Inc., Attention: Accounts Payable, 22001 Loudoun County Parkway, Building E-1, Ashburn, VA 20147. UUNET shall have the right to dispute any charge included in a BellSouth invoice; provided that all such disputes shall be brought in good faith with a bona fide basis in fact. In the event of any such dispute, the portion of the invoice that is undisputed shall be paid by UUNET as provided herein. UUNET shall have the right to withhold payment of any disputed amount until the dispute is resolved; provided that UUNET gives notice of such withheld amount to BellSouth and the factual basis for the dispute at the time payment is withheld. Notwithstanding any contrary provision of this Agreement, UUNET's failure to pay any invoice or portion thereof as a result of an unresolved, good faith dispute shall not be considered a breach of this Agreement.

     1.3    So long as Customer is not in default hereunder, Customer may request and BellSouth may agree to add additional items of equipment or other expansions of Customer's Network to any existing orders for the RAS Service. Customer may from time to time request additional services from BellSouth in connection with the activities described in an applicable order. All changes to the scope of the RAS Service to be performed by BellSouth hereunder must be requested in writing and require mutual agreement. Evaluation and/or implementation of requested changes may result in an adjustment to the costs or schedule for delivery of the RAS Service or other terms of the order. Changes to the scope of the RAS Service will be incorporated into this Agreement through written amendment, which may be subject to filing with and/or approval by appropriate regulatory authorities.

2.      The RAS Service may include transport components which are incorporated by BellSouth and sold to Customer as part of the RAS Service, as will be reflected in the Attachments. Customer may, in addition, purchase other tariffed transport services to connect to the RAS Service (e.g., egress circuits) from BellSouth's regulated telephone operations, in which event such regulated transport network services purchased by Customer shall be provided pursuant to applicable tariffs (and/or other written agreements between the parties, as applicable) and are not part of the RAS Service nor subject to these Terms. Subscriber agrees to be responsible for all rates, charges, and conditions for such other separately-purchased tariffed services.

DOJ - 00052
CONFIDENTIAL

1

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

Master CSA Number GA00-5399-00
FINAL - 9/24/00

3.      This Agreement is subject to and controlled by the provisions of BellSouth's or any of its affiliated companies' lawfully filed and approved tariffs, including but not limited to Section A2 of the General Subscriber Services Tariff, No. 2 of the Federal Communications Commission Tariff and the Private Line Services Tariff and all such revisions to said tariffs as may be made from time to time. Except for the rates and charges in the Attachments, the tariffs shall supersede any conflicting provisions of this Agreement. Notwithstanding the prior sentence or any other provision of this Agreement to the contrary, BellSouth agrees that in the event BellSouth attempts to enforce any existing or future tariff provision that is materially inconsistent with the terms, conditions, and/or pricing of this Agreement or the Attachments and that adversely affects UUNET's use of the RAS Service (including without limitation any adverse changes to the rates, charges, and/or other pricing terms set forth in the Attachments), the Parties shall discuss such effects on UUNET and negotiate in good faith a mutually agreeable resolution. During such discussion period, BellSouth agrees to defer the implementation of such inconsistent tariff provision. If the Parties are unable to reach a mutual agreement after ninety (90) days of negotiation (or such other period of time agreed upon by both parties in writing), UUNET shall be entitled to terminate this Agreement and the RAS Service to the extent of the material inconsistency with only the liability to buy back all affected 3Com NAS equipment as specified under Section II(K)(3) of Attachment No. 1. During the thirty (30) day period following the conclusion of such negotiation period, a transition schedule will be provided by UUNET with a termination date not to exceed ninety (90) days from the date of the termination notice.

4.      The rates, charges, and conditions described in the Attachments are based upon certain volume and service-related commitments made by Customer to Company, which are set forth with specificity in Attachment 1, along with Customer's obligations with respect to not meeting such commitments.

5.      Early Termination Charges.

        (a)     If Customer cancels or terminates without cause a service that is the subject of a Firm Order made pursuant to the Attachments at any time prior to the completed installation or expiration of the service period set forth in the appropriate Attachments, but after the execution of such Firm Order, Customer shall be responsible for the resulting termination charges specified in the Attachments, unless Customer meets the requirements of Section II(H)(4) of Attachment No. 1 and the canceled RAS Port can be treated as a Move for which Customer shall pay Move charges as defined in the Attachments.

        (b)     Customer further acknowledges that it has options for its telecommunication services from service providers other than BellSouth, and that it has chosen BellSouth to provide the services specified in the Attachments. Customer, therefore, agrees that in the event it terminates without cause any service that is the subject of a Firm Order made pursuant to the Attachments under this Agreement, Customer will be responsible for termination charges set forth in the Attachments. Customer, however, will not be responsible for termination charges if a certified reseller of BellSouth local service, which is not an affiliate of Customer, resells this Agreement to Customer and such reseller executes a written document agreeing to assume all of Customer's obligations to BellSouth under this Agreement. Subscriber, however, agrees that in the event it fails to meet its obligations under this Agreement or terminates this Agreement or services purchased pursuant to this Agreement (except where expressly authorized in this Agreement and/or Attachments) in order to obtain services from a facilities-based service provider or a service provider that utilizes unbundled network elements, Subscriber will be billed, as appropriate, termination charges as specified in the Attachments.

6.      This Agreement may be subject to appropriate regulatory approval prior to commencement of installation. In the event such regulatory approval is denied or such approval is predicated on material deviations from the RAS Service and/or pricing, terms, and/or conditions specified in this Agreement and/or Attachments, this Agreement shall be null and void, and shall be of no effect.

7.      This Agreement shall be governed by and construed in accordance with the laws of each state where the service is provided, unless otherwise provided herein or in the applicable tariff.

8.      BellSouth shall provide the RAS Service in accordance with the same first class standards applied by BellSouth to its similar projects for its affiliated companies and other clients, in a good faith effort to support Customer in developing, implementing and/or managing Customer's network or its other intended system(s), network designs or other projects or services as described in applicable orders.

DOJ - 00053
CONFIDENTIAL

2

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

Master CSA Number GA00-5399-00
FINAL - 9/24/00

9.    BellSouth agrees to the following responsibilities (subject to the limitations set forth in this Agreement):

    (a)    BellSouth will operate the RAS Service in accordance with its standard policies and procedures and will make the RAS Service available to Customer as described in these Terms.

    (b)    BellSouth will notify Customer in writing at least ninety (90) days in advance of any changes in BellSouth's policies in the operation of the RAS Service which are reasonably expected to materially affect Customer's use thereof. The discussion/resolution process set forth in Section 3 above also shall apply with respect to any such changes in BellSouth's policies.

    (c)    BellSouth warrants that the RAS Service to be supplied hereunder will be performed by qualified professional personnel in accordance with industry standards and that the RAS Service will be in compliance with this Agreement and the Attachments.

10.    NEITHER BELLSOUTH NOR CUSTOMER SHALL HAVE ANY LIABILITY FOR INCIDENTAL, CONSEQUENTIAL, INDIRECT OR SPECIAL DAMAGES IN CONNECTION WITH THIS AGREEMENT, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. EACH PARTY EXPRESSLY AGREES THAT EXCEPT WITH RESPECT TO LIABILITY UNDER SECTIONS 5, 12 AND 19 OF THESE TERMS, UNDER NO CIRCUMSTANCES SHALL EITHER PARTY'S TOTAL LIABILITY TO THE OTHER IN CONNECTION WITH THIS AGREEMENT EXCEED TWO (2) TIMES THE AMOUNT OF CHARGES PAID BY CUSTOMER FOR USE OF THE RAS SERVICE DURING THE TWELVE (12) MONTH PERIOD PRECEDING THE DATE THE CLAIM WAS FIRST MADE IN WRITING.

11.    BellSouth agrees to maintain, at its expense, during the entire time this Agreement is in effect the following levels of insurance. The Parties agree that BellSouth may elect to self-insure against all or some of the risks associated with the scope of work contained in this Agreement if it can provide sufficient evidence of its ability to do so.

    (a)    Commercial General Liability Insurance in an amount not less than two million dollars ($2,000,000) per occurrence for bodily injury or property damage;

    (b)    Employer's Liability Insurance in an amount not less than one million dollars ($1,000,000) per occurrence;

    (c)    Workers' Compensation Insurance in an amount not less than that prescribed by statutory limits;

    (d)    Commercial Automobile Liability Insurance applicable to bodily injury and property damage, covering owned, non-owned, leased and hired vehicles, in an amount not less than $1,000,000 per accident;

    (e)    Umbrella or Excess Liability Insurance with a combined single limit of no less than $1,000,000 to apply over Commercial General Liability, Employee's Liability, and Commercial Automobile Liability Insurance.

12.    Indemnification.

    (a)    If promptly notified in writing of any action brought against Customer based on a claim that the RAS Service infringes a patent, copyright, trade secret, trademark, or other intellectual property right, BellSouth will defend that action at its expense and will pay any and all fees, costs or damages that Customer may incur (provided that Customer shall permit BellSouth to control the defense of such action and shall not make any compromise, admission of liability or settlement of such claim without BellSouth's prior written approval). If a final injunction is obtained against Customer prohibiting usage of the RAS Service by reason of infringement of a patent, copyright, trade secret, trademark, or other intellectual property right, BellSouth will, at its option, either: (1) at its expense procure the right for Customer to continue using the RAS Service or (2) replace the RAS Service with a comparable service at a price equal to the prices set forth in this Agreement and applicable Attachments.

DOJ - 00054
CONFIDENTIAL

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
LUNET/BELL SOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT

S 84

Master CSA Number GA00-5399-00
FINAL - 9/24/00

(b)    Customer will indemnify and save harmless BellSouth from and against all loss, liability, damage, and expense, including all reasonable counsel fees that BellSouth may incur, due to claims for infringement of patents, copyright, trade secret, trademark, or other intellectual property rights, arising from Customer's use in connection with the RAS Service of equipment, software or information not provided by BellSouth, provided that BellSouth shall permit Customer to control the defense of such claim and shall not make any compromise, admission of liability or settlement of such claim without Customer's prior written approval.

13.    Force Majeure.

Neither party shall be responsible for any delay or failure in delivery or performance of any of its duties hereunder due to acts of God, acts or omissions of any regulated telephone network not under its control or any other occurrence commonly known as force majeure, including war, riots, embargoes, strikes, or other concerted acts of workers (whether of BellSouth or others), casualties or accidents. Either party may cancel or delay performance hereunder for so long as such performance is delayed by such occurrence or occurrences provided that if any such delay shall continue for more than thirty (30) days either party may terminate this Agreement or the affected RAS Service upon ten (10) days' written notice.

14.    Termination and Default.

(a)    BellSouth may, at its sole discretion, terminate this Agreement or suspend any pending Firm Order and discontinue Customer's access to and use of the RAS Service, if: (i) Customer fails to pay any amount within thirty (30) days after written notice provided pursuant to Section 16 below that the same is delinquent; or (ii) Customer breaches any of the terms, conditions, obligations, or representations contained in these Terms and fails to cure such breach within thirty (30) days after receiving written notice of such breach (or if such breach is not susceptible of cure within thirty (30) days, Customer has not initiated steps to, and is not diligently attempting to cure), or (iii) Customer becomes the subject of a voluntary or involuntary bankruptcy, insolvency, reorganization, or liquidation proceeding, makes an assignment for the benefit of creditors, or admits in writing its inability to pay debts when due.

(b)    If BellSouth changes any aspects of the RAS Service so as to materially adversely affect Customer's ability to utilize the RAS Service, or breaches any of these Terms and fails to cure such breach within thirty (30) days after written notice of such breach (or if such breach is not susceptible of cure within thirty (30) days, BellSouth has not initiated steps to, and is not diligently attempting to cure), Customer may terminate its RAS Service by written notice to BellSouth (which notice shall specify a transition schedule and termination date not to exceed ninety (90) days from the date of the termination notice), without obligation for any early termination charges otherwise payable hereunder.

15.    Use of Materials, Marks and Information.

(a)    The BellSouth company names and logos and all related product and service names, design marks and slogans are the property of BellSouth or its affiliates. Customer is not authorized to and shall not use any BellSouth name or mark in any advertising, publicity or in any other commercial manner without the prior written consent of BellSouth.

(b)    BellSouth may not use the name, logo or any other trademarks or service marks of Customer or any of its affiliated companies in any advertising, signage, marketing materials, brochures or any other materials in any medium without Customer's express advance written permission. Such prior written consent shall be required from both: (a) a Vice President or more senior officer of UUNET; and (b) an authorized representative of UUNET's media relations department. Any such permitted use shall be only within guidelines provided by Customer.

(c)    Except to the extent required by an individual state Public Utility Commission (PUC) or Public Service Commission (PSC), the existence and terms of this Agreement shall be held confidential by each party, as shall each party's confidential or proprietary information ("Confidential Information"). Neither party shall disclose the other party's Confidential Information to third parties without the other party's written consent, except as permitted pursuant to this Section. Each party shall disseminate the other party's Confidential Information among its Affiliates and employees only on a need-to-know basis and shall use such Confidential Information only for the purpose of performing its obligations hereunder. To the extent a party is required by applicable law, regulation, or a government agency or court order, subpoena, or investigative demand, to disclose the existence or terms of this Agreement or the other party's Confidential Information,

DOJ - 00055
CONFIDENTIAL

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT

S 85

such party shall use its reasonable efforts to minimize such disclosure and obtain an assurance that the recipient shall accord confidential treatment to such Confidential Information, and shall notify the other party contemporaneously of such disclosure.

16.    Except as otherwise provided in this Agreement, notices required to be given pursuant to this Agreement shall be effective when received, and shall be sufficient if given in writing, hand delivered or deposited in United States mail, postage prepaid, addressed to the appropriate party at the address set forth below. Either party hereto may change the name and address to whom all notices or other documents required under this Agreement must be sent at any time by giving written notice to the other party:

| BellSouth | Customer |
|---|---|
| BellSouth Telecommunications, Inc. | UUNET Technologies, Inc. |
| Vice President-Sales | 3060 Williams Drive |
| 1800 Century Blvd.; Suite 400 | Fairfax, VA 22031 |
| Atlanta; GA 30345 | (Attention: Sr. Director, Global Capacity Acquisition) |
| (Attention: Brian Singleton) | |

With a copy to:

With a copy to:

| BellSouth Business Systems, Inc. | UUNET Technologies, Inc. |
|---|---|
| 1800 Century Blvd.; Suite 170 | 22001 Loudoun County Parkway |
| Atlanta, GA 30345 | Ashburn, VA 20147 |
| (Attention: General Counsel) | (Attention: General Counsel) |

17.    Customer may permit its customers or other authorized users to utilize the RAS Service as part of business operations or services provided by Customer, subject to the terms and conditions of this Agreement. However, except as in Section 5(b), Customer's RAS Service and rights and obligations under this Agreement may not be assigned or transferred by Customer without the prior written consent of BellSouth, which shall not be unreasonably conditioned, delayed or withheld; provided, that Customer may assign the RAS Service and its rights and obligations under this Agreement to any affiliate, except to an affiliate that is a competitive local exchange carrier ("CLEC"), upon notice to BellSouth. Except as otherwise provided herein, any attempt by Customer to assign or transfer any of the rights, duties, or obligations of Customer with respect to the RAS Service without BellSouth's written consent shall be void, and no assignment or transfer shall release Customer from any of its obligations with respect to the RAS Service. BellSouth may assign, delegate or otherwise transfer its rights or obligations hereunder, in whole or in part, at any time, but no such assignment shall release BellSouth from ultimate responsibility for the RAS Service hereunder. The direct resale of the RAS Service by Customer or its assignee is prohibited under this Agreement; provided, however, that UUNET is not prohibited from combining the RAS Service with other service components (e.g., egress capacity, IP transport, dial network management, etc.) to create a value-added product for UUNET's customers and their end users. It is the intent of both Parties that a CLEC affiliate of UUNET may not directly purchase RAS Service under this Agreement and resell it to UUNET or other enhanced service providers; provided that UUNET may provide value-added dial access services to its CLEC affiliates and their end users which utilize the RAS Service as one service component of UUNET's value-added product.

18.    In the event that one or more of the provisions contained in this Agreement or incorporated within by reference shall be invalid, illegal or unenforceable in any respect under any applicable statute, regulatory requirement or rule of law, then such provisions shall be considered inoperative to the extent of such invalidity, illegality or unenforceability and the remainder of this Agreement shall continue in full force and effect.

19.    In the course of performance of its obligations under this Agreement, BellSouth agrees to comply with all applicable federal, state and municipal laws and ordinances, and all rules and regulations thereunder. BellSouth agrees to indemnify and hold Customer harmless from any loss, damage, cost or expense (including attorney fees) arising from BellSouth's noncompliance.

DOJ - 00056
CONFIDENTIAL

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
UUNET/BELL SOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

Master CSA Number GA00-5399-00
FINAL - 9/24/00

20.    UUNET may purchase the RAS Services pursuant to this Agreement for use (as part of UUNET's value-added dial access products) by UUNET's affiliates and their end users; provided that UUNET shall be the customer of record and responsible for any such purchases made on behalf of a UUNET affiliate.  For purposes of this Agreement, a party's "affiliate" shall mean any company controlling, controlled by, or under common control with such party.  This provision is not intended to, and does not, change the meaning and intent of Section 17 above as it relates to CLEC affiliates of UUNET, which section remains intact.

21.    Company agrees to offer Customer the same terms and conditions that it offers to similarly situated customers.  The factors that will be used to determine whether a customer is similarly situated include but are not limited to quantity of service, billing, geographical location, mix of services, dial access equipment costs, and other competitive circumstances. Upon Customer's request but not more than once each calendar year, a BellSouth officer shall certify BellSouth's compliance with this Section.

22.    The relationship created by this Agreement is non-exclusive.  UUNET shall be free to acquire services similar to the RAS Service from alternative sources without obligation to BellSouth.

23.    BellSouth's relationship to UUNET is that of an independent contractor.  BellSouth's employees and subcontractors shall be deemed to be independent contractors, and not employees of UUNET, for the purposes of all applicable laws and regulations.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives on the dates set forth below.

Accepted by:

Subscriber:

Company:

UUNET Technologies, Inc.

BellSouth Telecommunications, Inc.

By: _____

By: _____
         Authorized Signature                         Authorized Signature

Printed Name: _____ Kevin Boyne _____

Printed Name: _R.A. Anderson_

Title: _____ Chief Operating Officer _____

Title: _President_

Date: _____ 9/26/00 _____

Date: _9-27-00_

APPROVED AS TO FORM:

MKK 9/27/00

DOJ - 00057
CONFIDENTIAL

6

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION.  MAY NOT BE USED OR DISCLOSED OUTSIDE THE
UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT

ORIGINAL

Master CSA Number GA00-5399-00
FINAL – 9/25/00a

## ATTACHMENT NO. 1 TO
## MASTER CONTRACT SERVICE ARRANGEMENT NO. GA00-5399-00

This Attachment No. 1 ("Attachment") is entered into between UUNET Technologies, Inc. ("UUNET", "Customer", or "Subscriber") and BellSouth Telecommunications, Inc. ("BellSouth" or "Vendor"), along with the Master Contract Service Arrangement No. GA00-5399-00 and Order Attachments (collectively "Agreement"), for the sale and purchase of the herein described Remote Access Service ("RAS" or "RAS Service") at the rates and charges listed herein.

I.     Remote Access Service ("RAS") Using 3Com Dial Access Equipment.

     A.     UUNET Custom RAS Requirements

         (1)     The RAS Service shall provide integrated, remote analog and ISDN access to UUNET, its end users, and the end users of UUNET's affiliates (as provided for in the Agreement) and clients (collectively, "End Users") via modems referred to as network access servers ("NAS") deployed in central offices operated by BellSouth or its affiliates ("Vendor COs"). The RAS Service shall provide medium to high-speed data transport services for remote access to UUNET's Internet network. The RAS Service shall permit UUNET to receive calls from multiple analog modems and ISDN basic rate interface lines for handoff to separately purchased wide area network links. BellSouth shall connect each NAS used in connection with the RAS Service to the Public Switched Telephone Network ("PSTN") via ISDN primary rate interface ("PRI"), or other mutually agreed comparable telecommunications facilities. BellSouth shall arrange for the dedicated assignment (or preservation) of unique telephone numbers, when possible based on deployment of the NAS equipment and local number portability capabilities, for (or in use by) UUNET and its End Users.

         (2)     RAS Service includes equipment, telecommunications services and related facilities (including without limitation active PRI lines, 40 DID numbers per rotary, sequential circuit IDs (when possible), space, power, and other utilities), and ancillary support and maintenance as specified herein that are required to connect a call that has been dialed into the PSTN (such call dialing a designated telephone number) to an active DS0 channel-equivalent port (i.e., PRI B-channel) on the corresponding NAS ("RAS Port"). For the 3Com dial access equipment ("3Com NAS") specified in Exhibit A attached hereto, the demarcation of the RAS Service between BellSouth and UUNET shall be at the connection of the egress port on the Cisco egress router to the egress circuit connecting the Cisco egress router to BellSouth's or its affiliate's wide area network and/or UUNET's network.

         (3)     BellSouth and/or its affiliates shall own all of the 3Com NAS (including the modem chassis, all related management equipment, the Ethernet switch, and the Cisco egress router) used in connection with the RAS Service that are located on BellSouth's side of the demarcation of the RAS Service.

         (4)     In providing RAS Service to UUNET, BellSouth agrees to use only NAS equipment in a specified configuration that is approved by UUNET in advance in writing. Exhibit A sets forth the specifications for the 3Com NAS that shall be used by BellSouth in connection with the RAS Service. UUNET acknowledges that there will be a minimum of at least one (1) 3Com NAS per LATA. Multiple NAS locations within a LATA may be required to preserve existing telephone numbers (if UUNET so desires such preservation) in cases where multiple PRI rotaries out of different PSTN switches exist within the local calling area of a given LATA (i.e., Atlanta), and in network design cases that warrant the deployment of 3COM NAS equipment within other central offices within the given LATA.

         (5)     [Reserved for Future Use.]

DOJ - 00058
CONFIDENTIAL

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

S 88

(6)    Notwithstanding any contrary provision set forth in this Attachment or the Agreement, UUNET shall be exclusively responsible for the operational control (i.e., logical access) of all NAS equipment used in connection with the RAS Service.   UUNET shall be exclusively responsible for the purchase, installation, and management of all software upgrades for the NAS equipment.   UUNET agrees that BellSouth shall not be responsible for any failure by UUNET to properly operate the NAS equipment.

(7)    BellSouth shall have no responsibility for the authentication of End Users accessing RAS Ports. UUNET shall be exclusively responsible for controlling all End User access to RAS Ports.

(8)    BellSouth shall not implement any modifications or changes to UUNET's use of the RAS Service that would have a material impact on UUNET's RAS Service without affording UUNET a reasonable opportunity to object in writing prior to the implementation of such modifications or changes.  In the event of such an objection by UUNET, BellSouth agrees to defer the implementation of the objectionable modifications or changes while the parties confer and negotiate in good faith a mutually-agreeable resolution to UUNET's objection.

(9)    BellSouth agrees to provide UUNET with an operations and senior management escalation matrix, and to update and maintain such matrix on a current basis for the term of this Attachment.  Such matrix shall include email addresses and telephone access numbers for operations and senior management points of contact who are available and authorized to address and resolve BellSouth performance issues on a 24x7x365 basis.

(10)    Service outage credits may be claimed by UUNET when any RAS Port is interrupted or does not meet performance standards for any period lasting two (2) or more consecutive hours after UUNET's network operations center ("NOC") notifies BellSouth's NOC that a potential service outage exists.  No credit shall be available if the interruption is caused by (i) the failure of UUNET to properly operate the NAS equipment as set forth Section I(A)(6) above; (ii) the negligence or willful misconduct of UUNET; or (iii) an event of Force Majeure as provided in the Agreement.  The amount of the credit shall be equal to the applicable Monthly Fee for each affected RAS Port, pro-rated for the period from which BellSouth has been notified of the outage and during which a confirmed outage has occurred.  Outages shall be confirmed by a BellSouth employee authorized to make such determinations and will be calculated in ½-hour increments, or major fraction thereof, of the interruption.

(11)    BellSouth and/or its affiliates shall provide UUNET with 24x7x365 NOC-to-NOC technical support. BellSouth shall reasonably maintain all NAS equipment (along with all related equipment on BellSouth's side of the demarcation of the RAS Service) used in connection with the RAS Service. BellSouth shall assist UUNET in the resolution of any NAS equipment failure and BellSouth shall diligently respond to and repair any failure of the RAS Service, including without limitation the NAS equipment, but excluding software problems within the control of UUNET, based upon the grade of the failure, in accordance with the guidelines set forth below.

Service Outage Definitions

Service outages can be broken down into four classes according to level of severity.   The first (and most severe) class is that of **Total Service Outage** from any source.  Total service outage is defined to mean that there are no functioning access ports in that location.

The second class of service outage is that of **Major Customer Impact**.  Such an outage is defined to mean that an entire NAS has failed or that multiple PRIs or routing or overflow has failed.

The third class of service outage is a **Minor Outage**, which is  a single failed component within one  NAS that requires immediate dispatch.  The remainder of the NAS is in service providing a proportional number of available dial ports.  However, this problem cannot be resolved by "mapping out" the bad component and hence service is degraded for that location.

The fourth and least severe class of service outage is that of **Scheduled Repair** and is defined to occur whenever a component or some part of a component has failed and UUNET is able (through

DOJ - 00059
CONFIDENTIAL

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION.  MAY NOT BE USED OR DISCLOSED OUTSIDE THE
UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

S 89

the management interface) to isolate the component from the operation of the rest of the NAS, thus restoring all dial-up ports to service.

Service Response Intervals

The Service Response Interval for RAS is defined to be the time interval between the initiation of a call to BellSouth by UUNET requesting that repair services be provided and the time that repair has been initiated. For RAS equipment (3COM, etc.) repairs, initiation of repair activities is complete whenever a technician is on site and has placed a call to the UUNET NOC to coordinate repair activities. For PRI, initiation of repair activities is complete whenever a technician has entered the switch on a management channel and has begun taking actions to restore the PRI service.

For the RAS equipment, a different target service response interval will apply to each type of service outage.

- For Scheduled Repair of a RAS Hardware Element, a maintenance action will be scheduled with UUNET during the 4 - 7 am maintenance window of the next business day.

- For Minor Service Outages involving a RAS Hardware Element, maintenance actions will be carried out no later than the next business day.

- For Major Service Outages, the target Service Response Interval will be four hours.

- For Total System Failures, the target Service Response Interval will be two hours and will permit immediate escalation to a Service Manager, who will remain involved with the repair activities until service is restored.

For PRI service that is a part of RAS, the area operating standards will determine the response interval. This will be the same service interval that UUNET currently receives for their tariffed PRI service. The availability of a dedicated PRI test set (TPI 970 or equivalent) at the RAS bay should result in improved repair times for PRI troubles and will provide a definitive basis for resolving glare.

(12)    The below-listed minimum information shall be recorded by BellSouth for use by UUNET in tracking maintenance and other BellSouth performance issues. BellSouth shall furnish to UUNET a copy of individual trouble logs for the RAS Service upon the reasonable request by UUNET. Vendor shall maintain one entry per trouble ticket opened.

- UUNET Ticket #
- Vendor Ticket #
- Vendor Opened Date & Time
- Name and telephone # of the person initiating the trouble report
- Name and telephone # of the person receiving the trouble report
- Nature of the reported trouble
- Diagnosis of trouble; reason for outage (circuit, equipment, other, or no RFO)
- Name and telephone # of the person reporting trouble clearance
- Name and telephone # of the person receiving trouble clearance
- Vendor Restored Date & Time
- Total Time to Repair
- Total Time of Outage
- Vendor Closed Date & Time

DOJ - 00060
CONFIDENTIAL

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

Master CSA Number GA00-5399-00
FINAL – 9/25/00a

(13)    BellSouth shall be responsible for maintaining sufficient PSTN network capacity as consistent with BellSouth PSTN design standards pertinent to the serving INTRAC network for each service location, not including unforeseeable spike loads on the PSTN network. (Based on such design standards, a given End User has a 1 in 100 probability of receiving a fast busy signal when calling into the PSTN.) In doing so, BellSouth shall:

(i)    proactively monitor and manage the INTRAC network to ensure that sufficient capacity exists for each service location;

(ii)   develop and provide to UUNET a summary monthly report and a detailed quarterly report regarding the utilization and sizing of the applicable INTRAC network capacity;

(iii)  respond to each service impacting event immediately after being notified by UUNET; and

(iv)   use best efforts and all necessary resources to correct any identified lack of PSTN network capacity pertinent to the serving INTRAC network.

Further, BellSouth shall treat any service-impacting failure to properly manage the INTRAC network capacity as a Major Service Outage, as that term is defined under Section I.A.(11) of this Attachment, and shall pay service credits to UUNET for such service impacting situations. Service outage credits shall be based on the number of ports determined by both parties to be inaccessible due to insufficient PSTN network capacity to support the UUNET RAS Service. Credit payments will be based on the terms set forth under Section I.A.(10) of this Attachment.

B.    Pricing

(1)    The following Service Rates for those RAS Ports utilizing 3Com dial access equipment shall be:

| Price Tier | # Active RAS Ports | Monthly Fee per Active RAS Port | |
|---|---|---|---|
| | | Embedded Base Ports | Growth Ports |
| AA | 1 – 50,000 | $   30.00 | $   23.00 |
| BB | 50,001 – 75,000 | $   27.00 | $   23.00 |
| CC | 75,001 – 100,000 | $   24.00 | $   22.00 |
| DD | 100,001 + | $   22.00 | $   22.00 |

(2)    Those RAS Ports that are migrated from existing ANS or GridNet PRI services sold by BellSouth to UUNET shall be deemed the Embedded Base Ports for purposes of the pricing schedule for RAS Ports set forth above.

(3)    Those RAS Ports that are ordered from BellSouth as RAS Service (i.e., not migrated from existing ANS or GridNet PRI services sold by BellSouth to UUNET) shall be deemed the Growth Ports for purposes of the pricing schedule for RAS Ports set forth above.

(4)    Those RAS Ports that are transitioned by UUNET from existing third party providers to the RAS Service ("Winback Ports") shall be deemed Growth Ports for purposes of the pricing schedule for RAS Ports set forth above.

(5)    BellSouth and the Customer acknowledge that the rates specified in this Attachment are based on the use of the 3Com NAS specified in Exhibit A. The pricing contained herein may be subject to change if the Customer chooses to use equipment other than such 3Com NAS for new RAS Ports or modifies the configuration set forth in Exhibit A. In the event that the Customer chooses to use other equipment,

DOJ - 00061
CONFIDENTIAL

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

BellSouth and the Customer will negotiate in good faith the applicable change (if any) in the rates in this Attachment for each new RAS Port. Rate modifications resulting from equipment changes will not apply to existing RAS Ports. If BellSouth and the Customer are unable to reach agreement on the new rates used for RAS Service, BellSouth will continue to provide the Customer RAS Service using the 3Com NAS at the existing rates, terms, and conditions; however, BellSouth will have no obligation to provide the RAS Service to Customer using equipment other than the 3Com NAS.

(6)     Except pursuant to Section II(H) below, no non-recurring per-port charges shall apply with respect to the RAS Ports. To the extent that any applicable tariff includes non-recurring per-port charges, BellSouth agrees that such charges already have been factored into the monthly fee for the RAS Ports set forth below.

(7)     The prices set forth herein for the RAS Service include any applicable NAS egress port fees, but exclude any egress circuit charges. In the event that UUNET elects (in its sole discretion) not to obtain an egress circuit from BellSouth, BellSouth agrees to fully cooperate with UUNET and any third-party provider selected by UUNET to connect BellSouth's NAS or wide area network equipment to UUNET's network via an egress circuit provisioned by such third-party provider to BellSouth's central office or wide area network interconnection location. BellSouth shall be compensated by UUNET for any work associated with such third-party provider egress circuit interconnection to the extent that BellSouth is compensated by third parties at similar rates for similar work.

C.     Minimum Quantity Requirement

(1)     UUNET agrees to maintain a minimum of 100,001 active RAS Ports each month ("Minimum Quantity Requirement"), beginning on October 1, 2001, and ending on September 30, 2007 ("Minimum Commitment Period"). In the event that UUNET does not have at least 100,001 active RAS Ports during a given month during the Minimum Commitment Period, UUNET agrees to pay BellSouth for 100,001 RAS Ports at the Monthly Fee per Active RAS Port for Price Tier DD, in lieu of billing based upon the actual number of active RAS Ports in such month.

(2)     The Minimum Quantity Requirement set forth in Section I(C)(1) above shall not apply if the reason that less than 100,001 RAS Ports are active in a given month is due to reasons within the control of BellSouth, including any outsourced functions or BellSouth contracted services (except where such contractor is UUNET).

D.     PRI Under Existing BellSouth Contract

(1)     During the term for RAS Service, Customer may elect in writing to convert to the RAS Service all existing PRI, MegaLink and Channelized MegaLink Services that are purchased by Customer pursuant to an existing BellSouth term agreement or month-to-month agreement as defined under the Minimum Order Requirements, with no termination liability on the converted Service.

(2)     All PRI, MegaLink and Channelized MegaLink Services purchased pursuant to existing BellSouth term agreements or on a month-to-month basis that are converted to this Agreement and are used to provide RAS Service shall be subject to the terms and conditions of this Agreement and shall count toward the Minimum Quantity Requirement.

E.     Minimum Order Requirements

(1)     Within thirty (30) days after the Effective Date of this Agreement, UUNET shall provide BellSouth with a Firm Order (including service quantities by location) for a minimum of 25,000 RAS Ports that are Growth Ports.

DOJ - 00062
CONFIDENTIAL

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
MARKETPLACE SOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT

(2)    Within thirty (30) days after the Effective Date of this Agreement, the parties shall agree upon a migration implementation plan for the first 25,000 RAS Ports that are Embedded Base Ports; provided that such migration implementation plan shall be consistent with the Ready for Service milestones set forth in Section I(F)(1) below.

(3)    Within sixty (60) days after the Effective Date of this Agreement, the parties shall agree upon a migration implementation plan for the remaining RAS Ports (estimated to be 24,000) that are Embedded Base Ports; provided that such migration implementation plan shall be consistent with the Ready for Service milestones set forth in Section I(F)(1) below.

(4)    Within one-hundred twenty (120) days after the Effective Date of this Agreement, UUNET shall provide BellSouth with a Firm Order (including service quantities by location) for that number of new RAS Ports that is sufficient to bring the total number of ordered RAS Ports (both Embedded Base and Growth Ports) to at least 100,001 RAS Ports.

F.    Ready for Service Schedule

(1)    BellSouth agrees to migrate (Embedded Base Ports) and deploy (Growth Ports) those RAS Ports that are ordered by UUNET hereunder based on the following schedule:

| Ready for Service Date | Minimum No. of RAS Ports Activated Ready for Service |
|---|---|
| December 31, 2000 | 10,001 |
| January 31, 2001 | 25,001 |
| February 28, 2001 | 40,001 |
| March 31, 2001 | 55,001 |
| April 30, 2001 | 70,001 |
| May 31, 2001 | 85,001 |
| June 30, 2001 | 100,001 |

(2)    If BellSouth fails to meet the above-listed ready-for-service milestones in any three (3) consecutive months, except where due to reasons of Force Majeure or where due to the fault of UUNET or the timely delivery of NAS equipment purchased through UUNET, then the Monthly Fee per Active RAS Port corresponding to the Minimum No. of RAS Ports Activated + Ready for Service for the third missed Ready for Service Date shall apply prospectively to all active RAS Ports, until such time that the next higher Price Tier is achieved or this Section I(F)(2) is triggered again.

(3)    After UUNET's receipt of written notice (including email) indicating that a given new RAS Port is ready for service, UUNET shall have up to forty-five (45) days to obtain all necessary egress capacity and to complete all end-to-end testing of such new RAS Port. Unless UUNET notifies BellSouth of any service deficiencies with the new RAS Port(s) during this forty-five (45) day period, such new RAS Port(s) shall be deemed active and BellSouth will begin billing UUNET for the new RAS Port(s) upon the earlier of: (A) UUNET's notice to BellSouth of service acceptance of the new RAS Port(s); or (B) the expiration of the applicable forty-five (45) day period.

(4)    If UUNET notifies BellSouth of any service deficiencies with a new RAS Port during the forty-five (45) day period specified in Section I(F)(3) above, the parties shall cooperatively troubleshoot the new RAS Port in an expeditious manner until it is operational and accepted by UUNET. If the parties mutually determine that the source of the service deficiency is within the control of BellSouth (including any

DOJ - 00063
CONFIDENTIAL

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

contractor other than UUNET), then service activation and billing for such RAS Port shall be suspended until the service deficiency has been corrected and UUNET notifies BellSouth that the new RAS Port has been accepted; provided that if UUNET does not accept or reject the new RAS Port within ten (10) days of BellSouth's notification that the service deficiency has been corrected, service activation and billing for such RAS Port shall begin after that 10-day period. If the parties mutually determine that the source of the service deficiency is within the control of UUNET (including any contractor other than BellSouth), then service activation and billing for such RAS Port shall begin as of the later of: (A) ten (10) days after the date of such mutual determination; or (B) the expiration of the original 45-day period specified in Section - I(F)(3) above; provided, however, that if UUNET notifies BellSouth that the new RAS Port has been accepted, then service activation and billing for the new RAS Port will begin upon UUNET's acceptance.

G.  In migrating existing PRI services provided by BellSouth and/or its affiliates to the RAS Service, or in transitioning Winback Ports to the RAS Service, where the technology is available and implemented, all existing telephone numbers will be preserved in such migration upon the agreement of all relevant service providers if (1) federal number portability requirements apply to any specific request by Customer and its new service provider to port a telephone number, (2) Customer and its new service provider are themselves in compliance with any applicable federal number portability requirements that apply to the specific request, and (3) if Customer is in current compliance with its obligations under this Agreement. The parties shall closely coordinate such migrations and transitions in order to ensure that no-loss of existing service occurs (except where intentionally implemented by the parties during circuit cutover).

II.  **General Terms & Conditions**

A.  The initial term of this Agreement shall expire on September 30, 2007 ("Initial Term") and may be extended only by written mutual agreement of the parties.

B.  RAS Port Term

    (1)  The expiration date of the term for each RAS Port ordered under this Agreement (sometimes referred to herein as the ("Port Term" or "Minimum Billing Period") shall be based on the date when such RAS Port is activated, as follows:

| RAS Port Activation Date | RAS Port Expiration Date |
|---|---|
| 10/1/2000 – 9/30/2001 | 3/31/2008 |

    (2)  For RAS Ports activated during a given annual period commencing each October 1st after 9/30/2001, the RAS Port Expiration Date for such RAS Ports shall be the March 30th of the seventh (7th) year following such October 1st date (e.g., for a RAS Port activated on 11/1/2001, the applicable RAS Port Activation Date period would have commenced on 10/1/2001, thereby resulting in a RAS Port Expiration Date of 3/31/2009).

    (3)  The applicable terms and conditions of this Agreement shall survive the expiration of this Agreement with respect to such RAS Service through the expiration of its applicable Port Term. Any extension or change of the Port Term for a given RAS Port will require the mutual agreement of BellSouth and the Customer.

C.  With respect to those RAS Ports that are activated after the Effective Date of this Agreement, such RAS Ports will be provisioned utilizing 1-way ISDN PRI circuits.

D.  Hardware Upgrades

    In the event the manufacturer of the 3Com NAS, used in connection with the RAS Service provided to UUNET hereunder, offers a hardware upgrade to such equipment and BellSouth decides to implement such

DOJ - 00064
CONFIDENTIAL

7

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE

Master CSA Number GA00-5399-00
FINAL – 9/25/00a

upgrade with UUNET's concurrence, the parties shall agree to cooperate in good faith to determine the optimal method and implementation schedule for such upgrade, as well as the appropriate price and cost impacts of such upgrade on the parties.

E.    Single Number Service

The parties agree to mutually explore the technical parameters and implementation requirements of single number service ("SNS") in connection with the RAS Service, including the feasibility of deploying SNS on a state-by-state or other mutually-agreeable basis across the entire BellSouth region.

F.    Equipment Purchase

(1)    BellSouth agrees to purchase from UUNET at least 100,001 ports of 3Com dial access equipment; provided that the flat per-port price of such 3Com NAS equipment shall be $179/usable port (based on the configuration set forth in Exhibit A utilizing an ISDN FAS design). The planned quantities of 3Com equipment is attached hereto as Exhibit C; although the actual quantity of egress and modem racks may vary based on the parties' final network trunking and deployment plan. BellSouth will deploy the 3Com NAS equipment in the most optimal configurations feasible for UUNET and BellSouth based on the existing PRI rotary locations and any future agreed-upon service locations. Other terms and conditions of such purchase will be set forth in a separate agreement between the parties, which shall be negotiated in good faith during the thirty (30) days following the Effective Date of this Agreement. Should the parties not reach a mutual agreement within thirty (30) days, or such other time as may be agreed upon by the parties in writing, with respect to the purchase of the 3Com equipment from UUNET, then the Master Contract Services Arrangement and Attachments will be considered null and void.

(2)    The parties agree to negotiate in good faith additional purchases by BellSouth of spare parts, EF&I services, and maintenance/support services; provided that BellSouth shall not be obligated to make such purchases from UUNET.

G.    Customer and BellSouth agree that reciprocal compensation shall not apply to the RAS Service offered pursuant to this Agreement. Customer covenants and agrees that it will not engage in any activity or course of action that directly or indirectly results in a claim for reciprocal compensation against BellSouth or its affiliates in connection with the RAS Service, including, without limitation, in connection with any and all calls outbound from the NAS housing the RAS Ports during the term of this Agreement. Should any reciprocal compensation obligation of BellSouth (or any reciprocal compensation claim against BellSouth or its affiliates) arise in connection with the RAS Service offered under this Agreement, BellSouth will have the option during the thirty (30) days following such event to (i) renegotiate in good faith with Customer the affected terms and conditions of this Agreement; or (ii) terminate the Agreement by giving Customer thirty (30) days' written notice of such termination.

H.    Moves

(1)    Except for a "Move" (disconnect and reconnect) that meets the requirements of Sections II(H)(2) through II(H)(4) herein, Customer will be billed a non-recurring rate of $55 for the Move of each RAS Port.

(2)    Customer may Move no more than ten (10) percent of its total RAS Ports between Service Locations, as defined in Section II(I) below, during each contract year. RAS Ports must be moved in increments of 23 ports. The Moved RAS Ports will retain the original Service Activation Date for purposes of calculating the Minimum Billing Period. Customer must maintain the Minimum Port Requirement Per Service Location, as defined in Section II(I), at each Service Location involved in the Move unless the Customer chooses to move all ports from a Service Location.

DOJ - 00065
CONFIDENTIAL

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

(3)      Customer may Move all RAS Ports from a maximum of five (5) Service Locations during any calendar year.

(4)      A Move requires the submission of an order to disconnect a RAS Port at an existing Service Location and the submission, within 10 days of the order to disconnect, of an order to connect a new RAS Port at a different Service Location. The Service Activation Date of the RAS Port at the new Service Location will be the earlier of forty-five (45) days from the date the RAS Port was disconnected at the old Service Location or a mutually agreed upon service date where BellSouth is able to meet Customer's capacity requirements. Customer acknowledges that BellSouth desires to reuse the RAS equipment when ports are moved to avoid stranded RAS equipment. The service activation dates associated with the moved RAS Ports will be negotiated in good faith by both parties to maximize BellSouth's ability to achieve the foregoing objective. In the event BellSouth is unable to meet Customer's capacity requirements within forty-five (45) days, BellSouth and Customer will mutually agree upon a Service Activation Date. If Customer requests a RAS Port at a facility that is not a Service Location, the service date shall be mutually negotiated by BellSouth and Customer.

I.      Service Locations

(1)      BellSouth will provide Customer with RAS Service in all locations that are technically equipped to support RAS Service ("Service Locations"). A Service Location is technically equipped to support RAS Service if there is a switch at the Service Location that is enabled to provide PRI service, an access method that is compatible with the 3Com NAS equipment, sufficient central office floor space, sufficient switch and circuit capacity, and a central office upgrade is not required.

(2)      Customer initially desires to purchase RAS Ports in the Service Locations listed in Exhibit B. BellSouth's preferred facilities to provide RAS Ports will be 1-way ISDN PRI. If the central office is not equipped to support PRI with a T3 handoff (i.e., a 1A switch or 3/1 digital cross connect system), a similar type service, such as Channelized Megalink, with a T3 handoff may be used to provide the RAS Service. In the event the central office will not support PRI or a similar type service such as Channelized Megalink with a T3 handoff, BellSouth and Customer will negotiate in good faith the transport and other service requirements to provide RAS Service in locations that are not technically equipped to provide RAS Service with a T3 handoff. If BellSouth and Customer are unable to reach agreement on the addition of the new locations, the new locations will not become part of this Agreement. However, the existing rates, Terms and Conditions of this Agreement shall remain in full force and effect.

(3)      For those RAS Ports used by Customer in connection with its GridNet dial network, Customer agrees to purchase a minimum of 322 RAS Ports (1 full 3Com NAS modem chassis) at each new Service Location ("Minimum Port Requirement Per Service Location" for GridNet RAS Ports). For those RAS Ports used by Customer in connection with its Fixed Port dial network, Customer agrees to purchase a minimum of 192 RAS Ports at each new Service Location ("Minimum Port Requirement Per Service Location" for Fixed Port RAS Ports).

(4)      The Service Activation Dates for the first RAS Port orders at the Service Locations listed in Exhibit B will be in accordance with the Ready for Service Schedule set forth in Section I(F) above. Subsequent service orders for RAS Service, included in Customer's quarterly forecast and provided to BellSouth at least forty-five (45) days before Customer's desired Service Activation Date, which do not change during that forty-five (45) day period, will constitute a "Firm Order". The Service Activation Date for Firm Orders will be forty-five (45) days from the date the order is placed ("Firm Order Service Activation Date"). Service Activation Dates for Service Orders that do not meet the requirements of a Firm Order will be subject to negotiation ("Negotiated Service Activation Date").

(5)      After the initial ramp period defined in Section I(F), if during a twelve (12) month period BellSouth fails to install more than fifteen percent (15%) of the RAS Ports on or prior to the Service Activation Date due to events or circumstances within the control of BellSouth, to include outsourced

DOJ - 00066
CONFIDENTIAL

9
PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

functions or BellSouth contracted services (except to UUNET). Customer may terminate this Agreement if UUNET buys back all 3Com NAS equipment in accordance with Section II(K)(3) below.

J.    Termination Charges

Except where otherwise provided in the Agreement or this Attachment, if Customer terminates this Agreement or any service order for RAS Ports prior to the installation of a RAS Port that has been ordered or the expiration of the Port Term for such RAS Port, except for Moves as provided for in Section II(H) above, Customer shall be responsible for the termination charges set forth below:

| Contract Year Port Terminated | Termination Charges |
|---|---|
| 1-3 | 100% of remaining charges for the term |
| 4-5 | 75% of remaining charges for the term |
| 6-7 | 50% of remaining charges for the term |

K.    Annual Review

(1)    An annual review will be conducted by BellSouth and Customer to evaluate pricing, commitment levels, architecture or equipment changes, and market conditions. During the annual review, BellSouth and Customer will negotiate in good faith to maintain the competitive viability of this Agreement. Subject to the requirements of Section II(K)(2) below, if BellSouth and Customer are unable to reach agreement on any modifications, the existing terms and conditions of this Agreement shall remain in full force and effect.

(2)    During an annual review, Customer may request a review of BellSouth rates for RAS Service to determine whether changes in the BellSouth network architecture, tariffed services, or equipment have materially reduced the cost of providing RAS Service to Customer. Specifically, Customer and BellSouth agree to designate a subject matter expert from each company to evaluate the reasonableness of the rates for RAS Service in light of changes in BellSouth's network architecture, tariffed services, and equipment. Based upon the findings of such subject matter experts, the parties shall negotiate in good faith as to whether to implement a rate adjustment, and if so, the amount of such rate adjustment. Customer shall only be permitted to request a review of the rates at the annual review and BellSouth is only obligated to make rate adjustments during the annual review.

(3)    If Customer and BellSouth negotiate in good faith pursuant to the preceding paragraph and are unable to reach agreement within ninety (90) days from the start of the annual review for RAS Service, Customer may terminate this Agreement if Customer buys back from BellSouth, at the then-current net book value as reasonably determined by BellSouth in accordance with generally accepted accounting principles, any 3Com NAS equipment purchased by BellSouth and dedicated to Customer's use for this service offering. Further, nothing in this Section obligates BellSouth to disclose to Customer its underlying cost structure, financial books, or any other information that BellSouth reasonably deems confidential or proprietary; provided that UUNET may request written confirmation that such net book value has been accurately stated by BellSouth and is consistent with generally accepted accounting principles as determined by BellSouth's annual audit conducted by BellSouth's independent outside auditors. Should additional expense be incurred by BellSouth in performing this portion of the audit, UUNET will be responsible for such expense.

L.    Sale of Network Assets by BellSouth

In the event that BellSouth or its affiliates sells to a third party any network assets used in connection with the RAS Service, the number of RAS Ports associated with the network assets sold by BellSouth or its affiliate shall continue to count towards: (a) UUNET's satisfaction of the Minimum Quantity Requirements

DOJ - 00067
CONFIDENTIAL

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

Master CSA Number GA00-5399-00
FINAL — 9/25/00a

hereunder; and (b) the total number of active RAS Ports for purposes of calculating the applicable Price Tier under this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives on the dates set forth below.

Accepted by:

Subscriber:

UUNET Technologies, Inc.

By: _____
                 *Authorized Signature*

Printed Name: ____Kevin Boyne_____

Title: ____Chief Operating Officer_____

Date: _____9/26/00_____

. Company:

BellSouth Telecommunications, Inc.

By: _____
                 *Authorized Signature*

Printed Name: __R. A. Anderson_____

Title: ___President_____

Date: ___9-27-00_____

APPROVED AS TO FORM:

MKK 9/27/00

DOJ - 00068
CONFIDENTIAL

11
PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

## AMENDMENT NO. 1
### TO U S WEST NETWORK SERVICE AGREEMENT
### GENERAL TERMS AND CONDITIONS FOR
### SIGNALING SYSTEM 7 GATEWAY SERVICE/
### CENTRAL OFFICE-BASED REMOTE ACCESS SERVICE

This Amendment No. 1 is made to the above Agreement (the "Amendment") entered into this _____ day of _____, 1999, by and between U S WEST Communications, Inc. ("USWC") and UUNET Technologies, Inc. ("UUNET"). The parties hereby agree to amend the Agreement between the parties dated December 30, 1998 as set forth below. Unless otherwise specified herein, all defined terms used in this Amendment shall have the same meaning as set forth in the Agreement.

1. The following paragraphs shall be added to Section 6.1.1: "If UUNET or any of its Affiliates, as defined in section 6.2, at any time during the term of this Agreement directly use USWC Services to directly provide Voice over IP, as defined in section 6.1.1,without the prior development of mutually accepted terms, conditions, and rate structures applicable to Voice over IP, UUNET is in breach of this agreement. USWC may terminate for cause as defined in Section 10 and termination liability will apply."

   "UUNET and USWC will use all reasonable efforts to have the RAD manufacturer support both parties in the joint development of a mechanism (e.g. Trap, Management Information Base ('MIB')), that will signal USWC and UUNET of instances of activation of software or hardware capable of supporting Voice over IP. USWC has the option to randomly poll any USWC RAD a maximum of one time per day to validate that the Voice over IP functionality and associated trap is enabled and that voice over IP functionality is not enabled."

2. The following is added to Section 7.3.3.3: "This notice requirement includes the requirement of UUNET to notify USWC of the intentional loading of any software, including software which UUNET is aware has the capability to activate the Voice over IP function on the CSM/V3 card or any other card with similar functionality."

3. The following language shall be added to Section 13.1.3. "The minimum COBRA implementation for the high density TNT architecture with the CSM/V3 card design that UUNET would deploy in any given site is 18 PRIs unless otherwise mutually agreed to by UUNET and USWC."

4. The following shall be added to Attachment 3.


### High Density DS3 Ingress TNT Configuration

| Ascend Part Number | Description | |
|---|---|---|
| TNT-DC-H | Chassis with 1 DC power | |
| TNT-SP-DC | Second DC power | TNT-SL-HDLC2 |
| HDLC Slot Card | TNT-SL-CT3 | T3 Slot Card |
| TNT-SO-ISDN | ISDN software | |

DOJ - 00095
CONFIDENTIAL

TNT-SO-FR              Frame Relay Software
TNT-SP-DRAM-32         32MB DRAM
TNT-SL-48MODV3-S-C     48 Port slot card (V.90 & V.34

## High Density DS1 Ingress TNT Configuration

| Ascend Part Number | Description |
|---|---|
| TNT-DC-H | Chassis with 1 DC power |
| TNT-SP-DC | Second DC power |
| TNT-SL-HDLC2 | HDLC Slot Card |
| TNT-SL-CT1 | T1 Slot Card |
| TNT-SO-ISDN | ISDN software |
| TNT-SO-FR | Frame Relay Software |
| TNT-SP-DRAM-32 | 32MB DRAM |
| TNT-SL-48MODV3-S-C | 48 Port slot card (V.90 & V.34) |

This Amendment and the Agreement shall be read so as to complement each other. However, in the event of an irreconcilable conflict in the terms thereof, the provisions of this Amendment shall have precedence over the terms of the Agreement.

Except as amended herein, all of the terms and conditions of the Agreement remain unchanged and shall continue in full force and effect.

The parties have caused their duly authorized representatives to sign this Amendment as of the dates stated below.

**U S WEST COMMUNICATIONS, INC**          **UUNET Technologies, Inc.**

_____          _____
Signature                          Signature

_____          _____
Printed Name                       Printed Name

_____          _____
Title                              Title

_____          _____
Date                               Date

DOJ - 00096
CONFIDENTIAL

*Tab V*

# U S WEST NETWORK SERVICE AGREEMENT
## GENERAL TERMS AND CONDITIONS FOR
### SIGNALING SYSTEM 7 GATEWAY SERVICE/
### CENTRAL OFFICE-BASED REMOTE ACCESS SERVICE

WHEREAS, U S WEST Communications, Inc. ("USWC") and UUNET Technologies, Inc. ("UUNET") desire to enter into an agreement pursuant to which USWC will provide to UUNET Service, as defined herein, and USWC intends that the Service will, among other things, have the effect of reducing certain traffic on the Public Switched Telephone Network ("PSTN") owned and operated by USWC;

WHEREAS, USWC is offering the Service described in this Agreement as a unified retail service; and

WHEREAS, UUNET is an Enhanced Service Provider ("ESP"), and not a telecommunications carrier, as those terms are currently defined by the Federal Communications Commission, and UUNET is obtaining the Service described herein strictly for the purposes of furthering its business as an ESP; and

WHEREAS, the Service is being provisioned pursuant to this Agreement to meet the unique needs and circumstances of UUNET; and

WHEREAS, in order to meet the unique needs and circumstances of UUNET and to meet the operational imperatives of USWC, USWC and UUNET require that a specific architectural topology be employed to provision the Service; and

WHEREAS, in order to meet the unique needs and circumstances of UUNET in moving from its current High Capacity Digital Transport service ("HCDT") to an SS7-based service, USWC is agreeable to deploying, as an interim step, a Central Office Based Remote Access ("COBRA") architecture that will be selected and installed by USWC, until the SS7 Gateway is available in a form mutually acceptable to UUNET and USWC.

Now, therefore, this Agreement is made this ____ day of _____, 1998, between UUNET and USWC (collectively "Parties" and individually "Party"), for the provision of USWC Signaling System 7 Gateway ("SS7 Gateway") and Central Office Based Remote Access ("COBRA") Service, as defined on Attachment 1, attached hereto and incorporated herein by reference, ("Service").

**1**    SCOPE. USWC shall furnish and UUNET shall pay for the Service, and USWC is responsible for providing the Service to UUNET on an end to end basis Service does not include access lines and transport service.

1.1    USWC agrees to provide and UUNET agrees to order the Service. The Remote Access Devise (RAD) will be solely owned by USWC. The Service is marketed and sold by USWC. Until the SS7 Gateway, as defined in Attachment 1, is available COBRA Service, as defined in Attachment 1, will be deployed. The Service is available where facilities exist subject to the terms contained herein in Section 3. Deployment of the Service is subject to appropriate regulatory requirements and approvals.

1.2    UUNET is considered an Enhanced Service Provider ("ESP") as currently defined by the Federal Communications Commission. Should UUNET's, any of its Affiliates as defined in Section 6.2, all of which are permitted to purchase under this Agreement, status

12/14/98/UUNET-COBRA
Agreement Number CDS-980819-0115/C

change to a Competitive Local Exchange Carrier or Interexchange Carrier, either party may elect to phase out the Service provided to the affected entity within a six (6) month phase out period. During such phase out period, the affected entity shall be treated as an ESP. Should the services provided to its end-users by UUNET be determined by a regulatory body or USWC to be CPE-based or subject to collocation requirements, USWC may immediately and in its sole discretion terminate this Agreement phasing out Service over a six (6) month period.

1.3    The Service will be provided in compliance with all federal, state and local legal and regulatory requirements. Either party may terminate this Agreement pursuant to Section 10 below in connection with any breach of this Section.

2      TERM. This Agreement will commence on the latest signature date ("Effective Date"), provided mandatory filing requirements are met  The term of this Agreement is seven (7) years. All port growth ordered under this Agreement is co-terminus with the seven (7) year Agreement. Port orders received beyond the fourth year shall be renegotiated as part of a new agreement.

3      ARCHITECTURE TOPOLOGY. USWC defines where and in which USWC Central Offices equipment will be placed throughout the SS7 Gateway/COBRA network in order to balance USWC's network loads and capacity in a manner to ensure there will be no negative impact to UUNET or UUNET's existing customer's dialing patterns or service levels. See Attachment 2, attached hereto and incorporated herein by reference, for a list of existing cities in which Service will be provided. Additional cities may be added to Attachment 2. USWC will establish the final architecture topology to attempt to address UUNET's objective to reduce backhauls.   USWC intends to offer Service in all cities where facilities exist and where technically and economically feasible.

4      MIGRATION TO INTERIM PLATFORM.   UUNET and USWC agree to migrate from current UUNET dial-access service, HCDT and DSS, to COBRA as described in Attachment 1, and to a SS7 Gateway platform, as described in Attachment 1 as soon as the SS7 Gateway platform is available and certified by both Parties. USWC will use all reasonable efforts to convert all HCDT and DSS circuits within twenty four (24) months of the Effective Date. HCDT and DSS circuits which are not migrated to the interim platform as of the time the SS7 Gateway platform is certified pursuant to Section 5.1, will be migrated directly to the SS7 Gateway platform. Within thirty (30) days of the Effective Date, the Parties shall establish a written migration schedule to the interim platform. Until such time as all HCDT and DSS circuits are either migrated to the interim platform or the SS7 Gateway platform, the existing agreement between USWC and UUNET shall remain in effect.

5      MIGRATION TO SS7 ARCHITECTURE.

5.1    UUNET agrees to migrate from either HCDT and DSS or the interim platform to a SS7 Gateway solution, which will off-load Internet Provider traffic from the PSTN, at such time as equipment is available and the SS7 Gateway solution is certified by the parties. The interim platform will be aggressively deployed, as provided herein, until a SS7 Gateway solution can be deployed. The Parties agree to use all reasonable efforts to negotiate certification guidelines as well as certification and migration schedules. The parties will negotiate mutually acceptable written certification guidelines establishing acceptable capabilities for the SS7 Gateway platform within sixty (60) days of the Effective Date. The Parties agree in good faith to verify that the SS7 Gateway meets the certification guidelines.   Within sixty (60) days of verification that the SS7 Gateway meets the certification guidelines, the Parties shall agree to a written migration schedule to the SS7 Gateway.

DOJ - 00098
CONFIDENTIAL

Page 2

S 102

5.2    USWC and UUNET intend to use all reasonable efforts with potential SS7 Gateway Platform vendors to encourage and promote the development and deployment of an SS7 Gateway platform available for implementation as soon as possible. USWC and UUNET agree to hold quarterly executive and engineering level meetings, within sixty (60) days of the Effective Date of this Agreement discuss and review progress toward the SS7 Gateway solution.

5.3    In the event that an SS7 Gateway or functional equivalent, certified by both parties, is not available within (12) twelve months of the Effective Date of this Agreement UUNET agrees to certify additional equipment vendor(s), including those equipment vendor(s) identified by USWC ; if such vendor(s) exist, which incorporate SS7 Gateway functionality into the RAD architecture.

6    **UUNET RESPONSIBILITIES.**  (See Responsibility Matrix attached as Exhibit A incorporated herein by reference.)

6.1    Internet Protocol ("IP")-based Traffic

6.1.1    This contract does not represent an interconnection agreement. Should UUNET or any of its affiliates wish to directly use USWC Services to directly provide any two way telephony communications, whether local or long distance ("Voice over IP"), UUNET and USWC shall negotiate terms, conditions and rate structures, applicable to Voice over IP prior to UUNET utilizing the COBRA or SS7 Gateway platform to directly provide Voice over IP. In the event the parties are unable to reach agreement on the terms, conditions, and rate structures for these services, UUNET has the option to terminate this Agreement upon six (6) months' written notice to USWC, provided that upon such termination UUNET will (a) purchase, or lease if appropriate, any RAD dedicated to UUNET's use from USWC at the RAD's then-current USWC book value, and (b) promptly remove the RAD from USWC's premises.

6.2    UUNET Affiliates: UUNET's ESP Affiliates, defined as any entity acting as an ESP and controlling, controlled by, or under common control with UUNET ("Affiliates") are permitted to purchase under this Agreement. The Parties agree that this Agreement does not create a contractual relationship between USWC and UUNET's Affiliates. Therefore, UUNET agrees to accept responsibility and liability for all actions of its Affiliates that purchase Services under this Agreement. UUNET shall ensure that its Affiliates comply with all terms and conditions contained herein. In the event any Affiliate breaches any term or condition of this Agreement, such breach shall permit USWC to pursue any and all remedies contained herein.

6.3    If any access charges or other charges on this service are determined to be applicable by the FCC or governing regulatory body, UUNET shall pay those charges. In the event such charges result in an increase in the price of the Service by greater than ten (10) percent, ~~UUNET has the option to terminate this Agreement upon six (6) months written~~ notice to USWC, provided that upon such termination UUNET will (a) purchase, or lease if appropriate, any RAD dedicated to UUNET's use from USWC at the RAD's then-current USWC book value, and (b) promptly remove the RAD from USWC's premises, and (c) in addition, pay USWC $8,750.00 per RAD for costs incurred for engineering, installing and provisions the RAD platform. This fee will be reduced by $1,461.25 per year for the length of the contract.

USWC

6.4   Nothing in this Agreement is intended to nor shall it be construed to confer upon UUNET any right or interest in USWC's equipment, facilities, or property, nor any right to occupy or install any of its equipment or facilities in or upon any Company property.

7   **USWC RESPONSIBILITIES. (See Responsibility Matrix attached as Exhibit A incorporated herein by reference.)**

7.1   USWC will install, maintain and operate all necessary facilities and central office equipment to support the interim platform and SS7 Gateway and the provision of the Service.

7.2   USWC will provide prompt and effective technical support.

7.3   Physical Access to Service Platform

7.3.1   Only active USWC employees, or its subcontractors, properly trained in the maintenance and administration of the selected equipment, as defined in Attachment 3 or as may be substitute therefor, shall have physical access to the RAD. All physical platform upgrades shall be reviewed for impact on all aspects of the supporting USWC network. Mutually agreed upon physical upgrades shall be performed by USWC.

7.3.2   USWC shall own and control all software, hardware, physical, remote and logical link access for the SS7 Gateway.

7.3.3   UUNET shall have remote and logical access to the RAD. UUNET shall control all software on the RAD. USWC shall have the right to test new software and configuration changes implemented by UUNET but shall obtain no proprietary rights or license in such software or configuration. UUNET agrees to the following notification schedule for any software changes to be made to the Remote Access Device:

7.3.3.1   For emergency software changes: UUNET shall notify USWC with minimum notice of 48 hours to evaluate software prior to UUNET deploying that change, unless otherwise agreed upon by both parties.

7.3.3.2   For new software patches: UUNET will provide seven (7) business days notice prior to loading new software patches

7.3.3.3   For new software releases: UUNET will provide a minimum of ten (10) business days notice prior to loading new software releases.

7.3.3.4   Should USWC uncover a service-affecting problem in review of any software modification, UUNET agrees to suspend deployment until service problems can be resolved. Examples of "service affecting problems" are described as, but not limited to, the following: Any RAD software change that causes material problems in the PSTN, RAD, SS7 Gateway that prevents the SS7 Gateway from performing all of its material intended functions correctly, or that which causes the SS7 Gateway to propagate erroneous or incorrect SS7 signaling messages to the USWC Public Switched Telecommunications Network (PSTN).

8   SERVICE DEFINITION AND EQUIPMENT SELECTION USWC has chosen to deploy a specific hardware configuration, as defined in Attachment 3, which provides a specific set of capabilities.

12/14/98/UUNET-COBRA
Agreement Number CDS-980819-0115/C
DOJ - 00100
CONFIDENTIAL
Page 4
S 104

Any change to the specific hardware configuration, including but not limited to installation of different cards, and/or replacement of obsolete equipment, shall require USWC's consent and may require an additional agreement and/or renegotiated prices. Equipment to provide SS7 Gateway and the interim platform will be selected solely at the discretion of USWC from the list of UUNET certified equipment.    UUNET requests regarding the configuration and design of the equipment will be considered by USWC and employed in equipment selection when possible.

8.1    USWC and UUNET agree to work with the selected hardware vendor to assure continued availability of the hardware utilized in the specific configuration, as defined in Attachment 3, which, upon agreement of the Parties, may be updated from time to time.

9    CHARGES AND BILLING. UUNET agrees to pay the charges for Service as specified herein. These charges do not include applicable taxes imposed by law. Any taxes assessed will be clearly specified on the bill. UUNET shall pay each bill in full by the payment due date on each bill. UUNET shall pay each bill by the payment due date on the bill. Late payments are subject to a charge of one and one-half percent (1 1/2%) per month, or the maximum allowed by law, whichever is less. The charges for Services under this Agreement, do not include UUNET's purchase of any customer premises equipment or enhanced services from USWC.

9.1    Pricing for both the interim platform and SS7 Gateway service is defined in Attachment 4, attached hereto and incorporated herein by reference. This pricing shall, at the time of migration of UUNET's service to the interim platform or SS7 Gateway platform, replace all current pricing provided to UUNET by USWC for HCDT and DSS.

9.2    Ports ordered in years one (1) through four (4) of this Agreement are coterminous with the seven (7)-year term of this Agreement. Any ports ordered in years five (5) through seven (7) of this Agreement shall not be provided or priced under the terms of this Agreement.

9.3    Pricing will be based on a tier structure determined by the total number of ports. Ports are defined as any DS0 port (Layer 1) that physically terminates in a remote access device or functional equivalent. The initial total number of ports will be determined by the sum of all USWC provided UUNET's dial access ports nationwide, , all Services ordered by UUNET Affiliates under this Agreement and fifty percent (50%) of Affiliate's existing dial access ports as defined in Section 9.4 purchased outside of this Agreement. The total number of ports shall be adjusted monthly for all installed, working and Pending ports made under this Agreement and semi-annually for all Affiliate's dial access ports installed, working and pending outside of this Agreement.

9.4    Total number of ports applied to the pricing tier level is determined by:

9.4.1    Installed and Working dial access ports (interim platform, SS7 Gateway and HCDT/DSS DS0 equivalents) plus,

9.4.2    Pending ports under this Agreement, which are defined as those ports ordered by UUNET and not installed within thirty (30) days after order placement. Should UUNET cancel any pending firm order, UUNET shall pay the price it would have paid had the cancelled ports not been included in the determination of the pricing tier, retroactive to the date the order was first placed.

9.5    Full standard non-recurring charges (NRC) apply to all cancelled pending port orders, if orders are cancelled within thirty (30) days of the most recent due date provided by USWC.

12/14/98/UUNET-CDBRA
Agreement Number CDS-980819-0115/C

DOJ - 00101
CONFIDENTIAL

Page 5

S 105

9.6    For all SS7 Gateway/COBRA ports, the billing will commence on the date of UUNET's acceptance of the Service.

9.7    The price per port charged hereunder shall be no less favorable to UUNET than the price extended by USWC to any other retail non-governmental customers for similar services. Upon UUNET's request, but no more than once each calendar year, USWC's Business Interprise Solutions Vice President of Finance shall certify in writing to USWC's compliance with this Section 9.7.

10    **TERMINATION.** Either party may terminate this Agreement for cause provided written notice specifying the cause for termination and requesting correction within thirty (30) days is given the other party and such cause is not corrected within such thirty (30) day period. Cause is any material breach of the terms of this Agreement. Cause shall not include, without limitation, unrelated congestion in the public switched network or the failure of USWC to meet UUNET's requested installation schedule due to USWC's inability to obtain equipment from vendors. If USWC terminates this Agreement for cause, or if UUNET terminates this Agreement WITHOUT cause, UUNET shall be assessed termination liability (TLA) except as defined in Section 10.2.

10.1    Termination Liability (except as defined in Section 10.2)

10.1.1    Once activated, the total nationwide quantity of installed ports must remain in service for the remainder of the contract term as defined herein. Termination liability charges apply for all disconnected ports.

10.1.2    100% termination liability applies if UUNET disconnects and/or cancels any ports in years 1 through 3 of this Agreement.

10.1.3    75% termination liability applies if UUNET disconnects and/or cancels any ports in years 4 through 5 of this Agreement.

10.1.4    50% termination liability applies if UUNET disconnects and/or cancels any ports in years 6 through 7 of this Agreement.

10.2    Termination liability will not apply to the following:

10.2.1    If UUNET terminates this Agreement under the provisions provided in Section 6.1 relating to IP-based Traffic because the Parties are unable to negotiate a mutually agreeable provision for Voice over IP capability..

10.2.2    If either Party terminates this Agreement under the provision provided in Section 11 relating to Service Level Agreement, termination liability may or may not apply depending upon terms of such Service Level Agreement.

10.2.3    If USWC terminates this Agreement under the provision provided in Section 1.2 relating to UUNET's or any Affiliate's status change from an ESP to a Competitive Local Exchange Carrier or an Interexchange Carrier. Termination by UUNET pursuant to Section 1.2 shall not relieve UUNET of termination liability under Section 10.

10.2.4    If UUNET moves ports from one location to another, or adds and removes ports, in the same LATA, a non-recurring charge will apply in accordance with Attachment 4, Pricing. No additional termination liability will apply.

11    **SERVICE LEVEL AGREEMENTS.** Service Level Agreements ("SLA") which are applicable hereunder are attached and incorporated into this agreement in Attachment 5.

DOJ - 00102
CONFIDENTIAL

S 106

12    CPE INTERACTION. Customer Provided Equipment connected to the USWC network on disclosed interfaces must be allowed to access the Remove Access Device on open, commonly available data interfaces. A listing of the open CPE interfaces supported by selected equipment manufacturer must be forwarded to USWC by UUNET. If proprietary interfaces are supported across a disclosed Network Interface such as ISDN, Frame Relay or Private Line Data Service, these interfaces must be outlined and forwarded to USWC for disclosure in accordance with applicable regulatory requirements. Proprietary signaling to CPE devices including software downloads, operating system modification and firmware upgrades cannot originate within the Remove Access Device.

13    MINIMUM COMMITMENT LEVELS.

13.1    Port Minimum

13.1.1    An initial minimum of 40,000 ports (DS0 equivalents) must be ordered by UUNET by December 31, 1998.

13.1.2    Active port level shall be determined by the sum of UUNET's ordered and in service COBRA/SS7 Gateway ports, HCDT and DSS DS0 equivalents. UUNET shall be charged an annual shortfall charge of 50% of the applicable per port charge for each port UUNET is below the required minimum port level, once the minimum port level is reached, except if shortfall is a direct result of the action or inaction of USWC.

13.1.3    The minimum deployment level for SS7 Gateway/COBRA service is 6 PRI/DS1 circuits per USWC central office.

14    REVIEWS. UUNET and USWC agree to hold annual meetings to discuss aspects of the service offering including, but not limited to, market trends, architecture changes, and other significant factors which impact the service offering. If mutually agreed upon by both parties, terms and conditions may be modified.

14.1    The parties will meet on a regular basis to establish future network requirements and review capacity planning. UUNET will provide a quarterly forecast to USWC six months in advance of a formal order, such forecast to be deemed UUNET Confidential Information. The forecast will not be considered a firm order, but may be used for USWC capacity planning purposes.

14.2    USWC will plan, schedule and coordinate with UUNET when service is migrated from the interim platform to the SS7 Gateway platform. USWC and UUNET agree to conduct an annual review of USWC's records of UUNET's Services to ensure that all migrated Services are billed appropriately.

15.    GENERAL PROVISIONS.

15.1    PERSONAL INJURY; PROPERTY DAMAGE. Each party shall be responsible for any actual physical damages it directly causes to the other in the course of its performance under this Agreement, limited to damages resulting from personal injuries, death, or property damage arising from negligent acts or omissions; PROVIDED HOWEVER, THAT NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT, OR SPECIAL DAMAGES OF ANY KIND, INCLUDING BUT NOT LIMITED TO ANY LOSS OF USE, LOSS OF BUSINESS, OR LOSS OF PROFIT.

*[handwritten annotations: DOLLARS   FEES   BY UUNET   FEES PAID BY UUNET IN THE]*

**15.2**   LIMITATION OF LIABILITY. USWC SHALL NOT BE LIABLE TO UUNET FOR ANY INCIDENTAL, INDIRECT, SPECIAL, OR CONSEQUENTIAL DAMAGES OF ANY KIND INCLUDING BUT NOT LIMITED TO ANY LOSS OF USE, LOSS OF BUSINESS, OR LOSS OF PROFIT.   EXCEPT AS PROVIDED UNDER "PERSONAL INJURY; PROPERTY DAMAGE", INTELLECTUAL PROPERTY AND NONDISCLOSURE, ANY USWC LIABILITY TO UUNET FOR ANY DAMAGES OF ANY KIND UNDER THIS AGREEMENT SHALL NOT EXCEED, IN AMOUNT, A SUM EQUIVALENT TO THE GREATER OF ONE MILLION OR TWO TIMES PAID TO DATE NOT TO EXCEED LAST 24 MONTHS. REMEDIES UNDER THIS AGREEMENT ARE EXCLUSIVE AND LIMITED TO THOSE EXPRESSLY DESCRIBED IN THIS AGREEMENT.

*[handwritten: PRECEDING THE DATE OF SUCH CLAIM]*

**15.3**   NO WARRANTIES. USWC warrants that the Services to be supplied hereunder will be performed by qualified professional personnel in accordance with industry standards and that the Services will be in strict compliance with this Agreement and the terms set forth in the applicable service descriptions attached hereto.   USWC represents and warrants that the Services provided hereunder are designed to process and will process all date data, calculations, storage, and retrieval without error or interruption prior to, during and beyond the year 2000, and are in compliance with all applicable Year 2000 standards, including those of the International Standards Organization, British Standards Institution, and the U.S. government's Federal Acquisition Regulations. EXCEPT AS SET FORTH HEREIN, THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

**15.4**   UNCONTROLLABLE CIRCUMSTANCES. Neither party shall be deemed in violation of this Agreement if it is prevented from performing any of the obligations under this Agreement by reason of severe weather and storms; earthquakes or other natural occurrences; strikes or other labor unrest; power failures; nuclear or other civil or military emergencies; acts of legislative, judicial, executive or administrative authorities; or any other circumstances which are not within its reasonable control.

**15.5**   DISPUTE RESOLUTION.

**15.5.1.** Other than those claims over which a regulatory agency has exclusive jurisdiction, all claims, regardless of legal theory, whenever brought and whether between the parties or between one of the parties to this Agreement and the employees, agents or affiliated businesses of the other party, shall be resolved by arbitration.   A single arbitrator engaged in the practice of law and knowledgeable about telecommunications law shall conduct the arbitration in accordance with the then current rules of the American Arbitration Association ("AAA").

**15.5.2.** All expedited procedures prescribed by the AAA shall apply.   The arbitrator's decision shall be final and binding and judgment may be entered in any court having jurisdiction thereof.

**15.5.3** Other than the determination of those claims over which a regulatory agency has exclusive jurisdiction, federal law (including the provisions of the Federal Arbitration Act, 9 U.S.C. Sections 1-16) shall govern and control with respect to any issue relating to the validity of this Agreement to arbitrate and the arbitrability of the claims.

**15.5.4** If any party files a judicial or administrative action asserting claims subject to arbitration, and another party successfully stays such action and/or compels

arbitration of such claims, the party filing the action shall pay the other party's costs and expenses incurred in seeking such stay or compelling arbitration, including reasonable attorney's fees.

15.6.   LAWFULNESS.  This Agreement and the parties' actions under this Agreement shall comply with all applicable federal, state, and local laws, rules, regulations, court orders, and governmental agency orders. Any change in rates, charges or regulations mandated by the legally constituted authorities will act as a modification of any contract to that extent without further notice.  This Agreement shall be governed by the laws of the state where Service is provided.

15.7.   SEVERABILITY.  In the event that a court, governmental agency, or regulatory agency with proper jurisdiction determines that this Agreement or a provision of this Agreement is unlawful, this Agreement, or that provision of the Agreement to the extent it is unlawful, shall terminate.  If a provision of this Agreement is terminated but the parties can legally, commercially and practicably continue without the terminated provision, the remainder of this Agreement shall continue in effect.

15.8.   MISCELLANEOUS PROVISIONS.

15.8.1.  Failure or delay by either party to exercise any right, power, or privilege hereunder, shall not operate as a waiver hereto.

15.8.2.  This is a retail end user contract.  It may be assigned only with the consent of USWC.  It may not be assigned to a reseller or a telecommunications carrier under any circumstances.

15.8.3.  This Agreement benefits UUNET and USWC.  There are no third party beneficiaries.

15.8.4  This Agreement constitutes the entire understanding between UUNET and USWC with respect to Service provided herein and supersedes any prior agreements or understandings..

16. Intellectual Property.

16.1    USWC represents and warrants that each Service delivered hereunder does not and will not upon or misappropriate any patent, copyright, trade secret, trademark, or other proprietary infringe right (collectively, "Intellectual Property Rights") of any third party.  USWC represents and warrants that to its knowledge there are no third party claims to the contrary, and that USWC will promptly inform UUNET if it becomes aware of any such claims.

12/14/98/UUNET-COBRA
Agreement Number CDS-980819-0115/C

DOJ - 00105
CONFIDENTIAL

Page 9

S 109

16.2    All Deliverables created at UUNET's direction and expense separate from the per port charges contained herein shall be created as works made for hire. "Deliverables" shall mean any writings, reports, documentation, software, firmware, designs, technical data, inventions, developments, improvements, discoveries or other information (whether or not patentable, copyrightable or subject to trademark protection). Deliverables shall be the sole and exclusive property of UUNET. UUNET shall have the unilateral and unrestricted right to use such Deliverables and information and ideas contained therein in any way. USWC shall perform all lawful acts requested by UUNET (a) to perfect UUNET's title to all such Deliverables, including the execution of any assignments, and (b) to enable UUNET or its nominee to obtain and maintain patent, copyright, trademark, trade secret or other legal protection therefor anywhere in the world.

16.3    USWC shall indemnify and hold harmless UUNET, its Affiliates, and its and their directors, officers, employees, successors, assigns, agents, customers and any subsequent owner, lessee or user of any of the Services or Deliverables supplied hereunder (each, an "Indemnified Party") from and against any loss, damage, liability, costs and expenses (including reasonable attorneys' fees) which may be incurred on account of any suit, claim, judgment or demand involving infringement or alleged infringement of any third party's Intellectual Property Rights, provided that UUNET shall promptly notify USWC of any suit instituted against an Indemnified Party and, to the extent of its ability to do so, shall permit USWC to defend the same or make settlement in respect thereof (unless such settlement binds an Indemnified Party, involves payment by an Indemnified Party, or adversely and substantively affects an Indemnified Party's rights hereunder, in which case UUNET shall have the right to approve such settlement). UUNET shall have the right (at its expense) to participate in the defense of any such suit. This indemnification does not apply to any infringement or claim of infringement: (a) arising from adherence to instructions or drawings which UUNET has been directed by UUNET to follow after the Effective Date of this Agreement; or (b) which relates to combinations of USWC supplied Services with any other software or services not supplied by USWC.

16.4    If the use of any Service or Deliverable provided hereunder is enjoined as a result of infringement of any Intellectual Property Rights, USWC shall, at no expense to UUNET, either (a) obtain for each Indemnified Party the right to use the Service or Deliverable, (b) modify such Service or Deliverable in a manner that is acceptable to UUNET, maintains all existing functionality, and does not infringe on any third party's Intellectual Property Rights, (c) substitute equivalent Service or Deliverable that is acceptable to UUNET and does not infringe on any third party's Intellectual Property Rights, or (d) if commercially reasonable efforts to achieve the foregoing are unsuccessful, provide UUNET a refund for the preceding twenty four (24) months for such Service or Deliverable.

17. Non-Disclosure.

The existence and terms of this Agreement shall be held confidential by each party, as shall each party's confidential or proprietary information ("Confidential Information"). Neither party shall disclose the other party's Confidential Information to third parties without the other party's written consent, except as permitted pursuant to this Section. Each party shall disseminate the other party's Confidential Information among its Affiliates and employees only on a need-to-know basis and shall use such Confidential Information only for the purpose of performing its obligations hereunder. To the extent a party is required by applicable law, regulation, or a government agency or court order, subpoena, or investigative demand, to disclose the existence or terms of this Agreement or the other party's Confidential Information, such party shall use its reasonable

12/14/98/UUNET-COBRA
Agreement Number CDS-980819-0115/C

DOJ - 00106
CONFIDENTIAL

Page 10

S 110