[Debtor] must produce some evidence to support that statement.'" In re Forte, 234 B.R. 607, 618 (Bankr. E.D.N.Y. 1999) (citation omitted). Such a rebuttal requires "specific evidence" concerning the Debtor's tax liability, not just "unsupported statements." LaBow v. IRS, 763 F.2d 125, 131 (2d Cir. 1985); see In re Unimet Corp., 74 B.R. 156, 167 (Bankr. N.D. Ohio 1987) (bare allegations of debtor's corporate officer, without substantiation, are insufficient to rebut *prima facie* validity of IRS's claim).

16.    The evidence produced in objection to a claim must also have probative force at least equal to that of the proof of claim. See e.g., In re Allegheny International, Inc., 954 F.2d 167, 173-74 (3d Cir. 1992) ("[T]he objector must produce evidence equal in force to the *prima facie* case"); 4 Lawrence P. King, ed., Collier on Bankruptcy ¶ 502.02[3][f], at 502-18 (15th ed. Rev. 2005) ("Unless the . . . objector . . . introduces evidence as to the invalidity of the claim or the excessiveness of its amount, the claimant need offer no further proof of the merits of the claim.").

17.    Furthermore, UUNET carries the burden of proving the invalidity of the Excise Tax Claim, because "[a] taxpayer who wishes to challenge the validity of the [federal tax] assessment . . . 'bears the burden both of production and persuasion.'" United States v. McCombs, 30 F.3d 310, 318 (2d Cir. 1994) (citation omitted). The fact of bankruptcy does nothing to alter this burden, since "[t]he burden of proof in a bankruptcy case with respect to a tax obligation rests on the party who would have the burden in accordance with the underlying substantive law." In re Dayton Seaside Assocs. No.2, L.P., 257 B.R. 123, 127 (Bankr. S.D.N.Y. 2000) (citing Raleigh v. Illinois Dept. of Rev., 530 U.S. 15, 23 (2000)).

18.    Here, the Debtors have submitted no evidence in support of their numerous unsupported factual contentions in the Objection. The Objection attaches no documentary or

- 5 -

S 247

testimonial evidence whatsoever, let alone substantial evidence, to support the Debtors' claims.

19.     Thus, the Debtors have identified no basis to support their challenge to the Excise Tax Claim. Accordingly, the presumption that the Excise Tax Claim is valid remains in effect, and the Excise Tax Claim should be allowed in its entirety.

## II.     The Excise Tax Claim Is Valid Because UUNET Bought COBRA Services That Are Capable of Telephonic Quality Communication

20.     Even if the Debtors had submitted substantiated evidence to rebut the *prima facie* validity of the Excise Tax Claim, the claim is nonetheless valid and the Objection should be denied.

21.     The Excise Tax Claim is valid because UUNET purchased COBRA services capable of telephonic quality communication, regardless of how UUNET chose to use the services.

### A.     The Excise Tax Applies to Telephonic Quality Communication

22.     The Internal Revenue Code, Section 4251, imposes a three percent excise tax on amounts paid for certain communications services, including local telephone service, toll telephone service, and teletypewriter exchange service. See 26 U.S.C. § 4251 (the "Excise Tax").

23.     The taxable communications services are defined in 26 U.S.C. § 4252 ("Section 4252"). As relevant here, Section 4252(a) defines "local telephone service" to include:

(1) the access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and

(2) any facility or service provided in connection with a service described in paragraph (1).

26 U.S.C. § 4252(a).

- 6 -

**B.**    **The Excise Tax Applies to All Systems Capable of**
    **Telephonic Quality Communication, Regardless of Actual Use**

24.    As explained more fully below, the applicability of Section 4252(a) of the Excise

Tax is determined by a communication system's <u>capacity</u> to be used for covered

communications, regardless of its actual use or contractually-obligated use. <u>See</u> <u>Comdata</u>

<u>Network, Inc. v. United States</u>, 21 Cl. Ct. 128, 130-31 (1990).

25.    It follows that the relevant question under 4252(a) is whether UUNET bought

COBRA services that are capable of telephonic quality communication covered by the Excise

Tax, regardless of whether the COBRA services were actually used for that purpose. <u>See</u> <u>id.</u>

26.    In <u>Comdata</u>, plaintiff Comdata was in the business of providing money transfer

services by making funds available to individual truckers at authorized Comdata service centers

throughout the country. <u>See</u> <u>Comdata</u>, 21 Cl. Ct. at 129. Typically, a trucker would request

funds at a Comdata service center and an agent there would contact Comdata's offices by

telephone to request authorization for the transaction. <u>Id.</u>

27.    The service center agent's request would be made either verbally or electronically.

<u>Id.</u> In a verbal transaction, the service center agent would place a telephone call to a Comdata

service representative and provide the relevant information to process the request. <u>Id.</u> In an

electronic transaction, the service center's automated equipment allowed a service center agent to

transmit a funds request and the relevant information electronically, through telephone lines,

directly to the Comdata computer system. <u>Id.</u>

28.    Both the verbal and electronic transactions used Wide Area Telecommunications

Service ("WATS"), which provides long distance telephone service for selected service areas at

bulk rates. <u>Id.</u> When the service center agent dialed the Comdata number, the call was

- 7 -

S 249

transmitted over the local telephone system and connected with the supplier of Comdata's WATS line. Id. The call was completed over an "INWATS" access line (for incoming WATS calls) to Comdata's office. Id. There were no restrictions on who could call Comdata's INWATS numbers, but such a call would access only a randomly-selected Comdata customer service representative. Id. at 130. The incoming call could not be patched through to other numbers and no outgoing calls could be made from Comdata's office using this service.[3] Id.

29.    Plaintiff Comdata argued that the incidence of the excise tax is governed not by the capability of the service provided but rather by the actual use made of it. Id. Thus, the company argued, the restricted configuration of the service, which greatly limited its use, rendered it exempt from the excise tax. Id.

30.    The Court of Claims rejected Comdata's argument, ruling instead that Comdata's WATS service was a toll telephone service under § 4252(b)(2) because it was a service that entitled Comdata to the privilege of an unlimited number of telephone calls to or from a substantial portion of the telephone stations in a distant service area. Id. The court held that "the tax is applicable because the service provided [to Comdata] grants it the right to utilize the telephone lines to communicate with a substantial number of stations in a distant area. That the service may not, in fact, be so used by plaintiff is irrelevant to the existence of the privilege." Id. at 131 (emphasis added). The Comdata court noted that a system with no "inherent use limitations" is taxable, regardless of how the taxpayer chooses to use it. Id.

31.    The Comdata decision reinforces IRS Revenue Ruling 79-245, 1979-2 C.B. 380, 1979 IRB LEXIS 290 (July 1979) ("Rev. Rul. 79-245"), which held that "[w]here a telephone service provides the subscriber the privilege of telephonic quality communication with

---

[3] Comdata had a separate "OUTWATS" service for outgoing calls.

- 8 -

S 250

substantially all other subscribers to the local telephone system, it is immaterial whether the subscriber exercises the privilege." 1979 IRB LEXIS 290, at *5.

32.    In Rev. Rul. 79-245, a business leased certain data processing and transmission equipment, including modems and computers, and the computers handled data received over the regular telephone network from terminals at other locations. The modems converted the computer signals into signals that could be transmitted over telephone lines. Id. at *1. While these telephone signals were the same type used to transmit voice, the modems were designed only for nonvoice transmission and produced a signal which was usable only for transmission to other computer stations. Id. at *2.

33.    Although the business reserved the computer lines for nonvoice data transmission only, the IRS held that the excise tax still applied. Id. at *4-6. The business paid monthly charges to the local telephone company for local telephone service, but, instead of having standard telephones connected to the telephone lines the business had its computer and terminals connected to the telephone lines. Id. at *3. Thus, the system was interconnected through the local telephone exchange and anyone anywhere could connect to a station in the system by dialing the telephone number assigned by the local telephone company to that station. Id. However, to prevent access to the system from outside the business, the numbers were unlisted and a special security code had to be used to activate the equipment after the telephone connection was established. Id. Furthermore, intercommunication between teleprocessing stations could be established only if the stations had synchronized transmission speed and compatible programming. Thus, while anyone could dial the telephone number, only a station with specially programmed, compatible computer equipment could communicate with another teleprocessing station. Id.

- 9 -

34.    The IRS ruled that the amounts paid to the local telephone company for the local telephone service used with the teleprocessing equipment were subject to the Excise Tax. Id. at *6. The IRS reasoned that because the business had access to the local telephone exchange system through the lines used with the computer system, it had the privilege of telephonic quality communication with substantially all persons with telephones in the local system, within the meaning of Section 4252(a), regardless of whether the business exercised the privilege. Id. at *5-6.

35.    As with Comdata, the IRS ruled that "[w]here a telephone service provides the subscriber the privilege of telephonic quality communication with substantially all other subscribers to the local telephone system, it is immaterial whether the subscriber exercises the privilege." 1979 IRB LEXIS 290, at *5. In other words, because the subscriber could have chosen to plug a "regular telephone set" into the system, rather than a modem, in order to make regular telephone calls with other telephone users in the local system, the service was subject to the Excise Tax regardless of whether the subscriber ever actually did so. Id. at *4-6.

36.    In another context, at least one appellate court has endorsed Comdata's analytical approach and recognized the distinction between a technology's capability and its current use. In BellSouth Corp. v. FCC, the D.C. Court of Appeals questioned whether a specialized mobile radio spectrum that was "'dedicated' to data-only use is truly 'incapable' of being used for voice-to-voice services." 162 F.3d 1215, 1224 n. 8 (D.C. Cir. 1999).

C.    **The Excise Tax Claim Is Valid Because the COBRA Services Purchased by UUNET are Capable of Telephonic Quality Communication**

37.    Because the applicability of Section 4252(a) of the Excise Tax is determined by a communication system's capacity to be used for covered communications, the relevant question

- 10 -

here is whether the COBRA services purchased by UUNET are capable of telephonic quality communication, regardless of whether UUNET chooses to use them this way, either voluntarily or due to contractual obligations.

38.    UUNET's contracts and technical product descriptions prove that it bought COBRA services that include "(1) the access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and (2) any facility or service provided in connection with a service described in paragraph (1)."  26 U.S.C. § 4252(a).

### 1.    The COBRA Systems Purchased by UUNET Include Modems and DSPs, Which Require Two-Way, Telephonic Quality Communication to Operate

39.    The modems and DSPs within the COBRA systems purchased by UUNET cannot operate without two-way, telephonic quality communication.  (Hills Decl. ¶ 8-11).  Thus, the presence of modems and DSPs in all of the COBRA services proves that those services are capable of telephonic quality communication.  (Id.).

40.    All the COBRA services purchased by UUNET use either modems or DSPs for all their communication.  All access to modems or DSPs requires two-way, voice grade, telephonic quality communication.  The COBRA services purchased by UUNET provide access between UUNET's dial-up customers' modems and the modems and/or DSPs within the COBRA system, and thus require two-way, voice capable, telephonic quality communication.  (Id. ¶ 8).

41.    The Public Switched Telephone Network ("PSTN") is the basic infrastructure of the public telephone system.  It transmits telephonic quality communication in two ways, either as an analog transmission (which is the standard method from a private home) or as a digital representation of analog signals.  An ISP can connect to the PSTN either by analog (using a

- 11 -

modem) or digitally (using a DSP).  (Id. ¶ 9).

42.    It is contradictory for MCI to claim that the COBRA Services purchased by

UUNET rely on modems, but that these modems do not in turn rely on telephonic quality or

voice-quality communication connections.  (Hills Decl. Ex. B ¶ 10).  In general, a dial-up

customer's modem is connected to the dial-up customer's telephone line and requires a

telephonic or voice-quality, two-way communication channel to a recipient modem.  The purpose

of a modem is to transform signals into voice-like signals that can use the voice transmission

network.  The familiar beeping sound made by a modem uses the same range of frequency as

voice does, and so a modem has to "hear" these frequencies in order to operate.  Therefore, the

operation of a modem in a telecommunications system requires voice or telephonic quality

communication channels.  (Id. ¶ 10).

43.    Where the COBRA services use a digital interface to the PSTN (known as an

Integrated Services Digital Network Bearer Channel (an "ISDN-B channel")), an ISP has the

option of avoiding the use of a conventional modem and instead using a DSP, which converts the

digital representation of the voice quality signal directly to a format required by the ISP.  The use

of a DSP in this configuration still requires a telephonic quality communication.  (Id. ¶ 11).

### 2.    UUNET's Contracts With COBRA Service Providers Acknowledge that the COBRA Services Are Capable of Telephonic Quality Communication

44.    UUNET produced to the Government contracts between UUNET and five or six

of its COBRA Service providers.  (Hills Decl. Ex. C, bates-numbered DOJ ("DOJ") 35-45, 95-

118, 126-132, 52-68).  At least four of these contracts acknowledge that the COBRA services are

capable of telephonic quality communication, by (i) reference to the modems and DSPs within

the COBRA systems that cannot operate without voice or telephonic quality communication

- 12 -

channels, see supra Section C1, and (ii) repeated discussion of the services' ability to provide

Voice Over Internet Protocol ("VoIP") communication. (Id.). The acknowledgment that the

COBRA services are VoIP capable is a clear admission that the COBRA services are capable of

voice quality communication. (Hills Decl. ¶ 12).

     45.     An ISP's modem as used in a COBRA system either acts just like a dial-up

customer's modem, or (if digital) is a DSP which can be programmed to transmit data or VoIP on

a call-by-call basis. (Id.). The COBRA services contracts produced by UUNET acknowledge

this fact, and thus the voice capability of the system. (Id.).

**The Qwest COBRA Access Contract**

     46.     For example, MCI produced to the Government a contract between MCI

WorldCom Network Service, Inc. and Qwest Corporation entitled "Amended & Restated Central

Office-Based Remote Access Service Schedule" (the "Qwest COBRA Access Contract"). (Hills

Decl. Ex. C, DOJ 35-45). The Qwest COBRA Access Contract provides as follows:

> Should WorldCom or any of its affiliates wish to directly use the COBRA Services to
> directly provide any one-way or two-way voice telephony communications, whether local
> or long distance ("VoIP"), WorldCom and Vendor shall negotiate terms, conditions, and
> rate structures that are applicable to VoIP prior to WorldCom utilizing the COBRA
> Services to directly provide VoIP services. . . . If WorldCom or any of its affiliates at any
> time during the Service Term of this Schedule directly use the COBRA Services to
> provide VoIP without the prior development of mutually agreed-upon terms, conditions,
> and rate structures for VoIP, WorldCom shall be in breach of this Schedule . . . .

(Id. Ex. C, DOJ 37, ¶ A12).

     47.     This contract thus acknowledges, by its very language, that the COBRA services

obtained by WorldCom from Qwest are capable of "one-way or two-way voice telephony

communications" and VoIP telephony without any change in the COBRA's access services from

the local exchange carrier ("LEC"). The provision that "[i]f WorldCom or any of its affiliates at

- 13 -

any time during the Service Term of this Schedule directly use the COBRA Services to provide

VoIP without the prior development of mutually agreed-upon terms, conditions, and rate

structures for VoIP, WorldCom shall be in breach of this Schedule" makes evident that no

change in the COBRA's access services is necessary for WorldCom unilaterally to use the

COBRA services to provide VoIP. Accordingly, the COBRA services can provide voice

capable, telephonic quality communication. (Hills Decl. ¶ 15).[4]

      48.    The Qwest COBRA Access Contract also provides:

> COBRA Services provide integrated, remote analog & digital access to WorldCom that
> may be utilized by WorldCom's employees, WorldCom's end users, and the end users of
> WorldCom's affiliates, clients and resellers (collectively, "End Users") to connect to
> WorldCom's Internet network ("WorldCom Network") via modems referred to as
> network access servers ("NAS") deployed in central offices operated by Vendor [Qwest] .
> . . .  COBRA Services provide medium to high-speed data transport services for remote
> access to the WorldCom network. COBRA Services permit WorldCom to receive calls
> from multiple analog modems and ISDN basic rate interface lines for handoff to
> separately purchased wide area network links. Vendor shall connect each NAS used in
> connection with the COBRA Services to the Public Switched Telephone Network
> ("PSTN") via ISDN primary rate interface, or other mutually agreed comparable
> telecommunications facilities (collectively "PRI") and shall arrange for the dedicated
> assignment . . . of unique telephone numbers for (or in use by) WorldCom and End Users.

(Id. Ex. C, DOJ 35 ¶ A1).

      49.    This paragraph means that the COBRA Services purchased by WorldCom provide

WorldCom's employees and customers with regular telephonic access to modems, which

modems then connect to WorldCom's Internet network. By the terms of the contract, Qwest is

---

    [4] Indeed, the FCC has determined that an AT&T service called "phone-to-phone Internet
protocol telephony services" – which switches telephone calls placed on a "regular telephone" to
an Internet Protocol format transported over AT&T's Internet backbone and then converts the
call back from the IP format and delivers it through local exchange carriers ("LECs") local
business lines – is a telecommunications service. See In the Matter of Petition for Declaratory
Ruling that AT&T's Phone-to-Phone IP Telephony Services Are Exempt From Access Charges,
FCC 04-97, 19 F.C.C.R. 7457, 2004 WL 856557 (FCC Apr. 21, 2004) (holding that access
charges apply).

- 14 -

S 256

required to connect each modem within the COBRA Services to the PSTN, which is the basic infrastructure of the public telephone system, and to assign unique telephone numbers to the dial-up customers. These factors are all hallmarks of a voice-capable telephony system, which uses telephonic quality connections and dedicated telephone numbers to connect the dial-up customers to the Internet. (Hills Decl. ¶ 17).

50.    The Qwest COBRA Access Contract also provides that: "Vendor intends to offer the COBRA Services in all cities where facilities exist and where technically and economically feasible" (Id. Ex. C, DOJ 37 ¶ A13), and that "[v]endor agrees to use commercially reasonable efforts to make the COBRA Services available in all Vendor COs [central offices]" (id. ¶ B).

51.    This agreement that the COBRA services will be offered so widely demonstrates that the Qwest COBRA Access Contract offered WorldCom access to substantially all of the local telephone system, and thus substantially all persons in that system, located in the "fourteen-state Qwest . . . service area." (Hills Decl. ¶ 18). This satisfies the requirement of Section 4252(a), which applies the Excise Tax to services providing "access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system." 26 U.S.C. § 4252(a).

### The USWC COBRA Access Contract

52.    MCI also produced to the Government an earlier service agreement between UUNET and U.S. West Communications ("USWC," the "USWC COBRA Access Contract"), which includes the following provision:

> Should UUNET or any of its affiliates wish to directly use USWC Services to directly provide any two way telephony communications, whether local or long distance ("Voice over IP"), UUNET and USWC shall negotiate terms, conditions and rate structures,

- 15 -

applicable to Voice over IP prior to UUNET utilizing the COBRA or SS7 Gateway platform to directly provide Voice over IP.

(Hills Decl. Ex. C, DOJ 99 ¶ 6.1.1).

53.    Section 6.1.1 of the USWC COBRA Access Contract was apparently modified by Amendment No. 1 to the agreement, which provides:

> If UUNET or any of its affiliates, as defined in section 6.2, at any time during the term of this Agreement directly use USWC Services to directly provide Voice over IP, as defined in section 6.1.1, without the prior development of mutually accepted terms, conditions, and rate structures applicable to Voice over IP, UUNET is in breach of this agreement.

(Id. DOJ 95 ¶ 1). The amendment also requires UUNET and USWC to use reasonable efforts to develop technologies "that will signal USWC and UUNET of instances of activation of software or hardware capable of supporting Voice over IP. USWC has the option to randomly poll any USWC RAD . . . to validate that . . . voice over IP functionality is not enabled." (Id.).

54.    This contract thus contemplates, by its very language, that the COBRA services obtained by UUNET from USWC are capable of "two way telephony communications" and VoIP telephony without any change in the COBRA's access services from the local exchange carrier ("LEC"). Section 6.1.1 makes evident that no change in the COBRA's access services is necessary for UUNET unilaterally to use the COBRA services to provide VoIP. These provisions thus further confirm that the COBRA services can provide voice capable, telephonic quality communication. (Hills Decl. ¶ 21).

**The SBC Service Schedule**

55.    MCI also produced to the Government a service schedule between UUNET and SBC Global Services, Inc. (the "SBC Service Schedule") which includes the following provision:

> The DAS [Dial Access Solution] Services provide integrated, remote dial access service to Customer, its end users, and the end users of Customer's clients and resellers via modems referred to as network access servers ("NAS") deployed in central offices

- 16 -

operated by SBC . . . .  The DAS Services provide medium to high-speed data transport services for remote dial access to Customer's network.  The DAS Services permit Customer to receive calls from multiple analog modems and ISDN basic rate interface lines for handoff to separately purchased wide area network links.  SBC shall connect each NAS used in connection with the DAS Services provided hereunder to the Public Switched Telephone Network ("PSTN") via ISDN primary rate interface ("PRI") or comparable telecommunications facilities, and shall arrange for the dedicated assignment of unique telephone numbers for use by Customer, its end users (for example, America OnLine), and the end users of Customer's clients (for example, a subscriber to America OnLine).

(Hills Decl. Ex. C, DOJ 126 ¶ A.1(a), (b)).

56.    This paragraph means that the COBRA Services purchased by UUNET provide

UUNET's employees and customers with regular telephonic access to modems, which modems

then connect to WorldCom's Internet network.  By the terms of the contract, SBC is required to

connect each modem within the COBRA Services to the PSTN, which is the basic infrastructure

of the public telephone system, and to assign unique telephone numbers to the dial-up customers.

These factors are all hallmarks of a voice-capable telephony system, which uses telephonic

quality connections and dedicated telephone numbers to connect the dial-up customers to the

Internet.  (Hills Decl. ¶ 23).

**The BellSouth Contract**

57.    Finally, MCI produced to the Government a master contract service arrangement

between UUNET and BellSouth Telecommunications, Inc. (the "BellSouth Contract") (Hills

Decl. Ex. C, DOJ 52-68), which provides:

the RAS [Remote Access Service] shall provide integrated, remote analog and ISDN access to UUNET, its end users, and the end users of UUNET's affiliates . . . and clients . . . via modems referred to as network access services ("NAS") deployed in central offices operated by Bell South . . . .  The RAS Service shall provide medium to high-speed data transport services for remote access to UUNET's Internet network.  The RAS Service shall permit UUNET to receive calls from multiple analog modems and ISDN basic rate interface lines for handoff to separately purchased wide area network links.  BellSouth shall connect each NAS used in connection with the RAS Service to the

S 259

Public Switched Telephone Network ("PSTN") via ISDN primary rate interface ("PRI"), or other mutually agreed comparable telecommunications facilities. BellSouth shall arrange for the dedicated assignment (or preservation) of unique telephone numbers ... for (or in use by) UUNET and its End Users.

(Hills Decl. Ex. C, DOJ 58 ¶ I.A.(1)).

58.    This paragraph means that the COBRA Services purchased by UUNET provide UUNET's employees and customers with regular telephonic access to modems, which modems then connect to WorldCom's Internet network. By the terms of the contract, BellSouth is required to connect each modem within the COBRA Services to the PSTN, which is the basic infrastructure of the public telephone system, and to assign unique telephone numbers to the dial-up customers. These factors are all hallmarks of a voice-capable telephony system, which uses telephonic quality connections and dedicated telephone numbers to connect the dial-up customers to the Internet. (Hills Decl. ¶ 25).

### 3.    The Capabilities of the Technological Components of the COBRA Services Add Further Proof that the COBRA Services Are Capable of Telephonic Quality Communication

59.    The documents produced by UUNET add further proof, in discussing the technical capacities of the components of the COBRA services, that the COBRA services purchased by UUNET are capable of telephonic quality communication and are therefore subject to the Excise Tax.

60.    MCI produced to the Government documents reflecting the configuration of the Qwest COBRA system. (Hills Decl. Ex. C, DOJ 234-238). These product description documents indicate that the Qwest COBRA system includes a HiPerDSP Card Set. (Id. DOJ 234-35). The documents also state that a HiPerDSP Card Set "features a fully reprogrammable digital signal processing engine that lets administrators reconfigure the system to implement new

- 18 -

S 260

technologies and applications such as voice-over-IP. The card set supports a full range of trunk and communication standards . . . ." (Id. DOJ 236; 241-42). The HiPerDSP Card Set specifications also identify VoIP as an optional feature. (Id. DOJ 237).

61.    As Dr. Hills, the Government's expert witness, explains, the text of this product description demonstrates that the HiPerDSP Card Set supports voice capable, telephonic quality communication, and therefore that the Qwest COBRA services purchased by UUNET can provide voice capable, telephonic quality communication. (Hills Decl. ¶ 27).

62.    MCI also produced to the Government documents reflecting the configuration of the Verizon COBRA system. (Hills Decl. Ex. C, DOJ 245-59). These product description documents indicate that the Verizon COBRA system includes 48-port and 96-channel Lucent TNT cards. (Id. DOJ 245). These documents also state that the 48-port and 96-channel Lucent TNT cards can support Lucent's "True Access Operating System (TAOS)" with "Universal Port" capabilities, which in turn supports "multiple applications including simultaneous analog and digital modems for remote access, voice- and fax-over-IP . . ." as well as "residential 1 + long distance (LD) and 1010 dial-around services and call routing programmability in and out of the voice-over-IP (VoIP) network based on dialed number identification service or trunk group." (Id. DOJ 247 ¶ 3, 258).

63.    The Lucent TAOS Universal Port "uses the same DSP for voice or data on a call-by-call basis" and "this new MultiVoice functionality enables any Internet service provider (ISP) to offer telephony services in the $87 billion North American market for long-distance services." (Id. DOJ 249 ¶ 11).

64.    In addition, TAOS "interoperate[s]" with Lucent technologies which can "convert circuit trunks to VoIP packets" after receiving signals from the PSTN. (Id. DOJ 249 ¶ 13).

- 19 -

65.     According to Dr. Hills, the text of this product description demonstrates that the Lucent TAOS/TNT card system supports voice capable, telephonic quality communication, and therefore that the Verizon COBRA services purchased by UUNET can provide voice capable, telephonic quality communication. (Hills Decl. ¶ 31).

### 4.    UUNET's Billing Arrangements Add Further Proof that the COBRA Services Are Capable of Telephonic Quality Communication

66.     Finally, the method by which UUNET paid for the COBRA services adds further proof that UUNET purchased COBRA systems that include two-way telephonic quality access to the local telephone networks, and are therefore subject to the Excise Tax.

67.     The contractual billing arrangements between UUNET and all of the LECs provided that UUNET would pay bundled monthly charges per port, which include two-way telephonic quality access to the local telephone network. (Hills Decl. ¶ 32).

68.     Specifically, the contracts provide that, for example, the COBRA services will encompass "all NAS equipment, telecommunications services and related facilities (including without limitation active PRI lines) . . . required to connect a call that has been dialed into the PSTN . . . ." (Id. Ex. C DOJ 12). Similarly, the Qwest COBRA Access Contract provides: "COBRA services include all equipment, telecommunications services and related facilities (including without limitation active PRI lines . . .) . . . required to connect a call that has been dialed into the PSTN . . . ." (Id. DOJ 35 ¶ A2). Further, the COBRA services were billed on a per port basis, where the price of the port includes all access to the PSTN. (Id. DOJ 14, 38-39).

69.     This billing system demonstrates that (a) the COBRA services include access to the local telephone system, see § 4252(a)(1), because PRI lines are one way a user connects to the local telephone system and the PSTN, and (b) the NAS (that is, modems) included in the

S 262

COBRA service is a facility or service provided in connection with local telephone service, <u>see</u>

§ 4252(a)(2). Since telephonic quality access to the PSTN is bundled into the port charges, the

Excise Tax applies to the port charges. (Hills Decl. ¶ 33).

### III. In The Alternative, the Government Is Entitled To Discovery as to Whether the Telecommunications Excise Tax Applies Here

70. Because Debtors have filed an objection to the Excise Tax Claim, which is

contested by the Government, this is a contested matter. <u>See</u> Fed. R. Bankr. P. 9014; <u>In re</u>

<u>Rockefeller Center Properties & RCP Assocs.</u>, 241 B.R. 804, 817 (Bankr. S.D.N.Y. 1999)

("When an objection to a claim is contested, a contested matter is created.").

71. The Government is therefore entitled to formal discovery on the factual

underpinnings of Debtors' challenge to the Excise Tax Claim pursuant to Rule 26 of the Federal

Rules of Civil Procedure, as incorporated by the Bankruptcy Rules. <u>See</u> Fed. R. Bankr. P. 9014,

7026.

72. As noted above, the applicability of Section 4252(a) of the Excise Tax is

determined by a communication system's <u>capacity</u> to be used for covered communications,

regardless of its actual or contractually-obligated uses. <u>See</u> <u>Comdata</u>, 21 Cl. Ct. at 130-31.

73. The 265 pages of documents produced by Debtors and the Hills Declaration

demonstrate that the COBRA services purchased by UUNET are capable of telephonic quality

communication. If the Court concludes that the available evidence does not compel this

conclusion, however, then formal discovery is required, particularly because Debtors refused to

produce many of the documents sought by the Government during informal discovery, including

billing invoices, certain promotional materials, and contracts between UUNET and its customers.

(Hills Decl. Ex. C).

- 21 -

S 263

74.    More specifically, if the Court does not rule, based on this submission, that the Excise Tax applies because the COBRA services purchased by UUNET are capable of telephonic quality communication, the Government should be permitted to conduct formal, comprehensive fact and expert discovery on the technical capacity of the COBRA systems, through interrogatories, demands for the production of documents, and other written discovery, depositions, expert testimony, and any other vehicle for discovery permitted under the Federal Rules of Civil Procedure.

## CONCLUSION

75.    For the foregoing reasons, the Government respectfully requests that the Objection be denied and the Excise Tax Claim be allowed in full.  Alternatively, the Government respectfully requests that the Court permit formal discovery on the facts underlying Debtors' Objection to the Excise Tax Claim.


Dated: New York, New York
          September 27, 2005

                                        MICHAEL J. GARCIA
                                        United States Attorney for the
                                        Southern District of New York
                                        Attorney for the United States of America


                          By:    _____

                                        DANNA DROR (DD-7690)
                                        NICOLE GUERON (NG-7682)
                                        Assistant United States Attorneys
                                        86 Chambers Street, 3rd Floor
                                        New York, New York  10007
                                        Telephone: (212) 637-2689; 637-2699
                                        Facsimile: (212) 637-2686


- 22 -


S 264

# Exhibit B-2

MICHAEL J. GARCIA
United States Attorney
Southern District of New York
By:    DANNA DRORI (DD-7690)
       NICOLE GUERON (NG-7682)
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York  10007
Telephone: (212) 637-2689, 637-2699
Facsimile: (212) 637-2686

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
In re:                                    :          CHAPTER 11
                                          :
WORLDCOM, INC., et al.,                   :          Case No. 02-13533 (AJG)
                                          :
                Debtors.                  :          (Jointly Administered)
-----------------------------------------------------X

## DECLARATION OF AUSA NICOLE GUERON

NICOLE GUERON, pursuant to 28 U.S.C. § 1746, declares as follows

1.    I am an Assistant United States Attorney in the office of Michael J. Garcia, United

States Attorney for the Southern District of New York, attorney for the United States of America.

Assistant United States Attorney Danna Drori and I are the attorneys assigned to this matter.

2.    I submit this declaration in support of the Reply of the United States of America

to Reorganized Debtors' Objection to IRS Request for Payment No. 38365.

3.    Annexed hereto as Exhibit A is a true and correct copy of a Request for Payment,

numbered 37947, filed by the Internal Revenue Service on or about February 25, 2004.

4.    Annexed hereto as Exhibit B is a true and correct copy of the Internal Revenue

Service's Withdrawal of Proof of Claim No. 37947, filed by the Internal Revenue Service on or

Page 1 of 2

about June 21, 2005.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
September 27, 2005

NICOLE GUERON (NG-7682)
Assistant United States Attorney

S 267

# EXHIBIT A

S 270

# Request for Payment of Internal Revenue Taxes

**(Bankruptcy Code Cases—Administrative Expenses)**

Department of the Treasury/Internal Revenue Service

United States Bankruptcy Court for the _____SOUTHERN_____
District of _____NEW YORK STATE_____

In the Matter of:  UUNET TECHNOLOGIES, INC.
500 CLINTON CENTER DRIVE
CLINTON, MS 39056

Fiduciary:



| Case Number | 02-42302-AJG |
|---|---|
| Type of Bankruptcy Case | CHAPTER 11 |
| Date of Petition | 07/21/2002 |
| Creditor Number | |

1. The undersigned, whose business address is ___IRS Insolvency Group 4 290 Broadway  Stop 5TH FLR  New York, NY 10007___is the agent of the Department of the Treasury, Internal Revenue Service, and is authorized to make this request for payment on behalf of the United States.
2. Request is made for payment of taxes and any interest or penalty due under the internal revenue laws of the United States, as shown below.
3. The ground of liability is taxes due under the internal revenue laws of the United States.

### Administrative Claims

| Taxpayer ID Number | Kind of Tax | Tax Period | Tax Due | Interest Due | Penalty Due | Balance Due |
|---|---|---|---|---|---|---|
| 54-1543611 | 5 EXCISE | 12/31/2002 | $3,288,789.00 | $169,773.03 | $0.00 | $3,458,562.03 |
| 54-1543611 | 5 EXCISE | 03/31/2003 | $3,288,789.00 | $127,865.84 | $0.00 | $3,416,654.84 |
| 54-1543611 | 5 EXCISE | 06/30/2003 | $3,288,789.00 | $85,079.73 | $0.00 | $3,373,868.73 |
| 54-1543611 | 5 EXCISE | 09/30/2003 | $3,288,789.00 | $45,659.89 | $0.00 | $3,334,448.89 |
| 54-1543611 | 5 EXCISE | 12/31/2003 | $3,288,789.00 | $12,242.70 | $0.00 | $3,301,031.70 |
| 54-1543611 | 5 EXCISE | 01/01/2004-02/29/2004 | $2,192,526.00 | $0.00 | $0.00 | $2,192,526.00 |
| | | | $18,636,471.00 | $440,621.19 | $0.00 | $19,077,092.19 |

**Total Amount Due:** $19,077,092.19



Filed: USBC - Southern District of New York
Worldcom, Inc., Et Al.
02-13533 (AJG)    0000037947

5  UNASSESSED TAX CLAIMS HAVE BEEN FILED DUE TO PROPOSED ADDITIONAL ASSESSMENT DUE TO AN EXAMINATION OF THE TAX RETURN FOR THE PERIOD UNASSESSED.

The amount due includes interest and penalty computed to 03/06/2004.  Compound interest will accrue at the rate established under IRC Section 6621(a) and late payment penalty will be charged under IRC Section 6651. If the claim is paid after 03/06/2004, contact NAN DILLINGHAM at (212) 436-1341 for the current balance.

| Penalty for Presenting Fraudulent Claim - Fine of not more than $5,000 or imprisonment for not more than 5 years or both - Title 18, U.S.C., Section 152. | Signature  _M. Dillingham_  Marcia Smith | Date  02/25/2004 |
|---|---|---|
| | Title  Insolvency Territory 2 Manager | Telephone Number  (212) 436-1341 |

**Page 1 of 1**

Form 6338 - A (C)

# EXHIBIT B

DAVID N. KELLEY
United States Attorney
Southern District of New York
By: DANNA DRORI (DD-7690)
     NICOLE GUERON (NG-7682)
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2699
Facsimile: (212) 637-2686

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

In re:                                        :        CHAPTER 11

WORLDCOM, INC., et al.,                       :        Case No. 02-13533 (AJG)

            Debtors.                          :        (Jointly Administered)
------------------------------------------------------X

## INTERNAL REVENUE SERVICE'S
### WITHDRAWAL OF PROOF OF CLAIM # 37947

TO THE HONORABLE ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE:

The Internal Revenue Service (the "IRS"), by and through its undersigned counsel,

withdraws the following proof of claim:

   •   Claim No. 37947, dated February 25, 2004, in the amount of $19,077,092.19.

This withdrawal in no way affects, and the IRS hereby expressly reserves, all rights to

recover under Claim No. 38365, dated June 28, 2004 and filed on or about July 2, 2004, in the

amount of $16,276,440.81 (inclusive of interest and penalties computed through July 9, 2004),

Page 1 of 2

S 275

## File a Claim action:
02-13533-ajg WorldCom, Inc.

### U.S. Bankruptcy Court

### Southern District of New York

Notice of Electronic Filing

The following transaction was received from Gueron, Nicole entered on 6/21/2005 at 12:05 PM and filed on 6/21/2005
**Case Name:**          WorldCom, Inc.
**Case Number:**       02-13533-ajg
**Document Number:** 16282

**Docket Text:**
Withdrawal of Claim(s): *number 37947 filed by the Internal Revenue Service* filed by Nicole Gueron on behalf of United States of America.(Gueron, Nicole)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** L:\JDonovan\worldcom Withdrawal Excise Claim 37947.pdf
**Electronic document Stamp:**
[STAMP NYSBStamp_ID=842906028 [Date=6/21/2005] [FileNumber=4156200-0]

[091e93d3ecaf10c2d53fa181f5648229d9541be3467640e447d5c35c648ee7e210fc5
45456e60b8a79eeb38f72c1c32ca8c5c93026fa8c4a8c7329f2e042ad7c]]

**02-13533-ajg Notice will be electronically mailed to:**

Franklin Adams     franklin.adams@bbklaw.com,

Jason R. Adams     jadams@torys.com,

Laurie B. Adams     lbadams@hewm.com,

Michael B. Adams     mbadams@mcguirewoods.com,

David J. Adler     dadler@mccarter.com

Dallas Albaugh     dalbaugh@pryorcashman.com

Robert D. Albergotti     eservice@haynesboone.com,

Marc E. Albert     malbert@stinsonmoheck.com,

Jonathan Bradley Alter     jonathan.alter@bingham.com

https://ecf.nysb.uscourts.gov/cgi-bin/Dispatch.pl?531630789944426          6/21/2005

S 276

# Exhibit B-3

MICHAEL J. GARCIA
United States Attorney
Southern District of New York
By:    DANNA DRORI (DD-7690)
       NICOLE GUERON (NG-7682)
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2689, 637-2699
Facsimile: (212) 637-2686

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------X
In re:                                    :        CHAPTER 11

WORLDCOM, INC., et al.,                   :        Case No. 02-13533 (AJG)

Debtors.                                  :        (Jointly Administered)
------------------------------------------------X

## DECLARATION OF DR. MICHAEL HILLS

MICHAEL HILLS, pursuant to the provisions of 28 U.S.C. § 1746, declares as follows:

1.      I submit this declaration in support of the Reply of the United States of America

to Reorganized Debtors' Objection to Proof of Claim No. 38365.

2.      I am President of HTLT Telemanagement Ltd. (d/b/a HTLT Technologies),

located at 1111 August Drive, Annapolis, MD 21403.

3.      HTLT Technologies is a business that provides software tools, databases and

consulting services to the telecommunications industry.  Our main clients are long distance

service providers and internet services providers ("ISPs").  Our services include network

optimization, tariff data bases and maintenance of local calling area data bases.

4.      I received a Bachelor of Science degree in Physics in 1962, and a Ph.D in

-1-

S 278

Electrical Engineering in 1966, from Imperial College, London University.  (An abbreviated CV is attached hereto as Exhibit F).  From 1966 to 1976, I taught at the University of Essex where I helped to create the U.K.'s first graduate school in Telecommunications System Design.  I moved to the United States in 1976 as a consultant for what is now Cable & Wireless, where I worked on the design and optimization of their Long Distance network.  In 1980, I founded HTLT Technologies and have served as President since that date.  In my current position, I perform or advise on voice network optimization, ISP dial-up network design and Local Exchange Carrier tariff analysis.  I have a particular interest in the special problems associated with design of networks incorporating Voice Over Internet Protocol ("VoIP") technology.

5.    In my professional opinion, the central office-based remote access ("COBRA") services purchased by UUNET from local exchange carriers ("LECs") include access to the local telephone system and the capability of providing telephonic quality communication with substantially all people in the local telephone system.  The COBRA services include devices (such as digital service processors ("DSPs") or modems) that are capable of interfacing with the telephonic quality channels and converting the telephonic quality signals that travel on those channels to a digital format suitable for transmission over a high speed digital network.  These devices provide what is commonly known as a modem function, but can be configured to provide alternative voice services such as VoIP.

6.    I reviewed the following documents in reaching this conclusion:

a.    Internal Revenue Service Proof of Claim No. 38365, dated June 28, 2005 and filed July 2, 2004 (attached hereto as Exhibit A).

-2-

      b.     Reorganized Debtors' Objection to Proof of Claim No. 38365, dated August 5, 2004 (the "Objection," attached hereto as Exhibit B).

      c.     Documents produced by Debtors to the IRS in the parties' informal document production process, bates-stamped DOJ 00001- DOJ 00265 (selected pages are attached hereto as Exhibit C), produced in response to the Government's informal document request to MCI and UUNET (attached hereto as Exhibit D).

    7.    A "Tutorial on Methods of Dial-Up Access to ISPs" is attached hereto as Exhibit E. I wrote this Tutorial with the purpose of providing the Court with background on the nature of the technology at issue in this matter.

**The Modems and DSPs Within the COBRA Systems**
**<u>Require Two-Way, Telephonic Quality Communications</u>**

    8.    All the COBRA services purchased by UUNET use either modems or DSPs for all their communications.  All access to modems or DSPs requires two-way, voice grade, telephonic quality communication.  The COBRA services purchased by UUNET provide access between UUNET's dial-up customers' modems and the modems and/or DSPs within the COBRA system, and thus require two-way, voice capable, telephonic quality communications.

    9.    The Public Switched Telephone Network ("PSTN") transmits telephonic quality communications in two ways, either as an analog transmission (which is the standard method from a private home) or as a digital representation of analog signals.  An ISP can connect to the PSTN either by analog (using a modem) or digitally (using a DSP).

    10.    It is contradictory for MCI to claim that the COBRA Services purchased by UUNET rely on modems, but that these modems do not in turn rely on telephonic-quality or voice-quality communication connections.  (Exhibit B ¶ 10).  In general, an dial-up customer's

-3-

modem is connected to the dial-up customer's telephone line and requires a telephonic or voice-quality, two-way communication channel to a recipient modem. The purpose of a modem is to transform signals into voice-like signals that can use the voice transmission network. The familiar beeping sound made by a modem uses the same range of frequency as voice does, and so a modem has to "hear" these frequencies in order to operate. Therefore, the operation of a modem in a telecommunications system requires voice or telephonic quality communication channels.

       11.     Where the COBRA services use a digital interface to the PSTN (known as an Integrated Services Digital Network Bearer Channel (an "ISDN-B channel")), an ISP has the option of avoiding the use of a conventional modem and instead using a DSP, which converts the digital representation of the voice quality signal directly to a format required by the ISP. The use of a DSP in this configuration still requires a telephonic quality communication.

**UUNET's Contracts With COBRA Service Providers Concede that**
**the COBRA Services Are Capable of Telephonic Quality Communications**

       12.     An ISP's modem as used in a COBRA system either acts just like a dial-up customer's modem, or (if digital) is a DSP which can be programmed to transmit data or VoIP on a call-by-call basis. The COBRA services contracts produced by UUNET acknowledge this fact. In addition, the COBRA services contracts prove that the services are VoIP capable, thereby conceding that the COBRA services are capable of voice quality communications.

       The Qwest COBRA Access Contract

       13.     For example, MCI produced to the IRS a contract between MCI WorldCom Network Service, Inc. and Qwest Corporation entitled "Amended & Restated Central Office-Based Remote Access Service Schedule," dated June 29, 2001 (the "Qwest COBRA Access

-4-

Contract"). (Exhibit C, DOJ 35-45). The contract was produced by MCI in response to the

Government's informal document request for "[a]ll contracts and/or tariffs governing network

services and communications services provided by UUNET, including all contracts between (a)

UUNET and its customers; (b) UUNET and its suppliers; and (c) UUNET and its

communications providers." (Exhibit D, Request 3).

    14.    The Qwest COBRA Access Contract provides as follows:

> Should WorldCom or any of its affiliates wish to directly use the COBRA Services to
> directly provide any one-way or two-way voice telephony communications, whether local
> or long distance ("VoIP"), WorldCom and Vendor shall negotiate terms, conditions, and
> rate structures that are applicable to VoIP prior to WorldCom utilizing the COBRA
> Services to directly provide VoIP services. . . . If WorldCom or any of its affiliates at any
> time during the Service Term of this Schedule directly use the COBRA Services to
> provide VoIP without the prior development of mutually agreed-upon terms, conditions,
> and rate structures for VoIP, WorldCom shall be in breach of this Schedule . . . .

(Exhibit C, DOJ 37, ¶ A12).

    15.    This contract thus concedes, by its very language, that the COBRA services

obtained by WorldCom from Qwest are capable of "one-way or two-way voice telephony

communications" and VoIP telephony without any change in the COBRA's access services from

the LEC. The provision that "[i]f WorldCom or any of its affiliates at any time during the

Service Term of this Schedule directly use the COBRA Services to provide VoIP without the

prior development of mutually agreed-upon terms, conditions, and rate structures for VoIP,

WorldCom shall be in breach of this Schedule" makes evident that no change in the COBRA's

access services is necessary for WorldCom unilaterally to use the COBRA services to provide

VoIP. Accordingly, the COBRA services can provide voice capable, telephonic quality

communications.

    16.    The Qwest COBRA Access Contract also provides:

-5-

S 282

> COBRA Services provide integrated, remote analog & digital access to WorldCom that may be utilized by WorldCom's employees, WorldCom's end users, and the end users of WorldCom's affiliates, clients and resellers (collectively, "End Users") to connect to WorldCom's Internet network ("WorldCom Network") via modems referred to as network access servers ("NAS") deployed in central offices operated by Vendor [Qwest]. . . . COBRA Services provide medium to high-speed data transport services for remote access to the WorldCom network. COBRA Services permit WorldCom to receive calls from multiple analog modems and ISDN basic rate interface lines for handoff to separately purchased wide area network links. Vendor shall connect each NAS used in connection with the COBRA Services to the Public Switched Telephone Network ("PSTN") via ISDN primary rate interface, or other mutually agreed comparable telecommunications facilities (collectively "PRI") and shall arrange for the dedicated assignment . . . of unique telephone numbers for (or in use by) WorldCom and End Users.

(Exhibit C, DOJ 35 ¶ A1).

17.     This paragraph means that the COBRA Services purchased by WorldCom provide WorldCom's employees and customers with regular telephonic access to modems, which modems then connect to WorldCom's Internet network. Qwest is required to connect each modem within the COBRA Services to the PSTN, which is the basic infrastructure of the public telephone system, and to assign unique telephone numbers to the dial-up customers. In my professional opinion, these factors are all hallmarks of a voice-capable telephony system, which uses telephonic quality connections and dedicated telephone numbers to connect the dial-up customers to the Internet.

18.     The Qwest COBRA Access Contract also provides that: "Vendor intends to offer the COBRA Services in all cities where facilities exist and where technically and economically feasible" (Exhibit C, DOJ 37 ¶ A13), and that "Vendor agrees to use commercially reasonable efforts to make the COBRA Services available in all Vendor COs [central offices]" (id. ¶ B). In my professional opinion, this agreement that the COBRA services will be offered so widely demonstrates that the Qwest COBRA Access Contract offered WorldCom access to substantially

-6-

S 283

all of the local telephone system, and thus substantially all people in that system, located in the "fourteen-state Qwest . . . service area." (Id.).

### The USWC COBRA Access Contract

19.    MCI produced to the IRS a service agreement between UUNET and U.S. West Communications ("USWC," the "USWC COBRA Access Contract"), signed in December, 1998, which includes the following provision:

> Should UUNET or any of its affiliates wish to directly use USWC Services to directly provide any two way telephony communications, whether local or long distance ("Voice over IP"), UUNET and USWC shall negotiate terms, conditions and rate structures, applicable to Voice over IP prior to UUNET utilizing the COBRA or SS7 Gateway platform to directly provide Voice over IP.

(Exhibit C, DOJ 99 ¶ 6.1.1).

20.    Section 6.1.1 of the USWC COBRA Access Contract was apparently modified by Amendment No. 1 to the agreement, which provides:

> If UUNET or any of its affiliates, as defined in section 6.2, at any time during the term of this Agreement directly use USWC Services to directly provide Voice over IP, as defined in section 6.1.1, without the prior development of mutually accepted terms, conditions, and rate structures applicable to Voice over IP, UUNET is in breach of this agreement.

(Exhibit C, DOJ 95 ¶ 1). The amendment also requires UUNET and USWC to use reasonable efforts to develop technologies "that will signal USWC and UUNET of instances of activation of software or hardware capable of supporting Voice over IP. USWC has the option to randomly poll any USWC RAD . . . to validate that . . . voice over IP functionality is not enabled." (Id.).

21.    This contract thus concedes, by its very language, that the COBRA services obtained by UUNET from USWC are capable of "two way voice telephony communications" and VoIP telephony without any change in the COBRA's access services from the LEC. Section 6.1.1 makes evident that no change in the COBRA's access services is necessary for UUNET

-7-

unilaterally to use the COBRA services to provide VoIP. Accordingly, the COBRA services can

provide voice capable, telephonic quality communications.

The SBC Service Schedule

22.     MCI produced to the IRS a service schedule between UUNET and SBC Global

Services, Inc. (the "SBC Service Schedule"), dated December 31, 1999, which includes the

following provision:

> The DAS [Dial Access Solution] Services provide integrated, remote dial access service
> to Customer, its end users, and the end users of Customer's clients and resellers via
> modems referred to as network access servers ("NAS") deployed in central offices
> operated by SBC . . . . The DAS Services provide medium to high-speed data transport
> services for remote dial access to Customer's network. The DAS Services permit
> Customer to receive calls from multiple analog modems and ISDN basic rate interface
> lines for handoff to separately purchased wide area network links. SBC shall connect
> each NAS used in connection with the DAS Services provided hereunder to the Public
> Switched Telephone Network ("PSTN") via ISDN primary rate interface ("PRI") or
> comparable telecommunications facilities, and shall arrange for the dedicated assignment
> of unique telephone numbers for use by Customer, its end users (for example, America
> OnLine), and the end users of Customer's clients (for example, a subscriber to America
> OnLine).

(Exhibit C, DOJ 126 ¶ A.1(a), (b)).

23.     This paragraph means that the COBRA Services purchased by UUNET provide

UUNET's employees and customers with regular telephonic access to modems, which modems

then connect to WorldCom's Internet network. SBC is required to connect each modem within

the COBRA Services to the PSTN, which is the basic infrastructure of the public telephone

system, and to assign unique telephone numbers to the dial-up customers. In my professional

opinion, these factors are all hallmarks of a voice-capable telephony system, which uses

telephonic quality connections and dedicated telephone numbers to connect the dial-up customers

to the Internet.

-8-

S 285

### The BellSouth Contract

24.    MCI produced to the IRS a master contract service arrangement between UUNET and BellSouth Telecommunications, Inc. (the "BellSouth Contract"), dated September 24, 1990, with an attachment dated September 29, 2000.  (Exhibit C, DOJ 52-68).  The year 2000 Attachment provides:

> the RAS [Remote Access Service] shall provide integrated, remote analog and ISDN access to UUNET, its end users, and the end users of UUNET's affiliates . . . and clients . . . via modems referred to as network access services ("NAS") deployed in central offices operated by Bell South . . . .  The RAS Service shall provide medium to high-speed data transport services for remote access to UUNET's Internet network.  The RAS Service shall permit UUNET to receive calls from multiple analog modems and ISDN basic rate interface lines for handoff to separately purchased wide area network links.  BellSouth shall connect each NAS used in connection with the RAS Service to the Public Switched Telephone Network ("PSTN") via ISDN primary rate interface ("PRI"), or other mutually agreed comparable telecommunications facilities.  BellSouth shall arrange for the dedicated assignment (or preservation) of unique telephone numbers . . . for (or in use by) UUNET and its End Users.

(Exhibit C, DOJ 58 ¶ I.A.(1)).

25.    This paragraph means that the COBRA Services purchased by UUNET provide UUNET's employees and customers with regular telephonic access to modems, which modems then connect to WorldCom's Internet network.  BellSouth is required to connect each modem within the COBRA Services to the PSTN, which is the basic infrastructure of the public telephone system, and to assign unique telephone numbers to the dial-up customers.  In my professional opinion, these factors are all hallmarks of a voice-capable telephony system, which uses telephonic quality connections and dedicated telephone numbers to connect the dial-up customers to the Internet.

-9-

**The Capabilities of the Technological Components of the COBRA Services Add Further Proof That the COBRA Services Are Capable of Telephonic Quality Communications**

26.    MCI produced to the IRS documents reflecting the configuration of the Qwest COBRA system. (Exhibit C, DOJ 234-238). These product description documents indicate that the Qwest COBRA system includes a HiPerDSP Card Set. (Id. DOJ 234-35). The documents also state that a HiPerDSP Card Set "features a fully reprogrammable digital signal processing engine that lets administrators reconfigure the system to implement new technologies and applications such as voice-over-IP. The card set supports a full range of trunk and communication standards . . . ." (Id. DOJ 236; 241-42). The HiPerDSP Card Set specifications also identify VoIP as an optional feature. (Id. DOJ 237).

27.    It is my professional opinion that, as per the text of this product description, the HiPerDSP Card Set supports voice capable, telephonic quality communications, and therefore that the Qwest COBRA services used by UUNET can provide voice capable, telephonic quality communications.

28.    MCI also produced to the IRS documents reflecting the configuration of the Verizon COBRA system. (Exhibit C, DOJ 245-59). These product description documents indicate that the Verizon COBRA system includes 48-port and 96-channel Lucent TNT cards. (Id. DOJ 245). These documents also state that the 48-port and 96-channel Lucent TNT cards can support Lucent's "True Access Operating System (TAOS)" with "Universal Port" capabilities, which in turn supports "multiple applications including simultaneous analog and digital modems for remote access, voice- and fax-over-IP . . ." as well as "residential 1 + long distance (LD) and 1010 dial-around services and call routing programmability in and out of the

-10-

voice-over-IP (VoIP) network based on dialed number identification service or trunk group." (Id. DOJ 247 ¶ 3, 258).

29.    The Lucent TAOS Universal Port "uses the same DSP for voice or data on a call-by-call basis" and "this new MultiVoice functionality enables any Internet service provider (ISP) to offer telephony services in the $87 billion North American market for long-distance services." (Id. DOJ 249 ¶ 11).

30.    In addition, TAOS "interoperate[s]" with Lucent technologies which can "convert circuit trunks to VoIP packets" after receiving signals from the PSTN.  (Id. DOJ 249 ¶ 13).

31.    It is my professional opinion that, as per the text of this product description, the Lucent TAOS/TNT card system supports voice capable, telephonic quality communications, and therefore that the Verizon COBRA services used by UUNET can provide voice capable, telephonic quality communications.

**UUNET'S Billing Arrangements Add Further Proof That the**
**COBRA Services Are Capable of Telephonic Quality Communications**

32.    Finally, it should be noted that the contractual billing arrangements between UUNET and all of the LECs are bundled monthly charges per port which include two-way telephonic quality access to the local telephone network.  Specifically, the contracts provide that, for example, the COBRA services will encompass "all NAS equipment, telecommunications services and related facilities (including without limitation active PRI lines) . . . required to connect a call that has been dialed into the PSTN . . . ." (Id. DOJ 12).  Similarly, the Qwest COBRA Access Contract provides that "COBRA services include all equipment, telecommunications services and related facilities (including without limitation active PRI lines . . .) . . . required to connect a call that has been dialed into the PSTN . . . ." (Id. DOJ 35

-11-

S 288

¶ A2). Further, the COBRA services are being billed on a per port basis, where the price of the port includes all access to the PSTN. (Id. DOJ 14, 38-39).

33.     This billing system demonstrates that (a) the COBRA services include access to the local telephone system, see § 4252(a)(1), because PRI lines are one way a user connects to the local telephone system and the PSTN, and (b) the NAS (that is, modems) included in the COBRA service is a facility or service provided in connection with local telephone service, see § 4252(a)(2). Since telephonic quality access to the PSTN is bundled into the port charges, Federal Excise Tax applies to the port charges.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: Annapolis, MD
        Sept. 21, 2005

MICHAEL HILLS, Ph.D

-12-

# EXHIBIT A

# Request for Payment of Internal Revenue Taxes

(Bankruptcy Code Cases—Administrative Expenses)

Department of the Treasury/Internal Revenue Service

United States Bankruptcy Court for the ___SOUTHERN___
District of ___NEW YORK STATE___

In the Matter of:   UUNET TECHNOLOGIES, INC.
500 CLINTON CENTER DRIVE
CLINTON, MS 39056

Fiduciary:

Amendment No. 1 to Request for Payment dated 02/25/2004



| Case Number |
|---|
| 02-42302-AJG |

| Type of Bankruptcy Case |
|---|
| CHAPTER 11 |

| Date of Petition |
|---|
| 07/21/2002 |



Filed: USBC - Southern District of New York
Worldcom, Inc., Et Al.
02-13533 (AJG)          0000038365

1. The undersigned, whose business address is ___IRS Insolvency Group 4 290 Broadway  Stop 5TH FLR  New York, NY 10007/is the agent of
the Department of the Treasury, Internal Revenue Service, and is authorized to make this request for payment on behalf of
the United States.

2. Request is made for payment of taxes and any interest or penalty due under the internal revenue laws of the United States,
as shown below.

3. The ground of liability is taxes due under the internal revenue laws of the United States.

### Administrative Claims

| Taxpayer ID Number | Kind of Tax | Tax Period | Tax Due | Interest Due | Penalty Due | Balance Due |
|---|---|---|---|---|---|---|
| 54-1543611 | 5 EXCISE | 12/31/2002 | $3,997,592.00 | $275,259.66 | $0.00 | $4,272,851.66 |
| 54-1543611 | 5 EXCISE | 03/31/2003 | $3,737,766.00 | $208,960.20 | $0.00 | $3,946,726.20 |
| 54-1543611 | 5 EXCISE | 06/30/2003 | $1,726,848.00 | $73,705.70 | $0.00 | $1,800,553.70 |
| 54-1543611 | 5 EXCISE | 09/30/2003 | $1,395,081.00 | $42,549.48 | $0.00 | $1,437,630.48 |
| 54-1543611 | 5 EXCISE | 12/31/2003 | $1,476,730.00 | $29,788.86 | $0.00 | $1,506,518.86 |
| 54-1543611 | 5 EXCISE | 03/31/2004 | $2,466,803.00 | $23,088.91 | $0.00 | $2,489,891.91 |
| 54-1543611 | 5 EXCISE | 04/01/2004-04/20/2004 | $822,268.00 | $0.00 | $0.00 | $822,268.00 |
| | | | $15,623,088.00 | $653,352.81 | $0.00 | $16,276,440.81 |

**Total Amount Due:** $16,276,440.81



RECEIVED
JUL  2 2004
U.S. BANKRUPTCY COURT
SO. DIST. OF NEW YORK

5 UNASSESSED TAX CLAIMS HAVE BEEN FILED DUE TO PROPOSED ADDITIONAL ASSESSMENT DUE TO AN EXAMINATION OF THE TAX RETURN FOR THE PERIOD UNASSESSED.

The amount due includes interest and penalty computed to 07/09/2004.  Compound interest will accrue at the rate
established under IRC Section 6621(a) and late payment penalty will be charged under IRC Section 6651.  If the claim
is paid after 07/09/2004, contact NAN DILLINGHAM at (212) 436-1341 for the current balance.

| Penalty for Presenting Fraudulent Claim - Fine of not more than $5,000 or imprisonment for not more than 5 years or both - Title 18, U.S.C., Section 152. | Signature  *Marcia Smith*  Title  **Insolvency Territory 2 Manager** | Date  **06/28/2004**  Telephone Number  **(212) 436-1341** |
|---|---|---|

**Page 1 of 1**

Form 6338 - A (C)

# EXHIBIT B

S 295

HEARING DATE AND TIME: August 31, 2004 at 10:00 a.m. (New York Time)
OBJECTION DATE AND TIME: August 26, 2004 at 4:00 p.m. (New York Time)

WEIL, GOTSHAL & MANGES LLP
Attorneys for Reorganized Debtors
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Pérez, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
––––––––––––––––––––––––––––––––––––––––  x
In re                                     :   Chapter 11 Case No.
                                          :
WORLDCOM, INC., et al.                    :   02-13533 (AJG)
                                          :
                              Debtors     :   Jointly Administered
                                          :
––––––––––––––––––––––––––––––––––––––––  x
```

**REORGANIZED DEBTORS' OBJECTION TO PROOF OF CLAIM NO. 38365
(DEPARTMENT OF TREASURY ADMINISTRATIVE EXPENSE CLAIM)**

TO THE HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE

       Reorganized Debtor MCI, Inc. and certain of its direct and indirect subsidiaries
(collectively, the "Reorganized Debtors") respectfully represent:

## JURISDICTION

       1.    The Court has jurisdiction to consider this Objection and the relief
requested herein pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding
pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408
and 1409.

HO1:\294688\06\6BDS06!.DOC\81793.0004

## BACKGROUND

### General

2.    On July 21, 2002 (the "Commencement Date") and November 8, 2002, WorldCom, Inc. and certain of its direct and indirect subsidiaries (the "Debtors") commenced cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). By Orders, dated July 22, 2002 and November 12, 2002, the Debtors' chapter 11 cases were consolidated for procedural purposes. During the chapter 11 cases, the Debtors operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.    On October 31, 2003, this Court entered an order confirming the Debtors' Modified Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan").[1]

4.    On April 20, 2004, the Plan became effective in accordance with its terms, and pursuant to the Plan, WorldCom, Inc. merged with and into MCI, Inc. with MCI, Inc. being the survivor.

### Schedules and Proofs of Claim

5.    On November 21, 2002, the Debtors filed their Schedules of Liabilities (as amended and supplemented, the "Debtors' Schedules") and their Schedules of Executory Contracts and Unexpired Leases. On December 5, 2002, the Debtors filed their Statements of Financial Affairs.

6.    On October 29, 2002, this Court entered its Order (a) Pursuant to Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Certain Proofs of Claim and

---

[1]    Unless otherwise defined herein, capitalized terms shall have the meanings that are ascribed to such terms in the Plan.

S 298

Approving the Form and Manner of Notice Thereof (the "Bar Date Order"). The Bar Date Order established January 23, 2003 as the bar date for filing proofs of claim in these cases. Pursuant to the terms of the Bar Date Order, on or about November 22, 2002, the Debtors mailed notice of the bar date to in excess of 1.2 million creditors and potential claimants.

7.    On March 25, 2003, the Court entered its Order Pursuant to 11 U.S.C. § 105 Approving Notice Procedures Regarding Claim Objections and Deemed Schedule Amendment Motions ("Claim Objection Procedure Order"), approving certain procedures regarding noticing of claims objections and omnibus motions for deemed schedule amendments.

8.    As of the date of this Objection, in excess of 35,000 proofs of claim have been filed in connection with these chapter 11 cases (the "Proofs of Claim"). The Debtors have begun the process of conducting a comprehensive review and reconciliation of all prepetition claims, including both the claims scheduled in the Debtors' Schedules and the claims asserted in the Proofs of Claim (the "Filed Claims"). This process includes identifying particular Filed Claims that may be targeted for disallowance and expungement, reduction and allowance, or reclassification and allowance. This is one such objection.

## OBJECTION TO CLAIM

9.    The Reorganized Debtors hereby object to proof of claim no. 38365 filed by the Department of Treasury/Internal Revenue Service ("DOT") in the amount of $16,276,440.81 (the "Treasury Claim"). Claim no. 38365 amends DOT's claim no. 37947. The Treasury Claim was filed as an administrative expense claim for excise taxes assessed against UUNET Technologies, Inc. ("UUNET"), a Debtor, and includes interest computed to July 9, 2004. The Reorganized Debtors have reviewed this proof of claim, the Debtors' books and records, and the applicable provisions of the Internal Revenue Code (the "IRC"), and have

S 299

determined that there is no amount due with regard to the Treasury Claim.

10.     The Debtors are in the business of building communication networks and selling access to these networks to internet service providers ("ISPs"). ISPs in turn provide their customers access to the ISPs' services via the Debtors' networks. In order to build these networks, the Debtors purchase services known as central office-based remote access services ("COBRA") from local exchange carriers ("LECs"). COBRA services permit the end users of the Debtors' data network to send and receive data packets to and from the Debtors' data network and, ultimately, to other users of the Internet. LECs provide COBRA services to the Debtors via network access servers which are not capable of carrying voice transmissions. The end users of the Debtors' data network connect with the network access servers by dialing in, using their computer modems. The network servers then route data to and from the Debtors' data network and end users.

11.     Section 4251 of the IRC imposes a tax on amounts paid for taxable communications services, such as local telephone service and toll telephone service. A purchaser of such services must pay any tax owed under section 4251 of the IRC. *See* IRC Section 4251(a)(2). Providers of such services must collect such tax from the purchaser. *See* IRC Section 4291.

12.     Local telephone service is defined in IRC Section 4252(a) as: (1) the access to a local telephone system and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and (2) any facility or service provided in connection with a service described in (1).

S 300

13.    Toll telephone service is defined in IRC Section 4252(b) as: (1) a telephonic quality communication for which (A) there is a toll charge which varies in amount with the distance and elapsed transmission time of each individual communication and (B) the charge is paid in the United States, and (2) a service which entitles the subscriber, upon payment of a periodic charge (determined as a flat amount or upon the basis of total transmission time), to the privilege of an unlimited number of telephonic communications to or from all or a substantial portion of the persons having telephone or radio telephone stations in a specified area which is outside the local telephone system area in which the station provided with the service is located.

14.    UUNET's purchase of the COBRA services from LECs does not fall within the applicable definitions of taxable communications services. The COBRA service is a data-only service that does not provide UUNET with access to any telephone system and the privilege of voice-quality communication with substantially all persons on that system. In other words, UUNET could not plug in a telephone and gain access to a telephone system or the privilege of telephonic quality communication. Therefore, amounts paid by UUNET to the LECs for the purchase of COBRA services are not subject to the communications excise tax imposed by IRC Section 4251.

15.    Because of the nature of the services purchased by UUNET, federal excise taxes do not apply and the taxes and interest that form the basis of the Treasury Claim are not owed. The service purchased by UUNET was controlled by the LEC's, not by UUNET. Accordingly, the Debtors hereby request that the Court enter an order expunging and disallowing the Treasury Claim, claim no. 38365, in addition to the claim it amends, claim no. 37947.

S 301

## RESERVATION OF RIGHTS

16.    In the event that the Treasury Claim or claim no. 37947 are not expunged and disallowed for the reasons set forth herein, the Debtors hereby reserve their right to object to such proof(s) of claim on other grounds at a later date.

## MEMORANDUM OF LAW

17.    This Objection does not raise any novel issues of law, and, accordingly, the Debtors respectfully request that the Court waive the requirement contained in Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York that a separate memorandum of law be submitted in support of the Objection.

## NOTICE

18.    In accordance with the Claim Objection Procedures Order, notice of this Objection has been provided to counsel for: the U.S. Trustee, the Committee, the Debtors' postpetition lenders, the United States Attorney for the Southern District of New York, the ad hoc MCI Noteholders Committee, AT&T Corporation, Puerto Rico Telephone Company, Inc., the Mid-Size Carrier Group.  Further, in accordance with the Claim Objection Procedures Order, notice of this Objection has been provided to the persons or entities that filed the proof of claim identified above and their counsel (if known) by means of a personalized Claim Objection Notice.  The Reorganized Debtors submit that no other or further notice need be given.

19.    No previous application for the relief sought herein has been made to this or any other Court.

S 302

WHEREFORE the Reorganized Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: Houston, Texas
      August 5, 2004

                    /s/ *Sylvia M. Baker*
                    Marcia L. Goldstein, Esq. (MG 2606)
                    Lori R. Fife, Esq. (LF 2839)

                    WEIL, GOTSHAL & MANGES LLP
                    767 Fifth Avenue
                    New York, NY 10153-0119
                    Telephone: (212) 310-8000
                    Facsimile: (212) 310-8007

                        and

                    Alfredo R. Pérez, Esq.
                    Sylvia M. Baker, Esq.
                    WEIL, GOTSHAL & MANGES LLP
                    700 Louisiana, Suite 1600
                    Houston, TX 77002
                    Telephone: (713) 546-5000
                    Facsimile: (713) 224-9511

                    Attorneys for Reorganized Debtors

S 303



**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------- x
In re                                              :    **Chapter 11 Case No.**
                                                   :
**WORLDCOM, INC., et al.**                         :    **02-13533 (AJG)**
                                                   :
                            Debtors                :    **Jointly Administered**
                                                   :
-------------------------------------------------- x

### ORDER GRANTING THE REORGANIZED DEBTORS' OBJECTION TO
### PROOF OF CLAIM NO. 38365
### (DEPARTMENT OF TREASURY ADMINISTRATIVE EXPENSE CLAIM)

Upon consideration of the Reorganized Debtors' Objection to Proof of Claim No.

38365 (Department of Treasury Administrative Expense Claim) filed by Reorganized Debtor

MCI, Inc. and certain of its direct and indirect subsidiaries (collectively, the "Debtors") dated

August 5, 2004, seeking expungement and disallowance of the amended administrative expense

claim and original administrative expense claim filed by the Department of Treasury for excise

taxes, and it appearing that there is no amount due with respect to such claims because federal

excise taxes do not apply to the services which form the basis of such claims, all as described

more fully in the Objection; and it appearing that the expungement and disallowance of these

proofs of claim is in the best interest of the Reorganized Debtors, their estates and their creditors;

and good and sufficient notice having been given in accordance with the Claim Objection

Procedures Order; and after due consideration and sufficient cause appearing therefore, it is

ORDERED that proof of claim no. 38365 and any amendments thereto are hereby

expunged and such claims are hereby disallowed in their entirety;

ORDERED that proof of claim no. 37947 is hereby expunged as an amended

claim, and such claim is hereby disallowed in its entirety;

ORDERED that the requirement under Rule 9013-1(b) of the Local Bankruptcy

Rules for the Southern District of New York for the filing of a memorandum of law is waived.

Dated: New York, New York
_____, 2004

_____
HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE

S 305

# EXHIBIT C