# WEIL, GOTSHAL & MANGES LLP

700 LOUISIANA
SUITE 1600
HOUSTON, TEXAS 77002
(713) 546-5000
FAX: (713) 224-9511

AUSTIN
BOSTON
BRUSSELS
BUDAPEST
DALLAS
FRANKFURT
LONDON
MIAMI
MUNICH
NEW YORK
PARIS
PRAGUE
SHANGHAI
SILICON VALLEY
SINGAPORE
WARSAW
WASHINGTON, D.C.

WRITER'S DIRECT LINE

(713) 546-5190
james.grogan@weil.com

July 14, 2005

Danna Drori
Nicole Gueron
Assistant United States Attorneys
U.S. Department of Justice
86 Chambers Street, 3rd Floor
New York, New York 10007

Re:     *WorldCom, Inc., et al.* ("MCI"), Case No. 02-13533, Jointly Administered

Dear Ms. Drori and Ms. Gueron,

Enclosed for your consideration is a binder containing documents responsive to your informal document request dated February 14, 2005 (the "Document Request"). These documents are being produced in an effort to resolve the Reorganized Debtors' Objection to Proof of Claim No. 38365 (the "Objection"), and are subject to the Confidentiality Stipulation signed on July 1 and July 5, 2005, respectively, by the Treasury Department and MCI.

Following is an explanation of what is and what is not included in the binder. This discussion is exclusively for the purpose of settlement negotiations and accordingly, is inadmissible pursuant to Rule 408 of the Federal Rules of Evidence and all similar rules in any State. Further, these responses are not intended to be in lieu of formal objections to any discovery propounded by the Treasury Department.

Request no. 1 · All billing invoices relating to network services and communications services provided by UUNET.

In Claim no. 38365 (the "Claim"), the Treasury Department seeks tax payments for services *purchased* by UUNET, not for services provided by UUNET. Therefore, the invoices requested are not relevant to the Claim and have not been produced. Moreover, the request is unduly burdensome because UUNET generates approximately 90,000 invoices per month.

HO1:\316867\02\6SHV02!.DOC\81793.0023

WEIL, GOTSHAL & MANGES LLP

Darina Drori
Nicole Gueron
Assistant United States Attorneys
July 14, 2005
Page 2

Request no. 2  All billing invoices related to network services and communications services purchased by UUNET or to which UUNET subscribed.

The actual invoices satisfying this request are voluminous and not readily accessible. Therefore, we have produced a detailed schedule of UUNET's monthly purchases of COBRA services by vendor from October, 2002 through December, 2003 as a comprehensive summary of the billing invoices. [Tab 1]

Request no. 3  All contracts and/or tariffs governing network services and communications services provided by UUNET, including all contracts between (a) UUNET and its customers; (b) UUNET and its suppliers; and (c) UUNET and its communication providers.

Part 3(a) – Contracts between UUNET and its customers relates to services provided by UUNET. For the reason previously stated in connection with Request no. 1, these documents are not relevant to the Claim and, therefore, have not been produced. Additionally, this request is unduly burdensome.

Parts 3(b) and 3(c) – The only "suppliers" relevant to the Claim are communication providers. Therefore, the documents we have produced are responsive to both Parts 3(b) and 3(c). [Tabs 2 through 17]

Request no. 4  All documents concerning the network architecture and/or system topology of UUNET's systems, including its COBRA-based systems, including but not limited to blueprints, diagrams, schematics or other descriptive documents.

We have produced documents responsive to this request. [Tabs 18 through 23]

Request no. 5  All documents reflecting what transmission lines are used by UUNET to connect their network services to customers and suppliers, and how those transmission lines are used.

We have produced documents responsive to this request. [Tabs 2 through 23]

Request no. 6  All documents concerning the specifications for the equipment used by UUNET.

HO1:\316867\02\6SHV02!.DOC\81793.0023

S 310

WEIL, GOTSHAL & MANGES LLP

Danna Drori
Nicole Gueron
Assistant United States Attorneys
July 14, 2005
Page 3

We have produced documents responsive to this request. [Tabs 24 through 32, and Tabs 18, 21, 22]

    Request no. 7    All promotional materials produced or used by UUNET describing the functions and capacities of its communications systems.

We have included responsive information taken from MCI's website. [Tab 33]

    Request no. 8    All promotional materials received by UUNET from suppliers describing the functions and capacities of its communications systems.

We have produced documents responsive to this request. [Tab 34]

    I understand from Sharon Loftspring that you may consider requesting another extension. Given that the status conference is not set until August 9th and the documents we've produced are not voluminous, there should be no reason that the parties cannot move forward in the time period to which we've agreed. MCI may agree to a short extension, however, if the Treasury Department would agree to file a response to the Objection or provide meaningful feedback in terms of the discovery provided and the Treasury Department's position.

    Additionally, as you are aware, the Internal Revenue Service is currently reviewing a number of excise tax refund claims submitted by MCI that relate to the same COBRA services forming the basis of the Objection. MCI has been working with the IRS and its engineers in an effort to resolve their issues. Since the Bankruptcy Court's ruling on the Objection will have a direct impact on the refund claims, I suggest that we inform the Court of the refund claims at the status conference set for August 9, 2005.

    MCI is eager to move toward a resolution of this matter. We understand that the government has already been working toward a resolution of the same issue in the *XO Communications, Inc. v. United States* case, pending in the United States Court of Federal Claims, Case no. 03-2754 T. Perhaps we can discuss this after you've had an opportunity to review the enclosed documents.

HO1:\316867\02\6SHV021!.DOC\81793.0023

WEIL, GOTSHAL & MANGES LLP

Danna Drori
Nicole Gueron
Assistant United States Attorneys
July 14, 2005
Page 4

I look forward to hearing from you.

Best regards,

James Grogan

cc:    Sharon Loftspring [firm]
       Jeffrey Saltzberg

HO1:\316867\02\6SHV02!.DOC\81793.0023

S 312

**EXHIBIT 2**

**SPECIALIZED SERVICE ARRANGEMENT**

MCI WORLDCOM Network Services, Inc.

**Service Description**

Verizon will provide MCI WORLDCOM Network Services, Inc. (WCOM) with CyberPOP™ TCP/IP data aggregation service. CyberPOP service is a modem aggregation product that provides dial-up port based remote access services. CyberPOP service provides integrated, remote analog & digital access to WCOM that may be utilized by WCOM's end users and the end users of WCOM's affiliates, clients, and resellers (collectively, End Users) to connect to WCOM's Internet network (WCOM Network) via modems referred to as network access servers (NAS) deployed in central offices operated by Verizon (Verizon COs). Verizon shall connect each NAS used in connection with the CyberPOP service to the Public Switched Telephone Network (PSTN) via ISDN primary rate interface, or other mutually-agreed comparable telecommunications facilities (collectively, PRI), and shall arrange for the dedicated assignment (or preservation, to the fullest extent possible) of unique telephone numbers for (or in use by) WCOM and End Users.

CyberPOP service includes all NAS equipment, telecommunications services and related facilities (including without limitation active PRI lines, at least 40 lead trunk numbers (LTN) (with the exception of Single Number Routing ("SNR")), space, power, and other utilities), and ancillary support and maintenance required to connect a call that has been dialed into the PSTN (such call dialing a designated telephone number) to an active DS0 channel-equivalent port (i.e., PRI B-channel) on the corresponding NAS (CyberPOP Port). The demarcation of the CyberPOP service between Verizon and WCOM shall be at the connection of the NAS egress port at Verizon's central office.

CyberPOP service will provide local points of presence for WCOM within Verizon's franchised service areas. WCOM will not own or lease any CyberPOP service equipment, but will have exclusive operational control (i.e., logical access) of all NAS and related aggregation and out-of-band management equipment (collectively, NAS Equipment) used in connection with the CyberPOP service. This product will be configured via WCOM's specifications to allow monitoring and management of the NAS Equipment. Verizon's local network will provide the service from the local dial access to the delivery of TCP/IP and other protocols via the CyberPOP data aggregation equipment located at the Verizon Central Office. WCOM is responsible for obtaining facilities from Verizon's Central Office to the WCOM Point of Presence (POP).

CyberPOP service will utilize TCP/IP and other protocols based on IETF (Internet Engineering Task Force) standards. IETF is the engineering arm of the IAB (Internet Architecture Board). IETF defines protocol standards for Internet services. This tariff supports, at a minimum, the following standards:

| | |
|---|---|
| IP | Internet Protocol |
| TCP | Transmission Control Protocol |
| SLIP | Serial Line IP |
| CSLIP | Compressed Serial Line IP |
| PPP | Point to Point Protocol |
| HSSI | High Speed Serial Interface |

WCOM has the option of utilizing, as a feature of CyberPOP service, SNR in lieu of local telephone numbers, which are included as part of CyberPOP service, where technically feasible. This option enables End Users with Verizon local phone service in a defined geographic area (i.e., a LATA) to have access to WCOM via one specialized telephone number. The End User can initiate a call within the service area to WCOM and this call is treated as a local call by Verizon for the connection and duration of the call. This option is part of the WCOM Specialized Arrangement and is included where available in the rates and charges for CyberPOP service at no additional charge. The following two alternatives are offered to WCOM under this option:

1

DOJ - 00012
CONFIDENTIAL

1.    Verizon will assign a Single Number Routing telephone number from a 500 NPA; or

2.    WCOM can provide Verizon with its own 555-XXXX telephone number acquired from the North American Numbering Plan Administration.

CyberPOP data aggregation services are available where facilities and conditions permit.

### Obligations of Verizon

Special Access Lines and Special Transport beyond the CyberPOP service are not included in the CyberPOP service port price and are available elsewhere in this FCC tariff.

Verizon is responsible to provide WCOM with a firm order confirmation notice, which will initiate the order process.

Verizon will notify WCOM of the completion and readiness of the requested CyberPOP site.

NAS Equipment to provide CyberPOP service requires the review and approval of Verizon. WCOM may propose alternative NAS Equipment platforms from time to time for Verizon's review and approval. NAS Equipment upgrades to the existing port base will be made at the discretion of Verizon. WCOM requests regarding the configuration and design of the NAS Equipment will be evaluated for network compliance and compatibility by Verizon and employed where feasible. WCOM may request that NAS Equipment or other equipment upgrades outside the scope of this arrangement be implemented and charged to WCOM on a time and materials basis.

Verizon will participate with WCOM in joint testing and turn-up activities for new and moved port activations, including, at a minimum, login and RADIUS authentication to the WCOM Network via the ports being tested.

Verizon shall perform all hardware maintenance and remote hands & eyes support for the NAS Equipment, in accordance with mutually agreed-upon support procedures.

Verizon will provide WCOM with seventy-two (72) hours notice in advance of scheduled Wire Center or Central Office maintenance that could adversely impact CyberPOP services.

### Obligations of WCOM

WCOM is responsible for obtaining all appropriate IP addresses.

WCOM is responsible to obtain the facilities required for the dedicated transport of their traffic from Verizon's Central Office to WCOM's point(s) of presence.

WCOM's NAS Equipment must be compatible with Verizon's equipment.

WCOM must maintain NAS Equipment software configuration, software management and authentication control.

WCOM shall furnish information as may be required by Verizon to design and maintain the service and to ensure that the service arrangement is in compliance with the regulations contained herein.

WCOM's NAS Equipment must be in compliance with FCC rules and regulations.

WCOM's specified NAS Equipment must be in compliance with published Verizon NEBS standards.

WCOM will participate with Verizon in joint testing and turn-up activities for new and moved port activations, including, at a minimum, login and RADIUS authentication to the WCOM Network via the ports being tested.

2

DOJ - 00013
CONFIDENTIAL

S 314

WCOM must notify Verizon of any firm order cancellations prior to Verizon initiating any service installation activities. Firm order cancellations received after installation has proceeded (but before joint acceptance) will incur charges for time and materials expended to-date.

WCOM, when requesting Single Number Routing, is responsible for purchasing a quantity of ports to accommodate originating dial-up traffic offered to a selected CyberPOP hub for aggregating and routing to WCOM's designated POP. Verizon shall ensure adequate network trunking to support call completion to WCOM SNR CyberPOP hubs and shall use all commercially reasonable efforts to correct any identified lack of network capacity, consistent with the then-current locations and port quantities of WCOM's SNR CyberPOP hubs . Any NAS Equipment moves by WCOM from non-SNR hubs to SNR hubs, or between SNR hubs if Verizon concurs it is necessary, shall not count against the 5% quarterly moves limitation set forth below. Traffic generated by virtue of SNR under this arrangement will be routed exclusively to Verizon-provided CyberPOP locations.

WCOM agrees to provide Verizon with at least ten (10) business days prior written notice before deploying new software on the NAS Equipment that would implement any new major features or functionalities (i.e., left-of-decimal software upgrade) on the NAS Equipment.

### Enrollment Period

CyberPOP modem based data aggregation service is provided to WCOM under this tariff with a three (3) year commitment period. All 575,000 base ports are committed for thirty-six (36) months from the tariff effective date. Each additional port is committed for thirty-six (36) months from the port install date. For base ports, billing will commence at the new rates on the tariff effective date. For new service implementations, billing will commence on the date that customer acceptance has been completed. Customer acceptance is defined as verification from WCOM that the new service is operational following execution of joint testing and turn-up activities.

This tariff transitions WCOM (previously referenced as UUNET) from previous FCC tariff arrangements with Verizon for data aggregation services. This tariff supersedes any previously tariffed terms and conditions agreed upon by WCOM, or any of its affiliates, and Verizon for CyberPOP service (including comparable modem based data aggregation services purchased from Verizon). Previous terms and commitments beyond the new three (3) year enrollment period are terminated as a result of this tariff agreement without application of any early termination fees, penalties or other charges.

### Rate Application

CyberPOP service rates will be applied on a monthly basis for all dial-up ports in service nationwide. Nationwide is defined as the aggregate of all dial-up ports for all of the Verizon Operating Companies, which includes the former Bell Atlantic, Nynex, GTE and Contel footprints. There are separate rates identified for existing base ports and additional ports as outlined below.

### Monthly Recurring Charges (MRCs)

| Port Type | Rate (MRC) Per Port |
|---|---|
| Base (1-575,000) | $29.00 |
| Additional (575,001 +) | $17.50 |

Rates include Single Number Routing, where available, and all applicable engineering, furnishment, installation (EF&I) service and hardware maintenance charges, and all applicable fees and surcharges (other than fees and surcharges that are imposed by the Federal Communications Commission or other government agency on the CyberPOP service subsequent to the effective date of this tariff). Rates do not include applicable taxes. Except as otherwise specified in this arrangement, no non-recurring charges shall apply with respect to the CyberPOP ports

DOJ - 00014
CONFIDENTIAL

S 315

provided hereunder. When CyberPOP services utilize a PRI trunk group, D channels do not incur the above charges. The above rates become effective upon the effective date of the tariff.

## Commitment Levels

WCOM's Minimum Port Commitment is to maintain (in the aggregate across all Verizon franchise areas) an in service base of 575,000 ports for the entire thirty-six (36) month term period with 200,000 additional ports to be installed by month thirty-six (36) of the arrangement, less any NAS Equipment buy-backs (as described below), Sold CyberPOP Ports (as defined below), cancelled ports due to missed FOC/CFA dates (as described below), and ANS/GridNet ports that will not be converted to CyberPOP (to be determined based on mutually agreed-upon procedures). All ports purchased by WCOM ISP entities, including PRI and other equivalent telecommunications services used to provide dial-up ports for the WCOM Network that are converted to CyberPOP Ports under this tariff (such conversion shall be made without the application of any early termination fees, penalties, or other charges) shall be deemed to count towards satisfaction of this Minimum Port Commitment.

Ports that are in the process of being moved (as described below) shall continue to be counted for purposes of determining whether WCOM has met its Minimum Port Commitment.

Beginning in month 37 of this arrangement and thereafter, this Minimum Port Commitment shall no longer apply, and WCOM shall not be committed to obtain any minimum number of ports from Verizon under this tariff.

## Cancellation of Service

If CyberPOP Ports are not made ready for service by Verizon no later than fifteen (15) calendar days following the applicable FOC/CFA dates specified in the firm order, WCOM may, at anytime prior to availability of the port, cancel the CyberPOP ports covered by that firm order upon written notice to Verizon, and (a) WCOM's Minimum Port Commitment shall be reduced by an amount equal to the number of CyberPOP Ports that were the subject of the cancelled firm order, and (b) WCOM shall have the right to repurchase (at the purchase price paid by Verizon to WCOM) any NAS Equipment sold by WCOM to Verizon in connection with such cancelled firm order.

## Customer Initiated Buy-Backs

WCOM at their discretion may choose to downsize their presence at any Verizon CyberPOP location by buying back NAS Equipment that was deployed for their dedicated use. Verizon will disconnect, pack and ship the designated NAS Equipment back to WCOM. Buy-back requests will be implemented using mutually agreed-upon engineering procedures. A non-recurring charge as specified below will be billed for each port that is removed from service. There are restrictions on the quantity of ports that can be removed from service in a given timeframe.

WCOM may buy back a maximum of 14,200 ports during the first year, which begins on the effective date of this tariff. During year two (2), WCOM may buy back a maximum of 2% of their nationwide quantity of installed ports which are in service (or in the process of being moved) on the one (1) year anniversary of the tariff effective date. During year three (3), WCOM may buy back a maximum of 30% of their nationwide quantity of installed ports which are in service (or in the process of being moved) on the two (2) year anniversary of the tariff effective date.

For buy-back of ports that are in the process of being moved, the "buy back year" will be based upon the date (in relation to the 36-month enrollment period of this arrangement (as specified above)) that the port(s) was taken out of service to initiate the move.

WCOM's Minimum Port Commitment is reduced as a result of buy-back activities. The buy-back will be applied to the 575,000 base ports and the 200,000 additional ports, as applicable depending on the port types being bought back by WCOM.

4

DOJ - 00015
CONFIDENTIAL

S 316

Charges for customer initiated equipment buy-backs are applied on a one-time non-recurring charge (NRC) basis for each port that is purchased.

| Port Installation Date | Rate (NRC) per Port Removed | | |
|---|---|---|---|
| | Buy-back Year (Enrollment Period) | | |
| | Year 1 | Year 2 | Year 3 |
| Prior to 1998 Installs | $375 | $250 | $100 |
| 1998 Installs | $525 | $375 | $150 |
| 1999 Installs | $570 | $435 | $285 |
| 2000 Installs | $645 | $465 | $305 |
| 2001 Installs | | $270 | $200 |
| 2002 Installs | | | $270 |

For buy-back activities, WCOM may choose between the above rate structure or pay for the remaining life of the three (3) year term at the per port monthly rate applicable to the individual port, whichever is lower.

During the first thirty (30) calendar days after the effective date of the tariff, WCOM may cancel any pending orders, or ports installed per the WCOM capacity plan, for CyberPOP service (including comparable modem based data aggregation services purchased from Verizon) provided by Verizon to WCOM or its affiliates that have not yet been installed by Verizon, for a one-time $25.00 non-recurring charge per port. Such cancellation shall not count towards the year one (1) buy-backs that otherwise might apply to such activities under the tariff.

## Customer Initiated Moves

WCOM can move (disconnect and reconnect) dial-up port capacity from one Verizon CyberPOP location to another, up to a maximum of 5% per quarter of the total ports in service at the start of each calendar quarter (January, April, July, October) ("Quarterly Move Allotment").

Following the completion of the parties' joint pre-planning and engineering work, the parties shall use all commercially reasonable efforts to place the moved ports back in service within ninety (90) calendar days, or such other reactivation time period as may be mutually agreed-upon by the parties at the time of disconnect. Move requests will be implemented using mutually agreed-upon engineering procedures, and may result in the swap-out of NAS Equipment on a port-for-port basis (at WCOM's election and expense, if any). Hardware components being moved (and swapped, if applicable) must be compatible with the hardware/software configuration at the receiving CyberPOP location. Disconnect and reconnect move orders will be processed concurrently and standard Verizon operational processes and implementation timeframes will be utilized.

For the first thirty (30) calendar days following the tariff effective date for this arrangement, WCOM may identify and execute move activities (at a flat $25 per port rate) that do not count against the 5% per quarter limitation. The joint objective is that moved ports be reinstalled and placed back in service within one hundred twenty (120) calendar days after the effective date of tariff.

Charges for moves are applied on a one-time non-recurring charge (NRC) basis for each in service port (i.e., lit B-channel passing dial-up traffic) that is moved. MRC billing for the ports will be discontinued during the move process and will be reinstated at the time the move is completed. Once reinstated, the ports will be billed for the remaining duration of the thirty-six (36) month term at the same base or additional port MRC as originally charged for the port. Out-of-service days during the move of a port will not count against satisfying the thirty-six (36) month commitment period for the port. Detailed project planning will be required by both parties in order to establish mutually agreeable timelines for port moves. Unless otherwise agreed, or unless Verizon is not able to implement service to a moved port within 105 calendar days, billing for moved ports shall commence no later than 105 calendar days from the date the port was taken out of service for the move.

DOJ - 00016
CONFIDENTIAL

S 317

<u>Rate (NRC) per In Service Port Moved</u> :

First 60% of  Quarterly Move Allotment:          $25 per Port
Next 40% of Quarterly Move Allotment:           $45 per Port

### Service Enrollment

WCOM must specify in writing to Verizon that they elect to subscribe to the CyberPOP service as set out in this tariff.  The minimum CyberPOP service for a Central Office site in which NAS Equipment is located is 138 dial-up ports.

### Periodic Reviews

The parties shall meet monthly on or about the last business day of each month to reconcile port counts and determine, for billing purposes, the number of CyberPOP Ports that shall be deemed to have been active for that month.

WCOM's service commitment will be reviewed quarterly on or about the last business day of each calendar quarter (January, April, July, October) following the tariff effective date.  WCOM in-service port counts, port moves, port buy-backs, port installs, and SNR activity will be identified and jointly reconciled by WCOM and Verizon staffs. Any required reporting or billing adjustments will be agreed upon and executed within thirty (30) calendar days of completion of the reconciliation process.  In the event that a final reconciliation is not agreed upon by WCOM and Verizon within thirty (30) days, the issue will be escalated to executive management of both companies for resolution.

### Shortfall Charge

At the final thirty-six (36) month review, WCOM will be notified in writing as to the status of their overall commitment requirements.  This notification will inform WCOM of any shortfall in the quantity level below the Minimum Port Commitment, as specified above. At the final review, if the number of CyberPOP ports is below the Minimum Port Commitment, a one-time charge of $630 per port will be assessed for dial-up port quantity shortfalls of in-service ports below the Minimum Port Commitment.

### Service Availability

The Verizon objective level of service availability will be 95% of the monthly hours of operation for each Central Office.  Should the service availability actually be less than 95% of the monthly hours for the average port of a Central Office (e.g., 30 days x 24 hours x .95 = 684 hours), WCOM will receive a credit of 40% of the monthly bill for that Central Office.  Force Majeure events that impact service and which Verizon could not have prevented through the use of reasonable precautions will not be subject to the above penalty calculation.

### Withdrawal of Service Areas

In the event that Verizon ceases to offer CyberPOP service in a Verizon CO in which CyberPOP service is offered at any point under this tariff, through transfer of ownership of the Verizon CO to a non-Verizon entity, Verizon shall request the new owner to continue to provide service equivalent to Verizon's CyberPOP service at such CO, and shall, if the new owner agrees to continue the service, use commercially reasonable efforts to facilitate a smooth transition of CyberPOP service to the new provider.  Notwithstanding the foregoing, with respect to any CyberPOP Ports deployed in such Verizon COs ("Sold CyberPOP Ports"), WCOM shall have the right (and reasonable opportunity following written notice from Verizon) to terminate such Sold CyberPOP Ports prior to their transfer to the new provider without the application of any early termination fees or other charges, and to repurchase the

6

DOJ - 00017
CONFIDENTIAL

S 318

associated NAS Equipment from Verizon at the then-current depreciated book value (with no other charges applying). Verizon shall ship such NAS Equipment to WCOM at WCOM's expense. NAS Equipment repurchases resulting from Sold CyberPOP Ports shall not count towards the annual limit of regular buy backs specified in the tariff. In addition, and regardless of whether WCOM terminates such Sold CyberPOP Ports, the Minimum Port Commitment shall be reduced by the number of such Sold CyberPOP Ports.

**Duration of Tariff and Renewal Option**

This arrangement shall remain in effect so long as CyberPOP Ports are being provided under it.

At the expiration of the initial 36-month period following the effective date of this tariff, and subject to payment of any shortfall charge, the Minimum Port Commitment, adjusted as set out above, shall expire and shall no longer be binding.

During the period in which this tariff remains in effect after the expiration of the initial 36-month port term that applies to each CyberPOP Port ordered hereunder, (a) Verizon will continue with billing for such ports on a month-to-month basis at the MRC rates identified in this tariff, (b) WCOM may cancel any such ports upon sixty (60) days written notice, and (c) Verizon may cancel such ports by providing WCOM with one hundred eighty (180) calendar day notification that such ports will be terminated.

Verizon may terminate this tariff, with termination effective at any time after completion of the initial 36-months following the effective date of the tariff, by giving WCOM one hundred eighty (180) calendar day notice. Such termination shall not apply to CyberPOP Ports that are in service at the termination date, and this tariff shall remain in effect for such ports until the ports are terminated in accordance with the preceding subsection. Upon termination of this tariff, WCOM may not order any new CyberPOP Ports.

DOJ - 00018
CONFIDENTIAL

S 319

## AMENDED & RESTATED CENTRAL OFFICE-BASED REMOTE ACCESS SERVICE SCHEDULE

This Amended & Restated Central Office-Based Remote Access Service Schedule ("Schedule") is entered into by and between MCI WORLDCOM Network Services, Inc., with a place of business located at 22001 Loudoun County Parkway, Ashburn, VA 20147 ("WorldCom"), and Qwest Corporation, with a place of business located at 1801 California Street, Denver, CO 80202 ("Vendor"), pursuant to the Master Services Agreement between WorldCom and Qwest Government Services, Inc., dated June 29, 2001 ("Agreement").

This Schedule is governed by the terms and conditions of the Agreement, except as specifically stated herein. Where the provisions of the Agreement and this Schedule conflict, the terms and conditions of this Schedule shall prevail. Words and phrases defined in the Agreement shall have the same meaning in this Schedule. This Schedule shall be effective as of June 29, 2001 ("Schedule Effective Date").

A.    Service Description.

1.    Central office-based remote access services ("COBRA Services") provide integrated, remote analog & digital access to WorldCom that may be utilized by WorldCom's employees, WorldCom's end users, and the end users of WorldCom's affiliates, clients, and resellers (collectively, "End Users") to connect to WorldCom's internet network ("WorldCom Network") via modems referred to as network access servers ("NAS") deployed in central offices operated by Vendor or its affiliates ("Vendor COs"). COBRA Services provide medium to high-speed data transport services for remote access to the WorldCom network. COBRA Services permit WorldCom to receive calls from multiple analog modems and ISDN basic rate interface lines for handoff to separately purchased wide area network links. Vendor shall connect each NAS used in connection with the COBRA Services to the Public Switched Telephone Network ("PSTN") via ISDN primary rate interface, or other mutually agreed comparable telecommunications facilities (collectively, "PRI"), and shall arrange for the dedicated assignment (or preservation, to the fullest extent possible) of unique telephone numbers for (or in use by) WorldCom and End Users.

2.    COBRA Services include all equipment, telecommunications services and related facilities (including without limitation active PRI lines, at least 40 DID numbers per rotary, space, power, and other utilities), and ancillary support and maintenance required to connect a call that has been dialed into the PSTN (such call dialing a designated telephone number) to an active DS0 channel-equivalent port (i.e., PRI B-channel) on the corresponding NAS ("COBRA Port"). The demarcation of the COBRA Services between Vendor and WorldCom shall be at the connection of the NAS egress port to the egress circuit connecting the NAS to Vendor's or its affiliate's wide area network and/or the WorldCom Network.

   a.    Vendor acknowledges that certain of the COBRA Ports shall be utilized on WorldCom's Dial Access Network ("DAN"), which is a dial network shared by multiple WorldCom clients and resellers, and that other COBRA Ports shall be utilized on WorldCom's Fixed Port Network ("FPN"), which is a dial network dedicated to a single WorldCom reseller. As it pertains to the COBRA Services, those distinctions between the ordering, provisioning, and/or management of COBRA Ports on the DAN and the FPN are identified herein.

   b.    For purposes of this Service Schedule, FPN ports in the back-hauled UAS circuit configuration ("ANS Ports"), which are described more fully in the Uniform Access Services Schedule between the same parties as of the same date ("ANS Port Schedule"), shall count towards fulfillment of WorldCom's First and Second Commitments, described below.

3.    Vendor and/or its affiliates shall own all of the NAS equipment (generally including the NAS, Ethernet hub, terminal server, and OOB modem) used in connection with the COBRA Services that is located on Vendor's side of the demarcation of the COBRA Services. Nothing in this Schedule is intended to, nor shall it be construed to, confer upon WorldCom any right or interest in Vendor's equipment or property, nor any right to occupy or install any of its equipment or facilities in or upon any Vendor property.

   a.    Vendor acknowledges that separate NAS equipment shall be used to support the FPN, and that certain Vendor COs may contain two sets of NAS equipment (one set to support the DAN and the other set to support the FPN).

WORLDCOM / QWEST CONFIDENTIAL          PAGE 1          AMENDED QWEST MSA / COBRA – 6/29/01

DOJ - 00035
CONFIDENTIAL

4.   In providing COBRA Services under this Schedule, the parties agree to use NAS equipment only in specified configuration(s) as mutually agreed upon by the parties in advance. For any given Firm Order (as that term is defined in Subpart C below), the parties shall cooperate to determine the applicable NAS equipment and configuration to be deployed in connection with such ordered COBRA Ports.

5.   Vendor and/or its affiliates shall provide WorldCom with 24x7x365 NOC-to-NOC technical support. Vendor shall proactively maintain all NAS equipment (along with all related equipment on Vendor's side of the demarcation of the COBRA Services) used in connection with the COBRA Services. Vendor shall assist WorldCom in the resolution of any NAS equipment failure in accordance with the reasonable instructions of WorldCom's NOC and the response/repair times set forth in Subpart G(2) below.

6.   Notwithstanding any contrary provision set forth in this Schedule or the Agreement, WorldCom shall be exclusively responsible for the operational control (i.e., logical access) of all NAS equipment used in connection with the COBRA Services. WorldCom shall be exclusively responsible for the purchase, installation, and management of all software upgrades for the NAS equipment. WorldCom agrees that Vendor shall not be responsible for any failure by WorldCom to properly operate the NAS equipment.

     a.   WorldCom agrees to provide Vendor with at least ten (10) business days prior written notice before deploying new software on the NAS equipment that would implement any new major features or functionalities (i.e., left-of-decimal software upgrade, using the standard x.yz software version naming convention) on the NAS equipment. This notice requirement includes the intentional loading of any software that WorldCom is aware has the capability of implementing any Voice-over-IP functionalities on the NAS equipment.

     b.   In the event that Vendor reasonably determines that any software upgrade (or any right-of-decimal software update) implemented by WorldCom on the NAS equipment is adversely affecting the quality or performance of the COBRA Services, the PSTN, or other elements of Vendor's network, upon receipt of written notice from Vendor made pursuant to Section 14 of the Agreement which specifies the nature of such adverse service impacts, WorldCom shall suspend the deployment of such software upgrade/update until such service-impacting problems can be resolved.

7.   Vendor shall have no responsibility for the authentication of End Users accessing COBRA Ports. WorldCom shall be exclusively responsible for controlling all End User access to COBRA Ports.

8.   Each June after the Schedule Effective Date, the parties shall meet to review and discuss the architecture and equipment used in connection with the COBRA Services, then-current market conditions, and the market competitiveness of the prices and commitment levels set forth herein, as well as any business, performance, or operational issues as may then have arisen between the parties. The parties also shall discuss the deployment of future technologies in Vendor's networks, including without limitation alternative call delivery technologies (e.g., SS7 and/or soft switch technologies), and any corresponding price changes associated with such deployment. The parties agree to negotiate in good faith to maintain the mutually agreed-upon competitive viability of this Schedule and the COBRA Services provided hereunder.

9.   The Lucent TNT equipment specifications, technical parameters, and operational requirements applicable to the COBRA Services and NAS equipment attached as Exhibit 1 to the original Central Office-Based Remote Access Service Schedule between UUNET Technologies, Inc. ("UUNET") and Vendor, dated August 28, 2000, and the pricing for the Lucent TNT equipment attached to that same document as Exhibit 2, remain in full force and effect and shall constitute Exhibit 1 and Exhibit 2 of this Schedule as if fully attached hereto. The draft 3Com Total Control equipment specifications attached hereto as Exhibit 3 set forth certain technical parameters and operational requirements applicable to the COBRA Services and NAS equipment. The parties recognize and agree that the 3Com Total Control equipment specifications attached as Exhibit 3 are nearly final, but that some minor changes still need to be made, and the parties will use best efforts to finalize such specifications within thirty (30) days from the Schedule Effective Date. Pricing for the 3Com Total Control equipment is set forth in Exhibit 4, attached. The equipment configurations specified in Exhibits 1 and 3 for ports to be installed after the Effective Date may be updated by WorldCom from time to time; provided that such specifications must be compatible with Vendor's equipment and compliant with published Vendor NEBS standards.

DOJ - 00036
CONFIDENTIAL

S 321

10. In the event that the manufacturer of NAS equipment used in connection with the COBRA Services offers a hardware upgrade to such NAS equipment, the parties shall confer and mutually agree as to whether to deploy such hardware upgrade in connection with the COBRA Services, as well as the appropriate cost sharing and/or cost savings arrangements resulting from such a deployment.

11. Vendor and WorldCom acknowledge that the COBRA Service provided hereunder is being provisioned to meet the unique needs and circumstances of WorldCom. Should the COBRA Service provided hereunder be determined by a regulatory body to be subject to regulated collocation requirements, Vendor may, in its sole discretion, terminate this Schedule and phase-out the Service over a six (6) month period. If Vendor elects to phase-out the COBRA Service, WorldCom shall not be liable to Vendor for any termination charges or other liability that otherwise would have applied to such an early cancellation of such COBRA Services.

12. This Schedule does not represent an inter-connection agreement between the parties. Should WorldCom or any of its affiliates wish to directly use the COBRA Services to directly provide any one-way or two-way voice telephony communications, whether local or long distance ("VoIP"), WorldCom and Vendor shall negotiate terms, conditions, and rate structures that are applicable to VoIP prior to WorldCom utilizing the COBRA Services to directly provide VoIP. In the event the parties are unable to reach agreement on the terms, conditions, and rate structures for such VoIP services, WorldCom has the option to terminate this Schedule upon six (6) months' written notice to Vendor without application of any termination charges or other liability; provided that upon such termination WorldCom shall (a) purchase or lease if appropriate, any NAS equipment dedicated to WorldCom's use from Vendor at the then-current Vendor book value and/or residual lease value for such NAS equipment; and (b) promptly remove the NAS equipment from Vendor's premises. If WorldCom or any of its affiliates use the COBRA Services to provide VoIP without the prior development of mutually Schedule directly use the COBRA Services to provide VoIP without the prior development of mutually agreed-upon terms, conditions, and rate structures for VoIP, WorldCom shall be in breach of this Schedule and Vendor may terminate this Schedule for cause as defined in Section 4 of the Agreement.

13. The parties shall jointly determine where and in which Vendor Central Offices the NAS equipment will be placed and the resulting PSTN network architecture in order to: (a) provide WorldCom and its affiliates, clients, and resellers with appropriate geographic coverage; (b) minimize the number of egress circuits required to connect the NAS equipment to the WorldCom Network; and (c) balance Vendor's network loads and capacity in a manner to ensure there will be no negative impact to the dialing patterns or performance of the COBRA Services for WorldCom and its End Users. Vendor intends to offer the COBRA Services in all cities where facilities exist and where technically and economically feasible. Once the parties have mutually agreed upon the precise locations and quantities of COBRA Ports, Vendor shall be responsible for maintaining sufficient PSTN network capacity to support the current and projected peak traffic loads (not including unforeseeable one-time spike loads on the PSTN network) for each such service location, shall proactively monitor the PSTN network to ensure that sufficient capacity exists at all times, and shall use best efforts on a 24x7x365 basis to correct any identified lack of PSTN network capacity.

14. The parties agree to mutually explore the technical parameters and implementation requirements of single number service ("SNS") in connection with the COBRA Services, including the feasibility of deploying SNS on a state-by-state or other mutually-agreeable basis across Vendor's entire service territory.

B. Service Territory. The prices set forth in this Schedule shall apply to all COBRA Services provided hereunder for deployment in any Vendor CO where COBRA Services are available from Vendor and/or its current and future affiliates ("Available Vendor CO") within the fourteen-state Qwest (incumbent local exchange carrier) service area. Vendor agrees to use commercially reasonable efforts to make the COBRA Services available in all Vendor COs.

C. Service Ordering Procedures.

1. [Reserved]

2. DAN.

a. WorldCom agrees to provide Vendor with quarterly forecasts of potential DAN growth. Following the issuance of a given quarterly growth forecast, the parties agree to work cooperatively prior to the placement by WorldCom of a firm order for COBRA Ports in order to (i) identify the quantity of COBRA Ports for deployment; (ii) the applicable Vendor CO for such COBRA Ports; and (iii) a

DOJ - 00037
CONFIDENTIAL

S 322

mutually agreeable installation timeline for such COBRA Ports. Once the parties have cooperatively developed a deployment plan, WorldCom shall have ten (10) business days to send Vendor a firm and binding order in writing ("Firm Order") for the identified COBRA Ports.

b.   With respect to those COBRA Ports that are to be utilized on the DAN, the parties agree to implement an average NAS utilization rate across Vendor's entire deployment of 95% or greater (calculated on a NAS-by-NAS basis as the ratio of active and ordered COBRA Ports for such NAS against the total number of usable modem ports on such NAS). By way of example only, if a T1+/DC TNT is being used in a FAS configuration, the total number of usable modem ports is 460 modem ports. Accordingly, on an average basis, such TNT should have at least 437 active and ordered COBRA ports. In the event that the parties elect to deploy an alternative NAS configuration in connection with the DAN, the parties agree to negotiate in good faith to determine the applicable minimum COBRA Port order quantity for such alternative NAS configuration.

c.   Once Vendor receives WorldCom's Firm Order, any cancellation by WorldCom of the COBRA Ports identified in such Firm Order shall be subject to any applicable order cancellation charges as set forth in Subpart K(5) below, unless otherwise provided by the Agreement or this Schedule.

3.   **FPN.**

a.   To add any COBRA Ports that will support the FPN, WorldCom shall provide Vendor with a request for information ("RFI") in writing identifying (i) the number of COBRA Ports being considered for deployment by WorldCom; and (ii) the geographic location (for a new rotary) or the Vendor CO (for the expansion of an existing rotary) for such identified COBRA Ports.

b.   Vendor shall have seven (7) days from receipt of the RFI to advise WorldCom in writing whether (i) Vendor agrees to provision such identified COBRA Ports within the SLA installation time frame set forth in Subpart G(3) below; (ii) Vendor agrees to provision such identified COBRA Ports within an alternative, reasonable time frame that is greater than the SLA installation time frame set forth in Subpart G(3) below; or (iii) Vendor does not agree to provision such identified COBRA Ports.

c.   In the event that Vendor responds affirmatively to the RFI (i.e., provides a response pursuant to Subparts C(3)(b)(i)-(ii) above), WorldCom shall have seven (7) days from receipt of Vendor's written response to send Vendor a firm and binding order in writing ("Firm Order") for the identified COBRA Ports. Once Vendor receives WorldCom's Firm Order, any cancellation by WorldCom of the COBRA Ports identified in such Firm Order shall be subject to any applicable order cancellation charges as set forth in Subpart K(5) below, unless otherwise provided by the Agreement or this Schedule. If WorldCom does not send Vendor a Firm Order within seven (7) days from receipt of Vendor's written response pursuant to Subpart C(3)(b) above, WorldCom's RFI and Vendor's response thereto shall be deemed to have expired.

d.   With respect to those COBRA Ports that are to be utilized on the FPN, the parties agree to use commercially reasonable efforts to maximize the average NAS utilization rate across Vendor's entire deployment (calculated on a NAS-by-NAS basis as the ratio of active and ordered COBRA Ports for such NAS against the total number of usable modem ports on such NAS). The parties acknowledge that the locations and quantities of COBRA Ports for the FPN is determined by WorldCom's client, and that the management of the FPN NAS utilization rate may require the interim deployment of partially-filled NAS equipment. WorldCom agrees that any Firm Orders for new service locations on the FPN would include a minimum of 192 COBRA Ports.

D.   **Service Pricing.**

1.   The Monthly Fees for each port category for a given calendar month shall be in accordance with the following table:

| Port Type | Monthly Fee per Port |
|---|---|
| DAN COBRA Ports | $24.00 |

| ANS Ports | rate specified in ANS Port Schedule |
|---|---|
| ANS COBRA Ports (following conversion) | $24.00 |
| ANS Virtual COBRA Ports (following conversion) (no Buy-Down Fee) | $22.00 |
| ANS Virtual COBRA Ports (following conversion) (with Buy-Down Fee as per Subpart L(1)(c)) | $17.50 |

2.  Except where otherwise expressly provided in this Schedule (e.g., Subpart I(2) below), no non-recurring charges shall apply with respect to the COBRA Services. To the extent that any applicable tariff includes non-recurring charges, Vendor agrees that such non-recurring charges already have been factored into the Monthly Fees for the COBRA Services as set forth in Subpart D(1) above.

3.  The prices set forth herein for the COBRA Services include any applicable NAS egress port fees, but exclude any egress circuit, customer premise equipment, and enhanced service charges. In the event that WorldCom elects (in its sole discretion) not to obtain an egress circuit from Vendor, Vendor agrees to fully cooperate with WorldCom and any third-party provider selected by WorldCom to connect Vendor's NAS or wide area network equipment to the WorldCom Network via an egress circuit provisioned by such third-party provider to Vendor's central office or wide area network interconnection location. Vendor shall be compensated by WorldCom for any work associated with such third-party provider egress circuit interconnection to the extent that Vendor is compensated by third parties at similar rates for similar work.

4.  The Monthly Fees set forth in Subpart D(1) above include all applicable fees and surcharges (other than fees and surcharges that are imposed by the Federal Communications Commission or other government agency on the COBRA service subsequent to the Schedule Effective Date). Neither Vendor nor WorldCom are aware of any pending or proposed fees or surcharges that would apply to the COBRA Service.

5.  Prospectively from the Schedule Effective Date, the Monthly Fees set forth in Subpart D(1) above do not include applicable taxes; provided that the following procedures shall apply.

    a.  If any federal, state or local government tax excluding any tax levied on property or income (an "Applicable Tax") is required or permitted by applicable law, ordinance or tariff to be collected from WorldCom by Vendor, then (i) Vendor will bill, as a separately stated item, WorldCom for such Applicable Tax, (ii) WorldCom will timely remit such Applicable Tax to Vendor, and (iii) Vendor will remit such collected Applicable Tax to the applicable governmental authority as required by law. Vendor will also promptly review any new tax if requested by WorldCom, and will cooperatively seek relief, if appropriate. If, as specified in more detail below, WorldCom submits to Vendor an exemption certificate or other appropriate documentation, then Vendor shall not bill WorldCom for such Applicable Tax.

    b.  If Vendor does not collect an Applicable Tax because WorldCom asserts that it is not responsible for the Applicable Tax, or is otherwise excepted from the obligation which is later determined by formal action to be wrong then, as between Vendor and WorldCom, WorldCom will be liable for such uncollected Applicable Tax and any interest due and/or penalty assessed on the uncollected Applicable Tax by the applicable taxing authority or governmental entity.

    c.  If either Party is audited by a taxing authority or other governmental entity the other Party agrees to reasonably cooperate with the Party being audited in order to respond to any audit inquires in a proper and timely manner so that the audit and/or resulting controversy may be resolved expeditiously.

    d.  If applicable law does exclude or exempt a purchase of services under this arrangement from an Applicable Tax, and if such applicable law also provides an exemption procedure, such as an exemption certificate requirement, then, if WorldCom complies with such procedure, Vendor will not bill or collect such Applicable Tax during the effective period of the exemption.

e.  If applicable law does not exclude or exempt a purchase of services under this Agreement from an Applicable Tax, and does not also provide an exemption procedure, then Vendor will not bill or collect such Applicable Tax if WorldCom (i) furnishes Vendor with a letter signed by an officer of WorldCom claiming an exemption and identifying the applicable law which allows such exemption, and (ii) supplies Vendor with an indemnification agreement, reasonably acceptable to Vendor, which holds Vendor harmless on an after-tax basis with respect to forbearing to collect such Applicable Tax.

f.  With respect to any Applicable Tax or Applicable Tax controversy, WorldCom will be entitled to contest, pursuant to applicable law, and at its own expense, any Applicable Tax that it is ultimately obligated to pay. WorldCom will be entitled to the benefit of any refund or recovery resulting from such a contest.

E.  Service Acceptance Procedures.  WorldCom's acceptance of new, moved, or migrated COBRA Ports at a given location shall be made immediately following the successful completion of service acceptance tests conducted jointly by the parties.  At a minimum, such service acceptance tests shall include the login and RADIUS authentication to the WorldCom Network via the COBRA Ports being tested.  A given COBRA Port shall be deemed to be active upon WorldCom's acceptance of such COBRA Port pursuant to this Subpart E.  The acceptance procedure shall be as follows:

1.  After WorldCom's receipt of written notice (including via email) indicating that a given new COBRA Port is ready for service, WorldCom shall have up to forty-five (45) days to obtain all necessary egress capacity and to complete all end-to-end testing of such new COBRA Port.  Unless WorldCom notifies Vendor of any service deficiencies with the new COBRA Port during this forty-five (45) day period, such new COBRA Port shall be deemed active and Vendor will begin billing WorldCom for the new COBRA Port upon the earlier of: (A) WorldCom's notice to Vendor of service acceptance of the new COBRA Port; or (B) the expiration of the applicable forty-five (45) day period.

2.  If WorldCom notifies Vendor of any service deficiencies with a new COBRA Port during the forty-five (45) day period specified in Subpart E(1) above, the parties shall cooperatively troubleshoot the new COBRA Port in an expeditious manner until it is operational and accepted by WorldCom.  If the parties mutually determine that the source of the service deficiency is within the control of Vendor (including any contractor other than WorldCom), then service activation and billing for such COBRA Port shall be suspended until the service deficiency has been corrected and WorldCom notifies Vendor that the new COBRA Port has been accepted.  If the parties mutually determine that the source of the service deficiency is within the control of WorldCom (including any contractor other than Vendor), then service activation and billing for such COBRA Port shall begin as of the later of:  (A) ten (10) days after the date of such mutual determination; or (B) the expiration of the original forty-five (45) day period specified in Subpart E(1) above; provided, however, that if WorldCom notifies Vendor that the new COBRA Port has been accepted, then service activation and billing for the new COBRA Port will begin upon WorldCom's acceptance.

F.  Service Billing Procedures.  Vendor shall bill WorldCom monthly, based upon the applicable Monthly Fees specified in Subpart D(1) above, for each COBRA Port that is subject to WorldCom's First or Second Commitment or that is otherwise billable during the applicable monthly billing period.  Vendor shall pro-rate (calculated on a daily basis) any COBRA Port that is activated, terminated, or expires during the middle of such monthly billing period.  Vendor's monthly invoice for COBRA Services shall be submitted to WorldCom in accordance with the provisions of the Agreement.

G.  Service Level Agreements ("SLA").

1.  *Service Availability.*  Service outage credits may be claimed by WorldCom when any COBRA Port is interrupted or does not meet performance standards for any period lasting two (2) or more consecutive hours after WorldCom's network operations center ("NOC") notifies Vendor's NOC that a potential service outage exists.  No credit shall be available if the interruption is caused by (i) the failure of WorldCom to properly operate the NAS equipment as set forth in Subpart A(6) above; (ii) the negligence or willful misconduct of WorldCom; or (iii) an event of Force Majeure as provided in the Agreement.  The amount of the credit shall be equal to three (3) times the applicable Monthly Fee specified in Subpart D(1) above for each affected COBRA Port, pro-rated for the period during which a confirmed outage has occurred, including the initial one (1) hour.  Outages shall be confirmed by a Vendor employee authorized to make

such determinations and will be calculated in ½-hour increments, or major fraction thereof, of the interruption.

2.  *Service Failure Response Times.* Vendor will provide hardware support and maintenance, and deployment of resources necessary to fix/replace hardware failures (once WorldCom has contacted Vendor and requested assistance). Should an alarm occur, WorldCom will be responsible for contacting Vendor's NOC. WorldCom is responsible for determining the source/cause of the problem and resolving the problem. WorldCom may or may not choose to take action on an alarm. If the alarm involves a hardware failure, WorldCom will contact Vendor's NOC, provide specific information on the location and type of activity to occur (example: replace module XXX in device YYY located at ZZZ location). Vendor's NOC then will deploy the appropriate resources to address the hardware problem, and Vendor shall diligently respond to and repair such failure of the COBRA Services, including without limitation the NAS equipment, based upon the grade of the failure, in accordance with the tables set forth below.

| Grade | Severity / Problem Level | Mean Time to Respond | Mean Time to Repair |
|-------|--------------------------|----------------------|---------------------|
| 5 | Critical outage (entire hub down; dial rotary isolation; reseller link down; >10% of normal dial traffic disrupted; non-redundant device failure). *Examples:* PRI outage between the telephone switch and the NAS equipment; >30% of modems at any one CO are not responding; single point of failure piece of hardware outputting major alarms. | 15 minutes | 2 hours |
| 4 | Major outage (multiple users/nodes effected; <10% of dial traffic disrupted; severe service degradation). *Example:* <30% of modems at any one CO are not responding. | 1 hour | 4 hours |
| 3 | Minor outage (single user outage; capacity degradation; redundant device down; management access outage). *Examples:* No response from maintenance ports on a NAS server; single point of failure piece of hardware outputting minor alarms | 2 hours | Next business day |
| 2 | Important event (condition being monitored; resolved awaiting parts). *Examples:* Non-service affecting problem on a NAS server; request for call back on non-service affecting issues. | 4 hours | Second business day |
| 1 | Informational event (requests for documentation). | Next business day | Second business day |

3.  *Installation Objective.* Vendor shall install all new COBRA Ports within forty-five (45) days after receipt of a Firm Order from WorldCom (unless the parties agree upon an alternative installation timeline during the Service Order process specified in Subparts C(2)-(3) above). Vendor immediately shall provide written notice to WorldCom in the event that Vendor determines after beginning the COBRA Port installation process that Vendor will not be able to meet this installation objective (or such alternative installation timeline agreed upon by the parties during the Service Order process specified in Subparts C(2)-(3) above). Upon receipt of such notice from Vendor, WorldCom may cancel the ordered COBRA Ports without liability for any termination charges.

4.  *PRI Service Objective.* Except where such facilities are unavailable within a reasonable time frame to meet WorldCom's deployment plans, Vendor shall deploy the COBRA Services via PRI ISDN facilities.

5.  *Operations Reviews & Chronic Failures.* Each calendar quarter the parties shall conduct an operations review at which time Vendor shall present analyses of its performance against the foregoing SLA provisions. Vendor shall identify the total number of all Grade 5 and Grade 4 failures in a given month ("Total Monthly Failures"), as well as the total number of times that Vendor did not meet a Grade 5 or Grade 4 response or repair time during such month ("R/R Failures"). If the number of R/R Failures exceeds ten-percent (10%) of the number of Total Monthly Failures, both parties agree to: (a) within seven (7) days after the operations review, meet to determine the nature and source of such performance deficiencies and to develop mutually agreeable remedies and timelines to improve performance; and (b) escalate the identified deficiencies to Vendor's senior management for enhanced performance oversight. In the event that Vendor's R/R Failures affect more than 5,000 active COBRA Ports during two (2) successive calendar quarters after the beginning of the seventh (7th) month following the Schedule Effective Date, WorldCom may terminate the affected COBRA Ports without liability for any termination

S 326

charges. Any COBRA Ports cancelled by WorldCom pursuant to the foregoing provision shall reduce by an equal amount the First and Second Commitments specified in Subpart I(1) below.

6. _Escalation Matrix._ Vendor agrees to provide WorldCom with an operations and senior management escalation matrix, and to update and maintain such matrix on a current basis for the Service Term of this Schedule. Such matrix shall include email addresses and telephone access numbers for operations and senior management points of contact who are available and authorized to address and resolve Vendor performance issues on a 24x7x365 basis.

H.  Service Performance Reports. The below-listed information (which may be amended from time to time by written agreement of the parties) shall be recorded by Vendor for use by WorldCom in tracking maintenance and other Vendor performance issues. Vendor shall furnish to WorldCom a copy of the trouble log for the PRI Services at the quarterly operations review. Vendor shall maintain one entry per trouble ticket opened.

- WorldCom Ticket #
- Vendor Ticket #
- Vendor Opened Date & Time
- Name and telephone # of the person initiating the trouble report
- Name and telephone # of the person receiving the trouble report
- Nature of the reported trouble
- Diagnosis of trouble; reason for outage (circuit, equipment, other, or no RFO)
- Name and telephone # of the person reporting trouble clearance
- Name and telephone # of the person receiving trouble clearance
- Vendor Restored Date & Time
- Total Time to Repair
- Total Time of Outage
- Vendor Closed Date & Time

I.  Minimum Purchase Commitments.

1. _Minimum Port Commitment._

   a.  From July 1, 2001 through December 31, 2004, WorldCom agrees to pay for a minimum of 300,000 COBRA Ports each month ("First Commitment"). The following port categories are included in the satisfaction of this commitment: active DAN COBRA Ports, DAN COBRA Ports pending activation or egress, DAN COBRA Ports that are "on hold" or "banked", unconverted ANS Ports (ports provided through a UAS architecture under the ANS Port Schedule), ANS Ports that have been converted to COBRA or Virtual COBRA, and ports that are in the process of being moved.

   b.  From January 1, 2005 through August 31, 2007, WorldCom agrees to pay for a minimum of 150,000 COBRA Ports each month ("Second Commitment"). The following port categories are included in the satisfaction of this commitment: active DAN COBRA Ports, DAN COBRA Ports pending activation or egress, DAN COBRA Ports that are "on hold" or "banked", unconverted ANS Ports (ports provided through a UAS architecture under the ANS Port Schedule), ANS Ports that have been converted to COBRA or Virtual COBRA, and ports that are in the process of being moved.

   c.  Beginning on January 1, 2005, WorldCom may deactivate any COBRA Ports and/or ANS Ports in excess of the Second Commitment without application of any termination liability or other charges. WorldCom will give Qwest thirty (30) days advance written notice of any such deactivations, e.g., WorldCom may provide notice of deactivations on December 1, 2004 for ports to be deactivated on January 1, 2005. WorldCom shall designate in writing which COBRA Ports shall be deactivated and a commercially reasonable timeline (not to exceed six (6) months) within which to implement such deactivations. The rates set forth herein shall apply to any active COBRA Ports during such transition period. In the event that WorldCom desires to continue COBRA Ports in excess of the Second Commitment after such six (6) month transition period expires, the parties shall negotiate in good faith a new pricing schedule for such excess ports.

d.    Beginning on September 1, 2007, WorldCom may deactivate any or all COBRA Ports and/or ANS Ports. WorldCom will give Qwest thirty (30) days advance written notice of any such deactivations, e.g., WorldCom may provide notice of deactivations on August 1, 2007, for ports to be deactivated on September 1, 2007. WorldCom shall designate in writing which COBRA Ports shall be deactivated and a commercially reasonable timeline (not to exceed six (6) months) within which to implement such deactivations. The rates set forth herein shall apply to any active COBRA Ports during such transition period. In the event that WorldCom desires to continue COBRA Ports after such six (6) month transition period expires, the parties shall negotiate in good faith a new pricing schedule for such ports.

2.    For any COBRA Port located in a rotary that has been active for at least six (6) months, WorldCom may have Vendor move such COBRA Port to another Available Vendor CO for a reasonable time and materials charge related to such move (set forth in Exhibit 5). Each COBRA Port moved pursuant to this Subpart I(2) shall continue to count towards WorldCom's satisfaction of any applicable Minimum Port Commitment set forth in Subpart 1 above.

3.    In the event that Vendor ceases to offer COBRA Service (including without limitation ANS Ports) through transfer of ownership of the Qwest CO to a non-Qwest entity, Vendor shall request the new owner to continue to provide service equivalent to the COBRA Service (including without limitation Back-hauled UAS service) at such CO, and shall, if the new owner agrees to continue the service, use commercially reasonable efforts to facilitate a smooth transition of the COBRA Service to the new provider. Notwithstanding the foregoing, with respect to any existing COBRA Ports deployed in such Vendor COs ("Sold Ports"), WorldCom shall have the right (and reasonable opportunity following written notice from Vendor) to terminate such Sold Ports prior to their transfer to the new provider without the application of any early termination fees or other charges. Before exercising its right to terminate, WorldCom will discuss its legitimate business and/or technical reasons for doing so with Vendor, provided that this sentence shall impose no obligation or restriction on WorldCom's exercise of its right to terminate, which it may do at its sole discretion for any reason or no reason. In addition, and regardless of whether WorldCom terminates such Sold Ports, the First and Second Commitments set forth above shall be reduced by the number of such Sold Ports.

4.    If WorldCom elects to convert ANS Ports to ANS COBRA, then Vendor agrees to purchase from WorldCom the 3Com NAS equipment at the COBRA prices specified in Exhibit 4 to this Schedule. Other terms and conditions of such purchase will be set forth in a separate agreement between the parties, which shall be negotiated in good faith during the thirty (30) days following the Schedule Effective Date. The parties further agree to negotiate in good faith other purchases by Vendor of additional spare parts, EF&I services, and/or maintenance/support services; provided that Vendor shall not be obligated to make such purchases from WorldCom.

5.    With respect to spare parts for ANS Virtual COBRA ports (if any), WorldCom will provide Qwest with WorldCom-owned spare parts in advance, in accordance with a reasonable, mutually agreed-upon sparing solution. As needed, Qwest may use these spare parts to replace original parts for ANS Virtual COBRA ports, and upon such use title to such spare parts shall pass to Qwest. Such transfer of title and Qwest's use of the spare part shall occur on an even exchange basis for no charge; provided that Qwest notifies WorldCom of such use and promptly ships the original part to WorldCom. In the event the original part is not received by WorldCom within fifteen (15) business days from the date the spare part is first used by Qwest, Qwest shall reimburse WorldCom for the list price of the spare part used. Upon receipt, title to the original part shall transfer to WorldCom. This Subpart I(5) shall apply only with respect to spares for parts listed on Exhibit 4. Vendor shall be responsible for purchasing from third parties all ancillary NAS-related spare equipment (e.g., cabinets, cabling, DSX panels, etc.).

J.    Applicable Tariffs.

1.    Vendor's General Exchange and applicable Tariffs shall apply as appropriate. Vendor represents that such General Exchange and applicable Tariffs are not materially inconsistent with the terms and conditions of this Schedule or the Agreement.

2.    In the event that Vendor is required to make any tariff filings for the COBRA Services provided under this Schedule, Vendor agrees to provide WorldCom with a draft of such tariff filing for WorldCom's review and comment prior to such filing. Vendor agrees to afford WorldCom a reasonable period of time to conduct

such review (but no less than ten (10) days), and to incorporate or otherwise address any reasonable modifications requested in writing by WorldCom into such tariff filing. Should any tariff filing made by Vendor (or tariff approved by the applicable governing body, to the extent that such approved tariff differs from Vendor's submittal) with respect to the COBRA Services be materially inconsistent with or contrary to the terms and conditions of the Agreement or this Schedule, WorldCom may, at its option, terminate the affected COBRA Services without any termination charges or other liability by providing Vendor with written notice specifying a transition period (ending between one (1) and six (6) months from the date of WorldCom's termination notice), which shall be conducted pursuant to Section 2.3 of the Agreement. Such option to terminate must be exercised by WorldCom within thirty (30) days after tariff approval by the applicable governing body.

K.  Applicable Service Term and Early Termination Liabilities.

1.  This Schedule shall remain in effect until the expiration of the Second Commitment set forth in Subpart I above and the deactivation or transition of the COBRA Ports during the subsequent six (6) month transition period.

2.  [Reserved]

3.  Except as otherwise provided in the Agreement or this Schedule (including without limitation the deactivations and moves conducted pursuant to Subpart I above), if WorldCom cancels a given COBRA Port prior to the expiration of the First Commitment, or if WorldCom cancels a given COBRA Port retained by WorldCom to meet the Second Commitment prior to the expiration of the Second Commitment, WorldCom shall pay an early termination charge for such COBRA Port equal to the number of months remaining until the expiration of its Port Term, times the applicable Monthly Fee set forth in Subpart D(1), times the applicable termination percentage(s) based upon the number of months that such COBRA Port was in service (based on the COBRA Port installation or billing start date, whichever is earlier) in accordance with the following table:

| Months in Service | Termination Percentage |
|---|---|
| 0 – 36 | 100% |
| 37 – 60 | 75% |
| 61 – 84 | 50% |
| 84 + | 0% |

4.  Any COBRA Port and any ANS Port that WorldCom cancels and for which it pays a termination charge (as set forth in Subpart K(3) above or in the Uniform Access Services Schedule, as applicable) shall continue to count towards WorldCom's satisfaction of the First and Second Commitments set forth in Subpart I above.

5.  In the event that WorldCom cancels any Firm Order prior to activation, WorldCom shall reimburse Vendor for its costs (incurred through the date of termination) that relate to such terminated Firm Order, including but not limited to restocking charges and reasonable time and materials charges.

6.  WorldCom shall pay Vendor $75,100,000 for termination liability charges related to 150,000 ports associated with WorldCom's DAN COBRA Ports, ANS Ports and ANS COBRA and Virtual COBRA Ports. WorldCom shall pay Vendor $75,100,000 in two tranches, the first tranche, in the amount of $19 million, shall be due and payable on or before July 3, 2001, and the second tranche, in the amount of $56,100,000 million, shall be due and payable on or before June 30, 2002.

L.  Migration of Legacy FPN Capacity.

1.  WorldCom may elect to migrate ANS Ports to the COBRA architecture in accordance with one of the three following options:

a.  COBRA ($24/port): Vendor shall purchase from WorldCom the 3Com NAS equipment specified in Exhibit 4 at the COBRA prices specified therein. Vendor shall be responsible for purchasing from