third parties all ancillary NAS-related equipment and services (e.g., cabinets, cabling, DSX panels, rack/stack services, etc.).

    b.    Virtual COBRA ($22/port): Vendor shall purchase from WorldCom the 3Com NAS equipment specified in Exhibit 4 for $1 per major part or component. Vendor shall be responsible for purchasing from third parties all ancillary NAS-related equipment and services (e.g., cabinets, cabling, DSX panels, rack/stack services, etc.). In no event is Vendor authorized to purchase NAS Equipment at such $1 rates for any purpose other than to provide an additional COBRA Port to WorldCom in connection with this Schedule. Upon the expiration, termination, or cancellation of Virtual COBRA ports as provided in this Schedule, WorldCom shall have the right to repurchase the NAS Equipment sold to Vendor for $0.50 per major part or component.

    c.    Virtual COBRA ($17.50/port): Same as the Virtual COBRA ($22/port) option; provided that (i) WorldCom pays Vendor a one-time fee of $3.2 million ("Buy-Down Fee") upon making such election; and (ii) such option is limited to 15,000 ANS Ports to be converted at this reduced rate.

2.    The parties acknowledge that the migration of the ANS Ports provided by Vendor and/or its affiliates to WorldCom under the ANS Port Schedule in connection with the FPN may require the installation of certain equipment and facilities. Contingent upon the availability of such equipment and facilities, the migration of the ANS Ports to the COBRA Services shall follow a commercially reasonable, mutually agreed-upon migration schedule. Successful migration of any portion of such ANS Ports shall be deemed to have occurred when the replacement COBRA Services are provided to and accepted by WorldCom pursuant to Subpart E above. Vendor agrees that, to the fullest extent possible, all existing telephone numbers shall be preserved in the migration to the COBRA Services; provided that Vendor shall provide WorldCom with at least thirty (30) days prior written notice in the event that Vendor is unable to preserve an existing telephone number in connection with such migration to the COBRA Services.

3.    Vendor agrees that any termination charges associated with Vendor's or its affiliates' services that result from the migration of the ANS Ports to the COBRA Services either shall be waived by Vendor or its affiliates, or (if paid by WorldCom) shall be credited against Vendor's invoices for the COBRA Services. Upon conversion, the converted ANS Ports shall be deemed to be COBRA Ports for purposes of this Schedule.

Counterparts. This Schedule may be executed in several counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same instrument.

N.    Prior Agreement. This Schedule (along with the Agreement and any exhibits hereto) shall supersede the following prior agreements: (i) COBRA Service Schedule between UUNET Technologies, Inc. ("UUNET") and Vendor, dated August 28, 2000; and (ii) the agreement between UUNET and U S WEST Communications, Inc. (a predecessor entity to Vendor) for remote dial access services, entitled U S WEST Network Services Agreement General Terms and Conditions for Signaling System 7 Gateway Service / Central Office-Based Remote Access Service, dated December 30, 1998 (CDS-980819-0115) ("Prior COBRA Agreement").

IN WITNESS WHEREOF, the parties have caused this Schedule to be executed by their respective authorized representatives.

MCI WORLDCOM NETWORK SERVICES, INC.

By: _____

Printed Name: SCOTT SULLIVAN

Title: CHIEF FINANCIAL OFFICER

Date: 6/29/01

QWEST CORPORATION

By: _____

Printed Name: AFSHIN MOHEBBI

Title: PRES. & C.O.O.

Date: 6/29/01

DOJ - 00045
CONFIDENTIAL

S 330

ORIGINAL     COPY

Master CSA Number GA00-5399-00
FINAL - 9/24/00

# MASTER CONTRACT SERVICES ARRANGEMENT
# FOR RAS SERVICE

This Master Contract Services Arrangement for RAS Service ("Agreement") is entered into by and between BellSouth Telecommunications, Inc. ("BellSouth"), a Georgia corporation, and UUNET Technologies, Inc. ("UUNET", "Customer", or "Subscriber") and is entered into pursuant to Tariff Section A5 of the General Subscriber Services Tariff. This Agreement is based upon the following terms and conditions as well as those in Attachment 1 and any Order Attachment(s) affixed (collectively, "Attachments") and the appropriate lawfully filed and approved tariffs, which are by this reference incorporated herein.

BellSouth and Customer hereby agree as follows:

1.    Subscriber requests and BellSouth agrees, subject to the terms and conditions herein, to provide the Remote Access Service ("RAS" or "RAS Service") described in Attachment 1 and the Order Attachments (collectively, "Attachments") at the monthly and non-recurring rates, charges, and conditions as described in such Attachments. The rates, charges, and conditions described in Attachments are binding upon BellSouth and Subscriber for the duration of this Agreement. For the purposes of the effectiveness of the terms and conditions contained herein, this Agreement shall become effective upon execution by the second party ("Effective Date").

1.1    Customer will be invoiced monthly for usage of the RAS Service. Payment must be received by BellSouth within forty-five (45) days after the date of the invoice. Customer will pay or reimburse BellSouth for any and all sales and use taxes, duties, or levies imposed by any authority, government, or government agency (other than taxes levied on BellSouth's net income, gross receipts, or franchise taxes) in connection with Customer's usage of the RAS Service and invoiced by BellSouth. If any payment due hereunder is not made within sixty (60) days after the invoice date, late charges at the standard rates imposed by BellSouth for other delinquent charges, including interest, as set forth in BellSouth's tariffs and Commission rules for such charges, shall be due and payable with respect to such payment.

1.2    All invoices for RAS Service shall be sent to: UUNET Technologies, Inc., Attention: Accounts Payable, 22001 Loudoun County Parkway, Building E-1, Ashburn, VA 20147. UUNET shall have the right to dispute any charge included in a BellSouth invoice; provided that all such disputes shall be brought in good faith with a bona fide basis in fact. In the event of any such dispute, the portion of the invoice that is undisputed shall be paid by UUNET as provided herein. UUNET shall have the right to withhold payment of any disputed amount until the dispute is resolved; provided that UUNET gives notice of such withheld amount to BellSouth and the factual basis for the dispute at the time payment is withheld. Notwithstanding any contrary provision of this Agreement, UUNET's failure to pay any invoice or portion thereof as a result of an unresolved, good faith dispute shall not be considered a breach of this Agreement.

1.3    So long as Customer is not in default hereunder, Customer may request and BellSouth may agree to add additional items of equipment or other expansions of Customer's Network to any existing orders for the RAS Service. Customer may from time to time request additional services from BellSouth in connection with the activities described in an applicable order. All changes to the scope of the RAS Service to be performed by BellSouth hereunder must be requested in writing and require mutual agreement. Evaluation and/or implementation of requested changes may result in an adjustment to the costs or schedule for delivery of the RAS Service or other terms of the order. Changes to the scope of the RAS Service will be incorporated into this Agreement through written amendment, which may be subject to filing with and/or approval by appropriate regulatory authorities.

2.    The RAS Service may include transport components which are incorporated by BellSouth and sold to Customer as part of the RAS Service, as will be reflected in the Attachments. Customer may, in addition, purchase other tariffed transport services to connect to the RAS Service (e.g., egress circuits) from BellSouth's regulated telephone operations, in which event such regulated transport network services purchased by Customer shall be provided pursuant to applicable tariffs (and/or other written agreements between the parties, as applicable) and are not part of the RAS Service nor subject to these Terms. Subscriber agrees to be responsible for all rates, charges, and conditions for such other separately-purchased tariffed services.

DOJ - 00052
CONFIDENTIAL

1
PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

S 331

Master CSA Number GA00-5399-00
FINAL - 9/24/00

3.    This Agreement is subject to and controlled by the provisions of BellSouth's or any of its affiliated companies' lawfully filed and approved tariffs, including but not limited to Section A2 of the General Subscriber Services Tariff, No. 2 of the Federal Communications Commission Tariff and the Private Line Services Tariff and all such revisions to said tariffs as may be made from time to time. Except for the rates and charges in the Attachments, the tariffs shall supersede any conflicting provisions of this Agreement. Notwithstanding the prior sentence or any other provision of this Agreement to the contrary, BellSouth agrees that in the event BellSouth attempts to enforce any existing or future tariff provision that is materially inconsistent with the terms, conditions, and/or pricing of this Agreement or the Attachments and that adversely affects UUNET's use of the RAS Service (including without limitation any adverse changes to the rates, charges, and/or other pricing terms set forth in the Attachments), the Parties shall discuss such effects on UUNET and negotiate in good faith a mutually agreeable resolution. During such discussion period, BellSouth agrees to defer the implementation of such inconsistent tariff provision. If the Parties are unable to reach a mutual agreement after ninety (90) days of negotiation (or such other period of time agreed upon by both parties in writing), UUNET shall be entitled to terminate this Agreement and the RAS Service to the extent of the material inconsistency with only the liability to buy back all affected 3Com NAS equipment as specified under Section II(K)(3) of Attachment No. 1. During the thirty (30) day negotiation period, the conclusion of such negotiation period, a transition schedule will be provided by UUNET with a termination date not to exceed ninety (90) days from the date of the termination notice.

4.    The rates, charges, and conditions described in the Attachments are based upon certain volume and service-related commitments made by Customer to Company, which are set forth with specificity in Attachment 1, along with Customer's obligations with respect to not meeting such commitments.

5.    Early Termination Charges.

    (a)    If Customer cancels or terminates without cause a service that is the subject of a Firm Order made pursuant to the Attachments at any time prior to the completed installation or expiration of the service period set forth in the appropriate Attachments, but after the execution of such Firm Order, Customer shall be responsible for the resulting termination charges specified in the Attachments, unless Customer meets the requirements of Section II(H)(4) of Attachment No. 1 and the canceled RAS Port can be treated as a Move for which Customer shall pay Move charges as defined in the Attachments.

    (b)    Customer further acknowledges that it has options for its telecommunication services from service providers other than BellSouth, and that it has chosen BellSouth to provide the services specified in the Attachments. Customer, therefore, agrees that in the event it terminates without cause any service that is the subject of a Firm Order made pursuant to the Attachments under this Agreement, Customer will be responsible for termination charges set forth in the Attachments. Customer, however, will not be responsible for termination charges if a certified reseller of BellSouth local service, which is not an affiliate of Customer, resells this Agreement to Customer and such reseller executes a written document agreeing to assume all of Customer's obligations to BellSouth under this Agreement. Subscriber, however, agrees that in the event it fails to meet its obligations under this Agreement or terminates this Agreement or services purchased pursuant to this Agreement (except where expressly authorized in this Agreement and/or Attachments) in order to obtain services from a facilities-based service provider or a service provider that utilizes unbundled network elements, Subscriber will be billed, as appropriate, termination charges as specified in the Attachments.

6.    This Agreement may be subject to appropriate regulatory approval prior to commencement of installation. In the event such regulatory approval is denied or such approval is predicated on material deviations from the RAS Service and/or pricing, terms, and/or conditions specified in this Agreement and/or Attachments, this Agreement shall be null and void, and shall be of no effect.

7.    This Agreement shall be governed by and construed in accordance with the laws of each state where the service is provided, unless otherwise provided herein or in the applicable tariff.

8.    BellSouth shall provide the RAS Service in accordance with the same first class standards applied by BellSouth to its similar projects for its affiliated companies and other clients, in a good faith effort to support Customer in developing, implementing and/or managing Customer's network or its other intended system(s), network designs or other projects or services as described in applicable orders.

DOJ - 00053
CONFIDENTIAL

2

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

S 332

9.      BellSouth agrees to the following responsibilities (subject to the limitations set forth in this Agreement):

(a)      BellSouth will operate the RAS Service in accordance with its standard policies and procedures and will make the RAS Service available to Customer as described in these Terms.

(b)      BellSouth will notify Customer in writing at least ninety (90) days in advance of any changes in BellSouth's policies in the operation of the RAS Service which are reasonably expected to materially affect Customer's use thereof. The discussion/resolution process set forth in Section 3 above also shall apply with respect to any such changes in BellSouth's policies.

(c)      BellSouth warrants that the RAS Service to be supplied hereunder will be performed by qualified professional personnel in accordance with industry standards and that the RAS Service will be in compliance with this Agreement and the Attachments.

10.      NEITHER BELLSOUTH NOR CUSTOMER SHALL HAVE ANY LIABILITY FOR INCIDENTAL, CONSEQUENTIAL, INDIRECT OR SPECIAL DAMAGES IN CONNECTION WITH THIS AGREEMENT, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. EACH PARTY EXPRESSLY AGREES THAT EXCEPT WITH RESPECT TO LIABILITY UNDER SECTIONS 5, 12 AND 19 OF THESE TERMS, UNDER NO CIRCUMSTANCES SHALL EITHER PARTY'S TOTAL LIABILITY TO THE OTHER IN CONNECTION WITH THIS AGREEMENT EXCEED TWO (2) TIMES THE AMOUNT OF CHARGES PAID BY CUSTOMER FOR USE OF THE RAS SERVICE DURING THE TWELVE (12) MONTH PERIOD PRECEDING THE DATE THE CLAIM WAS FIRST MADE IN WRITING.

11.      BellSouth agrees to maintain, at its expense, during the entire time this Agreement is in effect the following levels of insurance. The Parties agree that BellSouth may elect to self-insure against all or some of the risks associated with the scope of work contained in this Agreement if it can provide sufficient evidence of its ability to do so.

(a)      Commercial General Liability Insurance in an amount not less than two million dollars ($2,000,000) per occurrence for bodily injury or property damage;

(b)      Employer's Liability Insurance in an amount not less than one million dollars ($1,000,000) per occurrence;

(c)      Workers' Compensation Insurance in an amount not less than that prescribed by statutory limits;

(d)      Commercial Automobile Liability Insurance applicable to bodily injury and property damage, covering owned, non-owned, leased and hired vehicles, in an amount not less than $1,000,000 per accident;

(e)      Umbrella or Excess Liability Insurance with a combined single limit of no less than $1,000,000 to apply over Commercial General Liability, Employee's Liability, and Commercial Automobile Liability Insurance.

12.      Indemnification.

(a)      If promptly notified in writing of any action brought against Customer based on a claim that the RAS Service infringes a patent, copyright, trade secret, trademark, or other intellectual property right, BellSouth will defend that action at its expense and will pay any and all fees, costs or damages that Customer may incur (provided that Customer shall permit BellSouth to control the defense of such action and shall not make any compromise, admission of liability or settlement of such claim without BellSouth's prior written approval). If a final injunction is obtained against Customer prohibiting usage of the RAS Service by reason of infringement of a patent, copyright, trade secret, trademark, or other intellectual property right, BellSouth will, at its option, either: (1) at its expense procure the right for Customer to continue using the RAS Service or (2) replace the RAS Service with a comparable service at a price equal to the prices set forth in this Agreement and applicable Attachments.

DOJ - 00054
CONFIDENTIAL

---

3
PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
IUNET/BELL SOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT

S 333

Master CSA Number GA00-5399-00
FINAL - 9/24/00

(b)     Customer will indemnify and save harmless BellSouth from and against all loss, liability, damage, and expense, including all reasonable counsel fees that BellSouth may incur, due to claims for infringement of patents, copyright, trade secret, trademark, or other intellectual property rights, arising from Customer's use in connection with the RAS Service of equipment, software or information not provided by BellSouth, provided that BellSouth shall permit Customer to control the defense of such claim and shall not make any compromise, admission of liability or settlement of such claim without Customer's prior written approval.

13.     Force Majeure.

Neither party shall be responsible for any delay or failure in delivery or performance of any of its duties hereunder due to acts of God, acts or omissions of any regulated telephone network not under its control or any other occurrence commonly known as force majeure, including war, riots, embargoes, strikes, or other concerted acts of workers (whether of BellSouth or others), casualties or accidents. Either party may cancel or delay performance hereunder for so long as such performance is delayed by such occurrence or occurrences provided that if any such delay shall continue for more than thirty (30) days either party may terminate this Agreement or the affected RAS Service upon ten (10) days' written notice.

14.     Termination and Default.

(a)     BellSouth may, at its sole discretion, terminate this Agreement or suspend any pending Firm Order and discontinue Customer's access to and use of the RAS Service, if: (i) Customer fails to pay any amount within thirty (30) days after written notice provided pursuant to Section 16 below that the same is delinquent; or (ii) Customer breaches any of the terms, conditions, obligations, or representations contained in these Terms and fails to cure such breach within thirty (30) days after receiving written notice of such breach (or if such breach is not susceptible of cure within thirty (30) days, Customer has not initiated steps to, and is not diligently attempting to cure), or (iii) Customer becomes the subject of a voluntary or involuntary bankruptcy, insolvency, reorganization, or liquidation proceeding, makes an assignment for the benefit of creditors, or admits in writing its inability to pay debts when due.

(b)     If BellSouth changes any aspects of the RAS Service so as to materially adversely affect Customer's ability to utilize the RAS Service, or breaches any of these Terms and fails to cure such breach within thirty (30) days after written notice of such breach (or if such breach is not susceptible of cure within thirty (30) days, BellSouth has not initiated steps to, and is not diligently attempting to cure), Customer may terminate its RAS Service by written notice to BellSouth (which notice shall specify a transition schedule and termination date not to exceed ninety (90) days from the date of the termination notice), without obligation for any early termination charges otherwise payable hereunder.

15.     Use of Materials, Marks and Information.

(a)     The BellSouth company names and logos and all related product and service names, design marks and slogans are the property of BellSouth or its affiliates. Customer is not authorized to and shall not use any BellSouth name or mark in any advertising, publicity or in any other commercial manner without the prior written consent of BellSouth.

(b)     BellSouth may not use the name, logo or any other trademarks or service marks of Customer or any of its affiliated companies in any advertising, signage, marketing materials, brochures or any other materials in any medium without Customer's express advance written permission. Such prior written consent shall be required from both: (a) a Vice President or more senior officer of UUNET; and (b) an authorized representative of UUNET's media relations department. Any such permitted use shall be only within guidelines provided by Customer.

(c)     Except to the extent required by an individual state Public Utility Commission (PUC) or Public Service Commission (PSC), the existence and terms of this Agreement shall be held confidential by each party, as shall each party's confidential or proprietary information ("Confidential Information"). Neither party shall disclose the other party's Confidential Information to third parties without the other party's written consent, except as permitted pursuant to this Section. Each party shall disseminate the other party's Confidential Information among its Affiliates and employees only on a need-to-know basis and shall use such Confidential Information only for the purpose of performing its obligations hereunder. To the extent a party is required by applicable law, regulation, or a government agency or court order, subpoena, or investigative demand, to disclose the existence or terms of this Agreement or the other party's Confidential Information,

4

DOJ - 00055
CONFIDENTIAL

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT

S 334

Master CSA Number GA00-5399-00
FINAL - 9/24/00

such party shall use its reasonable efforts to minimize such disclosure and obtain an assurance that the recipient shall accord confidential treatment to such Confidential Information, and shall notify the other party contemporaneously of such disclosure.

16.    Except as otherwise provided in this Agreement, notices required to be given pursuant to this Agreement shall be effective when received, and shall be sufficient if given in writing, hand delivered or deposited in United States mail, postage prepaid, addressed to the appropriate party at the address set forth below.  Either party hereto may change the name and address to whom all notices or other documents required under this Agreement must be sent at any time by giving written notice to the other party:

| BellSouth | Customer |
|---|---|
| BellSouth Telecommunications, Inc. | UUNET Technologies, Inc. |
| Vice President-Sales | 3060 Williams Drive |
| 1 800 Century Blvd.; Suite 400 | Fairfax, VA 22031 |
| Atlanta, GA 30345 | (Attention: Sr. Director, Global Capacity Acquisition) |
| (Attention: Brian Singleton) | |

| With a copy to: | With a copy to: |
|---|---|
| BellSouth Business Systems, Inc. | UUNET Technologies, Inc. |
| 1 800 Century Blvd.; Suite 170 | 22001 Loudoun County Parkway |
| Atlanta, GA 30345 | Ashburn, VA 20147 |
| (Attention: General Counsel) | (Attention: General Counsel) |

17.    Customer may permit its customers or other authorized users to utilize the RAS Service as part of business operations or services provided by Customer, subject to the terms and conditions of this Agreement.  However, except as in Section 5(b), Customer's RAS Service and rights and obligations under this Agreement may not be assigned or transferred by Customer without the prior written consent of BellSouth, which shall not be unreasonably conditioned, delayed or withheld; provided, that Customer may assign the RAS Service and its rights and obligations under this Agreement to any affiliate, except to an affiliate that is a competitive local exchange carrier ("CLEC"), upon notice to BellSouth.  Except as otherwise provided herein, any attempt by Customer to assign or transfer any of the rights, duties, or obligations of Customer with respect to the RAS Service without BellSouth's written consent shall be void, and no assignment or transfer shall release Customer from any of its obligations with respect to the RAS Service.  BellSouth may assign, delegate or otherwise transfer its rights or obligations hereunder, in whole or in part, at any time, but no such assignment shall release BellSouth from ultimate responsibility for the RAS Service hereunder.  The direct resale of the RAS Service by Customer or its assignee is prohibited under this Agreement; provided, however, that UUNET is not prohibited from combining the RAS Service with other service components (e.g., egress capacity, IP transport, dial network management, etc.) to create a value-added product for UUNET's customers and their end users.  It is the intent of both Parties that a CLEC affiliate of UUNET may not directly purchase RAS Service under this Agreement and resell it to UUNET or other enhanced service providers; provided that UUNET may provide value-added dial access services to its CLEC affiliates and their end users which utilize the RAS Service as one service component of UUNET's value-added product.

18.    In the event that one or more of the provisions contained in this Agreement or incorporated within by reference shall be invalid, illegal or unenforceable in any respect under any applicable statute, regulatory requirement or rule of law, then such provisions shall be considered inoperative to the extent of such invalidity, illegality or unenforceability and the remainder of this Agreement shall continue in full force and effect.

19.    In the course of performance of its obligations under this Agreement, BellSouth agrees to comply with all applicable federal, state and municipal laws and ordinances, and all rules and regulations thereunder.  BellSouth agrees to indemnify and hold Customer harmless from any loss, damage, cost or expense (including attorney fees) arising from BellSouth's noncompliance.

DOJ - 00056
CONFIDENTIAL

---

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT

S 335

Master CSA Number GA00-5399-00
FINAL - 9/24/00

20.    UUNET may purchase the RAS Services pursuant to this Agreement for use (as part of UUNET's value-added dial access products) by UUNET's affiliates and their end users; provided that UUNET shall be the customer of record and responsible for any such purchases made on behalf of a UUNET affiliate. For purposes of this Agreement, a party's "affiliate" shall mean any company controlling, controlled by, or under common control with such party. This provision is not intended to, and does not, change the meaning and intent of Section 17 above as it relates to CLEC affiliates of UUNET, which section remains intact.

21.    Company agrees to offer Customer the same terms and conditions that it offers to similarly situated customers. The factors that will be used to determine whether a customer is similarly situated include but are not limited to quantity of service, billing, geographical location, mix of services, dial access equipment costs, and other competitive circumstances. Upon Customer's request but not more than once each calendar year, a BellSouth officer shall certify BellSouth's compliance with this Section.

22.    The relationship created by this Agreement is non-exclusive. UUNET shall be free to acquire services similar to the RAS Service from alternative sources without obligation to BellSouth.

23.    BellSouth's relationship to UUNET is that of an independent contractor. BellSouth's employees and subcontractors shall be deemed to be independent contractors, and not employees of UUNET, for the purposes of all applicable laws and regulations.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives on the dates set forth below.

Accepted by:

Subscriber:                                  Company:

UUNET Technologies, Inc.                     BellSouth Telecommunications, Inc.

By: _____                  By: _____
        Authorized Signature                         Authorized Signature

Printed Name: ___Kevin Boyne___              Printed Name: _R.A. Anderson_

Title: __Chief Operating Officer__           Title: _President_

Date: ___9/26/00___                          Date: _9-27-00_

                                             APPROVED AS TO FORM:

                                             MKb 9/27/00

DOJ - 00057
CONFIDENTIAL

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT

S 336

# ORIGINAL

Master CSA Number GA00-5399-00
FINAL – 9/25/00a

## ATTACHMENT NO. 1 TO
## MASTER CONTRACT SERVICE ARRANGEMENT NO. GA00-5399-00

This Attachment No. 1 ("Attachment") is entered into between UUNET Technologies, Inc. ("UUNET", "Customer", or "Subscriber") and BellSouth Telecommunications, Inc. ("BellSouth" or "Vendor"), along with the Master Contract Service Arrangement No. GA00-5399-00 and Order Attachments (collectively "Agreement"), for the sale and purchase of the herein described Remote Access Service ("RAS" or "RAS Service") at the rates and charges listed herein.

I.    Remote Access Service ("RAS") Using 3Com Dial Access Equipment.

    A.    UUNET Custom RAS Requirements

        (1)    The RAS Service shall provide integrated, remote analog and ISDN access to UUNET, its end users, and the end users of UUNET's affiliates (as provided for in the Agreement) and clients (collectively, "End Users") via modems referred to as network access servers ("NAS") deployed in central offices operated by BellSouth or its affiliates ("Vendor COs"). The RAS Service shall provide medium to high-speed data transport services for remote access to UUNET's Internet network. The RAS Service shall permit UUNET to receive calls from multiple analog modems and ISDN basic rate interface lines for handoff to separately purchased wide area network links. BellSouth shall connect each NAS used in connection with the RAS Service to the Public Switched Telephone Network ("PSTN") via ISDN primary rate interface ("PRI"), or other mutually agreed comparable telecommunications facilities. BellSouth shall arrange for the dedicated assignment (or preservation) of unique telephone numbers, when possible based on deployment of the NAS equipment and local number portability capabilities, for (or in use by) UUNET and its End Users.

        (2)    RAS Service includes equipment, telecommunications services and related facilities (including without limitation active PRI lines, 40 DID numbers per rotary, sequential circuit IDs (when possible), space, power, and other utilities), and ancillary support and maintenance as specified herein, that are required to connect a call that has been dialed into the PSTN (such call dialing a designated telephone number) to an active DS0 channel-equivalent port (i.e., PRI B-channel) on the corresponding NAS ("RAS Port"). For the 3Com dial access equipment ("3Com NAS") specified in Exhibit A attached hereto, the demarcation of the RAS Service between BellSouth and UUNET shall be at the connection of the egress port on the Cisco egress router to the egress circuit connecting the Cisco egress router to BellSouth's or its affiliate's wide area network and/or UUNET's network.

        (3)    BellSouth and/or its affiliates shall own all of the 3Com NAS (including the modem chassis, all related management equipment, the Ethernet switch, and the Cisco egress router) used in connection with the RAS Service that are located on BellSouth's side of the demarcation of the RAS Service.

        (4)    In providing RAS Service to UUNET, BellSouth agrees to use only NAS equipment in a specified configuration that is approved by UUNET in advance in writing. Exhibit A sets forth the specifications for the 3Com NAS that shall be used by BellSouth in connection with the RAS Service. UUNET acknowledges that there will be a minimum of at least one (1) 3Com NAS per LATA. Multiple NAS locations within a LATA may be required to preserve existing telephone numbers (if UUNET so desires such preservation) in cases where multiple PRI rotaries out of different PSTN switches exist within the local calling area of a given LATA (i.e., Atlanta), and in network design cases that warrant the deployment of 3COM NAS equipment within other central offices within the given LATA.

        (5)    [Reserved for Future Use.]

DOJ - 00058
CONFIDENTIAL

I
PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

(6)     Notwithstanding any contrary provision set forth in this Attachment or the Agreement, UUNET shall be exclusively responsible for the operational control (i.e., logical access) of all NAS equipment used in connection with the RAS Service.  UUNET shall be exclusively responsible for the purchase, installation, and management of all software upgrades for the NAS equipment.  UUNET agrees that BellSouth shall not be responsible for any failure by UUNET to properly operate the NAS equipment.

(7)     BellSouth shall have no responsibility for the authentication of End Users accessing RAS Ports. UUNET shall be exclusively responsible for controlling all End User access to RAS Ports.

(8)     BellSouth shall not implement any modifications or changes to UUNET's use of the RAS Service that would have a material impact on UUNET's RAS Service without affording UUNET a reasonable opportunity to object in writing prior to the implementation of such modifications or changes.  In the event of such an objection by UUNET, BellSouth agrees to defer the implementation of the objectionable modifications or changes while the parties confer and negotiate in good faith a mutually-agreeable resolution to UUNET's objection.

(9)     BellSouth agrees to provide UUNET with an operations and senior management escalation matrix, and to update and maintain such matrix on a current basis for the term of this Attachment.  Such matrix shall include email addresses and telephone access numbers for operations and senior management points of contact who are available and authorized to address and resolve BellSouth performance issues on a 24x7x365 basis.

(10)     Service outage credits may be claimed by UUNET when any RAS Port is interrupted or does not meet performance standards for any period lasting two (2) or more consecutive hours after UUNET's network operations center ("NOC") notifies BellSouth's NOC that a potential service outage exists.  No credit shall be available if the interruption is caused by (i) the failure of UUNET to properly operate the NAS equipment as set forth Section I(A)(6) above; (ii) the negligence or willful misconduct of UUNET; or (iii) an event of Force Majeure as provided in the Agreement.  The amount of the credit shall be equal to the applicable Monthly Fee for each affected RAS Port, pro-rated for the period from which BellSouth has been notified of the outage and during which a confirmed outage has occurred.  Outages shall be confirmed by a BellSouth employee authorized to make such determinations and will be calculated in ½-hour increments, or major fraction thereof, of the interruption.

(11)     BellSouth and/or its affiliates shall provide UUNET with 24x7x365 NOC-to-NOC technical support. BellSouth shall reasonably maintain all NAS equipment (along with all related equipment on BellSouth's side of the demarcation of the RAS Service) used in connection with the RAS Service. BellSouth shall assist UUNET in the resolution of any NAS equipment failure and BellSouth shall diligently respond to and repair any failure of the RAS Service, including without limitation the NAS equipment, but excluding software problems within the control of UUNET, based upon the grade of the failure, in accordance with the guidelines set forth below.

Service Outage Definitions

Service outages can be broken down into four classes according to level of severity.  The first (and most severe) class is that of Total Service Outage from any source.  Total service outage is defined to mean that there are no functioning access ports in that location.

The second class of service outage is that of Major Customer Impact.  Such an outage is defined to mean that an entire NAS has failed or that multiple PRIs or routing or overflow has failed.

The third class of service outage is a Minor Outage, which is a single failed component within one NAS that requires immediate dispatch.  The remainder of the NAS is in service providing a proportional number of available dial ports.  However, this problem cannot be resolved by "mapping out" the bad component and hence service is degraded for that location.

The fourth and least severe class of service outage is that of Scheduled Repair and is defined to occur whenever a component or some part of a component has failed and UUNET is able (through

DOJ - 00059
CONFIDENTIAL

2

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION.  MAY NOT BE USED OR DISCLOSED OUTSIDE THE UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

Master CSA Number GA00-5399-00
FINAL – 9/25/00a

the management interface) to isolate the component from the operation of the rest of the NAS, thus restoring all dial-up ports to service.

Service Response Intervals

The Service Response Interval for RAS is defined to be the time interval between the initiation of a call to BellSouth by UUNET requesting that repair services be provided and the time that repair has been initiated. For RAS equipment (3COM, etc.) repairs, initiation of repair activities is complete whenever a technician is on site and has placed a call to the UUNET NOC to coordinate repair activities. For PRI, initiation of repair activities is complete whenever a technician has entered the switch on a management channel and has begun taking actions to restore the PRI service.

For the RAS equipment, a different target service response interval will apply to each type of service outage.

- For Scheduled Repair of a RAS Hardware Element, a maintenance action will be scheduled with UUNET during the 4 - 7 am maintenance window of the next business day.

- For Minor Service Outages involving a RAS Hardware Element, maintenance actions will be carried out no later than the next business day.

- For Major Service Outages, the target Service Response Interval will be four hours.

- For Total System Failures, the target Service Response Interval will be two hours and will permit immediate escalation to a Service Manager, who will remain involved with the repair activities until service is restored.

For PRI service that is a part of RAS, the area operating standards will determine the response interval. This will be the same service interval that UUNET currently receives for their tariffed PRI service. The availability of a dedicated PRI test set (TPI 970 or equivalent) at the RAS bay should result in improved repair times for PRI troubles and will provide a definitive basis for resolving glare.

(12)   The below-listed minimum information shall be recorded by BellSouth for use by UUNET in tracking maintenance and other BellSouth performance issues. BellSouth shall furnish to UUNET a copy of individual trouble logs for the RAS Service upon the reasonable request by UUNET. Vendor shall maintain one entry per trouble ticket opened.

- UUNET Ticket #
- Vendor Ticket #
- Vendor Opened Date & Time
- Name and telephone # of the person initiating the trouble report
- Name and telephone # of the person receiving the trouble report
- Nature of the reported trouble
- Diagnosis of trouble; reason for outage (circuit, equipment, other, or no RFO)
- Name and telephone # of the person reporting trouble clearance
- Name and telephone # of the person receiving trouble clearance
- Vendor Restored Date & Time
- Total Time to Repair
- Total Time of Outage
- Vendor Closed Date & Time

DOJ - 00060
CONFIDENTIAL

3
PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

Master CSA Number GA00-5399-00
FINAL – 9/25/00a

(13)    BellSouth shall be responsible for maintaining sufficient PSTN network capacity as consistent with BellSouth PSTN design standards pertinent to the serving INTRAC network for each service location, not including unforeseeable spike loads on the PSTN network. (Based on such design standards, a given End User has a 1 in 100 probability of receiving a fast busy signal when calling into the PSTN.) In doing so, BellSouth shall:

(i)    proactively monitor and manage the INTRAC network to ensure that sufficient capacity exists for each service location;

(ii)   develop and provide to UUNET a summary monthly report and a detailed quarterly report regarding the utilization and sizing of the applicable INTRAC network capacity;

(iii)  respond to each service impacting event immediately after being notified by UUNET; and

(iv)   use best efforts and all necessary resources to correct any identified lack of PSTN network capacity pertinent to the serving INTRAC network.

Further, BellSouth shall treat any service-impacting failure to properly manage the INTRAC network capacity as a Major Service Outage, as that term is defined under Section I.A.(11) of this Attachment, and shall pay service credits to UUNET for such service impacting situations. Service outage credits shall be based on the number of ports determined by both parties to be inaccessible due to insufficient PSTN network capacity to support the UUNET RAS Service. Credit payments will be based on the terms set forth under Section I.A.(10) of this Attachment.

B.    Pricing

(1)    The following Service Rates for those RAS Ports utilizing 3Com dial access equipment shall be:

| Price Tier | # Active RAS Ports | Monthly Fee per Active RAS Port | |
|---|---|---|---|
| | | Embedded Base Ports | Growth Ports |
| AA | 1 – 50,000 | $ 30.00 | $ 23.00 |
| BB | 50,001 – 75,000 | $ 27.00 | $ 23.00 |
| CC | 75,001 – 100,000 | $ 24.00 | $ 22.00 |
| DD | 100,001 + | $ 22.00 | $ 22.00 |

(2)    Those RAS Ports that are migrated from existing ANS or GridNet PRI services sold by BellSouth to UUNET shall be deemed the Embedded Base Ports for purposes of the pricing schedule for RAS Ports set forth above.

(3)    Those RAS Ports that are ordered from BellSouth as RAS Service (i.e., not migrated from existing ANS or GridNet PRI services sold by BellSouth to UUNET) shall be deemed the Growth Ports for purposes of the pricing schedule for RAS Ports set forth above.

(4)    Those RAS Ports that are transitioned by UUNET from existing third party providers to the RAS Service ("Winback Ports") shall be deemed Growth Ports for purposes of the pricing schedule for RAS Ports set forth above.

(5)    BellSouth and the Customer acknowledge that the rates specified in this Attachment are based on the use of the 3Com NAS specified in Exhibit A. The pricing contained herein may be subject to change if the Customer chooses to use equipment other than such 3Com NAS for new RAS Ports or modifies the configuration set forth in Exhibit A. In the event that the Customer chooses to use other equipment,

DOJ - 00061
CONFIDENTIAL

4

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

S 340

Master CSA Number GA00-5399-00
FINAL – 9/25/00a

BellSouth and the Customer will negotiate in good faith the applicable change (if any) in the rates in this Attachment for each new RAS Port. Rate modifications resulting from equipment changes will not apply to existing RAS Ports. If BellSouth and the Customer are unable to reach agreement on the new rates used for RAS Service, BellSouth will continue to provide the Customer RAS Service using the 3Com NAS at the existing rates, terms, and conditions; however, BellSouth will have no obligation to provide the RAS Service to Customer using equipment other than the 3Com NAS.

(6)    Except pursuant to Section II(H) below, no non-recurring per-port charges shall apply with respect to the RAS Ports. To the extent that any applicable tariff includes non-recurring per-port charges, BellSouth agrees that such charges already have been factored into the monthly fee for the RAS Ports set forth below.

(7)    The prices set forth herein for the RAS Service include any applicable NAS egress port fees, but exclude any egress circuit charges. In the event that UUNET elects (in its sole discretion) not to obtain an egress circuit from BellSouth, BellSouth agrees to fully cooperate with UUNET and any third-party provider selected by UUNET to connect BellSouth's NAS or wide area network equipment to UUNET's network via an egress circuit provisioned by such third-party provider to BellSouth's central office or wide area network interconnection location. BellSouth shall be compensated by UUNET for any work associated with such third-party provider egress circuit interconnection to the extent that BellSouth is compensated by third parties at similar rates for similar work.

C.    Minimum Quantity Requirement

(1)    UUNET agrees to maintain a minimum of 100,001 active RAS Ports each month ("Minimum Quantity Requirement"), beginning on October 1, 2001, and ending on September 30, 2007 ("Minimum Commitment Period"). In the event that UUNET does not have at least 100,001 active RAS Ports during a given month during the Minimum Commitment Period, UUNET agrees to pay BellSouth for 100,001 RAS Ports at the Monthly Fee per Active RAS Port for Price Tier DD, in lieu of billing based upon the actual number of active RAS Ports in such month.

(2)    The Minimum Quantity Requirement set forth in Section I(C)(1) above shall not apply if the reason that less than 100,001 RAS Ports are active in a given month is due to reasons within the control of BellSouth, including any outsourced functions or BellSouth contracted services (except where such contractor is UUNET).

D.    PRI Under Existing BellSouth Contract

(1)    During the term for RAS Service, Customer may elect in writing to convert to the RAS Service all existing PRI, MegaLink and Channelized MegaLink Services that are purchased by Customer pursuant to an existing BellSouth term agreement or month-to-month agreement as defined under the Minimum Order Requirements, with no termination liability on the converted Service.

(2)    All PRI, MegaLink and Channelized MegaLink Services purchased pursuant to existing BellSouth term agreements or on a month-to-month basis that are converted to this Agreement and are used to provide RAS Service shall be subject to the terms and conditions of this Agreement and shall count toward the Minimum Quantity Requirement.

E.    Minimum Order Requirements

(1)    Within thirty (30) days after the Effective Date of this Agreement, UUNET shall provide BellSouth with a Firm Order (including service quantities by location) for a minimum of 25,000 RAS Ports that are Growth Ports.

DOJ - 00062
CONFIDENTIAL

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
_____ ___ _ SOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT

S 341

(2)    Within thirty (30) days after the Effective Date of this Agreement, the parties shall agree upon a migration implementation plan for the first 25,000 RAS Ports that are Embedded Base Ports; provided that such migration implementation plan shall be consistent with the Ready for Service milestones set forth in Section I(F)(1) below.

(3)    Within sixty (60) days after the Effective Date of this Agreement, the parties shall agree upon a migration implementation plan for the remaining RAS Ports (estimated to be 24,000) that are Embedded Base Ports; provided that such migration implementation plan shall be consistent with the Ready for Service milestones set forth in Section I(F)(1) below.

(4)    Within one-hundred twenty (120) days after the Effective Date of this Agreement, UUNET shall provide BellSouth with a Firm Order (including service quantities by location) for that number of new RAS Ports that is sufficient to bring the total number of ordered RAS Ports (both Embedded Base and Growth Ports) to at least 100,001 RAS Ports.

F.    Ready for Service Schedule

(1)    BellSouth agrees to migrate (Embedded Base Ports) and deploy (Growth Ports) those RAS Ports that are ordered by UUNET hereunder based on the following schedule:

| Ready for Service Date | Minimum No. of RAS Ports Activated & Ready for Service |
|---|---|
| December 31, 2000 | 10,001 |
| January 31, 2001 | 25,001 |
| February 28, 2001 | 40,001 |
| March 31, 2001 | 55,001 |
| April 30, 2001 | 70,001 |
| May 31, 2001 | 85,001 |
| June 30, 2001 | 100,001 |

(2)    If BellSouth fails to meet the above-listed ready-for-service milestones in any three (3) consecutive months, except where due to reasons of Force Majeure or where due to the fault of UUNET or the timely delivery of NAS equipment purchased through UUNET, then the Monthly Fee per Active RAS Port corresponding to the Minimum No. of RAS Ports Activated + Ready for Service for the third missed Ready for Service Date shall apply prospectively to all active RAS Ports, until such time that the next higher Price Tier is achieved or this Section I(F)(2) is triggered again.

(3)    After UUNET's receipt of written notice (including email) indicating that a given new RAS Port is ready for service, UUNET shall have up to forty-five (45) days to obtain all necessary egress capacity and to complete all end-to-end testing of such new RAS Port. Unless UUNET notifies BellSouth of any service deficiencies with the new RAS Port(s) during this forty-five (45) day period, such new RAS Port(s) shall be deemed active and BellSouth will begin billing UUNET for the new RAS Port(s) upon the earlier of: (A) UUNET's notice to BellSouth of service acceptance of the new RAS Port(s); or (B) the expiration of the applicable forty-five (45) day period.

(4)    If UUNET notifies BellSouth of any service deficiencies with a new RAS Port during the forty-five (45) day period specified in Section I(F)(3) above, the parties shall cooperatively troubleshoot the new RAS Port in an expeditious manner until it is operational and accepted by UUNET. If the parties mutually determine that the source of the service deficiency is within the control of BellSouth (including any

DOJ - 00063
CONFIDENTIAL

6
PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

contractor other than UUNET), then service activation and billing for such RAS Port shall be suspended until the service deficiency has been corrected and UUNET notifies BellSouth that the new RAS Port has been accepted: provided that if UUNET does not accept or reject the new RAS Port within ten (10) days of BellSouth's notification that the service deficiency has been corrected, service activation and billing for such RAS Port shall begin after that 10-day period. If the parties mutually determine that the source of the service deficiency is within the control of UUNET (including any contractor other than BellSouth), then service activation and billing for such RAS Port shall begin as of the later of: (A) ten (10) days after the date of such mutual determination; or (B) the expiration of the original 45-day period specified in Section - I(F)(3) above; provided, however, that if UUNET notifies BellSouth that the new RAS Port has been accepted, then service activation and billing for the new RAS Port will begin upon UUNET's acceptance.

G.    In migrating existing PRI services provided by BellSouth and/or its affiliates to the RAS Service, or in transitioning Winback Ports to the RAS Service, where the technology is available and implemented, all existing telephone numbers will be preserved in such migration upon the agreement of all relevant service providers if (1) federal number portability requirements apply to any specific request by Customer and its new service provider to port a telephone number, (2) Customer and its new service provider are themselves in compliance with any applicable federal number portability requirements that apply to the specific request, and (3) if Customer is in current compliance with its obligations under this Agreement. The parties shall closely coordinate such migrations and transitions in order to ensure that no loss of existing service occurs (except where intentionally implemented by the parties during circuit cutover).

II.    **General Terms & Conditions**

A.    The initial term of this Agreement shall expire on September 30, 2007 ("Initial Term") and may be extended only by written mutual agreement of the parties.

B.    **RAS Port Term**

(1)    The expiration date of the term for each RAS Port ordered under this Agreement (sometimes referred to herein as the ("Port Term" or "Minimum Billing Period") shall be based on the date when such RAS Port is activated, as follows:

| RAS Port Activation Date | RAS Port Expiration Date |
|---|---|
| 10/1/2000 – 9/30/2001 | 3/31/2008 |

(2)    For RAS Ports activated during a given annual period commencing each October 1st after 9/30/2001, the RAS Port Expiration Date for such RAS Ports shall be the March 30th of the seventh (7th) year following such October 1st date (e.g., for a RAS Port activated on 11/1/2001, the applicable RAS Port Activation Date period would have commenced on 10/1/2001, thereby resulting in a RAS Port Expiration Date of 3/31/2009).

(3)    The applicable terms and conditions of this Agreement shall survive the expiration of this Agreement with respect to such RAS Service through the expiration of its applicable Port Term. Any extension or change of the Port Term for a given RAS Port will require the mutual agreement of BellSouth and the Customer.

C.    With respect to those RAS Ports that are activated after the Effective Date of this Agreement, such RAS Ports will be provisioned utilizing 1-way ISDN PRI circuits.

D.    Hardware Upgrades

In the event the manufacturer of the 3Com NAS, used in connection with the RAS Service provided to UUNET hereunder, offers a hardware upgrade to such equipment and BellSouth decides to implement such

DOJ - 00064
CONFIDENTIAL

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE

S 343

Master CSA Number GA00-5399-00
FINAL – 9/25/00a

upgrade with UUNET's concurrence, the parties shall agree to cooperate in good faith to determine the optimal method and implementation schedule for such upgrade, as well as the appropriate price and cost impacts of such upgrade on the parties.

E.   Single Number Service

The parties agree to mutually explore the technical parameters and implementation requirements of single number service ("SNS") in connection with the RAS Service, including the feasibility of deploying SNS on a state-by-state or other mutually-agreeable basis across the entire BellSouth region.

F.   Equipment Purchase

(1)     BellSouth agrees to purchase from UUNET at least 100,001 ports of 3Com dial access equipment; provided that the flat per-port price of such 3Com NAS equipment shall be $179/usable port (based on the configuration set forth in Exhibit A utilizing an ISDN FAS design). The planned quantities of 3Com equipment is attached hereto as Exhibit C; although the actual quantity of egress and modem racks may vary based on the parties' final network trunking and deployment plan. BellSouth will deploy the 3Com NAS equipment in the most optimal configurations feasible for UUNET and BellSouth based on the existing PRI rotary locations and any future agreed-upon service locations. Other terms and conditions of such purchase will be set forth in a separate agreement between the parties, which shall be negotiated in good faith during the thirty (30) days following the Effective Date of this Agreement. Should the parties not reach a mutual agreement within thirty (30) days, or such other time as may be agreed upon by the parties in writing, with respect to the purchase of the 3Com equipment from UUNET, then the Master Contract Services Arrangement and Attachments will be considered null and void.

(2)     The parties agree to negotiate in good faith additional purchases by BellSouth of spare parts, EF&I services, and maintenance/support services; provided that BellSouth shall not be obligated to make such purchases from UUNET.

G.   Customer and BellSouth agree that reciprocal compensation shall not apply to the RAS Service offered pursuant to this Agreement. Customer covenants and agrees that it will not engage in any activity or course of action that directly or indirectly results in a claim for reciprocal compensation against BellSouth or its affiliates in connection with the RAS Service, including, without limitation, in connection with any and all calls outbound from the NAS housing the RAS Ports during the term of this Agreement. Should any reciprocal compensation obligation of BellSouth (or any reciprocal compensation claim against BellSouth or its affiliates) arise in connection with the RAS Service offered under this Agreement, BellSouth will have the option during the thirty (30) days following such event to (i) renegotiate in good faith with Customer the affected terms and conditions of this Agreement; or (ii) terminate the Agreement by giving Customer thirty (30) days' written notice of such termination.

H.   Moves

(1)     Except for a "Move" (disconnect and reconnect) that meets the requirements of Sections II(H)(2) through II(H)(4) herein, Customer will be billed a non-recurring rate of $55 for the Move of each RAS Port.

(2)     Customer may Move no more than ten (10) percent of its total RAS Ports between Service Locations, as defined in Section II(I) below, during each contract year. RAS Ports must be moved in increments of 23 ports. The Moved RAS Ports will retain the original Service Activation Date for purposes of calculating the Minimum Billing Period. Customer must maintain the Minimum Port Requirement Per Service Location, as defined in Section II(I), at each Service Location involved in the Move unless the Customer chooses to move all ports from a Service Location.

DOJ - 00065
CONFIDENTIAL

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

S 344

Master CSA Number GA00-5399-00
FINAL – 9/25/00a

(3)    Customer may Move all RAS Ports from a maximum of five (5) Service Locations during any calendar year.

(4)    A Move requires the submission of an order to disconnect a RAS Port at an existing Service Location and the submission, within 10 days of the order to disconnect, of an order to connect a new RAS Port at a different Service Location. The Service Activation Date of the RAS Port at the new Service Location will be the earlier of forty-five (45) days from the date the RAS Port was disconnected at the old Service Location or a mutually agreed upon service date where BellSouth is able to meet Customer's capacity requirements. Customer acknowledges that BellSouth desires to reuse the RAS equipment when ports are moved to avoid stranded RAS equipment. The service activation dates associated with the moved RAS Ports will be negotiated in good faith by both parties to maximize BellSouth's ability to achieve the foregoing objective. In the event BellSouth is unable to meet Customer's capacity requirements within forty-five (45) days, BellSouth and Customer will mutually agree upon a Service Activation Date. If Customer requests a RAS Port at a facility that is not a Service Location, the service date shall be mutually negotiated by BellSouth and Customer.

I.    Service Locations

(1)    BellSouth will provide Customer with RAS Service in all locations that are technically equipped to support RAS Service ("Service Locations"). A Service Location is technically equipped to support RAS Service if there is a switch at the Service Location that is enabled to provide PRI service, an access method that is compatible with the 3Com NAS equipment, sufficient central office floor space, sufficient switch and circuit capacity, and a central office upgrade is not required.

(2)    Customer initially desires to purchase RAS Ports in the Service Locations listed in Exhibit B. BellSouth's preferred facilities to provide RAS Ports will be 1-way ISDN PRI. If the central office is not equipped to support PRI with a T3 handoff (i.e., a 1A switch or 3/1 digital cross connect system), a similar type service, such as Channelized Megalink, with a T3 handoff may be used to provide the RAS Service. In the event the central office will not support PRI or a similar type service such as Channelized Megalink with a T3 handoff, BellSouth and Customer will negotiate in good faith the transport and other service requirements to provide RAS Service in locations that are not technically equipped to provide RAS Service with a T3 handoff. If BellSouth and Customer are unable to reach agreement on the addition of the new locations, the new locations will not become part of this Agreement. However, the existing rates, Terms and Conditions of this Agreement shall remain in full force and effect.

(3)    For those RAS Ports used by Customer in connection with its GridNet dial network, Customer agrees to purchase a minimum of 322 RAS Ports (1 full 3Com NAS modem chassis) at each new Service Location ("Minimum Port Requirement Per Service Location" for GridNet RAS Ports). For those RAS Ports used by Customer in connection with its Fixed Port dial network, Customer agrees to purchase a minimum of 192 RAS Ports at each new Service Location ("Minimum Port Requirement Per Service Location" for Fixed Port RAS Ports).

(4)    The Service Activation Dates for the first RAS Port orders at the Service Locations listed in Exhibit B will be in accordance with the Ready for Service Schedule set forth in Section I(F) above. Subsequent service orders for RAS Service, included in Customer's quarterly forecast and provided to BellSouth at least forty-five (45) days before Customer's desired Service Activation Date, which do not change during that forty-five (45) day period, will constitute a "Firm Order". The Service Activation Date for Firm Orders will be forty-five (45) days from the date the order is placed ("Firm Order Service Activation Date"). Service Activation Dates for Service Orders that do not meet the requirements of a Firm Order will be subject to negotiation ("Negotiated Service Activation Date").

(5)    After the initial ramp period defined in Section I(F), if during a twelve (12) month period BellSouth fails to install more than fifteen percent (15%) of the RAS Ports on or prior to the Service Activation Date due to events or circumstances within the control of BellSouth, to include outsourced

---

9

DOJ - 00066
CONFIDENTIAL

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

S 345

Master CSA Number GA00-5399-00
FINAL – 9/25/00a

functions or BellSouth contracted services (except to UUNET). Customer may terminate this Agreement if UUNET buys back all 3Com NAS equipment in accordance with Section II(K)(3) below.

J.    **Termination Charges**

Except where otherwise provided in the Agreement or this Attachment, if Customer terminates this Agreement or any service order for RAS Ports prior to the installation of a RAS Port that has been ordered or the expiration of the Port Term for such RAS Port, except for Moves as provided for in Section II(H) above, Customer shall be responsible for the termination charges set forth below:

| Contract Year Port Terminated | Termination Charges |
|---|---|
| 1-3 | 100% of remaining charges for the term |
| 4-5 | 75% of remaining charges for the term |
| 6-7 | 50% of remaining charges for the term |

K.    **Annual Review**

(1)    An annual review will be conducted by BellSouth and Customer to evaluate pricing, commitment levels, architecture or equipment changes, and market conditions. During the annual review, BellSouth and Customer will negotiate in good faith to maintain the competitive viability of this Agreement. Subject to the requirements of Section II(K)(2) below, if BellSouth and Customer are unable to reach agreement on any modifications, the existing terms and conditions of this Agreement shall remain in full force and effect.

(2)    During an annual review, Customer may request a review of BellSouth rates for RAS Service to determine whether changes in the BellSouth network architecture, tariffed services, or equipment have materially reduced the cost of providing RAS Service to Customer. Specifically, Customer and BellSouth agree to designate a subject matter expert from each company to evaluate the reasonableness of the rates for RAS Service in light of changes in BellSouth's network architecture, tariffed services, and equipment. Based upon the findings of such subject matter experts, the parties shall negotiate in good faith as to whether to implement a rate adjustment, and if so, the amount of such rate adjustment. Customer shall only be permitted to request a review of the rates at the annual review and BellSouth is only obligated to make rate adjustments during the annual review.

(3)    If Customer and BellSouth negotiate in good faith pursuant to the preceding paragraph and are unable to reach agreement within ninety (90) days from the start of the annual review for RAS Service, Customer may terminate this Agreement if Customer buys back from BellSouth, at the then-current net book value as reasonably determined by BellSouth in accordance with generally accepted accounting principles, any 3Com NAS equipment purchased by BellSouth and dedicated to Customer's use for this service offering. Further, nothing in this Section obligates BellSouth to disclose to Customer its underlying cost structure, financial books, or any other information that BellSouth reasonably deems confidential or proprietary; provided that UUNET may request written confirmation that such net book value has been accurately stated by BellSouth and is consistent with generally accepted accounting principles as determined by BellSouth's annual audit conducted by BellSouth's independent outside auditors. Should additional expense be incurred by BellSouth in performing this portion of the audit, UUNET will be responsible for such expense.

L.    **Sale of Network Assets by BellSouth**

In the event that BellSouth or its affiliates sells to a third party any network assets used in connection with the RAS Service, the number of RAS Ports associated with the network assets sold by BellSouth or its affiliate shall continue to count towards: (a) UUNET's satisfaction of the Minimum Quantity Requirements

DOJ - 00067
CONFIDENTIAL

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

S 346

Master CSA Number GA00-5399-00
FINAL – 9/25/00a

hereunder; and (b) the total number of active RAS Ports for purposes of calculating the applicable Price Tier under this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives on the dates set forth below.

Accepted by:

Subscriber:                                    Company:

UUNET Technologies, Inc.                       BellSouth Telecommunications, Inc.

By: _____                    By: _____
           *Authorized Signature*                          *Authorized Signature*

Printed Name:  Kevin Boyne                      Printed Name:  R. A. Anderson

Title:  Chief Operating Officer                 Title:  President

Date:       9/26/00                             Date:  9-27-00

                                                APPROVED AS TO FORM:

                                                MKK 9/27/00

DOJ - 00068
CONFIDENTIAL

11

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

S 347

**AMENDMENT NO. 1**
**TO U S WEST NETWORK SERVICE AGREEMENT**
**GENERAL TERMS AND CONDITIONS FOR**
**SIGNALING SYSTEM 7 GATEWAY SERVICE/**
**CENTRAL OFFICE-BASED REMOTE ACCESS SERVICE**

This Amendment No. 1 is made to the above Agreement (the "Amendment") entered into this _____ day of _____, 1999, by and between U S WEST Communications, Inc. ("USWC") and UUNET Technologies, Inc. ("UUNET"). The parties hereby agree to amend the Agreement between the parties dated December 30, 1998 as set forth below. Unless otherwise specified herein, all defined terms used in this Amendment shall have the same meaning as set forth in the Agreement.

1. The following paragraphs shall be added to Section 6.1.1: "If UUNET or any of its Affiliates, as defined in section 6.2, at any time during the term of this Agreement directly use USWC Services to directly provide Voice over IP, as defined in section 6.1.1, without the prior development of mutually accepted terms, conditions, and rate structures applicable to Voice over IP, UUNET is in breach of this agreement. USWC may terminate for cause as defined in Section 10 and termination liability will apply."

"UUNET and USWC will use all reasonable efforts to have the RAD manufacturer support both parties in the joint development of a mechanism (e.g. Trap, Management Information Base ('MIB')), that will signal USWC and UUNET of instances of activation of software or hardware capable of supporting Voice over IP. USWC has the option to randomly poll any USWC RAD a maximum of one time per day to validate that the Voice over IP functionality and associated trap is enabled and that voice over IP functionality is not enabled."

2. The following is added to Section 7.3.3.3: "This notice requirement includes the requirement of UUNET to notify USWC of the intentional loading of any software, including software which UUNET is aware has the capability to activate the Voice over IP function on the CSM/V3 card or any other card with similar functionality."

3. The following language shall be added to Section 13.1.3. "The minimum COBRA implementation for the high density TNT architecture with the CSM/V3 card design that UUNET would deploy in any given site is 18 PRIs unless otherwise mutually agreed to by UUNET and USWC."

4. The following shall be added to Attachment 3.

**High Density DS3 Ingress TNT Configuration**

| Ascend Part Number | Description | |
|---|---|---|
| TNT-DC-H | Chassis with 1 DC power | |
| TNT-SP-DC | Second DC power | TNT-SL-HDLC2 |
| HDLC Slot Card | TNT-SL-CT3 | T3 Slot Card |
| TNT-SO-ISDN | ISDN software | |

DOJ - 00095
CONFIDENTIAL

TNT-SO-FR               Frame Relay Software
TNT-SP-DRAM-32          32MB DRAM
TNT-SL-48MODV3-S-C      48 Port slot card (V.90 & V.34

**High Density DS1 Ingress TNT Configuration**

| Ascend Part Number | Description |
|---|---|
| TNT-DC-H | Chassis with 1 DC power |
| TNT-SP-DC | Second DC power |
| TNT-SL-HDLC2 | HDLC Slot Card |
| TNT-SL-CT1 | T1 Slot Card |
| TNT-SO-ISDN | ISDN software |
| TNT-SO-FR | Frame Relay Software |
| TNT-SP-DRAM-32 | 32MB DRAM |
| TNT-SL-48MODV3-S-C | 48 Port slot card (V.90 & V.34) |

This Amendment and the Agreement shall be read so as to complement each other. However, in the event of an irreconcilable conflict in the terms thereof, the provisions of this Amendment shall have precedence over the terms of the Agreement.

Except as amended herein, all of the terms and conditions of the Agreement remain unchanged and shall continue in full force and effect.

The parties have caused their duly authorized representatives to sign this Amendment as of the dates stated below.

**U S WEST COMMUNICATIONS, INC**          **UUNET Technologies, Inc.**


Signature                                  Signature


Printed Name                               Printed Name


Title                                      Title


Date                                       Date

DOJ - 00096
CONFIDENTIAL

S 349