Tab U

U S WEST NETWORK SERVICE AGREEMENT
GENERAL TERMS AND CONDITIONS FOR
SIGNALING SYSTEM 7 GATEWAY SERVICE/
CENTRAL OFFICE-BASED REMOTE ACCESS SERVICE

WHEREAS, U S WEST Communications, Inc. ("USWC") and UUNET Technologies, Inc. ("UUNET") desire to enter into an agreement pursuant to which USWC will provide to UUNET Service, as defined herein, and USWC intends that the Service will, among other things, have the effect of reducing certain traffic on the Public Switched Telephone Network ("PSTN") owned and operated by USWC;

WHEREAS, USWC is offering the Service described in this Agreement as a unified retail service; and

WHEREAS, UUNET is an Enhanced Service Provider ("ESP"), and not a telecommunications carrier, as those terms are currently defined by the Federal Communications Commission, and UUNET is obtaining the Service described herein strictly for the purposes of furthering its business as an ESP; and

WHEREAS, the Service is being provisioned pursuant to this Agreement to meet the unique needs and circumstances of UUNET; and

WHEREAS, in order to meet the unique needs and circumstances of UUNET and to meet the operational imperatives of USWC, USWC and UUNET require that a specific architectural topology be employed to provision the Service; and

WHEREAS, in order to meet the unique needs and circumstances of UUNET in moving from its current High Capacity Digital Transport service ("HCDT") to an SS7-based service, USWC is agreeable to deploying, as an interim step, a Central Office Based Remote Access ("COBRA") architecture that will be selected and installed by USWC, until the SS7 Gateway is available in a form mutually acceptable to UUNET and USWC.

Now, therefore, this Agreement is made this ___ day of _____, 1998, between UUNET and USWC (collectively "Parties" and individually "Party"), for the provision of USWC Signaling System 7 Gateway ("SS7 Gateway") and Central Office Based Remote Access ("COBRA") Service, as defined on Attachment 1, attached hereto and incorporated herein by reference, ("Service").

1 SCOPE. USWC shall furnish and UUNET shall pay for the Service, and USWC is responsible for providing the Service to UUNET on an end to end basis Service does not include access lines and transport service.

1.1 USWC agrees to provide and UUNET agrees to order the Service. The Remote Access Devise (RAD) will be solely owned by USWC. The Service is marketed and sold by USWC. Until the SS7 Gateway, as defined in Attachment 1, is available COBRA Service, as defined in Attachment 1, will be deployed. The Service is available where facilities exist subject to the terms contained herein in Section 3. Deployment of the Service is subject to appropriate regulatory requirements and approvals.

1.2 UUNET is considered an Enhanced Service Provider ("ESP") as currently defined by the Federal Communications Commission. Should UUNET's, any of its Affiliates as defined in Section 6.2, all of which are permitted to purchase under this Agreement, status



DOJ - 00097
CONFIDENTIAL

change to a Competitive Local Exchange Carrier or Interexchange Carrier, either party may elect to phase out the Service provided to the affected entity within a six (6) month phase out period. During such phase out period, the affected entity shall be treated as an ESP. Should the services provided to its end-users by UUNET be determined by a regulatory body or USWC to be CPE-based or subject to collocation requirements, USWC may immediately and in its sole discretion terminate this Agreement phasing out Service over a six (6) month period.

1.3 The Service will be provided in compliance with all federal, state and local legal and regulatory requirements. Either party may terminate this Agreement pursuant to Section 10 below in connection with any breach of this Section.

2 TERM. This Agreement will commence on the latest signature date ("Effective Date"), provided mandatory filing requirements are met. The term of this Agreement is seven (7) years. All port growth ordered under this Agreement is co-terminus with the seven (7) year Agreement. Port orders received beyond the fourth year shall be renegotiated as part of a new agreement.

3 ARCHITECTURE TOPOLOGY. USWC defines where and in which USWC Central Offices equipment will be placed throughout the SS7 Gateway/COBRA network in order to balance USWC's network loads and capacity in a manner to ensure there will be no negative impact to UUNET or UUNET's existing customer's dialing patterns or service levels. See Attachment 2, attached hereto and incorporated herein by reference, for a list of existing cities in which Service will be provided. Additional cities may be added to Attachment 2. USWC will establish the final architecture topology to attempt to address UUNET's objective to reduce backhauls. USWC intends to offer Service in all cities where facilities exist and where technically and economically feasible.

4 MIGRATION TO INTERIM PLATFORM. UUNET and USWC agree to migrate from current UUNET dial-access service, HCDT and DSS, to COBRA as described in Attachment 1, and to a SS7 Gateway platform, as described in Attachment 1 as soon as the SS7 Gateway platform is available and certified by both Parties. USWC will use all reasonable efforts to convert all HCDT and DSS circuits within twenty four (24) months of the Effective Date. HCDT and DSS circuits which are not migrated to the interim platform as of the time the SS7 Gateway platform is certified pursuant to Section 5.1, will be migrated directly to the SS7 Gateway platform. Within thirty (30) days of the Effective Date, the Parties shall establish a written migration schedule to the Interim platform. Until such time as all HCDT and DSS circuits are either migrated to the interim platform or the SS7 Gateway platform, the existing agreement between USWC and UUNET shall remain in effect.

5 MIGRATION TO SS7 ARCHITECTURE.

5.1 UUNET agrees to migrate from either HCDT and DSS or the interim platform to a SS7 Gateway solution, which will off-load Internet Provider traffic from the PSTN, at such time as equipment is available and the SS7 Gateway solution is certified by the parties. The interim platform will be aggressively deployed, as provided herein, until a SS7 Gateway solution can be deployed. The Parties agree to use all reasonable efforts to negotiate certification guidelines as well as certification and migration schedules. The parties will negotiate mutually acceptable written certification guidelines establishing acceptable capabilities for the SS7 Gateway platform within sixty (60) days of the Effective Date. The Parties agree in good faith to verify that the SS7 Gateway meets the certification guidelines. Within sixty (60) days of verification that the SS7 Gateway meets the certification guidelines, the Parties shall agree to a written migration schedule to the SS7 Gateway.

5.2 USWC and UUNET intend to use all reasonable efforts with potential SS7 Gateway Platform vendors to encourage and promote the development and deployment of an SS7 Gateway platform available for implementation as soon as possible. USWC and UUNET agree to hold quarterly executive and engineering level meetings, within sixty (60) days of the Effective Date of this Agreement discuss and review progress toward the SS7 Gateway solution.

5.3 In the event that an SS7 Gateway or functional equivalent, certified by both parties, is not available within (12) twelve months of the Effective Date of this Agreement UUNET agrees to certify additional equipment vendor(s), including those equipment vendor(s) identified by USWC, if such vendor(s) exist, which incorporate SS7 Gateway functionality into the RAD architecture.

6 UUNET RESPONSIBILITIES. (See Responsibility Matrix attached as Exhibit A incorporated herein by reference.)

6.1 Internet Protocol ("IP")-based Traffic

6.1.1 This contract does not represent an interconnection agreement. Should UUNET or any of its affiliates wish to directly use USWC Services to directly provide any two way telephony communications, whether local or long distance ("Voice over IP"), UUNET and USWC shall negotiate terms, conditions and rate structures, applicable to Voice over IP prior to UUNET utilizing the COBRA or SS7 Gateway platform to directly provide Voice over IP. In the event the parties are unable to reach agreement on the terms, conditions, and rate structures for these services, UUNET has the option to terminate this Agreement upon six (6) months' written notice to USWC, provided that upon such termination UUNET will (a) purchase, or lease if appropriate, any RAD dedicated to UUNET's use from USWC at the RAD's then-current USWC book value, and (b) promptly remove the RAD from USWC's premises.

6.2 UUNET Affiliates: UUNET's ESP Affiliates, defined as any entity acting as an ESP and controlling, controlled by, or under common control with UUNET ("Affiliates") are permitted to purchase under this Agreement. The Parties agree that this Agreement does not create a contractual relationship between USWC and UUNET's Affiliates. Therefore, UUNET agrees to accept responsibility and liability for all actions of its Affiliates that purchase Services under this Agreement. UUNET shall ensure that its Affiliates comply with all terms and conditions contained herein. In the event any Affiliate breaches any term or condition of this Agreement, such breach shall permit USWC to pursue any and all remedies contained herein.

6.3 If any access charges or other charges on this service are determined to be applicable by the FCC or governing regulatory body, UUNET shall pay those charges. In the event such charges result in an increase in the price of the Service by greater than ten (10) percent; ~~UUNET has the option to terminate this Agreement upon six (6) months written~~ notice to USWC, provided that upon such termination UUNET will (a) purchase, or lease if appropriate, any RAD dedicated to UUNET's use from USWC at the RAD's then-current USWC book value, and (b) promptly remove the RAD from USWC's premises, and (c) in addition, pay USWC $8,750.00 per RAD for costs incurred for engineering, installing and provisions the RAD platform. This fee will be reduced by $1,461.25 per year for the length of the contract.

USWC

6.4 Nothing in this Agreement is intended to nor shall it be construed to confer upon UUNET any right or interest in USWC's equipment, facilities, or property, nor any right to occupy or install any of its equipment or facilities in or upon any Company property.

7 **USWC RESPONSIBILITIES. (See Responsibility Matrix attached as Exhibit A incorporated herein by reference.)**

7.1 USWC will install, maintain and operate all necessary facilities and central office equipment to support the interim platform and SS7 Gateway and the provision of the Service.

7.2 USWC will provide prompt and effective technical support.

7.3 Physical Access to Service Platform

7.3.1 Only active USWC employees, or its subcontractors, properly trained in the maintenance and administration of the selected equipment, as defined in Attachment 3 or as may be substitute therefor, shall have physical access to the RAD. All physical platform upgrades shall be reviewed for impact on all aspects of the supporting USWC network. Mutually agreed upon physical upgrades shall be performed by USWC.

7.3.2 USWC shall own and control all software, hardware, physical, remote and logical link access for the SS7 Gateway.

7.3.3 UUNET shall have remote and logical access to the RAD. UUNET shall control all software on the RAD.. USWC shall have the right to test new software and configuration changes implemented by UUNET but shall obtain no proprietary rights or license in such software or configuration. UUNET agrees to the following notification schedule for any software changes to be made to the Remote Access Device:

7.3.3.1 For emergency software changes: UUNET shall notify USWC with minimum notice of 48 hours to evaluate software prior to UUNET deploying that change. unless otherwise agreed upon by both parties.

7.3.3.2 For new software patches: UUNET will provide seven (7) business days notice prior to loading new software patches

7.3.3.3 For new software releases: UUNET will provide a minimum of ten (10) business days notice prior to loading new software releases.

7.3.3.4 Should USWC uncover a service-affecting problem in review of any software modification, UUNET agrees to suspend deployment until service problems can be resolved. Examples of "service affecting problems" are described as, but not limited to, the following: Any RAD software change that causes material problems in the PSTN, RAD, SS7 Gateway that prevents the SS7 Gateway from performing all of its material intended functions correctly, or that which causes the SS7 Gateway to propagate erroneous or incorrect SS7 signaling messages to the USWC Public Switched Telecommunications Network (PSTN ).

8 SERVICE DEFINITION AND EQUIPMENT SELECTION USWC has chosen to deploy a specific hardware configuration, as defined in Attachment 3, which provides a specific set of capabilities.

Any change to the specific hardware configuration, including but not limited to installation of different cards, and/or replacement of obsolete equipment, shall require USWC's consent and may require an additional agreement and/or renegotiated prices. Equipment to provide SS7 Gateway and the interim platform will be selected solely at the discretion of USWC from the list of UUNET certified equipment. UUNET requests regarding the configuration and design of the equipment will be considered by USWC and employed in equipment selection when possible.

8.1 USWC and UUNET agree to work with the selected hardware vendor to assure continued availability of the hardware utilized in the specific configuration, as defined in Attachment 3, which, upon agreement of the Parties, may be updated from time to time.

9 CHARGES AND BILLING. UUNET agrees to pay the charges for Service as specified herein. These charges do not include applicable taxes imposed by law. Any taxes assessed will be clearly specified on the bill. UUNET shall pay each bill in full by the payment due date on each bill. UUNET shall pay each bill by the payment due date on the bill. Late payments are subject to a charge of one and one-half percent (1 1/2%) per month, or the maximum allowed by law, whichever is less. The charges for Services under this Agreement, do not include UUNET's purchase of any customer premises equipment or enhanced services from USWC.

9.1 Pricing for both the interim platform and SS7 Gateway service is defined in Attachment 4, attached hereto and incorporated herein by reference. This pricing shall, at the time of migration of UUNET's service to the interim platform or SS7 Gateway platform, replace all current pricing provided to UUNET by USWC for HCDT and DSS.

9.2 Ports ordered in years one (1) through four (4) of this Agreement are coterminous with the seven (7)-year term of this Agreement. Any ports ordered in years five (5) through seven (7) of this Agreement shall not be provided or priced under the terms of this Agreement.

9.3 Pricing will be based on a tier structure determined by the total number of ports. Ports are defined as any DS0 port (Layer 1) that physically terminates in a remote access device or functional equivalent. The initial total number of ports will be determined by the sum of all USWC provided UUNET's dial access ports nationwide, , all Services ordered by UUNET Affiliates under this Agreement and fifty percent (50%) of Affiliate's existing dial access ports as defined in Section 9.4 purchased outside of this Agreement. The total number of ports shall be adjusted monthly for all installed, working and Pending ports made under this Agreement and semi-annually for all Affiliate's dial access ports installed, working and pending outside of this Agreement.

9.4 Total number of ports applied to the pricing tier level is determined by:

9.4.1 Installed and Working dial access ports (interim platform, SS7 Gateway and HCDT/DSS DS0 equivalents) plus,

9.4.2 Pending ports under this Agreement, which are defined as those ports ordered by UUNET and not installed within thirty (30) days after order placement. Should UUNET cancel any pending firm order, UUNET shall pay the price it would have paid had the cancelled ports not been included in the determination of the pricing tier, retroactive to the date the order was first placed.

9.5 Full standard non-recurring charges (NRC) apply to all cancelled pending port orders, if orders are cancelled within thirty (30) days of the most recent due date provided by USWC.

9.6 For all SS7 Gateway/COBRA ports, the billing will commence on the date of UUNET's acceptance of the Service.

9.7 The price per port charged hereunder shall be no less favorable to UUNET than the price extended by USWC to any other retail non-governmental customers for similar services. Upon UUNET's request, but no more than once each calendar year, USWC's Business Interprise Solutions Vice President of Finance shall certify in writing to USWC's compliance with this Section 9.7.

10 TERMINATION. Either party may terminate this Agreement for cause provided written notice specifying the cause for termination and requesting correction within thirty (30) days is given the other party and such cause is not corrected within such thirty (30) day period. Cause is any material breach of the terms of this Agreement. Cause shall not include, without limitation, unrelated congestion in the public switched network or the failure of USWC to meet UUNET's requested installation schedule due to USWC's inability to obtain equipment from vendors. If USWC terminates this Agreement for cause, or if UUNET terminates this Agreement WITHOUT cause, UUNET shall be assessed termination liability (TLA) except as defined in Section 10.2.

10.1 Termination Liability (except as defined in Section 10.2)

10.1.1 Once activated, the total nationwide quantity of installed ports must remain in service for the remainder of the contract term as defined herein. Termination liability charges apply for all disconnected ports.

10.1.2 100% termination liability applies if UUNET disconnects and/or cancels any ports in years 1 through 3 of this Agreement.

10.1.3 75% termination liability applies if UUNET disconnects and/or cancels any ports in years 4 through 5 of this Agreement.

10.1.4 50% termination liability applies if UUNET disconnects and/or cancels any ports in years 6 through 7 of this Agreement.

10.2 Termination liability will not apply to the following:

10.2.1 If UUNET terminates this Agreement under the provisions provided in Section 6.1 relating to IP-based Traffic because the Parties are unable to negotiate a mutually agreeable provision for Voice over IP capability..

10.2.2 If either Party terminates this Agreement under the provision provided in Section 11 relating to Service Level Agreement, termination liability may or may not apply depending upon terms of such Service Level Agreement.

10.2.3 If USWC terminates this Agreement under the provision provided in Section 1.2 relating to UUNET's or any Affiliate's status change from an ESP to a Competitive Local Exchange Carrier or an Interexchange Carrier. Termination by ~~UUNET pursuant to Section 1.2~~ shall not relieve UUNET of termination liability under Section 10.

10.2.4 If UUNET moves ports from one location to another, or adds and removes ports, in the same LATA, a non-recurring charge will apply in accordance with Attachment 4 Pricing. No additional termination liability will apply.

11 SERVICE LEVEL AGREEMENTS. Service Level Agreements ("SLA") which are applicable hereunder are attached and incorporated into this agreement in Attachment 5.

12 CPE INTERACTION. Customer Provided Equipment connected to the USWC network on disclosed interfaces must be allowed to access the Remove Access Device on open, commonly available data interfaces. A listing of the open CPE interfaces supported by selected equipment manufacturer must be forwarded to USWC by UUNET. If proprietary interfaces are supported across a disclosed Network Interface such as ISDN, Frame Relay or Private Line Data Service, these interfaces must be outlined and forwarded to USWC for disclosure in accordance with applicable regulatory requirements. Proprietary signaling to CPE devices including software downloads, operating system modification and firmware upgrades cannot originate within the Remove Access Device.

13 MINIMUM COMMITMENT LEVELS.

13.1 Port Minimum

13.1.1 An initial minimum of 40,000 ports (DS0 equivalents) must be ordered by UUNET by December 31, 1998.

13.1.2 Active port level shall be determined by the sum of UUNET's ordered and in service COBRA/SS7 Gateway ports, HCDT and DSS DS0 equivalents. UUNET shall be charged an annual shortfall charge of 50% of the applicable per port charge for each port UUNET is below the required minimum port level, once the minimum port level is reached, except if shortfall is a direct result of the action or inaction of USWC.

13.1.3 The minimum deployment level for SS7 Gateway/COBRA service is 6 PRI/DS1 circuits per USWC central office.

14 REVIEWS. UUNET and USWC agree to hold annual meetings to discuss aspects of the service offering including, but not limited to, market trends, architecture changes, and other significant factors which impact the service offering. If mutually agreed upon by both parties, terms and conditions may be modified.

14.1 The parties will meet on a regular basis to establish future network requirements and review capacity planning. UUNET will provide a quarterly forecast to USWC six months in advance of a formal order, such forecast to be deemed UUNET Confidential Information. The forecast will not be considered a firm order, but may be used for USWC capacity planning purposes.

14.2 USWC will plan, schedule and coordinate with UUNET when service is migrated from the interim platform to the SS7 Gateway platform. USWC and UUNET agree to conduct an annual review of USWC's records of UUNET's Services to ensure that all migrated Services are billed appropriately.

15. GENERAL PROVISIONS.

15.1 PERSONAL INJURY; PROPERTY DAMAGE. Each party shall be responsible for any actual physical damages it directly causes to the other in the course of its performance under this Agreement, limited to damages resulting from personal injuries, death, or property damage arising from negligent acts or omissions; PROVIDED HOWEVER, THAT NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT, OR SPECIAL DAMAGES OF ANY KIND, INCLUDING BUT NOT LIMITED TO ANY LOSS OF USE, LOSS OF BUSINESS, OR LOSS OF PROFIT.

DOLLARS FEES BY UUNET FEES PAID BY UUNET IN THE

15.2 LIMITATION OF LIABILITY. USWC SHALL NOT BE LIABLE TO UUNET FOR ANY INCIDENTAL, INDIRECT, SPECIAL, OR CONSEQUENTIAL DAMAGES OF ANY KIND INCLUDING BUT NOT LIMITED TO ANY LOSS OF USE, LOSS OF BUSINESS, OR LOSS OF PROFIT. EXCEPT AS PROVIDED UNDER "PERSONAL INJURY; PROPERTY DAMAGE", INTELLECTUAL PROPERTY AND NONDISCLOSURE ANY USWC LIABILITY TO UUNET FOR ANY DAMAGES OF ANY KIND UNDER THIS AGREEMENT SHALL NOT EXCEED, IN AMOUNT, A SUM EQUIVALENT TO THE GREATER OF ONE MILLION OR TWO TIMES PAID TO DATE NOT TO EXCEED ~~LAST~~ 24 MONTHS. REMEDIES UNDER THIS AGREEMENT ARE EXCLUSIVE AND LIMITED TO THOSE EXPRESSLY DESCRIBED IN THIS AGREEMENT.

PRECEDING THE DATE OF SUCH CLAIMS

15.3 NO WARRANTIES. USWC warrants that the Services to be supplied hereunder will be performed by qualified professional personnel in accordance with industry standards and that the Services will be in strict compliance with this Agreement and the terms set forth in the applicable service descriptions attached hereto. USWC represents and warrants that the Services provided hereunder are designed to process and will process all date data, calculations, storage, and retrieval without error or interruption prior to, during and beyond the year 2000, and are in compliance with all applicable Year 2000 standards, including those of the International Standards Organization, British Standards Institution, and the U.S. government's Federal Acquisition Regulations. EXCEPT AS SET FORTH HEREIN, THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

15.4 UNCONTROLLABLE CIRCUMSTANCES. Neither party shall be deemed in violation of this Agreement if it is prevented from performing any of the obligations under this Agreement by reason of severe weather and storms; earthquakes or other natural occurrences; strikes or other labor unrest; power failures; nuclear or other civil or military emergencies; acts of legislative, judicial, executive or administrative authorities; or any other circumstances which are not within its reasonable control.

15.5 DISPUTE RESOLUTION.

15.5.1. Other than those claims over which a regulatory agency has exclusive jurisdiction, all claims, regardless of legal theory, whenever brought and whether between the parties or between one of the parties to this Agreement and the employees, agents or affiliated businesses of the other party, shall be resolved by arbitration. A single arbitrator engaged in the practice of law and knowledgeable about telecommunications law shall conduct the arbitration in accordance with the then current rules of the American Arbitration Association ("AAA").

15.5.2. All expedited procedures prescribed by the AAA shall apply. The arbitrator's decision shall be final and binding and judgment may be entered in any court having jurisdiction thereof.

15.5.3 Other than the determination of those claims over which a regulatory agency has exclusive jurisdiction, federal law (including the provisions of the Federal Arbitration Act, 9 U.S.C. Sections 1-16) shall govern and control with respect to any issue relating to the validity of this Agreement to arbitrate and the arbitrability of the claims.

15.5.4 If any party files a judicial or administrative action asserting claims subject to arbitration, and another party successfully stays such action and/or compels

arbitration of such claims, the party filing the action shall pay the other party's costs and expenses incurred in seeking such stay or compelling arbitration, including reasonable attorney's fees.

15.6. LAWFULNESS. This Agreement and the parties' actions under this Agreement shall comply with all applicable federal, state, and local laws, rules, regulations, court orders, and governmental agency orders. Any change in rates, charges or regulations mandated by the legally constituted authorities will act as a modification of any contract to that extent without further notice. This Agreement shall be governed by the laws of the state where Service is provided.

15.7. SEVERABILITY. In the event that a court, governmental agency, or regulatory agency with proper jurisdiction determines that this Agreement or a provision of this Agreement is unlawful, this Agreement, or that provision of the Agreement to the extent it is unlawful, shall terminate. If a provision of this Agreement is terminated but the parties can legally, commercially and practicably continue without the terminated provision, the remainder of this Agreement shall continue in effect.

15.8. MISCELLANEOUS PROVISIONS.

15.8.1. Failure or delay by either party to exercise any right, power, or privilege hereunder, shall not operate as a waiver hereto.

15.8.2. This is a retail end user contract. It may be assigned only with the consent of USWC. It may not be assigned to a reseller or a telecommunications carrier under any circumstances.

15.8.3. This Agreement benefits UUNET and USWC. There are no third party beneficiaries.

15.8.4 This Agreement constitutes the entire understanding between UUNET and USWC with respect to Service provided herein and supersedes any prior agreements or understandings..

16. Intellectual Property.

16.1 USWC represents and warrants that each Service delivered hereunder does not and will not upon or misappropriate any patent, copyright, trade secret, trademark, or other proprietary infringe right (collectively, "Intellectual Property Rights") of any third party. USWC represents and warrants that to its knowledge there are no third party claims to the contrary, and that USWC will promptly inform UUNET if it becomes aware of any such claims.

16.2 All Deliverables created at UUNET's direction and expense separate from the per port charges contained herein shall be created as works made for hire. "Deliverables" shall mean any writings, reports, documentation, software, firmware, designs, technical data, inventions, developments, improvements, discoveries or other information (whether or not patentable, copyrightable or subject to trademark protection). Deliverables shall be the sole and exclusive property of UUNET. UUNET shall have the unilateral and unrestricted right to use such Deliverables and information and ideas contained therein in any way. USWC shall perform all lawful acts requested by UUNET (a) to perfect UUNET's title to all such Deliverables, including the execution of any assignments, and (b) to enable UUNET or its nominee to obtain and maintain patent, copyright, trademark, trade secret or other legal protection therefor anywhere in the world.

16.3 USWC shall indemnify and hold harmless UUNET, its Affiliates, and its and their directors, officers, employees, successors, assigns, agents, customers and any subsequent owner, lessee or user of any of the Services or Deliverables supplied hereunder (each, an "Indemnified Party") from and against any loss, damage, liability, costs and expenses (including reasonable attorneys' fees) which may be incurred on account of any suit, claim, judgment or demand involving infringement or alleged infringement of any third party's Intellectual Property Rights, provided that UUNET shall promptly notify USWC of any suit instituted against an Indemnified Party and, to the extent of its ability to do so, shall permit USWC to defend the same or make settlement in respect thereof (unless such settlement binds an Indemnified Party, involves payment by an Indemnified Party, or adversely and substantively affects an Indemnified Party's rights hereunder, in which case UUNET shall have the right to approve such settlement). UUNET shall have the right (at its expense) to participate in the defense of any such suit. This indemnification does not apply to any infringement or claim of infringement: (a) arising from adherence to instructions or drawings which USWC has been directed by UUNET to follow after the Effective Date of this Agreement; or (b) which relates to combinations of USWC supplied Services with any other software or services not supplied by USWC.

16.4 If the use of any Service or Deliverable provided hereunder is enjoined as a result of infringement of any Intellectual Property Rights, USWC shall, at no expense to UUNET, either (a) obtain for each Indemnified Party the right to use the Service or Deliverable, (b) modify such Service or Deliverable in a manner that is acceptable to UUNET, maintains all existing functionality, and does not infringe on any third party's Intellectual Property Rights, (c) substitute equivalent Service or Deliverable that is acceptable to UUNET and does not infringe on any third party's Intellectual Property Rights, or (d) if commercially reasonable efforts to achieve the foregoing are unsuccessful, provide UUNET a refund for the preceding twenty four (24) months for such Service or Deliverable.

**17. Non-Disclosure.**

The existence and terms of this Agreement shall be held confidential by each party, as shall each party's confidential or proprietary information ("Confidential Information"). Neither party shall disclose the other party's Confidential Information to third parties without the other party's written consent, except as permitted pursuant to this Section. Each party shall disseminate the other party's Confidential Information among its Affiliates and employees only on a need-to-know basis and shall use such Confidential Information only for the purpose of performing its obligations hereunder. To the extent a party is required by applicable law, regulation, or a government agency or court order, subpoena, or investigative demand, to disclose the existence or terms of this Agreement or the other party's Confidential Information, such party shall use its reasonable

efforts to minimize such disclosure and obtain an assurance that the recipient shall accord confidential treatment to such Confidential Information, and shall notify the other party contemporaneously of such disclosure.

18. **Notices and Correspondence.** All notices and correspondence shall be sent by either party in writing to the other in matters dealing with this Agreement to the following addresses:

If to UUNET:
3060 Williams Drive
Fairfax, VA 22031
Attention: General Counsel
Fax: 703-206-5807

If to USWC:

1801 California Street
Suite 5100
Denver, CO 80202
Attention: Karen Tatelman
Fax: 303-308-9456

or any other address provided prior written notice is given to the other party. Notices may be sent by registered or certified mail, postage prepaid, receipt requested, by nationally recognized overnight courier or by fax. Notices shall be deemed delivered within five days of mailing, the day after deposit with the overnight courier, or upon electronic confirmation of fax transmission.

19. **Notice of Labor Disputes.** Whenever USWC has knowledge that any actual or potential labor dispute is delaying or threatens to delay the timely performance of any Service, USWC shall immediately give notice thereof to UUNET.

20. **No Use of Trademarks.** Neither party may use the name, logo or any other trademarks or service marks of the other party in any advertising, signage, marketing materials, brochures or any other materials in any medium without the other party's express advance written permission. Any such permitted use shall be only within guidelines provided by the other party.

The parties hereby execute and authorize this Agreement as of the latest date shown below:

| UUNET Technologies, Inc. | U S WEST Communications, Inc. |
|---|---|
| [signature] | [signature] |
| Authorized Signature | Authorized Signature |
| DAVID R. BOAST | Solomon Trujillo |
| Name Typed or Printed | Name Typed or Printed |
| VP, Dial Access Network | President & CEO |
| Title | Title |
| 12/30/98 | 12/15/98 |
| Date | Date |

12/11/98/UUNET-COBRA
Agreement Number CDS-980819-0115/C



DOJ-00107
CONFIDENTIAL

S 360

DOJ - 00108
CONFIDENTIAL

ATTACHMENT 1
SERVICE DESCRIPTION and SYSTEM DESIGN
SS7 Gateway/COBRA
(Page 1 of 3))

Central Office SS7 Gateway Based Remote Access, is an architecture placing a USWC owned Remote Access Device ("RAD") in local Central Offices. ISP end user customers will dial local access numbers via digital or analog lines to gain access to the RAD via route signaling from the SS7 Gateway. In an effort to balance network traffic, RADs will be reasonably distributed among Digital Switching Systems designated by USWC and connected to the SS7 signaling network. Office selection will be performed with consideration of UUNET demand presence in each office. Calls from non-SS7 Gateway Central Offices will be routed over Interoffice Facilities to the nearest Central Office equipped with a SS7 Gateway connections and RAD for call completion. Modem pools in the RAD will complete the calls and perform an agreed upon network concentration delivered by USWC to UUNET. UUNET requests USWC to offer a finished, bundled, custom contracted service priced by the modem port rather than circuit. USWC billing to UUNET would be based on the total number of active ports and pending firm orders, where the price per port is determined by an agreed upon tiered structure. The SS7 Gateway and RAD architecture applies to new service, service on order, and migration of all existing active Primary Rate ISDN and Dial Access service. UUNET is requesting the SS7 Gateway and RAD based service as a new contract superseding previous term contracts, beginning a new seven-year term.

No locally stored content will be delivered to or originated by from the Remove Access Device. This includes physical and logical links to locally stored software, browsers, video, directory listings or other information based services.

In order to reach the customer objectives of an SS7 based service, the customer and U S WEST agree to deploy a Central Office Based Remote Access (COBRA) based RAD architecture as an interim step. The RAD deployed will be selected and installed by U S WEST for customer service. The RAD is capable of being upgraded to support SS7 Gateway service with minimum service interruption. Migration schedules and strategies will be mutually agreed upon in the regular Executive meetings.

SS7 Gateway functionality is an additional capability which will be added by the vendor to the COBRA RAD and is supported exclusively by USWC.

Attachment 1 (Page 2 of 3) – SS7 Gateway




SS-7 Architecture

Attachment 1 (Page 3 of 3) –Interim Platform






DOJ - 00111
CONFIDENTIAL

ATTACHMENT 2

USWC SITES WITH EXISTING UUNET CIRCUITS

| STATE | CITY | STATE | CITY |
|---|---|---|---|
| ARIZONA | Flagstaff * | NORTH DAKOTA | Fargo |
| | Phoenix | OREGON | Eugene |
| | Tucson | | Portland |
| COLORADO | Aspen * | | Salem |
| | Colorado Springs | SOUTH DAKOTA | Sioux Falls |
| | Denver | UTAH | Ogden |
| | Fort Collins | | Provo |
| IDAHO | Boise | | Salt Lake City |
| | Hailey * | WASHINGTON | Auburn |
| IOWA | Cedar Rapids | | Bellingham * |
| | Davenport | | Olympia |
| | Des Moines | | Silverdale/Bremerton |
| | Iowa City | | Seattle |
| MINNESOTA | Minneapolis | | Spokane |
| | St. Cloud | | Tacoma |
| MONTANA | Butte * | WYOMING | Cheyenne |
| | Great Falls * | | Laramie * |
| | Helena | | |
| NEBRASKA | Omaha | | |
| NEW MEXICO | Albuquerque | | |
| | Santa Fe | | |

TOTAL # OF CITIES: 38

* = Denotes less than 12 installed or pending PRI in that city.

## ATTACHMENT 3 – Hardware Configuration
(Page 1 of 2)

• **TNT Specific Configuration (Remote Access Device)**

Each TNT unit is called a shelf, which has 16 slots. The standard configuration consists of two 8-port T1 cards, an HDLC controller, and six modem cards, each having 48 56K KFLEX modems. The T1 cards have eight ports, numbered 0-7, and terminate either PRIs/Channelized T1s from the LEC switch (ingress circuits), or hi-cap frame T1s going to the UUNET backbone (egress circuits). Our standard is to use ports 0-5 on each card for ingress and to use port 6 for egress. For each TNT shelf, we maintain an ingress to egress circuit ratio of 6:1 or less. A fully loaded shelf supports a total of 12 ingress circuits and 2 egress circuits. Port 7 of both T1 cards is not required, but it may be used for reserve capacity.

The 6:1 or less egress ratio has a distinct advantage. Assume that a COBRA installation has 18 ingress and 3 egress circuits. Any additional ingress T1s activated would require an additional egress circuit in order to maintain the 6:1 or less ratio. However, suppose that 2 additional ingress T's were activated, bringing the total to 20, and a fourth egress was activated to support it. There would then be room to activate an additional 4 ingress T1s upon receiving an order without requiring any activation other than the ingress T1s from the switch to the TNT, all of which is entirely within the LECs control.

**TNT Configuration**

The figure on the next page shows the back of a fully loaded DC-powered TNT. The card type and slot number is shown on the left. Note that the controller card at the top of the chassis is in slot 17. Subsequent cards start with slot number 1. Slot 4 is empty. The modems occupy two slots each. Each modem card has enough modems to service 2 PRIs.

The equipment must be new and in the original packaging. USWC must have newly produced, never registered, non-refurbished equipment from the vendor.



DOJ - 00113
CONFIDENTIAL

ATTACHMENT 3
(Page 2 of 2)

Fully Loaded TNT Configuration

| (QTY) | Ascend Part Number[1] | Description |
|---|---|---|
| (1) | TNT-DC | Chassis with 1 DC power |
| (1) | TNT-SP-DC | Second DC power |
| (1) | TNT-SL-HA192 | HDLC Slot Card |
| (2) | TNT-SL-CT1 | T1 Slot Card |
| (1) | TNT-SO-ISDN | ISDN software |
| (1) | TNT-SO-FR | Frame Relay Software |
| (1) | TNT-SP-DRAM-32 | 32MB DRAM |
| (6) | TNT-SL-48MOD-S56 | 48 Port slot card (Series 56 & V.34) |

Minimum TNT Configuration

The minimum COBRA implementation that UUNET would deploy in any given site is 6 PRIs.

| (QTY) | Ascend Part Number | Description |
|---|---|---|
| (1) | TNT-DC | Chassis with 1 DC power |
| (1) | TNT-SP-DC | Second DC power |
| (1) | TNT-SL-HA192 | HDLC Slot Card |
| (1) | TNT-SL-CT1 | T1 Slot Card |
| (1) | TNT-SO-ISDN | ISDN software |
| (1) | TNT-SO-FR | Frame Relay Software |
| (1) | TNT-SP-DRAM-32 | 32MB DRAM |
| (3) | TNT-SL-48MOD-S56 | 48 Port slot card (Series 56 & V.34) |

[1] To the extent the current part number is used to represent different hardware or functionality from that which is represented at the time of this Agreement, USWC may terminate this Agreement under the provisions contained in the Agreement.

ATTACHMENT 4

PRICING

1. The term of this Agreement is seven (7) years from date of execution.
2. A minimum of 40,000 ports (DS0 equivalents) for the interim platform, SS7 Gateway and/or HCDT DS0 equivalents must be ordered by UUNET on or before December 31, 1998.
3. Pricing tiers are determined by in and Working circuits and pending ports as defined in Section 9.
4. USWC may flow through any price increase or decrease of equipment from UUNET's certified vendor equipment provided to UUNET on a percentage basis from the current costs.
5. Non-recurring charges ("NRC") - $125.00 per DS0 port. NRC are waived for all ports if UUNET reaches a port level of 40,000 or more in and working or pending DS0 ports.

| VOLUMES | INTERIM PLATFORM RATES PER MONTH | SS7 RATES PER MONTH |
|---|---|---|
| 40,000 | $58 | $51 |
| 40,001 – 50,000 | $57 | $50 |
| 50,001 – 60,000 | $56 | $48 |
| 60,001 – 70,000 | $53 | $44 |
| 70,001 – 85,000 | $49 | $40 |
| 85,001 – 100,000 | $45 | $36 |
| 100,000 + | $41 | $33 |

ATTACHMENT 5
SERVICE LEVEL AGREEMENT

**1. Problem Resolution Process for the Dial Access Equipment**

USWC ("Contractor") will provide hardware support and maintenance, and deployment of Resources necessary to fix/replace hardware failures (once UUNET has contacted the Contractor and requested assistance). Should an alarm occur, UUNET will be responsible for contacting the Contractor's Network Operations Center (NOC). UUNET is responsible for determining the source/cause of the problem (Problem Identification) and resolving the problem (Problem Resolution). UUNET may or may not choose to take action on an alarm. If the alarm involves a hardware failure, UUNET will contact the Contractor's NOC, provide specific information on the location and type of activity to occur (example: replace module XXX in device YYY located at ZZZ location). The Contractor's NOC will then deploy the appropriate contracted resources to address the hardware problem.

**2. Service Response**

The service interval for Contractor's response is to be determined by the criteria outlined below. A grade 1 problem is the most critical, grade 3 the least.

| GRADE | OUTAGE / PROBLEM |
|---|---|
| 1 | Circuit/ hardware outage inclusive of and between telephone switch, local cabling and wiring, and RAD. (The connections referred to are hardwired connections from the IMT port on the Central Office Switching System running to the RAD.) (Major alarms as reported to USWC NOC by UUNET or to UUNET NOC by USWC NOC.) |
| 1 | No response from maintenance ports on any associated equipment located in the Central Offices. |
| 2 | Circuit/ hardware outage inclusive of and between telephone switch, local cabling and wiring, and RAD. (The connections referred to are hardwired connections from the IMT port on the Central Office Switching System running to the RAD.) (Minor alarms as reported to the USWC NOC by UUNET or to UUNET NOC by USWC NOC.) |

level,
service ... age

5. Unc

All com

| | |
|---|---|
| 3 | Any non service affecting problems on any associated equipment located in the Central Offices. |
| 3 | Requests for call back on non service affecting issues. |

| GRADE | CONTRACTOR RESPONSE TIME FRAMES |
|---|---|
| 1 | Mean time to respond 30 minutes<br>Mean time to repair 2 hours for Tier 1 (High Density) cities Mean time to repair 4 hours for Tier 2 (Low Density) cities |
| 2 | Mean time to respond 2 hours<br>Mean time to repair 4 hours (Hardware is on-site)<br>Mean time to repair 24 hours (Hardware must be ordered) |
| 3 | Mean time to respond 4 hours<br>Mean time to repair by end of next business day |

Response time is defined as the timeframe for a USWC National Account Center technician to provide acknowledgment of receipt of a trouble report from a UUNET Network Operations Center technician.

**3. Circuit Activation**

Provisioning, test, and acceptance of the egress circuits are UUNET/ USWC's responsibility. Provisioning, test, and acceptance of the ingress PRI/DSS will be the joint responsibility of UUNET, configuring the RAD, and USWC, configuring the switch side.

USWC intends to aggressively schedule and cutover COBRA locations to accommodate UUNET's requirements.

**4. Remedies**

Each Calendar quarter the parties will conduct an Operations Review at which USWC will present analysis on its performance against the metrics set forth in this SLA. If for two consecutive calendar months USWC has failed to meet the Mean Time to Respond or Mean Time to Repair for all Grade 1 and Grade 2 problems (based on the average of the top ninety percent of all Grade 1 and Grade 2 trouble tickets opened that month), both Parties mutually agree to the following action plan: 1) Within 7 days of review, both Parties will meet to determine deficiencies and develop mutually acceptable remedies and timeline to improve service levels. 2) Escalation to USWC executive



DOJ-00117
CONFIDENTIAL