the privilege of communications with *telephones*, it does not fall within the meaning of a "local *telephone* service."

### COBRA Service Does Not Provide Telephonic Quality Communication

22.     Even if section 4252(a) did not require the privilege of communications with persons having telephones (which it does), excise tax would not apply to COBRA service because it does not provide the privilege of "telephonic quality" communications. In *Comdata Network Inc. v. United States*, the United States Claims Court held that tax is owed under section 4252(b) of the Tax Code for toll telephone service if the taxpayer has the "privilege" of the service, regardless of whether the taxpayer exercises that privilege.[23] Although the *Comdata* court recognized that the taxpayer had configured its service to restrict its use, those self-imposed restrictions did not alter the taxability of the service. But the court noted that there would be a critical difference if the service at issue was "inherently incapable of being used more expansively."[24]

23.     In the past the IRS has generally agreed with the *Comdata* court's reasoning. For example, the IRS has ruled that where a communications company furnishes one-way messages over regular telephone facilities to radio receivers or beepers, those services do not provide the subscribers with "local telephone service" as defined in section 4252(a) of the Tax Code.[25] The IRS reasoned that this service did not provide the privilege of telephonic quality communications because the subscriber could only receive data messages and signals.[26] But in another matter before the IRS, a business establishment purchase two telephone lines, one

---

[23]     *Comdata Network, Inc. v. United States*, 21 Cl. Ct. 128. 131 (1990).

[24]     *Id.*

[25]     Rev. Rul. 74-617, 1974-2 C.B. 365.

[26]     *Id.*

HO1.:324694'086'6YJ9905!.DOC:81793.0023

10

S 950

that it used for telephone communications, and another that it used with computer modems to store, merge, and calculate data according to programmed instructions received over the telephone network from terminals at other locations.[27] The IRS contended that, "by plugging in a regularly [sic] telephone set, if it so chooses, it may exercise the privilege of telephonic (voice) quality communication with substantially all persons having telephones in the local system...."[28] So the IRS ruled that the this regular telephone service was subject to tax under section 4252(a) despite the self-imposed limitations on its use.

      24.    COBRA service has no such self-imposed limitations on its use. Rather, the service the LECs provide is inherently limited to the transmission of high-speed data in Internet protocol. And the LECs that provide COBRA service own all of the equipment and facilities used to provide that service. The Reorganized Debtors could not simply unplug the LEC's network access server at the LEC's central office in order to plug in a telephone. As the Reorganized Debtors' contracts with each LEC make clear, the access point for COBRA service lies at the connection of the egress port (back-end) of the LEC's router or frame relay to the Reorganized Debtors' network. Simply put, if the Reorganized Debtors were to purchase access directly to the PSTN, it would be a service different from COBRA.

      25.    The text of section 4252(a) focuses on the *service* actually provided to the customer. As noted in the legislative history to the 1965 Act:

> The definition[] of local telephone service (previously general telephone service) . . . [has] been updated to make it clear that it is *the service as such* which is being taxed and not merely the equipment being supplied.[29]

---

[27]    Rev. Rul. 79-245, 1979-2 C.B. 380.

[28]    *Id.*

[29]    H.R. Rep. No. 433, 89th Cong., 1st Sess. 30 (1965) (emphasis added).

S 951

The LECs' service with COBRA consists of aggregating dial-up data transmissions from multiple end-users of the Internet, processing those data transmissions by means of modem banks and routers into high-speed data streams, and transmitting the data stream to the Reorganized Debtors.[30]   Although the dial-up Internet customer uses the PSTN *prior* to the application of COBRA service, the data product that the LEC delivers to the Reorganized Debtors has been fundamentally changed into an Internet-compatible protocol. Because the Internet and the PSTN operate on separate networks, with separate protocols, the Reorganized Debtors do not have the privilege of telephonic quality communications. And the Reorganized Debtors cannot simply plug in a telephone, if they so choose, to exercise the privilege of telephonic communications.

26.   In tacit acknowledgment of these inherent limitations, the IRS also argues that the Reorganized Debtors have the privilege of telephonic quality communications because "COBRA services are VoIP capable."[31]   Relying on the fact that COBRA service providers actually *prohibit* the use of VoIP with COBRA service, the government infers that COBRA service has VoIP *capability*.[32]   Testifying on behalf of the IRS, Dr. Hills acknowledged that nothing in the COBRA service agreements indicates that COBRA has VoIP capability. Specifically, Dr. Hills testified as follows:

> Q.   In your paragraph 14 [of Dr. Hills's Declaration], it does not say in there that the COBRA service has the VoIP capability?
> A.   It does not say that.
> Q.   So what you're basically doing you're drawing a negative inference?
>      . . .

---

[30]   Anderson Declaration at ¶ 6.1.

[31]   Reply at ¶ 44.

[32]   · *Id.* at ¶¶ 47, 52-54.

>          You're basically implying that
>          from the language?
>     A.   I am -- I am implying from the language that
>          the capability is there, and they've chosen not to use
>          it. That particular VoIP capability is there.
>     Q.   Because it does not say it directly in the
>          language?
>          . . .
>     A.   It's an inference, correct.[33]

This inference is both logically and factually wrong. LECs compete with VoIP service

providers for telephone customers and may prohibit VoIP for purely competitive reasons. And

regardless of the LECs' motivations, COBRA service does not have VoIP capability. COBRA

service was initiated in the initial expansion of public Internet access. The COBRA systems

contain dated hardware and software that do not support voice communications of any kind,

including VoIP.[34] And assuming that the COBRA network architecture could support VoIP

(which it cannot), the Reorganized Debtors would not be able to engage in telephonic quality

communications because the LEC does not supply the hardware, software, and firmware required

to initiate or terminate a VoIP call with COBRA service.[35]

### COBRA Does Not Provide Access to a "Local" Telephone System

27.    Although Congress did not define the term "local" in the 1965 Act, a

definition was largely unnecessary given that telephone carriers offered only two services in

1965: local exchange service and toll service[36]    For local service, state public utility

---

[33]    Deposition of Dr. Hills, 123:8-12, 123:15-21, 124:2, November 16, 2005. Relevant portions of Dr. Hills's
Deposition are attached hereto as Exhibit 4.

[34]    Anderson Declaration at ¶¶ 7.4-7.5.

[35]    *Id.* at ¶¶ 10.1-10.2.2.

[36]    *See, e.g.. San Diego v. Southern California Tel. Corp.*, 266 P.2d 14, 19 (Cal. 1954) (describing the
differences between forms of telephone services); *Pacific Tel. & Tel. Co. v. Hill*, 365 P.2d 1021, 1023 (Or.
1961) (same).

commissions "typically granted an exclusive franchise in each local service area to a local exchange carrier (LEC), which owned, among other things, the local loops (wires connecting telephones to switches), the switches (equipment directing calls to their destinations), and the transport trunks (wires carrying calls between switches) that constitute a local exchange network."[37] Individual subscribers could obtain local exchange service for a flat or minimum monthly rate without a special charge for each call.[38] Toll service, however, "require[d] the payment of a sum in addition to the monthly charge which all subscribers pay."[39]

        28.    In the years following the 1965 Act, the state-sanctioned monopolies that provided local telephone service became the subject of litigation between the United States Department of Justice and AT&T, the dominant telephone service provider at the time of the 1965 Act. This lawsuit was settled through what became known as the AT&T Consent Decree.[40] Pursuant to the AT&T Consent Decree, AT&T divested itself of twenty-four Bell operating companies by 1984 and accepted limitations on the transportation of telecommunications traffic by its local exchanges.[41] Since the divestiture of the Bell operating companies under the AT&T Consent Decree, regional and geographic limits on local telephone

---

[37]    *AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 371 (1999).

[38]    *Southern California Tel. Corp.*, 266 P.2d at 19.

[39]    *Pacific Tel. & Tel. Co.*, 365 P.2d at 1023.

[40]    *United States v. Western Elec. Co.*, 552 F. Supp. 131, 227-28, 231 (D.D.C. 1982), *aff'd mem. sub nom. Maryland v. United States*, 460 U.S. 1001 (1983), *modified*, 673 F. Supp. 525 (D.D.C. 1987) and 714 F. Supp. 1 (D.D.C. 1988), *aff'd in part and rev'd in part*, 900 F.2d 283 (D.C. Cir.), *cert. denied*, 111 S. Ct. 283 (1990), *modified*, 767 F. Supp. 308 (D.D.C. 1991), *aff'd*, 993 F.2d 1572 (D.C. Cir.), *cert. denied*, 510 U.S. 984 (1993).

[41]    Specifically, LECs were limited to telecommunications traffic within a local calling area, or local access and transport area ("LATA"). *See The People of the State of Cal. v. FCC*, 124 F.3d 934, 940 (8th Cir. 1997), *rev'd in part, on other grounds, AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 371 (1999). LECs were permitted to carry traffic within LATAs, or "intraLATA" traffic. *Id.* Traffic between telephones located in two different LATAs, or "interLATA" traffic, was allotted to long-distance carriers. *Id.* The concept of intraLATA and interLATA traffic has now been codified by Congress with the enactment of the Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56.

S 954

service remain an essential aspect of the telecommunications landscape.

29.    COBRA service does not fit within the definition of a "local" telephone service for two basic reasons: (a) the Reorganized Debtors purchase COBRA service in order to facilitate dial-up Internet access on a nation-wide basis and receive high-speed data streams; and (b) Internet-protocol data transmissions are not subject to any of the local calling area limitations encountered when telephone calls are routed over the PSTN. So the government's position on this point leaves many questions unanswered. For instance, the government has argued repeatedly in its Reply that COBRA service provides VoIP service.[42]  In fact, the IRS contends that "no change in the COBRA's *access services* is necessary for WorldCom unilaterally to use the COBRA services to provide VoIP."[43]  Assuming this were true, COBRA would not be a "local telephone service" because VoIP services have no geographic limits. Even though COBRA does not support VoIP services as the government contends, it is an Internet protocol service. As such, COBRA lacks the constraints of the PSTN's local calling areas and cannot be a "local" service.

30.    In recent communications excise tax litigation, the IRS has strained to tax various telecommunications service as a "local" telephone service, even where the service purchased lacks any geographic boundary and provides access to "an untold number of local services."[44]  The IRS has argued that section 4252(a) serves as a "catchall" provision—if the service at issue cannot be taxed as toll telephone service, it must be local telephone service.[45]

---

[42]    *See, e.g.,* Reply at ¶ 47.

[43]    *Id.*

[44]    *Office Max, Inc. v. United States,* 428 F.3d 583, 599-600 (6th Cir. 2005); *see also Am. Bankers Ins. Group v. United States,* 408 F.3d 1328, 1338 (11th Cir. 2005) (stating that the government's interpretation of "local telephone service" would make the statute a nullity).

[45]    *Am. Bankers Ins. Group,* 408 F.3d at 1337.

31.    But as the Court of Appeals for the Eleventh Circuit concluded, "[i]t is hardly a plain or natural reading of the statute to claim that the entire United States is part of one 'local telephone system.'"[46]  As is the case here, some services offered by local exchange carriers simply fall outside the reach of the tax collector. In many respects, "what the government asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted . . . may be included within its scope. To supply omissions transcends the judicial function."[47]  Judge Koeltl recently reiterated these reservations in this District when he rejected the IRS's attempt to unilaterally update the definition of toll telephone service in section 4252(b): "This case does not even involve a drafting error; it involves a disconnect between a forty-year old tax scheme and recent innovations in the telecommunications industry. It is plainly Congress's responsibility to decide whether to revise the statute to accommodate such developments."[48]

## CONCLUSION

32.    COBRA is a data service, not a voice or telephone service. Its only function is to provide the Reorganized Debtors with an Internet protocol high-speed data stream from the LEC. But the Communications Excise Tax only applies to "local telephone service", "toll telephone service" and "teletypewriter exchange service" as those terms are defined in the statute.[49]  The IRS has not asserted that COBRA services provide either a "toll telephone

---

[46]    *Id.* at 1338 (citing *Honeywell Int'l, Inc.*, 64 Fed. Cl. at 203); *see also Fortis*, 2004 U.S. Dist. LEXIS 18686, 2004 WL 2085528 at *15.

[47]    *Iselin v. United States*, 270 U.S. 245, 251 (1926); *see also Nat'l R.R. Corp. v. United States*, No. 04-5421, 2005 U.S. App. LEXIS 26884 at * 10-*13 (D.C. Cir. Dec. 9, 2005) (rejecting arguments by the IRS that all communications services are taxable, regardless of whether they fall within one of the provisions of section 4252 of the Tax Code).

[48]    *Fortis, Inc. v. U.S.*, 2004 WL, 2085528 at *9.

[49]    26 U.S.C. §§ 4251 and 4252.

S 956

service" or a "teletypewriter exchange service." Therefore, the only question before this Court is whether the Reorganized Debtors' COBRA services fall within section 4252(a)'s definition of "local telephone service."

33.    The facts in this case reveal that COBRA service did not give the Reorganized Debtors' the privilege of telephonic quality communication with persons having telephone stations and did not give the Reorganized Debtors access a local telephone system. As such, COBRA service does not meet the definition of local telephone service and therefore is not subject to the Communications Excise Tax.

34.    Accordingly, the Reorganized Debtors' Objection to the Excise Tax Claim should be granted in its entirety.

Dated: Houston, Texas
      December 16, 2005

Marcia V. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

and

Alfredo R. Pérez, Esq.

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX  77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Attorneys for the Reorganized Debtors

S 957

# Exhibit 1

## SECTIONS 4251 AND 4252 OF THE INTERNAL REVENUE CODE

### 26 U.S.C. § 4251.  Imposition of tax

**(a)**     **Tax imposed**

     **(1)**     **In general**

        There is hereby imposed on amounts paid for communications services a tax equal to the applicable percentage of amounts so paid.

     **(2)**     **Payment of tax**

        The tax imposed by this section shall be paid by the person paying for such services.

**(b)**     **Definitions**

    For purposes of subsection (a)—

     **(1)**     **Communications services**

        The term "communications services" means—

        **(A)**    local telephone service;

        **(B)**    toll telephone service; and

        **(C)**    teletypewriter exchange service.

    **(2) Applicable percentage**

    The term "applicable percentage" means 3 percent.

**(c)**     **Special rule**

    For purposes of subsections (a) and (b), in the case of communications services rendered before November 1 of a calendar year for which a bill has not been rendered before the close of such year, a bill shall be treated as having been first rendered on December 31 of such year.

**(d)**     **Treatment of prepaid telephone cards**

    **(1) In general**

    For purposes of this subchapter, in the case of communications services acquired by means of a prepaid telephone card—

        **(A)** the face amount of such card shall be treated as the amount paid for such communications services, and

        **(B)** that amount shall be treated as paid when the card is transferred by any telecommunications carrier to any person who is not such a carrier.

    **(2) Determination of face amount in absence of specified dollar amount**

HO1:\324694\06:4YJ/@061.DOC:\1793.0023

In the case of any prepaid telephone card which entitles the user other than to a specified dollar amount of use, the face amount shall be determined under regulations prescribed by the Secretary.

**(3) Prepaid telephone card**

For purposes of this subsection, the term "prepaid telephone card" means any card or any other similar arrangement which permits its holder to obtain communications services and pay for such services in advance.

.........................

## 26 U.S.C. § 4252. Definitions

**(a) Local telephone service**

For purposes of this subchapter, the term "local telephone service" means—

(1) the access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and

(2) any facility or service provided in connection with a service described in paragraph (1).

The term "local telephone service" does not include any service which is a "toll telephone service" or a "private communication service" as defined in subsections (b) and (d).

**(b) Toll telephone service**

For purposes of this subchapter, the term "toll telephone service" means—

(1) a telephonic quality communication for which

(A) there is a toll charge which varies in amount with the distance and elapsed transmission time of each individual communication and

(B) the charge is paid within the United States, and

(2) a service which entitles the subscriber, upon payment of a periodic charge (determined as a flat amount or upon the basis of total elapsed transmission time), to the privilege of an unlimited number of telephonic communications to or from all or a substantial portion of the persons having telephone or radio telephone stations in a specified area which is outside the local telephone system area in which the station provided with this service is located.

S 959

**(c) Teletypewriter exchange service**

For purposes of this subchapter, the term "teletypewriter exchange service" means the access from a teletypewriter or other data station to the teletypewriter exchange system of which such station is a part, and the privilege of intercommunication by such station with substantially all persons having teletypewriter or other data stations constituting a part of the same teletypewriter exchange system, to which the subscriber is entitled upon payment of a charge or charges (whether such charge or charges are determined as a flat periodic amount, on the basis of distance and elapsed transmission time, or in some other manner). The term "teletypewriter exchange service" does not include any service which is "local telephone service" as defined in subsection (a).

**(d) Private communication service**

For purposes of this subchapter, the term "private communication service" means—

(1) the communication service furnished to a subscriber which entitles the subscriber—

(A) to exclusive or priority use of any communication channel or groups of channels, or

(B) to the use of an intercommunication system for the subscriber's stations,

regardless of whether such channel, groups of channels, or intercommunication system may be connected through switching with a service described in subsection (a), (b), or (c),

(2) switching capacity, extension lines and stations, or other associated services which are provided in connection with, and are necessary or unique to the use of, channels or systems described in paragraph (1), and

(3) the channel mileage which connects a telephone station located outside a local telephone system area with a central office in such local telephone system,

except that such term does not include any communication service unless a separate charge is made for such service.

S 960

# Exhibit 2

## AN EXPLANATION OF THE DIFFERENCES
## BETWEEN COBRA SERVICE AND TELEPHONE SERVICE

The dispute between the Reorganized Debtors and the IRS centers on whether a forty-year old telephone tax applies to Internet access technologies. In order to understand why the telephone excise tax statute does not apply to COBRA service, it is important to understand the differences between the technology that Congress taxed in 1965, and the technology that the IRS wants to tax today. This Exhibit explains those differences.

### I.   Telephone Service: Switching Equipment and Local Exchanges

The network used to provide telephone services today remains relative unchanged since 1965. Approximately thirty years ago the United States District Court for the Southern District of New York described the mechanics of telephone services:

> Ordinary telephone service consists of the privilege of making calls within a local exchange area and, upon payment of an additional amount (message units or a toll charge), outside that area, plus the privilege of receiving relephone calls from any telephone within or outside the local exchange area. A subscriber receives access to the telephone network through a "line" or "loop" (usually consisting of a pair of wires) which is run from the telephone company central office to the subscriber's premises. At the subscriber's end, the line terminates in a "station," a broad term to describe the telephone instrument or other equipment used by the subscriber. When the subscriber makes a telephone call, switching equipment at the telephone company central office (or, in the case of long distance calls, at several telephone company offices) connects his line to the line of the called telephone, thereby completing the call. This ability to place calls through the telephone network is known as "exchange access."[50]

Today, local exchanges (also called local exchange carriers, or LECs) still use switching equipment to route telephone calls between the local exchange that serves the caller and the one that serves the dialed customer.[51] The International Telecommunications Union (the "ITU")

---

[50]     *DuPont Glore Inc. v. AT&T*, 437 F. Supp. 1104, 1107 (S.D.N.Y. 1977).

[51]     Anderson Declaration at ¶9.

HO1:\324694\06\6YJ1@06!.DOC\41793.0023

defines switching as "the establishment on demand, of an individual connection from a desired inlet to a desired outlet within a set of inlets and outlets for as long as is required for the transfer of information."[52]

## II.  COBRA: A Different Technology than Telephone Service

During the 1990's, local exchange carriers began to offer a wholesale product called central office based remote access ("COBRA") to any company with an Internet backbone (such as UUNET) in order to facilitate and enable dial-up Internet access via modems by customers of ISPs.  With COBRA, the LECs aggregate dial-up data transmissions from multiple end-users of the Internet, process those data transmissions by means of modem banks and routers into high-speed IP data streams (packets), and then transmit those data streams to companies like UUNET.[53]  A dial-up ISP like AOL uses the Reorganized Debtors' Internet backbone to access the data packets transmitted by the LECs through COBRA.  This, in turn, allows the ISPs' customers to access the Internet.

The inability of COBRA to function like a telephone service is due to the fact that the Internet relies on entirely different networking principles than the PSTN.  Moreover, the government's witness in this case, Dr. Michael Hills, testified that Internet protocol "is not well suited to voice transmission."[54]  The Internet connects multiple networks around the world that communicate with each other over a suite of standardized protocols: Transmission Control Protocol and Internet Protocol (collectively, ("TCP/IP").[55]  By using TCP/IP, network operators

---

[52]    ANNABEL Z. DODD, THE ESSENTIAL GUIDE TO TELECOMMUNICATIONS 178 (3d ed. 2002).

[53]    Anderson Declaration at ¶ 6.1.

[54]    Deposition of Dr. Hills, 17:1-2, November 16, 2005.

[55]    ANNABEL Z. DODD, THE ESSENTIAL GUIDE TO TELECOMMUNICATIONS 316 (3d ed. 2002).  The term TCP/IP has been used in the industry to denote the family of common Internet protocols.  These protocols

S 962

distribute packets of digital data at gigabyte speeds using high-speed routers. Packets are bundles of data in binary form that Internet networks organize for transmission in TCP/IP format.[56] Unlike the PSTN, the Internet does not require dedicated circuits or paths for the delivery of these packets. And multiple computers can share the same transport lines because each packet contains the addressing and user data required for successful delivery and reassembly by the receiving computer terminal.[57]

## A. The Reorganized Debtors' Internet Backbone Requires Internet Protocol Data

The Reorganized Debtors own a large Internet backbone that permits the exchange of high-speed data streams between Internet service providers ("ISPs"), the ISPs' customers, and the Internet cloud.[58] The Reorganized Debtors' customers in this process are the ISPs. These companies, such as AOL, purchase the Reorganized Debtors' services on a wholesale basis to provide their end-user customers and subscribers with Internet access. These ISP customers both send and receive Internet-protocol ("IP") data packets through the Reorganized Debtors' backbone. The Reorganized Debtors facilitate the exchange of data across interconnected networks, and between computers with diverse hardware architecture and various operating systems, by using the IP networking protocol.

## B. How does COBRA Work?

COBRA service allows Internet subscribers with dial-up connections to access the Internet. The dial-up modem represents one of the earliest, and most antiquated, Internet access

---

were standardized during the late 1970s as a result of specifications during a Defense Advanced Research Agency research project.

[56]    *Id.*

[57]    Newton's Telecom Dictionary 786 (19th ed. 2003).

[58]    Anderson Declaration at ¶ 6.1.

S 963

technologies. A dial-up modem converts digital information from a computer into analog data signals that are delivered over analog telephone lines. At the receiving end, another modem "demodulates" the signal, or converts it from analog data to digital data and transmits it to data terminal equipment such as a computer or a router. By using these modems, digital data on home computers can be sent to the Internet over phone lines, which almost all homes have available.[59]

As reflected in Figure 1 below, the end-user's modem dials a local telephone number associated with a LEC's network access server. The LEC connects that data transmission to the LEC's network access server, or NAS, via a switch and a Primary Rate Interface ("PRI") trunk. The NAS converts analog data from multiple dial-up Internet users into packet data streams that are compatible with the Internet. This high speed data stream is then transmitted via a frame relay line card or router to the Reorganized Debtors' Internet backbone network. The dividing point between the Reorganized Debtors' network and the LEC's COBRA equipment is a high-speed frame relay circuit or IP router that connects from the NAS to backbone equipment in the Reorganized Debtors' facility.[60]

---

[59]     *Id.* at ¶¶ 6, 6.1.

[60]     *Id.* at ¶ 6.2.

S 964



Figure 1

## C. The Dial-up User's Equipment

A dial-up Internet user needs three components at his or her home in order to access the Internet. The first component is a personal computer with a modem connected to it. The modem is then connected to the second component, a standard telephone line wall jack, exactly like the wall outlet used to plug in a regular telephone. The third component is an active local loop from a local telephone company which connects into the local exchange carrier's network. Figure 2 below illustrates these components. The local loop is purchased by the dial-up user from the LEC, and any usage charges and taxes from the local telephone company for use of that local loop are absorbed by the dial-up user, not the Reorganized Debtors.



Figure 2

HO1:\324694\06\6YJ@06!.DOC.81793.0023       5

S 965

## D. Three Components in a COBRA Configuration

COBRA services, as shown in Figure 3 below, include three key components: (i) a Primary Rate Interface; (ii) a Network Access Server; and (iii) a frame relay or router. The COBRA facilities are (a) provided by the LEC, and (b) owned and maintained by the LEC on LEC premises and/or facilities.[61]



Figure 3

### 1. The PRI

The first component is the PRI. A COBRA configuration contains a large volume of circuits between the LEC's switches and the LEC's modem bank, or NAS. The PRI is a circuit that contains 24 local loops or channels. In the case of COBRA based PRIs, only 23 of the 24 channels actually carry data. The 24th channel is used to set up and track the data carried on the other 23 channels. Figure 1 above provides a simple illustration of the Primary Rate Interface between the LEC's switches and the LEC's NAS.

### 2. The Network Access Server

The PRI is then connected to the modems contained in the LEC's network access server.

---

[61]     *Id.* at ¶ 7.2.

S 966

The NAS is a shelf that holds the circuit boards which perform the COBRA modem functions. The NAS hardware has PRI Line Cards installed to accept the PRI circuits and separate the 23 individual channels into 23 distinct units. In the case of the COBRA services purchased by the Reorganized Debtors, the PRI carries a digital copy of the data originated from the dial-up user's modem. With these line cards, the NAS can accept the data signal that arrives on a channel across the PRI, convert that analog data signal information into a data stream (also called data packets) to be sent to the ISP's network, and convert data packets from the ISP network to analog data format to be delivered back to the dial-up user.

### 3.    Frame Relay and Routers

As shown in Figure 3 above, the third key component of COBRA services is the frame relay or router function which is the point of interface in the network from the NAS to the Reorganized Debtors' Internet backbone network. The COBRA configuration supplied by the LECs uses dated system hardware. As a result, the NAS cards supplied with COBRA do not support voice communications of any kind, including voice over Internet protocol ("VoIP") communications.

# EXHIBIT 3

**Declaration of John R. Anderson in Support of the Reorganized Debtors' Objection
to the Request of the Internal Revenue Service / Department of Treasury for
Payment of Administrative Expense Claims**

**(Omitted—Served on November 1, 2005)**

S 968

# EXHIBIT 4

**Relevant Portions of Confidential Deposition of Dr. Michael Hills,
dated November 16/2005**

S 969

CONFIDENTIAL
Michael Hills, Ph.d.

Page 1

1               UNITED STATES BANKRUPTCY COURT

2               SOUTHERN DISTRICT OF NEW YORK

3        _____

4        IN RE:                    CHAPTER 11 Case No.

5        WORLDCOM, INC., ET AL,    02-13533 (AJG)

6        _____/     Jointly Administered

7                                  Pages 1-190

8                                  CONFIDENTIAL

9

10           The CONFIDENTIAL Deposition taken of

11                  Michael Hills, Ph.D.

12                  1300 Eye Street, N.W.

13                       Suite 900

14               Washington, D.C.  20005

15

16                  CONFIDENTIAL

17                  COPY

18

19  Reported by:   Chris Fox, Notary Public

20  Job No:   171232

21

DEC-16-2005  17:19          7132249511          98%          P.34

S 970

CONFIDENTIAL

Michael Hills, Ph.D.

Page 2

1 APPEARANCES:

2 NICOLE GUERON, ESQUIRE

3 Appearing on behalf of the United States

4      Assistant United States Attorneys

5      86 Chambers Street, Third Floor

6      New York, NY   10007

7      212.637.2699

8      Fax 212.637.2686

9      Nicole.gueron@usdoj.gov

10

11 WEIL, GOTSHAL & MANGES, LLP

12 Appearing on behalf of MCI, Inc.,

13      700 Louisiana

14      Suite 1600

15      Houston, Texas   77002

16      713.546.5040

17      Email:james.grogan@weil.com

18            Alfredo.perez@weil.com

19 BY:  Alfredo R. Perez, Esquire

20      James T. Grogan, III, Esquire

21 ALSO PRESENT:  John R. Anderson

S 971

Page 3

1

2                    November 16, 2005

3                       9:30 a.m.

4

5

6

7 Deposition of Michael Hills, Ph.D., held at the

8 Offices of:

9

10 Weil, Gotshal & Manges, LLP

11 1300 Eye Street

12 Suite 900

13 Washington, D.C.  20005

14

15

16 Pursuant to Notice, before Chris Fox, a

17 Notary Public of the District of Columbia

18

19

20

21

Esquire Deposition Services
DC 1-800-441-3376  MD 1-800-539-6398  VA 1-800-752-8979

## CONFIDENTIAL
### Michael Hills, Ph.d.

Page 123

1 requested.)

2          MS. GUERON:  Objection.

3      Q.    You want me to rephrase the question?

4      A.    No.  My statement remains the same.  They are

5 purchasing telephonic communications capability,

6 because that is necessary and essential for access to

7 the modems.

8      Q.    In your paragraph 14, it does not say in

9 there that the COBRA service has the VoIP capability?

10     A.    It does not say that.

11     Q.    So what you're basically doing you're drawing

12 a negative inference?

13          MS. GUERON:  Objection.

14     A.    I don't follow you.

15     Q.    All right.  You're basically implying that

16 from the language?

17     A.    I am -- I am implying from the language that

18 the capability is there, and they've chosen not to use

19 it.  That particular VoIP capability is there.

20     Q.    Because it does not say it directly in the

21 language?

### Esquire Deposition Services
### DC 1-800-441-3376  MD 1-800-539-6398  VA 1-800-752-8979

Page 124

1          MS. GUERON:  Objection.

2      A.   It's an inference, correct.

3      Q.   All right.  Then you go to the next sentence,
4  it says, after the quotation it says:  Makes evident
5  that no change in the COBRA's access service is
6  necessary for WorldCom to unilaterally use the COBRA
7  services to provide VoIP.  Do you see that?

8      A.   Yes.

9      Q.   So, by that you mean that the PRI lines are
10 coming into it?

11         MS. GUERON:  Objection.

12     Q.   Are coming into the COBRA --

13     A.   I -- my statement is that the PRI lines come
14 into the COBRA, can be used for VoIP by whatever means
15 might be required to change the internal configuration
16 of the COBRA.

17     Q.   But here you're focusing on whether a
18 different access is necessary?  You're not focusing on
19 whether it is appropriately configured for VoIP
20 services, correct?

21     A.   I'm focusing on the fact that PRI

MICHAEL J. GARCIA
United States Attorney
Southern District of New York
By:    DANNA DRORI (DD-7690)
        NICOLE GUERON (NG-7682)
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York  10007
Telephone: (212) 637-2689, 637-2699
Facsimile: (212) 637-2686

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:                                          :       CHAPTER 11
                                                :
WORLDCOM, INC., et al.,                         :       Case No. 02-13533 (AJG)
                                                :
          Debtors.                              :       (Jointly Administered)
-------------------------------------------------------X

### NOTICE REGARDING SURREPLY OF THE UNITED STATES OF AMERICA TO REORGANIZED DEBTORS' OBJECTION TO IRS REQUEST FOR PAYMENT NO. 38365

1.    This document provides notice that, on January 26, 2002, the Government served

the Surreply of the United States of America to Reorganized Debtors' Objection to IRS Request

for Payment No. 38365 (the "Reply") on Debtors and the Court, along with the supplemental

declaration of AUSA Nicole Guéron, and exhibits attached thereto.

2.    The Government did not file the Surreply, declarations or exhibits with the Court

either electronically or by hand, subject to the Court's protective order in this matter.

Dated: New York, New York
        January 26, 2006

                                        NICOLE GUERON (NG-7682)
                                        Assistant United States Attorney

Page 1 of 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
                       :

In re:                           :

WORLDCOM, INC., et al.,       :
                       :

       Debtors.         :
                       :

-----------------------------------------------------X

Hearing Date: February 1, 2006 10:00 AM

CHAPTER 11

Case No. 02-13533 (AJG)

(Jointly Administered)

## SURREPLY OF THE UNITED STATES OF AMERICA TO REORGANIZED DEBTORS' OBJECTION TO IRS REQUEST FOR PAYMENT NO. 38365

MICHAEL J. GARCIA
United States Attorney
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2689, 637-2699
Facsimile: (212) 637-2686

DANNA DRORI (DD-7690),
NICOLE GUERON (NG-7682),
Assistant United States Attorneys

- Of Counsel -

# TO BE FILED UNDER SEAL

S 976

## TABLE OF CONTENTS

**PAGE**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Undisputed Technical Facts Regarding Cobra Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.       The COBRA Service Provides Access to the Local Telephone System
         and the Privilege of Telephonic Quality Communication, or, at a
         Minimum, is a Facility or Service Provided in Connection With a
         Local Telephone System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.      IRS Revenue Rulings Are Entitled to "Great Deference" . . . . . . . . . . . . . . . . . . . 7

III.     A Modem to Modem Call is Taxable and a Traditional
         Telephone Is Irrelevant to the Excise Tax Analysis . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.      COBRA's Inability to Originate A Call is Irrelevant to the
         Excise Tax Analysis and, In Any Event, Could be Changed . . . . . . . . . . . . . . 11

         A.       The Ability to Originate a Call is Legally Irrelevant . . . . . . . . . . . . . . . . 12

         B.       COBRA Can Be Reconfigured to Originate Calls . . . . . . . . . . . . . . . . . . 13

         C.       COBRA is a Two-Way Communication System . . . . . . . . . . . . . . . . . . . 14

V.       COBRA Provides Access to a Local Telephone System . . . . . . . . . . . . . . . . . . . 15

VI.      COBRA's VoIP Capability is a Separate Basis for
         Excise Taxes to Apply . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

i

## TABLE OF AUTHORITIES

**CASES:**                                                                                    **PAGE**

Barnhart v. Walton, 535 U.S. 212 (2002) ...................................................................... 8

Bob Jones University v. United States, 461 U.S. 574 (1983) ........................................ 8

Chevron USA, Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984) ............... 8

Comdata Network, Inc. v. United States, 21 Cl. Ct. 128 (1990) ............................. 6, 14

Hollander v. American Cyanamid Co., 172 F.3d 192 (2d Cir. 1999) ........................... 3

United States v. Cleveland Indians Baseball Co., 532 U.S. 200 (2001) ........................ 8

United States v. Correll, 389 U.S. 299 (1967) ............................................................... 8

United States v. Mead Corp., 533 U.S. 218 (2001) ....................................................... 8

Weisbart v. U.S. Department of Treasury, 222 F.3d 93 (2d Cir. 2000) ......................... 7

**REVENUE RULINGS:**

IRS Revenue Ruling 75-102, 1975-1 C. B. 351, 1975 WL 34847 .............................. 12

IRS Revenue Ruling 77-196, 1977-1 C.B. 343, 1977 WL 43147 ............................... 12

IRS Revenue Ruling 79-245, 1979-2 C.B. 380, 1979 IRB LEXIS 290 (July 1979) ...... 9

IRS Revenue Ruling 89-84, 1989-1 C.B. 296, 1989 WL 572070 ............................... 13

**STATUTES:**

26 U.S.C. § 4251 ............................................................................................................ 1

26 U.S.C. § 4252(a) ............................................................................................... *passim*

26 U.S.C. § 4253 ............................................................................................................ 7

26 U.S.C. § 6662 ............................................................................................................ 9

ii

26 U.S.C. § 7805(a) .......................................................................................................... 9

**REGULATIONS**:

26 C.F.R. § 1.6662-3(b)(2) ............................................................................................... 9

26 C.F.R. § 601.601(d)(2) ................................................................................................. 9

iii

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:                                    :          CHAPTER 11
                                          :
WORLDCOM, INC., et al.,                   :          Case No. 02-13533 (AJG)
                                          :
         Debtors.                         :          (Jointly Administered)
-------------------------------------------------------X

### SURREPLY OF THE UNITED STATES OF AMERICA TO REORGANIZED DEBTORS' OBJECTION TO IRS REQUEST FOR PAYMENT NO. 38365

1.      The COBRA services purchased by MCI from local exchange carriers ("LECs") are

subject to federal excise taxes, 26 U.S.C. § 4251 *et seq.* COBRA functions as follows: (a) the

modem of a Dial-up User calls and connects to a modem within the COBRA system, via an analog

signal call placed over the Public Switched Telephone Network ("PSTN"). To quote MCI's expert

witness, John R. Anderson, "[t]he modem calls the modem using a telephonic quality path;"

(Anderson Dep. 54)[1] (b) after the COBRA's modem accepts the Dial-up User's modem call, it

converts the analog signal call into Internet Protocol ("IP") packets which can travel over the

Internet; (c) upon receipt of IP packets from the Internet, the COBRA modem converts the packets

to an analog format for travel over telephone lines back to the Dial-up User. As MCI's expert

acknowledged, "it's two-way communication." (Id. 99). (See infra Point I).

2.      MCI acknowledges that telephonic quality communications enter the COBRA system

on the PSTN (Resp. ¶ 25), but argues that the excise tax does not apply because the COBRA system

"fundamentally change[s]" the incoming telephonic quality communications into "high-speed IP

---

[1]      Supplemental Declaration of Assistant U.S. Attorney Nicole Guéron, dated
January 26, 2006 ("Guéron Supp. Decl."), Ex. A, Excerpts of Deposition Transcript of John R.
Anderson, dated January 5, 2006 ("Anderson Dep.").

-1-

data packets." (Resp. ¶¶ 16, 25).

3.      MCI's argument misses the point. The federal excise tax applies because the Dial-up

User has two-way communication with the COBRA system via telephonic quality messages over a

telephonic quality path. It simply does not matter for excise tax purposes that the COBRA system is

currently configured to convert those communications into IP packets once they are within the

COBRA system. What matters is that two-way, telephonic quality communications are the essence

of the COBRA system, without which it could not connect a Dial-up User to the Internet. Thus, the

COBRA system provides "access to a local telephone system, and the privilege of telephonic quality

communication with substantially all persons having telephone or radio telephone stations

constituting a part of such local telephone system," or, at a minimum, is a "facility or service

provided in connection with" a local telephone system. 26 U.S.C. § 4252(a). (See infra Point I).

4.      MCI objects to paying the excise tax because of the absence of a traditional telephone

in the COBRA system and the alleged inability of COBRA to originate telephone calls. (Resp.

¶¶ 18-21, 23). These facts are neither relevant nor material to the excise tax analysis, however,

under the language of the statute and long-standing IRS administrative interpretation, to which the

Court owes "great deference." (See infra Points III, IV). COBRA also clearly provides access to the

local telephone system, or acts as a service provided in connection with local telephone service,

although the IP packets it generates can travel across the entire Internet once they leave the COBRA

system. (See infra Point V).

5.      Finally, the COBRA system is capable of Voice Over Internet Protocol ("VoIP")

telephony. (See infra Point VI). Computer-to-computer VoIP systems are arranged so that a caller's

voice call is converted into an IP packet on the caller's computer, in the caller's home. In such a

-2-

system, the VoIP call leaves the Dial-up User's home as an IP packet. According to Anderson, "yeah, voice packets generated by the end user's computer could be transported by COBRA." (Anderson Dep. 45). Indeed, Anderson could not rule out the possibility that COBRA was, in fact, used that way. (Id. 126).

## UNDISPUTED TECHNICAL FACTS REGARDING COBRA SERVICES

6.    The declaration and deposition testimony of John Anderson, MCI's expert witness in these proceedings, demonstrate that the parties largely agree about the essential technical characteristics of the COBRA services purchased by MCI.[2]

7.    The parties agree that the COBRA services are activated when the modem[3] of a Dial-up User dials a local telephone number to access the modem bank (also called a Network Access Server ("NAS")) of a Local Exchange Carrier ("LEC"). (Anderson Decl. ¶ 6.2).

8.    To access the LEC, the Dial-up User's modem sends a telephonic quality analog signal over the Public Switched Telephone Network ("PSTN"). According to Anderson, "The [Dial-up User's] modem uses the telephone network to connect to the modem bank via the components in COBRA." (Anderson Dep. 51).

9.    As explained by Anderson, "The modem calls the modem using a telephonic quality

----

[2]    MCI's brief attaches as Exhibit 2 an unsigned document titled "an Explanation of the Differences Between COBRA Service and Telephone Service." The Court should disregard this document and strike it from the record. It is neither an expert report nor a legal brief – it makes factual representations and conclusions, was authored by MCI's counsel, not its expert, and is signed by no one. (Anderson Dep. 127-28). Exhibit 2 therefore improperly places unattributed and conclusory factual assertions before the Court, and it should be stricken from the record. Cf. Hollander v. American Cyanamid Co., 172 F.3d 192, 198 (2d Cir. 1999) (court may strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements)

[3]    A modem is a device which "converts digital information to a telephonic quality voice signal and vice versa." (Hills Decl. Ex. E ¶ 2).

-3-

path." (Anderson Dep. 54). The parties agree that "[a]ll access to modems or DSPs[4] requires two-way, voice grade, telephonic quality communication. The COBRA services purchased by UUNET provide access between Dial-up Users' modems and the modems and/or DSPs within the COBRA system, and thus require two-way, voice capable, telephonic quality communications." (Hills Decl. ¶ 8; Anderson Dep. 55 ("Q: Do you agree with Dr. Hills' conclusions in paragraph 8? A: (Witness perusing document). Yes.")).

10.    The Dial-up User's modem connects to the LEC via a "voice switch." (Anderson Decl. ¶ 6.2, Figure 6.1; Anderson Dep. 36). According to Anderson, there is "a telephonic quality communication between the dial up user and the LEC switch." (Anderson Dep. 48).

11.    Next, the modem call travels from the LEC voice switch to a Primary Rate Interface ("PRI") trunk. (Anderson Decl. ¶ 6.2). A PRI "provides 23 voice channels and one data channel between two points, one being a switch." (Anderson Dep. 35). According to Anderson, there is "a telephonic quality communication between the LEC switch and the PRI" (id. 48); this is because the "PRI has the capability of telephonic quality communication." (Id. 49).

12.    The PRI connects the LEC voice switch to the COBRA modem bank, also called the Network Access Server ("NAS"). (Anderson Dep. 36; Anderson Decl. ¶ 6.2; Figure 6.1). Again, as the parties agree, the "PRI is capable of telephonic quality communication." (Anderson Dep. 49).

13.    Thus, the COBRA services purchased by MCI include a telephonic quality communication path – the "privilege of telephonic quality communication" – all the way from the Dial-up User's modem to the COBRA service's NAS modems. Only once the Dial-up User's

---

    [4]    A digital service processor (DSP) acts analogously to a modem – it converts digital representations of telephonic quality voice signals to alternative digital representation and vice versa. (Hills Decl. Ex. E ¶ 2).

S 983

modem call leaves the PRI inside the COBRA's NAS modem bank is it converted to IP packets,
which can be sent over the Internet. (Anderson ¶ 7.3.2).

14.     The COBRA services also work the same way in reverse. Thus, the COBRA system
receives IP packets from the Internet, converts them to analog signal information within the COBRA
NAS modem bank, and sends these signals on the same telephonic quality communication PRI path
back through the COBRA system, to the LEC voice switch, and then over the PSTN back to the
Dial-up User's modem. (Anderson Dep. 99). In this way, COBRA is "full duplex," or in layman's
terms, "it's two-way communication." (Id.).

**ARGUMENT**

**I.      The COBRA Service Provides Access to the Local Telephone System
and the Privilege of Telephonic Quality Communication, or, at a Minimum,
is a Facility or Service Provided in Connection With a Local Telephone System**

15.     Two-way telephonic quality communications are the essence of the COBRA system,
without which it could not link a Dial-up User to the Internet. COBRA service provides MCI with
access to the local telephone system and the privilege of telephonic quality communication, or, at a
minimum, is a facility or service provided in connection with a local telephone system, regardless of
the conversion of the analog signals to IP packets that occurs within the COBRA system.

16.     Sections 4251 and 4252(a) impose an excise tax on "local telephone service," defined
to include "(1) the access to a local telephone system, and the privilege of telephonic quality
communication with substantially all persons having telephone or radio telephone stations
constituting a part of such local telephone system, and (2) any facility or service provided in
connection with a service described in paragraph (1)." 26 U.S.C. § 4252(a).

17.     According to the leading case construing Sections 4251 and 4252, "the word

-5-

privilege connotes right," rather than any particular use of telecommunications services. See Comdata Network, Inc. v. United States, 21 Cl. Ct. 128, 130-31 (1990). For that reason, the Comdata court rejected arguments about a party's actual use of telecommunications technology, and ruled instead that "the tax is applicable because the service provided [to Comdata] grants it the *right* to utilize the telephone lines to communicate with a substantial number of stations in a distant area. That the service may not, in fact, be so used by plaintiff is irrelevant to the existence of the privilege." Id. at 131 (emphasis added).

18.     The legislative history of the excise tax supports this analysis: it states that "in the case of local telephone service, the definition makes it clear that it is the right of access to a local telephone system and the privilege of telephonic quality communication which is taxed together with facilities or services provided with this service." S. Rep. 89-324, P.L. 89-44, 1965 WL 4428 (June 14, 1965).

19.     Anderson's testimony – on behalf of MCI – makes clear that the modem call from a Dial-up User to COBRA's modems travels on a telephonic quality path the entire way. (See supra Undisputed Technical Facts; Anderson Dep. 41-54). The fact that the COBRA PRI responds only to modem communications in the COBRA system's current configuration is irrelevant for excise tax purposes, because "[t]he PRI is *capable* of a voice quality path but in this configuration it's not voice." (Anderson Dep. 42 (emphasis added)). Under Comdata, the PRI's telephonic-quality capability renders the COBRA system taxable, even if COBRA is currently configured to respond only to modems. See 21 Cl. Ct. at 130-31.

20.     MCI does not contend that Comdata was wrongly decided, but merely – and unsuccessfully – attempts to distinguish it by arguing that the COBRA system is "inherently limited

-6-

to the transmission of high-speed data in Internet Protocol." (Resp. ¶ 24). Yet MCI's own briefing and expert testimony prove otherwise. Specifically, MCI acknowledges that the COBRA service accepts telephone quality transmissions from modems that use the PSTN, that the modem calls travel within COBRA on telephonic quality paths, and that "[a]ll access to modems or DSPs requires two-way, voice grade, telephonic quality communication. The COBRA services purchased by UUNET provide access between Dial-up Users' modems and the modems and/or DSPs within the COBRA system, and thus require two-way, voice capable, telephonic quality communications." (Hills Decl. ¶ 8; Anderson Dep. 41-54, 55 (agreeing with ¶ 8)).

21.     Thus, MCI's own testimony proves that COBRA is a voice-capable system. COBRA accepts incoming voice quality communications from the Dial-up User, and sends outgoing voice quality communications back to the Dial-Up User. Therefore, the system includes the privilege of voice quality communication.

22.     Finally, in seeking to exclude COBRA from the coverage of the excise tax, MCI ignores the fact that the excise tax lists numerous specific exemptions from tax, yet does not exempt voice-capable systems that are used for transmitting data. See 26 U.S.C. § 4253.

## II.     IRS Revenue Rulings Are Entitled to "Great Deference"

23.     As discussed in Sections III and IV below, numerous IRS Revenue Rulings support the IRS's arguments in this matter. These rulings, many of which are decades old, deserve "great deference" from the Court.

24.     "In [the Second] Circuit, a Revenue Ruling is 'entitled to great deference' . . . and is presumed to have 'the force of legal precedent unless unreasonable or inconsistent with the provisions of the Internal Revenue Code.'" Weisbart v. U.S. Dep't of Treasury, 222 F.3d 93, 98 (2d

-7-

Cir. 2000) (quoting Texasgulf, Inc. v. Comm'r, 172 F.3d 209, 217 (2d Cir. 1999) and Gillespie v.

United States, 23 F.3d 36, 39 (2d Cir. 1994)).  This is because

> [E]ver since the inception of the tax code, Congress has seen fit to vest in those
> administering the tax laws very broad authority to interpret those laws.  In an area as
> complex as the tax system, the agency Congress vests with administrative
> responsibility must be able to exercise its authority to meet changing conditions and
> new problems. . . .  [T]his Court has long recognized the primary authority of the IRS
> and its predecessors in construing the Internal Revenue Code.

Bob Jones Univ. v. United States, 461 U.S. 574, 596 (1983) (upholding IRS determination made by

revenue ruling); see United States v. Cleveland Indians Baseball Co., 532 U.S. 200, 220 (2001)

(reasonable revenue rulings "attract[] substantial judicial deference" where they reflect longstanding

interpretation of tax regulations); United States v. Correll, 389 U.S. 299, 306–07 (1967) (deferring

to IRS's administration of tax laws and right to "make appropriate adjustments").

     25.    The Second Circuit has never decided the question of whether revenue rulings

deserve the full deference accorded under Chevron USA, Inc. v. Natural Res. Def. Council, Inc.,

467 U.S. 837 (1984).  However, the Supreme Court has made it clear that, while notice-and-

comment rulemaking and formal adjudication almost always assure Chevron deference, the absence

of such formalities does not preclude such deference, so long as it appears that Congress intended to

grant the agency the power to make rules with the "force of law" and "the agency interpretation

claiming deference was promulgated in the exercise of that authority."  United States v. Mead Corp.,

533 U.S. 218, 226–27, 230–31 (2001); accord Barnhart v. Walton, 535 U.S. 212, 221–22 (2002)

(according Chevron deference to a "longstanding" agency interpretation reached through "means

less formal than 'notice and comment' rulemaking").

     26.    Revenue rulings satisfy this standard.  The IRS promulgates revenue rulings pursuant

to its statutory authority to "prescribe all needful rules and regulations for the enforcement of" the

-8-

Internal Revenue Code. 26 U.S.C. § 7805(a); Treas. Order 111-2, 1981-1 C.B. 698, 699. Revenue

rulings are formal interpretative rulings involving "substantive tax law." 26 C.F.R.

§ 601.601(d)(2)(v)(a). They are issued by the IRS National Office and published in the Internal

Revenue Bulletin as the agency's "official" position to guide taxpayers and IRS officials alike. Id.

§ 601.601(d)(2)(i)(a). Both rulings and regulations are written and reviewed at the same levels of

the IRS and the Treasury Department. Treas. Order 111-2. Like regulations, revenue rulings have

legal force and effect, as they are "precedents to be used in the disposition of other cases" that "may

be cited and relied upon for that purpose." 26 C.F.R. § 601.601(d)(2)(v)(d). And a taxpayer's

disregard of applicable revenue rulings can result in the imposition of penalties. 26 U.S.C. § 6662;

26 C.F.R. § 1.6662-3(b)(2). Revenue rulings consequently have the "force of law" within the

meaning of Mead, and Chevron deference is therefore required. Mead, 533 U.S. at 227.

     27.    Whether entitled to Chevron deference or merely "great deference" under Weisbart,

the revenue rulings discussed below are the considered opinions of the IRS, and the Government

respectfully submits that the Court should defer to those determinations.

## III.    A Modem to Modem Call is Taxable and a Traditional Telephone Is Irrelevant to the Excise Tax Analysis

     28.    In a 1979 revenue ruling, the IRS ruled that the excise tax applies to a service using

the local telephone system to connect modems to one another – in other words, exactly what the

COBRA service does. See IRS Revenue Ruling 79-245, 1979-2 C.B. 380, 1979 IRB LEXIS 290

(July 1979) ("Rev. Rul. 79-245"). Thus, the presence or absence of an actual telephone is irrelevant

to the excise tax analysis.

     29.    MCI argues that Section 4252 requires the presence of "actual telephones," that the

tax cannot apply to any technology "other than plain old telephone service," and that "the exchange

-9-

of data between computer modems" is not taxable. (Resp. ¶¶ 18-21). MCI does not cite a single
case, regulation or revenue ruling in support of this proposition. MCI is incorrect.

30.    Section 4252 refers to "telephone stations,' but that term is not defined by the statute
or regulations. Nor is the term defined in Newton's Telecom Dictionary, contrary to MCI's claim in
its brief (Resp. ¶ 15, citing page 698). (Guéron Supp. Decl. Ex. B.)

31.    Contrary to MCI's assertion, the IRS has long held that the excise tax applies to
systems that do not use traditional telephones. As discussed in the Government's moving papers,
the IRS ruled in 1979 that excise taxes for local telephone service were owed on a system that relied
on modem to modem communication. See Rev. Rul. 79-245, at *6. In this system, a company paid
monthly charges for local telephone service, "but, instead of having standard telephones connected
to the telephone lines the business establishment has its computer unit and terminals connected to
the telephone lines." Id. at *3. As the system was configured,

> The modems convert the computer signals into signals that can be transmitted over telephone
> lines. While these telephone signals are the same type used to transmit voice, the modems
> are designed only for nonvoice transmission and produce a signal which is usable only for
> transmission to other computer stations.

Id. at *2.

32.    This modem to modem system was taxable, the IRS concluded, regardless of the
absence of an actual telephone, because the company "has access to the local telephone exchange
system through the lines used with the computer system." Id. at *4 (emphasis added). In other
words, the IRS held that excise taxes apply even when the local telephone service is being used by
computer modems, not human callers. Id.

33.    The IRS determined that excise taxes were owed because "[w]here a telephone
service provides the subscriber the privilege of telephonic quality communication with substantially

-10-

all other subscribers to the local telephone system, it is immaterial whether the subscriber exercises the privilege." Id. at *5. The company "is a subscriber to local telephone service, even though the privilege of telephonic quality communication may not be exercised." Id.[5]

34.     Similarly, the Comdata case involved, in part, an automated communication system in which electronic fund request messages were transmitted by computers over telephone lines. 21 Cl. Ct. at 129. No telephones were used, yet the service was taxable. Id. at 130-31.

35.     Finally, MCI does not explain why the Court should conclude that a traditional telephone is a necessary feature of a service taxable under Section 4252(a)(2), which expressly includes in the definition of local telephone service "any facility or service provided in connection with" a local telephone system.

36.     Thus, communications between computer modems over the local telephone service are taxable, and MCI is incorrect when it argues that a traditional telephone is a prerequisite for tax liability.

## IV.     COBRA's Inability to Originate A Call is Irrelevant to the Excise Tax Analysis and, In Any Event, Could be Changed

37.     The fact that COBRA – as currently configured – cannot originate calls is irrelevant to the excise tax analysis and does not undermine the fact that COBRA provides two-way communication. Furthermore, COBRA is technologically capable of being reconfigured to originate calls; the sole barriers to such a change are contractual and economic.

---

[5]     MCI tries to distinguish Rev. Rul. 79-245 by noting that the company could have unplugged its modems and plugged in a telephone and had "regular telephone service," which it claims is impossible with the COBRA services. (Resp. ¶¶ 23-24). As confirmed by Anderson, MCI is wrong, because the PRI included in the COBRA services could be plugged into a PBX for "regular telephone service." (Anderson Dep. 35-36, 96-97, 103). Thus, the COBRA services are just as capable of "regular telephone service" as the services at issue in Rev. Rul. 79-245.

A.    **The Ability to Originate a Call is Legally Irrelevant**

38.    MCI maintains that the excise tax does not apply here because the COBRA system cannot initiate or originate telephone calls. (Resp. ¶ 23; Anderson Dep. 75; Anderson Decl. ¶ 3(b)). This is not the law.

39.    The IRS has held for decades that the ability to initiate calls is immaterial under the federal excise tax statute. In 1977, the IRS determined that "Section 4252(a)(1) makes no distinction between systems that provide access to a local telephone network only by receiving calls and systems that both receive and originate calls." IRS Revenue Ruling 77-196, 1977-1 C.B. 343, 1977 WL 43147 ("Rev. Rul. 77-196"). Accordingly, "the fact that . . . the basic [automatic call distributing] switching equipment can only receive incoming calls from a local telephone system is not material to the tax determination." Id.

40.    This decision was supported IRS precedent: the IRS had previously ruled that excise taxes are owed on the purchase of time-of-day and weather-forecast telephone announcements by companies that subscribe to the announcement service and attached advertising messages to the announcements. See IRS Revenue Ruling 75-102, 1975-1 C. B. 351, 1975 WL 34847 ("Rev. Rul. 75-102"). In the time and weather systems, "access to a local telephone system . . . is achieved through receiving incoming calls." Rev. Rul. 77-196 (describing the services at issue in Rev. Rul. 75-102). Nonetheless, the IRS concluded that "the time-of-day and weather forecast services furnished by the telephone company . . . provide access to a local telephone system and the privilege of telephonic quality communication with all persons having telephones in the system." Rev. Ruling 75-102. Thus, excise taxes applied.

41.    Both the 1975 and 1977 revenue rulings were reinforced by a 1989 revenue ruling, in

-12-

which the IRS reviewed a service that permitted subscribers (labeled "call initiators" by the IRS) to call a telephone number to hear information on news, sports or other topics recorded by an information provider. See IRS Revenue Ruling 89-84, 1989-1 C.B. 296, 1989 WL 572070 ("Rev. Rul. 89-94"). The information provider was the "call recipient" because the service apparently received incoming calls only. Id. The IRS determined that the information provider was liable for excise tax, because by providing a service which could receive telephone calls from subscribers, the information provider had "access to the local telephone system and the privilege of telephonic quality communication with all persons having telephones in the system." Id.

42.    Again with no support in statute, regulation or case law, MCI seeks to reverse decades of consistent administrative practice in the application of Section 4252(a), and numerous re-enactments of the statute by Congress. Nothing in the language of the excise tax statute, the legislative history, or decades of IRS administrative interpretation supports the argument that the excise tax applies only where there is a capacity to both initiate and receive calls. To the contrary, the IRS has repeatedly held otherwise. Accordingly, MCI's argument must fail.

**B.    COBRA Can Be Reconfigured to Originate Calls**

43.    Further, the COBRA system could be reconfigured by MCI and the LEC to originate telephonic quality communications. Anderson testified at deposition that it was technologically feasible for the Lucent DSP cards currently used in the COBRA system to be swapped for DSP cards that permit call origination. (Anderson Dep. 110-15). Anderson testified that "the only barriers" to replacing non-call-originating DSP cards with call-originating DSP cards were the contractual, business, and economic concerns of the LEC. (Id. 115-16).

44.    Thus, a readily achievable change would permit call initiation by COBRA and still

-13-

preserve all the COBRA functions purchased by MCI – the DSP cards that permit call initiation also permit Dial-up Users to call into COBRA and provide MCI with a high speed data stream from COBRA. (Id. 113-14, 119-20).

45.    In short, COBRA could be reconfigured to originate telephonic quality calls; the only barriers to such a change are the business choices of the contracting parties. Thus, despite MCI's claims to the contrary (Resp. ¶ 24), any limits on call origination by COBRA are self-imposed, not technological. Such self-imposed limitations are the type of restrictions that were at issue in Comdata – the disputed Comdata system had the "potential" to be used in an indisputably taxable manner, but was being used otherwise by choice. And just as the Comdata plaintiffs unsuccessfully argued, MCI maintains that the IRS should look to "actual use," not "the capability of the service provided." 21 Cl. Ct. at 130. The response of the Comdata Court, however, was unequivocal: "We cannot accept this argument." Id.

46.    As shown above, it is the capability of the COBRA service that triggers its taxability, not its actual use, and the COBRA service is capable of being configured to permit call origination.

### C.    COBRA is a Two-Way Communication System

47.    Finally, MCI concedes through the testimony of its expert that although the COBRA system cannot originate calls as currently configured, it nonetheless provides two-way communication between it and the Dial-up User. Specifically, Anderson testified at his deposition:

> Q:    This is a two-way process right, so that when the data stream comes back into the NAS what it kicks out towards the dial-up user would then again be a digital representation of an analogue [sic] signal?
> A:    Correct, it is full duplex.
> Q:    That doesn't mean anything to me, it's full duplex?
> A:    Yes, it's two-way communication.

(Anderson Dep. 99).

-14-

48.     This testimony is formalized in Anderson's Declaration, in which he notes that the

function of the COBRA NAS is to (1) accept a Dial-up User's voice-quality modem signals from

telephone lines, via the PRI, (2) convert this analog signal to an IP packet, and then (3) do the same

in the opposite direction, that is, accept IP packets from the Internet and convert them to analog

signals to deliver back to the Dial-up User via modem telephone lines. (Anderson Decl. ¶ 7.3.2).

49.     In other words, MCI's own expert concedes that COBRA provides two-way

telephonic quality communication between the Dial-up User and the COBRA modems. The issue of

whether COBRA can initiate this communication is entirely irrelevant to the excise tax analysis.

## V.     COBRA Provides Access to a Local Telephone System

50.     MCI argues that the COBRA services are not a "local" telephone service because the

IP packets that COBRA produces on the egress end of its system can travel anywhere geographically

by means of the Internet. Again, MCI's argument relies on considerations that are irrelevant to the

law of excise tax.

51.     The path of IP packets once they leave the COBRA system is beside the point. As

established by MCI's own expert witness, the services provided by the COBRA system begin when

a Dial-up User dials, by modem, a local telephone number associated with a LEC's modem bank in

its NAS. (Anderson Decl. ¶ 6.2). To accomplish this, the Dial-up User needs "an active local loop

from a local telephone company which connects into the local exchange carrier's network." (Id.

¶7.1). Next, the LEC connects that call to the COBRA system's NAS via the PSTN and a PRI

within the COBRA system. (Id. ¶7.2). The COBRA's PRI is "a circuit that contains 23 local loops

or channels." (Id. ¶ 7.3.1). The PRI is plugged into a local LEC switch on one end (Anderson Dep.

95), and the LEC's modems on the other (Anderson Decl. ¶ 7.3.2). The LEC's modems (or DSPs)

-15-

"convert the analog data signal information to a data stream (also called data packets) to be sent to the ISP's network." (Id.). This process occurs in reverse when the COBRA system communicates back to the Dial-up User. (Id.). Only after all this local traffic – once COBRA has converted the modem call to an IP packet – can the transmission travel over the Internet without geographical limitation.

52.    In simpler terms, a Dial-up User typically places a *local* telephone call via modem to the *Local* Exchange Carrier, which connects to the COBRA's PRI via *local* loops, and then to the COBRA's modem, which then converts the voice-quality modem signals to IP packets for transmission to the Internet. Anderson summarized it as follows at his deposition: "They are given a phone number, their modem or P.C. dials this phone number, which goes through the local phone company and is routed to a modem bank." (Anderson Dep. 22).

53.    Whereas the IP packets can of course travel anywhere, the pre-conversion voice quality modem transmissions are sent through the local telephone system. Accordingly, the COBRA system includes "access to a local telephone system," or, at a minimum, is a "facility or service provided in connection with" a local telephone system, is taxable under Section 4252(a).[6]

## VI.    COBRA's VoIP Capability is a Separate Basis for Excise Taxes to Apply

54.    Finally, the COBRA system is capable of Voice Over Internet Protocol ("VoIP") telephony by the transmission of VoIP packets. As such, it is a taxable service under Section 4252.

55.    MCI claims in its brief that "COBRA service does not have VoIP capability." (Resp.

---

[6]    MCI repeatedly refers to recent lawsuits concerning the definition of long distance "toll telephone service" in Section 4252(b). (Resp. ¶¶ 19, 30-31). By contrast, this case considers whether COBRA is "local telephone service," as defined by Section 4252(a). Thus, the toll telephone service cases are unrelated to this suit and irrelevant here.

-16-

¶ 26). But MCI's expert witness testified to the contrary at his deposition:

Q:    As currently configured, the COBRA system at issue here could accept
      and transmit a computer to computer VoIP packet, right?
A:    Yes.
Q:    You can't rule out the possibility, can you, that the COBRA systems at
      issue here have, in fact, done so, can you?
A:    I would have to speculate.
Q:    My question is, you can't rule it out that that has happened?
A:    No, I can't rule that out.
Q:    Is it true that the COBRA services at issue in this case can't distinguish
      between a computer to computer VoIP packet and any other packet
      coming out of a dial up user's computer?
A:    No, it doesn't look at the content of the packet.
Q:    So, yes, it cannot distinguish?
A:    It does not distinguish.

(Anderson Dep. 126-27).

56.    Anderson thus confirms the opinion of the Government's expert witness, Dr. Hills,

who explained at his deposition that there are at least two types of VoIP telephony, including one in

which a user sends a traditional voice call into a VoIP gateway, which converts it to VoIP internet

packets, and another in which the VoIP conversion from voice to packets is done on the user's own

computer, which generates packets which are then indistinguishable from any other packet going

over the Internet. (Guéron Supp. Decl. Ex. C, Excerpts of Deposition Transcript of Dr. Michael

Hills, dated November 16, 2005, at 80-81).

57.    Hills and Anderson agree that COBRA can transmit this second type of VoIP. A

Dial-up User, using a system such as the commercial service Skype, can place a VoIP call, convert

the voice signals into packets on the Dial-up User's computer, transmit those packets via modem to

the COBRA system, and send those packets onto the Internet, with no conversion of that packet by

the COBRA services. That packet would therefore carry a voice transmission from the Dial-up

User's home to the Internet via the COBRA services purchased by MCI. (Anderson Dep. 44-45,

-17-

126-27; Guéron Supp. Decl. Ex. C at 80-81).

58.    As noted in the Government's first brief, MCI's COBRA Access Contracts include

language such as the following:

> Should WorldCom or any of its affiliates wish to directly use the COBRA Services to
> directly provide any one-way or two-way voice telephony communications, whether local or
> long distance ("VoIP"), WorldCom and Vendor shall negotiate terms, conditions, and rate
> structures that are applicable to VoIP prior to WorldCom utilizing the COBRA Services to
> directly provide VoIP services. . . . If WorldCom or any of its affiliates at any time during
> the Service Term of this Schedule directly use the COBRA Services to provide VoIP without
> the prior development of mutually agreed-upon terms, conditions, and rate structures for
> VoIP, WorldCom shall be in breach of this Schedule . . . .

(Guéron Decl. Ex. C, DOJ 37, ¶ A12).

59.    MCI tries to distance itself from this contractual language, claiming that COBRA

cannot support VoIP communications. (Resp. ¶ 26). As demonstrated above and conceded by

Anderson, this is wrong. Further, MCI fails to explain why MCI would enter a contract which

specifically considers the terms under which COBRA can be used for VoIP, and the consequences to

the parties if COBRA is used for VoIP, if COBRA were actually incapable of VoIP.

60.    In the face of testimony from its own expert that COBRA is capable of VoIP, as well

as contractual language confirming the same, MCI's protests that COBRA cannot be used for VoIP

are utterly unconvincing.

## CONCLUSION

61.    For the foregoing reasons, and for the reasons stated in the Reply of the United States

of America to Reorganized Debtors' Objection to IRS Request for Payment No. 38365 (Docket No.

17177), the Government respectfully requests that the Objection be denied and the Excise Tax Claim

be allowed in full, and that any COBRA-related refund claim of MCI be denied. Alternatively, the

Government respectfully requests that the Court permit the parties to engage in formal discovery on

-18-

the facts underlying Debtors' Objection to the Excise Tax Claim.

Dated: New York, New York
      January 26, 2006

                              MICHAEL J. GARCIA
                              United States Attorney for the
                              Southern District of New York
                              Attorney for the United States of America

By:      _Nicole Guer_____

                              DANNA DRORI (DD-7690)
                              NICOLE GUERON (NG-7682)
                              Assistant United States Attorneys
                              86 Chambers Street, 3rd Floor
                              New York, New York  10007
                              Telephone: (212) 637-2689; 637-2699
                              Facsimile: (212) 637-2686

-19-

S 998