MICHAEL J. GARCIA
United States Attorney
Southern District of New York
By:    NICOLE GUERON (NG-7682)
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2699

Hearing Date: February 1, 2006 10:30 AM

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | CHAPTER 11 |
| | : | |
| WORLDCOM, INC., et al., | : | Case No. 02-13533 (AJG) |
| | : | |
| Debtors. | : | (Jointly Administered) |

--------------------------------------------------------X

### NOTICE OF CROSS MOTION OF THE UNITED STATES OF
### AMERICA TO EXCLUDE CERTAIN TESTIMONY OF
### JOHN R. ANDERSON AND ONE WORLDCOM EXHIBIT

PLEASE TAKE NOTICE THAT the Government is filing under seal this cross motion to

exclude one exhibit and certain testimony of John R. Anderson, expert witness for the

Reorganized Debtors, which may be offered in the hearing on the Objection to Proof of Claim

No. 38365 (IRS Administrative Expense Claim), scheduled for February 1, 2006.

Dated: New York, New York
        January 31, 2006

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for the United States of America

By:

NICOLE GUERON (NG-7682)
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2699
Facsimile: (212) 637-2686

MICHAEL J. GARCIA
United States Attorney
Southern District of New York
By:    DANNA DRORI (DD-7690)
        NICOLE GUERON (NG-7682)
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2689, 637-2699
Facsimile: (212) 637-2686

Hearing Date: February 1, 2006 10:30 AM

# TO BE FILED
# UNDER SEAL



UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

In re:                                          :        CHAPTER 11
                                                :
WORLDCOM, INC., et al.,                         :        Case No. 02-13533 (AJG)
                                                :
        Debtors.                                :        (Jointly Administered)

-------------------------------------------------------X

### OPPOSITION OF THE UNITED STATES OF AMERICA
### TO REORGANIZED DEBTORS' MOTION TO EXCLUDE CERTAIN
### TESTIMONY OF DR. MICHAEL HILLS AND CROSS MOTION TO
### EXCLUDE CERTAIN TESTIMONY OF JOHN ANDERSON
### AND ONE WORLDCOM EXHIBIT

TO THE HONORABLE ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE:

1.    The United States of America (the "United States" or "Government") by its

attorney, Michael J. Garcia, United States Attorney for the Southern District of New York,

respectfully submits this opposition to the Reorganized Debtors' Motion to Exclude Certain

Testimony of Dr. Michael Hills, filed on January 30, 2006 (the "Motion"), and this cross motion

to exclude certain testimony of John R. Anderson and one exhibit submitted by WorldCom

during briefing in this matter.

-1-

## PRELIMINARY STATEMENT

2.      The declaration of the Government's expert witness, Dr. Michael Hills, analyzes

the technical capabilities of the COBRA services purchased by MCI. His opinions are based on

40 years of experience in the telecommunications industry, a Ph.D. in electrical engineering, and

his review of the documents produced by MCI.

3.      Contrary to MCI's claims, Dr. Hills does not offer legal conclusions or legal

expertise. He discusses UUNET's COBRA contracts, not to interpret the legal import of the

contractual provisions, but to assist the Court's understanding of COBRA's technical

capabilities. Because these contracts describe technical aspects of the COBRA services, they are

relevant to Dr. Hills's analysis.

4.      The Government cross-moves to exclude any legal conclusions offered by MCI

expert John R. Anderson, and the document labeled Exhibit 2 to Reorganized Debtors' Response

to the Reply of the United States of America to Reorganized Debtors' Objection to the IRS

Request for Payment No. 38365.

## ARGUMENT

**I.     Dr. Hills Does not Purport to be a Legal Expert and the Court Should Not Preclude
Him From Testifying About the Technical Characteristics of UUNET's Contracts**

5.      MCI variously asserts that Dr. Hills purports to be a legal expert, an expert in

contract interpretation, and an expert on the applicability of federal excise taxes. (Motion ¶¶ 9,

10, 17). This is incorrect. Dr. Hills will not provide legal conclusions or opinions in his

testimony, and the Government certainly agrees that legal conclusions are the domain of the

Court.

6.      One the crucial legal questions before the Court is the meaning of "privilege" as

-2-

used in 26 U.S.C. § 4252(a), which refers to the "privilege of telephonic quality communication." In his Declaration, Dr. Hills does not opine about the meaning of the term "privilege" in the excise tax statute.

7.     Rather, the heart of Dr. Hills's Declaration – and his likely testimony at the hearing on February 1, 2006 – is his conclusion that "the central office-based remote access ("COBRA") services purchased by UUNET from local exchange carriers ("LECs") include access to the local telephone system and the capability of providing telephonic quality communication with substantially all people in the local telephone system." (Hills Decl. ¶ 5).  In his Declaration, Dr. Hills supports this conclusion in part with technical analysis independent of any particular documents (id. ¶¶ 8-11), and in part by pointing to provisions of contracts produced by MCI that demonstrate the technical capabilities of the COBRA services (id. ¶¶ 12-33).  His opinions are technical, not legal.

8.     MCI seeks to exclude any technical analysis based on the UUNET contracts. (Motion ¶ 9).  For example, MCI seeks to exclude any testimony at trial similar to the second paragraph of the following passage from paragraphs 16 and 17 of Dr. Hills's Declaration, in which Dr. Hills analyzes the technical aspects of the UUNET contracts:

> 16.     The Qwest COBRA Access Contract also provides:
>
> COBRA Services provide integrated, remote analog & digital access to WorldCom that may be utilized by WorldCom's employees, WorldCom's end users, and the end users of WorldCom's affiliates, clients and resellers (collectively, "End Users") to connect to WorldCom's Internet network ("WorldCom Network") via modems referred to as network access servers ("NAS") deployed in central offices operated by Vendor [Qwest] . . . .  COBRA Services provide medium to high-speed data transport services for remote access to the WorldCom network.  COBRA Services permit WorldCom to receive calls from multiple analog modems and ISDN basic rate interface lines for handoff to separately purchased wide area network links.  Vendor shall connect each NAS

-3-

S 1002

used in connection with the COBRA Services to the Public Switched Telephone
Network ("PSTN") via ISDN primary rate interface, or other mutually agreed
comparable telecommunications facilities (collectively "PRI") and shall arrange
for the dedicated assignment . . . of unique telephone numbers for (or in use by)
WorldCom and End Users.

(Id. Ex. C, DOJ 35 ¶ A1).

17.    This paragraph means that the COBRA Services purchased by WorldCom
provide WorldCom's employees and customers with regular telephonic access to
modems, which modems then connect to WorldCom's Internet network. By the
terms of the contract, Qwest is required to connect each modem within the
COBRA Services to the PSTN, which is the basic infrastructure of the public
telephone system, and to assign unique telephone numbers to the dial-up
customers. These factors are all hallmarks of a voice-capable telephony system,
which uses telephonic quality connections and dedicated telephone numbers to
connect the dial-up customers to the Internet.

(Hills Decl. ¶¶ 16-17).

9.    Dr. Hills's conclusion in paragraph 17 is technical – he reviews the contractual

language to highlight for the Court those aspects of the COBRA services that are indicative of

telephonic quality communications, such as the NAS modems, the PSTN, and unique dedicated

telephone numbers.

10.    MCI's motion presumes that the following contractual provision, for example, is

self-explanatory: "Vendor shall connect each NAS used in connection with the COBRA

Services to the Public Switched Telephone Network ('PSTN') via ISDN primary rate interface,

or other mutually agreed comparable telecommunications facilities (collectively 'PRI') and shall

arrange for the dedicated assignment . . . of unique telephone numbers for (or in use by)

WorldCom and End Users." The Government believes that it would be useful to the Court for an

expert witness to offer an explanation of the technical terms in such a provision. Dr. Hills will

not testify as to the legal ramifications of the provision.

-4-

11.    Similarly, MCI seeks to exclude from testimony the second paragraph of the

following passage from paragraphs 26 and 27 of Dr. Hill's Declaration:

> 26.    MCI produced to the IRS documents reflecting the configuration of the
> Qwest COBRA system. (Exhibit C, DOJ 234-238). These product description
> documents indicate that the Qwest COBRA system includes a HiPerDSP Card
> Set. (Id. DOJ 234-35). The documents also state that a HiPerDSP Card Set
> "features a fully reprogrammable digital signal processing engine that lets
> administrators reconfigure the system to implement new technologies and
> applications such as voice-over-IP. The card set supports a full range of trunk and
> communication standards . . . ." (Id. DOJ 236; 241-42). The HiPerDSP Card Set
> specifications also identify VoIP as an optional feature. (Id. DOJ 237).
>
> 27.    It is my professional opinion that, as per the text of this product
> description, the HiPerDSP Card Set supports voice capable, telephonic quality
> communications, and therefore that the Qwest COBRA services used by UUNET
> can provide voice capable, telephonic quality communications.

(Hills Decl. ¶¶ 26-27).

12.    This expert conclusion is based on the text of a product description, not a contract

term. Again, the Government believes that the product description is not self-explanatory to a

non-expert, and offers Dr. Hills to provide technical analysis, not legal opinions.

## II.    MCI's Expert John R. Anderson Should not be Permitted to Testify as to Legal Conclusions, and Exhibit Two to MCI's Brief Should be Excluded from the Record

13.    Ironically, it is MCI's expert who overreaches with a purely legal opinion on the

central legal issue of the meaning of "privilege" in Section 4252(a). Mr. Anderson opines that

the COBRA services "do not provide access to a local telephone service, nor does it provide the

privilege of telephonic quality communication with substantially all persons having telephone or

radio telephone stations constituting a part of such local telephone system . . . ." (Anderson Decl.

¶¶ 3, 11). This portion of Mr. Anderson's purportedly expert opinion is actually a word-for-word

quotation of 26 U.S.C. § 4252(a) – the very statute that the Court must interpret. It is a purely

-5-

legal conclusion clothed in a technical report, and any testimony along those lines should be excluded by the Court at tomorrow's hearing, and paragraphs 3 and 11 of Mr. Anderson's Declaration (as cited above) excluded from the record in this matter.

14.     In addition, MCI attached as Exhibit 2 to its Response to the Reply of the United States of America to Reorganized Debtors Objection to IRS Request for Payment No. 38365, an unsigned document titled "an Explanation of the Differences Between COBRA Service and Telephone Service." As discussed in the Surreply of the United States of America to Reorganized Debtors' Objection to IRS Request for Payment No. 38365, at n.2, the Court should exclude this document from the record.

15.     This "Exhibit 2" is neither an expert report nor a legal brief – it makes factual representations and conclusions, was authored by MCI's counsel, not its expert, and is signed by no one. (Anderson Dep. 127-28). Exhibit 2 therefore improperly places unattributed and conclusory factual assertions before the Court, and it should be stricken from the record. Cf. Hollander v. American Cyanamid Co., 172 F.3d 192, 198 (2d Cir. 1999) (court may strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements).

## CONCLUSION

16.     For the foregoing reasons, the Government respectfully requests that the Debtors' Motion to Exclude be denied and the Government's Motion to Exclude be granted in full.

## NOTICE

17.     Notice of this Motion has been provided to MCI. In light of the nature of the relief requested herein, the Government submits that no other or further notice need be provided.

-6-

To the extent that the Court considers only Mr. Anderson's oral testimony at the hearing on the

Objection, the Government will make its objections to such testimony at that time.

## WAIVER OF MEMORANDUM OF LAW

18.      Pursuant to Local Bankruptcy Rule for the Southern District of New York 9013-

1(b), because there are no novel issues of law presented herein, the Government respectfully

requests that this Court waive the requirement that they file a memorandum of law in support of

this Motion.

## NO PREVIOUS APPLICATION

19.      No previous application for the relief sought herein has been made to this or any

other Court.

Dated: New York, New York
       January 31, 2006

                              MICHAEL J. GARCIA
                              United States Attorney for the
                              Southern District of New York
                              Attorney for the United States of America

                    By:       _____
                              DANNA DRORI (DD-7690)
                              NICOLE GUERON (NG-7682)
                              Assistant United States Attorneys
                              86 Chambers Street, 3rd Floor
                              New York, New York  10007
                              Telephone: (212) 637-2689; 637-2699
                              Facsimile: (212) 637-2686

-7-

S 1006



MICHAEL J. GARCIA
United States Attorney
Southern District of New York
By:    DANNA DRORI (DD-7690)
        NICOLE GUERON (NG-7682)
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2689, 637-2699
Facsimile: (212) 637-2686

# TO BE FILED UNDER SEAL

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

In re:                   :            CHAPTER 11
                     :

WORLDCOM, INC., et al.,    :            Case No. 02-13533 (AJG)
                     :

        Debtors.          :            (Jointly Administered)
-----------------------------------------------------X

### SUPPLEMENTAL DECLARATION OF AUSA NICOLE GUERON

NICOLE GUERON, pursuant to 28 U.S.C. § 1746, declares as follows

1.      I am an Assistant United States Attorney in the office of Michael J. Garcia, United States Attorney for the Southern District of New York, attorney for the United States of America. Assistant United States Attorney Danna Drori and I are the attorneys assigned to this matter.

2.      I submit this declaration in support of the Surreply of the United States of America to Reorganized Debtors' Objection to IRS Request for Payment No. 38365.

3.      Annexed hereto as Exhibit A are true and correct copies of excerpts of the deposition transcript of John R. Anderson, dated January 5, 2006.

4.      Annexed hereto as Exhibit B is a true and correct copy of page 698 of Newton's Telecom Dictionary, 19th Edition, 2003.

Page 1 of 2

S 1007

5.    Annexed hereto as Exhibit C are true and correct copies of excerpts of the

deposition transcript of Dr. Michael Hills, dated November 16, 2005.


I declare under the penalty of perjury that the foregoing is true and correct.


Dated: New York, New York
       January 26, 2006

NICOLE GUERON (NG-7682)
Assistant United States Attorney

Page 2 of 2

S 1008

# EXHIBIT A

1

1

2  UNITED STATES BANKRUPTCY COURT
   SOUTHERN DISTRICT OF NEW YORK
3  ------------------------------------------------x
   In re:
4
         WORLDCOM, INC., et al,    Chapter 11 Case No.
5                                    02-13533 (AJG)
                           Debtors.
6
   ------------------------------------------------x
7

8

9          DEPOSITION OF JOHN ANDERSON, the

10  witness herein, pursuant to subpoena, held at the

11  offices of United States Attorney, Southern

12  District of New York, 86 Chambers Street, New

13  York, New York 10007, on Thursday, January 5,

14  2006, at 10:19 o'clock a.m., before James

15  Pungello, a Shorthand Reporter and Notary Public

16  of the State of New York.

17

18

19
                 ORIGINAL
20

21

22

23     TANKOOS REPORTING AND VIDEOCONFERENCING
       305 Madison Avenue          142 Willis Avenue
24     Suite 449                    P.O. Box 347
       New York, N.Y. 10165         Mineola, N.Y. 11501
25       (212) 349-9692              (516) 741-5235

S 1010

2

1

A P P E A R A N C E S:

2

UNITED STATES ATTORNEY'S OFFICE
3               Southern District of new York
                Attorneys for  United States of
4               American and Internal Revenue Service
                86 Chambers Street
5               New York, New York 10007

6       BY:    NICOLE GUERON, ESQ.

7

8       WEIL, GOTSHAL & MANGES, LLP
                Attorneys for WorldCom
9               700 Louisiana, Suite 1600
                Houston, Texas 77002
10
        BY:    ALFREDO R. PEREZ, ESQ.
11              JAMES T. GROGAN, III, ESQ.

12

13   ALSO PRESENT:

14               MICHAEL T. HILLS, Ph.D.

15               BRIAN H. BENJET

16                      *  *  *

17

18

19

20

21

22

23

24

25

S 1011

21

1                    J. Anderson

2      responsibility over the networks that

3      belonged to UUNET?

4           A      Approximately 2002, 2003.  Now

5      that I think about it, it was just prior to

6      bankruptcy.  When was bankruptcy?

7                  MR. PEREZ:  July 2002.

8           A      2002.

9           Q      Just prior?

10          A      Yeah.  Several months prior to

11     bankruptcy.

12          Q      Backing up.  You said that one of

13     your areas of expertise is dial up IP

14     networks?

15          A      Correct.

16          Q      Can you explain what that is?

17          A      Dial up IP networks are networks

18     that enable end users to use their local

19     phone or their home phone or their business

20     phone to dial into the internet using a

21     telephone line and achieve dial up access.

22          Q      How does it work?

23          A      Typically, there's many ways it

24     works.  Probably the most common or typical

25     way is an end user has a P.C. in the home or

S 1012

22

1                     J. Anderson

2        office with a modem in it, the end user

3        subscribes to an ISP such as America on line

4        or MSN or any of the other hundreds that are

5        available.  They are given a phone number,

6        their modem or P.C. dials this phone number

7        which goes through the local phone company

8        and is routed to a modem bank.

9                     Once at this modem bank the users

10       modem in their P.C. and the modem bank

11       acknowledge each other, exchange some

12       information for log on, the modem bank then

13       authenticates the user to allow him gateway

14       into the internet.

15                    Once that's there, the ISP takes

16       over as far as a screen pop or welcome screen

17       and they then have access to the internet.

18       Q       Does that description that you've

19       just given describe the way that the COBRA

20       services that are at issue in this suit

21       function?

22       A       At a high level, yes.

23       Q       Obviously, there are many more

24       details.  Are there any other details

25       particular to the UUNET-COBRA system that you

S 1013

23

                          J. Anderson

1    deem relevant?

3              MR. PEREZ:  I object to the

4    question.

5         A    That's a broad question, so I'm

6    not sure.

7         Q    Let me rephrase it.  Are there

8    any characteristics of the UUNET-COBRA system

9    that differentiate it from other forms of

10   dial up IP access?

11             MR. PEREZ:  I object to the form

12   of the question.

13        A    At a high level most dial up

14   networks are similar.

15        Q    You mentioned some areas of

16   expertise.  You do not have any legal

17   expertise; is that right?

18        A    I'm not a lawyer.  I don't

19   practice law.

20        Q    You don't have any expertise in

21   contract interpretation?

22        A    No.  I am not a lawyer.

23        Q    You don't have any expertise in

24   statutory interpretation, interpretation of

25   statutes?

J. Anderson

and handed it off to MCI high speed data

stream to connect it to our backbone, the

COBRA services in conjunction with the

backbone provided access to end users for

ISPs.

    Q    You've used ISP, that's internet

service provider?

    A    Yes.

    Q    Can you just show me in Exhibit

2, which is your declaration, what diagram or

diagrams best reflect the COBRA systems

purchased by MCI?

            MR. PEREZ:  I object to the form

of the question.

    A    Figure 6.1; figure 7.1; figure

7.2; figure 7.3.  That's it.

    Q    What is the maximum speed that

this COBRA system will support?

            MR. PEREZ:  I object to the form

of the question.

    A    It's a broad question.  You need

to clarify what part.

    Q    The DSP?

    A    The DSP will operate up to -- I

S 1015

1                   J. Anderson

2       don't remember the exact speed.  I can say

3       it's not 56 kilobit because the version is

4       V.25.

5             Q       Meaning it's less than 56 or more

6       than 56?

7             A       Less than 56.  I believe it's --

8       I'm drawing from my memory -- I don't know if

9       this is exact, I believe the highest speed it

10      would go is 33 kilohertz.

11            Q       Now, do you agree that the COBRA

12      services purchased by MCI include PRI

13      services, primary rate interface services?

14                   MR. PEREZ:  I object to the form

15      of the question.

16            A       PRIs are a component of COBRA

17      service that the LEC provides.

18            Q       You think that's a more accurate

19      way to put it?

20            A       Yes.

21            Q       So within the COBRA service that

22      is purchased by MCI, is the provision of a

23      PRI from the LEC; is that right?

24            A       I would not say from the LEC, the

25      PRI is a component within COBRA services.

S 1016

35

                              J. Anderson

1

2         Q        What exactly does a PRI do?

3         A        PRI is a primary rate interface

4    that provides a T-1 or 1.544 megabit stream

5    that is channelized from the ILEC switch to

6    the ILEC's modem bank.

7         Q        Not a lot of those words are

8    understood by the layperson.  Can you tell me

9    in less technical terms what a PRI does?

10        A        The PRI is a channelized -- PRI

11   is a -- I'm trying to make it less technical.

12                 MR. PEREZ:  If you can.

13        A        PRI provides 23 voice channels

14   and one data channel between two points, one

15   being a switch.

16        Q        One of those points is a switch?

17        A        Yes.

18        Q        One point is a switch you said.

19   Does it matter what the other point on the

20   other end of the PRI is?

21        A        It could be many different

22   things.

23        Q        What are some of the options?

24        A        A PBX, computer or modem bank.

25        Q        What's a PBX?

S 1017

36

J. Anderson

1

2      A      Private branch exchange. It's a

3      small switch which typically would reside in

4      an office building.

5      Q      Can you say generally with regard

6      to these COBRA services what was on either

7      end of the PRI?

8              MR. PEREZ: I object to the form

9      of the question.

10     A      Say it again.

11     Q      Let me ask it in a better way

12     then. With these COBRA services, what did

13     the PRI connect, from what to what was the

14     PRI connecting?

15     A      The LEC PRI connected the LEC

16     voice switch to the LEC modem bank.

17     Q      Can you look at paragraph 6.2 of

18     your declaration, please, Exhibit 2, look at

19     sentence two, it reads: "The LEC connects

20     that data transmission to the NAS via a

21     switch and a primary rate interface PRI

22     trunk," right?

23     A      Okay, I looked at it.

24     Q      What is the data transmission

25     you're referring to in that sentence?

S 1018

37

1                    J. Anderson

2       A       It would be data from the end

3   user's P.C. to the internet and vice versa.

4       Q       What kind of data do you mean?

5       A       Any packetized data and the

6   content of the packet could be anything.

7       Q       Could it be voice?

8       A       It could be voice, it could be

9   files, it could be music, it could be

10  pictures, anything.

11      Q       From the perspective of the PRI,

12  it doesn't know, to use a vernacular, what's

13  in the packet; is that right?

14              MR. PEREZ:  I object to the form

15  of the question.

16      A       It doesn't know, nor does it

17  care.

18      Q       So any packet with any content is

19  indistinguishable to a PRI; is that fair?

20      A       Correct.  Like a truck on the

21  highway really doesn't care what the content

22  of the truck is, it's just transporting, it's

23  the same here, it just transports the data.

24      Q       The data transmission to the NAS,

25  the other switch and PRI, that is an analogue

S 1019

```
 1                       J. Anderson
 2    signal; is that right?
 3                MR. PEREZ:  I object to the form
 4    of the question.
 5         Q     The data transmission referred to
 6    in sentence two of paragraph 6.2 is an
 7    analogue signal; is that right?
 8                MR. PEREZ:  Same objection.
 9         A     Where are you referencing?
10         Q     I'm looking at section two of
11    paragraph 6.2, where you're describing a data
12    transmission to the NAS.
13         A     Okay.
14         Q     Is that an analogue signal that's
15    traveling in that data transmission?
16         A     It's analogue data.
17         Q     What does that mean, analogue
18    data?
19         A     Analogue data -- the computer
20    generates data, the data then is fed into the
21    modem and the modem then converts that data
22    to an analogue signal for transmission over
23    the line from the end user's home or business
24    to the LEC switch.
25         Q     That analogue signal mimics voice
```

S 1020

40

1                         J. Anderson

2      data, the modem converts it to analogue data,

3      after it gets to the switch, the switch

4      digitizes it.

5           Q      After it gets to the switch?

6           A      After it gets to the switch.  So

7      once it's on the PRI, it is digital, however,

8      it is a representation of analogue data that

9      is digitized.

10          Q      When you said the switch, this is

11     a LEC switch?

12          A      Correct.

13          Q      It's depicted in figure 6.1?

14          A      Correct.

15          Q      You said that the PRI is now

16     carrying a digitalized version of the

17     analogue data?

18          A      Correct.

19          Q      Stepping away for a moment.  If

20     you know, in a traditional two-person

21     telephone conversation, voice -- analogue

22     voice transmissions are converted

23     or digitalized nowadays sometimes; is that

24     right?

25          A      In most cases, yes.

S 1021

1                        J. Anderson

2          Q      Is it fair to say that from the

3      dial up user to the LEC switch, there is a

4      voice quality transmission?

5                    MR. PEREZ:  I object to the form

6      of the question.

7          A       The LEC provides a voice quality

8      path in most cases from the end user to their

9      LEC switch.

10         Q       Coming out of a LEC switch on

11     that PRI, is it still a voice quality path?

12         A       Yes.

13         Q       Where does the voice quality path

14     end?

15                   MR. PEREZ:  I object to the form

16     of the question.

17         A       The voice quality path is

18     existent between the end user's home or

19     office into the LEC switch.  A PRI would

20     normally have a voice quality circuit,

21     however, the PRI in this diagram is dedicated

22     to data, so although it uses a voice quality

23     path, it's not necessarily -- it's not voice

24     that's going over this PRI.

25         Q       It's digitalized analogue signals

S 1022

1                         J. Anderson

2      going over this PRI, right?

3           A       Right.  The PRI is capable of a

4      voice quality path but in this configuration

5      it's not voice.  So it's kind of vague to say

6      where does it stop.

7           Q       Where does the capacity of that

8      voice quality path stop, it includes the PRI;

9      is that right?

10                  MR. PEREZ:  I object to the form

11     of the question.

12          A       A PRI has the capacity of

13     carrying voice quality.

14          Q       Okay.  Does that capacity end at

15     any time in this COBRA system?

16          A       You could consider that it ends

17     at the NAS.  I say that because if it's a low

18     speed connection, if it's the NAS and the end

19     user's P.C. have negotiated a very slow rate,

20     computer to computer voice would be such low

21     quality that I would not consider it voice

22     quality.  So the first point it potentially

23     ends is at the NAS.

24          Q       I don't entirely understand that

25     answer.  I'm not sure you can make it more

S 1023

1                        J. Anderson

2        vernacular, but you can try.

3                        Can you try to explain that again

4        with a little less technical jargon.

5        A       There is a variable at the NAS,

6        depending on that variable the voice quality

7        could end at the NAS.

8        Q       In. what circumstances would it

9        end at the NAS and under what circumstances

10       would it not end at the NAS?

11                       MR. PEREZ:  Again, I object to

12       the form of the question.

13       A       If the modems negotiated a very

14       slow speed, the voice quality path could not

15       continue past the NAS.  If the NAS is

16       negotiating a higher speed, what I would

17       consider marginal voice quality would be

18       achievable beyond the NAS for computer to

19       computer communications.

20       Q       What determines the speed that

21       the modems have negotiated, to use your term?

22       A       The modems themselves, the

23       quality of the path from the end user to the

24       NAS.

25       Q       Let's take the scenario whereby

S 1024

1                           J. Anderson

2         the voice quality has not ended at the NAS

3         but has gone through.

4                     Is it your opinion that the voice

5         quality capable transmission ends elsewhere?

6            A       For computer to computer

7         communications such as SKYPE or net to phone

8         which provide communications from a computer

9         to a computer, not to the public switch

10        telephone network, you could have voice

11        quality over the internet.

12           Q       So, in other words, if your dial

13        up user has SKYPE, the call is going to run

14        through your COBRA system unconverted,

15        unchanged, right?

16                    MR. PEREZ:  I object to the form

17        of the question.

18                    MS. GUERON:  Let me rephrase

19        that.

20           Q       If the dial up user has SKYPE, a

21        call placed by the dial up user will run

22        through the COBRA services purchased by MCI

23        unconverted and be received by the intended

24        recipient of the call; is that right?

25                    MR. PEREZ:  I object to the form

S 1025

                        J. Anderson

 1

 2   of the question.

 3       A       The intended recipient would have

 4   to be another computer.  The COBRA system

 5   would -- is just a transport mechanism,

 6   transport and aggregation system for data, so

 7   it would not care whether it was voice or

 8   not.  So, yeah, voice packets generated by

 9   the end user's computer could be transported

10   by COBRA.

11       Q       All right.  Now, leaving aside

12   the scenario of computer to computer VoIP.

13   The dial up user, the traditional dial up

14   user, at what point does the communication

15   from a traditional dial up user cease to be a

16   voice capable transmission?

17           MR. PEREZ:  I object to the form

18   of the question.  I think it's been asked and

19   answered but go ahead.

20           MS. GUERON:  Let me rephrase it.

21       Q       If I understand you correctly, I

22   think you said that the NAS may or may not be

23   the point at which a dial up user, a

24   non-SKYPE dial up user's transmissions loses

25   its voice capacity; is that a fair statement?

S 1026

1                    J. Anderson

2                    MR. PEREZ:  I object to the

3    question.  I'm not sure that's what he said

4    but he can answer that.

5         A      When you say non-SKYPE, you seem

6    to be asking two different things.

7         Q      I am, I'm moving away from SKYPE

8    now, back to the scenario of the traditional

9    dial up user who has a modem and is trying to

10   attach to AOL and sends a signal into --

11   calls up its modem, sends a signal out to the

12   LEC, travels over the PRI into the NAS.

13                It's my understanding that what

14   you said thus far is that that is a voice

15   capable transmission path over the PRI,

16   correct?

17        A      Correct.

18        Q      And then you stated that in some

19   circumstances that voice capacity might end

20   at the NAS and in some circumstances it might

21   not end at the NAS depending on the modem's

22   capacity?

23        A      Correct.

24        Q      Correct.  Let's say it doesn't

25   end at the NAS, in the scenario where the NAS

1              J. Anderson

2      modem can pass on a voice capable path, does

3      the voice capability end anywhere else within

4      the COBRA, in your opinion?

5              MR. PEREZ:  I object to the form

6      of the question.  I think it mischaracterizes

7      his testimony.

8      A       The output of the NAS is the end

9      of the COBRA system, so if it is voice

10     quality for computer to computer voice, then

11     it doesn't end in COBRA system.

12     Q       Is it your position that the only

13     voice quality transmission that can run

14     throughout the COBRA system is a computer to

15     computer VoIP system?

16             MR. PEREZ:  I object to the form

17     of the question.

18     A       Ask again.

19             MS. GUERON:  Can you read that

20     back.

21             (Record read.)

22             MR. PEREZ:  Same objection.

23     A       Computer to computer is possible,

24     computer to PSTN is also possible; however,

25     the network would require a VoIP gateway

S 1028

1                       J. Anderson

2       somewhere else in the network.

3                   MR. PEREZ:  Can you read back the

4       question and the answer, please.

5                   (Record read.)

6                   MR. PEREZ:  Can we take a

7       two-minute break.

8           A       Can I add to it?

9                   MS. GUERON:  Let him add to it.

10          A       The dial up network is -- no, I

11      don't want to add to it.  I think I will say

12      the same thing.

13                  MS. GUERON:  Okay, let's take a

14      break.

15                  (Recess taken.)

16          Q       Mr. Anderson, is there a

17      telephonic quality communication between the

18      dial up user and the LEC switch?

19          A       Yes.

20          Q       Is there a telephonic quality

21      communication between the LEC switch and the

22      PRI?

23                  MR. PEREZ:  I object to the form

24      of the question.

25          A       Yes.

S 1029

J. Anderson

1

2      Q      Is there a telephonic quality

3   communication between the PRI and the NAS?

4      A      PRI is capable of telephonic

5   quality communication.

6      Q      You're not limiting that answer,

7   are you, to a SKYPE VoIP type communication,

8   are you?

9              MR. PEREZ:  I object to the form

10  of the question.

11     A      PRI has the capability of

12  telephonic quality communication.

13     Q      Given those answers, why do you

14  conclude that the COBRA services cannot

15  receive telephonic quality voice calls?

16             MR. PEREZ:  I object to the form

17  of the question.

18     A      The PRI is one component of COBRA

19  and it may have telephonic quality

20  communications, however, COBRA, as MCI

21  purchased it, does not provide the ability to

22  make telephone calls.

23     Q      To originate the telephone call

24  you mean?

25     A      To originate a telephone call.

S 1030

1                        J. Anderson

2          Q      I didn't ask about origination.

3     I asked you why you made the statement in

4     paragraph 3B of your declaration that "COBRA

5     services cannot originate, dial out any type

6     of call and cannot receive telephonic quality

7     voice calls from users of the public switch

8     telephone network"?

9          A      COBRA services, as I said, cannot

10    dial out, originate a call, the only kind of

11    call it can receive is a data call from a

12    modem.

13         Q      It's a telephonic quality line,

14    however, that is receiving that call, right,

15    that's what you've told me?

16                MR. PEREZ:  I object to the form

17    of the question.

18         A      That's kind of broad, what you're

19    saying.

20         Q      Let me just reask the more simple

21    question.  Why is it your view that COBRA

22    services cannot receive telephonic quality

23    voice calls?

24                MR. PEREZ:  I object to the form

25    of the question.  It's been asked and

S 1031

1                          J. Anderson

2    answered.

3         Q      Let me rephrase it.  What is your

4    basis for concluding that the COBRA services

5    cannot receive telephonic quality voice

6    calls?                   .

7                 MR. PEREZ:  Same objection.

8         A      The COBRA system can only receive

9    calls from a modem and only modem tones are

10   capable, data calls.

11        Q      Are you saying that a modem is

12   not a telephone quality communication --

13   excuse me, a modem does not emit telephone

14   quality communications?

15        A      I'm saying the COBRA platform

16   could not receive a telephone call that you

17   or I could talk on.

18        Q      What about a telephone call from

19   a modem?

20        A      The modem uses the telephone

21   network to connect to the modem bank via the

22   components in COBRA.

23        Q      A modem uses telephonic

24   quality -- a modem requires telephonic

25   quality transmissions, right?

S 1032

1                    J. Anderson

2          A      Yes.

3          Q      Modems call into the COBRA

4     system, right?

5          A      Yes.

6          Q      Telephonic quality transmission

7     calls into the COBRA system therefore, right?

8                 MR. PEREZ:  I object to the form

9     of the question.

10         A      The modem uses a telephonic

11    quality network to connect, yes.

12         Q      And the COBRA system accepts that

13    communication from the dial up user's modem

14    into the COBRA system, right?

15                MR. PEREZ:  I object to the form

16    of the question.

17         A      Repeat it.

18                (Record read.)

19         A      Yes.

20         Q      Given that modems require

21    telephonic quality communication to operate,

22    and given that the COBRA system accepts modem

23    calls, what is your basis for concluding that

24    COBRA services cannot receive telephonic

25    quality voice calls?

S 1033

1                        J. Anderson

2          A      What I'm implying is that COBRA

3     can only handle data calls from a modem, not

4     a voice call.

5          Q      Let's say with paragraph 3B we

6     took out the word voice from that second

7     clause, would your opinion change, so would

8     you still conclude COBRA services cannot

9     receive telephonic quality calls from users

10    or with the omission of the word voice does

11    your conclusion change?

12                    MR. PEREZ:  I object to the form

13    of the question.

14         A      If you remove voice it changes

15    what I'm saying, and what I'm saying is that

16    you can't make or receive a voice call using

17    the COBRA network.

18         Q      But can you, in fact, receive a

19    telephonic quality call from a modem?

20                    MR. PEREZ:  I object to the form

21    of the question.

22         A      The modem calls the modems of

23    COBRA.  The modem -- the end user's modem

24    calls the COBRA modem.

25         Q      That's the essence of the COBRA

S 1034

1                          J. Anderson

2        system, right, is a modem making a telephonic

3        quality call from the dial up user's computer

4        to the modem in the COBRA system, right?

5                    MR. PEREZ:   I object to the form

6        of the question.

7            A      The modem calls the modem using a

8        telephonic quality path.

9            Q      Okay.  And the modem in the COBRA

10       accepts that call?

11           A      From a modem only.

12                  (Dr. Hills' Declaration marked

13       Anderson Exhibit 3.)

14           Q      Let me hand you what I've marked

15       as Anderson Exhibit 3, please.  Can you let

16       me know if you've ever seen this document

17       before?

18           A      Yes.

19           Q      You've reviewed it previously?

20           A      Yes.

21           Q      Continuing our discussion of

22       modems.  If you would look at paragraph 8 of

23       Dr. Hills' declaration, which is Exhibit 3.

24                  Do you agree with what Dr. Hills

25       has opined in the first -- in this paragraph?

S 1035

55

1                       J. Anderson

2                  MR. PEREZ:  I'm sorry, in the

3       first paragraph or in the first sentence?

4                  MS. GUERON:  In the entire

5       paragraph.

6                  MR. PEREZ:  I missed the

7       question.

8            Q     Do you agree with Dr. Hills'

9       conclusions in paragraph 8?

10                 (Witness perusing document.)

11           A     Yes.

12           Q     Do you agree with his conclusions

13      in paragraph 9?

14                 MR. PEREZ:  I object to the form

15      of the question because I think there is some

16      statements in Dr. Hills' things that are

17      vague.

18                 MS. GUERON:  If you want to

19      differentiate what you want to agree with and

20      don't.

21           A     The answer to the question is no.

22           Q     Do you agree with any of the

23      conclusions in paragraph 9?

24           A     The first sentence.

25           Q     You agree with the first

S 1036

1                          J. Anderson

2       sentence?

3            A      Uh-hum.

4            Q      You disagree with the second

5       sentence that begins "an ISP"?

6            A      Yes.

7            Q      What's the source of that

8       disagreement?

9            A      Typically ISPs don't connect to

10      the PSTN.

11           Q      They use an intermediary is what

12      you mean?

13           A      Correct.

14           Q      Well, if the sentence read "An

15      ISP can connect to the PSTN via an

16      intermediary either by analogue or digitally

17      using a DSP," would you then agree with the

18      sentence?

19           A      Yes.

20           Q      Do you agree with the conclusions

21      of paragraph 10 of Exhibit 3?

22                  MR. PEREZ:  I object to the form

23      of the question.  I think that's an argument.

24           A      No.

25           Q      Let's leave aside sentence one

                    J. Anderson

1

2       Q       That means software?

3       A       The software load for the NAS.

4       Q       The word software isn't in that

5   sentence, so for a nontechnical person, what

6   in this sentence reflects that it's software

7   that's being discussed?

8       A       It says software right in there.

9       Q       The word software is not in the

10   first sentence of paragraph one -- excuse me,

11   of paragraph 6.

12      A       It's in the second sentence.

13      Q       Okay, true.  So it's your

14   position that the second sentence is a

15   restatement of the first?

16      A       It's a clarification.

17      Q       Because the first sentence says

18   "all NAS equipment," right?

19      A       Logical access.

20      Q       Right.  What does that mean?

21      A       The software.

22      Q       Logical access means software?

23      A       Yes.

24      Q       Just because that's not a phrase

25   that I've ever heard before, what's your

S 1038

1                    J. Anderson

2     basis for stating that logical access means

3     software?

4          A     You have to read the whole

5     paragraph, reading just one sentence is

6     vague.  Once you read the whole paragraph, it

7     becomes clear that it's saying MCI or

8     WorldCom is responsible for software in the

9     NAS.

10          Q     Do you agree that when buying

11     COBRA services one thing that MCI gets is

12     access to the local telephone system?

13                    MR. PEREZ:  I object to the form

14     of the question, vague.

15          A     No.

16          Q     What is your basis for

17     disagreeing with that statement?

18          A     Access to the local telephone

19     system means your ability to make local

20     telephone calls.

21          Q     To originate calls?

22          A     To originate and receive local

23     telephone calls.

24          Q     What's your basis for saying

25     that?

S 1039

1                        J. Anderson

2          A       My knowledge, my experience.

3          Q       Anything else?

4          A       No.

5          Q       Do you have any reason --

6     withdrawn.  Does your knowledge and

7     experience extend to what Congress meant when

8     it used the phrase "access to a local

9     telephone system" in 26 USC 4252?

10               MR. PEREZ:  I object to the form

11    of the question.  It's vague.

12         A       I don't know what that document

13    is.

14               (26 USC Section 4252 marked

15    Anderson Exhibit 5.)

16         Q       Let me show it to you.  I'm

17    marking as Anderson Exhibit 5, 26 USC, 4252.

18               If you look at 4252 (a) (1), Mr.

19    Anderson, do you see that the words "access

20    to a local telephone system" are used?

21         A       In (a) (1)?

22         Q       Correct.

23         A       Yeah.

24         Q       Okay.  Now you just testified a

25    little earlier that it's your understanding,

1                          J. Anderson

2      connected to specific types of usage, was it?

3           A      No.

4           Q      And the port charge included the

5      entire COBRA service which encompassed the

6      PRI component, right?

7           A      The entire charge was for the

8      amount of capacity and there was many

9      components including a PRI.

10          Q      Do the COBRA services include at

11     the COBRA ingress port sockets that are

12     designed to receive PRI service from the LEC

13     switch?

14                 MR. PEREZ:  I object to the form

15     of the question.  It's vague.

16          A      Further define what you're

17     asking.

18          Q      Well, at the COBRA ingress port

19     is there a socket that's designed to receive

20     a PRI?

21                 MR. PEREZ:  Same objection.

22          A      I would say there is not an

23     ingress port for COBRA.  COBRA is a service.

24     There is an egress port, but not an ingress

25     port.

S 1041

95

J. Anderson

1

2    Q    Let me ask it a different way

3    then.  My question is, as the PRI services

4    come into COBRA, are there sockets that

5    receive them?

6              MR. PEREZ:  I object to the form

7    of the question.  I think it mischaracterizes

8    his testimony.

9    A    Are you asking me about the COBRA

10   design or the COBRA service?

11   Q    I think it's a design question.

12   A    In reference to the COBRA design,

13   the PRI plugs into the modems on one side and

14   a local switch on the other.

15   Q    The local switch is the LEC side?

16   A    Both components are LEC, the LEC

17   modems and the LEC switch.

18   Q    Let's look at it visually.

19   Figure 6.1 of your declaration which is

20   Exhibit 1 --

21              MR. PEREZ:  2.

22   Q    -- 2.  So on the left-hand side

23   of the PRI is the LEC switch?

24   A    Correct.

25   Q    And on the right-hand side of the

S 1042

1                        J. Anderson

2      PRI where it goes into the NAS there is

3      another socket there?

4           A      The LEC NAS or N-A-S has a port

5      for the PRI.

6           Q      If the NAS had a PRI enabled PBX

7      in it, could the PRI service plug into that

8      at the NAS?

9           A      There is no PBX in the COBRA

10     service.

11          Q      I know.  This is a hypothetical

12     question.  If there were a PRI enabled PBX

13     at that point where the NAS -- where the PRI

14     plugs into the NAS, could the PRI plug into

15     that instead of into the NAS?

16                 MR. PEREZ:  I object to the form

17     of the question.  It's vague.

18          A      A PRI can plug into a PBX but a

19     PBX would not be COBRA service.

20          Q      But would you agree that it is

21     technologically capable for the PRI that is

22     used here to plug into a PBX rather than the

23     NAS that is in the COBRA system?

24                 MR. PEREZ:  I object to the form

25     of the question.  It's vague.

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

S 1043

1                    J. Anderson

2        A      A PBX cannot replace the NAS, no.

3        Q      Not without changing, so that

4     it's not the COBRA system anymore?

5        A      It wouldn't be COBRA service

6     anymore.

7        Q      So, is it fair to say that it's

8     technologically possible for the PRI to plug

9     into a PBX but then the system isn't a COBRA

10    system anymore; is that right?

11            MR. PEREZ:  Same objection.

12       A      If you plug a PRI into a PBX,

13    yes, you no longer have a COBRA service, you

14    have a totally different service which you

15    can purchase from the LEC.

16       Q      Can I turn your attention to

17    paragraph 7.3.2 of Exhibit 2, please.  You

18    say that the DSP -- this is towards the

19    bottom of page eight, "The DSP has three

20    basic functions," right?

21       A      Yes, I said that.

22       Q      "The first function is to accept

23    the data signal when it arrives on the

24    channel across the PRI."

25            Now, I think we've talked about

S 1044

1                    J. Anderson

2     this previously.  This is an analogue signal

3     coming from the modem of the dial up user; is

4     that right?

5          A     You're mixing two different

6     things there.  This is not talking about the

7     in-line signal, no.

8          Q     What am I mixing up?

9          A     It's got a digital signal coming

10    in, not an analogue.

11         Q     When is this converted to a

12    digital signal, this incoming signal?

13         A     It's digital coming out of the

14    switch.

15         Q     The LEC switch?

16         A     The LEC switch.  It would be

17    converted to digital by the switch or a

18    component prior to the switch.

19         Q     I'm sorry.  So this is a digital

20    representation of the analogue signal?

21         A     Correct.

22         Q     Then once that signal is in the

23    NAS, it converts to a data stream, right,

24    that's your conclusion?

25         A     Converts to an IP data stream.

S 1045

1                     J. Anderson

2          Q      This is a two-way process, right,

3     so that when the data stream comes back into

4     the NAS what it kicks out towards the dial up

5     user would then be again a digital

6     representation of an analogue signal?

7          A      Correct, it is full duplex.

8          Q      That doesn't mean anything to me.

9     It's full duplex?

10         A      Yes, it's two-way communication.

11         Q      Can you look at paragraph 7.4.2.,

12    at the bottom you say that "The lucent DSP

13    cards deployed in the COBRA services

14    purchased by the debtors were not equipped to

15    permit voice calls," you see that?

16         A      Which sentence are you talking

17    about?

18         Q      It's starts the second line from

19    the bottom of page ten.

20         A      Yes.

21         Q      What would happen if a voice call

22    came in to the COBRA service and tried to

23    enter that system, what would happen to that

24    call?

25                MR. PEREZ:  I object to the form

S 1046

J. Anderson

1

2     of the question.  It's vague.

3         A      The modem would attempt to

4     answer, not recognize the sounds it was

5     hearing because it's not a modem tone and

6     eventually time out and disconnect.

7         Q      Would that be similar to what

8     happens if a person intending to make a

9     regular telephone call accidentally

10    telephones a fax number?

11        A      Similar process.

12        Q      Where the speaker hears -- would

13    the speaker hear a noise or some kind of

14    signal that it was not a normal telephone

15    conversation?

16               MR. PEREZ:  I object to the form

17    of the question.  Vague.

18        A      The person originating the phone

19    call would hear the screeches and tones of

20    the modem bank.

21        Q      Which was sort of attempting to

22    communicate with what it assumed was a modem

23    coming in?

24        A      Correct.

25        Q      That would go on for awhile and

S 1047

102

1                           J. Anderson

2      be COBRA anymore, you would have to

3      completely change the modems, pull the modems

4      out, put some other device in it, it would no

5      longer be COBRA service.

6          Q       Is there any mechanism whereby

7      the COBRA service, as it exists, can

8      reconnect to a dial up user's modem if the

9      call is dropped?

10         A       No.

11         Q       Is that something that could be

12     reconfigured within the COBRA system or not?

13         A       No.

14         Q       There is no technological way to

15     reconfigure COBRA to permit such a mechanism?

16         A       The COBRA system, as it was

17     deployed, did not have that capability.

18         Q       I understand that.  My question

19     is, could it have been reconfigured to have

20     that capability?

21                 MR. PEREZ:  I object to the form

22     of the question.  It calls for speculation on

23     the part of the witness.

24         A       That's a broad question.  Could I

25     fly without wings, you know, could anything

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

S 1048

1                    J. Anderson

2    happen.  It's too broad.

3        Q    Okay.  I certainly don't mean it

4    to be that broad.  I mean it to be a question

5    of technical feasibility.

6              What is the obstacle within the

7    COBRA system to it being able to originate a

8    call out?

9        A    The hardware and software is not

10   capable of doing it.

11       Q    You said to change that you'd

12   need to change the modems?

13       A    You need to change the modems and

14   the software to some other device like a PBX

15   but then it's no longer the COBRA service.

16       Q    You'd have to replace the NAS

17   with a PBX?

18            MR. PEREZ:  I object to the form

19   of the question.

20       A    If you make it -- if you change

21   out the equipment it's no longer COBRA

22   service.  So, in order for it to continue to

23   be COBRA you can't change anything and make

24   it possible to originate calls.

25       Q    You stated earlier that, in your

S 1049

1           J. Anderson
2    opinion, a system that couldn't originate
3    calls was not -- did not have access to the
4    local telephone system, right?
5           A    Yes.
6           Q    Just to flush out that
7    understanding a little.  Would it be your
8    view, for example, that a catalog company    .
9    that gets phone calls in from customers, LL
10   Bean, customers call in, place their orders,
11   if the people receiving those orders can't
12   call out, is it your opinion that that call
13   center does not have access to the local
14   telephone system?
15              MR. PEREZ:  I object to the form
16   of the question.  It calls for speculation on
17   the part of the witness.
18         A    Do I disagree with that, is that
19   what you're asking?
20         Q    My question is, in the scenario
21   that I described, is it your opinion that
22   that system does or does not have access to
23   the local telephone system?
24              MR. PEREZ:  Further objection.
25   It assumes facts not in evidence which is

1                          J. Anderson

2    that he had an opinion about this.

3         Q      Or do you have no opinion?

4         A      Based on the question you asked,

5    there is not enough information to say yes or

6    no.

7         Q      What information would you need?

8         A      What does their network look like

9    and how is it used.

10        Q      Is that because it matters to you

11   whether it's a software, whether it's a

12   software obstacle versus a hardware obstacle

13   to placing outgoing calls?

14                MR. PEREZ:  I object to the form

15   of the question.  Assumes facts not in

16   evidence.

17        A      If the end user is dialing into

18   the internet to place orders through a modem

19   like COBRA, then the modem network cannot --

20   is not part of the local telephone network.

21                If they are just making telephone

22   calls to somebody who has no buttons on their

23   phone to make an outgoing call, then that's a

24   different situation.

25        Q      In that different second

S 1051

1                    J. Anderson
2    telephone system, right?
3         A      If you bought and they delivered
4    the service, yes.
5         Q      So if you're moving houses, you
6    move into a house, you buy a hookup to your
7    LEC but for three weeks you don't yet move
8    in, starting from the moment the line is
9    hooked up or the service is hooked up,
10   rather, you have access, right, even if you
11   haven't plugged a phone into the telephone
12   jack?
13                MR. PEREZ:  I object to the form
14   of the question.  Calls for speculation.
15        A      Yes.
16        Q      Because the access is limited to
17   the service you bought from the LEC, not what
18   you physically done to activate it; is that
19   right?
20                MR. PEREZ:  I object to the form
21   of the question.  Vague.
22        A      Yes.
23                MS. GUERON:  Hold on one second.
24                (Pause.)
25                MR. PEREZ:  If you're going to

S 1052

1              J. Anderson

2    change areas, if we could take a two-minute

3    break.

4              MS. GUERON:  Go ahead.

5              (Recess taken.)

6         Q    Mr. Anderson, you just said

7    previously that if the COBRA was reconfigured

8    such that it could originate calls, it

9    wouldn't be COBRA any longer?

10        A    Yes.

11        Q    Doesn't Lucent sell DSP cards

12   that can originate calls?

13        A    Yes, Lucent does sell those

14   products.

15        Q    Couldn't those have been used,

16   couldn't those have replaced the DSP cards in

17   the COBRA system to permit COBRA to originate

18   calls?

19        A    No.

20        Q    How come?

21        A    The contracts restricted that

22   from happening.

23        Q    Let me understand.  Did the

24   contracts restrict it from happening at

25   anyone's request or simply that it wasn't

S 1053

1                          J. Anderson

2          MCI's decision?

3               A       The contracts said if the

4          hardware was going to be swapped out, that

5          both companies would have to agree to it, and

6          the contracts also -- at least one of the

7          contracts said that basically what you're

8          implying is VoIP was not permittable.

9               Q       I didn't mean to be opening the

10         door to a whole VoIP conversation, although I

11         want to have a little further discussion on

12         that.

13                      But I was talking about two-way

14         communication of the type that COBRA is doing

15         just such that a DSP card -- an alternate DSP

16         card that permits origination could be

17         swapped out, as you said, that is

18         technologically possible with the COBRA

19         system?

20                      MR. PEREZ:  I object to the form

21         of the question.  It's vague.

22                      MS. GUERON:  Let me withdraw it.

23              Q       You agreed that Lucent does sell

24         DSP cards that permit call origination,

25         right?

112

J. Anderson

2    A    Yes.

3    Q    Then you said, but you can't do

4    that in this system because the contracts

5    don't permit it, that was your testimony?

6    A    I'm assuming you meant the VoIP

7    cards, and, yes, the contract doesn't permit

8    it.

9    Q    Now, leaving aside what the

10   contract permits, are there any technological

11   impediments to making that card swap?

12            MR. PEREZ:  I object to the form

13   of the question.  Calls for speculation.

14   A    If you swap out those cards, it's

15   no longer COBRA.

16   Q    Why?

17   A    It becomes a VoIP gateway.

18   Q    Are you saying that dial up users

19   couldn't use it anymore?

20   A    Yes, they could.

21   Q    You told me that MCI was buying a

22   service whereby dial up users can call in and

23   they get a high speed data stream out the

24   back end, right?

25   A    Yes.

S 1055

J. Anderson

1                         J. Anderson

2          Q    Would swapping the Lucent cards

3    change that?

4          A    It provides additional

5    capabilities that we didn't purchase.

6          Q    Okay, I understand that, that

7    it's not what the contracts call for now.

8                But would swapping those cards

9    undue the ability of a dial up customer --

10   dial up user to call in to the COBRA?

11         A    No.

12         Q    Would it eliminate the ability of

13   MCI to get the high speed data stream out the

14   back end of the COBRA that it purchased?

15         A    No.

16         Q    So the Lucent cards would add a

17   capability, the Lucent call origination

18   cards, if I can call them that -- let me back

19   up.

20               What are these Lucent DSP cards

21   called, the ones that can originate calls?

22         A    I would have to look.  I don't

23   know the name off the top of my head.

24         Q    Lucent DSP cards that can

25   originate calls, if they had been swapped

S 1056

```
 1                      J. Anderson
 2      into the COBRA system, they would have added
 3      capabilities that were outside the contract
 4      between the LEC and MCI, right?
 5           A     Correct.
 6           Q     But they would not have destroyed
 7      the capabilities that are what MCI purchased
 8      from the LEC, would they?
 9           A     No.
10           Q     And the only barrier to making
11      that card swap is contractual?
12                 MR. PEREZ:  I object to the form
13      of the question.  I think it calls for
14      speculation on the part of the witness.
15           A     No.
16           Q     What other barriers are there?
17           A     Economic and business barriers.
18           Q     Meaning what exactly?
19           A     It would be a huge capital
20      investment for the LEC for no gain and it
21      would be a business threat to the LEC for no
22      gain.
23           Q     So, is it fair to say, then, that
24      the only impediments to replacing the
25      existing COBRA DSP card with a DSP card that
```

115

1                    J. Anderson

2     could originate calls were contractual and

3     also the economic and business judgment of

4     the contracting parties?

5              MR. PEREZ:  Objection, calls for

6     speculation.

7        A     Of the contracting parties for

8     the first one.  For the second two, for the

9     LEC.

10       Q     I'm sorry, you lost me.  The

11    first one and the second two means what?

12       A     The barriers, the contractual

13    barrier was between both MCI and the LEC, the

14    business and economic barriers were the

15    LEC's.

16       Q     I understand.  So.  To say it

17    again as clearly as we can.  The only barrier

18    to replacing the DSP cards within the COBRA

19    system that cannot originate calls with DSP

20    cards that could originate calls, such that

21    the COBRA system could originate calls, the

22    barriers such as switch were, one,

23    contractual, and that affected both the LEC

24    and MCI, and secondly the business judgment

25    and economic concerns of the LEC, correct?

S 1058

116

J. Anderson

2       A     Correct.  In addition there would

3   have to be a substantial investment by the

4   LEC in other components that don't exist.

5       Q     What do you mean by that?

6       A     Call controllers and other

7   devices.

8       Q     Would that be -- I'm sorry.

9       A     As I put in my deposition.

10      Q     In your declaration?

11      A     I'm sorry, in my declaration.

12      Q     Can you just point me to where

13  you put that in your declaration.

14          MR. PEREZ:  You want to take a

15  minute to read the whole thing?

16          THE WITNESS:  Yes.

17          MS. GUERON:  Fine.

18          (Pause.)

19          MR. PEREZ:  Let's take a quick

20  break.

21          (Recess taken.)

22          MS. GUERON:  Can you read back

23  the last question and answer, please.

24          (Record read.)

25       A     10.1.

S 1059

117

1                    J. Anderson

2        Q     Now, is there any reason that the

3    gateway or the control services you described

4    would have to be provided by the LEC rather

5    than by MCI in this scenario?

6              MR. PEREZ:  I object to the form

7    of the question.  It's vague.  I don't know

8    what you mean, this scenario.

9        Q     Do you understand what I mean,

10   Mr. Anderson?

11       A     No, I don't.

12       Q     You said that you agreed with me

13   that the only barriers to changing the Lucent

14   DSP card such as to permit outgoing call

15   origination, were contractual and economic

16   barriers, you said you agreed and said --

17   sort of as an add on, but the LEC would also

18   have to provide gateways and control

19   services, I asked you where you said that in

20   your declaration, you said 10.1.

21             My follow-up is, why is it that

22   the LEC would have to be the entity providing

23   those additional services rather than MCI?

24             MR. PEREZ:  I object to the form

25   of the question.  It's vague.  I think you're

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

S 1060

118

1                          J. Anderson

2    mixing two different things.

3        A       You're asking two questions, in

4    my mind.

5        Q       All right.  What do you think I'm

6    asking?

7        A       You're asking about a VoIP

8    network but talking about COBRA, so which one

9    are you talking about?

10       Q       We're talking about COBRA, the

11   COBRA system as it exists which could be

12   changed to permit origination of calls from

13   the COBRA system with a new DSP card?

14               MR. PEREZ:  I object to the form

15   of the question.

16               MS. GUERON:  I'm not done.

17       Q       And we agreed that the barriers

18   to such a change are economic and contractual

19   but those are the only barriers, right?

20               MR. PEREZ:  I object to the form

21   of the question.  It mischaracterizes his

22   testimony.

23               MS. GUERON:  What am I

24   mischaracterizing, I thought that's the

25   conversation we just had for the last ten

S 1061

J. Anderson

2    minutes.

3    A    If you add those components and

4    you make these changes, it's no longer COBRA.

5    So, if it's not -- you're making it something

6    else and then asking me barriers to make it

7    something else.

8    Q    But you agree, I believe, that

9    the system, as modified, would provide all

10    those COBRA services plus it would have other

11    capabilities?

12    A    You're making it a VoIP gateway

13    by doing that and then it's no longer COBRA,

14    it's a VoIP gateway.

15    Q    But dial up users can call in,

16    right?

17    A    Dial up users in some VoIP

18    gateways can use a VoIP gateway for dial up

19    access.

20    Q    So if this COBRA system were

21    modified by adding a new DSP card that would

22    permit the system to originate calls, all the

23    COBRA services provided by MCI would still be

24    there, right?

25    A    Yes.

S 1062

```
 1                          J. Anderson
 2          Q       It would have additional
 3    capabilities of call origination which are
 4    calling VoIP?
 5          A       Yes.
 6                  MR. PEREZ:  I object to the form
 7    of the question.
 8          Q.      The barriers to such a
 9    modification are the contractual barriers
10    between MCI and the LEC and the business
11    barriers that make it unprofitable or unwise
12    for the LEC, right?
13          A       Yes.
14          Q       And you added, right before we
15    took a break, the other barriers that the LEC
16    would have to add a gateway and control
17    services, right?
18          A       It would become something other
19    than COBRA.
20          Q       That's not my question.  I'm not
21    asking about whether there is some
22    transformation of what you called a service.
23    I'm just asking about the technological
24    barriers.
25          A       What you're asking me is
```

S 1063

J. Anderson

converting it to VoIP.  In my mind, if you
convert to VoIP it's not the COBRA.  I feel
like you're taking me down a path of
converting it to VoIP and now we're talking
about something else.  I'm trying to stick on
one but you're asking questions about VoIP,
in my mind.

Q    Because from your perspective the
minute you change the Lucent DSP card such
that it can originate calls, it's now a VoIP
system?

A    One of the components.

Q    It now has one of the components
of the VoIP system?

A    Yes.

Q    Were such a switch to be made,
hypothetically, could MCI be the entity that
provided the control services and the gateway
over that system?

A    No.

Q    Why not?

A    The LEC would not allow it.

Q    For business reasons?

A    Many reasons.

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

S 1064

1                          J. Anderson

2          Q       Any technological reasons?

3          A       Security, business, economic.

4          Q       You're telling me that I'm

5      transforming the COBRA into VoIP, so I wanted

6      to take a step back and ask you, what's VoIP?

7          A       Voice over IP.

8          Q       What does that mean?

9          A       Voice over the internet.

10         Q       What transforms what you're

11     describing as a COBRA system into a VoIP

12     system when you change call origination?

13                 MR. PEREZ:  I object to the form

14     of the question.  It's vague.

15         A       It doesn't make sense to me.

16         Q       What are the characteristics of

17     VoIP, in your characterization?

18         A       Characteristics of VoIP?

19         Q       Yes.

20         A       It's voice packetized into IP

21     packets and sent over the internet.

22         Q       There are several ways to create

23     a VoIP call; is that right?

24         A       Many ways.

25         Q       What are some of the ways?

S 1065

123

J. Anderson

1

2      A      Early forms would have been

3    applications on a P.C. such as SKYPE, other

4    ways are using your phone but a converter box

5    -- your black phone, your normal home phone

6    that you convert using a converter box

7    convert it to IP and then putting it on an IP

8    network.

9      Q      Is one difference between the

10    different methods of creating a VoIP call the

11    site at which the packet is generated?

12      A      Again, I didn't understand the

13    question.

14      Q      With different VoIP methods, are

15    the packets created in different locations?

16      A      Yes.

17      Q      Do you agree that there is one

18    type of VoIP call in which the caller places

19    a call into a gateway with a voice call and

20    that the call is then converted into a

21    internet packet at that gateway?

22      A      Yes.

23      Q      Would you give that type of VoIP

24    any particular name, is there a standard

25    industry name for that?

124

J. Anderson

1

2      A      No.

3      Q      In that type of a VoIP call, the

4   call leaves the user's phone as a voice call,

5   right?

6      A      Correct.

7      Q      It travels on --

8      A      Depends.

9      Q      Depends on what?  I'm sorry,

10   depends where the gateway is?

11      A      Yes.

12      Q      So it can be that the gateway

13   would be in the user's home?

14      A      Yes.

15      Q      But if it's not the call goes out

16   of the user's phone as a voice call and is

17   accessing the gateway in some external

18   system?

19      A      Correct.

20      Q      And that gateway is turned into

21   -- the voice call is turned into packets?

22      A      Correct.

23      Q      Would you agree that there is

24   another type of VoIP whereby the voice call

25   is converted into packets on the P.C. of a

S 1067

125

1                           J. Anderson

2       user, in the user's home?

3              A      Yes.

4              Q      That's the SKYPE type of VoIP?

5              A      That's an example.

6              Q      That's an example.  I think

7       earlier today you were calling that computer

8       to computer VoIP?

9              A      Yes.

10             Q      With computer to computer VoIP

11      the packet leaving the caller's home is

12      indistinguishable from any other kind of

13      packet, right?

14             A      Yes and no.  It depends what

15      level you're looking at.  If you get down and

16      look at the individual bits, you can figure

17      out what it is.

18             Q      Just the way one photograph to

19      another in two different packets are

20      different?

21             A      Yeah.

22             Q      That isn't the level I meant.  I

23      meant from the level of a system transmitting

24      the packets?

25             A      The system would not be able to

S 1068

126

1                      J. Anderson

2       identify it.

3            Q       So a voice packet would not look

4       any different to a transmittal system from a

5       text packet or a photograph or a song?

6            A       Packet is a packet is a packet,

7       the content is.

8            Q   .   As currently configured, the

9       COBRA system at issue here could accept and

10      transmit a computer to computer VoIP packet,

11      right?

12           A       Yes.

13           Q       You can't rule out the

14      possibility, can you, that the COBRA systems

15      at issue here have, in fact, done so, can

16      you?

17           A       I would have to speculate.

18           Q       My question is, you can't rule it

19      out that that has happened?

20           A       No, I can't rule that out.

21           Q       Is it true that the COBRA

22      services at issue in this case can't

23      distinguish between a computer to computer

24      VoIP packet and any other packet coming out

25      of a dial up user's computer?

S 1069

127

                            J. Anderson

1

2          A       No, it doesn't look at the

3      content of the packet.

4          Q       So, yes, it cannot distinguish?

5          A       It does not distinguish.

6                  (Explanation between the

7      differences of COBRA and telephone service

8      marked Anderson Exhibit 6.)    .

9          Q       Changing topics a bit.  I'd like

10     to mark this exhibit as Anderson Exhibit 6.

11                 Have you ever seen this document

12     before, Mr. Anderson?

13         A       Yes.

14         Q       Can you tell me what it is?

15         A       An explanation between the

16     differences of COBRA and telephone service.

17         Q       Who wrote it?

18         A       I don't know.

19         Q       Did you write it?

20         A       Did I read it?

21         Q       Did you write it?

22         A       Some of what I -- some of what I

23     wrote is included in here.

24         Q       Did you create this document,

25     that is, Exhibit 6, which is labeled at the

S 1070

1                       J. Anderson

2    top Exhibit 2?

3                    MR. PEREZ:  I don't want to

4    answer the question but this looks like it's

5    a document that was generated on our server

6    at Houston, so at the bottom it will tell you

7    HO-1 is our server in Houston, so it would be

8    a Weil Gotshal document.

9                    MS. GUERON:  Okay.

10       Q       Have you had a chance to read it?

11       A       Yes, I read this.

12       Q       You read it before it was

13   attached to Weil Gotshal's papers filed in

14   Bankruptcy Court?

15       A       I don't know when that occurred.

16       Q       Do you agree with everything in

17   Exhibit 2?

18                   MR. PEREZ:  The question is

19   broad.  I object to the form of the question.

20   It's broad.

21       A       If we go through it, I can tell

22   you what I agree with.

23       Q       Earlier I think you said that --

24   let me ask you plainly.  Have you ever read

25   the excise tax statute, 26 USC 4252 before

S 1071

129

```
 1                    J. Anderson

 2     today?

 3          A      No, I've never sat down and read

 4     it.

 5          Q      You've never seen the text of

 6     Anderson Exhibit 5 previously?

 7          A      You know what, now that I saw

 8     that, this is a huge document that, yeah, I

 9     may have gone through this, but I would say I

10     never really sat down and read it word for

11     word, but if it's in the documents that were

12     submitted, yeah, I've gone through all of the

13     documents.

14          Q      The documents that were submitted

15     meaning what?

16          A      The documents that were given to

17     me, that stack, so if it's included in there,

18     yes, I've gone through all of those over the

19     last few months.  So I may have seen it and

20     just not remember reading it.

21               MR. PEREZ:  I don't think it's in

22     there.

23               MS. GUERON:  You don't think it's

24     in this document?

25               MR. PEREZ:  Yes.  This is an
```

(212) 349-9692 TANKOOS REPORTING COMPANY (516) 741-5235

S 1072

# EXHIBIT B

S 1073

# NEWTON's TELECOM DICTIONARY



## STAY INFORMED

To be alerted by email to updates and corrections
go to www.cmpbooks.com/newton


REFERENCE ONLY
Not to be taken
From The Library

CMP**Books**
San Francisco

S 1074

TK
5102
.N49
2003

RANDOLPH MEMORIAL LIBRARY
Borough of Manhattan
Community College
199 Chambers Street
New York, N.Y. 10007

**NEWTON's TELECOM DICTIONARY**
copyright © 2003 Harry Newton
email: Harry@HarryNewton.com
personal web site: www.HarryNewton.com
business web site: www.TechnologyInvestor.com

All rights reserved under International and Pan-American Copyright conventions,
including the right to reproduce this book or portions thereof in any form whatsoever.

Published by CMP Books
An imprint of CMP Media LLC
Main office: CMP Books, 600 Harrison St., San Francisco, CA 94107 USA
Phone: 415-947-6615; Fax: 415-947-6015
Sales office: CMP Books, 12 West 21 Street, New York, NY 10010
Phone 917-305-3333; Fax 212-206-0387
www.cmpbooks.com
Email: books@cmp.com



# CMP

CMP Business Media

For individual orders, and for information on special discounts for quantity orders,
please contact:
CMP Books Distribution Center, 6600 Silacci Way, Gilroy, CA 95020
Tel: 1-800-500-6875 or 408-848-3854; Fax: 408-848-5784
Email: cmp@rushorder.com; Web: www.cmpbooks.com

Distributed to the book trade in the U.S. by:
Publishers Group West, 1700 Fourth Street, Berkeley, California 94710

Distributed in Canada by:
Jaguar Book Group, 100 Armstrong Avenue, Georgetown, Ontario M6K 3E7 Canada

Printed in the United States of America

This book is also sold through www.Amazon.com, www.Fatbrain.com and
www.BarnesAndNoble.com

Distributed to the book trade in the U.S. and Canada by Publishers Group West
1700 Fourth St., Berkeley, CA 94710
Fax: 408-848-5784
cmp@rushorder.com

ISBN Number 1-57820-307-4

March 2003

Nineteenth Edition

Matt Kelsey, Publisher
Ray Horak, Senior Contributing Editor
Saul Roldan, Cover Artist
Lisa Giaquinto, Project Manager
Brad Greene, Text Layout

**Sandhog**

merely making a profit. Some people look for the money so they can continue having fun writing software, creating hardware, and doing whatever cool neat new things amuse them. These are "sandbox" companies. They will never produce a real product for their customers or a profit for their stockholders. To be a successful investor, you need to identify sandbox companies and avoid them like the plague. I get a lot of proposals from inventors seeking money. In response to one, I wrote, "The problem I have - and I can smell this one - is that this is a sandbox company. A bunch of incredibly bright boys are looking for money so they can keep creating cool new technologies. My job, as investor, is to provide the money, not question the use, or God forbid, that they might actually focus their endeavors on creating a commercial product that will sell."

3. A protected area of a computer system in which programs run with limited privileges. For example Java applets may be confined to a sandbox environment which prevents them from accessing the computer system's permanent storage (e.g. hard disk) or networking services. Another example of a sandbox is an isolated network segment used for testing.

4. A network security term. A protective mechanism used in some programming environments that limits the actions that programs can take. A program normally has all the same privileges as the user who runs it. However, a sandbox restricts a program to a set of privileges and commands that make it difficult or impossible for the program to cause any damage to the user's data.

**Sandhog** An underground worker, typically those building tunnels.

**Sandpil** See Sandbox.

**Sanitize** Jim Frishtel's term for forcing VARs to "get on board or get out."

**Sanity Check** A check to confirm the service capability of a switching system. This test has not been applied to the author of this dictionary.

**SAP** 1. Service Access Point. OSI terminology for portion of a network address that identifies the host application sending or receiving a data packet. In TCP/IP terminology, a SAP is a "port." SAPs and ports identify the specific application or service on that computer; examples include e-mail and file server software. In the ATM Reference Model, traffic passes up and down the ATM Layers through SAPs, which are named for the specific Layers; e.g., the User Layer, ATM Adaptation Layer (AAL), ATM Layer, and Physical Layer (PHY). The term also is used in SMDS architecture, and to reference the same concept.

2. An IBM term for a logical point made available by an interface card where information can be received and transmitted.

3. Systems, Applications, and Protocols. Translated from the German Systemanalyse und Programmentwicklung. SAP AG was founded in 1972 by five former IBM employees. It has grown to be one of the largest providers of inter-enterprise software solutions in the world. Software products address applications such as Customer Relationship Management (CRM), e-commerce, supply chain management, and product lifecycle management.

4. Session Announcement Protocol. A protocol developed by the IETF as a companion to the Session Initiation Protocol (SIP). SAP is a method by which a multimedia conferencing session over an IP-based network is announced to the potential conference participants.

**SAPI** Service Access Point Identifier. The SAPI identifies a logical point at which data link layer services are provided by a data link layer entity to a Layer 3 entity. ISDN jargon. See also Windows Telephony.

**SAR** 1. Segmentation And Reassembly. Generically speaking, a process of segmenting relatively large data packets into smaller packets for purposes of achieving compatibility with a network protocol relying on a smaller specific packet size. The process is often required in conjunction with ATM, SMDS and X.25 networks.

2. A sublayer of the ATM protocol stack, specifically of the ATM Adaptation Layer (AAL). The native Protocol Data Unit (PDU) associated with the transmitting device is segmented into 48-octet payload fields at this sublayer. At the target end of the data communication, the SAR serves to reassemble the native PDU by extracting and combining multiple 48-octet payloads from multiple ATM calls.

3. Specific Absorption Rate. Specific Absorption Rate (SAR): SAR is a measure of the rate of energy that is absorbed, or deposited in a mass of dielectric materials, such as biological tissues (i.e. a human being, like you and me). Usually SAR is expressed in watts per kilogram (W/kg) or milliwatts per kilogram (mW/kg). Here's Motorola's explanation of SAR: Your wireless phone is a radio transmitter and receiver. It is designed and manufactured not to exceed the exposure limits for radio frequency (RF) energy set by the Federal Communications Commission (FCC) of the U.S. Government. These limits are part of comprehensive guidelines and establish permitted levels of radio frequency (RF) energy for the general population. The guidelines are based on standards that were developed by independent scientific organizations through periodic and thorough evaluation of scientific

studies. The standards include a substantial safety margin designed to assure the safety of all persons, regardless of age and health. The exposure standard for wireless mobile phones employs a unit of measurement known as the Specific Absorption Rate, or SAR. The SAR limit set by the FCC is 1.6watts/kilogram (W/kg). Tests for SAR are conducted using standard operating positions reviewed by the FCC (Federal Communications Commission) with the phone transmitting at its highest certified power level in all tested frequency bands. Although the SAR is determined at the highest certified power level, the actual SAR level of the phone while operating can be well below the maximum value. This is because the phone is designed to operate at multiple power levels so as to use only the power required to reach the network. In general, the closer you are to a wireless base station antenna, the lower the power output. Before a phone model is available for sale to the public, it must be tested and certified to the FCC that it does not exceed the limit established by the government-adopted requirement for safe exposure. The tests are performed in positions and locations (for example, at the ear and worn on the body) as required by the FCC for each model. The highest SAR value for this model phone (a typical Motorola mobile phone) when tested for use at the ear is 1.51 W/kg and when worn on the body, as described in this user guide, is 0.75 W/kg. (Body-worn measurements differ among phone models, depending upon available accessories and FCC requirements.) While there may be differences between the SAR levels of various phones and at various positions, they all meet the government requirement. The FCC has granted an Equipment Authorization for this model phone with all reported SAR levels evaluated as in compliance with the FCC RF exposure guidelines. SAR information on this model phone is on file with the FCC and can be found under the Display Grant section of www.fcc.gov/oet/fccid. See also www.sfc-wireless.com/pages/press/articles/ART015.htm.

**Sarchasm** The Washington Post's Style Invitational asked readers to take any word from the dictionary, alter it by adding, subtracting or changing one letter, and supply a new definition. This one is one of the winners. Sarchasm is the gulf between the author of sarcastic wit and the reader who doesn't get it.

**Sardines** Canned herrings were dubbed "sardines" because the canning process was first developed in Sardinia, Italy.

**SAS** 1. Simple Attachment Scheme.

2. Severely errored frame/Alarm indication Signal. A one-second period of time in which are detected multiple frame errors or an alarm indication signal over a digital circuit. See also CV, ES and SES.

**SASG** Special Autonomous Study Group. These ITU-T study groups are chartered to produce handbooks on basic telecommunications technical or administrative subjects for developing countries.

**SASI** Shugart Associates System Interface. The first SCSI interface specification defined by Shugart, a disk drive manufacturer. Later it was modified and renamed as the Small Computer System Interface (SCSI), pronounced Scuzzy. See also SCSI.

**SASL** Simple Authentication and Security Layer. An Internet security mechanism specified in RFC 2722. SASL is a method for adding authentication support to connection-oriented protocols. SASL grew out of the work on IMAP4 (Internet Messaging Access Protocol version 4), a next-generation e-mail protocol which is likely to replace POP (Post Office Protocol) for Internet mail servers. IMAP4 includes the ability for mail clients and servers to negotiate the authentication mechanism they will use. SASL allows a client to request authentication from a server and, as an option, to negotiate the use of any authentication mechanism (e.g., Kerberos version 4, simple username/passwords), and one-time passwords such as S/Key) registered with IANA (Internet Assigned Numbers Authority). SASL mechanisms are named by strings, from 1 to 20 characters in length, and consisting of uppercase letters, digits, hyphens, and/or underscores. See also Authentication, IANA, IMAP, Kerberos, and POP.

**SAT** 1. Subscriber Access Termination. An SMDS term.

2. Supervisory Audio Tone. A cellular term. When a cellular call is set up, the MSC (Mobile Switching Center) sends a SAT to the cell phone. The SAT is returned by the cell phone through an automatic loopback. The MSC checks the characteristics of the SAT in order to ensure signal quality before setting up the call. See also Loopback and MSC.

**SATA** See Serial ATA.

**SATAN** Security Administration Tool for Analyzing Networks. This tool allows a network analyst to mimic a malicious hacker (or cracker) for the purpose of identifying weaknesses in system and network security. It also provides malicious hackers a nifty tool. See Hacker.

**Satcom** A shortened way of saying "satellite communications."

**Satellite** 1. A microwave receiver, repeater, regenerator in orbit above the earth.

S 1076

# EXHIBIT C

**CONFIDENTIAL**
**Michael Hills, Ph.d.**

```
                                                      Page 1
  1              UNITED STATES BANKRUPTCY COURT

  2              SOUTHERN DISTRICT OF NEW YORK

  3         _____ ____

  4     IN RE:                    CHAPTER 11 Case No.

  5     WORLDCOM, INC., ET AL,    02-13533 (AJG)

  6     _____/   Jointly Administered

  7                                    Pages 1-190

  8                                    CONFIDENTIAL

  9

 10         The CONFIDENTIAL Deposition taken of

 11              Michael Hills, Ph.D.

 12              1300 Eye Street, N.W.

 13                  Suite 900

 14              Washington, D.C.  20005

 15

 16                  CONFIDENTIAL

 17                  COPY

 18

 19 Reported by:  Chris Fox, Notary Public

 20 Job No:   171232

 21
```

**Esquire Deposition Services**
**DC 1-800-441-3376   MD 1-800-539-6398   VA 1-800-752-8979**

S 1078

CONFIDENTIAL
Michael Hills, Ph.d.

Page 2

```
 1 APPEARANCES:

 2 NICOLE GUERON, ESQUIRE

 3 Appearing on behalf of the United States

 4     Assistant United States Attorneys

 5     86 Chambers Street, Third Floor

 6     New York, NY   10007

 7     212.637.2699

 8     Fax 212.637.2686

 9     Nicole.gueron@usdoj.gov

10

11 WEIL, GOTSHAL & MANGES, LLP

12 Appearing on behalf of MCI, Inc.,

13     700 Louisiana

14     Suite 1600

15     Houston, Texas   77002

16     713.546.5040

17     Email:james.grogan@weil.com

18           Alfredo.perez@weil.com

19 BY:  Alfredo R. Perez, Esquire

20     James T. Grogan, III, Esquire

21 ALSO PRESENT:  John R. Anderson
```

S 1079

**CONFIDENTIAL**
**Michael Hills, Ph.d.**

Page 3

1

2                      November 16, 2005

3                         9:30 a.m.

4

5                            .

6

7 Deposition of Michael Hills, Ph.D., held at the

8 Offices of:

9

10 Weil, Gotshal & Manges, LLP

11 1300 Eye Street

12 Suite 900

13 Washington, D.C.   20005

14

15

16 Pursuant to Notice, before Chris Fox, a

17 Notary Public of the District of Columbia

18

19

20

21

S 1080

**CONFIDENTIAL**
**Michael Hills, Ph.d.**

Page 79

1      A.   It was clearly capable of having voiceover IP

2 communications, if by capable, you mean is it possible?

3 Yes.

4      **Q.   Was it, to your knowledge, was it configured**

5 **in a way that would allow that to occur?**

6      A.   Based on the assertions from Mr. Anderson, I

7 don't believe so.

8      **Q.   Do you have any reason to doubt**

9 **Mr. Anderson's assertions?**

10     A.   I have no basis to dispute them.

11     **Q.   Have you done any work to determine whether**

12 **his assertions are correct?**

13     A.   No.

14     **Q.   Do you intend to do any work to determine**

15 **whether his assertions are correct?**

16     A.   At the moment, I don't foresee it.

17          MR. PEREZ:   Okay.   I'm at a good stop.

18          Off the record.

19          (Recess taken.)

20          MS. GUERON:   Back on the record.

21     A.   Yes.   I'd like to clarify one of my answers

S 1081

**CONFIDENTIAL**
**Michael Hills, Ph.d.**

Page 80

1 before we start.

2          BY MR. PEREZ:

3     **Q.   Please do.**

4          THE WITNESS:  Can you re-read the question?

5          MS. GUERON:  We had -- there was a question

6 and answer he was concerned about.

7          (Record read back by court reporter as

8 requested.)

9          THE WITNESS:  Okay.  Could you repeat the

10 question for me?

11          (Record re-read back by court reporter as

12 requested.)

13    A.   I'd like to clarify that I was referring to

14 one particular type of work implementation, where the

15 audio signal goes into the COBRA and comes out as -- as

16 VoIP.

17          That was the specific configuration that was

18 discussed by Mr. Anderson, and to which I concurred.

19 It was not -- it was capable of doing, but was not

20 enabled to do it.

21    **Q.   Are there other types of VoIP configuration?**

S 1082

Page 81

1     A.    Yes.

2     Q.    And can you tell me what they are?

3     A.    The other main class of VoIP configuration is

4 where the VoIP conversion is done on the user's own

5 computer, and generates packets which are then

6 indistinguishable from any other packet going over the

7 Internet.

8     Q.   We'll come back to that.

9          First of all, just to kind of -- a couple of

10 housekeeping matters.

11         Let me show you what has been marked as

12 Exhibit 8.  See if you can recognize that?

13         (Deposition Exhibit No. 8 marked.)

14    A.    Yeah.  This appears to be my expert report

15 prepared for -- on the basis of the XO case, dated

16 December 21st, 2004.

17    Q.    All right.  And to your knowledge, is there

18 anything -- is there any statement in this report that

19 is not accurate, no longer accurate?

20    A.    I have no reason to believe so.

21    Q.    All right.  And let me hand you what has been

**CONFIDENTIAL**
**Michael Hills, Ph.d.**

Page 82

1 marked as Exhibit 9.

2          (Deposition Exhibit No. 9 marked.)

3     Q.    See if you can identify that, sir.

4          MS. GUERON:  For the record, I think you said

5 December 21?

6     A.    September 21st.

7          This appears to be the transcript of my

8 deposition in that case.

9     Q.    Do you know whether you actually went ahead

10 and signed the deposition?

11    A.    Yes.

12    Q.    Okay.  And do you recall whether there were

13 any changes that you made?  Any changes to the

14 deposition?

15    A.    I don't recall making any changes.  I'm not

16 saying I didn't, but I don't recall making any.

17    Q.    So you think that the testimony you provided

18 here is still true and correct?

19    A.    To the best of my recollection.

20    Q.    Do still have in front of you, I think is it

21 Exhibit 6, which is your report?

```
MIME-Version:1.0
From:nysbinfo@nysb.uscourts.gov
To:courtmail@nysblei.nysb.circ2.dcn
Bcc: AJRLAW@aol.com, ddobbin@avrumrosenlaw.com, kberson@avruumrosenlaw.com, fkantrow
ecdolan@hhlaw.com, vtabak@hhlaw.com, szempolich@hhlaw.com, ezabicki@picklaw.net, ffo
mrosenthal@gibsondunn.com, mschley@schleylook.com, mseymour@lowenstein.com, mshaiken
Message-Id:<4891184@nysb.uscourts.gov>
Subject:02-13533-ajg Transcript
```

Content-Type: text/html

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

## U.S. Bankruptcy Court

### Southern District of New York

Notice of Electronic Filing

The following transaction was received from Clerk's Office of the U.S. Bankruptcy Court entered on 2/24/2006 at 10:24 AM and filed on 2/23/2006
**Case Name:**        WorldCom, Inc.
**Case Number:**      02-13533-ajg
**Document Number:** 17959

**Docket Text:**
Transcript *(UNDER SEAL) Of Debtor's Objection To Proof Of Claim No. 38365 Filed by Department Of The Treasury* (related document(s)[17873]) filed by Clerk's Office of the U.S. Bankruptcy Court on behalf of Weil Gotshal & Manges LLP. (Rodriguez, Maria)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\Documents and Settings\mrodriguez-castillo\My Documents\under seal.pdf
**Electronic document Stamp:**
[STAMP NYSBStamp_ID=842906028 [Date=2/24/2006] [FileNumber=4891182-0]
[8cbd26085f7bd8f507db577ee3befb4e38abc6fb59cc7fe9f5288ff27754c52fd912d
ae2132c19dd63654e2deab8abed2d10a13a7e2f7c050f645e210c9e2bc3]]

**02-13533-ajg Notice will be electronically mailed to:**

Franklin C. Adams      franklin.adams@bbklaw.com

Jason R. Adams      jadams@torys.com,

Laurie B. Adams      lbadams@hewm.com,

Michael B. Adams      mbadams@mcguirewoods.com,

S 1085

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------

In Re                                    :

WORLDCOM, INC et. al  :

            ·    Debtors    :
-------------------------------------------------------------

Chapter 11 Case No.
02-13533 (AJG)

## CONFIDENTIAL – SUBJECT TO BANKRUPTCY COURT ORDER

THE MATERIAL HEREIN HAS BEEN FILED UNDER SEAL PURSUANT TO AN
ORDER OF THE BANKRUPTCY COURT, DATED JANUARY 31, 2006,
DIRECTING THE CLERK TO FILE SUCH MATERIAL UNDER SEAL.

1

2     UNITED STATES BANKRUPTCY COURT
3     SOUTHERN DISTRICT OF NEW YORK
      -------------------------------x
4     In re
                                  Case No.
5     WORLDCOM, INC., et al,      02-13533
                                  **SEE BELOW
6          Reorganized Debtors.
      -------------------------------x
7          February 1, 2006
           10:40 a.m.
8
           United States Custom House
9          One Bowling Green
           New York, New York   10004
10

11         TRANSCRIPT UNDER SEAL
12     DIGITALLY RECORDED PROCEEDINGS
          (Proceedings -- Entire Day)
13
      10:30 WORLDCOM, INC., ET AL
14
      Debtors' Objection to Proof of Claim No.
15    38365 filed by Department of the Treasury.

16

17    B E F O R E :

18      THE HONORABLE ARTHUR J. GONZALEZ
        United States Bankruptcy Judge
19

20

21

22      DEBORAH HUNTSMAN, Court Reporter
        198 Broadway, Suite 903
23      New York, New York   10038
        (212) 608-9053    (917) 723-9898
24

25

---

1

2     A P P E A R A N C E S :

3     WEIL, GOTSHAL & MANGES LLP
      Attorneys for Reorganized Debtors
4          700 Louisiana, Suite 1600
           Houston, Texas    77002
5
      BY:  ALFREDO R. PEREZ, ESQ.
6               -and-
           JAMES T. GROGAN, III, ESQ.
7

8     U.S. DEPARTMENT OF JUSTICE
      U.S. ATTORNEY'S OFFICE
9     SOUTHERN DISTRICT OF NEW YORK
      Attorneys for the IRS and the United
10    States
           86 Chambers Street
11         New York, New York   10007

12    BY:  NICOLE GUERON, ESQ.
                -and-
13         DANNA DRORI, ESQ.

14

15

16

17

18

19

20

21

22

23

24

25

---

3

1          CONFIDENTIAL - Proceedings
2               JUDGE GONZALEZ:  Please be seated.
3          Is anyone else here on any matter,
4     other than WorldCom?
5               (Whereupon no response was heard.)
6               JUDGE GONZALEZ:  It is the Debtors'
7     objection to the proof of claim.
8               MR. PEREZ:  Good morning, Your
9     Honor.  Alfredo Perez for the Reorganized
10    Debtors.  Your Honor, I believe that I saw
11    yesterday on the docket that the Court
12    entered the form of Scheduling Order which we
13    had provided.  I wanted to highlight a couple
14    of things in that Order just to make sure
15    that both sides understand what the ground
16    rules are, and then just give you a little
17    bit of background.  Then, Your Honor, there
18    are a couple of housekeeping matters and I
19    don't know how the Court would like to
20    proceed.  Then at that point, I would be
21    prepared to give my opening statement, and
22    then we have one witness, Your Honor.  It is
23    my understanding that the Government has one
24    witness as well.  So depending on how the
25    Court wants to proceed, I could just continue

---

4

1     or listen to counsel for the Government.
2               JUDGE GONZALEZ:  I will hear from
3     the Government first.
4               MS. GUERON:  Would Your Honor like
5     to hear the housekeeping matters, or would
6     Your Honor like to hear the Government's
7     opening at this time?
8               JUDGE GONZALEZ:  The housekeeping.
9               MS. GUERON:  I think Mr. Perez had
10    the concerns regarding the exhibits.  Is that
11    what you were going to start with?
12              MR. PEREZ:  That is correct.
13              JUDGE GONZALEZ:  All right.
14              MR. PEREZ:  Let me just talk about
15    that.  Number one, Your Honor, based on the
16    Order that was entered yesterday, this is in
17    essence a bifurcated trial.  The trial today
18    is with respect to liability under section
19    4252.  Second, Your Honor, we have prepared
20    two exhibit books.  The first exhibit book is
21    exhibits that we can use freely.  The second
22    exhibit book, which is marked "confidential,"
23    are the ones that have been submitted under
24    seal, and we would request that all the

CONFIDENTIAL - Proceedings

1  parties, rather than referring to the
2  specific name of the entity providing the
3  COBRA service, they just refer to the entity
4  as the "vendor," so that we don't have a
5  record.  These will not become part of the
6  public record, but rather will remain under
7  seal.
8
9          Second, Your Honor, just for
10  informational purposes, as I indicated when
11  we had our status conference, yesterday we
12  filed a motion requesting a tax refund of
13  approximately $35 million or $38 million in
14  connection with taxes that were originally
15  paid on COBRA service pre-petition.  We have
16  also moved in connection with that motion to
17  consolidate it with this proceeding.  The
18  third thing, Your Honor, is we had filed a
19  motion to exclude certain testimony from
20  Dr. Hills.  It was really in the nature of a
21  motion in limine, if you will, with respect
22  to some of the testimony.  We received a
23  response last night.  I don't know if right
24  now is the appropriate time to deal with
25  that, but that is something at some point we

CONFIDENTIAL - Proceedings

1  would have to take up that comes up.
2
3          The fourth matter, Your Honor, is
4  there are several exhibits that are subject
5  to objection.  I think Exhibits 1 through 3
6  are not subject to objection.  Exhibits 4 to
7  10 are subject to objection.  Exhibits 11
8  through 25 are not subject to objection.
9  Exhibit 26 is subject to objection.  Then the
10  balance of Exhibits 27 through 32 are not
11  subject to objection.  I don't know whether
12  the Court wants to take that up, when an
13  effort is made to introduce them, or that we
14  can discuss admission into evidence with
15  respect to those exhibits at this point?  So
16  those are the four housekeeping matters, Your
17  Honor.
18          JUDGE GONZALEZ:  Does the
19  Government have any additional matters?
20          MS. GUERON:  No, we do not, Your
21  Honor.
22          JUDGE GONZALEZ:  All right.  Why
23  don't you begin then with the motion that you
24  identified as a motion in limine with respect
25  to portions of Dr. Hills' testimony.

CONFIDENTIAL - Proceedings

1
2          MR. PEREZ:  Correct, Your Honor.
3          JUDGE GONZALEZ:  All right.  Go
4  ahead.
5          MR. PEREZ:  I am sorry.  Did you
6  say proceed on that one?
7          JUDGE GONZALEZ:  Yes.
8          MR. PEREZ:  Your Honor, Dr. Michael
9  Hills, who is sitting here in the courtroom,
10  whom we had the opportunity to depose a while
11  back, submitted a declaration.  Obviously, to
12  the extent that he is testifying in an open
13  Court, the declaration was just part of the
14  record.  It won't be evidence in the case.
15  But to the extent that it would be considered
16  evidence in the case, then there are certain
17  portions of his testimony or of his
18  declaration that we believe constitute
19  basically legal conclusions on the part of
20  Dr. Hill, and that those are inappropriate
21  for expert testimony by a non-legal expert.
22  The basis of our motion, Your Honor, is that
23  he cannot in essence interpret contracts to
24  obtain the result that is given in his expert
25  report.  That it has to be on the basis of

CONFIDENTIAL - Proceedings

1  other than legal knowledge.  Your Honor, the
2  types of comments that he makes -- I will
3  just give you a couple of examples -- are he
4  will refer to a contract provision in one of
5  the COBRA contracts, and then he will make a
6  statement such as, this contract thus
7  concedes by its very language that the COBRA
8  services obtained by UUNET from the vendor
9  were capable of two-way voice
10  telecommunications.  Section 6.1 makes
11  evident that the COBRA services purchased
12  allow UUNET unilaterally to use COBRA
13  services to provide VOIP.  I believe, Your
14  Honor, when we took his deposition, he
15  indicated that he was making a negative
16  inference from the portions of the contract,
17  basically interpreting the contract language
18  to come to his conclusion because it nowhere
19  said what he was saying but in essence he
20  took the negative inference.  Your Honor, I
21  think that type of conclusion with respect to
22  contract language is appropriate for the
23  Court to make, but it isn't appropriate for
24  any expert to make, much less a non-legal

CONFIDENTIAL - Proceedings

expert.

MS. GUERON: Good morning, Your Honor. The Government opposes the Debtors' motion and also cross-moved. Certainly the Government agrees with the proposition --

JUDGE GONZALEZ: Before you go any further, just identify yourself for the record.

MS. GUERON: Forgive me, Your Honor. Assistant United States attorney Nicole Gueron from the Southern District of New York for the IRS and the United States. With me is Assistant United States Attorney Danna Drori, and also at counsel table is Dr. Hills, who is the expert we are discussing.

Certainly the Government agrees with the proposition that no expert witness should come in here and offer legal conclusions or direct the Court as to any legal finding. That is not what the Government seeks to do here with Dr. Hills' expert testimony. But the contracts at issue here are opaque. They include very technical

---

CONFIDENTIAL - Proceedings

language. If I might give you an example of some of the language that Dr. Hills' declaration spoke to. There were, for example, documents that stated things along this nature -- and I will not refer to any vendor by name certainly -- the documents also state that a HiPer DSP card set features a fully pre-programable digital signal processing engine that lets administrators reconfigure the system to implement new technologies and applications, such as Voice Over IP. The card set supports a full range of trunk and communication standards. The HiPer DSP card set specifications that also identify VOIP as an optional feature.

This is language actually from one of the product descriptions described in Dr. Hills' declaration. Dr. Hills follows that citation to product descriptions with a conclusory paragraph that states, "It is my professional opinion that as per the text of this product description, the HiPer DSP card set supports voice capable telephonic quality communications and, therefore, that the

---

11

CONFIDENTIAL - Proceedings

vendor COBRA services used by UUNET can provide voice capable telephonic quality communications."

The Government's point is that this is not a self-explanatory document. What a HiPer DSP card set can or cannot do is not obvious to a layman. We provide Dr. Hills to give the Court assistance. Certainly, if during his testimony, the Court feels he is intruding on the legal domain, the Court is free to say so. But to the extent that Dr. Hills is explaining rather complex technical points, we believe his testimony should proceed unimpaired. Ironically, should this argument be made, it really could apply in the other direction as to Mr. Anderson, MCI's expert, who in the course of his declaration, while portions are entirely technical, Mr. Anderson actually quotes verbatim the relevant statute, which is 26 U.S.C. 4252(a). He takes the text of the statute, puts it into paragraphs 3 and 11 of his declaration, but states them as if they are his opinion, and then goes on from there to provide

---

12

CONFIDENTIAL - Proceedings

support for the conclusion, that is, that COBRA services do not provide access to the local telephone service nor the privilege of telephonic quality communication. What that means and what the privilege of telephonic quality communication is, is the central legal issue for Your Honor to decide today. So to the extent that anyone is forcing a legal conclusion into a technical opinion, it would be Mr. Anderson, and for that reason we cross-moved.

Finally, there is the simple issue of Exhibit 2 to the Debtors' brief in support of their objection that was filed recently, and we would move to strike that from the record in its entirety. It is an unsigned document that includes many technical and factual suppositions. It is not an expert report. It is not a legal brief. Counsel cannot place unsubstantiated factual assertions before the Court, and that is exactly what they seek to do. Just to clarify for the Court, that is not Exhibit 2 in the binder that you are holding here

14

```
 1      CONFIDENTIAL - Proceedings
 2   today.  That exhibit is not in this binder
 3   and, perhaps, the Debtors have decided not to
 4   use it at all, in which case, that can
 5   simplify matters for Your Honor, but it
 6   should be stricken from the record
 7   nonetheless.
 8          JUDGE GONZALEZ:  It seems to me
 9   that to the extent the expert is testifying
10   about the technical capacity of the devices
11   involved, I think that is within the expert's
12   purview.  To the extent the expert testifies
13   what can be done under the terms of the
14   contract, I think that is left to the Court.
15   I may not be able to rule on it at this
16   point -- and I guess both sides recognize
17   that -- and we will just have to hear what is
18   said at the testimony, to determine whether
19   or not there is a testimony that goes to what
20   the rights of a party may be able to be under
21   the contract, versus whether or not from a
22   technical standpoint the references to the
23   devices involved can perform that service.
24          MS. GUERON:  Thank you, Your Honor.
25          JUDGE GONZALEZ:  I don't know if
```

15

```
 1      CONFIDENTIAL - Proceedings
 2   argument, just like the rest of our brief
 3   would be part of the argument.
 4          JUDGE GONZALEZ:  All right.  The
 5   Government, go ahead.
 6          MS. GUERON:  Your Honor, it is not
 7   styled as part of the argument.  It is not
 8   signed by counsel and it is titled "An
 9   Explanation of the Differences Between COBRA
10   Service and Telephone Service."  So it is
11   styled as factual representations, almost
12   like an expert report to provide the Court
13   with some background about the differences
14   between COBRA service and telephone service,
15   which is, of course, a crucial matter before
16   the Court.  So if it were an expert report,
17   we could have cross-examined the expert on
18   it, but we did not.  We couldn't.  We did not
19   have it.  If it is a legal brief, it should
20   be signed by counsel and identified as
21   argument.  It lies in some netherworld.  I
22   would point the Court to Hollander v.
23   American Cyanamid Co., 172 F.3d 192, 198 (2d
24   Cir. 1999), which is cited in the
25   Government's brief on page 6, in which the
```

14

```
 1      CONFIDENTIAL - Proceedings
 2   that answers your question, but I think that
 3   is about the best I can do without listening
 4   to the testimony.
 5          With respect to the second position
 6   about Exhibit 2, let me hear from Mr. Perez
 7   as to whether that is an issue or not.
 8          MR. PEREZ:  Your Honor, we are not
 9   offering it as an exhibit, but it was part of
10   one of our filings.  It would just be like
11   had we inserted it in our pleading.  It is
12   not part of Mr. Anderson's affidavit.  We
13   took some law that we had and we took some of
14   the assertions in this affidavit.  We could
15   have put it in the brief and the brief would
16   have been 30 pages long.  Instead, we did the
17   brief shorter, and then we just put an annex.
18   I think it is perfectly appropriate what we
19   did.  It is not like we are tendering it as
20   an exhibit in this case.
21          JUDGE GONZALEZ:  So it is not
22   evidence.  It is part of the argument?
23          MR. PEREZ:  Yes, Your Honor, it is
24   part of the evidence.  There are some factual
25   assertions in there, but it is part of the
```

16

```
 1      CONFIDENTIAL - Proceedings
 2   Court of Appeals stated the Court can strike
 3   portions of an affidavit that are not based
 4   on the affiant's personal knowledge and that
 5   contain conclusory statements.  This isn't in
 6   an affidavit.  No one is taking
 7   responsibility for these allegations, but
 8   they are not signed by anyone and, therefore,
 9   what are they?  We are troubled that they
10   could become part of the record and that,
11   should this ever go up on appeal, a Court
12   might consider, although no entities or no
13   individual takes responsibility for making
14   those assertions.
15          MR. PEREZ:  Let me just correct one
16   thing.  This was filed in connection with our
17   response, and our witness was questioned
18   about the factual assertions in there.  I am
19   not sure if I understood counsel correctly,
20   but the implication that this somehow was not
21   given to them at the time we filed our
22   response is not correct.  They had it.  They
23   asked the witness about it.  Your Honor, in
24   connection with our response to their reply,
25   we attached numerous things, including a copy
```

1      CONFIDENTIAL - Proceedings
2   of the statute and an explanation of the
3   differences between COBRA service and
4   telephone service.  It could have easily been
5   in the pleading.  It was just an attachment
6   in order to keep the pleading down.  The
7   pleading, as it was, was 17 pages, and the
8   explanation itself runs 7 pages.  Most of it
9   is verbatim almost, from Mr. Anderson's
10  declaration.  I really fail to see what the
11  issue is.
12      JUDGE GONZALEZ:  I am not clear.
13  Had this been integrated into the argument or
14  do you just want me to order that the Debtors
15  adopt it as part of their argument, and then
16  if it were in their argument, what would you
17  do with it?  You would just attack the
18  argument as saying that there is a factual
19  assertion there that is not supported by the
20  record?
21      MS. GUERON:  The Government's
22  concern is solely that this document one day
23  appeared to be an uncontested factual
24  assertion that stays in the record.  The
25  document purports to be an explanation of the

18      CONFIDENTIAL - Proceedings
2   difference of two systems.  That is an
3   important fact for the Court to determine.
4   If the Court could order that it basically is
5   simply argument by counsel that Exhibit 2 is
6   effectively briefing, perhaps that could
7   solve the problem.
8      JUDGE GONZALEZ:  I can order its
9   briefing, but I think to the extent you would
10  disagree with any portion of their argument,
11  you need to then adopt your argument to
12  reflect that you disagree with some of the
13  underlying premises
14      MS. GUERON:  Certainly, Your Honor,
15  and the Government will do so today.  It is
16  more that procedurally, we are concerned that
17  a document that is not signed by anyone and
18  that isn't a legal argument stand in the
19  record as what purports to be a factual
20  argument.
21      JUDGE GONZALEZ:  All right.  It
22  will be deemed part of the brief as argument.
23  So then, where are we left with in terms of
24  moving to the next step?
25      MR. PEREZ:  Your Honor, I think we

1      CONFIDENTIAL - Proceedings
2   ready for our opening.
3      MS. GUERON:  Unless Your Honor
4   wants to hear the objections on the exhibits
5   now, or whether Your Honor would rather wait
6   until they are actually sought to be entered
7   into the record?
8      MR. PEREZ:  I think it might be
9   helpful to the Court, for the Court to listen
10  to it now, because it is just really one
11  objection as to all of the exhibits.
12      JUDGE GONZALEZ:  All right.  Thank
13  you.
14      MR. PEREZ:  Your Honor, we can
15  start with the easy one, which is the
16  objection to Exhibit 26.  That is my
17  objection, Your Honor.  This was prepared by
18  Dr. Hills.  We questioned him about it at his
19  deposition.  To the extent that Dr. Hills is
20  going to use this as a demonstrative aid, I
21  do not have an objection to that.  To the
22  extent that Dr. Hills would purport to
23  introduce this as evidence of what the COBRA
24  service was, I would have an objection, Your
25  Honor.

1      CONFIDENTIAL - Proceedings
2      MS. GUERON:  Your Honor, at this
3   point, since Dr. Hills is the rebuttal expert
4   witness and we are going second, we don't
5   know yet which way we will be using it.  So I
6   would just ask the Court to reserve on that
7   question.
8      JUDGE GONZALEZ:  All right.
9      MS. GUERON:  As to the Government's
10  objections, Your Honor, we object to the
11  Exhibits numbered 4 through 10.  Our concern
12  is this, as reflected even by the way they
13  are listed, these documents have no Bate
14  stamp numbers.  The reason for that is that
15  they were not produced to the Government
16  during the informal discovery that initially
17  took place.  Rather, they were attached to
18  WorldCom's papers filed in support of their
19  objection after reading the Government's
20  initial brief.  The discovery in this case
21  has proceeded in a somewhat haphazard manner.
22  We moved forward in an informal way with
23  discovery in an effort to resolve this
24  amicably, but the Government is concerned
25  and, as we stated in our papers, we have

CONFIDENTIAL - Proceedings

1    never received full formal discovery in this
2    matter.  Many of the documents the Government
3    sought, WorldCom chose not to produce and
4    wrote a letter, as a cover letter, when it
5    produced 265 pages, saying what it would
6    produce and what it wouldn't.  Some of these
7    documents, or at least one of them, was
8    created after the Government's brief was
9    written in order to support the response that
10   MCI was going to make.  These documents
11   reflect that the Government has never
12   received full discovery.  We don't know, for
13   example, whether similar letters to Exhibit 4
14   were written to the Debtors that were less
15   helpful to the Debtors' argument, but those
16   weren't attached to their brief.  We don't
17   know that, because we haven't gotten full
18   discovery.
19          So to the extent that Exhibits 4
20   through 10 seek to supplement the record, it
21   is really a one-sided supplementing of the
22   record, and that is the basis for our
23   objection.
24          MR. PEREZ:  Your Honor, I believe
25

CONFIDENTIAL - Proceedings

1    that this timeline accurately reflects what
2    transpired, and in this circumstance where
3    you have basically informal discovery, the
4    Government has not provided any discovery to
5    us, and where there is absolutely no surprise
6    whatsoever, I think it would be inappropriate
7    for the Court to exclude that testimony.  But
8    let me just recount what happened.
9          In February of 2005, the parties
10   agreed to exchange informal discovery.  On
11   February 14th, the IRS sought discovery with
12   respect to COBRA contracts, COBRA promotional
13   materials, network architecture, design
14   schematics, customer contracts, billing
15   records, et cetera.  On July 14th, the
16   Debtors produced the documents referred to.
17   On September 23rd, the Debtors received
18   Dr. Hills' declaration for the first time,
19   referring to Voice Over IP.  At that point,
20   is when MCI turned to its expert, and on
21   November 1st, by that time the expert had
22   concluded his declaration with the
23   attachments, and that declaration with all
24   the attachments and all the documents were
25

23

CONFIDENTIAL - Proceedings

1    served on November 1st.  On November 16th, we
2    took the deposition of their experts, and
3    then subsequently on January 1st, more than
4    two months after they originally received the
5    documents, they took the deposition of our
6    expert Mr. Anderson with the full ability to
7    question him about it.
8          If I could just turn to the
9    documents, Your Honor, because I think that
10   is instructive.  The one thing the Court
11   needs to recognize, COBRA is an antiquated
12   technology.  Basically, the Court will
13   recall, we restructured and renegotiated
14   those contracts during the case.
15   Ninety-nine percent of them are gone.  They
16   have been gone.  A lot of this stuff was
17   built in the 1990s, so it was antiquated
18   technology.
19          If the Court will turn to Exhibit
20   11, which is not objected to, that is an
21   e-mail from an individual at Lucent.  There
22   were two types of COBRA systems, one done by
23   3Com, Your Honor, or CommWorks, and the other
24   one by Lucent.  We asked him, we want the
25

24

CONFIDENTIAL - Proceedings

1    promotional literature.  Please give us the
2    promotional literature.  The gentleman from
3    Lucent -- and this was February 8th.  So
4    immediately after we agreed to informal
5    discovery, we went out and sought this.  We
6    are having a hard time finding any marketing
7    literature on these cards.  This literature
8    would have had to have been generated in the
9    1999 and 2000 time frame, it seems it is no
10   longer available.  Well, Your Honor, at the
11   time that we got Mr. Hills' declaration, he
12   raised the possibility that the COBRA system
13   could be used for Voice Over IP for the first
14   time.  That had never been raised before.  So
15   at that point, Mr. Anderson looked for
16   additional materials to determine whether the
17   equipment provided by third party vendors
18   could have been used to do Voice Over IP.
19   Exhibit 4 is a letter that he received from
20   Lucent saying the modems in the systems can't
21   be used for voice communications.  Your
22   Honor, under the Federal Rules of Evidence,
23   experts can rely on what you normally would
24   have done or what an expert normally would
25

26

```
 1        CONFIDENTIAL - Proceedings
 2  have done, when you are talking about a third
 3  party vendor, is go to the third party vendor
 4  to get the technical specifications of those
 5  types of equipment. Similarly, Your Honor,
 6  Exhibits 5, 6, 7, 8, 9 and 10 are the manuals
 7  of either Lucent or 3Com. Some of them are
 8  older manuals than the ones we have produced.
 9  Some of them are the newer manuals than the
10  ones we produced, so that you could compare
11  and contrast what you needed for Voice Over
12  IP and what was in the systems.
13        So, Your Honor, number one, there
14  is no prejudice here whatsoever. They have
15  had the documents for at least two months
16  before the deposition, three months before
17  today. We engaged in a process of informal
18  discovery. We in good faith complied with
19  that discovery. Once Mr. Hills raised the
20  issue of Voice Over IP, we sought to respond.
21  Mr. Hills, as the timeline indicates, filed
22  his declaration first raising that issue for
23  the first time. So I think it would be in
24  essence unfair not to let us defend on that
25  issue, particularly in view of the fact that
```

```
 1        CONFIDENTIAL - Proceedings
 2  there is no surprise and that we were
 3  handling this in an informal fashion.
 4        JUDGE GONZALEZ:  The Government, is
 5  there any response?
 6        MS. GUERON:  The only response,
 7  Your Honor, is that to the extent that the
 8  implication is that we held back the Voice
 9  Over IP argument, the Voice Over IP argument
10  was made by the Government for the first
11  time, the first time it ever filed anything
12  other than a proof of claim. So in our very
13  first filing in our first brief on this
14  issue, we raised the Voice Over IP argument.
15  That is all.
16        JUDGE GONZALEZ:  All right.  I am
17  going to overrule the objection and I will
18  allow the exhibits.
19        MR. PEREZ:  Your Honor, for
20  purposes of the record, Exhibits 1 through 25
21  and 27 through 31 have been admitted into
22  evidence.  Is that correct?
23        JUDGE GONZALEZ:  Yes.  Subject to,
24  I believe, once that objection is disposed
25  of, there is are no other objections; is that
```

27

```
 1        CONFIDENTIAL - Proceedings
 2  correct?
 3        MR. PEREZ:  There is only an
 4  objection to 26, which I think the Court was
 5  holding.
 6        JUDGE GONZALEZ:  Is that correct?
 7  The Government agrees?
 8        MS. GUERON:  That is correct, Your
 9  Honor.
10        (Whereupon, Exhibits 1 through
11  25 and 27 through 31 were received into
12  evidence, this date.)
13        JUDGE GONZALEZ:  How long are your
14  opening statements?
15        MR. PEREZ:  Your Honor, I read an
16  article this morning about the opening
17  statements in the Enron trial, and the
18  comment was that the worst thing they did was
19  they didn't keep them brief. So I think I
20  can be done in probably 15 or 20 minutes.
21        MS. GUERON:  That is adequate for
22  the Government as well, Your Honor.
23        JUDGE GONZALEZ:  When would be a
24  reasonable time to take a break? We go
25  through opening statements, and we will be
```

28

```
 1        CONFIDENTIAL - Proceedings
 2  finished maybe by 10 minutes to 12:00. Your
 3  witness' direct would take how long?
 4        MR. PEREZ:  Your Honor, I would
 5  imagine it would take probably between
 6  45 minutes and an hour.
 7        JUDGE GONZALEZ:  So we would
 8  approximately maybe break at 1:00 or near
 9  1:00 before the cross of that witness?
10        MS. GUERON:  That is fine, Your
11  Honor.
12        MR. PEREZ:  I would have to break
13  for lunch right before the cross, but I will
14  be quicker. I will be quicker.
15        MS. GUERON:  The cross, I imagine,
16  would be no more than half an hour.
17        JUDGE GONZALEZ:  If we can fit it
18  in before 1:00 or by 1:15, then we will go
19  straight through, but then you will be very
20  limited on redirect.
21        MR. PEREZ:  I am aware of the
22  concept of failure to open, Your Honor.
23        JUDGE GONZALEZ:  All right.  Go
24  ahead.
25        MR. PEREZ:  What is it that we are
```

30

CONFIDENTIAL - Proceedings
1
2   talking about?  Your Honor, we have been here
3   for an hour -- well, we have been here a lot
4   longer.  We have been here before the Court
5   and we have been throwing around numbers and
6   we have been talking about COBRA and we have
7   been talking about all of these things, but
8   why are we here?  Your Honor, we are here
9   because the IRS has filed a Proof of Claim
10  seeking to charge the Reorganized Debtors --
11  and this is all in the post-petition period,
12  Your Honor; the pre-petition period is
13  covered by the motions for refund -- in the
14  post-petition period, they want to assess a
15  three percent excise tax on certain services
16  purchased by the Debtors from various LECs or
17  ILECs, Local Exchange Carriers or Incumbent
18  Local Exchange Carriers.  You know them well.
19  There are four of them or, at least, there
20  were four at the time.  The names changed,
21  but they remain the same.  We are here
22  because of a specific statute.  That statute
23  is a section of the Internal Revenue Code, 26
24  U.S.C. section 4251, which first says, "you
25  can impose a tax on local telephone service,"

CONFIDENTIAL - Proceedings
1
2   and then section 4252, which says "local
3   telephone service means ..."  That is really
4   where we start.  What does "local telephone
5   service" mean?
6           Your Honor, I have a little
7   demonstrative aid, which I will hand to
8   counsel, and I would like permission to
9   approach the Court.
10          JUDGE GONZALEZ:  All right.  Go
11  ahead.
12          MR. PEREZ:  Which will take me
13  through the argument.  Your Honor, section
14  4252(a) defines what local telephone service
15  means.  It says it is access to the local
16  telephone system and the privilege of
17  telephonic quality communication with
18  substantially all persons having a telephone
19  or radio telephone stations constituting part
20  of such local telephone system and any
21  facility or service provided in connection
22  with the service described in paragraph 1.
23  In addition to that, even if you have local
24  telephone service, it does not include any
25  private communication service.  So you have

31

CONFIDENTIAL - Proceedings
1
2   got to meet all of the requirements for local
3   service, but even if you meet those
4   requirements, it can't be a private
5   communication service.
6           So what is COBRA service, Your
7   Honor?  I think on the second page of the
8   PowerPoint, I go through what COBRA service
9   is.  Basically what COBRA service does, Your
10  Honor, is it aggregates the dial-up users,
11  after the Incumbent Exchange Carrier does
12  several things, it sends a high-speed
13  datastream to MCI, and MCI takes that stream
14  and sends it to the various internet service
15  providers.  So in essence, what MCI gets is
16  the high-speed datastream that come out of
17  the back of the NAS, what is referred to as
18  at NAS, which is what you get for COBRA
19  service.
20          So, Your Honor, if you would turn
21  to the third page, it is like a stool, and
22  the stool has four legs and they have to have
23  each one of those four legs in order for the
24  excise tax to be applicable.  They have to
25  have the privilege.  It has to be telephonic

32

CONFIDENTIAL - Proceedings
1
2   quality voice communications.  It has to be
3   with substantially all persons having a
4   telephone, and it cannot be a private
5   communication.  Your Honor, not only do we
6   think that it is not taxable, but we also
7   think that the Government and that the
8   evidence will show that they cannot meet any
9   single one of these requirements, not one of
10  these requirements.  If any one of them
11  falls, the whole tax falls.
12          The next page is just a depiction
13  of, if any one of them falls, they all fall.
14  Your Honor, we don't believe there is any
15  privilege, because the evidence will show
16  that the taxpayer, i.e., the Reorganized
17  Debtors, had no ability to make or receive a
18  telephone call.  That the COBRA service is
19  limited to the provision of a high-speed
20  internet data output at the egress port, and
21  that the vendor owns all the facilities
22  provided in COBRA services and those
23  facilities cannot be reconfigured by the
24  Reorganized Debtors into telephone service.
25          Also, Your Honor, there is only one

34

```
 1        CONFIDENTIAL - Proceedings
 2  case in this area.  That is the Comdata case,
 3  and I am sure there will be a lot of talk
 4  about Comdata, but we believe firmly that the
 5  evidence will show that there is no
 6  self-imposed limitations like the ones
 7  indicated in Comdata.
 8        Additionally, Your Honor, we don't
 9  believe that they meet the leg that there is
10  voice communication.  We believe that the
11  evidence will show that COBRA's an antiquated
12  data service, it is not capable of telephonic
13  quality voice communications, and that the
14  COBRA service is inherently limited to
15  low-speed internet data transmission.
16  Furthermore, they cannot meet the leg that
17  there is communication with telephones in the
18  local telephone system.  The evidence will
19  show there is no dial tone with the COBRA
20  service, that there is no telephone
21  connection, that what you get is high-speed
22  data packets, which are not compatible with
23  the public telephone network.  That the COBRA
24  service is not capable of being used to
25  originate or receive calls from substantially
```

```
 1        CONFIDENTIAL - Proceedings
 2  all telephones in the local system.
 3        Additionally, Your Honor, we
 4  believe that the evidence will show that it
 5  is a private communication, because the
 6  channels on the vendors' NAS are dedicated to
 7  MCI's exclusive use.  Then there is a point
 8  to point private line.  Furthermore, that MCI
 9  is charged separately for the COBRA service.
10        Now, we are going to hear a lot of
11  talk about voice quality, voice quality path,
12  and voice quality communication.  This
13  statute was written in 1965, and I believe
14  the evidence will show that in 1965 you had
15  to have somebody to be able to talk to.  That
16  is what the statute says.  You have to have
17  voice quality communication, not that the
18  data is carried on a voice quality path or
19  anything like that.  You have to have voice
20  quality communication and meet each one of
21  those four standards, in addition to access
22  to the local telephone system, and we think
23  that the evidence will show that they cannot
24  meet any single one of those four standards.
25        MS. GUERON:  Your Honor, the COBRA
```

35

```
 1        CONFIDENTIAL - Proceedings
 2  services purchased by MCI are subject to
 3  federal excise taxes.  MCI would have the
 4  Court rule that the excise tax is totally
 5  inapplicable to the COBRA service.  MCI cites
 6  neither caselaw, nor regulations, nor Revenue
 7  Rulings supporting its position.  MCI is
 8  wrong.  This Court should deny MCI's
 9  objection, and allow the IRS's claim in full,
10  because the COBRA system is taxable.  The
11  reason it is taxable is that it uses local
12  telephone lines and telephonic quality
13  communications throughout to connect a
14  dial-up user to the modems inside the COBRA
15  system.  The modem to modem communication has
16  been held subject to the excise tax by the
17  IRS in Revenue Rulings that are decades old,
18  and Revenue Rulings are accorded great
19  deference in this circuit, as instructed very
20  recently by the Second Circuit.
21        MCI concedes -- and you will hear
22  testimony today that reflects these
23  concessions -- that parts of the COBRA system
24  use telephone lines and telephonic quality
25  paths to connect a dial-up user to the COBRA
```

36

```
 1        CONFIDENTIAL - Proceedings
 2  modems that receive that call.  In the words
 3  of MCI's own expert Mr. Anderson, the dial-up
 4  user's modem, quote, "uses the telephone
 5  network to connect to the modem bank via the
 6  components in COBRA."  Mr. Anderson agrees
 7  that the dial-up user's modem calls the
 8  COBRA's modem using a telephonic quality
 9  path.
10        He agrees with what is probably the
11  central premise of the Government's argument
12  here, and this is paragraph 8 of the
13  declaration of Dr. Hills.  It reads as
14  follows:  All access to modems requires
15  two-way voice grade telephonic quality
16  communication.  The COBRA services purchased
17  by UUNET provide access between dial-up
18  users' modems and modems or DSPs within the
19  COBRA system and, thus, require two-way voice
20  capable telephonic quality communications.
21  That is paragraph 8 of Dr. Hills'
22  declaration.  At deposition Mr. Anderson was
23  asked, do you agree with that proposition,
24  and he answered yes.
25        With these fundamental concessions
```

38

```
 1      CONFIDENTIAL - Proceedings
 2   from MCI, the outcome of the case should be
 3   certain, Your Honor, that the excise taxes
 4   must apply to the COBRA services.  Now, we
 5   fundamentally agree on a lot in this case.
 6   We agree on the purpose of COBRA and we agree
 7   largely on how it works.  I would like to
 8   take Your Honor through that.  Exhibit 2,
 9   which is a diagram that was also used by
10   Mr. Perez in his opening, will provide a
11   model for the way the opening will proceed.
12      First of all, the purpose of COBRA
13   is to allow dial-up users to connect to the
14   internet using the public telephone network.
15   To make that simple, Your Honor, this is how
16   it works:  you have someone at home who
17   doesn't have cable or broadband or a fancy
18   way to access the internet.  He has a modem
19   on his computer and he has a telephone jack
20   in his wall.  He logs onto his computer.  He
21   clicks onto an ISP logo, an internet service
22   provider logo.  He hears his modem make the
23   screeching tones that reflect logging onto
24   the internet.  What that is, is the modem
25   connecting using old-fashioned telephone
```

39

```
 1      CONFIDENTIAL - Proceedings
 2   pink -- at the LEC switch.  The parties agree
 3   that there is a telephonic quality
 4   communication between the dial-up user and
 5   the LEC switch.  Next the dial-up user's
 6   modem call travels from the LEC switch to a
 7   PRI, a Primary Rate Interface Trunk, and that
 8   is labeled in Exhibit 2.  The parties agree
 9   that there is a telephonic quality
10   communication between the LEC switch and the
11   PRI, and that PRIs from the capability of
12   telephonic quality communication.  Next in
13   the COBRA system, the PRI connects the LEC
14   voice switch to the COBRA's modem bank, which
15   are inside the NAS, the Network Access
16   Server.
17      The parties agree, as I said, that
18   the PRI is capable of telephonic quality
19   communication, and, thus, the parties agree,
20   that starting on the left-hand side of the
21   Exhibit 2, the dial-up user has a telephonic
22   quality communication path all the way from
23   his home into the modems that reside inside
24   the NAS of the COBRA system.
25      Now, the parties also agree that
```

40

```
 1      CONFIDENTIAL - Proceedings
 2   lines through the public system telephone
 3   network to a local exchange carrier voice
 4   switch, and then to the COBRA modem bank, and
 5   then ultimately to the internet.
 6      There are a lot of undisputed
 7   technical facts, Your Honor, and let me just
 8   lay them out for you.  Starting at the far
 9   left side of diagram that is Exhibit 2, that
10   cone depicts the dial-up user who is plugging
11   into the telephone jack via the modem to
12   start this communication process to the
13   COBRA.  The COBRA services are activated when
14   the modem of the dial-up user dials a local
15   telephone number to contact the LEC.  The
16   dial-up user's modem sends a telephonic
17   quality signal over the Public Switch
18   Telephone Network.  The modem makes the
19   screeching tones and, according to
20   Mr. Anderson, the modem calls the modem in
21   COBRA using a telephonic quality path.
22      The dial-up users' modem connects
23   to the LEC via a voice switch -- that is
24   moving a little further to the right in
25   diagram 2.  That is the area that is in
```

```
 1      CONFIDENTIAL - Proceedings
 2   once inside the NAS, the COBRA system goes on
 3   to convert the dial-up user's modem call to
 4   internet data, and that, as the data exits
 5   the COBRA and joins the MCI backbone network,
 6   it ultimately travels on the internet.  But
 7   that point isn't relevant here, Your Honor,
 8   because up until the modems of the NAS, the
 9   call is traveling on a telephonic quality
10   path.  This system also works the same way in
11   reverse, as Mr. Anderson said, its full
12   duplex or its two-way communication in
13   layman's terms, meaning the dial-up user is,
14   say, trying to get the Google webpage.  Once
15   the call reaches the internet and the
16   internet sends back the welcome webpage
17   screen, it enters COBRA, it enters the NAS
18   and the modem bank of the COBRA system, and
19   it is converted into a signal that can travel
20   back over a telephonic quality line, back
21   over the Public Switch Telephone Network, and
22   back to someone's home over a traditional
23   telephone line.  All of these points are
24   undisputed, Your Honor.
25      So what is the legal consequence of
```

CONFIDENTIAL - Proceedings

1  this? It is very simple. The legal
2  consequence is that excise taxes apply. As
3  described above, this is a two-way telephonic
4  quality communication. That is the essence
5  of COBRA. Without it, it could not link the
6  dial-up user to the internet. The point of
7  COBRA is to link up dial-up users who have
8  only their telephone lines as the way to get
9  to the internet. Because they are using
10  telephone lines and telephonic quality
11  communications, the excise tax applies.
12  I would like to go through the
13  arguments MCI makes in opposition. Most of
14  them are quite simply entirely irrelevant to
15  the excise tax analysis, and I will go one by
16  one. First, MCI argues that it uses COBRA
17  for data transmission, and what it gets is a
18  high-speed datastream. That misses the
19  point. The federal excise tax applies,
20  because the dial-up user has two-way
21  communication with the COBRA system modems
22  via telephonic quality messages over a
23  telephonic quality path. It doesn't matter
24  for excise tax purposes, that ultimately the

CONFIDENTIAL - Proceedings

1  COBRA system converts those communications to
2  IP packets. As held by the only Court to
3  rule on the interpretation of 4252 in any
4  relevant way, and MCI apparently agrees --
5  and this is the Comdata court -- the question
6  is not the actual use of the
7  telecommunications technology. To quote
8  Comdata, the tax is applicable, because the
9  service provided to Comdata grants it the
10  right to utilize the telephone lines to
11  communicate with the substantial number of
12  stations in the distant area. That the
13  service may not, in fact, be so used by
14  plaintiff is irrelevant to the existence of
15  the privilege.
16  The legislative history of the
17  excise tax supports this analysis. The 1965
18  Senate Report states that in the case of
19  local telephone service, the definition makes
20  it clear that it is the right of access to a
21  local telephone service, and the privilege of
22  telephonic quality communication, which is
23  taxed, together with the facilities or
24  services provided with this service.

CONFIDENTIAL - Proceedings

1  Under Comdata, the COBRA system is
2  taxable, because its modems and PRIs have
3  telephonic quality capability, regardless of
4  whether they are used for traditional voice
5  calls. Further, the excise tax lists
6  exemptions, specific types of services that
7  are exempted, but what is not exempted is a
8  voice capable system that is currently being
9  configured and used to transmit data.
10  The second argument that MCI makes
11  is that the excise tax doesn't apply, because
12  there are no traditional telephones in the
13  COBRA system. You can't pick up an
14  old-fashioned and make a traditional call.
15  That is one leg of their stool. MCI doesn't
16  cite a single case or regulation or revenue
17  ruling in support of this proposition, and
18  MCI is flatly wrong. They assert that the
19  tax applies, only if you can pick up a
20  telephone and make a voice call, but the IRS
21  has long held otherwise. Revenue Ruling
22  79-245 held that modem to modem
23  communications are taxable under the excise
24  tax. The telecommunication system described

CONFIDENTIAL - Proceedings

1  in that ruling was a modem to modem
2  communication where, quote, "instead of
3  having standard telephones connected to the
4  telephone lines, the business establishment
5  has its computer unit and terminals connected
6  to the telephone lines." The IRS went on in
7  its description, the modems convert the
8  computer signals into signals that can be
9  transmitted over telephone lines. While
10  these telephone signals are the same type
11  used to transmit voice, the modems are
12  designed only for non-voice transmission and
13  produce a signal which is usable only for
14  transmission to other computer stations.
15  Sounds familiar? It should. It is just like
16  the COBRA system.
17  What did the IRS hold in 1979?
18  That the modem to modem system was taxable,
19  regardless of the absence of an actual
20  telephone, because the company, quote, has
21  access to the local telephone exchange system
22  through the lines used with the computer
23  system. The IRS ruled that where the
24  telephone system provides the subscriber the

CONFIDENTIAL - Proceedings

1    privilege of telephonic quality
2    communication, it is immaterial whether the
3    subscriber exercises the privilege.  That
4    Revenue Ruling should be accorded great
5    deference, Your Honor.  The Comdata case also
6    supports it, because in the Comdata case one
7    portion of the services described and held
8    taxable were an automated communication
9    system in which no voice phone call was made,
10    it was deemed taxable.
11         Finally, the Court should remember
12    that 4252(a)(2), the second portion of the
13    relevant statute, expressly includes in the
14    definition of the local telephone service,
15    quote, "any facility or service provided in
16    connection with a local telephone system."
17    Nothing in that language implies a
18    traditional telephone.
19         MCI makes a third argument, that it
20    didn't really speak to in its opening, but in
21    its papers and at deposition they raised
22    repeatedly, they argue that the excise tax
23    didn't apply, because COBRA can't originate
24    telephone calls.  Now, the ability to

---

46

CONFIDENTIAL - Proceedings

1    originate telephone calls is entirely
2    irrelevant to the excise tax analysis.  Even
3    if it were relevant, the evidence will show
4    today, that COBRA could be reconfigured to
5    originate calls.  The IRS again in Revenue
6    Rulings has made very clear that the ability
7    to originate a call was irrelevant.  In a
8    Revenue Ruling in 1977, the IRS stated,
9    quote, "section 4252(a)(1) makes no
10    distinction between systems that provide
11    access to local telephone network only by
12    receiving calls in systems that both receive
13    and originate calls."  The IRS further
14    stated, the facts that the system at issue,
15    quote, "can only receive incoming calls from
16    a local telephone system is not material to
17    the tax determination."  In making that
18    ruling, the IRS was relying on a Revenue
19    Ruling from a few years earlier, 75-102 where
20    the IRS again ruled that the types of systems
21    in the old days when you would call in and
22    you would learn what time it is or what the
23    weather would be, systems that only receive
24    incoming calls were also taxable.  Plus, Your

---

47

CONFIDENTIAL - Proceedings

1    Honor, you will learn that the COBRA system
2    can be reconfigured.  It isn't currently
3    configured to originate calls, but MCI
4    concedes that the only barriers to such a
5    reconfiguration are economic or contractual.
6    It would be burdensome.  It is not in their
7    business judgment to do so.  But that is not
8    a technical barrier, and that is just the
9    kind of barrier that under Comdata is not
10    relevant to excise tax analysis.
11         In Comdata, the plaintiffs argued
12    that the IRS should look to actual use, not
13    the capability of the service provided, and
14    the response of the Comdata court was we
15    cannot accept this argument.  That is the
16    very same argument that is being put to you
17    today, Your Honor.
18         MCI's fourth argument in its papers
19    is that the excise tax doesn't apply, because
20    COBRA is not part of a local telephone
21    system.  They are making some arguments about
22    the fact that the IP packets, once they leave
23    the COBRA system, travel the globe on the
24    internet.  That may well be, Your Honor, but

---

48

CONFIDENTIAL - Proceedings

1    within the COBRA system they are buying, it
2    is a local telephone call to a local exchange
3    carrier connecting to the PRI via local loops
4    and, therefore, there is local telephone
5    service being provided with the COBRA.  That
6    is why it is taxable under 4252(a).
7         Finally, turning to VOIP, Voice
8    Over Internet Protocol, this is a separate
9    and stand-alone basis for the excise taxes to
10    apply.  If Your Honor were to discount the
11    VOIP argument, it has nothing to do with the
12    argument the Government has just outlined
13    previously, but the COBRA system is capable
14    of VOIP.  Computer to computer VOIP systems
15    are arranged, so that a caller's voice call
16    is converted into a voice packet on the
17    caller's computer in the caller's home.  In
18    such a system, the VOIP call leaves the
19    dial-up user's home as a voice packet.  There
20    are other kinds of VOIP as well.  The
21    Government isn't arguing about those kinds of
22    VOIP systems.  But in a computer to computer
23    VOIP system, such a system can travel over
24    COBRA.  MCI claims in its brief that, quote,

1        CONFIDENTIAL - Proceedings
2   "COBRA service does not have VOIP
3   capability," but MCI's expert expressly
4   disagreed at his deposition. According to
5   him, quote, yes, voice packets generated by
6   the end user's computer could be transported
7   by COBRA. He admitted at deposition that he
8   couldn't rule out that that, in fact,
9   happened using COBRA. He admitted that the
10  COBRA services cannot distinguish between a
11  computer to computer VOIP packet and any
12  other kind of packet coming out of a dial-up
13  user's computer, like a simple keystroke
14  request for a webpage.
15       MCI's COBRA access contracts
16  acknowledge that voice capability. They
17  provide if WorldCom wants to use COBRA for
18  VOIP, it should negotiate terms with the
19  vendors prior to doing so, and they provide,
20  quote, "if WorldCom directly uses the COBRA
21  services to provide VOIP without the prior
22  development of mutually agreed-upon terms,
23  then WorldCom shall be in breach of this
24  schedule."
25       In the face of testimony from their

1        CONFIDENTIAL - Proceedings
2   own expert that COBRA can be used for VOIP,
3   in a contract that explains what exactly will
4   happen at WorldCom if it does use COBRA for
5   VOIP, it is simply untenable for WorldCom to
6   argue that COBRA cannot be used for VOIP.
7       In sum, Your Honor, this Court
8   should deny MCI's objection and allow the
9   IRS's claim in full, because the COBRA system
10  is taxable and it uses local telephone lines
11  and telephonic quality communications to
12  connect the dial-up user to the internet
13  through modem to modem communications that
14  the IRS has long held are subject to the
15  excise taxes of 4251 and 4252.
16       Thank you very much.
17       JUDGE GONZALEZ: All right. Thank
18  you. We will proceed then in a moment.
19  WorldCom will call its first witness. The
20  witness can seat himself up.
21       I am going to take probably a
22  three- or four-minute break. The parties, if
23  they need a few minutes longer, let me know,
24  and we will proceed with the witness'
25  testimony.

1  CONFIDENTIAL - Anderson - Direct - Perez
2        MR. PEREZ: Thank you, Your Honor.
3        (Whereupon, a recess was taken.)
4        JUDGE GONZALEZ: Please be seated.
5        Would you swear the witness in,
6   please.
7   J O H N   A N D E R S O N ,
8     called as a witness, having been first
9     duly sworn by a Notary Public (Liza
10    Ebanks), was examined and testified as
11    follows:
12       JUDGE GONZALEZ: Are there cups by
13  the water container?
14       THE WITNESS: Yes, there are.
15       JUDGE GONZALEZ: There is fresh
16  water.
17       THE WITNESS: Thank you.
18  DIRECT EXAMINATION
19  BY MR. PEREZ:
20    Q    Would you please state your name.
21    A    My name is John Anderson.
22    Q    Sir, how are you currently
23  employed?
24    A    I am employed by Verizon Business.
25    Q    What is your current position with

1  CONFIDENTIAL - Anderson - Direct - Perez
2   Verizon Business?
3     A    I am director of switch and IP
4   planning.
5     Q    How long have you been so employed?
6     A    Several weeks since the merger.
7     Q    How were you previously employed?
8     A    I was employed by MCI.
9     Q    For how long were you employed by
10  MCI?
11    A    Approximately 24 years.
12    Q    Would you tell the Court your
13  educational background since high school?
14    A    After high school, I enlisted in
15  the U.S. Air Force, where I attended a
16  technical course on telecommunications. The
17  course focused on microwave systems and
18  multiplex systems. The course was about
19  six months. We studied five days a week,
20  six hours a day, so about 600 hours of study.
21  I graduated with honors and was subsequently
22  a Telecom Technician for the U.S. Air Force.
23       After I left the Air Force, I
24  attended college. I graduated from the North
25  Central College in Naperville, Illinois. I

54

1 CONFIDENTIAL - Anderson - Direct - Perez
2 had a Bachelor's Degree in Business with a
3 minor in Computer Science. I was working
4 fulltime while going to school. However, I
5 did do excellent academically.
6          After that, I attended the
7 University of Dallas where I worked on an MBA
8 Program. The MBA Program has a focus in
9 telecommunications. I have completed 15 of
10 the 17 required courses. I currently have a
11 4.0 GPA.
12          Then, finally, I have taken
13 numerous telecommunication courses on systems
14 and network courses that MCI and other
15 vendors offer.
16     Q     What year did MCI hire you?
17     A     In 1982.
18     Q     Were you still in school then or
19 were you out of school?
20     A     I was still in school.
21     Q     What positions have you held with
22 MCI?
23     A     I was hired as a field engineer.
24 As a field engineer, I maintained and
25 operated microwave radios and multiplex

55

1 CONFIDENTIAL - Anderson - Direct - Perez
2 Carrier. After several years as the access
3 manager, I moved back to engineer where I
4 became manager of special networks. In that
5 position I was responsible for the design and
6 planning of data networks, such as the X.25
7 packet network, the CCS-7 signaling network,
8 and some other data networks. I was also
9 responsible for integrating networks into
10 MCI's system.
11          After that I was promoted to
12 director. I managed a large group of
13 people -- about 300 engineers and technicians
14 who designed and implemented the instructions
15 that go into a switch network that tell calls
16 how to get from the origination point to the
17 termination point. This is a highly complex
18 environment, because of the volume of calls.
19 Finally, I moved into my current role as
20 director of switch and IP planning.
21     Q     When was that? When did you move
22 into your current role?
23     A     Around 1982 -- I am sorry. 2002.
24     Q     Would you tell the Court what your
25 responsibilities are in your current

56

1 CONFIDENTIAL - Anderson - Direct - Perez
2 systems in one of MCI's largest central
3 offices. After that, I was promoted to an
4 engineer supervisor. I supervised a small
5 group of engineers that did circuit design.
6 After that, I was promoted to manager over an
7 installation construction organization. My
8 responsibilities were to install
9 telecommunications equipment, digital
10 cross-connect stacks, packet switches, and
11 other telecommunication equipment in central
12 offices in a five-state area in basically the
13 Midwest.
14          After that, I moved into terminal
15 management, where I was a central office
16 terminal manager. I managed a large central
17 office that had two digital telephone
18 switches. After that, I moved into LEC, a
19 Telco Management Manager, where I managed the
20 relationship with what was then Ameritec, and
21 we also ordered all interconnect between the
22 MCI and Ameritec.
23     Q     Let me just stop you. You said
24 "LEC." Could you spell that and define that?
25     A     LEC, L-E-C, or Local Exchange

1 CONFIDENTIAL - Anderson - Direct - Perez
2 position?
3     A     In my current position, I manage a
4 group of about 180 engineers and planners
5 that are responsible for the design,
6 planning, and sizing of four major networks.
7 I have oversight and authority for all
8 decisions leading up to the planning and
9 sizing of these networks. I am ultimately
10 responsible for those four networks, and I
11 will go through those four networks. The
12 long distance network, which is one of the
13 largest long distance networks in the United
14 States. It currently carries about 14
15 billion minutes. That is about 6 billion
16 calls a month, that is per month. In that
17 role for design, the design responsibilities
18 which are basically determining the
19 configuration and the call, how the network
20 is built for design. That was design. For
21 sizing, I am responsible determining the
22 capacity of the network and how calls flow
23 through the network.
24          With the LD network we determine
25 where these switches or what switches are

CONFIDENTIAL - Anderson - Direct - Perez

2  going to go in the network, and these are
3  large devices that run from $2 million to
4  $5 million a piece, so I have a very large
5  capital budget.  In addition, we are
6  determining how these switches go in the
7  network, meaning how they are configured, how
8  they are going to interface with the MCI
9  network, and how they are going to interface
10  with other networks.  I also determine when
11  they are going to go in, so that they fit
12  into the network when they are needed from a
13  capacity standpoint and not going in early so
14  that we don't have idle capacity.  We also
15  determine geographically where they go, so
16  that they meet the market demand of the
17  geographic area.
18          The second network I manage is the
19  CLEC network or Competitive Local Exchange
20  Carrier.  It is also one of the largest local
21  CLEC networks in the United States.  It
22  currently carries about 9 billion minutes of
23  traffic a month.  My responsibilities for the
24  local network are very similar to the LD
25  network, in that I am responsible for design,

CONFIDENTIAL - Anderson - Direct - Perez

2  States.  It is the largest in the world.  I
3  am responsible for the United States'
4  network.  It carries about 8 billion minutes
5  of traffic every month.  This is another
6  unique network for me in that quite a lot of
7  my time has been focused on this network.
8  When I picked the network up, responsibility
9  for the network, it was determined that the
10  network was antiquated.  It was old
11  technology.  It had problems.  It was plagued
12  with technical problems.  It was very, very
13  high cost, and it drove the product into the
14  red.  In addition, if you talked to our
15  larger customers or our ISP customers, they
16  would have said that the dial network, which
17  was COBRA primarily, was the
18  lowest-performing or the worst quality
19  network out of all of the vendors they used.
20          The reason why it consumed so much
21  of my time, is that we basically rebuilt the
22  whole network.  We started with a design from
23  scratch, built the network from ground up.
24  It required us to come up with a network
25  design, the requirements for all the software

CONFIDENTIAL - Anderson - Direct - Perez

2  sizing, and the planning of the network.  I
3  am also responsible for the VOIP network or
4  Voice Over IP Network.  This is a relatively
5  new technology.  I am also responsible for
6  the design, planning, and sizing of that
7  network.  But this is unique, because MCI
8  partners with cable companies to provide
9  VOIP.  With this, cable companies are fairly
10  new to the telephone business.  So they know
11  cable, but they don't know telephone.  One of
12  my roles is to help guide them through
13  learning how telephone networks work, and how
14  the industry works.  So I am giving them
15  techniques for traffic engineering,
16  techniques for network planning, and
17  techniques for network configuration.  I also
18  guide them through the maze of how the
19  industry works and what you need to make a
20  telephone service work.
21          Then, finally, I am responsible for
22  the IP dial network or dial-up internet
23  network, which we talked about earlier.  The
24  dial IP network that Verizon Business or MCI
25  has is one of the largest in the United

CONFIDENTIAL - Anderson - Direct - Perez

2  systems that needed to be put in, the
3  requirements for all of the hardware that
4  needed to be put in, the processes for
5  developing the design, the processes for
6  migrating traffic off from COBRA onto MCI's
7  dial network.  The end result is the dial
8  network is now, if you talk to our largest
9  vendors, the best-performing network in the
10  nation with the best price points.  Those are
11  not subjective measurements, but specific
12  measurements.  What we built is 800,000
13  modems that required 1.5 million circuits to
14  be designed, and like I said, it is currently
15  carrying 8 billion minutes of traffic a
16  month.
17      Q      In your position, are you familiar
18  with the capabilities of the various
19  networks?
20      A      Very much so.  It is an integral
21  part of my responsibilities.
22      Q      Are there differences between, for
23  instance, the dial-up IP network and the VOIP
24  network?
25      A      Yes.  They are very different

62

1 CONFIDENTIAL - Anderson - Direct - Perez
2 networks, two totally different platforms.
3     Q     Are there also differences between
4 the dial-up networks and the local and the
5 long distance networks?
6     A     Yes.  All four networks are totally
7 different platforms.
8     Q     Are you familiar with the term
9 Central Office Base Remote Access services?
10    A     Yes, that is COBRA.
11    Q     Are you one of the people at MCI
12 most familiar with COBRA services?
13    A     From a network perspective
14 and from a capability perspective, I am the
15 leading expert on COBRA.  You could say there
16 are other people within the company that may
17 have more detailed knowledge in specific
18 areas, but overall, I would venture to say I
19 am the expert.
20    Q     When did you first become familiar
21 with COBRA services?
22    A     I first became familiar in the
23 1990s when it became apparent that COBRA had
24 some quality issues and problems.  I became
25 intimately familiar with it when I picked up

62

1 CONFIDENTIAL - Anderson - Direct - Perez
2 responsibility for it in 2002.
3     Q     At the time that you picked up
4 responsibilities for 2002, are you purchasing
5 the same level of COBRA services today that
6 you were purchasing in 2002?
7     A     The same level?
8     Q     Yes, level of services.
9     A     Do you mean, like, quantity?
10    Q     Yes.
11    A     No.  COBRA services are basically
12 decommissioned.  Ninety-nine percent of the
13 traffic has been moved off from COBRA onto
14 this new dial network that we built.  COBRA
15 is basically gone.
16    Q     When did that occur?
17    A     We began the decommissioning
18 process several years ago.  We completed it.
19 Well, we completed up to 99 percent in March
20 of last year.
21    Q     Why is it that you can't do that
22 last one percent?
23    A     There are some small areas within
24 the United States that are operated by
25 smaller CLECs.  It requires us to have an

63

1 CONFIDENTIAL - Anderson - Direct - Perez
2 interconnect agreement with those small
3 CLECs.  When we establish these interconnect
4 agreements, it opens up the door for
5 competition.  Hence, they resist setting up
6 an interconnect agreement, and it is fought
7 on a legal front.  Once they get through that
8 legal front -- which in every case I am
9 familiar with, they do -- we then can set up
10 interconnects and then port this traffic into
11 our network.
12    Q     Mr. Anderson, were you asked to
13 give opinions in connection with the
14 Reorganized Debtors' objection to the IRS
15 claim?
16    A     Yes, I was.
17    Q     What did you do to prepare or
18 render those opinions?
19    A     I went back and researched quite a
20 few documents and manuals, the manuals you
21 had talked about earlier.  I also brought in
22 some of my staff to go over what the network
23 is, reviewed the documents that were provided
24 by you guys, and the documents that Dr. Hills
25 wrote.

64

1 CONFIDENTIAL - Anderson - Direct - Perez
2     Q     Let's go to the exhibits real
3 quickly.  Exhibit 1 is the statute, but let's
4 look at Exhibit 2.  Tell me about that
5 document?
6     A     This is a high-level depiction of
7 COBRA and how it fits in the overall network.
8     Q     Who prepared this document?
9     A     I did.
10    Q     What about Exhibit 3?
11    A     This is a more detailed picture of
12 the COBRA platform.  If you look at the NAS,
13 which is in the white box, this is a more
14 detailed picture of the NAS.
15    Q     Again, who prepared that document?
16    A     I did.
17    Q     Now, look at Exhibits 4 through 20,
18 if you would.
19    A     Okay.
20    Q     Are you familiar with those
21 documents?
22    A     Yes.
23    Q     Did you review those documents in
24 connection with the opinions that you gave?
25    A     Yes, I did.

66

1 CONFIDENTIAL - Anderson - Direct - Perez
2    Q    Then let's turn to Exhibits 23, 24
3 and 25.
4    A    Okay.
5    Q    Are you familiar with Exhibits 23,
6 24 and 25?
7    A    Yes, I am.
8    Q    Who prepared those documents?
9    A    I did.
10    Q    Now, I have another volume of
11 exhibits and they are Exhibits 27 through 32.
12 These are COBRA contracts with various
13 vendors. Are you familiar with these
14 documents?
15    A    Yes, I am.
16    Q    As part of your ongoing
17 responsibility when you acquired
18 responsibility over COBRA service, did you
19 have occasion to review some or portions of
20 these documents?
21    A    Yes. I had to review, and I was
22 familiar with portions of the documents,
23 specifically on the network pieces of the
24 documents, so that I knew what the
25 limitations were of what we could do with

1 CONFIDENTIAL - Anderson - Direct - Perez
2 COBRA and what we couldn't do with COBRA.
3    Q    Did you review these documents in
4 connection with the opinions that you
5 rendered?
6    A    Yes. I went back and used these in
7 the opinions.
8    Q    Could you tell the Court what COBRA
9 service is?
10    A    COBRA service is a service provided
11 by the incumbent LECs that aggregates dial-up
12 data and puts it into an internet protocol
13 and hands it off to MCI as a high-speed
14 datastream.
15    Q    What is that MCI receives from this
16 product?
17    A    We receive high-speed data.
18    Q    Now, let's turn back to Exhibit 2.
19 Where is MCI in this exhibit?
20    A    MCI is the blue cloud on the right.
21    Q    The top blue cloud?
22    A    Yes, correct.
23    Q    Can you generally describe this
24 exhibit to the Court?
25    A    This picture describes where the

67

1 CONFIDENTIAL - Anderson - Direct - Perez
2 COBRA fits into the overall network. If you
3 start on the left side of the page, dial-up
4 user. The dial-up user has a computer with a
5 modem in it inside his house, and he uses a
6 local phone line that he owns and purchases
7 to reach the PSTN. His modem dials a phone
8 number that is associated with COBRA, and it
9 is switched through the PSTN local switch,
10 which is the pink box, put on the PRI and
11 connected to the NAS. This also has many,
12 many local users. It only depicts one. The
13 NAS then converts the data that is coming
14 from the end user's PC to packets and
15 aggregates it with other data and puts it on
16 this high-speed connection which MCI plugs
17 into which is labeled "frame relay." We then
18 take that data, put it on our backbone, and
19 it is then routed to the appropriate internet
20 provider ISP, such as AOL or MSN.
21    Q    The data that MCI receives, what
22 kind of data is that?
23    A    It is high-speed data, IP or
24 TCP/IP, which is basically known as your
25 internet data.

68

1 CONFIDENTIAL - Anderson - Direct - Perez
2    Q    Does MCI own any of the components
3 that are inside the COBRA system?
4    A    No. We own none of it. It is all
5 owned by the ILEC, all of it.
6    Q    Are you familiar with the term
7 "telephonic quality communication"?
8    A    Yes, I am.
9    Q    Are you also familiar with the term
10 "telephonic quality path"?
11    A    Yes.
12    Q    Is there a difference between those
13 two terms?
14    A    Definitely. Telephonic quality
15 path is a path or, let's say, for example,
16 the local loop or the wires that go from the
17 user to the switch, that is a path; and it
18 has certain parameters that must meet in
19 order to be graded as telephonic quality. So
20 it is a path. Telephonic quality
21 communications is an ability to communicate
22 between, let's say, two individuals, a
23 telephone call. You need a telephonic
24 quality path to have telephonic quality
25 communications. But that telephonic quality

1 CONFIDENTIAL - Anderson - Direct - Perez
2 path can be used for many, many different
3 things that aren't telephonic quality
4 communications.  An example would be a data
5 private line.  A data private line is running
6 data from point A to point B, but it requires
7 a telephonic quality path in order to do it.
8 So you can't really exchange the terms
9 "telephonic quality path" and "telephonic
10 quality communications."  They are two
11 different things that are not equivalent.
12 One requires the other, but they are not the
13 same.
14     Q    Would you please turn to Exhibit 3?
15     A    Okay.
16     Q    Would you explain to the Court what
17 Exhibit 3 is?
18     A    Exhibit 3 is a more detailed
19 picture of the NAS, which is on Exhibit 2, or
20 the white box labeled "COBRA."  It shows two
21 different pictures, the top and the bottom.
22 The top one depicts the Lucent equipment that
23 we used -- that the COBRA used, not we used.
24 It also depicts the 3Com equipment that COBRA
25 also could have used.  To go through what it

1 CONFIDENTIAL - Anderson - Direct - Perez
2 is, is a PRI is connected into this NAS, and
3 that is the PRI page from the previous page
4 that goes from the LEC switch to the NAS.
5 This PRI goes into a PRI line card, and the
6 PRI line card breaks down the PRI, which has
7 23 individual channels of dial-up data.  The
8 PRI data is then handed to a DSP card, and
9 the DSP card acts basically as a modem.  So
10 it is going to convert that representation of
11 analog data coming in to data which is then
12 handed to either the frame relay card or the
13 router.  At this point is where the data
14 starts to become one datastream, and it is
15 all aggregated or integrated into a
16 high-speed datastream, which is out of the
17 frame relay card or the router, which MCI
18 plugs into.
19     Q    Now, I want you to look at this
20 from the point of view of the taxpayer.  Who
21 is the taxpayer in this case?
22         MS. GUERON:  Objection, Your Honor.
23 I am not sure that is within the purview of
24 Mr. Anderson's expertise.
25         JUDGE GONZALEZ:  What is the

1 CONFIDENTIAL - Anderson - Direct - Perez
2 relevance to this person's skill in answering
3 that question?
4         MR. PEREZ:  Excuse me, Your Honor?
5         JUDGE GONZALEZ:  He is testifying
6 as an expert on telecommunications.
7         MR. PEREZ:  I will change it.
8     Q    Assume, Mr. Anderson, that MCI is
9 the taxpayer in this case which the IRS is
10 seeking to tax, where is MCI in this diagram?
11     A    MCI is not --
12         MS. GUERON:  Objection.
13         JUDGE GONZALEZ:  What is your
14 objection?
15         MS. GUERON:  I don't see what the
16 first part of the question about taxpayer has
17 to do with the second part.  If he is asking
18 where MCI is in this diagram, it should stand
19 alone.  It has got nothing to do with who is
20 the taxpayer.
21         JUDGE GONZALEZ:  I will allow the
22 question, because I don't think there is any
23 dispute that we are here because MCI is
24 alleged to owe some taxes.
25         MR. PEREZ:  I agree, Your Honor.

1 CONFIDENTIAL - Anderson - Direct - Perez
2     Q    Where is MCI in this diagram,
3 Mr. Anderson?
4     A    MCI is actually not in the diagram.
5 It is where the arrows point to MCI on the
6 left side.  MCI is plugged into this diagram,
7 but they are not actually in the diagram.
8     Q    Let's go back to Exhibit 2, and I
9 guess just for clarity, in Exhibit 3 you list
10 two types of different types of COBRA
11 service; correct?
12     A    Correct.
13     Q    When you go back to Exhibit 2, that
14 is the top one; is that correct?
15     A    Yes, that is correct.
16     Q    So Exhibit 2 really corresponds to
17 the top 1, which is the Lucent network access
18 server?
19     A    Correct.
20     Q    Now, in Exhibit 2 you testified
21 that MCI is this blue cloud on the far
22 right-hand side?
23     A    Correct.
24     Q    What connects MCI to the COBRA
25 service?

1 CONFIDENTIAL - Anderson - Direct - Perez
2      A    It is a high-speed datastream, and
3 typically we used at least point to point
4 high-speed data private line.  We would go to
5 whoever the low cost carrier was to get to
6 the COBRA, see the CO or the central office
7 where the COBRA platform was, and they would
8 plug that private line into the COBRA
9 platform and then backhaul it to one of our
10 hubs, which could have been in the same city
11 or could have been across the country, and
12 into one of our routers.
13      Q    Now, you have been in the
14 telecommunications business for 24 years; is
15 that correct?
16      A    I have been with MCI for 24 years.
17 I was before that in the military.
18      Q    Do you know what local telephone
19 service is?
20      A    Yes.  The local telephone service
21 is service where one end user can call
22 another end user within a geographically
23 bounded area.
24      Q    And presumably will have a
25 conversation?

1 CONFIDENTIAL - Anderson - Direct - Perez
2      A    Yes.  You have to be able to talk
3 to each other.
4      Q    Do you have an opinion of whether
5 COBRA services gives MCI the right to
6 communicate with other persons that have
7 local telephone service?
8      A    No.  COBRA cannot call another end
9 user, nor can another end user call somebody
10 via the COBRA platform.  It is impossible to
11 put voice over this -- telephonic quality
12 voice, I will put it that way.
13      Q    Is COBRA service the same as local
14 telephone service?
15      A    No.
16      MS. GUERON:  Objection, Your Honor.
17 Just to the extent that local telephone
18 service is a statutorily defined term.  To
19 the extent that he is asking Mr. Anderson to
20 speak to what 4252 means for his local
21 telephone service, we would object.
22      MR. PEREZ:  Your Honor, the statute
23 uses plain language.  I think I can ask him.
24 The statute talks about privilege.  Well,
25 obviously, the Court is going to have to make

1 CONFIDENTIAL - Anderson - Direct - Perez
2 a legal determination as to what privilege
3 is, but it is also plain language.  The only
4 case that is cited, went to the dictionary to
5 look up what it meant.  I think the person
6 who has been in the business for over 25
7 years can tell what his understanding is of
8 these terms.
9      JUDGE GONZALEZ:  I think he can
10 tell what his understanding of the terms is,
11 but he can't interpret the statute as to
12 whether that is what it means.  The word
13 "person" has a common understanding and the
14 word "person" in a statute may mean something
15 else.
16      MR. PEREZ:  Absolutely, Your Honor.
17 He is not a lawyer.  He doesn't purport to be
18 acting as a lawyer.  This is a statute that
19 was promulgated in 1965, so it has been
20 around.  It has been around for a while.
21      Q    Could MCI plug a telephone into the
22 COBRA service?
23      A    No.  Because all we had was a
24 high-speed data line, and you can't plug a
25 phone into a high-speed data line.

1 CONFIDENTIAL - Anderson - Direct - Perez
2      Q    Where did the high-speed data line
3 get plugged in?
4      A    On the MCI side?
5      Q    Yes.
6      A    We took the high-speed data line
7 and plugged it into what we call an internet
8 edge router.
9      Q    On the COBRA side, where did it get
10 plugged in?
11      A    On the COBRA side, they plugged it
12 into either the frame relay or the output of
13 the NAS.
14      Q    Now, could MCI get a dial tone
15 using COBRA services?
16      A    No.
17      Q    Could MCI make a telephone call to
18 anyone having a telephone station using the
19 COBRA service?
20      A    No.
21      Q    Could MCI receive a telephone call
22 from anyone using COBRA services?
23      A    No.  MCI cannot.
24      Q    Let's look back to Exhibit 3.  Did
25 MCI own any of the equipment that is shown on

1 CONFIDENTIAL - Anderson - Direct - Perez
2 Exhibit 3?
3          MS. GUERON:  Objection.  Asked and
4 answered.
5          JUDGE GONZALEZ:  I think the record
6 will reflect that it was asked and answered.
7          MR. PEREZ:  All right.  Let me move
8 on then.
9     Q     Where is this equipment located?
10    A     The COBRA equipment is located in
11 the vendor or one of the ILECs' central
12 office.
13    Q     Hence the name "central
14 office-based remote access"?
15    A     Yes.  Exactly.
16    Q     Now, could MCI physically go and
17 touch the equipment?
18    A     No.  We had no physical access to
19 the equipment.  It was behind central
20 office's locked doors.
21    Q     Now, let's go to Exhibit 27,
22 please.  It is the contracts in the other
23 book -- and I would just caution you, and I
24 know it is difficult -- but let's just refer
25 to the contracting party as the "vendor."

1 CONFIDENTIAL - Anderson - Direct - Perez
2     A     Okay.
3     Q     If you would, please, turn to DOJ
4 page 12.
5     A     Okay.
6     Q     Could you familiarize yourself with
7 that page, please.
8     A     This is a service description for
9 one of the vendors who provided COBRA.
10    Q     Now, do you recognize this
11 document?
12    A     Yes.
13    Q     Now, the first sentence refers to
14 cyber pop.  What is cyber pop?
15    A     Cyber pop is just another name for
16 COBRA.  Each vendor had their own name for
17 COBRA.  MCI called it COBRA.
18    Q     In the first paragraph here, it
19 indicates that you will be receiving TCP/IP
20 data; is that correct?
21    A     Yes.
22    Q     All right.  Is TCP/IP data suitable
23 for communications over the Public Switch
24 Telephone Network?
25    A     No.

1 CONFIDENTIAL - Anderson - Direct - Perez
2     Q     Why is that?
3     A     The Public Switch Telephone Network
4 is a voice network that uses TDM technology
5 and TDM switches.  TCP/IP is the internet
6 network.
7          If you would, where was the
8 demarcation point between the COBRA services,
9 and in essence where MCI received the IP data
10 packets?
11    A     The demark would have been the
12 output of the NAS.
13    Q     Is that reflected in this
14 paragraph, the last sentence of the second
15 paragraph?
16          MS. GUERON:  Objection, Your Honor.
17 I would just note to the extent that he is
18 describing what is technically in the
19 contract, that is acceptable.  To the extent
20 that this is contract interpretation, I
21 believe, that is the argument that MCI was
22 making about Dr. Hills' testimony.  If he is
23 reflecting the technological aspects detailed
24 in the contract, the Government has no
25 objection.  But we would like that to be the

1 CONFIDENTIAL - Anderson - Direct - Perez
2 consistent rule then.
3          MR. PEREZ:  Your Honor, I haven't
4 asked him to interpret the contract.  I have
5 asked him to point out various provisions in
6 the contract, and he has been pointing them
7 out.  It says they received TCP/IP data, and
8 then I asked him was that data consistent
9 with the public telephone system.  The answer
10 was no, but this has nothing to do with the
11 contract.  He is just reading the terms of
12 the contract.
13          JUDGE GONZALEZ:  All right.  Go
14 ahead.
15    Q     The demarcation point, I had asked
16 you about?
17    A     Yes.  The last sentence of the
18 second paragraph says the demarcation of the
19 cyber pop service between vendor and WorldCom
20 shall be the connection of the NAS egress
21 port at vendor's central office.
22    Q     Does the next sentence of the next
23 paragraph state that WorldCom will not own or
24 lease any cyber pop service equipment?
25    A     Yes.  It says WorldCom will not own

82

1 CONFIDENTIAL - Anderson - Direct - Perez
2 or lease any cyber pop service equipment.
3    Q    Let me ask you a question, could
4 MCI plug a telephone into the egress port of
5 the NAS?
6         MS. GUERON:  Objection.  Asked and
7 answered.
8         JUDGE GONZALEZ:  I think the
9 question previously was:  could MCI plug a
10 telephone into the COBRA system.  I am not
11 sure if this is a different question or not.
12 I know the words are different.
13      MR. PEREZ:  It is a more specific
14 question, Your Honor.
15         JUDGE GONZALEZ:  All right.  I will
16 allow the question and overrule the
17 objection.  Go ahead.
18    A    The answer is no.  You cannot plug
19 a telephone into the output of the NAS.
20 There are several reasons.  Physically a
21 telephone has a specific jack and the output
22 of a NAS has a specific jack, so physically
23 you can't do it.  If you were to force it and
24 you plugged it in, a telephone works on a
25 totally different basis than high-speed data,

1 CONFIDENTIAL - Anderson - Direct - Perez
2 so the two won't work together at all.  You
3 can't put a phone into this.
4    Q    Let me ask you this:  with respect
5 to Exhibits 28 through 32, regarding the
6 questions that I just asked you, are those
7 other contracts similar in their contents to
8 Exhibit 27 that we just reviewed?
9         MS. GUERON:  Objection.
10         JUDGE GONZALEZ:  What is your
11 objection?
12         MS. GUERON:  These are very lengthy
13 documents, Your Honor.  Some parts may be
14 similar and some parts may not.  He is asking
15 again for interpretation of the contract.
16    Q    I guess what I am asking is a
17 couple of things.  With respect to these
18 other contracts, to your knowledge, was the
19 egress point of the NAS where the demarcation
20 point was with respect to each of these
21 contracts?
22    A    Yes.  It was consistent across all
23 of them.
24    Q    Did MCI own any of the equipment
25 under any of these contracts?

83

1 CONFIDENTIAL - Anderson - Direct - Perez
2    A    We own no equipment in any COBRA
3 contract no matter who the vendor or ILEC
4 was.
5    Q    Again, could MCI have plugged in a
6 telephone to the egress port with respect to
7 any of those contracts?
8    A    No.  It is the same answer as
9 before.  They are incompatible.  You can't do
10 that.
11    Q    Now, do you have an opinion of
12 whether a COBRA service is capable of
13 telephonic quality voice communication?
14    A    Yes, I have an opinion.
15    Q    What is your opinion?
16    A    That it is not capable.
17    Q    What is the basis of your opinion?
18    A    The basis of my opinion is that the
19 COBRA platform was dial-up data or low speed
20 data on input, a platform at low speed really
21 is not capable of carrying voice.  This can
22 be put in numerics to try to explain it.  It
23 is common knowledge that a voice path
24 requires 64 kilobytes per second of data.
25 The COBRA platform was dial-up.

84

1 CONFIDENTIAL - Anderson - Direct - Perez
2 Theoretically, the fastest it could go was 56
3 kilobytes.  However, that is on paper.  In a
4 lab environment, the best you are probably
5 going to get is maybe 53 kilobytes and that
6 is with no cable.  So when you deploy it out
7 in the real world, you are going to have two
8 things going on.  One, the modems are
9 configured -- and this is a consistent basis
10 across all dial-up networks -- modems are
11 configured where download speed is faster
12 than upload speed.  What I mean by download
13 speed is that data from the internet going
14 back to the end user runs at a faster speed
15 than data that goes from the end user to the
16 internet.  The reason that is basically,
17 when people surf the internet, they download
18 webpages.  So there is huge data coming from
19 the internet to the end user, but when they
20 are interacting with the user, they are
21 putting in a web address or maybe they are
22 filling out a form or something.  So the data
23 from the end user is not a lot.  So basically
24 what you end up with is data that goes from
25 the internet to the end user.  You are going

CONFIDENTIAL - Anderson - Direct - Perez

2  to run about 33 or maybe a little faster, as
3  far as data flow goes.  Then data from the
4  end user back toward the internet is going to
5  run about, let's say, 24 kilobytes.  That is
6  pretty much an agreed-upon standard.  It is
7  set up in the modems.
8        Now, you asked about telephonic
9  quality communications.  If you are going to
10  put voice over data over dial-up data, there
11  is overhead in the data to tell the packets
12  where to go.  It is addressed for each one of
13  the packets.  That is going to chew up about
14  25 percent of the bandwidth.  So now what you
15  are looking at is for data that is coming
16  from the end user towards the internet, and
17  it has gone from 25, let's say, down to,
18  let's say, 18 kilobytes per second.  So now
19  you have got an 18-kilobyte signal that is
20  going from the end user to the internet.  To
21  put voice on that, which requires
22  64 kilobytes, it is going to degrade so much
23  that the voice will go through, a voice
24  packet will go across it.  It will transmit
25  it.  But when you put the voice packets back

---

CONFIDENTIAL - Anderson - Direct - Perez

2  together on the other end, there is not
3  enough data there to reassemble it to make a
4  clear voice.  You won't understand what you
5  are hearing.  What you will get is garble.  A
6  good analogy would be when you are on your
7  cellphone when you are falling out of range
8  of the cell tower and it starts to sound like
9  ar-ee-ar-ee, it is going to sound like that.
10  So the bottom line, although it will pass
11  packets, it is not understandable voice, so
12  it is not telephonic quality communications.
13     Q     Was the COBRA technology very
14  sophisticated?
15     A     In today's terms, it was very
16  unsophisticated.
17     Q     Why was that?
18     A     It was developed back in the 1990s
19  before broadband was available.  Broadband,
20  meaning cable modems or DSL.  It was the way
21  to access the internet using local telephone
22  lines, because the best way to get the public
23  to access the internet was using an existing
24  telephone line.  Since then, technology has
25  advanced quite a lot in this field as far as,

---

CONFIDENTIAL - Anderson - Direct - Perez

2  like I said, DSL and cable modems, to bring
3  high-speed data into the home, so that the
4  internet can be used for other things.
5     Q     Now, you are familiar with the
6  contracts, Exhibits 27 through 32; correct?
7     A     Yes, I am.
8     Q     Could MCI make physical
9  modifications to the COBRA sites?
10     A     No.  We had no access or no
11  authority to make changes to the physical
12  equipment.
13     Q     Were you able to do anything with
14  respect to the COBRA service?
15     A     We had remote access that we could
16  go in and remotely disable a modem, if we
17  thought it was a problem.  I mean, if there
18  was a technical problem with the modem, we
19  could go in and disable it.  We could also go
20  in and download software upgrades to the
21  modem.
22     Q     Do you have an opinion whether the
23  COBRA services purchased by MCI gave MCI the
24  ability to communicate with substantially all
25  persons having a telephone or radio telephone

---

CONFIDENTIAL - Anderson - Direct - Perez

2  stations constituting part of the local
3  telephone system?
4        MS. GUERON:  Objection, Your Honor.
5  Those are terms straight out of the statute.
6        JUDGE GONZALEZ:  Restate the
7  question, because there was something I heard
8  in the beginning.
9     Q     Do you have an opinion whether the
10  COBRA services purchased by MCI gave MCI the
11  ability to communicate with substantially all
12  persons having a telephone or radio telephone
13  constituting part of the local telephone
14  system?
15        JUDGE GONZALEZ:  Now, with the word
16  "ability," you are questioning the technical
17  ability under the contract?
18        MR. PEREZ:  Right.
19        MS. GUERON:  I withdraw the
20  objection, Your Honor.
21        JUDGE GONZALEZ:  All right.  Go
22  ahead.
23     A     From a technical aspect, no, you
24  didn't.
25     Q     What is the basis for your opinion?

90

CONFIDENTIAL - Anderson - Direct - Perez

2  A     The basis is that the COBRA
3  platform was a dial-up -- the COBRA service
4  was a dial-up internet access service, and it
5  wasn't for the use of voice nor could it
6  handle voice.  It was dial-up data only.
7  Q     On the lines for the telephone
8  calls, could people call out or could people
9  just call in?
10     MS. GUERON:  Objection.
11     MR. PEREZ:  Let me rephrase it.
12  Q     Again, let's turn to Exhibit 27,
13  going back to page 12.
14  A     DOJ 12; right?
15  Q     DOJ 12; right.
16  A     Okay.  Got it.
17  Q     Let me come back to that question.
18  Do you know what DID stands for?
19  A     Yes.  Direct Inward Dial.
20  Q     Do you know whether the COBRA
21  system used DID phone lines?
22  A     Yes.  Between the switch and the
23  COBRA -- the LEC switch and the LEC COBRA
24  modems, there were DID lines.  What DID lines
25  are is Direct Inward Dial, which basically

CONFIDENTIAL - Anderson - Direct - Perez

2  says that the lines can have telephone calls
3  go in one direction only.  When I say "one
4  direction," the origination of a telephone
5  call.  So an end user or someone anywhere in
6  the telephone network could dial that phone
7  number and connect to the modem.  But with
8  the Direct Inward Dial, the modem, even if
9  you could make the modem dial a digit, there
10  is no dial tone back.  So you can't dial out.
11  It only works one way.
12  Q     Was there a dial tone at the egress
13  point in the NAS?
14  A     No.  There is no dial tone
15  anywhere.  It doesn't exist.
16  Q     Now, were all of the COBRA systems
17  kind of similarly configured?
18  A     Yes.  There was a consistent
19  network design.
20  Q     Now, do you have an opinion whether
21  COBRA entitles MCI to the exclusive use of
22  any communication channel of groups of
23  channel?
24  A     Yes.  The COBRA platform was for
25  exclusive use of MCI.

91

CONFIDENTIAL - Anderson - Direct - Perez

2  Q     What is the basis of your opinion?
3  A     The basis is my understanding of
4  the platform, in that the platform had
5  dial-up users coming into it.  The egress
6  port was only handed to MCI.  So we were the
7  only people that could have traffic come
8  across that platform for us.  In addition,
9  like my description before, as the traffic
10  came in, the dial-up data traffic came in to
11  the platform, and it was converted to data
12  and the data was then integrated into a
13  single datastream, a high-speed datastream,
14  out of the NAS or RAS, that datastream was
15  exclusively for MCI.  So within the RAS,
16  there is no way to get the data to anyone
17  else, but MCI.
18  Q     Did MCI pay a separate charge for
19  the COBRA service?
20  A     Yes.  We paid for the COBRA
21  platform.
22  Q     How was that charge paid?
23  A     By port, which is the capacity of
24  the network -- the capacity of the platform,
25  not the network.

92

CONFIDENTIAL - Anderson - Direct - Perez

2  Q     Is the line from the egress point
3  of the NAS to MCI's pop exclusively used by
4  MCI?
5  A     Definitely.  It is a point to point
6  private line.
7  Q     Now, we have heard about Voice Over
8  IP in Ms. Gueron's opening statement.  Is the
9  COBRA service a Voice Over IP gateway?
10  A     No, it is not.
11  Q     Did MCI, to your knowledge, have
12  the ability to make it a Voice Over IP
13  gateway?
14  A     No.  It could not be a Voice Over
15  IP gateway for numerous reasons.
16  Q     Would you turn to Exhibit 23, and
17  could you explain to the Court what
18  Exhibit 23 is?  Before you do that, I want to
19  ask you one question.
20  A     Okay.  Go ahead.
21  Q     In every other diagram we started
22  with the end user on the right, and this one
23  starts with the end user on the left; right?
24  A     Yes.  It is reversed.
25  Q     So pretend you are on the right

CONFIDENTIAL - Anderson - Direct - Perez

2  side. Would you explain to the Court what
3  Exhibit 23 is.
4      JUDGE GONZALEZ: You may turn it
5  upside down.
6      MR. PEREZ: That makes it a lot
7  more intelligible then.
8  A   You want me to explain the call
9  flow from the end user?
10  Q   Yes. I want you to explain what it
11  is.
12  A   This is a high level diagram of
13  what a VOIP gateway would look like. Now,
14  what a VOIP gateway is, the term "gateway" is
15  pretty descriptive. It is a device that
16  interfaces with the internet and the Public
17  Switch Telephone Network so that you can put
18  telephone calls over the internet. In the
19  internet you could have telephone calls that
20  go from computer to computer, and that
21  doesn't touch the telephone network at all.
22  But in recent developments, and you see it
23  now, like, where your telephone is tied to
24  the internet, but you can call somebody who
25  is in the Public Switch Telephone Network.

---

94

CONFIDENTIAL - Anderson - Direct - Perez

2  In order to do that, you now have to tie the
3  internet to the Public Switch Telephone
4  Network. That is what a VOIP server does.
5  It acts as a switch and it has all the
6  instructions and all the complex routing
7  scenarios so that it can get an IP address
8  tied to a telephone number.
9      What this picture shows is how it
10  would flow. The analog phone, which is the
11  phone just like you have in your home, we
12  call it a "black phone." It is kind of the
13  terminology that we use in the telephone
14  business. It goes into a SIP server which
15  converts the phone into IP packets, just
16  basic conversion. Then it puts it on the
17  internet. In a practical application, what
18  you will have is a broadband modem, either
19  DSL or broadband cable modem, and you plug
20  your phone into it. It now puts your phone
21  signal out over the internet. Now, this
22  phone when you dial somebody and it is on the
23  internet, the internet has no way to get to
24  the Public Switch Telephone Network for phone
25  calls normally. So what it does is it routes

---

CONFIDENTIAL - Anderson - Direct - Perez

2  it to what we call a "gateway." The gateway
3  gets this internet message in that it looks
4  just like any other internet message, but it
5  is a phone call. A phone call will be set up
6  and then, subsequently, it is going to have
7  voice. What it does is it goes to its
8  servers and says, what do I do with this
9  thing? The server then looks at the IP
10  address, and then goes to routing tables and
11  it says, oh, this is a call destined for,
12  let's say, Los Angeles, based on the digits
13  he dialed. If it is a call for Los Angeles,
14  we want to put it over the internet network
15  to a gateway, which is depicted here, in Los
16  Angeles. When it gets to the gateway, the
17  gateway then is going to look at this and
18  say, "What do I do with it? I got a whole
19  bunch of data." It is going to look at it
20  and say, "Oh, I need to get this to the
21  Public Switch Telephone Network," and it is
22  going to send a message over what we call the
23  SS-7 or signaling network to the Public
24  Switch Telephone Network, saying, "I have got
25  a call for you." It is going to come back

---

96

CONFIDENTIAL - Anderson - Direct - Perez

2  and say, "Okay, send me your call." He is
3  then going to convert it back to TDM or
4  normal telephone protocol, and hand it off to
5  the PSTN or Public Switch Telephone Network
6  in Los Angeles. So basically what this is
7  doing is the gateway does the conversion from
8  IP or internet to telephone. But the server,
9  which is up above -- really we depict it as
10  one server, and it is really a series of
11  servers -- is where all the instructions are
12  that tell it how to do this. The server is
13  the brains, and the gateway is the mechanism
14  that does it.
15  Q   Now, does this have anything to do
16  with COBRA?
17  A   No. When I am talking about my
18  third network, this is the kind of networks
19  that we designed for VOIP which are
20  relatively new technology out there. This is
21  not COBRA. This is VOIP.
22      MR. PEREZ: Your Honor, give me one
23  minute, and let me see if I have anything
24  else.
25      Your Honor, I don't have anything

CONFIDENTIAL - Anderson - Direct - Perez

further at this time.

    JUDGE GONZALEZ:  I just want to ask a few questions.  But first, I forgot earlier this morning, to say in terms of full disclosure, I have a personal account with Verizon Wireless, I have a Court wireless cellphone issued to me on Verizon Wireless. I don't have any other contract for Verizon. Actually, I have a internet provider phone service that makes it somewhat interesting to listen to some of this.  Also I have the typical relationship with the IRS that I think everyone else has.

    So with that said, the question I had, I was trying to understand, if I look at the dial-up process from the home phone, and there is a wire that carries electrical current on it, that current that goes out, I thought you said earlier that the voice is sent.  Why don't you explain to me the technology of it?  I speak into the phone. It is on the typical telephone line that is in someone's house.  How is that converted or what is it converted to?  You mentioned, I

---

CONFIDENTIAL - Anderson - Direct - Perez

thought, 64 as a number regarding the speed. Is that what happens there?

    THE WITNESS:  In a traditional telephone setting, which is 99.9 percent of the cases, and this would be a case at your home, let's start with your voice.  A normal human voice is 300 to 3,400 hertz.  That is the frequency of your voice.  What a telephone set does is it converts that audio or air pressure that is vibrating at that frequency to an electrical signal that is vibrating at the same exact frequency.  That is what goes across the wire from your house towards the central office.  So it is an analog signal.  The wires that run from your house to the central office, were designed for analog signals.

    JUDGE GONZALEZ:  So then my question is when you hook up the computer in a dial-up format, is it just a different frequency that is going out then with the data information, instead of like, within that range you spoke about the human voice, it is just in a different range?

---

CONFIDENTIAL - Anderson - Direct - Perez

    THE WITNESS:  Actually, it uses the same exact range.  The data in a computer, a good way to explain it is, data is basically ones and zeros.  If a one comes in, it puts out this tone.  If a zero comes out, it puts out another tone.  Now, it gets a little more complex.  Let's say we have four frequencies. Then say, if it is a zero, zero in a row, it will put out tone one.  If it is a zero, one, it will put out tone two.  If it is a one, zero, it will put out tone three.  If it is a one, one, it will put out tone four.  So it uses basically the same frequencies that a voice uses, but it is using that to get to the central office.

    Now, you had asked earlier about the 64 kilobytes.  In the telephone network, the only part is that analog data or those tones or frequencies that mimic what our voices actually are, is in the wire out of your house towards the central office.  As soon as you get to the switch or a component, maybe even in the neighborhood that is associated with the switch, it takes that and

---

CONFIDENTIAL - Anderson - Direct - Perez

converts it to data, and your voices now become data.  Because the voice is so complex, and in order to get the voice to sound exactly the same on the other end, the conversion of a voice to data takes 64 kilobytes per second of data to go through the telephone network.  So the telephone network, the switches, and the backbone are all digital or data.

    JUDGE GONZALEZ:  But before that system was developed, if you go back at least probably 30 years ago, but what was happening before would be these frequencies would be transmitted and ultimately to a receiver that would translate them back into the voice. Translate may be the wrong word.  Now, is that zero and the ones and the various configurations of zeros and ones the whining sound, is that what you mentioned before?  If you were to amplify those zeros and the ones, what would it sound like?

    THE WITNESS:  You mean coming from like a modem?

    JUDGE GONZALEZ:  Right.

1 CONFIDENTIAL - Anderson - Direct - Perez
2        THE WITNESS: It sounds like
3 screeching. It is just noise.
4        JUDGE GONZALEZ: But if you knew
5 how to interpret that screeching, you would
6 know which were zeros and which were ones?
7        THE WITNESS: Yes.
8        JUDGE GONZALEZ: I don't know if
9 the human ear could do that?
10        THE WITNESS: It is impossible for
11 the human ear to do it, but a modem can
12 interpret it.
13        MR. PEREZ: That raises a couple of
14 questions that I would like to follow up on
15 your comment.
16    Q    Mr. Anderson, could I pick up a
17 telephone at home and use that number on a
18 voice call -- not on a computer call -- and
19 dial up the COBRA service?
20    A    Yes. You could call the COBRA
21 service with your phone, and what would
22 happen is the modem in the COBRA platform
23 would answer the phone and it is going to
24 wait for a modem tone, because it expects a
25 computer modem to call it. It is also going

1 CONFIDENTIAL - Anderson - Direct - Perez
2 to put that screeching sound, because it is
3 going to say, hey, I am here. It needs to
4 talk to the other modem. The end user is
5 just going to hear chee-chee-chee-chee.
6        JUDGE GONZALEZ: Is that what
7 happens with a fax machine, if you
8 incorrectly call a fax number, instead of an
9 audio?
10        THE WITNESS: The concept of a fax
11 is basically the same. It is using tones
12 just like a modem to transmit data. The
13 modem in the COBRA platform, it is going to
14 wait a while. It is going to say, where is
15 the modem tone? Then eventually it is going
16 to say, I don't hear any modem tones. Even
17 if the guy is talking, hello, hello, hello,
18 it is not a modem tone with a modem. The
19 modem is going to say, shut it off, and it is
20 going to disconnect the circuit. So a voice
21 will always dead end into the modem. It
22 can't go any further. You can't talk to
23 anybody. You can't tell the modem, progress
24 further. The modem says, "I only talk to
25 modems." It is like the modem speaking

103

1 CONFIDENTIAL - Anderson - Direct - Perez
2 French and the person speaking English. The
3 two just can't communicate.
4    Q    But it is the difference that one
5 is data and the other one is basically an
6 analog signal?
7    A    Exactly. One is data and one is
8 voice, which is analog.
9    Q    Do you know of any way in which you
10 could actually make the COBRA service answer
11 voice telephone calls?
12    A    No. It cannot. The technology is
13 too old. The capability is just not there.
14 It was designed for dial-up data only, and
15 that is the only thing it can do.
16        MR. PEREZ: Thank you, Your Honor.
17        JUDGE GONZALEZ: All right. This
18 question is directed at the Government, will
19 you finish your cross-examination by 1:30?
20        MS. GUERON: I think we would, Your
21 Honor.
22        JUDGE GONZALEZ: I was considering
23 taking a few minutes, just in case someone
24 needed to take a break, and then pick up at
25 the latest at five minutes to 1:00.

104

1 CONFIDENTIAL - Anderson - Cross - Gueron
2        MS. GUERON: That would be fine,
3 Your Honor.
4        JUDGE GONZALEZ: You are not sure
5 now. Do you have much in the way of thoughts
6 about redirect and how long that would take?
7        MR. PEREZ: No. Your Honor, I have
8 basically put on my affirmative case. I
9 suspect the Government will go into areas
10 that they believe are part of their defenses,
11 if you will. So I suspect that I will have
12 questions with respect to issues that were
13 not part of my affirmative case.
14        JUDGE GONZALEZ: We will try to get
15 it all packaged together, before we break for
16 any substantial period of time.
17        MS. GUERON: Thank you, Your Honor.
18        (Whereupon, a recess was taken.)
19        JUDGE GONZALEZ: Let's start again.
20 We will begin the cross-examination by the
21 Government.
22 CROSS-EXAMINATION
23 BY MS. GUERON:
24    Q    Good afternoon, Mr. Anderson.
25    A    Good afternoon.

1 CONFIDENTIAL - Anderson - Cross - Gueron

2    Q    Can I direct your attention to

3 Exhibit 2, please, in the exhibit binder.

4 Did you create that diagram?

5    A    Yes.

6    Q    Is it fair to say that the COBRA

7 services are activated when the modem of a

8 dial-up user dials a local telephone number

9 to access the LEC and the modem bank of the

10 COBRA system?

11    A    I would say when the dial-up user's

12 modem dials a phone number into the NAS and

13 the two connect, you have achieved access

14 into the COBRA network.

15    Q    To access the LEC, the dial-up

16 user's modem uses the telephone network;

17 correct?

18    A    Correct.

19    Q    To access COBRA, the dial-up user

20 must connect onto the Public Switch Telephone

21 Network; right?

22        MR. PEREZ:  I am going to object to

23 the form of the question, Your Honor.  COBRA

24 is a service, so I am not sure what the

25 question means when somebody is talking about

---

1 CONFIDENTIAL - Anderson - Cross - Gueron

2 accessing COBRA.  COBRA is a service provided

3 to MCI.  The question is vague, Your Honor,

4 because I don't understand it.

5        JUDGE GONZALEZ:  Restate the

6 question.

7    Q    To gain access to the COBRA system,

8 the dial-up user connects to the Public

9 Switch Telephone Network; is that right?

10    A    Yes.  He uses the telephone line

11 that he purchases for his home or office.

12    Q    And you agree that the dial-up

13 user's modem calls the COBRA system's modem

14 using a telephonic quality path; right?

15    A    Yes.  I think we should be specific

16 there.  It is using a telephonic quality

17 path.  Like I described earlier, there is a

18 difference between path and telephonic

19 quality communications.

20    Q    I would appreciate it if you would

21 answer the questions I am asking only,

22 Mr. Anderson.

23        JUDGE GONZALEZ:  Let me just ask

24 him to clarify the question.  In Exhibit 2,

25 the modem that the dial user is communicating

---

1 CONFIDENTIAL - Anderson - Cross - Gueron

2 to, where is that modem in Exhibit 2?  Is it

3 the PRI?  Is it a modem coming out of the LEC

4 switch or is it in the NAS?

5        THE WITNESS:  The modem would be in

6 the NAS.

7        JUDGE GONZALEZ:  So where it says

8 "PRI" with a red line, communication comes

9 out of the LEC switch through that connection

10 to a modem at the NAS?

11        THE WITNESS:  Yes.  The analog data

12 or the representation of an analog data is

13 coming across that PRI into the NAS.

14    Q    The modems are within the NAS; is

15 that right?

16    A    Yes.

17    Q    If you would look at Exhibit 3 for

18 a moment, those modems within the NAS that

19 the Court was just asking about, are those

20 depicted on Exhibit 3 with the DSP card box?

21    A    Yes.  The modem function is in that

22 DSP card.

23    Q    And the COBRA modem accepts the

24 call from the dial-up user's modem; right?

25    A    Yes, it does.

---

1 CONFIDENTIAL - Anderson - Cross - Gueron

2    Q    You agree with the following

3 statement, do you not -- and this from

4 Dr. Hills' declaration in paragraph 8:  All

5 access to modems or DSPs require two-way

6 voice grade telephonic quality communication.

7 The COBRA services purchased by UUNET provide

8 access between dial-up users' modems and the

9 modems and/or DSPs within the COBRA system

10 and, thus, require two-way voice capable

11 telephonic quality communications?

12    A    Yes.  I agree that for a modem to

13 communicate from the end user to the COBRA

14 platform, you need a voice grade circuit.

15    Q    That is not what I asked.  I read

16 you that statement, and I am asking you is

17 your answer yes or no, that you agree?

18        MR. PEREZ:  Your Honor --

19        JUDGE GONZALEZ:  Reread the

20 statement, and then I will hear any objection

21 or request for clarification.  Reread the

22 question.

23    Q    Do you agree with the following

24 statement: All access to modems or DSPs

25 requires two-way voice grade telephonic

1 CONFIDENTIAL - Anderson - Cross - Gueron
2 quality communication.  The COBRA services
3 purchased by UUNET provide access between
4 dial-up user's modems and the modems and/or
5 DSPs within the COBRA system and, thus,
6 require two-way voice capable telephonic
7 quality communications?
8            JUDGE GONZALEZ:  Before you answer,
9 Mr. Perez?
10           MR. PEREZ:  I just wanted to see
11 whether it would be helpful to the witness to
12 actually see what has been written, but I
13 guess the witness can tell us.
14           THE WITNESS:  I think it would be
15 helpful, if I could see it.  Is it in here?
16           MR. PEREZ:  May I approach?
17           JUDGE GONZALEZ:  Go ahead.
18           MS. GUERON:  Let me approach.
19 Would Your Honor like a copy as well?
20           JUDGE GONZALEZ:  No.  That is all
21 right.  Go ahead.
22     Q     What I am reading to you is
23 paragraph 8 of Dr. Hills' declaration, and I
24 am asking if you agree with paragraph 8?
25     A     I am not sure it is a yes or no

111

1 CONFIDENTIAL - Anderson - Cross - Gueron
2 you agree with Dr. Hills' conclusion in
3 paragraph 8?  There is a parenthetical that
4 says:  (Witness perusing document.)  Answer:
5 Yes.
6           Were you asked that question and
7 did you give that answer?
8     A     Yes, I did.  But after further --
9     Q     Thank you, Mr. Anderson.  You
10 agree, do you not, that a dial-up customer's
11 modem is connected to the dial-up customer's
12 telephone line and requires a telephonic or
13 voice quality two-way communication channel
14 to a recipient modem?
15     A     It requires a telephonic quality
16 grade telephone line, yes.
17     Q     You agree, do you not, that the
18 operation of a modem in a telecommunication
19 system requires voice or telephonic quality
20 communication channels?
21     A     One more time?  I am sorry.
22     Q     Do you agree with the following
23 statement:  The operation of a modem in a
24 telecommunication system requires voice or
25 telephonic quality communication channels?

1 CONFIDENTIAL - Anderson - Cross - Gueron
2 question.
3     Q     Do you remember, Mr. Anderson, that
4 you gave a deposition in my office?
5     A     Yes, I do.
6     Q     At the U.S. Attorney's Office?
7     A     Yes.
8     Q     Do you recall that that deposition
9 occurred on January 5, 2006?
10     A     Uh-huh.
11     Q     Can you answer with a yes or a no?
12 You said "uh-huh."
13           JUDGE GONZALEZ:  Wait a minute.
14 The question has to do with whether or not
15 you recall having a deposition taken at the
16 U.S. Attorney's Office -- yes or no?
17           THE WITNESS:  Yes.  I remember
18 that.
19     Q     Do you remember that that
20 deposition was on January 5, 2006?
21     A     Yes.
22     Q     This is on page 55 of
23 Mr. Anderson's deposition, line 8:  Do you
24 recall being asked the following question and
25 giving the following answer:  Question:  Do

112

1 CONFIDENTIAL - Anderson - Cross - Gueron
2     A     Yes.
3     Q     Looking at Exhibit 2, after the
4 dial-up user makes a call, the dial-up user's
5 modem connects to the LEC via a voice switch;
6 is that right?
7     A     Yes, it does.
8     Q     There is a telephonic quality
9 communication between the dial-up user and
10 the LEC switch; correct?
11     A     It has that capability, yes.
12     Q     My question is:  is there a
13 telephonic quality communication between the
14 dial-up user and the LEC switch?
15     A     If he is using his telephone, yes.
16 If he is using low speed data, no.
17     Q     Does the phrase "dial-up user"
18 imply a telephone to you?
19     A     No.
20     Q     On page 48, line 16, at deposition
21 were you asked the following question and did
22 you give the following answer:  Question:
23 Mr. Anderson, is there a telephonic quality
24 communication between the dial-up user and
25 the LEC switch?  Answer:  Yes.

CONFIDENTIAL - Anderson - Cross - Gueron

2        Were you asked that question and
3    did you give that answer?
4        Yes.  But I think it's out of
5    context.
6    Q    Now, once the dial-up user's call
7    goes to the LEC switch, the next step is that
8    the modem call travels from the LEC voice
9    switch to a PRI trunk; is that right?
10    A    Correct.
11    Q    And that is depicted on Exhibit 2?
12    A    Correct.
13    Q    You agree that there is a
14    telephonic quality communication between the
15    LEC switch and the PRI; right?
16    A    It has a telephonic quality
17    capability.
18    Q    Directing the Court's attention to
19    Mr. Anderson's deposition at page 48, line
20    20, were you asked the following question and
21    did you give the following answer:  Question:
22    Is there a telephonic quality communication
23    between the LEC switch and the PRI?
24    Mr. Perez interposed an objection, and the
25    answer was yes.

CONFIDENTIAL - Anderson - Cross - Gueron

2        Were you asked that question and
3    did you give that answer?
4        MR. PEREZ:  May I interpose my
5    objection?
6        JUDGE GONZALEZ:  What is your
7    objection?
8        MR. PEREZ:  I think my objection is
9    to the form of the question, because it was
10    not clear what counsel meant by "telephonic
11    quality communication."  In other words,
12    basically -- and I don't want to testify for
13    the witness or put words in his mouth -- but
14    it is just basically the same issue he has
15    been talking about all along.  So it was an
16    objection as to the form of the question,
17    because that telephonic quality communication
18    was vague as it related to this question.
19        MS. GUERON:  Your Honor, the very
20    question above the one that Mr. Perez
21    objected to was, it had an exactly parallel
22    structure and it used the phrase "telephonic
23    quality communication," and it didn't draw an
24    objection.
25        JUDGE GONZALEZ:  All right.  I will

CONFIDENTIAL - Anderson - Cross - Gueron

2    allow the question.  I think ultimately this
3    probably gets addressed in redirect, so we
4    can proceed along these lines.
5    Q    Mr. Anderson, were you asked the
6    following question and did you give the
7    following answer at deposition:  Question:
8    Is there a telephonic quality communication
9    between the LEC switch and the PRI?  Answer:
10    Yes.
11    A    Yes.  But, again, I think that is
12    out of context.  You have got to look at all
13    of the questions preceding it.
14    Q    It is true, is it not, that the PRI
15    has a capability of telephonic quality
16    communication?
17    A    Yes, it does.
18    Q    A PRI is a circuit that contains 23
19    local loops or channels; is that right?
20    A    23 channels.  23 voice channels, or
21    23 and 1 data channel, not necessarily
22    locals.
23    Q    Let me direct your attention to
24    your declaration at paragraph 7.3.1, and I
25    will bring that to you.  Do you say in

CONFIDENTIAL - Anderson - Cross - Gueron

2    paragraph 7.3.1 that the PRI is a circuit
3    that contains 24 local loops or channels?
4    A    Yes, I do.  But that applies to
5    COBRA.  When you asked earlier, a PRI can be
6    used in many ways.  That is why I said not
7    necessarily local.  In this configuration,
8    yes, it is local.
9    Q    I see.  So you were saying that in
10    the COBRA configuration, the PRI is a circuit
11    that contains 24 local loops or circuits?
12    A    Yes.
13    Q    A PRI can plug into a PBX; is that
14    right?
15    A    Yes.
16    Q    Now, the next stage in the COBRA
17    process, referring you back to Exhibit 2, is
18    that the PRI connects the LEC voice switch to
19    the COBRA modem bank within the network
20    access server NAS; is that right?
21    A    You are saying the PRI connects the
22    LEC switch to the LEC NAS, is that what you
23    are asking?
24    Q    Yes.
25    A    Yes, it does.

1 CONFIDENTIAL - Anderson - Cross - Gueron

2    Q    And it connects specifically to the

3 modem bank inside the NAS; is that right?

4    A    Well, it connects to the line card

5 in the NAS.

6    Q    To the PRI line card inside the

7 NAS?

8    A    Which subsequently is connected to

9 the DSP switches, you could call the modems.

10    Q    That is depicted in Exhibit 3 as

11 well, that passage from the PRI to the PRI

12 line card to the DSP card?

13    A    Yes, it is.

14    Q    Again, at this point in the COBRA

15 system, the PRI is still capable of

16 telephonic quality communication; right?

17    A    It is capable, yes.

18    Q    The NAS uses the digital service

19 process or the DSP to provide the modem

20 function of the COBRA system; correct?

21    A    Correct.

22    Q    The COBRA DSP accepts an analog

23 signal from the PRI; right?

24    A    It is a digital representation of

25 an analog signal.

1 CONFIDENTIAL - Anderson - Cross - Gueron

2    Q    Thus, you agree, do you not, that

3 the COBRA services purchased by MCI include a

4 telephonic quality communication path all the

5 way from the dial-up user's modem to the

6 COBRA service's NAS modem?

7    A    Say it one more time?  I am sorry.

8    Q    Do you agree that the COBRA

9 services purchased by MCI include a

10 telephonic quality communication path all the

11 way from the dial-up user's modem to the

12 COBRA service's NAS modem?

13    A    In the context that "path" means

14 capable, yes.

15    Q    Just directing your attention to

16 Exhibit 3 again, Mr. Anderson, a PRI is used

17 in the COBRA system regardless of which type

18 of DSP card is used; is that right?

19    A    That is correct.

20    Q    And a PRI is a component of the

21 COBRA service purchased by MCI; right?

22    A    Yes, it is.

23    Q    Now, the COBRA service works the

24 same way in reverse as what you have

25 described here; is that right?

119

1 CONFIDENTIAL - Anderson - Cross - Gueron

2    A    From a data flow standpoint, yes,

3 it works in reverse.  But you talked about

4 calls coming in and DSP answering it, that

5 does not work in reverse.

6    Q    Other than the call origination

7 function, does it work the same way in each

8 direction?

9    A    Yes, the data can flow in both

10 directions.  One point of clarification, it

11 works the same from a process standpoint, but

12 like I described earlier, from a data flow

13 standpoint, one direction is much slower than

14 the other.

15    Q    You described COBRA as full duplex;

16 right?

17    A    Yes, I did.

18    Q    That means that it is two-way

19 communication?

20    A    Two-way data communication.

21    Q    Well, at deposition you testified

22 that it was two-way communication; right?

23    A    Well, maybe I could have been

24 clearer at deposition, but it is two-way data

25 communication.

120

1 CONFIDENTIAL - Anderson - Cross - Gueron

2    Q    But at deposition your testimony

3 was simply it is two-way communication?

4        MR. PEREZ:  Your Honor, I am going

5 to object.  She is arguing with the witness.

6        MS. GUERON:  I am not arguing, Your

7 Honor, I am trying to get him to acknowledge

8 what he said at deposition.

9        JUDGE GONZALEZ:  I think he did,

10 and he said, yes, but I guess I could have

11 been clearer and identified it as two-way

12 data communication.  So I think it is an

13 acknowledgment of what was said at the

14 deposition.  So you didn't need to argue

15 about it then.

16        MR. PEREZ:  So is my objection

17 sustained?

18        MS. GUERON:  I will move on.

19        JUDGE GONZALEZ:  I think so.

20    Q    You take the position that the

21 COBRA system cannot originate calls; right?

22    A    Correct.

23    Q    Isn't the following statement true:

24 The only barrier to replacing the DSP cards

25 within the COBRA system that cannot originate

1 CONFIDENTIAL - Anderson - Cross - Gueron

2 calls with DSP cards that could originate

3 calls, such that the COBRA system could

4 originate calls, the only barriers were

5 contractual and the business and economic

6 judgment concerns of MCI and of the LEC?

7    A    Correct.

8    Q    You have been distinguishing

9 between a telephonic quality path and a

10 telephonic quality communication here?

11    A    Correct.

12    Q    But do you agree that a telephonic

13 quality path is capable of transmitting

14 telephonic quality communication?

15    A    Yes.

16    Q    Have you heard of something called

17 "computer to computer VOIP"?

18    A    Yes.

19    Q    As currently configured, the COBRA

20 system at issue here could accept and

21 transmit a computer to computer VOIP packet;

22 right?

23    A    It could transmit the packets, yes.

24    Q    You cannot rule out the possibility

25 that the COBRA system did, in fact, transmit

1 CONFIDENTIAL - Anderson - Cross - Gueron

2 computer to computer VOIP packets; correct?

3    A    No.  I can't rule that out.

4    Q    The COBRA services at issue here

5 can't distinguish between a computer to

6 computer VOIP packet and any other packet

7 coming out of a dial-up user's computer, can

8 it?

9    A    No.  A packet is a packet is a

10 packet.

11    Q    Skype, S-k-y-p-e, that is a form of

12 computer to computer VOIP; is that right?

13    A    As I understand it, yes.

14    Q    If a dial-up user has the Skype

15 service, then voice packets generated by his

16 computer could be transported by COBRA;

17 right?

18    A    The packets could be transmitted,

19 yes.

20    Q    Now, the COBRA service is provided

21 to MCI by the LEC; correct?

22    A    Yes.  The LEC sells the service.

23    Q    And the LEC also sells the service

24 which is access to the PSTN?

25    A    It sells that service to end users.

123

1 CONFIDENTIAL - Anderson - Cross - Gueron

2    Q    It sells that service to MCI?

3    A    Access to the PSTN?

4    Q    Yes.

5    A    It would sell it to MCI in the area

6 where MCI wanted a local phone for one of

7 their offices, but that is the only scenario

8 where it sells local access.

9    Q    The COBRA service includes access

10 to the PSTN; correct?

11    A    Yes, COBRA.  But COBRA service is

12 part of the LEC, so they are not selling that

13 service to us -- COBRA.  It is part of COBRA.

14    Q    When MCI buys COBRA, it buys access

15 to the PSTN as part of the COBRA service?

16    A    I wouldn't say we buy access to the

17 PSTN.  We buy COBRA service, which is an

18 aggregated data service.

19    Q    The PSTN and COBRA are maintained

20 by the LEC on the LEC premises and

21 facilities; is that right?

22         MR. PEREZ:  I will object to the

23 question.  I think it is vague.

24         JUDGE GONZALEZ:  Which particular

25 services are you referring to?

124

1 CONFIDENTIAL - Anderson - Cross - Gueron

2    Q    Let me direct your attention to

3 paragraph 7.2 of your declaration.

4    A    I am sorry.  What was the number?

5    Q    7.2.  It is on the bottom of page

6 6.

7    A    Okay.

8    Q    You state here, do you not, both

9 the PSTN and COBRA are (a) provided by the

10 LEC and (b) owned and maintained by the LEC

11 on LEC premises and/or facilities; is that

12 right?

13    A    Yes, that is correct.

14    Q    MCI paid for COBRA on a monthly

15 basis; correct?

16    A    Yes, we did.

17    Q    And it paid on a per port basis?

18    A    Correct.

19    Q    And the monthly charge did not vary

20 with the volume carried by each port, did it?

21    A    No.  It did not vary.

22    Q    And the monthly charge did not vary

23 with the type of communication that traveled

24 over the COBRA system; correct?

25    A    When you say "type," I am not

CONFIDENTIAL - Anderson - Cross - Gueron

1 CONFIDENTIAL - Anderson - Cross - Gueron
2 following what you mean by the type?
3     Q    Let me read to you the question and
4 answer you were asked at deposition at page
5 93, line 21.  Mr. Anderson, were you asked
6 the following question and did you give the
7 following answer:  Question:  And the monthly
8 charge did not vary, did it, with the type of
9 communications that traveled over the system?
10 Answer:  No.
11          Were you asked that question and
12 did you give that answer?
13          MR. PEREZ:  Your Honor, I am going
14 to object.  There is no showing that there
15 was any inconsistent statement.  She asked a
16 question, and he said, what do you mean by
17 "type"?  There is no inconsistent statement
18 to allow her to impeach based on the
19 testimony at the deposition.
20          JUDGE GONZALEZ:  What is the
21 inconsistent statement?
22          MS. GUERON:  He seemed unable to
23 answer the question or understand the
24 question.  I was trying to demonstrate that
25 he did understand the question previously, he

1 CONFIDENTIAL - Anderson - Cross - Gueron
2 is simply choosing not to answer it in this
3 setting.
4          JUDGE GONZALEZ:  That may be a
5 little technical.  I think the witness is
6 entitled to ask the question as to what type,
7 and he is entitled to the clarification as to
8 the type.  I will sustain the objection.
9 Clarify the question as to the type of
10 communications?
11    Q    The monthly charge that MCI paid
12 did not vary with the content of the packet
13 sent over COBRA, did it?
14    A    Correct.  Only data could go across
15 it.  So whatever the data was made up of,
16 files or music or whatever, it didn't matter.
17    Q    It didn't matter.  So if the data
18 were VOIP packets, the charge would not vary;
19 right?
20    A    No.  It would not vary.
21    Q    The per port charge included the
22 entire COBRA service and all its components,
23 including the PRI; is that right?
24    A    Yes.  It included everything that
25 made up COBRA service.

127

1 CONFIDENTIAL - Anderson - Redirect - Perez
2     Q    And that includes the PRI?
3     A    The PRI is included in it as part
4 of the COBRA configuration.
5          MS. GUERON:  If I could have a
6 moment, Your Honor?
7          (Whereupon, counsel conferred off
8 the record.)
9          MS. GUERON:  I have nothing
10 further, Your Honor.
11          JUDGE GONZALEZ:  All right.
12          Redirect?
13          MR. PEREZ:  Yes, Your Honor.
14 REDIRECT EXAMINATION
15 BY MR. PEREZ:
16     Q    I have just a quick question.
17 Ms. Gueron talked a lot about the end user.
18 The end user has to have normal telephone
19 service in order to plug in his computer; is
20 that correct?
21     A    Yes.  That is correct.  He has to
22 buy it.
23     Q    Then would that end user have to
24 pay tax for that service?
25          MS. GUERON:  Objection.

128

1 CONFIDENTIAL - Anderson - Redirect - Perez
2          MR. PEREZ:  Let me rephrase it.
3     Q    Did you at one time have a dial-up
4 service at your home?
5     A    Yes.  Many, many years ago.
6     Q    Do you on a monthly basis look at
7 your phone bills?
8          MS. GUERON:  Objection, Your Honor.
9 He is not a fact witness, he is an expert
10 witness.  I don't think this is quite fair.
11          MR. PEREZ:  I don't think it is
12 disputed that the end user has to pay FET on
13 the local service that he purchases.
14 Frankly, I don't know that it is really a
15 disputed issue.
16          MS. GUERON:  Then you can argue it.
17 It is not for this witness.
18          JUDGE GONZALEZ:  I think this
19 witness at best can answer the question as to
20 what happened on his phone bill.
21     Q    Do you know whether the local loop
22 is part of the COBRA service?
23          MS. GUERON:  Objection.
24          JUDGE GONZALEZ:  What is your
25 objection?

1CONFIDENTIAL - Anderson - Redirect - Perez

2          MS. GUERON:  The "local loop"?

3   That is not a term we have used yet.

4       Q     Could you look at Exhibit 2,

5   please.  It is the loop between the dial-up

6   user and the LEC switch, sometimes referred

7   to as the "local loop"?

8       A     Yes.  That is a common term.

9       Q     Is that part of the COBRA service?

10      A     No, it is not.

11      Q     The COBRA service is the stuff that

12  is shown in white in the box on the

13  right-hand side?

14      A     Correct.

15      Q     Now, Ms. Gueron asked you about

16  paragraph 8, and she read to you the

17  statement in your deposition.  Could you go

18  back and tell the Court the comment that you

19  had with respect to paragraph 8?

20      A     Can I see paragraph 8?

21      Q     Do you still have it?

22          MS. GUERON:  Yes.  He should still

23  have it.

24      A     This one?  Okay.

25      Q     Paragraph 8 of Dr. Hills'

1CONFIDENTIAL - Anderson - Redirect - Perez

2   declaration?

3       A     I have got it, yes.  Do you want me

4   to comment on it?

5       Q     Yes.

6       A     When I agree with this telephonic

7   quality communications, what I am implying is

8   you need a telephonic quality capable line in

9   order to put modem tones on there.  But after

10  further reading of this, if you read it the

11  wrong way, it can say you can put telephonic

12  quality communications on there.  Like I said

13  earlier, if you are running slow speed data,

14  that is not telephonic quality communications

15  any longer.  So the line is needed, but once

16  you put the data on it, it changes the whole

17  capability of that line.  A weak example

18  might be, if you bought a car that is

19  advertised to go 130 miles per hour, and you

20  drive it on a pothole road, you can't go 130

21  miles per hour.  The road then dictates how

22  fast that can go.  In this case, you have a

23  telephonic quality communication capable

24  line, both from the customer to the switch

25  and from the switch to the modems.  But once

1CONFIDENTIAL - Anderson - Redirect - Perez

2   you run slow speed data on it, the parameters

3   have changed.  You now have to go by what the

4   parameters are, and that is why I am hesitant

5   to say -- I am not hesitant -- I won't agree

6   that it is telephonic quality communications.

7   It is a telephonic quality path, but no

8   communications.

9       Q     Now, if you were to plug a PBX into

10  a PRI, would that still be, quote, COBRA

11  service?

12      A     No.  It becomes voice PBX service.

13  It is not COBRA.

14      Q     I think you just testified to this.

15  Did the PRI that was used in connection with

16  the COBRA service, did that actually transmit

17  voice grade communication?

18      A     No, it did not.  Again, because the

19  slow data speeds restricted it.

20      Q     Now, Ms. Gueron asked you about

21  DSPs being able to originate phone calls.  Do

22  you recall that?

23      A     Yes.

24      Q     If a DSP were able to originate a

25  phone call, would that still be COBRA

1CONFIDENTIAL - Anderson - Redirect - Perez

2   service?

3       A     No, it is not COBRA service.  It is

4   something else now.  It becomes a VOIP

5   gateway basically.  Well, no.  It doesn't

6   even become a VOIP gateway.  Because in the

7   deposition she zeroed in on the DSPs cards

8   and swapping that out and, if you swapped it

9   out, could you dial out, and the answer is

10  yes.  The DSP could dial out, but there are

11  still other barriers that are in the way,

12  such as the DID line and the fact that there

13  is no controller to tell it to dial, it

14  doesn't dial out.  So swapping out the DSP

15  card, if you look at just that one piece,

16  yes, it has the capability to do it.  But it

17  doesn't allow the platform to dial out.  I

18  will try another analogy here.  It would be

19  if you are going to change a car into a

20  truck, and you go buy truck tires and put it

21  on the car, you will have made a step towards

22  making it a truck, but it is not a truck yet.

23  You have still got to change a whole bunch of

24  other things.  So just changing the DSP card

25  takes you in that direction, but it is a long

1CONFIDENTIAL - Anderson - Redirect - Perez

2  way from being able to actually dial out.

3    Q    Now, in connection with these DSP

4  cards, do you know whether these DSP cards

5  were available during the period that COBRA

6  was installed?

7    A    That is a good point. As we said

8  before, it is antiquated equipment that was

9  put in in the 1990s. DSP cards for VOIP

10  technology really are a recent development by

11  the vendors. So putting them in this COBRA

12  platform, they didn't exist at the time. By

13  the time they did exist, we were in the

14  process of decommissioning it. So they

15  weren't there. The time lines don't line up.

16    Q    Would that have created a

17  technological barrier to doing this?

18        MS. GUERON:  Objection.

19        JUDGE GONZALEZ:  What is your

20  objection?

21        MS. GUERON:  The question is vague.

22  "Doing this"?

23        JUDGE GONZALEZ:  Specify what you

24  mean by that.

25    Q    Would there have been a

---

1CONFIDENTIAL - Anderson - Redirect - Perez

2  technological barrier to replacing the DSP

3  cards because of the timing that you just

4  described?

5    A    Yes. I guess I looked at it from a

6  time perspective, but considering if you went

7  back in time, the technology didn't exist.

8  So, yes, it is a technological barrier at

9  that point in time.

10    Q    With respect to dial-up computer to

11  dial-up computer Skype traffic, if you will,

12  do you remember that line of questions from

13  Ms. Gueron?

14    A    Yes.

15    Q    Do you have to have a computer in

16  order to be able to do that?

17    A    Yes.

18    Q    I believe your testimony was that,

19  as a result of the low speeds, it was

20  virtually impossible to do. Is that your

21  testimony?

22    A    Yes. In the one direction, the

23  speed is so low that the voice would be

24  unintelligible. It would pass the packets,

25  just like my example of a cellphone. You get

---

1CONFIDENTIAL - Anderson - Redirect - Perez

2  out of the range, it is still passing the

3  data, but you can't understand it.

4    Q    Now, you testified at various times

5  that the packets would be transmitted, do you

6  remember that?

7    A    Yes.

8    Q    Does that equate with a telephonic

9  quality communication?

10    A    No. Not at all. Because if it is

11  not enough data, you are not going to be able

12  to understand. So you can pass packets at a

13  slow speed, and it will get to the other end,

14  but when it puts the packets back together to

15  represent the voice, there is not enough data

16  to really give you a clear voice. Like I

17  said, you wouldn't be able to understand it.

18  It would be garbled or it would be noise.

19    Q    So the fact that packets were

20  passed is really irrelevant to whether there

21  was any telephonic quality communication?

22    A    Exactly.

23        MR. PEREZ:  Excuse me one minute,

24  Your Honor. I have nothing further, Your

25  Honor.

---

1    CONFIDENTIAL - Proceedings

2        JUDGE GONZALEZ:  Is there any

3  recross?

4        MS. GUERON:  No, Your Honor.

5        JUDGE GONZALEZ:  All right. Thank

6  you. The witness may step down.

7        We can take a break. It is 20 to

8  2:00, and return as close to 20 to 3:00 as

9  possible.

10        MS. GUERON:  Before we do, Your

11  Honor, can I make a Rule 7052(c) judgment on

12  partial findings motion?

13        JUDGE GONZALEZ:  Go ahead.

14        I will let the witness step down,

15  though.

16        (Whereupon, the witness was

17  excused.)

18        JUDGE GONZALEZ:  All right. Leave

19  it there. The other witness may use it.

20        MS. GUERON:  Let me ask first, has

21  MCI completed its affirmative case?

22        MR. PEREZ:  We have no further

23  witnesses, Your Honor. We do have argument,

24  but we have no further witnesses.

25        MS. GUERON:  Well, in that case, as

---

CONFIDENTIAL - Proceedings

1    CONFIDENTIAL - Proceedings
2    MCI's counsel stated, they have completed
3    their affirmative case.  The Government
4    maintains that MCI has failed to meet its
5    burden and that the Court can render judgment
6    against them at this time pursuant to Rule
7    7052(c) of the Federal Rules of Bankruptcy
8    Procedure.
9         JUDGE GONZALEZ:  Would you care to
10   tell me what Rule 7052(c) provides?
11        MS. GUERON:  I would love to, Your
12   Honor.  It is entitled "Judgment on Partial
13   Findings," and it provides:  If during a
14   trial without a jury a party has been fully
15   heard on an issue, and the Court finds
16   against the party on that issue, the Court
17   may enter judgment as a matter of law against
18   that party with respect to a claim or defense
19   that cannot under the controlling law be
20   maintained or defeated without a favorable
21   finding on that issue, or the Court may
22   decline to render any judgment until the
23   close of all of the evidence.  Such a
24   judgment shall be supported by findings of
25   fact and conclusions of law as required by

CONFIDENTIAL - Proceedings

1    CONFIDENTIAL - Proceedings
2    subdivision A of this rule.
3         JUDGE GONZALEZ:  Before I turn to
4    Mr. Perez, what are the findings of fact and
5    conclusions of law that you want me to find
6    in the Government's favor to grant judgment
7    at this point?
8         MS. GUERON:  Your Honor, the
9    findings of fact and conclusions of law that
10   we would point to are that, as per MCI's
11   expert, the dial-up user has a telephonic
12   quality path all the way through the COBRA
13   system to the COBRA modems.  What MCI is
14   purchasing is a system that is capable of
15   carrying telephonic quality communications.
16   What the COBRA system provides here is a
17   modem to modem communication between the
18   dial-up user and the COBRA system modem.
19   Under the revenue rulings, that is taxable
20   under 4251 and 4252.  That modem to modem
21   communication, while it may not be a voice
22   communication, doesn't need to be a voice
23   communication to be taxable.  You can't pick
24   up a telephone?  Maybe so.  It isn't being
25   currently used for voice?  Maybe so.  But

CONFIDENTIAL - Proceedings

1    CONFIDENTIAL - Proceedings
2    these are telephone lines and telephonic
3    quality paths, and what the IRS Revenue
4    Rulings show is that that is taxable.  It
5    doesn't matter that COBRA can't originate a
6    call.  It doesn't matter that they are using
7    it for modem to modem communications.
8    Comdata and the Revenue Rulings say that
9    those scenarios are taxable.  That a modem to
10   modem communication using the PSTN and
11   telephonic quality path is taxable, it
12   appears to be undisputed.  Most of the facts
13   in this matter truly are undisputed and the
14   experts largely agree, and on those facts and
15   on the standard under Comdata and the Revenue
16   Rulings which are owed great deference, the
17   Government would posit that the Court has
18   everything it needs to rule in the
19   Government's favor at this time.
20        JUDGE GONZALEZ:  All right.  Thank
21   you.
22        The Debtors?
23        MR. PEREZ:  Your Honor, we would
24   request that the Court deny it.  Your Honor,
25   I think we have knocked out every single one

CONFIDENTIAL - Proceedings

1    CONFIDENTIAL - Proceedings
2    of the legs under that stool.  I think the
3    testimony is that there isn't telephonic
4    quality communication.  I believe that the
5    testimony is that there is no privilege,
6    because you can't make a call and you can't
7    do anything with it and you can't change it.
8    Furthermore, Your Honor, I believe that it is
9    undisputed that it is a private line or a
10   private communication.  That is the
11   testimony.  Even if it were a local
12   telephone, the evidence is undisputed right
13   now that it is private communication, which
14   takes it out of the statute already.
15        Your Honor, I sat quietly during
16   the opening statements.  I really tried to do
17   an opening statement where we talked about
18   what the evidence would be.  I didn't try to
19   argue the evidence.  In essence, what I was
20   faced with was a closing argument and an
21   opening statement, talking about what has
22   happened at deposition and talking about what
23   the cases are.  Frankly, I think the
24   Government has totally, absolutely totally
25   misread Comdata and Revenue Ruling 79-245.

CONFIDENTIAL - Proceedings

1    In that case, Your Honor, in both
2    of those cases, you have a normal telephone
3    loop from here to there, from there to there,
4    and you had a computer plugged in at both
5    ends. The Revenue Ruling says, yes, if you
6    had got a local telephone loop between there
7    and there and you have got computers on both
8    sides, all you have got to do is take out the
9    computer and put a telephone in and you are
10   there. The same thing with Comdata. They
11   had a bunch of truckers that they didn't want
12   calling out. They just wanted to use it for
13   data. But the truckers could have come in.
14   They could have unplugged it, put it in, and
15   you would have had it. That is not what we
16   have here. We are getting a high-speed
17   datastream at the end of the NAS. We can't
18   do anything with that. This is a data
19   service. Those were regular telephone
20   services which they just chose to do it. So,
21   Your Honor, these two things don't hit
22   topside nor bottom, and we request that the
23   Court deny it.
24        JUDGE GONZALEZ: What I agree

CONFIDENTIAL - Proceedings

1    with -- and I don't think either side really
2    disagrees -- it really is a legal issue for
3    the most part. I don't think there are a lot
4    of factual differences with the parties. I
5    am not prepared at this time to rule on this.
6    I will take it under consideration. We will
7    proceed with the balance of the hearing. If
8    I were to agree with the Government after
9    reviewing the record, I could render a
10   judgment without considering the Government's
11   case beyond that. I am not prepared to rule
12   now, so we will continue, and we will return.
13   So in that regard, as I said, I will take it
14   under advisement.
15        Now, we will break for an hour.
16   Part of my prior foreclosing I forgot about.
17   I had a different relationship with the IRS
18   than most taxpayers. I actually did work for
19   the IRS. I thought I recognized an attorney
20   that was there when I was. I did work for
21   District Counsel's Office and I left in 1988.
22   I think a number of years have gone by since
23   then.
24        Thank you. I will see everyone at

143

CONFIDENTIAL - Hills - Direct - Gueron

1    approximately a quarter to 3:00.
2        (Whereupon, a recess was taken.)
3        JUDGE GONZALEZ: Please be seated.
4    Would the Government call their witness,
5    please.
6        MS. GUERON: Yes. The Government
7    calls Dr. Michael Hills.
8    M I C H A E L  T.  H I L L S , Ph.D.,
9        called as a witness, having been first
10       duly sworn by a Notary Public (Liza
11       Ebanks), was examined and testified as
12       follows:
13       JUDGE GONZALEZ: Please be seated.
14       You made proceed.
15   DIRECT EXAMINATION
16   BY MS. GUERON:
17   Q    Can you state your name for the
18   record, please.
19   A    Michael Hills.
20   Q    Are you employed?
21   A    Yes.
22   Q    By whom?
23   A    HTLT Technologies Limited.
24   Q    Can you state your educational

144

CONFIDENTIAL - Hills - Direct - Gueron

1    background, please.
2    A    Yes. I have a Bachelor's Degree in
3    Science from the University of London, and a
4    Ph.D. in Electrical Engineering from the
5    University of London.
6    Q    When did you get your Bachelor's
7    Degree?
8    A    In 1962.
9    Q    When did you get your Ph.D.?
10   A    Around 1969.
11   Q    Where did you work before working
12   at HTLT Technologies?
13   A    I taught in a university, first of
14   all, at London University, the Imperial
15   College. Then I moved to the University of
16   Essex in Colchester.
17   Q    For how many years did you teach at
18   the University of London and the University
19   of Essex?
20   A    From 1963 to 1975.
21   Q    What were you teaching?
22   A    Telecommunications.
23   Q    What did you do next
24   professionally?

146

1  CONFIDENTIAL - Hills - Direct - Gueron
2      A    I moved to the United States and
3  started a consulting company which is now
4  known as HTLT Technologies.
5      Q    What do you do at HTLT
6  Technologies?
7      A    We are a company that specializes
8  in network design and optimization.
9      Q    What does that mean exactly?
10     A    We provide a number of databases
11 and tools and techniques for basically on the
12 size of facilities required in a typical
13 voice telecommunication network, and then
14 once we know the quantities of channels we
15 might need on any particular occasion.  We
16 maintain databases of all of the FCC and
17 interstate tariffs, and we are able to
18 determine the optimum mix of such facilities.
19     Q    What types of entities are your
20 clients at HTLT?
21     A    Typically long distance carriers,
22 ISPEs.
23     Q    Have you done any work with HTLT
24 that specifically informs your testimony in
25 this proceeding?

147

1  CONFIDENTIAL - Hills - Direct - Gueron
2  you concluded about the COBRA services
3  purchased by MCI?
4      A    That an integral part of the COBRA
5  services purchased by MCI is access to the
6  local telephone network and the ability to
7  receive calls from substantially everybody
8  within the local calling area.
9      Q    What is the basis for that
10 conclusion?
11     A    The basis?  The documentation
12 provided to me by the Debtors, and the
13 contracts, and just general industry
14 knowledge.
15     Q    I would like to direct your
16 attention to Exhibit 2 of the binder you have
17 before you.
18     A    Yes.
19     Q    Could you please describe, starting
20 on the left-hand side of the diagram, each
21 component of the COBRA services, and then I
22 will ask you a few questions about them.  But
23 let's start on the left-hand side, what does
24 the dial-up user do to access the COBRA
25 system?

148

1  CONFIDENTIAL - Hills - Direct - Gueron
2      A    Yes.  We have done work on sizing
3  local networks for job modem dialing pools.
4      Q    How is that relevant to what we are
5  discussing in these proceedings?
6      A    It means that, coupled with my
7  industry knowledge, I have a thorough
8  understanding of the technologies required to
9  make such systems work.
10     Q    Starting within an overview, can
11 you give the Court an overview of what
12 exactly are the COBRA services that MCI
13 purchased?
14     A    They are basically a set of
15 services that within a particular area allow
16 MCI to purchase aggregated dial-in traffic,
17 so that people within the area covered by a
18 particular contract can, using their regular
19 telephone lines, dial a local call and
20 connect to a modem bank, and that modem bank
21 then provides access to the MCI network.
22     Q    Have you provided an expert opinion
23 about the COBRA services purchased by MCI?
24     A    Yes.
25     Q    Speaking generally first, what have

1  CONFIDENTIAL - Hills - Direct - Gueron
2      A    The dial-up user has a local loop
3  purchased from the local exchange carrier,
4  and this plugs into a modem connected to
5  their computer.
6      Q    Now, what is an example of a local
7  exchange carrier, just so we are all
8  understanding?
9      A    They changed their names, but
10 Verizon and Qwest.
11     Q    What exactly is the Public Switch
12 Telephone Network?
13     A    It is the network which allows
14 voice communication to be established between
15 one or more people in the country or in the
16 world, even.
17     Q    You said the dial-up user uses a
18 modem.  What exactly is a "modem"?
19     A    A modem is a device the takes data
20 from the computer and converts it to the same
21 set of frequencies that are used by voice
22 transmission.
23     Q    When you are using a modem and you
24 hear the high, screeching tones that a modem
25 makes, what is that sound?

CONFIDENTIAL - Hills - Direct - Gueron

2   A    That sound is a representation of

3   data.

4   Q    What is the frequency range of

5   voice?

6   A    Traditionally, in the Public Switch

7   Telephone Network, it is 300 to 3400 hertz.

8   Q    What is the frequency range used by

9   a modem?

10   A    The same.

11   Q    So modems require the same

12   frequency range as a voice to operate; is

13   that true?

14   A    That is true.  In fact, modems are

15   designed to utilize to the maximum effect

16   possible the same frequency characteristics

17   as the voice channel.

18   Q    What about a facsimile?

19   A    Different coding system, but the

20   same principle.

21   Q    Now, is it your opinion that modems

22   require telephonic quality communication to

23   function or not?

24       MR. PEREZ:  Objection, Your Honor.

25   It is leading.

CONFIDENTIAL - Hills - Direct - Gueron

2       JUDGE GONZALEZ:  My recollection is

3   that you can lead an expert witness.

4       MS. GUERON:  That is my

5   understanding also, Your Honor.

6       JUDGE GONZALEZ:  Objection.

7   Overruled.  Go ahead.

8   A    Sorry.  Would you repeat the

9   question?

10   Q    Is it your opinion that modems

11   require telephonic quality communication to

12   function or not?

13   A    That is my opinion.

14   Q    What is the basis for that opinion?

15   A    Modems will not operate without a

16   telephonic quality communication channel.

17   Q    Why not?

18   A    Because in order to transmit the

19   data over a telephonic quantity channel, you

20   need the same bandwidth and the same

21   characteristics as voice.

22   Q    Now, MCI claims that the COBRA

23   system only sends data.  Do you agree with

24   that conclusion?

25   A    The COBRA system incorporates

CONFIDENTIAL - Hills - Direct - Gueron

2   telephonic quality communication in order to

3   operate.

4       MR. PEREZ:  I am going to object to

5   that.  It is not responsive.

6       JUDGE GONZALEZ:  I am not so sure

7   that is an objection you can raise, is it?

8       MR. PEREZ:  Then the objection that

9   I am going to raise is:  my objection is that

10   the questioner should proceed by question and

11   answer, not question and then answer on

12   another question.  Maybe not responsive is

13   not the right objection, but the objection is

14   that I would request that counsel be

15   instructed to proceed by question and answer.

16       JUDGE GONZALEZ:  I am not clear as

17   to what question that answer was responsive

18   to.

19       MS. GUERON:  Let me ask it again.

20   Q    MCI claims that the system sends

21   data.  You heard that testimony earlier?

22   A    Yes, I have.

23   Q    Does that claim in any way

24   contradict your opinions about the COBRA

25   system?

CONFIDENTIAL - Hills - Direct - Gueron

2   A    No.

3   Q    Why not?

4       JUDGE GONZALEZ:  The answer was,

5   no, does that claim contradict anything that

6   you understand about the COBRA system?  Was

7   that the question?

8       MS. GUERON:  Yes.

9       JUDGE GONZALEZ:  Then the answer

10   was no?

11       MS. GUERON:  No.

12       THE WITNESS:  It does not

13   contradict.

14       JUDGE GONZALEZ:  All right.  Go

15   ahead.

16   Q    Why not?

17   A    Because the data is transmitted

18   through the telephonic quality voice channel.

19   Q    What exactly is the LEC voice

20   switch depicted on Exhibit 2?

21   A    It is like a very special purpose

22   computer.  The pair of wires coming in from

23   the local user connects to the computer, and

24   when the user keys in a phone number, the

25   local switch decides based on the number

CONFIDENTIAL - Hills - Direct - Gueron

1 dialed where the call should go and which

2 should be the next switch to take that call,

3 and it will route the call either to its

4 final destination or to another switch, which

5 would actually get it to the final

6 designation.

7     Q    How does the modem call into the

8 LEC switch?

9     A    Exactly the same way as a voice

10 call.

11     Q    So what happens exactly?

12     A    Modems are designed to provide the

13 ability to make a telephone call, that is

14 conventionally known as going off hook, and

15 then to detect a dial tone.  Once it has

16 detected dial tone, it will then send out the

17 regular touchtone signals or, if necessary,

18 the rotary signals to send the address

19 information to the switch.

20     Q    Now, have you reached a conclusion

21 about whether or not the communication

22 between the dial-up modem and the LEC switch

23 is a telephonic quality communication?

24     A    I have.

---

155

CONFIDENTIAL - Hills - Direct - Gueron

1 switch, and it receives the dial digits

2 indicating which service is required, if the

3 number dialed happens to be one of the

4 numbers associated with the COBRA service,

5 the call will be connected to another LEC

6 switch to which the COBRA equipment is

7 connected.

8     Q    What happens next?

9     A    The LEC switch which connects to

10 the COBRA equipment typically uses a

11 technology called Primary to Interface, PRI,

12 which is two  pairs of wires which are

13 designed to take 23 or 24 voice channels,

14 rather than just one.

15     Q    Is the PRI capable of telephonic

16 quality communication?

17     A    PRI is designed to be able to carry

18 telephonic quality communication.

19     Q    What is your basis for saying that?

20     A    The design specifications for PRI

21 include the same set of characteristics that

22 are used within the LEC switch, in

23 particular, within the LEC switch which is

24 implemented digitally.

---

CONFIDENTIAL - Hills - Direct - Gueron

1     Q    What is that conclusion?

2     A    It is.

3     Q    What is your basis for saying that?

4     A    Because it is using the telephonic

5 quality communication terminal that the home

6 user has bought or rented for telephonic

7 communication.

8     Q    What specifically is the telephonic

9 quality communication in this transaction

10 between the dial up modem and the LEC voice

11 switch?

12     A    Telephone communication is defined

13 as the set of characteristics that allow a

14 pair of people to be able to conduct a

15 conversation and hear each other

16 satisfactorily.

17     Q    How does the communication between

18 the modem and PSTN satisfy that?

19     A    The modem is designed to use

20 exactly the same characteristics as are

21 required for voice.

22     Q    Now, what happens next in the COBRA

23 system after the call enters the LEC switch?

24     A    Once the call enters the LEC

---

156

CONFIDENTIAL - Hills - Direct - Gueron

1     Q    Have you reached a conclusion as to

2 whether the communication between the LEC

3 voice switch and the PRI is a telephonic

4 quality communication?

5     A    I have.

6     Q    What is your conclusion?

7     A    It is a telephonic quality

8 communication.

9     Q    How do you know that?

10     A    Because it connects to a modem

11 bank, and the modem bank would not operate

12 without telephonic communication.

13     Q    What happens next in the COBRA

14 system after the dial-up user's call travels

15 on to the PRI?

16     A    The modem bank in the COBRA system

17 is designed to detect the ring signal and

18 will answer the call.

19     Q    That is the modem bank in the NAS?

20     A    Correct.

21     Q    Does the fact that the modem may be

22 a DSP matter for purposes of assessing

23 whether there is a telephonic quality

24 communication?

158

1  CONFIDENTIAL - Hills - Direct - Gueron
2      A    A DSP is designed to basically,
3  amongst other things, replace a modem.
4      Q    So it doesn't matter?
5      A    It does not matter.
6      Q    Have you reached a conclusion as to
7  whether the communication between the PRI and
8  the NAS COBRA modem bank is a telephonic
9  quality communication?
10     A    I have.
11     Q    What conclusion have you reached?
12     A    It is.
13     Q    How do you know that?
14     A    As I previously stated, the modem
15 to modem communication requires a telephonic
16 quality communication to operate the way it
17 was designed to.
18     Q    At what stage does the call from
19 the dial-up user enter the COBRA system?
20     A    It enters it when the PRI
21 terminates in the modem bank.
22     Q    Is it fair to say, in your opinion,
23 that the PRI is part of the COBRA system?
24     A    My understanding is that the PRI is
25 part of the COBRA system.

160

1  CONFIDENTIAL - Hills - Direct - Gueron
2      Q    What is the basis for that
3  understanding?
4      A    The contracts I looked at say so
5  explicitly.
6      Q    What happens next in the COBRA
7  system after the NAS modems?
8      A    Once the call is answered by the
9  modem bank, the modem bank is programed to
10 send out its own set of tones to tell the
11 calling party what type of modem it is, and
12 it is also programmed to listen for the modem
13 tones from the calling party.
14     Q    What happens next?
15     A    If two-way communication is
16 established and the two modems are able to
17 talk to each other, the NAS equipment will
18 then send a message to some system within the
19 MCI network that sends out characters back to
20 the user to say, who are you, and name, and
21 password, and so forth.
22     Q    If those are provided?
23     A    Then the end user will be able to
24 use the telephone network to access the
25 internet.

159

1  CONFIDENTIAL - Hills - Direct - Gueron
2      Q    Now, looking at the COBRA in the
3  other direction, from right to left, does it
4  function in reverse?
5      A    Once a connection is established,
6  it functions in reverse.  So if what you send
7  to the internet is a Google search request,
8  when the data comes back from Google, it will
9  go back into the NAS and the modems will then
10 translate that data back into tones, which
11 will get sent back to the home user, and this
12 will allow them to display the result screen.
13     Q    Now, when the information comes
14 from Google into the NAS on the right-hand
15 side, what kind of information is it coming
16 in?
17     A    It is packets of information.
18     Q    Does it stay in packets of
19 information?
20     A    The NAS will basically decide which
21 packets are designed for the user that
22 requested them, and then those packets will
23 be disassembled and sent back to that
24 particular user.
25     Q    In what form are they sent back to

160

1  CONFIDENTIAL - Hills - Direct - Gueron
2  the user?
3      A    By the modem tones.
4      Q    When the information coming back
5  from Google travels out of the COBRA modems
6  back to the user, is it a telephonic quality
7  communication?
8      A    It is relying on telephonic quality
9  communication.
10     Q    Now, I believe you heard
11 Mr. Anderson testify that voice requires 64
12 kilobytes and that, therefore, it can't
13 travel through the COBRA without being
14 garbled.  Do you recall hearing that
15 testimony?
16     A    I do, yes.
17     Q    Do you agree?
18     A    Not necessarily.
19     Q    Why not?
20     A    The growth of the VOIP industry
21 from the late 1990s has developed different
22 coding schemes that are better adapted to the
23 internet and use lower bandwidths.
24     Q    What can these coding schemes
25 accomplish?

CONFIDENTIAL - Hills - Direct - Gueron

2    A    There are coding schemes which
3    provide what are regarded as adequate voice
4    quality, some as low as 14 kilobytes a
5    second, and others more recently with Skype,
6    they claim coding as low as 3 kilobytes a
7    second.
8    Q    What does that mean in terms of
9    whether or not dial-up can be used for VOIP?
10    A    Dial-up can be used for VOIP.
11    Q    Will the voice come through at a
12    sufficient quality to have a conversation?
13    A    Yes.
14    Q    Dr. Hills, a little while ago you
15    mentioned some of the COBRA access contracts
16    that you reviewed?
17    A    COBRA contracts.  They weren't
18    access contracts.
19    Q    Sorry.  COBRA contracts.  If you
20    would take a look at Exhibit 27.
21    A    Okay.
22    Q    If I could direct your attention to
23    DOJ 12?
24    A    Okay.
25    Q    Is this one of the contracts to

---

CONFIDENTIAL - Hills - Direct - Gueron

2    which you were referring previously?
3    A    I did.
4    Q    Now, you are not a legal expert,
5    are you?
6    A    Oh, no.
7    Q    And you are not providing a legal
8    opinion for the Court, are you?
9    A    No.
10    Q    Do any of the technical terms in
11    the contract before you reflect the technical
12    characteristics of COBRA that you have
13    described in your earlier testimony?
14    A    They do.
15    Q    Can you tell the Court which ones?
16    A    Okay.  If you look at the paragraph
17    marked "server's description," the second
18    line says, vendor's service provides
19    integrated remote analog and digital access
20    to WorldCom that may be used by WorldCom end
21    users and the end users of WorldCom's
22    affiliates, clients, and resellers to connect
23    WorldCom's internet network via modems
24    referred to as network access servers
25    deployed in the central offices operated by

---

CONFIDENTIAL - Hills - Direct - Gueron

2    the vendor.  Vendor shall connect each NAS
3    used in conjunction with the vendor's service
4    to the Public Switch Telephone Network via
5    ISDN, prime rate interface, or other mutually
6    agreed comparable facilities.
7    Q    What are those mutually agreed
8    comparable facilities labeled in that
9    sentence?
10    A    Collectively, they are called PRI.
11    Q    Now, we haven't previously heard
12    about the ISDN primary rate interface.  What
13    exactly is that?
14    A    That is precisely what we have been
15    talking about.
16    Q    I am sorry.  We haven't heard the
17    term?
18    A    You are confusing it with basic.
19    Q    We haven't heard the term ISDN in
20    the Court today.  What is that?
21    A    ISDN, a lot of people say, I still
22    don't know what it means, Integrated Services
23    Digital Network, I believe, is the official
24    acronym, but I could be incorrect.
25    Q    What is that exactly?

---

CONFIDENTIAL - Hills - Direct - Gueron

2    A    It is a protocol that was
3    developed, I guess, in the early 1990s for
4    connecting subscribers to switches and
5    switches to equipment.
6    Q    Is that used in the PSTN, the
7    Public Switch Telephone Network?
8    A    Yes.
9    Q    Are there any other portions of the
10    contract at Exhibit 27 that reflect the
11    technical characteristics of COBRA that you
12    have described?
13    A    Yes.  The second paragraph starts:
14    Vendor services include all NAS equipment,
15    telecommunication services, and related
16    facilities (including without limitation
17    active PRI lines, at least 40 lead trunk
18    numbers, LTNs ...) and it goes on and
19    expresses other items.
20    Q    Let me direct your attention,
21    Dr. Hills to Exhibit 29 on page 35 of that
22    exhibit.
23    A    Yes.
24    Q    Do any of the technical terms of
25    this contract reflect the technical

1  CONFIDENTIAL - Hills - Direct - Gueron
2  characteristics of COBRA that you have
3  described in your testimony?
4      A    Yes.  They use almost identical
5  words.
6      Q    Is it your recollection from
7  reviewing these contracts, that others of the
8  contracts also use identical words?
9      A    Virtually identical words, yes.
10     Q    So is it your understanding that
11 the COBRA services that MCI buys include PRI?
12     A    That is the way the contract reads
13 to me, yes.
14     Q    Now, you have never analyzed a
15 COBRA system before you began working on this
16 matter; is that right?
17     A    That is correct.
18     Q    Were you nonetheless able to form
19 an opinion about the COBRA services?
20     A    I was.
21     Q    How were you able to form this
22 opinion about the COBRA services?
23     A    It is basically just a different
24 arrangement of fairly standard components to
25 achieve dialing access to the internet.

1  CONFIDENTIAL - Hills - Direct - Gueron
2      Q    Were these components that you had
3  worked with in other contexts?
4      A    Yes.
5      Q    What type of contexts?
6      A    Basically when sizing the number of
7  circuits required, how many PRIs would be
8  needed.
9      Q    Now, did you hear Mr. Anderson
10 earlier testify that a PRI can plug into a
11 PBX?
12     A    Yes.
13     Q    Do you agree with that?
14     A    Yes.
15     Q    What is a PBX?
16     A    A PBX is a switch that is generally
17 on a company's premises.  So that if you had
18 a company with 1,000 employees in one
19 building, you might only need 100 lines
20 coming in and out of that building to support
21 those.  So a PBX is a device that will allow
22 the 1,000 users within the building to talk
23 to each other and to receive and make
24 telephone calls to the outside world.
25     Q    When you said there were only 100

167

1  CONFIDENTIAL - Hills - Direct - Gueron
2  lines coming in, did you mean 100 telephone
3  lines?
4      A    One hundred local loops, yes.
5      Q    Now, can the PRI coming into the
6  COBRA system plug into a PBX?
7      A    The PRI specification is a standard
8  specification, which would plug into any
9  equipment that is designed to accept it.
10     Q    Including a PBX?
11     A    Including centrally redesigned
12 PBXs.
13     Q    Now, the COBRA system as configured
14 currently doesn't do that; right?
15     A    It does not do that.
16     Q    But is it your view that the PRI
17 could plug into a PBX?
18     A    That is my understanding, yes.
19     Q    Did you hear Mr. Anderson testify
20 earlier that the COBRA uses DID lines?
21     A    Yes.
22     Q    Will you remind us again what a DID
23 line is?
24     A    Technically a DID line stands for
25 Direct Inward Dialing.  What, in fact, the

168

1  CONFIDENTIAL - Hills - Direct - Gueron
2  COBRA system used was regular trunks
3  configured to have what is called "hunting,"
4  and those trunks could be figured one-way or
5  two-way, depending on the way it was ordered.
6      Q    How were they configured here?
7      A    They were configured here to
8  basically have incoming only calls.
9      Q    Mr. Anderson said that only MCI
10 could get information out of the back end of
11 the COBRA system on those DID lines; correct?
12     A    He said that, yes.
13     Q    Now, is there any limit to who can
14 call into a DID line in this configuration?
15     A    Anybody who has the appropriate
16 calling plan can call into those DID trunks.
17     Q    So does that mean anyone with a
18 modem could call into those DID lines?
19     A    Yes.
20     Q    In fact, anyone with a telephone
21 could as well; right?
22     A    Yes.
23     Q    What would happen, if someone with
24 a telephone called in?
25     A    They would hear the ringing.  They

CONFIDENTIAL - Hills - Direct - Gueron

1  would hear the ringing stop, and they would
2  hear an annoying screech. Then after a
3  while, the modem would decide nothing was
4  going to answer it, and it will disconnect
5  the call.
6  Q    And anyone with a modem who calls
7  in could connect; is that right?
8  A    Anyone could connect to the NAS
9  equipment, yes.
10 Q    These DID lines, where exactly are
11 those in Exhibit 2?
12 A    They are the PRI lines.
13 Q    So it is just another word for the
14 PRI lines?
15 A    It is configuration of the PRI
16 lines.
17 Q    I would like to change gears a
18 little and talk about Voice Over Internet
19 Protocol, VOIP. What exactly is VOIP?
20 A    VOIP is a technology which allows
21 regular voice signals to be converted to
22 packets that are designed to transition the
23 TCP/IP network, which is commonly known as
24 the internet. This transformation can occur

CONFIDENTIAL - Hills - Direct - Gueron

1  in several places. There has been talk about
2  computer to computer VOIP where the
3  transformation is actually done within the
4  end user's own computer, and then there are
5  the more sophisticated versions where the
6  person makes a regular telephone call to a
7  special bank of circuits, that Mr. Anderson
8  referred to as a gateway, which will allow
9  those calls to enter the internet network.
10 Q    Taking a look at Exhibit 23?
11 A    Yes.
12 Q    That is one kind of a VOIP gateway
13 being depicted there?
14 A    This is a VOIP gateway in which the
15 end user goes to the equipment using a
16 regular voice channel.
17 Q    But that is not the only kind of
18 VOIP there is; right?
19 A    The other type is computer to
20 computer VOIP.
21 Q    Is COBRA capable of computer to
22 computer VOIP?
23 A    Absolutely.
24 Q    How does it work? How does

171

CONFIDENTIAL - Hills - Direct - Gueron

1  computer to computer VOIP work over COBRA?
2  A    It is the packets through the COBRA
3  system. The COBRA does not determine what
4  the packets are and what is contained in
5  them, so those packets could be music, they
6  could be e-mail, they could be video, or they
7  could be VOIP.
8  Q    How exactly does it work? How
9  exactly does computer to computer VOIP work
10 over COBRA?
11 A    Basically the first thing you have
12 to do, if you are a dial-up user, you have to
13 connect to the internet by dialing up. So
14 the first thing you need to do is to be
15 connected to the internet, and then connect
16 yourself to a site which hosts VOIP service.
17 You will then enter the number that you
18 require or some other form of address of the
19 person that you require into this equipment,
20 and the VOIP network will then transmit that
21 call to another user, if that user is on the
22 internet, or else it will connect it to the
23 PSTN.
24 Q    Now, starting at the dial-up user's

172

CONFIDENTIAL - Hills - Direct - Gueron

1  house, how does the VOIP packet head out
2  towards the internet?
3  A    Every time the user speaks, his or
4  her speech gets assembled into packets.
5  Typically once every 20 or 30 milliseconds,
6  20 or 30 thousandths of a second, a packet is
7  created. That packet is transmitted through
8  the internet to the destination.
9  Q    How does it get to the internet
10 though?
11 A    Over the dial-up connection
12 established through the COBRA system, if we
13 are talking about a COBRA dial-up user.
14 Q    So with this type of COBRA system,
15 how would the dial-up user's voice packet get
16 to the internet?
17 A    It would just be more packet.
18 Instead of keying an e-mail in, they are
19 sending voice information.
20 Q    So it would be the same process as
21 you have described earlier in your testimony?
22 A    Yes. Once you have established the
23 connection to the internet or to the site
24 that is supporting the VOIP.

CONFIDENTIAL - Hills - Direct - Gueron

1  CONFIDENTIAL - Hills - Direct - Gueron
2      Q      Would that computer to computer
3  VOIP packet be converted or altered in any
4  way as it travels over the COBRA system?
5      A      No.
6      Q      Do any of the documents that you
7  reviewed describe VOIP?
8      A      For the documents supplied to me
9  for this opinion, the only mention of VOIP
10  was in the contracts.
11      Q      Can you identify for the Court what
12  portion of the contracts you are referring
13  to, for example, using Exhibit 27?
14      A      27, yes.
15      Q      You know what, Dr. Hills, let me
16  make that easier for you.  Let me give you a
17  copy of your declaration.
18      A      Okay.  Thank you.  Yes, in my
19  declaration, in my paragraph 14, I quote one
20  of the vendor's contracts.
21      Q      Let me direct your attention to
22  that contract, which is today marked as
23  Exhibit 29.
24      A      Okay.  Paragraph 12; right.
25      Q      Could you just identify that for

1  CONFIDENTIAL - Hills - Direct - Gueron
2  the Court?
3      A      Okay.  I am looking at Exhibit 29.
4  Sorry, DOJ 37.
5      Q      And that is part of the Exhibit 29?
6      A      Yes.  It is DOJ Bates stamp 37,
7  paragraph 12, states:  This schedule does not
8  represent an interconnection agreement
9  between the parties.  Should WorldCom or any
10  of its affiliates wish to directly use COBRA
11  services to directly provide one-way or
12  two-way voice telephone communications where
13  the local or long distance (VOIP), WorldCom
14  and vendor shall negotiate terms, conditions,
15  and rate structures that are applicable to
16  VOIP prior to WorldCom utilizing COBRA
17  services directly provided VOIP.  There is
18  other language following that.
19      Q      Does your declaration point you to
20  any other contracts?
21      A      My recollection is I found
22  comparable language in all contracts.
23      Q      Did MCI provide any product
24  descriptions that you reviewed?
25      A      Yes.

---

175

CONFIDENTIAL - Hills - Direct - Gueron

1  CONFIDENTIAL - Hills - Direct - Gueron
2      Q      Let me direct your attention to
3  Exhibit 13.
4      A      Right.
5      Q      Can you review that and see if that
6  document made any mention of VOIP that was
7  relevant to your analysis?
8      A      This is a product page produced by
9  the vendor talking about the design of what
10  they call the HiPer DSP card, which enables
11  multiple modem sessions, ISDN processing,
12  voice codecs, and multiple processing.
13  Toward the end of the paragraph, it says,
14  this permits administrators to reconfigure
15  the system to implement new technologies and
16  applications such as Voice Over IP.
17      Q      Let me direct your attention to
18  Exhibit 15, if you could, Dr. Hills.  Did you
19  review Exhibit 15 in analyzing the COBRA
20  system?
21      A      Yes.
22      Q      Did Exhibit 15 provide any
23  reference to Voice Over Internet Protocol
24  capabilities?
25      A      Yes.  On the second page, page 2

176

CONFIDENTIAL - Hills - Direct - Gueron

1  CONFIDENTIAL - Hills - Direct - Gueron
2  out of 3, it has similar language.  It lets
3  the administrators reconfigure the system to
4  permit new technologies and applications,
5  such as Voice Over IP.
6      Q      That is page DOJ 242; is that
7  right?
8      A      242; correct.
9      Q      What exactly is Exhibit 15?
10      A      Exhibit 15 is a page that MCI
11  provided to us, which they actually got from
12  the internet.
13      Q      What is the product being
14  described?
15      A      It is a DSP that was designed for
16  use in equipment comparable to one of the
17  vendor's configurations.
18      Q      Could you take a look at
19  Exhibit 12, Dr. Hills?
20      A      Yes.
21      Q      What is Exhibit 12?
22      A      It is an extract from a technical
23  manual by Lucent regarding the operating
24  system used in the COBRA equipment, their
25  equipment that was used as part of COBRA.

CONFIDENTIAL - Hills - Direct - Gueron

1  CONFIDENTIAL - Hills - Direct - Gueron
2      Q    Does Exhibit 12 make any reference
3  to Voice Over IP calls?
4      A    Yes.  It says that you need special
5  software in order to implement the Voice Over
6  IP.
7      Q    Referring back to Exhibit 2,
8  Dr. Hills, can you just show the Court for
9  how much of this diagram there is a
10  telephonic quality connection between the
11  dial-up user and the place the dial-up user
12  is connecting to?
13      A    As far as this diagram is
14  concerned, there is a telephonic quality
15  communication between the dial-up user and
16  the modem pole or DSP pole that is imbedded
17  in the NAS.
18      MS. GUERON:  I have nothing
19  further.
20      JUDGE GONZALEZ:  All right.  I will
21  take a few minutes for a recess, and we will
22  have cross-examination, and any redirect, and
23  recross thereafter.  All right.  I will
24  return in a few minutes.
25      MR. PEREZ:  Thank you, Your Honor.

CONFIDENTIAL - Hills- Cross - Perez

1  CONFIDENTIAL - Hills- Cross - Perez
2      (Whereupon, a recess was taken.)
3      JUDGE GONZALEZ:  Please be seated.
4      MS. GUERON:  We are missing one
5  essential player.
6      JUDGE GONZALEZ:  All right.  We
7  will wait.
8      (Whereupon, there was a pause in
9  the proceedings.)
10      MR. PEREZ:  Your Honor, may I
11  proceed?
12      JUDGE GONZALEZ:  Go ahead.
13  CROSS-EXAMINATION
14  BY MR. PEREZ:
15      Q    Good afternoon, Dr. Hills.  How are
16  you?
17      A    Fine.  Thank you.
18      Q    Dr. Hills, your company primarily
19  provides network sizing advice; is that
20  correct?
21      A    A combination of network sizing,
22  and tariff analysis, and economic
23  optimization.  We also provide local call
24  area databases saying what is local.
25      Q    In essence what your company does

179

1   CONFIDENTIAL - Hills- Cross - Perez
2  is it tells your clients what to do to
3  maximize the traffic and minimize the cost
4  using the various tariffs available?
5      A    That is the primary objective, yes.
6      Q    Now, you actually don't go out and
7  contract for the services to set up a
8  network, do you?
9      A    No.
10      Q    And you don't purchase the
11  equipment to implement those services?
12      A    No.
13      Q    And you are not responsible for
14  making sure that the network works?
15      A    We are not.
16      Q    Neither you nor your company tell
17  your clients what hardware, software, or
18  firmware is needed in order to make the
19  network run?
20      A    We do not.
21      Q    Have you actually ever implemented
22  a voice network?
23      A    Some of my staff have.  I have not.
24      Q    Have you ever implemented a data
25  network?

180

1   CONFIDENTIAL - Hills- Cross - Perez
2      A    Again some of my staff have, but I
3  haven't.
4      Q    Is your knowledge of the COBRA
5  contract based on your review of the
6  contracts provided to you by MCI?
7      A    Yes.
8      Q    Prior to reading those contracts,
9  you never heard of COBRA service?
10      A    I had not.
11      Q    If I recall correctly, at the time
12  of your deposition, you had one other prior
13  engagement for the IRS in which you were
14  supporting the position that the federal
15  excise tax was applicable; is that correct?
16      A    I was supporting the position that
17  the FET was applicable on certain components
18  of the networks under discussion.
19      Q    And you had likewise been retained
20  by the IRS on four more matters in which you
21  were going to assert that the FET tax was
22  applicable?
23      A    I haven't reached a conclusion in
24  the other new matters yet, but they are
25  basically the same set of facts.

CONFIDENTIAL - Hills- Cross - Perez

1    Q    At the time of your deposition, you

2 had no knowledge whether the COBRA services

3 were still being used by MCI or not; correct?

4    A    I had not.

5    Q    You had no idea of when those

6 services had been phased out?

7    A    I had not.

8    Q    You really had no personal

9 knowledge of how the COBRA services had been

10 used by MCI?

11    A    I am sure as a dial-in user at some

12 stage I must have used their services, but I

13 had no direct knowledge whether it was COBRA

14 or not.

15    Q    Do you know whether or not you were

16 able to pick up a phone call or pick up a

17 telephone and call someone through the COBRA

18 system?

19    A    Are you talking about VOIP?

20    Q    No. Just a regular black

21 telephone.

22    A    With a regular black telephone, if

23 you were going to dial the COBRA number, it

24 would give you a modem which gives you access

CONFIDENTIAL - Hills- Cross - Perez

1 to all sorts of services.

2    Q    Could you talk to it?

3    A    If you accessed a service such as

4 Skype or Net2Phone, you could provide speech

5 communication, yes.

6    Q    But that is Voice Over Internet, I

7 said voice. Could you pick up a

8 phone and call someone through the COBRA

9 system?

10    A    I answered that, I thought.

11    Q    It is your testimony that you can

12 pick up a phone, without regard to any sort

13 of VOIP, and call someone through the COBRA

14 system; is that your testimony?

15    A    To call someone through the COBRA

16 system requires a technology such as VOIP --

17 PC to PC VOIP or something similar, yes.

18    Q    If someone doesn't have a PC, you

19 can't call them; right?

20    A    That is incorrect.

21    Q    Well, if it is PC to PC VOIP, if

22 someone doesn't have a PC, can you still call

23 them?

24    A    Yes.

183

CONFIDENTIAL - Hills- Cross - Perez

1    Q    How?

2    A    It is a service called VOIP to

3 PSTN. You can go in and you can sign up for

4 the service, and you can say, I want to be

5 able to call public phone numbers both in the

6 U.S. and overseas.

7    Q    Do you know whether that service

8 was available in July of 2002?

9    A    I believe a service like that was

10 available from a company called Net2Phone,

11 which is N-e-t, numeral, P-h-o-n-e, one word.

12    Q    Is it your testimony that Net2Phone

13 was not computer to computer, but it was

14 computer to PSTN?

15    A    I have no specific recollection.

16    Q    So you have no recollection of

17 whether it was computer to computer or

18 computer to PSTN?

19    A    My recollection is it is provided

20 computer to PSTN communication, yes.

21    Q    Now, do you recognize any

22 difference between a voice grade path and

23 telephonic quality communications?

24    A    In my mind, those two terms are

184

CONFIDENTIAL - Hills- Cross - Perez

1 equivalent.

2    Q    So your having telephonic quality

3 communications, so long as you have a voice

4 grade path, is irrelevant; is that correct?

5       MS. GUERON: Objection.

6       JUDGE GONZALEZ: What is your

7 objection?

8       MS. GUERON: I don't understand the

9 question exactly, Your Honor.

10       JUDGE GONZALEZ: You may restate

11 the question.

12    Q    I asked you if you recognize any

13 difference between a telephonic quality

14 communication versus a voice grade path, and

15 your answer was to you they are the same

16 thing?

17    A    Let me refine that. A voice grade

18 communication path provides a voice grade

19 communication or provides the ability to

20 support a voice grade communication.

21    Q    But would you be able to in every

22 circumstance pick up the phone and listen to

23 someone and communicate audibly with someone?

24    A    If they have compatible equipment

CONFIDENTIAL - Hills- Cross - Perez

1  CONFIDENTIAL - Hills- Cross - Perez
2  at the other end or compatible software at
3  the other end, yes.
4      Q     But if they don't, then you
5  wouldn't; correct?
6      A     Correct.
7      Q     Now, is it your testimony that
8  COBRA services were configured to be able to
9  have one- or two-way voice quality
10  communication?
11     A     The COBRA systems of the essence
12  require two-way voice communication between
13  the telephone at the dial-up user's and the
14  modems within the COBRA system.
15     Q     My question is: did you know
16  whether the COBRA services, which MCI
17  purchases, were capable of one- or two-way
18  voice communication?
19     A     Based on the documentation provided
20  by MCI, the COBRA equipment that was in place
21  did not have the hardware or software to do
22  what is commonly known as VOIP, but PC to PC
23  VOIP was entirely possible.
24     Q     All right.  Now, is the crux of
25  your opinion that because a PRI line comes

1  CONFIDENTIAL - Hills- Cross - Perez
2  into the COBRA service, that makes it a
3  telephonic quality communication.  Is that
4  the crux of your opinion?
5      A     The PRI provides a telephonic
6  quality communication which is essential for
7  the COBRA system to work.
8      Q     Is there any other factor that
9  supports your opinion that it is telephonic
10  quality communication?
11     MS. GUERON:  Objection.
12     JUDGE GONZALEZ:  What is your
13  objection?
14     MS. GUERON:  The question was:
15  that it is telephonic quality communication,
16  and I am not sure what that "it" refers to.
17  The question was is there any other factor
18  supporting that its --
19     MR. PEREZ:  The conclusion.
20     JUDGE GONZALEZ:  I think the
21  witness testified that having the PRI line,
22  he concluded that it had to have
23  telecommunication capacity.  Then I think the
24  question was is there any other factor that
25  supports that conclusion?

187

1  CONFIDENTIAL - Hills- Cross - Perez
2      MR. PEREZ:  Right.
3      A     General industry knowledge that
4  modem to modem communication requires
5  telephonic quality communication.
6      Q     Does it require telephonic quality
7  communication or a voice grade path?
8      A     A voice grade path is one way to
9  provide telephonic communication, yes.
10     Q     Now, go back to Exhibit 2, please.
11     A     Okay.
12     Q     The end user's phone calling into
13  the PSTN, that is not part of COBRA service?
14     A     It is not.
15     Q     And the LEC transmitting that
16  communication is also not part of the COBRA
17  service?
18     A     It is not part of the COBRA.
19     Q     That is paid for by the end user;
20  correct?
21     A     The end user pays for the local
22  loop.
23     Q     Now, as the COBRA system was
24  configured, do you know whether someone could
25  dial out using the COBRA equipment?

188

1  CONFIDENTIAL - Hills- Cross - Perez
2      A     Based on the information provided
3  by MCI, they could not.
4      Q     Now, do you equate capability with
5  the word "privilege"?
6      MS. GUERON:  Objection.
7      JUDGE GONZALEZ:  Repeat the
8  question, please.
9      Q     Do you equate "capability" with the
10  word "privilege"?
11     JUDGE GONZALEZ:  What is the
12  objection?
13     MS. GUERON:  Well, Your Honor, if I
14  had asked my expert witness what "privilege"
15  means, which is a statutory term, I am sure I
16  would draw an objection about legal
17  conclusions.  Now, Mr. Perez is doing that,
18  and I am not sure whether it is fair to ask
19  him on cross about legal conclusions that I
20  did not ask him about on direct, because I
21  had drawn an objection given their motion to
22  exclude.
23     JUDGE GONZALEZ:  But I think you
24  are arguing as if I overruled your objection.
25  I just want to know what it is.  Your

CONFIDENTIAL - Hills- Cross - Perez

1    CONFIDENTIAL - Hills- Cross - Perez
2    objection is that it is a legal conclusion?
3            MS. GUERON: Yes.
4            JUDGE GONZALEZ: Mr. Perez?
5            MR. PEREZ: Your Honor, I don't
6    believe it is a legal conclusion. I am
7    simply asking him, in his mind does he equate
8    "capability" with "privilege." That is all I
9    am asking.
10           JUDGE GONZALEZ: But he is going to
11   have to define in the first place what
12   "capability" is and what "privilege" is.
13           MR. PEREZ: I am not going to ask
14   him about privilege. I am just going to ask
15   him about capability.
16           JUDGE GONZALEZ: Where does the
17   word "privilege" come from?
18           MR. PEREZ: Your Honor, it comes
19   from the statute.
20           JUDGE GONZALEZ: So how is he going
21   to answer that question without drawing a
22   legal conclusion as to what that word means?
23   If the word is used in the industry, you
24   certainly can ask him what his understanding
25   of the industry use of that word is.

1    CONFIDENTIAL - Hills- Cross - Perez
2            MR. PEREZ: Your Honor, he
3    testified repeatedly that he thought the
4    system was capable of telephonic quality
5    communication and that he thought the system
6    was capable of VOIP traffic. The question
7    that I am asking him is, which I think is a
8    fair question on cross, do you equate
9    capability with privilege? If he says no --
10           JUDGE GONZALEZ: But what is
11   "privilege"?
12           MR. PEREZ: Your Honor, I am happy
13   to argue that, if the Court wants?
14           JUDGE GONZALEZ: I am trying to
15   understand. You are asking him to equate
16   something. Where does he go to the
17   definition of "privilege"? Is that an
18   industry term?
19           MR. PEREZ: Your Honor, I am happy
20   to move on. I thought it was a relatively
21   straightforward question. If he is using
22   "capability" as a shorthand for "privilege,"
23   maybe that is a better question. They are
24   the same, but if he is using "capability" as
25   a shorthand for "privilege."

191

1    CONFIDENTIAL - Hills- Cross - Perez
2            JUDGE GONZALEZ: I am trying to get
3    to the essence of privilege. What does
4    "privilege" mean? Is it a right to do
5    something?
6            MR. PEREZ: I think it is a right
7    to do something.
8            JUDGE GONZALEZ: Then ask him in
9    the normal use or define the word
10   "privilege," and then ask if that is what he
11   means.
12           MR. PEREZ: All right.
13   Q      Do you have a common knowledge of
14   what the word "privilege" means?
15   A      Yes. I have a common knowledge of
16   it.
17   Q      What is your knowledge?
18   A      It means you pay for the privilege
19   of doing something, and whether you do it, it
20   is irrelevant.
21   Q      Having the capability, is that
22   sufficient to have the privilege?
23   A      Without capability, the privilege
24   will be meaningless.
25   Q      That is not my question. My

192

1    CONFIDENTIAL - Hills- Cross - Perez
2    question is: is having the capability
3    sufficient to have the privilege?
4            MS. GUERON: Your Honor, I object.
5    I am not sure whether it is a legal
6    conclusion or if it is somewhat of a
7    metaphysical question, but I don't really see
8    that this is what Dr. Hills is here to
9    testify about.
10           JUDGE GONZALEZ: Mr. Perez, I think
11   it is just a lot simpler if you just focus on
12   what does "capability" mean to the witness.
13   Q      Dr. Hills, what does "capability"
14   mean to you?
15   A      "Capability" means that the service
16   you have has certain technical capabilities
17   to support certain types of communications.
18   Q      Regardless of whether you have the
19   right to use that type of communication or
20   not?
21   A      It is discoupled from the right.
22   It is the capability.
23   Q      Now, you are not saying that in
24   connection with the services that it
25   purchased from the LEC, MCI was actually

CONFIDENTIAL - Hills- Cross - Perez

1  purchasing PRIs?
2
3      A    That is precisely what I am saying,
4  based on the contracts.
5      Q    Was MCI also purchasing space?
6      A    In the contracts it said that the
7  vendor will provide the space for the
8  equipment.
9      Q    So is it your opinion that MCI was
10  purchasing space?
11      A    The service would require space to
12  provide it and that was built into the price.
13      Q    Was MCI purchasing a service or was
14  it purchasing space?
15      A    I don't see the distinction.
16      Q    Was MCI purchasing power?
17      A    To provide the service you needed
18  power, yes.
19      Q    So was MCI purchasing power?
20      A    The cost of the power would have
21  been part of the calculations the vendor came
22  to when determining the price.
23      Q    How do you know that?
24      A    Because they want to make a profit.
25      Q    But were you involved in the

---

CONFIDENTIAL - Hills- Cross - Perez

1  negotiations to know that that was one of the
2  things that they considered?
3
4      A    Oh, no.  I am just using common
5  sense.
6      Q    Now, as far as you are concerned,
7  it doesn't matter whether MCI could or could
8  not make a call for them to have the
9  capability of voice quality communication;
10  that is correct?
11      A    That is correct.
12      Q    It doesn't matter what the status
13  of the equipment was for you to draw that
14  conclusion?
15      A    It does not matter.
16      Q    And it doesn't matter what comes
17  out of the egress port of the NAS for you to
18  draw that conclusion?
19      A    It does not matter.
20      Q    And it doesn't matter that MCI
21  received internet packets for you to draw
22  that conclusion?
23      A    It does not matter.
24      Q    And it doesn't matter how the COBRA
25  equipment was configured for you to draw that

---

195

CONFIDENTIAL - Hills- Cross - Perez

1  conclusion?
2
3      A    It does not matter.
4      Q    And it doesn't matter whether there
5  were any contractual limitations on the
6  ability for voice quality communications for
7  you to draw your conclusions?
8      A    It does not matter.
9      Q    So long as the theoretical
10  capability existed, it is your opinion that
11  MCI had voice quality communications with
12  substantially all persons in the public
13  telephone system?
14      A    I would agree with that statement,
15  except I would remove the word "theoretical."
16  They did have the capability.
17      Q    You are not saying that the COBRA
18  service or the COBRA service that was
19  purchased was a VOIP gateway?  You are not
20  saying that; correct?
21      A    I am not saying that.
22      Q    And it couldn't be used as a VOIP
23  gateway?
24      A    I never said that.
25      Q    So there had to have been

---

196

CONFIDENTIAL - Hills- Cross - Perez

1  significant changes in order for you to have
2  a VOIP gateway that didn't exist with COBRA;
3  is that correct?
4      MS. GUERON:  Objection.
5      JUDGE GONZALEZ:  What is your
6  objection?
7      MS. GUERON:  I didn't understand
8  the question.  For you to have a VOIP gateway
9  that did exist with COBRA?  I just didn't
10  understand it, Your Honor.
11      JUDGE GONZALEZ:  Restate the
12  question.
13      Q    I think the question was:  you
14  would have to have many changes in order to
15  have a VOIP gateway, not what you had in
16  COBRA; is that correct?
17      A    You would have to make some
18  changes, yes.
19      Q    The portions of the contracts that
20  you referred to specifically prohibited MCI
21  from using COBRA as a VOIP gateway; is that
22  correct?
23      A    No.  What the contract says was, if
24  you want to use it as a VOIP gateway, if you

198

CONFIDENTIAL - Hills- Cross - Perez

1    CONFIDENTIAL - Hills- Cross - Perez
2    want to have originating or terminating VOIP
3    calls, we need to renegotiate terms to deal
4    with that.
5        Q    Now, you don't dispute
6    Mr. Anderson's statement that what MCI
7    receives from the COBRA services is a
8    high-speed datastream?
9        A    I agree with Mr. Anderson in that
10    statement.
11        Q    You don't dispute that the
12    demarcation point between the COBRA services
13    and the Debtors is the egress port in the
14    NAS?
15        A    That is what the contract says.
16        Q    You do not dispute Mr. Anderson's
17    testimony that the COBRA components were not
18    configured in such a way to permit voice
19    quality calls?
20        A    I don't dispute his statements
21    saying it wasn't configured to the right
22    VOIP.
23        Q    I guess I am asking a little bit of
24    a different question. Was the COBRA service
25    which MCI purchased configured to provide

1    CONFIDENTIAL - Hills- Cross - Perez
2    voice quality calls?
3        A    I would agree with Mr. Anderson
4    when he says that the COBRA equipment was not
5    designed for a normal telephone user to dial
6    up and access it without a modem.
7        Q    So you agree with him that it is
8    not configured in a way to allow voice
9    quality calls?
10        A    No.  I didn't say that.
11        Q    Do you have your deposition in
12    front of you?
13        A    Yes.  My deposition, do I?
14        Q    Let me bring that up here.
15        A    Thank you.
16        Q    If you would turn to page 162 --
17        A    Okay.
18        Q    -- lines 10 through line 17.
19    Question:  Was the service configured in a
20    way that would allow voice quality calls?
21    Answer:  Was the COBRA service configured?
22    Question:  Yes.  The entire COBRA service
23    which MCI purchased.  Answer:  The components
24    within COBRA were, based on Mr. Anderson's
25    testimony, weren't configured to do that.

199

1    CONFIDENTIAL - Hills- Cross - Perez
2        Do you agree you said that?
3        A    I agree I said that.
4        Q    You don't disagree with
5    Mr. Anderson's testimony that the COBRA
6    services were not configured to permit MCI to
7    dial out calls?
8        A    I agree with Mr. Anderson there.
9        Q    In your opinion, whether the
10    Debtors could plug in a telephone or a
11    private branch exchange keyset or other
12    recognized instrument for making telephonic
13    quality calls, is irrelevant to your opinion?
14        A    My opinion is that the PRI service
15    that is purchased as part of the COBRA
16    service could support other forms of voice
17    communication such as a PBX.
18        Q    But, if it is a PBX, then it is not
19    COBRA service; correct?
20        A    Right.  I made the very simple
21    statement that the PRI as part of it could be
22    plugged into a PBX.
23        Q    But if you plugged a PRI into a
24    PBX, would MCI be purchasing COBRA services?
25        A    No.

200

1    CONFIDENTIAL - Hills- Cross - Perez
2        Q    So let me just go back to the
3    question I asked.  In your opinion, whether
4    or not the Debtors can plug in a telephone,
5    or a private branch exchange, a keyset, or
6    other recognized instrument for making
7    telephonic quality calls, is irrelevant to
8    your opinion?
9        A    To which opinion?
10        Q    To the opinion that COBRA provides
11    telephonic quality communications?
12        A    My opinion is that COBRA relies by
13    its very essence on telephonic quality
14    communication to operate.
15        MR. PEREZ:  I move to strike as
16    non-responsive.
17        Q    But just one last time:  in your
18    opinion, whether or not the Debtors can plug
19    in a telephone, a private branch exchange, a
20    keyset or other recognized instrument for
21    making phone calls into the COBRA service is
22    irrelevant for your opinion?
23        A    It is my opinion that the ability
24    for them to do that is merely illustrative of
25    the fact that the PRI provides telephonic

```
 1    CONFIDENTIAL - Hills- Cross - Perez
 2    quality communication.
 3         Q    So are you saying that it is
 4    irrelevant?
 5         A    It is one additional argument that
 6    you keep asking for about are there any other
 7    arguments that say the PRI supports
 8    telephonic quality communication.
 9         Q    You don't believe that the COBRA
10    services were configured to dial out calls,
11    do you?
12         A    Based on the information supplied
13    to me by Mr. Anderson, I don't believe that.
14         JUDGE GONZALEZ:  You do not or you
15    do?
16         THE WITNESS:  I do not believe they
17    can make outgoing calls.
18         Q    You don't have any opinion as to
19    whether the COBRA services could be
20    reconfigured; is that right?
21         A    Based on the information provided,
22    there was a list of things that would have to
23    be done in order to reconfigure it.  So the
24    answer is, yes, it could be, but it wasn't
25    deemed economic or desirable to do so.
```

```
 1    CONFIDENTIAL - Hills- Cross - Perez
 2         Q    At least at the time I took your
 3    deposition, you didn't have any opinion on
 4    that issue on whether it could be
 5    reconfigured; correct?
 6         A    Based on the documents provided to
 7    me, they clearly said it could.  They clearly
 8    listed what would have to be done to
 9    reconfigure it.  So, therefore, one assumes
10    that it could be reconfigured, but there were
11    technical and economic reasons not to do so.
12         Q    If you wanted to convert COBRA to a
13    VOIP gateway, you would need other equipment;
14    correct?
15         A    At a minimum you would need a
16    different sets of cards.
17         Q    You would also need different
18    software?
19         A    The different set of cards would
20    require different support software; correct.
21         Q    In the information that you
22    reviewed, there was no indication that that
23    equipment existed within the COBRA services
24    that were being provided?
25         A    Based upon information suppled to
```

```
 1    CONFIDENTIAL - Hills- Cross - Perez
 2    me, no, there was none of that equipment or
 3    software in the existing equipment; correct.
 4         Q    Now, I believe I asked you that the
 5    basis for you to believe that the COBRA
 6    system was VOIP capable was the language in
 7    the various contracts?
 8         A    The reason why I thought that the
 9    COBRA equipment was VOIP capable was, one, it
10    is technically feasible, and secondly, it was
11    explicitly mentioned in the contracts as if
12    it were to be done, it would require
13    additional contractual terms.
14         Q    But basically you were drawing the
15    inference that it was capable based on what
16    was in the contract?
17         A    I was drawing the inference
18    primarily from the technical specifications
19    of the cards that could be used.
20         Q    Let me see if I understand your
21    testimony correctly.  Is it your testimony
22    that once a dial-up user puts this
23    information in, it goes all the way to the
24    ISP for authentication?  Is that your
25    testimony?
```

```
 1    CONFIDENTIAL - Hills- Cross - Perez
 2         A    When the dial-up user makes the
 3    initial telephone call, they receive a screen
 4    from the COBRA equipment asking for a
 5    password, and then that user name and
 6    password is sent to some other system for
 7    validation.
 8         Q    Let me ask you a question:  the
 9    various technologies that you were talking
10    about in which you would have adequate voice
11    quality at lower speeds, were those available
12    in 2002, do you know?
13         A    Most of those technologies were
14    based on standards that were adopted in the
15    mid to late 1990s, yes.
16         Q    But were they commercially
17    available in 2002?
18         A    I don't know the exact dates.
19         Q    Are you familiar with G.726?
20         A    Yes.
21         Q    What is that?
22         A    That is one of the protocols.
23         Q    Do you know if that is commercially
24    available today?
25         A    Yes.
```