

*Additional Verizon Obligations*

Verizon shall adjust the billing for all Internet dial-related backhaul circuits purchased by WCOM or any of its affiliates from Verizon to the most cost-effective WCOM rates (to be determined under separate negotiation by Verizon and WCOM) within forty-five (45) calendar days after the effective date of the tariff.

Verizon shall provide WCOM with 24x7x365 NOC-to-NOC technical support. Verizon shall proactively maintain all NAS Equipment hardware (along with all related equipment on Verizon's side of the demarcation of the CyberPOP service) used in connection with the CyberPOP service. Verizon shall assist WCOM in the resolution of any NAS Equipment failure in accordance with the reasonable instructions of WCOM's NOC.

Verizon shall have no responsibility for the authentication of End Users accessing CyberPOP Ports.

CyberPOP rotaries shall be equipped with forward circular sequential hunting, super-group features on DMS switches, circuit order sequencing in racks and chassis, and new circuit IDs for PRI circuits converted to CyberPOP service. Verizon and WorldCom shall mutually consult and agree on the following technical issues: (a) appropriate use of FAS or NFAS circuit configurations, and (b) custom or national messaging.

*Additional WCOM Obligations*

WCOM shall be exclusively responsible for controlling all End User access to CyberPOP Ports.

WCOM shall be exclusively responsible for the purchase, installation, and management of all software upgrades for the NAS Equipment.

*Order Process for Additional Ports*

From time to time, WCOM shall transmit requests for additional CyberPOP Ports with desired FOC dates and CFA dates to Verizon ("Service Request"). Within seven (7) calendar days after receipt of a Service Request, Verizon shall respond in writing by (a) acknowledging the Service Request and the associated FOC/CFA dates as supportable, (b) acknowledging the Service Request as supportable, but proposing alternative FOC/CFA dates, or (c) rejecting the Service Request as unsupportable (each, a "Verizon Response").

- If Verizon responds that the Service Request and WCOM-proposed FOC/CFA dates are supportable, WCOM may (in its sole discretion and within seven (7) calendar days after receipt of such Verizon Response) issue a firm order to Verizon for such ports with the agreed-upon FOC/CFA dates. Verizon will then acknowledge receipt of the firm order and begin the installation process.

- If Verizon proposes alternative FOC/CFA dates, WCOM may (in its sole discretion and within seven (7) calendar days after receipt of such Verizon Response) issue a firm order to Verizon for such ports with the alternative FOC/CFA dates. Verizon will then acknowledge receipt of the firm order and begin the installation process.

- If WCOM elects not to issue a firm order within seven (7) calendar days after receipt of a Verizon Response acknowledging that the Service Request is supportable, then such Service Request and associated Verizon Response shall be deemed to have expired.

*Additional Processes for Moved Ports*

Before requesting a move, WCOM and Verizon shall conduct a joint planning meeting. As a result of such meeting, WCOM shall place a firm move order ("Move Order") with Verizon specifying the location from and the one or more location(s) to which port capacity is to be moved. Unless the parties agree otherwise in the Move Order, both

DOJ - 00003
CONFIDENTIAL

S 1717

parties shall use all commercially reasonable efforts to place such moved ports back in service within ninety (90) calendar days.

A move shall involve the installation of NAS Equipment in the one or more location(s) to which the port capacity is being moved, and the deactivation and removal of the NAS Equipment at the location from which the port capacity is being removed.

In concurrence with the planning sessions and move order, and at WCOM and Verizon's mutual election, either of the following methods may be used to implement a moved port:

- WCOM sells to Verizon the necessary NAS Equipment for the new location(s) at the prices specified herein, which will be shipped by WCOM at WCOM's expense to the new location(s) (or a Verizon-specified staging facility). Such NAS Equipment for the new location(s) may be new equipment or equipment that has been previously used elsewhere in the WCOM Network, and may be a different configuration or NAS type from the NAS Equipment being disconnected at the old location (provided that the number of in service CyberPOP Ports being disconnected and reconnected is the same). Upon the disconnect of the moved ports at the old location, the associated NAS Equipment at such old location shall be re-purchased by WCOM for the same prices paid by Verizon for the equipment at the new location(s), and the NAS Equipment from the old location will be shipped by Verizon to WCOM at Verizon's expense.

- Verizon disconnects the NAS Equipment at the old location and redeploys the same NAS Equipment to the new location(s).

As part of a move, WCOM may reallocate moved ports among the various WCOM dial networks (DAN, ANS and GridNet/CompuServe).

*Migration of Legacy Capacity*

During the first thirty (30) calendar days after the tariff effective date, the parties shall use all commercially reasonable efforts to develop a mutually acceptable engineering solution (including an end-office hubbing architecture using DS3 ingress circuits, where warranted) for migrating ports on the WCOM GridNet network to CyberPOP services, consistent with Verizon NEBS requirements and network architecture.

In addition, certain WCOM-designated existing digital access services ("PRI Services") provided by Verizon to WCOM for dial-up access to the WCOM Network shall be migrated to this CyberPOP tariff within six (6) months of the tariff effective date. As part of this migration, WCOM may reallocate migrated ports among the various WCOM dial networks. Verizon agrees that, to the fullest extent possible, all existing telephone numbers shall be preserved in the migration to the CyberPOP services; provided that Verizon shall provide WCOM with at least thirty (30) days prior written notice in the event that Verizon is unable to preserve an existing telephone number in connection with such migration to the CyberPOP services.

The 36-month port term and the tariff rates for additional ports shall become effective for all PRI Services migrated to the CyberPOP service, following joint testing and acceptance by the parties. Verizon agrees that any termination charges associated with Verizon's services that result from the migration of the PRI Services to the CyberPOP services do not apply.

In the event that the parties elect (due to technical/engineering reasons) not to migrate certain PRI Services to CyberPOP service, the Minimum Port Commitment specified in the tariff will be reduced by the B-channel equivalent port count of the unmigrated PRI circuits. The 36-month port term will apply and the local tariffed rates will be billed.

On the first day of the seventh month following the effective date of the tariff, the tariff rates for additional ports shall become effective for all PRI services that have not been converted over to CyberPOP. WCOM will file a claim

3

DOJ - 00004
CONFIDENTIAL

with Verizon each quarter for the difference in amounts owed for the billed PRI versus CyberPOP, and Verizon shall credit such claim against amounts otherwise owed by WCOM for the CyberPOP service.

*Designation of Existing Ports*

Within thirty (30) calendar days after the effective date of this tariff, WCOM will designate in writing which of the currently installed ports in excess of the 575,000 base ports shall be treated as additional ports (so that the number of base ports shall be equal to 575,000), and Verizon accordingly will adjust the billing for such ports to the additional port rate. WCOM shall reimburse Verizon for the purchase price less depreciation of the NAS Equipment (less $1 per major part or component) for such designated additional ports. Upon the termination or expiration of such designated additional ports, WCOM shall have the right to repurchase the NAS Equipment associated with such designated additional ports, as further provided below.

*Service Failure Response Times*

Verizon will provide hardware support and maintenance, and deployment of resources necessary to fix/replace hardware failures (once WCOM has contacted Verizon and requested assistance). Should an alarm occur, WCOM will be responsible for contacting Verizon's NOC. WCOM is responsible for determining the source/cause of the problem and resolving the problem. WCOM may or may not choose to take action on an alarm. If the alarm involves a hardware failure, WCOM will contact Verizon's NOC, provide specific information on the location and type of activity to occur (example: replace module XXX in device YYY located at ZZZ location). Verizon's NOC then will deploy the appropriate resources to address the hardware problem, and Verizon shall diligently respond to and repair such failure of the CyberPOP services, including without limitation the NAS Equipment, based upon the grade of the failure, in accordance with the tables set forth below.

| Grade | Severity / Problem Level | Mean Time to Respond | Mean Time to Repair |
|-------|--------------------------|----------------------|---------------------|
| 5 | **Critical outage** (entire hub down; dial rotary isolation; reseller link down; >10% of normal dial traffic disrupted; non-redundant device failure). *Examples:* PRI outage between the telephone switch and the NAS Equipment; >30% of modems at any one CO are not responding; single point of failure piece of hardware outputting major alarms. | 15 minutes | 2 hours |
| 4 | **Major outage** (multiple users/nodes effected; <10% of dial traffic disrupted; severe service degradation). *Example:* <30% of modems at any one CO are not responding. | 1 hour | 4 hours |
| 3 | **Minor outage** (single user outage; capacity degradation; redundant device down; management access outage). *Examples:* No response from maintenance ports on a NAS server; single point of failure piece of hardware outputting minor alarms | 2 hours | Next business day |
| 2 | **Important event** (condition being monitored; resolved awaiting parts). *Examples:* Non-service affecting problem on a NAS server; request for call back on non-service affecting issues. | 4 hours | Second business day |
| 1 | **Informational event** (requests for documentation). | Next business day | Second business day |

DOJ - 00005
CONFIDENTIAL

S 1719

*Escalation Matrix*

Verizon agrees to provide WCOM with an operations and senior management escalation matrix, and to update and maintain such matrix on a current basis for the term of this tariff. Such matrix shall include email addresses and telephone access numbers for operations and senior management points of contact who are available and authorized to address and resolve Verizon performance issues on a 24x7x365 basis.

*Service Performance Reports*

The below-listed information (which may be amended from time to time by written agreement of the parties) shall be recorded by Verizon for use by WCOM in tracking maintenance and other Verizon performance issues. Verizon shall furnish to WCOM a copy of the trouble log for the CyberPOP services at the quarterly review. Verizon shall maintain one entry per trouble ticket opened.

- WCOM Ticket #
- Verizon Ticket #
- Verizon Opened Date & Time
- Name and telephone # of the person initiating the trouble report
- Name and telephone # of the person receiving the trouble report
- Nature of the reported trouble
- Diagnosis of trouble; reason for outage (circuit, equipment, other, or no RFO)
- Name and telephone # of the person reporting trouble clearance
- Name and telephone # of the person receiving trouble clearance
- Verizon Restored Date & Time
- Total Time to Repair
- Total Time of Outage
- Verizon Closed Date & Time

*Circuit Report Data Base*

Verizon shall develop systems to track and share data (at a circuit level) relating to all CyberPOP Ports provided under this arrangement. Such systems shall include the ability to record, track, and report, at a minimum, the following information:

- circuit ID number
- CLLI code
- number of in service (or in the process of being moved) ports on the circuit
- NAS Equipment type
- WCOM dial network with which circuit is associated (DAN, GridNet, ANS, etc.)
- date of installation/acceptance
- new tariff pricing effective date (for ports installed prior to tariff effective date)
- applicable port rate
- number of months elapsed during which port has been billing under new tariff rates
- number of months that billing is in suspension during a move

*Fees and Surcharges*

As stated in the tariff, all applicable fees and surcharges (other than fees and surcharges that are imposed by the Federal Communications Commission or other government agency on the CyberPOP service subsequent to the effective date of this tariff) are included in the rates for base ports and additional ports. Neither Verizon nor WorldCom are aware of any pending or proposed fees or surcharges that would apply to the CyberPOP service.

DOJ - 00006
CONFIDENTIAL

S 1720

If (a) there is a fee or surcharge that is imposed or authorized by the Federal Communications Commission or other government agency on the CyberPOP service subsequent to the effective date of the CyberPOP tariff, (b) Verizon attempts to pass that fee or surcharge on to WorldCom, and (c) such fee or surcharge has the effect of increasing the MRC by 5% or more, then WorldCom shall have the right to buy back affected CyberPOP ports at the rates specified in the tariff without such buy back activities being subject to, or counting towards, any annual limits that would otherwise be applicable.

*Taxes*

As stated in the tariff, the rates for base ports and additional ports do not include applicable taxes. With respect to any purchase of service under this arrangement, if any federal, state or local government tax excluding any tax levied on property or income (a "Tax") is required or permitted by applicable law, ordinance or tariff to be collected from WorldCom by Verizon, then (i) Verizon will bill, as a separately stated item, WorldCom for such Tax, (ii) WorldCom will timely remit such Tax to Verizon, and (iii) Verizon will remit such collected Tax to the applicable governmental authority as required by law. Verizon will also promptly review any new tax if requested by WorldCom, and will cooperatively seek relief, if appropriate. If, as specified in more detail below, WorldCom submits to Verizon an exemption certificate or other appropriate documentation, then Verizon shall not bill WorldCom for such Tax.

If Verizon does not collect a Tax because WorldCom asserts that it is not responsible for the Tax, or is otherwise excepted from the obligation which is later determined to be wrong then, as between Verizon and WorldCom, WorldCom will be liable for such uncollected Tax and any interest due and/or penalty assessed on the uncollected Tax by the applicable taxing authority or governmental entity.

If either Party is audited by a taxing authority or other governmental entity the other Party agrees to reasonably cooperate with the Party being audited in order to respond to any audit inquires in a proper and timely manner so that the audit and/or any resulting controversy may be resolved expeditiously.

If applicable law does exclude or exempt a purchase of services under this arrangement from a Tax, and if such applicable law also provides an exemption procedure, such as an exemption certificate requirement, then, if WorldCom complies with such procedure, Verizon will not bill or collect such Tax during the effective period of the exemption.

If applicable law does not exclude or exempt a purchase of services under this Agreement from a Tax, and does not also provide an exemption procedure, then Verizon will not bill or collect such Tax if WorldCom (i) furnishes Verizon with a letter signed by an officer of WorldCom claiming an exemption and identifying the applicable law which allows such exemption, and (ii) supplies Verizon with an indemnification agreement, reasonably acceptable to Verizon, which holds Verizon harmless on an after-tax basis with respect to forbearing to collect such Tax.

With respect to any Tax or Tax controversy, WorldCom will be entitled to contest, pursuant to applicable law, and at its own expense, any Tax that it is ultimately obligated to pay. WorldCom will be entitled to the benefit of any refund or recovery resulting from such a contest.

*Number Portability*

In the event WCOM elects to move Internet dial-up traffic utilizing the CyberPOP service to WCOM's OnNet facilities or to those of its affiliates (e.g., following the expiration of a port term or after a buy-back, or in connection with a port move), Verizon shall transfer (i.e., LNP) the telephone number to WCOM related to such traffic in accordance with, at WCOM's option, (a) the terms of the relevant interconnection agreement between Verizon and the appropriate WCOM entity, or (b) the applicable Verizon tariff covering such activities. This provision regarding number portability applies only with respect to traditional local telephone numbers (i.e., non 555 or 500 numbers). Any 555 numbers acquired by WCOM from the North American Numbering Plan Administration and provided to

6

DOJ - 00007
CONFIDENTIAL

S 1721

Verizon for use in connection with the SNR feature of the CyberPOP service shall also be transferred back to WorldCom upon request.

*Simplified Billing and Dispute Resolution Procedures for CyberPOP Services*

The parties agree to develop a simplified billing procedure (based on the parties' mutual agreement of the number of active base and additional ports as of the last day of a given month), as well as a prompt method for resolving billing disputes and such other reasonable procedures as the parties may hereafter jointly establish.

*NAS Equipment Used for Additional CyberPOP Ports*

Verizon's purchases of NAS Equipment from WCOM for use in connection with the additional CyberPOP ports specified in the tariff shall be governed by the terms of the Amended and Restated RAS Equipment Resale Agreement entered into between Telesector Resources Group, Inc. and MCI WORLDCOM Network Services, Inc., contemporaneously with this letter ("Equipment Agreement"), the form of which is attached as Exhibit 3. In the event of a conflict between the terms of the Equipment Agreement and the terms of this letter, the terms of this letter shall control.

In addition to the Lucent TNT equipment specified in the Equipment Agreement, WCOM shall offer to sell to Verizon various NAS Equipment configurations and platforms, including without limitation the 3Com Total Control platform for use with the WCOM ANS and GridNet networks. The applicable NAS Equipment configuration for additional ports may be updated by WCOM from time to time. NAS Equipment must be compatible with Verizon's equipment and compliant with published Verizon NEBS standards; provided that the 3Com Total Control and the Lucent TNT platform are deemed to be acceptable to Verizon.

NAS Equipment for additional ports shall be sold to Verizon for $1.00 per major part or component. In no event is Verizon authorized to purchase NAS Equipment at such reduced rates for any purpose other than to provide an additional CyberPOP port to WCOM in connection with the tariff.

Upon the expiration, termination, or cancellation of additional ports as provided in this arrangement, WCOM shall have the right to repurchase the NAS Equipment associated with such additional ports for $0.50 per major part or component. This $0.50 fee shall not apply where WCOM is exercising its right to buy-back ports and the associated NAS Equipment before the expiration or termination of the port term in exchange for the payment of the non-recurring charges specified in the tariff.

With respect to existing CyberPOP NAS Equipment purchased by Verizon or its affiliates from WCOM or its affiliates between October 1, 2000 and the effective date of the tariff, and which is no longer required by Verizon to provide Internet dial-up services to WCOM or any of its affiliates as a result of this arrangement, WCOM shall repurchase such NAS Equipment from Verizon at the purchase price less depreciation paid by Verizon. Verizon shall ship such NAS Equipment to WCOM at WCOM's expense.

WCOM may sell Verizon new NAS Equipment or NAS equipment previously-used in the WCOM Network to meet the NAS Equipment requirements related to new additional ports, migrated PRI services, and existing port capacity moves. NAS Equipment must be compatible with Verizon's equipment and compliant with published Verizon NEBS standards.

Embedded base NAS Equipment upgrades will be made at Verizon's discretion and will be on a time and material basis.

*Notices*

Any notice or demand required under this letter, the tariff, or by law to be made in writing shall be sent by: (i) facsimile; (ii) overnight courier; or (iii) certified or registered mail, with return receipt requested. Such written

7

DOJ - 00008
CONFIDENTIAL

notice shall be deemed delivered upon record of: (i) transmission receipt; (ii) one (1) day after shipment via overnight courier; or (iii) three (3) days after mailing by certified or registered mail. Notice addresses specified herein may be updated from time to time by a party upon the delivery of notice to the other party in accordance with this section.

Notices to Verizon shall be sent to the following three (3) addresses:

| | |
|---|---|
| Verizon<br>Attn: Asst. General Counsel<br>P.O. Box 152092<br>Mail Code HQE03H52<br>Irving, TX 75015<br>Fax: (972) 718-1251 | Verizon<br>Attn: Director ISP Business Sales & Marketing<br>11750 Beltsville Drive<br>2nd floor Suite 200<br>Beltsville, MD 20705<br>Fax (301) 595-6518 |

Verizon
Attn: Director WCOM National Acct Mgmt
P.O. Box 152092
Mail Code HQE02N05
Irving, TX 75015
Fax: (972 718-5834

Notices to WorldCom shall be sent to the following two (2) addresses:

| | |
|---|---|
| MCI WORLDCOM Network Services, Inc.<br>Attn: Sr. Director, Global Capacity Acquisition<br>22001 Loudoun County Parkway<br>Mailstop: 3060-662<br>Ashburn, Virginia 20147<br>Fax: (703) 645-4160 | MCI WORLDCOM Network Services, Inc.<br>Attn: Chief Counsel, Network Legal Team<br>22001 Loudoun County Parkway<br>Ashburn, Virginia 20147<br>Fax: (703) 886-5807 |

*Other Matters*

The terms of this letter and the Settlement Agreement are confidential and proprietary to Verizon and WorldCom and shall be treated as confidential Information in accordance with the terms of the Mutual Nondisclosure Agreement between UUNET Technologies, Inc. and Bell Atlantic Network Service, Inc., effective as of September 7, 1999, which terms shall survive the expiration or earlier termination of these arrangements for CyberPOP service by two (2) years.

The parties understand that the CyberPOP service tariff is subject to filing with the Federal Communications Commission, and may also be subject to the intervention of other entities as well as to judicial review. In the event that this process materially and adversely changes the rights, obligations or risks of Verizon or WorldCom, either party may terminate this letter agreement and the related provision of and subscription to CyberPOP service, without liability to the other.

Verizon and WorldCom agree that this letter, the CyberPOP tariff, the Settlement Agreement, and the Equipment Agreement represent the complete agreement between the parties with respect to this subject, and in the event that Verizon enforces or attempts to enforce any tariff provision that is materially different from the provisions of this arrangement, then WCOM shall be allowed to terminate the ports affected by such enforcement or attempted enforcement without liability for any early termination or other charges, and, to the extent that the ports being so terminated are additional ports, repurchase the NAS Equipment associated with those additional ports as specified above.

8

DOJ - 00009
CONFIDENTIAL

S 1723

The agreements set out in this letter shall become effective only when signed by authorized representatives of both parties.

The Verizon Operating Telephone Companies

_(signature)_

Virginia P. Ruesterholz
Senior Vice President
Wholesale Services

Date: 6/13/01

MCI WORLDCOM Network Services, Inc.

_(signature)_

Louis R. Prestwood
Senior Vice President
Network Financial Management

Date: 6/15/01

9

DOJ - 00010
CONFIDENTIAL

S 1724

**EXHIBIT 1**

Verizon Operating Telephone Companies

Contel of Minnesota, Inc. d/b/a Verizon Minnesota
Contel of the South, Inc. d/b/a Verizon Mid-States
GTE Alaska Incorporated d/b/a Verizon Alaska
GTE Arkansas Incorporated d/b/a Verizon Arkansas
GTE Midwest Incorporated d/b/a Verizon Midwest
GTE Southwest Incorporated d/b/a Verizon Southwest
Verizon California Inc.
Verizon Delaware Inc.
Verizon Florida Inc.
Verizon Hawaii Inc.
Verizon Maryland Inc.
Verizon New England Inc.
Verizon New Jersey Inc.
Verizon New York Inc.
Verizon North Inc.
Verizon Northwest Inc.
Verizon Pennsylvania Inc.
Verizon South Inc.
Verizon Virginia Inc.
Verizon Washington, DC Inc.
Verizon West Virginia Inc.
Verizon West Coast Inc.

10

DOJ - 00011
CONFIDENTIAL

S 1725

**EXHIBIT 2**

**SPECIALIZED SERVICE ARRANGEMENT**

MCI WORLDCOM Network Services, Inc.

**Service Description**

Verizon will provide MCI WORLDCOM Network Services, Inc. (WCOM) with CyberPOP™ TCP/IP data aggregation service. CyberPOP service is a modem aggregation product that provides dial-up port based remote access services. CyberPOP service provides integrated, remote analog & digital access to WCOM that may be utilized by WCOM's end users and the end users of WCOM's affiliates, clients, and resellers (collectively, End Users) to connect to WCOM's Internet network (WCOM Network) via modems referred to as network access servers (NAS) deployed in central offices operated by Verizon (Verizon COs). Verizon shall connect each NAS used in connection with the CyberPOP service to the Public Switched Telephone Network (PSTN) via ISDN primary rate interface, or other mutually-agreed comparable telecommunications facilities (collectively, PRI), and shall arrange for the dedicated assignment (or preservation, to the fullest extent possible) of unique telephone numbers for (or in use by) WCOM and End Users.

CyberPOP service includes all NAS equipment, telecommunications services and related facilities (including with out limitation active PRI lines, at least 40 lead trunk numbers (LTN) (with the exception of Single Number Routing ("SNR")), space, power, and other utilities), and ancillary support and maintenance required to connect a call that has been dialed into the PSTN (such call dialing a designated telephone number) to an active DS0 channel-equivalent port (i.e., PRI B-channel) on the corresponding NAS (CyberPOP Port). The demarcation of the CyberPOP service between Verizon and WCOM shall be at the connection of the NAS egress port at Verizon's central office.

CyberPOP service will provide local points of presence for WCOM within Verizon's franchised service areas. WCOM will not own or lease any CyberPOP service equipment, but will have exclusive operational control (i.e., logical access) of all NAS and related aggregation and out-of-band management equipment (collectively, NAS Equipment) used in connection with the CyberPOP service. This product will be configured via WCOM's specifications to allow monitoring and management of the NAS Equipment. Verizon's local network will provide the service from the local dial access to the delivery of TCP/IP and other protocols via the CyberPOP data aggregation equipment located at the Verizon Central Office. WCOM is responsible for obtaining facilities from Verizon's Central Office to the WCOM Point of Presence (POP).

CyberPOP service will utilize TCP/IP and other protocols based on IETF (Internet Engineering Task Force) standards. IETF is the engineering arm of the IAB (Internet Architecture Board). IETF defines protocol standards for Internet services. This tariff supports, at a minimum, the following standards:

| | |
|---|---|
| IP | Internet Protocol |
| TCP | Transmission Control Protocol |
| SLIP | Serial Line IP |
| CSLIP | Compressed Serial Line IP |
| PPP | Point to Point Protocol |
| HSSI | High Speed Serial Interface |

WCOM has the option of utilizing, as a feature of CyberPOP service, SNR in lieu of local telephone numbers, which are included as part of CyberPOP service, where technically feasible. This option enables End Users with Verizon local phone service in a defined geographic area (i.e., a LATA) to have access to WCOM via one specialized telephone number. The End User can initiate a call within the service area to WCOM and this call is treated as a local call by Verizon for the connection and duration of the call. This option is part of the WCOM Specialized Arrangement and is included where available in the rates and charges for CyberPOP service at no additional charge. The following two alternatives are offered to WCOM under this option:

1

DOJ - 00012
CONFIDENTIAL

1.      Verizon will assign a Single Number Routing telephone number from a 500 NPA; or

2.      WCOM can provide Verizon with its own 555-XXXX telephone number acquired from the North American Numbering Plan Administration.

CyberPOP data aggregation services are available where facilities and conditions permit.

**Obligations of Verizon**

Special Access Lines and Special Transport beyond the CyberPOP service are not included in the CyberPOP service port price and are available elsewhere in this FCC tariff.

Verizon is responsible to provide WCOM with a firm order confirmation notice, which will initiate the order process.

Verizon will notify WCOM of the completion and readiness of the requested CyberPOP site.

NAS Equipment to provide CyberPOP service requires the review and approval of Verizon.  WCOM may propose alternative NAS Equipment platforms from time to time for Verizon's review and approval.  NAS Equipment upgrades to the existing port base will be made at the discretion of Verizon.  WCOM requests regarding the configuration and design of the NAS Equipment will be evaluated for network compliance and compatibility by Verizon and employed where feasible. WCOM may request that NAS Equipment or other equipment upgrades outside the scope of this arrangement be implemented and charged to WCOM on a time and materials basis.

Verizon will participate with WCOM in joint testing and turn-up activities for new and moved port activations, including, at a minimum, login and RADIUS authentication to the WCOM Network via the ports being tested.

Verizon shall perform all hardware maintenance and remote hands & eyes support for the NAS Equipment, in accordance with mutually agreed-upon support procedures.

Verizon will provide WCOM  with seventy-two (72) hours notice in advance of scheduled Wire Center or Central Office maintenance that could adversely impact CyberPOP services.

**Obligations of WCOM**

WCOM is responsible for obtaining all appropriate IP addresses.

WCOM is responsible to obtain the facilities required for the dedicated transport of their traffic from Verizon's Central Office to WCOM's point(s) of presence.

WCOM's NAS Equipment must be compatible with Verizon's equipment.

WCOM must maintain NAS Equipment software configuration, software management and authentication control.

WCOM shall furnish information as may be required by Verizon to design and maintain the service and to ensure that the service arrangement is in compliance with the regulations contained herein.

WCOM's NAS Equipment must be in compliance with FCC rules and regulations.

WCOM's specified NAS Equipment must be in compliance with published Verizon NEBS standards.

WCOM will participate with Verizon in joint testing and turn-up activities for new and moved port activations, including, at a minimum, login and RADIUS authentication to the WCOM Network via the ports being tested.

2

DOJ - 00013
CONFIDENTIAL

S 1727

WCOM must notify Verizon of any firm order cancellations prior to Verizon initiating any service installation activities. Firm order cancellations received after installation has proceeded (but before joint acceptance) will incur charges for time and materials expended to-date.

WCOM, when requesting Single Number Routing, is responsible for purchasing a quantity of ports to accommodate originating dial-up traffic offered to a selected CyberPOP hub for aggregating and routing to WCOM's designated POP. Verizon shall ensure adequate network trunking to support call completion to WCOM SNR CyberPOP hubs and shall use all commercially reasonable efforts to correct any identified lack of network capacity, consistent with the then-current locations and port quantities of WCOM's SNR CyberPOP hubs . Any NAS Equipment moves by WCOM from non-SNR hubs to SNR hubs, or between SNR hubs if Verizon concurs it is necessary, shall not count against the 5% quarterly moves limitation set forth below. Traffic generated by virtue of SNR under this arrangement will be routed exclusively to Verizon-provided CyberPOP locations.

WCOM agrees to provide Verizon with at least ten (10) business days prior written notice before deploying new software on the NAS Equipment that would implement any new major features or functionalities (i.e., left-of-decimal software upgrade) on the NAS Equipment.

### Enrollment Period

CyberPOP modem based data aggregation service is provided to WCOM under this tariff with a three (3) year commitment period. All 575,000 base ports are committed for thirty-six (36) months from the tariff effective date. Each additional port is committed for thirty-six (36) months from the port install date. For base ports, billing will commence at the new rates on the tariff effective date. For new service implementations, billing will commence on the date that customer acceptance has been completed. Customer acceptance is defined as verification from WCOM that the new service is operational following execution of joint testing and turn-up activities.

This tariff transitions WCOM (previously referenced as UUNET) from previous FCC tariff arrangements with Verizon for data aggregation services. This tariff supersedes any previously tariffed terms and conditions agreed upon by WCOM, or any of its affiliates, and Verizon for CyberPOP service (including comparable modem based data aggregation services purchased from Verizon). Previous terms and commitments beyond the new three (3) year enrollment period are terminated as a result of this tariff agreement without application of any early termination fees, penalties or other charges.

### Rate Application

CyberPOP service rates will be applied on a monthly basis for all dial-up ports in service nationwide. Nationwide is defined as the aggregate of all dial-up ports for all of the Verizon Operating Companies, which includes the former Bell Atlantic, Nynex, GTE and Contel footprints. There are separate rates identified for existing base ports and additional ports as outlined below.

### Monthly Recurring Charges (MRCs)

| Port Type | Rate (MRC) Per Port |
|---|---|
| Base (1-575,000) | $29.00 |
| Additional (575,001 +) | $17.50 |

Rates include Single Number Routing, where available, and all applicable engineering, furnishment, installation (EF&I) service and hardware maintenance charges, and all applicable fees and surcharges (other than fees and surcharges that are imposed by the Federal Communications Commission or other government agency on the CyberPOP service subsequent to the effective date of this tariff). Rates do not include applicable taxes. Except as otherwise specified in this arrangement, no non-recurring charges shall apply with respect to the CyberPOP ports

DOJ - 00014
CONFIDENTIAL

S 1728

provided hereunder. When CyberPOP services utilize a PRI trunk group, D channels do not incur the above charges. The above rates become effective upon the effective date of the tariff.

## Commitment Levels

WCOM's Minimum Port Commitment is to maintain (in the aggregate across all Verizon franchise areas) an in service base of 575,000 ports for the entire thirty-six (36) month term period with 200,000 additional ports to be installed by month thirty-six (36) of the arrangement, less any NAS Equipment buy-backs (as described below), Sold CyberPOP Ports (as defined below), cancelled ports due to missed FOC/CFA dates (as described below), and ANS/GridNet ports that will not be converted to CyberPOP (to be determined based on mutually agreed-upon procedures). All ports purchased by WCOM ISP entities, including PRI and other equivalent telecommunications services used to provide dial-up ports for the WCOM Network that are converted to CyberPOP Ports under this tariff (such conversion shall be made without the application of any early termination fees, penalties, or other charges) shall be deemed to count towards satisfaction of this Minimum Port Commitment.

Ports that are in the process of being moved (as described below) shall continue to be counted for purposes of determining whether WCOM has met its Minimum Port Commitment.

Beginning in month 37 of this arrangement and thereafter, this Minimum Port Commitment shall no longer apply, and WCOM shall not be committed to obtain any minimum number of ports from Verizon under this tariff.

## Cancellation of Service

If CyberPOP Ports are not made ready for service by Verizon no later than fifteen (15) calendar days following the applicable FOC/CFA dates specified in the firm order, WCOM may, at anytime prior to availability of the port, cancel the CyberPOP ports covered by that firm order upon written notice to Verizon, and (a) WCOM's Minimum Port Commitment shall be reduced by an amount equal to the number of CyberPOP Ports that were the subject of the cancelled firm order, and (b) WCOM shall have the right to repurchase (at the purchase price paid by Verizon to WCOM) any NAS Equipment sold by WCOM to Verizon in connection with such cancelled firm order.

## Customer Initiated Buy-Backs

WCOM at their discretion may choose to downsize their presence at any Verizon CyberPOP location by buying back NAS Equipment that was deployed for their dedicated use. Verizon will disconnect, pack and ship the designated NAS Equipment back to WCOM. Buy-back requests will be implemented using mutually agreed-upon engineering procedures. A non-recurring charge as specified below will be billed for each port that is removed from service. There are restrictions on the quantity of ports that can be removed from service in a given timeframe.

WCOM may buy back a maximum of 14,200 ports during the first year, which begins on the effective date of this tariff. During year two (2), WCOM may buy back a maximum of 2% of their nationwide quantity of installed ports which are in service (or in the process of being moved) on the one (1) year anniversary of the tariff effective date. During year three (3), WCOM may buy back a maximum of 30% of their nationwide quantity of installed ports which are in service (or in the process of being moved) on the two (2) year anniversary of the tariff effective date.

For buy-back of ports that are in the process of being moved, the "buy back year" will be based upon the date (in relation to the 36-month enrollment period of this arrangement (as specified above)) that the port(s) was taken out of service to initiate the move.

WCOM's Minimum Port Commitment is reduced as a result of buy-back activities. The buy-back will be applied to the 575,000 base ports and the 200,000 additional ports, as applicable depending on the port types being bought back by WCOM.

DOJ - 00015
CONFIDENTIAL

S 1729

Charges for customer initiated equipment buy-backs are applied on a one-time non-recurring charge (NRC) basis for each port that is purchased.

| Port Installation Date | Rate (NRC) per Port Removed | | |
|---|---|---|---|
| | Buy-back Year (Enrollment Period) | | |
| | Year 1 | Year 2 | Year 3 |
| Prior to 1998 Installs | $375 | $250 | $100 |
| 1998 Installs | $525 | $375 | $150 |
| 1999 Installs | $570 | $435 | $285 |
| 2000 Installs | $645 | $465 | $305 |
| 2001 Installs | | $270 | $200 |
| 2002 Installs | | | $270 |

For buy-back activities, WCOM may choose between the above rate structure or pay for the remaining life of the three (3) year term at the per port monthly rate applicable to the individual port, whichever is lower.

During the first thirty (30) calendar days after the effective date of the tariff, WCOM may cancel any pending orders, or ports installed per the WCOM capacity plan, for CyberPOP service (including comparable modem based data aggregation services purchased from Verizon) provided by Verizon to WCOM or its affiliates that have not yet been installed by Verizon, for a one-time $25.00 non-recurring charge per port. Such cancellation shall not count towards the year one (1) buy-backs that otherwise might apply to such activities under the tariff.

### Customer Initiated Moves

WCOM can move (disconnect and reconnect) dial-up port capacity from one Verizon CyberPOP location to another, up to a maximum of 5% per quarter of the total ports in service at the start of each calendar quarter (January, April, July, October) ("Quarterly Move Allotment").

Following the completion of the parties' joint pre-planning and engineering work, the parties shall use all commercially reasonable efforts to place the moved ports back in service within ninety (90) calendar days, or such other reactivation time period as may be mutually agreed-upon by the parties at the time of disconnect. Move requests will be implemented using mutually agreed-upon engineering procedures, and may result in the swap-out of NAS Equipment on a port-for-port basis (at WCOM's election and expense, if any). Hardware components being moved (and swapped, if applicable) must be compatible with the hardware/software configuration at the receiving CyberPOP location. Disconnect and reconnect move orders will be processed concurrently and standard Verizon operational processes and implementation timeframes will be utilized.

For the first thirty (30) calendar days following the tariff effective date for this arrangement, WCOM may identify and execute move activities (at a flat $25 per port rate) that do not count against the 5% per quarter limitation. The joint objective is that moved ports be reinstalled and placed back in service within one hundred twenty (120) calendar days after the effective date of tariff.

Charges for moves are applied on a one-time non-recurring charge (NRC) basis for each in service port (i.e., lit B-channel passing dial-up traffic) that is moved. MRC billing for the ports will be discontinued during the move process and will be reinstated at the time the move is completed. Once reinstated, the ports will be billed for the remaining duration of the thirty-six (36) month term at the same base or additional port MRC as originally charged for the port. Out-of-service days during the move of a port will not count against satisfying the thirty-six (36) month commitment period for the port. Detailed project planning will be required by both parties in order to establish mutually agreeable timelines for port moves. Unless otherwise agreed, or unless Verizon is not able to implement service to a moved port within 105 calendar days, billing for moved ports shall commence no later than 105 calendar days from the date the port was taken out of service for the move.

DOJ - 00016
CONFIDENTIAL

S 1730

Rate (NRC) per In Service Port Moved :

| | |
|---|---|
| First 60% of Quarterly Move Allotment: | $25 per Port |
| Next 40% of Quarterly Move Allotment: | $45 per Port |

## Service Enrollment

WCOM must specify in writing to Verizon that they elect to subscribe to the CyberPOP service as set out in this tariff. The minimum CyberPOP service for a Central Office site in which NAS Equipment is located is 138 dial-up ports.

## Periodic Reviews

The parties shall meet monthly on or about the last business day of each month to reconcile port counts and determine, for billing purposes, the number of CyberPOP Ports that shall be deemed to have been active for that month.

WCOM's service commitment will be reviewed quarterly on or about the last business day of each calendar quarter (January, April, July, October) following the tariff effective date. WCOM in-service port counts, port moves, port buy-backs, port installs, and SNR activity will be identified and jointly reconciled by WCOM and Verizon staffs. Any required reporting or billing adjustments will be agreed upon and executed within thirty (30) calendar days of completion of the reconciliation process. In the event that a final reconciliation is not agreed upon by WCOM and Verizon within thirty (30) days, the issue will be escalated to executive management of both companies for resolution.

## Shortfall Charge

At the final thirty-six (36) month review, WCOM will be notified in writing as to the status of their overall commitment requirements. This notification will inform WCOM of any shortfall in the quantity level below the Minimum Port Commitment, as specified above. At the final review, if the number of CyberPOP ports is below the Minimum Port Commitment, a one-time charge of $630 per port will be assessed for dial-up port quantity shortfalls of in-service ports below the Minimum Port Commitment.

## Service Availability

The Verizon objective level of service availability will be 95% of the monthly hours of operation for each Central Office. Should the service availability actually be less than 95% of the monthly hours for the average port of a Central Office (e.g., 30 days x 24 hours x .95 = 684 hours), WCOM will receive a credit of 40% of the monthly bill for that Central Office. Force Majeure events that impact service and which Verizon could not have prevented through the use of reasonable precautions will not be subject to the above penalty calculation.

## Withdrawal of Service Areas

In the event that Verizon ceases to offer CyberPOP service in a Verizon CO in which CyberPOP service is offered at any point under this tariff, through transfer of ownership of the Verizon CO to a non-Verizon entity, Verizon shall request the new owner to continue to provide service equivalent to Verizon's CyberPOP service at such CO, and shall, if the new owner agrees to continue the service, use commercially reasonable efforts to facilitate a smooth transition of CyberPOP service to the new provider. Notwithstanding the foregoing, with respect to any CyberPOP Ports deployed in such Verizon COs ("Sold CyberPOP Ports"), WCOM shall have the right (and reasonable opportunity following written notice from Verizon) to terminate such Sold CyberPOP Ports prior to their transfer to the new provider without the application of any early termination fees or other charges, and to repurchase the

DOJ - 00017
CONFIDENTIAL

S 1731

associated NAS Equipment from Verizon at the then-current depreciated book value (with no other charges applying). Verizon shall ship such NAS Equipment to WCOM at WCOM's expense. NAS Equipment repurchases resulting from Sold CyberPOP Ports shall not count towards the annual limit of regular buy backs specified in the tariff. In addition, and regardless of whether WCOM terminates such Sold CyberPOP Ports, the Minimum Port Commitment shall be reduced by the number of such Sold CyberPOP Ports.

### Duration of Tariff and Renewal Option

This arrangement shall remain in effect so long as CyberPOP Ports are being provided under it.

At the expiration of the initial 36-month period following the effective date of this tariff, and subject to payment of any shortfall charge, the Minimum Port Commitment, adjusted as set out above, shall expire and shall no longer be binding.

During the period in which this tariff remains in effect after the expiration of the initial 36-month port term that applies to each CyberPOP Port ordered hereunder, (a) Verizon will continue with billing for such ports on a month-to-month basis at the MRC rates identified in this tariff, (b) WCOM may cancel any such ports upon sixty (60) days written notice, and (c) Verizon may cancel such ports by providing WCOM with one hundred eighty (180) calendar day notification that such ports will be terminated.

Verizon may terminate this tariff, with termination effective at any time after completion of the initial 36-months following the effective date of the tariff, by giving WCOM one hundred eighty (180) calendar day notice. Such termination shall not apply to CyberPOP Ports that are in service at the termination date, and this tariff shall remain in effect for such ports until the ports are terminated in accordance with the preceding subsection. Upon termination of this tariff, WCOM may not order any new CyberPOP Ports.

7

DOJ - 00018
CONFIDENTIAL

S 1732

ORIGINAL
*Copy*

## EXHIBIT 3

## AMENDED AND RESTATED RAS EQUIPMENT RESALE AGREEMENT

This Amended and Restated RAS Equipment Resale Agreement ("Agreement") is made by and between Telesector Resources Group, Inc. ("Customer"), with offices at 240 East 38th Street, 14th Floor, New York, New York 10016, on behalf of itself and its affiliates (including Verizon Communications ("Verizon")); and MCI WORLDCOM Network Services, Inc. ("WorldCom" or "WCOM"), with offices at 22001 Loudoun County Parkway, Ashburn, Virginia 20147, on behalf of itself and its affiliates.

This Agreement (as amended and restated) is entered into by the parties in connection with WorldCom's purchase of CyberPOP™ service from Verizon pursuant to the CyberPOP letter agreement dated May 15, 2001 ("CyberPOP Letter") and the accompanying special tariff arrangement ("Tariff"). The effective date of this Agreement ("Effective Date") shall be deemed to be the effective date of the Tariff.

The parties hereto agree as follows:

1.  **EQUIPMENT & PRICING.** WorldCom is acting only as a reseller with respect to the hardware and software offered under this Agreement ("Equipment"), which was manufactured by a third party ("Manufacturer"). Except as set forth herein, Customer and/or its affiliates' use of the Equipment is subject to the terms and conditions of the contract (to be determined) between Manufacturer and Customer and/or its affiliates of a date to be determined ("TBD Contract"). The applicable Equipment configurations and special pricing offered under this Agreement are specified in the attached Schedules A and B; provided that such special pricing shall apply only to Equipment purchased by Customer after the Effective Date in connection with WCOM's purchase of CyberPOP service (i.e., additional ports) from Verizon after the Effective Date. In no event is Customer authorized to purchase Equipment at such special pricing for any purpose other than to provide an additional CyberPOP port to WCOM in connection with the Verizon CyberPOP tariff.

    The applicable Equipment configurations specified in Schedules A and/or B for ports to be installed after the Effective Date may be updated by WCOM from time to time; provided that such Equipment must be compatible with Verizon's equipment and compliant with published Verizon NEBS standards. Notwithstanding the foregoing, the 3Com Total Control and the Lucent TNT platform are deemed to be acceptable to Verizon.

    WCOM may sell Customer new Equipment or equipment previously-used in the WCOM Network to meet the Equipment requirements related to new additional ports, migrated PRI services, and existing port capacity moves under the Tariff. In addition, WCOM may sell Customer older generations of the Equipment specified in the configurations in Schedules A and/or B. Notwithstanding the foregoing, all Equipment must be compatible with Customer's equipment and compliant with published Verizon NEBS standards.

2.  **TERM.** Customer and/or its affiliates may place orders for the Equipment pursuant to Section 3 below during the term of the Tariff. This Agreement shall automatically expire upon the expiration or termination of WCOM's right to purchase additional CyberPOP ports under the Tariff.

3.  **ORDER PROCESS.** When Customer and/or its affiliates wishes to purchase an Equipment configuration specified in Schedule A or B, Customer and/or its affiliates shall inform WorldCom in writing of such Equipment configuration and the quantities required to satisfy WorldCom's firm order for additional CyberPOP ports, and shall submit a signed purchase order for such Equipment specifying a shipping location (e.g., staging facility; warehouse, or central office). Within five (5) business days after receipt of Customer and/or its affiliates' purchase order, WorldCom will accept such purchase order (or will notify Customer and/or its affiliates of any technical reasons why such purchase order is erroneous, based on the Equipment requirements for the associated purchase by WorldCom of CyberPOP service).

4.  **EQUIPMENT REPURCHASE/BUY-BACK RIGHTS.** As specified in the CyberPOP Letter and Tariff, in certain circumstances WorldCom may have the right to repurchase or buy back from

DOJ - 00212
CONFIDENTIAL

S 1733

Verizon the Equipment sold to Customer under this Agreement or prior agreements between Customer and/or its affiliates and WorldCom and/or its affiliates. The parties to this Agreement acknowledge that the applicable terms, conditions, and prices for such repurchases or buy-backs are set forth in the CyberPOP Letter and/or Tariff, and that such rights and obligations set forth therein shall extend and apply to the Equipment purchased by Customer hereunder.

Upon the repurchase or buy-back of some or all of the Equipment, the parties shall work cooperatively during the thirty (30) days following such event to coordinate the return of such Equipment to WorldCom.

If Customer or its affiliate believes that certain Equipment is subject to repurchase or buy-back by WorldCom, Customer or such affiliate shall provide written notice to WorldCom in accordance with Section 12 below that identifies with specificity the Equipment in question and the reasons why such Equipment may be subject to repurchase or buy-back by WorldCom, and shall provide WorldCom with at least thirty (30) calendar days to respond. In the event that WorldCom elects not to repurchase or buy-back such Equipment, or if WorldCom fails to respond to such written notice by Customer or its affiliate within the 30-day response period, then Customer or its affiliate shall be free to dispose of or otherwise utilize elsewhere in its network such Equipment.

5.   **ORDER FULFILLMENT.** Upon WorldCom's acceptance of Customer and/or its affiliates' purchase order, WorldCom shall request fulfillment of the order by the Manufacturer within five (5) business days. WorldCom shall notify Manufacturer that fulfillment of the order shall be subject to the TBD Contract. TITLE TO THE EQUIPMENT AND RISK OF LOSS IN CONNECTION WITH THE EQUIPMENT SHALL PASS TO CUSTOMER AND/OR ITS AFFILIATES UPON SHIPMENT OF THE EQUIPMENT FROM THE MANUFACTURING FACILITY.

6.   **DISCLAIMER OF WARRANTY.** WorldCom represents and warrants it can and will deliver good and marketable title to all Equipment ordered hereunder, free from any lien or encumbrance. EXCEPT AS SET FORTH IN THE PRECEDING SENTENCE, WORLDCOM EXPRESSLY DISCLAIMS ALL EXPRESS AND IMPLIED WARRANTIES WITH RESPECT TO THE EQUIPMENT, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. CUSTOMER ACKNOWLEDGES THAT IN ENTERING INTO THIS AGREEMENT, IT IS NOT RELYING ON ANY WARRANTIES OR REPRESENTATIONS MADE BY WORLDCOM, INCLUDING ANY REPRESENTATION THAT THE EQUIPMENT MEETS CUSTOMER AND/OR ITS AFFILIATES' REQUIREMENTS OR ITS OPERATION WILL BE UNINTERRUPTED OR ERROR-FREE.

7.   **MAINTENANCE AND SUPPORT.** WorldCom does not provide, and accepts no responsibility for, the maintenance and support of the Equipment. PROVISION OF ALL MAINTENANCE AND SUPPORT, IF APPLICABLE, SHALL BE THE RESPONSIBILITY OF THE MANUFACTURER, NOT WORLDCOM. If Customer and/or its affiliates identifies an Equipment failure or determines that the Equipment is defective, Customer and/or its affiliates must notify the Manufacturer. Customer and/or its affiliates is responsible for enforcing all maintenance and/or support commitments made by the Manufacturer; provided that WorldCom shall use commercially reasonable efforts to assist Customer and/or its affiliates in enforcing any product warranties made in the Manufacturer's end user agreement.

8.   **INVOICING AND PAYMENT.** The prices for all Equipment purchased hereunder shall be invoiced upon shipment of the Equipment. Payment is due thirty (30) days after Customer and/or its affiliates' receipt of invoice. Accounts are in default if payment is not received within 10 days after Customer and/or its affiliates' receipt of a written notice of non-payment. Customer and/or its affiliates agrees to pay WorldCom its reasonable expenses incurred in enforcing its rights under this Agreement. All prices herein are exclusive of shipping, insurance, and taxes/duties, all of which shall be paid by Customer and/or its affiliates.

8.1   Equipment returned by Customer and/or its affiliates and accepted as returned by the Manufacturer shall result in the payment of a refund by WorldCom which, at the option of Customer and/or its affiliates, (a) may be applied in the form of a credit on future purchases; or (b) result in cash payment. Payment by Customer and/or its affiliates of invoices does

S 1734

not mean or imply that the Equipment has been accepted and does not impair or limit in any way Customer and/or its affiliates' full rights and remedies of acceptance under Customer and/or its affiliates' separate contract with Manufacturer with respect to the Equipment.

9. **LIMITATION OF LIABILITY.** IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL (INCLUDING WITHOUT LIMITATION LOST PROFITS OR LOST DATA), INCIDENTAL, PUNITIVE, OR EXEMPLARY DAMAGES ARISING FROM OR RELATING TO THIS AGREEMENT OR THE EQUIPMENT OFFERED HEREUNDER, EVEN IF ADVISED IN ADVANCE OF THE POSSIBILITY OF SUCH DAMAGES.

10. **EXPORT LAW COMPLIANCE.** Customer and/or its affiliates acknowledges that the export, import, and use of the Equipment and related technical data may be regulated by the United States and other governments. Customer and/or its affiliates agrees to comply with all applicable laws and regulations in connection with use of the Equipment, including the U.S. Export Administration Act, the regulations implemented thereunder by the Department of Commerce, and any other applicable laws or regulations.

11. **FORCE MAJEURE.** WorldCom shall not be liable for any delay or failure in performance due to Force Majeure, which shall include without limitation acts of God, earthquake, labor disputes, changes in law, regulation or government policy, riots, war, fire, epidemics, transportation difficulties, or other occurrences which are beyond WorldCom's reasonable control.

12. **NOTICES.** Any notice or demand required under this Agreement or by law to be made in writing shall be sent by: (i) facsimile; (ii) overnight courier; or (iii) certified or registered mail, with return receipt requested. Such written notice shall be deemed delivered upon record of: (i) transmission receipt; (ii) one (1) day after shipment via overnight courier; or (iii) three (3) days after mailing by certified or registered mail.

     Notices to Customer shall be sent to the following address:

     Telesector Resources Group, Inc.
     240 East 38th Street, 14th Floor
     New York, New York 10016
     Attention: Michael W. Ivanoff
     Fax: (212) 476-5262

     Notices to WorldCom shall be sent to the following two (2) addresses:

| | |
|---|---|
| MCI WORLDCOM Network Services, Inc. | MCI WORLDCOM Network Services, Inc. |
| Attn: Sr. Director, Global Capacity Acquisition | Attn: Chief Counsel, Network Legal Team |
| 22001 Loudoun County Parkway | 22001 Loudoun County Parkway |
| Mailstop: 3060-662 | Bldg. E1-3-501 |
| Ashburn, Virginia 20147 | Ashburn, Virginia 20147 |
| Fax: (703) 645-4160 | Fax: (703) 886-5807 |

13. **TRADEMARKS, ASSIGNMENT & NO WAIVER.** Neither party may use the other party's name, trademarks, tradenames, or other proprietary identifying symbols without the prior written approval of the other party. Neither party may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the other party; provided that either party may assign or transfer this Agreement in whole to an affiliate of such party upon written notice to the other party. As used herein, "affiliate" shall mean an entity controlled by, controlling, or under common control with a party. No failure on the part of either party to exercise, and no delay in exercising, any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy granted hereby or by law.

14. **AFFILIATES AND SUBCONTRACTORS.** WorldCom's affiliates or subcontractors may perform some or all of WorldCom's duties and/or obligations hereunder; provided that WorldCom shall remain responsible for the performance of this Agreement by such entities.

DOJ - 00214
CONFIDENTIAL

S 1735

15. **CONFIDENTIALITY.** Pursuant to the parties' Mutual Non-Disclosure Agreement, dated September 7, 1999, the parties agree to keep confidential the terms of this Agreement. Such confidentiality obligations shall survive the termination or expiration of this Agreement for an additional period of two (2) years.

16. **APPLICABLE LAW.** This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, without reference to any conflict of laws principles.

17. **ENTIRE AGREEMENT.** Except as otherwise expressly set forth in this Agreement, this Agreement supersedes all previous or contemporaneous written or oral representations, proposals, quotations, understandings, or agreements relating to the subject matter hereof (including without limitation the RAS Equipment Resale Agreement between UUNET Technologies, Inc. and Customer, dated October 17, 2000), and shall prevail notwithstanding any variance with the terms and conditions of any purchase order submitted by Customer and/or its affiliates.

AGREED AND ACCEPTED BY TELESECTOR RESOURCES GROUP, INC.:

Signature: _____
John Greer
Director
Corporate Sourcing

Date: _____6/14/01_____

AGREED AND ACCEPTED BY MCI WORLDCOM Network Services, Inc.:

Signature: _____
Louis R. Prestwood
Senior Vice President
Network Financial Management

Date: _____6/1/01_____

DOJ - 00215
CONFIDENTIAL

S 1736

TNT

## AMENDED AND RESTATED EXHIBIT A
## Verizon/WCOM CyberPOP™: Lucent TNT Equipment Configuration (5/14/01)

### T1/DC CONFIGURATION (480 modem ports per chassis)

| Part No. | Description | Qty. | Virtual COBRA Price (US$) |
|---|---|---|---|
| TNT-2DC-H | TNT Chassis, Shelf Controller, Dual DC Power, 19" Rack Mount Kit, 32 MB DRAM, 32MB Flash Memory, and Heat Baffle. | 1 | $1 |
| TNT-SL-48MODV3-S-C | 48-Port Modem Card (V.90 and V.34 compatible) | 10 | $10 |
| TNT-SL-HDLC2 | 96 Channel HDLC Slot Card | 1 | $1 |
| TNT-SL-CT1 | T1 Slot Card | 3 | $3 |
| WCOM COBRA SW | WCOM TNT Custom Software Bundle (WCOM use only) | 1 | N/C |
| **Total System Price** | | | **$15** |

### Pricing Notes

1. Virtual COBRA pricing ($1/part) valid only for RAS Equipment purchased by Verizon for use in support of WCOM's purchase of CyberPOP service from Verizon

2. Prices are exclusive of EF&I hardware and services (e.g., racks, panels, cables, OOB mgmt devices, ancillary components, rack/stack services, and site preparation, engineering, and installation services and materials), which are the responsibility of Verizon

3. In lieu of the ten (10) TNT-SL-48MODV3-S-C modem cards, five (5) APX8-SL-96DSP modem cards may be used for new deployments in accordance with mutually-coordinated configuration changes.

4. Prices are exclusive of shipping, insurance, taxes, and duties, which are the responsibility of Verizon

**WCOM Confidential**

DOJ - 00216
CONFIDENTIAL

S 1737