3Com

## AMENDED AND RESTATED EXHIBIT B
## Verizon/WCOM CyberPOP™: 3Com Total Control Equipment Configuration (6/14/01)

### 3Com TC/DC (HDM) CONFIGURATION (336 modem ports per chassis)

| Part No. | Description | Qty. | Virtual COBRA Price (US$) |
|---|---|---|---|
| 3C05047T6-00 | Total Control DC Mgmt. Chassis (per cabinet/rack of 4 modem chassis) | 1 | $1 |
| 003458-00 | TCH Dual 130A/DC Power w/ HiPerNMC Card Set | 1 | included |
| 003802-01 | EdgeServer OverDrive, 256mb, 2x2GB HD | 1 | included |
| 003281-00 | 16 port Serial NIC | 1 | included |
| 001893-00 | Pentium Pro Processor | 1 | included |
| 002157-01 | Dual 10/100 BaseT Ethernet NIC | 1 | included |
| 000849-12 | Quad Analog Digital Modem Card Set | 1 | included |
| 003458-00 | TCH Dual 130A/DC Power w/ HiPerNMC card set (per modem chassis) | 1 | $1 |
| 002106-01 | HiPerARC Card Set (Ethernet) (per modem chassis) | 1 | $1 |
| 002092-00 | HiPerDSP Card Set (24 ports/card) (per modem chassis) | 14 | $14 |
| Cisco7206/VXR | Cisco 7206 DC VXR (per 8 modem chassis) | 1 | $1 |
| 3C39008-DC or Cisco WS-C2924M-XL-EN-DC | 3Com 3900 DC Ethernet Switch or Cisco 24-port DC NEBS switch (per cabinet/rack of 4 modem chassis) | 1 | $1 |
| WCOM COBRA SW | WCOM 3Com-TC Custom Software Bundle (WCOM use only) | 1 | N/C |
| **Total System Price** | | | **$19** |

### Pricing Notes

1. Virtual COBRA pricing ($1/part) valid only for RAS Equipment purchased by Verizon for use in support of WCOM's purchase of CyberPOP service from Verizon

2. Prices are exclusive of EF&I hardware and services (e.g., cabinet/racks, panels, cables, OOB mgmt devices, ancillary components, rack/stack services, and site preparation, engineering, and installation services and materials), which are the responsibility of Verizon

3. The Cisco 7206 may use DS3, 4xDS1, or 8xDS1 cards (depending on egress capacity requirements from a given site)

4. For certain GridNet sites, a carrier access mux may be required to support DS3 ingress, subject to Verizon NEBS compliance

5. Prices are exclusive of shipping, insurance, taxes, and duties, which are the responsibility of Verizon

6. In light of 3Com's plans to "end of life" the 3Com 3900 DC Ethernet Switch, the Cisco 24-port DC NEBS Switch may be used instead

WCOM Confidential

DOJ - 00217
CONFIDENTIAL

Amendeu_equipment Exhibit.final.clean

3Com

## AMENDED AND RESTATED EXHIBIT B
### Verizon/WCOM CyberPOP™: 3Com Total Control Equipment Configuration (5/14/01)

| Part No. | Description | Qty. | Virtual COBRA Price (US$) |
|---|---|---|---|
| **3Com TC/DC (HDM) CONFIGURATION (336 modem ports per chassis)** | | | |
| 3C054077e-00 | Total Control DC Mgmt. Chassis (per cabinet/rack of 4 modem chassis) | 1 | $1 |
| 003458-00 | TCH Dual 130/ADC Power w/ HiPerNMC Card Set | 1 | included |
| 003802-01 | EdgeServer OverDrive, 255mb, 2x2GB HD | 1 | included |
| 003281-00 | 16 port Serial NIC | 1 | included |
| 001893-00 | Pentium Pro Processor | 1 | included |
| 002157-01 | Dual 10/100 Base T Ethernet NIC | 1 | included |
| 000849-12 | Quad Analog Digital Modem Card Set | 1 | included |
| 003458-00 | TCH Dual 130/ADC Power w/ HiPerNMC card set (per modem chassis) | 1 | $1 |
| 002106-01 | HiperARC Card Set (Ethernet) (per modem chassis) | 1 | $1 |
| 002092-00 | HiPerDSP Card Set (24 ports/card) (per modem chassis) | 14 | $14 |
| Cisco7206/VXR | Cisco 7206 DC VXR (per 8 modem chassis) | 1 | $1 |
| 3C3808S-DC or Cisco WS-C3524MA-GLEN-DC | 3Com 3900 DC Ethernet Switch or Cisco 24-port DC NEBS switch (per cabinet/rack of 4 modem chassis) | 1 | $1 |
| WCOM COBRA SW | WCOM 3Com-TC Custom Software Bundle (WCOM use only) | 1 | N/C |
| **Total System Price** | | | **$19** |

### Pricing Notes

1. Virtual COBRA pricing ($1/part) valid only for RAS Equipment purchased by Verizon for use in support of WCOM's purchase of CyberPOP service from Verizon

2. Prices are exclusive of EF&I hardware and services (e.g., cabinet/racks, panels, cables, OOB mgmt devices, ancillary components, rack/stack services, and site preparation, engineering, and installation services and materials), which are the responsibility of Verizon

3. The Cisco 7206 may use DS3, 4xDS1, or 8xDS1 cards (depending on egress capacity requirements from a given site)

4. For certain GridNet sites, a carrier access mux may be required to support DS3 ingress, subject to Verizon NEBS compliance

5. Prices are exclusive of shipping, insurance, taxes, and duties, which are the responsibility of Verizon

6. In light of 3Com's plans to "end of life" the 3Com 3900 DC Ethernet Switch, the Cisco 24-port DC NEBS Switch may be used instead

3/14/2005

WCOM Confidential

DOJ - 00235
CONFIDENTIAL

2

Amended Equipment Exhibit.final.clean

## AMENDED AND RESTATED EXHIBIT A
### Verizon/WCOM CyberPOP™: Lucent TNT Equipment Configuration (5/14/01)

**T1/DC CONFIGURATION (480 modem ports per chassis)**

| Part No. | Description | Qty. | Virtual COBRA Price (US$) |
|---|---|---|---|
| TNT-2DC-H | TNT Chassis, Shelf Controller, Dual DC Power, 19" Rack Mount Kit, 32 MB DRAM, 32MB Flash Memory, and Heat Baffle. | 1 | $1 |
| TNT-SL-48MODV3-S-C | 48-Port Modem Card (V.90 and V.34 compatible) | 10 | $10 |
| TNT-SL-HDLC2 | 96 Channel HDLC Slot Card | 1 | $1 |
| TNT-SL-CT1 | T1 Slot Card | 3 | $3 |
| WCOM COBRA SW | WCOM TNT Custom Software Bundle (WCOM use only) | 1 | N/C |
| **Total System Price** | | | **$15** |

**Pricing Notes**

1. Virtual COBRA pricing ($/part) valid only for RAS Equipment purchased by Verizon for use in support of WCOM's purchase of CyberPOP service from Verizon

2. Prices are exclusive of EF&I hardware and services (e.g., racks, panels, cables, OOB mgmt devices, ancillary components, rack/stack services, and site preparation, engineering, and installation services and materials), which are the responsibility of Verizon

3. In lieu of the ten (10) TNT-SL-48MODV3-S-C modem cards, five (5) APX8-SL-96DSP modem cards may be used for new deployments in accordance with mutually-coordinated configuration changes.

4. Prices are exclusive of shipping, insurance, taxes, and duties, which are the responsibility of Verizon

WCOM Confidential

3/~/2005

TNT

12

DOJ - 00245
CONFIDENTIAL

H. Dean Goff
Director
MCI WorldCom National Account Management



**GTE Network Services**

600 Hidden Ridge
P.O. Box 152092
Irving, TX 75015-2092
Tel: 972 718-5225
Fax: 972 718-5834
dean.goff@telops.gte.com

Mail Code: HQE02N05

October 13, 1999



Mr. Reese W. Radcliffe
Director – Global Capacity Acquisition
UUNET Technologies, Inc.
3060 Williams Drive
Fairfax, Virginia 22031

Dear Reese:

Subject: CYBERPOP

As indicated in GTE's preliminary proposal, I have shared your correspondence
with senior management in Wholesale Markets' Account Management, Product
Management, and Operations Support organizations. I did this to ensure WM's
management teams had a clear understanding of UUNET's business drivers,
service expectations, product applications and the price conscious-competitive
markets you serve.

Based on your feedback, GTE has developed an enhanced pricing strategy for
our CyberPOP product. As you know, CyberPOP is a GTE tariffed product with
FCC oversight. GTE is providing this instrument to clarify our proposed changes
in the current offering and remove any misunderstanding or undocumented
commitments that may exist.

Outstanding issues are addressed below, with expanded comments clarifying
GTE's proposed resolution. A summary of the current pricing is set out in
Attachment 1. Our new pricing proposal is located in Attachment #2, with a
matrix depicting the price structure.

This correspondence should not be perceived as a contract for services or a
business arrangement that would violate GTE's FCC No. 1 Tariff-Facilities for
Interstate Access-Advanced Communication Networks. Pricing specified in
Attachment #2 and the other provisions related to CyberPOP services referenced
in this proposal shall be available to UUNET the effective date of the tariff
changes.

A part of GTE Corporation

DOJ - 00133
CONFIDENTIAL

S 1741

Mr. Reese W. Radcliffe
October 13, 1999
Page 2

<u>Renewal Enrollment Term</u> – The length of the service periods are 4, 5, 6 and 7 years.  GTE will file a change to the tariff to restructure the pricing for the 7-year term and to provide that a customer may change to a longer term, which will be measured from the beginning of the customer's current term, at the rates of the longer term, which will be effective upon GTE's receipt of the customer's written request to change to the longer term, or on a later date as specified by the customer.  UUNET has indicated that it will increase from its current subscription at the 6-year term to the new pricing under the 7-year term.  To finalize this commitment, UUNET must submit a written request to change the term, (Attachment #3), once the tariff change has become effective.  The start date for the 7-year term will be February 18, 1997.

<u>Proposed 7 Year Rate Plan Pricing</u> – Enrollment in the 7 year rate plan will provide a new embedded per port pricing which is specified in Attachment #2 with a minimum volume of 300,000 CyberPOP ports.

<u>Rate Application</u> – The total number of billed analog and ISDN CyberPOP$^{SM}$ channels will determine the rate to be applied to all dial-up channels at each central office.  For example, if the total number of billed dial-up channels is 9,250, all dial-up channels will be rated at the rate for the 8,000 – 11,999 tier.

<u>Backhaul Availability in Relation to CyberPOP Billing</u> – Should a backhaul egress facility shortage be encountered after notice of site completion to UUNET by GTE, and UUNET has made every reasonable effort to acquire backhaul facilities from internal or external sources (CAPs, IXCs, ILECs, CLECs) and no facilities are available to the designated CyberPOP location, GTE will defer billing for 60 days.  After that point it will be mutually agreed to (1) start billing for services rendered; (2) redeploy the network components elsewhere in the network; or (3) allow UUNET to cancel services in this location without liability.

<u>Migration to New Upgraded Technologies</u> – Requests regarding the configuration and design of the equipment will be considered by GTE and employed in equipment selection when possible.  Requests for migration to new or upgraded CyberPOP equipment/configurations will require a written request from UUNET no later than 120 days prior to the required timeframe.  GTE will evaluate the impact and provide a response back to UUNET within 30 days of written request.  GTE's response shall include any and all applicable special construction charge to recover significant expenditures for equipment and configuration upgrades.  UUNET shall inform GTE within ten (10) days after receipt of GTE's response whether or not to proceed with UUNET's request.

DOJ - 00134
CONFIDENTIAL

S 1742

Mr. Reese W. Radcliffe
October 13, 1999
Page 3

Property Repositioning – GTE will assess and communicate any property repositioning to UUNET within 60 days of public notification. Once the property has been operationally transferred to the new owner, GTE Network Services will evaluate the effected CyberPOP port count and adjust the new in-service level count effected. At that point, GTE will honor UUNET's highest obtained in-service level to maintain consistence with UUNET's current price point. For example, should the UUNET in-service level total 300K ports and repositioning affected 20K ports, GTE would adjust the tariff to reflect the 280K ports at the same rate as the 300K port level.

Reese, I have tried to clarify each of the outstanding issues and the new proposal. As you can see, everything ties together under the CyberPOP umbrella and no one piece can stand alone. UUNET's decision processes will determine our speed-to-market with the new pricing and growth strategy. As indicated, GTE is required to file amendments to the existing tariff before we can apply new per-port pricing and other provisions described above.

Let me apologize one more time for our delays, I hope we have delivered on your expectations and made it worth the wait.

Sincerely,

H. Dean Goff
Director
MCI WorldCom National Account Management

HDG:lm
Attachments

DOJ - 00135
CONFIDENTIAL

## ATTACHMENT # 1

## Current Price Structure

Analog and ISDN CyberPOP<sup>SM</sup> Channels

4 Year Arrangement - Pricing
| 8,000 – 11,999 | $74.00 |
| 12,000 – 15,999 | $72.00 |
| 16,000 – 23,999 | $70.00 |
| 24,000 – 31,999 | $68.00 |
| 32,000 – 39,999 | $66.00 |
| 40,000 + | $62.00 |

5 Year Arrangement - Pricing
| 8,000 – 11,999 | $60.00 |
| 12,000 – 23,999 | $59.00 |
| 24,000 – 39,999 | $58.00 |
| 40,000 + | $57.00 |

6 Year Arrangement - Pricing
| 40,000 – 59,999 | $55.00 |
| 60,000 – 79,999 | $54.00 |
| 80,000 – 99,999 | $53.00 |
| 100,000 – 119,999 | $52.00 |
| 120,000 – 139,999 | $51.00 |
| 140,000 – 159,999 | $50.00 |
| 160,000 – 179,999 | $49.00 |
| 180,000 – 199,999 | $48.00 |
| 200,000 – 299,999 | $46.00 |

7 Year Arrangement – Pricing *
(Tariff to be revised)
| 200,000 – 299,999 | $46.00 |
| 300,000 + | $45.00 |

*  NOTE:  See Attachment #2 for new 7-Year Pricing Proposal

DOJ - 00136
CONFIDENTIAL

## ATTACHMENT #2

| Tier #1 | | | | Tier #2 | |
|---|---|---|---|---|---|
| BILLED PORTS | EMBEDDED BASE | PRICE | | INCREMENTAL BILLED PORTS | PRICE |
| 300,000 Ports | 300,000 | $44.00 | | 300,001+ | $32.00 |
| 350,000 Ports | 300,000 | $42.00 | | | |
| 400,000 Ports | 300,000 | $40.00 | | | |

**Application Guidelines:**

1. The proposed plan is a three level structure, constructed on the 300,000 embedded base with a sliding price scale that will reduce in increments of 50,000 billed Ports.

2. Incremental growth (beyond the 300,000 embedded base) is represented in Tier #2 and discounted to $32 a Port.

Example: UUNET @ 325,000 Billed Ports

    300,000 @$44.00 =    $13,200,000
     25,000 @$32.00 =       $800,000
                        $14,000,000

Example: UUNET @350,000 Billed Ports

    300,000 @$42.00 =    $12,600,000
     50,000 @$32.00 =     $1,600,000
                        $14,200,000

DOJ - 00137
CONFIDENTIAL

**Attachment #3**

**Renewal Option Letter of Intent**

UUNET Technologies, Inc. ("UUNET") and the GTE Network Services operating companies listed on Exhibit 1 ("GTE") are entering into this letter of intent to recognize UUNET's agreement to exercise a renewal option.  This renewal option is for Modem Based Data Aggregation – CyberPOP services from GTE and GTE's agreement to file a transmittal with the FCC adding to the tariff this renewal option, extending the enrollment from 72 months to 84 months and incorporating in the tariff new volume price tiers for the 84 month period.  This letter will identify the start date of the 84-month period as February 18, 1997.

UUNET understands that the services will be governed by the terms, conditions and provisions set forth in GTE's tariff, and the procedures outlined in the UUNET/GTE Service Agreement.

To indicate UUNET's agreement to change the enrollment period from 72 to 84 months, please sign below:

AGREED & ACCEPTED

_____          _15 SEPT 1999_____
Signature                                                          Date

Reese W. Radcliffe
Director-Global Capacity Acquisition
UUNET Technologies, Inc.

Approved By UUNET LEGAL Department
By: _____
Signature
Date ___9/15/99___

DOJ - 00138
CONFIDENTIAL

Attachment A

## GTE Network Services Operating Companies

GTE Alaska Incorporated
GTE Arkansas Incorporated
GTE California Incorporated
GTE Florida Incorporated
GTE Hawaiian Telephone Company Incorporated
GTE Midwest Incorporated
GTE North Incorporated
GTE-Northwest Incorporated
GTE South Incorporated
GTE Southwest Incorporated
GTE West Coast Incorporated
Contel of Minnesota, Inc. d/b/a GTE Minnesota
Contel of the South, Inc. d/b/a GTE Systems of the South, d/b/a GTE Systems of Indiana, d/b/a GTE Systems of Michigan



**GTE Telephone Operations**

Post Office Box 152092
Irving, TX 75015-2092

February 14, 1997

Reply To
HQW03B61

Mr. David Boast
Vice President – Technology
UUNET Technologies, Inc.
3060 Williams Drive
Fairfax, VA 22031-4648

Subject: Modem Based Data Aggregation Service

Dear Mr. Boast:

UUNET Technologies, Inc. and the GTE telephone operating companies listed on Attachment A ("GTE") are entering into this letter of intent to reflect UUNET Technologies, Inc. agreement to order CyberPOP (a modem-based data aggregation service) from GTE and GTE's agreement to file an addendum to the tariff to recognize another service level of 40,000+ ports with a corresponding rate of $.64 per port. UUNET Technologies, Inc. understands that the service will be governed by the terms, conditions, and provisions set forth in GTE's tariff and the procedures outlined in the UUNET Technologies, Inc./GTE Service Agreement.

To indicate UUNET Technologies, Inc. agreement to be bound by this letter of intent, please execute the duplicate original of this letter of intent and return same to Marita Roddy at MC;HQW03B61, 700 Hidden Ridge, Irving, Texas 75038.

ACCEPTED AND AGREED TO THIS
18 DAY OF FEB , 1997

By, _____
David Boast
Vice President – Technology
UUNET Technologies, Inc.

By: _____
Larry J. Sparrow
President – Carrier Markets

Approved By LEGAL Department
Signature _____
Date 2/18/97

DOJ - 00140
CONFIDENTIAL

S 1748

# EXHIBIT 28

S 1749

ORIGINAL



MASTER SERVICES AGREEMENT
BETWEEN
SBC GLOBAL SERVICES, INC.
AND
UUNET TECHNOLOGIES, INC.

This Agreement is entered into as of December 31, 1999 ("Effective Date") between SBC Global Services, Inc., ("SBC"), a Delaware close corporation with a place of business located at 225 West Randolf Street, Chicago, Illinois, and UUNET Technologies, Inc., a Delaware corporation with a place of business located at 3060 Williams Drive, Fairfax, VA ("UUNET" or "Customer").

WHEREAS, SBC values Customer's business and desires to provide to Customer discounted pricing for certain SBC services based upon the satisfaction of the conditions set forth in this Agreement;

WHEREAS, Customer desires to obtain discounted pricing for certain SBC services based upon Customer's purchase of a minimum quantity of such SBC services as stated herein; and

WHEREAS, SBC is the single point of contact ("SBC SPOC") through which UUNET may order services under this Agreement for itself and its affiliates from the SBC family of companies, including without limitation SBC Advanced Solutions, Inc., Ameritech Advanced Data Services, The Ohio Bell Telephone Company, Indiana Bell Telephone Company Incorporated, Illinois Bell Telephone Company, Michigan Bell Telephone Company, Wisconsin Bell, Inc. (individually and collectively, "Ameritech"), Pacific Bell Telephone Company ("Pacific Bell"), Nevada Bell, Southwestern Bell Telephone Company ("SWBT"), and The Southern New England Telephone Company ("SNET");

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants and agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, SBC and Customer agree as follows:

**Term**

1.1    The term of this Agreement will commence upon the Effective Date and will terminate upon the expiration or termination of the last service term of the Service Schedule(s) entered into by the parties. Each Service Schedule shall set forth its own service term and, if applicable, any renewal term thereof. No Service Schedule hereunder shall commence later than five (5) years after the Effective Date of this Agreement, absent a written amendment to this Agreement. Absent a specified renewal term, a Service Schedule automatically shall renew on a month-to-month basis at the same rates, unless otherwise not renewed by either party upon thirty (30) days prior written notice to the other party.

1.2    If Customer terminates a Service Schedule (or a specific Service component described in a Service Schedule) prior to completion of the applicable service term set forth in such Service Schedule, except as otherwise provided in this Agreement or the Service Schedule, Customer shall pay SBC any applicable early termination charges. Such charges shall be set forth in the Service Schedule for the terminated Service.

1.3    In the event of expiration or termination of this Agreement or any Service Schedule hereunder, the parties shall work cooperatively to minimize any potential interruptions of service and/or other disruptions or inconveniences to Customer's end users; provided that (unless the result of a termination by Customer for cause or a termination by SBC without cause) Customer shall reimburse SBC for all reasonable and necessary costs associated with such work to the extent it exceeds the effort required to terminate the Services offered under the Agreement or a Service Schedule, as appropriate.

**Service Schedules; Revenue-Based Annual Volume Discount.**

2.1    Each service ("Service") purchased hereunder shall be the subject of a service schedule ("Service Schedule") that specifies, at a minimum, the following terms and conditions: (a) service description; (b) applicable service territory; (c) service ordering procedures; (d) service prices; (e) service acceptance procedures; (f) service billing procedures; (g) minimum purchase commitments, if any; (h) service level agreements; (i) applicable federal, state, or local tariffs, if any; and (j) applicable service term and early termination liabilities. Each Service Schedule shall be signed by the authorized representatives of both parties and, so executed, shall constitute an integral component of this Agreement. In the event of any conflict between this Agreement and a Service Schedule, the provisions of the Service Schedule shall govern.

S 1750

2.2    In the event that the parties enter into multiple Service Schedules under this Agreement, the parties agree also to negotiate in good faith in an attempt to achieve a revenue-based annual volume discount that would apply to all Services purchased under this Agreement.

3.    Payment & Taxes.

3.1    Payments will be made by Customer within thirty (30) days after the date of receipt of an accurate invoice submitted by SBC; provided that if a Service provided hereunder is subject to an alternative payment provision set forth in an applicable tariff, then such alternative payment provision shall apply to such Services. All invoices for Services provided hereunder shall be sent to: UUNET Technologies, Inc., Attention: Accounts Payable, 3060 Williams Drive, Fairfax, VA 22031. All applicable Taxes shall be itemized in each invoice. Failure by Customer to remit payment in a timely manner shall result in the imposition of a late payment fee of 1.5% per month, or the highest amount allowed by law; provided that if a Service provided hereunder is subject to an alternative late payment charge provision set forth in an applicable tariff, then such alternative late payment charge provision shall apply to such Services.

3.2    All prices for Services provided hereunder are exclusive of any sales or VAT taxes imposed or levied by any government entity on the Services provided hereunder or pay in connection with any Service provided hereunder; provided that SBC is required to collect or pay in connection with any Service provided hereunder; provided that in no event shall Customer be required to pay any taxes on the net income, municipal franchise, real or personal property, or gross receipts of SBC. In the event that Customer believes it is exempt from otherwise applicable Taxes, Customer shall provide SBC with an exemption certificate evidencing such claimed exemption, which SBC shall honor.

3.3    Customer shall have the right to dispute any charges included on an SBC invoice; provided that all such disputes are brought by Customer in good faith with a bona fide basis in fact. In the event of any such dispute, the portion of the invoice that is undisputed shall be paid by Customer as provided herein. Customer shall have the right to withhold payment of any disputed amount; provided that Customer provides SBC with notice of such withheld amount, the factual basis for the dispute, and the reason for the dispute at the time the payment is withheld. All invoicing disputes that cannot be resolved by negotiation shall be resolved in accordance with the provisions of Section 13 below. Notwithstanding any provision contained in this Agreement to the contrary, Customer's failure to pay any invoice or portion thereof as a result of an unresolved dispute shall not be considered a breach of this Agreement, unless Customer fails to reasonably cooperate in the resolution of such dispute. Payment of a disputed amount by Customer following the resolution of any dispute shall include all applicable interest in accordance with Section 3.1 above.

4    Termination.

4.1    Either party may terminate this Agreement without penalty if any one of the following events of default should occur: (a) if the other party consistently fails to perform or comply with any material provision of this Agreement, or fails on one or more occasion(s) to comply with Section 7 (Intellectual Property Indemnity), Section 8 (Confidentiality), Section 9 (No Publicity), or any other provision of this Agreement or a Service Schedule issued hereunder that by its nature indicates that the violating party no longer can be trusted to be a strategic customer/vendor of the other party; (b) if the other party becomes insolvent or admits in writing its inability to pay debts as they mature, or makes an assignment for the benefit of creditors; (c) if a petition under any foreign, state, or United States bankruptcy act, receivership statute, or the like, as they now exist, or as they may be amended, is filed by the other party; or (d) if such a petition is filed against the other party by any third party and such application is not resolved favorably to such other party within sixty (60) days. Termination due to default under subpart (a) above shall be effective thirty (30) days after receipt of written notice sent to the defaulting party pursuant to Section 14 below if such default has not been cured during such thirty (30) day notice period.

4.2    Customer's failure to pay any undisputed invoice within thirty (30) days after receipt of written notice from SBC pursuant to Section 14 below indicating that such invoice is past due shall constitute a material failure to perform this Agreement under Section 4.1(a) above.

4.3    Termination of this Agreement shall effect the termination of all Service Schedules hereunder. Termination of any particular Service Schedule, in whole or in part, shall not serve to terminate or affect any other Service Schedule, this Agreement, or any other rights or obligations of the parties, unless specifically and conspicuously stated in the notice of termination.

DOJ - 00120
CONFIDENTIAL

S 1751

4.4        The provisions set forth in Sections 5 (Warranties), 6 (Limitation of Liability), 7 (Intellectual Property Indemnity), and 8 (Confidentiality), as well as any other provision that reasonably may be expected to survive, shall survive the expiration or termination of this Agreement.

5.    Warranties.

5.1        SBC warrants that it shall provide suitably qualified personnel to perform this Agreement and all Service Schedules issued hereunder in a timely and efficient manner with diligence and care, consistent with the professional standards of practice in the industry, and in conformance with all applicable laws and regulations, and that the Services shall comply with this Agreement and the applicable Service Schedule. SBC shall provide, maintain, and upgrade the Services in accordance with the same first-class standards applied by SBC to similar projects for itself, for any of its affiliated companies, and for other clients (other than those related to national security, emergency preparedness, or public safety or health).

5.2        SBC acknowledges that it is aware of the risk and uncertainty surrounding the advent of Year 2000. SBC certifies that it is participating in a multi-entity internal task force dedicated to reviewing and preparing systems and processes to function normally following Year 2000. SBC warrants that its service obligations to Customer hereunder, including billing, order processing, and other aspects of SBC's business relationship with Customer, shall not be adversely affected by Year 2000 defects in SBC's internal systems or processes. In addition to any potential service credits, SBC further agrees to use best efforts to prevent and promptly correct any such defects.

5.3        SBC represents and warrants that it has the ability and authority to provide, directly or indirectly through its affiliates and/or subcontractors, the Services described in each Service Schedule agreed upon by the parties within those LATAs where SBC or its affiliates operate as an incumbent local exchange carrier.

6    Limitation of Liability.

6.1        EXCEPT WITH RESPECT TO THE PARTIES' OBLIGATIONS UNDER SECTIONS 7 (INTELLECTUAL PROPERTY INDEMNITY) AND 8 (CONFIDENTIALITY), IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY SPECIAL, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT OR A SERVICE SCHEDULE ISSUED HEREUNDER, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

6.2        Neither party will be liable or responsible for the content of any information contained on the Internet. Neither party will assume any responsibility for any consequences suffered by any third person as a result of obtaining Internet access, including without limitation damages arising from accessing Internet content or from computer viruses.

7    Intellectual Property Indemnity.

7.1        SBC shall defend, indemnify, and hold harmless Customer from any third party claim alleging that the Services provided hereunder violate the patent, trade secret, copyright, or other intellectual property right of any third party; provided that Customer provides SBC: (a) prompt notice of such claim; (b) sole control over the defense and/or settlement of such claim; and (c) all assistance reasonably required for the defense of such claim.

7.2        Customer shall defend, indemnify, and hold harmless SBC from any third party claim alleging that Customer's Service specifications provided to SBC hereunder (if any) violate the patent, trade secret, copyright, or other intellectual property right of any third party; provided that SBC provides Customer: (a) prompt notice of such claim; (b) sole control over the defense and/or settlement of such claim; and (c) all assistance reasonably required for the defense of such claim.

8.    Confidentiality. The parties agree to abide by the mutual non-disclosure obligations set forth in the attached Exhibit 1.

9    No Publicity. Neither party may use the name, logo, trademarks, service marks, or other proprietary identifying symbols of the other party in any press release, public statement, advertising, signage, marketing materials, brochures, or other materials in any medium without the other party's prior written consent. With respect to Customer, such prior written consent shall be required from both: (a) a Vice President or more senior officer of Customer; and (b) an authorized representative of Customer's media relations department. Any such permitted use shall comply with the guidelines or instructions provided by the other party.

DOJ - 00121
CONFIDENTIAL

S 1752

10. **Force Majeure.**

   10.1    Neither party shall be liable for any loss or damage resulting from any cause beyond its reasonable control ("Force Majeure"), such as, but not limited to, fire, explosion, lightning, flood, earthquake, strikes or labor disputes, floods, storms, acts of God, war, civil disturbances, acts of civil or military authorities, or the public enemy. Upon the occurrence of any Force Majeure event and to the extent such Force Majeure event substantially interferes with a party's performance with respect to a Service, such party shall be excused from such performance during the period of the Force Majeure event; provided that the party invoking this Section 10.1 uses all commercially reasonable efforts to avoid or remove such causes of nonperformance. In the event that SBC invokes this Section 10.1, Customer's payment obligations for any affected Service(s) shall be suspended during the period of such Force Majeure event.

   10.2    In the event of a delaying or interfering condition having more than thirty (30) calendar days duration, the other party may terminate the affected Service(s) without liability for any termination charges upon ten (10) days prior written notice to the party invoking Section 10.1 above.

11. **Insurance.** SBC is self-insured up to a retention level of $25,000,000. This includes general public liability, auto liability, and professional liabilities. SBC also is self-insured with respect to property coverage up to $25,000,000. Above this retention level, SBC has comprehensive all risk protection for all property owned, leased, or under its care, custody, or control. Loss settlement is based on replacement cost.

12. **Assignment.** Neither party may assign any of its rights or obligations under this Agreement (by contract or operation of law) without the prior written consent of the other party, which shall not be unreasonably withheld, conditioned, or delayed; provided that either party may assign this Agreement in its entirety to any affiliate of such party upon written notice to the other party. For purposes of this Agreement, an affiliate shall mean any entity that controls, is controlled by, or is under common control with a party.

13. **Governing Law.**

   13.1    This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without reference to any conflict of laws principles; provided that if a Service purchased hereunder is subject to an alternative governing law provision set forth in an applicable tariff, then such alternative governing law provision shall apply to such Service.

   13.2    The parties shall in good faith attempt to resolve through informal negotiations, at the lowest possible level of authority, any disagreement, controversy, claim, or dispute arising under this Agreement or a Service Schedule issued hereunder ("Dispute"). The parties agree that time shall be of the essence in the resolution of such Dispute. In the event that such negotiations are not successful, the Dispute shall be referred to each party's respective operational Vice President or its equivalent, who shall attempt to resolve the Dispute within thirty (30) days. In the event that the parties are not able to resolve the Dispute with this thirty (30) day period, or such other period of time as the parties may mutually agree upon, either party shall be entitled to pursue its legal and/or equitable remedies in a federal or state court of competent jurisdiction.

14. **Notices.** All notices or other communications hereunder shall be deemed to have been fully given when made in writing and delivered in person, by confirmed facsimile or overnight courier, or deposited in the United States mail, postage prepaid, and addressed as follows:

   To Customer:

           UUNET Technologies, Inc.
           3060 Williams Drive
           Fairfax, Virginia 22031
           Attention: General Counsel
           Fax: (703) 206-5807

DOJ - 00122
CONFIDENTIAL

S 1753

To SBC:

> SBC Business Communications Services
> 530 McCullough, Room 1460
> San Antonio, Texas 78215
> Attention: President
> Fax: (210) 886-4415
>
> -and-
>
> SBC Communications Inc.
> 175 E. Houston, Room 4-Z-90
> San Antonio, Texas 78205
> Attention: General Attorney & Assistant General Counsel—Strategic Marketing
> Fax: (210) 554-7164

The addresses to which notices may be given by either party may be changed upon written notice given to the other party pursuant to this Section 14.

15. **Construction.** This Agreement is the joint work product of the parties and in the event of any ambiguities, no inferences shall be drawn against either party.

16. **Non-Waiver.** The failure of SBC or Customer to insist upon strict performance of any provision of this Agreement or a Service Schedule in any one or more instances shall not be construed as a waiver or relinquishment for the future of any such provision, but the same shall be and remain in full force and effect.

17. **Severability.** If any term of this Agreement or a Service Schedule is found to be unenforceable in any jurisdiction, then such term shall be enforced to the maximum extent permitted by law, rather than voided, and the remaining terms of this Agreement or the Service Schedule shall remain in full force and effect.

18. **Headings.** Article, section, or paragraph headings contained in this Agreement or any Service Schedule are for reference purposes only and shall not affect the meaning or interpretation of this Agreement or any Service Schedule.

19. **Relationship of Parties.**

   19.1    The relationship created by this Agreement is non-exclusive. Customer shall be free to acquire services similar to the Services from alternative sources without obligation to SBC.

   19.2    SBC's relationship to Customer is that of an independent contractor. SBC's employees and subcontractors shall be deemed to be independent contractors, and not employees of Customer, for the purposes of all applicable laws and regulations.

   19.3    This Agreement is not intended by the parties to constitute or create any form of business relationship beyond the express terms hereof, and the rights and obligations of the parties shall only be those expressly set forth in writing. Neither party shall have authority to bind the other, except to the extent authorized herein.

20. **Purchases on Behalf of Customer Affiliates.** Customer may purchase Services pursuant to this Agreement for the use by Customer's affiliates and their end users.

21   **Applicable Tariff Regulations.**

   21.1    SBC and Customer acknowledge that this Agreement and some or all of the Services provided hereunder may be subject to review by certain federal, state, and local regulatory bodies. If any regulatory action by such bodies alters the terms and conditions of this Agreement (or any Service Schedule) materially and adversely to either party, the affected party may terminate the affected Service(s) without liability for any termination charges upon thirty (30) days prior written notice to the other party; provided that the parties are unable to negotiate in good faith a mutually agreeable alternate relationship within ten (10) days of such notice. This Section 21.1 may be superceded with respect to a given Service by a specific provision set forth in the Service Schedule for such Service; provided that such provision conspicuously and unambiguously states that it is superceding this Section 21.1.

   21.2    Customer further acknowledges that the Services provided hereunder may be subject to SBC's tariff(s). All tariffs applicable to a given Service shall be identified by SBC in the Service Schedule for such Service.

Notwithstanding anything in this Agreement to the contrary, in the event that SBC enforces or attempts to enforce any tariff provision that is materially different from the provisions of this Agreement, Customer may cancel the Service(s) affected by such enforcement or attempted enforcement without liability for any termination charges upon thirty (30) days prior written notice to SBC.

21.3    Approval of this Agreement by any applicable regulatory body does not constitute a determination that the terms and provisions for termination, or any resulting termination liability, of the Agreement should be upheld in a court of law. Approval of any applicable regulatory agency of the termination liability language is not intended to indicate that the applicable regulatory agency has approved any terms or provisions contained therein. The parties are free to pursue all available legal remedies should a dispute of such nature arise.

21.4    Customer acknowledges that SBC is subject to certain requirements set forth in certain orders of the United States District Court for the District of Columbia in Civil Action No. 82-0192 ("Court") and the Telecommunications Act of 1996. In the event that SBC reasonably determines in good faith that the terms and conditions regarding any Service(s) provided hereunder have a substantial likelihood of being construed by a federal or state court or other governmental entity to be in conflict with any such rules, regulations, and orders, SBC may request in writing that the parties negotiate in good faith to modify the relevant terms and conditions by written amendment to this Agreement or applicable Service Schedule; provided that if the parties are unable to reach agreement upon such a modification within a reasonable period of time, SBC may terminate the affected Service(s) without liability for any termination charges upon thirty (30) days prior written notice to Customer.

21.5    This Agreement and the attached Service Schedules are in addition to, and in no way replace, any applicable tariff provisions, and together with such tariff provisions, shall be used to settle any dispute that may arise with respect to a Service provided hereunder.

22.    Entire Agreement. This Agreement, all Services Schedules agreed upon by the parties hereunder, and any applicable tariff provisions shall constitute the complete, final, and exclusive statement of the terms of the agreement between SBC and Customer regarding the subject matter hereof, and shall supersede all prior or contemporaneous written or oral representations, understandings, and communications relating thereto. The terms and conditions of this Agreement and any Service Schedule shall not be varied, supplemented, waived, qualified, modified, or interpreted by any prior or subsequent course of dealing between the parties, failure, or delay to enforce any rights hereunder, or by any usage of trade or manner other than by a subsequent writing signed by authorized representatives of both parties. Neither party shall be bound by any pre-printed terms additional to or different from those in this Agreement or any Service Schedule that may appear subsequently in the other party's form documents, purchase orders, quotations, acknowledgments, invoices, or other communications, except for any applicable tariff provisions.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective authorized representatives.

UUNET TECHNOLOGIES, INC.

By: _____

Printed Name: REESE W. RADCLIFFE

Title: Director, Global Cap Acquisition

SBC GLOBAL SERVICES, INC.

By: _____

Printed Name: R. Wilkins

Title: Pres. SBC-BCS

Approved By UUNET LEGAL Department

By: _____
Signature

Date 1/28/00

## EXHIBIT 1: MUTUAL NON-DISCLOSURE OBLIGATIONS

Each party to the Agreement may wish to disclose certain proprietary and confidential information to the other party on a confidential basis. Such proprietary or confidential information ("Confidential Information") includes without limitation all technical or non-technical information; financial, accounting, or marketing data; business plans, analyses, forecasts, predictions, or projections; intellectual property, trade secrets, or know-how; personal, member, or account information of end users; and reports, analyses, studies, or other materials containing or based upon Confidential Information. Confidential Information may take the form of documentation, drawings, specifications, software, technical, or engineering data, or other physical or electronic writings.

B.    "Representatives" means the affiliates of either party, and the respective directors, officers, employees, attorneys, consultants, and other agents and advisors of either party or of the affiliates of either party. Each party shall be responsible for any breach of these non-disclosure obligations by its respective Representatives and shall take all reasonably necessary measures to restrain its Representatives from the unauthorized disclosure or use of Confidential Information.

C.    All Confidential Information disclosed in connection with the Agreement shall be deemed confidential and subject to these non-disclosure obligations unless otherwise confirmed in writing by the disclosing party. The existence and terms of the Agreement, and the fact and substance of all discussions or correspondence relating to the Agreement, including the identification of either party by name or identifiable description, shall be deemed Confidential Information of both parties and shall not be disclosed without the consent of the other party.

D.    These non-disclosure obligations shall apply as of the Effective Date of the Agreement, and shall cover all Confidential Information disclosed in connection with the Agreement before or after the Effective Date. Upon termination or expiration of the Agreement, the parties' obligations with respect to all Confidential Information disclosed in connection with the Agreement shall survive for an additional two (2) years.

E.    With respect to Confidential Information disclosed in connection with the Agreement, unless otherwise mutually agreed upon in writing, the receiving party and its Representatives shall: (a) hold the Confidential Information in confidence, exercising a degree of care not less than the care used to protect its own confidential or proprietary information from disclosure, and in no event less than a reasonable degree of care; (b) restrict disclosure of the Confidential Information solely to those Representatives with a need to know and not disclose it to any other person; (c) advise those Representatives of their confidentiality obligations with respect to the Confidential Information; (d) use and/or reproduce the Confidential Information only in connection with or as authorized by the Agreement.

F.    Confidential Information shall be deemed the property of the disclosing party and each party retains the right, in its sole discretion, to determine whether to disclose any Confidential Information to the other party. Within ten (10) days upon written request from the disclosing party, except as licensed in the Agreement, the receiving party shall return to the disclosing party or destroy all Confidential Information in tangible form that is in the receiving party's possession, custody, or control.

G.    The receiving party shall have no obligation to preserve the confidential nature of any information that: (a) was previously known to such party free of any confidentiality obligation; (b) is or becomes publicly available by means other than unauthorized disclosure; (c) is developed by or on behalf of such party independent of any Confidential Information furnished in connection with the Agreement; or (d) is received from a third party whose disclosure does not violate any confidentiality obligation.

H.    Except as expressly warranted in the Agreement, each party acknowledges that neither party makes any representation or warranty (express or implied) as to the accuracy or completeness of any Confidential Information, and agrees to assume full responsibility for all conclusions it may derive from the Confidential Information.

I.    In the event that the receiving party or its Representatives (a) need to make disclosures of Confidential Information for securities law purposes, or (b) are required by law, regulation, government agency or court order, discovery request, subpoena, or civil investigative demand to disclose any Confidential Information, in the case of (a) the receiving party shall provide the disclosing party with prompt written notice so that the disclosing party can work with the receiving party to limit the disclosure to the greatest extent possible consistent with legal obligations (provided that disclosure of the name of the other party shall never be made without that party's prior written consent); or in the case of (b) the receiving party shall use reasonable efforts to minimize such disclosure and to obtain an assurance that the recipient shall accord confidential treatment to the Confidential Information, and shall notify the disclosing party contemporaneously of such disclosure.

J.    These non-disclosure obligations shall not be construed as granting or conferring any rights by license or otherwise in any Confidential Information disclosed, or under any trademark, patent, trade secret, copyright, or any other intellectual property right of either party. Confidential Information shall not constitute any representation, warranty, assurance, guarantee, or inducement by either party to the other of any kind, especially with respect to the non-infringement of trademarks, patents, trade secrets, copyrights, or any other intellectual property right. Each party shall comply with any and all export laws and regulations applicable to the Confidential Information.

DOJ - 00125
CONFIDENTIAL

S 1756

ORIGINAL
**COPY**

**SBC & UUNET MSA**
**SERVICE SCHEDULE A**

**DIAL ACCESS SOLUTION -- INTERNET SERVICE PROVIDER**

This Service Schedule is entered into by the parties pursuant to the Master Services Agreement between SBC Global Services, Inc. ("SBC") and UUNET Technologies, Inc. ("UUNET" or "Customer"), dated December 31, 1999 ("Agreement"). The Agreement and this Service Schedule, along with any applicable tariffs identified herein, set forth the terms and conditions applicable to the provision of Dial Access Solution -- Internet Service Provider services ("DAS Services") by SBC and its affiliates. Words and phrases defined in the Agreement shall have the same meaning in this Service Schedule. This Service Schedule shall be effective as of December 31, 1999 ("Service Effective Date").

A.1.     Service Description; Demarcation.

    (a).    The DAS Services provide integrated, remote dial access service to Customer, its end users, and the end users of Customer's clients and resellers via modems referred to as network access servers ("NAS") deployed in central offices operated by SBC or an SBC affiliate classified as an incumbent local exchange carrier ("SBC COs"). The DAS Services provide medium to high-speed data transport services for remote dial access to Customer's network. The DAS Services permit Customer to receive calls from multiple analog modems and ISDN basic rate interface lines for handoff to separately purchased wide area network links. SBC shall connect each NAS used in connection with the DAS Services provided hereunder to the Public Switched Telephone Network ("PSTN") via ISDN primary rate interface ("PRI") or comparable telecommunications facilities, and shall arrange for the dedicated assignment of unique telephone numbers for use by Customer, its end users (for example, America OnLine), and the end users of Customer's clients (for example, a subscriber to America OnLine). SBC shall bill Customer for the use of the DAS Services in accordance with the provisions of the Agreement and this Service Schedule.

    (b).    The DAS Services include all equipment, telecommunications services and related facilities (including without limitation active PRI lines, at least 40 DID numbers per rotary, space, power, and other utilities), and ancillary support and maintenance required to connect a call which has been dialed into the PSTN (such call dialing a designated telephone number) to an active DS0 channel-equivalent port (i.e., PRI B-channel) on the corresponding NAS ("DAS Port"). The demarcation of the DAS Services between SBC and Customer shall be at the connection of the NAS egress port to the egress circuit connecting the NAS to the SBC or SBC affiliate's wide area network and/or Customer's network.

A.2.     Applicable Service Territory. The prices set forth in this Service Schedule shall apply to all DAS Services purchased hereunder for deployment in those SBC COs where DAS Services are available from SBC and/or its current and future affiliates. SBC agrees to use commercially reasonable efforts to make the DAS Services available in all SBC COs.

A.3.     Service Ordering Procedure.

    (a).    Customer shall provide SBC with a request for information ("RFI") in writing identifying (i) the number of DAS Ports being considered for deployment by Customer; and (ii) the geographic location (for a new rotary) or the central office (for the expansion of an existing rotary) for such identified DAS Ports.

    (b).    SBC shall have seven (7) calendar days from receipt of such RFI to advise Customer in writing whether (i) SBC agrees to provision such identified DAS Ports within the SLA installation time frame set forth in Section A.10(c) below; (ii) SBC agrees to provision such identified DAS Ports within an alternative, reasonable time frame that is greater than the SLA installation time frame set forth in Section A.10(c) below; or (iii) SBC does not agree to provision such identified DAS Ports.

    (c).    In the event that SBC responds affirmatively to Customer's RFI (in other words, provides a response pursuant to Sections A.3(b)(i) or A.3(b)(ii) above, Customer shall have seven (7) calendar days from receipt of SBC's written response to send SBC a firm and binding order in writing ("Firm Order") for the identified DAS Ports. Once SBC receives Customer's Firm Order, any cancellation by Customer of such Firm Order shall be subject to any applicable early termination charges as set forth in Section A.14 below, unless otherwise provided by the Agreement or this Service Schedule. If Customer does not send SBC a

DOJ - 00126
CONFIDENTIAL

SBC COBRA (final)

SBCO2001

S 1757

Firm Order within seven (7) calendar days from receipt of SBC's written response, Customer's RFI and SBC's response thereto shall be deemed to have expired.

(d).    In the event that SBC responds negatively to Customer's RFI (such negative response not being caused by an event of Force Majeure or SBC's inability to secure NAS equipment meeting Customer's specifications), SBC agrees that the number of identified DAS Ports thereafter shall count towards: (i) Customer's satisfaction of any applicable minimum purchase commitment set forth in Section A.8 below; and (ii) the number of active and ordered DAS Ports pursuant to Section A.4(a) below.  In the event that SBC responds affirmatively in part and negatively in part regarding the DAS Ports identified in Customer's RFI, this Section A.3(d) shall apply only with respect to those DAS Ports for which SBC does not agree to provision.

A.4.    Service Prices.

(a).    The monthly fee per DAS Port for a given calendar month shall be based on the number of active DAS Ports, plus the number of DAS Ports identified in any Firm Orders issued by Customer, plus the number of DAS Ports subject to the provisions set forth in Section A.3(d) above, plus the number of DAS Ports subject to the provisions set forth in Section A.10(e) below, plus the number of DAS Ports subject to the provisions set forth in Section A.14(e) below, and plus the number of DAS Ports subject to the provisions set forth in Section A.15 below, all of which to be determined as of the last day of such month, in accordance with the following table and subject to the Minimum Purchase Commitment set forth in Section A.8 below:

| Active & Ordered DAS Ports | Monthly Fee per DAS Port |
| --- | --- |
| 0 – 400,000 | $25.50 |
| 400,001 – 500,000 | $24.50 |
| 500,001 + | $24.00 |

(b).    No non-recurring charges shall apply with respect to the DAS Services provided that the Minimum Purchase Commitment set forth in Section A.8 below is met.  To the extent that any applicable tariff includes non-recurring charges, SBC agrees that such non-recurring charges already have been factored into the monthly fee for the DAS Services as set forth above; provided that all other performance obligations of Customer described in this Service Schedule, including the Minimum Purchase Commitment set forth in Section A.8 below, are met.

A.5.    Service Acceptance Procedures.  Customer's acceptance of new or migrated DAS Ports at a given location shall be made promptly following the successful completion of service acceptance tests conducted jointly by the parties.  At a minimum, such service acceptance tests shall include the login and RADIUS authentication to Customer's network via the newly deployed DAS Ports.

A.6.    Service Billing Procedures.  SBC shall bill Customer monthly in arrears based on the applicable monthly fee specified in Section A.4(a) above for all active DAS Ports as of the last day of the preceding month.

A.7.    Egress Circuit Access.  The prices set forth herein for the DAS Services include any applicable NAS egress port fees, but exclude any egress circuit charges.  SBC agrees, to the extent consistent with its then current policies applicable to similar interconnections, to fully cooperate with Customer and any third-party provider selected by Customer to connect any SBC NAS or SBC wide area network equipment to Customer's network via an egress circuit provisioned by such third-party provider to an SBC central office or SBC wide area network location.  SBC shall be compensated by Customer for any work associated with such interconnection to the extent SBC is compensated by third parties for similar work.

A.8.    Minimum Purchase Commitment.  Customer agrees to maintain a minimum of 300,000 active DAS Ports each month beginning with the first day of the thirteenth (13th) month after the Service Effective Date ("Minimum Commitment Date").  In the event that Customer does not have 300,000 active DAS Ports during a given month after the Minimum Commitment Date, Customer agrees to pay SBC for 300,000 DAS Ports in each such month

DOJ - 00127
CONFIDENTIAL

SBC COBRA (final)

SBCO2002

S 1758