REAR VIEW

**UUNET COBRA
CABINET
(using 3Com Equipment)**



Modem Chassis #4

Modem Chassis #3

Modem Chassis #2

Modem Chassis #1

Feed-thru Patch Pnel

Management Chassis

3Com Ethernet Switch
(front)

(Note: front of the ethernet switch
is facing the rear of the cabinet.)

Cisco 7204 Egress
Aggregator

Mod-Tap Patch Panel #4
Mod-Tap Patch Panel #3
Mod-Tap Patch Panel #2
Mod-Tap Patch Panel #1

(Note:Mod-Tap patch panels are
installed on rear rails with RJ45
connectors facing the front of the
cabinet and punch downs facing
rear of cabinet for each access by
the LEC provider)

Page 24 of 25

DOJ - 00189
CONFIDENTIAL

SBC COBRA (final)

SBCO2024

S 1780

***3Com Cabinet Specifications***

| | |
|---|---|
| Cabinet Size: | 24" wide x 36" deep x 84" high, plus room to open 24" access doors front and back.<br>Weight:<br>Second and Third Generation:  800 lbs. (no UPS installed)<br>Phase IV (now being installed):  750 lbs. (no UPS)<br>Footprint should be 3' deep X 2' wide for each cabinet and accommodate a height of 7 feet.<br>Requires 24" access front and rear doors to open 24" with no obstacles. |
| Electrical: | Requires two (2) twenty-amp (20) 120 volt single phase 3.1 KVA plugs, with (2) L5-20R receptacles per cabinet.  Plug locations under raised floor or directly accessible within 6 inches of cabinet if slab floor. They should be no more than 6 inches from the cabinet and no higher than 4 inches from the floor.  Raised floor cutout must be 1 foot X 1 foot in dimension. |
| Flooring: | Raised computer floor preferred provided under-floor ventilation is present, otherwise slab floor is acceptable.  First floor location preferable.<br>Floor loading requirements are 100 lbs. per square foot. |
| Telephone: | Each cabinet may have a maximum of sixty-two (62) DS1 circuits and one (1) POTS line. |
| Environmental: | Room temperatures maintained between 55-75 degrees F. is required.  Each cabinet generates 12,000 BTUs per hour.<br><br>Facility must provide a virtually dust-dirt free environment for cabinet location.  Cabinets should not be placed within 2 feet of any heating or air conditioning vents and or ducts or located in the proximity of automated sprinkler heads. |
| Grounding: | Cabinet must be grounded at facility.  Any facility with a grounding ring must ground cabinet to facility grounding ring. |

DOJ - 00190<br>CONFIDENTIAL

SBC COBRA (final)

SBCO2025

S 1781

# EXHIBIT 29

S 1782

# COPY

## AMENDED & RESTATED MASTER SERVICES AGREEMENT

This Amended & Restated Master Services Agreement ("Agreement" or "MSA") is entered into by and between MCI WORLDCOM Network Services, Inc., with a place of business located at 22001 Loudoun County Parkway, Ashburn, VA 20147 ("WorldCom"), and Qwest Government Services, Inc., on behalf of itself, Qwest Corporation, Qwest Interprise America, Inc., and other Qwest affiliated companies as identified in service schedules hereunder, with a place of business located at 1801 California Street, Denver, CO 80202 ("Vendor"), effective as of June 29, 2001 ("Effective Date").

The parties hereto agree as follows:

1. **Services.**

   1.1 Each service ("Service") provided hereunder shall be the subject of a service schedule ("Service Schedule") that specifies, at a minimum, the following terms and conditions:

      (a) Service Description;

      (b) Service Territory;

      (c) Service Ordering Procedures and Order Forms;

      (d) Service Pricing;

      (e) Desired In-Service Date & Acceptance Procedures (if any);

      (f) Service Billing Procedures;

      (g) Service Level Agreements (if available);

      (h) Service Performance Reports (if available);

      (i) Minimum Purchase Commitments (if any);

      (j) Applicable Tariffs (if any); and

      (k) Applicable Service Term and Early Termination Liabilities (if any).

   Each Service Schedule shall be signed by the authorized representatives of both parties and, so executed, shall constitute an integral component of this Agreement. In the event of any conflict between this Agreement and a Service Schedule, the provisions of the Service Schedule shall govern.

   1.2 In the event that the parties enter into multiple Service Schedules under this Agreement, and to the extent that Vendor is able to do so, the parties may negotiate in good faith an annual, revenue-based volume credit that would apply to the Services provided hereunder. Such volume credit will be covered under a separate customer revenue plan to be negotiated by the Parties, and will apply to those Services under this Master Services Agreement as agreed to by the Parties in such separate agreement. Such volume credit also shall be subject to applicable federal and state laws, regulations, and tariffs.

   1.3 Unless otherwise expressly provided in a Service Schedule, the aggregate prices for Services provided hereunder shall be no less favorable to WorldCom than the aggregate prices extended by Vendor to any other retail non-governmental customer meeting similar qualifications or requirements as WorldCom for substantially similar Services with substantially similar quantities, locations, architectures, configurations, and contractual terms and conditions. Upon WorldCom's request, but no more than once per year, Vendor's finance official shall certify in writing as to Vendor's compliance with this Section 1.3.

   1.4 Except where modifications or changes to Service are required by law or regulation, Vendor shall not implement any material modifications or changes to a Service without first providing WorldCom with written notice and a description of such modifications or changes. Material modifications or changes as defined herein shall mean modifications or changes that significantly affect the quality of Service WorldCom receives. Furthermore, Vendor shall afford WorldCom a reasonable opportunity to object in writing prior to the implementation of such modifications or changes. In the event of such an objection by WorldCom, to the extent a delay will not affect the provision of services to other customers, Vendor agrees to defer the implementation of the objectionable modifications or changes while the parties confer

S 1783

and negotiate in good faith a mutually-agreeable resolution to WorldCom's objection.

1.5 Notwithstanding Section 1.4 above, for those custom Services provided by Vendor (e.g., COBRA, COWAN) that are identified as such in the applicable Service Schedule, Vendor agrees not to implement any material modifications to the quality or engineering of such Service without first providing WorldCom with at least 120 days prior written notice ("Notice Period") and a detailed description of the proposed modifications. The parties shall conduct joint testing of Vendor's proposed modifications and shall use commercially reasonable efforts to reach mutual agreement as to the nature and scope of the modifications to be implemented. In the event that the parties are unable to reach agreement and Vendor proceeds to implement the proposed modifications after the expiration of the Notice Period, WorldCom may terminate the affected Service Schedule upon written notice to Vendor without liability for any termination charges.

## 2.   Term.

2.1 The term of this Agreement will commence upon the Effective Date, and will conclude upon the later of: (a) thirty-six (36) months after the Effective Date; or (b) the expiration or termination of the last service term of the Service Schedules issued hereunder. Each Service Schedule shall set forth its own service term and, if applicable, any renewal term thereof. Absent a specified renewal term, a Service Schedule automatically shall renew on a month-to-month basis at the same rates as during the prior service term, except that tariffed services shall continue to be provided at the then current tariff rates for month-to-month service, unless not renewed by either party upon thirty (30) days prior written notice to the other party.

2.2 Except as otherwise provided in this Agreement or the applicable Service Schedule, if WorldCom terminates a Service prior to completion of the applicable service term, WorldCom shall pay Vendor any applicable early termination charges. Such charges shall be set forth with particularity in the Service Schedule for the terminated Service.

2.3 In the event of expiration or termination of this Agreement or any Service Schedule issued hereunder, the parties shall work cooperatively to minimize any potential interruptions of service and/or other disruptions or inconveniences to WorldCom and its end users. In the event that this Agreement or a Service Schedule is terminated by WorldCom prior to the expiration date, WorldCom may specify in writing a transition schedule of up to six (6) months with respect to the Service(s) being terminated. For tariffed Services, in no event shall such transition schedule extend beyond the original term of the relevant Service Schedule(s). Vendor agrees to continue performing the terminated Service(s) during the specified transition period in accordance with the terms of this Agreement, the applicable Service Schedule, and the transition schedule; provided that WorldCom shall pay Vendor for the terminated Service(s) performed during the specified transition period at the same rates in effect prior to the issuance of WorldCom's termination notice. Additionally, should WorldCom terminate this Agreement or any Service Schedule issued hereunder without cause, WorldCom shall pay any early termination charges as set forth in the relevant Service Schedule(s).

## 3.   Payment & Taxes.

3.1 Payments will be made by WorldCom within thirty (30) days after receipt of an accurate invoice submitted by Vendor; provided that if a Service is subject to an alternative payment provision set forth in an applicable tariff, then such alternative payment provision shall apply to that Service. All invoices for Services shall be sent to: MCI WORLDCOM Network Services, Inc., Attention: Accounts Payable, 22001 Loudoun County Parkway, Building E-1, Ashburn, VA 20147. Where permitted by law, late payment charges shall be assessed according to tariff or law. Vendor's failure to submit to WorldCom an invoice for Services performed during a given month ("Month of Performance") within eighteen (18) months after the end of the Month of Performance shall constitute a complete and voluntary waiver of such Service charges by Vendor, and WorldCom shall not be liable for payment for the Month of Performance of such Services. Such waiver shall not apply to Services governed by Federal Communications Commission (FCC) Tariff. Additionally, the foregoing 18-month limitation on billing shall not apply where Services have been invoiced, but were invoiced incorrectly, and an adjustment (either credit or back bill) becomes necessary.

S 1784

3.2    The prices for Services shown in Service Schedules hereunder do not include applicable taxes, usual and customary surcharges, and any other government imposed fees and charges that relate to the Service or installation (collectively, "Taxes"). WorldCom agrees to pay all applicable Taxes that Vendor is required or authorized to collect or pay in connection with a Service; provided that such Taxes are properly itemized in each invoice submitted by Vendor. In no event shall WorldCom be required to pay any taxes on the net income, municipal franchise, real or personal property, or gross receipts of Vendor. In the event that WorldCom believes that it is exempt from otherwise applicable Taxes, WorldCom shall provide Vendor with an exemption certificate evidencing such claimed exemption, which Vendor shall honor.

3.3    For regulated Services, WorldCom shall also pay all Taxes that are mandated by law or regulation subsequent to execution of this Agreement or its underlying Service Schedules. For other Taxes that are not mandated, but that Vendor may be authorized to collect (in connection with regulated Services) at its option, by federal, state or local governmental agencies, which arise subsequent to execution of this Agreement or its underlying Service Schedules, WorldCom shall pay such Taxes unless the net monthly recurring price paid by WorldCom to Vendor for such Service is increased by such non-mandated Taxes by ten percent (10%) or more. In such event, upon written notice by WorldCom to Vendor the parties shall negotiate in good faith an appropriate price reduction for such Service. In the event that the parties are unable to reach a mutually satisfactory agreement with respect to such price reduction within ninety (90) days after WorldCom's written notification, WorldCom may elect to terminate the affected Service without liability for any termination charges upon thirty (30) days prior written notice to Vendor, subject to the transition provisions set forth in Section 2.3 above.

3.4    For unregulated Services, in the event that new or increased Taxes are imposed upon such Service after the applicable Service Schedule is executed by the parties, such that the net monthly recurring price paid by WorldCom to Vendor for such Service is increased by ten percent (10%) or more, upon written notice by WorldCom to Vendor the parties shall meet and confer regarding such change in Taxes, and negotiate in good faith any appropriate revisions to the applicable Service Schedule as may be mutually agreed upon by the parties. In the event that the parties are unable to reach a mutually satisfactory agreement with respect to such price reduction within ninety (90) days after WorldCom's written notification, WorldCom may elect to terminate the affected Service without liability for any termination charges upon thirty (30) days prior written notice to Vendor, subject to the transition provisions set forth in Section 2.3 above.

3.5    WorldCom shall have the right to dispute any charge included in a Vendor invoice; provided that all such disputes shall be brought in good faith with a bona fide basis in fact. In the event of any such dispute, the portion of the invoice that is undisputed shall be paid by WorldCom as provided herein. WorldCom shall have the right to withhold payment of any disputed amount; provided that WorldCom gives notice of such withheld amount to Vendor and the factual basis for the dispute at the time payment is withheld. Notwithstanding any contrary provision of this Agreement, WorldCom's failure to pay any invoice or portion thereof as a result of an unresolved, good faith dispute shall not be considered a breach of this Agreement.

4.    **Termination.**

4.1    Either party may terminate this Agreement without liability for any termination charges if any one of the following events of default should occur:

(a) if the other party fails to perform or comply with any material provision of this Agreement, including without limitation any Service Schedule issued hereunder; or

(b) if the other party becomes insolvent or admits in writing its inability to pay debts as they mature, or makes an assignment for the benefit of creditors; or

(c) if a petition under any foreign, state, or United States bankruptcy act, receivership statute, or the like, as they now exist, or as they may be amended, is filed by the other party; or

(d) if such a petition is filed against the other party by any third party and such application is not resolved favorably to such other party within sixty (60) days.

Termination due to default under subpart (a) above shall be effective thirty (30) days after receipt of

S 1785

written notice sent to the defaulting party pursuant to Section 14 below if such default has not been cured during such thirty (30) day notice period.

4.2   WorldCom's failure to pay any undisputed invoice within thirty (30) days after receipt of written notice from Vendor pursuant to Section 14 below indicating that such invoice is past due shall constitute a material failure to perform this Agreement under Section 4.1(a) above.

4.3   Termination of this Agreement shall effect the termination of all Service Schedules issued hereunder. Termination of any single Service Schedule, in whole or in part, shall not serve to terminate or affect any other Service Schedule, this Agreement, or any other rights or obligations of the parties, unless specifically and conspicuously stated in the notice of termination.

4.4   The provisions set forth in Section 5 (Representations & Warranties), Section 6 (Limitation of Liability), Section 7 (Intellectual Property Indemnity), and Section 8 (Confidentiality), as well as any other provision that reasonably may be expected to survive, shall survive the expiration or termination of this Agreement; provided that Section 8 shall survive only for the period specified in Subpart D of Exhibit 1.

5.    **Representations & Warranties.**

5.1   Vendor shall provide suitably qualified personnel to perform this Agreement and all Service Schedules issued hereunder in a timely and efficient manner with diligence and care, consistent with the professional standards of practice in the industry, and in conformance with all applicable laws and regulations.

5.2   Services provided by Vendor to WorldCom under Service Schedules to this Agreement shall comply with this Agreement and the applicable Service Schedule, including, where applicable, any service specifications or service level agreements set forth therein.

5.3   Vendor agrees to provide and maintain the Services (including without limitation Vendor's network) in accordance with the general standards of commercial practice in the telecommunications industry. The parties agree that those standards applied by Vendor to similar projects for itself, for any of its affiliated companies, and for other similarly-situated commercial clients may be considered indicia of then-current industry standards. All Service upgrades or other modifications shall be implemented in accordance with Sections 1.4 and 1.5 (as applicable) above, as well as any Service upgrade and cost-sharing/savings provisions set forth in the applicable Service Schedule.

5.4   EXCEPT AS OTHERWISE PROVIDED HEREIN OR IN SERVICE SCHEDULES HEREUNDER, THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

6.    Limitation of Liability.   EXCEPT WITH RESPECT TO THE PARTIES' OBLIGATIONS UNDER SECTION 7 (INDEMNITIES) AND SECTION 8 (CONFIDENTIALITY), IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY SPECIAL, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING WITHOUT LIMITATION ANY SERVICE SCHEDULE ISSUED HEREUNDER, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  ADDITIONALLY, EXCEPT AS PROVIDED UNDER SECTION 7 (INDEMNITIES) OR SECTION 8 (CONFIDENTIALITY), VENDOR LIABILITY TO WORLDCOM FOR ANY DAMAGES OF ANY KIND UNDER THIS AGREEMENT SHALL NOT EXCEED, IN AMOUNT, A SUM EQUIVALENT TO THE APPLICABLE OUT-OF-SERVICE CREDIT UNDER THE RELEVANT TARIFF, OR AS OTHERWISE PROVIDED IN SERVICE SCHEDULES HEREUNDER.  REMEDIES UNDER THIS AGREEMENT ARE EXCLUSIVE AND LIMITED TO THOSE EXPRESSLY DESCRIBED IN THIS AGREEMENT AND ITS UNDERLYING SERVICE SCHEDULES.

7.    Indemnities.

7.1   Vendor shall defend, indemnify, and hold harmless WorldCom and its affiliates, customers, resellers, and end users from any third party claim alleging that a Service provided hereunder violates any United States patent, trade secret, or copyright of any third party ("Infringement Claim"); provided that WorldCom provides Vendor with: (a) prompt notice of such claim; (b) sole control over the defense and/or settlement of such claim; and (c) all assistance reasonably required (at Vendor's expense) for the defense of such claim.

S 1786

7.2 Section 7.1 shall not apply to any infringement or claim of infringement: (a) arising from adherence to instructions or drawings which Vendor has been directed by WorldCom to follow; (b) which is not directly related to the equipment, software, or Services furnished by Vendor; or (c) which arises solely because of the combination of Vendor-supplied equipment, software, or Services with the software, equipment, or services of another party.

7.3 If the use of a Service is enjoined as a result of an Infringement Claim, in addition to the indemnity set forth in Section 7.1 above, Vendor shall (at Vendor's expense and at Vendor's option) either: (i) obtain for WorldCom the right to use the infringing Service; (ii) modify such Service in a manner that maintains all existing functionality, is acceptable to WorldCom, and does not infringe any third party intellectual property rights; or (iii) substitute equivalent services that are acceptable to WorldCom and do not infringe any third party intellectual property rights.

7.4 Sections 7.1 through 7.3 above state the entire liability of Vendor with regard to any such infringement.

7.5 Each party shall be responsible for any actual physical damages it directly causes to the other in the course of its performance under this Agreement or its underlying Service Schedule(s), limited to damages resulting from personal injuries, death, or property damage arising from negligent acts or omissions; PROVIDED, HOWEVER, THAT NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT, OR SPECIAL DAMAGES OR ANY KIND, INCLUDING BUT NOT LIMITED TO ANY LOSS OF USE, LOSS OF BUSINESS, OR LOSS OF PROFIT.

8. **Confidentiality.** The parties agree to abide by the mutual non-disclosure obligations set forth in the attached Exhibit 1.

9. **No Publicity.** Neither party may use the name, logos, trademarks, service marks, or other proprietary identifying symbols of the other party in any press release, public statement, advertising, signage, marketing materials, brochures, or other materials in any medium without the other party's prior written consent. With respect to WorldCom, such prior written consent shall be required from both: (a) a Vice President or more senior officer of WorldCom; and (b) an authorized representative of WorldCom's media relations department. Any such permitted use shall comply with the guidelines or instructions provided by the other party. Consent may be revoked by a party at any time for any reason upon written notice to the other party.

10. **Force Majeure.**

10.1 Neither party shall be liable for any loss or damage resulting from any cause beyond its reasonable control ("Force Majeure"), such as, but not limited to, fire, explosion, lightning, flood, earthquake, strikes or labor disputes, floods, storms, acts of God, war, civil disturbances, acts of civil or military authorities, changes of law or regulation, or the public enemy. Upon the occurrence of any Force Majeure event and to the extent such Force Majeure event substantially interferes with a party's performance with respect to or use of a Service, such party shall be excused from its applicable obligations under this Agreement during the period of the Force Majeure event; provided that the party invoking this Section 10.1 uses all commercially reasonable efforts to avoid or remove the causes of the Force Majeure event. In the event that Vendor invokes this Section 10.1 for a Service outage, WorldCom shall be entitled to an out-of-service credit for the period of the period of such force majeure event, as set forth in the applicable tariff or Service Schedule.

10.2 In the event of a delaying or interfering condition having more than forty-five (45) days duration, the other party may terminate the portion of Service(s) that cannot be restored without liability for any termination charges, and reduce any applicable minimum purchase commitments accordingly, upon fifteen (15) days prior written notice to the party invoking Section 10.1 above, subject to the transition provisions set forth in Section 2.3 above. Portions of Service(s) not affected, or that have been restored, may not be terminated without liability for termination charges.

11. **Insurance.** Vendor agrees to maintain (at Vendor's expense) during the term of this Agreement: Commercial General Liability Insurance in an amount not less than two million dollars ($2,000,000) per occurrence for bodily injury or property damage; Employer's Liability Insurance in an amount not less than one million dollars ($1,000,000) per occurrence; Workers' Compensation Insurance in an amount not less that that prescribed by statutory limits; Commercial Automobile Liability Insurance applicable to bodily injury and property damage, covering owned, non-owned, leased, and hired vehicles, in an amount not less than one million dollars

($1,000,000) per accident; and Umbrella or Excess Liability Insurance with a combined single limit of no less than one million dollars ($1,000,000) per occurrence to apply over Commercial General Liability, Employer's Liability, Workers' Compensation, and Commercial Automobile Liability Insurance.

Assignment. Neither party may assign any of its rights or obligations under this Agreement (by contract or operation of law) without the prior written consent of the other party, which shall not be unreasonably withheld, conditioned, or delayed; provided that either party may assign this Agreement in its entirety to any affiliate of such party upon written notice to the other party. For purposes of this Agreement, an affiliate shall mean any entity that controls, is controlled by, or is under common control with a party. Notwithstanding the foregoing, Vendor may assign this Agreement and any underlying Service Schedule(s) to a successor corporation without prior written notice to WorldCom.

13.    Governing Law & Dispute Resolution.

13.1    This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to any conflict of laws principles; provided that if a Service is subject to an alternative governing law provision set forth in an applicable tariff, then such alternative governing law provision shall apply to such Service. This Agreement, its underlying Service Schedules, and the Parties' actions thereunder shall comply with all applicable federal, state, and local laws, rules, regulations, court orders, and governmental agency orders. Any change in rates, charges or regulations mandated by the legally constituted authorities will act as a modification of any contract to that extent without further notice; provided that Vendor shall supply WorldCom with written notice of such change as soon thereafter as practicable.

13.2    Other than those claims over which a regulatory agency has exclusive jurisdiction or those claims that solely seek injunctive relief for imminent harm, all claims, regardless of legal theory, whenever brought and whether between the Parties or between one of the Parties to this Agreement or its underlying Service Schedules, and the employees, agents or affiliated businesses of the other Party, shall be resolved by arbitration. A single arbitrator engaged in the practice of law and knowledgeable about telecommunications law shall conduct the arbitration in accordance with the then current rules of the American Arbitration Association ("AAA").

13.3.    All expedited procedures prescribed by the AAA shall apply. The cost of the arbitration, including the fees and expenses of the arbitrator, shall be shared equally by the parties unless the award provided otherwise. The arbitrator's decision shall be final and binding and judgment may be entered in any court having jurisdiction thereof. Except as required by applicable law or regulation, the existence, outcome, and contents of any arbitration proceeding shall be kept confidential and the arbitrator shall be required to adhere to the same obligation of confidentiality.

13.4.    Other than the determination of those claims over which a regulatory agency has exclusive jurisdiction, federal law (including the provisions of the Federal Arbitration Act, 9 U.S.C. §§ 1-16) shall govern and control with respect to any issue relating to the validity of this Agreement to arbitrate and the arbitrability of the claims. Any arbitration initiated by WorldCom shall be held in Denver, Colorado. Any arbitration initiated by Vendor shall be held in the Washington, D.C. metropolitan area.

13.5.    If any Party files a judicial or administrative action asserting claims subject to arbitration, and another Party successfully stays such action and/or compels arbitration of such claims, the Party filing the action shall pay the other Party's costs and expenses incurred in seeking such stay or compelling arbitration, including reasonable attorney's fees.

14.    Notices. All notices or other communications hereunder shall be deemed to have been fully given when made in writing and delivered in person, by confirmed facsimile or overnight courier, or deposited in the United States mail, postage prepaid, and addressed as follows:

To WorldCom:    MCI WORLDCOM Network Services, Inc.
Attention: Vice President & Chief Network Counsel
22001 Loudoun County Parkway
Ashburn, VA  20147
Fax: (703) 886-5807

S 1788

<u>With a copy to:</u>

MCI WORLDCOM Network Services, Inc.
Attention: Senior Director, Global Capacity Acquisition
Mailstop: 3060-662
22001 Loudoun County Parkway
Ashburn, VA 20147
Fax: (703) 645-4160

<u>To Vendor:</u>

Qwest Government Services, Inc.
Attention: Carolyn P. Payne, Account Director
421 S.W. Oak Street, 7th Floor
Portland, OR 97204
Fax: (503) 425-5252

<u>With a copy to:</u>

Qwest Communications International Inc.
Attention: David Aschkinasi, Corporate Counsel
1801 California Street, Suite 3800
Denver, CO 80202-1984
Fax: (303) 308-1656

The addresses to which notices may be given by either party may be changed upon written notice given to the other party pursuant to this Section 14.

15. <u>Non-Waiver.</u> The failure of a party to insist upon strict performance of any provision of this Agreement (including without limitation a Service Schedule issued hereunder) in one or more instances shall not be construed as a waiver or relinquishment for the future of any such provision, but the same shall be and remain in full force and effect.

16. <u>Severability.</u> If any term of this Agreement (including without limitation a Service Schedule issued hereunder) is determined by a federal or state court to be unenforceable, then such term shall be enforced to the maximum extent permitted by law, rather than voided, and the remaining terms of this Agreement shall remain in full force and effect.

17. <u>Relationship of Parties.</u>

17.1    The relationship created by this Agreement is non-exclusive. WorldCom shall be free to acquire services similar to the Services from alternative sources without obligation to Vendor.

17.2    WorldCom and Vendor hereby declare and agree that each is engaged in an independent business and shall perform its obligations under this Agreement and its underlying Service Schedule(s) as an independent contractor and not as an agent, employee, or servant of the other. Each has and hereby retains the right to exercise full control of and supervision over the performance of its own obligations hereunder and full control over the employment, direction, compensation, and discharge of its own employees assisting in the performance of such obligations. Each shall be solely responsible for all matters relating to payment of its own employees, including compliance with social security, withholding, and all other regulations governing such matters. Each shall be responsible for its own acts and those of its subordinates, employees, agents, and subcontractors during the performance of its obligations hereunder.

17.3    This Agreement is not intended by the parties to constitute or create any form of business relationship beyond the express terms hereof, and the rights and obligations of the parties shall only be those expressly set forth herein. Neither party shall have authority to bind the other, except to the extent expressly authorized herein.

17.4    On a semi-annual basis (or more frequently as warranted by market circumstances), WorldCom may

S 1789

request that the parties conduct a business review of this Agreement, Vendor's performance of the Services provided hereunder, the market competitiveness of the discounted pricing set forth in the any Service Schedule issued hereunder, any projected technology improvements and other market developments, the projected growth of the parties' business relationship hereunder, and such other relevant business issues as the parties may deem appropriate.

18.    Purchases on Behalf of WorldCom Affiliates.

18.1    WorldCom may purchase Services pursuant to this Agreement for use by WorldCom's affiliates and their end users. HOWEVER, THE PROVISION BY VENDOR OF SERVICES PURCHASED BY WORLDCOM UNDER THIS AGREEMENT SHALL NOT BE INTERPRETED, CONSTRUED, OR REGARDED, EITHER EXPRESSLY OR IMPLIED, AS BEING FOR THE BENEFIT OF, OR CREATING ANY VENDOR OBLIGATION TOWARD ANY THIRD PARTY OR LEGAL ENTITY OTHER THAN WORLDCOM. THIS AGREEMENT BENEFITS ONLY VENDOR AND WORLDCOM; THERE ARE NO THIRD-PARTY BENEFICIARIES.

18.2    The limitations of liability set forth in Section 6, as well as all other relevant provisions of this Agreement and the applicable Service Schedule(s), shall apply to any Services purchased by WorldCom under this Section 18 for use by WorldCom's affiliates and their end users.

19.    Applicable Tariff Regulations.

19.1    The parties acknowledge that this Agreement and some or all of the Services Schedule(s) hereunder may be subject to review and approval by certain federal, state, and local regulatory bodies. If any such regulatory body does not approve this Agreement or any Service Schedule(s), or requests alteration of the terms and conditions of this Agreement (including without limitation any Service Schedule issued hereunder) that materially and adversely impacts either party, the affected Agreement and/or Service Schedule(s) may be terminated by either Party without liability. Alternatively, the Parties may modify this Agreement and/or Service Schedule(s) by mutual agreement in order to obtain regulatory approval.

19.2    WorldCom acknowledges that Services provided hereunder may be subject to Vendor's published tariffs. All tariffs applicable to a given Service shall be identified by Vendor in the Service Schedule for such Service. In the event of a conflict between the terms and conditions of this Agreement or its underlying Service Schedule(s) and the applicable tariff, the then current tariff shall prevail. For any Service that was not subject to a Vendor tariff at the time the applicable Service Schedule was executed by the parties, Vendor agrees that any subsequently implemented tariff provision that would apply to such Service shall be materially consistent with the provisions of this Agreement and the applicable Service Schedule, or WorldCom may terminate the affected Service without liability for any termination charges upon written notice to Vendor if Vendor does not remedy the material inconsistency within sixty (60) days of receipt of written notice of such inconsistency. For purposes of this Section 19.2, the Central Office-Based Remote Access Service Schedule, as amended and restated effective June 29, 2001, was originally executed by the parties on or about, and became effective as of, August 28, 2000.

19.3    Approval of this Agreement by any applicable regulatory body does not constitute a determination that the terms and conditions of this Agreement should be upheld in a court of law. Approval by any applicable regulatory body of any termination liability provision is not intended to indicate that the applicable regulatory body has approved such terms and conditions. The parties are free to pursue all available legal remedies should a dispute of such nature arise.

19.4    This Agreement (including without limitation all Service Schedules issued hereunder) is in addition to, and in no way replaces, any applicable tariff provisions, and together with such tariff provisions, shall be used to settle any dispute that may arise with respect to a Service provided hereunder.

20.    Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same instrument.

S 1790

21.  <u>Entire Agreement</u>. This Agreement (including all Services Schedules issued hereunder and any applicable tariff provisions identified therein) shall constitute the complete, final, and exclusive statement of the terms of the agreement between Vendor and WorldCom regarding the subject matter hereof, and shall supersede all prior or contemporaneous written or oral representations, understandings, and communications relating thereto. Specifically, this Agreement supersedes in its entirety the original Master Services Agreement between UUNET Technologies, Inc. ("UUNET") and Qwest Business & Government Services, Inc., dated August 28, 2000, and Vendor acknowledges that UUNET assigned such original MSA and all rights and obligations related thereto to WorldCom, effective as of June 29, 2001. The terms and conditions of this Agreement shall not be varied, supplemented, waived, qualified, modified, or interpreted by any prior or subsequent course of dealing between the parties, failure, or delay to enforce any rights hereunder, or by any usage of trade or manner other than by a subsequent writing signed by authorized representatives of both parties. Neither party shall be bound by any pre-printed terms additional to or different from those in this Agreement that may appear subsequently in the other party's form documents, purchase orders, quotations, acknowledgments, invoices, or other communications.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective authorized representatives.

MCI WORLDCOM NETWORK SERVICES, INC.

By: _____

Printed Name: _SCOTT SULLIVAN_

Title: _CHIEF FINANCIAL OFFICER_

Date: _6/29/01_

QWEST GOVERNMENT SERVICES, INC.

By: _____

Printed Name: _AFSHIN MOHEBBI_

Title: _Pres. & C.O.O._

Date: _6/29/01_

S 1791

## EXHIBIT 1

### MUTUAL NON-DISCLOSURE OBLIGATIONS

Each party to the Agreement may wish to disclose certain proprietary and confidential information to the other party on a confidential basis. Such proprietary or confidential information ("Confidential Information") includes without limitation all technical or non-technical information; financial, accounting, or marketing data; business plans, analyses, forecasts, predictions, or projections; intellectual property, trade secrets, or know-how; personal, member, account, or identification information of end users; and reports, analyses, studies, or other materials containing or based upon Confidential Information. Confidential Information may take the form of documentation, drawings, specifications, software, technical, or engineering data, or other physical or electronic writings. If Confidential Information is provided in writing, it shall be clearly marked "CONFIDENTIAL", "PROPRIETARY", or the like. If Confidential Information is provided orally or in any other intangible form, the disclosing party shall tell the receiving party that the information is confidential at the time of first disclosure, and within 10 days of such disclosure shall deliver to the receiving party documents or other tangible materials clearly marked "CONFIDENTIAL", "PROPRIETARY", or the like which disclose or describe that information.

B.  "Representatives" means the affiliates of either party, and the respective directors, officers, employees, attorneys, consultants, and other agents and advisors of either party or of the affiliates of either party.  Each party shall be responsible for any breach of these non-disclosure obligations by its respective Representatives and shall take all reasonably necessary measures to restrain its Representatives from the unauthorized disclosure or use of Confidential Information.

C.  All Confidential Information disclosed in connection with the Agreement shall be deemed confidential and subject to these non-disclosure obligations unless otherwise confirmed in writing by the disclosing party.  WorldCom understands that, to the extent the Agreement, together with its underlying Service Schedule(s) deviates from Vendor's standard tariff pricing, terms or conditions, the Agreement and its underlying Service Schedules may be required to be filed with the state regulatory agencies where Service is provided. Except for disclosure required for such filings, the Parties agree that the existence and terms of the Agreement and its underlying Service Schedule(s) shall be held confidential by each Party.  Except with regard to such regulatory filings, the existence and terms of the Agreement, and the fact and substance of all discussions or correspondence relating to the Agreement, including the identification of either party by name or identifiable description, shall be deemed Confidential Information of both parties and shall not be disclosed without the consent of the other party.

D.  These non-disclosure obligations shall apply as of the Effective Date of the Agreement, and shall cover all Confidential Information disclosed in connection with the Agreement after the Effective Date.  Upon termination or expiration of the Agreement, the parties' obligations with respect to all Confidential Information disclosed in connection with the Agreement shall survive for an additional two (2) years.

E.  With respect to Confidential Information disclosed in connection with the Agreement, unless otherwise mutually agreed upon in writing, and except as provided in subparts C above or G below, the receiving party and its Representatives shall: (a) hold the Confidential Information in confidence, exercising a degree of care not less than the care used to protect its own confidential or proprietary information from disclosure, and in no event less than a reasonable degree of care; (b) restrict disclosure of the Confidential Information solely to those Representatives with a need to know and not disclose it to any other person; (c) advise those Representatives of their confidentiality obligations with respect to the Confidential Information; (d) use and/or reproduce the Confidential Information only in connection with or as authorized by the Agreement.

F.  Confidential Information shall be deemed the property of the disclosing party and each party retains the right, in its sole discretion, to determine whether to disclose any Confidential Information to the other party.  Within ten (10) days upon written request from the disclosing party, except as licensed in the Agreement, the receiving party shall return to the disclosing party or destroy all Confidential Information in tangible form that is in the receiving party's possession, custody, or control.

G.  The receiving party shall have no obligation to preserve the confidential nature of any information that: (a) was previously known to such party free of any confidentiality obligation; (b) is or becomes publicly available by means other than unauthorized disclosure; (c) is developed by or on behalf of such party independent of any Confidential Information furnished in connection with the Agreement; (d) is received from a third party whose disclosure does not violate any confidentiality obligation; (e) is disclosed by the disclosing party to a third party without similar restrictions on disclosure; (f) is required to be disclosed pursuant to operation of law or pursuant to order of a governmental agency (subject to the provisions of Subpart I below); or (g) is required to be disclosed pursuant to regulatory requirements as described in Subpart C above (subject to the provisions of Subpart I below).

H.  Except as expressly warranted in the Agreement, each party acknowledges that neither party makes any representation or warranty (express or implied) as to the accuracy or completeness of any Confidential Information, and agrees to assume full responsibility for all conclusions it may derive from the Confidential Information.

I.  In the event that the receiving party or its Representatives (a) need to make disclosures of Confidential Information for securities law purposes, or (b) are required by law, regulation, government agency or court order, discovery request, subpoena, or civil investigative demand to disclose any Confidential Information, in the case of (a) the receiving party shall provide the disclosing party with prompt written notice so that the disclosing party can work with the receiving party to limit the disclosure to the greatest extent possible consistent with legal obligations (provided that disclosure of the name of the other party shall never be made without that party's prior written consent); or in the case of (b) the receiving party shall use reasonable efforts to minimize such disclosure and (wherever possible) to obtain an assurance that the recipient shall accord confidential treatment to the Confidential Information, and shall notify the disclosing party contemporaneously of such disclosure.

J.  These non-disclosure obligations shall not be construed as granting or conferring any rights by license or otherwise in any Confidential Information disclosed, or under any trademark, patent, trade secret, copyright, or any other intellectual property right of either party.  Confidential Information shall not constitute any representation, warranty, assurance, guarantee, or inducement by either party to the other of any kind, especially with respect to the non-infringement of trademarks, patents, trade secrets, copyrights, or any other intellectual property right. Each party shall comply with any and all export laws and regulations applicable to the Confidential Information.

WORLDCOM / QWEST  CONFIDENTIAL              PAGE 10        DOJ - 00028            QWEST MSA – 6/29/01
                                                         CONFIDENTIAL

S 1792

## UNIFORM ACCESS SERVICES SCHEDULE

...hereas WorldCom currently purchases Uniform Access Services ("UAS") from Vendor for use in WorldCom's fixed-port ...al-up network ("ANS Network"); and

Whereas the parties wish to amend and restate the terms and conditions on which WorldCom purchases such services for the ANS Network until such time as such services may be converted by WorldCom to COBRA services;

Therefore, this Uniform Access Services Schedule ("Schedule") is entered into by and between MCI WORLDCOM Network Services, Inc., with a place of business located at 22001 Loudoun County Parkway, Ashburn, VA 20147 ("WorldCom"), and Qwest Corporation, with a place of business located at 1801 California Street, Denver, CO 80202 ("Vendor"), pursuant to the Master Services Agreement between WorldCom and Qwest Government Services, Inc., dated June 29, 2001 ("Agreement").

Words and phrases defined in the Agreement shall have the same meaning in this Schedule. This Schedule shall be effective as of June 29, 2001 ("Schedule Effective Date").

A.    Service Description.

1.    UAS Service ("Service") utilizes digital DS1 exchange telecommunications facilities and common equipment, linking WorldCom's, or WorldCom's colocation vendor's, premises to Vendor's local exchange switching office. Service includes: (a) use of digital facility (transmission capacity at a maximum speed of 1.544 megabits per second); (b) use of common equipment to interconnect with Vendor's local exchange switch; and (c). and network connection configured for "In-Only" or "Two-way" traffic. ("Circuit").

2.    Each Circuit shall be connected to WorldCom's access equipment via U.S. telecommunications industry standard four (4) wire technology associated with 1.544 Mbps service. Any necessary connection panels shall be provided by WorldCom. Unless otherwise required by an applicable tariff, the demarcation of the Service between Vendor and WorldCom shall be at the connection of a Circuit to the ingress port of WorldCom's access equipment (including any connection panels provided by WorldCom).

3.    Vendor shall own (or lease from a third party) all of the telecommunications equipment, cabling, and wiring used to provide the Service (collectively, "Service Equipment"). In providing the Service hereunder, Vendor agrees to utilize Service Equipment that complies with all current U.S. telecommunications industry standards.

4.    Vendor shall provide WorldCom with 24x7x365 technical support and proactively maintain and monitor all Circuits and Service Equipment. Vendor shall assist WorldCom in the immediate resolution of any Circuit failure in accordance with agreed-upon maintenance procedures and the response/repair times set forth in Subpart G(2) below.

5.    In addition to Vendor's monitoring responsibilities, WorldCom also may monitor some or all Circuits provided hereunder and report any detected malfunctions to the appropriate Vendor service center.

6.    Each June after the Schedule Effective Date, the parties shall meet to review and discuss the architecture and equipment used in connection with the Services, then-current market conditions, and the market competitiveness of the volume pricing set forth herein, as well as any business, performance, or operational issues as may then have arisen between the parties. The parties also shall discuss the deployment of future technologies in Vendor's networks, including without limitation, alternative call delivery technologies (e.g., soft switch technologies), and any corresponding price decreases associated with such deployment. The parties agree to negotiate in good faith to maintain the competitive viability of this Schedule and the Services provided hereunder.

B.    Service Territory. The prices set forth in this Schedule shall apply to all Circuits provided hereunder in all locations where Services are available (presently and in the future) within the fourteen-state Qwest (incumbent local exchange carrier) service area from Vendor and/or its current and future affiliates. Vendor agrees to use commercially reasonable efforts to make the Services available in all states and/or localities where Vendor is duly authorized to provide telecommunications services.

C.    Service Ordering Procedures.

DOJ - 00029
CONFIDENTIAL

S 1793

1. WorldCom shall provide Vendor with a request for information ("RFI") in writing identifying (i) the number of Circuits being considered for deployment by WorldCom; and (ii) the geographic location (for a new rotary) or the central office (for the expansion of an existing rotary) for such identified Circuits.

2. Vendor shall have seven (7) days from receipt of the RFI to advise WorldCom in writing whether (i) Vendor agrees to provision such identified Circuits within the SLA installation time frame set forth in Subpart G(3) below; (ii) Vendor agrees to provision such identified Circuits within an alternative, reasonable time frame that is greater than the SLA installation time frame set forth in Subpart G(3) below; or (iii) Vendor does not agree to provision such identified Circuits.

3. In the event that Vendor responds affirmatively to the RFI (i.e., provides a response pursuant to Subparts C(2)(i) or C(2)(ii) above), WorldCom shall have seven (7) days from receipt of Vendor's written response to send Vendor a firm and binding order in writing ("Firm Order") for the identified Circuits. Once Vendor receives WorldCom's Firm Order, any cancellation by WorldCom of the Circuits identified in such Firm Order shall be subject to any applicable early termination charges as set forth in Subpart K(3) below, unless otherwise provided by the Agreement or this Schedule. If WorldCom does not send Vendor a Firm Order within seven (7) days from receipt of Vendor's written response, WorldCom's RFI and Vendor's response thereto shall be deemed to have expired.

D. **Service Pricing.**

1. The Monthly Fee per Circuit shall be based on a rate of $22.50 per dial port (B channel) (equivalent to $540.00 per Circuit) provisioned over such Circuit ("ANS Ports"), plus any applicable mileage fees as set forth in Vendor's applicable UAS tariff(s).

2. No non-recurring charges shall apply with respect to the existing Circuits. To the extent that any applicable tariff includes non-recurring charges, Vendor agrees that such non-recurring charges already have been factored into the Monthly Fee per Circuit set forth in Subpart D(1) above.

3. For Circuits installed after the Schedule Effective Date, a non-recurring charge per Circuit shall apply in the amount of the lesser of (a) Vendor's then-current non-recurring charge under the applicable Vendor UAS tariff, or (b) $1050.00.

4. The Monthly Fees set forth in Subpart D(1) above do not include applicable Taxes; provided that the following procedures shall apply.

   a. If any Taxes are required or permitted by applicable law, ordinance or tariff to be collected from WorldCom by Vendor, then (i) Vendor will bill, as a separately stated item, WorldCom for such Tax, (ii) WorldCom will timely remit such Tax to Vendor, and (iii) Vendor will remit such collected Tax to the applicable governmental authority as required by law. Vendor will also promptly review any new tax if requested by WorldCom, and will cooperatively seek relief, if appropriate. If, as specified in more detail below, WorldCom submits to Vendor an exemption certificate or other appropriate documentation, then Vendor shall not bill WorldCom for such Tax.

   b. If Vendor does not collect a Tax because WorldCom asserts that it is not responsible for the Tax, or is otherwise excepted from the obligation which is later determined by formal action to be wrong then, as between Vendor and WorldCom, WorldCom will be liable for such uncollected Tax and any interest due and/or penalty assessed on the uncollected Tax by the applicable taxing authority or governmental entity.

   c. If either Party is audited by a taxing authority or other governmental entity the other Party agrees to reasonably cooperate with the Party being audited in order to respond to any audit inquires in a proper and timely manner so that the audit and/or any resulting controversy may be resolved expeditiously.

   d. If applicable law does exclude or exempt a purchase of services under this arrangement from a Tax, and if such applicable law also provides an exemption procedure, such as an exemption certificate requirement, then, if WorldCom complies with such procedure, Vendor will not bill or collect such Tax during the effective period of the exemption.

S 1794

e.   If applicable law does not exclude or exempt a purchase of services under this Agreement from a Tax, and does not also provide an exemption procedure, then Vendor will not bill or collect such Tax if WorldCom (i) furnishes Vendor with a letter signed by an officer of WorldCom claiming an exemption and identifying the applicable law which allows such exemption, and (ii) supplies Vendor with an indemnification agreement, reasonably acceptable to Vendor, which holds Vendor harmless on an after-tax basis with respect to forbearing to collect such Tax.

f.   With respect to any Tax or Tax controversy, WorldCom will be entitled to contest, pursuant to applicable law, and at its own expense, any Tax that it is ultimately obligated to pay. WorldCom will be entitled to the benefit of any refund or recovery resulting from such a contest.

E.   **Service Installation & Acceptance Procedures.**

1.   At any time during the installation process for each Circuit, Vendor shall provide the order status and then-current projected installation date to WorldCom's designated contact.

2.   WorldCom's acceptance of new Circuits installed at a given location shall be made promptly following the successful completion of service acceptance tests conducted jointly by the parties. A Circuit shall be deemed to be active upon WorldCom's acceptance of such Circuit pursuant to this Subpart E.

F.   **Service Billing Procedures.** Billing for Services shall be handled in accordance with the Amended and Restated Central Office-Based Remote Access Service Schedule entered into between the same parties as of the same date as this Schedule ("COBRA Schedule"). All ANS Ports provided under this Schedule shall count towards satisfaction of WorldCom's First and Second Commitments under the COBRA Schedule.

G.   **Service Level Agreements.**

1.   *Service Availability.* If Vendor causes a Service interruption, an out-of-service credit will be calculated under the state local exchange tariff. If there is no applicable tariff and the interruption lasts for more than twenty-four (24) consecutive hours after Vendor receives notice of it, Vendor will give WorldCom credit calculated by: (a) dividing the monthly rate for the affected Service by thirty (30) days; and then (b) multiplying that daily rate by the number of days, or major fraction, that Service was interrupted. Routine maintenance or rearrangement of facilities or equipment is not considered an out-of-service condition, provided (a) Vendor has provided WorldCom with forty-eight (48) hours advance written notice of such activities, and (b) Service is restored by the end of the period specified in the notification.

2.   *Service Failure Response Times.* Vendor shall diligently respond to and repair any failure of the Services based upon the grade of the failure, in accordance with the table set forth below.

| Grade | Severity / Problem Level | Mean Time to Respond | Mean Time to Repair |
|---|---|---|---|
| 5 | **Critical outage** (entire hub down; dial rotary isolation; reseller link down; >10% of normal dial traffic disrupted; non-redundant device failure). *Examples*: Circuit outage between the telephone switch and the NAS equipment; >30% of modems at any one CO are not responding; single point of failure piece of hardware outputting major alarms. | 15 minutes | 2 hours |
| 4 | **Major outage** (multiple users/nodes effected; <10% of dial traffic disrupted; severe service degradation). *Example*: <30% of modems at any one CO are not responding. | 1 hour | 4 hours |
| 3 | **Minor outage** (single user outage; capacity degradation; redundant device down; management access outage). *Examples*: No response from maintenance ports on a NAS server; single point of failure piece of hardware outputting minor alarms. | 2 hours | Next business day |
| 2 | **Important event** (condition being monitored; resolved awaiting parts). *Examples*: Non-service affecting problem on a NAS server; request for call back on non-service affecting issues. | 4 hours | Second business day |
| 1 | **Informational event** (requests for documentation). | Next business day | Second business day |

3. _Installation Objective._ Vendor shall install all new Circuits within forty-five (45) days after receipt of a Firm Order from WorldCom or in accordance with the alternative, reasonable time frame specified in Vendor's RFI response. Vendor immediately shall provide written notice to WorldCom in the event that Vendor determines after beginning the Circuit installation process that Vendor will not be able to meet this installation objective (or such alternative, reasonable time frame identified by Vendor in its RFI response pursuant to Subpart C(2)(ii) above). Upon receipt of such notice from Vendor, WorldCom may cancel the ordered Circuit(s) without liability for any termination charges.

4. _Operations Reviews & Chronic Failures._ Each calendar quarter the parties shall conduct an operations review at which time Vendor shall present analyses of its performance against the foregoing SLA provisions. Vendor shall identify the total number of all Grade 5 and Grade 4 failures in a given month ("Total Monthly Failures"), as well as the total number of times that Vendor did not meet a Grade 5 or Grade 4 response or repair time during such month ("R/R Failures"). If the number of R/R Failures exceeds ten-percent (10%) of the number of Total Monthly Failures, both parties agree to meet to: (i) determine the nature and source of such performance deficiencies and to develop mutually agreeable remedies and timelines to improve performance; and (ii) negotiate in good faith a mutually-agreeable monetary settlement with respect to the identified performance failures. In the event that Vendor's R/R Failures affect more than 100 Circuits during two (2) successive calendar quarters, WorldCom may terminate the affected Circuits without liability for any termination charges. The number of dial ports provisioned over any Circuits cancelled by WorldCom pursuant to the foregoing provision shall continue to count towards satisfaction of WorldCom's First and Second Commitments under the COBRA Schedule.

5. _Escalation Matrix._ Vendor agrees to provide WorldCom with an operations and senior management escalation matrix, and to update and maintain such matrix on a current basis for the service term of this Schedule. Such matrix shall include email addresses and telephone access numbers for operations and senior management points of contact who are available and authorized to address and resolve Vendor performance issues on a 24x7x365 basis.

H. _Service Performance Reports._ The below-listed information shall be recorded by Vendor for use by WorldCom in tracking maintenance and other Vendor performance issues. Vendor shall furnish to WorldCom a copy of the trouble log for the Services at the quarterly operations review. Vendor shall maintain one entry per trouble ticket opened, including at a minimum the following information.

- WorldCom Ticket #
- Vendor Ticket #

S 1796

- Vendor Opened Date & Time
- Name and telephone # of the person initiating the trouble report
- Name and telephone # of the person receiving the trouble report
- Nature of the reported trouble
- Diagnosis of trouble
- Name and telephone # of the person reporting trouble clearance
- Name and telephone # of the person receiving trouble clearance
- Vendor Restored Date & Time
- Total Time to Repair
- Total Time of Outage
- Vendor Closed Date & Time

I.  [RESERVED].

J.  Applicable Tariffs.  In the event that Vendor is required to make any tariff filings with respect to this Schedule, Vendor agrees to provide WorldCom with a draft of such tariff filing for WorldCom's review, comment, and approval, which shall not be unreasonably withheld, conditioned, or delayed by WorldCom.  Vendor agrees to afford WorldCom a reasonable period of time to conduct such review (but no less than ten (10) days), and to incorporate or otherwise address any reasonable comments provided in writing by WorldCom to Vendor.  In no event shall any tariff filing made by Vendor be inconsistent with or contrary to the terms and conditions of the Agreement or this Schedule.

K.  Applicable Service Term and Early Termination Liabilities.

1.  The term, renewal, and deactivation (in connection with the WorldCom's Minimum Purchase Commitment) of Services provided under this Schedule shall be handled in the same manner as for COBRA Ports under the COBRA Schedule.

2.  [Reserved].

3.  [Reserved].

4.  [Reserved].

5.  For any Circuit located in a rotary that has been active for at least six (6) months, WorldCom may have Vendor move such Circuit to another location where Vendor provides Services by paying only the applicable non-recurring installation charge for such Circuit.

6.  Except as otherwise provided in the Agreement or this Schedule, if WorldCom cancels a given Circuit prior to the expiration of this Schedule, WorldCom shall pay an early termination charge equal to fifty percent (50%) of the then-current Monthly Fee per Circuit calculated pursuant to Subpart D(I) above times the number of months remaining until the expiration of this Schedule, and WorldCom's First and Second Commitments under the COBRA Schedule shall be reduced by the number of dial-up ports provisioned over the cancelled Circuits.

7.  In the event that Vendor ceases to offer  Service through transfer of ownership of the Qwest CO to a non-Qwest entity, Vendor shall request the new owner to continue to provide service equivalent to the  Service at such CO, and shall, if the new owner agrees to continue the service, use commercially reasonable efforts to facilitate a smooth transition of the  Service to the new provider.  Notwithstanding the foregoing, with respect to any existing Circuits deployed in such Vendor COs ("Sold Circuits"), WorldCom shall have the right (and reasonable opportunity following written notice from Vendor) to terminate such Sold Circuits prior to their transfer to the new provider without the application of any early termination fees or other charges.  Before exercising its right to terminate, WorldCom will discuss its legitimate business and/or technical reasons for doing so with Vendor, provided that this sentence shall impose no obligation or restriction on WorldCom's exercise of its right to terminate, which it may do at its sole discretion for any reason or no reason.  In addition, and regardless of whether WorldCom terminates such Sold Circuits, WorldCom's First and Second Commitments under the COBRA Schedule shall be reduced by the number of such Sold Circuits.

8.  At any point, WorldCom may elect to migrate some or all of the Services to the architecture described in the COBRA Schedule ("COBRA Services") in accordance with the procedures specified in the COBRA Schedule. Vendor agrees that any termination charges associated with Vendor's or its affiliates' services

S 1797

*TAG G*

that result from the migration of the Services to the COBRA Services either shall be waived by Vendor or its affiliates, or (if paid by WorldCom) shall be credited against Vendor's invoices for the COBRA Services.

L.    Counterparts. This Schedule may be executed in several counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same instrument.

M.    Prior Contracts. This Schedule (in connection with the Agreement) supersedes in its entirety all prior contracts between WorldCom (or its affiliates) and Vendor for UAS services used in connection with WorldCom's ANS Network in the Qwest service areas.

IN WITNESS WHEREOF, the parties have caused this Schedule to be executed by their respective authorized representatives.

MCI WORLDCOM Network Services, Inc.                    Qwest Corporation

By: _____                    By: _____

Printed Name: _Louis R. Rustwood_              Printed Name: _AFSHIN MOHEBBI_

Title: _E.V.P._                                            Title: _PRES. & C.O.O._

Date: _6/29/01_                                           Date: _6-29-01_

# AMENDED & RESTATED CENTRAL OFFICE-BASED REMOTE ACCESS SERVICE SCHEDULE

This Amended & Restated Central Office-Based Remote Access Service Schedule ("Schedule") is entered into by and between MCI WORLDCOM Network Services, Inc., with a place of business located at 22001 Loudoun County Parkway, Ashburn, VA  20147 ("WorldCom"), and Qwest Corporation, with a place of business located at 1801 California Street, Denver, CO  80202 ("Vendor"), pursuant to the Master Services Agreement between WorldCom and Qwest Government Services, Inc., dated June 29, 2001 ("Agreement").

This Schedule is governed by the terms and conditions of the Agreement, except as specifically stated herein. Where the provisions of the Agreement and this Schedule conflict, the terms and conditions of this Schedule shall prevail. Words and phrases defined in the Agreement shall have the same meaning in this Schedule. This Schedule shall be effective as of June 29, 2001 ("Schedule Effective Date").

A.   Service Description:

1.   Central office-based remote access services ("COBRA Services") provide integrated, remote analog & digital access to WorldCom that may be utilized by WorldCom's employees, WorldCom's end users, and the end users of WorldCom's affiliates, clients, and resellers (collectively, "End Users") to connect to WorldCom's Internet network ("WorldCom Network") via modems referred to as network access servers ("NAS") deployed in central offices operated by Vendor or its affiliates ("Vendor COs"). COBRA Services provide medium to high-speed data transport services for remote access to the WorldCom network. COBRA Services permit WorldCom to receive calls from multiple analog modems and ISDN basic rate interface lines for handoff to separately purchased wide area network links. Vendor shall connect each NAS used in connection with the COBRA Services to the Public Switched Telephone Network ("PSTN") via ISDN primary rate interface, or other mutually agreed comparable telecommunications facilities (collectively, "PRI"), and shall arrange for the dedicated assignment (or preservation, to the fullest extent possible) of unique telephone numbers for (or in use by) WorldCom and End Users.

2.   COBRA Services include all equipment, telecommunications services and related facilities (including without limitation active PRI lines, at least 40 DID numbers per rotary, space, power, and other utilities), and ancillary support and maintenance required to connect a call that has been dialed into the PSTN (such call dialing a designated telephone number) to an active DS0 channel-equivalent port (i.e., PRI B-channel) on the corresponding NAS ("COBRA Port"). The demarcation of the COBRA Services between Vendor and WorldCom shall be at the connection of the NAS egress port to the egress circuit connecting the NAS to Vendor's or its affiliate's wide area network and/or the WorldCom Network.

   a.   Vendor acknowledges that certain of the COBRA Ports shall be utilized on WorldCom's Dial Access Network ("DAN"), which is a dial network shared by multiple WorldCom clients and resellers, and that other COBRA Ports shall be utilized on WorldCom's Fixed Port Network ("FPN"), which is a dial network dedicated to a single WorldCom reseller. As it pertains to the COBRA Services, those distinctions between the ordering, provisioning, and/or management of COBRA Ports on the DAN and the FPN are identified herein.

   b.   For purposes of this Service Schedule, FPN ports in the back-hauled UAS circuit configuration ("ANS Ports"), which are described more fully in the Uniform Access Services Schedule between the same parties as of the same date ("ANS Port Schedule"), shall count towards fulfillment of WorldCom's First and Second Commitments, described below.

3.   Vendor and/or its affiliates shall own all of the NAS equipment (generally including the NAS, Ethernet hub, terminal server, and OOB modem) used in connection with the COBRA Services that is located on Vendor's side of the demarcation of the COBRA Services. Nothing in this Schedule is intended to, nor shall it be construed to, confer upon WorldCom any right or interest in Vendor's equipment or property, nor any right to occupy or install any of its equipment or facilities in or upon any Vendor property.

   a.   Vendor acknowledges that separate NAS equipment shall be used to support the FPN, and that certain Vendor COs may contain two sets of NAS equipment (one set to support the DAN and the other set to support the FPN).

DOJ - 00035
CONFIDENTIAL

S 1799

10.    In the event that the manufacturer of NAS equipment used in connection with the COBRA Services offers a hardware upgrade to such NAS equipment, the parties shall confer and mutually agree as to whether to deploy such hardware upgrade in connection with the COBRA Services, as well as the appropriate cost sharing and/or cost savings arrangements resulting from such a deployment.

11.    Vendor and WorldCom acknowledge that the COBRA Service provided hereunder is being provisioned to meet the unique needs and circumstances of WorldCom. Should the COBRA Service provided hereunder be determined by a regulatory body to be subject to regulated collocation requirements, Vendor may, in its sole discretion, terminate this Schedule and phase-out the Service over a six (6) month period. If Vendor elects to phase-out the COBRA Service, WorldCom shall not be liable to Vendor for any termination charges or other liability that otherwise would have applied to such an early cancellation of such COBRA Services.

12.    This Schedule does not represent an inter-connection agreement between the parties. Should WorldCom or any of its affiliates wish to directly use the COBRA Services to directly provide any one-way or two-way voice telephony communications, whether local or long distance ("VoIP"), WorldCom and Vendor shall negotiate terms, conditions, and rate structures that are applicable to VoIP prior to WorldCom utilizing the COBRA Services to directly provide VoIP. In the event the parties are unable to reach agreement on the terms, conditions, and rate structures for such VoIP services, WorldCom has the option to terminate this Schedule upon six (6) months' written notice to Vendor without application of any termination charges or other liability; provided that upon such termination WorldCom shall (a) purchase or lease if appropriate, any NAS equipment dedicated to WorldCom's use from Vendor at the then-current Vendor book value and/or residual lease value for such NAS equipment; and (b) promptly remove the NAS equipment from Vendor's premises. If WorldCom or any of its affiliates at any time during the Service Term of this Schedule directly use the COBRA Services to provide VoIP without the prior development of mutually agreed-upon terms, conditions, and rate structures for VoIP, WorldCom shall be in breach of this Schedule and Vendor may terminate this Schedule for cause as defined in Section 4 of the Agreement.

13.    The parties shall jointly determine where and in which Vendor Central Offices the NAS equipment will be placed and the resulting PSTN network architecture in order to: (a) provide WorldCom and its affiliates, clients, and resellers with appropriate geographic coverage; (b) minimize the number of egress circuits required to connect the NAS equipment to the WorldCom Network; and (c) balance Vendor's network loads and capacity in a manner to ensure there will be no negative impact to the dialing patterns or performance of the COBRA Services for WorldCom and its End Users. Vendor intends to offer the COBRA Services in all cities where facilities exist and where technically and economically feasible. Once the parties have mutually agreed upon the precise locations and quantities of COBRA Ports, Vendor shall be responsible for maintaining sufficient PSTN network capacity to support the current and projected peak traffic loads (not including unforeseeable one-time spike loads on the PSTN network) for each such service location, shall proactively monitor the PSTN network to ensure that sufficient capacity exists at all times, and shall use best efforts on a 24x7x365 basis to correct any identified lack of PSTN network capacity.

14.    The parties agree to mutually explore the technical parameters and implementation requirements of single number service ("SNS") in connection with the COBRA Services, including the feasibility of deploying SNS on a state-by-state or other mutually-agreeable basis across Vendor's entire service territory.

B.    Service Territory. The prices set forth in this Schedule shall apply to all COBRA Services provided hereunder for deployment in any Vendor CO where COBRA Services are available from Vendor and/or its current and future affiliates ("Available Vendor CO") within the fourteen-state Qwest (incumbent local exchange carrier) service area. Vendor agrees to use commercially reasonable efforts to make the COBRA Services available in all Vendor COs.

C.    Service Ordering Procedures.

    1.    [Reserved]

    2.    DAN.

        a.    WorldCom agrees to provide Vendor with quarterly forecasts of potential DAN growth. Following the issuance of a given quarterly growth forecast, the parties agree to work cooperatively prior to the placement by WorldCom of a firm order for COBRA Ports in order to (i) identify the quantity of COBRA Ports for deployment; (ii) the applicable Vendor CO for such COBRA Ports; and (iii) a

DOJ - 00037
CONFIDENTIAL

S 1800