# MASTER SERVICES AGREEMENT-DRAFT

This Master Services Agreement is by and between BellSouth Telecommunications, Inc. ("BellSouth") and _____
("Customer"). BellSouth and Customer hereby agree to the following terms and conditions:

I. Customer hereby orders the services described in the Master Services Agreement Order Attachment(s) ("Order Attachment") at the monthly and non-recurring rates, charges, and in accordance with terms and conditions as described in the Order Attachment(s). BellSouth agrees to provide and Customer agrees to pay for the Services included in the Attachment(s) to this Agreement.

II. This Agreement is subject to and controlled by the provisions of BellSouth's tariffs including but not limited to the General Subscriber Services Tariff and the Private Line Tariff and all such revisions to said tariffs as may be made from time to time. Except for the rates and charges in this Agreement and Attachment(s), the tariff shall supersede any conflicting provisions of this Agreement. Company agrees that any appropriate tariff decreases for any rate element will automatically flow through to the Customer.

III. If Customer cancels this Agreement prior to the completed installation of the service but after the execution of this Agreement by Customer and Company, Customer shall pay all reasonable cost incurred in the implementation of this Agreement. Such reasonable costs shall not exceed all costs which could apply if the work in the implementation of this Agreement had been completed.

IV. If Customer cancels this Agreement at any time prior to the expiration of the service period set for in the appropriate order Attachment, Customer shall be responsible for all termination charges unless otherwise specified. Termination charges are defined as all reasonable charges due or remaining as a result of the minimum service period agreed to by Company and Customer as set forth in the Attachment(s).

V. This Agreement where used in conjunction with a Special Assembly or Contract Services Arrangement may be subject to the appropriate regulatory approval prior to commencement of installation. Should such regulatory approval be denied, after a proper request by Company, any Special Assembly and/or Contract Service Arrangement shall be null, void and of no effect.

VI. The service period shall be as specified in the order Attachment(s) to this Agreement.

VII. For the determination of any service period, the service period shall commence the date that the installation of service is completed.

VIII. At the expiration of the service period for any service that is available pursuant to the tariff, the Customer may continue the Service according to renewal options provided under the tariff. If the Customer does not elect an additional service period, or does not request discontinuance of service, the service will be provided at the monthly rate currently in effect for month-to-month rates.

IX. Customer may order additional existing services or new services under this Agreement by submitting an appropriate order Attachment properly authorized and submitted in accordance with the Company's procedures. Rates for additional and/or new services will be in accordance with the applicable tariff rates or otherwise stated in the appropriate Order Attachment.

X. This Agreement shall be construed in accordance with the laws of each state where the Service is provided.

XI. Except as otherwise provided in this Agreement, notices required to be given pursuant to this Agreement shall be effective when received, and shall be sufficient if given in writing, hand delivered or United States mail, postage prepaid, addressed tot he appropriate party at the address set forth below:

| COMPANY | CUSTOMER |
|---|---|
| (NAME AND ADDRESS) | (NAME AND ADDRESS) |

XII. Customer may not assign its rights or obligations under this Agreement without the express written consent of Company and only pursuant to the conditions contained in the appropriate tariff.

XIII. In the event that one or more of the provisions contained in this Agreement or incorporated within by reference shall be invalid, illegal or unenforceable in any respect under any applicable statute, regulatory requirement or rule of law, then such provisions shall be considered inoperative to the extent of such invalidity, illegality or unenforceability and the remainder of this Agreement shall continue in full force and effect.

XIV.   This Agreement shall become effective upon execution by both parties.

*IN WITNESS WHEREOF,* the parties hereto have caused this Agreement to be executed by their duly authorized representatives on the dates set forth below.

CUSTOMER:                                  BELLSOUTH TELECOMMUNICATIONS, INC.

BY:_____         BY:_____
           (Authorized Signature)                     (Authorized Signature)

TITLE:_____      TITLE_____

DATE:                                       DATE:

DOJ - 00094
CONFIDENTIAL

BEZ56014

S 1859

# ORIGINAL

3x11 Sush

Exhibit A

### UUNET COBRA
### 3COM RACKED EQUIPMENT SPECIFICATIONS
Rev. 2 (8/21/00)

**Integrated Equipment Racks**

The 3Com COBRA equipment is delivered to the LEC facility as a complete assembly housed in two or more 19" x 84" relay racks (one egress rack plus one or more modem/management racks). This insures all necessary components are properly arranged and cabled. The LEC will install the racks, plug in the power cords, and connect the circuits to pre-wired patch panels.

**Access Types**

UUNET end-users will access the COBRA service via analog modem or ISDN on the ingress (incoming) port side. The ingress circuit will be a channelized DS3, which is connected to an M13 Mux located in the modem rack. The equipment will aggregate the traffic and provide an egress (or outgoing) port connection to DS3 egress circuits connecting to UUNET Network facilities, which will be provided by UUNET via third-party telecommunications providers or ordered separately from the LEC, in UUNET's discretion.

**Design Summary**

The 3Com Total Control Modem Chassis functions as the NAS. One modem chassis can support up to fourteen (14) HiPerDSP cards, with each HiPerDSP card being able to support one T1 PRI. Each modem rack can support up to four (4) modem chassis, for a total of 56 HiPerDSP cards per rack or 1,344 modems (1,288 usable ports). Dial traffic is passed to the 3Com Ethernet switch located in the egress rack, which is connected to the egress aggregator (the Cisco 7206 egress aggregator).

The 3Com Total Control management chassis is used for authentication, data collection, and management of the dial equipment in the cabinet. The management chassis has an analog modem card for Out-of-band (OOB) access that is used during the initial configuration of the equipment and for troubleshooting if access is not available via the egress circuit(s). The physical demarcation point for the equipment is the egress port of the Cisco 7206 egress aggregator.

**COBRA Out-of-Band Management Network**

Initial configuration and emergency maintenance of the 3Com and Cisco equipment is performed by UUNET via analog telephone line and modem. This is called out-of-band ("OOB") access. As part of the COBRA service and without additional charge, the LEC will provide a dedicated analog phone line for each OOB modem installed in a given modem rack.

OOB access is not the preferred method for accessing the equipment because it is slower than IP. OOB access is used initially to configure the equipment and permit activation of the first egress circuit. After the first egress circuit is activated, the remaining equipment configuration and code downloading typically is done via IP through the egress circuit.

**Circuit Configuration**

All circuit configurations required at the NAS are the sole responsibility of UUNET. The parameters of circuit translation options required by UUNET are:

- PRI
- FAS or NFAS (to be determined by both parties, as appropriate)
- B8ZS/ESF
- 40 DID numbers per rotary

DOJ - 00223
CONFIDENTIAL

S 1860

- 5ESS hunting (GUCD or LUCD; DMS hunting Forward Circular Sequential)
- Sequential Circuit IDs (where possible)

### 3Com Total Control Equipment Configuration

Each Total Control unit is called a chassis. There are up to four (4) modem chassis and one (1) management chassis installed in each modem rack.

The modem chassis are dedicated to housing modems, with each chassis being able to support up to fourteen (14) HiPerDSP cards. Each HiPerDSP card terminates one (1) T1 PRI.

The management chassis is dedicated to housing cards required to manage the equipment in the modem and egress racks. The management chassis is responsible for data collection, authentication, domain name service and out-of-band management to all of the equipment in the racks. Within the management chassis is a 3Com EdgeServer card. This card contains UUNET proprietary software. In the event the EdgeServer needs to be replaced, UUNET will need to re-install this proprietary software. Remote hands & eyes assistance may be required from a LEC technician.

With the COBRA service, UUNET is responsible for providing configuration and management of the equipment in the racks. The LEC is responsible for all COBRA equipment sparing.

Provisioning, test, and acceptance of the egress circuits are UUNET's responsibility, unless such egress circuits are ordered by UUNET from the LEC. Provisioning, test, and acceptance of the ingress DS3 and PRI/DSS will be the joint responsibility of UUNET, configuring the 3Com equipment, and the LEC, configuring the switch side.

### Site Manual

A detailed Site Manual, including Central Office floor plans, bay placement, bay configuration, cabling schematics, PRI configuration, DSX cross connects, and contact procedures will be provided by the LEC to UUNET as part of the COBRA service. The LEC may choose to provide secure web access to such information.

### Site Environmentals/Specifications

| | |
|---|---|
| Footprint: | Footprint should be 3' deep X 2' wide for each rack, and accommodate a height of 7 feet and a weight of 750 lbs. |
| Electrical: | Redundant 30amp DC feeds to each relay rack to be connected to Hendry fuse panels. |
| Flooring: | Raised computer floor preferred provided under-floor ventilation is present, otherwise slab floor is acceptable. First floor location preferable. Floor loading requirements are 100 lbs. per sq. foot. |
| Telephone: | Each rack may have a maximum of two DS3 circuits (56 PRIs) connected to such modem rack, and one (1) POTS line for OOB mgmt., and one clear channel egress DS3 in the egress rack. |
| Environmental: | Room temperatures maintained between 55-75 degrees F. is required. |
| | Facility must provide a virtually dust-dirt free environment for rack location. Racks should not be placed within 2 feet of any heating or air conditioning vents and or ducts or located in the proximity of automated sprinkler heads. |

DOJ - 00224
CONFIDENTIAL

S 1861

Grounding:        Racks must be grounded at facility.  Any facility with a grounding ring must ground rack to facility grounding ring.

### Equipment Requirements

The equipment components for the egress and modem (minimum build) racks are as below.  A modem rack can be enhanced from the minimum build configuration by adding up to 14 HiPerDSP cards for each of the three (3) empty modem chassis that are pre-built into the rack.  Such cards can be added when a given rack is ordered by UUNET from 3Com, or installed separately later by the LEC.

Egress Rack*

| Quantity | Part No. | Description | Unit List $ |
|---|---|---|---|
| 1 | CISCO7206-DC | Cisco 7206 DC non-VXR | $ 36,300.00 |
| 1 | 3C39036-DC | 3Com 3900 DC Ethernet Switch | $ 7,995.00 |
| 1 | 2500CAT5PS-24B | Lucent 24-port Patch Panel | $ 260.00 |
| 2 | OHCKTK225R | Fuse Panel | $ 868.00 |
| 1 | 08022-646 | 7' Rack | $ 2,000.00 |
| 1 | UU-STD-1A | Cable Harness | $ 880.00 |
| 1 | UU-STD-1B | Misc. Hardware and Labels | $ 2,900.00 |
| 1 | UU-STD-1C | Staging/Integration Service | N/A |

      *     *Supports up to 8 Modem Chassis per Egress Rack*
Note:   *GridNet and Fixed Port Networks Each Require Separate Egress Rack*

Modem Rack

| Quantity | Part No. | Description | Unit List $ |
|---|---|---|---|
| 1 | 3C0504776-00 | Total Control DC Mgmt. Chassis * | $ 27,438.00 |
| includes: | | | |
| 1 | 003458-00 | TCH Dual 130A/DC Power w/ HiPerNMC | $ 8,150.00 |
| 1 | 003802-01 | EdgeServer OverDrive, 256mb, 2x2GB HD | $ 12,750.00 |
| 1 | 003281-00 | 16 port Serial Ethernet NIC | $ 1,200.00 |
| 1 | 001893-00 | Pentium Pro Processor | $ 1,300.00 |
| 1 | 002157-01 | Dual 10/100 BaseT Ethernet NIC | $ 600.00 |
| 1 | 000849-12 | Quad Analog Digital Modem Card Set | $ 3,438.00 |
| 4 | 003458-00 | TCH Dual 130A/DC Power w/ HiPerNMC ** | $ 8,150.00 |
| 4 | 002106-01 | HiperARC Card Set (Ethernet) | $ 9,575.00 |
| 14 | 002092-00 | HiPerDSP Card Set (24 ports/card) *** | $ 10,925.00 |
| 1 | 2500CAT5PS-24B | Lucent 24-port Patch Panel | $ 260.00 |
| 2 | 930-0093 | Carrier Access Mux **** | $ 9,995.00 |
| 2 | OHCKTK225R | Fuse Panels | $ 868.00 |
| 1 | 08022-646 | 7' Rack | $ 2,000.00 |
| 1 | UU-STD-2A | Cable Harness | $ 5,000.00 |
| 1 | UU-STD-2B | Misc. Hardware and Labels | $ 3,100.00 |
| 1 | UU-STD-2C | Staging/Integration Service | N/A |

    *    *Supports up to 4 Modem Chassis per Management Chassis*
    **   *Supports up to 14 DSP Cards & 1 HiperARC Card per Modem Chassis*
    ***  *Additional HiperDSP Cards available at same Unit Disc. Price*
    **** *Supports up to 2 Modem Chassis per Mux*

DOJ - 00225
CONFIDENTIAL

S 1862

**EXHIBIT 1: INGRESS/EGRESS**



DOJ - 00226
CONFIDENTIAL

S 1863

EXHIBIT 2: MODEM RACK

FRONT VIEW



| | |
|---|---|
| | DC Fuse Panel |
| | DC Fuse Panel |
| | M13 Mux |
| | Modem Chassis #4 |
| | Modem Chassis #3 |
| | RJ-45 Patch Panel |
| | M13 Mux |
| | Modem Chassis #2 |
| | Modem Chassis #1 |
| | RJ-45 Patch Panel |
| | Management Chassis |

DOJ - 00227
CONFIDENTIAL

Rev. 2.0 – 8/21/00

S 1864

**EXHIBIT 3: MODEM RACK**



REAR VIEW

- DC Fuse Panel
- DC Fuse Panel
- M13 Mux
- Modem Chassis #4
- Modem Chassis #3
- RJ-45 Patch Panel
- M13 Mux
- Modem Chassis #2
- Modem Chassis #1
- RJ-45 Patch Panel
- Mgmt Chassis

UUNET CONFIDENTIAL

DOJ - 00228
CONFIDENTIAL

Rev. 2.0 – 8/21/00

S 1865

EXHIBIT 4: EGRESS RACK



FRONT VIEW

DC Fuse Panel

DC Fuse Panel

3Com Ethernet Switch (front) — Ethernet Switch

RJ-45 Patch Panel

Cisco 7206 Egress Aggregator — Aggregation System

UUNET CONFIDENTIAL

Page 7

DOJ - 00229
CONFIDENTIAL

Rev. 2.0 – 8/21/00

S 1866

EXHIBIT 5: EGRESS RACK



REAR VIEW

DC Fuse Panel

DC Fuse Panel

3Com Ethernet Switch (Rear) — Ethernet Switch

RJ-45 Patch Panel

Cisco 7206 Egress Aggregator — Aggregation System

UUNET CONFIDENTIAL

DOJ - 00230
CONFIDENTIAL

Rev. 2.0 – 8/21/00

S 1867

ORIGINAL

## Exhibit B

The following list of cities identifies the locations where Gridnet and ANS have PRI services currently active. There will be a minimum of at least one 3Com NAS per LATA to support the deployment of RAS Service.

| Gridnet City | State |
|---|---|
| ALBANY | GA |
| ALEXANDRIA | LA |
| ANDERSON | SC |
| ASHEVILLE | NC |
| ASHEVILLE 2 | NC |
| ATHENS | GA |
| ATLANTA | GA |
| ATLANTA 2 | GA |
| ATLANTA 3 | GA |
| AUGUSTA | GA |
| BATON ROUGE | LA |
| BATON ROUGE 2 | LA |
| BILOXI | MS |
| BIRMINGHAM | AL |
| BIRMINGHAM 2 | AL |
| BRUNSWICK | GA |
| BURLINGTON | NC |
| CHAPEL HILL | NC |
| CHARLESTON | SC |
| CHARLESTON 2 | SC |
| CHARLOTTE | NC |
| CHATTANOOGA | TN |
| CLARKSVILLE | TN |
| COCOA | FL |
| COLUMBIA | SC |
| COLUMBUS | GA |
| DAYTONA BEACH | FL |
| DEERFIELD BEACH | FL |
| FLORENCE | AL |
| FORT LAUDERDALE | FL |
| FORT LAUDERDALE 2 | FL |
| GAINESVILLE | FL |
| GOLDSBORO | NC |
| GREENSBORO | NC |
| GREENSBORO 2 | NC |
| GREENVILLE | SC |
| GULFPORT | MS |
| HUNTSVILLE | AL |
| JACKSON | MS |
| JACKSON | TN |
| JACKSONVILLE | FL |
| JACKSONVILLE 2 | FL |
| KEY WEST | FL |
| KNOXVILLE | TN |
| KNOXVILLE 2 | TN |

DOJ - 00231
CONFIDENTIAL

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE
UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

S 1868

| City | State |
|------|-------|
| LAFAYETTE | LA |
| LAKE CHARLES | LA |
| LOUISVILLE | KY |
| MACON | GA |
| MELBOURNE | FL |
| MEMPHIS | TN |
| MIAMI | FL |
| MOBILE | AL |
| MONROE | LA |
| MONTGOMERY | AL |
| NASHVILLE | TN |
| NASHVILLE 2 | TN |
| NEW ORLEANS | LA |
| ORLANDO | FL |
| ORLANDO 2 | FL |
| OWENSBORO | KY |
| PANAMA CITY | FL |
| PASCAGOULA | MS |
| PENSACOLA | FL |
| PENSACOLA 2 | FL |
| RALEIGH | NC |
| RALEIGH 2 | NC |
| SAVANNAH | GA |
| SHREVEPORT | LA |
| SPARTANBURG | SC |
| THOMASVILLE | GA |
| TUSCALOOSA | AL |
| VERO BEACH | FL |
| WEST PALM BEACH | FL |
| WEST PALM BEACH 2 | FL |
| WILMINGTON | NC |
| WINSTON-SALEM | NC |

| ANS City | ST |
|----------|-----|
| BATON ROUGE | LA |
| GULFPORT | MS |
| MIAMI | FL |
| SHREVEPORT | LA |
| SHREVEPORT | LA |
| ATLANTA | GA |
| ORLANDO | FL |
| ORLANDO | FL |
| KNOXVILLE | TN |
| JACKSONVILLE | FL |
| JACKSONVILLE | FL |
| ST. AUGUSTINE | FL |
| RALEIGH | NC |
| RALEIGH | NC |

PRIVATE/PROPRIETARY
CONTAINS PRIVATE AND/OR PROPRIETARY INFORMATION. MAY NOT BE USED OR DISCLOSED OUTSIDE THE UUNET/BELLSOUTH COMPANIES EXCEPT PURSUANT TO A WRITTEN AGREEMENT.

DOJ - 00232
CONFIDENTIAL

S 1869

ORIGINAL

Bell South MCSA Attach1 Exc 092400.FINAL.xls

## UUNET/BellSouth 3Com COBRA – MCSA Attachment IV Exhibit 2
### Racked DC NEBS3 7206 non-VXR 16/1600

**Egress Rack**

| Quantity | Part No. | Description | Unit List Price |
|---|---|---|---|
| 1 | CISCO7206-DC | Cisco 7206 DC (non-VXR) | $ 36,300.00 |
| 1 | 3C39036-DC | 3Com 3900 DC Ethernet Switch | $ 7,995.00 |
| 1 | 2500CAT5PS-24B | Lucent 24-port Patch Panel | $ 260.00 |
| 2 | OHCKTK225R | Fuse Panel | $ 868.00 |
| 1 | 08022-646 | 7' Rack | $ 2,000.00 |
| 1 | UU-STD-1A | Cable Harness | $ 880.00 |
| 1 | UU-STD-1B | Misc. Hardware and Labels | $ 2,900.00 |
| 1 | UU-STD-1C | Staging/Integration Service | $ 2,510.00 |
| | | **Planned Quantity** | **100** |

**Modem Rack (Minimum Build)**

| Quantity | Part No. | Description | Unit List Price |
|---|---|---|---|
| 1 | 3C0504776-00 | Total Control DC Management Chassis | $ 27,438.00 |
| INCLUDES: | | | |
| 1 | 003458-00 | TCH Dual 130A/DC Power w/ HiPerNMC | |
| 1 | 003802-01 | EdgeServer OverDrive, 256mb, 2x2GB Hard Drives | |
| 1 | 003281-00 | 16 port Serial Ethernet NIC | |
| 1 | 001893-00 | Intel Pentium Processor | |
| 1 | 002157-01 | Dual 10/100 BaseT Ethernet NIC | |
| 1 | 000849-12 | Quad Analog Digital Modem Card Set | |
| 4 | 003458-00 | TCH Dual 130A/DC Power w/ HiPerNMC | |
| 4 | 002106-01 | HiPerARC Card Set (Ethernet) | $ 8,150.00 |
| 14 | 002092-01 | HiPerDSP Card Set (24 ports/card) | $ 9,575.00 |
| 1 | 2500CAT5PS-24B | Lucent 24-port Patch Panel | $ 10,925.00 |
| 2 | 930-0093 | Carrier Access Mux | $ 260.00 |
| 2 | OHCKTK225R | Fuse Panels | $ 9,995.00 |
| 1 | 08022-646 | 7' Rack | $ 868.00 |
| 1 | UU-STD-2A | Cable Harness | $ 2,000.00 |
| 1 | UU-STD-2B | Misc. Hardware and Labels | $ 5,000.00 |
| 1 | UU-STD-2C | Staging/Integration Service | $ 3,100.00 |
| | | **Planned Quantity** | **125** |

**3Com Modem Cards**

| Planned Quantity | Part No. | Description | Unit List Price |
|---|---|---|---|
| 2600 | 002092-01 | HiPerDSP Card Set (24 ports/card) | $ 10,925.00 |

40,250 usable ports (23 per modem card)
59,800 usable ports (23 per modem card)
100,050 usable ports (23 per modem card)
179 per usable port
$17,908,950

**Included Spares (No Add'l Charge)**

| | | |
|---|---|---|
| 1 | CISCO7206-DC | Cisco 7206 DC (non-VXR) |
| 1 | 3C39036-DC | 3Com 3900 DC Ethernet Switch |
| 1 | 2500CAT5PS-24B | Lucent 24-port Patch Panel |
| 1 | OHCKTK225R | Fuse Panel |
| 1 | 3C0504776-00 | Total Control DC Management Chassis |
| 1 | 003458-00 | TCH Dual 130A/DC Power w/ HiPerNMC |
| 1 | 002106-01 | HiPerARC Card Set (Ethernet) |
| 1 | 002092-01 | HiPerDSP Card Set (24 ports/card) |
| 1 | 930-0093 | Carrier Access Mux |

DOJ - 00233
CONFIDENTIAL

UUNET, an MCI WorldCom Co. 3Com Confidential

9/25/00

S 1870

# EXHIBIT 31

S 1871

*Tab V*

# U S WEST NETWORK SERVICE AGREEMENT
## GENERAL TERMS AND CONDITIONS FOR
### SIGNALING SYSTEM 7 GATEWAY SERVICE/
CENTRAL OFFICE-BASED REMOTE ACCESS SERVICE

WHEREAS, U S WEST Communications, Inc. ("USWC") and UUNET Technologies, Inc. ("UUNET") desire to enter into an agreement pursuant to which USWC will provide to UUNET Service, as defined herein, and USWC intends that the Service will, among other things, have the effect of reducing certain traffic on the Public Switched Telephone Network ("PSTN") owned and operated by USWC;

WHEREAS, USWC is offering the Service described in this Agreement as a unified retail service; and

WHEREAS, UUNET is an Enhanced Service Provider ("ESP"), and not a telecommunications carrier, as those terms are currently defined by the Federal Communications Commission, and UUNET is obtaining the Service described herein strictly for the purposes of furthering its business as an ESP; and

WHEREAS, the Service is being provisioned pursuant to this Agreement to meet the unique needs and circumstances of UUNET; and

WHEREAS, in order to meet the unique needs and circumstances of UUNET and to meet the operational imperatives of USWC, USWC and UUNET require that a specific architectural topology be employed to provision the Service; and

WHEREAS, in order to meet the unique needs and circumstances of UUNET in moving from its current High Capacity Digital Transport service ("HCDT") to an SS7-based service, USWC is agreeable to deploying, as an interim step, a Central Office Based Remote Access ("COBRA") architecture that will be selected and installed by USWC, until the SS7 Gateway is available in a form mutually acceptable to UUNET and USWC.

Now, therefore, this Agreement is made this ___ day of _____, 1998, between UUNET and USWC (collectively "Parties" and individually "Party"), for the provision of USWC Signaling System 7 Gateway ("SS7 Gateway") and Central Office Based Remote Access ("COBRA") Service, as defined on Attachment 1, attached hereto and incorporated herein by reference, ("Service").

1      SCOPE. USWC shall furnish and UUNET shall pay for the Service, and USWC is responsible for providing the Service to UUNET on an end to end basis Service does not include access lines and transport service.

1.1     USWC agrees to provide and UUNET agrees to order the Service. The Remote Access Devise (RAD) will be solely owned by USWC. The Service is marketed and sold by USWC. Until the SS7 Gateway, as defined in Attachment 1, is available   COBRA Service, as defined in Attachment 1, will be deployed. The Service is available where facilities exist subject to the terms contained herein in Section 3. Deployment of the Service is subject to appropriate regulatory requirements and approvals.

1.2     UUNET is considered an Enhanced Service Provider ("ESP") as currently defined by the Federal Communications Commission. Should UUNET's, any of its Affiliates as defined in Section 6.2, all of which are permitted to purchase under this Agreement, status

S 1872

change to a Competitive Local Exchange Carrier or Interexchange Carrier, either party may elect to phase out the Service provided to the affected entity within a six (6) month phase out period. During such phase out period, the affected entity shall be treated as an ESP. Should the services provided to its end-users by UUNET be determined by a regulatory body or USWC to be CPE-based or subject to collocation requirements, USWC may immediately and in its sole discretion terminate this Agreement phasing out Service over a six (6) month period.

1.3    The Service will be provided in compliance with all federal, state and local legal and regulatory requirements. Either party may terminate this Agreement pursuant to Section 10 below in connection with any breach of this Section.

2    **TERM.** This Agreement will commence on the latest signature date ("Effective Date"), provided mandatory filing requirements are met. The term of this Agreement is seven (7) years. All port growth ordered under this Agreement is co-terminus with the seven (7) year Agreement. Port orders received beyond the fourth year shall be renegotiated as part of a new agreement.

3    **ARCHITECTURE TOPOLOGY.** USWC defines where and in which USWC Central Offices equipment will be placed throughout the SS7 Gateway/COBRA network in order to balance USWC's network loads and capacity in a manner to ensure there will be no negative impact to UUNET or UUNET's existing customer's dialing patterns or service levels. See Attachment 2, attached hereto and incorporated herein by reference, for a list of existing cities in which Service will be provided. Additional cities may be added to Attachment 2. USWC will establish the final architecture topology to attempt to address UUNET's objective to reduce backhauls. USWC intends to offer Service in all cities where facilities exist and where technically and economically feasible.

4    MIGRATION TO INTERIM PLATFORM. UUNET and USWC agree to migrate from current UUNET dial-access service, HCDT and DSS, to COBRA as described in Attachment 1, and to a SS7 Gateway platform, as described in Attachment 1 as soon as the SS7 Gateway platform is available and certified by both Parties. USWC will use all reasonable efforts to convert all HCDT and DSS circuits within twenty four (24) months of the Effective Date. HCDT and DSS circuits which are not migrated to the interim platform as of the time the SS7 Gateway platform is certified pursuant to Section 5.1, will be migrated directly to the SS7 Gateway platform. Within thirty (30) days of the Effective Date, the Parties shall establish a written migration schedule to the interim platform. Until such time as all HCDT and DSS circuits are either migrated to the interim platform or the SS7 Gateway platform, the existing agreement between USWC and UUNET shall remain in effect.

5    MIGRATION TO SS7 ARCHITECTURE.

5.1    UUNET agrees to migrate from either HCDT and DSS or the interim platform to a SS7 Gateway solution, which will off-load Internet Provider traffic from the PSTN, at such time as equipment is available and the SS7 Gateway solution is certified by the parties. The interim platform will be aggressively deployed, as provided herein, until a SS7 Gateway solution can be deployed. The Parties agree to use all reasonable efforts to negotiate certification guidelines as well as certification and migration schedules. The parties will negotiate mutually acceptable written certification guidelines establishing acceptable capabilities for the SS7 Gateway platform within sixty (60) days of the Effective Date. The Parties agree in good faith to verify that the SS7 Gateway meets the certification guidelines. Within sixty (60) days of verification that the SS7 Gateway meets the certification guidelines, the Parties shall agree to a written migration schedule to the SS7 Gateway.

S 1873

5.2    USWC and UUNET intend to use all reasonable efforts with potential SS7 Gateway Platform vendors to encourage and promote the development and deployment of an SS7 Gateway platform available for implementation as soon as possible. USWC and UUNET agree to hold quarterly executive and engineering level meetings, within sixty (60) days of the Effective Date of this Agreement discuss and review progress toward the SS7 Gateway solution.

5.3    In the event that an SS7 Gateway or functional equivalent, certified by both parties, is not available within (12) twelve months of the Effective Date of this Agreement UUNET agrees to certify additional equipment vendor(s), including those equipment vendor(s) identified by USWC ; if such vendor(s) exist, which incorporate SS7 Gateway functionality into the RAD architecture.

6    UUNET RESPONSIBILITIES. (See Responsibility Matrix attached as Exhibit A incorporated herein by reference.)

6.1    Internet Protocol ("IP")-based Traffic

6.1.1    This contract does not represent an interconnection agreement. Should UUNET or any of its affiliates wish to directly use USWC Services to directly provide any two way telephony communications, whether local or long distance ("Voice over IP"), UUNET and USWC shall negotiate terms, conditions and rate structures, applicable to Voice over IP prior to UUNET utilizing the COBRA or SS7 Gateway platform to directly provide Voice over IP. In the event the parties are unable to reach agreement on the terms, conditions, and rate structures for these services, UUNET has the option to terminate this Agreement upon six (6) months' written notice to USWC, provided that upon such termination UUNET will (a) purchase, or lease if appropriate, any RAD dedicated to UUNET's use from USWC at the RAD's then-current USWC book value, and (b) promptly remove the RAD from USWC's premises.

6.2    UUNET Affiliates: UUNET's ESP Affiliates, defined as any entity acting as an ESP and controlling, controlled by, or under common control with UUNET ("Affiliates") are permitted to purchase under this Agreement. The Parties agree that this Agreement does not create a contractual relationship between USWC and UUNET's Affiliates. Therefore, UUNET agrees to accept responsibility and liability for all actions of its Affiliates that purchase Services under this Agreement. UUNET shall ensure that its Affiliates comply with all terms and conditions contained herein. In the event any Affiliate breaches any term or condition of this Agreement, such breach shall permit USWC to pursue any and all remedies contained herein.

6.3    If any access charges or other charges on this service are determined to be applicable by the FCC or governing regulatory body, UUNET shall pay those charges. In the event such charges result in an increase in the price of the Service by greater than ten (10) percent, UUNET has the option to terminate this Agreement upon six (6) months written notice to USWC, provided that upon such termination UUNET will (a) purchase, or lease if appropriate, any RAD dedicated to UUNET's use from USWC at the RAD's then-current USWC book value, and (b) promptly remove the RAD from USWC's premises, and (c) in addition, pay USWC $8,750.00 per RAD for costs incurred for engineering, installing and provisions the RAD platform. This fee will be reduced by $1,461.25 per year for the length of the contract.

S 1874

6.4     Nothing in this Agreement is intended to nor shall it be construed to confer upon UUNET any right or interest in USWC's equipment, facilities, or property, nor any right to occupy or install any of its equipment or facilities in or upon any Company property.

7     **USWC RESPONSIBILITIES. (See Responsibility Matrix attached as Exhibit A incorporated herein by reference.)**

7.1     USWC will install, maintain and operate all necessary facilities and central office equipment to support the interim platform and SS7 Gateway and the provision of the Service.

7.2     USWC will provide prompt and effective technical support.

7.3     Physical Access to Service Platform

7.3.1     Only active USWC employees, or its subcontractors, properly trained in the maintenance and administration of the selected equipment, as defined in Attachment 3 or as may be substitute therefor, shall have physical access to the RAD'. All physical platform upgrades shall be reviewed for impact on all aspects of the supporting USWC network. Mutually agreed upon physical upgrades shall be performed by USWC.

7.3.2     USWC shall own and control all software, hardware, physical, remote and logical link access for the SS7 Gateway.

7.3.3     UUNET shall have remote and logical access to the RAD. UUNET shall control all software on the RAD. USWC shall have the right to test new software and configuration changes implemented by UUNET but shall obtain no proprietary rights or license in such software or configuration. UUNET agrees to the following notification schedule for any software changes to be made to the Remote Access Device:

7.3.3.1     For emergency software changes: UUNET shall notify USWC with minimum notice of 48 hours to evaluate software prior to UUNET deploying that change, unless otherwise agreed upon by both parties.

7.3.3.2     For new software patches: UUNET will provide seven (7) business days notice prior to loading new software patches

7.3.3.3     For new software releases: UUNET will provide a minimum of ten (10) business days notice prior to loading new software releases.

7.3.3.4     Should USWC uncover a service-affecting problem in review of any software modification, UUNET agrees to suspend deployment until service problems can be resolved. Examples of "service affecting problems" are described as, but not limited to, the following: Any RAD software change that causes material problems in the PSTN, RAD, SS7 Gateway that prevents the SS7 Gateway from performing all of its material intended functions correctly, or that which causes the SS7 Gateway to propagate erroneous or incorrect SS7 signaling messages to the USWC Public Switched Telecommunications Network (PSTN).

8     **SERVICE DEFINITION AND EQUIPMENT SELECTION** USWC has chosen to deploy a specific hardware configuration, as defined in Attachment 3, which provides a specific set of capabilities.

S 1875

Any change to the specific hardware configuration, including but not limited to installation of different cards, and/or replacement of obsolete equipment, shall require USWC's consent and may require an additional agreement and/or renegotiated prices. Equipment to provide SS7 Gateway and the interim platform will be selected solely at the discretion of USWC from the list of UUNET certified equipment. UUNET requests regarding the configuration and design of the equipment will be considered by USWC and employed in equipment selection when possible.

8.1    USWC and UUNET agree to work with the selected hardware vendor to assure continued availability of the hardware utilized in the specific configuration, as defined in Attachment 3, which, upon agreement of the Parties, may be updated from time to time.

9    CHARGES AND BILLING. UUNET agrees to pay the charges for Service as specified herein. These charges do not include applicable taxes imposed by law. Any taxes assessed will be clearly specified on the bill. UUNET shall pay each bill in full by the payment due date on each bill. UUNET shall pay each bill by the payment due date on the bill. Late payments are subject to a charge of one and one-half percent (1 1/2%) per month, or the maximum allowed by law, whichever is less. The charges for Services under this Agreement, do not include UUNET's purchase of any customer premises equipment or enhanced services from USWC.

9.1    Pricing for both the interim platform and SS7 Gateway service is defined in Attachment 4, attached hereto and incorporated herein by reference. This pricing shall, at the time of migration of UUNET's service to the interim platform or SS7 Gateway platform, replace all current pricing provided to UUNET by USWC for HCDT and DSS.

9.2    Ports ordered in years one (1) through four (4) of this Agreement are coterminous with the seven (7)-year term of this Agreement. Any ports ordered in years five (5) through seven (7) of this Agreement shall not be provided or priced under the terms of this Agreement.

9.3    Pricing will be based on a tier structure determined by the total number of ports. Ports are defined as any DS0 port (Layer 1) that physically terminates in a remote access device or functional equivalent. The initial total number of ports will be determined by the sum of all USWC provided UUNET's dial access ports nationwide, , all Services ordered by UUNET Affiliates under this Agreement and fifty percent (50%) of Affiliate's existing dial access ports as defined in Section 9.4 purchased outside of this Agreement. The total number of ports shall be adjusted monthly for all installed, working and Pending ports made under this Agreement and semi-annually for all Affiliate's dial access ports installed, working and pending outside of this Agreement.

9.4    Total number of ports applied to the pricing tier level is determined by:

9.4.1    Installed and Working dial access ports (interim platform, SS7 Gateway and HCDT/DSS DS0 equivalents) plus,

9.4.2    Pending ports under this Agreement, which are defined as those ports ordered by UUNET and not installed within thirty (30) days after order placement. Should UUNET cancel any pending firm order, UUNET shall pay the price it would have paid had the cancelled ports not been included in the determination of the pricing tier, retroactive to the date the order was first placed.

9.5    Full standard non-recurring charges (NRC) apply to all cancelled pending port orders, if orders are cancelled within thirty (30) days of the most recent due date provided by USWC.

S 1876

9.6     For all SS7 Gateway/COBRA ports, the billing will commence on the date of UUNET's acceptance of the Service.

9.7     The price per port charged hereunder shall be no less favorable to UUNET than the price extended by USWC to any other retail non-governmental customers for similar services. Upon UUNET's request, but no more than once each calendar year, USWC's Business Interprise Solutions Vice President of Finance shall certify in writing to USWC's compliance with this Section 9.7.

10     TERMINATION.   Either party may terminate this Agreement for cause provided written notice specifying the cause for termination and requesting correction within thirty (30) days is given the other party and such cause is not corrected within such thirty (30) day period.   Cause is any material breach of the terms of this Agreement.   Cause shall not include, without limitation, unrelated congestion in the public switched network or the failure of USWC to meet UUNET's requested installation schedule due to USWC's inability to obtain equipment from vendors.   If USWC terminates this Agreement for cause, or if UUNET terminates this Agreement WITHOUT cause, UUNET shall be assessed termination liability (TLA) except as defined in Section 10.2.

10.1    Termination Liability (except as defined in Section 10.2)

10.1.1    Once activated, the total nationwide quantity of installed ports must remain in service for the remainder of the contract term as defined herein.   Termination liability charges apply for all disconnected ports.

10.1.2    100% termination liability applies if UUNET disconnects and/or cancels any ports in years 1 through 3 of this Agreement.

10.1.3    75% termination liability applies if UUNET disconnects and/or cancels any ports in years 4 through 5 of this Agreement.

10.1.4    50% termination liability applies if UUNET disconnects and/or cancels any ports in years 6 through 7 of this Agreement.

10.2    Termination liability will not apply to the following:
10.2.1    If UUNET terminates this Agreement under the provisions provided in Section 6.1 relating to IP-based Traffic because the Parties are unable to negotiate a mutually agreeable provision for Voice over IP capability..

10.2.2    If either Party terminates this Agreement under the provision provided in Section 11 relating to Service Level Agreement, termination liability may or may not apply depending upon terms of such Service Level Agreement.

10.2.3    If USWC terminates this Agreement under the provision provided in Section 1.2 relating to UUNET's or any Affiliate's status change from an ESP to a Competitive Local Exchange Carrier or an Interexchange Carrier. Termination by UUNET pursuant to Section 1.2 shall not relieve UUNET of termination liability under Section 10.

10.2.4    If UUNET moves ports from one location to another, or adds and removes ports, in the same LATA, a non-recurring charge will apply in accordance with Attachment 4 Pricing.  No additional termination liability will apply.

11     SERVICE LEVEL AGREEMENTS. Service Level Agreements ("SLA") which are applicable hereunder are attached and incorporated into this agreement in Attachment 5.

12/14/98/UUNET-COBRA
Agreement Number CDS-980819-0115-C

DOJ - 00102
CONFIDENTIAL

Page 6

S 1877

12    CPE INTERACTION. Customer Provided Equipment connected to the USWC network on disclosed interfaces must be allowed to access the Remove Access Device on open, commonly available data interfaces. A listing of the open CPE interfaces supported by selected equipment manufacturer must be forwarded to USWC by UUNET. If proprietary interfaces are supported across a disclosed Network Interface such as ISDN, Frame Relay or Private Line Data Service, these interfaces must be outlined and forwarded to USWC for disclosure in accordance with applicable regulatory requirements. Proprietary signaling to CPE devices including software downloads, operating system modification and firmware upgrades cannot originate within the Remove Access Device .

13    MINIMUM COMMITMENT LEVELS.

    **13.1**    Port Minimum

        13.1.1    An initial minimum of 40,000 ports (DS0 equivalents) must be ordered by UUNET by December 31, 1998.

        13.1.2    Active port level shall be determined by the sum of UUNET's ordered and in service COBRA/SS7 Gateway ports, HCDT and DSS DS0 equivalents. UUNET shall be charged an annual shortfall charge of 50% of the applicable per port-charge for each port UUNET is below the required minimum port level, once the minimum port level is reached, except if shortfall is a direct result of the action or inaction of USWC.

        13.1.3    The minimum deployment level for SS7 Gateway/COBRA service is 6 PRI/DS1 circuits per USWC central office.

14    REVIEWS. UUNET and USWC agree to hold annual meetings to discuss aspects of the service offering including, but not limited to, market trends, architecture changes, and other significant factors which impact the service offering. If mutually agreed upon by both parties, terms and conditions may be modified.

    **14.1**    The parties will meet on a regular basis to establish future network requirements and review capacity planning. UUNET will provide a quarterly forecast to USWC six months in advance of a formal order, such forecast to be deemed UUNET Confidential Information. The forecast will not be considered a firm order, but may be used for USWC capacity planning purposes.

    **14.2**    USWC will plan, schedule and coordinate with UUNET when service is migrated from the interim platform to the SS7 Gateway platform. USWC and UUNET agree to conduct an annual review of USWC's records of UUNET's Services to ensure that all migrated Services are billed appropriately.

15.    GENERAL PROVISIONS.

    **15.1**    PERSONAL INJURY; PROPERTY DAMAGE. Each party shall be responsible for any actual physical damages it directly causes to the other in the course of its performance under this Agreement, limited to damages resulting from personal injuries, death, or property damage arising from negligent acts or omissions; PROVIDED HOWEVER, THAT NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT, OR SPECIAL DAMAGES OF ANY KIND, INCLUDING BUT NOT LIMITED TO ANY LOSS OF USE, LOSS OF BUSINESS, OR LOSS OF PROFIT.

S 1878

*DOLLARS*  *FEES*  *BY UUNET*  *FEES PAID BY UUNET IN THE*

**15.2** LIMITATION OF LIABILITY. USWC SHALL NOT BE LIABLE TO UUNET FOR ANY INCIDENTAL, INDIRECT, SPECIAL, OR CONSEQUENTIAL DAMAGES OF ANY KIND INCLUDING BUT NOT LIMITED TO ANY LOSS OF USE, LOSS OF BUSINESS, OR LOSS OF PROFIT. EXCEPT AS PROVIDED UNDER "PERSONAL INJURY; PROPERTY DAMAGE", INTELLECTUAL PROPERTY AND NONDISCLOSURE, ANY USWC LIABILITY TO UUNET FOR ANY DAMAGES OF ANY KIND UNDER THIS AGREEMENT SHALL NOT EXCEED, IN AMOUNT, A SUM EQUIVALENT TO THE GREATER OF ONE MILLION OR TWO TIMES PAID TO DATE NOT TO EXCEED LAST 24 MONTHS. REMEDIES UNDER THIS AGREEMENT ARE EXCLUSIVE AND LIMITED TO THOSE EXPRESSLY DESCRIBED IN THIS AGREEMENT.

*PRECEEDING THE DATE OF SUCH CLAIM*

**15.3** NO WARRANTIES. USWC warrants that the Services to be supplied hereunder will be performed by qualified professional personnel in accordance with industry standards and that the Services will be in strict compliance with this Agreement and the terms set forth in the applicable service descriptions attached hereto. USWC represents and warrants that the Services provided hereunder are designed to process and will process all date data, calculations, storage, and retrieval without error or interruption prior to, during and beyond the year 2000, and are in compliance with all applicable Year 2000 standards, including those of the International Standards Organization, British Standards Institution, and the U.S. government's Federal Acquisition Regulations. EXCEPT AS SET FORTH HEREIN, THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

**15.4** UNCONTROLLABLE CIRCUMSTANCES. Neither party shall be deemed in violation of this Agreement if it is prevented from performing any of the obligations under this Agreement by reason of severe weather and storms; earthquakes or other natural occurrences; strikes or other labor unrest; power failures; nuclear or other civil or military emergencies; acts of legislative, judicial, executive or administrative authorities; or any other circumstances which are not within its reasonable control.

**15.5** DISPUTE RESOLUTION.

**15.5.1.** Other than those claims over which a regulatory agency has exclusive jurisdiction, all claims, regardless of legal theory, whenever brought and whether between the parties or between one of the parties to this Agreement and the employees, agents or affiliated businesses of the other party, shall be resolved by arbitration. A single arbitrator engaged in the practice of law and knowledgeable about telecommunications law shall conduct the arbitration in accordance with the then current rules of the American Arbitration Association ("AAA").

**15.5.2.** All expedited procedures prescribed by the AAA shall apply. The arbitrator's decision shall be final and binding and judgment may be entered in any court having jurisdiction thereof.

**15.5.3** Other than the determination of those claims over which a regulatory agency has exclusive jurisdiction, federal law (including the provisions of the Federal Arbitration Act, 9 U.S.C. Sections 1-16) shall govern and control with respect to any issue relating to the validity of this Agreement to arbitrate and the arbitrability of the claims.

**15.5.4** If any party files a judicial or administrative action asserting claims subject to arbitration, and another party successfully stays such action and/or compels

12/14/98/UUNET-COBRA
Agreement Number CDS-980819-0115/C

DOJ - 00104
CONFIDENTIAL

Page 8

S 1879

arbitration of such claims, the party filing the action shall pay the other party's costs and expenses incurred in seeking such stay or compelling arbitration, including reasonable attorney's fees.

15.6.   LAWFULNESS.  This Agreement and the parties' actions under this Agreement shall comply with all applicable federal, state, and local laws, rules, regulations, court orders, and governmental agency orders.  Any change in rates, charges or regulations mandated by the legally constituted authorities will act as a modification of any contract to that extent without further notice.  This Agreement shall be governed by the laws of the state where Service is provided.

15.7.   SEVERABILITY.  In the event that a court, governmental agency, or regulatory agency with proper jurisdiction determines that this Agreement or a provision of this Agreement is unlawful, this Agreement, or that provision of the Agreement to the extent it is unlawful, shall terminate.  If a provision of this Agreement is terminated but the parties can legally, commercially and practicably continue without the terminated provision, the remainder of this Agreement shall continue in effect.

15.8.   MISCELLANEOUS PROVISIONS.

15.8.1.  Failure or delay by either party to exercise any right, power, or privilege hereunder, shall not operate as a waiver hereto.

15.8.2.  This is a retail end user contract.  It may be assigned only with the consent of USWC.  It may not be assigned to a reseller or a telecommunications carrier under any circumstances.

15.8.3.  This Agreement benefits UUNET and USWC.  There are no third party beneficiaries.

15.8.4  This Agreement constitutes the entire understanding between UUNET and USWC with respect to Service provided herein and supersedes any prior agreements or understandings..

16. Intellectual Property.

16.1    USWC represents and warrants that each Service delivered hereunder does not and will not upon or misappropriate any patent, copyright, trade secret, trademark, or other proprietary infringe right (collectively, "Intellectual Property Rights") of any third party.  USWC represents and warrants that to its knowledge there are no third party claims to the contrary, and that USWC will promptly inform UUNET if it becomes aware of any such claims.

S 1880

16.2    All Deliverables created at UUNET's direction and expense separate from the per port charges contained herein shall be created as works made for hire. "Deliverables" shall mean any writings, reports, documentation, software, firmware, designs, technical data, inventions, developments, improvements, discoveries or other information (whether or not patentable, copyrightable or subject to trademark protection). Deliverables shall be the sole and exclusive property of UUNET. UUNET shall have the unilateral and unrestricted right to use such Deliverables and information and ideas contained therein in any way. USWC shall perform all lawful acts requested by UUNET (a) to perfect UUNET's title to all such Deliverables, including the execution of any assignments, and (b) to enable UUNET or its nominee to obtain and maintain patent, copyright, trademark, trade secret or other legal protection therefor anywhere in the world.

16.3    USWC shall indemnify and hold harmless UUNET, its Affiliates, and its and their directors, officers, employees, successors, assigns, agents, customers and any subsequent owner, lessee or user of any of the Services or Deliverables supplied hereunder (each, an "Indemnified Party") from and against any loss, damage, liability, costs and expenses (including reasonable attorneys' fees) which may be incurred on account of any suit, claim, judgment or demand involving infringement or alleged infringement of any third party's Intellectual Property Rights, provided that UUNET shall promptly notify USWC of any suit instituted against an Indemnified Party and, to the extent of its ability to do so, shall permit USWC to defend the same or make settlement in respect thereof (unless such settlement binds an Indemnified Party, involves payment by an Indemnified Party, or adversely and substantively affects an Indemnified Party's rights hereunder, in which case UUNET shall have the right to approve such settlement). UUNET shall have the right (at its expense) to participate in the defense of any such suit. This indemnification does not apply to any infringement or claim of infringement: (a) arising from adherence to instructions or drawings which USWC has been directed by UUNET to follow after the Effective Date of this Agreement; or (b) which relates to combinations of USWC supplied Services with any other software or services not supplied by USWC.

16.4    If the use of any Service or Deliverable provided hereunder is enjoined as a result of infringement of any Intellectual Property Rights, USWC shall, at no expense to UUNET, either (a) obtain for each Indemnified Party the right to use the Service or Deliverable, (b) modify such Service or Deliverable in a manner that is acceptable to UUNET, maintains all existing functionality, and does not infringe on any third party's Intellectual Property Rights, (c) substitute equivalent Service or Deliverable that is acceptable to UUNET and does not infringe on any third party's Intellectual Property Rights, or (d) if commercially reasonable efforts to achieve the foregoing are unsuccessful, provide UUNET a refund for the preceding twenty four (24) months for such Service or Deliverable.

17. **Non-Disclosure.**

The existence and terms of this Agreement shall be held confidential by each party, as shall each party's confidential or proprietary information ("Confidential Information"). Neither party shall disclose the other party's Confidential Information to third parties without the other party's written consent, except as permitted pursuant to this Section. Each party shall disseminate the other party's Confidential Information among its Affiliates and employees only on a need-to-know basis and shall use such Confidential Information only for the purpose of performing its obligations hereunder. To the extent a party is required by applicable law, regulation, or a government agency or court order, subpoena, or investigative demand, to disclose the existence or terms of this Agreement or the other party's Confidential Information, such party shall use its reasonable

DOJ - 00106
CONFIDENTIAL

S 1881

efforts to minimize such disclosure and obtain an assurance that the recipient shall accord confidential treatment to such Confidential Information, and shall notify the other party contemporaneously of such disclosure.

18. **Notices and Correspondence.** All notices and correspondence shall be sent by either party in writing to the other in matters dealing with this Agreement to the following addresses:

If to UUNET:
3060 Williams Drive
Fairfax, VA 22031
Attention: General Counsel
Fax: 703-206-5807

If to USWC:

1801 California Street
Suite 5100
Denver, CO 80202
Attention: Karen Tatelman
Fax: 303-308-9456

or any other address provided prior written notice is given to the other party. Notices may be sent by registered or certified mail, postage prepaid, receipt requested, by nationally recognized overnight courier or by fax. Notices shall be deemed delivered within five days of mailing, the day after deposit with the overnight courier, or upon electronic confirmation of fax transmission.

19. **Notice of Labor Disputes.** Whenever USWC has knowledge that any actual or potential labor dispute is delaying or threatens to delay the timely performance of any Service, USWC shall immediately give notice thereof to UUNET.

20. **No Use of Trademarks.** Neither party may use the name, logo or any other trademarks or service marks of the other party in any advertising, signage, marketing materials, brochures or any other materials in any medium without the other party's express advance written permission. Any such permitted use shall be only within guidelines provided by the other party.

The parties hereby execute and authorize this Agreement as of the latest date shown below:

UUNET Technologies, Inc.

Authorized Signature

Name Typed or Printed: DAVID R. BOAST

Title: VP, DIAL ACCESS NETWORK

Date: 12/30/88

U S WEST Communications, Inc.

Authorized Signature

Name Typed or Printed: Solomon Trujillo

Title: President & CEO

Date: 12/15/98

12/11/98/UUNET-COBRA
Agreement Number CDS-980819-0115/C

Page 11

DOJ - 00107
CONFIDENTIAL

S 1882

DOJ - 00108
CONFIDENTIAL

S 1883