Exhibit C

Service Description (UUNET CONFIDENTIAL)

## PART 1 (LUCENT/ASCEND TNT EQUIPMENT)

UUNET's Dial Access Division has invested time and money to develop CO-Based Remote Access (COBRA), a confidential and proprietary approach to building dial Internet infrastructure. UUNET requires the Services of Contractor in order to implement its approach and has entered into the Agreement herewith to obtain such Services.

UUNET's classical Internet dial access architecture consisted of PRI's which were backhauled into a NAS located in a UUNET hub, where the traffic was aggregated and routed onto UUNET's Internet backbone. Since the COBRA architecture moves the NAS out to the CO, the traffic is then aggregated at the CO. Realizing a 6:1 concentration ratio, COBRA requires only one egress frame T1 backhaul for each six ingress PRI's in the NAS, a significant departure from the 1:1 ratio required in the classical scenario. This reduces the number of circuits between the CO and the hub, and drops the attendant costs. In addition, it reduces the need for CFA from an IXC for all inter-LATA circuits, which, historically has been the pacing item in bringing Internet service to market. UUNET's use of this architecture will improve time to market for services offered, reducing the opportunity cost associated with the delay between order entry and activation.

The following technical specifications are only one example of the technical specifications to be used in connection with the RAS Services. The parties understand that UUNET also utilizes 3Com technology which is also currently being deployed by UUNET and ICG. UUNET shall provide reasonable written specifications with regard to the 3Com technology.

1.   COBRA Technical Specification

   a.   *Design Summary*

   UUNET's COBRA architecture consists of the following four distinct components installed within the CO:

   ❑   Ascend MAX TNT (NAS)
   ❑   Ethernet hub (OOB management)
   ❑   Cisco 2511 (OOB management)
   ❑   Modem (OOB management)

   The Ascend MAX TNT functions as the Network Access Server (NAS). Each TNT can terminate up to 12 ingress T1s (currently – DS3 termination for all 28 T1s is pending) which equates to 288 modems (although only 276 are used for ingress PRIs). Traffic is aggregated within the TNT and passed to the Internet via frame T1 circuits.

   The Cisco 2511, the Ethernet hub, and the modem (which will require a POTS line from the local switch) permit initial and also emergency equipment management.

   The modem and all of the TNTs are attached to the Cisco 2511 via async ports. In addition, each of the TNTs, as well as the Cisco 2511, are connected to the Ethernet hub. This architecture allows redundant out-of-band access to all of the TNTs once a dial-up connection to the 2511 has been established, either via the async connection to the console port of the TNT or over the local (non-routed) Ethernet management LAN.

   b.   *Basic COBRA Architecture*

   At the CO, Contractor PRIs are wired from the switch to the TNT. These PRIs are referred to as "ingress circuits." The TNT concentrates the traffic from the ingress circuits onto frame T1 circuits. These frame T1s are referred to as "egress circuits" or "backhauls".

DOJ - 00191
CONFIDENTIAL

S 1914

Egress circuits are provisioned at a ratio of 6 or less ingress circuits to 1 egress circuit. A "fully loaded" TNT has 12 ingress circuits and a *minimum* of 2 egress circuits. A TNT can support a maximum of 4 egress circuits, which provides room for expansion should the aggregation ratio metrics change moving forward.

The egress circuits are backhauled to the nearest suitable UUNET hub and terminated on a channelized entrance DS3. The DS3 is in turn terminated on a channelized T3 card in a Cisco 7000 series router.

All egress circuits connected to the same TNT must terminate into the same router. Different TNTs within the same CO may be terminated on different routers. These routers may be in the same hub or in different hubs.

This basic architecture is illustrated in the following diagram:



c.     *COBRA Out Of Band Management Network*

Initial and emergency management of the TNT will be done by UUNET via analog telephone line and modem. This is called out of band access (OOB).

Note that OOB access is not the preferred way to access the TNT because it is slower than IP. OOB access is used to initially configure the TNT and permit activation of the first backhaul circuit. After the first backhaul is activated, TNT configuration and code loading is done via IP through the backhaul itself.

The Cisco 2511 is functioning only as a local terminal server, and no routing functions are being performed. Similarly, the Ethernet hub is a local, closed network management LAN, and does not provide a path to any other equipment within the CO.

DOJ - 00192
CONFIDENTIAL

S 1915



*d.    TNT Specific Configuration*

Each TNT unit is called a shelf, which has 16 slots. The standard configuration consists of two 8-port T1 cards, an HDLC controller, and six modem cards, each having 48 56K KFLEX modems. The T1 cards have eight ports, numbered 0-7, and terminate either PRIs/Channelized T1s from the Contractor switch (ingress circuits), or hi-cap frame T1s going to the UUNET backbone (egress circuits). Our standard is to use ports 0-5 on each card for ingress and to use port 6 for egress. For each TNT shelf, we maintain an ingress to egress circuit ratio of 6:1 or less. A fully loaded shelf supports a total of 12 ingress circuits and 2 egress circuits. Port 7 of both T1 cards is not required, but it may be used for reserve capacity.

The 6:1 or less egress ratio has a distinct advantage. Assume that a COBRA installation has 18 ingress and 3 egress circuits. Any additional ingress T1s activated would require an additional egress circuit in order to maintain the 6:1 or less ratio. However, suppose that 2 additional ingress T's were activated, bringing the total to 20, and a fourth egress was activated to support it. There would then be room to activate an additional 4 ingress T1s upon receiving an order without requiring any activation other than the ingress T1s from the switch to the TNT, all of which is entirely within the Contractors control. This has proven to be quite effective in reducing opportunity cost associated with the delay between order and activation.

*e.    Circuit Configuration*

All circuit configuration required at the NAS shall be the responsibility of UUNET. The parameters of circuit translation options required by UUNET are:

DOJ - 00193
CONFIDENTIAL

□ Pricing is based on PRI only. If channelized T1s are provided on a short term basis prior to a PRI upgrade, UUNET shall be charged a reduced per port charge agreed upon on a case-by-case basis.
□ NFAS
□ B8ZS/ESF
□ 10 DID numbers per rotary
□ Forward circular sequential hunting.  (If this functionality is available on the applicable switch it shall be activated)

*f.*     *TNT Configuration*

The figure on the next page shows the back of a fully loaded DC-powered TNT. The card type and slot number is shown on the left. Note that the controller card at the top of the chassis is in slot 17. Subsequent cards start with slot number 1. Slot 4 is empty.  The modems occupy two slots each. Each modem card has enough modems to service 2 PRIs.

ICG / UUNET CONFIDENTIAL

3/30/00 – AMENDED

DOJ - 00194
CONFIDENTIAL

S 1917



Slot 17 Controller Card

Slot 1 T1 Card

Slot 2 HDLC Card

Slot 3 T1 Card

Slot 5-6 56K Modem Card

Slot 7-8 56K Modem Card

Slot 9-10 56K Modem Card

Slot 11-12 56K Modem Card

Slot 13-14 56K Modem Card

Slot 15-16 56K Modem Card

3/30/00 - AMENDED

ICG / UUNET CONFIDENTIAL

PAGE 24

DOJ - 00195
CONFIDENTIAL

g.    *TNT Equipment*

The minimum COBRA implementation that UUNET would deploy in any given site is 6 PRIs, with the right to augment that order by 2 PRIs at a time until the maximum capacity of 12 has been reached. The equipment required for a minimum configuration is outlined below.

| (QTY) | Ascend Part Number | Description |
|-------|--------------------|-------------|
| (1) | TNT-2DC-H | Chassis with 2 DC power |
| (1) | TNT-SL-HDLC2 | HDLC Slot Card |
| (1) | TNT-SL-CT1 | T1 Slot Card |
| (1) | TNT-SO-ISDN | ISDN software |
| (1) | TNT-SO-FR | Frame Relay Software |
| (1) | TNT-SO-ANC | Navis Access Software |
| (1) | TNT-SO-L2TP | Layer 2 Tunneling Software |
| (3) | TNT-SL-48MODV3-S-C | 48 Port slot card (Series V.90 & V.34) |

Contractor shall be responsible for the purchase, installation, support and maintenance of all this equipment.

## 2.    COBRA Service Description

This section serves to identify which party will be responsible for various components of this project. Many responsibilities have been identified previously within this Exhibit, but are included here for clarity.

a.    *UUNET Management of the Dial Access Equipment*

UUNET will be fully responsible for the management of the NAS, to include initial and ongoing configuration, software release levels and updates, and general "code control" of the NAS. UUNET will monitor and manage the NAS over the egress ports, with the out of band POTS line functioning as a backup. Contractor will have a "view" into the NAS for the sole purpose of performing services required by UUNET, but Contractor shall not have any right to any software or information installed on or available from the NAS or other equipment.

b.    *Contractor Management of the Dial Access Equipment*

Contractor's responsibility for the management of the equipment is limited to the hardware aspects only. The Contractor will provide initial installation, hardware support and maintenance, and deployment of resources necessary to fix/replace hardware failures (once UUNET has contacted the Contractor and requested assistance). Should an alarm occur, UUNET will be responsible for contacting the Contractor's Network Operations Center (NOC). UUNET is responsible for determining the source/cause of the problem (Problem Identification) and resolving the problem (Problem Resolution). UUNET may or may not choose to take action on an alarm. If the alarm involves a hardware failure, UUNET will contact the Contractor's NOC, provide specific information on the location and type of activity to occur (example: replace module XXX in device YYY located at ZZZ location). The Contractor's NOC will then deploy the appropriate contracted resources to address the hardware problem.

c.    *Service Response*

The service interval for Contractor's on-site response is to be determined by the criteria outlined below. A grade 1 problem is the most critical, grade 3 the least.

| GRADE | OUTAGE / PROBLEM |
|-------|------------------|
| 1 | T-1 outage between telephone switch and modem pool. |
| 1 | No response from maintenance ports on any associated equipment located in the Central Offices. |

ICG / UUNET CONFIDENTIAL

3/30/00 - AMENDED

DOJ - 00196
CONFIDENTIAL

S 1919

| | |
|---|---|
| 1 | 30% of the modems or more at any one site are not responding. |
| 1 | Any single point of failure piece of hardware outputting major alarms. |
| 2 | Less than 30% of the modems at any one site are not responding. |
| 2 | Any single point of failure piece of hardware outputting minor alarms. |
| 3 | Any non service affecting problems on any associated equipment located in the Central Offices. |
| 3 | Requests for documentation. |
| 3 | Requests for call back on non service affecting issues. |

| GRADE | CONTRACTOR RESPONSE TIME FRAMES | |
|---|---|---|
| 1 | Mean time to respond | 30 minutes |
| | Mean time to repair | 4 hours |
| 2 | Mean time to respond | 2 hours |
| | Mean time to repair | 12 hours (Hardware is on-site) |
| | Mean time to repair | 24 hours (Hardware must be ordered) |
| 3 | Mean time to respond | 4 hours |
| | Mean time to repair | By end of next business day |

*d.    Authentication*

User authentication will be the sole responsibility of UUNET.

*e.    IP Address Space*

UUNET will provide IP addresses for the NAS from its assigned range. UUNET will retain ownership of such IP address at all times, including upon termination of Service or of the Agreement for any reason.

*f.    Ingress Port "Overflow"*

The overflow of PRI from one hunt group to another will be standard within a single Central Office switch. If UUNET requires overflow of PRI from one Central Office switch to a different Central Office switch within the same local free calling area, then UUNET recognizes there may be a requirement to file a special assembly.

PAGE 26                    ICG / UUNET CONFIDENTIAL                    3/30/00 - AMENDED

DOJ - 00197
CONFIDENTIAL

S 1920

## EXHIBIT C, PART 2 (3COM EQUIPMENT)

**INTRODUCTION**

UUNET's Dial Access Division has invested time and money to develop an alternative approach to building its dial infrastructure, and it requires a strategic alliance with the LECs ( Local Exchange Carrier that offers local PSTN service) in order to be effected. It is a proven combination of architecture, equipment, and software, and is referred to at UUNET by the name CO-Based Remote Access (COBRA). This document provides an overview of COBRA from both technical and business viewpoints.

COBRA is an effort to push the Network Access Server (NAS) out to the LEC Central Offices (COs) while still providing UUNET with a dedicated platform. The NAS is LEC-owned and UUNET-managed. It is expected to be an integrated service offering wherein UUNET purchases modem ports instead of circuits from the LECs. Billing is based upon the total number of active ports, and the cost per port is determined by a tiered structure that includes the number of ports on order. This architecture would be applied to new service, service on order, and conversion of all existing active Dial Access service. UUNET typically commits to a multi-year term, which may be extended based on price discounts.

COBRA is a wholesale offering that will allow UUNET to obtain dedicated modem ports with one-way ISDN PRI on the ingress (incoming) side and UUNET-provided dedicated facility connections on the egress (outgoing) side. The equipment will be installed in the LEC Central Offices and will allow for connections that consist of:

- Analog Modem ports (up to 56K, supporting v.90 protocol)
- ISDN digital ports, single B-channel - 64K
- Point to Point DS1, Point to Point DS3 egress

The LEC will provide the network access servers (NAS) within those Central Offices agreed upon by UUNET and the LEC. Additional Network Access Servers will be deployed in other central offices if agreed upon by the LEC and UUNET at a later date.

Though different vendors' NAS products are continuously evaluated by UUNET, this document will address the 3Com Total Control Modem Chassis. The 3Com Equipment will be purchased from UUNET (acting as a reseller), and allow the LECs to benefit from UUNET's unique relationship with 3Com through the discount rates UUNET offers. The Total Control units are installed by the LECs in their COs, and all hardware maintenance is the responsibility of the LEC. Operational aspects of the hardware are controlled by UUNET, including configuration management, user authentication, trouble identification, and Internet backbone connectivity. This allows both the LEC and UUNET to focus on their core competencies: the LEC managing circuits and equipment, and UUNET managing configurations, modem code updates, IP address space, session records, and other Internet related responsibilities.

In the current environment of vastly changing telecom reform, UUNET is faced with new alternatives that require a re-evaluation of strategic direction and partnering. UUNET looks forward to working together with the LECs to create a win-win solution that makes it so desirable to do business that there would be no need to look elsewhere for service.

**3COM COBRA DESIGN BENEFITS**

**Partner's Leverage of Core Competencies**

UUNET has years of knowledge, skills, and experience in the Internet – from deployment to customer demands to usage patterns to modem anomalies to routing. LECs excel at providing circuits and deploying the required support infrastructure. COBRA allows each of the partners in this relationship to focus on their respective core competencies, leveraging their individual expertise such that the whole will be greater than the sum of its parts.

ICG / UUNET CONFIDENTIAL

3/30/00 - AMENDED

DOJ - 00198
CONFIDENTIAL

S 1921

**Improved Time to Market**

The LEC will benefit from an improved time to market in the form of a reduction of the opportunity cost associated with the delay between circuit order and activation. The time to market will decrease for a number of reasons. UUNET will not have to locate a suitable collocation site and arrange for possible modifications to the heating, air conditioning, and electrical facilities and the LEC will not have to plan and construct outside plant to supply the required circuits at our new remote location. Thus, the turn around time between circuit order and activation is limited to how quickly the LEC can cross connect the required number of circuits.

Not only is an improved time to market desired by and a realized benefit to the LEC, but it is to UUNET as well. When a given rotary becomes blocked (i.e., users dial in but get a busy signal because there are no modem ports left), UUNET seeks to augment the loaded rotary with additional capacity as soon as possible. Although every effort is made to predict when blockage will occur and order additional capacity ahead of time, UUNET still encounters blocked POPs. There is an opportunity cost to UUNET for every rotary that is blocked because users are trying to dial up and generate connect time revenue. An improved time to market is clearly one of the most significant advantages to COBRA that benefit both UUNET and the LEC.

**Extended Coverage into New markets**

UUNET's classic architecture limited the number of rotaries UUNET would access because of the cost of deploying circuits from remote COs back to UUNET hubs. COBRA will allow UUNET to branch out and provide dial access service into the more geographically remote areas that had been previously cost prohibitive. This has the potential for UUNET to realize 100% coverage within the LEC region.

**Relief of Interoffice Trunking**

Migration of the NAS to the CO allows for the opportunity to relieve congested interoffice facilities. Every CO is now a candidate for NAS equipment, and they can be deployed into the COs where the traffic emanates, reducing the need for tandem aggregation.

**EC's CO Space Integrity**

Because of the unique business arrangement and architecture of COBRA, the LEC can maintain the integrity of the CO while generating revenue from currently vacant floor space.

**Strategic Long Term Relationship**

Availability of the product offering that UUNET proposes at the appropriate cost per port would encourage UUNET to choose the incumbent LEC as the preferred provider within a given region. A competitive cost from the LEC will reduce the need for UUNET to evaluate the various CLEC (Competitive LEC) alternatives. UUNET's COBRA solution provides an increased ease of doing business that scales well, and permits UUNET to develop a strategic long term relationship with key partners. UUNET seeks mature and stable business partners with wide geographic coverage that allow them to gain the greatest coverage with minimal points of contact and focus on a region-wide strategic direction. Implementation of this business proposal would make clear the strategic direction for UUNET within the LEC territory.

**3COM COBRA FUNCTIONALITY**

The 3Com COBRA architecture supports specific functionality and draws on a unique relationship with the NAS vendor. This functionality has evolved over time and is vital to our ability to provide highly reliable Internet service. This section of the document highlights certain specific features that are fundamental requirements of UUNET, and should be seriously considered prior to the suggestion of any deviation of the product offering described. It has been UUNET's experience that most LECs already have some type of modem port offering, and generally prefer to use that offering to meet UUNET's needs. While those product offerings clearly have potential for sale into specific target customer bases, such as small, local ISP's, none meet the special requests and unique requirements of UUNET unless they conform exactly to the specifications outlined herein.

ICG / UUNET CONFIDENTIAL                3/30/00 - AMENDED

DOJ - 00199
CONFIDENTIAL

S 1922

**Integrated Equipment Cabinet**

The 3Com COBRA equipment is delivered to the LEC facility as a complete assembly housed in a standard 24"W x 36"D 72"H cabinet. This insures all necessary components are properly arranged and cabled. The LEC will place the cabinet, plug in the power cords, and connect the circuits to pre-wired patch panels.

**Access Types**

UUNET end-users will be able to access the COBRA service via analog modem or ISDN on the ingress (incoming) port side. The equipment will then aggregate the traffic and provide an egress (or outgoing) port connection to one of the following egress circuits:

- Point-to-Point DS1
- Point-to-Point DS3

These egress circuits will be required to deliver the dial access traffic to UUNET's chosen location. UUNET will be responsible for providing the egress circuit(s) connecting the dial access site to the UUNET hub location. The circuit(s) can be ordered from the LEC or another carrier. UUNET will determine the type of egress port to be deployed.

**Billing and Statistics Support**

This will be managed by UUNET via remote access to the NAS.

**Verification-Termination Server Support**

This will be managed by UUNET via remote access to the NAS.

**Modem Hot Swaps**

The 3Com modem cards are hot swappable. This makes physical maintenance to a NAS less time-consuming since the NAS does not require a re-boot in order to replace a modem card.

**3COM COBRA TECHNICAL SPECIFICATIONS**

**Design Summary**

The 3Com Total Control Modem Chassis functions as the NAS. One modem chassis can support up to fourteen (14) HiPerDSP cards with each HiPerDSP card being able to support one T1 PRI. Each physical cabinet can support four (4) modem chassis with a total of 56 HiPerDSPs per cabinet or 1344 modems. Dial traffic is passed to the 3Com ethernet switch that is directly connected to the egress aggregator. (See diagram at end of document.)

The 3Com Total Control management chassis is used for authentication, data collection and management of the dial equipment in the cabinet. The management chassis has an analog modem card for Out-of-band (OOB) access that is used during the initial configuration of the equipment and for troubleshooting if access is not available via the egress circuit(s).

The Cisco 7204 is used for the termination of the egress T1 or DS3 circuit(s).

**3. Basic COBRA Architecture**

At the CO, the LEC PRI circuits are wired from the switch to the pre-installed mod-tap panels in the modem cabinet. These PRIs are referred to as "ingress circuits". The 3Com equipment concentrates the traffic from the ingress circuits onto the clear channel T1s or single T3 via the egress aggregator. These are called the "egress circuits" or "backhauls".

DOJ - 00200
CONFIDENTIAL

## COBRA Out-of-Band Management Network

Initial configuration and emergency maintenance of the 3Com and Cisco equipment is performed by UUNET via analog telephone line and modem. This is called out-of-band access (OOB). As part of the COBRA service, the LEC will provide a dedicated analog phone line for each OOB modem installed in a given CO.

Note that OOB access is not the preferred way to access the equipment because it is slower than IP. OOB access is used initially to configure the equipment and permit activation of the first backhaul circuit. After the first backhaul is activated, equipment configuration and code downloading is done via IP through the backhaul.

### Circuit Configuration

All circuit configurations required at the NAS are the sole responsibility of UUNET. The parameters of circuit translation options required by UUNET are:

- PRI
- NFAS
- B8ZS/ESF
- 40 DID numbers per rotary
- Ascending hunt sequence
- Caller Identification (Number Only)

### 3Com Total Control Specific Configuration

Each Total Control unit is called a chassis. There are five (5) chassis installed in each physical cabinet. Four (4) of the chassis are dedicated to housing modems with each of the chassis being able to support up to fourteen (14) HiPerDSP cards. Each HiPerDSP card terminates one (1) T1 PRI.

The fifth chassis in the cabinet is dedicated to housing cards required to manage the equipment in the cabinet. The management chassis is responsible for data collection, authentication, domain name service and out-of-band management to all of the equipment in the cabinet. Within the management chassis is a 3Com EdgeServer card. This card contains UUNET proprietary software. In the event the EdgeServer needs to be replaced, UUNET will need to re-install this proprietary software. Remote hands & eyes assistance may be required from a LEC technician.

### Equipment Requirements Itemization

3Com Total Control Modem Chassis (maximum of 4 per cabinet/336 ports per chassis)

| Qty | Part # | Description | List Price |
|-----|--------|-------------|-----------|
| 1 | 003459-00 | TCH Dual 130A/AC Power with HiPerNMC | $7,745 |
| 1 | 002106-01 | HiPerARC Card Set (Ethernet) | $9,575 |
| 14 | 002092-00 | HiPerDSP Card Set (24 ports per card) | $152,950 |
| | | Total List | $170,270 |

Total Control Management Chassis (one (1) required per cabinet)

| Qty | Part # | Description | List Price |
|-----|--------|-------------|-----------|
| 1 | 003459-00 | TCH Dual 130A/AC Power with HiPerNMC | $7,745 |
| 1 | 002588-00 | EdgeServer Pro, 256mb, 2x2Gb hard drives | $12,750 |
| 1 | 003281-00 | 16 port serial NIC | $1500 |
| 1 | 001893-00 | Pentium Pro Processor | $1,300 |
| 1 | 002157-00 | Dual 10/100 Base T Ethernet NIC | $600 |
| 1 | 000849-00 | Quad Analog Digital Modem Card Set | $3,438 |

ICG / UUNET CONFIDENTIAL          3/30/00 - AMENDED

DOJ - 00201
CONFIDENTIAL

S 1924

| | | | Total List | $27,333 |
|---|---|---|---|---|

Peripherals

| Qty | Part # | Description | List Price |
|---|---|---|---|
| 1 | 3C169-80 | 3Com SuperStack Ethernet Switch | $2,695 |
| 1 | Cisco7204/150 | Egress Aggregator w/NPE-150, AC | $29,800 |
| 4 | ANX-27.1B.241.B002G | Mod-Tap Patch Panels | $160 |
| 1 | ANX-148646RJ-45 | Feed-thru Patch Panel | $125 |
| 1 | SPE-P4Cables-Base | Phase 4 Cable Kit | $1,100 |
| 1 | NOR-CC-NT3-842436-19BG | 7' Data Cabinet | $1,500 |

3Com Spare Parts

| Qty | Part# | Description | List Price |
|---|---|---|---|
| 1 | 002588-00 | EdgeServer Pro, 256mb, 2x2Gb hard drives | $12,750 |
| 1 | 002157-00 | Dual 10/100 Base T Ethernet NIC | $600 |
| 1 | 003281-00 | 16 port serial NIC | $1,500 |
| 1 | 001893-00 | Pentium Pro Processor | $1,300 |
| 1 | 002092-00 | HiPer DSP Card Set (24 ports per card) | $10,925 |
| 1 | 003440-00 | HiPer NMC Card Set | $4,826 |
| 1 | 002106-00 | HiPer ARC Card Set | $9,575 |
| 1 | 000849-00 | Quad/Analog Card Set | $3,438 |
| 1 | 001402-00 | AC Power Supply PSIJ/PSI Set (130 amp) | $1,995 |
| 1 | 001404-00 | DC Power Supply PSU/PSI Set (130 amp) | $2,195 |

The Cisco 7204 egress aggregator and 3Com ethernet switch reside in the physical cabinet with the modems.

The DC power option would require different power supplies, etc. Options are listed below.

| Qty | Part # | Description | List Price |
|---|---|---|---|
| 1 | 003458-00 | TCG Dual 130 A/DC power with HiPer NMC | $8,150 |
| 1 | 2H252-25R | Cabletron SS2200 Ethernet Switch | $4,995 |
| 1 | Cisco 7204/150 | Egress Aggregator w/NPE-150, DC | $31,300 |

## 3COM COBRA SERVICE DESCRIPTION

The following service features will be included with COBRA or as options that may be offered.

### UUNET Management of Dial Access

UUNET will be responsible for the management of the NAS for this service. The "UUNET Management of dial access" implies that UUNET will have full responsibility for initial and ongoing configuration, software release levels and updates, and general "code control" of the NAS. The monitoring/management/ reporting activities performed by UUNET will occur over the egress port link(s) into the NAS or through a backup dial-in channel that the LEC will provide for each site. The LEC will not have a "view" into the NAS. However, the LEC will provide hardware, remote hands and eyes, and Central Office switching maintenance and deployment of resources.

With the COBRA service, UUNET is responsible for providing configuration and management of the equipment in the cabinet.

The physical demarcation point for the equipment is the end of the ethernet cable from the 3Com SuperStack Switch that connects to the fast ethernet card in the egress aggregator.

PAGE 31                          ICG / UUNET CONFIDENTIAL                          3/30/00 - AMENDED

DOJ - 00202
CONFIDENTIAL

S 1925

## Alarm Management

...uld an alarm occur, UUNET will contact the LEC to report the alarm and request maintenance support if it is required. ...NET may or may not choose to take action on this alarm.

## Problem Identification

Problem Identification will be carried out by UUNET through either the primary or backup management interfaces and will isolate the problem to one of three sources:

- the egress circuits between the NAS and the UUNET location,
- the NAS itself, or
- the PRI or other ingress trunks connecting the NAS to the PSTN.

At each site, a TPI 970 (or equivalent) PRI test set will be maintained by the LEC to aid in the resolution of glare situations in which it cannot be determined with certainty that the NAS is operational.

## Problem Resolution

Since the egress circuits are UUNET-provided, if UUNET's Problem Identification activities determine that the trouble lies in the egress circuits, a trouble report will be issued with the provider of those circuits.

The LEC will provide hardware support and maintenance, and deployment of resources necessary to fix/replace hardware failures (once UUNET has contacted the LEC and requested assistance). Should an alarm occur that involves a hardware failure, UUNET will be responsible for contacting the LEC's Network Operations Center (NOC), provide specific information on the location and type of activity to occur (example: replace module XXX in device YYY located at ZZZ location), and the LEC will then immediately deploy the appropriate resources to address the hardware problem.

...on request of UUNET and under the direction of UUNET staff, the LEC will provide support services which include but ...: not limited to the following.

1) Power cycle equipment
2) Visual inspection of equipment
3) Adjustment of dip switches on cards
4) Physical reseat of cards and cables
5) Replacement of old cards with new
6) Miscellaneous tasks with a duration of less than 15 minutes.

## Equipment Sparing

The LEC will be responsible for sparing at each COBRA site, and replacement of the following equipment:

- 3Com Total Control chassis and components in chassis
- 3Com SuperStack Ethernet Switch
- Cabling within the cabinet
- Mod-Tap and Feed-thru patch panels

## Service Response

The service interval for the LEC's response is to be determined by the criteria outlined below. A grade 1 problem is the most critical, grade 3 the least.

DOJ - 00203
CONFIDENTIAL

S 1926

| GRADE | OUTAGE / PROBLEM |
|---|---|
| 1 | T-1 outage between telephone switch and modem pool. |
| 1 | No response from maintenance ports on any associated equipment located in the Central Offices. |
| 1 | 30% of the modems or more at any one site are not responding. |
| 1 | Any single point of failure piece of hardware outputting major alarms. |
| 2 | Less than 30% of the modems at any one site are not responding. |
| 2 | Any single point of failure piece of hardware outputting minor alarms. |
| 3 | Any non-service affecting problems on any associated equipment located in the Central Offices. |
| 3 | Requests for documentation. |
| 3 | Requests for call back on non service affecting issues. |

| GRADE | CONTRACTOR RESPONSE TIME FRAMES |
|---|---|
| 1 | Mean time to respond 30 minutes<br>Mean time to repair 2 hours for Tier 1 (High- Density) cities<br>Mean time to repair 4 hours for Tier 2 (Low-Density) cities |
| 2 | Mean time to respond 2 hours<br>Mean time to repair 4 hours (Hardware is on-site)<br>Mean time to repair 24 hours (Hardware must be ordered) |
| 3 | Mean time to respond 4 hours<br>Mean time to repair by end of next business day * |

\* Maintenance that will impact customers using the UUNET equipment must be scheduled during maintenance periods; generally between 4 a.m. and 7 a.m.

Response time is defined as the timeframe for a LEC technician to provide acknowledgment of receipt of a trouble report from a UUNET Network Operations Center technician.

Circuit Activation

Provisioning, test, and acceptance of the egress circuits are UUNET's responsibility, unless such egress circuits are ordered by UUNET from the LEC.   Provisioning, test, and acceptance of the ingress PRI/DSS will be the joint responsibility of UUNET, configuring the 3Com equipment, and the LEC, configuring the switch side.

Remedies

Each Calendar quarter the parties will conduct an Operations Review at which the LEC will present analysis on its performance, including but not limited to the metrics set forth herein.  If in a given calendar month the LEC has failed to meet the Mean Time to Respond or Mean Time to Repair for all Grade 1 and Grade 2 problems (based on the average of the top ninety percent of all Grade 1 and Grade 2 trouble tickets opened that month), both parties mutually agree to the following action plan: 1) Within 7 days of review, both parties will meet to determine deficiencies and develop mutually acceptable remedies and timeline to improve service levels, 2) Escalation to the LEC executive level, and  3) Parties will negotiate mutually agreed upon monetary settlement for service outages on an Individual Case Basis.

Site Manual

A detailed Site Manual, including Central Office floor plans, bay placement, bay configuration, cabling schematics, PRI configuration, DSX cross connects, and contact procedures will be provided as part of the service. Alternatively, the LEC may choose to provide secure HTML access to this information via the World Wide Web.

DOJ - 00204
CONFIDENTIAL

S 1927

# Ingress/Egress for Fixed Port Network



*Central Office*

ICG / UUNET CONFIDENTIAL          3/30/00 - AMENDED

DOJ - 00205
CONFIDENTIAL

S 1928



Figure 1
Cabinet Front

Fuse Panel 2
Fuse Panel 1

Chassis 4

Chassis 3

DSX Panel

Chassis 2

Chassis 1

Management Chassis

3Com 3900 Switch

Cisco 7204 Router

3Com System Integration Services

ICG / UUNET CONFIDENTIAL

3/30/00 - AMENDED

DOJ - 00206
CONFIDENTIAL

S 1929



**Figure 2**
**Cabinet Back**

Fuse Panel 2
Fuse Panel 1

Phone Jack

Chassis 4

Chassis 3

DSX Panel

Management Patch Panel

Chassis 2

Chassis 1

Management Chassis

3Com 3900 Switch

Cisco 7204 Router

3Com System Integration Services

PAGE 36          ICG / UUNET CONFIDENTIAL          3/30/00 - AMENDED

DOJ - 00207
CONFIDENTIAL

S 1930

FRONT VIEW

UUNET COBRA
CABINET
(using 3Com Equipment)

Modem Chassis #4

Modem Chassis #3

Modem Chassis #2

Modem Chassis #1

Management Chassis

3Com Ethernet Switch
(rear)

Cisco 7204 Egress
Aggregator

Mod-Tap Patch Panel #4
Mod-Tap Patch Panel #3
Mod-Tap Patch Panel #2
Mod-Tap Patch Panel #1

PAGE 37                    ICG / UUNET CONFIDENTIAL                    3/30/00 - AMENDED

DOJ - 00208
CONFIDENTIAL

REAR VIEW

UUNET COBRA
CABINET
(using 3Com Equipment)



Modern Chassis #4

Modern Chassis #3

Modern Chassis #2

Modern Chassis #1

Feed-thru Patch Pnel

Management Chassis

3Com Ethernet Switch
(front)

(Note: front of the ethernet switch
is facing the rear of the cabinet.)

Cisco 7204 Egress
Aggregator

Mod-Tap Patch Panel #4
Mod-Tap Patch Panel #3
Mod-Tap Patch Panel #2
Mod-Tap Patch Panel #1

(Note:Mod-Tap patch panels are
installed on rear rails with RJ45
connectors facing the front of the
cabinet with punch downs facing
rear of cabinet for each access by
the LEC provider)

PAGE 38

ICG / UUNET CONFIDENTIAL

3/30/00 - AMENDED

DOJ - 00209
CONFIDENTIAL

S 1932

a. *3Com Cabinet Specifications*

| | |
|---|---|
| Cabinet Size: | 24" wide x 36" deep x 84" high, plus room to open 24" access doors front and back. (29" x 34" x 84" used for LEC installations)<br>Weight:<br>    Second and Third Generation:  800 lbs. (no UPS installed)<br>    Phase IV (now being installed):  750 lbs. (no UPS)<br>Footprint should be 3' deep X 2' wide for each cabinet and accommodate a height of 7 feet. Requires 24" access front and rear doors to open 24" with no obstacles. |
| Electrical: | Requires two (2) twenty-amp (20) 120 volt single phase 3.1 KVA plugs, with (2) L5-20R receptacles per cabinet.  Plug locations under raised floor or directly accessible within 6 inches of cabinet if slab floor. They should be no more than 6 inches from the cabinet and no higher than 4 inches from the floor.  Raised floor cutout must be 1 foot X 1 foot in dimension. |
| Flooring: | Raised computer floor preferred provided under-floor ventilation is present, otherwise slab floor is acceptable.  First floor location preferable.<br>Floor loading requirements are 100 lbs. per square foot. |
| Telephone: | Each cabinet may have a maximum of sixty-two (62) DS1 circuits and one (1) POTS line. |
| Environmental: | Room temperatures maintained between 55-75 degrees F. is required.  Each cabinet generates 12,000 BTUs per hour.<br><br>Facility must provide a virtually dust-dirt free environment for cabinet location.  Cabinets should not be placed within 2 feet of any heating or air conditioning vents and or ducts or located in the proximity of automated sprinkler heads. |
| Grounding: | Cabinet must be grounded at facility.  Any facility with a grounding ring must ground cabinet to facility grounding ring. |

ICG / UUNET CONFIDENTIAL

3/30/00 - AMENDED

DOJ - 00210
CONFIDENTIAL

S 1933

```
MIME-Version:1.0
From:nysbinfo@nysb.uscourts.gov
To:courtmail@nysblei.nysb.circ2.dcn
Bcc: AJRLAW@aol.com, ddobbin@avrumrosenlaw.com, kberson@avruumrosenlaw.com, fkantrow
fisherc@ghrdc.com, fjaeger@liquiditysolutions.com, flanchers@michigan.gov, frank.vel
msimon@sbllplaw.com, mst@mtllp.com, msteen@pitneyhardin.com, msternstein@sheppardmul
Message-Id:<5159183@nysb.uscourts.gov>
Subject:02-13533-ajg Notice (GENERIC)
```

Content-Type: text/html

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. Bankruptcy Court

### Southern District of New York

Notice of Electronic Filing

The following transaction was received from Richards, Beverly entered on 5/26/2006 at 12:25 PM and filed on 5/23/2006
**Case Name:**        WorldCom, Inc.
**Case Number:**     02-13533-ajg
**Document Number:** 18286

**Docket Text:**
Transcript of Hearing Held on April 11, 2006 filed by J&J Transcribers, Inc. **(DOCUMENT FILED UNDERSEAL)** (Richards, Beverly).

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**A:\Under Seal Statement.pdf
**Electronic document Stamp:**
[STAMP NYSBStamp_ID=842906028 [Date=5/26/2006] [FileNumber=5159181-0]

[8a615b76d2f9da41677abaa148e1e9027bec6c1ef7aec11e8b738b843492ffbfb7934
8615c0e4aaaf6b1287f14b5f24064b2e3f9348868095df2abdd42f09817]]

**02-13533-ajg Notice will be electronically mailed to:**

Franklin C. Adams     franklin.adams@bbklaw.com

Jason R. Adams    jadams@torys.com,

Laurie B. Adams    lbadams@hewm.com,

Michael B. Adams     mbadams@mcguirewoods.com,

S 1934

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------X

In re:                             :
                                        In Proceedings For A
                                   :    Reorganization Under
Worldcom, Inc., et al.                  Chapter 11
                                        Case No: 02-13533 (AJG)



                                   :
          Debtor.
                                   :
----------------------------------X

## CONFIDENTIAL - SUBJECT TO BANKRUPTCY COURT ORDER

THE MATERIAL HEREIN HAS BEEN FILED UNDER SEAL PURSUANT TO AN
ORDER OF THE BANKRUPTCY COURT DIRECTING THE CLERK TO FILE SUCH
MATERIAL UNDER SEAL.


Transcript of Hearing Held on April 11, 2006 9:04 a.m. filed by
J&J Court Transcribers, Inc.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:                          . Case No.02-13533 (AJG)
                                .
                                .
  WORLDCOM, INC., et al.,       . One  Bowling Green
                                . New York, New York  10004-1408
          Debtor,              .
                                . April 11, 2006
. . . . . . . . . . . . . . . . . 9:04 a.m.

S E A L E D    T R A N S C R I P T

TRANSCRIPT OF HEARING
BEFORE HONORABLE ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:            Weil, Gotschal & Manges, LLP
                           By:  ALFREDO R. PEREZ, ESQ.
                           700 Louisiana, Suite 1600
                           Houston, Texas  77002

For the United States of   United State Attorney's Office
America and the Internal    By:  NICOLE GUERON, ESQ.
Revenue Service:            Department of Justice
                            33 Whitehall Street
                            New York, New York 10004

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net
(609) 586-2311  Fax No.  (609) 587-3599

---

2

1    THE COURT:  Please be seated.  All right.  Who is
2 going to proceed first?
3    MR. PEREZ:  Good morning, Your Honor.  Alfredo Perez.
4 We're here today on the final arguments on the debtors'
5 objection to the excise tax claim filed by the Internal Revenue
6 Service.  Your Honor, I have -- had I been technologically
7 astute, I would have had a slide presentation, but in lieu of
8 that, I have some slides that are, basically, going to track my
9 argument.
10    THE COURT:  All right.  You may hand it up.  Thank
11 you.
12    MR. PEREZ:  And, Your Honor, I provided a copy of the
13 slides to counsel for the government.  Your Honor, really,
14 we're only here -- there's one issue, and I know the Court has
15 gotten a lot of briefing, and we had a full day trial, but
16 there's really only one issue in this case, and that is, you
17 know, whether the debtors are required to pay the excise tax on
18 the -- on the COBRA services that they purchased from the
19 ILECs, it's a straightforward issue.  There's just -- that's
20 the one issue before the Court.
21    So, the first place we have to start, Your Honor, is
22 what does the statute say, and the statute, Your Honor, it's
23 Section -- Title 26 USC 4251, and it says that the taxes
24 imposed on the amount paid for communication services, and the
25 tax shall be paid by the person paying for such services.  And,

J&J COURT TRANSCRIBERS, INC.

---

3

1 further on, again, in Section 4251, it defines communication
2 services to mean one of three things, either local telephone
3 service, a toll telephone service, or a teletypewriter exchange
4 service.  And, Your Honor, in our circumstance, the -- where
5 we're focusing in is on local telephone service.  I don't
6 believe there's been any allegation that we have a toll
7 telephone service, or a teletypewriter exchange service.
8    So, then you go to the next provision of the statute,
9 which is Section 4252, and 4252(a) defines what local telephone
10 service means.  And local telephone service -- it's not a
11 lengthy definition, but it has several components.  You have to
12 have the privilege of telephonic quality communication, with
13 substantially all persons having telephone or radio telephone
14 stations constituting part of the local telephone system, and
15 then it taxes any facility or service provided in connection
16 with the local telephone service.  And then further on, in the
17 definition, but still part of 4252(a) is -- it says that local
18 telephone service does not mean any service, which is a private
19 communication service.
20    Now, for the first time in the findings of fact and
21 conclusions of law, the government alleged that we had somehow
22 waived that, Your Honor, and I'll address that at the
23 appropriate time.  But, it's not the case.  It's been in the
24 case since the beginning.
25    So, going back to -- this statute was passed in 1965.

J&J COURT TRANSCRIBERS, INC.

---

4

1 The way it was enacted was, it raised the tax a little bit, but
2 then the tax was going to be -- was supposed to be phased out.
3 There's never been, to my knowledge, any regulations
4 promulgated under that statute that's now 41 years old.  So,
5 what was the IRS's position in 1970?  In the Agron case, Your
6 Honor, which was decided -- which is a District Court opinion
7 from Illinois 1970, the IRS agreed that the local telephone
8 service in Section 4252(a) is to be given its commonly accepted
9 and understood meaning, the right to use a telephone, which is
10 part of a telephone system, and to communicate thereby with
11 other persons having telephones, which are part of the system.
12 That's the crux -- that's what the statute covers.  It's a 1965
13 statute that's never been touched.
14    What's the IRS's position today?  Your Honor, in
15 their surreply they basically say a traditional telephone is
16 irrelevant to their excise tax analysis.  Also, further in
17 their surreply, not in here, it says the absence of a
18 traditional phone in the COBRA system is neither relevant, nor
19 material to the excise tax analysis.  Your Honor, we think
20 that's, simply, not the case.  You know, although the Internal
21 Revenue Service may want to rewrite the statute to include
22 things that were not included in '65, and were not contemplated
23 in '65, that task lies with Congress, Your Honor, not with this
24 Court.
25    Before I start talking about the facts that were

J&J COURT TRANSCRIBERS, INC.

5

1 proven at the trial, and the law, I wanted to go over the
2 statutory -- how to look at the statute, and we need to start
3 with the statute, and these are well-settled principles. I
4 don't think there's any dispute. But, obviously, you know,
5 when you read a statute, you presume that the legislature says
6 what it means, and that -- and means in the statute what it
7 says there. The analysis begins and ends, generally, with the
8 language of the statute. If the statute is ambiguous, the
9 words are to be given their plain and ordinary meaning. In a
10 situation where the statute says -- uses the term means, that
11 meaning excludes anything that's not stated there, and we have
12 that in 4252(a).
13     If a federal tax is involved, Your Honor, the
14 language used by the legislature should not be extended by
15 implication, to reach other matters, and many cases say that if
16 there's any doubt regarding the construction of the tax
17 statute, it should be resolved in favor of the taxpayer.
18     Probably the most -- the two most instructive cases
19 is an old Supreme Court case, and a relatively recent case from
20 this district -- a District Court case. In the Supreme Court
21 case, Your Honor, which involved the sale -- involved a tax on
22 the sale of tickets to sporting events and theatrical events,
23 et cetera, the Supreme Court said, what the government asks is
24 not a construction of a statute, but, in effect, the
25 enlargement of it by this Court, so that what was omitted may

        J&J COURT TRANSCRIBERS, INC.

6

1 be included within its scope. To supply omissions transcends
2 the judicial function. And then Judge Koeltl, and I'm not sure
3 I'm pronouncing that correctly, in a 2004 opinion, in essence,
4 reiterated the reservations and, unilaterally, rejected the
5 IRS's attempt to expand the definition of toll service, and
6 toll service, Your Honor, is the one that falls under 4252(b),
7 not (a), the one that we're under, but I think the same concept
8 applies. In that case he said, this case does not even involve
9 a drafting error. It involves a disconnect between a forty-
10 year old tax scheme and the recent innovations in the
11 telecommunications industry. It is, plainly, Congress's
12 responsibility to decide whether to revise the statute to
13 accommodate those developments.
14     So, Your Honor, going back to the elements of the tax
15 -- go back to our stool, that stool has four legs. One is the
16 privilege, the other one is the quality of telephonic -- the
17 telephonic quality voice communications, with substantially all
18 persons having a telephone, and -- and then, regardless of
19 that, even if it -- even if you don't -- any of those don't
20 fall, then that is not a private communication. And the way
21 the statute is written, you have to have each one of those
22 elements in order for there to be a tax. So, if any of the
23 element falls, there -- there is no tax.
24     And then, perhaps, the biggest disagreement between
25 the government and the debtors is who -- how do you look at the

        J&J COURT TRANSCRIBERS, INC.

7

1 statute? From whose perspective? If you go to Slide 10, Your
2 Honor, it's our view, and I think it's the correct view, that
3 you look at the statute from the standpoint of the purchaser of
4 the services, because 4251 says that the taxes imposed on this
5 section shall be paid by the person paying for those services.
6     What is COBRA service? And what did the debtors
7 purchase? I think Mr. Anderson, the expert witness, was very
8 clear, that the COBRA service aggregates dial-up data, and puts
9 it into an internet protocol, and hands it off to MCI as high-
10 speed datastream. It is a high-speed data IP or TCP IP, which
11 is basically known as internet data. And we have here Exhibit
12 Number 2, which was introduced at the trial, which shows it.
13     So, what's the difference between telephone service,
14 and COBRA service? If you look at the next slide, Your Honor,
15 Number 12, when you have the dial-up user, the dial-up user
16 uses regular telephone service. That telephone service goes on
17 a TDM protocol, with TDM switches, and it purchases that phone
18 line from the LECs.
19     The COBRA service, Your Honor, which is at the very
20 other end of that, with the arrow, it's not a telephone line.
21 It's got internet protocol. There's no dial tone. It's a
22 high-speed data line that you can't use a phone with, and it's
23 not capable of originating or receiving calls from people in
24 the local telephone system.
25     With COBRA service, Your Honor, it's impossible to

        J&J COURT TRANSCRIBERS, INC.

8

1 plug in a telephone. It's impossible to make a telephone call.
2 It's impossible to receive a telephone call. And it's
3 impossible to talk to people having telephone -- I think the --
4 I think that the evidence on that was undisputed, Your Honor.
5 Additionally, in Slide 15, the reorganized debtors did not
6 have the right to reconfigure the COBRA services to make it
7 into a telephone service. Under the contracts with the LECs,
8 the egress port of the NAS was where they connected. They had
9 no authority. MCI had no authority to make any physical
10 modifications to the COBRA equipment. As Mr. Anderson
11 testified, it was behind the central office's locked doors.
12 And even Dr. Hills agreed that if you replace the NAS with some
13 other type of equipment, such as PBX, you wouldn't -- you
14 wouldn't be purchasing COBRA services anymore. It would be
15 some other service that might come along.
16     You have to have -- the fact that you have the right
17 to purchase another service, the fact that you have the right
18 to go out and buy something else, that doesn't make it a
19 service that's covered under 4252. The right to purchase
20 something doesn't make it a telecommunications service, because
21 the excise tax is only payable on the amounts paid for the
22 communications service, not for the right to do something else.
23 The excise tax, Your Honor, should not be imposed on services
24 that could have been purchased, when, in fact, they weren't
25 purchased.

        J&J COURT TRANSCRIBERS, INC.

9

1      Your Honor, again, I think the testimony on whether
2  the COBRA service is capable of telephonic communications, I
3  think that's largely undisputed.  Dr. Hills says that the
4  definition of telephonic quality communications is a set of
5  characteristics to allow a pair of people to be able to conduct
6  a conversation to hear each other satisfactory.  And, Mr.
7  Anderson testified, again, largely uncontroverted, that
8  although you might have a telephone quality path, that in order
9  to conduct a telephonic -- that you need more than that in
10  order to conduct a telephonic quality conversation.  And that
11  having a telephonic quality path, versus having a telephonic
12  quality communications are two different things, and they're
13  not equivalent.  There are technical differences.  You have to
14  have 64 kilobytes of digitized data.  The COBRA platform was
15  low speed, and wasn't, itself, capable of carrying voice.  It
16  was technologically impossible to do it, because it would be,
17  in essence, noise.
18      And, if you compare that to telephone service, Your
19  Honor, telephone service is -- the subscriber gets a dial tone.
20  It has the ability to plug in a jack, and that's very different
21  then getting a high-speed data line, which allows for internet
22  protocols.
23      Additionally, Your Honor, you didn't have
24  communications with people having telephones and, Your Honor, I
25  realize that all of these, in essence, are part of the same

                    **J&J COURT TRANSCRIBERS, INC.**

10

1  thing, in that they all, in essence, support each other.  I
2  mean, not having telephonic quality communications is, in
3  essence, results in not being able to communicate with all the
4  people that have telephones without the system.  Dr. Hills
5  testified that the LECs did not design COBRA service for
6  telephone users to dial up and access the COBRA system.  If the
7  telephone user called the number with the COBRA service, he
8  would hear that annoying screech.  And, but what MCI purchased
9  did not allow them to make a phone call, to plug in a phone, to
10  insert a jack, or to receive or make a phone call.
11      So, what are the IRS's arguments as to why this
12  should be taxed?  And the IRS makes numerous arguments, but
13  I'll focus on five of those arguments.  And, the main thing the
14  IRS does is it focuses on the portion of the diagram of Exhibit
15  Number 2, showing the dial-up user.  Well, we're at the other
16  end.  What we get is at the other end of that diagram.  But,
17  the first point is -- first argument is that the dial-up users
18  have a voice quality path.  The second one is that COBRA
19  service is provided in connection with the local telephone
20  system, because, in essence, the dial-up users have a voice
21  quality path, and they're using their normal telephone line.
22      Third argument is that you can have computer to
23  computer voice communications.
24      Fourth argument is that the limitation on use of
25  voice is a self-imposed limitation.

                    **J&J COURT TRANSCRIBERS, INC.**

11

1      And the fifth argument is that Section 4253 does not
2  exempt voice -- I'm sorry, does not exempt data from the Act.
3  But, we believe that the law is, Your Honor, that where a
4  service at issue does not offer the taxpayer the right to plug
5  in a phone, and to communicate audibly with other persons
6  having telephones that that service is not a local telephone
7  service, -- and that the IRS -- and that the excise tax does
8  not apply.  And, if you go -- in essence, dissect their
9  arguments and they really rely on two cases, primarily, one is
10  the Comdata case, and the other one is Revenue Ruling 79-245.
11      But in Slide Number 23, the dial-up users -- whether
12  the dial-up users have the right to use their telephone lines,
13  in our estimation, Your Honor, is totally irrelevant to whether
14  the reorganized debtors should be taxed, because 4251 talks
15  about the person -- the services are taxed to the person paying
16  for them, and that wasn't the service that the reorganized
17  debtors were receiving.  And there's nothing in the statute, or
18  in any case law that would impute the dial-up user's right to
19  use their telephones to a tax on MCI.  We weren't paying for
20  the dial-up user's right to use their telephone.  That was --
21  they paid that under their normal telephone bill.  And the
22  Revenue Ruling 79-245, which they placed primary reliance on,
23  in which they said modem to modem communication was subject to
24  a tax, Your Honor, we think, is clearly distinguishable and, in
25  fact, supports our position.

                    **J&J COURT TRANSCRIBERS, INC.**

12

1      The next slide, Your Honor, 24, in essence, shows
2  what happened and what the facts are in Revenue Ruling 79-245.
3  What you had was you had a company that had -- that used a
4  telephone line between two computer terminals and there was a
5  dedicated telephone line.  They only used it between these two
6  terminals.  The company took the position, with the IRS, that
7  -- that this was only designed for non-voice communication.
8  Therefore, they couldn't do it.  The IRS said is, all you got
9  to do is go unplug your computer, plug in a phone, and you've
10  got a regular phone line.  There's nothing different there.
11  There's absolutely nothing different than a phone line.  I
12  think the exact quote is, by plugging a regular telephone set,
13  if it so chooses, it may exercise the privilege of telephonic
14  voice communication with substantially all persons having
15  telephones in the system.  That's something simply that Your
16  Honor that MCI, the reorganized debtors, could never have done.
17  They could have never come and plugged in a telephone at the
18  egress port in the NAS and talked to the regular telephone
19  system.
20      COBRA service just simply doesn't allow you to plug
21  in a telephone and to talk to other people.  The service that
22  we got was exactly how it was sold to us.  We didn't do
23  anything with it.  Here, what these -- what this company
24  purchased was just a regular telephone.  They limited it to the
25  computer communications, but there was no legal or contractual

                    **J&J COURT TRANSCRIBERS, INC.**

13

1  prohibition from them just taking that out and plugging it in.
2      Next argument that they make, Your Honor is that the
3  COBRA service is a facility used in connection with a local
4  telephone system.  And this is a little bit of a misreading of
5  the statute, but, in essence, what they're saying is, and what
6  4252(a) does not say is a facility or service provided in
7  connection with a local telephone system, subject to taxation.
8  It doesn't say that.  So, if -- that's -- that would be an
9  extremely broad reading that any facility or service provided
10  in connection with the telephone system would be subject to
11  taxation.
12      What the statute says is, a facility or service
13  provided in connection with a service described in one.  So,
14  you got to have the service.  It's not an independent ground.
15  You've got to have the service described in one, which is voice
16  quality with all people having telephones, and having the
17  privilege in order for it to be taxable.  So, purchasing the
18  service as described in 4252(a)(1) is a condition precedent to
19  liability under 4252(a)(2), and because we didn't purchase
20  those services, there's no independent liability.
21      Next argument, Your Honor, is that the COBRA service,
22  and this is the argument that the government makes, is capable
23  of computer to computer voice communications.  Your Honor, we
24  don't think it's true.  I think Mr. Anderson's testimony is,
25  you can pass packets at low speed, and it will go to the other

**J&J COURT TRANSCRIBERS, INC.**

14

1  end, but when it puts the packets back together to represent
2  voice, there's just not enough data there, really, to give you
3  a clear voice.  Like I would say, you wouldn't be able to
4  understand it.  It would garbled it or it would be noise.  But,
5  regardless, Your Honor, we think that's irrelevant whether you
6  could put computer to computer voice communications.  The tax
7  code requires that a person paying for local telephone service
8  must have the privilege of telephonic quality communications,
9  and there's just simply no basis, nothing in the statute which
10  says that the reorganized debtors have to pay a tax because
11  third parties who subscribe to Skype or some other form of
12  computer to computer voice communications would be able to
13  talk.
14      The statute requires that the privilege of telephonic
15  quality communication would be -- with substantially all
16  persons having telephones.  I think that's right in the
17  statute.  And, simply because you have a computer, and can talk
18  to somebody having a computer, that knocks you out of -- with a
19  person having -- all persons having telephones because you have
20  to have a computer.
21      Mr. Anderson testified that the traditional telephone
22  setting is 99 percent of the cases.  So, that you can
23  communicate with a computer is really irrelevant in that you're
24  talking about you have to be able to communicate with a phone.
25  And if Your Honor -- and if that weren't enough, in each one of

**J&J COURT TRANSCRIBERS, INC.**

15

1  these contracts, the LECs limited our ability to do anything
2  other than carry this data.  And it would have been a breach of
3  these contracts, and subject to terminating the service had --
4  had MCI put VOIP over the circuits and in Trial Exhibit 29 DOJ
5  Page 37, in one such example that we cited in there.
6      The fourth argument made by the government is that we
7  haven't -- that we have erected self-imposed limitations in
8  order to avoid using COBRA services for telephonic quality
9  communications.  I'm kind of a little bit at odds with the rest
10  of their arguments, but I think that's just, simply, not the
11  case.  We're using the service as it was intended in Revenue
12  Ruling 79-245, had they unplugged the computer, plugged the
13  telephone in, the LECs providing it would have been fine.  It
14  would have been using the service as it was intended.  There
15  was no breach of contract.  There was no subject to
16  termination.
17      And, in our circumstance, we get the high-speed
18  datastream.  We don't own any of the equipment.  We don't own
19  any of the facilities.  We use the service exactly as it's
20  delivered.  No evidence that it was altered or modified, or
21  that we could have altered or modified it.
22      Their principle reliance on this -- for this
23  argument, Your Honor, is on the Comdata decision and, again, we
24  think Comdata supports our position and, in fact, is contrary
25  to the position taken by the government.  Comdata -- in Comdata

**J&J COURT TRANSCRIBERS, INC.**

16

1  you had -- again, in Comdata, you're not talking about 4252(a),
2  you're talking about 4252(b), because it's a toll service.
3  But, I think the same principles apply.  And there was -- the
4  argument that Comdata made -- it was a WATS service.  The
5  argument that Comdata made was that because it limited its
6  workers to only communicating with their service center, that
7  they couldn't talk to, substantially, all the people in the --
8  having telephones in the local telephone system.  Again, they
9  could have clearly unplugged the computer, or unplugged that
10  phone, put in another phone, and called whoever they wanted.
11  It would not have been a breach of their contract.  They have
12  the WATS service.  The WATS service allowed them to call
13  whoever they wanted.  It was a self-imposed limitation.  It
14  wasn't a limitation inherent in the service, but, in fact, had
15  they done that, the LECs who provided the WATS line would not
16  have been, in any way, shape or form, had reason to complain.
17      COBRA service, again, is totally different.  We don't
18  have that ability.  If we wanted to plug a phone.  If we wanted
19  to call somebody, we're getting a high-speed datastream.  It's
20  just simply not possible.  The limitations are not limitations
21  that are imposed by us.  We're not limiting the uses of it.  We
22  are -- we're using it exactly as we bought it, and exactly as
23  we intended.
24      The fifth argument, Your Honor, is that the data
25  services are not covered by the statutory exemptions in 4252 --

**J&J COURT TRANSCRIBERS, INC.**

17

1  53, and 4253 exempts a person who buys one of the three taxable

2  services and, in essence, exempts news organizations,

3  servicemen in combat zone, the American Red Cross, non-profit

4  hospital.

5       4253 does not expand the definition of what taxable

6  services are.  It, merely, exempts certain types of individuals

7  and organizations from the service.  Your Honor, we're not

8  arguing that we're exempt.  We're not arguing that the use of a

9  telephone line for data transmission, such as in 79-245 would

10 be exempt.  We're, simply, arguing that we don't fall under

11 4252(a), not that we have an exemption under 4253.

12      In essence, Your Honor, Slide 34 summarizes what we

13 believe are the differences between the two cases, or the two

14 precedents cited by the government and our situation.  In both

15 the Comdata case and in Revenue Ruling 79-245, you could have

16 plugged in a phone at either end.  You could have made calls to

17 anyone that would not have been a violation of any rule or any

18 regulation, or any contract.  That service was capable of doing

19 it, and both those circumstance the person purchasing the

20 services, simply, chose to limit it the way they did.  We're

21 buying a high-speed datastream, and there's no way that we

22 could somehow use that high-speed datastream to do anything

23 else.  The one revenue ruling that is relevant in this case,

24 Your Honor, it's shown on Slide 35, is Revenue Ruling 74-617,

25 which talks about beeper service.  And beeper service you have

J&J COURT TRANSCRIBERS, INC.

18

1  all -- anybody can call in.  It's connected to the PSTN system.

2  Any dial-up user or, in this case, you know, home user could

3  call in to call the beeper service and, in that case, the IRS

4  said, that's not taxable, because all they're receiving is --

5  and the intended use is to receive data.  In essence, the

6  beeper tones with the telephone numbers.

7       COBRA service, Your Honor, does not -- is not local

8  telephone service that you have to have in order to be taxable.

9  It doesn't have the capability of telephonic quality

10 communications, with all persons having a telephone.  And,

11 furthermore, Your Honor, we think that it's a private

12 communication service, which is, likewise, exempt from the tax.

13 The Court doesn't have to reach this, because I don't think --

14 I think the three legs are already knocked out.  But, the IRS,

15 in their findings of fact, indicated that we somehow had waived

16 this argument.  Your Honor, nothing could be further from the

17 truth.  We -- in our objection, stated that this was not a

18 taxable communication service, under 4252(a).  Private

19 communication -- the lack of private communication is one of

20 the requirements of 4252(a).  Our argument has always been that

21 it doesn't fall within that definition under 4252(a).  One of

22 the factual basis for that is that we had the exclusive use of

23 the channels and that we were separately charged for that

24 service, which is what you have to show as a factual matter in

25 order to have private communications.  So, whether we had

J&J COURT TRANSCRIBERS, INC.

19

1  exclusive use of the channel, and whether we received, you

2  know, a separate charge, is a factual matter, Your Honor.  It's

3  not a legal argument.

4       In our objection, on August 5th, 2004, we said that

5  it did -- it wasn't a taxable communication service.  In the

6  declaration of John Anderson, which was dated November 1, 2005,

7  in Paragraph 4 he says, "In my professional opinion, COBRA

8  service provided by the LECs entitles MCI to exclusive or

9  priority use of any communication, channel, or groups of

10 channels, regardless of whether such channels may be connected

11 through other switching to the PSTN."

12      In Paragraph 8, he says, "COBRA services provides MCI

13 with exclusive use of any channels.  MCI has exclusive or

14 priority use of such channels within the COBRA service.  MCI is

15 separately charged by the Lex for the COBRA service."

16      And in his conclusion, he says, "COBRA service also

17 provides MCI with exclusive or priority use of the channels,

18 regardless of whether such channels may be connected to the

19 LECs switches."

20      Ms. Gueron deposed Mr. Anderson on -- subsequent to

21 that, on January 5th, two months later.  Questioned him about

22 Paragraph 8, which specifically dealt with that.  In --

23 subsequent to that, on January 26th, the IRS filed its

24 surreply.  It had a full opportunity to brief it at that time.

25      On January 31st, they filed their motion to exclude

J&J COURT TRANSCRIBERS, INC.

20

1  Mr. Anderson's testimony.  No reference to it.  And at the

2  trial, at least three -- four different times during the

3  opening statement, I referenced to the fact that these were

4  private communication services.  Mr. Anderson was asked on it,

5  on direct.  Mr. Anderson was asked on it on cross.  There's,

6  simply, no basis for the IRS's contention -- the government's

7  contention that -- that this was brought up at the last minute.

8       And, Your Honor, all of the cases that had been cited

9  are, simply, inapposite.  The Carmody case involved a Rule 59

10 motion after -- for a new trial after a jury verdict and,

11 basically, the Court said, arguments raised, for the first

12 time, in the reply brief, didn't -- need not be considered.

13 And they referenced a Second Circuit case that if you failed to

14 raise an issue in the initial brief it's waived.  The Playboy

15 Enterprises case that they cite, it's a motion to supplement

16 the record after remand from the Second Circuit and, basically,

17 the Court says that it would be manifestly unfair to allow the

18 movant to make a complex and, possibly, dispositive argument

19 after Playboy's opportunity to respond has passed.  Thereby

20 silencing Playboy on the issues and depriving the Court of

21 Playboy's views.

22      That's, simply, not the case here, Your Honor.  It

23 was raised many times with many opportunities to respond.  The

24 Hughes case, Your Honor, it was a summary judgment case, and,

25 again, the Court said, you can't raise something for the first

J&J COURT TRANSCRIBERS, INC.

21

1  time in the reply brief.

2      And then the last case that the cited, the Morgan

3  case involved a special rule in a deportation proceeding, where

4  the basis to determine why an alien's deportation is invalid,

5  it has to be pled in -- with great detail.

6      Your Honor, simply, not the case. This has been in

7  the case from the outset. It was -- the factual basis was

8  brought forth by Mr. Anderson three times in his declaration.

9  He was questioned about it. There was testimony about it.

10  There's been no waiver.

11      So, what is private communication? Your Honor, there

12  are many things that are private communications, but the one

13  that we're relying on is that we have exclusive or priority use

14  of the channels, regardless -- and then it goes on to say,

15  regardless of whether such channels are connected with a

16  service, through switching with the local telephone service.

17  And so long as there is a separate telephone charge.

18      If -- on Slide 38, we do have exclusive use of the

19  channels. All the data that comes into the NAS, there's no

20  other person that's going to receive that data. Those ports

21  are for our exclusive use, and we are charged -- we only

22  receive one service, and we are charged separately on a per

23  port basis for that service.

24      The main case that they cite, in opposition to that,

25  Your Honor, is the Western Electric case, which I believe is

J&J COURT TRANSCRIBERS, INC.

22

1  distinguishable. In Western Electric, the -- this is another

2  provision of private communication services, which relates to

3  intercoms. And, in essence, Your Honor, there were two

4  services purchased. There were the normal telephone calling

5  services, and the intercom and, in that case, the Court held

6  that the intercom service was private communications, but the

7  normal, outgoing telephone service was not.

8      In summary, Your Honor, the COBRA service, we don't

9  believe, in any, way, shape or form, falls under the statute

10  because we didn't have the various elements. We didn't receive

11  voice quality communications. We couldn't communicate. MCI,

12  as the taxpayer could, simply, not do anything. We can -- we

13  do not owe any tax based on the rights of third parties,

14  because the tax applies to the service that we're paying for.

15  The fact that we could have purchased other services is

16  irrelevant to this consideration. In each one of the

17  circumstances, where the Court or the service has imposed

18  liability, you've had an actual telephone line, you've had the

19  ability to plug in a phone, which is something that you,

20  simply, do not have here. You cannot do that at the egress

21  port of the NAS.

22      Your Honor, for all of those reasons, we would

23  request that the Court grant the reorganized debtor's

24  objection.

25      THE COURT: All right. I'm going to take a few

J&J COURT TRANSCRIBERS, INC.

23

1  minute recess, and then I'll hear from the U.S. Attorney's

2  Office on behalf of the IRS.

3      MS. GUERON: Thank you, Your Honor.

4      (Tape Off)

5      THE COURT: All right. Please be seated.

6      MR. PEREZ: Your Honor, Ms. Gueron reminded me, after

7  the Court left, that we also have a motion for determination of

8  refund rights and consolidation that we carried, I think, until

9  today, and it's my understanding that the government does not

10  oppose the motion. For procedural purposes, obviously, they

11  oppose the motion on -- they oppose the relief requested in the

12  motion on the merits. So, we'll confer with Ms. Gueron, have a

13  form of order -- an agreed form of order submitted in the next

14  few days. Okay?

15      MS. GUERON: That's fine.

16      MR. PEREZ: Is that all right with Your Honor?

17      THE COURT: That's fine.

18      MS. GUERON: Good morning, Your Honor. May it please

19  the Court, Nicole Gueron, Assistant United States Attorney, for

20  the Southern District of New York, for the United States of

21  America and the Internal Revenue Service.

22      As a roadmap, Your Honor, first I'll make brief

23  reference to the burdens of proof in this matter, and I'll

24  describe the fundamentals of the government's argument as to

25  why COBRA is taxable, and then rebut MCI's arguments against

J&J COURT TRANSCRIBERS, INC.

24

1  taxing COBRA.

2      First, in MCI's papers there appear to be some

3  reference to the idea that the taxpayer did not carry the

4  burden of proof here, rather, it was on the government. It's

5  well settled that a party objecting to a proof of claim has the

6  burden of coming forward with sufficient evidence to rebut that

7  claim. That's from In Re King, a 2004 bankruptcy case, and

8  that's stating a well-established principle.

9      United States v. Macones, from the Second Circuit, in

10  '94, states that a taxpayer who wishes to challenge the

11  validity of a tax assessment bears the burden both of

12  production and persuasion. And bankruptcy does nothing to

13  alter that fact. The Supreme Court held that, in 2000, in the

14  Rally matter.

15      And, certainly, in the refund suit, which we're not

16  addressing here today, a taxpayer always has the burden of

17  proof as to a refund claim.

18      So, the burden of proof is on MCI, and it fails to

19  carry that burden, Your Honor. COBRA is subject to excise tax

20  as a local telephone service under 26 USC 4252(a). The

21  government argument is simple, and it is supported by the only

22  authority on point, which is the Comdata case, and the revenue

23  rulings. And the revenue rulings must be accorded great

24  deference by this Court. The Second Circuit hasn't quite

25  decided whether it's going to apply Chevron deference or merely

J&J COURT TRANSCRIBERS, INC.

25

1  great deference to revenue rulings but, nonetheless, the
2  revenue rulings are accorded, at a minimum, in this circuit,
3  great deference.
4          COBRA has a system that uses telephone lines and
5  telephonic quality communication between modems to permit a
6  dial-up user, who wishes to access the internet to do so via
7  local telephone service.  Two way telephonic quality
8  communications are the essence of the COBRA system, without
9  which it could not link a dial-up user to COBRA, and then on to
10  the internet.  Local telephone service is access to a local
11  telephone system, and the privilege of telephonic quality
12  communication with substantially all persons having telephone
13  or radio telephone stations.
14          The government submits that this system meets all of
15  those elements.  First access.  MCI doesn't appear to dispute
16  the access point.  The Translux case states that access means
17  the interface or connection between the service provided and
18  the transmission lines.  The parties agree that COBRA access to
19  access to the public switch telephone network via PRI lines
20  and, Your Honor, Exhibit 2, from the trial, is something I'm
21  using a lot this morning, so I enlarged it.
22          THE COURT:  Well, unless you want to point to it,
23  don't concern yourself with it, because I think, if my
24  recollection is correct, Exhibit 2 is on which -- is on one of
25  the pages I was directed to earlier.

**J&J COURT TRANSCRIBERS, INC.**

26

1          MR. PEREZ:  Eleven, Your Honor.  Page 11.
2          THE COURT:  Eleven, okay.
3          MS. GUERON:  That's right, Your Honor.  So, it's also
4  Slide 11.  And, as reflected in Exhibit 2, and Slide 11, the
5  COBRA connects right into the PSTN, which is the pink box of
6  Exhibit 2, with the PRI line, a voice capable, traditional, 24
7  channel line.  So, the system includes excess.  What about the
8  privilege of telephonic quality communication?  Privilege means
9  the right and capacity, not necessarily the actual use, the
10  Comdata case states that unequivocally.  When the taxpayer, in
11  Comdata, tried to argue that the court should be looking at
12  actual use, rather than capacity, technological capacity, the
13  court rejected it, out of hand, and said we cannot accept that
14  argument.
15          The COBRA services purchased by MCI include
16  telephonic quality communications from the dial-up users modem,
17  to the COBRA services modem, over the PRI lines.  This is so
18  because modems require telephonic quality communications to
19  work.  As Dr. Hills stated in his declaration, at Paragraph 8,
20  "all access to modems or DSPs requires two-way voice grade
21  telephonic quality communication."
22          The COBRA services provided by UUNET -- excuse me,
23  the COBRA services purchased by UUNET provide access between
24  dial-up user's modems and the modems or DSPs within the COBRA
25  system and, thus, require two-way voice capable telephonic

**J&J COURT TRANSCRIBERS, INC.**

27

1  quality communications.  That was Dr. Hills' unequivocal
2  statement, and Anderson -- Mr. Anderson, the MCI expert was
3  asked about that at deposition, and his answer, whether he
4  agreed with it, was a very simple, yes.
5          Now, at trial, Mr. Anderson disavowed that.  He tried
6  to back away from it.  He said he didn't mean what he said at
7  deposition.  That's a troubling effort to move away from a very
8  clear admission at deposition from a witness who isn't
9  independent but is, in fact, an MCI employee, although
10  certainly well versed in the technical aspects of this.  To
11  walk away so plainly from a very significant admission at
12  deposition, is something the Court, we submit, should not give
13  credence to.
14          And, furthermore, Mr. Anderson's distancing of that
15  admission was, simply, to say, well, I didn't say that
16  telephonic quality communication was required for modems, only
17  a telephonic quality path.  But as Dr. Hills testified, a voice
18  grade communication path provides a voice grade communication
19  or provides the ability to support a voice grade communication.
20  That's in the trial transcript at 184.  And since capacity is
21  the legal test, Anderson's distinction or effort to move away
22  from telephonic quality communications really doesn't matter,
23  because the point is, even if it is a telephonic quality path,
24  which the government would not concede, it is capable of
25  telephonic quality communication, and Comdata tells us that

**J&J COURT TRANSCRIBERS, INC.**

28

1  that's the test we should be applying here in analyzing the
2  taxability of COBRA.  So, we've shown access and privilege.
3          Third, the requirement is that the access -- the
4  privilege to communicate be with substantially all persons
5  having a telephone station within the system.  Well, we have
6  that here, as Mr. Anderson and Dr. Hills testified, anyone with
7  a modem can access and connect to the COBRA system.  Anyone can
8  call in and connect to the NAS, in the white box of Exhibit 2,
9  that is the COBRA system.  So, COBRA satisfies 4252(a), local
10  telephone system.
11          And, Your Honor, if you look at Exhibit 2, the reason
12  that the tax should apply here becomes obvious.  The dial-up
13  user, like any phone user, pays a telephone bill.  Pays taxes
14  on the line, which is the local -- which is the connection
15  between the dial-up user in the pink box there, the PSTN.  Like
16  any telephone user, you get your telephone line, you pay your
17  taxes on it, and you can use that telephone line to call people
18  traditionally, to make modem calls, to use a facsimile machine,
19  and the tax is paid.
20          Now, in any traditional telephone call, Your Honor,
21  both people -- both sides of the telephone call pay tax, the
22  caller and the receiver, because both of them, by connecting
23  the call, are getting access to the telephone system, and the
24  privilege of speaking to everyone.  Who's paying the tax on the
25  other side in the COBRA system?  The dial-up user calls into

**J&J COURT TRANSCRIBERS, INC.**

29

1  the PSTN.  That call is connected.  It's a modem call.  That
2  call is connected over a PRI, a traditional voice capable line
3  into the COBRA system.  Who owes the tax on the other side?
4  Well, who owes it?  4251 tells us who owes it, the person who
5  bought it.  Who bought it?  MCI.  The person receiving the
6  call, or the entity receiving the call on the other end
7  connecting through the PSTN, back to the dial-up user, owes the
8  tax.  That's MCI, the undisputed buyer of the service.  It's a
9  modem to modem call through the public telephone system
10 network.  And the IRS has held such tax -- systems taxable for
11 decades.  This isn't a new effort by the IRS to rewrite a
12 forty-year old statute.  MCI keeps harping on the fact that
13 this is a forty-year old statute.  But, since 1979, decades ago
14 now, the IRS has held that a modem to modem call is taxable.
15 This isn't a new fangled technology, Your Honor.  The internet
16 piece of it may be new, but the modem to modem aspect of the
17 call has been ruled, for decades, taxable.
18        And that is also true in the Comdata case, from 1990,
19 in which it was not a traditional telephone to telephone call,
20 but rather computer to computer.
21        Now, one point that MCI seems to be making is that
22 MCI couldn't have a traditional call, but yet, in the trial
23 testimony it was very clear that the PRI leading into COBRA
24 could be plugged into a PBX, that's a traditional, multi-
25 personed telephone system that you would have, for example, in

                    J&J COURT TRANSCRIBERS, INC.

30

1  an office, where one call in then distributes out to many voice
2  lines.  That PRI could plug into a PBX.  It could be a voice to
3  voice system.
4        Now, MCI responds to that, well, yeah, but if we did
5  that it wouldn't be the COBRA system anymore.  What's the legal
6  significance of that?  In Comdata or in Revenue Ruling 79-245,
7  it may well be that if they decided not to use the computer
8  technology, but rather to plug a regular telephone in, it
9  wouldn't be the system anymore.  Comdata didn't want a phone to
10 phone system.  It had that as one option, as described in the
11 Comdata case.  It wanted a computer to computer system, and if
12 it had used a telephone, it would have changed the service it
13 was using.  That has no legal consequence here, Your Honor.
14 Sure, it would have been changed, but the capacity for
15 telephonic quality communication is the root of the tax here.
16        Now, the government will now turn to refuting MCI's
17 numerous arguments, and the first one is really the question of
18 -- as Mr. Perez put it, where does the Court focus its
19 attention here?  MCI is trying to misdirect the Court's focus
20 outside of the COBRA and that way to claim that this is a
21 service devoted to delivering high-speed data.  We just heard
22 Mr. Perez say, repeatedly, we're getting a high-speed
23 datastream here.  That's what this system is about.  And if you
24 look at Slide 12, Your Honor, of MCI's presentation, you can
25 see this.  Look at the right-hand arrow.  Look where MCI is

                    J&J COURT TRANSCRIBERS, INC.

31

1  directing your attention, Your Honor.  Outside of COBRA, to the
2  frame relay line that connects to the MCI backbone network, and
3  with that focus outside of the COBRA system, MCI argues, this
4  isn't a taxable system.  We're only purchasing a high-speed
5  datastream, MCI argues.  Not telephonic quality communication.
6  And MCI argues, it's impossible to plug a telephone line into
7  the COBRA output port, because it's only for high-speed data.
8  From this perspective, Your Honor, MCI would have the Court
9  determine that it is, merely, incidental to the COBRA system
10 that it provides telephonic quality communication to the dial-
11 up users who enter the COBRA system on the left-hand side of
12 the box that constitutes COBRA, in Exhibit 2.  This is the
13 wrong way to look at it.  MCI's focus is, utterly, misplaced,
14 because the Court must consider, we submit, what goes on inside
15 of COBRA, not merely what comes out of COBRA at the end.  When
16 the Court analyzes what COBRA is, and what service it provides,
17 it is, plainly, a system that is devoted to modem to modem
18 telephonic quality communication between the dial-up user and
19 the modems within the COBRA NAS.  Maybe you can't plug a
20 telephone into that output line, the high-speed data line on
21 the right-hand side, where the arrow points on Slide 12, but
22 you can plug a PBX into the PRI inside the COBRA system.  And
23 it's crucial to remember that MCI buys all of COBRA as a single
24 package.  That means, not just the internet protocol output
25 from COBRA, but all of the functions, all of the services,

                    J&J COURT TRANSCRIBERS, INC.

32

1  internal and essential to COBRA.  And then allow COBRA to
2  fulfill it's function.  That means, the voice capable PRI line
3  that connect the PSTN and the LEC voice switch to the COBRA
4  modems.  That means that what is bought is not merely the
5  aggregated high-speed data coming out the egress port, but all
6  of the internal workings of COBRA.  The telephonic quality
7  communication between the dial-up user's modem, and the COBRA
8  modem, and it's undisputed that all of COBRA is a telephonic
9  quality path, capable of telephonic quality communication until
10 we get to the output of this system, which is high-speed data.
11       The modem to modem calls, within COBRA, are not high-
12 speed data.  They are modems using traditional telephone lines
13 for traditional telephonic quality communications.  And it is
14 not incidental, of course, that MCI is buying a COBRA service,
15 which provides telephonic quality communication.
16       MCI appears to be arguing here that, all we really
17 want is the high-speed data coming out the back, and however we
18 get that is incidental.
19       The opposite is true.  Remember what MCI's expert
20 testified.  In the 1990's, before broadband, and cable services
21 providing internet access were available, COBRA was the way to
22 access the internet, using local telephone lines, because the
23 best way to get the public to access the internet was using an
24 existing telephone line.  That's a quote from Mr. Anderson,
25 from the trial, at Page 86.  In their initial objection, MCI

                    J&J COURT TRANSCRIBERS, INC.

33

1  argued or explained, rather, that it purchases the COBRA
2  services, quote, in order to build its communication networks.
3  Why is this so essential to MCI's function?  MCI doesn't just
4  want, Your Honor, the output -- the high-speed data that comes
5  out the back of COBRA.  What MCI needs, so that it can turn to
6  its internet service provider customers and provide a useful
7  service, is not just the second step of the aggregated data
8  from the dial-up user.  MCI needs the first step, which is a
9  way to get the dial-up users onto the COBRA platform, and then
10  into a format of high-speed data.  MCI -- it is absolutely
11  essential to what MCI is buying that it starts with telephonic
12  quality communication on a regular old telephone line, coming
13  out of someone's house.  That's not incidental at all.  It is
14  the essence of COBRA, because MCI would have no service to
15  provide if it did not have a way to get dial-up users on
16  traditional telephone lines, making traditional modem calls,
17  into the COBRA modems and then, thereafter, to get that data in
18  a form that can go onto the internet.
19        Now, MCI next argues that Section 4251 provides that
20  the excise tax would only be owed if MCI not only purchases
21  local telephone service, but also receives it and uses it.  In
22  other words, that the fact that MCI is only getting high-speed
23  data, rather than using COBRA for modem to modem calls, itself,
24  means that it doesn't owe the tax.  This appears to be a new
25  argument.  A new slant on the statute, but it is flatly wrong.

J&J COURT TRANSCRIBERS, INC.

34

1  And the language of the statute makes that absolutely clear.
2        4251(a)(2) provides, the tax imposed by this section
3  shall be paid by the person paying for such services.  It
4  doesn't say the tax is owed by the one using the telephone
5  service.  It doesn't say the tax is owed by someone receiving
6  telephone service.  It says the tax is owed by the one paying
7  for it.  MCI pays for COBRA.  So, MCI owes the tax.  MCI argues
8  that it doesn't owe the tax, because it doesn't have the
9  privilege of telephonic quality communication, only the dial-up
10  user has that privilege with the COBRA modems.  There's no case
11  support for that, and it's clearly a faulty statutory reading.
12        Leaving aside the merits of whether MCI has the
13  privilege of telephonic quality communication, which the
14  government would argue it does, and has argued it does, still
15  4251 does not require that MCI have the privilege to be liable
16  for the tax.  It doesn't require that MCI be the recipient of
17  the taxable phone service.  It only requires that MCI be the
18  one buying the service, and MCI clearly does buy that service.
19  That's undisputed in the contracts in evidence in Exhibits 27,
20  and 28, and 29 show that.
21        MCI asserted, in its proposed findings of fact, at
22  Paragraph 24, Your Honor, that Dr. Hills testified that the
23  dial-up user pays for telephone lines that transmit telephonic
24  quality communication, and we just want to make sure that this
25  is entirely clear, that assertion, at Paragraph 24, is

J&J COURT TRANSCRIBERS, INC.

35

1  incorrect.  The testimony that MCI is referring to there is
2  regarding the telephonic quality communication outside of
3  COBRA, between the dial-up user, and the PSTN, public switch
4  telephone network, but there's no dispute that the dial-up user
5  does not pay for the PRI line inside of COBRA or the DSP modem
6  cards inside the COBRA NAS.  That is paid for -- that is
7  purchased by MCI, and MCI owes the tax on it.
8        To use a simple example of why this must be so,
9  imagine the following scenario.  I decide to help out a
10  neighbor, who is in financial trouble by paying for his phone
11  service.  But my neighbor doesn't give me the key to his house,
12  and I don't give anyone the phone number of the neighbor, and I
13  can't use the neighbor's answering machine, because I can't get
14  into the neighbor's house.  I still owe the excise tax on the
15  phone service, even though I have no way to use it, and I have
16  no access to telephonic quality communication with anyone on
17  that phone service, because I can't get into the house.  The
18  neighbor has the access to the telephonic quality -- to the
19  telephone system, and has the privilege of telephonic quality
20  communication with anyone.  But since I paid for the service,
21  since I bought it, I owe the tax, regardless of whether I can
22  use it at all.
23        Under MCI's analysis, if you pay the bill, but you
24  can't use the service, you don't owe the tax.  But that's not
25  what the statute says.  The statute doesn't say you pay if you

J&J COURT TRANSCRIBERS, INC.

36

1  use it.  It says, you pay if you buy it.  And MCI did.  There's
2  no case law or revenue ruling to support MCI's analysis and,
3  frankly, if MCI were right, no one would pay their own phone
4  bill.  Everyone would pay each other's phone bill, and then
5  argue that they have no access to the local telephone service,
6  because it's their neighbor's service that they're paying for.
7        This example is analogous to COBRA, although,
8  obviously, vastly simpler.  MCI buys COBRA so the dial-up users
9  can access COBRA, via telephonic quality communication, because
10  that is the first step on the path to internet access.  And
11  again, MCI would have no service to offer the internet service
12  providers, unless the dial-up user can use a telephonic quality
13  communication over a traditional line to connect to COBRA.  So,
14  COBRA -- so, MCI pays for that COBRA service so that the dial-
15  up user could take that first step on the path to the
16  internet.
17        Turning to the argument that MCI puts forward, that
18  the system isn't taxable because there is no telephone.  MCI
19  argues, in its brief, and argued here today that Section 4252
20  requires the presence of a traditional telephone.  That the tax
21  cannot apply unless subscribers can converse or talk to each
22  other.  The cases in revenue rulings don't support this, Your
23  Honor.  Section 4252 refers to a telephone station, not a
24  telephone.  They assert that this means a telephone.  They cite
25  the 1970 Agron case, but that case involves no analysis of what

J&J COURT TRANSCRIBERS, INC.

37

1  a telephone station is.  And, more importantly, it predates the
2  1979 revenue ruling, that's 79-245, and the 1990 Comdata
3  decision, both of which found taxable systems without a
4  traditional telephone.  In an earlier brief they cited to a
5  page of Newton's telecom dictionary for this proposition.
6  There was no definition of telephone station at the page they
7  cited.  To the contrary.  And this is a cite, Your Honor, that
8  is not in our briefs.  So, I would call the Court's attention,
9  and we regret that it isn't in our papers, Dupont v. AT&T, 437
10 F.Sup. 1104, Southern District of New York, 1977.  Judge
11 Weinfeld held, "at the subscriber's end, a line terminates in a
12 station.  A broad term to describe the telephone instrument or
13 other equipment used by the subscriber."  That definition makes
14 sense here, Your Honor.  A telephone station is a telephone or
15 other equipment used, and that's exactly what we have in this
16 case.  A modem.  That is the other equipment used.  Telephone
17 station can include a modem, and we know that because the IRS
18 has long held that.
19        Revenue Ruling 79-245, to which the Court must afford
20 great deference found a modem to modem communication system
21 taxable.  And this is what the IRS said, now over 25 years ago.
22        Instead of having standard telephones connected to
23 the telephone lines, the business establishment has its
24 computer unit in terminals connected to the telephone lines.
25 The modems convert the computer signals into signals that can

38

1  be transmitted over telephone lines.  When these telephone
2  signals -- excuse me -- while these telephone signals are the
3  same type used to transmit voice, the modems are designed only
4  for non-voice transmission, and produce a signal, which is
5  usable only for transmission to other computer stations.  It's
6  a modem to modem non-voice all over telephonic quality lines.
7        And what's the conclusion?  The system is taxable,
8  regardless of the absence of an actual telephone, because the
9  company, quote, has access to the local telephone exchange
10 system through the lines used with the computer system.
11        The IRS further went on to say, where a telephone
12 service provides the subscriber with the privilege of
13 telephonic quality communication, it is immaterial whether the
14 subscriber exercises the privilege.  A telephone was not part
15 of that system, and the IRS found it to be immaterial, because
16 the point is that the modem to modem communication over the
17 telephonic quality paths and lines is sufficient to trigger the
18 excise tax.  And the Comdata case involved a similar scenario,
19 Your Honor, where modem to modem or computer to computer
20 communications to transmit money wire requests were used and
21 held taxable.  There was no telephone in that system.  Maybe
22 there could have been.  There may be there could have been, as
23 MCI points out, but that would have changed the service Comdata
24 used just as it would have changed COBRA to attach a PBX to the
25 PRI.  The IRS's point is, you have the capacity and we don't

39

1  mind that you're using it otherwise, for a non-voice
2  communication.  It's still taxable.
3        The citation that MIS -- excuse me -- that MCI makes
4  to the Fortis case, the recent Fortis case, and the toll
5  telephone cases is entirely inapposite, because the IRS has
6  spoken, for decades now, to the fact that modem to modem calls
7  are taxable.  This is not a new construction, and Judge
8  Koeltl's analysis that the IRS is trying to rewrite the statute
9  in the Fortis toll telephone type cases is totally inapposite
10 here.  The IRS has been on record, for decades, saying that a
11 modem to modem call is taxable.
12        And, finally, Your Honor, 4252(a)(2), which expressly
13 includes in the definition of a telephone service, a facility
14 or service provided in connection with the telephone service,
15 that language does not imply a traditional telephone.
16        MCI argues that 4252(a)(2) is, basically, just a tag
17 on to 4252(a)(1) that you have to find a telephone service as a
18 condition precedent before 4252(a)(2) has any meaning.  That's
19 an odd statutory construction because it, basically, renders
20 4252(a)(2) extraneous.  Without case support, the Court should
21 not be adopting an analysis of a statute that renders a second
22 part extraneous.
23        Another point argued by MCI that the government
24 disagrees with and rebuts here, is that the COBRA system can't
25 originate calls, and that, therefore, it's not taxable.  But

40

1  the ability to originate calls is totally irrelevant to the
2  excise tax analysis.  And, again, the IRS has made this clear
3  for decades.
4        In Revenue Ruling 77-196, the IRS stated that Section
5  4252(a)(1) makes no distinction between systems that provide
6  access to a local telephone network only by receiving calls,
7  and systems that both receive and originate calls.  In fact,
8  they held -- the fact that the basic switching equipment can
9  only receive incoming calls is not material to the tax
10 determination.  And the IRS held that in the 1977 revenue
11 ruling, in the 1975 revenue ruling, that's 75-102, and in 1989
12 as well.  That's a revenue ruling cited in the government's
13 brief.
14        For example, in the 1975 ruling, the excise tax
15 applied to a system whereby callers could call in to a
16 recording service and hear what time it was, or what the
17 weather forecast was.  Now, that was an incoming only system,
18 but because anybody could call into the system, the IRS deemed
19 the purchaser of the service to have access to the local
20 telephone system, and the privilege of telephonic quality
21 communication with everyone in that system, even though it was
22 only a one-way service.
23        The revenue ruling relied on by MCI, 74-617, that Mr.
24 Perez discussed earlier, is inapposite here, Your Honor.  The
25 beeper service that Mr. Perez was discussing.  And the reason

S 1945

41

1  it's inapposite is this, 74-617 described a beeper service
2  where the subscriber -- the person who holds the beeper --
3  could get messages or signals only from the company providing
4  the service.  In other words, if you want to reach someone
5  holding the beeper, you're the caller, you call the company,
6  the company sends the signal to the beeper.  The only
7  transmission is between the person holding the beeper at his
8  side, and the company sending that signal.  So, the only
9  communication is between two entities.  Note your average
10 person can't call into the beeper, at least, not in the 74-617
11 revenue ruling system.
12        And, as a result, that system is totally unlike the
13 system in COBRA, and as a result, it was held not taxable
14 because not everyone in the telephone system has access to that
15 communication system.  COBRA, by contrast, is entirely
16 different.  Anyone with a modem, sitting at home, can call into
17 the modem of the COBRA system.  And so it's very
18 distinguishable from Revenue Ruling 74-617.  It's much more
19 like -- COBRA is -- COBRA is much more like the system where
20 anyone from home can call in to find out what the weather
21 forecast is, or what the time of day is.
22        Further, there's the technological point, Your Honor,
23 that COBRA could be reconfigured to originate calls.  The DSP
24 cards -- that's another word for a modem, inside the COBRA NAS,
25 that are currently used, don't permit call origination.  But

                J&J COURT TRANSCRIBERS, INC.

42

1  Mr. Anderson conceded, at deposition, and on cross examination,
2  that the only barrier to changing that was a contractual
3  barrier, not a technological barrier.  And there's nothing in
4  Comdata that implies that the privilege and capacity is limited
5  or goes away.  The capacity for a telephonic quality call
6  disappears if there's a contract saying you're not going to use
7  it that way.  To the contrary, the point of Comdata is if you
8  have the technological capacity, you are liable for the tax,
9  even if you're not using it that way.  And that's what the
10 COBRA system has here.  Mr. Anderson --
11        THE COURT:  Well, how do you address the word
12 privilege?
13        MS. GUERON:  How do we -- I -- excuse me?
14        THE COURT:  In that context.  I mean, you say, well,
15 I have the privilege to do something, I interpret that as I
16 have the right to do it?
17        MS. GUERON:  Yes.
18        THE COURT:  Now, did they then -- MCI have the right
19 to do what you suggest that they could have technologically
20 altered?
21        MS. GUERON:  By contract, as the contract currently
22 read, no.
23        THE COURT:  All right.  So, how do you -- how does
24 someone have a privilege and, at the same time, are they not
25 able to, under -- I mean, what do they buy?  If I have the

                J&J COURT TRANSCRIBERS, INC.

43

1  privilege to sell merchandise, I mean, in effect like a
2  license, then I have a right to do something.  But, if someone
3  from a company sells me something and says, you can't resell
4  it, how do you then interpret that that I have still have a
5  privilege?
6        MS. GUERON:  This is a question as to the privilege
7  to originate calls?
8        THE COURT:  Yes.
9        MS. GUERON:  The point would be, Your Honor, that you
10 have a system that's technologically capable of it, and you
11 currently have a contractual agreement thing not to originate
12 calls, but the lines at issue -- the taxability of the lines is
13 triggered by whether they can be used for communications.
14        THE COURT:  So, you just, without looking into it in-
15 depth, you've just written out the word privilege?
16        MS. GUERON:  No, Your Honor.  Privilege --
17        THE COURT:  Well, where is -- I interrupt only to get
18 you to focus on the issue that I'm trying to understand.  What
19 is the meaning of privilege?  What privilege did MCI have?
20        MS. GUERON:  Well, in general, in the COBRA system,
21 it had the capacity of telephonic quality communication for
22 modem to modem.  In general, the privilege it had was the right
23 for the modem of the dial-up user at home to connect to the
24 modem of the COBRA NAS.
25        THE COURT:  Now, is that enough?

                J&J COURT TRANSCRIBERS, INC.

44

1        MS. GUERON:  With access and with everyone in the
2  system being able to call in, yes.  That is enough, Your Honor,
3  because it is a telephonic quality communication from modem to
4  modem.
5        THE COURT:  And that's the PRI modem?
6        MS. GUERON:  Correct, Your Honor.  It's a voice
7  capable line, and anyone can call into the COBRA modems, and
8  that PRI line gives MCI the privilege -- or gives MCI the COBRA
9  system that MCI bought -- it creates a system with the
10 privilege of that communication.  And the fact --
11        THE COURT:  So, it's a privilege to use -- to receive
12 that signal?
13        MS. GUERON:  And to transmit back.  Remember it is a
14 two-way system, Your Honor, between the COBRA modem and the
15 dial-up user.
16        THE COURT:  But who has the privilege to transmit
17 back?
18        MS. GUERON:  MCI bought COBRA because it was a two-
19 way system.  So, that it could -- the dial-up user could
20 transmit the modem signal saying, I'm trying to log onto the
21 internet, and that when the internet data came back, for
22 example, the screen page from Google, that it went back through
23 the COBRA system, back onto the telephone lines, back to the
24 dial-up user.  The COBRA system would be of no value if it was
25 not two-way communication.

                J&J COURT TRANSCRIBERS, INC.

45

1    THE COURT: All right. So, this whole discussion
2  about technological capability, what is the significance of it
3  at all?
4    MS. GUERON: Your Honor, we find it irrelevant. It's
5  truly about the suspender's argument for the government. The
6  first --
7    THE COURT: Yes, but it's only one suspender.
8    MS. GUERON: Sorry?
9    THE COURT: It only really reflects one suspender,
10  because you can't argue -- at least, I can't hear you -- I
11  don't hear you arguing that it has both -- or it has the
12  capacity -- it has the capacity, but it doesn't have the
13  privilege. So, how can that support your conclusion that it's
14  another way to establish that the excise tax is due, if it only
15  has half --
16    MS. GUERON: Keeping in mind, Your Honor, that the
17  government's first point is that call original is irrelevant.
18  The government's second point is that the call origination
19  function could be reconfigured, but --
20    THE COURT: Well, they don't have the privilege to do
21  it.
22    MS. GUERON: They don't have the contractual
23  privilege. The question is --
24    THE COURT: What other kind of privilege is there?
25    MS. GUERON: Technological, Your Honor. Capacity.

J&J COURT TRANSCRIBERS, INC.

46

1    THE COURT: That's a privilege?
2    MS. GUERON: Capacity. In Comdata, the Court --
3    THE COURT: Capacity -- no, really. We're talking in
4  circles, and this transcript is going to be very difficult to
5  understand. Privilege and capacity are two separate concepts,
6  unless you establish they're not. Did MCI have the privilege
7  to originate calls? Yes or no, from the government's
8  standpoint?
9    MS. GUERON: Not under the contract as currently
10  written.
11    THE COURT: Did they have the privilege? I mean,
12  that's like saying somebody has a first amendment right, but
13  they don't have it under the constitution as written. They
14  have it or they don't have it.
15    MS. GUERON: Your Honor, privilege is not defined by
16  the statute, and if privilege means technological capacity,
17  then we would argue they do. But, Your Honor, obviously --
18    THE COURT: Well, then privilege should not have been
19  in the statute. You just wrote the word out of the statute,
20  because all it would say if you had the technological capacity,
21  and it wouldn't have the word privilege there, if privilege
22  meant technological capacity.
23    (Pause)
24    THE COURT: All right. Go ahead.
25    MS. GUERON: So, on the point of origination, Your

J&J COURT TRANSCRIBERS, INC.

47

1  Honor, the government's main point is that the IRS has held,
2  for a long time, for decades, that the ability of a system to
3  originate calls or not is irrelevant to the excise tax
4  analysis, because a one-way system, such as the time of day, or
5  the weather systems is subject to the excise tax, under Revenue
6  Ruling 77-196 and 75-102.
7    MCI argued previously, although not so much this
8  morning, that COBRA is not a local telephone service. The
9  government will just touch on that briefly. That argument
10  appeared to be rooted in the idea that the internet protocol
11  packet can travel anywhere on the internet. That may well be,
12  Your Honor. Once there are packets on the internet, yes, they
13  can travel globally, but the COBRA service is currently as used
14  by the dial-up user through to the modem system, travels on
15  local lines, local calls through the PSTN, through the local
16  exchange carrier, through the local PRI loops to the modem, and
17  as such it is a local telephone service.
18    Your Honor, we'd like -- I'd like to turn now to the
19  question of whether or not COBRA is a private communication
20  service. First of all, this was not briefed by MCI. It was
21  not raised in its objection, and it was not briefed by MCI in
22  response to the government's argument. There was a brief
23  reference to it in Mr. Anderson's declaration, and then we
24  heard it, for the first time, as a legal proposition at trial,
25  and, for that reason, the government would argue that it's

J&J COURT TRANSCRIBERS, INC.

48

1  waived.
2    But that said, more importantly, MCI is wrong. The
3  COBRA service is not a private communication system. The only
4  testimony about anything private, or that might be private that
5  we heard at trial was a reference to the line connecting MCI to
6  COBRA, and that's outside of the COBRA system. It's undisputed
7  that the demarcation point between COBRA and MCI is the output
8  port from the COBRA system. And the taxable status of a
9  connection between MCI's backbone network, this blue cloud in
10  Exhibit 2, and the COBRA system, that blue line on Exhibit 2,
11  the taxable status of that connection is not at issue in this
12  case. That's not part of this case. What's in this case is
13  what's in the white box, labeled COBRA, in Exhibit 2, and in
14  particular, those PRI lines going into the COBRA, and the
15  modems, the DSP modems within the COBRA NAS.
16    For background, Your Honor, private communication
17  services, as defined by 4252(d), provide that inter-premise
18  telephone services, or intercom systems, as they're
19  traditionally called, are not subject to tax. This is the
20  Trans-Lux case and the Western Electric case, and they explain
21  that that exception was written because the telephone carriers
22  were getting injured competitively by services that were just
23  providing private service -- private telecommunication service
24  to companies internal to that system, and those systems were
25  tax free because they weren't connected to the PSTN.

J&J COURT TRANSCRIBERS, INC.

49

1    The COBRA is not a set of private communication

2  channels. It's not an intercom or an inter-premise system.

3  Mr. Anderson testified at trial, on Page 91, that the dial-up

4  platform -- that the COBRA platform has dial-up users coming

5  into it. And Dr. Hills testified, at trial, at Page 169, that

6  anyone could connect to the NAS equipment. And if you look at

7  Slide 38, Your Honor, of MCI's presentation, what you see is a

8  system where, on the left-hand side, any dial-up user can call

9  in, and any dial-up user can get information back out, once the

10 call has gone through to the internet and come back. The only

11 place where MCI is getting exclusive communication is on the

12 right-hand side, the circuits to the MCI backbone network.

13 That is not part of this case.

14    The point of the COBRA system is that anyone with a

15 modem can dial in and access the internet. Anyone with a modem

16 can get into this system, and can get data back. That has

17 nothing in common with a private communication channel. And

18 Revenue Ruling 78-437 makes clear that the private

19 communication channel exception is for inter-premise, intercom

20 services, which is, of course, the language of the statute.

21    COBRA is, of course, a unitary service. It includes

22 the PRI, not just the output -- the potentially private line

23 from COBRA to the MCI backbone network, and there's no separate

24 charge within the contracts for COBRA that we have reviewed, in

25 this case, for that outlying line on the right-hand side of

          J&J COURT TRANSCRIBERS, INC.

50

1  COBRA from the egress port. To the contrary, the MCI/COBRA

2  contracts exclude the egress circuits that connect COBRA to

3  MCI. They are expressly excluded from the contracts here, Your

4  Honor. They're not part of this case. And whether or not

5  they're private is not an issue for the Court at all. And the

6  testimony at trial also makes clear that whatever MCI was

7  claiming is private is outside of COBRA. So, for example, at

8  92, in the trial transcript, Mr. Anderson is asked:

9  "Q   Is the line from the egress port of the NAS to MCI's POP

10 exclusively used by MCI?

11 "A   Definitely. It's a point to point private line."

12    Once again, that's outside of COBRA, Your Honor.

13 That's to the right of the box labeled COBRA.

14    Similarly, Mr. Anderson was asked, in the trial, at

15 Pages 72 to 73, what connects MCI to the COBRA service? And he

16 answers that it's a private line. That's outside of this case.

17 It doesn't matter, Your Honor, what connects MCI to COBRA.

18 What matters is that within COBRA anyone can call in and

19 connect, and it's not a private service at all. And anyone can

20 get data coming back out of COBRA because it's a two-way

21 service back to the dial-up user. The demarcation point

22 between the COBRA service and MCI is the output of the COBRA

23 NAS, and whether or not the line connecting the COBRA NAS to

24 MCI's private is entirely irrelevant.

25    Finally, COBRA's voice over internet protocol

          J&J COURT TRANSCRIBERS, INC.

51

1  capability, VOIP capability is a separate stand alone basis for

2  the excise taxes to apply. The COBRA system is capable of

3  voice over internet protocol. Packet -- voice packets, if

4  converted at the dial-up user's home, can travel over the COBRA

5  system. The COBRA services can't distinguish between those

6  packets, and MCI can't know whether such packets did, in fact,

7  travel over COBRA and Mr. Anderson conceded that.

8     And by acknowledging, as MCI did this morning, that

9  it would be a breach of contract to use VOIP, MCI acknowledges

10 that, in fact, the system could carry VOIP, but that they

11 contractually agreed not to.

12    In sum, Your Honor, COBRA is a local telephone

13 service that connects with any dial-up user -- that connects

14 any dial-up user with the modem over the public switch

15 telephone network, using a telephonic quality communication.

16 This is the reason MCI buys COBRA, to connect dial-up users to

17 COBRA so that they can then connect on those of MCI's network to

18 the internet. MCI would have no use for COBRA if it were not a

19 telephonic quality communication using the local telephone

20 service connecting the dial-up users this way, because then the

21 dial-up users would not be able to access the internet.

22    MCI's arguments contrary are distractions from these

23 central points about issues that don't matter, such as whether

24 there's a telephone, or whether the calls can be originated by

25 MCI. And, further, MCI's arguments are a distraction because

          J&J COURT TRANSCRIBERS, INC.

52

1  MCI buys the service, and the buyer of the service pays the tax

2  regardless of who uses the service, or receives it. Thus, the

3  Court should dismiss MCI's objection, and require it to pay the

4  excise taxes it owes. Thank you very much, Your Honor.

5     THE COURT:  We're going to take a couple of minutes,

6  and then I'll hear a brief response from the debtors.

7     MR. PEREZ:  Thank you, Your Honor.

8        (Recess)

9     THE COURT:  Please be seated. Go ahead.

10    MR. PEREZ:  Your Honor, I have a brief comment. Your

11 Honor, before I start my comment, I would like to move to

12 strike all references to testimony outside of the record that

13 Ms. Gueron referred to, in particular, references to Mr.

14 Anderson's deposition, which are not in the trial record in

15 this case. You know, generally speaking, most of the things in

16 the Bankruptcy Court are in the record, but I thought, in this

17 case, we were careful that because we were going to have the

18 live witnesses -- both Mr. Hills' declaration, as well as

19 the deposition transcripts, while they could be, certainly,

20 used for impeachment purposes, or read into the record, they

21 weren't in there, and I would move to strike those portions of

22 the record.

23    MS. GUERON:  Your Honor, they were read for

24 impeachment purposes at trial.

25    THE COURT:  I couldn't hear you. They're -- to the

          J&J COURT TRANSCRIBERS, INC.

53

1  extent they were read for impeachment purposes, that's the
2  limitation upon which they were -- they're in the record.
3          MS. GUERON:  That's right, Your Honor, and that's the
4  extent to which I was relying on them.  And, furthermore, Mr.
5  Perez relied, extensively, in his opening on statements from
6  Mr. Anderson's declaration, as to the private communication
7  service argument.  So, those should likewise be stricken from
8  this argument.
9          MR. PEREZ:  Your Honor, that's absolutely not true.
10 I relied on those arguments as to the issue of whether there
11 had been waiver, not as to the facts of the case.  The
12 references to his declaration was the fact that those things,
13 in months before the trial, months before they filed their
14 surreply, those had to been in the record.  They were not put
15 in for the purposes of determining whether it was private
16 communications or not.
17         THE COURT:  All right.  So, both --
18         MR. PEREZ:  All right.
19         THE COURT:  -- excuse me, both are in for the limited
20 purposes as stated, one in the context of impeachment and the
21 other in support of the argument that the issues were raised.
22         MR. PEREZ:  Thank you, Your Honor.  Your Honor, I
23 have about five or six points that I'd like to address.  The
24 first point is, is the question is who is paying the tax at the
25 other end?  Your Honor, where is that in the statute?  Where is

                    J&J COURT TRANSCRIBERS, INC.

54

1  it in the statute that somebody has to be paying the tax at the
2  other end?  I don't see that written anywhere in there.  And,
3  furthermore, Your Honor, the -- their own revenue rulings
4  absolutely don't support that proposition.  And the beeper
5  case, Your Honor, I think, is perfectly analogous.  In that
6  situation, you had the local -- any local person could call
7  somebody's beeper if they had their beeper number.  In our
8  case, the dial-up user, if they have the ISP's dial-up number
9  could call the modem.  So, there was -- anybody could call in
10 here, yet, the IRS determined that the service from the local
11 loop here was not taxable, and Your Honor, we have the same
12 situation in the COBRA service.  In essence, what you have is
13 you have the LEC providing this service.  It -- the LEC,
14 obviously, does the PSTN, and it also provides COBRA service
15 and then, in essence, it's calling us to the frame relay.
16         Your Honor, our situation, COBRA is absolutely
17 analogous to the beeper service.  In essence, what the
18 government -- the way the government wants to redraft the
19 statute is, if at any -- in any case, or at any time, you are
20 connected to the PSTN, in any way, shape or form, then it's
21 taxable.  And, Your Honor, that's not what the statute says.
22 We have to have the privilege.  It has to be telephonic
23 communication.  And it has to be with substantially all persons
24 having telephone or telephone stations.  And the fact that
25 there is the technological possibility of the LEC providing a

                    J&J COURT TRANSCRIBERS, INC.

55

1  different service, which could, you know, have a PBX, or
2  something like that, it's irrelevant, because that's not the
3  service we bought.  We didn't buy that service.  We bought
4  COBRA service, and what COBRA service gave us was this high-
5  speed data line.  And for the government to argue that we're
6  looking at the wrong side of this, we're not looking at the
7  wrong side of this, we bought a service.  In essence, what the
8  government was really trying to do is tax us for the LEC's
9  network elements.  We didn't by a PRI.  We bought the COBRA
10 service.  They're trying to tax us for the LEC's network
11 elements.
12         Your Honor, I believe that the plain reading of 4252,
13 you only get to 4252 if you have a service that's covered under
14 one, and not otherwise.  I think the statute is clear.  But
15 then the two cases that they primarily rely on, the 79 revenue
16 ruling and Comdata, Your Honor, they just don't say what the
17 government says it says.
18         Let me just read you the 79 revenue ruling.  The
19 business establishment pays fixed monthly charges to the
20 telephone company for local telephone service, but instead of
21 having standard telephones connected to the telephone lines,
22 the business establishment has its computer unit and terminals
23 connected to the telephone lines.  They're buying this local
24 loop.  They're just connecting computers.  That's not what
25 we're buying.  We're not buying a local loop.  We're buying

                    J&J COURT TRANSCRIBERS, INC.

56

1  this COBRA services that gives us this high-speed data line.
2          And, of course, the 79 revenue ruling is going to
3  find that it's taxable because it says -- goes on to say, the
4  business establishment, in this case, has access to the local
5  telephone exchange through the lines used with the computer
6  system.  No doubt about it.  In addition, by plugging in a
7  regular telephone set, if it so chooses, it may exercise the
8  privilege of telephonic voice quality communications with
9  substantially all persons having -- having telephones in the
10 local system.
11         Your Honor, totally different situation than ours.
12 Comdata, I think, is exactly the same situation.  There it --
13 instead of having local telephone service they bought a WATS
14 line.  Watts line is covered under 4252(b), it's another type
15 of communication service that's taxed.  There's no question
16 that the WATS service, in and of itself, would be taxable, but
17 if they limited the way that Comdata tried to limit it, whether
18 they say that because of the actual use, it wasn't taxable, not
19 because the WATS service that they bought wasn't capable --
20 wasn't, otherwise, taxable.  Again, Your Honor, totally
21 different.  The service that we bought did not have the
22 privilege of telephonic communications.  We got a high-speed
23 datastream.
24         So, I don't think there's any faulty statutory
25 reading, and I don't believe that we have, in any way, misread

                    J&J COURT TRANSCRIBERS, INC.

57

1 the cases. And, Your Honor, the privilege doesn't just relate
2 to originating phone calls. It also relates to -- I'm sorry --
3 to originating phone calls, it also relates to receiving phone
4 calls. We can't receive phone calls. We get a high-speed
5 datastream. There's no way that MCI can receive a phone call
6 in this system. We do not have the privilege of telephonic
7 quality communication.
8        So, I think the government's arguments,
9 notwithstanding the two cases that they rely on, when read
10 carefully, absolutely support the debtors' position, and, in
11 fact, the service that we purchase did not give us the voice
12 quality communication. Thank you, Your Honor.
13        MS. GUERON: May I just make one point, Your Honor?
14        THE COURT: If you do then Mr. Perez gets to respond
15 to that one point, Your Honor.
16        MS. GUERON: That's fine, Your Honor.
17               (Pause)
18        MS. GUERON: Just on the point, Your Honor, that MCI
19 just argued that the government is trying to tax us for the
20 LEC's network elements. MCI argues we didn't buy a PRI. We
21 only bought the service at the output of the COBRA service.
22 What COBRA does internal to it, incidental, not part of our
23 system, not part of what we're paying for. Well, the contracts
24 hold otherwise. For example, Exhibit 29, Page 35, Paragraph
25 (A)(1) provides, "Vendor shall connect each NAS used in

                    **J&J COURT TRANSCRIBERS, INC.**

58

1 connection with the COBRA Services to the Public Switch
2 Telephone Network via ISDN primary rate interface, or other
3 mutually agreed comparable telecommunications facilities,
4 collectively PRI." Now, what that means is -- what MCI said to
5 LEC was, we're buying the COBRA service, and what we want is
6 PRI lines connected to the PSTN so that the dial-up users can
7 make a telephone quality communication to the COBRA modems.
8 That's exactly what they bought. That's exactly what they're
9 paying for. That's exactly what they contracted for. It's not
10 incidental, it is the only way that COBRA will be of any use to
11 MCI. That high-speed datastream doesn't come from nowhere,
12 Your Honor. It comes as the aggregation of the telephonic
13 quality modem calls from the modems, and that's exactly what
14 MCI bought -- intended to buy, contracted for, and got.
15        MR. PEREZ: Just very briefly, Your Honor. I don't
16 think there's any dispute as to what the COBRA service was, but
17 if you look at that page that they refer to, the very top of it
18 says, service description. Yes, what she read was a
19 description of what was entailed in the service. But what we
20 got out of the service was this high-speed data line that we
21 could give to our internet service router. They aggregated all
22 of these various calls from the dial-up users, and they sent it
23 off to us. But, again, Your Honor, in the beeper case,
24 everybody, likewise, called the -- likewise, called the public
25 switch telephone system. That wasn't -- and that wasn't

                    **J&J COURT TRANSCRIBERS, INC.**

59

1 taxable. And, Your Honor, had we purchased -- had we gone out
2 and purchased a PRI, that probably would have been taxable, but
3 we didn't purchase a PRI. We purchased -- we didn't purchase
4 that element. We purchased a service, Your Honor.
5        THE COURT: All right. Thank you. I'll take it
6 under advisement. That concludes this morning's -- well,
7 before I conclude, my analogy before should have been
8 completed. It was -- and to do so, the analogy of one
9 suspender should have been coupled with a belt without a buckle
10 to complete the analogy. Thank you.
11        MR. PEREZ: Thank you, Your Honor.
12        MS. GUERON: Thank you, Your Honor.
13               * * * * * *
14               CERTIFICATION
15        I, DEBRA L. STOREY, certify that the foregoing is a
16 correct transcript to the best of my ability, from the
17 electronic sound recording of the proceedings in the above-
18 entitled matter.
19
20 /s/ Debra L. Storey          Date: May 22, 2006
21 DEBRA L. STOREY
22 J&J COURT TRANSCRIBERS, INC.
23
24

                    **J&J COURT TRANSCRIBERS, INC.**